## Exhibit A

### July 1, 2025 Amendment Motion

## Exhibit A-1

**July 1, 2025 Amendment Motion (Portuguese)**

F C D G  FERRO, CASTRO NEVES,
DALTRO & GOMIDE
ADVOGADOS          PADIS·MATTAR
ADVOGADOS

EXMA. SRA. JUÍZA DE DIREITO DA 7ª VARA EMPRESARIAL DA COMARCA DA
CAPITAL DO ESTADO DO RIO DE JANEIRO

**URGENTE**

PEDIDO DE TUTELA DE URGÊNCIA

Processo nº 0090940-03.2023.8.19.0001

**OI S.A. – EM RECUPERAÇÃO JUDICIAL.** ("OI"), **PORTUGAL TELECOM
INTERNATIONAL FINANCE BV – EM RECUPERAÇÃO JUDICIAL** ("PTIF") e **OI
BRASIL HOLDINGS COOPERATIEF UA – EM RECUPERAÇÃO JUDICIAL** ("OI COOP"
e, em conjunto com OI e PTIF, "GRUPO OI" ou "RECUPERANDAS"), já qualificadas nos
autos da recuperação judicial em epígrafe, vêm, por seus advogados abaixo
assinados, com fundamento nos arts. 35, I, "a", e 49 da Lei nº 11.101/2005 ("LRE") e
nas Cláusulas 9.6, 9.6.1 e 9.6.2 do Plano de Recuperação Judicial do GRUPO OI de
fls. 56.788/56.939 ("PLANO" ou "PRJ"), apresentar Aditamento ao PLANO (docs. 1 e 2,
"ADITAMENTO") e seu respectivo Laudo de Viabilidade Econômico-Financeira (doc.
3), bem como formular pedido de tutela cautelar incidental de urgência, com
fundamento nos arts. 300 do Código de Processo Civil ("CPC") e 189 da LRE, nos
seguintes termos:

PREMISSAS FRUSTRADAS E OS PRÓXIMOS PASSOS DO PROCESSO DE
SOERGUIMENTO DO GRUPO OI

1.        Na Assembleia Geral de Credores ("AGC") encerrada em 19.04.2024, os
credores aprovaram o PLANO do GRUPO OI, após ampla negociação, na forma do art.
45 da LRE (fls. 247/255). O PLANO foi homologado por esse MM. Juízo em
28.05.2024, com a concessão da recuperação judicial (fls. 61.100/61.135).

2.        Desde então, o GRUPO OI, vem implementando as diversas medidas previstas

TJRJ CAP EMP07 202502824750 01/07/25 22:50:17138550 PROGER-VIRTUAL

no PRJ, necessárias à reestruturação de seu passivo, manutenção do capital de giro e à viabilização de seu novo plano estratégico de negócios.

3.      Destaca-se, nesse sentido, **(i)** o financiamento DIP, no âmbito do qual foi liberado o valor de US$ 655 milhões em favor das RECUPERANDAS, o que contribuiu para o capital de giro durante o processo de recuperação judicial e o investimento em suas atividades operacionais; **(ii)** a alienação **(ii.a)** de parte dos seus ativos *non core*, como a UPI TV por Assinatura, pelo valor de até R$ 30.000.000,00 (cf. fls. 111.719) e WLL, pelo valor de até R$ 4.400.000,00 (cf. fls. 98.628/98674); **(ii.b)** de diversos imóveis não utilizados pelo GRUPO OI e que representam um custo de manutenção mensal desnecessário às empresas; e **(ii.c)** da UPI ClientCo, em operação que gerou um benefício econômico às RECUPERANDAS de mais de R$ 5.7 bilhões (cf. item 40 abaixo – fls. 83.976/84.110 e 111.938).

4.      Por meio dessas e de outras medidas, o GRUPO OI vem trabalhando para equacionar a sua dívida, reduzir os seus custos e remodelar a sua estratégia de negócios, sobretudo pelo descomissionamento de atividades relacionadas ao antigo regime de concessão e pelo direcionamento de suas operações a novos mercados de alto potencial de crescimento (cf. itens 43/54 abaixo).

5.      Desde a aprovação do PLANO, as RECUPERANDAS experimentaram **expressiva redução de sua dívida líquida**, que passou de **R$ 25.4 bilhões para R$ 10.29 bilhões** entre o primeiro trimestre de 2024 e maio de 2025 e pagaram mais de **R$ 780 milhões de seu passivo concursal**, o que evidencia o substancial cumprimento das obrigações do PLANO devidas até o momento (doc. 5, p. 90).

6.      De acordo com as projeções das RECUPERANDAS, o PLANO, nas condições atualmente vigentes, tem o potencial de reduzir em aproximadamente 61% a sua dívida líquida – mesmo após a contração do Novo Financiamento[1] –, inclusive com

---

[1] Nos termos da cláusula 5.4.1. do PRJ, o termo definido "Novo Financiamento" possui a seguinte definição: "*A Oi contratará novos recursos no valor total de até USD 655.000.000,00 (seiscentos e cinquenta e cinco milhões de Dólares), não podendo ser inferior a USD 650.000.000,00*

uma redução anual média de 70% nas despesas relacionadas aos credores detentores de créditos oriundos de obrigações *take or pay*.

7.    Além desses fatos, o GRUPO OI vem experimentando o franco desenvolvimento das atividades operacionais estratégicas apontadas como o seu atual "*core business*" no plano de negócios e Laudo Econômico-Financeiro de fls. 56.941/57.000. A melhoria de receitas está sendo obtida sobretudo por meio do ramo de negócios "Oi Soluções" ("OI SOLUÇÕES") da Oi, que obteve receita operacional líquida de mais de **R$ 1,75 bilhão** no exercício findo em dezembro/2024, representando expressiva fatia da receita total do GRUPO OI de 2024 (doc. 5, p. 27).

8.    Tais circunstâncias revelam o acerto e a imprescindibilidade das medidas previstas no PLANO para o soerguimento do GRUPO OI, em benefício dos interesses da coletividade de credores e dos 2.999 empregados diretos e 19.656 empregados indiretos do GRUPO OI.

9.    A implementação dessas medidas nos últimos meses apenas foi possível em virtude dos esforços empregados pela nova governança do GRUPO OI ("Nova Governança"[2]), apesar do curto período em que estão na gestão das RECUPERANDAS, e pela colaboração da maioria de seus *stakeholders*, incluindo seus credores.

---

*(seiscentos e cinquenta milhões de Dólares) ou o equivalente em Reais, sendo (a) até USD 505.000.000,00 (quinhentos e cinco milhões de Dólares), não podendo ser inferior a USD 500.000.000,00 (quinhentos milhões de Dólares) ou o equivalente em Reais ("Valor Novo Financiamento – Credores Opção de Reestruturação I") a ser concedido pelos Credores Opção de Reestruturação I ("Credores do Novo Financiamento" e "Novo Financiamento – Credores Opção de Reestruturação I", respectivamente); e (b) USD 150.000.000,00 (cento e cinquenta milhões de Dólares), ou o equivalente em Reais ("Valor Novo Financiamento – Terceiros") a ser concedido por qualquer Pessoa que não os Credores Opção de Reestruturação I ("Terceiros Novo Financiamento" e "Novo Financiamento – Terceiros", sendo o Novo Financiamento – Terceiros e o Novo Financiamento – Credores Opção de Reestruturação I definidos, em conjunto, como o "Novo Financiamento")."*.

[2] Nos termos da cláusula 7.3.1. do PRJ, o termo definido "Nova Governança" possui a seguinte definição: "*Os 3 (três) novos membros do Conselho de Administração listados no Anexo 7.3 deverão permanecer em seus cargos no Conselho de Administração até a eleição de novos membros do Conselho de Administração em assembleia geral extraordinária da Oi a ser realizada após a conclusão do Aumento de Capital – Capitalização de Créditos ("Nova Governança"), exceto nas hipóteses de renúncia, impedimento superveniente ou vacância previstas em Lei*".

10.     Apesar dos inúmeros avanços relatados acima, a Nova Governança das Recuperandas, implementada a partir de 12.12.2024, se deparou com a **frustração** de algumas das premissas regulatórias, financeiras e mercadológicas adotadas pela antiga gestão do Grupo Oi na elaboração do PRJ.

11.     Consoante será detalhado nos itens 58/70 abaixo, a antiga gestão do Grupo Oi projetou, em suma, que **(i)** a alienação da UPI ClientCo acarretaria no recebimento de **R$ 7.3 bilhões** *em dinheiro* no biênio de 2024-2025; **(ii)** as Recuperandas reduziriam drasticamente os custos de manutenção da infraestrutura necessária à prestação dos serviços de telefonia STFC com a adaptação da concessão para o modelo de autorização *a partir de junho de 2024*; e **(iii)** o desembolso em função do passivo trabalhista se manteria nos níveis históricos (fls. 56.941/57.000).

12.     No entanto, essas relevantes premissas, que serviram de base para o racional econômico das diversas obrigações de pagamento assumidas no PRJ, **não** foram verificadas após a homologação por esse MM. Juízo.

13.     Afinal, **(i)** o valor pretendido pela antiga administração para a venda da UPI ClientCo se mostrou desconectado da realidade de mercado e, como resultado, o referido ativo foi alienado em fevereiro de 2025 mediante ***contrapartidas financeiras não pecuniárias*** no montante de R$ 5.7 bilhões. Embora essa operação tenha contribuído significativamente para a redução das dívidas extraconcursais das Recuperandas e ampliado a participação do Grupo Oi na V.tal - Rede Neutra de Telecomunicações S.A. ("V.tal"), ela **não** resultou na entrada imediata de receitas líquidas previstas pela Oi para o biênio 2024-2025; **(ii)** os custos para a manutenção da infraestrutura necessária à prestação dos serviços de telefonia STFC continuaram a ser impostos pela ANATEL até **novembro de 2024** por 5 (cinco) meses **após** o período projetado originalmente; e **(iii)** o passivo trabalhista foi reduzido de R$ 808.4 milhões para apenas R$ 803.9 milhões entre maio de 2024 e maio de 2025, uma velocidade muito **inferior** à projetada pela antiga gestão do Grupo Oi quando da elaboração do PRJ.

14.     Tais circunstâncias, alheias à vontade da Nova Governança do GRUPO OI, vêm pressionando o caixa das RECUPERANDAS e dificultando o cumprimento de obrigações financeiras de curto prazo previstas no PLANO, o que, por sua vez, coloca em <u>risco</u> a conclusão exitosa do processo de soerguimento.

15.     Não é demais recordar que a recuperação judicial do GRUPO OI é a maior da história do país e de toda a América Latina, com implicações em diversos países, circunstância que evidencia, por si só, o enorme desafio representado pela necessidade de equacionamento de tamanho passivo concursal e extraconcursal.

16.     Diante disso, a Nova Governança do GRUPO OI passou a estudar alternativas com os seus assessores financeiros e renegociar débitos com os seus credores, a fim de equacionar a pressão por liquidez imediata e, por consequência, assegurar a continuidade do seu soerguimento, em respeito ao princípio da função social e da preservação da empresa. Em síntese, busca-se soluções que permitam a continuidade dos pagamentos, a superação das dificuldades temporárias de fluxo de caixa relatadas acima e, paralelamente, a preservação dos negócios operacionais que seguem garantindo milhares de empregos.

17.     Nesse contexto, será necessária a convocação de uma nova Assembleia Geral de Credores no âmbito da presente recuperação judicial, com fundamento no art. 35, I, alínea "a", da LRE e nas Cláusulas 9.6, 9.6.1 e 9.6.2 do PRJ, a fim de permitir que os credores possam deliberar a respeito da eventual aprovação do **ADITAMENTO AO PLANO** ora apresentado ("<u>ADITAMENTO</u>" – docs. 1 e 2), o qual será detalhado em seus principais aspectos nos itens 94/95 abaixo.

18.     Adiante-se, por oportuno, que a maior parte das condições pactuadas no PRJ aprovado pelos credores e homologado por esse MM. Juízo foi mantida no ADITAMENTO. Consoante será detalhado abaixo, <u>não</u> haverá alteração em relação às condições de pagamento de parte relevante dos credores, em especial aquelas pactuadas com relação à ANATEL.

19.    Essencialmente, as RECUPERANDAS buscam, por meio do ADITAMENTO, **(i)** reestruturar créditos concursais trabalhistas que não tiveram condições de pagamento alteradas pelo PLANO; **(ii)** modificar condições e prazos de pagamento de determinados fornecedores, de forma a reduzir custos imediatos e aliviar a pressão momentânea por caixa de curto prazo; e **(iii)** repactuar a forma de pagamento de fornecedores *take-or-pay* vinculados a linhas de negócio descontinuadas ou com baixa utilização (itens 94/95 abaixo).

20.    O ADITAMENTO também propõe a adoção de outros meios para a redução do passivo, como, por exemplo, pagamento com valores oriundos da venda de imóveis das RECUPERANDAS — os quais, como se sabe, ultrapassam 7 mil imóveis não utilizados, avaliados em mais de **R$ 4 bilhões**, que drenam relevantes recursos mensais das RECUPERANDAS com o pagamento de tributos e despesas de manutenção e que poderiam ser mais bem aproveitados como fonte de pagamento dos credores (itens 55/70 abaixo).

21.    Entretanto, considerando **(i)** o tempo necessário para viabilizar **(a)** as eventuais objeções dos credores ao ADITAMENTO; e **(b)** a publicação do edital e a realização, em duas convocações, da AGC; **(ii)** o risco de o GRUPO OI não conseguir honrar com as obrigações financeiras de curto prazo assumidas no PRJ; e **(iii)** o risco de implementação de medidas constritivas sobre os bens do GRUPO OI, oriundas de demandas cujos créditos serão reestruturados na forma do ADITAMENTO (docs. 1 e 2), o GRUPO OI necessitará da concessão de **medidas liminares urgentes**, com fundamento no art. 300 do CPC c/c art. 189 da LRE, que lhe confiram a proteção judicial necessária para assegurar a execução exitosa dessa nova etapa do seu processo de reestruturação (cf. itens 102/138, abaixo).

22.    Nesse sentido, para garantir a efetividade da eventual aprovação do ADITAMENTO e o soerguimento do GRUPO OI, torna-se imprescindível a concessão de tutela de urgência, em caráter *inaudita altera parte*, para o fim de:

(i)      <u>suspender</u>, por 180 dias, a exigibilidade das obrigações contidas no PRJ e
as execuções movidas contra as RECUPERANDAS relativas a créditos ou
obrigações sujeitos ao ADITAMENTO, impedindo-se, nesse período, a
apresentação de pedidos de convolação da recuperação judicial em
falência e/ou tentativas de execução específica do PRJ;

(ii)     <u>proibir</u>, por 180 dias, qualquer forma de retenção, arresto, penhora,
sequestro, busca e apreensão e constrição judicial ou extrajudicial sobre
os bens do GRUPO OI, oriunda de demandas judiciais e/ou extrajudiciais
cujos créditos ou obrigações sujeitem-se ao ADITAMENTO; e

(iii)    <u>proibir</u> a decretação de inadimplemento e/ou vencimento antecipado de
obrigações com fundamento único na apresentação do ADITAMENTO,
mediante operação de cláusulas *ipso facto*.

23.    Registra-se, por oportuno, que a jurisprudência vem admitindo a
implementação de medidas liminares, de natureza cautelar, voltadas a garantir a
efetividade da negociação e da aprovação do aditivo ao plano de recuperação
judicial – e.g., recuperação judicial do Grupo Constellation ("<u>GRUPO
CONSTELLATION</u>")[3] e outras descritas nos itens 129/132 abaixo.

24.    Adiante-se que a juridicidade das medidas acima referidas e a legalidade das
disposições do ADITAMENTO <u>foram submetidas à análise do Prof. Paulo Penalva Santos</u>
("<u>PAULO PENALVA</u>"), Procurador aposentado do Estado do Rio de Janeiro e professor
de Direito Empresarial da Pós-Graduação da FGV e da Escola de Magistratura
fluminense. Em sua análise, elaborada especificamente para a presente demanda, o
parecerista foi categórico ao reconhecer em sua nota técnica[4] a <u>viabilidade</u> e a
<u>legalidade</u> das medidas propostas, à luz da melhor doutrina e da jurisprudência sobre
a matéria (doc. 4):

"11. Assim, <u>é possível que um devedor apresente modificativo ao plano
de recuperação judicial aprovado em assembleia-geral de credores</u>. A
possibilidade decorre não apenas da ausência de proibição legal e da
liberdade contratual (art. 5º, inciso II da Constituição da República e art.

---

[3] TJRJ, nº 0288463-96.2018.8.19.0001, 1ª Vara Empresarial do Rio de Janeiro. Decisão: 7.4.2021.

[4] As RECUPERANDAS informam que o parecer final do Prof. Paulo Penalva será apresentado nos
autos no prazo de 30 dias, sendo a Nota Técnica elaborada pela premência do tempo e a situação
urgente enfrentada pelo Grupo Oi.

421 do Código Civil), como está prevista no art. 35, inciso 'l', alínea 'a', da Lei nº 11.101/2005, ao dispor que compete à AGC deliberar, na recuperação judicial, sobre a 'aprovação, rejeição ou modificação do plano de recuperação judicial apresentado pelo devedor'." (doc. 4, p. 4).

-.-.-.-

"47. Pois bem, a partir da introdução, no direito positivo, do consequencialismo jurídico e à luz da ponderação dos interesses envolvidos, a perspectiva de insucesso do processo de soerguimento de empresa viável corresponde a uma realidade a ser levada em consideração na decisão de manter, ou não, a exigibilidade das obrigações que se vencerem até deliberação dos credores afetados pela proposta de aditamento ao PRJ original.

48. Verificada a presença dos requisitos autorizativos previstos no Código de Processo Civil ("CPC") (art. 300 e seguintes), é possível a concessão de tutela de urgência com a finalidade de suspender a exigibilidade das obrigações que se vencerem até a data da assembleia geral de credores que irá deliberar sobre a proposta de aditamento, e para que os credores a serem reestruturados não possam promover constrições no patrimônio do devedor neste mesmo período." (doc. 4, p. 10).

25.    Em resumo, a concessão da referida tutela de urgência é **imprescindível** para viabilizar a preservação das RECUPERANDAS durante o período de 180 dias – período suficiente para o GRUPO OI negociar o ADITAMENTO com os seus credores, bem como deliberar a sua aprovação em eventual AGC.

## O CONTEXTO DESTE ADITAMENTO:
## CAUSAS DA SITUAÇÃO PATRIMONIAL DO GRUPO OI E DA NECESSIDADE DO ADITAMENTO E MODIFICAÇÃO DO PLANO

### (i)    AS PRINCIPAIS MEDIDAS JÁ IMPLEMENTADAS NESTA SEGUNDA RECUPERAÇÃO JUDICIAL

26.    O processo de reestruturação pelo qual o GRUPO OI vem passando desde sua primeira recuperação judicial (processo nº 0203711.65.2016.8.19.0001) tem como principal pilar o equacionamento da operação de telefonia fixa legada da concessão STFC e dos diversos temas a ela associados, incluindo a migração do regime público de concessão para o regime de autorização e a redução da preponderância da

telefonia fixa no contexto das novas tecnologias de telecomunicação.

27.    Em síntese, a prestação de serviços objeto da concessão da ANATEL se tornou **obsoleta** e, ao mesmo tempo, **muito custosa para o GRUPO OI**, situação que foi agravada em razão do atraso na adaptação do marco regulatório, tendo as RECUPERANDAS sido obrigadas a manter os excessivos custos dos contratos com previsão de obrigação mínima (*take or pay*) relacionados ao fornecimento de capacidade satelital e à prestação de serviços e/ou locação de itens de infraestrutura, mas que há muito tempo não lhe trazem mais benefícios econômicos – pelo contrário, representam custos mensais de aproximadamente **R$ 60 milhões**.

28.    Por essa razão, parte das medidas de recuperação propostas e implementadas por meio do PRJ sempre esteve voltada à alienação de ativos e bens do seu patrimônio que haviam sido adquiridos para a prestação de tais serviços no âmbito da concessão, mas que há muito tempo já não têm sentido no contexto da nova realidade do mercado – como imóveis e torres.

29.    Em continuidade às ações adotadas na primeira recuperação judicial [5], diversas outras medidas e alienações de ativos foram implementadas nos autos dessa segunda recuperação judicial, com o mesmo objetivo estratégico.

30.    As controvérsias entre OI e ANATEL, relativas à adaptação do regime de concessão para autorização, foram submetidas ao Procedimento de Solução Consensual perante o Tribunal de Contas da União ("TCU"), o qual contou com a participação das referidas partes e do Ministério das Comunicações.

---

[5] No âmbito da 1ª Recuperação Judicial, o GRUPO OI realizou a venda **(i)** da operação de rede de telecomunicações via fibra ótica, sob a forma da UPI InfraCo, em uma transação de R$ 12.923.338.290,68; **(ii)** da operação em telefonia e dados móveis, sob a forma da UPI Ativos Móveis ("UPI ATIVOS MÓVEIS"), com preço de R$ 15.922.235.801; **(iii)** das Unidades de Torres, sob a forma das UPIs Torres, por R$ 1.077.000.000; **(iv)** das unidades de datacenters, via UPI Data Center, por R$325.000.000,00; **(v)** de diversos imóveis; e **(vi)** da Lemvig RJ Infraestrutura e Redes de Telecomunicações S.A., detentora de parte da infraestrutura de torres da Oi, à NK 108 Empreendimentos e Participações S.A. Tais medidas permitiram a redução do passivo do GRUPO OI de R$ 65 bilhões em 2016 para R$ 35 bilhões em 2022, viabilizando o pagamento de aproximadamente **R$ 26 bilhões** de créditos sujeitos à 1ª Recuperação Judicial.

31.     Após extensa negociação entre as partes, foi aprovada a migração para o regime de autorização, com aquiescência da ANATEL, do Ministério das Comunicações e da Advocacia Geral da União (AGU). O Termo Único de Autorização foi assinado pela OI em novembro de 2024, o que permitiu a redução significativa de suas obrigações do STFC, conforme previsto na Lei Geral de Telecomunicações (Lei nº 9.472/1997), com as alterações introduzidas pela Lei nº 13.879/2019.

32.     Por sua vez, essa transição possibilitou que o GRUPO OI alinhe as suas obrigações à dinâmica atual do mercado, mantendo o compromisso de universalização em áreas sem alternativas ao serviço de voz, ao mesmo tempo em que se desonera de encargos típicos da concessão, como a manutenção de postes e orelhões, que são economicamente inviáveis.

33.     Está em curso, ainda, o procedimento arbitral nº 26470/PFF ("ARBITRAGEM"), instaurado pela OI contra a ANATEL acerca da insustentabilidade e do desequilíbrio econômico e financeiro da concessão. Essas controvérsias <u>não</u> foram objeto do acordo celebrado no âmbito do TCU e podem trazer créditos significativos em favor da OI.

34.     Além disso, em 30.9.2024, a OI celebrou um acordo com a ANATEL para equacionar o crédito detido pela agência, o que resultou em um **<u>desconto</u>** de 55,37% no saldo devedor de seu crédito, perfazendo **<u>R$ 8.4 bilhões</u>**. O pagamento acordado foi em 36 (trinta e seis) parcelas, com quitação por meio do levantamento de depósitos judiciais, enquanto o saldo remanescente será quitado em 78 (setenta e oito) parcelas não lineares até 2034.

35.     Ainda no âmbito desta segunda recuperação judicial, as RECUPERANDAS tiveram êxito em celebrar, com um grupo de credores financeiros internacionais e com a V.tal, financiamentos de longo prazo, na modalidade "*debtor in possession*" ("<u>DIP</u>"), no valor de **<u>US$ 655 milhões</u>**, o que foi essencial para a redução de custos e obtenção de capital de giro de curto prazo, bem como de recursos para o

investimento em suas atividades. Entretanto, tais recursos foram largamente utilizados no curso do próprio processo recuperacional, sob a égide da antiga governança do GRUPO OI, de modo que apenas uma pequena parte desses valores encontrava-se disponível quando a Nova Governança foi implementada.

36.    Outra medida importante foi o aumento de capital aprovado pelo Conselho de Administração em 21.8.2024 e homologado em 28.10.2024, conforme previsto nas Cláusulas 4.2.23 e seguintes do PLANO, cujas ações foram majoritariamente subscritas por credores mediante a capitalização de parte do saldo remanescente dos créditos concursais detidos por credores quirografários que elegeram a "Opção de Reestruturação I", sendo a outra parte subscrita, em dinheiro, pelos acionistas da Companhia, em exercício de seu direito de preferência.

37.    O GRUPO OI também vendeu e transferiu, em 28.02.2025, a unidade produtiva isolada (UPI), composta por 100% das ações de emissão da Oi Serviços de Televisão por Assinatura S.A. ("UPI TV por Assinatura") para a Mileto Tecnologia S.A., por montante de até R$ 30.000.000,00 (fl. 98056/98.085 e 111.719).

38.    Essa operação permitiu a monetização de ativos (SeaC, base de assinantes de TV e equipamentos terminais associados, bem como os bens, direitos e obrigações relacionados) associados à prestação de serviços DTH, os quais já estavam previstos para serem desmobilizados no Laudo Econômico-Financeiro, em razão de seu redirecionamento estratégico e dos altos custos relacionados aos contratos de provimento de capacidade satelital, aquisição de conteúdo e licenças de canais.

39.    O GRUPO OI também assinou contrato de compra e venda com a Datora Telecomunicações Ltda., cujo objeto consistiu na alienação dos seus ativos ligados a WLL (internet por meio de rádio frequência *wireless*), pelo valor de até R$ 4.400.000,00.

40.    Por fim, o GRUPO OI celebrou com a V.tal, em 28.02.2025, o "Acordo de Investimento e Outras Avenças", por meio do qual alienou a unidade produtiva

isolada (UPI) composta por 100% das ações de emissão da ClientCo Serviços de Rede Nordeste S.A. ("UPI ClientCo"), para cujo capital social a OI contribuiu ativos, passivos, direitos e obrigações relacionados a operações de telecomunicações com clientes pessoas-física. Essa operação, prevista expressamente no PLANO, não só permitiu a alienação de uma atividade que vinha lhe causando prejuízos, como representou um benefício econômico em contrapartidas financeiras que totalizaram **R$ 5.715.500.148,00** (fls. 83.976/84.110 e 111.938).

41.    Em síntese, as operações aprovadas e previsas no PLANO vêm sendo **exitosas** ao equacionar o legado da concessão e transformar, **em receitas**, determinados ativos que vinham representando apenas despesas por não integrarem mais, há muito, os seus objetivos estratégicos operacionais.

42.    Essas medidas, associadas às condições repactuadas no PLANO aprovado, **reduziram** o seu passivo em **15 bilhões** desde a sua aprovação (de R$ 25.4 bilhões no primeiro trimestre de 2024 para R$ 10.29 bilhões em 10.5.2025), conforme também ilustrado no gráfico abaixo, já tendo sido quitada parte substancial dos créditos submetidos à recuperação judicial (docs. 5, 6 e 7):



**(ii)** A NOVA OI E O REDIRECIONAMENTO ESTRATÉGICO DE SUAS ATIVIDADES *CORE*

43.     Como amplamente noticiado ao mercado, sobretudo a partir da implementação das medidas previstas no PLANO, o GRUPO OI direcionou as suas atividades ao novo *core business* enunciado no Laudo de Viabilidade Econômico-Financeira apresentado com o PLANO em 19.4.2024[6], isto é, à prestação de serviços voltados ao oferecimento de soluções de Tecnologia da Informação e Comunicação (TIC) e Telecomunicações por meio do ramo "Oi Soluções" (doc. 5, p. 34 e 102).

44.     Atualmente, o GRUPO OI possui um portfólio completo destinado a clientes corporativos, órgãos governamentais e empresas públicas, que envolve o oferecimento de soluções de *Cloud*, segurança, *hardware*, telefonia fixa, observabilidade, inteligência artificial e UC&C (*unified communication & colaboration*).

45.     O GRUPO OI oferece soluções para bancos, lojas físicas, *e-commerce*, indústrias, mineração e segurança pública, integrando todos os serviços de TIC em Telecomunicações necessários ao funcionamento dessas atividades. Também podem ser mencionados, como exemplos, os serviços de gestão de *facilities*, vídeo monitoramento, wi-fi 6.0, segurança cibernética, monitoramento dos dispositivos de TI da agência, além da criação de um *hub* de mensageria por meio de plataforma para gestão e disparo de SMS e mensagens via Whatsapp.

46.     Essas atividades, focadas em operações B2B (*Business to Business*), exigem um volume menor de investimentos do que as atividades de telefonia fixa e móvel e de *internet*, que historicamente eram prestadas pelo GRUPO OI no mercado de

---

[6] Como constou do Laudo Econômico-Financeiro da E&Y: "[O]s principais focos do segmento B2B serão os serviços relacionados a dados e banda larga e informática, o que reflete uma tendência de mercado, na visão da Companhia. Seguindo esse movimento, a Companhia tem a expectativa de fortalecer sua presença no mercado de informática, como consequência, essa linha de serviço passa a representar 50% da receita de Oi Soluções em 2027. Este aumento se baseia no crescimento das soluções de SDWAN, Cibersegurança e Cloud. Considerando o foco no segmento de TI, a Companhia projetou uma estabilização da receita de Dados + Banda larga a partir de 2027.". (fls. 56.941/57.000).

consumo. Não obstante, elas são capazes de gerar receitas muito relevantes, dado o seu valor agregado e maior margem de lucros.

47.     Atualmente, o GRUPO OI atende mais de **43 mil clientes** através do ramo "OI SOLUÇÕES" – dentre eles, 46% das prefeituras, 68% dos governos estaduais e 69% dos órgãos do Governo Federal, além de 82% das mil maiores empresas privadas do país e as 10 maiores dos setores bancário, comércio, construção, indústria e serviços (docs. 6 e 7, p. 3).

48.     Recentemente, também foi criada a **OI SERVICES**, empresa que presta serviços compartilhados para suporte financeiro, operacional e de TI, como RH, finanças, sistemas de informação e tecnologia, operações e logística. Conforme divulgado nos resultados do 1º Trimestre de 2025, essa empresa projeta-se como ativo estratégico, com potencial de crescimento de até 19% a.a., à medida que os serviços de BPO passarem a ser prestados a outras empresas brasileiras (docs. 6 e 7).

49.     No total, a receita anual dos serviços da Nova Oi **superou R$ 3,1 bilhões** em 2024, em meio ao processo de descomissionamento do legado e de expansão dos serviços *core* (doc. 5). Em paralelo, o grupo também vem redimensionando a sua estrutura, otimizando custos e reduzindo os seus gastos não essenciais.

50.     Nesse sentido, o ano de 2025 marca o início de um novo modelo operacional do GRUPO OI. Houve verdadeira transformação na composição de suas receitas, impulsionada pelas vendas de soluções de TIC, juntamente com contratos de longo prazo e menor CAPEX. Adicionalmente, espera-se que, até o final deste ano, as RECUPERANDAS tenham concluído a desmobilização do legado, o que representará economias acumuladas de mais **R$ 2,5 bilhões**.

51.     Em síntese, o GRUPO OI vem expandindo e consolidando a sua posição no mercado por novas frentes estratégicas de soluções digitais e, em paralelo, acelerando a descontinuação de operações deficitárias. Dessa estratégia combinada, desponta uma estrutura operacional mais enxuta, mas com potencial mais elevado

de lucratividade e de geração de caixa de forma sustentável (doc. 7, p. 7):



52.    Como se vê, esse conjunto de negócios jurídicos e realinhamentos estratégicos – viabilizados pelo Plano – promoveram uma verdadeira virada nas operações das Recuperandas.

53.    **Não se está, sequer remotamente, diante da realidade pré-recuperacional: o Grupo Oi foi capaz de receber recursos relevantes, reduzir custos, monetizar ativos que não tinham contrapartidas em receita, reorganizar a sua estrutura de dívidas e postergar datas de pagamento, permitindo investimentos em atividades *core* com alto potencial de lucratividade.**

54.    No entanto, como se adiantou, seu processo de reestruturação foi impactado por alguns percalços, identificados a partir da implementação da Nova Governança em 12.12.2024, o que tornou necessária a apresentação do Aditamento ao Plano, a fim de viabilizar a efetiva recomposição do caixa e reorganização financeira do Grupo Oi.

### (iii) A Nova Governança e os impactos da não obtenção de propostas válidas para a venda infrutífera da ClientCo por pagamento em Dinheiro

55.    Em conformidade com a Cláusula 7.3 e seguintes do PLANO, após a conclusão do aumento de capital da OI, em 11.12.2024, foi realizada uma Assembleia Geral de Acionistas, em que foi eleito o novo Conselho de Administração e a nova Diretoria Estatutária, implementando-se a Nova Governança prevista no PLANO (fls. 104.029/104.030, item 66). Essa medida permitiu o ingresso de administradores independentes com ampla experiência em gestão, finanças e reestruturação de empresas.

56.    Desde a nomeação dos novos membros, o Conselho de Administração da OI implementou uma série de melhorias em prol da reestruturação do GRUPO OI, entre elas a conclusão das complexas operações de alienação das UPIs ClientCo e TV por Assinatura. No entanto, por razões alheias à vontade das RECUPERANDAS, o GRUPO OI ainda não se recuperou plenamente e vem enfrentando dificuldades no seu fluxo de caixa.

57.    Conforme já antecipado no capítulo introdutório desta petição, a Nova Gestão do GRUPO OI se deparou com a frustração das expectativas relevantes que nortearam o racional econômico do PLANO, notadamente com relação à **alienação de ativos**, as quais não se concretizaram como projetado.

58.    Isso porque, ao elaborar o PLANO, a antiga gestão do GRUPO OI considerou a venda da UPI ClientCo pelo preço mínimo de **R$ 7.3 bilhões** (fls. 56.941/57.000), a serem pagos totalmente **em dinheiro**. Nos termos da Cláusula 5.2.2.1.6 do PLANO, dessa quantia, o equivalente a **R$ 1.5 bilhão** seria destinado ao caixa da OI para o incremento de suas atividades e pagamento de obrigações de curto prazo, mormente as de cunho trabalhista e com fornecedores, enquanto o restante **– R$ 5.8 bilhões -** seria utilizado para o pagamento de seu passivo concursal.

59.    Contudo, essa premissa contida no PRJ foi **frustrada**, na medida em que o processo competitivo se desenvolveu de maneira **diversa** da planejada.

60.      A única proposta recebida na primeira rodada de leilão **não** atendia ao preço mínimo em dinheiro previsto pela Cláusula 5.2.2.1.2, "i", do PRJ - i.e., era de apenas **R$ 1 bilhão** em dinheiro (fls. 72.481/72.486 e 73323/73325), valor mais de **sete vezes inferior aos 7.3 bilhões esperados**.

61.      Conduzida a segunda rodada de leilão, nos termos do PRJ, **não** foram apresentadas propostas em dinheiro para aquisição do ativo (fls. 78930/78935 e 81.553/81561).

62.      Diante disso, em conformidade com as Cláusulas 5.2.2.1.2, "iii", 5.2.2.1.3, "ii", e 5.2.2.1.5, "i" e "iii", do PLANO, a UPI ClientCo foi alienada à V.tal, que, embora tenha apresentado uma proposta de valor econômico estimado em R$ 5.68 bilhões, **não** contemplava ingresso efetivo de recursos (a curto prazo) nos caixas das RECUPERANDAS (fls. 83.976/84.110 e 111.938)[7].

63.      Não se disputa que a venda da UPI à V.tal implicou em significativo ganho financeiro para o GRUPO OI[8], tendo a proposta atendido todas as condições da Cláusula 5.2.2.1.5 do PLANO – tanto é que foi homologada por esse MM. Juízo (cf. r. decisão de fls. 61.100/61.135), além de ter sido aprovada pelo CADE e pela ANATEL sem restrições.

64.      No entanto, é também inegável que a OI obteve, com essa operação, receitas significativamente **inferiores** às projetadas pela antiga gestão ao negociar o PRJ com os credores, o que teve por consequência o **descasamento entre a projeção de**

---

[7] Mais especificamente, a proposta incluía a transferência de **(i)** R$ 308,3 milhões em debêntures (inclusive juros acumulados, taxas e prêmios) emitidas para a V.Tal no âmbito do financiamento DIP; **(ii)** R$375,4 milhões em créditos não sujeitos ao PLANO que a V.Tal detinha contra a Oi; e **(iii)** R$4,99 bilhões emitidos em novas ações ordinárias da V.Tal, que serão pagas por meio da contribuição de ações da UPI ClientCo.

[8] Mais especificamente, a alienação da UPI Client CO resultou: **(i)** na eliminação de mais de R$ 400 milhões em dívidas, promovendo um alívio substancial no seu passivo financeiro; **(ii)** no encerramento de um contrato oneroso com a V.tal, cujos termos representavam significativo comprometimento do fluxo de caixa e um impacto negativo sobre a rentabilidade da operação; **(iii)** no incremento de 10,5% na participação societária da OI na V.tal, elevando sua fatia para 27,5%; e **(iv)** na redução de atividades não rentáveis para a OI mediante a alienação de suas atividades no varejo de fibra ótica, permitindo que o direcionamento de esforços à Oi Soluções.

liquidez imediata utilizada como base para a elaboração do fluxo de pagamentos do Plano e a real disponibilidade de caixa do Grupo Oi. Consequentemente, a Oi precisou obter *waivers* e deslocar a quitação de tais créditos para o futuro, passando a depender, sobretudo, dos prazos de concretização da alienação da UPI V.tal.

65.    Confira-se, nesse sentido, o Fluxo de Caixa das atividades de investimento que foi projetado pela antiga gestão do Grupo Oi à época da apresentação do Plano. Esperava-se um ingresso de mais de **R$ 7 bilhões em dinheiro em caixa** ainda neste exercício de 2025, decorrentes da venda da ClientCo (fls. 56.941/57.000):

| Fluxo de Caixa das Atividades de Investimento (Em milhões de R$) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| (-) Despesas de capital | (570) | (266) | (118) | (117) | (116) | (115) | (115) | (114) | (114) | (114) | (114) |
| (+/-) Alienação e outras operações não recorrentes | 343 | 125 | 140 | 100 | 100 | 100 | 100 | 150 | 150 | 150 | 150 |
| (+/-) Venda UPI ClientCo | - | 7.300 | - | - | - | - | - | - | - | - | - |
| (+/-) Venda UPI V.tal | - | - | 8.000 | - | - | - | - | - | - | - | - |
| (=) Fluxo de Caixa das Atividades de Investimento | (227) | 7.159 | 8.022 | (17) | (16) | (15) | (15) | 36 | 36 | 36 | 36 |

66.    Confira-se, comparativamente, o fluxo de pagamentos crescente que foi projetado no Plano para o biênio de 2025-2026, que seriam arcados, em parte, justamente com os recursos obtidos com a UPI ClientCo (fls. 56.941/57.000):

### 7.5.4 Projeção do Plano de Credores

A seguir é apresentado o fluxo de pagamento aos credores, de acordo com o Plano de Recuperação Judicial.

| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Classe I | (241) | (201) | (193) | (188) | (186) | - | - | - | - | - | - |
| Classe II | - | - | - | - | - | - | - | - | - | - | - |
| Classe III | (292) | (1.533) | (5.739) | (590) | (396) | (589) | (2.515) | - | - | - | - |
| Classe IV | (14) | - | - | - | - | - | - | - | - | - | - |
| Fluxo de Pagamento | (547) | (1.734) | (5.932) | (778) | (582) | (589) | (2.515) | - | - | - | - |

67.     Por óbvio, **a frustração dessa expectativa de receita comprometeu a
disponibilidade de caixa das R**ECUPERANDAS **de curto prazo**, o que **(i)** reduziu o
montante de recursos disponíveis para o incremento de suas operações; e **(ii)**
dificultou a realização dos pagamentos que estavam previstos para ocorrer neste e no
próximo exercícios – e, por consequência, a própria execução do PLANO nas
condições pactuadas.

68.     Outro fator que impactou o caixa da OI foi o **atraso** na alienação da UPI
ClientCo. Com efeito, a venda da UPI ClientCo levou aproximadamente **três meses
a mais para ser concluída do que o previsto no PRJ**, o que gerou, conforme
estimativas da Companhia, um impacto adicional de mais de **R$ 600 milhões** no
caixa da OI.

69.     Isso porque a operação da ClientCo gerava prejuízos de **R$ 150 milhões por
mês ao G**RUPO **O**I, apresentando **custos de operação muito maiores do que as
receitas**[9], principalmente em razão do contrato de prestação de serviços de banda
larga utilizando a tecnologia *Fiber to the Home* (FTTH), que foi encerrado com a
venda da UPI ClientCo.

70.     Adicionalmente, tal atraso contribuiu para uma **piora operacional em tais
serviços**, gerando perdas adicionais de aproximadamente **R$ 166 milhões**.

   (iv) A**TRASOS NA MIGRAÇÃO DO** R**EGIME** P**ÚBLICO DO** STFC - **DESPESAS EXTRAORDINÁRIAS
        COM A MANUTENÇÃO DA INFRAESTRUTURA**

71.     A OI também sofreu severos impactos de liquidez em decorrência da
manutenção do STFC ao longo de 2024, dado que a previsão do PRJ aprovado era
de conclusão da migração de concessão para autorização entre maio e junho de
2024, e sua efetiva conclusão ocorreu somente em novembro de 2024 – **um atraso
de pelo menos seis meses em relação ao previsto no PRJ**, que gerou impactos

---

[9] As despesas da OI com infraestrutura de transmissão eram as mais representativas das despesas
relacionadas à planta e às suas receitas.

operacionais e financeiros consideráveis.

72.      Em decorrência disso, a OI foi compelida a manter as obrigações do contrato
de concessão por tempo superior ao esperado quando se projetou o PLANO, o que
**impediu** a desmobilização de diversos sítios, bem como da tecnologia obsoleta das
redes de cobre, resultando na continuidade dos custos de contratos com previsão de
obrigação mínima (“*Take or Pay*”), que não trazem qualquer benefício econômico
para as RECUPERANDAS em razão do baixo consumo dos serviços.

73.      A manutenção prolongada desses ativos gerou custos expressivos que
poderiam ter sido evitados, consumindo recursos valiosos, que poderiam ser
redirecionados para investimentos mais estratégicos e inovadores. Além disso, a
demora no processo impactou negativamente o plano de reestruturação e otimização
operacional da OI, retardando a implementação de medidas essenciais para a
redução do passivo operacional e para a adequação do modelo de negócios frente às
transformações regulatórias e mercadológicas.

74.      Esse atraso também repercutiu em um aumento dos custos fixos e
operacionais, deteriorando a margem financeira da OI e elevando o risco de liquidez
em um momento crítico de recuperação judicial.

75.      Vale frisar que a antiga gestão da OI também havia estimado, nas projeções
que embasaram a elaboração do PLANO, que haveria uma redução expressiva de
despesas no biênio 2024-2025 em decorrência direta da adaptação ao modelo de
autorização. Todavia, a adaptação prevista para junho de 2024 ocorreu apenas em
novembro de 2024, frustrando o potencial original de redução das referidas despesas
no biênio 2024-2025, o que, por óbvio, vem dificultando o cumprimento do fluxo
de pagamentos previstos para o curto prazo.

76.      O atraso na mudança do regime, por culpa exclusiva da ANATEL, gerou um
impacto total adicional de pelo menos **R$ 510 milhões** no caixa da OI, sendo R$ 160
milhões devidos a título de multas adicionais cobradas pela ANATEL e R$ 350

milhões de custos não reduzidos.

(v)  Aspectos relacionados à dívida trabalhista do Grupo Oi

77.    Adicionalmente, outro fator crítico que pressiona o caixa das Recuperandas é
o **expressivo aumento no volume de condenações trabalhistas registrado no último
exercício**. Esse crescimento significativo das responsabilidades trabalhistas, conforme
estabelecido no PRJ, demandará desembolsos financeiros com prazo de carência
extremamente reduzido – de apenas seis meses –, **impondo um desafio adicional à
gestão de caixa e à previsibilidade orçamentária da Oi**.

78.    A Oi sempre envidou esforços no sentido de conferir condições mais
vantajosas aos credores da Classe I - Trabalhista, em razão do caráter alimentar dos
respectivos créditos. A companhia tem ciência de sua responsabilidade social, não
apenas perante seus credores trabalhistas, mas também em relação a seus atuais
funcionários e à cadeia produtiva que sustenta sua operação. Contudo, a manutenção
das condições estabelecidas no Plano aprovado em 2016 - **diante de um cenário
econômico e operacional substancialmente diverso** - se revela inviável, inclusive
diante da nova realidade de caixa da Companhia, o que impõe a necessidade de
revisão dessas condições.

79.    Como se sabe, nos termos da Cláusula 4.1 do Plano, os créditos Classe I não
foram reestruturados nesta segunda recuperação judicial, que manteve integralmente
os valores e condições originais de carência e parcelamento previstas no aditamento
ao plano da primeira recuperação judicial, aprovado em 08.09.2020, o qual previu,
como regra geral, o pagamento integral de tais créditos em 5 parcelas mensais, com
prazo de carência de 180 dias[10].

80.    Adicionalmente, a Cláusula 4.1.1 do Plano previu que os créditos trabalhistas
não reconhecidos ou habilitados na Data da Homologação deveriam continuar

---

[10] https://www.recjud.com.br/recuperacao-judicial-judicial-reorganization-2016/.

tramitando até que um valor final e líquido fosse determinado, mas que, após o trânsito em julgado da decisão homologatória do valor devido e a respectiva habilitação, seriam incluídos no fluxo de pagamentos nas mesmas condições abreviadas de carência e de parcelamento acima descritas (fls. 56.788/56.939).

81.    Para estabelecer essa condição benéfica de pagamentos aos credores Classe I e elaborar as projeções de pagamentos do PLANO (cf. itens 65/66 acima), a antiga gestão do GRUPO OI se baseou em estimativas da redução desse passivo que, no entanto, **não** estão se concretizando de acordo com o estimado — em grande parte porque houve frustração nas expectativas de corte de custos e de ingresso imediato de recursos no caixa, como visto acima.

82.    Conforme levantamento realizado pela Nova Governança do GRUPO OI, estima-se que as reclamações trabalhistas – incluindo a Fundação Atlântico – totalizem hoje o valor total de aproximadamente **R$ 1.57 bilhão**, sendo que, conforme o seguinte gráfico, houve um **incremento de 1.337,45% no desembolso com dívidas trabalhistas nos últimos 12 meses**, que saltou de uma média de R$ 2.43 milhões por mês, incorridos entre 1.3.2023 a 1.5.2024, para um gasto mensal médio de R$ 32.5 milhões no último ano. Confira-se o seguinte gráfico comparativo dos desembolsos mensais da OI com o passivo trabalhista entre os 1<sup>os</sup> Trimestres de 2024 e de 2025:



83.    Esse fator tem causado um **impacto mensal milionário que não foi previsto quando elaborado o PLANO**, o que, em conjunto com as demais causas acima elencadas, vem **pressionando de maneira extraordinária o fluxo de caixa das RECUPERANDAS e comprometendo a sua liquidez e capacidade de pagamento das obrigações do PLANO**.

84.    Tal incremento não decorre de qualquer erro de gestão, mas de fatores estruturais e conjunturais próprios da realidade empresarial brasileira —— e do necessário redimensionamento do GRUPO OI.

85.    Com o objetivo de manter-se operacional e em conformidade com suas obrigações legais, sociais e com o PLANO aprovado, a OI teve de promover uma readequação profunda em sua estrutura, o que incluiu a redução de seu quadro de pessoal, a alienação de ativos e o encerramento de determinadas operações. Medidas como essas, ainda que necessárias à preservação da empresa, acarretaram, como efeito colateral inevitável, o aumento do número de desligamentos e, por conseguinte, o crescimento exponencial das demandas trabalhistas.

86.    É de conhecimento geral a complexidade do regime jurídico trabalhista brasileiro, composto por mais de três mil normas vigentes, muitas das quais de difícil compatibilização prática, o que impõe desafios significativos à adaptação das empresas aos novos modelos de negócio e à dinâmica contemporânea das relações produtivas e laborais. Em tal cenário, é praticamente inevitável que empresas que necessitem realizar reestruturações operacionais – sobretudo por força de sua situação econômico-financeira – enfrentem um aumento imediato e substancial no número de ações trabalhistas.

87.    Ademais, a experiência dos últimos anos demonstrou que a opção adotada no PLANO por não reestruturar a Classe I teve por consequência a prolação de decisões conflitantes de diferentes Varas do Trabalho e Tribunais Regionais, bem como bloqueios indevidos de contas bancárias provenientes de credores concursais.

Tais decisões acabaram por comprometer a previsibilidade e a segurança jurídica necessárias à efetiva reestruturação da empresa, gerando impactos negativos no fluxo de caixa das Recuperandas.

88.     Em síntese, ainda que as diversas medidas de reestruturação adotadas pela Nova Governança tenham representado avanços relevantes na reestruturação do Grupo Oi, a ausência de liquidez imediata, decorrente da frustração de premissas relevantes do Plano, somada a custos não previstos e à intensificação de obrigações trabalhistas de curto prazo, resultou em um cenário de complexidade operacional. Esse contexto impõe a necessidade de novas medidas voltadas à renegociação do passivo, com o objetivo de preservar recursos e assegurar a continuidade da execução do Plano (cf. relatado nos itens 26/54 acima).

89.     Por conta disso, o Grupo Oi entende que, para garantir a sustentabilidade financeira e viabilizar a geração de ativos no curto e médio prazos, bem como impedir o eventual descumprimento de obrigações contidas no PRJ, torna-se imprescindível a **reestruturação de créditos classificados na Classe I**, bem como de **determinadas disposições dos credores fornecedores da Classe III**, por meio de medidas que possibilitem o **alongamento dos prazos de pagamento**, bem como o pagamento com a venda de imóveis da Oi ou por meio da **dação em pagamento de tais ativos**.

90.     Ressalte-se que esses créditos representam as dívidas concursais em dinheiro que serão **exigíveis** ainda no exercício de 2025, o que confere especial **urgência** e **prioridade** à sua adequada gestão, de forma a aliviar o fluxo de caixa do Grupo Oi e permitir o equacionamento de todo o passivo concursal.

91.     Além disso, tais medidas permitirão o equacionamento definitivo dessas dívidas, conferindo maior previsibilidade financeira e jurídica ao Plano.

92.     Destaque-se, por fim, que a flexibilização dessas obrigações, que serão

destacadas em seus principais aspectos a seguir, não apenas contribuirá para a
adequação do perfil financeiro do GRUPO OI às suas reais capacidades de pagamento,
mas também demonstra o compromisso das RECUPERANDAS em cumprir todas as suas
obrigações – incluindo as demais já reestruturadas pelo PRJ –, ainda que dentro de
condições ajustadas e compatíveis com a sua atual realidade financeira.

93.     Essa reestruturação, portanto, não deve ser interpretada como mera
postergação do pagamento do passivo concursal, mas como uma solução estratégica
e imprescindível para a estabilização financeira do GRUPO OI e o desenvolvimento
sustentável da operação das RECUPERANDAS, abrindo caminho para a geração de valor
e a retomada do crescimento sustentável, em benefício de todos os seus *stakeholders*.

**SÍNTESE DO ADITAMENTO AO PLANO**
**INCLUSÃO DA CLASSE I E SUBCLASSES REESTRUTURADAS**
**NOVAS MEDIDAS PARA A SUPERAÇÃO DA CRISE**

94.     Em busca de uma solução mais eficiente para a readequação de sua estrutura
de capital, manutenção de seu capital de giro e alívio da pressão por liquidez de
curto prazo, o GRUPO OI propõe, entre outros pontos[11]: **(i)** a alteração das condições
de pagamento dos Créditos detidos por Credores Trabalhistas (Cláusula 4.1),
Credores Fornecedores Parceiros (Cláusula 4.2.6), Credores Take or Pay com
Garantia (Cláusula 4.2.8), Credores Take or Pay sem Garantia – Opção I (Cláusula
4.2.9), Credores Take or Pay sem Garantia – Opção II (Cláusula 4.2.10) e Credores
Extraconcursais Aderentes (Cláusula 4.10); **(ii)** a utilização de depósitos recursais para
a obtenção de recursos imediatos e pagamento dos credores (Cláusulas 5.4); e **(iii)** a
possibilidade de contratação de empresa especializada para gerir os Imóveis por
meio de veículo a ser criado para esse fim (Cláusula 5.3.5).

---

[11] O resumo desta petição dispõe apenas sobre **uma parte** das alterações e previsões, consideradas
mais relevantes pelas RECUPERANDAS. Para a avaliação da integralidade das proposições, os
credores devem consultar o ADITAMENTO (**doc. 1**) ou o comparativo *"Redline"* (**doc. 2**).

95.    Para facilitar a análise das alterações pelos credores, as RECUPERANDAS anexam, em conjunto com o ADITAMENTO (doc. 1), um comparativo, em marcas de revisão ("*Redline*"), que destaca todas as previsões modificadas, suprimidas ou incluídas no ADITAMENTO (doc. 2). Abaixo, destacam-se algumas das modificações e dos acréscimos mencionados acima[12]:

- CLÁUSULA 4.1. CRÉDITOS TRABALHISTAS – CLASSE I: Os Credores Trabalhistas poderão escolher entre duas opções de pagamentos, o que deverá ser formalizado em até 30 (trinta) dias da Data da Homologação do ADITAMENTO, mediante preenchimento do formulário constante do Anexo 4.1.3.

- Pela **Opção I**, os credores receberão seus créditos em dinheiro, mediante depósito em conta a ser informada pelo próprio credor, no valor de até R$ 9.000,00, em 180 dias da Homologação do Aditamento. Os credores com créditos superiores a essa quantia também poderão aderir à Opção I, desde que concedam quitação do saldo. A CLÁUSULA 4.1.1.1 prevê o valor agregado total de R$ 30.000.000,00 para pagamentos na Opção I, de modo que, atingido esse valor, os credores que escolherem a Opção I receberão o remanescente de seus créditos na forma da Opção II.

- Pela **Opção II**, os Credores Classe I receberão seus créditos em parcela única, sem nenhum deságio, limitada a 150 (cento e cinquenta) salários-mínimos [13], no prazo de 3 anos contados da Homologação do

---

[12] A descrição deste capítulo visa apenas facilitar a leitura do ADITAMENTO pelos credores. Desse modo, as RECUPERANDAS ressalvam que, em caso de divergência entre esta manifestação e o documento em anexo do ADITAMENTO, prevalecerão as condições dispostas no ADITAMENTO.

[13] Os créditos que excederem 150 salários-mínimos serão quitados na forma da Cláusula 4.2.11 (Modalidade de Pagamento Geral), conforme amplamente admitido pela jurisprudência do Superior Tribuna de Justiça (REsp 1812143/MT, Rel. Ministro Marco Buzzi, Quarta Turma, julgado em 09/11/2021, DJe 17/11/2021; REsp 1649774/SP, Rel. Ministro Marco Aurélio Bellizze, Terceira Turma, julgado em 12/02/2019, DJe 15/02/2019; STJ, AgInt no REsp 1924178/SP, Rel. Ministro Luis Felipe Salomão, Quarta Turma, julgado em 14/09/2021, DJe 23/09/2021).

Como também foi esclarecido pelo Prof. PAULO PENALVA em seu parecer, "62. **A possibilidade de o PRJ prever a limitação dos créditos trabalhistas a 150 salários-mínimos na recuperação judicial foi objeto de análise pelo STJ, que decidiu pela possibilidade o PRJ prever e a AGC aprovar essa limitação** disponibilidade do direito e, consequentemente, pela possibilidade da limitação. 63. O entendimento firmado no STJ em relação ao crédito trabalhista é no sentido de que '*é possível, por deliberação da AGC, a aplicação do limite previsto no art. 83, I, da Lei 11.101/2005 às empresas em recuperação judicial, desde que devida e expressamente previsto pelo plano de recuperação judicial, instrumento adequado para dispor sobre forma de pagamento das dívidas da empresa em soerguimento (princípio da preservação da empresa)*' [STJ, REsp 1812143 MT 2019, Rel. Ministro MARCO BUZZI, QUARTA TURMA, julgado em 09/11/2021, DJe 17/11/2021]. Isso significa que **o saldo do crédito superior a 150 salários-mínimos poderá ser pago na condição de crédito quirografário, exatamente como consta da regra legal falimentar.**" (doc. 4, p. 13)

ADITAMENTO[14], de modo que o valor excedente a 150 salários-mínimos será pago nas condições da Modalidade de Pagamento Geral (Cláusula 4.2.11 do Plano).

Em conformidade com o previsto no art. 54, §2º, da LRE, o ADITAMENTO constituiu garantia integral e suficiente do pagamento dos Créditos Trabalhistas – Classe I, conforme lista de ativos do Anexo 4.1.2.1 do ADITAMENTO.

- **CLÁUSULA 4.2.6. CRÉDITOS DE CREDORES FORNECEDORES PARCEIROS:** Atendendo à necessidade de caixa da OI, a curto e médio prazos, o ADITAMENTO prevê apenas o alongamento dos prazos de pagamento, que serão quitados com os recursos levantados pelas RECUPERANDAS com a venda de imóveis até 31 de dezembro 2038.

- **CLÁUSULA 4.2.7. CRÉDITOS DE CREDORES TAKE OR PAY COM GARANTIA:** Não haverá alteração no deságio já previsto no PLANO com relação ao remanescente desses créditos, que seguirá sendo de 60% para os créditos devidos no período de 2024 a janeiro de 2025 e de 62% para o período de fevereiro de 2025 a julho de 2027. Serão alteradas outras disposições relativas às demais condições de pagamento, nos termos da Cláusula 4.2.7, prevendo-se a sua quitação mediante a receita da venda de IMÓVEIS (Cláusula 5.3.4, "ii", '1.2') até 31 de dezembro de 2038.

- **CLÁUSULA 4.2.8. CRÉDITOS DE FORNECEDORES TAKE OR PAY SEM GARANTIA – OPÇÃO I:** Há previsão de alongamento da dívida, de modo que tais Credores serão pagos com os recursos levantados pelas RECUPERANDAS com a venda de imóveis até 31 de dezembro 2038. O ADITAMENTO manteve o deságio de 20% previsto no PLANO para os créditos devidos entre 1º de janeiro de 2024 e 31 de dezembro de 2025, alterando-se o deságio dos créditos devidos no biênio de 2026/2027 para 35%, sendo que, a partir de 1º de julho de 2027, os contratos desses credores serão rescindidos, sem

---

[14] O Prof. PAULO PENALVA também atestou a legalidade dessa cláusula: "64. Assim, ficam estabelecidas duas premissas: **(i)** a Lei nº 11.101/2005 permite a prorrogação de pagamento dos créditos trabalhistas em até 2 (dois) anos adicionais ao período de 1 (um) ano previsto no *caput* do art. 54, desde que observados os requisitos cumulativos dos incisos do §2º desse artigo; e **(ii)** o entendimento do STJ é no sentido de ser válido que o PRJ preveja a limitação dos créditos da Classe I em 150 (cento e cinquenta) salários-mínimos. 65. A partir dessas premissas é possível concluir que, havendo autorização da AGC, os créditos trabalhistas que excederem 150 (cento e cinquenta) salários-mínimos podem ser classificados como quirografários. Nesta hipótese, o valor excedente não precisará atender aos requisitos do §2º do art. 54 da Lei nº 11.101/2005, uma vez que o excesso será convertido em crédito quirografário. Apenas os créditos abaixo do referido limite é que deverão necessariamente observar as condicionantes do §2º do art. 54 da Lei nº 11.101/2005. 66. Isso porque **(i)** o art. 50, I, da Lei nº 11.101/2005 expressamente autoriza a concessão de prazos e condições especiais para pagamento, sem fixar limitação [AgInt no REsp 1828635/RS, Rel. Ministro MOURA RIBEIRO, TERCEIRA TURMA, Julgado em 20/09/2021 - DJe 23/09/2021.]; e **(ii)** a limitação prevista no art. 54, *caput*, da Lei nº 11.101/2005 se restringe aos créditos da Classe I." (doc. 4, pp. 13 e 14).

penalidades.

- **CLÁUSULA 4.2.9. CRÉDITOS DE FORNECEDORES TAKE OR PAY SEM GARANTIA – OPÇÃO II:** Com relação aos credores que escolheram a Opção II, o ADITAMENTO mantém o deságio original de 60% previsto para o período de 2024 até 31 de dezembro de 2025, com a previsão de que todos os contratos desses credores serão rescindidos em 1º de julho de 2027. O ADITAMENTO também prevê o alongamento das condições de pagamento, nos mesmos termos do previsto para as outras classes – isto é, serão quitados com os recursos levantados pelas Recuperandas com a venda de imóveis até 31 de dezembro 2038.

- **CLÁUSULA 4.10. CREDOR EXTRACONCURSAL ADERENTE:** O ADITAMENTO prevê que os Credores Extraconcursais Aderentes cujos créditos foram constituídos após 1º de março de 2023 e inadimplidos até a data de homologação do ADITAMENTO poderão participar da distribuição de recursos prevista na Cláusula 5.3.4 (*waterfall*).

- **CLÁUSULA 5.3.4. RECEITA LÍQUIDA DA VENDA DE IMÓVEIS:** O ADITAMENTO altera uma série de disposições relativas aos critérios e condições da ordem de pagamentos com a receita da alienação de imóveis. Considerando a necessidade premente de aliviar a pressão sobre o caixa da OI e de investimentos em atividades operacionais, o valor agregado de receita destinado às atividades das RECUPERANDAS será ampliado para R$ 600.000.000,00. Também será ampliado o valor agregado da receita da venda desses bens que será destinado aos pagamentos, de forma *pro rata*, dos Credores listados na Cláusula 5.3.5

- **CLÁUSULA 5.3.5: VEÍCULO IMÓVEIS:** De forma a reduzir os custos de manutenção e venda de tais bens de seu ativo não circulante, diminuir a pressão sobre o caixa da OI e atribuir eficiência ao procedimento de alienação de imóveis, o ADITAMENTO prevê, como alternativa à venda direta, a possibilidade de constituição ou contratação de empresa especializada na gestão de imóveis para a constituição de um veículo para o qual serão aportados tais bens, cuja participação societária de tal veículo poderá ser dada em pagamento aos Credores para quitação de seus respectivos Créditos.

- **CLÁUSULA 5.4: DEPÓSITOS RECURSAIS:** Em conformidade com o que ocorreu em outras recuperações judiciais[15], o Aditamento prevê o levantamento dos depósitos recursais de ações trabalhistas. Como forma de garantia

---

[15] Esse é o caso da recuperação judicial da Paranapanema (nº 1001409-24.2022.8.26.0260), da 1ª Vara Regional de Competência Empresarial e de Conflitos Relacionados à Arbitragem do Foro Especializado 1ª RAJ/7ª RAJ/9ª RAJ do e. TJSP, cujo Plano de Recuperação Judicial, aprovado e homologado, previu que "*[a]s Recuperandas estão autorizadas pelos Credores a levantar diretamente os Depósitos Recursais realizados em contas vinculadas a reclamações trabalhistas para os pagamentos*" dos créditos trabalhistas.

adicional do pagamento dos Créditos Trabalhistas, a razão de 50% dos depósitos recursais será utilizada para pagamento dos Credores Trabalhistas que elegeram a Opção I e, uma vez atingido o valor agregado da Cláusula 4.1.1, também para o pagamento dos Credores Trabalhistas que elegeram a Opção II. Os outros 50% dos depósitos recursais serão destinados ao capital de giro da Oi.

- O ADITAMENTO também prevê a possibilidade de constituição de um veículo, ao qual poderão ser revertidos os direitos sobre depósitos recursais ainda não levantados, cujas quotas poderão ser dadas em pagamento aos Credores Trabalhistas – Opção II para quitação de seus respectivos créditos.

## VIABILIDADE ECONÔMICO-FINANCEIRA
## À LUZ DO ADITAMENTO AO PLANO DE RECUPERAÇÃO JUDICIAL

96.    À luz de todas as premissas acima expostas, as RECUPERANDAS apresentam o anexo Laudo de Viabilidade Econômico-Financeiro, elaborado a partir das premissas do aditivo e das projeções de receitas e despesas atualizadas (doc. 3), atestando a viabilidade de suas atividades e do ADITAMENTO apresentado.

97.    A partir da análise de todas as **Receitas Operacionais** do GRUPO OI, o laudo evidencia que há **sólida projeção de crescimento das atividades e receitas decorrentes da OI**, sobretudo daquelas associadas aos serviços desempenhadas em suas novas atividades *core*, como o produto "OI SOLUÇÕES" da OI. Como se depreende do seguinte gráfico de "Receitas Operacionais Líquidas", por exemplo, projeta-se um faturamento cada vez maior nessas novas frentes estratégicas e em suas subsidiárias, proporcionando um seu crescimento sustentável (doc. 3, p. 17):



98.    O laudo também evidencia que a mudança de orientação estratégica do Grupo Oi, aliada à venda de operações deficitárias e à progressiva redução do legado da Concessão, permitirão a recuperação do Fluxo de Caixa Operacional (FCO) da Oi em **pouquíssimos anos**, em razão da combinação entre o aumento do faturamento dos novos serviços prestados e a redução de custos e despesas com manutenção de plantas e locação de infraestrutura de transmissão e telecomunicações, por exemplo, que representam, atualmente, relevantes custos incorridas para manter operações *não core* e/ou deficitárias (doc. 3, p. 18).

99.    Note-se, a respeito, que **o Fluxo de Caixa Operacional, hoje negativo, se tornará positivo dentro de poucos anos**, o que demonstra a viabilidade do crescimento sustentável de suas atividades (doc. 3, p. 19):



100.    Por fim, o laudo também atesta a viabilidade econômico-financeira do Aditamento.

101.    Afinal, considerando as premissas operacionais acima sintetizadas, bem como as receitas não operacionais decorrentes da venda de ativos e novas condições e prazos de pagamento, o laudo comprova que o Grupo Oi tem capacidade de pagamento de suas dívidas. Tal conclusão pode ser visualizada no gráfico a seguir, o qual evidencia a existência de Saldo de Caixa suficiente para o cumprimento integral das obrigações nos prazos pactuados no Aditamento (doc. 3, p. 32):



## IMPOSITIVA CONCESSÃO DE TUTELA DE URGÊNCIA: SUSPENSÃO DA EXIGIBILIDADE DO PLANO E DE EXECUÇÕES RELATIVAS A CRÉDITOS OU OBRIGAÇÕES SUJEITAS AO ADITAMENTO AO PLANO

102.    Nos termos do art. 300 do CPC, "*[a] tutela de urgência será concedida quando houver elementos que evidenciem a probabilidade do direito e o perigo de dano ou o risco ao resultado útil do processo*". A aplicação do CPC ao processo recuperacional, por outro lado, está expressamente prevista no art. 189 da LRE.

103.    No presente caso, por todos os motivos já expostos acima, é imprescindível que esse MM. Juízo conceda, com fundamento no art. 300 do CPC, a tutela de urgência requerida pelas RECUPERANDAS, em caráter *inaudita altera parte,* pois trata-se de medida não apenas necessária, mas essencial – senão vital –, para garantir a continuidade do GRUPO OI, para o fim de:

(i)    <u>suspender</u>, por 180 dias, a exigibilidade das obrigações previstas no PRJ, com a subsequente proibição de alegação de descumprimento e/ou ajuizamento de ações de falência ou execuções movidas contra o GRUPO OI relativas a créditos ou obrigações sujeitas ao ADITAMENTO;

(ii)    <u>proibir</u>, por 180 dias, qualquer forma de retenção, arresto, penhora, sequestro, busca e apreensão e constrição judicial ou extrajudicial sobre os bens das RECUPERANDAS, oriunda de demandas judiciais e/ou extrajudiciais cujos créditos ou obrigações sujeitem-se ao ADITAMENTO; e

(iii)    <u>impedir</u> o vencimento antecipado de qualquer obrigação pela mera apresentação do ADITAMENTO, mediante operação de cláusulas *ipso facto*.

104.    Antecipa-se, desde logo, que não se trata propriamente de uma extensão do *stay period* estabelecido no início da presente recuperação judicial, mas a adoção de uma nova medida, de natureza cautelar, com o objetivo de preservar suas atividades durante o período necessário à negociação e aprovação do ADITAMENTO pelos credores. Isso porque, caso não sejam deferidas as medidas liminares ora requeridas, o patrimônio do GRUPO OI será **inexoravelmente dilapidado**, comprometendo de forma **irreversível** o êxito desta recuperação judicial.

105.    Esclareça-se, por oportuno, que a concessão de tutelas de urgência com a finalidade de suspender a exigibilidade das obrigações que se vencerem até a data da assembleia geral de credores que irá deliberar sobre a proposta de aditamento é perfeitamente possível no âmbito de um processo de recuperação judicial, sendo tal possibilidade reconhecida pelo Prof. PAULO PENALVA – uma das principais autoridades em Direito Comercial no Brasil – em nota técnica elaborada especificamente para o caso concreto (doc. 4, pp. 10/11):

> "47. Pois bem, a partir da introdução, no direito positivo, do c:onsequencialismo jurídico e à luz da ponderação dos interesses envolvidos, a perspectiva de insucesso do processo de soerguimento de empresa viável corresponde a uma realidade a ser levada em consideração na decisão de manter, ou não, a exigibilidade das obrigações que se vencerem até deliberação dos credores afetados pela proposta de aditamento ao PRJ original.
>
> 48. Verificada a presença dos requisitos autorizativos previstos no Código de Processo Civil ("CPC") (art. 300 e seguintes), é possível a concessão de tutela de urgência com a finalidade de suspender a exigibilidade das obrigações que se vencerem até a data da assembleia geral de credores que irá deliberar sobre a proposta de aditamento, e para que os credores a serem reestruturados não possam promover constrições no patrimônio do devedor neste mesmo período.
>
> 49. A aplicação subsidiária de disposições do CPC ao processo de recuperação judicial é expressamente admitida pelo art. 189 da Lei nº 11. lO 1/2005, sendo cabível - como de regra ocorre na aplicação subsidiária - se houver omissão na lei específica e não houver incompatibilidade da norma do CPC com o processo recuperacional.". (doc. 4, pp. 10/11)

106.    Feito esse esclarecimento, convém destacar que os requisitos previstos no art.

300 do CPC encontram-se devidamente preenchidos. A **probabilidade do direito** invocado pelo GRUPO OI – possibilidade de apresentação e de votação do ADITAMENTO em Assembleia Geral de Credores – é manifesta no presente caso.

107.    Nos termos do art. 35, I, alínea "a" da LRE, "*[a] assembléia-geral de credores terá por atribuições deliberar sobre: I – na recuperação judicial: a) aprovação, rejeição ou* **modificação do plano de recuperação judicial apresentado pelo devedor**".

108.    A respeito do tema, ensina MARCELO BARBOSA SACRAMONE que "*do mesmo modo que a Assembleia Geral de Credores tem atribuição exclusiva para apreciar o plano de recuperação judicial,* **também possuirá atribuição exclusiva para apreciar o pedido de aditamento ou alteração do plano de recuperação judicial anteriormente aprovado pelos credores. A deliberação a respeito do aditamento será feita da mesma forma que em face do plano de recuperação judicial. Tanto os requisitos para a convocação da AGC quanto o quórum de instalação e de deliberação serão os mesmos**" (Marcelo Barbosa Sacramone. Comentários à Lei de Recuperação de Empresas e Falência. 4ª edição. São Paulo: SaraivaJur, 2023. p. 166).

109.    Por sua vez, a jurisprudência do e. Superior Tribunal de Justiça endossa a possibilidade de apresentação de aditivo ao plano de recuperação judicial quando novas situações justificam uma mudança nas disposições contidas em plano de recuperação judicial aprovado pelos credores:

> "RECURSO ESPECIAL. DIREITO EMPRESARIAL. FALHA NA PRESTAÇÃO JURISDICIONAL. INEXISTÊNCIA. RECUPERAÇÃO JUDICIAL. ENCERRAMENTO. PLANO DE RECUPERAÇÃO. ADITIVOS. TERMO INICIAL. PRAZO BIENAL. CONCESSÃO. BENEFÍCIO. HABILITAÇÕES PENDENTES. IRRELEVÂNCIA.(...) 8. **A apresentação de aditivos ao plano de recuperação judicial pressupõe que o plano estava sendo cumprido e, por situações que somente se mostraram depois, teve que ser modificado, o que foi admitido pelos credores**. Não há, assim, propriamente uma ruptura da fase de execução, motivo pelo qual inexiste justificativa para a modificação do termo inicial da contagem do prazo bienal para o encerramento da recuperação judicial. 9. A existência de

habilitações/impugnações de crédito ainda pendentes de trânsito em julgado, o que evidencia não estar definitivamente consolidado o quadro geral de credores, não impede o encerramento da recuperação. 10. Recurso especial não provido." (REsp n. 1.853.347/RJ, Min. Rel. Ricardo Villas Bôas Cueva, Terceira Turma, julgado em 5.5.2020)

-.-.-.-

"AGRAVO INTERNO NO AGRAVO EM RECURSO ESPECIAL. PROCESSUAL CIVIL. RECUPERAÇÃO JUDICIAL. TERMO INICIAL DO PRAZO DE FISCALIZAÇÃO. DATA DA CONCESSÃO DA RECUPERAÇÃO. ADITIVOS AO PLANO. ALTERAÇÃO DO TERMO. DESNECESSIDADE. AGRAVO INTERNO PROVIDO. AGRAVO CONHECIDO. RECURSO ESPECIAL PROVIDO. 1. "<u>A apresentação de aditivos ao plano de recuperação judicial pressupõe que o plano estava sendo cumprido e, por situações que somente se mostraram depois, teve que ser modificado, o que foi admitido pelos credores. Não há, assim, propriamente uma ruptura da fase de execução, motivo pelo qual inexiste justificativa para a modificação do termo inicial da contagem do prazo bienal para o encerramento da recuperação judicial</u>" (REsp 1.853.347/RJ, Rel. Ministro RICARDO VILLAS BÔAS CUEVA, TERCEIRA TURMA, julgado em 05/05/2020, DJe de 11/05/2020). 2. O acórdão recorrido, ao alterar a data do termo inicial para o término do prazo de carência, decidiu em dissonância com a jurisprudência desta Corte de Justiça, devendo ser restabelecida a decisão objeto de agravo de instrumento. 3. Agravo interno provido para reconsiderar a decisão agravada e, em nova análise, conhecer do agravo edar provimento ao recurso especial." (AgInt no AREsp n. 1.663.617/SP, Min. Rel. Raul Araújo, Quarta Turma, julgado em 22.11.21)

-.-.-.-

"RECURSO ESPECIAL. RECUPERAÇÃO JUDICIAL. MODIFICAÇÃO DO PLANO DE RECUPERAÇÃO APÓS O BIÊNIO DE SUPERVISÃO JUDICIAL. POSSIBILIDADE, DESDE QUE NÃO TENHA OCORRIDO O ENCERRAMENTO DAQUELA. PRINCÍPIO DA PRESERVAÇÃO DA EMPRESA. ALTERAÇÃO SUBMETIDA À ASSEMBLEIA GERAL DE CREDORES. SOBERANIA DO ÓRGÃO. DEVEDOR DISSIDENTE QUE DEVE SE SUBMETER AOS NOVOS DITAMES DO PLANO. PRINCÍPIOS DA RELEVÂNCIA DOS INTERESSES DOS CREDORES E DA PAR CONDITIO CREDITORUM. 1. O legislador brasileiro, ao elaborar o diploma recuperacional, traçou alguns princípios, de caráter axiológico-programático, com o intuito de manter a solidez das diversas normas que compõem a referida legislação. Dentre todos, destacam-se os princípios da relevância dos interesses dos credores; par conditio creditorum; e da preservação da empresa, os quais são encontrados no artigo 47 da Lei 11.101/2005. 2. Essa base principiológica serve de alicerce para a

constituição da Assembleia Geral de Credores, a qual possui a atribuição de aprovar ou rejeitar o plano de recuperação judicial, nos moldes apresentados pelo Administrador Judicial da empresa recuperanda. 3. Outrossim, por meio da "Teoria dos Jogos", percebe-se uma interação estratégica entre o devedor e os credores, capaz de pressupor um consenso mínimo de ambos a respeito dos termos delineados no plano de recuperação judicial. Essas negociações demonstram o abandono de um olhar individualizado de cada crédito e um apego maior à interação coletiva e organizada. 4. <u>Discute-se, na espécie, sobre a modificação do plano originalmente proposto, após o biênio de supervisão judicial - constante do artigo 61 da Lei de Falências -, sem que houvesse o encerramento da recuperação judicial da empresa recuperanda. Ainda que transcorrido o prazo de até 2 anos de supervisão judicial, não houve, como ato subsequente, o encerramento da recuperação, e, por isso, os efeitos da recuperação judicial ainda perduram, mantendo assim a vinculação de todos os credores à deliberação da Assembleia</u>. 5. Recurso especial provido." (REsp n. 1.302.735/SP, Min. Rel. Luis Felipe Salomão, Quarta Turma, julgado em 17.3.2016)

110.    Os precedentes suscitados acima são aplicáveis ao presente caso pois, consoante detalhado acima, por causas alheias ao controle das RECUPERANDAS e diante da frustração das premissas assumidas quando da elaboração do PLANO (condições de arrematação da UPI ClientCo, fluxo das condenações trabalhistas, atrasos para a migração do regime de STFC para autorização etc.), são necessárias alterações de algumas das disposições contidas no PLANO, a fim de sanar as dificuldades de fluxo de caixa de curto prazo.

111.    Além disso, o GRUPO OI, por todas as razões já detalhadas de forma exaustiva nos itens 26/93 acima – às quais as RECUPERANDAS apenas fazem referência, para não tornar essa petição desnecessariamente longa –, também comprovou a necessidade de se modificar o PRJ aprovado pelos credores, bem como aprovar o ADITAMENTO.

112.    Também atestando, para o caso específico, a viabilidade da apresentação do ADITAMENTO, veja-se a opinião de PAULO PENALVA em sua nota técnica:

"11. Assim, é possível que um devedor apresente modificativo ao plano de recuperação judicial aprovado em assembleia-geral de credores. A possibilidade decorre não apenas da ausência de proibição legal e da liberdade contratual (art. 5º, inciso II da Constituição da

República e art. 421 do Código Cível), como está prevista no art. 35, inciso "I", alínea "a", da Lei nº 11.101/2005, ao dispor que compete à AGC deliberar, na recuperação judicial, sobre a 'aprovação, rejeição **ou modificação do plano de recuperação judicial** apresentado pelo devedor'.

12. A jurisprudência consagra esse entendimento de que, apresentada uma proposta de modificação do PRJ, deve ser convocada uma AGC para deliberar a respeito. **Portanto, o PRJ homologado pode sofrer alteração enquanto a recuperação judicial não estiver encerrada.**". (doc. 4, p. 4)

113.    E por fim, consoante exposto nos itens 43/54 acima, a necessidade de alteração de algumas poucas previsões do PRJ, mormente aquelas relativas a obrigações de curto prazo, não significa que o GRUPO OI não seja viável. Muito pelo contrário, o Laudo Econômico-Financeiro anexo (doc. 3) atestou a viabilidade econômico-financeira das atividades das RECUPERANDAS e a possibilidade de superação da crise liquidez mediante a implementação das novas condições propostas no ADITAMENTO, sendo imprescindível, portanto, que ele seja analisado e votado em Assembleia Geral de Credores.

114.    De modo similar, há **perigo de dano** iminente e o **risco ao resultado útil** da presente recuperação judicial caso as medidas pleiteadas pelas RECUPERANDAS nos itens 103 acima não sejam deferidas.

115.    As RECUPERANDAS enfrentam dificuldades de fluxo de caixa de curto prazo, em razão de diversos fatores externos já expostos. Além disso, projetam uma redução expressiva de sua liquidez nos próximos meses, em virtude da manutenção prolongada de custos operacionais, sem o aumento de receitas na mesma proporção. Tal cenário acarreta o risco concreto de que as RECUPERANDAS não consigam cumprir integralmente suas obrigações financeiras de curto prazo previstas no PRJ, até a realização da AGC que deliberará sobre o ADITAMENTO.

116.    Essa situação ameaçaria os esforços que vêm sendo empreendidos pela Nova Governança da OI, juntamente com seus credores, em prol de sua reestruturação, o

que seria prejudicial a todos os *stakeholders* do GRUPO OI. Essa circunstância seria especialmente danosa pelo cenário descrito nos itens 55/70 acima, isto é, em que o GRUPO OI, sob a liderança da sua Nova Governança, vem apresentando sólidos resultados indicando o seu crescimento econômico, a sua viabilidade econômico-financeira e a retomada financeira e operacional pelas novas operações estratégicas do grupo (cf. itens 43/54 *supra*).

117.    O deferimento das medidas também é imperioso em razão do princípio da preservação e da função social da empresa. A recuperação judicial é a **maior** da América Latina, havendo milhares de credores, inclusive 2.340 trabalhistas, que dependem da manutenção de suas atividades para receberem seus créditos. Além disso, a preservação das atividades do GRUPO OI também permitirá a manutenção dos **21.955 empregos diretos e indiretos gerados pelas RECUPERANDAS**.

118.    Por sua vez, o prosseguimento das execuções movidas contra as RECUPERANDAS relativas a créditos ou obrigações sujeitos ao ADITAMENTO – em especial as execuções que tramitam perante a Justiça do Trabalho – **representa grave risco à continuidade das atividades do GRUPO OI**.

119.    Nesse sentido, o prosseguimento dessas execuções – as quais são lastreadas em créditos que serão reestruturados na forma do ADITAMENTO – possibilitará a implementação de inúmeras medidas constritivas contra o patrimônio das RECUPERANDAS, as quais poderão ter como resultado o bloqueio de recursos importantíssimos que precisam ser utilizados pelo GRUPO OI para a manutenção de suas operações.

120.    Há, assim, o **risco iminente** de que o prosseguimento dessas execuções, com a consequente implementação de eventuais medidas constritivas contra as RECUPERANDAS, crie um efeito cascata, dificultando as operações do GRUPO OI antes mesmo dos credores negociarem e votarem o ADITAMENTO, em prejuízo aos interesses de milhares de credores e dos 21.955 empregados diretos e indiretos do GRUPO OI.

121.    Em resumo, o GRUPO OI, por meio das tutelas de urgência requeridas nesta petição, busca tão somente assegurar o resultado útil da reestruturação proposta no ADITAMENTO, viabilizando que possa ser negociada e votada pelos credores em AGC a ser designada por esse MM. Juízo. Nada além disso.

122.    Não haveria sentido lógico manter a obrigação de pagamento do PRJ original vigente e exigível, se, nesta manifestação, o GRUPO OI está apresentando um ADITAMENTO justamente para alterar tais obrigações, por manifesta impossibilidade de cumpri-las concomitantemente à rotina da sua operação. Seria um ato contraditório com o próprio escopo do ADITAMENTO.

123.    No entanto, **a viabilidade dessas negociações exige, como condição indispensável, a suspensão**, por até 180 dias – prazo, em princípio, suficiente para a realização do conclave e de todos os atos legais que necessariamente o antecedem (por exemplo, apresentação de objeções, publicação de edital, etc.) –, da exigibilidade das disposições contidas no PRJ, das execuções movidas contra as RECUPERANDAS relativas a créditos ou obrigações sujeitos ao ADITAMENTO e da possibilidade de vencimento antecipado de obrigações, a fim de **afastar** os riscos ao seu soerguimento no curso das negociações.

124.    Como se adiantou, o Prof. PAULO PENALVA atestou em sua nota técnica a possibilidade da concessão de tutela de urgência para suspender a exigibilidade das obrigações contidas no PRJ, bem como as execuções movidas contra a Recuperanda, quando a devedora demonstrou a necessidade de modificação do plano originalmente aprovado pelos credores. Nesse sentido:

> "50. A previsão do *stay period* como efeito do deferimento do processamento da recuperação judicial garante a suspensão das execuções e constrições enquanto o devedor negocia as condições de equacionamento de suas dívidas, **proteção que se mostra compatível com a suspensão da exigibilidade de determinadas obrigações também após a apresentação de proposta de aditamento ao PRJ**, a perdurar até a realização da assembleia-geral de credores que irá deliberar sobre tal proposta do devedor. **A finalidade da suspensão promovida, em um momento inicial, pelo *stay period*, é rigorosamente a mesma daquela que**

será gerada por força da apresentação do aditamento, valendo, nesta
hipótese, as mesmas considerações constantes dos itens 28 a 36 acima."
(doc. 4, p. 11).

125.    Como demonstrado pelo Prof. PAULO PENALVA, embora o art. 6º, §4º, da LRE
seja hipótese legal típica de suspensão de obrigações, criada para o período prévio à
aprovação do plano de recuperação judicial, nada impede a concessão de **outras**
medidas cautelares **atípicas**, com fundamento no art. 300 do CPC e no art. 189 da
LRE, sobretudo num cenário em que a medida protetiva tem finalidade meramente
assecuratória e se presta, rigorosamente, à mesma finalidade do *stay period*, que é
permitir a continuidade da empresa **viável** acometida por dificuldades momentâneas
de fluxo de caixa de curto prazo, enquanto ela renegocia os seus débitos.

126.    Em suas palavras, "*§4º do art. 6º da Lei n~ 11.101/2005 trata de hipótese
legal de suspensão das obrigações do devedor que tem o processamento da sua
recuperação judicial deferido. No entanto, **isso não impede a suspensão em outras
hipóteses não expressamente previstas na legislação, desde que se demonstre que o
stay period é medida necessária para permitir a renegociação dos débitos,** e estejam
atendidos os requisitos do art. 300 do CPC.*" (doc. 4, p. 11, grifou-se).

127.    Conforme ressaltado pelo eminente professor, essa medida poderia até
mesmo ser fundamentada no poder geral de cautela do juiz – inclusive porque ela
visa a garantir a própria efetividade do ADITAMENTO, já que seria até mesmo
contraditório com essa proposta se, durante a pendência das negociações, o GRUPO
OI seguisse pagando os créditos nos termos do PLANO que será modificado:

"54. Ademais, **o** *stay period* **também poderia estar fundamentado no
poder geral de cautela do juiz de determinar as medidas adequadas para
assegurar o resultado útil do processo** (art. 297 do CPC). O resultado útil,
na hipótese, é eventual aprovação de alteração do PRJ, que é o
instrumento mais importante para o soerguimento da empresa. Sem o stay
period, os credores afetados poderão cobrar individualmente os seus
créditos e comprometer a efetiva recuperação da devedora. Até porque, <u>a
manutenção da obrigação de pagar os valores constantes do PRJ após a
apresentação do Aditamento ao PRJ poderia representar, em última
instância, comportamento contraditório com a própria necessidade de ser</u>

**aditado o PRJ. Afinal, .se a devedora pudesse pagar as dívidas nas condições do PRJ, ela não teria a necessidade de promover o seu aditamento.**

55. Se o poder geral de cautela permite ao juiz até mesmo o deferimento de medidas atípicas, com muito mais razão permitiria o deferimento do *stay period*, que é uma medida típica (art. 6º, inciso 1, da Lei nº 11.101/2005)." (doc. 4, pp. 11 e 12, grifou-se).

128.    Não é só. A jurisprudência, ao analisar caso análogos ao presente, também tem admitido medidas semelhantes.

129.    Providências idênticas às aqui pretendidas foram **concedidas** pelo MM. Juízo da 1ª Vara Empresarial do Rio de Janeiro na recuperação judicial do GRUPO CONSTELLATION[16], empresa líder em desempenho em operações no pré-sal, para exploração de petróleo e gás no Brasil. No curso de sua recuperação judicial, concedida em 12.7.2019, as Recuperandas passaram a enfrentar problemas de fluxo de caixa, por razões externas, e precisaram aditar o plano de recuperação judicial.

130.    Para assegurar a liquidez de sua operação e a manutenção de caixa durante a renegociação do plano de recuperação judicial, as recuperandas formularam, em 06.04.2021, pedido de tutela de urgência para **(i)** concessão de prazo para a apresentação de aditivo, **com a suspensão da exigibilidade das obrigações previstas no PRJ vigente, até que o aditivo fosse aprovado e homologado**; e **(ii)** a extensão do período de supervisão judicial do processo de recuperação judicial por mais 12 (doze) meses, o que foi **deferido** pelo MM. Juízo Recuperacional[17], em decisão mantida pela e. 16ª Câmara Cível do e. Tribunal de Justiça do Rio de Janeiro:

---

[16] TJRJ, nº 0288463-96.2018.8.19.0001, 1ª Vara Empresarial do Rio de Janeiro. Decisão: 7.4.2021.

[17] "Fls. 124169/124185: considerando as razões expostas pelas recuperandas, razões essas que dispensam maiores esclarecimentos, lhes concedo prazo para a apresentação de aditivo ao plano, **determinando desde já a suspensão da exigibilidade das obrigações do plano, principais e acessórias, sendo consideradas todas inexigíveis até que um novo aditivo seja apresentado, aprovado e homologado**, incluindo a obrigação acessória de manutenção de liquidez mínima, prevista no plano e nos seus anexos novos instrumentos de reestruturação, bem como nos acordos homologados nestes autos, deferindo, ainda, a extensão do período de supervisão deste juízo com relação a presente recuperação judicial por mais 12 (doze) meses contados desta data.".

"(...) Decisão que, acolhendo motivos relacionados à pandemia, **deferiu o pedido das Recuperandas de suspensão das obrigações pactuadas no PRJ primitivo até que novo conclave aprove, ou não, aditivo a ser apresentado. Inconformismo de parte dos credores.** (...) 3. Descumprido o Plano de Recuperação, mormente diante de contextos econômicos extraordinários, é legítimo o deferimento de prazo a credores e recuperandas para a elaboração e apresentação de plano substituto, mercê do Princípio da Preservação da Empresa e da iniquidade de uma possível aplicação automática do artigo 73, IV, da Lei 11.101. **4. Proteção da recuperanda contra ações e execuções que pode ser deferida como instrumento de apoio à nova crise da empresa, impedindo ataques capazes de inviabilizarem a apresentação de novo plano.** Proteção que, contudo, não pode ser dada por prazo indeterminado, ou 'até que um novo aditivo seja apresentado', submetendo-se os credores ao talante das recuperandas. 5. Prazo de proteção fixado em 90 dias do deferimento da apresentação de novo plano, acrescido de mais 60 para a manifestação dos credores em nova assembleia.". (TJ-RJ, 16ª Câm. Cív. AI nº 0032565-80.2021.8.19.0000, Rel. Des. Eduardo Gusmão Alves de Brito Neto, j. 1.8.2022)

131.    Destaca-se ainda a decisão proferida pelo MM. Juízo da 1ª Vara Empresarial do Rio de Janeiro nos autos da recuperação judicial da J.J. MARTINS, deferindo providências voltadas à preservação da empresa, inclusive determinando a suspensão da exigibilidade das obrigações concursais.[18]

132.    Da mesma maneira, na recuperação judicial da WERNER, determinou-se "*a SUSPENSÃO do cumprimento do plano de recuperação judicial pelo prazo de 6 (seis) meses, a contar do mês de março*" [19]. Na recuperação judicial de GPC, por sua vez, foi determinada a "*suspensão do pagamento de todos os créditos concursais pelo prazo de 90 dias*" [20].

133.    Considerando **(i)** a necessidade da repactuação de determinadas cláusulas do PLANO; **(ii)** a apresentação do anexo Laudo Econômico-Financeiro atestando a viabilidade econômico-financeira das atividades das RECUPERANDAS (doc. 3); e **(iii)** a

---

[18] TJRJ, nº 0053441-63.2015.8.19.0001, 1ª Vara Empresarial do Rio de Janeiro. Decisão: 22.5.20.

[19] TJRJ, nº 0007270-46.2020.8.19.0042, 4ª Vara Cível de Petrópolis. Decisão: 16.6.20.

[20] TJRJ, nº 0116330-24.2013.8.19.0001, 7ª Vara Empresarial do Rio de Janeiro. Decisão: 6.4.20.

imprescindibilidade de se preservar as atividades das RECUPERANDAS durante o tempo necessário à negociação, repactuação, aprovação e homologação das obrigações previstas no ADITAMENTO (docs. 1 e 2), a concessão da tutela de urgência ora pleiteada é medida que se impõe no presente caso.

134.    A não concessão da medida comprometerá gravemente a continuidade das atividades das RECUPERANDAS, expondo-as a execuções e constrições patrimoniais que inviabilizam a manutenção de suas operações e, por consequência, colocam em risco o cumprimento das obrigações previstas no ADITAMENTO, frustrando os objetivos do processo recuperacional e da LRE.

135.    Por fim, cumpre notar que diversos contratos firmados com fornecedores de produtos e serviços ao GRUPO OI possuem cláusulas resolutivas expressas (cláusulas *ipso facto*), que preveem a rescisão das avenças, de pleno direito, em situações como a presente. A partir da apresentação deste ADITAMENTO, há risco de que fornecedores essenciais do GRUPO OI acionem tais cláusulas, o que afetaria a operação do GRUPO OI antes que seus credores apreciassem o ADITAMENTO.

136.    Nesse contexto, também como forma de preservar o resultado útil da medida aqui proposta, é necessário que a eficácia das aludidas cláusulas seja suspensa, em atenção ao princípio da preservação da empresa, conforme vem reiteradamente sido deferido por esse Tribunal de Justiça do Estado do Rio de Janeiro, sob o entendimento de que tais disposições são abusivas e incompatíveis com tal princípio[21].

---

[21] Medidas assim foram deferidas tanto na 1ª Recuperação Judicial do GRUPO OI, quanto em sede cautelar nesta 2ª Recuperação Judicial, quando se determinou a suspensão das cláusulas de todos os contratos que previssem a rescisão pelo simples fato da distribuição da recuperação judicial. Confira-se, a respeito, o que a 8ª Câmara Cível consignou ao confirmar a decisão proferida na 1ª RJ: "AGRAVO INTERNO EM AGRAVO DE INSTRUMENTO. DIREITO EMPRESARIAL, ADMINISTRATIVO E PROCESSO CIVIL. RECUPERAÇÃO JUDICIAL. IRRESIGNAÇÃO CONTRA DECISÃO DE INDEFERIMENTO DE EFEITO SUSPENSIVO. **SOBRESTAMENTO DE EFICÁCIA DE CLÁUSULA DE RESCISÃO CONTRATUAL. Ponderação entre o rigor contratual de vínculo negocial entre as partes e a função social da atividade desenvolvida pela agravada que enseja a manutenção do fornecimento de produtos pelo agravante para evitar a risco de prejuízo às atividades da pelo agravada.** CONHECIMENTO E DESPROVIMENTO do recurso." (TJRJ, 8ª CC, AI nº 0038854-05.2016.8.19.0000, Des. Relator Cézar Augusto Rodrigues Costa, j. 14.2.2017). Medidas idênticas foram deferidas na Recuperação Judicial das AMERICANAS (TJRJ, 4ª Vara

137.    Assim, o GRUPO OI, com fundamento no art. 300 do CPC, confia em que
V.Exa. concederá a tutela de urgência requerida abaixo, em caráter *inaudita altera
parte*, para o fim de (i) suspender, por 180 dias, a exigibilidade das obrigações
previstas no PRJ, com a subsequente proibição de alegação de descumprimento do
PRJ e/ou ajuizamento de ações de falência ou de execuções movidas contra o GRUPO
OI relativas a créditos ou obrigações sujeitas ao ADITAMENTO; (ii) proibir, por 180
dias, qualquer forma de retenção, arresto, penhora, sequestro, busca e apreensão e
constrição judicial e/ou extrajudicial sobre os bens das RECUPERANDAS, oriunda de
demandas judiciais e/ou extrajudiciais cujos créditos ou obrigações sujeitem-se ao
ADITAMENTO; e (iii) impedir a decretação de inadimplemento e/ou vencimento
antecipado de qualquer obrigação com fundamento na apresentação do ADITAMENTO
(cláusulas *ipso facto*).

138.    Por fim, cumpre esclarecer que as medidas aqui pleiteadas implicariam
apenas na **suspensão** provisória da exigibilidade das obrigações do PLANO, de modo
que, na remota hipótese em que a proposta de ADITAMENTO não venha a ser aprovada
(*quod non!*), a consequência não será aquela prevista no §8º do art. 56 da LRE, mas
a cessação do sobrestamento do PLANO, que continuará vigente.

## PEDIDOS

139.    Por todo exposto, as RECUPERANDAS confiam em que V.Exa., após o
deferimento da tutela de urgência requeridas nos itens 103 e 137 acima, em caráter

---

Empresarial, Processo nº 0803087-20.2023.8.19.0001, Juiz de Direito Paulo Assed, proferida em
13.1.2023) e por diversos outros Tribunais de Justiça do país (TJSP, 2ª Câmara Reservada de Direito
Empresarial, AI nº 2017701-76.2019.8.26.0000, Rel. Des. Maurício Pessoa, j. 10.6.2019; TJRS, 6ª
CC, AI nº 70052212727, Rel. Des. Artur Arnildo Ludwig, j. 20.6.2013; e TJPR, 17ª CC, AI nº
1.292.381-0, Des. Rel. Luis Sérgio Swiech, j.22.72015).

Esse também é o entendimento da doutrina, que reconhece a **nulidade de cláusula *ipso facto***, pois
*"são objetivos do direito da insolvência criar condições para a recuperação da empresa, quando
viável, e maximizar o valor do patrimônio liquidado no caso da falência, para distribuí-lo conforme
a hierarquia legal de prioridades"; ao que podem acrescer-se os objetivos de preservar o valor atual
da alocação dos ativos da empresa devedora, **de modo a viabilizar sua recuperação. Portanto,
conforme autorizada opinião de Deborah Kirschbaum, a decisão que defere o processamento não
autoriza que o credor invoque a cláusula resolutiva expressa por insolvência***" (AYOUB, Luiz
Roberto. CAVALLI, Cássio Machado. A construção jurisprudencial da recuperação judicial de
empresas – 4. ed., Rio de Janeiro: Forense, 2020, grifou-se).

*inaudita altera parte* diante do iminente risco em que o GRUPO OI se encontra de sofrer agressivas constrições em seu patrimônio, **(i)** intimará os credores, o i. Ministério Público e os i. Administradores Judiciais para tomarem ciência a respeito do ADITAMENTO e do Laudo Econômico-Financeiro (docs. 1, 2 e 3); e **(ii)** determinará a expedição do edital referido no art. 52, §1º, da LRE, dando ciência a respeito da apresentação do ADITAMENTO e do Laudo Econômico-Financeiro, intimando os credores para apresentarem eventuais objeções.

140.    Por fim, o GRUPO OI requer que todas as intimações e publicações sejam feitas, cumulativa e exclusivamente, em nome dos advogados signatários desta manifestação, sob pena de nulidade (art. 272, §1º, do CPC).

Nestes termos
P. deferimento.
Rio de Janeiro, 1º de julho de 2025.

| | | |
|---|---|---|
| Marcos Pitanga Ferreira | Thiago Peixoto Alves | Paulo Padis |
| OAB/RJ 144.825 | OAB/SP 301.491 | OAB/RJ 139.860- A |
| | | |
| Luiz Carlos Malheiros França | João Felipe Martins de Almeida | Talitha Aguillar Leite |
| OAB/RJ 163.989 | OAB/RJ 200.664 | OAB/SP 344.859 |
| | | |
| João Felipe Lynch Meggiolaro | Helena Acker Caetano | Mariana Leoni Beserra |
| OAB/RJ 216.273 | OAB/RJ 230.206 | OAB/SP 443.636 |
| | | |
| Fernanda Anuda | Edson Bossonaro Júnior | |
| OAB/RJ 241.307 | OAB/RJ 264.022 | |
| | | |
| Diana Lise Freitas | Luís Fellipe Freitas | |
| OAB/RJ 256.584 | OAB/RJ 261.146 | |

| LISTA DE DOCUMENTOS |
|---|
| **-** | Procuração e Atos Societários |
| **Doc. 01** | Aditamento ao Plano de Recuperação Judicial da OI, PTIF e OI COOP |
| **Doc. 02** | *Redline* comparativo entre o PLANO homologado de 19.4.2024 e o ADITAMENTO DO PLANO |
| **Doc. 03** | Laudo de Viabilidade Econômico-Financeira do ADITAMENTO AO PLANO |
| **Doc. 04** | Nota Técnica do Prof. Paulo Penalva |
| **Doc. 05** | Formulário de Referência às Demonstrações Financeiras Consolidadas do GRUPO OI de dezembro de 2024 |
| **Doc. 06** | Demonstrações Financeiras intermediárias do 1º Trimestre de 2025 do Grupo Oi |
| **Doc. 07** | Apresentação das Demonstrações Financeiras intermediárias do 1º Trimestre de 2025 do Grupo Oi |

---

**ADITAMENTO AO PLANO DE RECUPERAÇÃO JUDICIAL CONSOLIDADO DE**

**OI S.A. – EM RECUPERAÇÃO JUDICIAL**

**PORTUGAL TELECOM INTERNATIONAL FINANCE BV – EM RECUPERAÇÃO JUDICIAL**

**OI BRASIL HOLDINGS COÖPERATIEF UA – EM RECUPERAÇÃO JUDICIAL**

1º de julho de 2025

---

TJRJ CAP EMP07 202502824750 01/07/25 22:50:17138550 PROGER-VIRTUAL

Após a implementação de diversas medidas de reestruturação previstas no plano de recuperação judicial conjunto aprovado em assembleia geral de credores em 19 de abril de 2024 e homologado por decisão proferida em 28 de maio de 2024 pela 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro ("Juízo da Recuperação Judicial") ("Plano"), conforme detalhado abaixo, a Nova Gestão do Grupo Oi (conforme definido abaixo) identificou alguns indicadores de ordem econômico-financeira que afetam o cumprimento das obrigações de curto prazo previstas no Plano. Neste contexto, diante da necessidade de reestruturação das condições de pagamento de determinados credores para a adequação da geração de caixa e do fluxo de pagamento do Grupo Oi no curto prazo, as sociedades **OI S.A. – Em Recuperação Judicial** ("Oi" ou "Companhia"), sociedade anônima de capital aberto, inscrita no CNPJ/MF sob o nº 76.535.764/0001-43, com sede e principal estabelecimento na Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V**. **– Em Recuperação Judicial** ("PTIF"), pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, com sede em Amsterdam, Delflandllan 1 (Queens Tower), Office 806, 1062 EA, e principal estabelecimento nesta cidade do Rio de Janeiro; e **OI BRASIL HOLDINGS COÖPERATIEF U.A. – Em Recuperação Judicial** ("Oi Coop"), pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, com sede em Amsterdam, Delflandllan 1 (Queens Tower), Office 806, 1062 EA, e principal estabelecimento nesta cidade do Rio de Janeiro (sendo Oi, PTIF e Oi Coop em conjunto doravante denominadas como "Grupo Oi" ou "Recuperandas"), apresentam, nos autos do processo de recuperação judicial nº 0090940-03.2023.8.19.0001 (migrado do processo nº 0809863-36.2023.8.19.0001 – PJe) ("Recuperação Judicial"), em curso perante o Juízo da Recuperação Judicial, este aditamento ao Plano ("Aditamento"), nos termos dos artigos 45 e 48 da Lei 11.101/2005 ("LRF"), conforme alterada, pelas razões a seguir expostas.

1.    DEFINIÇÕES E REGRAS DE INTERPRETAÇÃO

**1.1.    Definições e Interpretação.** Os termos e expressões utilizados neste Aditamento em letras maiúsculas terão os significados a eles atribuídos no Plano, exceto se expressamente alterados por meio do presente Aditamento, nos termos do **Anexo 1.1**. Os princípios e regras de interpretação descritos no Plano são, por meio desta cláusula, incorporados e se aplicam integralmente a este Aditamento. Todos e quaisquer termos definidos neste Aditamento deverão ser incorporados ao Plano.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

**2. HISTÓRICO DE REESTRUTURAÇÃO DO GRUPO OI E OBJETIVOS DESTE ADITAMENTO AO PLANO**

**2.1. Primeira Recuperação Judicial.** Ao longo das últimas décadas, após a privatização dos serviços de telecomunicações no Brasil em 1998, a perda de relevância da telefonia fixa no novo contexto da prestação dos serviços, associados à abrangência e aos custos necessários para cumprimento de todas as obrigações da concessão, foram elementos determinantes para a drástica redução da lucratividade das operações do Grupo Oi.

Além da rápida mudança no setor de telecomunicações, com o surgimento de novas tecnologias e necessidade de manutenção da concessão, uma grave crise financeira e a precarização dos indicadores fiscais brasileiros aumentaram drasticamente a dívida da Oi, especialmente alta pela necessidade de investimentos para antecipar o cumprimento de metas de universalização impostas pela ANATEL, bem como, naquela ocasião, para permitir a aceleração da exploração dos serviços móveis (em 2022 pela Telemar e, em 2004, pela Brasil Telecom, hoje Oi).

O nível de endividamento foi sensivelmente impactado pelos altos índices de inflação brasileiros, somado à depreciação da moeda nacional frente ao dólar norte americano. Desta feita, diferente do que acontecia com os seus competidores diretos, que se financiavam por meio de suas controladoras no exterior, com juros e inflação muito mais baixos, a Oi foi massivamente impactada na sua estrutura de capital.

Para piorar a situação, a aquisição da Brasil Telecom, viabilizada por meio de alteração no decreto do Plano Geral de Outorgas (Decreto nº 6.654/2008) e aprovada com diversos condicionamentos e obrigações pela ANATEL no final de 2008 (ato nº 7.828/2008), acabou revelando contingências que geraram grandes perdas de caixa e de resultado para a operação e que geram, até hoje, significativas ineficiências.

Diante do cenário de crise financeira e mercadológica, em junho de 2016, a Oi ajuizou pedido de recuperação judicial ("Primeira Recuperação Judicial"), de modo que o pedido de processamento da recuperação judicial foi deferido em 29 de junho de 2016 pelo Juízo da Recuperação Judicial, reconhecendo a viabilidade da Companhia e, principalmente, a importância da sua sobrevivência, não apenas para os seus credores, como para os seus milhares de empregados e para o Brasil.

O Plano da Primeira Recuperação Judicial, aditado em 2020 ("Aditamento ao Plano da Primeira Recuperação Judicial"), previa diversas medidas para a reestruturação da sua dívida financeira e para implementação do seu novo plano estratégico de negócios, dentre elas: *(i)* aumentos de

capital; *(ii)* alienação de parte dos seus ativos *non core*; e *(iii)* alienação de bens do seu ativo não circulante.

Os aumentos de capital foram realizados entre julho de 2018 e janeiro de 2019. Diante da conversão de dívida em capital, bem como a subscrição e integralização de novas ações, o passivo líquido das Recuperandas foi reduzido em mais de R$ 11.000.000.000,00 (onze bilhões de Reais) e o valor total de R$ 4.000.000.000,00 (quatro bilhões de Reais) foi aportado no Grupo Oi.

A alienação dos ativos *non core* do Grupo Oi também foi um mecanismo utilizado pelas Recuperandas para reestruturação da sua dívida. Dentre as operações efetivadas, o Grupo Oi realizou a venda das participações acionárias que detinha na PT Ventures SGPS, S.A., concluída em 24 de janeiro de 2020, e na Cabo Verde Telecom S.A., concluída em 21 de maio de 2019, permitindo uma verdadeira transformação operacional do Grupo Oi.

Não obstante todas as medidas implementadas, o Grupo Oi realizou a venda *(i)* da operação de rede de telecomunicações baseada em fibra ótica, sob a forma da UPI InfraCo ("UPI InfraCo"), em uma transação que totalizou R$ 12.923.338.290,68 (doze bilhões, novecentos e vinte e três milhões, trezentos e trinta e oito mil, duzentos e noventa Reais e sessenta e oito centavos); *(ii)* da operação em telefonia e dados no mercado de comunicação móvel, sob a forma da UPI Ativos Móveis ("UPI Ativos Móveis"), com preço de fechamento ajustado de R$ 15.922.235.801,48 (quinze bilhões, novecentos e vinte e dois milhões, duzentos e trinta e cinco mil, oitocentos e um Reais e quarenta e oito centavos); *(iii)* das Unidades de Torres, sob a forma das UPIs Torres ("UPIs Torres"), pelo valor de R$ 1.077.000.000 (um bilhão e setenta e sete milhões de Reais); *(iv)* das unidades de datacenters, sob a forma da UPI Data Center ("UPI Data Center"), pelo valor de R$325.000.000,00 (trezentos e vinte e cinco milhões de Reais); *(v)* de diversos imóveis; e *(vi)* da Lemvig RJ Infraestrutura e Redes de Telecomunicações S.A., detentora de parte da infraestrutura de torres reversíveis e não reversíveis da Oi, à NK 108 Empreendimentos e Participações S.A.

A atuação do Grupo Oi, ao longo de toda a Primeira Recuperação Judicial, foi pautada para garantir o cumprimento de todas as suas obrigações, o que foi refletido no pagamento de, aproximadamente, R$25 bilhões de créditos sujeitos àquele processo, sendo *(i)* R$ 11,6 bilhões mediante conversão de dívida em capital (ações da Oi); *(ii)* R$ 4,6 bilhões em favor do Banco Nacional de Desenvolvimento Econômico e Social – BNDES; *(iii)* R$2,4 bilhões aos seus fornecedores parceiros; *(iv)* aproximadamente R$ 425 milhões para pequenos credores em

programas de mediação; *(v)* mais de R$ 730 milhões a credores trabalhistas; *(vi)* mais de R$ 1,93 bilhão em favor da ANATEL, por meio de conversão em renda de depósitos judiciais; e *(vii)* R$ 3,5 bilhões em juros aos *bondholders* qualificados.

**2.2.    <u>Segunda Recuperação Judicial</u>.** Apesar dos esforços do Grupo Oi para implementar seu novo plano estratégico entre 2019 e 2022, conforme previsto no Aditamento ao Plano da Primeira Recuperação Judicial, fatores externos e imprevisíveis comprometeram sua reestruturação, levando à necessidade de buscar novamente proteção judicial. Embora todas as obrigações previstas no plano de recuperação judicial anterior tenham sido integralmente cumpridas até seu encerramento, a nova crise foi desencadeada, em grande parte, por atrasos regulatórios e concorrenciais que postergaram a conclusão das vendas da UPI Ativos Móveis e UPI InfraCo, fundamentais para viabilizar o Aditamento ao Plano da Primeira Recuperação Judicial.

Adicionalmente, a pandemia da Covid-19 e as variações econômicas subsequentes frustraram premissas-chave do Aditamento ao Plano da Primeira Recuperação Judicial, elevando substancialmente os custos financeiros da Companhia. O aumento do dólar e a deterioração dos indicadores macroeconômicos agravaram a desconexão entre a estrutura de capital do Grupo Oi e sua nova realidade operacional, exigindo a manutenção de ativos e contratos onerosos por períodos superiores aos esperados, consumindo caixa e comprometendo sua sustentabilidade.

O Grupo também enfrentou perdas mais severas do que o projetado em sua base de clientes de telefonia fixa, enquanto se mantinha obrigado a contratos com cláusulas extremamente onerosas de obrigação mínima (*take or pay*), cujos serviços já não refletiam sua demanda atual, gerando desequilíbrios econômicos relevantes. Soma-se a isso a frustração de expectativas de recebimento de caixa, como no caso da arbitragem envolvendo a UPI Ativos Móveis e a desistência da Sky em adquirir a base de clientes de TV por assinatura da Oi.

Além disso, a permanência no regime de concessão, sem a esperada migração para o modelo de autorização e sem definição dos valores de indenização devidos pela ANATEL, resultou na continuidade de obrigações dispendiosas associadas a um serviço obsoleto, reconhecidamente insustentável. Ainda que a Companhia tenha buscado, com apoio de seu assessor financeiro, alternativas para reestruturar sua dívida e adaptar-se à nova realidade operacional, as negociações com os principais credores não foram bem-sucedidas, reforçando a necessidade de uma nova Recuperação Judicial.

Diante de todo esse contexto, em 1º de março de 2023, o Grupo Oi ajuizou novo pedido de

recuperação judicial ("Segunda Recuperação Judicial"), que resultou na aprovação do Plano em assembleia geral de credores em 19 de abril de 2024.

Desde o ajuizamento da Segunda Recuperação Judicial, o Grupo Oi tem envidado seus melhores esforços para negociar com seus principais credores e fornecedores para manter suas atividades regulares. Como é de amplo conhecimento do Juízo da Recuperação e seus credores, a Oi tem adotado diversas medidas a fim de viabilizar a reestruturação de certas dívidas da Companhia e o suporte às suas operações em andamento. Dentre todas as ações implementadas pelo Grupo Oi, destacam-se as seguintes ações e transações realizadas até o momento:

(i)     as controvérsias entre Oi e ANATEL foram submetidas ao Procedimento de Solução Consensual estabelecido pela Instrução Normativa nº 91, de 22 de dezembro de 2022, editada pelo Tribunal de Contas da União ("TCU"), culminando na suspensão da arbitragem perante a CCI. No âmbito desse procedimento, foi constituída Comissão de Solução Consensual ("CSC"), que discutiu e viabilizou uma proposta de solução consensual, o encerramento dos contratos de concessão de telefonia fixa com transição para uma autorização do Serviço Telefônico Fixo Comutado ("STFC") com escopo reduzido e prazo definido;

(ii)    celebrou junto à ANATEL um acordo, nos termos das Leis nº 13.988/2020, nº 10.480/2002 e nº 10.522/2002, conforme alterada pela Lei nº 14.112/2020, e das Portarias nº 249/2020 e nº 333/2020, para equacionar o crédito detido pela Agência Reguladora no âmbito da Primeira Recuperação Judicial. Conforme o referido acordo, nos termos do instrumento de segunda repactuação da transação, a ANATEL concedeu à Oi um desconto de 55,37% (cinquenta e cinco vírgula trinta e sete por cento) sobre o valor total do seu crédito. O acordo foi assinado em setembro de 2024, com o pagamento iniciado por meio do levantamento de depósitos judiciais. O saldo remanescente será quitado em 114 (cento e quatorze) parcelas não lineares até 2034.

(iii)   celebrou, com um grupo de credores financeiros internacionais representando a maioria dos *(i)* detentores de 10%/12% Senior PIK Toggle Notes com vencimento em 2025 emitidas pela Oi, em 27 de julho de 2018, e garantidas, conjunta e solidariamente, pela Telemar e Oi Móvel, ambas incorporadas na Oi, além da Oi Coop e a PTIF; e *(ii)* titulares de créditos contra a Oi decorrentes de acordos com Agências de Crédito à Exportação (*Export Credit Agencies*), um financiamento de longo prazo, na modalidade "*debtor in possession*", objeto de um *Note Purchase Agreement*,

contando com a garantia formalizada por meio de alienação fiduciária de ações de titularidade da Oi na V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal"), conforme divulgado ao mercado em Fato Relevante da mesma data ("DIP Emergencial Original"), o qual foi posteriormente aditado para adicionar uma liquidez de USD 125.000.000,00 (cento e vinte e cinco milhões de Dólares) para a Companhia, redução de custos, simplificação e melhoria das condições, além de satisfazer as necessidades de capital de giro de curto prazo do Grupo Oi e investimento para manutenção de suas atividades ("DIP Emergencial Original Atualizado");

**(iv)**  celebrou com a V.tal, em 27 de outubro de 2023, o Instrumento de Cessão Onerosa de Sucata e Outras Avenças e demais documentos correlatos, incluindo instrumentos de garantias ("Operação Sucata").

**(v)**  celebrou com a V.tal e outros, em 28 de fevereiro de 2025, o Acordo de Investimento e Outras Avenças, que teve por objeto a alienação e transferência de uma unidade produtiva isolada (UPI), composta por 100% (cem por cento) das ações de emissão da ClientCo Serviços de Rede Nordeste S.A. ("UPI ClientCo"), para cujo capital social a Companhia contribuiu determinados ativos, passivos, direitos e obrigações da operação de fibra óptica, em conformidade com o disposto no Plano, com contrapartidas que somam o valor de R$ 5.715.500.148,00 (cinco bilhões, setecentos e quinze milhões, quinhentos mil treze cento e quarenta e oito Reais);

**(vi)**  vendeu e transferiu, em 28 de fevereiro de 2025, a unidade produtiva isolada (UPI), composta por 100% (cem por cento) das ações de emissão da Oi Serviços de Televisão por Assinatura S.A. ("UPI TV por Assinatura") para a Mileto Tecnologia S.A., por montante de até R$ 30.000.000,00 (trinta milhões de Reais); e

**(vii)**  migrou do regime de concessão para o de autorização, com aprovação da Anatel em novembro de 2024, permitindo que o Grupo Oi deixasse de prestar o serviço de telefonia fixa como serviço público, passando a atuar sob regime privado, conforme previsto na Lei Geral de Telecomunicações (Lei nº 9.472/1997), com as alterações introduzidas pela Lei nº 13.879/2019. Essa transição possibilitou que a Companhia alinhe suas obrigações à dinâmica atual do mercado, mantendo o compromisso de prestação obrigatória de serviço de voz em áreas sem alternativas, até no máximo 31 de dezembro de 2028, ao mesmo tempo em que se desonera de encargos típicos da concessão, como a manutenção de postes e orelhões, que já se eram

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD3-1D70E87E2A76

economicamente inviáveis na extensão territorial até então exigível.

Além de todas as medidas mencionadas, o Plano aprovado também previa *(i)* o aumento de capital da Companhia por meio da capitalização de determinados créditos; e *(ii)* a nomeação de novos membros ao Conselho de Administração da Companhia para permanecerem nos seus cargos até a eleição de membros independentes após a conclusão do aumento de capital.

Inicialmente, em 7 de junho de 2024, três novos membros foram nomeados ao Conselho de Administração. Posteriormente, nos termos da Cláusula 7.3.1 do Plano, em reuniões realizadas em 21 de agosto de 2024 e 24 de novembro de 2024, o Conselho de Administração aprovou o aumento de capital da Companhia por meio da conversão de créditos detidos por certos credores financeiros internacionais, o que resultou a troca de controle da Companhia e a eleição de conselheiros independentes ("CA") em 11 de dezembro de 2024.

Por sua vez, em continuidade à implementação da nova governança, em 12 de dezembro de 2024, o CA destituiu os antigos membros da Diretoria Estatutária da Companhia e elegeu novos membros ("Diretoria Estatutária" e, em conjunto com o CA, a "Nova Gestão").

A partir disso, os membros da Diretoria Estatutária assumiram os seus cargos e imediatamente iniciaram as análises econômica, financeira e mercadológica do Grupo Oi. O objetivo da Diretoria Estatutária é priorizar a continuidade e o crescimento da Oi por meio de um plano estratégico para as operações atuais, permitindo a manutenção da liquidez e fluxo de caixa no curto prazo.

Após a dedicação da Diretoria Estatutária para entender o negócio como um todo e traçar um plano operacional estratégico, a Companhia reduziu seus custos e despesas e otimizou a sua geração de caixa, confirmando a sua viabilidade financeira. Contudo, não obstante o trabalho realizado pela Nova Gestão nos últimos seis meses e considerando as medidas de reestruturação tomadas até o momento, constatou-se que a Companhia necessita de meses adicionais para a efetiva recomposição de caixa e organização financeira. Nesse sentido, pagamentos de determinados credores cujas condições dependem de disponibilidade de recursos no curto prazo poderão comprometer a sustentabilidade financeira do Grupo Oi.

Diante desse cenário, o Grupo Oi apresenta este Aditamento, que tem como principais objetivos: *(i)* alterar as condições de pagamento dos Credores Trabalhistas (Classe I) e certos Credores Quirografários (Classe III), para garantir a adequação do fluxo de pagamento dos credores no curto prazo e permitir a manutenção do capital de giro da Companhia sob a Nova Gestão;

8

Docusign Envelope ID: 6BB4A9EE-257F-4205-ACD9-1970E87E2A76

*(iii)* prever a redução do passivo do Grupo Oi e aumentar a disponibilidade de recursos imediatos para manutenção de suas atividades; e *(iv)* garantir um fôlego financeiro para que a Nova Gestão possa adequar a estrutura de capital do Grupo Oi conforme a realidade financeira da Companhia após a implementação de diversas medidas de reestruturação previstas no Aditamento ao Plano Primeira Recuperação e no Plano atualmente vigente.

**2.3.    Estrutura atual do Grupo Oi e suas Afiliadas.** A nova Oi que surgiu da reorganização societária e venda de ativos na Primeira Recuperação Judicial e no curso da Segunda Recuperação Judicial é uma empresa voltada para o provimento de conectividade por fibra ótica e serviços digitais para usuários residenciais, empresariais e corporativos, com foco no modelo *client-centric*. Estruturalmente, a companhia é formada pela Oi S.A., voltada para B2C, PME; a Oi Soluções, o braço de conectividade e soluções de TI para B2B; a V.tal, na qual a Oi detém participação acionária relevante; e, por três empresas, a Oi Services, a Serede e a Tahto, que são subsidiárias integrais da Oi e representam elementos importantes no processo de transformação do Grupo Oi.

Todas as Recuperandas atuam de forma coordenada e integrada sob controle societário, operacional, financeiro, administrativo e gerencial único, exercido pela sociedade controladora, a Oi.

Com relação especificamente às Recuperandas, a Oi é registrada na CVM - Comissão de Valores Mobiliários, tendo suas ações negociadas na B3 S.A. – Brasil, Bolsa, Balcão ("B3") sob os códigos OIBR3 e OIBR4. Os ADR's - "*American Depositary Receipts*" representativos de ações ordinárias e preferenciais de sua emissão estão sendo negociados no mercado de balcão nos Estados Unidos sob os códigos de negociação "OIBZQ" e "OIBRQ", respectivamente. O capital social da Companhia é pulverizado.

Após a migração de regime perante a ANATEL, por meio da assinatura do Termo Único de Autorização para exploração de serviços de telecomunicações em 2024, a Oi passou a ser uma empresa que presta serviços de telecomunicações em regime privado.

A PTIF e a OI COOP são subsidiárias integrais da controladora Oi, registradas na Holanda, tendo sido utilizadas como veículos de investimento do Grupo Oi. Tais veículos não exercem atividades operacionais, tendo atuado apenas, antes ainda da Primeira Recuperação Judicial da Oi, como sua *longa manus* para a captação de recursos no mercado internacional, recursos esses que foram vertidos para o financiamento de atividades do grupo no Brasil.

Além da direção única e das atividades claramente integradas, as empresas do Grupo Oi apresentam uma estreita relação econômica, tendo em vista a existência de contratos, garantias e obrigações que vinculam as empresas entre si, tornando-as financeiramente dependentes umas das outras.

**2.4.    Viabilidade Econômico-Financeira e Operacional do Grupo Oi.** A viabilidade deste Aditamento e das medidas nele previstas para a reestruturação de determinados créditos sujeitos à Recuperação é detalhadamente confirmada pelo Laudo Econômico-Financeiro, nos termos do art. 53, II e III, da LRF, o qual consta do **Anexo 2.4** do Plano.

**3.    MEDIDAS DE REESTRUTURAÇÃO**

**3.1.    Visão Geral.** O Grupo Oi propõe a adoção das medidas elencadas abaixo como forma de superar sua atual e momentânea crise econômico-financeira, as quais estão detalhadas nas seções específicas do Plano, nos termos da LRF e demais Leis aplicáveis:

**3.1.1.    Reestruturação dos Créditos Concursais.** O Grupo Oi realizará uma reestruturação e equalização de seu passivo relativo a Créditos Concursais e a Créditos Extraconcursais cujos titulares desejem ser Credores Extraconcursais Aderentes, adequando-os à sua capacidade de pagamento, mediante alteração no prazo, nos encargos e na forma de pagamento, nos termos estabelecidos na **Cláusula 4 e seguintes**.

**3.1.1.1.**    As Recuperandas envidarão seus melhores esforços para cancelar os títulos emitidos e existentes atualmente, observado o disposto nas legislações aplicáveis a cada uma das jurisdições às quais as Recuperandas estão sujeitas, e poderão tomar todas as providências cabíveis e necessárias em toda e qualquer jurisdição aplicável, incluindo Brasil, Portugal, Estados Unidos da América e Reino Unido, a fim de cumprir com as respectivas legislações e implementar as medidas previstas no Plano, podendo, nestes casos, consultar terceiros, como, por exemplo, instituições depositárias, de forma a assegurar que as medidas a serem implementadas estejam em conformidade com as legislações das respectivas jurisdições**.**

**3.1.1.2.    Sub-rogação da Oi.** O pagamento dos Créditos Classe III será devido e realizado sempre pela Oi, de acordo com os termos e condições descritos neste Aditamento, de forma que os Credores Concursais passarão a ser credores da Oi e não mais da Recuperanda que seja sua respectiva devedora original. Por forma da Homologação Judicial do Plano, a Oi assumiu e se sub-rogou em todos os direitos e

obrigações das demais Recuperandas que eram a respectiva devedora original dos Créditos Concursais, exceto pelos Créditos *Intercompany*, que permanecem com o devedor original. Eventuais Créditos detidos pela Oi por força de pagamentos realizados no âmbito do Plano e deste Aditamento que importem ou importaram na sub-rogação das respectivas obrigações perante as demais Recuperandas serão considerados e tratados como Créditos *Intercompany* para os fins do Plano, inclusive pagamento.

**3.1.2.** **Alienação e Oneração de Ativos.** O Grupo Oi, *(i)* a qualquer tempo após a Data de Homologação do Plano, *(i.1)* poderá alienar ou Onerar os bens listados no **Anexo 5.1**; *(i.2)* poderá promover a alienação, cessão ou Oneração dos bens listados no **Anexo 4.2.8.3** do Plano; *(i.3)* deverá promover a alienação dos bens listados nos **Anexos 5.2.1(iii)(a)** e **5.2.1(iii)(b)**, nos termos da **Cláusula 4.2.8.6**; *(i.4)* poderá alienar, ceder ou Onerar os direitos e/ou recebíveis decorrentes do Processo Arbitral n.º 26470/PFF que tramita perante a CCI, de acordo com os termos e condições para tanto estabelecidos no âmbito do Procedimento de Solução Consensual, cujo termo de autocomposição deverá ser celebrado em termos materialmente consistentes com as condições previstas no **Anexo 3.2**; *(i.5)* deverá promover a alienação dos Imóveis;*(i.6)* deverá tomar as medidas necessárias para alienar ou Onerar os ativos eventualmente recebidos pela Oi como parte do pagamento do preço de aquisição no âmbito do Procedimento Competitivo para a alienação da UPI ClientCo; *(i.7)* deverá promover processos organizados de alienação para a UPI ClientCo, nos termos da **Cláusula 5.2 e seguintes**; e *(i.8)* poderá promover qualquer Oneração de bens prevista no Plano**;** e *(ii)* a qualquer tempo após a implementação da Nova Governança, *(ii.1)* poderá alienar ou Onerar quaisquer outros *(ii.1.1)* bens integrantes do seu ativo permanente (não circulante), incluindo aqueles listados nos **Anexos 3.1.2** e **4.2.2.2.1(f)(l);** *(ii.1.2)* bens integrantes do seu ativo circulante, e *(ii.1.3)* direitos decorrentes de decisões judiciais ou arbitrais transitadas em julgado ou não em favor das Recuperandas; e *(ii.2)* poderá promover processos organizados de alienação para a UPI V.tal, nos termos da **Cláusula 5.2 e seguintes**, observadas, em qualquer caso, aquelas alienações e Onerações que sejam prerrogativas conferidas ao Grupo Oi, conforme disposto nos itens (i.1), (i.2),(i.4), (ii.1) e (ii.2) acima.

**3.1.2.1.** Em qualquer dos casos previstos nos itens (i) a (ii) da **Cláusula 3.1.2,** a alienação, cessão e/ou Oneração poderá ocorrer na forma dos arts. 60, 60-A, 66, 140, 141 e 142 da LRF, da forma que o Grupo Oi entender mais eficiente, inclusive extrajudicialmente e diretamente a eventuais interessados, independentemente de nova

aprovação dos Credores Concursais ou do Juízo da Recuperação Judicial (exceto se expressamente previsto de forma diversa no Plano), ou da obtenção de alvará judicial específico para formalização da alienação, cessão e/ou Oneração em questão junto aos registros de imóveis competentes, desde que observados os termos e condições do Plano, a Lei aplicável e eventuais exigências, autorizações ou limitações contratuais e/ou regulatórias necessárias e aplicáveis, notadamente no que diz respeito à ANATEL e ao CADE, e aquelas previstas no Estatuto Social da Oi ou das demais Recuperandas, observada, sem prejuízo do disposto na **Cláusula 4.2.8.6**, a manutenção de eventuais direitos de V.tal derivados de contratos de comodato sobre os Imóveis.

**3.1.2.2.** Ficam ratificadas por meio e por força da Aprovação do Plano, sujeita à Homologação Judicial do Plano, as alienações, cessões e/ou Onerações *(i)* de ativos realizadas no curso normal dos negócios da Companhia entre o encerramento da Primeira Recuperação Judicial e a Data do Pedido noticiadas nos autos da Recuperação Judicial; *(ii)* dos direitos e/ou recebíveis decorrentes do Processo Arbitral n.º 26470/PFF que tramita perante a CCI, observados os termos e condições para tanto estabelecidos no âmbito do Procedimento de Solução Consensual, cujo termo de autocomposição deverá ser celebrado em termos materialmente consistentes com as condições previstas no **Anexo 3.2**; (*iii*) aquelas autorizadas ou determinadas por decisões judiciais ou arbitrais, transitadas em julgado ou não, ou por Lei até a Data de Homologação do Aditamento.

**3.1.2.3.** Na alienação de UPI(s), a(s) UPI(s) e o(s) adquirente(s) não sucederá(ão) nas obrigações do Grupo Oi de quaisquer naturezas, nos termos do art. 60, parágrafo único e art. 141, inciso II da LRF e do art. 133, parágrafo primeiro, inciso II da Lei nº 5.172/1966, inclusive as obrigações de natureza fiscal, tributárias e não tributárias, ambiental, regulatória, administrativa, penal, anticorrupção, cível, comercial, consumerista, trabalhista e previdenciária.

**3.1.2.3.1.** O disposto na **Cláusula 3.1.2.3** será aplicável após a Homologação Judicial do Plano, independentemente da forma que vier a ser implementada para alienação ou cessão da(s) UPI(s)(s), aplicando-se, conforme o caso, o disposto nos arts. 60, parágrafo único, 60-A, 142, 144 ou 145 da LRF.

**3.1.2.4.** Na alienação dos demais bens móveis ou Imóveis do Grupo Oi (incluindo eventuais ativos recebidos pela Oi em razão de dação em pagamento pela alienação de

UPIs nos termos do Plano, conforme aplicável), que não constituírem ou formarem UPIs, sejam tais bens vendidos individualmente ou em bloco, direta ou indiretamente, mediante o aporte dos mesmos no capital de alguma sociedade do Grupo Oi e a venda das quotas ou ações de sua emissão, o(s) adquirente(s) não sucederá(ão) nas obrigações do Grupo Oi de quaisquer naturezas, nos termos do disposto nos art. 66, §3º, 141, inciso II e no art. 142 da LRF, inclusive as obrigações de natureza ambiental, regulatória, administrativa, anticorrupção ou trabalhista, excepcionadas as obrigações relativas ao próprio bem alienado (*propter rem*), tais como imposto predial e territorial urbano ("IPTU") e condomínio, nas hipóteses de alienação dos Imóveis, observada, sem prejuízo do disposto na **Cláusula 4.2.8.6**, a manutenção de eventuais direitos de V.tal derivados de contratos de comodato sobre os Imóveis.

**3.1.2.4.1.** Observada a **Cláusula 7.2**, as Recuperandas deverão elaborar e submeter aos Credores Opção de Reestruturação I e aos Credores *Take or Pay* sem Garantia – Opção I, um plano anual de vendas para alienação dos Imóveis em até 30 (trinta) Dias Úteis da Data de Homologação do Plano ("Plano de Vendas"), o qual deverá necessariamente prever um valor mínimo de venda anual de R$100.000.000,00 (cem milhões de Reais) ("Valor Mínimo Anual de Vendas"). Nos anos subsequentes à Aprovação do Plano e até o pagamento integral do Novo Financiamento, da Dívida ToP sem Garantia *Reinstated* – Opção I e da Dívida *Roll-Up*, as Recuperandas deverão apresentar aos Credores Opção de Reestruturação I e aos Credores *Take or Pay* sem Garantia – Opção I o Plano de Vendas para referidos anos até 31 de janeiro de cada ano, podendo ser alterado pelas Recuperandas para substituição dos Imóveis a serem alienados em determinado ano e desde que respeitado o Valor Mínimo Anual de Vendas.

**3.1.2.4.1.1.** Observado o disposto na **Cláusula 3.1.2.4.1.2** abaixo e, em qualquer caso, até o pagamento integral do Novo Financiamento, da Dívida *Roll-Up* e da Dívida ToP sem Garantia *Reinstated* – Opção I, os Credores Opção de Reestruturação I e os Credores *Take or Pay* sem Garantia – Opção I terão direito de acompanhar a alienação dos Imóveis e o cumprimento do Plano de Vendas e, para tanto, terão direito de requisitar e receber informações a respeito do processo de alienação dos Imóveis e cumprimento do Plano de Vendas.

**3.1.2.4.1.2.** Até a implementação da Nova Governança, caberá ao Supervisor

Judicial (*Watchdog*) acompanhar o cumprimento do Plano de Vendas, o qual, para tanto, terá as atribuições estabelecidas na **Cláusula 7.2.5**.

**3.1.3.** **Novos Recursos.** O Grupo Oi poderá prospectar os novos recursos e adotar as medidas previstas na **Cláusula 5.5 e seguintes**, sem a necessidade de nova autorização dos Credores Concursais ou do Juízo da Recuperação Judicial, mediante a contratação de novas linhas de crédito, financiamentos de qualquer natureza ou outras formas de captação, inclusive no mercado de capitais e com o oferecimento de garantias, a serem aprovados nos termos do Estatuto Social da Oi ou das demais Recuperandas, conforme aplicáveis, e desde que observados os termos e condições dispostos do Plano e na LRF, e observadas e/ou obtidas eventuais exigências, autorizações ou limitações contratuais ou regulatórias necessárias, notadamente no que diz respeito à ANATEL e ao CADE, conforme aplicáveis. Quaisquer novos recursos terão natureza extraconcursal para fins do disposto na LRF, salvo se acordado de modo diverso entre as partes. Quaisquer outras operações de prospecção de novos recursos não previstas na **Cláusula 5.5 e seguintes** do Plano só poderão ocorrer após a implementação da Nova Governança.

**3.1.4.** **Reorganização Societária.** O Grupo Oi poderá realizar operações de Reorganização Societária e adotar as medidas previstas na **Cláusula 6**, visando à obtenção de uma estrutura mais eficiente e adequada à implementação das propostas previstas do Plano (incluindo a constituição e alienação de UPIs), à continuidade de suas atividades, à implementação de seu plano estratégico de negócios, e desde que observados os termos e condições dispostos no Plano e na LRF, e observadas e/ou obtidas eventuais exigências, autorizações ou limitações contratuais ou regulatórias necessárias, notadamente no que diz respeito à ANATEL e ao CADE, conforme aplicáveis. Quaisquer outras operações de Reorganização Societária não previstas na **Cláusula 6** no Plano só poderão ocorrer após a implementação da Nova Governança.

**3.1.5.** **Depósitos Judiciais.** Após a Homologação Judicial do Plano, o Grupo Oi poderá efetuar o imediato levantamento do valor integral dos Depósitos Judiciais que não tenham sido utilizados para pagamentos, nas formas previstas no Plano.

**3.2.** **Acordo ANATEL.** O Grupo Oi celebrou termo de autocomposição no âmbito do Procedimento de Solução Consensual em termos materialmente consistentes com as condições previstas no **Anexo3.1.6** do Plano, de forma a viabilizar, de forma amigável, o encerramento dos contratos de concessão de telefonia fixa para uma autorização do STFC.

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87E2A76

**3.3.** **Aditamento ao Plano.** Somado aos meios de recuperação expostos acima, como solução mais eficiente para a readequação da estrutura de capital do Grupo Oi e manutenção da saúde financeira de curto prazo da Companhia, o Aditamento prevê, em síntese,: *(i)* a alteração das condições de pagamento dos Créditos detidos por Credores Trabalhistas (**Cláusula 4.1**), Credores Fornecedores Parceiros (**Cláusula 4.2.6**), Credores *Take or Pay* com Garantia (**Cláusula 4.2.8**), Credores *Take or Pay* sem Garantia – Opção I (**Cláusula 4.2.8**), Credores *Take or Pay* sem Garantia – Opção II (**Cláusula 4.2.9**) e Credores Extraconcursais Aderentes (**Cláusula 4.10**); *(ii)* utilização de depósitos recursais para a obtenção de recursos imediatos e pagamento dos Credores (**Cláusulas 5.4**); *(iii)* a exclusão da Cláusula 4.2.7 do Plano – Créditos Transacionados de Fornecedores; e *(iv)* a possibilidade de constituição de veículo para aporte dos Imóveis (**Cláusula 5.3.5**).

**4.** **REESTRUTURAÇÃO DOS CRÉDITOS**

**4.1.** **Créditos Trabalhistas – Classe I.** Os Credores Trabalhistas poderão eleger uma das seguintes opções de pagamento:

**4.1.1.** **Créditos Trabalhistas – Opção I.** Limitado ao valor agregado de R$ 30.000.000,00 (trinta milhões de reais), os Credores Trabalhistas titulares de Créditos Trabalhistas que concordarem em aderir à opção de pagamento prevista nesta **Cláusula 4.1.1**, nos termos da **Cláusula 4.1.3** ("Créditos Trabalhistas – Opção I"), receberão o valor de até R$ 9.000,00 (nove mil reais) em até 180 (cento e oitenta) dias contados da Homologação Judicial do Aditamento, limitado ao valor dos seus respectivos Créditos Trabalhistas.

**4.1.1.1.** Uma vez atingido o limite do valor agregado de R$ 30.000.000,00 (trinta milhões de reais) previsto na **Cláusula 4.1.1**, os Créditos Trabalhistas serão obrigatoriamente reestruturados nos termos dos Créditos Trabalhistas – Opção II.

**4.1.1.2.** Os Credores Trabalhistas que aderirem à opção prevista na **Cláusula 4.1.1** cujos Créditos Trabalhistas – Opção I excedam o valor de R$ 9.000,00 (nove mil reais) concederão às Recuperandas quitação plena, irrevogável e irrestrita em relação ao saldo remanescente do seu respectivo Crédito.

**4.1.2.** **Créditos Trabalhistas – Opção II.** Os Credores Trabalhistas titulares de Créditos Trabalhistas que concordarem em aderir à opção de pagamento prevista nesta **Cláusula 4.1.2** ("Créditos Trabalhistas – Opção II"), nos termos da **Cláusula 4.1.3**, serão

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

pagos em parcela única, limitada ao valor equivalente a 150 (cento e cinquenta) salários-mínimos, no prazo de 3 (três) anos contados da Data de Homologação do Aditamento.

**4.1.2.1.** Para assegurar o pagamento no prazo previsto na **Cláusula 4.1.2**, os Créditos Trabalhistas – Opção II serão garantidos pelos ativos listados no **Anexo 4.1.2.1** deste Aditamento.

**4.1.2.2.** Os Credores Trabalhistas cujos Créditos Trabalhistas – Opção II excedam o valor equivalente a 150 (cento e cinquenta) salários-mínimos serão pagos na forma da **Cláusula 4.2.11** do Plano (Modalidade de Pagamento Geral).

**4.1.3.** **Opção de Pagamento Trabalhista**. Os Credores Trabalhistas deverão enviar às Recuperandas, no prazo de 30 (trinta) dias contados a partir da Homologação Judicial deste Aditamento e na forma da **Cláusula 10.7**, o formulário de opção de pagamento constante do **Anexo 4.1.3** ("Formulário de Opção Trabalhista").

**4.1.3.1.** Os Credores Trabalhistas que deixarem de enviar o Formulário de Opção Trabalhista nos termos da **Cláusula 4.1.3** serão automaticamente pagos nos termos da **Cláusula 4.1.2**.

**4.2.** **Créditos Quirografários – Classe III**. Com exceção dos Créditos Classe III de titularidade dos Credores Quirografários que, conforme expressamente previsto no Plano e nos termos do art. 45, §3º da LRF, não serão afetados e reestruturados por este Aditamento (incluindo aqueles que, conforme escolha de pagamento realizada pelo seu titular no contexto da Primeira Recuperação Judicial, serão reestruturados e pagos nos termos da **Cláusula 4.3.7 e seguintes** do Plano da Primeira Recuperação Judicial ou da **Cláusula 4.3.6** do Plano da Primeira Recuperação Judicial), cada Credor Quirografário titular de Créditos Classe III poderá optar, à sua discricionariedade, por ter a totalidade de seus respectivos Créditos Classe III pagos na forma prevista nesta **Cláusula 4.2**, desde que observadas as condições e requisitos aplicáveis a cada Credor Quirografário e a seus respectivos Créditos Classe III, sem possibilidade de divisão do valor do Crédito Classe III entre as referidas opções, com exceção das hipóteses em que determinada parcela do Crédito Classe III do respectivo Credor Quirografário deva ser paga de acordo com uma opção de pagamento específica prevista no Plano em razão de sua origem.

**4.2.1.** **Pagamento Linear de Créditos Classe III**. Exceto se disposto de forma contrária no Plano:

(i)     **Credores Quirografários titulares de Créditos Classe III no valor igual ou inferior a R$5.000,00 (cinco mil Reais)**. Os Credores Quirografários titulares de Créditos Classe III no valor total de até R$5.000,00 (cinco mil Reais) poderão optar, nos termos da **Cláusula 4.4,** pelo recebimento integral do valor do seu Crédito Classe III constante da Relação de Credores do Administrador Judicial *(a)* prioritariamente mediante levantamento do valor do Depósito Judicial no seu respectivo Processo contra o Grupo Oi, em até 30 (trinta) dias contados da Data de Homologação do Plano; ou *(b)* em uma única parcela, por meio de depósito a ser realizado pelas Recuperandas, em moeda corrente nacional, em até 30 (trinta) dias contados da Data de Homologação do Plano, em conta bancária a ser indicada pelo Credor Quirografário titular de Créditos Classe III quando da Escolha da Opção de Pagamento; e

(ii)     **Credores Quirografários titulares de Créditos Classe III em valor superior a R$5.000,00 (cinco mil Reais)**. Os Credores Quirografários titulares de Créditos Classe III em valor superior a R$5.000,00 (cinco mil Reais) poderão optar, nos termos previstos na **Cláusula 4.4,** pelo recebimento do valor total de R$5.000,00 (cinco mil Reais), compreendendo, quando for o caso, todas e quaisquer custas e despesas processuais incorridas pelo Credor Quirografário em questão. Ao realizar a opção prevista nesta **Cláusula 4.2.1(ii)**, o respectivo Credor Quirografário titular de Créditos Classe III renunciará automaticamente o direito de receber o pagamento do valor de seu Crédito Classe III que exceder R$5.000,00 (cinco mil Reais) e outorgará às Recuperandas, no mesmo momento da Escolha da Opção de Pagamento, a mais ampla, rasa, irrevogável e irretratável quitação do valor que exceder R$5.000,00 (cinco mil Reais).

**4.2.2.     Opção de Reestruturação I**. Os Credores Quirografários que *(i)* sejam titulares exclusivamente de Créditos Financeiros; *(ii)* estejam adimplentes com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**; e *(iii)* concordarem em participar do Novo Financiamento e tempestivamente enviarem à Oi os Termos de Adesão Novo Financiamento, nos termos da **Cláusula 5.5.1.3**, poderão, nos termos na **Cláusula 4.4**, optar por receber o pagamento dos seus respectivos Créditos Classe III de acordo com os termos e condições desta **Cláusula 4.2.2 e seguintes** ("Créditos Opção de Reestruturação I" e "Credores Opção de Reestruturação I", respectivamente).

**4.2.2.1.     Dívida *Roll-Up***. A Oi realizará a emissão de uma dívida no valor total de

Docusign Envelope ID: 6BB1A9FF-257F-4205-ACD9-1070E87E2A76

R$6.750.000.000,00 (seis bilhões, setecentos e cinquenta milhões de Reais) ("<u>Valor
Total Dívida *Roll-Up*</u>"), em 2 (duas) tranches, sendo a primeira tranche no valor de
R$4.500.000.000,00 (quatro bilhões e quinhentos milhões de Reais) ("<u>Tranche 1 Dívida
*Roll-Up*</u>") e a segunda tranche no valor de R$2.250.000.000,00 (dois bilhões, duzentos
e cinquenta milhões de Reais) ("<u>Tranche 2 Dívida *Roll-Up*</u>"), para pagamento de parte
dos Créditos Opção de Reestruturação I, devidamente convertidos pela Taxa de Câmbio
Conversão, quando aplicável ("<u>Dívida *Roll-Up*</u>"), de acordo com os termos e condições
descritos nas subcláusulas abaixo e nos respectivos Instrumentos da Dívida *Roll-Up*.

**4.2.2.2.**    A Oi poderá emitir *(i)* Debêntures *Roll-Up* para Créditos Classe III em
Reais, observados os termos e condições previstos no **Anexo 4.2.2.2.1(A)**; e/ou *(ii)*
Notes *Roll-Up* para Créditos Classe III em Dólar, as quais deverão prever termos e
condições equivalentes (ressalvadas apenas as adequações necessárias em razão das
respectivas Leis aplicáveis), observados os termos e condições previstos no **Anexo
4.2.2.2.1(B)**. Em qualquer hipótese, a Tranche 1 *Dívida Roll-Up* e a Tranche 2 Dívida
*Roll-Up* farão parte de um único Instrumento de Dívida *Roll-Up*, seja ele em Reais ou
Dólares.

**4.2.2.2.1. <u>Tranche 1 Dívida Roll-Up</u>**. A Tranche 1 *Dívida Roll-Up*, no valor total de
R$4.500.000.000,00 (quatro bilhões e quinhentos milhões de Reais) ("<u>Valor Total da
Tranche 1 Dívida *Roll-Up*</u>"), observará os seguintes termos e condições mínimos:

(a)    <u>Data de Emissão</u>: Será a data assim definida nos respectivos Instrumentos
de Dívida *Roll-Up*, conforme aplicável, que deverá ocorrer até 15 de julho de 2024,
podendo ser estendida em comum acordo pela Oi e os Credores Opção de
Reestruturação I (mediante Deliberação de Credores Opção de Reestruturação I). A
Dívida *Roll-Up* deverá ser emitida, em forma e conteúdo satisfatórios aos Credores
Opção de Reestruturação I (mediante Deliberação de Credores Opção de
Reestruturação I), agindo de boa-fé, substancialmente nos termos e condições
estabelecidos no **Anexo 4.2.2.2.1(A) e Anexo 4.2.2.2.1(B)** na mesma data do Novo
Financiamento e, em sendo o caso, da Dívida Participativa e da Dívida *A&E
Reinstated*.

(b)    <u>Alocação</u>: Observado o valor total dos Créditos Classe III de titularidade do
respectivo Credor Opção Reestruturação I constante da Relação de Credores do
Administrador Judicial, cada Credor Opção Reestruturação I fará jus a um percentual

18

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

do Valor da Tranche 1 Dívida *Roll-Up* proporcional ao valor efetivamente desembolsado por tal Credor Opção Reestruturação I no contexto do Novo Financiamento – Credores Opção de Reestruturação I e receberá uma quantidade equivalente de debêntures e/ou notes emitidas na Tranche 1 Dívida *Roll-Up*.

(c)    Pagamento do Principal: O valor do principal da Tranche 1 Dívida *Roll-Up* será amortizado em uma única parcela (*bullet*), no último Dia Útil do mês de dezembro de 2028 ("Data de Vencimento da Tranche 1 Dívida *Roll-Up*").

(d)    Juros e Correção Monetária: Sobre os Créditos Classe III incidirão juros remuneratórios desde a Data de Homologação até a data do efetivo pagamento, a serem capitalizados semestralmente ao valor do principal e pagos, em dinheiro, na Data de Vencimento da Tranche 1 Dívida *Roll-Up*. Para os Créditos Classe III denominados originalmente em *(i)* Dólares, será aplicada taxa de juros anual de 8,5% (oito vírgula cinco por cento); e (*ii*) Reais, será aplicada taxa de juros anual correspondente àquela aplicável aos Créditos Classe III originalmente denominados em Dólares, a ser calculada com base nas curvas de fechamento de mercado divulgadas no sistema de informações da *Bloomberg*, do Dia Útil imediatamente anterior à data da Assembleia Geral de Credores que deliberar sobre a Aprovação do Plano.

(e)    Resgate Facultativo ou Amortização Extraordinária: A Oi poderá resgatar ou amortizar, a qualquer tempo e a seu exclusivo critério, nos termos a serem previstos nos respectivos Instrumentos da Dívida *Roll-Up*, e no Contrato entre Credores (*Intercreditor Agreement*), inclusive nos termos da **Cláusula 5.3**, sem a incidência de nenhuma penalidade e por meio do pagamento do valor de face do respectivo instrumento de dívida e dos juros capitalizados até a data de exercício da opção, a totalidade ou, de forma *pro rata*, de parte das debêntures e das notes emitidas âmbito da Tranche 1 Dívida *Roll-Up* e em circulação, desde que o Empréstimo-Ponte (caso realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I tenham sido prévia e integralmente quitados.

(f)    Garantias: A Dívida *Roll-Up* será garantida pelos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, de forma *pro rata*, observados os termos e condições previstos nos Instrumentos da Garantia *Roll-Up*, listados no **Anexo 4.2.2.2.1(f)(II)**, os quais estão em negociação e serão finalizados de boa-fé entre a Oi e Credores Opção de

Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e aprovados por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, respectivamente, bem como a ordem de pagamento (*waterfall*) e demais termos previstos no Contrato entre Credores (*Intercreditor Agreement*), substancialmente na forma do **Anexo 4.2.2.2.1(f)(III)**. As garantias outorgadas nos termos desta **Cláusula 4.2.2.2.1(f)** estão, conforme aplicável, sujeitas a autorizações regulatórias sobre os Imóveis ou de terceiros, necessárias em razão de contratos de comodato celebrados sobre os Imóveis em benefício de V.tal.

(g)    Liberação de Garantias**:** Na hipótese de alienação dos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, as Onerações previstas no **item (f)** acima deverão ser liberadas na data de fechamento da respectiva alienação ("Data de Fechamento Alienação"), para que as respectivas operações possam ser realizadas e concluídas, desde que *(i.a)* na mesma Data de Fechamento Alienação, o pagamento do preço do respectivo ativo seja integralmente feito em conta bancária vinculada (*conta escrow*) de titularidade da Oi e que será alienada fiduciariamente em benefício dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e *(i.b)* o contrato da conta *escrow* deverá estabelecer a obrigação de realizar a distribuição da Geração de Caixa Excedente (*Cash Sweep*) nos termos previstos na **Cláusula 5.3**, no Dia Útil subsequente à Data de Fechamento Alienação do referido ativo; ou *(ii)* caso o pagamento do preço de aquisição do ativo no contexto do respectivo Procedimento Competitivo envolva dação em pagamento de ativos, tais ativos, salvo se de outro modo aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, serão Onerados, por meio de garantia constituída e aperfeiçoada previamente à Data de Fechamento Alienação, sob condição suspensiva, tornando-se eficaz concomitantemente com a liberação da garantia, observados, neste caso, os termos e condições previstos no **item (f)** acima.

(h)    Demais Condições Contratuais: As demais condições aplicáveis às debêntures emitidas no âmbito da Dívida *Roll-Up* estarão descritas na escritura de Debêntures *Roll-Up*, observado o **Anexo 4.2.2.1.1(A)**, e as demais condições aplicáveis às notes emitidas no âmbito da Dívida *Roll-Up* estarão descritas na

escritura de Notes *Roll-Up*, observado o **Anexo 4.2.2.2.1(B)**.

**4.2.2.2.2. Tranche 2 Dívida Roll-Up.** A Tranche 2 *Dívida Roll-Up* será emitida unicamente por meio das Notes *Roll-Up*, tanto para Créditos Classe III em Dólar, quanto para Créditos Classe III em Reais, devidamente convertidos pela Taxa de Câmbio Conversão, no valor total de R$2.250.000.000,00 (dois bilhões, duzentos e cinquenta milhões de Reais) ("Valor Total da Tranche 2 Dívida *Roll-Up*"), observados os seguintes termos e condições mínimos:

(a)    Data de Emissão: Será a data assim definida nos respectivos Instrumentos de Dívida *Roll-Up*, conforme aplicável, que deverá ocorrer até 15 de julho de 2024, podendo ser estendida em comum acordo pela Oi e os Credores Opção de Reestruturação I (mediante Deliberação de Credores Opção de Reestruturação I). A Dívida *Roll-Up* deverá ser emitida, em forma e conteúdo satisfatórios aos Credores Opção de Reestruturação I (mediante Deliberação de Credores Opção de Reestruturação I), agindo de boa-fé, substancialmente nos termos e condições estabelecidos no **Anexo 4.2.2.2.1(B)** na mesma data do Novo Financiamento, e, em sendo o caso, da Dívida Participativa e da Dìvida *A&E Reinstated*.

(b)    Alocação: Observado o valor total dos Créditos Classe III de titularidade do respectivo Credor Opção Reestruturação I constante da Relação de Credores do Administrador Judicial, cada Credor Opção Reestruturação I fará jus a um percentual do Valor Total da Tranche 2 Dívida *Roll-Up* proporcional ao valor efetivamente desembolsado por tal Credor Opção Reestruturação I no contexto do Novo Financiamento – Credores Opção de Reestruturação I e receberá uma quantidade equivalente de notes emitidas na Tranche 2 Dívida *Roll-Up.*

(c)    Pagamento do Principal: O valor do principal da Tranche 2 Dívida *Roll-Up* será amortizado em uma única parcela (*bullet*), no último Dia Útil do mês de dezembro de 2028, prorrogável até o último Dia Útil do mês de dezembro de 2030, conforme previsto nos respectivos Instrumentos de Dívida ("Data de Vencimento da Tranche 2 Dívida *Roll-Up*").

(d)    Juros e Correção Monetária: Sobre os Créditos Classe III incidirão juros remuneratórios desde a Data de Homologação até a data do efetivo pagamento, a serem capitalizados semestralmente ao valor do principal e pagos, em dinheiro, na Data de Vencimento da Tranche 2 Dívida Roll-Up. Para os Créditos Classe III

denominados originalmente em *(i)* Dólares, será aplicada taxa de juros anual de 8,5% (oito vírgula cinco por cento); e *(ii)* Reais, será aplicada taxa de juros anual correspondente àquela aplicável aos Créditos Classe III originalmente denominados em Dólares, a ser calculada com base nas curvas de fechamento de mercado divulgadas no sistema de informações da *Bloomberg*, do Dia Útil imediatamente anterior à data da Assembleia Geral de Credores que deliberar sobre a Aprovação do Plano.

(e)    <u>Resgate Obrigatório ou Amortização Extraordinária</u>: A Oi deverá resgatar ou amortizar, após 31 de Dezembro de 2028, nos termos a serem previstos no respectivo Instrumento de Dívida *Roll-Up,* sem a incidência de nenhuma penalidade e por meio do pagamento do valor de principal, dos juros capitalizados e quaisquer outros encargos incorridos até a data de exercício da opção, a totalidade ou, de forma *pro rata*, de parte das notes emitidas no âmbito da Tranche 2 Dívida *Roll-Up* e em circulação, desde que o Empréstimo-Ponte (caso realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I e a Tranche 1 Dívida *Roll-Up* tenham sido prévia e integralmente quitados.

(f)    <u>Resgate Facultativo ou Amortização Extraordinária</u>: A Oi poderá resgatar ou amortizar, a qualquer tempo e a seu exclusivo critério, nos termos a serem previstos no respectivo Instrumento de Dívida *Roll-Up,* sem a incidência de nenhuma penalidade e por meio do pagamento do valor de principal, dos juros capitalizados e quaisquer outros encargos incorridos até a data de exercício da opção, a totalidade ou, de forma *pro rata*, de parte das notes emitidas no âmbito da Dívida *Roll-Up* Tranche 2 e em circulação, desde que o Empréstimo-Ponte (caso realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I e a Tranche 1 Dívida *Roll-Up* tenham sido prévia e integralmente quitados.

(g)    <u>Garantias</u>: A Dívida *Roll-Up* será garantida pelos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, de forma *pro rata*, observados os termos e condições previstos nos Instrumentos da Garantia *Roll-Up*, listados no **Anexo 4.2.2.2.1(f)(II)**, os quais estão em negociação e serão finalizados de boa-fé entre a Oi e Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e aprovados por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, respectivamente, bem

como a ordem de pagamento (*waterfall*) e demais termos previstos no Contrato entre Credores (*Intercreditor Agreement*), substancialmente na forma do **Anexo 4.2.2.2.1(f)(III)**. As garantias outorgadas nos termos desta **Cláusula 4.2.2.2.2(g)** estão, conforme aplicável, sujeitas a autorizações regulatórias sobre os Imóveis e de terceiros, necessárias em razão de contratos de comodato sobre Imóveis.

(h)    Liberação de Garantias: Na hipótese de alienação dos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, as Onerações previstas no **item (g)** acima deverão ser liberadas na Data de Fechamento Alienação, para que as respectivas operações possam ser realizadas e concluídas, desde que *(i.a)* na mesma Data de Fechamento Alienação, o pagamento do preço do respectivo ativo seja integralmente feito em conta bancária vinculada (conta *escrow*) de titularidade da Oi e que será ser alienada fiduciariamente em benefício dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e *(i.b)* o contrato da conta *escrow* deverá estabelecer a obrigação de realizar a distribuição da Geração de Caixa Excedente (Cash Sweep) nos termos previstos na **Cláusula 5.3**, no Dia Útil subsequente à Data de Fechamento Alienação do referido ativo; ou *(ii)* caso o pagamento do preço de aquisição do ativo no contexto do respectivo Procedimento Competitivo envolva dação em pagamento de ativos, tais ativos, , salvo se de outro modo aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, serão Onerados, por meio de garantia constituída e aperfeiçoada previamente à Data de Fechamento Alienação, sob condição suspensiva, tornando-se eficaz concomitantemente com a liberação da garantia, observados, neste caso, os termos e condições previstos no **item (g)** acima.

(i)    Demais Condições Contratuais: As demais condições aplicáveis às notas emitidas no âmbito da Tranche 2 Dívida *Roll-Up* estarão descritas no respectivo Instrumento de Dívida *Roll-Up*, em forma e conteúdo satisfatórios aos Credores Opção de Reestruturação I (mediante Deliberação de Credores Opção de Reestruturação I), agindo de boa-fé, substancialmente nos termos e condições previstos no **Anexo 4.2.2.1.1(B)**. O Instrumento de Dívida *Roll-Up* conterá a previsão de que, em ou a partir de 30 de junho de 2027, a Oi poderá deliberar pela extensão da Data de Vencimento da Tranche 2 Dívida *Roll-up* até 31 de dezembro de 2030, hipótese em que  os Credores Opção Reestruturação I não poderão cobrar ou exigir

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

do Grupo Oi o pagamento do valor do principal da Tranche 2 Dívida *Roll-Up*, dos juros capitalizados e demais encargos e penalidades eventualmente incidentes no respectivo Instrumento de Dívida *Roll-Up*, renunciando o direito de buscar a satisfação de tais valores mediante a execução de qualquer outro bem integrante do patrimônio das Recuperandas e/ou requerer a falência das Recuperandas, com base no inadimplemento da obrigação de pagamento de qualquer saldo eventualmente remanescente após a excussão das garantias constituídas sobre os ativos referidos no **Anexo 4.2.2.2.1(f)(I)**.

4.2.2.2.3. O Valor Total Dívida *Roll-Up* indicado na **Cláusula 4.2.2.1** é o montante total a ser disponibilizado pela Oi para emissão da Tranche 1 Dívida Roll-Up e da Tranche 2 Dívida *Roll-Up*. Para cada R$1,00 (um Real) de Debêntures *Roll-Up* emitidas nos termos e na forma da escritura de Debêntures *Roll-Up* será pago R$1,00 (um Real) do Crédito Opção de Reestruturação I do respectivo Credor Opção de Reestruturação I. Observado o disposto na Cláusula **4.2.2.2.2(i)**, para cada USD1,00 (um Dólar) de Notes *Roll-Up* emitidas nos termos e na forma da escritura de Notes *Roll-Up* será pago USD$1,00 (um Dólar) do Crédito Opção de Reestruturação I do respectivo Credor Opção de Reestruturação I.

4.2.2.2.4. **Regras de Interpretação**. Na hipótese de haver conflito de interpretação entre as disposições do Plano e as obrigações previstas no respectivo Instrumento de Dívida *Roll-Up* após a sua celebração, o referido instrumento prevalecerá, sendo certo que o respectivo Instrumento de Dívida *Roll-Up* deverá refletir, no mínimo, os termos e condições previstos nesta **Cláusula 4.2.2.1.**

4.2.2.2.5. **Credores Opção de Reestruturação I Inadimplentes**. Na hipótese de determinado Credor Opção de Reestruturação I deixar de cumprir, por qualquer motivo, com sua obrigação assumida no contexto do Novo Financiamento ("Credor Opção de Reestruturação I Inadimplente") e seu compromisso não for assumido por outro Credor Opção de Reestruturação I, o Valor Total Dívida *Roll-Up*, e consequentemente o Valor Total da Tranche 1 Dívida *Roll-Up* e o Valor Total da Tranche 2 Dívida *Roll-Up*, serão reduzidos na proporção da parcela devida e que foi inadimplida pelo respectivo Credor Opção de Reestruturação I Inadimplente no contexto do Novo Financiamento, e a totalidade do Crédito Classe III de tal Credor Opção de Reestruturação I Inadimplente será reestruturada nos termos da **Cláusula 4.2.11**.

**4.2.2.3.** **Aumento de Capital – Capitalização de Créditos**. A Oi realizará um aumento de capital a ser aprovado pelo Conselho de Administração da Oi, dentro do limite do capital autorizado previsto no Estatuto Social da Oi, com a consequente emissão por subscrição privada (ou seja, sem registro na CVM) de novas ações ordinárias de emissão da Oi, na forma dos arts. 170, §1º e 171, §2º, da Lei das Sociedades por Ações e demais disposições legais aplicáveis, que viabilize a subscrição e integralização de novas ações pelos *(a)* Credores Opção de Reestruturação I, mediante a capitalização de parte do respectivo saldo remanescente de Crédito Opção de Reestruturação I após o pagamento nos termos da **Cláusula 4.2.2.1,** de forma *pro rata* aos Créditos Classe III detidos pelos Credores Opção de Reestruturação I, observado o disposto na **Cláusula 4.2.2.3.1** ("Novas Ações Capitalização de Créditos"); e *(b)* acionistas titulares de ações ordinárias de emissão da Oi em circulação por ocasião do Aumento de Capital – Capitalização de Créditos que exercerem seu respectivo direito de preferência mediante aporte em dinheiro ("Aumento de Capital – Capitalização de Créditos").

**4.2.2.3.1.** O Aumento de Capital – Capitalização de Créditos será realizado em valor suficiente para permitir *(i)* a capitalização de parte do saldo remanescente dos Créditos Opção de Reestruturação I, após o pagamento de parte dos Créditos de Credores Opção de Reestruturação I nos termos da **Cláusula 4.2.2.1**; e *(ii)* o recebimento por tais Credores Opção de Reestruturação I de Novas Ações Capitalização de Créditos que, em conjunto, representem até 80% (oitenta por cento) do capital social total da Oi, observado o direito de preferência dos acionistas da Oi por ocasião do Aumento de Capital – Capitalização de Créditos, nos termos do art. 171 da Lei das Sociedades por Ações.

**4.2.2.3.2.** O preço de emissão das Novas Ações Capitalização de Créditos será oportunamente fixado pelo Conselho de Administração da Oi, observados os parâmetros, termos e condições previstos na Lei das Sociedades por Ações, incluindo o disposto no art. 170 da Lei das Sociedades por Ações, sendo que uma parcela poderá ser destinada à reserva de capital e o restante ao capital social da Oi.

**4.2.2.3.2.1.** Para fins da capitalização de Créditos Classe III em Dólar no contexto do Aumento de Capital – Capitalização de Créditos, tais créditos serão convertidos para a moeda corrente nacional com base na Taxa de Câmbio Conversão.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

**4.2.2.3.3.** A emissão das Novas Ações Capitalização de Créditos observará os termos e condições previstos na Lei das Sociedades por Ações, incluindo o direito de preferência previsto no art. 171, *caput* e §2º da Lei das Sociedades por Ações, conforme aplicável, e as Novas Ações Capitalização de Créditos conferirão os mesmos direitos conferidos pelas demais ações ordinárias de emissão da Oi em circulação.

**4.2.2.3.4.** Na hipótese de exercício do direito de preferência pelos acionistas da Oi por ocasião do Aumento de Capital – Capitalização de Créditos, as importâncias deverão ser pagas pelos respectivos acionistas em dinheiro e serão entregues, de forma *pro rata*, aos Credores Opção de Reestruturação I cujos Créditos Opção de Reestruturação I serão capitalizados, sendo certo que, neste caso, o percentual do capital social total da Oi mencionado acima a ser detido por tais Credores Quirografários após a conclusão do Aumento de Capital – Capitalização de Créditos deverá ser proporcionalmente reduzido.

**4.2.2.3.5.** A efetivação do Aumento de Capital – Capitalização de Créditos estará sujeita à aprovação ou análise prévia da ANATEL e do CADE, conforme aplicável, obrigando-se a Oi, mediante o envio das informações e documentos aplicáveis pelos Credores Quirografários, a adotar todas as medidas necessárias junto aos referidos órgãos para obtenção da referida aprovação ou análise prévia.

**4.2.2.3.6.** Cada Credor Opção de Reestruturação I poderá optar, à sua discricionariedade e até a aprovação do Aumento de Capital – Capitalização de Créditos pelo Conselho de Administração, por *(i)* renunciar, no todo ou em parte, à parcela *pro rata* das Novas Ações Capitalização de Créditos a que faria jus em razão da subscrição e integralização do Aumento de Capital – Capitalização de Créditos nos termos da **Cláusula 4.2.2.3**, nos termos do Termo de Renúncia ao Recebimento das Novas Ações Capitalização de Créditos constante do **Anexo 4.2.2.3.6**, hipótese em que o valor da subscrição e integralização do Aumento de Capital – Capitalização de Créditos deverá ser reduzido na proporção da parcela renunciada; ou *(ii)* transferir para qualquer Pessoa ("Cessionário Novas Ações Capitalização de Créditos"), no todo ou em parte, o seu direito de recebimento da referida parcela das Novas Ações Capitalização de Créditos a que faria jus em razão da subscrição e integralização do Aumento de Capital – Capitalização de Créditos nos termos da **Cláusula 4.2.2.3**, de modo que o Cessionário Novas Ações Capitalização de Créditos fará jus ao

recebimento da referida parcela das Novas Ações Capitalização de Créditos nos mesmos termos aplicáveis ao respectivo Credor Opção de Reestruturação I originário, passando a ser considerado Credor Opção de Reestruturação I em relação às Novas Ações Capitalização de Créditos.

4.2.2.3.6.1. O Credor Opção de Reestruturação I que transferir, total ou parcialmente, seu direito de recebimento da sua parcela das Novas Ações Capitalização de Créditos deverá, até a data em que for publicado o Aviso aos Acionistas que divulgar o início do prazo para o exercício do direito de preferência dos acionistas da Oi em relação ao Aumento de Capital – Capitalização de Créditos, informar à Oi sobre o Cessionário Novas Ações Capitalização de Créditos, o qual deverá fornecer à Companhia as informações necessárias para as aprovações regulatórias aplicáveis.

4.2.2.3.7. Qualquer Credor Opção de Reestruturação I que, nos termos da **Cláusula 4.2.2.3.6**, optar por renunciar ao, ou transferir, no todo ou em parte, para um Cessionário Novas Ações Capitalização de Créditos, o seu direito de recebimento da parcela *pro rata* das Novas Ações Capitalização de Créditos a que fará jus em razão da subscrição e integralização do Aumento de Capital – Capitalização de Créditos nos termos da **Cláusula 4.2.2.3**, reconhece, por força da Aprovação do Plano (e sujeito à Homologação Judicial do Plano), que *(i)* o seu Crédito Opção de Reestruturação I correspondente às Novas Ações Capitalização de Créditos a que o respectivo Credor Opção de Reestruturação I faria jus estará quitado e a referida renúncia ou transferência de direito não prejudicará o direito dos demais Credores Opção de Reestruturação I, tampouco conferirá direitos adicionais ao Credor Opção de Reestruturação I que renunciar ou transferir os referidos direitos, sendo certo que a respectiva renúncia ou transferência de direito *(a)* não afetará as alocações do Valor Total da Tranche 1 Dívida *Roll-Up* e do Valor Total da Tranche 2 Dívida *Roll-Up*, que deverão ser realizadas como se tal renúncia ou transferência de direito não tenha sido realizada; e *(b)* não afetará a quantidade de debêntures emitidas no âmbito da Tranche 1 Dívida *Roll-Up* e notes emitidas no âmbito da Tranche 1 Dívida *Roll-Up* da Tranche 2 Dívida *Roll-Up* que o Credor Opção de Reestruturação I em questão e que os demais Credores Opção de Reestruturação I fazem jus, cujos cálculos deverão ser realizados como se tal renúncia ou transferência de direito não tenha sido realizada; e *(ii)* a referida renúncia ou transferência de direito não altera ou modifica a Escolha da Opção de Pagamento realizada nos termos do Plano,

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

tampouco limita, em qualquer aspecto, os compromissos assumidos pelo Credor Opção de Reestruturação I nos termos do Plano, do Novo Financiamento e da Opção de Reestruturação I, incluindo o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3** do Plano.

**4.2.2.3.8.** Para fins de esclarecimento, em qualquer das hipóteses (i) ou (ii) da **Cláusula 4.2.2.3.6** acima, não serão afetados os direitos do Credor Opção de Reestruturação I referentes à Dívida *Roll-Up* e ao Novo Financiamento.

**4.2.3.    Opção de Reestruturação II**. Os Credores Quirografários poderão optar expressamente, nos termos e condições previstos na **Cláusula 4.4**, por receber o pagamento dos seus respectivos Créditos Classe III de acordo com os termos e condições desta **Cláusula 4.2.3 e seguintes** ("Créditos Opção de Reestruturação II" e "Credores Opção de Reestruturação II", respectivamente).

**4.2.3.1.    Dívida *A&E Reinstated***. A Oi reestruturará 8% (oito por cento) dos Créditos Opção de Reestruturação II, por meio desta **Cláusula 4.2.3.1 e suas subcláusulas** abaixo, de acordo com os seguintes termos e condições ("Dívida *A&E Reinstated*"):

(a)    Data de Emissão: Será a data assim definida nos respectivos Instrumentos de Dívida *A&E Reinstated*, conforme aplicável, que deverá ocorrer até 15 de julho de 2024, podendo ser estendido de comum acordo entre a Oi e os Credores Opção de Reestruturação II. A Dívida A&E deverá ser emitida na mesma data do Novo Financiamento, da Dívida *Roll-Up* e, em sendo o caso,da Dívida Participativa.

 Pagamento do Principal: O valor do principal será amortizado em uma única parcela (*bullet*), no último Dia Útil do mês de dezembro de 2044 ("Data de Vencimento da Dívida *A&E Reinstated*").

(b)    Juros e Correção Monetária: Sobre os Créditos Classe III incidirão juros remuneratórios desde a Data de Homologação até a data do efetivo pagamento, a serem capitalizados ao valor do principal e pagos, em dinheiro, na Data de Vencimento da Dívida *A&E Reinstated*. Para os Créditos Classe III denominados originalmente em Reais, será aplicada taxa de juros anual de 50% (cinquenta por cento) do Certificado de Depósito Interbancário (CDI). Não incidirão juros para os Créditos Classe III denominados originalmente em Dólares.

Docusign Envelope ID: 6BB1A9FE-257F-4205-ACD9-1B70E87E2A76

(c)    <u>Demais Condições Contratuais</u>: As demais condições aplicáveis à Dívida *A&E Reinstated* serão descritas nos Instrumentos Dívida *A&E* Reinstated, substancialmente na forma do **Anexo 4.2.3.1(d).**

**4.2.3.2.    <u>Dívida Participativa</u>**. A Oi realizará a emissão da Dívida Participativa aos respectivos Credores Opção de Reestruturação II em Reais e em Dólar, de acordo com os termos e condições estabelecidos no **Anexo 4.2.3.2**, para pagamento de 92% (noventa e dois por cento) dos Créditos Opção de Reestruturação II, de acordo com os seguintes termos e condições:

(a)    <u>Data de Emissão</u>: Será a data assim definida no Instrumento de Dívida Participativa, conforme aplicável, que deverá ocorrer até 15 de julho de 2024, podendo ser estendido de comum acordo entre a Oi e os Credores Opção de Reestruturação II. A Dívida Participativa deverá ser emitida na mesma data do Novo Financiamento, da Dívida *Roll-Up* e, em sendo o caso, da Dívida *A&E Reinstated*.

(b)    <u>Pagamento do Principal</u>: A Dívida Participativa será amortizada *(i)* em apenas uma parcela (*bullet*), na Data de Vencimento da Dívida Participativa;  ou *(ii)* antecipadamente, de forma parcial, mediante a destinação de 50% (cinquenta por cento) do Lucro Líquido da Oi, de forma *pro rata*, entre os titulares da Dívida Participativa, desde que o Novo Financiamento, a Dívida ToP sem Garantia 2024/2025 *Reinstated* – Opção I e a Dívida ToP com Garantia 2024/Janeiro 2025 *Reinstated*, a Dívida *Roll-Up*, o Empréstimo-Ponte, se aplicável, tenham sido integralmente quitados ("<u>Data de Amortização Antecipada da Dívida Participativa</u>").

(c)    <u>Data de Vencimento</u>: A Dívida Participativa vencerá no último Dia Útil do mês de dezembro de 2050 ("<u>Data de Vencimento da Dívida Participativa</u>").

(d)    <u>Juros e Correção Monetária</u>: Sobre os Créditos Classe III incidirão juros remuneratórios desde a Data de Homologação até a data do efetivo pagamento, a serem capitalizados ao valor do principal e pagos, em dinheiro, na Data de Vencimento da Dívida Participativa ou na Data de Amortização Antecipada de Dívida Participativa, conforme aplicável. Para os Créditos Classe III denominados originalmente em Reais, será aplicada taxa de juros anual de 0,5% (zero vírgula cinco por cento). Não incidirão juros para os Créditos Classe III denominados originalmente em Dólares.

(e)      Opção de Pré-Pagamento: A Oi terá a opção de, a seu exclusivo critério, a qualquer tempo, quitar antecipadamente, de forma *pro rata*, os valores devidos na forma desta **Cláusula 4.2.3.2**, por meio do pagamento de 10% (dez por cento) do valor do principal e juros capitalizados até a data de exercício da opção, desde que o Empréstimo-Ponte (caso realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I e a Dívida ToP com Garantia 2024/Janeiro 2025 *Reinstated*, a Dívida *Roll-Up* tenham sido prévia e integralmente quitados. Caso a Oi exerça a opção de pré-pagamento prevista neste item, o montante equivalente a 90% (noventa por cento) do valor do principal e juros capitalizados até a data de exercício da opção de pré-pagamento dos Créditos Classe III reestruturados nos termos desta **Cláusula 4.2.3.2** será considerado como deságio para fins do Plano.

(f)      Demais Condições Contratuais: As demais condições aplicáveis à Dívida Participativa estão descritas no instrumento do **Anexo 4.2.3.2** ("Instrumento de Dívida Participativa").

(g)      Regras de Interpretação: Na hipótese de haver conflito de interpretação entre as disposições do Plano e as obrigações previstas nos respectivos Instrumentos de Dívida Participativa após a sua celebração, o referido instrumento prevalecerá, sendo certo que os Instrumentos de Dívida Participativa deverão refletir, no mínimo, os termos e condições previstos nesta **Cláusula 4.2.3.2**.

**4.2.3.3.**   O Credor Quirografário que desejar receber o pagamento dos seus respectivos Créditos Classe III de acordo com os termos e condições desta **Cláusula 4.2.3** deverá assumir e estar adimplente com o Compromisso de Não Litigar, Quitação e Renúncia da **Cláusula 9.3** com relação à totalidade de seus Créditos.

**4.2.4.   Créditos Concursais Agências Reguladoras.** Observado o disposto no art. 45, §3º da LRF, os Créditos Concursais Agências Reguladoras não serão afetados ou reestruturados pelo Plano ou por este Aditamento.

**4.2.4.1.**   O disposto na **Cláusula 4.2.4** não prejudica a prerrogativa das partes de celebrar transação envolvendo os Créditos Concursais Agências Reguladoras, incluindo, mas não se limitando, aos parcelamentos previstos na Lei nº 10.522 de 19 de junho de 2002, cujos termos deverão ser celebrados em termos materialmente consistentes com as condições previstas no A**nexo 3.1.6.** Na hipótese de superveniência de norma legal, acordo ou decisão administrativa, judicial ou arbitral que

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87F2A76

permita ou determine forma alternativa para quitação ou garantia dos Créditos Concursais Agências Reguladoras, as Recuperandas tomarão todas as providências para aderir a tais alternativas.

### 4.2.5.    **Créditos de Credores Fornecedores.**

**4.2.5.1.    Créditos de Fornecimento – Primeira Recuperação Judicial.** Observado o disposto no art. 45, §3º da LRF, os Créditos de Fornecimento de titularidade dos Credores Fornecedores, incluindo dos Credores Fornecedores Parceiros, que foram novados nos termos do Plano da Primeira Recuperação Judicial não serão afetados e não serão reestruturados nos termos do Plano, sendo certo que as suas condições de pagamento permanecerão idênticas àquelas atualmente existentes e aplicáveis a tais Créditos de Fornecimento, conforme novadas por força do Plano da Primeira Recuperação Judicial.

**4.2.5.2.    Novos Créditos de Fornecimento.** Os Credores Fornecedores detentores de Créditos de Fornecimento que não tenham sido novados nos termos do Plano da Primeira Recuperação Judicial e que não optarem por receber o pagamento de tais Créditos de Fornecimento de forma diversa, conforme opções de pagamento aplicáveis previstas no Plano, receberão o pagamento dos referidos Créditos de Fornecimento nos termos e condições previstos abaixo:

(a)    Carência: Até o último Dia Útil de dezembro de 2045.

(b)    Parcelas: Amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no primeiro Dia Útil após o prazo de carência referido no item (a) acima, e as demais no mesmo dia dos anos subsequentes.

(c)    Juros e Correção Monetária: Os Créditos de Fornecimento (ou eventuais saldos remanescentes) denominados originalmente em *(i)* Reais serão corrigidos anualmente pela TR, a partir da Data de Homologação ou do Reconhecimento do Plano na jurisdição do Credor Fornecedor, conforme aplicável, e pagos em conjunto com a última parcela referida no item (b) acima; e *(ii)* Dólares ou Euros, não serão corrigidos e não terão a incidência de juros.

(d)    Opção de Pré-Pagamento: A Oi terá a opção de, a seu exclusivo critério, a qualquer tempo, quitar antecipadamente os valores devidos na forma desta **Cláusula**

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

**4.2.5.2**, por meio do pagamento de 15% (quinze por cento) do valor do principal e juros capitalizados até a data de exercício da opção, desde que o Empréstimo-Ponte (se realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I*,* Dívida ToP sem Garantia *Reinstated* - Opção II, a Dívida ToP com Garantia *Reinstated,* a Dívida *Roll-Up,* a Dívida *A&E Reinstated* e, se realizado, o Empréstimo-Ponte tenham sido prévia e integralmente quitados. Caso a Oi exerça a opção de pré-pagamento prevista neste item, o montante equivalente a 85% (oitenta e cinco por cento) do valor do principal e juros capitalizados até a data de exercício da opção de pré-pagamento dos Créditos de Fornecimento reestruturados nos termos desta **Cláusula 4.2.5.2** será considerado como deságio para fins no Plano.

**4.2.5.2.1.**    Para fins de clareza, os Credores titulares de Créditos de Fornecimento que não optarem, nos termos da **Cláusula 4.4**, por receber o pagamento de tais Créditos de Fornecimento na forma das **Cláusulas 4.2.6** a **4.2.8** (conforme aplicáveis) ou descumprirem as obrigações e compromissos assumidos para recebimento de seus Créditos nas formas estabelecidas em tais Cláusulas serão pagos na forma da **Cláusula 4.2.5.2** acima, não sendo a eles aplicável a modalidade geral de pagamento estabelecida na **Cláusula 4.2.11.**

**4.2.6.**    **Créditos de Credores Fornecedores Parceiros.** Os Credores Fornecedores Parceiros que forem titulares de Créditos de Fornecimento serão pagos até 31 de dezembro de 2038 com os valores obtidos pelas Recuperandas por meio da *(i)* alienação de Imóveis, observados os termos das **Cláusulas 5.3.4** e **5.3.4.1**, ou por meio da modalidade prevista na **Cláusula 5.3.5**.

**4.2.6.1.**    Em 1º de janeiro de 2039, ficará outorgada, em caráter irrevogável e irretratável, a mais ampla, plena e rasa quitação pelos Credores Fornecedores Parceiros quanto a eventual saldo remanescente de seus respectivos Créditos, independentemente de qualquer outra formalidade.

**4.2.6.2.**    Na hipótese de determinado Credor Fornecedor Parceiro (i) deixar de cumprir com o Compromisso de Não Litigar, Quitação e Renúncia; ou (ii) após solicitação por qualquer das Recuperandas, se recusar a fornecer bens, conteúdos, direitos e serviços nos termos e condições (a) dos contratos celebrados antes da Data do Pedido e praticados até a Data do Pedido; ou (b) conforme mutuamente acordado ou praticado entre o respectivo Credor Fornecedor Parceiro e o Grupo Oi após a Data do Pedido, em

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87E2A76

ambos os casos dos itens (a) e (b) acima, até o início do pagamento de seus respectivos Créditos de Fornecimento nos termos previstos na **Cláusula 4.2.6**, conforme aplicável, tal Credor Fornecedor Parceiro terá a totalidade de seus respectivos Créditos de Fornecimento pagos na forma da **Cláusula 4.2.5.2**.

**4.2.6.3.**    Os Créditos de Fornecimento dos Credores Fornecedores Parceiros que tenham escolhido a opção de pagamento prevista na **Cláusula 4.2.6 e seguintes** poderão ser compensados com créditos líquidos e certos detidos pela Oi contra o respectivo Credor Fornecedor Parceiro, nos termos da **Cláusula 10.13**, desde que tal compensação seja expressamente anuída pelo respectivo Credor Fornecedor Parceiro.

**4.2.7.**    **Créditos de Credores *Take or Pay* com Garantia**. Os Créditos remanescentes oriundos de obrigações com natureza *take or pay* de titularidade dos Credores *Take or Pay* com Garantia ("Dívida ToP com Garantia *Reinstated*") serão reestruturados e pagos até 31 de dezembro de 2038 nos termos e condições previstos na **Cláusula 4.2.7.1** com os valores obtidos pelas Recuperandas por meio da alienação de Imóveis, observados os termos das **Cláusulas 5.3.4** e **5.3.4.1**, ou por meio da modalidade prevista na **Cláusula 5.3.5**.

**4.2.7.1.**    Incidirão os seguintes descontos sobre a Dívida ToP com Garantia *Reinstated*:

(a)    **Período entre 2024/Janeiro 2025**. Os Créditos da Dívida ToP com Garantia *Reinstated* remanescentes devidos entre 1º de janeiro de 2024 e 15 de fevereiro de 2025 terão um desconto de 60% (sessenta por cento); e

(b)    **Período entre Fevereiro 2025/Julho 2027**. Os Créditos da Dívida ToP com Garantia *Reinstated* remanescentes devidos entre 16 de fevereiro de 2025 e 31 de julho de 2027 terão desconto de 62% (sessenta e dois por cento).

**4.2.7.2.**    Em 1º de janeiro de 2039, ficará outorgada, em caráter irrevogável e irretratável, a mais ampla, plena e rasa quitação pelos Credores *Take or Pay* com Garantia quanto a eventual saldo remanescente de seus respectivos Créditos, independentemente de qualquer outra formalidade.

**4.2.7.3.**    Os Credores *Take or Pay* com Garantia elegeram esta opção de pagamento no Prazo de Escolha da Opção de Pagamento, concordaram, automaticamente, *(a)* com

a rescisão dos contratos de fornecimento em que são partes, a qual ocorreu em 28 de fevereiro de 2025; e *(b)* com a sujeição de Créditos de sua titularidade aos termos e condições desta Cláusula, ainda que não submetidos a esta Recuperação Judicial; e *(c)* estar adimplentes, a qualquer tempo, com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**.

**4.2.7.4.**    O disposto na **Cláusula 4.2.6.2** será aplicável aos Credores *Take or Pay* com Garantia que deixarem de cumprir, a qualquer tempo, com seu Compromisso de Não Litigar, Quitação e Renúncia.

**4.2.8.    Créditos de Credores *Take or Pay* sem Garantia – Opção I**. Os Credores *Take or Pay* sem Garantia que já aderiram ao Plano com a totalidade dos seus Créditos detidos contra as Recuperandas relativos aos contratos listados no **Anexo 4.2.9.5**, e concordarem em aderir à opção de pagamento prevista nesta **Cláusula 4.2.8**, nos termos previstos na **Cláusula 4.4** ("Credores *Take or Pay* sem Garantia - Opção I"), serão pagos nos termos previstos abaixo:

**4.2.8.1.    Período até a Data do Pedido**. Os Créditos detidos pelos Credores *Take or Pay* sem Garantia - Opção I devidos pelas Recuperandas até a Data do Pedido, decorrentes da prestação de serviços e/ou locação de infraestrutura, serão pagos até 31 de dezembro de 2038 com os valores obtidos pelas Recuperandas por meio da *(i)* alienação de quaisquer Imóveis, observadas os termos das **Cláusulas 5.3.4** e **5.3.4.1**; e *(ii)* alienação de quaisquer outros ativos previstos na **Cláusula 5.3**, observado o disposto na **Cláusula 5.3.4**.

**4.2.8.2.    Período entre a Data do Pedido e 31 de dezembro de 2023**. Os Créditos detidos pelos Credores *Take or Pay* sem Garantia - Opção I foram integralmente pagos nos termos da Cláusula 4.2.9.2 do Plano.

**4.2.8.3.**    Os Créditos detidos pelos Credores *Take or Pay* sem Garantia - Opção I referentes aos períodos *(a)* entre 1º de janeiro de 2024 e 31 de dezembro de 2025 ("Dívida ToP sem Garantia *Reinstated* – Opção I"); e *(b)* entre 1º de janeiro de 2026 e 30 de junho de 2027; serão pagos até 31 de dezembro de 2038 com os valores obtidos pelas Recuperandas *(i)* por meio da alienação de Imóveis, observados os termos das **Cláusulas 5.3.4** e **5.3.4.1**, ou por meio da modalidade prevista na **Cláusula 5.3.5**; e *(ii)* com relação à Dívida ToP sem Garantia *Reinstated* – Opção I, por meio da alienação

dos ativos previstos na **Cláusula 5.3**, observado o disposto na **Cláusula 5.3.4**. Sobre esses Créditos incidirão os seguintes descontos:

(a)    <u>**Período entre 2024/2025**</u>. Os Créditos da Dívida ToP sem Garantia *Reinstated* – Opção I terão um desconto de 20% (vinte por cento) e manterão as garantias outorgadas pelas Recuperandas no Plano, conforme previsto nos **Anexos 4.2.2.2.1(f)(I), 4.2.2.2.1(f)(II) e 4.2.2.2.1(f)(III)** do Plano. Os Credores Take or Pay sem Garantia – Opção I concordam, desde já, em aditar os respectivos Instrumentos de Garantia e o Contrato entre Credores (*Intercreditor Agreement*) celebrados com as Recuperandas e os Credores aplicáveis a fim de incorporar as alterações necessárias à implementação do disposto nas **Cláusulas 5.3.4** e **5.3.4.1**; e

(b)    <u>**Período entre 2026/2027**</u>. Os Créditos relativos ao período entre 1º de janeiro de 2026 e 30 de junho de 2027 terão desconto de 35% (trinta e cinco por cento).

**4.2.8.4.**  <u>**Período a partir de 1º de julho de 2027**</u>. Os contratos de locação de infraestrutura e os contratos de cessão de direito de exploração comercial listados no **Anexo 4.2.8.1**, celebrados entre a Oi e os Credores *Take or Pay* sem Garantia - Opção I que optarem por reestruturar a totalidade de seus Créditos nos termos desta **Cláusula 4.2.8** serão automaticamente rescindidos em 1º de julho de 2027, sem qualquer penalidade, indenização ou obrigações financeiras futuras para as partes.

**4.2.8.5.**  Em 1º de janeiro de 2039, ficará outorgada, em caráter irrevogável e irretratável, a mais ampla, plena e rasa quitação pelos Credores *Take or Pay* sem Garantia – Opção I quanto a eventual saldo remanescente de seus respectivos Créditos, independentemente de qualquer outra formalidade.

**4.2.8.6.**  Salvo se de outra forma acordada com o respectivo Credor *Take or Pay* sem Garantia - Opção I e observado o disposto na **Cláusula 4.2.8.7**, a Oi deverá transferir ao respectivo Credor *Take or Pay* sem Garantia - Opção I, na forma prevista na **Cláusula 5.2.4** deste Aditamento ou de outra forma permitida na forma dos arts. 60, 60-A, 66, 140, 141 e 142 da LRF *(i)* a propriedade das Torres de titularidade da Oi em relação às quais o respectivo Credor *Take or Pay* sem Garantia – Opção I seja titular do direito de uso, conforme indicadas no **Anexo 5.2.1(iii)(a)** ("<u>Acervo Torres Selecionadas</u>"); e *(ii)* a propriedade/posse dos Imóveis, conforme listados no **Anexo 5.2.1(iii)(b)**, limitados ao valor de R$40.000.000,00 (quarenta milhões de reais) por Credor *Take or Pay* sem Garantia – Opção **I** ("<u>Acervo Imóveis Selecionados</u>"),

observadas as condições acordadas entre cada Credor *Take or Pay* sem Garantia – Opção I, conforme aplicável, e a V.tal.

**4.2.8.6.1.** O Acervo Torres Selecionadas e o Acervo Imóveis Selecionados serão conferidos ao capital social de SPEs (sendo uma ou mais SPEs para cada Credor *Take or Pay* sem Garantia), mediante operações societárias ou contratuais, sendo que tais SPEs deverão ser alienadas aos Credores *Take or Pay* sem Garantia – Opção I na forma prevista na **Cláusula 5.2.4** do Plano ou de outra forma permitida na forma dos arts. 60, 60-A, 66, 140, 141 e 142 da LRF, desde que acordada com os Credores *Take or Pay* sem Garantia - Opção I.

**4.2.8.6.2.** A alienação referida nesta **Cláusula 4.2.8.6**, independentemente da forma escolhida para sua realização, será implementada sem sucessão do(s) adquirente(s) às obrigações do Grupo Oi de quaisquer naturezas, nos termos do art. 60, parágrafo único e art. 141, inciso II da LRF e do art. 133, §1º, inciso II da Lei nº 5.172/1966, inclusive as obrigações de natureza fiscal, tributárias e não tributárias, ambiental, regulatória, administrativa, penal, anticorrupção, cível, comercial, consumerista, trabalhista e previdenciária.

**4.2.8.6.3.** Os Credores serão responsáveis por arcar com todas as despesas necessárias para a formação e a transferência das UPIs na forma da **Cláusula 4.2.8.6**, incluindo, mas não se limitando a tributos, emolumentos, desocupação, desmobilização e regularização de *sites* objeto do Acervo Torres Selecionadas e do Acervo Imóveis Selecionados. Na hipótese de a Oi pretender ocupar um ou mais *sites* objeto do Acervo Torres Selecionadas e Acervo Imóveis Selecionados após 1º de julho de 2027, as Partes deverão negociar, de boa-fé, novas disposições contratuais para disciplinar a ocupação e utilização dos *sites* pela Oi, incluindo, mas não se limitando, ao valor da respectiva contraprestação pecuniária pela locação, prazos, penalidades e hipóteses de encerramento, observadas as condições acordadas entre cada Credor *Take or Pay* sem Garantia – Opção I, conforme aplicável, e a V.tal. O respectivo Credor *Take or Pay* sem Garantia – Opção I não está obrigado a locar qualquer *site* à Oi caso as partes não cheguem a um bom termo após negociação de boa-fé.

**4.2.8.6.4.** Após a alienação referida nesta **Cláusula 4.2.8.6**, os respectivos Credores *Take or Pay* sem Garantia – Opção I serão integralmente responsáveis por todos os

custos e despesas relativos ao Acervo Imóveis Selecionados, na qualidade de novos titulares, sendo vedada a cobrança da Oi de quaisquer remunerações, reembolsos ou rateio decorrentes do uso do respectivo solo do Acervo Imóveis Selecionados, ressalvada eventual obrigação cujo fato gerador seja anterior à aquisição e transferência.

**4.2.8.7.**    Com relação à transferência do Acervo Imóveis Selecionados:

**4.2.8.7.1.** A Oi se compromete a celebrar promessas de compra e venda dos Imóveis Selecionados constantes do Acervo Imóveis Selecionados não transferidos com as SPEs Imóveis e Torres Selecionados correspondentes, sendo certo que o crédito oriundo da celebração destas promessas de compra e venda deverá ser capitalizado ou convertido em capital das SPEs Imóveis e Torres Selecionados correspondentes antes de sua transferência aos Credores *Take or Pay* sem Garantia – Opção I adquirentes. Eventuais custos de transferência dos bens do Acervo Imóveis Selecionados incidentes sobre a operação de compra e venda prevista nesta Cláusula, incluindo, mas não limitado a taxas de registro, emolumentos, custas administrativas, tributos ou quaisquer despesas para a transferência dos bens do Acervo Imóveis Selecionados serão arcados pelo respectivo Credores *Take or Pay* sem Garantia – Opção I.

**4.2.8.7.1.1.** No caso de promessas de compra e venda dos Imóveis Selecionados constantes do Acervo Imóveis Selecionados celebradas até a Data de Homologação deste Aditamento, o respectivo Credor *Take or Pay* sem Garantia – Opção I se obriga a, em até 10 (dez) Dias Úteis contados da Homologação Judicial deste Aditamento, aditar tais compromissos de compra e venda para prever que todos eventuais custos de transferência dos bens do Acervo Imóveis Selecionados serão arcados pelo respectivo Credor *Take or Pay* sem Garantia – Opção I, nos termos da **Cláusula 4.2.8.7.1**.

**4.2.8.7.2.** Na hipótese de não ser possível a transferência definitiva de determinado Imóvel Selecionado à respectiva SPE, o Credor *Take or Pay* sem Garantia – Opção I terá o direito de solicitar a substituição por outro Imóvel de propriedade da Oi, a ser definido de comum acordo entre a Oi e o Credor *Take or Pay* sem Garantia – Opção I, em valor similar para que componha o Acervo Imóveis Selecionados e desde que

já objeto de contrato de comodato ou similar entre a Oi e o respectivo Credor *Take or Pay* sem Garantia – Opção I.

**4.2.8.8.**    Com relação ao Acervo Torres Selecionadas:

**4.2.8.8.1.** Em até 30 (trinta) Dias Úteis contados da Homologação Judicial deste Aditamento, a Oi deverá negociar de boa-fé e celebrar com cada Credor *Take or Pay* sem Garantia - Opção I contratos de cessão onerosa e/ou contratos de locação, conforme aplicável, com vigência a partir de 1º de julho de 2027, relativos (*a*) aos Imóveis, não integrantes do Acervo Imóveis Selecionados; ou (*b*) aos Imóveis de Terceiro, desde que, em ambos os casos, o respectivo Credor *Take or Pay* sem Garantia - Opção I tenha Torres instaladas que integrem o Acervo Torres Selecionadas, de forma que o respectivo Credor *Take or Pay* sem Garantia - Opção I possa permanecer utilizando os referidos Imóveis até (i) a sua respectiva alienação pela Oi; ou (ii) a data final do respectivo contrato original de cessão de exploração de uso celebrado com o Credor *Take or Pay* sem Garantia - Opção I, o que ocorrer primeiro, ressalvadas as exceções acordadas entre as partes, observadas as condições acordadas entre cada Credor *Take or Pay* sem Garantia – Opção I, conforme aplicável, e a V.Tal.

**4.2.8.8.2.** Observadas as condições acordadas entre cada Credor *Take or Pay* sem Garantia – Opção I, conforme aplicável, o contrato de cessão onerosa e/ou o contrato de locação a ser celebrado entre a Oi e determinado Credor *Take or Pay* sem Garantia Opção I deverá prever que *(i)* a Oi poderá alienar o(s) Imóvel(is) objeto(s) do respectivo contrato a qualquer tempo; *(ii)* em qualquer hipótese de alienação, o Credor *Take or Pay* sem Garantia - Opção I terá o direito de preferência para aquisição do(s) Imóvel(is) a ser(em) alienado(s), incluindo o procedimento de exercício desse direito de preferência; e *(iii)* a partir de 1º de julho de 2027, o Credor *Take or Pay* sem Garantia - Opção I ficará responsável por todos os custos e despesas relativos ao(s) Imóvel(is) objeto do contrato de cessão onerosa e/ou do contrato de locação, incluindo quaisquer custos e despesas relativos à locação, ocupação (água, esgoto, energia, limpeza, segurança, manutenção e, no caso de IPTU, o valor na quota-parte em que tal Credor *Take or Pay* sem Garantia – Opção I utilizar do respectivo Imóvel). O disposto nesta Cláusula não afetará o contrato de comodato celebrado com a V.tal.

**4.2.8.8.3.** Sem prejuízo do disposto na **Cláusula 4.2.8.8.2**, a Oi transferirá, a critério do respectivo Credor *Take or Pay* sem Garantia – Opção I, para a correspondente SPE Imóveis e Torres Selecionados, os instrumentos celebrados com o proprietário dos Imóveis nos quais estejam instaladas Torres integrantes do Acervo Torres Selecionadas, desde que (i) no correspondente Imóvel a única instalação existente seja Torre integrante do referido Acervo Torres Selecionadas; e (ii) a transferência não seja contrária às Leis aplicáveis. A Oi não arcará com quaisquer ônus decorrentes da eventual não aceitação por parte do respectivo proprietário dos Imóveis acima referidos, quando aplicável, desde que a Oi tenha observado os trâmites contratuais aplicáveis.

**4.2.8.8.4.** Sem prejuízo do disposto na **Cláusula 4.2.8.8.2**, nos casos em que não for possível a cessão em razão do disposto na **Cláusula 4.2.8.8.3(i)**, a Oi, mediante solicitação do Credor *Take or Pay* sem Garantia – Opção I, envidará melhores esforços para negociar, em conjunto com o Credor *Take or Pay* sem Garantia – Opção I e ao respectivo proprietário do Imóvel a segregação do respectivo contrato de modo a individualizar a utilização do espaço ocupado pela Torre, observadas as condições acordadas entre cada Credor *Take or Pay* sem Garantia – Opção I, conforme aplicável, e a V.Tal.

**4.2.8.9.**    Os Credores *Take or Pay* sem Garantia – Opção I que desejarem receber o pagamento de seus respectivos Créditos nos termos desta **Cláusula 4.2.8** deverão *(i)* concordar em aderir expressamente à opção de pagamento prevista nesta **Cláusula 4.2.8**, durante o Prazo de Escolha da Opção de Pagamento, nos termos previstos na **Cláusula 4.4**, momento em que concordará automaticamente com a sujeição de Créditos de sua titularidade aos termos e condições desta Cláusula, ainda que não submetidos a esta Recuperação Judicial; e *(ii)* estar adimplentes, a qualquer tempo, com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**.

**4.2.8.10.**    O disposto na **Cláusula 4.2.6.2** será aplicável aos Credores *Take or Pay* sem Garantia - Opção I que deixarem de cumprir, a qualquer tempo, com seu Compromisso de Não Litigar, Quitação e Renúncia.

**4.2.9.**    <u>**Créditos *Take or Pay* sem Garantia – Opção II**</u>. Os Credores *Take or Pay* sem Garantia que optaram, nos termos da **Cláusula 4.4**, pela opção de pagamento prevista

nesta **Cláusula 4.2.9** ("<u>Credores *Take or Pay* sem Garantia – Opção II</u>") terão a totalidade de seus Créditos remanescentes devidos nos períodos *(a)* entre 1º de fevereiro de 2024 e 31 de dezembro de 2025; e *(b)* a partir de 1º de janeiro de 2026; pagos até 31 de dezembro de 2038 com os valores obtidos pelas Recuperandas por meio da alienação de Imóveis, observados os termos das **Cláusulas 5.3.4** e **5.3.4.1**, ou por meio da modalidade prevista na **Cláusula 5.3.5** ("<u>Dívida ToP sem Garantia *Reinstated* – Opção II</u>").

**4.2.9.1.**    Incidirão os seguintes descontos sobre a Dívida ToP sem Garantia *Reinstated* – Opção II:

(a)    <u>**Período entre 2024/2025**</u>. Os Créditos remanescentes da Dívida ToP sem Garantia *Reinstated* – Opção II devidos entre 1º de fevereiro de 2024 e 31 de dezembro de 2025 terão desconto de 60% (sessenta por cento).

(b)    <u>**Período a partir de 2026**</u>. As Recuperandas e os Credores Take or Pay sem Garantia – Opção II rescindirão, com efeitos a partir de 1º de janeiro de 2026, os contratos de fornecimento celebrados entre as partes, sendo certo que, neste caso, será aplicado um desconto de 100% (cem por cento) sobre os seus Créditos devidos a partir de 1º de janeiro de 2026, sem qualquer indenização, penalidade ou custo a ser incorrido pelas Recuperandas ou pelos Credores Take or Pay sem Garantia – Opção II.

**4.2.9.2.**    Em 1º de janeiro de 2039, ficará outorgada, em caráter irrevogável e irretratável, a mais ampla, plena e rasa quitação pelos Credores *Take or Pay* sem Garantia - Opção II quanto a eventual saldo remanescente de seus respectivos Créditos, independentemente de qualquer outra formalidade.

**4.2.9.3.**    O disposto na **Cláusula 4.2.7.4** será aplicável aos Credores *Take or Pay* sem Garantia - Opção II que deixarem de cumprir, a qualquer tempo, com seu Compromisso de Não Litigar, Quitação e Renúncia.

**4.2.10.    Créditos Ex-Bondholders Não-Qualificados**. Considerando a natureza e perfil dos Ex-Bondholders Não-Qualificados, a Oi realizará o pagamento dos Créditos Ex-Bondholders Não-Qualificados da seguinte forma:

(i)    <u>**Créditos Ex-Bondholders Não-Qualificados até USD10.000,00**</u>. Os Ex-Bondholders Não-Qualificados titulares de Créditos Ex-Bondholders Não-

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

Qualificados no montante de até USD10.000,00 (dez mil Dólares) (inclusive), conforme Relação de Credores do Administrador Judicial, poderão optar, de acordo com os termos e prazo previstos na **Cláusula 4.4**, pelo recebimento integral de seus Créditos Ex-Bondholders Não-Qualificados, em uma única parcela, sem desconto, sem incidência de juros ou correção, até 31 de dezembro de 2024, *desde que* tais Ex-Bondholders Não-Qualificados *(a)* comprovem, no ato da escolha da opção de pagamento, que são titulares de Créditos Ex-Bondholders Não-Qualificados no valor máximo de até USD 10.000,00 (dez mil Dólares) (inclusive), conforme Relação de Credores do Administrador Judicial; e *(b)* estejam adimplentes com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**.

(ii)    **Créditos Ex-Bondholders Não-Qualificados até USD20.000,00**. Os Ex-Bondholders Não-Qualificados que forem titulares de Créditos Ex-Bondholders Não-Qualificados em montante superior a USD10.000,00 (dez mil Dólares) e até USD20.000,00 (vinte mil Dólares) (inclusive), conforme Relação de Credores do Administrador Judicial, poderão optar, de acordo com os termos e prazo previstos na **Cláusula 4.4**, pelo recebimento integral de seus Créditos Ex-Bondholders Não-Qualificados, em uma única parcela, sem desconto, sem incidência de juros ou correção, até 31 de dezembro de 2026, *desde que* tais Ex-Bondholders Não-Qualificados *(a)* comprovem, no ato da escolha da opção de pagamento, que são titulares de Créditos Ex-Bondholders Não-Qualificados no valor máximo de até USD 20.000,00 (vinte mil Dólares) (inclusive) conforme Relação de Credores do Administrador Judicial; e *(b)* estejam adimplentes com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**.

(iii)    **Créditos Ex-Bondholders Não-Qualificados acima de USD20.000,00**. Os Ex-Bondholders Não-Qualificados que forem titulares de Créditos Ex-Bondholders Não-Qualificados em montante superior a USD20.000,00 (vinte mil Dólares), conforme Relação de Credores do Administrador Judicial, poderão optar, de acordo com os termos e prazo previstos na **Cláusula 4.4**, pelo recebimento de seus Créditos Ex-Bondholders Não-Qualificados de acordo com uma das demais opções de pagamento previstas no Plano, dentre aquelas previstas nas **Cláusulas 4.2.1, 4.2.2 ou 4.2.3**, observado, em qualquer caso, os requisitos e condições para a escolha das respectivas opções. Para fins de clareza, tais Ex-Bondholders Não-Qualificados que forem titulares de Créditos Ex-Bondholders Não-Qualificados em montante superior a USD20.000,00 (vinte mil Dólares) não poderão escolher as opções de pagamento

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

previstas nos itens "(i)" e "(ii)" acima e renunciar o direito de receber a parcela de
seus respectivos Créditos Ex-Bondholders Não-Qualificados que exceda o montante
de USD20.000,00 (vinte mil Dólares).

**4.2.10.1.**  Caso determinado Ex-Bondholder Não-Qualificado *(i)* não manifeste expressa
e tempestivamente sua opção para receber o pagamento de seu respectivo Crédito Ex-
Bondholders Não-Qualificados de acordo com os termos e condições previstos nesta
**Cláusula 4.2.10 e seguintes;** ou *(ii)* não cumpra com os requisitos previstos nesta
**Cláusula 4.2.10 e seguintes** para recebimento do pagamento de seu respectivo Crédito
Ex-Bondholders Não-Qualificados, tal Ex-Bondholder Não-Qualificado terá a
integralidade do seu Crédito Ex-Bondholders Não-Qualificados alocado para pagamento
na forma da **Cláusula 4.2.11**.

**4.2.11.**  **Modalidade de Pagamento Geral.** Observado o disposto no art. 45, §3º da LRF,
os Créditos Quirografários novados nos termos das **Cláusulas 4.3.6** do Plano da Primeira
Recuperação Judicial não serão afetados e não serão reestruturados nos termos do Plano,
sendo certo que as suas condições de pagamento permanecerão idênticas àquelas
atualmente existentes e aplicáveis a tais Créditos Quirografários, conforme novadas por
força do Plano da Primeira Recuperação Judicial. Sem prejuízo do disposto nesta **Cláusula
4.2.11**, os Créditos Quirografários (ou os respectivos e eventuais saldos remanescentes)
indicados na **Cláusula 4.2.11.1** serão pagos na moeda original, conforme descrito a seguir:

(a)    Carência: Até o último Dia Útil de 2048.

(b)    Parcelas: Amortização do principal em 5 (cinco) parcelas anuais, iguais e
sucessivas, vencendo-se a primeira no último Dia Útil do prazo de carência referido
no item (a), e as demais no mesmo dia dos anos subsequentes.

(c)    Juros e Correção Monetária: Os Créditos Classe III (ou eventuais saldos
remanescentes) denominados originalmente em *(i)* Reais serão corrigidos
anualmente pela TR, a partir da Data de Homologação ou do Reconhecimento do
Plano na Jurisdição do Credor Fornecedor, conforme aplicável, e pagos em conjunto
com a última parcela referida no item (b) acima; e *(ii)* Dólares ou Euros, não serão
corrigidos e não terão a incidência de juros.

(d)    Opção de Pré-Pagamento: A Oi terá a opção de, a seu exclusivo critério, a
qualquer tempo, quitar antecipadamente os valores devidos na forma desta

**Cláusula 4.2.11**, por meio do pagamento de 15% (quinze por cento) do valor do principal e juros capitalizados até a data de exercício da opção, desde que o Empréstimo-Ponte (caso realizado), o Novo Financiamento, a Dívida ToP sem Garantia *Reinstated* – Opção I, Dívida ToP sem Garantia *Reinstated* – Opção II, a Dívida ToP com Garantia *Reinstated,* a Dívida *Roll-Up* e a Dívida *A&E Reinstated* tenham sido prévia e integralmente quitados. Caso a Oi exerça a opção de pré-pagamento prevista neste item, o montante equivalente a 85% (oitenta e cinco por cento) do valor do principal e juros capitalizados até a data de exercício da opção de pré-pagamento dos Créditos Quirografários reestruturados nos termos desta **Cláusula 4.2.11** será considerado como deságio para fins do Plano.

**4.2.11.1.** Exceto se disposto de forma contrária neste Aditamento, a Modalidade Geral de Pagamento prevista na **Cláusula 4.2.11** se aplica aos Créditos Quirografários *(a)* cujo titular escolha tal modalidade de pagamento, nos termos da **Cláusula 4.4**; *(b)* cujo titular, por qualquer motivo, até o recebimento do pagamento integral do seu respectivo Crédito Quirografário reestruturado nos termos do Plano, deixe de cumprir com o seu Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**, conforme aplicável; ou *(c)* que não possam ser pagos por qualquer das demais modalidades previstas neste Aditamento, notadamente nas hipóteses de *(i)* o Credor Quirografário não indicar válida, correta e tempestivamente a opção de pagamento de seu respectivo Crédito Quirografário, na forma da **Cláusula 4.4**; *(ii)* o Credor Fornecedor Parceiro, uma vez solicitado por qualquer das Recuperandas, se recusar a fornecer bens e/ou serviços previstos nos contratos celebrados antes da Data do Pedido nos mesmos termos e condições praticados até a Data do Pedido pelo respectivo Credor Fornecedor Parceiro para as Recuperandas, conforme previsto na **Cláusula 4.2.6.2**; (*iii*) haver a materialização de Créditos Ilíquidos, nos termos da **Cláusula 4.5**; *(iv)* haver a habilitação de Créditos Retardatários, nos termos da **Cláusula 4.7**; *(v)* haver a majoração de Créditos, nos termos da **Cláusula 4.8**; (*vi*) haver a reclassificação dos Créditos, nos termos da **Cláusula 4.9**; ou (*vii*) enquadramento no conceito de Credores Opção de Reestruturação I Inadimplentes, nos termos da **Cláusula 4.2.2.2.4** ("Credores Quirografários – Modalidade de Pagamento Geral").

**4.2.12. Créditos *Intercompany*.**

**4.2.12.1. Créditos *Intercompany* em Reais**. As Recuperandas poderão, em até 18 (dezoito) meses da Data de Homologação e desde que implementada a Nova

Governança, convencionar forma alternativa de extinção dos Créditos *Intercompany* em Reais nos seus termos e condições aplicáveis na Data do Pedido, incluindo, mas não se limitando, a dação em pagamento, operações de reestruturação societária, aumentos e reduções de capital e encontro de contas na forma da Lei, desde que não envolva desembolso de caixa ou dinheiro pelas Recuperandas. As Recuperandas quitarão os Créditos *Intercompany* em Reais remanescentes a partir de 25 (vinte e cinco) anos após o término do pagamento dos Créditos previsto na forma da **Cláusula 4.2.11,** conforme abaixo:

(a)    Parcelas: Amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do término do prazo previsto na **Cláusula 4.2.12.1**, e as demais no mesmo dia dos anos subsequentes.

(b)    Juros e Correção Monetária: Os Créditos *Intercompany* em Reais serão corrigidos anualmente pela TR a partir da Data de Homologação, e pagos em conjunto com a última parcela referida no item (a) acima.

**4.2.12.2.** **Créditos *Intercompany* em Dólares ou Euros.** As Recuperandas poderão, em até 18 (dezoito) meses da Data de Homologação e desde que implementada a Nova Governança, convencionar forma alternativa de extinção dos Créditos *Intercompany* em Dólares ou Euros nos seus termos e condições aplicáveis na Data do Pedido, incluindo, mas não se limitando, a dação em pagamento, operações de reestruturação societária, aumentos e reduções de capital e encontro de contas na forma da Lei, desde que não envolva desembolso de caixa ou dinheiro pelas Recuperandas. As Recuperandas quitarão os Créditos *Intercompany* denominados em Dólares ou em Euros remanescente, a partir de 25 (vinte e cinco) anos após o término do pagamento dos Créditos previsto na forma da **Cláusula 4.2.11**, conforme abaixo:

(a)    Parcelas: Amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do término do prazo previsto na **Cláusula 4.2.12.2**, e as demais no mesmo dia dos anos subsequentes.

(b)    Juros e Correção Monetária: Sem incidência de juros ou correção monetária.

**4.3.**    **Créditos Concursais – ME/EPP.** Observado o disposto no art. 45, §3º da LRF, os Créditos ME/EPP, conforme valores indicados na Relação de Credores do Administrador Judicial, não serão afetados e não serão reestruturados nos termos do Plano e as respectivas

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

condições de pagamento permanecerão idênticas àquelas atualmente existentes, conforme o caso, nos termos *(i)* novados por força do Plano da Primeira Recuperação Judicial; ou *(ii)* originalmente negociados e acordados com o Grupo Oi.

**4.4.** **Escolha de Opção de Pagamento**. Para fins do disposto na **Cláusula 4.2**, os Credores deverão, no prazo de até 30 (trinta) dias contados da Data de Homologação deste Aditamento ("Prazo de Escolha da Opção de Pagamento") (exceto no caso dos Credores que quiserem optar pela opção de pagamento prevista na **Cláusula 4.2.1**, cujo prazo aplicável será de 20 (vinte) dias corridos contados da Data de Homologação), escolher entre as opções de pagamento de seus respectivos Créditos, conforme disponíveis no Plano, por meio das plataformas eletrônicas https://credor.oi.com.br/ ou https://deals.is.kroll/oi, conforme aplicável aos seus Créditos, informando, na mesma oportunidade, os dados da conta bancária na qual deverá ser realizado o pagamento, caso aplicável, bem como apresentar demais informações eventualmente necessárias ("Escolha da Opção de Pagamento")..

    **4.4.1.** As Recuperandas não se responsabilizam por qualquer desconformidade com a escolha e informações fornecidas pelo Credor nos termos do Plano, pela escolha intempestiva, ou por qualquer impedimento legal ou regulatório do Credor para recebimento do pagamento de seus Créditos nos termos da opção de pagamento escolhida, hipótese na qual estarão eximidas da obrigação de realizar o respectivo pagamento, sendo aplicado o disposto na **Cláusula 10.5.1**.

    **4.4.2.** O Prazo para Escolha da Opção de Pagamento poderá ser prorrogado pelas Recuperandas, desde que enviem notificação aos Credores no prazo máximo de até 3 (três) Dias Úteis após o término do Prazo de Escolha da Opção de Pagamento, desde que tal prorrogação não atrase os atos de implementação de acordo com os prazos previstos no Plano, incluindo o prazo para a contratação do Novo Financiamento.

    **4.4.3.** Caso determinado Credor outorgue uma procuração para um representante da Companhia previamente à data da Assembleia Geral de Credores, com poderes para votação do Plano em seu nome e indicando a opção de pagamento prevista no Plano e os dados da conta bancária na qual deverá ser realizado o pagamento, tal Credor estará dispensado de realizar a escolha de pagamento de seus respectivos Créditos nos termos desta **Cláusula 4.4**, devendo apresentar as informações eventualmente necessárias à obtenção das aprovações regulatórias aplicáveis.

    **4.4.4.** Exceto se disposto de forma contrária no Plano, em especial o disposto na

Docusign Envelope ID: 6BB1A9FE-257F-4205-ACD9-1B70E87E2A76

**Cláusula 4.2** e na **Cláusula 4.4.4.1**, considerando o caráter alternativo das opções de pagamento estabelecidas na **Cláusula 4**, a escolha de cada Credor deverá necessariamente se restringir a apenas uma das referidas opções, ressalvadas as hipóteses em que determinada parcela do Crédito Classe III do respectivo Credor Quirografário deva ser paga de acordo com uma opção de pagamento específica prevista no Plano em razão de sua origem.

4.4.4.1.    Os agentes (*trustee* ou representantes de titulares de Créditos originados nos *ECA Facility Agreements*) que representem mais de um Credor poderão escolher diferentes opções de pagamento aplicáveis aos seus representados, sendo certo que cada Credor representado não poderá voluntariamente receber o pagamento de seus respectivos Créditos por meio de mais de uma opção de pagamento, exceto na hipótese prevista na **Cláusula 4.4.4** acima.

4.4.5.    A escolha manifestada pelo respectivo Credor na plataforma eletrônica https://credor.oi.com.br/ será irrevogável e irretratável, não podendo ser posteriormente alterada por qualquer razão, a menos que haja expressa concordância das Recuperandas.

4.4.6.    O Credor que estiver comprovadamente impossibilitado, por razões técnicas ou operacionais, de realizar a escolha da opção de pagamento de seus respectivos créditos por meio da plataforma disponibilizada pela Oi no endereço eletrônico a ser divulgado oportunamente pelas Recuperandas, poderá enviar a escolha da opção de pagamento, no mesmo prazo previsto na **Cláusula 4.4** e nos termos do **Anexo 4.4.6,** pelo correio para a caixa postal da Oi nº 532, CEP 20.070-972, Rio de Janeiro-RJ, devendo informar os dados da conta bancária na qual deverá ser realizado o pagamento de seu respectivo Crédito.

4.4.7.    O Credor que não realizar a escolha da opção de pagamento de seus respectivos créditos no prazo e formas estabelecidos no Plano receberá seu respectivo Crédito na forma prevista na **Cláusula 4.2.11**.

4.4.8.    As Escolhas da Opção de Pagamento pelos Credores Quirografários titulares de Créditos Financeiros em moeda estrangeira e/ou titulares de Créditos novados e reestruturados nos termos da **Cláusula 4.3.3.1** do Plano da Primeira Recuperação Judicial ("Credores Financeiros Estrangeiros") somente serão consideradas válidas caso o respectivo Credor Quirografário realize a sua escolha de pagamento de forma tempestiva e individual por intermédio da plataforma eletrônica https://deals.is.kroll/oi ou diretamente com a Kroll Issuer Services Limited ("Agente Especializado").

4.4.9.    O Agente Especializado será responsável por consolidar as escolhas de pagamento realizadas individualmente pelos Credores Financeiros Estrangeiros e enviar para a Oi a relação de todas as escolhas entre as opções de pagamento aplicáveis previstas na **Cláusula 4.2 e seguintes** realizadas por tais Credores Financeiros de forma individual.

4.4.9.1.    A Oi solicitará ao agente dos *Facility Agreements,* ao *trustee* dos Bonds 2025 e ao Agente Especializado que informem aos Credores Financeiros Estrangeiros sobre o procedimento de Escolha da Opção de Pagamento de forma individual aplicável para tais Credores Financeiros Estrangeiros.

4.4.9.2.    Os titulares dos Bonds 2025 deverão fazer sua Escolha da Opção de Pagamento por meio do *(i)* Programa de Oferta Automática – Sistema ATOP; *(ii)* Depósito ou Saque no Custodiante – DWAC, de acordo com os procedimentos regulares; ou *(iii)* outro meio aplicável. A escolha da opção de pagamento pelos titulares de Bonds 2025 será realizada de acordo com a Lei aplicável aos Bonds 2025, devendo ocorrer concomitantemente e até o Prazo de Escolha da Opção de Pagamento. Enquanto o Prazo de Escolha da Opção de Pagamento estiver em andamento, os titulares dos Bonds 2025 poderão retirar suas escolhas e reapresentá-las quantas vezes desejarem até a data final do Prazo de Escolha da Opção de Pagamento, ou até a última data possível de acordo com a Lei aplicável, o que ocorrer por último. A Oi poderá, mas não será obrigada a, aceitar a desistência das escolhas de pagamento após a data final desse período. Os titulares de Bonds 2025 que optarem pelo pagamento de seus Créditos nos termos da Opção de Reestruturação I ou da Opção de Reestruturação II receberão seus títulos por meio da *Depository Trust Company – DTC*, conforme procedimentos regulares.

**4.5.    Ordem de Desconto de Principal e Juros.** Para todos os fins, qualquer desconto ou o deságio aplicado aos Créditos a serem reestruturados nos termos no Plano será aplicado primeiramente aos juros que forem devidos e a serem pagos e, apenas posteriormente, à parcela do principal.

**4.6.    Créditos Ilíquidos.** Os Créditos Ilíquidos se sujeitam integralmente aos termos e condições do Plano e aos efeitos da Recuperação Judicial. Os Créditos Ilíquidos no momento da Data de Homologação que se materializarem e forem reconhecidos por decisão judicial ou arbitral que os tornem líquidos, transitada em julgado, ou por acordo entre as partes, inclusive

fruto de Mediação/Conciliação/Acordo, desde que com base em critérios estabelecidos pela jurisprudência do Superior Tribunal de Justiça ou do Supremo Tribunal Federal, serão pagos na forma prevista na **Cláusula 4.2.11**, exceto quando disposto de forma distinta no Plano.

    **4.6.1.**    Para fins de clareza, eventuais Credores Concursais cujos Créditos Ilíquidos se materializarem e forem reconhecidos por decisão judicial ou arbitral que os tornem líquidos, transitada em julgado, ou por acordo entre as partes, antes da Data de Homologação, deverão escolher a opção de pagamento de seus respectivos Créditos Concursais nos termos da **Cláusula 4.4 e** serão pagos de acordo com a forma da opção de pagamento escolhida.

**4.7.**    **Créditos Retardatários**. Na hipótese de reconhecimento de Créditos por decisão judicial ou arbitral, transitada em julgado, ou acordo entre as partes, posteriormente à Data de Homologação, serão eles considerados Créditos Retardatários e deverão ser pagos de acordo com a classificação e critérios estabelecidos no Plano para a classe na qual os Créditos Retardatários em questão devam ser habilitados e incluídos, sendo certo que, na hipótese de os Créditos Retardatários envolverem Créditos Classe III, seus respectivos pagamentos deverão ser realizados na forma prevista na **Cláusula 4.2.11**.

**4.8.**    **Modificação do Valor de Créditos.** Na hipótese de modificação do valor de qualquer dos Créditos já reconhecidos e inseridos na Relação de Credores do Administrador Judicial por decisão judicial ou arbitral, transitada em julgado, ou, ainda que sujeito à decisão judicial, por concordância pelas Recuperandas ou acordo entre as partes, o valor alterado do respectivo Crédito deverá ser pago nos termos previstos no Plano, sendo certo que, caso determinado Crédito Classe III tenha sido majorado, a parcela majorada do Crédito Classe III em questão ("Parcela Majorada de Créditos Classe III") deverá ser paga nos termos da **Cláusula 4.2.11**, salvo se a majoração do Crédito Classe III ocorrer até o término do Prazo de Escolha da Opção de Pagamento previsto na **Cláusula 4.4** do Plano, hipótese em que a Parcela Majorada de Créditos Classe III deverá ser paga de acordo com a opção de pagamento escolhida pelo respectivo Credor Quirografário para recebimento do Crédito Classe III que for objeto de majoração.

**4.9.**    **Reclassificação de Créditos**. Caso, por decisão judicial ou arbitral, transitada em julgado, ou acordo entre as partes, seja determinada a reclassificação de qualquer dos Créditos para Créditos Classe III, o Crédito reclassificado deverá ser pago nos termos e condições previstos na **Cláusula 4.2.11**.

**4.10. Credores Extraconcursais Aderentes.** Os Credores Extraconcursais detentores de créditos constituídos após a Data do Pedido e não pagos pelas Recuperandas até o fim do Prazo de Escolha da Opção de Pagamento que desejarem receber os seus Créditos Extraconcursais na forma de uma das opções de pagamento previstas no Plano, poderão fazê-lo, desde que informem às Recuperandas no prazo de até 30 (trinta) dias contados da Data de Homologação deste Aditamento e cumpram com todos os requisitos aplicáveis à respectiva opção de pagamento escolhida.

**4.10.1.** Os Credores Extraconcursais referidos na **Cláusula 4.10** participarão da distribuição de recursos prevista na **Cláusula 5.3.4** de forma *pro rata*, limitada ao valor de seus respectivos Créditos.

**4.10.1.1.** Em 1º de janeiro de 2039, ficará outorgada, em caráter irrevogável e irretratável, a mais ampla, plena e rasa quitação pelos Credores Extraconcursais Aderentes quanto a eventual saldo remanescente de seus respectivos Créditos, independentemente de qualquer outra formalidade.

**4.11. Liberação de Valor Retidos.** A partir da Homologação Judicial do Plano, as Recuperandas efetuarão, a seu exclusivo critério, a liberação de valores que foram retidos em decorrência das regras de retenção de parcela de valores contidas em determinados contratos de fornecimento celebrados com determinados Credores Quirografários, em razão de avaliação de risco de possível perda financeira futura para o Grupo Oi, sendo certo que a liberação dos valores retidos aos respectivos Credores Quirografários só será realizada se e quando comprovado pelo respectivo Credor Quirografário, nos estritos termos do contrato de fornecimento, que o risco de perda financeira para as Recuperandas que justificou a respectiva retenção não mais subsiste.

**5. RECURSOS PARA PAGAMENTO DE CREDORES**

**5.1. Alienação e Oneração de Ativos.** Como forma de levantamento de recursos necessários para o cumprimento das obrigações do Plano, o Grupo Oi, *(i)* a qualquer tempo após a Data de Homologação, *(i.1)* poderá alienar ou Onerar os bens listados no **Anexo 5.1**; *(i.2)* poderá promover a alienação, cessão ou Oneração dos bens listados no **Anexo 4.2.8.3** do Plano, nos termos da **Cláusula 4.2.8.3** do Plano; *(i.3)* deverá promover a alienação dos bens listados nos **Anexos 5.2.1(iii)(a)** e **5.2.1(iii)(b)**, nos termos da Cláusula 4.2.9.6 do Plano; *(i.4)* deverá promover a alienação dos Imóveis; *(i.5)* deverá promover processos organizados de alienação para a UPI ClientCo, nos termos da **Cláusula 5.2 e seguintes;** *(i.6)* deverá tomar as medidas

necessárias para alienar ou Onerar os ativos eventualmente recebidos pela Oi como parte do pagamento do preço de aquisição no âmbito do Procedimento Competitivo de alienação da UPI ClientCo; e *(i.7)* poderá promover qualquer Oneração de bens prevista no Plano; e *(ii)* a qualquer tempo após a implementação da Nova Governança, *(ii.1)* poderá alienar ou Onerar quaisquer outros *(ii.1.1)* bens integrantes do seu ativo permanente (não circulante), incluindo aqueles listados nos **Anexos 3.1.2** e **4.2.2.2.1(f)(I);** *(ii.1.2)* bens integrantes do seu ativo circulante, e *(ii.1.3)* direitos decorrentes de decisões judiciais ou arbitrais transitadas em julgado ou não em favor das Recuperandas; e *(ii.2)* poderá promover processos organizados de alienação para a UPI V.tal, nos termos da **Cláusula 5.2 e seguintes**. Em qualquer caso, podendo a Oi promover (i) a alienação, cessão ou Oneração prevista no Plano para outros fins, inclusive dos direitos e/ou recebíveis decorrentes do Processo Arbitral n.º 26470/PFF que tramita perante a CCI, de acordo com os termos e condições para tanto estabelecidos no âmbito do Procedimento de Solução Consensual, cujo termo de autocomposição deverá ser em termos materialmente consistentes com as condições previstas no **Anexo 3.2**, e (ii) aquelas alienações e Onerações que sejam prerrogativas conferidas ao Grupo Oi, conforme disposto nos itens (i.1), (i.2), (i.4), (ii.1) e (ii.2) acima.

**5.1.1.**    As alienações ou Onerações previstas na **Cláusula 5.1** poderão ocorrer na forma dos arts. 60, 60-A, 66, 140, 141 e 142 da LRF, independentemente de nova aprovação dos Credores Concursais ou do Juízo da Recuperação Judicial (exceto se expressamente previsto de forma diversa no Plano), ou da obtenção de alvará judicial específico para formalização da alienação, cessão ou Oneração em questão junto aos registros de imóveis competentes, desde que observados os termos e condições do Plano, a Lei e, caso aplicável, eventuais exigências, autorizações ou limitações contratuais e/ou regulatórias necessárias e aplicáveis, notadamente no que diz respeito à ANATEL e ao CADE, e aquelas previstas no Estatuto Social da Oi ou das demais Recuperandas.

**5.1.2.**    As Recuperandas empreenderão seus melhores esforços com o objetivo de se beneficiarem de oportunidades de alienação de ativos, inclusive decorrentes de eventuais alterações no modelo regulatório, sempre observado o disposto na **Cláusula 5.1** e o interesse das próprias Recuperandas e dos Credores, observadas obrigações ainda pendentes de cumprimento perante Credores nos termos do Plano.

**5.1.3.**    Conforme previsto na **Cláusula 5.1** acima, as Recuperandas poderão, após a implementação da Nova Governança, promover a alienação ou Oneração de ativos que não estejam listados nos **Anexos 3.1.2 e 5.1**, *desde que* observadas *(i)* eventuais

exigências ou autorizações previstas no Estatuto Social da Oi ou das demais Recuperandas; *(ii)* eventuais exigências, autorizações ou limitações contratuais e/ou regulatórias necessárias e aplicáveis; *(iii)* a manutenção de eventuais direitos de terceiros derivados de contratos de comodato sobre os Imóveis; e *(iv)* enquanto não encerrada a Recuperação Judicial, *desde que* aprovada pelo Juízo da Recuperação Judicial, ressalvado se disposto diversamente na **Cláusula 3.1.2**.

5.1.4.    Conforme estabelecido na **Cláusula 3.1.2.4**, na alienação de bens móveis ou Imóveis do Grupo Oi, que constituírem ou não UPIs, incluindo a alienação de tais bens individualmente ou em bloco, direta ou indiretamente, mediante o aporte dos mesmos no capital de alguma sociedade e a alienação das quotas ou ações de sua emissão, o(s) adquirente(s) não sucederá(ão) nas obrigações de quaisquer naturezas do Grupo Oi, nos termos dos art. 66, §3º, art. 141, inciso II, e art. 142 da LRF, inclusive as obrigações de natureza ambiental, regulatória, administrativa, anticorrupção e trabalhista, excepcionadas as obrigações relativas ao próprio bem alienado (*propter rem*), tais como, no caso de imóveis, IPTU e condomínio.

**5.2.    Constituição e Alienação de UPIs**. Observados os termos previstos na **Cláusula 5.1**, como forma de incrementar as medidas voltadas para sua recuperação econômico-financeira e facilitar o processo de alienação de ativos, as Recuperandas deverão constituir e organizar as UPIs descritas nas **Cláusula 5.2.1** (em conjunto, as "UPIs Definidas") para serem alienadas, individualmente ou em blocos, de maneira total ou parcial, a menos que expressamente estabelecido de outro modo no Plano, sem que a(s) UPI(s) e o(s) adquirente(s) suceda(m) às Recuperandas em quaisquer dívidas, contingências e obrigações de quaisquer naturezas, inclusive em relação às obrigações de natureza fiscal, tributárias e não tributárias, ambiental, regulatória, administrativa, cível, consumerista, comercial, trabalhista, previdenciária, penal e anticorrupção, nos termos dos arts. 60, parágrafo único, 141, inciso II e 142 da LRF e do art. 133, §1º, inciso II da Lei nº 5.172/1966. Após a implementação da Nova Governança, as Recuperandas poderão constituir outras UPIs que não as UPIs Definidas.

5.2.1.    **Constituição das UPIs Definidas.** As UPIs Definidas descritas nos itens (i), (ii) e (iii) abaixo deverão ou poderão, conforme aplicável, ser constituídas mediante a realização e implementação de operações de reorganização societária que as Recuperandas julgarem mais eficientes e convenientes, inclusive, mas sem limitação, na forma de sociedades de propósito específico, para cujo capital as Recuperandas transferirão os bens e ativos listados nos Anexos que forem aplicáveis (em cada caso, uma "SPE").

(i)      **Composição da UPI ClientCo**. As Recuperandas poderão constituir uma ou mais UPIs ClientCo, sendo que cada UPI ClientCo será composta por 100% (cem por cento) das ações de emissão de uma SPE (cada uma, uma "<u>SPE ClientCo</u>"), para cujo capital social as Recuperandas deverão contribuir ou transferir, por meio de operações societárias ou contratuais, a totalidade ou uma parcela, conforme aplicável, dos ativos, passivos, obrigações e direitos descritos no **Anexo 5.2.1(i)**, conforme definido pelas Recuperandas ("<u>Acervo ClientCo</u>" e "<u>UPI ClientCo</u>", respectivamente). Todos os demais ativos, passivos, obrigações e direitos que não forem transferidos pelas Recuperandas à SPE ClientCo (ou às SPEs ClientCo, conforme aplicável) e que não componham o Acervo ClientCo não integrarão a(s) UPI(s) ClientCo e não farão parte da alienação judicial, continuando na propriedade e obrigação das Recuperandas.

   *(a)*      A Oi deverá (i) assinar o instrumento previsto no **Anexo 5.2.1(i)(b)**, por meio do qual a Oi outorgará alienação fiduciária sobre 100% (cem por cento) das ações de emissão da SPE ClientCo (ou de cada SPE ClientCo, conforme aplicável) aos Terceiros Novo Financiamento, Credores do Novo Financiamento, Credores do Empréstimo-Ponte, caso aplicável, Credores da Dívida ToP sem Garantia *Reinstated* – Opção I e Credores da Dívida *Roll-Up*, e (ii) registrar o instrumento previsto no **Anexo 5.2.1(i)(b)** perante todos os cartórios e livros necessários para o aperfeiçoamento de tal garantia; em qualquer caso, observada a ordem de prioridade prevista no **Anexo 4.2.2.2.1(f)(I)** e no Contrato entre Credores (*Intercreditor Agreement*), a qual permanecerá eficaz e válida até a Data do Fechamento Alienação da UPI ClientCo.

(ii)      **Composição da UPI V.tal**. Caso alienada, a UPI V.tal será composta pelos ativos, passivos, obrigações e direitos descritos no **Anexo 5.2.1(ii)** ("<u>Acervo V.tal</u>") e poderá ser organizada na forma de uma SPE para cujo capital social as Recuperandas deverão contribuir ou transferir, por meio de operações societárias ou contratuais, todo o Acervo V.tal ("<u>SPE V.tal</u>"). Todos os demais ativos, passivos, obrigações e direitos que não estejam descritos como Acervo V.tal no **Anexo 5.2.1(ii)** não integrarão a UPI V.tal e não farão parte da alienação judicial, continuando na propriedade e obrigação das Recuperandas, ou de outra SPE, caso assim estabelecido no Plano.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1870E87E2A76

*(a)*    A Oi deverá (i) assinar um instrumento por meio do qual outorgará alienação fiduciária sobre 100% (cem por cento) das ações de emissão da SPE V.tal aos Terceiros Novo Financiamento, Credores do Novo Financiamento, Credores do Empréstimo-Ponte, caso aplicável, Credores da Dívida ToP sem Garantia *Reinstated* – Opção I e Credores da Dívida *Roll-Up*, e (ii) registrar o instrumento previso no item (i) acima perante todos os cartórios e livros necessários para o aperfeiçoamento de tal garantia; em qualquer caso, observada a ordem de prioridade prevista no **Anexo 4.2.2.2.1(f)(I)** e no Contrato entre Credores (*Intercreditor Agreement*), a qual permanecerá eficaz e válida até a Data do Fechamento Alienação da UPI V.tal.

(iii)    **Composição das UPIs Imóveis e Torres Selecionados**. Cada UPI Imóveis e Torres Selecionados será composta por 100% (cem por cento) das ações de emissão de uma respectiva SPE ("SPEs Imóveis e Torres Selecionados"), para cujo capital social as Recuperandas deverão contribuir ou transferir, por meio de operações societárias ou contratuais, os respectivos ativos, passivos, contratos, obrigações e direitos descritos no **Anexo 5.2.1(iii)(a)** ("Acervo Torres Selecionadas") e no **Anexo 5.2.1(iii)(b)** ("Acervo Imóveis Selecionados" e "UPIs Imóveis e Torres Selecionados"), conforme previamente discutido e acordado com os respectivos adquirentes das UPIs Imóveis e Torres Selecionados. Todos os demais ativos, passivos, obrigações e direitos que não forem transferidos pelas Recuperandas às SPEs Imóveis e Torres Selecionados e que não componham o Acervo Imóveis Selecionados ou o Acervo Torres Selecionadas não integrarão as UPIs Imóveis e Torres Selecionados e não farão parte da alienação judicial, continuando na propriedade e obrigação das Recuperandas.

(a)    Na hipótese de impossibilidade de contribuição de qualquer das Torres Selecionadas à SPE Imóveis e Torres Selecionados, as Recuperandas e os Credores deverão envidar seus melhores esforços para, de boa-fé, negociar a substituição da respectiva torre por outra que esteja disponível e apta a ser aportada à referida SPE.

**5.2.1.1.**    **Transferência dos Acervos das UPIs Definidas e Operação das SPEs**. As Recuperandas contribuirão e transferirão os Acervos das UPIs Definidas para as respectivas SPEs Definidas, na forma e até a data da celebração dos respectivos contratos de compra e venda ou outra data posterior a ser prevista nos respectivos

contratos de compra e venda, conforme aplicável, de forma que as SPEs Definidas, quando transferidas para seus respectivos adquirentes, possam operar os respectivos Acervos das UPIs Definidas de maneira independente e com as autorizações necessárias.

**5.2.2.**    **Alienação da UPI ClientCo e UPI V.tal**. Sem prejuízo de outros termos e condições previstos no respectivo Edital e observado o disposto nas cláusulas a seguir, bem como nos arts. 60, 60-A, 66-A e 142 da LRF, a(s) UPI(s) ClientCo e a UPI V.tal serão alienadas judicialmente, total ou parcialmente, em conjunto ou separadas, livres e desembaraçadas de qualquer Ônus, por processo competitivo na modalidade de propostas fechadas, conforme autorizado pelo art. 142, inciso IV da LRF, após a lavratura e assinatura do respectivo auto de arrematação pelas partes interessadas e mediante a transferência das ações de emissão de cada SPE UPI Definida, conforme aplicável, sem que a(s) UPI(s) e o(s) respectivo(s) adquirente(s) suceda(m) às Recuperandas em quaisquer dívidas, contingências e obrigações de quaisquer naturezas, inclusive em relação às obrigações de natureza fiscal, tributárias e não tributárias, ambiental, regulatória, administrativa, cível, comercial, consumerista, trabalhista, penal, anticorrupção e previdenciária, nos termos dos arts. 60, parágrafo único, 141, inciso II e 142 da LRF e do art. 133, §1º, inciso II da Lei nº 5.172/1966 ("Procedimento Competitivo").

**5.2.2.1.**    **Alienação da UPI ClientCo**. O Procedimento Competitivo para a alienação da UPI ClientCo (ou das UPIs ClientCo, conforme aplicável) será realizado em até duas rodadas, na modalidade de propostas fechadas, conforme as regras definidas nas **Cláusula 5.2.2 e seguintes**, e no respectivo edital de alienação.

**5.2.2.1.1.**    **Objeto da Alienação**. O objeto da alienação será 100% (cem por cento) das ações de emissão da SPE ClientCo (ou das SPEs ClientCo, conforme aplicável) detidas pela Oi e por suas Afiliadas, que deverá corresponder, a todo tempo, a 100% (cem por cento) das ações de emissão da SPE ClientCo (ou de todas as SPEs ClientCo, conforme aplicável), livres e desembaraçadas de qualquer Ônus, na forma dos artigos 60, parágrafo único, 141, inciso II e 142 da LRF e do artigo 133, §1º, inciso II da Lei nº 5.172/1996. Até a Data do Fechamento Alienação da UPI ClientCo (ou das UPIs ClientCo, conforme aplicável), a totalidade das ações de emissão da SPE ClientCo (ou das SPEs ClientCo, conforme aplicável) deverá permanecer Onerada nos termos do Plano e tal garantia será liberada na Data do Fechamento Alienação da UPI ClientCo (ou das

UPIs ClientCo, conforme aplicável), desde que de acordo com os termos previstos no Plano.

    **5.2.2.1.1.1.** Na hipótese de serem formadas múltiplas UPIs ClientCo, as UPIs ClientCo poderão ser alienadas para adquirentes distintos, desde que sejam observadas as seguintes condições mínimas: *(i)* todos os adquirentes deverão preencher os Requisitos Mínimos de Qualificação, *(ii)* todas as UPIs ClientCo deverão ser alienadas em um mesmo Procedimento Competitivo; *(iii)* na Primeira Rodada de Alienação UPI ClientCo, o valor agregado de alienação de todas as UPIs ClientCo deverá observar o Preço Mínimo UPI ClientCo; e *(iv)* o fechamento de todas as operações de alienação de todas as UPIs ClientCo deverá ocorrer de forma simultânea, na mesma Data de Fechamento Alienação; sendo que os Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I)e os Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I), poderão dispensar os requisitos previstos nos itens (ii), (iii) e (iv) acima.

**5.2.2.1.2.** **Primeira Rodada.** O edital de alienação da primeira rodada ("Edital UPI ClientCo – Primeira Rodada") deverá ser apresentado ao Juízo da Recuperação Judicial e publicado no Diário de Justiça Eletrônico em até 30 (trinta) dias corridos contados da Data de Homologação e conterá os seguintes termos e condições para a primeira rodada do Procedimento Competitivo de alienação da UPI ClientCo ("Primeira Rodada de Alienação UPI ClientCo"):

(i) **Preço Mínimo UPI ClientCo e Forma de Pagamento**: Para fins da Primeira Rodada de Alienação UPI ClientCo, somente serão consideradas válidas e poderão ser aceitas propostas com ofertas de pagamento à vista, em dinheiro e em moeda corrente nacional. O preço mínimo para alienação da UPI ClientCo (ou, no caso de múltiplas UPIs ClientCo, o preço mínimo de todas as UPIs ClientCo consideradas conjuntamente) aquele será de R$7.300.000.000,00 (sete bilhões e trezentos milhões de Reais) para a Oi ("Preço Mínimo UPI ClientCo").

(ii) **Audiência Primeira Rodada UPI ClientCo e Proposta Vencedora UPI ClientCo:** As propostas fechadas apresentadas na Primeira Rodada de

Alienação UPI ClientCo serão abertas durante audiência a ser designada em até 30 (trinta) dias corridos contados da data de publicação do Edital UPI ClientCo – Primeira Rodada, em data a ser designada no Edital UPI ClientCo – Primeira Rodada ("Audiência Primeira Rodada UPI ClientCo"), no âmbito da qual será declarada vencedora a proposta que apresentar o maior preço de aquisição para a UPI ClientCo, desde que seja, necessariamente, igual ou maior que o Preço Mínimo UPI ClientCo ("Proposta Vencedora UPI ClientCo") para pagamento integral em dinheiro. Na hipótese de serem formadas múltiplas UPIs ClientCo, a determinação das Propostas Vencedoras UPI ClientCo considerará o valor agregado das melhores propostas para alienação de todas as UPIs ClientCo, observados os termos da **Cláusula 5.2.2.1.1.1**.

(iii)    **Deliberação sobre Propostas Inferiores ao Preço Mínimo UPI ClientCo**: Caso, na Primeira Rodada de Alienação UPI ClientCo, a Oi receba apenas *(i)* propostas para aquisição da UPI ClientCo, em dinheiro, em valores inferiores ao Preço Mínimo UPI ClientCo; ou *(ii)* propostas para aquisição das UPIs ClientCo, em dinheiro, cuja soma dos preços oferecidos pelos proponentes não atinja o Preço Mínimo UPI ClientCo (em ambos os casos, as "Propostas Inferiores ao Preço Mínimo UPI ClientCo"), a Audiência Primeira Rodada UPI ClientCo deverá ser suspensa e a Administração Judicial deverá submeter, em 2 (dois) Dias Úteis contados da Audiência Primeira Rodada UPI ClientCo, todas as Propostas Inferiores ao Preço Mínimo UPI ClientCo à análise e deliberação: *(iii.1)* dos Credores Opção de Reestruturação I; e *(iii.2)* dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I.

(a)    Em até 10 (dez) dias contados do recebimento das Propostas Inferiores ao Preço Mínimo UPI ClientCo, os Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I)e os Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I) deverão deliberar se quaisquer das Propostas Inferiores ao Preço Mínimo UPI ClientCo são aceitáveis e comunicar sua decisão à Administração Judicial, observado o disposto na **Cláusula 5.2.3.2**., hipótese na qual a(s) Proposta(s) Inferior(es) ao Preço Mínimo UPI ClientCo aceita(s) será(ão) consideradas a(s) Proposta(s) Vencedora(s), ressalvado que os Credores Opção de Reestruturação I e os Credores da

Dívida ToP sem Garantia *Reinstated* – Opção I não poderão, sem o prévio e expresso consentimento dos Terceiros Novo Financiamento, deliberar pela aceitação de quaisquer Propostas Inferiores ao Preço Mínimo UPI ClientCo que não resultem na quitação integral, em dinheiro, do montante total e atualizado do Novo Financiamento – Terceiros.

(b)    Caso a deliberação pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I não ocorra ou o resultado da deliberação não seja comunicado à Administração Judicial no prazo previsto acima, todas as Propostas Inferiores ao Preço Mínimo UPI ClientCo serão consideradas automaticamente rejeitadas. A Administração Judicial deverá comunicar o resultado da deliberação ao Juízo da Recuperação Judicial em até 2 (dois) Dias Úteis após o término do prazo previsto acima. Para fins de esclarecimento, a Oi não terá direito de veto sobre a deliberação dos Credores Opção de Reestruturação I e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, nos termos desta Cláusula, tampouco de impor aos Credores Opção de Reestruturação I e aos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I a aceitação de quaisquer Propostas Inferiores ao Preço Mínimo UPI ClientCo.

**5.2.2.1.3.    <u>Encerramento da Primeira Rodada e Início da Segunda Rodada de Alienação UPI ClientCo</u>.** Será realizada uma segunda rodada do Procedimento Competitivo de alienação da UPI ClientCo ("<u>Segunda Rodada de Alienação UPI ClientCo</u>"), caso se verifique uma das seguintes hipóteses:

(i)    Na Audiência Primeira Rodada UPI ClientCo, a Oi não receber nenhuma proposta;

(ii)    Na Audiência Primeira Rodada UPI ClientCo, a Oi não receber nenhuma proposta em dinheiro que atenda aos requisitos mínimos necessários para o Processo Competitivo de alienação da UPI ClientCo;

(iii)    Na Audiência Primeira Rodada UPI ClientCo, a Oi não receber ofertas para todas as UPIs ClientCo formadas;

(iv)    Na Audiência Primeira Rodada UPI ClientCo, a Oi receber apenas Propostas Inferiores ao Preço Mínimo UPI ClientCo e tais Propostas Inferiores

ao Preço Mínimo UPI ClientCo sejam rejeitadas pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, nos termos da **Cláusula 5.2.2.1.2(iii)**;

**5.2.2.1.3.1.** Em até 3 (três) Dias Úteis contados da ocorrência de qualquer dos eventos descritos na **Cláusula 5.2.2.1.3**, a Oi disponibilizará aviso no sítio eletrônico https://www.recjud.com.br/, nos termos do Edital UPI ClientCo – Primeira Rodada, comunicando o encerramento da Primeira Rodada de Alienação da UPI ClientCo e, por consequência, o início da Segunda Rodada de Alienação da UPI ClientCo.

**5.2.2.1.4.    Edital UPI ClientCo – Segunda Rodada.** O edital de alienação da segunda rodada que ("Edital UPI ClientCo – Segunda Rodada") *(i)* deverá ser submetido pelas Recuperandas para revisão e aprovação dos Credores Opção de Reestruturação I e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I em até 5 (cinco) dias corridos contados da publicação prevista na **Cláusula 5.2.2.1.3.1** acima; e *(ii)* revisto e deliberado, cumulativamente, pelos *(a)* Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I); e *(b)* Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I), observado o disposto na **Cláusula 5.2.3.2**.

**5.2.2.1.4.1.**    A revisão e deliberação do Edital UPI ClientCo – Segunda Rodada pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I deverá ser comunicada à Administração Judicial em até 5 (cinco) dias contados da data em que o Edital UPI ClientCo – Segunda Rodada for submetido aos respectivos Credores. Caso a deliberação pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I não seja comunicada à Administração Judicial no prazo previsto, o Edital UPI ClientCo – Segunda Rodada será considerado automaticamente rejeitado. A Administração Judicial deverá comunicar o resultado da deliberação à Oi em até 1 (um) Dia Útil contado do fim do prazo estabelecido acima ou da data em que for notificada sobre a deliberação dos Credores Opção de Reestruturação I e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, o que ocorrer primeiro.

**5.2.2.1.5.   Segunda Rodada.** O Edital UPI ClientCo – Segunda Rodada conterá os seguintes termos e condições para a segunda rodada do Procedimento Competitivo de alienação da UPI ClientCo ("Segunda Rodada de Alienação UPI ClientCo"):

(i)      **Preço e Forma de Pagamento**: Para fins da Segunda Rodada de Alienação UPI ClientCo, não haverá preço mínimo para alienação da UPI ClientCo (ou das UPIs ClientCo, conforme aplicável), podendo ser aceitas propostas que prevejam quaisquer formas de pagamento ou uma combinação delas, incluindo *(a)* pagamento em dinheiro; *(b)* compensação, entrega, cancelamento, perdão ou qualquer outra medida semelhante para fins de implementação da respectiva transação, da integralidade ou parcela de Créditos Extraconcursais (incluindo juros e correção monetária) detidos por Credores do Novo Financiamento ou Terceiros Novo Financiamento e/ou suas Afiliadas, desde que *(b.1)* decorrentes de obrigações contratadas pela Oi e já devidamente prestadas ou finalizadas pelo respectivo proponente; e *(b.2)* reconhecidos pelas Recuperandas; e/ou *(c)* dação em pagamento de Ativos Permitidos ClientCo , os quais deverão estar livres e desembaraçados de qualquer Ônus.

(ii)      **Audiência Segunda Rodada UPI ClientCo:** As propostas fechadas apresentadas na Segunda Rodada de Alienação UPI ClientCo ("Propostas Segunda Rodada UPI ClientCo") serão abertas durante audiência a ser realizada em até 15 (quinze) dias corridos contados da data de publicação do Edital UPI ClientCo – Segunda Rodada ("Audiência Segunda Rodada UPI ClientCo"). A Audiência Segunda Rodada UPI ClientCo estará limitada à abertura das Propostas Segunda Rodada UPI ClientCo, e não haverá declaração ou deliberação sobre a Proposta Vencedora UPI ClientCo durante a Audiência Segunda Rodada UPI ClientCo. A Audiência Segunda Rodada UPI ClientCo deverá ser suspensa imediatamente após a abertura Propostas Segunda Rodada UPI ClientCo, a fim de viabilizar o procedimento de deliberação previsto na **Cláusula 5.2.2.1.5(iii)** abaixo.

(iii)      **Deliberação sobre a(s) Proposta(s) Vencedora(s) UPI ClientCo**: A Administração Judicial deverá submeter, em 2 (dois) Dias Úteis contados da Audiência Segunda Rodada UPI ClientCo, todas as propostas recebidas na

forma da **Cláusula 5.2.2.1.5(i)** e/ou na Audiência Segunda Rodada UPI ClientCo à análise e deliberação *(iii.1)* dos Credores Opção de Reestruturação I; e *(iii.2)* dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, independentemente dos valores e condições ofertados pelos respectivos proponentes.

(a)    Em até 10 (dez) dias contados do recebimento das Propostas Segunda Rodada UPI ClientCo, os Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I)e os Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I) deverão deliberar se quaisquer das Propostas Segunda Rodada UPI ClientCo são aceitáveis e comunicar sua decisão à Administração Judicial, observado o disposto na **Cláusula 5.2.3.2**., hipótese na qual a(s) Proposta(s) Segunda Rodada UPI ClientCo aceita(s) será(ão) considerada(s) a(s) Proposta(s) Vencedora(s), ressalvado que os Credores Opção de Reestruturação I e os Credores da Dívida ToP sem Garantia *Reinstated* – Opção I não poderão, sem o prévio e expresso consentimento dos Terceiros Novo Financiamento, deliberar pela aceitação de quaisquer Propostas Segunda Rodada UPI ClientCo que não resultem na quitação integral, em dinheiro, do montante total e atualizado do Novo Financiamento – Terceiros.

(b)    Caso a deliberação pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I não ocorra ou o resultado da deliberação não seja comunicado à Administração Judicial no prazo previsto acima, todas as Propostas Segunda Rodada UPI ClientCo serão consideradas automaticamente rejeitadas. A Administração Judicial deverá comunicar o resultado da deliberação ao Juízo da Recuperação Judicial em até 1 (um) Dia Útil após o término do prazo previsto acima. Para fins de esclarecimento, a Oi não terá direito de veto sobre a deliberação dos Credores Opção de Reestruturação I e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, nos termos desta Cláusula.

(iv)    **Vinculação da Oi**. Por força e operação do Plano e do Edital UPI ClientCo – Segunda Rodada, a Oi estará formal e irrevogavelmente vinculada

à Proposta Vencedora, obrigando-se a praticar todos os atos úteis ou necessários para implementação da transação prevista na Proposta Vencedora, inclusive a negociação de boa-fé e celebração do contrato de compra e venda e demais instrumentos acessórios, até a Data do Fechamento Alienação UPI ClientCo, observado que as Recuperandas não serão obrigadas a arcar com custos de implementação da transação irrazoáveis e/ou fora dos padrões de mercado. Para fins de esclarecimentos, a Oi não terá o direito de rejeitar ou vetar a Proposta Vencedora, tampouco de impor aos Credores Opção de Reestruturação I e aos Credores da Dívida ToP sem Garantia Reinstated – Opção I a aceitação de quaisquer Propostas Segunda Rodada UPI ClientCo, bem como de outros termos e condições que não estejam expressamente previstos no Edital UPI ClientCo – Segunda Rodada.

(v)    **Data Limite**: Na hipótese de a Proposta Vencedora ser declarada na Segunda Rodada de Alienação UPI ClientCo, a Data de Fechamento Alienação da UPI ClientCo deverá ocorrer até 10 de setembro de 2024 ("Data Limite Fechamento Segunda Rodada Alienação UPI ClientCo"), podendo tal Data Limite Fechamento Segunda Rodada Alienação UPI ClientCo ser estendida por deliberação e aprovação dos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I) e dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I).

**5.2.2.1.6.   Valor Retido da Receita Líquida da Venda da UPI ClientCo.** O Conselho de Administração da Oi poderá, em até 5 (cinco) dias corridos contados da deliberação da(s) Proposta(s) Vencedora(s) UPI ClientCo, deliberar, sobre a necessidade de retenção, pela Oi, de até R$1.500.000.000,00 (um bilhão e quinhentos milhões de Reais) da parcela em dinheiro da Receita Líquida da Venda da UPI ClientCo relativa à alienação da(s) UPI(s) ClientCo para investimentos em suas próprias atividades ou de suas Afiliadas ("Valor de Retenção"). Caso, por qualquer razão após o fechamento da alienação da(s) UPI(s) ClientCo, a Oi não consiga ou não seja autorizada a reter o montante total de R$ 1.500.000.000,00 (um bilhão e quinhentos milhões de Reais) da Receita Líquida da Venda da UPI ClientCo ("Valor Total de Retenção"), o Conselho de Administração da Oi poderá deliberar e definir o montante necessário que precisará ser captado, o qual, somado a eventual montante que tiver efetivamente conseguido reter da Receita

Líquida da Venda da UPI ClientCo, não poderá ser superior ao Valor Total de Retenção e informar, em até 5 (cinco) dias da referida deliberação, o montante a ser captado nos termos da **Cláusula 5.5.3** aos Credores do Novo Financiamento, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I. Neste caso, a Oi poderá oferecer em garantia ao Endividamento Adicional Permitido os ativos listados no **Anexo 5.4.3**, a qual observará a ordem de prioridade (*waterfall*) igualmente descrita no **Anexo 5.4.3** e as regras estabelecidas no Contrato entre Credores (*Intercreditor Agreement*).

**5.2.2.1.6.1.** A Oi deverá, em até 5 (cinco) Dias Úteis contados da data da deliberação por seu Conselho de Administração, solicitar, fundamentadamente, autorização ("Pedido de Retenção"), cumulativamente, dos *(i)* Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I) e *(ii)* Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I), observado o disposto na **Cláusula 5.2.3.2)**, para realizar a retenção do Valor de Retenção indicado pelo Conselho de Administração.

**5.2.2.1.6.1.1.** A deliberação pelos Credores Opção de Reestruturação I e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I sobre o Pedido de Retenção deverá ser comunicada à Administração Judicial em até 15 (quinze) Dias Úteis contados da data em que os Credores Opção de Reestruturação Ie Credores da Dívida ToP sem Garantia *Reinstated* – Opção I forem notificados sobre o Pedido de Retenção. Caso a deliberação pelos Credores não ocorra ou o resultado de tal deliberação não seja comunicada à Administração Judicial no prazo previsto acima, o Pedido de Retenção será considerado automaticamente rejeitado. A Administração Judicial deverá comunicar o resultado da deliberação pelos Credores à Oi em até 1 (um) Dia Útil após o término do prazo previsto acima.

**5.2.2.1.6.2.** Os Credores Opção de Reestruturação I e os Credores da Dívida ToP sem Garantia *Reinstated* – Opção I poderão aceitar ou rejeitar, total ou parcialmente, o Pedido de Retenção feito pelas Recuperandas, observado que, no caso de rejeição, total ou parcial, ou ausência de comunicação à Administração Judicial, as Recuperandas estarão autorizadas a levantar o

Endividamento Adicional Permitido, no valor correspondente à diferença ou totalidade do Valor de Retenção objeto do Pedido de Retenção, conforme aplicável, nos termos da **Cláusula 5.5.3.**

**5.2.2.1.6.3.**    Caso determinado Credor Opção de Reestruturação I, Terceiros Novo Financiamento ou Credor da Dívida ToP sem Garantia *Reinstated* – Opção I seja o proponente de uma proposta fechada apresentadas, tal proponente ficará impedido de deliberar sobre Proposta(s) Inferior(es) ao Preço Mínimo UPI ClientCo e o Pedido de Retenção e, para tanto, o respectivo Quórum de Deliberação aplicável ao grupo de tal proponente não levará em consideração o montante de Créditos de titularidade de tal proponente.

**5.2.2.1.7.    Demais Condições UPI ClientCo**. As propostas fechadas a serem apresentadas pelos interessados deverão observar, além dos Requisitos Mínimos de Qualificação previstos no Plano, os seguintes requisitos, sem prejuízo de outras condições e requisitos previstos no Edital UPI ClientCo: *(i)* aquisição de todas as ações de emissão da SPE ClientCo ou de cada SPE ClientCo, conforme aplicável; *(ii)* a expressa adesão aos termos e condições fixados no Edital UPI ClientCo; *(iii)* a concordância com formato e procedimento do Procedimento Competitivo para alienação da UPI ClientCo estabelecidos no Plano e no Edital UPI ClientCo; e *(iv)* a obrigação do interessado de se declarar expressamente vinculado e obrigado a observar todos os termos, condições e obrigações estabelecidos no Plano relativamente à venda da UPI ClientCo, bem como outras eventuais condições que venham a ser definidas até a data da publicação do Edital UPI ClientCo.

**5.2.2.1.8.    Liberação de Garantias.** Na hipótese de alienação da(s) UPI(s) ClientCo, e desde que realizada estritamente nos termos previstos no Plano, as Onerações constituídas em favor dos Credores do Novo Financiamento, Terceiros Novo Financiamento, Credores do Empréstimo-Ponte, Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, Credores da Dívida *Roll-Up*, conforme aplicável e, caso aplicável, dos Credores do Endividamento Adicional Permitido, e que recaiam sobre o Acervo ClientCo ou sobre as ações de emissão da SPE ClientCo deverão ser liberadas na Data de Fechamento Alienação da UPI ClientCo, para que as respectivas operações possam ser realizadas e concluídas, desde que *(i.a)* na mesma Data de Fechamento Alienação da UPI ClientCo, o pagamento do preço do respectivo ativo seja integralmente feito em conta

bancária vinculada (conta *escrow*) de titularidade da Oi e que será ser alienada fiduciariamente em benefício dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I,, e *(i.b)* o contrato da conta *escrow* deverá estabecer a obrigação de realizar a distribuição da Geração de Caixa Excedente (Cash Sweep) nos termos previstos na **Cláusula 5.3**, no Dia Útil subsequente à Data de Fechamento UPI ClientCo do referido ativo; ou *(ii)* caso o pagamento do preço de aquisição da UPI ClientCo no contexto do respectivo Procedimento Competitivo envolva dação em pagamento de ativos, tais ativos, salvo se de outro modo aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, serão Onerados, por meio de garantia constituída e aperfeiçoada previamente à Data de Fechamento Alienação, em favor dos Credores Novo Financiamento, Terceiros Novo Financiamento, Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, Credores da Dívida *Roll-up* e, caso aplicável, dos Credores do Endividamento Adicional Permitido, e tal garantia seja constituída e aperfeiçoada perante todos os cartórios e livros necessários até a Data de Fechamento Alienação da UPI ClientCo, sob condição suspensiva, tornando-se eficaz concomitantemente com a liberação da garantia, observados, neste caso, os termos e condições previstos no Contrato entre Credores (*Intercreditor Agreement*).

**5.2.2.2.** **Alienação da UPI V.tal**. Observados os termos da **Cláusula 5.1(***ii***.2)**, o Procedimento Competitivo para a alienação da UPI V.tal poderá ser realizado nos termos da **Cláusula 5.2.2.2 e seguintes**, na modalidade de propostas fechadas, conforme as regras definidas no Plano e no respectivo edital de alienação ("Edital UPI V.tal").

**5.2.2.2.1.** **Edital UPI V.tal.** O Edital UPI V.tal deverá ser revisado e aprovado, cumulativamente, pelos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I).

**5.2.2.2.1.1.** A revisão e aprovação do Edital UPI V.tal pelos Credores Opção de Reestruturação I deverá ser comunicada à Administração Judicial em até 15 (quinze) dias contados da data em que os respectivos Credores forem notificados sobre o Edital UPI V.tal. Caso a deliberação pelos Credores Opção

de Reestruturação I não seja comunicada à Administração Judicial no prazo previsto, o Edital UPI V.tal será considerado automaticamente rejeitado. A Administração Judicial deverá comunicar o resultado da deliberação à Oi em até 1 (um) Dia Útil.

**5.2.2.2.2.**  **Objeto da Alienação**. O objeto da alienação será de até 100% (cem por cento) das ações de emissão da, conforme aplicável, *(i)* V.tal de titularidade da Oi e de suas subsidiárias no momento da conclusão da referida operação; *ou (ii)* SPE V.tal; em ambos os casos dos itens (i) e (ii), livres e desembaraçadas de qualquer Ônus, na forma dos artigos 60, parágrafo único, 141, inciso II e 142 da LRF e do artigo 133, §1º, inciso II da Lei nº 5.172/1996. Até a Data do Fechamento Alienação da UPI V.tal (ou das UPIs V.tal, conforme aplicável), a totalidade das ações de emissão da V.tal ou da SPE V.tal, conforme aplicável, deverá permanecer Onerada nos termos do Plano.

**5.2.2.2.3.**  **Preço Mínimo UPI V.tal**. O preço mínimo agregado para alienação da UPI V.tal a ser previsto no Edital UPI V.tal será o valor a ser pago à vista, em dinheiro, em moeda corrente nacional, de R$8.000.000.000,00 (oito bilhões de Reais) para a Oi ("Preço Mínimo UPI V.tal"), ressalvado que o Preço Mínimo UPI V.tal poderá ser proporcionalmente alterado para refletir eventual mudança no Acervo V.tal até a data de publicação do Edital UPI V.tal.

**5.2.2.2.4.**  **Deliberação sobre Propostas Inferiores ao Preço Mínimo UPI V.tal**. Caso a Oi receba apenas propostas para aquisição da UPI V.tal, em dinheiro, em valores inferiores ao Preço Mínimo UPI V.tal ("Propostas Inferiores ao Preço Mínimo UPI V.tal"), todas as Propostas Inferiores ao Preço Mínimo UPI V.tal deverão ser submetidas à análise e deliberação: dos Credores Opção de Reestruturação I.

(a)    Em até 10 (dez) dias contados do recebimento das Propostas Inferiores ao Preço Mínimo UPI V.tal, os Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I) deverão deliberar se quaisquer das Propostas Inferiores ao Preço Mínimo UPI V.tal são aceitáveis e comunicar sua decisão à Administração Judicial, observado o disposto na **Cláusula 5.2.3.2.**, hipótese na qual a Proposta Inferior ao Preço Mínimo UPI V.tal aceita será considerada a Proposta Vencedora. Os recursos

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

em dinheiro apurados com a Proposta Vencedora serão distribuídos nos termos da **Cláusula 5.3.2**. Caso a Proposta Vencedora contemple qualquer pagamento em bens ou direitos, tal Proposta Vencedora deverá assegurar o pagamento integral, em dinheiro, do Novo Financiamento - Terceiros.

(b)    Caso a deliberação pelos Credores Opção de Reestruturação I não ocorra ou o resultado da deliberação não seja comunicado à Administração Judicial no prazo previsto acima, todas as Propostas Inferiores ao Preço Mínimo UPI V.tal serão consideradas automaticamente rejeitadas. A Administração Judicial deverá comunicar o resultado da deliberação ao Juízo da Recuperação Judicial em até 2 (dois) Dias Úteis após o término do prazo previsto acima. Para fins de esclarecimento, a Oi não terá direito de veto sobre a deliberação dos Credores Opção de Reestruturação I, nos termos desta Cláusula, tampouco de impor aos Credores Opção de Reestruturação I a aceitação de quaisquer Propostas Inferiores ao Preço Mínimo UPI V.tal.

**5.2.2.2.5.    Forma de Pagamento UPI V.tal**. O Edital UPI V.tal deverá prever que o valor de alienação da UPI V.tal deverá ser pago à vista, em dinheiro, em moeda corrente nacional, exceto se aprovado de outra maneira pelos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I), em qualquer caso observado o disposto na **Cláusula 5.2.3.2**, e ressalvado que os Credores Opção de Reestruturação I não poderão, sem o prévio e expresso consentimento dos Terceiros Novo Financiamento, deliberar pela aceitação de quaisquer propostas que não resultem na quitação integral, em dinheiro, do montante total e atualizado do Novo Financiamento – Terceiros.

**5.2.2.2.6.**    A realização do Procedimento Competitivo para a alienação da UPI V.tal será de discricionariedade dos órgãos administrativos da Oi e não será mandatória.

**5.2.2.2.7.    Demais Condições UPI V.tal**. As propostas fechadas a serem apresentadas pelos interessados deverão observar, além dos Requisitos Mínimos de Qualificação previstos no Plano, os seguintes requisitos, sem prejuízo de outras condições e quesitos previstos no Edital UPI V.tal *(i)* a expressa adesão aos termos e condições fixados no Edital UPI V.tal; *(ii)* a concordância com formato e procedimento do Procedimento Competitivo para alienação da UPI V.tal

estabelecidos no Plano; e *(iii)* a obrigação do interessado de se declarar expressamente vinculado e obrigado a observar todos os termos, condições e obrigações estabelecidos no Plano relativamente à venda da UPI V.tal, bem como outras eventuais condições que venham a ser definidas até a data da publicação do Edital UPI V.tal.

**5.2.2.2.8.** **Liberação de Garantias.** Na hipótese de alienação da UPI V.tal, e desde que realizada estritamente nos termos previstos no Plano, as Onerações que recaem sobre o Acervo V.tal deverão ser liberadas na Data de Fechamento Alienação da UPI V.tal, para que as respectivas operações possam ser realizadas e concluídas, desde que *(i.a)* na mesma Data de Fechamento Alienação, o pagamento do preço do respectivo ativo seja integralmente feito em conta bancária vinculada (conta escrow) de titularidade da Oi e que será alienada fiduciariamente em benefício dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I,, e *(i.b)* o contrato da conta *escrow* deverá estabelecer a obrigação de realizar a distribuição da Geração de Caixa Excedente (Cash Sweep) nos termos previstos na **Cláusula 5.3**, no Dia Útil subsequente à Data de Fechamento Alienação do referido ativo; ou *(ii)* caso o pagamento do preço de aquisição da UPI V.tal no contexto do respectivo Procedimento Competitivo envolva dação em pagamento de ativos, tais ativos, salvo se de outro modo aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, serão Onerados em favor dos Credores Novo Financiamento, Terceiros Novo Financiamento, Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, Credores da Dívida *Roll-up* e, caso aplicável, dos Credores do Endividamento Adicional Permitido, e tal garantia seja constituída e aperfeiçoada perante todos os cartórios e livros necessários até a Data de Fechamento Alienação da UPI ClientCo, sob condição suspensiva, tornando-se eficaz concomitantemente com a liberação da garantia, observados, neste caso, os termos e condições previstos no Contrato entre Credores (*Intercreditor Agreement*).

**5.2.3.** **Regras Gerais dos Procedimentos Competitivos.** O Procedimento Competitivo para alienação de cada UPI Definida deverá observar todos os termos e condições constantes do Plano, da legislação e regulamentação aplicável, incluindo a observância e

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

obtenção das eventuais exigências, autorizações ou limitações regulatórias necessárias, notadamente no que diz respeito à ANATEL e ao CADE, e do respectivo edital, ficando as Recuperandas desde já autorizadas a solicitar ao Juízo da Recuperação Judicial que o auto de arrematação, a ser lavrado após a conclusão de determinado Procedimento Competitivo, preveja que sua eficácia fique condicionada ao efetivo cumprimento das condições precedentes previstas no contrato de compra e venda aplicável à respectiva UPI Definida. Para fins de esclarecimento, cada Procedimento Competitivo deverá ser feito na modalidade de proposta fechada, de modo que as respectivas Propostas Vinculantes permanecerão em sigilo até a data e hora designadas para sua divulgação nos termos do respectivo Edital.

**5.2.3.1.    Edital do Procedimento Competitivo.** Os termos e condições do Procedimento Competitivo (conforme definido abaixo) para a alienação de cada uma das UPIs Definidas será previsto em edital a ser apresentado nos autos da Recuperação Judicial pelas Recuperandas e oportunamente publicado no Diário da Justiça Eletrônico do Tribunal de Justiça do Estado do Rio de Janeiro e em jornal de grande circulação, os quais contemplarão, dentre outras regras: *(a)* prazo para habilitação e para realização do respectivo Procedimento Competitivo; *(b)* prazo e condições para realização de Auditoria, se aplicável; *(c)* os procedimentos a serem adotados em cada Procedimento Competitivo, incluindo a ordem de apresentação e de abertura das Propostas Vinculantes e os critérios para definir as propostas vencedoras, e em todo caso deverão observar as regras mínimas previstas no Plano.

**5.2.3.2.    Coordenação das Deliberações dos Credores**. Caberá ao Administrador Judicial a coordenação de todas as deliberações dos Credores previstas na **Cláusula 5.2.2**, o qual ficará responsável pela apuração tempestiva do quórum de deliberação das respectivas matérias. Quando aplicável, para fins de cômputo das participações dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I que sejam titulares de Créditos em moeda estrangeira nas respectivas deliberações de Credores, deverá ser considerado o valor de tais Créditos conforme convertidos para moeda corrente nacional com base na Taxa de Câmbio Conversão.

**5.2.3.3.    Dispensa de Avaliação Judicial**. As Recuperandas, agindo com transparência e boa-fé, considerando as peculiaridades e características únicas dos ativos que formam as UPIs Definidas e visando à celeridade dos trâmites necessários

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

para a implementação da alienação das UPIs Definidas e à redução de custos no procedimento, sem prejuízo do disposto no Plano, dispensam a realização da avaliação judicial nos Procedimentos Competitivos de alienação das UPIs Definidas, com o que, desde já, os Credores concordam mediante aprovação do Plano. Sujeito apenas e tão somente à Homologação Judicial do Plano, os Credores e as Recuperandas renunciam, desde já, a quaisquer direitos, defesas ou prerrogativas exclusivamente com relação à falta de avaliação judicial nos Procedimentos Competitivos aqui previstos.

**5.2.3.4.** **Auditoria Prévia**. As Recuperandas deverão, no âmbito de cada Procedimento Competitivo *(i)* disponibilizar aos interessados em participar do Procedimento Competitivo, mediante a assinatura de acordo de confidencialidade e quaisquer outros documentos ou a realização de medidas que visem à preservação dos interesses das Recuperandas e o cumprimento das regras legais aplicáveis, inclusive aquelas relativas a aspectos concorrenciais, acesso aos documentos e informações relacionados à respectiva UPI Definida e aos ativos, obrigações e direitos que a compõem para a realização de auditoria legal, financeira e contábil, e avaliação independente dos referidos documentos e informações pelos interessados ("Auditoria"); *(ii)* disponibilizar equipe responsável para responder as dúvidas dos interessados acerca dos ativos, obrigações e direitos que compõem a respectiva UPI Definida; *(iii)* franquear aos interessados razoável acesso aos ativos e passivos vertidos, ou a serem vertidos a cada UPI Definida; e *(iv)* tomar todas as demais medidas necessárias e adequadas para a regular realização do Procedimento Competitivo. Os prazos e condições para a realização da Auditoria de cada UPI Definida constarão do respectivo Edital.

**5.2.3.5.** **Requisitos Mínimos de Qualificação**. Os interessados em participar dos Procedimentos Competitivos deverão manifestar seu interesse no prazo de 7 (sete) Dias Úteis contados da publicação do respectivo Edital ("Qualificação"). Sem prejuízo dos critérios financeiros e demais documentos e condições que venham a ser exigidos em cada Edital nos termos do Plano, cada interessado em participar de qualquer Procedimento Competitivo deverá demonstrar por meio de sua notificação de Qualificação o preenchimento dos seguintes requisitos mínimos de qualificação ("Requisitos Mínimos de Qualificação"), sob pena de desqualificação pela Oi, ressalvado que eventuais interessados que tenham apresentado Proposta Vinculante UPI ClientCo e/ou Proposta Vinculante UPI V.tal que tenham sido aceitas pelas Recuperandas e pelos Credores nos termos das respectivas deliberações estarão dispensados de demonstrar o preenchimento dos Requisitos Mínimos de Qualificação:

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

(i)       o interessado deverá indicar o Procedimento Competitivo no qual deseja participar, indicando, ainda, a UPI Definida para cuja aquisição pretende apresentar proposta;

(ii)      o interessado, por si e/ou por suas Afiliadas, deverá apresentar proposta de aquisição da UPI Definida que desejar, observadas as formas de pagamento permitidas em cada Procedimento Competitivo, bem como os prazos e demais condições previstas na minuta do respectivo contrato de compra e venda, no Plano e no respectivo Edital;

(iii)     o interessado deverá apresentar comprovantes de existência e regularidade, devidamente emitidos pelos órgãos responsáveis pelo registro de constituição do interessado;

(iv)     no caso de pessoa jurídica, o interessado deverá apresentar cópia dos respectivos documentos constitutivos, assim como documento societário que comprove as pessoas físicas ou jurídicas titulares do capital da pessoa jurídica em questão;

(v)      o interessado deverá apresentar declaração de referência bancária de pelo menos 2 (duas) instituições financeiras de primeira linha atestando a sua capacidade econômica, financeira e patrimonial para participar do respectivo Procedimento Competitivo;

(vi)     o interessado deverá apresentar prova de que possui disponibilidade de recursos ou meios suficientes para fazer frente ao pagamento do preço mínimo da respectiva UPI Definida, mediante apresentação de carta de crédito irrevogável e irretratável de instituição financeira registrada no Banco Central do Brasil; e

(vii)    o interessado deverá, obrigatoriamente, concordar expressamente com os termos e condições do Plano e do respectivo Edital, sem quaisquer ressalvas.

**5.2.3.6.**    **Contrato de Compra e Venda**. Após a determinação da Proposta Vencedora, o proponente da Proposta Vencedora e/ou suas Afiliadas deverá celebrar com a Oi um contrato de compra e venda para a aquisição da UPI Definida que tiver adquirido no respectivo Procedimento Competitivo em termos usualmente adotados para operações dessa natureza, no prazo máximo de 90 (noventa) dias corridos contados da data de

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1970E87E2A76

lavratura do Auto de Arrematação, podendo ser estendido pela Oi, desde que aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I. Caso a Oi receba uma Proposta Vinculante para determinado Procedimento Competitivo, o contrato de compra e venda da respectiva UPI Definida deverá ser celebrado substancialmente na forma da minuta que constar como anexo do respectivo Edital.

**5.2.3.7.    Auto de Arrematação**. O Juízo da Recuperação Judicial *(i)* homologará a Proposta Vencedora de cada UPI Definida; e *(ii)* lavrará Auto de Arrematação em favor do vencedor do Procedimento Competitivo de cada UPI Definida e/ou de qualquer Afiliada de tal vencedor. O Auto de Arrematação constituirá documento hábil a comprovar a aquisição judicial da respectiva UPI Definida, com a ausência de sucessão do adquirente em quaisquer dívidas e/ou obrigações das Recuperandas e/ou de quaisquer outras empresas do Grupo Oi, na forma dos arts. 60, parágrafo único, 60-A, 141, inciso II e 142 da LRF e do art. 133, §1º, inciso II da Lei nº 5.172/1966.

**5.2.3.7.1.**    Enquanto as alienações de todas as UPIs Definidas não forem concluídas, sob pena de descumprimento do Plano, *(i)* as UPIs Definidas não poderão assumir ou se sub-rogar em qualquer dívida ou obrigação; e *(ii)* o Grupo Oi não poderá alienar, transferir, onerar ou de qualquer forma dispor dos ativos que compõem as UPIs Definidas, exceto conforme hipóteses previstas no Plano.

**5.2.3.7.2.**    Os ativos, bens e direitos que comporão as UPIs *(i)* são essenciais e estão integralmente vinculados ao cumprimento do Plano, para todos os fins e efeitos de direito, independentemente da transferência de tais ativos para as respectivas UPIs Definidas, nos termos do Plano; e *(ii)* não poderão ser objeto de averbação premonitória, penhora, arresto, sequestro ou qualquer tipo de constrição em benefício ou para assegurar direito de qualquer terceiro, sejam ou não detentores de Créditos de qualquer natureza contra o Grupo Oi.

**5.2.4.    Alienação das UPIs Imóveis e Torres Selecionados.** Observado o disposto nas cláusulas a seguir, bem como nos arts. 60, 60-A, 66-A e 142 da LRF, as UPIs Imóveis e Torres Selecionadas serão alienadas judicialmente, total ou parcialmente, juntas, em conjunto ou separadas, livres e desembaraçadas de qualquer Ônus, por venda direta, pela Oi, de 100% (cem por cento) das ações de emissão de cada uma das SPEs Imóveis e

Torres Selecionados para os Credores *Take or Pay* sem Garantia – Opção I, em razão da particularidade dos ativos que compõem cada UPI Imóveis e Torres Selecionadas. Mediante comum acordo entre a Oi e o respectivo Credor *Take or Pay* sem Garantia – Opção I e sujeito ao cumprimento de condições regulatórias aplicáveis, o Acervo Torres Selecionadas será transferido, no todo ou em parte, diretamente e sem a necessidade de contribuição ao capital da SPE Imóveis e Torres Selecionadas, anteriormente à Data-Limite Transferência Imóveis e Torres Selecionados.

**5.2.4.1.**    O preço de aquisição de cada SPE que integra a UPI Imóveis e Torres Selecionados será pago pelo respectivo Credor *Take or Pay* sem Garantia – Opção I (ou qualquer uma de suas Afiliadas) mediante dação em pagamento de parte dos Créditos do Credor *Take or Pay* sem Garantia – Opção I em valor equivalente ao valor do Acervo Torres Selecionadas e do Acervo Imóveis Selecionados.

**5.2.4.2.**    Na transferência de cada UPI Imóveis e Torres Selecionados, nos termos da **Cláusula 5.2.4**, a Oneração das ações de emissão da SPE Imóveis e Torres ou dos Imóveis e Torres Selecionados, em favor dos Credores *Take or Pay* sem Garantia – Opção I, conforme aplicável, de titularidade da Oi previstas no Plano deverão ser liberadas na Data de Fechamento Alienação das UPIs Imóveis e Torres Selecionados, para que a respectiva operação possa ser realizada e concluída.

**5.2.4.3.**    Em decorrência da alienação das UPIs Imóveis e Torres Selecionados na forma descrita acima, as SPEs Imóveis e Torres Selecionados não responderão por quaisquer obrigações das Recuperandas, incluindo aquelas estabelecidas no Plano, como as obrigações de pagamento de Créditos Concursais, e os Credores *Take or Pay* sem Garantia – Opção I adquirentes das ações de emissão das SPEs Imóveis e Torres Selecionados não sucederão às Recuperandas em quaisquer de suas dívidas ou obrigações ou de quaisquer outras empresas do Grupo Oi, na forma dos arts. 60, parágrafo único, 60-A, 141, inciso II e 142 da LRF e do art. 133, §1º, inciso II da Lei nº 5.172/1966.

**5.2.4.4.**    Os Credores *Take or Pay* sem Garantia – Opção I adquirentes das ações de emissão das SPEs Imóveis e Torres Selecionados deverão celebrar com a Oi instrumento para formalização da aquisição de cada UPI Imóveis e Torres Selecionados em termos usualmente adotados para operações dessa natureza em até 60 (sessenta) dias da Data de Homologação. Na hipótese de não ser possível a transferência definitiva

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1870E87E2A76

de determinado Imóvel Selecionado à respectiva SPE, o Credor *Take or Pay* sem
Garantia – Opção I terá o direito de solicitar a substituição por outro Imóvel de
propriedade da Oi, a ser definido de comum acordo entre a Oi e o respectivo Credor
*Take or Pay* sem Garantia – Opção I, em valor similar para que componha o Acervo
Imóveis Selecionados, sendo que, caso não tenha sido realizado até 31 de dezembro
de 2025 e caso não exista outro Imóvel de propriedade da Oi que possua valor similar
e seja passível de transferência , a Oi compensará o Credor *Take or Pay* sem Garantia
– Opção I no valor equivalente mediante diminuição dos descontos futuros previstos no
Plano.

**5.2.4.5.    Direito de Preferência**. A alienação das UPIs Imóveis e Torres Selecionados
deverá respeitar o direito de preferência e demais direitos outorgados a terceiros e aos
Credores *Take or Pay* – Opção I sobre os bens integrantes do Acervo Imóveis
Selecionados e do Acervo Torres Selecionadas no âmbito dos instrumentos aplicáveis,
incluindo os contratos *take or pay*.

**5.2.4.6.**    Os adquirentes das UPIs Imóveis e Torres Selecionados deverão observar os
termos de quaisquer contratos de cessão do direito de uso a que estejam sujeitos os
Imóveis e Torres Selecionados que componham o acervo da UPI adquirida.

**5.2.4.7.    Preservação das Alienações de UPIs**. Fica assegurada, nos termos dos
arts. 74 e 131 da LRF, a preservação, em qualquer hipótese, de todo e qualquer ato de
alienação em relação à alienação das UPIs Definidas, desde que praticados em
conformidade com as disposições do Plano.

**5.3.    Geração de Caixa Excedente (*Cash Sweep*)**. Após o pagamento integral do DIP
Emergencial Original Atualizado e observado o disposto na **Cláusula 5.3.6**, as Recuperandas
destinarão a *(i)* Receita Líquida da Venda da UPI ClientCo; *(ii)* Receita Líquida da Venda da UPI
V.tal; *(iii)* Receita Líquida da Venda de Ativos; e *(iv)* Receita Líquida da Venda de Imóveis, de
acordo com os seguintes termos e condições:

**5.3.1.    Receita Líquida da Venda da UPI ClientCo.** A Oi destinará a Receita Líquida da
Venda da UPI ClientCo na seguinte ordem:

(i)      o montante correspondente ao Valor de Retenção, cujo Pedido de Retenção
tenha sido aprovado pelos Credores Opção de Reestruturação I e dos Credores da
Dívida ToP sem Garantia *Reinstated* – Opção I, nos termos das **Cláusulas 5.2.2.1.6**

**e seguintes**, será destinado para Oi realizar investimentos em suas próprias atividades e/ou de suas Afiliadas;

(ii)    o montante equivalente a 100% (cem por cento) do saldo remanescente da Receita Líquida da Venda da UPI ClientCo após a retenção e destinação prevista no **item (i)** acima, conforme aplicável, será usado para amortizar integralmente o Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, de forma *pro rata*;

(iii)    após a amortização integral do Novo Financiamento e, se realizado, do Empréstimo-Ponte, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda da UPI ClientCo será usado para amortizar integralmente a Dívida ToP sem Garantia *Reinstated – Opção I,* de forma *pro rata*;

(iv)    após a amortização integral da Dívida ToP sem Garantia *Reinstated – Opção I*, o montante equivalente a *(a)* 60% (sessenta por cento) de eventual saldo da Receita Líquida da Venda da UPI ClientCo será usado para resgate ou amortização da totalidade ou de parte, de forma *pro rata*, da Dívida *Roll-Up;* e *(b)* 40% (quarenta por cento) de eventual saldo da Receita Líquida da Venda da UPI ClientCo poderá ser usado pela Oi para investimentos em suas próprias atividades ou de suas Afiliadas, desde que, até a amortização integral da Dívida *Roll-Up*, os recursos decorrentes da venda de ativos nos termos do Plano que sejam efetivamente destinados à Oi, incluindo o Valor de Retenção, deverão observar o limite total e agregado de R$ 5.500.000.000,00 (cinco bilhões e quinhentos milhões de reais) ("Limite de Liquidez Oi").

**5.3.2.**    **Receita Líquida da Venda da UPI V.tal.** A Oi destinará a Receita Líquida da Venda da UPI V.tal na seguinte ordem:

(i)    o montante equivalente a 100% (cem por cento) da Receita Líquida da Venda da UPI V.tal será usado para amortizar integralmente o Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, de forma *pro rata*;

(ii)    após a amortização integral do Novo Financiamento e, se realizado, do Empréstimo-Ponte, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda da UPI V.tal será usado para amortizar integralmente a Dívida ToP sem Garantia *Reinstated – Opção I,* de forma *pro rata*;

(iii)    após a amortização integral da Dívida ToP sem Garantia *Reinstated* – Opção I, o montante equivalente a USD100.000.000,00 (cem milhões de Dólares) de eventual saldo da Receita Líquida da Venda da UPI V.tal será usado para amortizar o Endividamento Adicional Permitido, caso aplicável; e

(iv)    após a amortização integral da Dívida ToP sem Garantia *Reinstated* – Opção I e, se aplicável, do Endividamento Adicional Permitido, até o limite de a USD100.000.000,00 (cem milhões de Dólares), o montante equivalente a *(a)* 60% (sessenta por cento) de eventual saldo da Receita Líquida da Venda da UPI V.tal será usado para resgate ou amortização da totalidade ou de parte, de forma *pro rata*, da Dívida *Roll-Up;* e *(b)* 40% (quarenta por cento) de eventual saldo da Receita Líquida da Venda da UPI V.tal será usado pela Oi para investimentos em suas próprias atividades ou de suas Afiliadas, desde que sempre observado do Limite de Liquidez Oi previsto na **Cláusula 5.3.1(iv)**.

**5.3.3.**    **Receita Líquida da Venda de Ativos**. Sem prejuízo do disposto nas **Cláusulas 5.3.1 e 5.3.2** acima e da **Cláusula 5.3.4** abaixo, a Oi destinará os montantes da Receita Líquida da Venda de Ativos da seguinte forma:

(i)    o montante equivalente a 100% (cem por cento) da Receita Líquida da Venda de Ativos será usado para amortizar integralmente o Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, de forma *pro rata*;

(ii)    após a amortização integral do Novo Financiamento e, se realizado, do Empréstimo-Ponte, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda de Ativos será usado para amortizar integralmente a Dívida ToP sem Garantia *Reinstated* – Opção I, de forma *pro rata*; e

(iii)    após a amortização integral da Dívida ToP sem Garantia *Reinstated* – Opção I, o montante equivalente a *(a)* 60% (sessenta por cento) de eventual saldo da Receita Líquida da Venda de Ativos será usado para resgate ou amortização da totalidade ou de parte, de forma *pro rata*, da Dívida *Roll-Up;* e *(b)* 40% (quarenta por cento) de eventual saldo da Receita Líquida da Venda de Ativos será usado pela Oi para investimentos em suas próprias atividades ou de suas Afiliadas, desde que sempre observado do Limite de Liquidez Oi previsto na **Cláusula 5.3.1(iv).**

**5.3.4.**    **Receita Líquida da Venda de Imóveis**. Como condição à destinação da Receita

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

Líquida da Venda de Imóveis na ordem de pagamento abaixo, a Companhia envidará esforços para alterar, conforme aplicável, as regras de pagamento (*waterfall*) e documentos correlatos junto aos credores detentores das garantias cujos objetos são os Imóveis ou recebíveis decorrentes da alienação dos Imóveis:

(i)    **Receita Líquida da Venda de Imóveis limitada a R$ 600.000.000,00**. A Receita Líquida da Venda de Imóveis acumulada recebida pela Oi desde a Homologação do Plano, limitada ao montante agregado de R$ 600.000.000,00 (seiscentos milhões de Reais), será 100% (cem por cento) usada pela Oi para investimentos em suas próprias atividades ou de suas Afiliadas;

(ii)    **Receita Líquida da Venda de Imóveis acima de R$ 600.000.000,00, limitada a R$ 1.600.000,00**. Após o término do prazo previsto na **Cláusula 4.10**, a Receita Líquida da Venda de Imóveis acumulada recebida pela Oi no montante que ultrapassar R$ 600.000.000,00 (seiscentos milhões de Reais), limitada ao montante agregado de R$ 1.600.000.000,00 (um bilhão e seiscentos milhões de Reais), será utilizada para pagamento, de forma *pro rata* aos respectivos Créditos, aos seguintes Credores:

(1.1)    Credores Fornecedores Parceiros*;*

(1.2)    Dívida ToP com Garantia *Reinstated*;

(1.3)    Dívida ToP sem Garantia *Reinstated* – Opção I;

(1.4)    Dívida ToP sem Garantia *Reinstated* – Opção II;

(1.5)    Credores Extraconcursais Aderentes.

(iii)    **Receita Líquida da Venda de Imóveis acumulada acima de R$ 1.600.000.000,00**. A Receita Líquida da Venda de Imóveis acumulada recebida pela Oi acima de R$ 1.600.000.000,00 (um bilhão e seiscentos milhões de Reais) será 100% (cem por cento) distribuída da seguinte forma:

(a)    o montante equivalente a 100% (cem por cento) da Receita Líquida da Venda de Imóveis será usado para amortizar integralmente a Dívida ToP sem Garantia *Reinstated* – Opção I*, de forma *pro rata;*

(b)    após a amortização integral da Dívida ToP sem Garantia *Reinstated* – Opção I, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda de Imóveis será usado para amortizar integralmente o Endividamento Adicional Permitido, caso aplicável;

(c)    após a amortização integral da Dívida ToP sem Garantia *Reinstated* – Opção I e, caso aplicável, do Endividamento Adicional Permitido, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda de Imóveis será usado para amortizar integralmente o Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, de forma *pro rata*; e

(d)    após a amortização integral do Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda de Imóveis será usado para amortizar integralmente a Dívida *Roll-Up,* de forma *pro rata*.

**5.3.4.1.**    <u>**Conta Escrow Imóveis**</u>. Na hipótese de alienação de qualquer Imóvel antes da Data de Fechamento Alienação da UPI ClientCo, as Recuperandas deverão depositar os valores relativos à respectiva Receita Líquida da Venda de Imóveis em uma conta vinculada de titularidade das Recuperadas, a ser por elas constituída ("<u>Conta Escrow Imóveis</u>"), os quais só poderão ser distribuídos, nos termos da **Cláusula 5.3.4**, após a Data de Fechamento Alienação da UPI ClientCo, no prazo estabelecido no próprio contrato da Conta Escrow Imóveis. Caso as Recuperandas alienem Imóveis após a Data de Fechamento Alienação da UPI ClientCo, os valores relativos à respectiva Receita Líquida da Venda de Imóveis devida aos Credores serão distribuídos bimestralmente pelas Recuperandas, observado o disposto na **Cláusula 5.3.4**.

**5.3.4.2.**    As Recuperandas deverão outorgar, na data de criação da Conta Escrow Imóveis, garantia sobre a Conta Escrow Imóveis à Dívida ToP sem Garantia *Reinstated* – Opção I, que terá prioridade sobre referida garantia, e ao Novo Financiamento, observada a ordem de pagamento (*waterfall*) e demais termos previstos no Contrato entre Credores (*Intercreditor Agreement*).

**5.3.5.**    <u>**Veículo Imóveis**</u>. Em alternativa à venda direta dos Imóveis, as Recuperandas poderão, a seu exclusivo critério, constituir veículo para o qual serão aportados os Imóveis ("<u>Veículo Imóveis</u>"), podendo, as Recuperandas, a seu exclusivo critério, optar por dar em pagamento aos Credores, nos termos dos artigos 356 a 359 do Código Civil, participação

societária do referido Veículo Imóveis, na proporção dos seus respectivos Créditos.

5.3.5.1. Mediante a implementação da dação em pagamento prevista na **Cláusula 5.3.5**, os Credores aplicáveis outorgarão às Recuperandas, de forma irrevogável e irretratável, a mais ampla, rasa e geral quitação com relação aos Créditos aplicáveis, não tendo mais nada a reclamar com relação aos referidos Créditos.

5.3.6.    **Distribuição dos recursos do Cash Sweep**. A distribuição dos valores relativos ao Cash Sweep descritos na Cláusulas 5.3 ocorrerá, observadas as regras e prioridades nela descritas, com a consequente redução proporcional do saldo dos respectivos Créditos e limitado ao valor dos respectivos Créditos, conforme aplicável. Eventual saldo remanescente dos Créditos após o pagamento decorrente do Cash Sweep será recalculado e ajustado nos termos do presente Aditamento e seu pagamento observará o disposto, respectivamente, nas **Cláusulas 4.2.8, 4.2.9 e 4.2.2**, conforme o caso.

5.4.    **Depósitos Recursais.** Mediante a Homologação Judicial deste Aditamento, as Recuperandas estarão autorizadas a levantar todos e quaisquer depósitos recursais que garantem Créditos Concursais decorrentes de recursos de natureza trabalhista, em trâmite perante a Justiça do Trabalho.

5.4.1.1.    À medida que os depósitos recursais de natureza trabalhista forem levantados pelas Recuperandas, os recursos obtidos serão utilizados da seguinte forma:

(a)    50% (cinquenta por cento) dos recursos levantados pelas Recuperandas serão utilizados para o pagamento dos Credores Trabalhistas – Opção I, sendo certo que, uma vez atingido o  limite do valor agregado de R$ 30.000.000,00 (trinta milhões de reais), nos termos da **Cláusula 4.1.1**, 50% (cinquenta por cento) dos recursos obtidos pelas Recuperandas deverão ser utilizados para pagamento dos Credores Trabalhistas – Opção II; e

(b)    50% (cinquenta por cento) dos recursos levantados pelas Recuperandas será utilizado para o capital de giro da Companhia.

5.4.1.1.1. Caso o valor líquido do Crédito Trabalhista a ser pago nos termos das **Cláusulas 4.1.1 e 4.1.2**, no momento do levantamento do depósito recursal de natureza trabalhista, seja inferior ao valor correspondente a 50% (cinquenta por cento) do respectivo depósito recursal de natureza trabalhista, as Recuperandas

pagarão ao Credor Trabalhista o equivalente ao seu Crédito Trabalhista, sendo a diferença utilizada para capital de giro da Companhia.

**5.4.1.2.** **Veículo Direitos Creditórios**. Após o término do prazo de 3 (três) anos previsto na **Cláusula 4.1.2** deste Aditamento, as Recuperandas poderão, a seu exclusivo critério, constituir veículo para o qual serão aportados os direitos creditórios sobre os depósitos recursais de natureza trabalhista ("Veículo Direitos Creditórios"), podendo, inclusive, dar em pagamento aos Credores Trabalhistas – Opção II, nos termos dos artigos 356 a 359 do Código Civil, participação societária do referido Veículo Direitos Creditórios, na proporção dos seus respectivos Créditos Trabalhistas – Opção II.

**5.4.1.2.1.** Mediante a implementação da dação em pagamento prevista na **Cláusula 5.4.1.2**, os Credores Trabalhistas – Opção II outorgarão às Recuperandas, de forma irrevogável e irretratável, a mais ampla, rasa e geral quitação com relação ao Crédito Trabalhista – Opção II, não tendo mais nada a reclamar com relação aos referidos Créditos.

**5.5.** **Formas de Financiamento**. Como fator essencial para a manutenção do capital de giro adequado das Recuperandas e de suas Afiliadas e para viabilizar o pagamento de Créditos Extraconcursais, incluindo o DIP Emergencial Original Atualizado, bem como de parte dos Crédito Concursais após a Homologação Judicial do Plano, a Oi *(i)* contratará o Novo Financiamento previsto na **Cláusula 5.5.1**; *(ii)* contratará o Empréstimo-Ponte previsto na **Cláusula 5.5.2**; e *(iii)* poderá contratar o Endividamento Adicional Permitido, sujeito aos termos e condições previstos na **Cláusula 5.5.3**.

**5.5.1.** **Novo Financiamento**. A Oi contratará novos recursos no valor total de até USD 655.000.000,00 (seiscentos e cinquenta e cinco milhões de Dólares), não podendo ser inferior a USD 650.000.000,00 (seiscentos e cinquenta milhões de Dólares) ou o equivalente em Reais, sendo *(a)* até USD 505.000.000,00 (quinhentos e cinco milhões de Dólares), não podendo ser inferior a USD 500.000.000,00 (quinhentos milhões de Dólares) ou o equivalente em Reais ("Valor Novo Financiamento – Credores Opção de Reestruturação I") a ser concedido pelos Credores Opção de Reestruturação I ("Credores do Novo Financiamento" e "Novo Financiamento – Credores Opção de Reestruturação I", respectivamente); e *(b)* USD 150.000.000,00 (cento e cinquenta milhões de Dólares), ou o equivalente em Reais ("Valor Novo Financiamento – Terceiros") a ser concedido por

qualquer Pessoa que não os Credores Opção de Reestruturação I ("Terceiros Novo
Financiamento" e "Novo Financiamento – Terceiros", sendo o Novo Financiamento –
Terceiros e o Novo Financiamento – Credores Opção de Reestruturação I definidos, em
conjunto, como o "Novo Financiamento").

**5.5.1.1.    Natureza Prioritária.** O Novo Financiamento será considerado financiamento
extraconcursal prioritário e gozará de prioridade absoluta sobre todas as demais
obrigações de pagamento devidas pelas Recuperandas, observado o disposto nos arts.
66, 67, 69 e seguintes e 84 da LRF. Com a Homologação Judicial do Plano, as
Recuperandas poderão contratar o Novo Financiamento sem a necessidade de nova
autorização pela Assembleia Geral de Credores ou pelo Juízo da Recuperação Judicial,
inclusive para a constituição das garantias, e eventual modificação em grau de recurso
da Homologação Judicial do Plano não alterará a natureza extraconcursal e super
prioritária do Novo Financiamento, na forma dos arts. 69-A e 69-B da LRF.

**5.5.1.2.    Destinação de Recursos.** A Oi destinará 100% (cem por cento) do Valor
Total do Novo Financiamento prioritariamente para amortizar ou refinanciar o saldo do
DIP Emergencial Original Atualizado (incluindo todos os seus encargos devidos até a
data do seu pagamento), caso existente, inclusive mediante a conversão prevista na
**Cláusula 5.4.1.3.1(i)**. A Oi usará eventual saldo remanescente, após a amortização do
saldo do DIP Emergencial Original Atualizado (incluindo todos os seus encargos devidos
até a data do seu pagamento) para o cumprimento de suas obrigações, observados os
termos do Plano.

**5.5.1.3.    Adesão ao Novo Financiamento.** Observado o disposto na **Cláusula 5.5**,
cada Pessoa que desejar participar do Novo Financiamento deverá enviar para a Oi, em
até 30 (trinta) dias contados da Data de Homologação e de acordo com a **Cláusula 10.7**,
o Termo de Adesão Novo Financiamento constante do **Anexo 5.5.1.3**, devidamente
preenchido e assinado pela respectiva Pessoa ou seus representantes.

**5.5.1.4.    Compromisso de Adesão ao Novo Financiamento – Credores Opção de
Reestruturação I.** Como forma de apoio à Recuperação Judicial e ao soerguimento do
Grupo Oi, os Credores do DIP Emergencial Original Atualizado firmaram com a Oi um
compromisso de apoio ao Novo Financiamento – Credores Opção de Reestruturação I,
por meio do qual poderão *(i)* converter seus Créditos Extraconcursais decorrentes do
DIP Emergencial Original Atualizado ou, caso aplicável, do Empréstimo-Ponte em

parcela do Novo Financiamento – Credores Opção de Reestruturação I, na proporção de USD1,00/USD1,00 (ou o equivalente em Reais) de Créditos Extraconcursais para cada USD1,00/USD1,00 (ou o equivalente em Reais) de Novo Financiamento – Credores Opção de Reestruturação I; e/ou *(ii)* desembolsar o valor remanescente, em dinheiro, do total do Novo Financiamento – Credores Opção de Reestruturação I, caso o montante convertido não seja suficiente para atingir o Valor Novo Financiamento – Credores Opção de Reestruturação I ("Diferença Novo Financiamento – Credores Opção de Reestruturação I"), desde que verificadas todas as condições aplicáveis previstas no Plano e nos Instrumentos do Novo Financiamento – Credores Opção de Restruturação I. Em contrapartida, os Credores do DIP Emergencial Original Atualizado e do Empréstimo-Ponte, conforme aplicável, farão jus ao recebimento do *Conversion Fee*, nos termos previstos na **Cláusula 5.5.1.4.4.**

**5.5.1.4.1.1.** Os Credores Opção de Reestruturação I poderão, a seu exclusivo critério, determinar a alocação da Diferença Novo Financiamento – Credores Opção de Reestruturação I entre todos ou parte dos Credores Opção de Reestruturação I, caso aplicável, desde que, e em qualquer circunstância, a totalidade do Valor do Novo Financiamento – Credores Opção de Reestruturação I seja efetivamente atingida.

**5.5.1.4.2. Compromisso de Adesão ao Novo Financiamento – Terceiros.** Como forma de apoio à Recuperação Judicial e ao soerguimento do Grupo Oi, terceiro, por meio da entrega à Oi de Termo de Adesão ao Novo Financiamento – Terceiros, comprometeu-se a apoiar o Novo Financiamento – Terceiros, por meio do qual se obrigou a desembolsar o Valor Novo Financiamento – Terceiros, mediante *(a)* conversão de seus Créditos Extraconcursais decorrentes do Empréstimo-Ponte, caso aplicável, em parcela do Novo Financiamento – Terceiros, na proporção de USD1,00/USD1,00 (ou o equivalente em Reais) de Créditos Extraconcursais para cada USD1,00/USD1,00 (ou o equivalente em Reais) de Novo Financiamento – Terceiros; e/ou *(b)* o desembolso, em dinheiro, do valor remanescente do total do Novo Financiamento – Terceiros, caso o montante convertido não seja suficiente para atingir o Valor Novo Financiamento – Terceiros; em qualquer caso, desde que verificadas todas as condições aplicáveis previstas no Plano e nos Instrumentos do Novo Financiamento – Terceiros. Em contrapartida, os Terceiros Novo Financiamento farão jus ao recebimento da Taxa de Apoio, nos termos previstos na **Cláusula 5.5.1.4.5**.

**5.5.1.4.3. Conversão Obrigatória de Créditos.** Sem prejuízo do disposto na **Cláusula 5.5.1.4**, o instrumento a ser celebrado pelas Recuperandas para a contratação do Empréstimo-Ponte nos termos da **Cláusula 5.5.2** deverá prever que cada Credor do Empréstimo-Ponte estará obrigado a converter o montante do Empréstimo-Ponte concedido à Oi em parcela do Novo Financiamento, na proporção de R$1,00/USD1,00 do montante do Empréstimo-Ponte concedido para cada R$1,00/USD1,00 de Novo Financiamento. Neste caso, cada Credor Empréstimo-Ponte fará jus ao recebimento do *Conversion Fee*, nos termos previstos na **Cláusula 5.5.1.4.4**.

**5.5.1.4.4. Conversion *Fee*.** Cada Credor que converter seus Créditos Extraconcursais decorrentes do DIP Emergencial Original Atualizado ou do Empréstimo-Ponte em parte do Novo Financiamento – Credores de Opção de Restruturação I, nos termos previstos na **Cláusula 5.5.1.4**, fará jus ao recebimento de uma taxa de conversão, nos termos previstos nos Instrumentos do Novo Financiamento e no montante proporcional ao montante de seus Créditos Extraconcursais ("*Conversion Fee*").

**5.5.1.4.5. Taxa de Apoio.** Cada Terceiro Novo Financiamento que se comprometer a apoiar o Novo Financiamento – Terceiros, nos termos da **Cláusula 5.5.1.4.2**, fará jus ao recebimento de uma taxa de apoio, nos termos previstos nos Instrumentos do Novo Financiamento e no montante proporcional ao Valor Novo Financiamento – Terceiros efetivamente desembolsado ("Taxa de Apoio").

**5.5.1.5. Contratação do Novo Financiamento**. Para a contratação do Novo Financiamento, a Oi realizará a emissão de *(i)* Notes Novo Financiamento – Credores Opção de Reestruturação I em Dólar ou Debêntures Novo Financiamento – Credores Opção de Reestruturação I em Reais; e *(ii)* Notes Novo Financiamento – Terceiros em Dólar ou Debêntures Novo Financiamento – Terceiros em Reais (sendo **itens (i)** e **(ii)**, "Instrumentos do Novo Financiamento"), os quais deverão prever termos e condições substancialmente iguais (ressalvadas apenas as adequações necessárias em razão das respectivas Leis aplicáveis) e observar os seguintes termos e condições mínimos:

(a)    Data de Emissão: Será a data assim definida nos respectivos Instrumentos do Novo Financiamento, a qual deverá ocorrer até 15 de julho de 2024, podendo ser estendida em comum acordo pela Oi, os Credores do Novo Financiamento e os

Terceiros Novo Financiamento. O Novo Financiamento deverá ser emitido na mesma data da Dívida *Roll-Up*, da Dívida Participativa e da Dívida *A&E Reinstated,* em forma e conteúdo satisfatórios aos Credores Opção de Reestruturação I (mediante Deliberação de Credores Opção de Reestruturação I) e aos Terceiros Novo Financiamento (mediante Deliberação de Terceiros Novo Financiamento), agindo de boa-fé, substancialmente nos termos e condições estabelecidos no **Anexo 5.5.1** na data definida no respectivo Instrumento do Novo Financiamento.

(b)    Pagamento do Principal: O valor do principal será amortizado, em apenas uma parcela (*bullet*), em 30 de junho de 2027 ("Data de Vencimento Novo Financiamento").

(c)    Juros e Correção Monetária: Na hipótese de o Novo Financiamento ser concedido em Dólares, as Recuperandas poderão optar entre *(a)* juros de 10,0% (dez por cento) ao ano, a serem pagos trimestralmente com início no último dia do terceiro mês após a Data de Emissão prevista no **item (a)** acima, sendo que o primeiro e o segundo pagamentos de juros serão integralmente capitalizados ao valor de principal e os demais pagamentos serão feitos em dinheiro; ou *(b)* juros de 13,5% (treze vírgula cinco por cento) ao ano, sendo que 7,5% (sete vírgula cinco por cento) serão pagos trimestralmente, em dinheiro, com início no último dia do terceiro mês após a Data de Emissão prevista no **item (a)** acima e 6,0% (seis por cento) serão capitalizados trimestralmente ao valor do principal e pagos na Data de Vencimento Novo Financiamento. Na hipótese de o Novo Financiamento ser concedido em Reais, as Recuperandas poderão optar entre *(a)* juros de 15,99% (quinze vírgula noventa e nove por cento) ao ano, a serem pagos trimestralmente com início no último dia do terceiro mês após a Data de Emissão prevista no **item (a)** acima, sendo que o primeiro e o segundo pagamentos de juros serão capitalizados ao valor de principal e os demais pagamentos serão feitos em dinheiro; ou *(b)* juros de 20,06% (vinte vírgula zero seis por cento) ao ano, sendo que 13,04% (treze vírgula zero quatro por cento) serão pagos trimestralmente, em dinheiro, com início no último dia do terceiro mês após a Data de Emissão prevista no **item (a)** acima e 7,02% (sete vírgula zero dois por cento) serão capitalizados trimestralmente ao valor do principal e pagos na Data de Vencimento Novo Financiamento..

(d)    Garantias: O Novo Financiamento será garantido pelos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, de forma *pro rata*, observados os termos e condições previstos

nos Instrumentos de Garantia do Novo Financiamento, listados no **Anexo 4.2.2.2.1(f)(II)**, os quais estão em negociação e serão finalizados de boa-fé entre a Oi e Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e aprovados por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, respectivamente, bem como a ordem de pagamento (*waterfall*) e demais termos previstos no Contrato entre Credores (*Intercreditor Agreement*), substancialmente na forma do **Anexo 4.2.2.2.1(f)(III)**, observada, em qualquer caso, a impossibilidade de anulação ou declaração de ineficácia de tais garantias na forma do art. 66-A da LRF.

(e)     Liberação de Garantias**:** Na hipótese de alienação dos ativos listados no **Anexo 4.2.2.2.1(f)(I)**, as Onerações previstas no **item (d)** acima deverão ser liberadas na Data de Fechamento Alienação, para que as respectivas operações possam ser realizadas e concluídas, desde que *(i.a)* na mesma Data de Fechamento Alienação, o pagamento do preço do respectivo ativo seja integralmente feito em conta bancária vinculada (conta escrow) de titularidade da Oi que deverá ser alienada fiduciariamente em benefício dos Credores Opção de Reestruturação I, Terceiros Novo Financiamento e Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, e *(i.b)* o contrato da conta *escrow* deverá estabelecer a obrigação de realizar a distribuição da Geração de Caixa Excedente (Cash Sweep) nos termos previstos na **Cláusula 5.3**, no Dia Útil subsequente à Data de Fechamento Alienação do referido ativo; ou *(ii)* caso o pagamento do preço de aquisição do ativo no contexto do respectivo Procedimento Competitivo envolva dação em pagamento de ativos, tais ativos, salvo se de outro modo aprovado por Deliberação de Credores Opção de Reestruturação I, Deliberação de Terceiros Novo Financiamento e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, serão Onerados, por meio de garantia constituída e aperfeiçoada previamente à Data de Fechamento Alienação, sob condição suspensiva, tornando-se eficaz concomitantemente com a liberação da garantia, observados, neste caso, os termos e condições previstos no **item (d)** acima.

(f)     Prioridade do Novo Financiamento. Os valores desembolsados no âmbito do Novo Financiamento – Credores Opção de Reestruturação I são classificados como Créditos Extraconcursais, *pari passu* com o Novo Financiamento – Terceiros, e com prioridade sobre os demais Créditos Concursais e Extraconcursais das

Recuperandas, nos termos dos arts. 67, 69, 69-A e seguintes, e 84, I-B, da LRF, desde que o DIP Emergencial Original Atualizado e o Empréstimo-Ponte tenham sido prévia e integralmente quitados.

(g)    <u>Regras de Interpretação</u>: Na hipótese de haver conflito de interpretação entre as disposições do Plano e as obrigações previstas nos respectivos Instrumentos do Novo Financiamento, o referido instrumento prevalecerá, sendo certo que os Instrumentos do Novo Financiamento deverão refletir, no mínimo, os termos e condições previstos nesta **Cláusula 5.5.1** e no **Anexo 5.5.1**.

**5.5.1.5.1.** O Novo Financiamento – Credores Opção de Reestruturação I poderá ser outorgado às Recuperandas pelos Credores Opção de Reestruturação I ou *(i)* quaisquer fundos ou entidades administradas ou geridas pelo referido Credor Opção de Reestruturação I ou que seja assessorada ou gerida pelo mesmo assessor ou gestor do referido Credor Opção de Reestruturação I; ou *(ii)* qualquer Afiliada do referido Credor Opção de Reestruturação I ou das partes descritas no **item (i)**. O Credor Opção de Reestruturação I será considerado, para todos os fins, como tendo validamente eleito e participado da Opção de Reestruturação I se quaisquer uma das partes mencionadas nos **itens (i) e (ii)** desta **Cláusula 5.5.1.5.1** tiver tempestivamente submetido o compromisso de adesão ao Novo Financiamento – Credores Opção de Reestruturação I, nos termos da **Cláusula 5.5.1.3** acima.

**5.5.2.** **Empréstimo-Ponte**. As Recuperandas captarão *(i)* após a Data de Homologação do Plano; ou *(ii)* caso aceito pelos Credores do Empréstimo-Ponte, após a Aprovação do Plano, desde que previamente aprovado pelo Juízo da Recuperação Judicial, novos recursos, no montante total em Reais equivalente a até USD 135.796.059,00 (cento e trinta e cinco milhões, setecentos e noventa e seis mil e cinquenta e nove Dólares) ("<u>Limite Empréstimo-Ponte</u>"), por meio de um empréstimo-ponte a ser contratado na forma do instrumento do **Anexo 5.5.2(i)**, garantido na forma dos instrumentos constantes do **Anexo 5.5.2(ii)** ("<u>Empréstimo-Ponte</u>"), observadas as obrigações assumidas no contexto do DIP Emergencial Original Atualizado.

**5.5.2.1.** O Empréstimo-Ponte será concedido preferencialmente pelos Credores do Financiamento DIP Original Atualizado, os quais deverão confirmar seu compromisso de financiamento até 19 de abril de 2024. Caso até 19 de abril de 2024, os Credores do Financiamento DIP Original Atualizado não confirmem seu compromisso de

financiamento ou permaneçam silentes, as Recuperandas ficarão automaticamente autorizadas pelos Credores Concursais que forem Credores do Financiamento DIP Original Atualizado a buscar alternativas de financiamento no mercado para captação de montante equivalente ao Empréstimo-Ponte com qualquer Pessoa e contarão com um *waiver* de tais Credores do Financiamento DIP Original Atualizado e dos demais Credores do Financiamento DIP Original Atualizado nos respectivos instrumentos para tal contratação.

**5.5.3.** <u>**Endividamento Adicional Permitido**</u>. Caso (i) o Valor de Retenção aprovado pelos Credores Opção de Reestruturação I, pelos Terceiros Novo Financiamento e pelos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, nos termos da **Cláusula 5.2.2.1.6**, seja inferior a R$ 1.500.000.000,00 (um bilhão e quinhentos milhões de reais), ou (ii) não seja aprovado qualquer Valor de Retenção, a Oi estará autorizada a captar recursos financeiros junto a terceiros em montante correspondente à diferença entre R$ 1.500.000.000,00 (um bilhão e quinhentos milhões de reais) e o Valor de Retenção efetivamente aprovado, se for o caso ("<u>Endividamento Adicional Permitido</u>"). Nessa hipótese, a Oi poderá oferecer em garantia ao Endividamento Adicional Permitido os ativos listados no **Anexo 5.5.3**, a qual observará a ordem de prioridade (*waterfall*) igualmente descrita no **Anexo 5.5.3** e as regras estabelecidas no Contrato entre Credores (*Intercreditor Agreement*).

**5.6.** <u>**Aumentos de Capital Adicionais**</u>. Exceto conforme permitido nos termos do Plano, a Companhia poderá realizar, a qualquer tempo após a implementação da Nova Governança, sem a necessidade de prévia autorização dos Credores Concursais em Assembleia Geral de Credores, e observadas e/ou obtidas eventuais exigências, autorizações ou limitações regulatórias necessárias, notadamente no que diz respeito à ANATEL e ao CADE, novos aumentos de capital por meio de subscrição pública ou privada, bem como Aumentos de Capital Autorizados, sendo certo que os recursos captados pelas Recuperandas por meio dos referidos aumentos de capital não terão natureza extraconcursal para fins do disposto na LRF, uma vez que não representam obrigações de pagamento.

**5.6.1.** <u>**Aumentos de Capital em Recuperandas**</u>. Após a implementação da Nova Governança, a Oi também poderá, caso necessário e sem a necessidade de prévia autorização dos Credores Concursais em Assembleia Geral de Credores, *(i)* aprovar, subscrever e integralizar aumentos de capital em outras Recuperandas; e/ou *(ii)* realizar empréstimo via *intercompany* para a transferência de recursos para outras Recuperandas.

Docusign Envelope ID: 6BB4A9EE-257F-4205-ACD9-1070E87E2A76

**6.    REORGANIZAÇÃO SOCIETÁRIA**

**6.1.**    As Recuperandas poderão realizar *(a)* a qualquer tempo, inclusive antes da implementação da Nova Governança, as operações de reorganização societária descritas no **Anexo 6.1(A),** bem como operações previstas no Plano ou que possibilitem a implementação do Plano; e *(b)* após a implementação da Nova Governança, as operações de reorganização societária descritas no **Anexo 6.1(B)** e outras operações de reorganização societária que venham a ser oportunamente definida pelas Recuperandas, nos termos do art. 50 da LRF, tais como cisão, fusão, incorporação ou incorporação de ações de uma ou mais sociedades, transformação, dissolução ou liquidação entre as próprias Recuperandas e/ou quaisquer de suas Afiliadas, sempre com o objetivo de otimizar as suas operações e obter uma estrutura mais eficiente, manter suas atividades, incrementar os seus resultados e implementar seu plano estratégico, contribuindo assim para o cumprimento das obrigações constantes do Plano, em qualquer caso desde que aprovadas pelos órgãos societários aplicáveis das respectivas Recuperandas, obtidas as autorizações governamentais, caso aplicáveis e necessárias, e observadas as obrigações das Recuperandas assumidas perante Credores Extraconcursais.

**7.    GOVERNANÇA CORPORATIVA**

**7.1.**    **Condução Regular dos Negócios**. A partir da Aprovação do Plano e até a implementação da Nova Governança, as Recuperandas se obrigam a conduzir suas operações e atividades (e as operações e atividades de suas Afiliadas) com zelo e diligência, em observância à Lei, observado que as Recuperandas não deliberem ou pratiquem quaisquer dos atos listados no **Anexo 7.1** ("Matérias Restritas"), exceto se *(i)* estejam expressamente previstos no Plano; *(ii)* sejam realizados para viabilizar a implementação do Plano ou de acordo com o Plano; ou *(iii)* de outra forma tenham sido previamente autorizados por escrito pela Deliberação Extraordinária de Credores Opção de Reestruturação I.

**7.2.**    **Supervisor Judicial (*Watchdog*).** Para fins de observação das atividades das Recuperandas e supervisão da alienação de Imóveis, nos termos da **Cláusula 7.2.5**, a nomeação de uma das empresas indicadas por Credores Quirografários listadas no **Anexo 7.2** como Supervisor Judicial (*Watchdog*) será definida por Deliberação de Credores Opção de Reestruturação I e Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I, em até 5 (cinco) Dias Úteis contados da Data de Homologação do Plano, a qual permanecerá em seu cargo até a implementação da Nova Governança; sendo certo que a não indicação do Supervisor Judicial (*Watchdog*) nos termos aqui estabelecidos e eventuais consequências da

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

falta de nomeação não serão consideradas descumprimento pelas Recuperandas do Plano.

**7.2.1.**    O Supervisor Judicial (*Watchdog*) será independente, sem vínculo de qualquer natureza, presente ou pretérito, com os Credores do Novo Financiamento ou com as Recuperandas.

**7.2.2.**    As Recuperandas permitirão que o Supervisor Judicial (*Watchdog*) *(i)* tenha acesso a todos os documentos e informações financeiras, econômicas e operacionais da Oi e de suas Afiliadas, incluindo balanços, receitas, fluxo de caixa, extratos de contas bancárias, incluindo informações sobre os Imóveis ("Informações da Companhia"); *(ii)* participe, sem direito a voto ou manifestação, na condição de mero ouvinte, de todas e quaisquer assembleias gerais, reuniões de conselho de administração ou reuniões de quaisquer comitês estatutários ou não ou de administradores das Recuperandas; e *(iii)* tenha acesso a todos e quaisquer documentos e informações relativos à implementação do Plano, incluindo acesso a todos e cada um dos documentos e reuniões relacionados aos processos de fusões e aquisições e vendas de ativos, incluindo informações sobre os Imóveis.

**7.2.3.**    Enquanto estiver nomeado, caberá, ainda, ao Supervisor Judicial (*Watchdog*) acompanhar o cumprimento do Plano de Vendas nos termos da **Cláusula 3.1.2.4.1 e subcláusulas**. Neste sentido, o Supervisor Judicial (*Watchdog*) terá as seguintes atribuições: (*i*) atualizar, mensalmente ou sempre que razoavelmente solicitado pelos Credores Opção de Restruturação I e pelos Credores *Take or Pay* sem Garantia – Opção I sobre o processo de alienação dos Imóveis; (*ii*) acompanhar o recebimento de propostas e negociações pelas Recuperandas e/ou pelo corretor de imóveis eventualmente escolhido para realizar a alienação dos Imóveis; (*iii*) acompanhar as movimentações da Conta Escrow Imóveis e monitorar os recursos depositados na Conta Escrow Imóveis; (*iv*) atualizar, semestralmente ou sempre que razoavelmente solicitado pelos Credores Opção de Restruturação I e pelos Credores *Take or Pay* sem Garantia – Opção I, o valor dos Imóveis e fornecer relatório por escrito aos Credores Opção de Restruturação I e aos Credores *Take or Pay* sem Garantia – Opção I a respeito das avaliações; e (*v*) apresentar relatórios trimestralmente ou em menor periodicidade, caso solicitado pelos Credores Opção de Restruturação I e pelos Credores *Take or Pay* em Garantia – Opção I em observância às disposições do Plano, referentes à avaliação, processo de alienação dos Imóveis e movimentações da Conta Escrow Imóveis; e (*vi*) acompanhar o Plano de Vendas.

**7.2.3.1.** As Recuperandas deverão facultar ao Supervisor Judicial (*Watchdog*) acesso a todas as informações e documentos considerados necessários pelos respectivo Supervisor Judicial (*Watchdog*) para o bom desempenho de suas atribuições, desde que observadas as obrigações de confidencialidade assumidas pelo Supervisor Judicial (*Watchdog*) nos termos da **Cláusula 7.2.4** a seguir.

**7.2.4.** O Supervisor Judicial (*Watchdog*) celebrará um acordo de confidencialidade com as Recuperandas, substancialmente nos termos do **Anexo 7.2.4,** para fins de acesso a Informações da Companhia e de suas Afiliadas que sejam confidenciais**.**

**7.2.4.1.** O Supervisor Judicial (*Watchdog*) não poderá repassar quaisquer Informações da Companhia e de suas Afiliadas que sejam confidenciais sem antes realizar o devido tratamento das informações recebidas.

**7.2.4.1.1.** Para dar o devido tratamento às informações, o Supervisor Judicial (*Watchdog*) deve agregar, anonimizar e/ou modificar o formato das informações, bem como adotar qualquer outra medida que, em seu entendimento, seja necessária para assegurar a confidencialidade das informações sensíveis da Companhia, inclusive com relação aos próprios receptores das informações fornecidas. Caso entenda necessário, o Supervisor Judicial (*Watchdog*) também pode solicitar que as informações compartilhadas sejam de acesso restrito aos assessores externos dos receptores, os quais deverão celebrar acordo de confidencialidade com as Recuperandas.

**7.2.4.1.2.** Na medida em que as Informações da Companhia não sejam confidenciais, os Credores do Novo Financiamento poderão solicitar acesso a elas direto ao Supervisor Judicial (*Watchdog*). Caso algum dos Credores do Novo Financiamento deseje ter acesso a Informações da Companhia que são confidenciais deverá solicitá-las ao Supervisor Judicial (*Watchdog*), que ficará responsável por dar o devido tratamento às informações a serem prestadas, nos termos da **Cláusula 7.2.4.1.1.**

**7.2.5.** **Alienação de Imóveis**. O Supervisor Judicial (*Watchdog*) terá as seguintes atribuições em relação à alienação dos Imóveis: (*i*) atualizar os Credores Opção de Restruturação I e os Credores *Take or Pay* sem Garantia - Opção I, mensalmente ou sempre que razoavelmente solicitado pelos Credores Opção de Restruturação I e pelos Credores *Take or Pay* sem Garantia - Opção I, sobre o processo de alienação dos Imóveis; (*ii*) acompanhar o recebimento de propostas e negociações pelas Recuperandas e/ou pelo

corretor de imóveis eventualmente escolhido para realizar a alienação dos Imóveis; (*iii*) acompanhar as movimentações da Conta Escrow Imóveis e monitorar os recursos depositados na Conta Escrow Imóveis; (*iv*) atualizar, mensalmente ou sempre que razoavelmente solicitado pelos Credores Opção de Restruturação I e pelos Credores *Take or Pay* sem Garantia - Opção I, o valor dos Imóveis e fornecer relatório por escrito aos Credores Opção de Restruturação I e aos Credores *Take or Pay* sem Garantia - Opção I a respeito das avaliações; e (*v*) apresentar relatórios, caso solicitado pelos os Credores Opção de Restruturação I e pelos Credores *Take or Pay* sem Garantia -Opção I em observância às disposições do Plano, referentes à avaliação, processo de alienação dos Imóveis e movimentações da Conta Escrow Imóveis; e (*vi*) acompanhar o Plano de Vendas.

**7.2.5.1.**    O encargo conferido ao Supervisor Judicial (*Watchdog*) com relação aos Imóveis encerrará quando houver o pagamento da Dívida ToP sem Garantia *Reinstated* – Opção I.

**7.2.6.**    Em nenhuma hipótese, o Supervisor Judicial (*Watchdog*) poderá adotar medidas que signifiquem o exercício de controle na Oi ou em suas Afiliadas, até a obtenção das aprovações regulatórias necessárias.

**7.3.**    **Conselho de Administração.** Em até 10 (dez) dias contados da Data de Homologação do Plano, as Recuperandas tomarão as medidas necessárias para que os 3 (três) novos membros identificados no **Anexo 7.3** sejam nomeados em substituição a 3 (três) membros do atual Conselho de Administração da Oi nos termos da Lei aplicável, condicionada a eficácia da posse de tais 3 (três) novos membros às aprovações regulatórias aplicáveis.

**7.3.1.**    Os 3 (três) novos membros do Conselho de Administração listados no **Anexo 7.3** deverão permanecer em seus cargos no Conselho de Administração até a eleição de novos membros do Conselho de Administração em assembleia geral extraordinária da Oi a ser realizada após a conclusão do Aumento de Capital – Capitalização de Créditos ("Nova Governança"), exceto nas hipóteses de renúncia, impedimento superveniente ou vacância previstas em Lei.

**7.3.2.**    A Oi envidará seus melhores esforços para obter as aprovações regulatórias necessárias à efetiva posse dos 3 (três) novos membros do Conselho de Administração.

**8.    COMPROMISSOS ADICIONAIS**

**8.1.    Pagamentos de Dividendos**. As Recuperandas estarão autorizadas, após a quitação integral das obrigações relativas ao DIP Emergencial Original Atualizado, ao Novo Financiamento, ao Empréstimo-Ponte, à Dívida ToP sem Garantia *Reinstated* – Opção I, à Dívida ToP com Garantia 2024/Janeiro 2025 *Reinstated* e à Dívida *Roll-Up*, a declarar ou efetuar o pagamento de qualquer dividendo, retorno de capital ou realizar qualquer outro pagamento ou distribuição sobre (ou relacionado) às ações de suas emissões (incluindo qualquer pagamento em relação a qualquer fusão ou consolidação envolvendo as Recuperandas), desde que observadas as obrigações das Recuperandas assumidas perante Credores Extraconcursais. Estão excetuados da restrição prevista nesta **Cláusula 8.1** a declaração ou pagamento de *(a)* dividendos, retorno de capital ou realizar qualquer outro pagamento ou distribuição exclusivamente de uma Recuperanda para outra Recuperanda e, neste caso, quaisquer restrições somente poderão ser impostas após o Aumento de Capital – Capitalização de Créditos; ou *(b)* pagamentos por qualquer Recuperanda para acionistas dissidentes de acordo com a legislação aplicável.

**8.2.    Obrigações de Fazer.** Por meio do Plano, as Recuperandas comprometem-se a, durante o curso da Recuperação Judicial e até o cumprimento integral das obrigações assumidas no Plano, *(a)* conduzir os negócios nos termos da **Cláusula 7.1**; *(b)* observar todos os termos, condições e limitações estabelecidos no Plano; e *(c)* cumprir com todas as obrigações assumidas no Plano.

**9.    EFEITOS DO PLANO**

**9.1.    Vinculação do Plano.** A partir da Homologação Judicial do Plano, as disposições do Plano vinculam as Recuperandas, seus acionistas e sócios, os Credores Concursais, os Credores Extraconcursais Aderentes e respectivos cessionários e sucessores, nos termos do art. 59 da LRF.

**9.1.1.**    A Aprovação do Plano (sujeita à Homologação Judicial do Plano) constitui autorização e consentimento vinculante dos Credores Concursais para que as Recuperandas possam, dentro dos limites da Lei e dos termos do Plano e seus Anexos, adotar todas e quaisquer providências que sejam apropriadas e necessárias para a implementação das medidas previstas no Plano e em seus Anexos, inclusive *(i)* a obtenção de medida judicial, extrajudicial ou administrativa (seja de acordo com qualquer lei de insolvência ou no âmbito de qualquer procedimento de natureza principal ou incidental)

pendente ou a ser iniciado pelas Recuperandas, qualquer dos representantes das Recuperandas ou qualquer representante da Recuperação Judicial em qualquer jurisdição que não seja o Brasil com o propósito de conferir força, validade e efeito à Recuperação Judicial, ao Plano e sua implementação; e *(ii)* o estabelecimento de procedimentos para *(a)* Credores Concursais não residentes no Brasil manifestarem sua escolha quanto à opção para pagamento de seus respectivos Créditos Concursais, sem prejuízo do disposto nas **Cláusulas 4.4**, **4.4.3 e 4.4.8**; *(b)* pagamento dos Créditos Concursais de titularidade dos referidos Credores Concursais não residentes no Brasil na forma aplicável, conforme prevista no Plano; e (*c*) para garantir o tratamento equitativo dos Credores Concursais, deduzir dos valores dos Créditos a serem pagos pelas Recuperandas, nos termos do Plano, aos Credores Concursais, residentes ou não no Brasil, indicados na Relação de Credores do Administrador Judicial, todo e qualquer valor recebido por tais credores das Recuperandas e/ou decorrente da eventual alienação, liquidação ou excussão dos seus ativos em outras jurisdições, conforme aplicável.

9.2.    **Novação.** Com a Homologação Judicial do Plano, o Plano implicará a novação dos Créditos Concursais, conforme o disposto no art. 59 da LRF, que serão pagos nos termos do Plano. Por força da novação decorrente da Homologação Judicial do Plano, todos os termos, condições, *covenants*, índices financeiros, hipóteses de vencimento antecipado, restrições, dentre outros, e todas as obrigações e garantias de qualquer natureza relativas aos Créditos Concursais contratadas ou prestadas pelas Recuperandas serão extintas e deixarão de ser aplicáveis às Recuperandas (e eventuais coobrigados, garantidores, Afiliadas, sucessores, cessionários, administradores, ex-administradores sucessores ou cessionários), sendo substituídas, em todos os seus termos (exceto se e quando disposto de forma diversa no Plano), pelas previsões do Plano ou seus Anexos. A novação decorrente da Homologação Judicial do Plano implicará a extinção e respectivo cancelamento, liberação ou rescisão, conforme o caso, de todas e quaisquer obrigações financeiras e garantias prestadas pelas Recuperandas, sujeitos à Recuperação Judicial, decorrentes de títulos e valores mobiliários, contratos financeiros, bem como de qualquer outro instrumento financeiro pago nos termos do Plano, sendo que, no caso em que o Plano previr a emissão de um novo instrumento de dívida, a extinção e respectivo cancelamento, liberação ou rescisão apenas ocorrerá após a emissão de referido novo instrumento de dívida.

9.2.1.    Para fins de esclarecimento, a novação ora referida em razão da Homologação Judicial do Plano não se estende a fianças bancárias e seguros garantia ou qualquer outra forma de garantia prestada por terceiros em favor das Recuperandas para assegurar os

Juízos nos autos das ações judiciais que tenham por objeto créditos concursais, não importando novação ou extinção das obrigações desses em favor das Recuperandas.

**9.3.**     **Compromisso de Não Litigar, Quitação e Renúncia**. Os Credores Não Litigantes, que aprovaram o Plano sem ressalvas, obrigam-se, por operação e força do Plano, de forma individual e não solidária, em caráter irrevogável e irretratável, observadas as Exclusões do Compromisso de Não Litigar, Quitação e Renúncia, a *(i)* suspender ou fazer com que seja suspensa (ainda que a suspensão acarrete extinção sem julgamento de mérito) toda e qualquer Demanda em curso contra as Recuperandas, no Brasil ou no exterior (e eventuais coobrigados, garantidores, Afiliadas, sucessores, cessionários, administradores, ex-administradores) desde a Homologação Judicial do Plano e até a ocorrência de cada Evento de Quitação aplicável a cada Credor Não Litigante ("Período de Suspensão de Demandas"); e *(ii)* se abster de tomar qualquer medida de execução ou ajuizar qualquer Demanda (incluindo incidentes para desconsideração da personalidade jurídica) contra as Recuperandas, no Brasil ou no exterior (e eventuais coobrigados, garantidores, Afiliadas, sucessores, cessionários, administradores, ex-administradores); ou *(iii)* outorgar as Quitações e Renúncias de Demandas conforme previsto na **Cláusula 9.3.4**, direta, imediata e automaticamente, a partir da ocorrência de cada Evento de Quitação, *ipso facto*, sem necessidade de prática de qualquer ato adicional ("Compromisso de Não Litigar, Quitação e Renúncia").

**9.3.1.**     As obrigações previstas na **Cláusula 9.3 e seguintes** consideram-se assumidas, em caráter irrevogável e irretratável, pelos Credores Não Litigantes e  no ato da escolha por quaisquer das opções referidas na **Cláusula 4.2.2** (Opção de Reestruturação I), **Cláusula 4.2.3** (Opção de Reestruturação II), **Cláusula 4.2.6** (Créditos de Credores Fornecedores Parceiros), **Cláusula 4.2.7** (Créditos *Take or Pay* com Garantia), **Cláusula 4.2.8** (Créditos *Take or Pay* sem Garantia – Opção I) e **Cláusula 4.2.9** (Créditos de *Take or Pay* sem Garantia – Opção II).

**9.3.2.**     As Recuperandas e os Credores Não Litigantes acordam e estabelecem, com fundamento no disposto no art. 6º, I da LRF, que durante o Período de Suspensão das Demandas haverá a suspensão do prazo prescricional dos respectivos direitos dos Credores Não Litigantes.

**9.3.3.**     **Exclusões do Compromisso de Não Litigar, Quitação e Renúncia**. Estão excluídas e não são abrangidas pelo Compromisso de Não Litigar, Quitação e Renúncia ("Exclusões do Compromisso de Não Litigar, Quitação e Renúncia") as: (*a*) Demandas

promovidas por Credores Não Litigantes contra as Recuperandas em conexão a atos, fatos, relações e negócios jurídicos ocorridos ou celebrados após 20 de abril de 2024, incluindo, mas não limitado ao Novo Financiamento e, se realizado, ao Empréstimo-Ponte; (*b*) Demandas relacionadas à inclusão dos respectivos Créditos na Relação de Credores ou ao montante de tais Créditos previstos na Relação de Credores, desde que os Credores envolvidos em tais Demandas tenham expressamente escolhido uma das opções de pagamento previstas no Plano ou aderido ao presente Plano nos termos da **Cláusula 4.10** para receber a integralidade dos seus respectivos Créditos detidos contra as Recuperandas, independentemente de eventual decisão favorável aos respectivos Credores; (*c*) qualquer Demanda promovida por qualquer Credor Não Litigante para o cumprimento de obrigações previstas no Plano, nos  seus Anexos e demais instrumentos relacionados ao Plano, incluindo, mas sem limitação, eventuais acordos de suporte ao Plano, instrumentos de dívida e de garantia outorgados, observados os termos dos respectivos instrumentos; (*d*) Demandas promovidas por Credores em relação ao DIP Emergencial Atualizado e suas garantias, nos termos dos respectivos instrumentos; e (*e*) Demandas no exercício do direito de defesa por qualquer Credor contra Demandas promovidas por qualquer Recuperanda, incluindo mas sem limitação, eventuais demandas decorrentes de acordos de suporte ao Plano, instrumentos de dívida e de garantia outorgados, observados os termos dos respectivos instrumentos.

**9.3.4.    Quitações e Renúncias de Demandas.** Ressalvada a hipótese da **Cláusula 10.2** e observadas as Exclusões do Compromisso de Não Litigar, Quitação e Renúncia, a ocorrência do(s) Evento(s) de Quitação abaixo especificados implicará, direta, imediata e automaticamente, *ipso facto*, sem necessidade de prática de qualquer ato adicional, a renúncia ao direito de ajuizar novas Demandas e a outorga, por todos os Credores Não Litigantes (em nome próprio e de suas Afiliadas, seus sucessores, cessionários, agentes, prepostos, consultores, assessores e representantes, a qualquer título) envolvidos em cada Evento de Quitação, de quitação plena, ampla, integral, absoluta, incondicional, irrevogável e irretratável, em favor das Recuperandas (e eventuais coobrigados, garantidores, Afiliadas, sucessores, cessionários, administradores, ex-administradores), exclusivamente com relação às Demandas e aos seus respectivos Créditos Concursais ou Créditos Extraconcursais Aderentes, conforme aplicável, reestruturados por meio do Plano ("Quitações e Renúncias de Demandas").

(i)    Evento de Quitação I - Opção de Reestruturação I: Automaticamente após a verificação cumulativa (*i*) da emissão das Dívidas *Roll-Up* nos termos da **Cláusula**

**4.2.2.1**, conforme aplicável; e (*ii*) da conclusão do Aumento de Capital – Capitalização de Créditos com o recebimento das Novas Ações Capitalização de Créditos pelos Credores Opção de Reestruturação I, conforme aplicável, os Credores Opção de Reestruturação I terão por outorgadas, de modo voluntário, as Quitações e Renúncias de Demandas previstas na **Cláusula 9.3.4** ("Evento de Quitação I");

(ii)    Evento de Quitação II - Opção de Reestruturação II: Automaticamente após a verificação cumulativa (*i*) da emissão da Dívida *A&E Reinstated* nos termos da **Cláusula 4.2.3.1**; e (*ii*) da emissão das Dívidas Participativas nos termos da **Cláusula 4.2.3.2**, os Credores Opção de Reestruturação II terão por outorgadas, de modo voluntário, as Quitações e Renúncias de Demandas previstas na **Cláusula 9.3.4** ("Evento de Quitação II");

(iii)    Evento de Quitação III – Credores Fornecedores Parceiros: Automaticamente após o recebimento do pagamento do montante equivalente a 10% (dez por cento) do montante de seus respectivos Créditos nos termos da **Cláusula 4.2.6**, os Credores que optarem por ter seus respectivos Créditos Quirografários reestruturados nos termos da opção para Credores Fornecedores Parceiros terão por outorgadas, de modo voluntário, as Quitações e Renúncias de Demandas prevista na **Cláusula 9.3.4** ("Evento de Quitação III");

(iv)    Evento de Quitação IV – Credores *Take or Pay* com Garantia: Automaticamente após o recebimento do pagamento do montante equivalente a 10% (dez por cento) do montante de seus respectivos Créditos nos termos da **Cláusula 4.2.7**, os Credores Fornecedores *Take or Pay* com Garantia que optarem por ter seus respectivos Créditos reestruturados nos termos da **Cláusula 4.2.7** terão por outorgadas, de modo voluntário, as Quitações e Renúncias de Demandas previstas na **Cláusula 9.3.4**  ("Evento de Quitação IV") ("Evento de Quitação IV"); e

(v)    Evento de Quitação V – Credores *Take or Pay* sem Garantia – Opção II: Automaticamente após o recebimento do pagamento do montante equivalente a 10% (dez por cento) do montante de seus respectivos Créditos nos termos da **Cláusula 4.2.9.1**, os Credores que optarem por ter seus respectivos Créditos *Take or Pay* sem Garantia reestruturados nos termos da **Cláusula 4.2.9** terão por outorgadas, de modo voluntário, as Quitações e Renúncias de Demandas previstas na **Cláusula 9.3.4** acima ("Evento de Quitação VI").

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

**9.3.5.** **Extinção das Demandas**. Observado o quanto disposto na **Cláusula 9.3.3**, os Credores que optarem por ter seus respectivos Créditos Classe III reestruturados nos termos da **Cláusula 4.2.2** (Opção de Reestruturação I), **Cláusula 4.2.3** (Opção de Reestruturação II), **Cláusula 4.2.6** (Créditos de Credores Fornecedores Parceiros), **Cláusula 4.2.7** (Créditos de *Take or Pay* com Garantia), **Cláusula 4.2.8** (Créditos de *Take or Pay* sem Garantia – Opção I) e **Cláusula 4.2.9** (Créditos de *Take or Pay* sem Garantia – Opção II), conforme aplicável, obrigam-se, de forma irrevogável e irretratável, a requerer (ou fazer com que seja requerida), no prazo de 5 (cinco) dias contados do respectivo Evento de Quitação nos termos da **Cláusula 9.3.4**, a extinção, com resolução do mérito, das Demandas existentes contra as Recuperandas (e eventuais coobrigados, garantidores, Afiliadas, sucessores, cessionários, administradores, ex-administradores), sem ônus para qualquer parte e com renúncia irrevogável ao prazo de recurso, nos termos do art. 487, III, "b" do Código de Processo Civil Brasileiro.

**9.3.6.** Salvo se disposto de modo diverso na respectiva transação, cada um dos Credores Não Litigantes e as Recuperandas concordam, estabelecem e se obrigam, de forma irrevogável e irretratável, caso aplicável, a *(i)* arcar com o pagamento das respectivas custas judiciais ou administrativas pendentes de pagamento decorrentes ou porventura necessárias para a suspensão ou extinção de Demandas nos termos desta **Cláusula 9.3**, conforme aplicável, inclusive habilitações e impugnações de crédito, caso venha a ser determinado pelo Juízo competente; e *(ii)* arcar integral e unicamente com o pagamento de honorários contratuais e/ou de sucumbência devidos ou fixados em favor do(s) seu(s) respectivo(s) advogado(s) constituído(s) para o patrocínio da Demanda, nos casos de extinção das demandas, a qualquer título, seja em decorrência dos pedidos de suspensão ou dos pedidos de extinção, inclusive em sede de habilitações e impugnações de crédito, obrigando-se cada parte a envidar os melhores esforços para obter de seus respectivos advogados a renúncia ao direito a honorários de sucumbência; obrigando-se, em qualquer caso, a manterem-se reciprocamente indenes e a reembolsar a outra parte, conforme aplicável, pelos valores eventualmente cobrados e efetivamente desembolsados pela respectiva parte em relação aos itens "(i)" e "(ii)" acima que não eram de sua responsabilidade nos termos desta Cláusula, no prazo de até 5 (cinco) dias do recebimento da notificação encaminhada à respetiva parte responsável por tais valores, informando sobre a cobrança e desembolso ou na data em que a cobrança se tornar devida, o que ocorrer primeiro, acrescidos dos encargos legais. Para fins de clareza, *(a)* quaisquer custas judiciais ou administrativas e despesas já incorridas por qualquer das partes serão de sua responsabilidade e não serão reembolsadas pela outra parte, independentemente do que

determinar o Juízo competente; e *(b)* os valores relativos aos honorários periciais serão sempre de responsabilidade da requerente da perícia ou rateadas caso tenha sido determinada de ofício pelo Juízo competente ou requerida por ambas as partes, nos termos do art. 95, do Código de Processo Civil Brasileiro. Esta Cláusula não se aplica às obrigações de pagamento de custos e despesas assumidas pelas Recuperandas, nos termos dos instrumentos previstos no Plano ou em seus Anexos.

**9.3.7.**    Observado o quanto disposto na **Cláusula 9.3.3** e ressalvada a hipótese prevista na **Cláusula 10.2**, com a Homologação Judicial do Plano, os Credores Concursais, salvo os Credores Trabalhistas, não mais poderão, *(i)* ajuizar ou prosseguir em toda e qualquer Demanda de qualquer natureza contra as Recuperandas relacionada a qualquer Crédito Concursal, excetuado o disposto no art. 6º, §1º, da LRF relativamente a Processos em que se estejam discutindo Créditos Ilíquidos; *(ii)* executar qualquer sentença, decisão judicial ou sentença arbitral contra as Recuperandas relacionada a qualquer Crédito Concursal; *(iii)* penhorar ou Onerar quaisquer bens das Recuperandas para satisfazer seus respectivos Créditos Concursais; *(iv)* criar, aperfeiçoar, excutir ou executar qualquer garantia real sobre os bens e direitos das Recuperandas para assegurar o pagamento de Crédito Concursal; *(v)* reclamar qualquer direito de compensação de seu respectivo Crédito Concursal contra qualquer crédito devido às Recuperandas; e *(vi)* buscar a satisfação de seu Crédito Concursal por qualquer outro meio, que não o previsto no Plano, inclusive mediante a liquidação de cartas de fiança bancária, seguros garantia ou qualquer outra forma de garantia apresentados pelas Recuperandas.

**9.3.7.1.**    Para fins do disposto na **Cláusula 9.3.7**, item (vi) acima e por força da Homologação Judicial do Plano, as Recuperandas poderão requerer a desoneração e a devolução às instituições emissoras de quaisquer garantias, como cartas de fiança bancárias e seguros garantia, apresentadas pelo Grupo Oi com o objetivo de assegurar os Juízos nos autos das ações judiciais que tenham por objeto créditos concursais, observadas as obrigações assumidas pelas Recuperandas perante o poder público no âmbito de acordos e transações realizados na forma da Lei.

**9.4.**    **Cancelamento de Protestos**. A Homologação Judicial do Plano acarretará o cancelamento de todo e qualquer protesto junto a Cartórios de Títulos e Documentos que tenha origem em Crédito Concursal, bem como na exclusão definitiva do nome das Recuperandas nos registros de quaisquer órgãos de proteção ao crédito quando o apontamento se originar de Crédito Concursal.

**9.5.** **Formalização de Documentos e Outras Providências.** Exceto com relação aos Credores Reestruturação I e Terceiros Novo Financiamento, o Grupo Oi, os adquirentes de quaisquer ativos de propriedade de qualquer das Recuperandas e os Credores e seus representantes e advogados deverão praticar todos os atos e firmar todos os contratos e outros documentos que, na forma e na substância, sejam necessários ou adequados para cumprimento e implementação do disposto no Plano e de eventuais acordos de suporte ao Plano.

**9.6.** **Modificação do Plano.** O Grupo Oi poderá apresentar aditamentos, alterações ou modificações ao Plano a qualquer tempo após a Data de Homologação do Plano, desde que tais aditamentos, alterações ou modificações sejam aceitos e aprovados pelos Credores Concursais, nos termos da LRF.

**9.6.1.** **Efeito Vinculativo das Modificações do Plano.** Os aditamentos, alterações ou modificações ao Plano vincularão o Grupo Oi, seus Credores Concursais e seus respectivos cessionários e sucessores, a partir de sua aprovação pelos Credores Concursais na forma dos arts. 45, 45-A ou 58, *caput* ou §1º da LRF.

**9.7.** **Equivalência Econômica no Cumprimento do Plano.** Na hipótese de qualquer das operações e condições previstas no presente Plano, que não envolva pagamento em dinheiro aos Credores Concursais, não ser possível de ser implementada pelas Recuperandas, seja pelo transcurso dos prazos previstos para a implementação de tais operações, por razões regulamentares ou por qualquer outro motivo que não seja imputável às Recuperandas, as Recuperandas adotarão as medidas necessárias com o objetivo de assegurar um resultado econômico equivalente para os Credores Concursais ou conforme acordado nos respectivos Contratos de Compra e de Venda das UPIs Torres e Imóveis Selecionados, observadas, em qualquer cenário, as hipóteses previstas no Plano que exigem a aprovação dos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I), dos Terceiros Novo Financiamento (conforme Deliberação de Terceiros Novo Financiamento) e/ou Credores da Dívida ToP sem Garantia *Reinstated* – Opção I (conforme Deliberação dos Credores da Dívida ToP sem Garantia *Reinstated* – Opção I).

**9.8.** **Ratificação de Atos.** A Aprovação do Plano (sujeita à Homologação Judicial do Plano) implicará a aprovação e ratificação de todos os atos regulares de gestão praticados pelas Recuperandas para implementar a sua reestruturação, em especial aquelas adotadas no curso da Recuperação Judicial, incluindo, mas não se limitando aos atos necessários à reestruturação na forma proposta no Plano, à celebração do DIP Emergencial Original Atualizado, bem como

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87E2A76

todos demais atos e ações necessárias para integral implementação e consumação do Plano e
da Recuperação Judicial, os quais ficam expressamente autorizados, validados e ratificados para
todos os fins de direito, inclusive e especialmente dos art. 66, 74 e 131 da LRF.

**9.9.** **Isenção de Responsabilidade e Renúncia.**

**9.9.1.** **Isenção de Responsabilidade e Renúncia das Partes Isentas.** Em decorrência
da Homologação Judicial do Plano, os Credores expressamente liberam as Partes Isentas
de toda e qualquer responsabilidade pelos atos regulares de gestão praticados antes ou
depois da Data do Pedido até a data da Aprovação do Plano, nos termos da **Cláusula 7.1**,
inclusive com relação à reestruturação prevista no Plano, conferindo às Partes Isentas
quitação ampla, rasa, geral, irrevogável e irretratável de todos os direitos e pretensões
patrimoniais, penais e morais porventura decorrentes dos referidos atos a qualquer título.
Quaisquer atos irregulares de gestão não estão abrangidos por esta Cláusula.

**10.** **DISPOSIÇÕES GERAIS**

**10.1.** **Condições Suspensivas.** A eficácia do Plano está condicionada à *(i)* Aprovação do
Plano; e *(ii)* Homologação Judicial do Plano.

**10.2.** **Condição Resolutiva.** Sem prejuízo das condições suspensivas estipuladas na
**Cláusula 10.1**, são condições resolutivas do Plano, *(a)* o não recebimento pela Companhia do
valor total e integral *(a.1)* do Novo Financiamento até 15 de julho de 2024, exceto se eventual
extensão for negociada de comum acordo entre a Oi e os Credores do Novo Financiamento e
dos Terceiros Novo Financiamento, na forma da **Cláusula 5.5.1.5(a)**; e *(a.2)* do Empréstimo-
Ponte, em até 8 (oito) Dias Úteis contados da data do envio do *request notice* previsto nos
Instrumentos de Dívida do Empréstimo-Ponte; *(b)* a não verificação das condições precedentes
de eficácia, salvo se eventualmente dispensadas, no âmbito do Procedimento de Solução
Consensual; *(c)* a resolução do termo de autocomposição celebrado no âmbito do Procedimento
de Solução Consensual; *(d)* a celebração de termo de autocomposição no âmbito do
Procedimento de Solução Consensual em termos materialmente inconsistentes com as
principais condições constantes do **Anexo 3.2**; e *(e)* a não conclusão do Procedimento
Competitivo de alienação da UPI ClientCo até a Data Limite Fechamento Segunda Rodada
Alienação UPI ClientCo (inclusive se estendida nos termos da **Cláusula 5.2.2.1.5(iv)**)
("Condições Resolutivas do Plano"). Uma vez verificada qualquer Condição Resolutiva do Plano,
o Plano e suas estipulações serão automaticamente resolvidos, com a consequente manutenção
e/ou reconstituição dos direitos e garantias dos Credores nas condições originariamente

contratadas, como se o Plano não tivesse sido aprovado, exceto no caso de eventuais multas ou penalidades previstas nos termos do Plano para descumprimento de obrigações assumidas por Credores durante a vigência do Plano, as quais poderão ser cobradas pelas Recuperandas nos termos previstos no Plano.

10.2.1.  Na hipótese de implementação de quaisquer das Condições Resolutivas, as administrações das Recuperandas ficam desde já autorizadas, por força da Aprovação do Plano, a tomar todas as medidas necessárias para convocar uma nova Assembleia Geral de Credores, a fim de deliberar sobre a aprovação de um plano de recuperação judicial alternativo ou de uma modificação ao Plano, no melhor interesse das Recuperandas, nos termos do que determina o art. 35, I, "a", da LRF.

10.3.  **Obrigações de Fazer e Não-Fazer.** Por meio do Plano, as Recuperandas comprometem-se a, durante o curso da Recuperação Judicial e até a quitação integral das obrigações previstas no Plano, *(a)* conduzir as atividades e operações do Grupo Oi de acordo com os atos regulares de gestão, observadas as Matérias Restritas previstas no **Anexo 7.1**; *(b)* observar todos os termos, condições e limitações estabelecidos no Plano; e *(c)* cumprir com todas as obrigações assumidas no Plano.

10.3.1.  Sem prejuízo do disposto na **Cláusula 10.3** acima, as Recuperandas comprometem-se a adotar as medidas que estejam ao seu alcance e sejam necessárias para que este Plano seja reconhecido como eficaz, exequível e vinculante nas jurisdições estrangeiras aplicáveis, na medida em que tal reconhecimento se faça necessário para a implementação das medidas previstas no Plano em relação aos respectivos Credores.

10.4.  **Créditos em Moeda Estrangeira**. Para efeitos de pagamento, exceto pela concordância expressa do Credor em favor da conversão de seu respectivo Crédito da moeda estrangeira para a moeda corrente nacional ou conforme previsto de forma diversa no Plano, os créditos registrados originalmente em moeda estrangeira serão mantidos na respectiva moeda original para todos os fins de direito e serão pagos de acordo com o quanto disposto no Plano. Os Credores Quirografários titulares de Créditos registrados em moeda estrangeira poderão, a seu exclusivo critério, optar pela conversão de seu crédito para moeda corrente nacional, devendo, para tanto, informar expressamente essa opção no momento e conjuntamente ao envio do respectivo termo de adesão indicando a opção de pagamento, hipótese em que o respectivo Crédito Classe III será convertido pela Taxa de Câmbio Conversão.

10.4.1.  Sem prejuízo do disposto acima e desde que não afete os direitos dos demais

Credores Concursais, as Recuperandas poderão estender os prazos previstos no Plano que sejam aplicáveis aos Credores Quirografários titulares de Créditos registrados em moeda estrangeira exclusivamente para o cumprimento de regras ou procedimentos previstos em legislação estrangeira, caso necessário.

**10.5.    Meios de Pagamento.** Exceto se previsto de forma diversa no Plano, os valores devidos aos Credores, nos termos do Plano, serão pagos mediante transferência direta de recursos, por meio de transferência eletrônica disponível (TED), ou por pagamento instantâneo brasileiro (PIX) ou, no caso dos credores detentores de Créditos Classe III em Dólar, mediante remessa de valores para a conta do respectivo credor estrangeiro, a ser informada individualmente pelo Credor ao realizar a escolha de pagamento na forma da **Cláusula 4.4**. No caso dos Créditos Financeiros, o pagamento será feito diretamente nos sistemas aplicáveis de liquidação e custódia, perante o *trustee* ou os agentes.

10.5.1.    Os pagamentos previstos no Plano serão realizados somente após a disponibilização e envio pelos Credores Concursais de seus dados cadastrais atualizados e informações de conta bancária na plataforma eletrônica disponibilizada pela Oi no endereço eletrônico a ser divulgado oportunamente pelas Recuperandas. Caso o Credor Concursal não disponibilize e envie as referidas informações em tempo hábil, ou estejam impedidos por razões legais ou regulatórias, para que as Recuperandas possam realizar o respectivo pagamento, nas datas e prazos previstos no Plano, não será considerado descumprimento de Plano. Não haverá incidência de multas, atualização monetária ou encargos moratórios em relação aos pagamentos que não tenham sido efetuados nas datas e prazos previstos no Plano em virtude de os Credores Concursais não terem disponibilizado e enviado tempestivamente as referidas informações.

10.5.2.    Os documentos da efetiva transferência de recursos servirão como comprovante de quitação dos respectivos valores efetivamente pagos pelas Recuperandas.

**10.6.    Datas de Pagamento.** Na hipótese de qualquer pagamento ou obrigação prevista no Plano estar prevista para ser realizada ou satisfeita em um dia que não seja um Dia Útil, o referido pagamento ou obrigação poderá ser realizado ou satisfeito, conforme o caso, no Dia Útil imediatamente seguinte, sem que isso caracterize impontualidade das Recuperandas ou implique incidência de Encargos Financeiros. Da mesma forma, tendo em vista eventuais obrigações de pagamento dependentes de atos ainda não performados, as Recuperandas envidarão todos os esforços para realizar os pagamentos na data mais breve possível, de acordo

com a sistemática do Plano.

**10.7.    Comunicações.** Todas as notificações, requerimentos, pedidos e outras comunicações ao Grupo Oi, requeridas ou permitidas por este Plano, para serem eficazes, devem ser feitas por escrito e serão consideradas realizadas quando enviadas por e-mail com comprovante de entrega, observando-se os dados de contato a seguir:

**Oi S.A. – Em Recuperação Judicial**

E-mail: fabio.wagner@oi.net.br / daniella.ventura@oi.net.br / elen.souto@oi.net.br / luiz.rosa@oi.net.br

A/C: Fábio Wagner / Daniella Geszikter Ventura / Elen Marques Souto La Croix / Luiz Henrique Soares Rosa

**10.8.    Anuência dos Credores**. Os Credores Concursais têm plena ciência de que os prazos, termos e condições de satisfação de seus Créditos são alterados por este Plano e que as Cláusulas, termos e condições previstos no Plano da Primeira Recuperação Judicial não serão mais aplicáveis às Recuperandas ou aos Credores Concursais e seus respectivos Créditos, exceto se previsto expressamente de forma diferente no Plano. Os Credores Concursais, no exercício de sua autonomia da vontade, declaram que concordam expressamente com as referidas alterações, nos termos previstos no Plano.

**10.9.    Divisibilidade das Previsões do Plano.** Na hipótese de qualquer termo ou disposição do Plano ser considerada inválida, nula ou ineficaz pelo Juízo da Recuperação Judicial, a validade e eficácia das demais disposições não serão afetadas, devendo as Recuperandas propor novas disposições para substituírem aquelas declaradas inválidas, nulas ou ineficazes, de forma a manter o propósito do estabelecido no Plano.

**10.10.    Pagamento Máximo**. Os Credores Concursais não receberão do Grupo Oi, em hipótese alguma, quaisquer valores que ultrapassem o valor estabelecido no Plano para pagamento de seus Créditos Concursais, os quais deverão sempre observar o previsto na Relação de Credores do Administrador Judicial.

**10.11.    Cessão de Créditos.** Exceto se previsto de forma diversa no Plano ou nos instrumentos emitidos na forma do Plano, os Credores Concursais poderão ceder seus Créditos Concursais ou direitos de participação sobre tais Créditos Concursais a outros Credores Concursais ou a terceiros, e tal cessão somente será considerada eficaz e produzirá efeitos desde que (*i*) a cessão

Docusign Envelope ID: 6BB4A9EE-257F-4205-ACD9-1970E87E2A76

seja notificada para o Grupo Oi e para a Administração Judicial com antecedência mínima de 5 (cinco) dias das datas de pagamento; (ii) a notificação seja acompanhada do comprovante de que os cessionários receberam e aceitaram, de forma irrevogável, os termos e as condições previstas no Plano (incluindo, mas não se limitando, às condições de pagamento), e que têm conhecimento que o crédito cedido é um Crédito Concursal sujeito às disposições do Plano; (iii) a cessão ou a promessa de cessão seja imediatamente comunicada ao Juízo da Recuperação, na forma do art. 39, §7º da LRF. O disposto nos **itens (i) a (iii)** acima não se aplica aos Credores do Novo Financiamento e aos Credores Opção de Reestruturação I, que poderão ceder seus Créditos livre e independentemente de prévia notificação e/ou concordância das Recuperandas.

**10.12.** **Sub-rogação**. Para fins de esclarecimento, na hipótese de qualquer parte se sub-rogar, a qualquer título e a qualquer tempo, nos direitos de determinado Credor Concursal sobre os respectivos Créditos Concursais, tal parte fará jus ao pagamento dos referidos Créditos Concursais nos mesmos termos aplicáveis ao respectivo Credor Concursal.

**10.13.** **Compensação de Créditos**. Após a implementação da Nova Governança, as Recuperandas terão a opção, mas não a obrigação, a seu exclusivo critério, de quitar a totalidade ou parte do saldo remanescente dos Créditos Concursais de titularidade de seus Credores Fornecedores e Credores *Intercompany*, mediante a utilização de eventuais créditos, adiantamentos, benefícios, bônus ou equivalentes, que as Recuperandas possuam contra o respectivo Credor, para compensação de Créditos Concursais, nos termos do art. 368 e seguintes do Código Civil. Para que não restem dúvidas, eventual saldo remanescente do Crédito Concursal de determinado Credor após efetuada a compensação prevista nesta Cláusula receberá o tratamento previsto na opção de pagamento de seus Créditos Concursais, conforme escolhido ou aplicável ao respectivo Credor, nos termos do Plano.

**10.14.** **Alterações Anteriores à Aprovação do Plano.** As Recuperandas se reservam o direito, na forma da Lei, de alterar este Plano até a data da Aprovação do Plano, inclusive de modo a complementar o protocolo com documentos adicionais e traduções de documentos correlatos.

**10.15.** **Poderes do Grupo Oi para implementar o Plano.**

**10.15.1.** A Aprovação do Plano seguida da Homologação Judicial do Plano dará poderes à Oi, por meio de seus representantes legais, para tomar todas as medidas necessárias para a implementação do Plano.

**10.15.2.** Após a Homologação Judicial do Plano, o Grupo Oi fica desde já autorizado a

adotar todas as medidas necessárias para (i) submeter a Aprovação do Plano ao processo de insolvência em curso perante a *Bankruptcy Court of the Southern District of New York* (*Chapter 15*) e a Suprema Corte de Justiça da Inglaterra e País de Gales*,* com o objetivo de conferir efeitos ao Plano em território norte-americano e no Reino Unido, respectivamente, vinculando os Credores ali domiciliados e estabelecidos, bem como (ii) iniciar e/ou dar andamento a outros procedimentos judiciais, extrajudiciais ou administrativos, sejam de insolvência ou de outra natureza, em outras jurisdições além da República Federativa do Brasil, incluindo no território norte-americano e holandês, conforme necessário, para a implementação do Plano, incluindo, mas não se limitando, aos processos de insolvência ou procedimentos necessários à implementação das disposições do Plano, notadamente nos termos da Lei aplicável dos Estados Unidos da América e da Holanda. Os processos auxiliares no exterior não poderão alterar os termos e as condições do Plano.

**10.16. Lei Aplicável.** Exceto se previsto de forma diversa no Plano ou nos instrumentos de dívida emitidos nos termos das **Cláusulas 4.2.2.1, 4.2.3.1, 5.5 e 5.5.1.4**, os direitos, deveres e obrigações decorrentes do Plano deverão ser regidos, interpretados e executados de acordo com as leis vigentes na República Federativa do Brasil, observadas as legislações aplicáveis para cada um dos Anexos.

**10.17. Resolução de Conflitos e Eleição de Foro.** Todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, incluindo pretensões de Credores relativas ao valor dos seus respectivos Créditos Concursais poderão ser previamente submetidas a procedimento de Mediação, na forma do regulamento da Câmara de Mediação e Arbitragem da Fundação Getúlio Vargas/RJ ou alternativamente do Núcleo Permanente de Métodos Consensuais de Solução de Litígios do Tribunal de Justiça do Estado do Rio de Janeiro. Caso as controvérsias ou disputas em questão não sejam solucionadas na Mediação, serão elas resolvidas *(i)* pelo Juízo da Recuperação Judicial, até o encerramento do processo de Recuperação Judicial com trânsito em julgado da decisão homologatória; e *(ii)* por qualquer juízo empresarial do Foro Central da Comarca do Rio de Janeiro, após o encerramento do processo de Recuperação Judicial com trânsito em julgado da decisão homologatória. Para fins de clareza, esta disposição não se aplica aos instrumentos emitidos ou celebrados pelas Recuperandas, para implementação ou em conexão com este Plano, incluindo, mas sem limitação, eventuais acordos de suporte ao Plano, instrumentos de dívida e de garantia outorgados nos termos do Plano, em relação aos quais serão observados os termos dos respectivos instrumentos.


O Aditamento é firmado pelos representantes legais devidamente constituídos do Grupo Oi.

Rio de Janeiro, 1º de julho de 2025.

*(Restante da página intencionalmente deixada em branco.*

*Folha de assinaturas na página que segue.)*

*(Página de assinaturas do Aditamento ao Plano de Recuperação Judicial Consolidado de Oi S.A.
– Em Recuperação Judicial, Portugal Telecom International Finance BV – Em Recuperação
Judicial e Oi Brasil Holdings Coöperatief UA – Em Recuperação Judicial firmado em 1º de julho
de 2025)*



**Oi S.A. – Em Recuperação Judicial**



**PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – Em Recuperação Judicial**



**OI BRASIL HOLDINGS COÖPERATIEF U.A. – Em Recuperação Judicial**

**LISTA DE ANEXOS**

Anexo 1.1 – Definições

Anexo 2.4 – Laudo Econômico-Financeiro

Anexo 3.1.2 – Ativos para Alienação e/ou Oneração Pós-Implementação da Nova Governança

Anexo 3.2 – Termo de Autocomposição

Anexo 4.1.2.1 – Garantia – Credores Trabalhistas

Anexo 4.1.3 – Formulário de Opção Trabalhistas

Anexo 4.2.2.2.1(A) – Termos e Condições Debêntures *Roll-Up*

Anexo 4.2.2.2.1(B) – Termos e Condições Notes *Roll-Up*

Anexo 4.2.2.2.1(f)(I) – Bens e Ativos em Garantia e Ordens de Prioridade (*Waterfall*)

Anexo 4.2.2.2.1(f)(II) – Lista de Instrumentos de Garantia

Anexo 4.2.2.1.1(f)(III) – Contrato entre Credores (*Intercreditor Agreement*)

Anexo 4.2.2.3.6 – Termo de Renúncia ao Recebimento das Novas Ações Capitalização de Créditos

Anexo 4.2.3.1(d) – Instrumentos de Dívida *A&E Reinstated*

Anexo 4.2.3.2 – Instrumento da Dívida Participativa em Reais e em Dólares

Anexo **Erro! Fonte de referência não encontrada.** – Ativos para Transferência para Credores *Take or Pay/SES*

Anexo 4.2.9.5.1 – Contratos *Take or Pay* sem Garantia que serão rescindidos

Anexo 4.4.6 – Notificação Opção de Pagamento

Anexo 5.1 – Ativos para Alienação e/ou Oneração

Anexo 5.2.1(i) – Acervo ClientCo

Anexo 5.2.1(i)(b) – Alienação Fiduciária das Ações da SPE ClientCo

Anexo 5.2.1(ii) – Acervo V.tal

Anexo 5.2.1(iii)(a) – Acervo Torres Selecionadas

Anexo 5.2.1(iii)(b) – Acervo Imóveis Selecionados

Anexo 5.3.3 – Receita Líquida da Venda de Ativos

Anexo 5.3.4 – Receita Líquida da Venda de Imóveis

Anexo 5.5.1.3 – Termo de Adesão Novo Financiamento

Anexo 5.4.1 – Termos e Condições do Novo Financiamento

Anexo 5.5.2(i) – Instrumento de Dívida Empréstimo-Ponte

Anexo 5.5.2(ii) – Instrumentos de Garantia do Empréstimo-Ponte

Anexo 5.4.3 – Bens e Ativos em Garantia e Ordens de Prioridade (*Waterfall*) com Endividamento Adicional Permitido

Anexo 6.1(A) – Reorganizações Societárias a Qualquer Tempo

Anexo 6.1(B) –Reorganizações Societárias Pós-Nova Governança

Anexo 7.1 – Atos Regulares de Gestão

Anexo 7.2 – *Watchdog*

Anexo 7.2.4 – Acordo de Confidencialidade *Watchdog*

Anexo 7.3 – Composição do Conselho de Administração

Docusign Envelope ID: 6BB1A9FF-257F-4205-ACD9-1070E87F2A76

## ANEXO 1.1

### DEFINIÇÕES

"**Administrador Judicial**" significa os escritórios Wald Administração de Falências e Empresas em Recuperação Judicial Ltda., com sede na Rua General Venâncio Flores, nº 305, 10º andar, Leblon, Rio de Janeiro – RJ, CEP 22441-090; K2 Consultoria Econômica, com sede na Rua Primeiro de Março, nº 23, 14º andar, Centro, Rio de Janeiro – RJ, CEP 20010-000; e Preservar Administração Judicial Perícia e Consultoria Empresarial Ltda. (Preserva-Ação Administração Judicial), com sede na Avenida Rio Branco, nº 116, 15º andar, Centro, Rio de Janeiro – RJ, conforme nomeados pelo Juízo da Recuperação Judicial, nos termos das decisões proferidas, respectivamente, em 2 de fevereiro de 2023, ratificada em 16 de março de 2023, e em 25 de junho de 2023.

"**Afiliadas**" significa, com relação a qualquer Pessoa, qualquer Pessoa direta ou indiretamente Controladora, Controlada ou sob Controle comum dessa Pessoa.

"**Alienação de Ativos**" significa as operações de alienação de ativos nos termos da **Cláusula 5.1**.

"**ANATEL ou Agência Reguladora**" significa a Agência Nacional de Telecomunicações, criada pela Lei nº 9.472 de 16 de julho 1997.

"**Aprovação do Plano**" significa a aprovação do Plano pelos Credores Concursais na Assembleia Geral de Credores, na forma do art. 45, 56-A ou 58, *caput* e §1º da LRF, ou por meio de termos de adesão na forma do art. 45-A da LRF. Para os efeitos do Plano, considera-se que a Aprovação do Plano ocorrerá na data da Assembleia Geral dos Credores que aprovar o Plano. Na hipótese de aprovação nos termos do art. 45-A e do art. 58, *caput* e §1º da LRF, considera-se a Aprovação do Plano na data da decisão que conceder a Recuperação Judicial.

"**Assembleia Geral de Credores**" significa qualquer assembleia geral de credores realizada nos termos do Capítulo II, Seção IV da LRF.

"**Ativos Permitidos ClientCo**" significa (a) as ações de emissão de V.tal; e/ou (b) ações de companhias listadas na B3 e que componham o índice Bovespa, com *market cap* superior a R$ 7.300.000.000,00 (sete bilhões e trezentos milhões de Reais), sendo certo que o valor atribuído às respectivas ações poderá ser determinado com base no preço médio ponderado por volume das ações de emissão do respectivo ativo nos 90 (noventa) dias que antecederem a data do

Procedimento Competitivo; e/ou (c) ações de companhias listadas em bolsas de valores estrangeiras e que componham o índice S&P500 ou FTSE100.

"**Ato Regular de Gestão**" significa o ato praticado de boa-fé por administrador ou conselheiro das Recuperandas, com diligência e lealdade, em cumprimento aos deveres fiduciários em relação às Recuperandas e aos Credores, dentro de suas atribuições e poderes, sem violação da Lei, do Estatuto Social e do Plano, fundamentado na técnica aplicável, mediante decisão negocial desinteressada, informada e refletida.

"**Audiência Propostas UPI ClientCo**" significa a audiência para abertura das propostas formuladas visando à aquisição da UPI ClientCo com data e horário fixados no respectivo Edital o UPI ClientCo, na presença do Administrador Judicial, Recuperandas e demais proponentes.

"**Audiência Propostas UPI V.tal**" significa a audiência para abertura das propostas formuladas visando à aquisição da UPI V.tal com data e horário fixados no respectivo Edital de alienação da UPI V.tal, na presença do Administrador Judicial, Recuperandas e demais proponentes.

"**Aumentos de Capital Autorizados**" significa um ou mais aumentos de capital da Oi mediante deliberação do Conselho de Administração, por meio de emissão pública ou privada de ações ordinárias ou preferenciais, caso aplicável, até que o valor do seu capital social alcance o limite previsto no Estatuto Social da Oi no momento da realização do respectivo aumento de capital, podendo, ainda, dentro do referido limite, (*i*) deliberar sobre a emissão de bônus de subscrição e de debêntures conversíveis em ações; ou (*ii*) outorgar opção de compra de ações a administradores, empregados da Companhia ou sociedade sob seu Controle e/ou a pessoas naturais que lhes prestem serviços, de acordo com o Plano aprovado pela Assembleia Geral de Credores sem que os acionistas tenham direito de preferência à subscrição dessas ações

"**Bonds 2025**" significa as 10%/12% Senior PIK Toggle Notes com vencimento em 2025 emitidas pela Oi, em 27 de julho de 2018, e garantidas, conjunta e solidariamente, por Oi Móvel S.A. (incorporada pela Companhia em fevereiro de 2022), Telemar Norte Leste S.A. (incorporada pela Companhia em maio de 2021), Oi Coop e PTIF.

"**CADE**" significa o Conselho Administrativo de Defesa Econômica.

"**Código Civil**" significa a Lei nº 10.406, de 10 de janeiro 2002.

"**Contrato entre Credores (*Intercreditor Agreement*)**" significa o contrato celebrado entre os Terceiros Novo Financiamento, os Credores do Novo Financiamento, os Credores da Dívida ToP

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

sem Garantia *Reinstated* **–** Opção I e os Credores da Dívida Roll-Up, observados os termos e condições previstos no **Anexo 4.2.2.2(g)(III)**, que prevê as regras de excussão, do *waterfall* pagamento e compartilhamento das garantias outorgadas no âmbito do Plano.

"**Controle**" significa, nos termos do art. 116 da Lei das Sociedades por Ações, *(i)* a titularidade de direitos de sócios que assegurem ao seu titular, de modo permanente, a maioria dos votos nas deliberações sociais e o poder de eleger a maioria dos administradores da sociedade; e *(ii)* o uso efetivo de tal poder para dirigir as atividades sociais e orientar o funcionamento dos órgãos da sociedade. As expressões e termos "Controlador", "Controlado por", "sob Controle comum" e "Controlada" têm os significados logicamente decorrentes desta definição de "Controle".

"**Credores do DIP Emergencial Original Atualizado**" significa os Credores Extraconcursais titulares de Créditos Extraconcursais detidos contra a Oi decorrentes da participação no DIP Emergencial Original Atualizado.

"**Crédito do DIP Emergencial Original Atualizado**" significa os Créditos Extraconcursais detidos contra a Oi decorrentes da participação no DIP Emergencial Original Atualizado.

"**Crédito Trabalhista Fundação Atlântico**" significa o Crédito Trabalhista de titularidade da Fundação Atlântico de Seguridade Social, entidade de previdência privada vinculada ao Grupo Oi.

"**Créditos**" significa os Créditos Concursais e os Créditos Extraconcursais detidos contra as Recuperandas.

"**Créditos Classe III**" significa os Créditos Concursais previstos nos arts. 41, inciso III, e 83, inciso VI, da LRF contra as Recuperandas, detidos por Pessoas que não sejam quaisquer das próprias Recuperandas.

"**Créditos Concursais**" significa os créditos e obrigações de fazer sujeitos aos efeitos da Recuperação Judicial e do Plano, vencidos ou vincendos, cujos respectivos contratos, obrigações e/ou fatos geradores ocorreram antes da Data do Pedido, independentemente de estarem ou não relacionados na Relação de Credores do Administrador Judicial. Os Créditos Concursais são todos os Créditos referidos no Plano, independentemente de sua natureza, à exceção dos Créditos Extraconcursais.

"**Créditos Concursais Agências Reguladoras**" significa Créditos Concursais líquidos não tributários de titularidade de agências reguladoras ou decorrentes de obrigações impostas em

Docusign Envelope ID: 6BB1A9FF-257F-4205-ACD9-1970E87E2A76

razão de deliberação de agências reguladoras, incluindo a ANATEL. Não estão incluídos nos Créditos Concursais Agências Reguladoras eventuais multas administrativas já consideradas indevidas por decisão proferida no âmbito do Superior Tribunal de Justiça.

"**Créditos de Fornecimento**" significa os Créditos Classe **III** decorrentes do fornecimento de bens, conteúdos, direitos e ou serviços não financeiros ao Grupo Oi e que não sejam Créditos Financeiros.

"**Créditos Ex-Bondholders Não-Qualificados**" significa os Créditos Classe III novados e reestruturados nos termos da **Cláusula 4.3.3.1** do Plano da Primeira Recuperação Judicial de titularidade dos Ex-Bondholders Não-Qualificados.

"**Créditos Extraconcursais**" significa os créditos detidos contra as Recuperandas que não se sujeitam aos efeitos do Plano em razão *(i)* do seu fato gerador ser posterior à Data do Pedido, incluindo, mas não limitado ao DIP Emergencial Original Atualizado e parte dos Créditos *Take or Pay* sem Garantia; ou *(ii)* de se enquadrarem no art. 49, §3º e §4º da LRF, ou qualquer outra norma legal/judicial que os exclua dos efeitos do Plano.

"**Créditos Extraconcursais Aderentes**" significa os Créditos Extraconcursais dos Credores Extraconcursais Aderentes.

"**Créditos Financeiros**" significa os Créditos Classe **III** *(i)* decorrentes de operações contratadas e realizadas pelas Recuperandas no âmbito do Sistema Financeiro Nacional com instituições financeiras, sob qualquer modalidade, bem como outros créditos financeiros; e *(ii)* relativos a contratos (*facility agreements*), debêntures ou títulos de dívida (*bonds*) negociados ou emitidos no exterior e regulados por Leis estrangeiras emitidos pelas Recuperandas.

"**Créditos Ilíquidos**" significa os Créditos Concursais *(i)* objeto de ação judicial ou de arbitragem, iniciada ou não, derivados de quaisquer relações jurídicas e contratos existentes antes da Data do Pedido; *(ii)* em relação a cujo valor haja pendência de resolução de controvérsia ou disputa; ou *(iii)* aqueles que, ainda que não se enquadrem nos itens *(i)* e *(ii)* acima, por qualquer razão não constem da Relação de Credores do Administrador Judicial.

"**Créditos Intercompany**" significa os créditos das Recuperandas decorrentes de mútuos realizados entre si ou com suas Afiliadas como forma de gestão de caixa e transferência de recursos entre as diferentes sociedades que compõem o Grupo Oi, inclusive com recursos decorrentes de operações realizadas no mercado internacional.

Docusign Envelope ID: 6BB1A9FF-257F-4205-ACD9-1070E87F2A76

"**Créditos ME/EPP**" significa os Créditos Concursais detidos por microempresas ou empresas de pequeno porte, definidos conforme a Lei Complementar nº 123/2006, nos termos do art. 41, inciso IV da LRF.

"**Créditos Opção de Reestruturação I**": Significa os Créditos Classe **III** que não sejam Créditos de Fornecimento, Créditos Transacionados, Créditos *Take or Pay* com Garantia ou Créditos *Take or Pay* sem Garantia, detidos pelos Credores Quirografários que elegerem ser pagos por meio da Opção de Reestruturação I prevista na **Cláusula 4.2.2.**

"**Créditos Opção de Reestruturação II**": Significa os Créditos Classe **III** que não sejam Créditos de Fornecimento, Créditos Transacionados, Créditos *Take or Pay* com Garantia ou Créditos *Take or Pay* sem Garantia, detidos pelos Credores Quirografários que elegerem ser pagos por meio da Opção de Reestruturação II prevista na **Cláusula 4.2.3.**

"**Créditos Quirografários**" significa os Créditos Classe **III** e os Créditos Concursais Agências Reguladoras.

"**Créditos Retardatários**" significa os Créditos Concursais que forem incluídos na lista de credores após a publicação da Relação de Credores do Administrador Judicial na imprensa oficial na forma do disposto no art. 7º, §2º da LRF, exceto aqueles Créditos Concursais que tenham sido objeto de transação entre as Recuperandas e o Credor respectivo até a Data de Homologação do Plano.

"**Créditos *Take or Pay* com Garantia**" significa os Créditos Classe **III** indicados como "Contratos TOP" na lista de Credores Concursais prevista no art. 51, inciso **III** da LRF e/ou reconhecidos no Parecer do Administrador Judicial como créditos originais de obrigações *take or pay* e que sejam oriundos de obrigações de pagamento garantidas por aval, caução ou fiança assumidas pelas Recuperandas por serviços a serem prestados por Credores Fornecedores na modalidade de *take or pay*.

"**Créditos *Take or Pay* sem Garantia**" significa os Créditos Classe **III** indicados como "Contratos TOP" na lista de Credores Concursais prevista no art. 51, inciso **III** da LRF e/ou reconhecidos no Parecer do Administrador Judicial como créditos originais de obrigações take or pay e que sejam oriundos de obrigações de pagamento assumidas pelas Recuperandas por serviços prestados e a serem prestados e/ou locação de infraestrutura por Credores Fornecedores na modalidade de take or pay, porém não originalmente garantidas por aval, caução ou fiança.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

**"Créditos Trabalhistas"** significa os Créditos Concursais derivados da legislação do trabalho ou decorrentes de acidente de trabalho, nos termos do art. 41, inciso I da LRF.

**"Créditos Transacionados**" significa os Créditos Classe III oriundos de acordos celebrados entre Credores Fornecedores, que não possuam qualquer tipo de Demanda em curso contra qualquer das Recuperandas antes da Data do Pedido, homologados judicialmente, para estabelecer formas específicas de pagamentos dos seus respectivos Créditos Classe III.

**"Credores"** significa todos os credores referidos neste Aditamento.

**"Credores Concursais"** significa os titulares de Créditos Concursais.

**"Credores Extraconcursais"** significa os titulares de Créditos Extraconcursais.

"**Credores Extraconcursais Aderentes**" significa os Credores Extraconcursais que desejarem receber os seus Créditos Extraconcursais na forma do Plano, aplicável aos Credores Quirografários, Credores Fornecedores, Credores Fornecedores Parceiros ou Credores Fornecedores Transacionados.

"**Credores Financeiros**" significa os Credores Quirografários titulares de Créditos Financeiros.

"**Credores Fornecedores**" significa os Credores Quirografários titulares de Créditos de Fornecimento.

**"Credores Fornecedores Parceiros"** significa os Credores Fornecedores que *(a)* estejam adimplentes com o Compromisso de Não Litigar, Quitação e Renúncia previsto na **Cláusula 9.3**, exceto em caso de incidente de verificação de crédito relacionado ao Processo de Recuperação Judicial ou nas hipóteses previstas na **Cláusula 9.3.3**; *(b)* tenham votado favoravelmente à aprovação do presente Plano, exceto em caso de impedimento de direito de voto em razão do art. 43 da LRF ou qualquer outro impedimento legal; e *(c.1.)* mantenham o fornecimento às Recuperandas de bens, conteúdos, direitos ou serviços, conforme aplicável, sem alteração injustificada dos termos e condições praticados até a Data do Pedido em relação às Recuperandas (não sendo consideradas injustificadas as alterações decorrentes de negociações realizadas entre os Credores e as Recuperandas, mesmo após a Data do Pedido); ou *(c.2)* mantiveram, durante toda a vigência dos respectivos contratos de fornecimento celebrados antes da Data do Pedido, o compromisso de fornecer às Recuperandas bens, conteúdos, direitos ou serviços, conforme aplicável, sem alteração injustificada dos termos e condições praticados até o término da vigência dos respectivos contratos de fornecimento.

"**Credores Não Litigantes**" significa qualquer Credor (incluindo suas respectivas Afiliadas) que optar por receber o pagamento do seu respectivo Crédito Quirografário reestruturado nos termos da **Cláusula 4.2.2** (Opção de Reestruturação I), **Cláusula 4.2.3** (Opção de Reestruturação II) e **Cláusula 4.2.6** (Créditos de Credores Fornecedores Parceiros), **Cláusula 4.2.7** (Créditos *Take or Pay* com Garantia), **Cláusula 4.2.79** (Créditos *Take or Pay* sem Garantia – Opção I) e **Cláusula 4.2.7** (Créditos *Take or Pay* sem Garantia – Opção II).

"**Credores Opção de Reestruturação I**": significa os Credores Quirografários que elegerem ser pagos por meio da Opção de Reestruturação I prevista na **Cláusula 4.2.2.**

"**Credores Opção de Reestruturação II**": significa os Credores Quirografários que elegerem ser pagos por meio da Opção de Reestruturação II prevista na **Cláusula 4.2.3.**

"**Credores Participantes Novo Financiamento**" significa as Pessoas que participarem do Novo Financiamento.

"**Credores Quirografários**" significa os Credores detentores de Créditos Classe III.

"**Credores Concursais ME/EPP**" significa os titulares de Créditos ME/EPP.

"**Credores Retardatários**" significa os titulares dos Créditos Retardatários.

"**Credores *Take or Pay* com Garantia**" significa os Credores Fornecedores Parceiros titulares dos Créditos *Take or Pay* com Garantia.

"**Credores *Take or Pay* sem Garantia**" significa os Credores Fornecedores Parceiros titulares dos Créditos *Take or Pay* sem Garantia.

"**Credores Trabalhistas**" significa os titulares de Créditos Trabalhistas.

"**Credores Trabalhistas Depósitos Judiciais**" significa os Credores Trabalhistas que são partes de processos judiciais envolvendo as Recuperandas, em cujos autos tenham sido realizados Depósitos Judiciais.

"**Data de Homologação do Aditamento**" significa o dia da publicação da decisão de primeiro grau que homologar este Aditamento.

"**Data do Pedido**" significa a data do ajuizamento do pedido de recuperação judicial, qual seja, 1º de março de 2023.

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1970E87E2A76

"**Data de Homologação do Plano**" significa o dia da publicação da decisão de primeiro grau que homologou o Plano e concedeu a Recuperação Judicial, qual seja, 29 de maio de 2024.

"**Debêntures Novo Financiamento – Credores Opção de Reestruturação I**" significa as debêntures a serem emitidas em favor dos Credores Opção de Reestruturação I em razão do Novo Financiamento, observados os termos e condições previstos no **Anexo 5.5.1**.

"**Debêntures Novo Financiamento – Terceiros**" significa as debêntures a serem emitidas em favor de Terceiros em razão do Novo Financiamento, observados os termos e condições previstos no **Anexo 5.5.1.**

"**Debêntures *Roll-Up***" significa as debêntures a serem emitidas em favor dos Credores Opção de Reestruturação I, observados os termos e condições previstos no **Anexo 4.2.2.1(A).**

"**Deliberação de Credores Opção de Reestruturação I**" significa qualquer deliberação entre Credores do Novo Financiamento – Credores Opção de Reestruturação I prevista no Plano (excluída aquela prevista na **Cláusula 7.1(iii)**), cuja matéria será considerada aprovada por titulares de no mínimo 60% (sessenta por cento) do valor total dos Créditos oriundos do Novo Financiamento – Credores Opção de Reestruturação I existentes no momento da deliberação.

"**Deliberação Extraordinária de Credores Opção de Reestruturação I**" significa qualquer deliberação entre Credores do Novo Financiamento – Credores Opção de Reestruturação I prevista na **Cláusula 7.1(iii)** do Plano, cuja matéria será considerada aprovada por voto de titulares de mais de 50% (cinquenta por cento) do valor total dos Créditos oriundos do valor total do Novo Financiamento – Credores Opção de Reestruturação I existentes no momento da deliberação. Qualquer Credor do Novo Financiamento – Credores Opção de Reestruturação I (juntamente com suas afiliadas e partes relacionadas) que detenha mais de 30% (trinta por cento) do poder de voto (ou seus votos, conforme aplicável), terá o seu voto limitado a 30% (trinta por cento) e, consequentemente, o denominador utilizado para o cálculo do poder de voto será reduzido pelo percentual de Créditos oriundos do Novo Financiamento – Credores Opção de Reestruturação I que for descontado para fins do voto.

"**Deliberação de Credores da Dívida ToP sem Garantia *Reinstated* – Opção I**" significa qualquer deliberação entre Credores da Dívida ToP sem Garantia *Reinstated* – Opção I prevista no Plano, cuja matéria será considerada aprovada por titulares de mais de 75% (setenta e cinco por cento) do valor total dos Créditos decorrentes da Dívida ToP sem Garantia *Reinstated* – Opção I existentes no momento da deliberação.

"**Deliberação de Terceiros Novo Financiamento**" significa qualquer deliberação entre Terceiros Novo Financiamento prevista no Plano, cuja matéria será considerada aprovada por titulares de mais de 60% (sessenta por cento) do valor total Novo Financiamento Terceiros existente no momento da deliberação.

"**Deliberação de Terceiros Novo Financiamento**", significa qualquer deliberação entre Terceiros Novo Financiamento prevista no Plano, cuja matéria será considerada aprovada por titulares de mais de 50% (cinquenta por cento) do valor total dos Créditos decorrentes do Novo Financiamento – Terceiros existentes no momento da deliberação.

"**Demanda**" significa, em qualquer grau de jurisdição ou instância, qualquer litígio, ação, reivindicação, processo, reclamação, incidente de desconsideração de personalidade jurídica, procedimento arbitral, execução, protesto judicial, decisão, fiscalização, solicitação de informações (inclusive para o início de um procedimento de fiscalização), cobrança, notificação (judicial ou extrajudicial), auto de infração, intimação, procedimento, inquérito, demanda judicial, arbitral ou administrativa, ou, ainda, qualquer outro tipo de investigação, ação ou processo, seja judicial, arbitral, administrativo ou criminal.

"**Depósito Judicial**" significa os depósitos judiciais efetuados pelo Grupo Oi no âmbito de ações judiciais de qualquer natureza, os quais serão utilizados no pagamento de determinados créditos, conforme estabelecido no Plano, bem como os depósitos realizados em decorrência de decisões proferidas na Primeira Recuperação Judicial e nesta Recuperação Judicial em conexão com a alienação de ativos.

"**Dia Útil**" significa todo e qualquer dia que não um sábado, domingo ou feriado na cidade do Rio de Janeiro, Estado do Rio de Janeiro, exceto se previsto de outra forma expressa no Plano.

"**DIP Emergencial Original Atualizado**" significa o financiamento de longo prazo, conferido à Companhia na modalidade "*debtor-in-possession*", no valor de até USD400.000.000,00 (quatrocentos milhões de Dólares), com um grupo relevante de credores financeiros que representam a maioria dos *(i)* detentores de 10%/12% Senior PIK Toggle Notes com vencimento em 2025 emitidas pela Oi, em 27 de julho de 2018, e garantidas, conjunta e solidariamente, pela Telemar e Oi Móvel, ambas incorporadas na Oi, além da Oi Coop e a PTIF; e *(ii)* titulares de créditos contra a Oi decorrentes de acordos com Agências de Crédito à Exportação (*Export Credit Agencies*), contando com a garantia formalizada por meio de alienação fiduciária de ações de titularidade da Oi na V.tal  e cujas condições principais estão descritas na **Cláusula 2.2**do Plano.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

"**Dívidas Participativas**" significa, em conjunto, as dívidas a serem emitidas ou contratadas pela Oi para pagamento de 92% (noventa e dois por cento) do Credores Opção de Reestruturação II para Créditos Classe III em Real e em Dólares, de acordo com os termos e condições previstos no **Anexo 4.2.3.2**.

"**Dívidas *Roll-Up***" significa, em conjunto, as Debêntures *Roll-Up* e as Notes *Roll-Up*.

"**Dólar**" ou "**USD**" significa a moeda corrente nos Estados Unidos da América.

"***ECA Facility Agreements***" significa os Contratos de Empréstimos originalmente firmados entre a Oi S.A. ou sua subsidiária Telemar Norte Leste e certas Agências de Crédito à Exportação (*Export Credit Agencies*) e que, nos termos da Cláusula 13.8 do Plano da Primeira Recuperação Judicial poderiam ser cedidos a outros Credores ou a terceiros desde que cumpridas certas condições.

"**Encargos Financeiros**" significa qualquer correção monetária, juros, multa, penalidades, indenização, inflação, perdas e danos, juros moratórios e/ou outros encargos de natureza semelhante.

"**Estatutos Sociais**" significa os estatutos sociais ou documento constitutivo assemelhado da Oi, PTIF e Oi Coop e suas Afiliadas.

"**Euro**" significa a moeda corrente na União Europeia.

"**Ex-Bondholders Não-Qualificados**" significa as pessoas físicas, investidores de varejo, não profissionais ou qualificados, que, no contexto da Primeira Recuperação Judicial, detinham Créditos Classe III representados por títulos emitidos no exterior e regulados por leis estrangeiras, e cujos Créditos Classe III foram novados e reestruturados nos termos da Cláusula 4.3.3.1 do Plano da Primeira Recuperação Judicial.

"**Grupo Oi**" significa a Oi, Oi Coop e PTIF.

"**Homologação Judicial do Aditamento ao Plano**" significa a decisão judicial proferida pelo Juízo da Recuperação Judicial que homologar este Aditamento, nos termos do art. 58, *caput* ou §1º da LRF.

"**Homologação Judicial do Plano**" significa a decisão judicial proferida pelo Juízo da Recuperação Judicial que homologar o Plano e conceder a Recuperação Judicial ao Grupo Oi,

nos termos do art. 58, *caput* ou §1º da LRF.

"**Imóveis**" significa todos os imóveis de propriedade da Oi e/ou de suas Afiliadas e/ou cuja propriedade esteja pendente de regularização em nome da Oi ou de suas Afiliadas.

"**Imóveis de Terceiro**" significa todos os imóveis de propriedade de terceiros em que a Oi e/ou de suas Afiliadas tenham o direito de uso, posse e/ou exploração.

"**Instrumentos de Dívida**" significa os Instrumentos de Dívida Roll-Up, Instrumento de Dívida Participativa, Instrumentos de Dívida *A&E Reinstated* e Instrumentos do Novo Financiamento.

"**Instrumentos de Dívida *Roll-Up***" significa, em conjunto, a Escritura Debêntures *Roll-Up*, as Escrituras Notes *Roll-Up*.

"**Instrumentos de Garantia Novo Financiamento**" significa os instrumentos a serem celebrados pela Oi, contendo os termos e condições para a oferta dos bens e ativos listados no **Anexo 5.5.1.5(d)(I)**, em garantia no contexto do Novo Financiamento.

"**Instrumentos de Garantia *Roll-Up***" significa os instrumentos a serem celebrados pela Oi, contendo os termos e condições para a oferta dos bens e ativos listados no **Anexo 4.2.2.1(f)(I)**, em garantia no contexto da Dívida *Roll-Up*.

"**Juízo da Recuperação Judicial**" significa o juízo da 7ª Vara Empresarial da Comarca da Capital/RJ.

"**Laudos**" significa os laudos econômico-financeiro e de avaliação dos bens e ativos do Grupo Oi, elaborados nos termos do art. 53, incisos II e III da LRF.

"**Laudo Econômico-Financeiro**" significa o laudo que atestou e confirmou, nos termos do art. 53, II e III, da LRF, a viabilidade do Plano e das medidas nele previstas para a recuperação do Grupo Oi, o qual consta do **Anexo 2.4** do Plano.

"**Lei**" significa qualquer lei, regulamento, ordem, sentença ou decreto expedido por qualquer Autoridade Governamental.

"**Lei das Sociedades por Ações**" significa a Lei nº 6.404, de 15 de dezembro 1976, conforme alterada.

"**LRF**" significa a Lei nº 11.101, de 9 de fevereiro de 2005, conforme alterada.

"**Lucro Líquido da Oi**" significa o resultado financeiro da Oi em determinado exercício social, após a compensação de prejuízos acumulados e da provisão para o pagamento do imposto de renda, da contribuição social sobre o lucro e de qualquer outro tributo ou contribuição que venha a ser criado e devido pela Oi, bem como os ajustes do art. 202 da Lei das Sociedades por Ações, sem prejuízo do disposto nos §4º e §5º do referido artigo.

"**Mediação/Conciliação/Acordo**" significa qualquer procedimento a ser instaurado nos termos da Lei nº 13.140, de 26 de junho de 2015, e dos art. 20-A e seguintes da LRF, ou qualquer transação realizada para solução de incidentes de verificação de créditos, ou para tornar líquidos créditos ilíquidos.

"**Notes *Roll-Up***" significa, quando referidas em conjunto, as Tranche 1 Notes *Roll-Up* e as Tranche 2 Notes Roll-Up, a serem emitidas substancialmente na forma do **Anexo 4.2.2.2.1(B)** .

"**Oneração**" significa todo e qualquer ônus ou gravame, de qualquer natureza, incluindo, qualquer promessa de venda, opção de compra ou venda, vínculo, encargos, caução, restrição, direito de preferência ou de primeira oferta, direito de garantia, fideicomisso, penhor, penhora, hipoteca, alienação fiduciária, cessão fiduciária, reserva de domínio, reivindicação, servidão, usufruto ou qualquer outro direito real de fruição, caução ou outra garantia, bem como quaisquer outras reivindicações que possuam substancialmente os mesmos efeitos dos institutos acima referidos. As expressões e termos "Onerar", "Ônus e "Oneração" têm os significados logicamente decorrentes desta definição de "Oneração".

"**Partes Isentas das Recuperandas**" significa as Recuperandas, suas Afiliadas, controladas, subsidiárias, coligadas, entidades associadas, e outras sociedades pertencentes ao mesmo grupo, e seus respectivos acionistas, diretores, conselheiros, administradores e ex-administradores, funcionários, advogados, assessores, agentes, mandatários e representantes, incluindo seus antecessores e sucessores.

"**Pessoa**" significa qualquer indivíduo, firma, sociedade, companhia, associação sem personalidade jurídica, parceria, *trust* ou outra pessoa jurídica ou de decisão administrativa que não seja objeto de questionamento no Poder Judiciário.

"**Plano**" significa o plano de recuperação judicial conjunto aprovado em Assembleia Geral de Credores realizada em 18 e 19 de abril de 2024, de acordo com a LFR, e homologado pelo Juízo da Recuperação Judicial em 28 de maio de 2024, incluindo todos os aditamentos, modificações, alterações e complementações, bem como todos anexos e documentos mencionados nas

cláusulas do Plano.

"**Plano da Primeira Recuperação Judicial**" significa o Plano da Primeira Recuperação Judicial aprovado pelos credores em Assembleia Geral de Credores realizada em 19 e 20 de dezembro de 2017, de acordo com a LRF, e homologado pelo Juízo da Recuperação Judicial em 8 de janeiro de 2018, e posteriormente aditado por meio do Aditamento ao Primeiro Plano de Recuperação Judicial aprovado em assembleia geral de credores realizada em 8 de setembro de 2020 e homologado pelo Juízo da Recuperação Judicial em 5 de outubro de 2020.

"**Plano de Vendas**" significa o plano de vendas para efetivação da alienação dos Imóveis que deverá ser preparado pelas Recuperandas e submetido aos Credores Opção de Reestruturação I e aos Credores *Take or Pay* sem Garantia – Opção I, na forma da **Cláusula 7.2.5.**

"**Primeira Recuperação Judicial**" significa o processo de recuperação judicial da Companhia e suas subsidiárias integrais, diretas e indiretas, Oi Móvel S.A. (incorporada pela Companhia em fevereiro de 2022), Telemar Norte Leste S.A. (incorporada pela Companhia em maio de 2021), Copart 4 Participações S.A. (incorporada pela Telemar em janeiro de 2019), Copart 5 Participações S.A. (incorporada pela Companhia em março de 2019), PTIF e Oi Coop, cujo processamento foi deferido, em 29 de junho de 2016, pelo Juízo da Recuperação Judicial, nos autos do processo de recuperação judicial nº 0203711-65.2016.8.19.0001.

"**Procedimento de Solução Consensual**" significa o procedimento de solução consensual de controvérsia e prevenção de conflitos relativo ao processo TC 020.662-2023-8 que tramita na Secretaria de Controle Externo de Solução Consensual e Prevenção de Conflitos (SecexConsenso) do Tribunal de Contas da União.

"**Processos**" significa todo e qualquer litígio, em esfera judicial, administrativa ou arbitral (em qualquer fase, incluindo execução/cumprimento de sentença) em curso na Data do Pedido envolvendo discussão relacionada a qualquer dos Créditos Concursais perante o Poder Judiciário ou Tribunal Arbitral, conforme o caso, inclusive reclamações trabalhistas.

"**Real**" significa a moeda corrente na República Federativa do Brasil.

"**Receita Líquida de Venda**" significa o valor total da contrapartida em dinheiro ou de qualquer outra forma atribuída, conforme o caso, ao ativo alienado após a Data de Homologação do Plano, incluindo ações de emissão de determinada SPE Definida de titularidade das Recuperandas ou de suas Afiliadas, e que sejam efetivamente alienadas a terceiros pelas Recuperandas, sendo

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1870E87E2A76

certo que o referido valor será (a) líquido (x) dos Valores Ajuste de Preço; (y) dos Valores Custo aplicáveis; e (z) conforme aplicáveis nos casos de alienação de imóveis, dos valores relativos aos custos de desmobilização/ descomissionamento de tais imóveis; e (b) **somando-se** (x) o valor de quaisquer dívidas ou obrigações das Recuperandas direta ou indiretamente assumidas pelo adquirente, à exceção dos passivos que integram a UPI V.tal e a UPI ClientCo, conforme o caso, e (y) quaisquer Valores Adicionais, sendo certo que, em qualquer caso, os valores correspondentes serão computados como Receita Líquida de Venda somente se e conforme seu efetivo desembolso para as Recuperandas. Para os fins desta definição, **(a) "Valores Adicionais"** significa os valores referentes a quaisquer quantias a serem devidas ou liberadas às Recuperandas após o fechamento da alienação de, conforme o caso, determinado ativo ou UPI Definida dependendo de eventos futuros, incluindo parcelas de preço a prazo, preço contingente (earn-outs), liberação de valores depositados em garantia (escrow) e eventos similares; **(b) "Valores Ajuste de Preço"** significa os valores de ajustes do preço de aquisição de alienação de, conforme o caso, determinado ativo ou UPI Definida acordados entre as Recuperandas e o respectivo adquirente no contrato de compra e venda, sendo certo que eventual retenção ou depósito em conta de depósito em garantia (escrow) do ajuste de preço não serão superiores a 15% (quinze por cento) do respectivo preço de aquisição, exceto se ajuste de preço em percentual superior for aprovado por Deliberação de Credores Opção de Reestruturação I e Deliberação de Credores Dívida ToP sem Garantia *Reinstated* – Opção I; e **(c) "Valores Custo"** significa (i) os valores dos custos e despesas comprovadamente incorridos e necessários à respectiva operação (tais como custos e despesas com assessoria legal, contábil e financeira e comissão de vendas) limitado, de forma conjunta, aos montantes totais equivalentes a 3,5% (três vírgula cinco por cento) do preço de aquisição para cada operação; e (ii) os valores de tributos incorridos e pagos , incluindo imposto de renda calculado na operação (ou que vierem a ser desembolsados no mesmo exercício social do fechamento da operação ou do recebimento do valor correspondente pelas Recuperandas) tendo como fato gerador a venda do ativo ou da respectiva UPI Definida, inclusive eventuais reorganizações societárias necessárias para tanto, sendo certo que as Recuperandas serão as únicas responsáveis pelo recolhimento de referidos tributos.

"**Receita Líquida da Venda da UPI V.tal**" significa a Receita Líquida de Venda decorrente da alienação da UPI V.tal.

"**Receita Líquida da Venda da UPI ClientCo**" significa a Receita Líquida de Venda decorrente da alienação da UPI ClientCo.

"**Receita Líquida da Venda de Ativos**" significa a Receita Líquida de Venda decorrente da alienação dos ativos listados nos **Anexo 5.3.3**, exceto as ações de emissão da SPE V.tal e da SPE ClientCo.

"**Receita Líquida da Venda de Imóveis**" significa a Receita Líquida de Venda decorrente da alienação dos imóveis listados no **Anexo 5.3.4**.

"**Reconhecimento do Plano na Jurisdição do Credor**" significa toda e qualquer decisão ou ordem judicial necessária para que este Plano possa produzir seus regulares efeitos na jurisdição aplicável ao Credor em questão.

"**Recuperação Judicial**" significa este processo de recuperação judicial, autuado sob o nº 0090940-03.2023.8.19.0001 (migrado do processo nº 0809863-36.2023.8.19.0001 – PJe), em curso perante o Juízo da Recuperação Judicial.

"**Recuperandas**" significa a Oi, Oi Coop e PTIF.

"**Relação de Credores do Administrador Judicial**" significa a lista de credores elaborada pelo Administrador Judicial na forma do art. 7, §2º da LRF.

"**Reorganizações Societárias**" significa a reorganização societária a ser realizada nos termos da **Cláusula 6.1** do Plano.

"**Sky**" significa a SKY Serviços de Banda Larga Ltda. (CNPJ nº 00.497.373/0001-10).

"**Taxa de Câmbio Conversão**" significa a taxa de fechamento médio de venda de Dólar/Real dos 30 (trinta) dias anteriores à Aprovação do Plano, divulgada pelo Banco Central do Brasil, correspondente a 5.0567.

"**Torres**" significa todo o conjunto estrutural capaz de suportar a instalação de antenas para transmissão e radiofrequência com segurança e dentro dos limites admissíveis de deformação angular - flexão mais torção, incluindo a estrutura da torre, a fundação da estrutura da torre, a iluminação da torre (incluindo a barreira à luz, os controles de fotocélula e fiação, cabos), plataforma de trabalho da torre, todos os suportes de antenas e equipamentos da torre, plataformas de descanso da torre, de escadas para a torre (incluindo o cabo de segurança Trava-Quedas, guarda corpo, estaios, os estiramentos vertical e horizontal, o sistema de aterramento geral da torre (incluindo para-raios, fios e ligações terra para a torre e malha de aterramento do terreno), sistema de aterramento para o site (incluindo o sistema global de aterramento para o

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

local em relação a cercas, paredes, portas, recipientes, portões e entradas de energia), quadro de entrada de energia onde ficam localizados os medidores, fundações de concreto e/ou abrigos de metal para entrada de energia, infraestrutura de energia a partir da rede de distribuição da concessionária, o padrão de entrada de energia, incluindo dutos, postes e tubulações de energia e fibra óptica, caixas de passagem e os materiais relativos ao perímetro do site (como muros, cercas, portões, etc.), skid metálicos para Estação Rádio Base, base de concreto para Estação Rádio Base, "eco box" (estrutura em perfis metálicos e piso em chapa xadrez e dimensões variáveis) metálicos para Estação Rádio Base, sistema de iluminação do sites, tomada industrial para gerador (steck), excluindo-se quaisquer Equipamentos da Operadora que estejam instalados ou acoplados na Torre.

"**TR**" significa a taxa de referência instituída pela Lei nº 8.177/91, conforme apurada e divulgada pelo Banco Central do Brasil, cujo produto agregar-se-á ao saldo do valor nominal do Crédito para fins de cálculo do valor pecuniário das obrigações previstas no Plano, e que será devido nas datas de pagamento aqui estabelecidas. No caso de indisponibilidade temporária da TR, será utilizado, em sua substituição, o último número-índice divulgado, calculado *pro rata temporis* por Dias Úteis, porém, não cabendo, quando da divulgação do número-índice devido, quaisquer compensações financeiras. Na ausência de apuração e/ou divulgação do número-índice por prazo superior a 5 (cinco) Dias Úteis após a data esperada para sua divulgação, ou, ainda, no caso de sua extinção ou por imposição legal ou determinação judicial, a TR deverá ser substituída pela substituta determinada legalmente para tanto.

"**TRE**" significa Tribunal Regional Eleitoral.

"**TSE**" significa Tribunal Superior Eleitoral.

"**UPI**" significa as unidades produtivas isoladas que serão alienadas nos termos do art. 60 da LRF.

## Exhibit A-2

**July 1, 2025 Amendment Motion (English)**




EXMA. MS. JUDGE OF LAW OF THE 7ª BRANCH OF THE DISTRICT OF THE CAPITAL OF THE STATE OF RIO DE JANEIRO

**URGENT**

**REQUEST FOR URGENT PROTECTION**

Case No 0090940-03.2023.8.19.0001

**OI S.A. – IN JUDICIAL RECOVERY,** ("OI"), **PORTUGAL TELECOM INTERNATIONAL FINANCE BV – IN JUDICIAL** RECOVERY ("PTIF") AND **OI BRASIL HOLDINGS COOPERATIEF UA – IN JUDICIAL** RECOVERY ("O Ic OOP " And, together With the I and PTIF, " G Rupo O I" or "R ECUPERANDAS "), already qualified in the file of the judicial recovery in the above, come, by their undersigned lawyers, based on Art. 35, I, "A", e 49 of Law No. 11.101/2005 ("LRE") and in clauses 9.6, 9.6.1 and 9.6.2 of the Judicial Recovery Plan of GRupo O I de Fls. 56,788/56,939 ("P LANO " or "PRJ"), present addition to P LANO (docs. 1 and 2, "The DITAMENTO") and its respective Report on Economic and Financial Feasibility (doc. 3), as well as make an urgent injunction request, based on article 300 of the Code of Civil Procedure ("CPC") and Article 189 of the LRE, under the following terms:

**FRUSTRATED PREMISES AND THE NEXT STEPS OF THE OI GROUP'S SOERGUIMENTO PROCESS**

1.      At the General Meeting of Creditors ("AGC") closed in 19.04.2024, the creditors approved the P LANO of GRupo O I after extensive negotiation, in the form of art.
LRE 45 (fls. 247/255). The P LANO was approved by THIS MM. Judgment in 28.05.2024, with the granting of judicial recovery (fls. 61,100/61,135).

2.      Since then, the GRupo O I has been implementing the various measures envisaged

In the PRJ, necessary for the restructuring of its liabilities, maintenance of working capital and the viability of its new strategic business plan.

3.      In this sense, **(i)** the DIP financing, within which the amount of$ US 655 million was released in favor of R ECUPERANDAS, which contributed to working capital during the judicial recovery process and investment in its operational activities; (**ll**) the alienation (**ll. a**) of part of its *non-core*assets, such as UPI TV by subscription, for the amount of up to$ R 30,000,000.00 (cf. fls. 111,719) and WLL, for the value of up to$ R 4,400,000.00 (cf. fls. 98,628/98674)**; (ii.b)** of several buildings not used by G Rupo O I and which represent an unnecessary monthly maintenance cost to companies; **and (ii.c)** of UPI ClientCo, in operation that generated an economic benefit to R ECUPERANDAS of more than R$ 5.7 billion (cf. item 40 below – fls. 83,976/84,110 and 111,938).

4.      Through these and other measures, G Rupo O I has been working to equate its debt, reduce its costs and reshape its business strategy, above all, the decommissioning of activities related to the former concession regime and the direction of its operations to new markets with high growth potential (cf. items 43/54 below).

5.      Since the approval of P LANO , theR ECUPERANDAS experienced **a significant reduction in its net**debt , which increased **from$ R 25.4 10.29 billion to R$** 2024 **billion** between the first quarter of 2025 and May **780** and paid more **than R$ million of its accrual liabilities** , this shows the substantial fulfillment of the obligations of P LANO due so far (doc. 5, p. 90).

6.      According to the projections of theR ECUPERANDAS , Plano , under the current conditions, has the potential to reduce its net debt by approximately 61% – even after the contraction of the New[Financing 1] –, including with

---

[1] pursuant to clause 5.4.1. From the PRJ, the term "New Financing" has the following definition: " *Oi will hire new resources in the total amount of up to USD 655,000,000.00 (six hundred fifty-five million dollars), and may not be less than USD 650,000,000.00*

an average annual reduction of 70% in expenses related to creditors holding *take or* pay bonds.

7.     In addition to these facts, G Rupo O I has been experiencing the frank development of strategic operational activities pointed out as its current " *core* business " in the business plan and FLS Economic-Financial Report 56,941/57,000. Revenue improvement is being obtained mainly through the business branch "Oi Solutions" ("O Is oluções") of oI , which obtained net operating revenue of more **than$ R 1.75** 2024 **billion** in the financial year ended in December/, representing an expressive slice of the total revenue of G Rupo o I of 2024 (doc. 5, p. 27).

8.     Such circumstances reveal the correctness and indispensability of the measures provided for in P LANO for the raising of the GRupo O I, for the benefit of the interests of the creditors' collectivity and of the 2,999 direct employees and 19,656 indirect employees of the GRupo O I .

9.     The implementation of these measures in recent months was only possible due to the efforts employed by the new governance of GRupo O I ( " New" Governance[2] ), despite the short period in which they are in the management of R Ecuperandas, and the collaboration of the majority of *its* stakeholders , including your creditors.

---

*(Six hundred and fifty million dollars) or the equivalent in reais, being (a) up to USD 505,000,000.00 (five hundred and five million dollars), not less than USD 500,000,000.00 (five hundred million dollars) or the equivalent in reais ("Value New Financing – creditors Restructuring Option I") to be granted by creditors Restructuring Option I (" New Financing Creditors" and "New Financing – Credentials Restructuring Option I", respectively); and (b) USD 150,000,000.00 (one hundred and fifty million dollars), or the equivalent in Reais ("New Financing Value – Third Parties") to be granted by anyone other than creditors Restructuring Option I ("Third Parties New Financing" and "New Financing – Third Parties", with the New Financing – Third Parties and the New Financing – Creditors Restructuring Option I defined together as the "New Financing").".*

[2] *pursuant to clause 7.3.1. From the PRJ, the term "New Governance" has the following definition: "The 3 (three) new members of the Board of Directors listed in Annex 7.3 shall remain in their positions on the Board of Directors until the election of new members of the Board of Directors at Oi's extraordinary general meeting to be held after the completion of the Capital Increase – capitalization of Credits ("New Governance"), except in the cases of resignation, overveniente impediment or vacancy provided for in Law".*

10.     Despite the numerous advances reported above, the New Governance of
R ECUPERANDAS, implemented since 12.12.2024, was faced with **the** frustration of
some of the regulatory, financial and market premises adopted by the former
management of GRupo O I in the elaboration of the PRJ.

11.     As will be detailed in items 58/70 below, the former management of G
Rupo O I designed, in short, that **(i)** the disposal of UPI ClientCo would result in **$** the
receipt of **R 7.3** 2024 _billion in cash_ in the biennium of 2025-; **(II)** R ECUPERANDAS
would drastically reduce the costs of maintaining the infrastructure necessary for
the provision of STFC telephony services by adapting the concession to the
authorization model _from June 2024_; **and (iii)** the disbursement due to the labor
liabilities would remain at the historical levels (fls. 56,941/57,000).

12.     However, these relevant premises, which served as the basis for the
economic rational of the various payment obligations assumed in the PRJ, **were**
not verified after the approval by THIS MM.

13.     After all, **(i)** the value intended by the former administration for the sale
of UPI ClientCo was disconnected from the market reality and, as a result, the
said asset was alienated in February 2025 through **non-cash financial** counterparts
in the amount of$ R 5.7 billion. Although this operation has contributed
significantly to the reduction of the extra-concursal debts of R Ecuperandas and
expanded the participation of GRupo O I in V.tal - Rede Neutra de
Telecommunications S.A. (“V.tal”), it **did** not result in the immediate entry of net
revenues foreseen by OI for the biennium 2024-2025; **(II)** the costs for maintaining
the infrastructure necessary for the provision of STFC telephony services continued
to be imposed by ANATEL **until November 2024** for five (5) **months** after the
originally designed period; **e (III)** Labour liabilities were reduced from$ R 808.4 803.9
million to just R$ 2024 million between May 2025 and May, a speed **much
lower** than that projected by the former management of GRupo O I when the
PRJ was developed.

**14.    Such circumstances, beyond the will of the New Governance of the GRupo O I , have been pressing the box of R ECUPERANDAS and hindering the fulfillment of short-term financial obligations provided for in P LANO ,which, in turn, it endangers the successful conclusion of the soariness process.**

15.    It is not too much to remember that the judicial recovery of theG Rupo O I is the largest in the history of the country and of the whole of Latin America, with implications in several countries, a circumstance that shows, in itself, the enormous challenge represented by the need for passive size equalization and extraconcursal.

16.    In view of this, the New Governance of G Rupo O I began to study alternatives with its financial advisors and renegotiate debts with its creditors, in order to equate the pressure for immediate liquidity and, consequently, ensure the continuity of its rise, regarding the principle of social function and preservation of the company. In summary, we seek solutions that allow the continuity of payments, overcoming the temporary cash flow difficulties reported above and, in parallel, the preservation of the operational businesses that continue to guarantee thousands of jobs.

17.    In this context, it will be necessary to convene a new General Meeting of Creditors within the scope of this judicial recovery, based on Article 35, I, paragraph "a", of the LRE and clauses 9.6 , 9.6.1 and 9.6.2 of the PRJ, in order to allow creditors to decide on the possible approval of **The AcaIl FOR** Proposals presented ("TheCall for Proposals " – docs. 1 and 2), which will be detailed in its main aspects in items 94/95 below.

18.    It is appropriate that most of the conditions agreed in the PRJ approved by the creditors and approved by that MM. Judgment was maintained in ADITAMENTO. As will be detailed below, there will be no change in relation to the terms of payment of relevant part of creditors, especially those agreed with respect to ANATEL.

19.    Essentially, theR ECUPERANDAS seek, through ADITAMENTO, **(i)** restructure labor concursal credits that did not have payment conditions altered by P LANO; **(ii)** modify payment terms and conditions of certain suppliers in order to reduce immediate costs and relieve momentary pressure per short-term box; **and (iii)** repackage the payment method of *take-or-pay* suppliers linked to discontinued or low-use lines of business (items 94/95 below).

20.    O TheDITAMENTO also proposes the adoption of other means for the reduction of liabilities, such as payment with amounts derived from the sale of real estate of R ECUPERANDAS – which, as we know, exceed 7 thousand unused properties, valued at more than**$ R 4 billion**, that drain relevant monthly resources from R ECUPERANDAS with the payment of taxes and maintenance expenses and that could be better used as a source of payment of creditors (items 55/70 below).

21.    However, **considering (i**) the time necessary to **enable (a)** the possible objections of creditors to TheDUTAMENTO ; and **(b)** the publication of the notice and the realization, in two calls, of the AGC; **(II)** the risk that G Rupo O I cannot honor with the short-term financial obligations assumed in the PRJ; **and (III)** the risk of implementing restrictive measures on G Rupo O I assets, arising from demands whose credits will be restructured in the form of ADITAMENTO (docs. 1 and 2), the GRupo O I will need **urgent injunctions** to be granted, based on Article 300 of the CPC c/c art. 189 of the LRE, which give it the necessary judicial protection to ensure the successful execution of this new stage of its restructuring process (cf. items 102/138, below).

22.    In this sense, in order to ensure the effectiveness of the eventual approval of the ADITAMENTO and the uplifting of the GRupo O I , it is essential to grant urgent protection, in an *unprecedented* nature, *changes*part , to the end of:

**(i)**    <u>To suspend</u>, for 180 days, the enforceability of the obligations contained in the PRJ and the executions brought against theR ECUPERANDAS relating to claims or obligations subject to TheDUTAMENTO, and in that period, the submission of claims for bankruptcy judicial recovery and/or specific enforcement attempts of the PRJ;

**(ii)**    Prohibit, for 180 days, any form of retention, arrest, seizure, seizure, search and seizure and judicial or extrajudicial constriction on the assets of GRupo O I, arising from judicial and/or extrajudicial demands whose claims or obligations are subject to TheDITAMENTO ; and

**(iii)**    Prohibit the decree of default and/or advance expiration of obligations on the sole basis of the presentation of A DITAMENTO, by operation of *ipso facto* clauses .

23.    It is noted, as appropriate, that the jurisprudence has been admitting the implementation of injunctive measures, aimed at ensuring the effectiveness of the negotiation and approval of the additive to the judicial recovery plan – e.g., judicial recovery of the Constellation Group (" G RUPO C ONSTELLATION ")[3] and others described in items 129/132 below.

24.    Further, the legality of the above measures and the legality of the provisions of TheA DITAMENTO **were submitted to the analysis of Prof. Paulo Penalva** Santos ("PAULO P ENALVA "), retired Public Prosecutor of the State of Rio de Janeiro and Professor of Business Law of the Post-Graduation of FGV and the School of Magistracy of Rio de Janeiro. In his analysis, elaborated specifically for the present demand, the reviewer was categorical in recognizing in his technical [note 4] the feasibility and legality of the proposed measures, in the light of the best doctrine and jurisprudence on the matter (doc. 4):

> 11 ". Thus**, it is possible for a debtor to present an amendment to the judicial recovery plan approved at the general meeting of** creditors. The possibility arises not only from the absence of legal prohibition and contractual freedom (Article 5, section II of the Constitution of the Republic and art.

---

[3] TJRJ, nº 0288463-96.2018.8.19.0001, 1ª Paulo Business Court. Decision: 7.4.2021.

[4] TheR ECUPERANDAS report that the final opinion of Prof. Paulo Penalva will be presented in the files within 30 days, and the Technical Note is prepared by the urgency of time and the urgent situation faced by Oi Group.

421 of the Civil Code), as provided for in article 35, paragraph 'l', point 'a', of Law No. 11,101/2005, at the disposal that the AGC decides, in the judicial recovery, on the 'approval, rejection or modification of the judicial recovery plan presented by the debtor'." (doc. 4, p. 4).

-.-.-.-

47 ". Well, from the introduction, in positive law, of legal consequences and in the light of the weighting of the interests involved, the prospect of failure of the viable company's soiling process corresponds to a reality to be taken into account in the decision to maintain, or not, the enforceability of the obligations to be overcome until deliberation of the creditors affected by the proposal to add to the original PRJ.

48<u>. Verified the presence of the authoritative requirements provided for in the Code of Civil Procedure ("CPC") (Art. 300 et seq.), it is possible to grant urgency protection in order to suspend the enforceability of the obligations that are due up to the date of the general meeting of creditors that will decide on the proposed addition, and so that the creditors to be restructured cannot promote constrictions in the debtor's assets in this same period</u> ." (doc. 4, p. 10).

25.    In summary, the granting of such urgency protection is essential to enable the preservation of R ECUPERANDAS during the period of 180 days – sufficient period for G Rupo O I to negotiate the DITAMENTO with its creditors, as well as to decide its approval in any AGC.

## THE CONTEXT OF THIS ADDITION:
## CAUSES OF THE EQUITY SITUATION OF THE OI GROUP AND THE NEED FOR THE ADDITION AND MODIFICATION OF THE PLAN

(i)    THE S MAIN MEASURES ALREADY IMPLEMENTED IN THIS SECONDR ECUPERAÇÃO J UDICIAL

26.    The restructuring process by which G Rupo O I has been going through since its first judicial recovery (Case No. 0203711.65.2016.8.19.0001) has as main pillar the equalization of the legacy fixed telephony operation of the STFC concession and the various related issues, including the migration of the public concession regime to the authorization regime and the reduction of the preponderance of

fixed telephony in the context of new telecommunication technologies.

27.    In summary, the provision of services subject to ANATEL's concession has **become** obsolete and, at the same time, **very costly for G**ʀᴜᴘᴏ ᴏ I , a situation that has been aggravated due to the delay in adapting the regulatory framework, whereas ʀ ᴇᴄᴜᴘᴇʀᴀɴᴅᴀs ʜas been obliged to maintain the excessive costs of *take or pay* contracts related to the provision of satellite capacity and the provision of services and/or leasing of infrastructure items, but that they have long not brought you any more economic benefits – on the contrary, they represent monthly costs of **approximately$ R 60** million .

28.    For this reason, part of the recovery measures proposed and implemented through the PRJ has always been focused on the disposal of assets and assets of its assets that had been acquired for the provision of such services within the scope of the concession, but that they have long been meaningless in the context of the new reality of the market – such as real estate and towers.

29.    In continuity with the actions taken in the first judicial recovery [5] , several other measures and asset divestitures were implemented in the proceedings of this second judicial recovery, with the same strategic objective.

30.    The disputes between I and ANATEL, concerning the adaptation of the concession regime for authorization, were submitted to the consensual settlement procedure before the Court of Auditors of the Union (" TCU"), which was attended by the said parties and the Ministry of Communications.

---

[5] In the context of the 1ª judicial recovery, ɢ ʀᴜᴘᴏ ᴏ I made the **sale (i)** of the optical fiber telecommunications network operation, in the form of UPI Infez, in a transaction of$ R 12,923,338,290.68; **(II)** the operation in telephony and mobile data, in the form of the Upi mobile assets ("Upi To M "), with a price of$ R 15,922,235,801 1,077,000,000; **(iii)** of the units of Torres, in the form of the Upis Torres, for R$; **(IV)** of data center units, via UPI Data Center, for$R 325,000,000.00; **(V)** of several properties; **and (vi)** of Lemvig RJ Telecommunications Infrastructure and Networks S.A., owner of part of Oi's tower infrastructure, $ NK 108 Empreendimentos e Participacoes S.A. These measures allowed the reduction of Gʀᴜᴘᴏ ᴏ I's liabilities from R 65 2016 billion in 35 to R$ 2022 billion in **26**, enabling the payment of **approximately R$** billion credits subject to 1ª the 1st judicial recovery.

31.    After extensive negotiation between the parties, the migration to the authorization regime was approved, with acquiescence of ANATEL, the Ministry of Communications and the Attorney General of the Union (AGU). The single authorization term was signed by O I in November 2024, which allowed the significant reduction of its STFC obligations, as provided for in the General Telecommunications Law (Law No. 9,472/1997), with the changes introduced by Law No. 13,879/2019.

32.    In turn, this transition enabled G Rupo O I to align its obligations to the current market dynamics, maintaining the commitment of universalization in areas without alternatives to voice service, while dishonoring itself of typical concession charges, such as the maintenance of poles and orelles, which are economically unviable.

33.    The arbitration procedure No. 26470/PFF ("ARBITRAGEM ") is also underway, initiated by O I against ANATEL about the unsustainability and the economic and financial imbalance of the concession. These controversies were not the subject of the agreement entered into under the TCU and may bring significant credits in favor of O I .

34.    In addition, in 30.9.2024, O I concluded an agreement with ANATEL to equate the credit held by the agency, which resulted in a 55.37% discount on the balance owed to its credit, amounting **to$ R 8.4** billion . The agreed payment was in 36 (thirty-six) installments, with discharge by means of the withdrawal of judicial deposits, while the remaining balance will be settled in 78 (seventy-eight) non-linear installments by 2034.

35.    Also within the framework of this second judicial recovery, R ECUPERANDAS succeeded in celebrating, with a group of international financial creditors and with V.tal, long-term financing, in the form "*debtor in* possession " (" DIP"), in the amount **of$ US 655** million , this was essential for cost reduction and short-term working capital acquisition, as well as resources for the

investment in its activities. However, such resources were widely used in the course of the recovery process itself, under the aegis of the former governance of GRupo O I , so that only a small part of these values were available when the New Governance was implemented.

36.    Another important measure was the capital increase approved by the Board of Directors in 21.8.2024 and approved in 28.10.2024, as provided for in clauses 4.2.23 and following of Plano , whose shares were mostly subscribed by creditors by capitalizing part of the remaining balance of the concursal claims held by chiropractic creditors who elected the "Restructuring Option I", the other party being subscribed, in cash, by the Company's shareholders, in exercise of its right of preference.

37.    G Rupo O I also sold and transferred, in 28.02.2025, the isolated productive unit (UPI), composed of 100% of the shares issued by Oi Serviços de TV por Pagamento S.A. ("UPI TV por Pagamento") to Mileto Tecnologia S.A., for an amount of up to$ R 30,000,000.00 (FL. 98056/98,085 and 111,719).

38.    This operation allowed the monetization of assets (SEAC, TV subscriber base and associated terminal equipment, as well as the related goods, rights and obligations) associated with the provision of DTH services, which were already planned to be demobilized in the Economic-Financial Report, due to its strategic redirection and high costs related to contracts for the provision of satellite capacity, content acquisition and channel licenses.

39.    G Rupo O I also signed a purchase and sale contract with Datora Telecommunications Ltda., whose object consisted in the sale of its assets linked to WLL ( internet via *wireless* radio frequency), for the amount of up to$ R 4,400,000.00.

40.    Finally, the GRupo O I concluded with V.tal, in 28.02.2025, the "Investment Agreement and other Avenças", through which it alienated the productive unit

Isolated (UPI) composed of 100% of the shares issued by ClientCo Serviços de Rede Nordeste S.A. ("<u>UPI ClientCo"), to whose share capital O</u> I contributed assets, liabilities, rights and obligations related to telecommunications operations with individuals-physical clients. This operation, expressly provided for in Plano , not only allowed the sale of an activity that was causing it losses, but also represented an economic benefit in financial counterparts that **totaled$ R 5,715,500,148.00** 83,976 (fls. 84,110/111,938 and).

41.    In summary, the operations approved and anticipated in P lano have been **successful** in considering the legacy of the concession and transforming, **in** revenues, certain assets that had been representing only expenses for not integrating their strategic operational objectives any longer.

42.    These measures, associated with the conditions reagreed in the approved P lano, **have reduced** their liabilities by **15 billion** since their approval (from$ R 25.4 2024 billion in the first quarter of 10.29 to R$ 10.5 billion in 2025.), as also illustrated in the chart below, substantial part of the claims submitted to judicial recovery (docs. 5, 6 and 7):



**(ii)** N OVA O I AND THE STRATEGIC REDIRECTION OF ITS *CORE* ACTIVITIES

43.     As widely reported to the market, especially from the implementation of the measures provided for in Plano , G Rupo O I directed its activities to the *new core business* set out in the Economic and Financial Feasibility Report presented with P LANO in 19.4.2024[6], that is, the provision of services aimed at offering Information and Communication Technology (ICT) and Telecommunications solutions through the "Oi Solutions" branch (doc. 5, p. 34 and 102).

44.     Currently, G Rupo O I has a complete portfolio aimed at corporate clients, government agencies and public companies, which involves offering cloud solutions, security, hardware, fixed telephony, observability, artificial Intelligence and UC&C ( *Unified communication &* collaboration ).

45.     G Rupo O I offers solutions for banks, physical stores, *e*-commerce, industries, mining and public safety, integrating all the ICT services in Telecommunications necessary for the operation of these activities. Also, as examples, *facilities* management services, video monitoring, Wi-Fi 6.0, cyber security, monitoring of the agency's IT devices, as well as creating *a* messaging *hub* through a platform for managing and triggering SMS and messaging via Whatsapp can be mentioned.

46.     These activities, focused on B2B operations ( *Business to Business*), require a smaller volume of investments than fixed and mobile telephony and internet activities, which historically were provided by GRupo O I in the market

---

[6] As stated in the E&Y Economic-Financial Laudo: "[o]s The main focus of segment B2B will be the services related to data and broadband and computing, which reflects a market trend, in the Company's view. Following this **movement,** the Company expects to strengthen its presence in the computer market, as a consequence, this service line represents 50% of Oi Solutions revenue in 2027. This increase is based on the growth of SDWAN, Cybersecurity, and Cloud solutions. Considering the focus on the IT segment, the Company projected a stabilization of data revenue + broadband from 2027." (fls. 56,941/57,000).

consumption. Nevertheless, they are able to generate very relevant revenues, given their added value and greater profit margin.

47.    Currently, G Rupo O I serves more **than 43 thousand** clients through the "O Is OLUÇÕES" — branch, 46% of the city halls, 68% of the state governments and 69% of the federal government agencies, in addition to 82% of the country's largest private companies and the 10 largest in the banking, commerce, construction, industry and services sectors (docs. 6 and 7, p. 3).

48.    Recently, **Ois ERVICES** was also created, a company that provides shared services for financial, operational and IT support , such as HR, finance, information and technology systems, operations and logistics. As reported in the results of the 1st quarter of 2025, this company is projected as a strategic asset, with growth potential of up to 19% a.a., as BPO services become provided to other Brazilian companies (docs. 6 and 7).

49.    In total, the annual revenue of Nova Oi services **exceeded$ R 3.1** 2024 **billion** in, amid the process of decommissioning legacy and expansion of *core* services (doc. 5). In parallel, the group has also been resizing its structure, optimizing costs and reducing its non-essential expenses.

50.    In this sense, 2025 marks the beginning of a new operational model of GRupo O I . There has been a real transformation in the composition of its revenues, driven by sales of ICT solutions, along with long-term and lower CAPEX contracts. Additionally, it is expected that by the end of this year, R ECUPERANDAS will have completed the demobilization of the legacy, which will represent accumulated savings of **more$ R 2.5** billion .

51.    In short, G Rupo O I has been expanding and consolidating its position in the market by new strategic fronts of digital solutions and, in parallel, accelerating the discontinuation of deficit operations. From this combined strategy, a slimmer operational structure emerges, but with higher potential

profitability and cash generation in a sustainable way (doc. 7, p. 7):



52.    As we can see, this set of legal businesses and strategic realignments – enabled by P lano – promoted a real turn in R ECUPERANDAS operations.

53.    **It is not even remotely faced with pre-recuperative reality: g Rupo O I was able to receive relevant resources, reduce costs, monetize assets that had no revenue counterparts, reorganize its debt structure and postpone payment dates, allowing investments in core activities with high profitability potential.**

54.    However, as it was said, its restructuring process was impacted by some mishaps, identified from the implementation of the New Governance in 12.12.2024, which made it necessary to present A DITAMENTO TO Plano , in order to enable the effective recomposition of the cash and financial reorganization of the G RUPO OI.

### (iii) Nova Governança AND THE IMPACTS OF NOT OBTAINING VALID PROPOSALS FOR THE FRUITLESS SALE OF ClientCo BY PAYMENT IN Dinheiro

55.    In accordance with clause 7.3 and following of Plano, after the completion of the capital increase of OI, in 11.12.2024, a General Shareholders Meeting was held, in which the new Board of Directors and the new Statutory Board was elected, implementing the New Governance foreseen in Plano (fls. 104,029/104,030, item 66). This measure allowed the entry of independent administrators with extensive experience in management, finance and restructuring of companies.

56.    Since the appointment of the new members, the Board of Directors of OI has implemented a series of improvements in favor of the restructuring of GRupo OI, including the completion of the complex disposal operations of Upis ClientCo and pay TV. However, for reasons beyond the will of theR Ecuperandas, the GRupo OI has not yet fully recovered and has been facing difficulties in its cash flow.

57.    As already anticipated in the introductory chapter of this petition, the New Management of the GRupo OI came across the frustration of the relevant expectations that guided the economic rational of Plano, especially regarding **the alienation of** assets , which did not materialize as projected.

58.    This is because, in preparing Plano, the former management of GRupo I considered the sale of UPI ClientCo for the minimum price **of$ R 7.3** 56,941 billion (Fls. 57,000/), to be paid fully **in**cash . According to clause 5.2.2.1.6 of thePlano , of this amount, the equivalent of**$ R 1.5** billion would be allocated to the OI box for the increase of its activities and payment of short-term obligations, especially those of labor nature and with suppliers, while the remainder –**$ R 5.8** billion – would be used for the payment of its concursal liabilities.

59.    However, this premise contained in the PRJ **was**frustrated, since the competitive process developed **differently** from the planned one.

60.    The only proposal received in the first auction round **did** not meet the minimum cash price provided for in clause 5.2.2.1.2, "i", of the PRJ - i.e., was only**$ R 1** 72,481 billion in cash (fls. 72,486/73323 and 73325/ **7.3**), a value more **than seven times lower than the expected billion**.

61.    Conducted the second round of auction, under the terms of the PRJ, **no** cash proposals were submitted for the acquisition of the asset (fls 78930/78935 and 81,553/81561).

62.    Therefore, in accordance with clauses 5.2.2.1.2, "III", 5.2.2.1.3, "II", and 5.2.2.1.5, "i" e "III", of P LANO , the UPI ClientCo was sold to V.tal, which, although it presented a proposal of economic value estimated at$ R 5.68 83,976 billion, **did** not include effective inflows of resources (in the short term) in the R ECUPERANDAS boxes (fls. 84,110/111,938 and 7 ).

63.    It is not disputed that the sale of the IPU to V.tal implied a significant financial gain for the G Rupo O ¹ ⁸, and the proposal met all the conditions of clause 5.2.2.1.5 of the P LANO – so much so that it was approved by that MM R. Fl. Decision 61,100/61,135), in addition to being approved by CADE and ANATEL without restrictions.

64.    **However, it is also undeniable that O I obtained, with this operation, revenues significantly lower than those projected by the old management when negotiating the PRJ with the creditors, which resulted in the dismarriage between the projection of**

---

[7] More specifically, the proposal included the transfer of **(i)**$ R 308.3 375.4 million in debentures (including accrued interest, fees and premiums) issued to V.tal under the DIP financing; **(ii)** R$ million in credits not subject to P LANO held against Oi; and
**(III)**$R 4.99 billion issued in new common shares of V.tal, which will be paid through the contribution of UPI ClientCo shares.

[8] More specifically, the disposal of UPI Client CO resulted in**: (I)** the elimination of more than$ R 400 million in debts, promoting substantial relief in its financial liabilities; **(II)** at the conclusion of an onerous contract with V.tal, the terms of which represented a significant compromise in cash flow and a negative impact on the profitability of the operation;
**(III)** an increase of 10.5% in O I's share in V.tal, raising its share to 27.5%; **and (iv)** in the reduction of non-profitable activities for O I through the sale of its activities in fiber optic retail, allowing the direction of efforts to Oi Solutions.

**Immediate liquidity used as a basis for the elaboration of P LANO payment flow and the real cash availability of GRupo O l .** Consequently, O l needed to *obtain waivers and* move the discharge of such credits into the future, **depending, above all, on the deadlines for the implementation of the disposal of UPI V.**tal .

65.    Check out, in this sense, the cash flow of investment activities that was designed by the former management of GRupo O l at the time of the presentation of P LANO. It was expected that more **than$ R 7** 2025 **billion in** cash still in this financial year of 56,941, resulting from the sale of ClientCo (Fls. 57,000/):

| Fluxo de Caixa das Atividades de Investimento (Em milhões de R$) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| (-) Despesas de capital | (570) | (266) | (118) | (117) | (116) | (115) | (115) | (114) | (114) | (114) | (114) |
| (+/-) Alienação e outras operações não recorrentes | 343 | 125 | 140 | 100 | 100 | 100 | 100 | 150 | 150 | 150 | 150 |
| (+/-) Venda UPI ClientCo | - | 7.300 | - | - | - | - | - | - | - | - | - |
| (+/-) Venda UPI V.tal | - | - | 8.000 | - | - | - | - | - | - | - | - |
| (=) Fluxo de Caixa das Atividades de Investimento | (227) | 7.159 | 8.022 | (17) | (16) | (15) | (15) | 36 | 36 | 36 | 36 |

66.    Consider, comparatively, the increasing payment flow that was projected in P lano for the biennium of 2025-2026, which would be partially allocated with the resources obtained with the UPI ClientCo (Fls.

**7.5.4  Projeção do Plano de Credores**

A seguir é apresentado o fluxo de pagamento aos credores, de acordo com o Plano de Recuperação Judicial.

| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Classe I | (241) | (201) | (193) | (188) | (186) | - | - | - | - | - | - |
| Classe II | - | - | - | - | - | - | - | - | - | - | - |
| Classe III | (292) | (1.533) | (5.739) | (590) | (396) | (589) | (2.515) | - | - | - | - |
| Classe IV | (14) | - | - | - | - | - | - | - | - | - | - |
| Fluxo de Pagamento | (547) | (1.734) | (5.932) | (778) | (582) | (589) | (2.515) | - | - | - | - |

56,941/57,000):

67.    Of course**, the frustration of this revenue expectation compromised the cash availability of short-term R ECUPERANDAS** , **which (i)** reduced the amount of resources available for the increase of its operations; **and (ii)** made it difficult to make the payments that were planned to take place in this and the next financial years – and, consequently, the implementation of P lano itself under the agreed conditions.

68.    Another factor that impacted OI's cash was **the** delay in the disposal of UPI ClientCo. In fact, the sale of UPI ClientCo took **approximately three months longer to be completed than expected in the PRJ** , which generated, according to the Company's estimates, an additional impact of more **than$ R 600 million** on OI's cash.

69.    This is because ClientCo's operation generated losses of**$ R 150** [9] **million per month to G Rupo O** I , presenting **much higher operating costs than** [revenues], mainly due to the contract to provide broadband services using *Fiber to the* Home (FTTH) technology, which was terminated with the sale of UPI ClientCo.

70.    In addition, this delay contributed to **an operational worsening in such** services, generating additional losses of **approximately$ R 166** million .

### (iv) THE TRASOS IN THE MIGRATION OF THE PUBLIC R EGIME P OF THE STFC - EXTRAORDINARY EXPENSES WITH THE MAINTENANCE OF THE INFRASTRUCTURE

71.    OI also suffered severe liquidity impacts as a result of the maintenance of the STFC throughout 2024, since the forecast of the approved PRJ was to conclude the concession migration for authorization between May and June 2024, and its effective conclusion occurred only in November 2024 – **a delay of at least six months compared to that predicted in the PRJ** , which generated impacts

---

[9] OI's expenses on transmission infrastructure were the most representative of the expenses related to the plant and its revenues.

considerable operational and financial.

72.    As a result, O I was compelled to maintain the obligations of the concession contract for longer than expected when the P LANO was designed, **which** prevented the demobilization of several sites, as well as the obsolete technology of copper networks, resulting in the continuity of the costs of contracts with minimum obligation (" *Take or Pay*"), which do not bring any economic benefit to R ECUPERANDAS due to the low consumption of services.

73.    The prolonged maintenance of these assets generated significant costs that could have been avoided, consuming valuable resources that could be redirected to more strategic and innovative investments. In addition, the delay in the process negatively impacted the restructuring and operational optimization plan of OI, delaying the implementation of essential measures for the reduction of operational liabilities and for the adequacy of the business model in relation to regulatory and market transformations.

74.    This delay also reflected in an increase in fixed and operational costs, deteriorating the financial margin of OI and raising the liquidity risk at a critical moment of judicial recovery.

75.    It is worth noting that the former management of OI had also estimated, in the projections that supported the elaboration of P LANO, that there would be a significant reduction of expenses in the biennium 2024-2025 due to direct adaptation to the authorization model. However, the adaptation planned for June 2024 occurred only in November 2024, frustrating the original potential for reducing these expenses in the biennium 2024-2025, which , of course, has hampered compliance with the flow of payments foreseen for the short term.

76.    The delay in the change of the regime, due to ANATEL's exclusive fault, generated an additional total impact of at **least$ R 510** 160 **million** in O I's cash, of which R$ 350 million was due as additional fines charged by ANATEL and R$

millions of unreduced costs.

(v) THE SECTOS RELATED TO THE LABOR DEBT OF GRUPO O I

77.     Additionally, another critical factor that presses the R ECUPERANDAS box is the **significant increase in the volume of labor convictions recorded in the last** exercise . This significant growth in labor responsibilities, as established in the PRJ, will require financial disbursements with an extremely low grace period – of only six months – **imposing an additional challenge to cash management and budget predictability of** OI .

78.     OI has always made efforts to confer more advantageous conditions on the creditors of Class I - Labor, due to the food character of the respective credits. The company is aware of its social responsibility, not only before its labor creditors, but also in relation to its current employees and the productive chain that sustains its operation. However, the maintenance of the conditions established in the P lano approved in 2016 - **in the face of a substantially different economic and operational scenario** - proves unfeasible, even in the face of the new reality of the Company's cash, which imposes the need to revise these conditions.

79.     As is known, under clause 4.1 of the P LANO, Class I credits were not restructured in this second judicial recovery, which fully maintained the original values and conditions of deprivation and installment provided for in the addition to the plan of the first judicial recovery, approved in 08.09.2020, which provided for, as a general rule, the full payment of such credits in 5 monthly installments, with a grace period of 180 days [10].

80.     In addition, clause 4.1.1 of P LANO provided that labor credits not recognized or enabled in the Date of Approval should continue

---

[10] https://www.recjud.com.br/recuperacao-judicial-judicial-reorganization-2016/.

processing until a final and net value was determined, but that after the final decision of the approval decision of the amount due and the respective qualification, they would be included in the flow of payments under the same abbreviated conditions of grace and installment described above (phil 56,788/56,939).

81.    To establish this beneficial condition of payments to Class I creditors and to prepare P LANO payment projections (cf. Items 65/66 above), the former management of G Rupo O I was based on estimates of the reduction of this liability, which, however, are **not** materializing according to the estimated — largely because there was frustration in the expectations of cutting costs and immediate entry of resources into the box, as seen above.

82.    According to a survey carried out by the New Governance of GRupo O I , it is estimated that the labor claims – including the Atlantic Foundation – total today the total value of **approximately$ R 1.57** billion , and, according to the following graph, there was **a 1,337.45% increase in disbursement with labor debts in the last 12** months , which jumped from an average of$ R 2.43 1.3.2023 million per month, incurred between 1.5 and 2024.32.5, to an average monthly expenditure of R$ million in the last year. Check out the following comparative chart of monthly disbursements of O I with the labor liabilities between the 1st quarter of 2024 and 2025:



83.    This factor has caused a **monthly millionaire impact that was not predicted when the P LANO was elaborated**, which, together with the other causes listed above, was **not predicted**. it has **been pressing in an extraordinary way the cash flow of R ECUPERANDAS and compromising its liquidity and payment capacity of P LANO bonds**.

84.    This increase does not result from any management error, but from structural and conjunctural factors proper to the Brazilian business reality —— and from the necessary resizing of the GRupo O I .

85.    In order to remain operational and in compliance with its legal, social obligations and approved P LANO, O I had to promote a deep readjustment in its structure, which included the reduction of its staff, the disposal of assets and the closure of certain operations. Measures such as these, although necessary for the preservation of the company, led, as an inevitable side effect, to increase the number of shutdowns and, consequently, the exponential growth of labor demands.

86.    The complexity of the Brazilian labor legal regime is generally known , composed of more than three thousand current norms, many of which are difficult to reconcile, which imposes significant challenges to the adaptation of companies to new business models and to the contemporary dynamics of productive and labor relations. In such a scenario, it is practically inevitable that companies that need to carry out operational restructuring – mainly due to their economic and financial situation – face an immediate and substantial increase in the number of labor actions.

87.    Moreover, the experience of recent years has shown that the option adopted in P LANO for not restructuring Class I resulted in the prolation of conflicting decisions from different Labor Courts and Regional Courts, as well as improper blockages of bank accounts from concursal creditors.

These decisions eventually compromise the predictability and legal certainty necessary for the effective restructuring of the company, generating negative impacts on the cash flow of RECUPERANDAS .

88.    In summary, although the various restructuring measures adopted by Nova Governance have represented significant advances in the restructuring of the GRupo O I , the absence of immediate liquidity, resulting from the frustration of relevant premises of Plano , added to unforeseen costs and the intensification of short-term labor obligations, resulted in a scenario of operational complexity. This context requires the need for new measures aimed at renegotiation of liabilities, with the aim of preserving resources and ensuring the continuity of the execution of PLANO (cf. reported in items 26/54 above).

89.    As a result, G Rupo O I understands that, in order to ensure financial sustainability and enable the generation of assets in the short and medium term, as well as prevent the possible failure to comply with obligations contained in the PRJ, it is essential to **restructure credits classified in Class**I , as well as **certain provisions of Class**III **suppliers creditors**, by means of measures that allow **the extension of payment periods**, as well as payment with the sale of OI properties or by means of **the payment of such**assets .

90.    It should be noted that these credits represent the debts incurred in cash that will **be due** in the financial year 2025, which gives special urgency and **priority** to their proper management, in order to relieve the cash flow of theG Rupo O I and allow the equalization of the entire concursal liability.

91.    In addition, such measures will allow the definitive equalization of these debts, giving greater financial and legal predictability to Plano .

92.    Finally, it should be highlighted that the flexibilization of these obligations, which will be

Highlighted in its main aspects below, it will not only contribute to the adequacy of the financial profile of GRupo O I to its real payment capabilities, but also demonstrates the commitment of R Ecuperandasto fulfill all its obligations – including the others already restructured by PRJ –, although under conditions adjusted and compatible with your current financial reality.

93.    Such restructuring should therefore not be interpreted as mere postponement of the payment of the concursal liability, but as a strategic and essential solution for the financial stabilization of the GRupo O I and the sustainable development of the R Ecuperandas operation, paving the way for value generation and the resumption of sustainable growth, for the benefit of all *its*stakeholders .

### SUMMARY OF THE ADDITION TO THE PLAN
### INCLUSION OF CLASS I AND RESTRUCTURED SUBCLASSES
### NEW MEASURES TO OVERCOME THE CRISIS

94.    In search of a more efficient solution for the readjustment of its capital structure, maintenance of its working capital and relief of pressure by short-term liquidity, G Rupo O I proposes, among other[points 11]: **(I)** the change in the terms of payment of Credits held by Labor Credentials (clause 4.1), Provider Creditors Partners (clause 4.2.6), Take or Pay creditors with Guarantee (clause 4.2.8), Take or Pay creditors without Guarantee – option I (clause 4.2.9), Take or Pay creditors without Guarantee – option II (clause 4.2.10) and Acceding Extraconcursal Creditors (clause 4.10)**; (ii)** the use of recursive deposits for the acquisition of immediate remedies and payment of creditors (clauses 5.4); **and (iii)** the possibility of hiring a specialized company to manage the Real Estate by means of a vehicle to be created for this purpose (clause 5.3.5).

---

[11] The summary of this petition only covers **part** of the amendments and forecasts, considered most relevant by theR ECUPERANDAS . For the evaluation of the full range of proposals, creditors should consult TheDITAMENTO **( doc. 1 )** or the *"Redline"* comparison **( doc. 2 )**.

95.   In order to facilitate the analysis of the changes by creditors, theR ECUPERANDAS attach, together with the ADITAMENTO (doc. 1), a comparison, in revision marks ("*Redline* "), which highlights all forecasts modified, deleted or included in Thea DITAMENTO (doc. 2). Below are some of the modifications and additions mentioned [above 12]:

- C LAUSULA 4.1. C REDUCTS T RABALHISTAS - C LASSE I : Labour creditors may choose between two payment options, which should be formalized within thirty (30) days of the date of approval of ADITAMENTO by filling out the form in Annex 4.1.3.

- By **Option**I, creditors will receive their cash credits, upon deposit into account to be informed by the creditor himself, in the amount of up to$ R 9,000.00 180, within days of approval of the addendum. Creditors with claims greater than that amount may also join Option I, provided they grant discharge of the balance. C Lausula 4.1.1.1 provides for the total aggregate value of$ R 30,000,000.00 for payments in Option I, so that, if this value is reached, creditors who choose Option I will receive the remainder of their credits in the form of Option II.

- By **Option**II , Class I creditors will receive their claims in a single installment, without any disallowance, limited to 150 (one hundred and fifty) minimum wages [13] , within 3 years counted from the approval of the

---

[12] The description of this chapter is only intended to facilitate the reading of The A-Letter by creditors. In this way, theR ECUPERANDAS emphasize that, in the event of divergence between this manifestation and the document annexed to A DITAMENTO, the conditions laid **down in ADITAMENTO** shall prevail.

[13] Credits exceeding 150 minimum wages will be paid in the form of clause 4.2.11 (General Payment Method), as widely accepted by the jurisprudence of the Superior Court of Justice (Resp 1812143/MT, Rel. Minister Marco Buzzi, Fourth Chamber, judged on 09/11/2021, DJe 17/11/2021; Resp 1649774/SP, Rel. Minister Marco Aurélio Bellizze, Third Chamber, judged on 12/02/2019, DJe 15/02/2019; STJ, AgInt No Resp 1924178/SP, Rel. Minister Luis Felipe Solomon, Fourth Chamber, judged on 14/09/2021, DJe 23/09/2021).

As was also clarified by Prof. P AULO P ENALVA in his opinion, "62. **The possibility for the PRJ to provide for the limitation of labor credits to 150 minimum wages in the judicial recovery was analyzed by the STJ , who decided on the possibility for the PRJ to predict and the AGC approve this limitation of** the availability of the law and, consequently, for the possibility of limitation. 63. The understanding established in the STJ in relation to labor credit is in the sense that '*it is possible, by decision of AGC, to apply the limit provided for in article 83, I, of Law 11.101/2005 to companies in judicial recovery, provided that due and expressly provided for by the* judicial recovery *plan, an appropriate instrument to provide for the payment of the debts of the company in recovery (principle of the preservation of the company)* ' [STJ, Resp 1812143 MT 2019, Rel. MINISTER MARCO BUZZI, FOURTH CLASS, tried on 09/11/2021, DJe 17/11/2021]. This means **that the credit balance of more than 150 minimum wages can be paid on the condition of a credit card, exactly as stated in the Falimentar legal rule** ." (doc. 4, p. 13)

Notice 14, so that the amount exceeding 150 minimum wages will be paid under the terms of the General Payment Method (clause 4.2.11 of the Plan).

In accordance with the provisions of article 54, §2°, of LRE, the DITAMENTO constituted a full and sufficient guarantee of the payment of Labor Credits – Class I, according to the list of assets in Annex 4.1.2.1 of The Ditamento.

- CLAUSE    4.2.6. CREDITS    FROM    CREDITORS    SUPPLIERS
  Partners :
  Given the need for cash of OI , in the short and medium term, TheDITAMENTO only provides for the lengthening of payment periods, which will be paid with the resources raised by R ECUPERANDAS with the sale of real estate until December 31 2038.

- CLAUSE 4.2.7. TAKE OR PAY creditors credits with GUARANTEE : No.
  There will be a change in the discount already provided for in P LANO in relation to the remainder of these credits, which will continue to be 60% for the credits due from 2024 to January 2025 and 62% for the period from February 2025 to July 2027. Other provisions relating to the other payment terms shall be amended in accordance with clause 4.2.7, and their discharge shall be provided for in respect of revenue from the sale of mobile I (clause 5.3.4, "II" ', 1.2 31') until December 2038,.

- CLAUSE 4.2.8. TAKE OR PAY Supplier Credits without WARRANTY –
  OptionI : There is forecast of debt stretching, so that such creditors will be paid with the funds raised by theR ECUPERANDAS with the sale of real estate until December 31 2038. O TheDITAMENTO maintained the 20% discount foreseen in P LANO for the credits due between January 1 , 2024 and December 31 , 2025, changing the discount of the credits due in the biennium of 2026/2027 to 35%, and from July 1 , 2027, the contracts of these creditors shall be terminated without

---

14 Prof. PAULO P ENALVA also attested the legality of this clause ": 64. Thus, two premises are established: (I) Law No. 11.101/2005 allows the extension of payment of labor credits up to two (2) years additional to the period of 1 (one) year provided in *the caput of* art. 54, provided that the cumulative requirements of the paragraphs of §2 of this article are observed; **and (ii)** the understanding of the STJ is in the sense that it is valid that the PRJ provides for the limitation of Class I credits in 150 (one hundred and fifty) minimum wages. 65. **From these premises it is possible to conclude that, with authorization from AGC, labor credits exceeding 150 (one hundred and fifty) minimum wages can be classified as chiropractors . In this case, the excess amount will not need to meet the requirements of §2 of article 54 of Law No. 11,101/2005, since the excess will be converted into chiropractor credit.** Only the credits below the said limit are that they must necessarily observe the constraints of §2 of article 54 of Law No. 11.101/2005. 66. This is **because (i)** Art. 50, I, of Law No. 11.101/2005 expressly authorizes the granting of special terms and conditions for payment, without fixing limitation [Aglnt No Resp 1828635/RS, Rel. MINISTER MOURA Ribeiro, THIRD CLASS, judged on 20/09/2021 - DJe
23/09/2021.]; **and (ii)** the limitation provided for in article 54, *caput* , of Law no. 11.101/2005 is restricted to
Class I." Credits (doc. 4, pp. 13 and 14).

penalties.

- CLAUSE 4.2.9. TAKE OR PAY SUPPLIER CREDITS WITHOUT WARRANTY – OPTIONII : with regard to the creditors who chose Option II, ADITAMENTO maintains the original goodwill of 60% scheduled for the period 2024 to December 31, 2025, with the provision that all contracts of these creditors will be terminated on July 1 , 2027. TheDITAMENTO also provides for the lengthening of the payment terms, in the same terms as for the other classes — that is, they will be paid with the resources raised by the Recuperandas with the sale of real estate until December 31, 2038.

- C LAUSULA 4.10. C AROUND AND XTRACONCURSAL DERENTE : O THE DUTAMENTO PREVISIONS
  That the Acceding Extraconcursal creditors whose claims were constituted after 1 March 2023 and inadmitted until the date of approval of the A DITAMENTO may participate in the distribution of resources provided for in clause 5.3.4 ( waterfall ).

- C LAUSULA 5.3.4. R ECEITA L IQUID OF THEV ENDA OF IFURNITURE : O THE DITAMENTO ALTERS
  a series of provisions concerning the criteria and conditions of the order of payments with the revenue of the disposal of real estate. Considering the urgent need to relieve pressure on OI cash and investments in operational activities, the aggregate revenue value for R ECUPERANDAS activities will be increased to$ R 600,000,000.00. The aggregate value of the proceeds from the sale of these goods will also be increased, which will be allocated to the *pro*rata payments of the creditors listed in clause 5.3.5

- C LAUSULA 5.3.5:V ECULA IMOBILE : In order to reduce the costs of maintenance and sale of such goods from its non-circulating asset, decrease the pressure on the OI box and give efficiency to the procedure for the disposal of real estate, the Ditamentoprovides, as an alternative to direct sale, the possibility of setting up or hiring a company specialized in the management of real estate for the constitution of a vehicle to which such goods will be transferred, whose corporate participation of such vehicle may be paid to creditors for discharge of their respective Credits.

- CLAUSE 5.4: RECURSIVE deposits : In accordance with what occurred in other judicial recoveries [15], the addition provides for the removal of recursive deposits of labor shares. As a form of warranty

---

[15] This is the case of the judicial recovery of Paranapanema (nº 1001409-24.2022.8.26.0260), the 1ª Regional Court of Corporate Competence and Conflicts related to Arbitration of the Specialized Forum 1ª RAJ/9ª RAJ/7ª RAJ do e. TJSP, whose Plan of Judicial Recovery, Approved and Approved, he predicted that " *[a]s Recuperandas are authorized by creditors to directly raise Recursal deposits made in accounts linked to labor claims for* " *payments* of labor credits.

Additional to the payment of Labor Credits, the ratio of 50% of the recursive deposits will be used for payment of Labor Creditors who elected Option I and, once the aggregate value of Clause 4.1.1 has been reached, also for the payment of Labor Creditors who elected Option II, the other 50% of the recursive deposits will be allocated to Oi's working capital.

- The DITAMENTO also provides for the possibility of setting up a vehicle, to which the rights on recursive deposits not yet withdrawn can be reversed, whose quotas may be given in payment to Labor creditors – Option II to discharge their respective claims.

## ECONOMIC AND FINANCIAL VIABILITY
## IN THE LIGHT OF THE ADDITION TO THE JUDICIAL RECOVERY PLAN

96.    In the light of all the above assumptions, theR ECUPERANDAS present the Annex Report on Economic and Financial Feasibility, elaborated from the premises of the additive and the projections of revenue and expenditure updated (doc. 3), attesting to the viability of its activities and the proposed statement.

97.    From the analysis of all **operational revenues** of G Rupo O I , the report shows that there is **a solid projection of growth of activities and revenues resulting from O** I , especially those associated with the services performed in its new *core* activities , as the product "O IS OLUÇÕES" from O I . As can be seen from the following chart of "net operating revenues", for example, an increasing turnover is projected on these new strategic fronts and its subsidiaries, providing its sustainable growth (doc. 3, p. 17):



98.    The report also shows that the change in strategic orientation of G Rupo O I , combined with the sale of deficit operations and the progressive reduction of the legacy of the concession, will allow the recovery of O I operational cash flow (FCO) in **a few years**, due to the combination between the increase in the turnover of new services provided and the reduction of costs and expenses with plant maintenance and rental of transmission and telecommunications infrastructure, for example, which currently represent relevant costs incurred to maintain *non*-core and/or deficit operations (doc. 3, p. 18).

99.    It should be noted, in this respect, **that the operational cash flow,** which is **now negative, will become positive within a few** years , which demonstrates the viability of the sustainable growth of its activities (doc. 3, p. 19):



100.    Finally, the report also attests to the economic and financial viability of A DITAMENTO.

101.    After all, considering the above operational premises, as well as the non-operational revenues arising from the sale of assets and new conditions and payment deadlines, the report proves that G Rupo O I has the capacity to pay its debts. Such conclusion can be seen in the following chart , which shows the existence of a Cash Balance sufficient for the full fulfillment of the obligations within the deadlines agreed in A DITAMENTO (doc. 3, p. 32):



## UNFAVORABLE GRANTING OF EMERGENCY PROTECTION: SUSPENSION OF THE ENFORCEABILITY OF THE PLAN AND OF EXECUTIONS RELATING TO CLAIMS OR OBLIGATIONS SUBJECT TO THE ADDITION TO THE PLAN

102.    Pursuant to article 300 of the CPC, " *[a] urgency protection shall be granted when there are elements that show the probability of the right and the danger of damage or the risk to the useful outcome of the proceeding*". The application of the CPC to the recovery process, on the other hand, is expressly provided for in article 189 of the LRE.

103.    In the present case, for all the reasons already set out above, it is essential that THIS COURT grant, based on article 300 of the CPC, the urgency protection required by the ᴇCUPERANDAS , in *unprecedented* nature *changes part*, because it is a measure not only necessary, but also necessary, to ensure that the law is not only necessary, but also the law of the law. but **essential** – if not vital – to ensure the continuity of G ʀᵤₚₒ ᴏ ɪ , for the purpose of:

(i)    <u>Suspend</u>, for 180 days, the enforceability of the obligations provided for in the PRJ, with the subsequent prohibition of allegation of non-compliance and/or filing of bankruptcy proceedings or executions brought against the Gʀᵤₚₒ ᴏ ɪ relating to claims or obligations subject to the DITAMENTO;

(ii)    Prohibit, for 180 days, any form of retention, arrest, seizure, seizure, search and seizure and judicial or extrajudicial constriction on the assets of ʀ ECUPERANDAS, arising from judicial and/or extrajudicial demands whose claims or obligations are subject to the DITAMENTO ; and

(iii)    <u>To </u> prevent the advance expiration of any obligation by mere presentation of ADITAMENTO, by operating *ipso FACT* clauses .

104.    It is anticipated that it is not exactly an extension of *the stay period* established at the beginning of the present judicial recovery, but the adoption of a new measure, of a precautionary nature, with the aim of preserving its activities during the period necessary for the negotiation and approval of ADITAMENTO by the creditors. This is because, if the injunctions currently required are not deferred, the assets of GRUPO OI will be **inexorably dilapidated, irrevocably** compromising the success of this judicial recovery.

105.    It should be clarified, as appropriate, that the granting of emergency safeguards in order to suspend the enforceability of the obligations that are due up to the date of the general meeting of creditors that will decide on the proposed addition is perfectly possible in the context of a judicial recovery process, this possibility is recognized by Prof. PAULO P ENALVA - one of the main authorities in Commercial Law in Brazil – in a technical note elaborated specifically for the specific case (doc. 4, pp. 10/11):

> 47 ". Well, from the introduction, in positive law, of the legal c:onsequalism and in the light of the weighting of the interests involved, <u>the prospect of failure of the viable company's uplifting process corresponds to a reality to be taken into account in the decision to maintain, or not, the enforceability of the obligations to be overcome until deliberation of the creditors affected by the proposal to add to the original PRJ.</u>

> 48. **Verified the presence of the authoritative requirements provided for in the Code of Civil Procedure ("CPC") (Art. 300 et seq.), it is possible to grant urgency protection in order to suspend the enforceability of the obligations that are due up to the date of the general meeting of creditors that will decide on the proposed addition, and so that creditors to be restructured cannot promote constrictions in the debtor's assets in this same period**.

> 49. The subsidiary application of provisions of the CPC to the judicial recovery process is expressly admitted by art. 189 of Law no. 11. Lo 1/2005, being applicable - as a rule occurs in the subsidiary application
> - If there is omission in the specific law and there is no incompatibility of the CPC standard with the recovery process." (doc. 4, pp. 10/11)

106.    After this clarification, it should be noted that the requirements provided for in art.

300 of the CPC are properly filled. **The probability of the** right invoked by the G Rupo O I – possibility of submission and voting of the A DITAMENTO in the General Meeting of Creditors – is expressed in the present case.

107.   Pursuant to article 35, I, paragraph "a" of the LRE, " *[a] general meeting of creditors shall have the task of deciding on: I – in the judicial recovery: A) approval, rejection or* **modification of the judicial recovery plan presented by the debtor**".

108.   On the subject, teaches M ARCELO B ARBOSA S ACRAMONE that "*in the same way that the General Meeting of Creditors has exclusive attribution to assess the judicial recovery plan,* **it will also have exclusive attribution to assess the request for addition or amendment of the judicial recovery plan previously approved by creditors. The decision regarding the addition will be made in the same way as in the face of the judicial recovery plan. Both the requirements for the convening of the AGC and the quorum for installation and deliberation will be the** same " (Marcelo Barbosa Sacramone. Comments to the Law on Corporate Recovery and Bankruptcy. 4ª edition. Sao Paulo: SaraivaJur, 2023. p. 166).

109.   In turn, the case law of the E. Superior Court of Justice endorses the possibility of filing an additive to the judicial recovery plan when new situations justify a change in the provisions contained in the judicial recovery plan approved by creditors:

> "SPECIAL FEATURE. BUSINESS LAW. FAILURE IN THE JUDICIAL PROVISION. INEXISTENCE. JUDICIAL RECOVERY. SHUTDOWN. RECOVERY PLAN. ADDITIVES. INITIAL TERM. BIENAL DEADLINE. CONCESSION. BENEFIT. PENDING QUALIFICATIONS. IRRELEVANCE. (...) 8**. The presentation of additives to the judicial recovery plan presupposes that the plan was being fulfilled and, for situations that only proved to be later, it had to be modified, which was admitted by the** creditors. Thus, there is no proper rupture of the execution phase, which is why there is no justification for the modification of the initial end of the counting of the biennial period for the closure of the judicial recovery. 9. The existence of

credit qualifications/challenges still pending in court, which shows that the general framework of creditors is not definitively consolidated, does not prevent the closure of the recovery. 10. Special appeal not provided." (Resp n. 1,853,347/RJ, min. Rel. Ricardo Villas Buas Cueva, Third Class, judged on 5.5.2020)

-.-.-.-

"INTERNAL AGGRAVATION IN THE AGGRAVATION IN SPECIAL APPEAL. CIVIL PROCEDURE. JUDICIAL RECOVERY. INITIAL EXPIRY OF THE MONITORING PERIOD. DATE OF GRANT OF RECOVERY. ADDITIVES TO THE PLAN. AMENDMENT OF THE TERM. LACK OF NEED. INTERNAL AGGRAVATION PROVIDED. KNOWN STAPLE. SPECIAL FEATURE PROVIDED. 1._" The presentation of additives to the judicial recovery plan presupposes that the plan was being fulfilled and, for situations that only proved to be later, it had to be modified, which was admitted by the creditors. Thus, there is no proper rupture of the execution phase, which is why there is no justification for the modification of the initial term of the counting of the biennial period for the closure of the judicial recovery_" (Resp 1,853,347/RJ, Rel. MINISTER RICARDO VILLAS BÔAS CUEVA, THIRD CLASS, Judged on 05/05/2020, DJe of 11/05/2020). 2. The judgment under appeal, when amending the date of the initial end to the end of the grace period, decided in dissonance with the case -law of this Court of Justice, and the decision subject to an instrument's aggravation should be re-established. 3. Internal aggravation provided to reconsider the aggravated decision and, in a new analysis, to know the aggravation and to provide the special appeal." (AgInt no AREsp n. 1,663,617/SP, min. Rel. Raul Araujo, Fourth Chamber, judged in 22.11.21)

-.-.-.-

"SPECIAL FEATURE. JUDICIAL RECOVERY. MODIFICATION OF THE RECOVERY PLAN AFTER THE BIENNIUM OF JUDICIAL SUPERVISION. POSSIBILITY, PROVIDED THAT THE CLOSURE OF THAT DID NOT OCCUR. PRINCIPLE OF PRESERVATION OF THE COMPANY. AMENDMENT SUBMITTED TO THE GENERAL MEETING OF CREDITORS. SOVEREIGNTY OF THE ORGAN. DISSIDENT DEBTOR WHO MUST SUBMIT TO THE NEW PROVISIONS OF THE PLAN. PRINCIPLES OF RELEVANCE OF THE INTERESTS OF CREDITORS AND PAR CONDITION CREDITORUM. 1. The Brazilian legislator, when elaborating the recovery diploma, outlined some principles, of axiological-programmatic character, in order to maintain the solidity of the various norms that make up the said legislation. Among all, we highlight the principles of relevance of creditors' interests; par conditio creditorum ; and of the preservation of the company, which are found in article 47 of Law 11,101/2005. 2. This principiological basis serves as the foundation for

Constitution of the General Meeting of Creditors, which has the attribution of approving or rejecting the judicial recovery plan, in the manner presented by the Judicial Administrator of the company recuperates. 3. Moreover, through the "Game Theory", a strategic interaction between the debtor and the creditors is perceived, capable of assuming a minimum consensus of both of them regarding the terms outlined in the judicial recovery plan. These negotiations demonstrate the abandonment of an individualized look of each credit and a greater attachment to collective and organized interaction. 4. **We discuss, in kind, the modification of the plan originally proposed, after the biennium of judicial supervision - contained in article 61 of the Bankruptcy Law - without the closure of the judicial recovery of the company recovered. Although the period of up to 2 years of judicial supervision has elapsed, there has been no subsequent closure of the recovery, and therefore the effects of the judicial recovery still persist, thus maintaining the binding of all creditors to the resolution of the**Assembly. 5. Special feature provided." (Resp n. 1,302,735/SP, min. Rel. Luis Felipe Solomon, Fourth Class, judged on 17.3.2016)

110.   The precedents raised above are applicable to the present case because, as detailed above, for causes outside the control of R ECUPERANDAS and in the face of frustration of the premises assumed when the preparation of P LANO (conditions of withdrawal of the UPI ClientCo, flow of labor convictions, delays to migration from the STFC regime for authorization etc.), changes to some of the provisions contained in P LANO are necessary in order to remedy the difficulties of short-term cash flow.

111.   Furthermore, the GRupo O I , for all the reasons already detailed in detail in items 26/93 above – to which theR ECUPERANDAS only refer, not to make this petition unnecessarily long – has also proved the need to modify the PRJ approved by creditors, as well as approve The A-Step.

112.   Also attesting, for the specific case, the feasibility of the presentation of A DITAMENTO, see the opinion of PAULO P ENALVA in its technical note:

11 ". Thus, it is possible for a debtor to present an amendment to the judicial recovery plan approved at the general meeting of creditors. The possibility arises not only from the absence of legal prohibition and contractual freedom (Article 5, section II of the Constitution

> Republic and art. 421 of the Civil Code), as provided for in article 35, paragraph "l", point "a", of Law No. 11,101/2005, at the disposal that the AGC decides, in the judicial recovery, on the 'approval, **rejection or modification of the judicial recovery plan** presented by the debtor'.
>
> 12. The case-law enshrines this understanding that, when a proposal for modification of the PRJ is submitted, a AGC must be convened to deliberate on the matter. **Therefore, the approved PRJ may change as long as the judicial recovery is not closed**.". (doc. 4, p. 4)

113.   And finally, as explained in items 43/54 above, the need to change some of the few PRJ forecasts, especially those relating to short-term obligations, does not mean that G Rupo O O I is not viable. Quite the contrary, the attached Economic-Financial Report (doc. 3) attested the economic and financial viability of R ECUPERANDAS activities and the possibility of overcoming the liquidity crisis by implementing the new conditions proposed in ADITAMENTO, and it is therefore essential that it be analyzed and voted in the General Meeting of Creditors.

114.   Similarly, there **is a danger of imminent damage** and **the risk to the useful** outcome of the present judicial recovery if the measures sought by theR ECUPERANDAS in items 103 above are not deferred.

115.   R ECUPERANDAS face short-term cash flow difficulties due to several external factors already exposed. In addition, they project a significant reduction in their liquidity in the coming months, due to the prolonged maintenance of operating costs, without increasing revenues in the same proportion. Such scenario entails the concrete risk that R ECUPERANDAS cannot fully comply with their short-term financial obligations provided for in the PRJ, until the AGC will decide on ADITAMENTO.

116.   This situation would threaten the efforts being undertaken by the New Governance of O I, together with its creditors, for its restructuring, O

That would be detrimental to all stakeholders of G Rupo O I . This circumstance would be especially damaging by the scenario described in items 55/70 above, that is, in which the GRupo O I , under the leadership of its New Governance, has been presenting solid results indicating its economic growth, its economic and financial viability and the financial and operational resumption by the new strategic operations of the group (cf. items 43/54 *above* ).

117.    The adoption of the measures is also imperative because of the principle of preservation and the social function of the enterprise. The judicial recovery is **the** largest in Latin America, with thousands of creditors, including 2,340 workers, who depend on the maintenance of their activities to receive their credits. In addition, the preservation of GRupo O I activities will also allow the maintenance of **the 21,955 direct and indirect jobs generated by R ECUPERANDAS .**

118.    In turn, the continuation of the executions brought against theR ECUPERANDAS relating to credits or obligations subject to TheDUTAMENTO – in particular the executions that take place before the Labor Court – **poses a serious risk to the continuation of the activities of the GRupo O I .**

119.    In this sense, the continuation of these executions – which are backed up in credits that will be restructured in the form of ADITAMENTO – will enable the implementation of numerous restrictive measures against the assets of R ECUPERANDAS , which may result in the blocking of very important resources that need to be used by G Rupo O I for the maintenance of its operations.

120.    There is therefore an **imminent risk** that the continuation of these executions, with the consequent implementation of possible restrictive measures against theR ECUPERANDAS, will create a cascade effect, making the operations of the GRupo O I difficult even before the creditors negotiate and vote on The A Ditamento, to prejudice the interests of thousands of creditors and the 21,955 direct and indirect employees of GRupo O I .

121.    In summary, the Gʀᴜᴘᴏ ᴏ ɪ , through the urgent tutelles required in this petition, seeks only to ensure the useful result of the restructuring proposed in Aᴅɪᴛᴀᴍᴇɴᴛᴏ, enabling it to be negotiated and voted by the creditors in AGC to be designated by that MM. Nothing else.

122.    There would be no logical sense to maintain the obligation of payment of the original PRJ in force and due, if, in this demonstration, the Gʀᴜᴘᴏ ᴏɪ is presenting a right to change such obligations, because it is manifest impossibility to fulfill them concomitantly with the routine of its operation. It would be a contradictory act with the very scope of Aᴅɪᴛᴀᴍᴇɴᴛᴏ.

123.    However, **the viability of these negotiations requires, as an indispensable**condition, **the** suspension for up to 180 days – a time limit, in principle, sufficient for the realization of the conclave and all legal acts that necessarily precede it (e.g., presentation of objections, publication of a notice, etc.) –, the enforceability of the provisions contained in the PRJ, the executions brought against theʀ ᴇᴄᴜᴘᴇʀᴀɴᴅᴀs concerning claims or obligations subject to Theᴅɪᴛᴀᴍᴇɴᴛᴏ and the possibility of early maturity of obligations, in order **to** remove the risks of its rise in the course of the negotiations.

124.    As was said, Prof. Pᴀᴜʟᴏ ᴘ ᴇɴᴀʟᴠᴀ attested in its technical note the possibility of granting emergency protection to suspend the enforceability of the obligations contained in the PRJ, as well as the executions moved against the Recuperanda, when the debtor demonstrated the need for modification of the plan originally approved by the creditors. In this sense:

> 50 ". The forecast of *the stay* period as effect of the deferral of the processing of the judicial recovery guarantees the suspension of executions and constrictions while the debtor negotiates the conditions of equating his debts, **protection that is compatible with the suspension of the enforceability of certain obligations also after the submission of a proposal for an addition to the PRJ ,**to remain until the general meeting of creditors that will decide on such a proposal from the debtor. **The purpose of the suspension promoted, at an initial moment, by *the stay period*, is strictly the same as that of**

**it will be generated by the presentation of the addendum, using, in
this hypothesis, the same considerations as in items 28 to 36 above** ."
(doc. 4, p. 11).

125.    As demonstrated by Prof. PAULO P ENALVA , although Article 6, §4, of LRE is
a typical legal hypothesis of suspension of obligations, created for the period prior
to the approval of the judicial recovery plan, nothing prevents the granting of
other **atypical** precautionary measures , based on article 300 of the CPC and
article 189 of the LRE, especially in a scenario in which the protective measure
has merely an assemblatory purpose and is strictly suited to the same purpose as
the *stay period*, that is to allow the continuity of the **viable** company affected by
momentary difficulties of short-term cash flow, while it renegotiates its debts.

126.    In his words, "*§4 of article 6 of Law~ n 11.101/2005 deals with a legal
hypothesis of suspension of the debtor's obligations that have the processing
of his/her judicial recovery. However, **this does not prevent suspension in other
cases not expressly provided for in the legislation, provided that the stay period is
shown to be a necessary measure to allow the renegotiation of** debts, and the
requirements of article 300 of the CPC are met.* " (doc. 4, p. 11, he shouted).

127.    As highlighted by the eminent teacher, this measure could even be
based on the general power of caution of the judge – including because it aims
to ensure the effectiveness of the A DITAMENTO, since it would even be
contradictory to this proposal if, during the pending negotiations, the decision was
made to be made. theG Rupo O I would continue to pay the credits under the
terms of theP LANO that will be modified:

> 54 ". In addition, **the stay period could also be based on the general
> power of caution of the judge to determine the appropriate measures to
> ensure the useful outcome of the proceeding** (Art. 297 of the CPC). The
> useful result, in the hypothesis, is the eventual approval of change of
> the PRJ, which is the most important instrument for the company's
> uplifting. Without the stay period, affected creditors may individually
> charge their claims and compromise the effective recovery of the debtor.
> Moreover**, the maintenance of the obligation to pay the values
> contained in the PRJ after the submission of the addition to the PRJ
> could ultimately represent contradictory behavior with the need to be**

**Added PRJ. After all, .If the debtor could pay the debts under the conditions of the PRJ, she would not have the need to promote its** addition .

55. If the general power of caution allows the judge even to approve atypical measures, with much more reason it would allow the acceptance of *the stay period*, which is a typical measure (Art. 6, paragraph 1, of Law No. 11,101/2005)." (doc. 4, pp. 11 and 12, screamed).

128.    It is not just. The case law, in examining cases similar to the present, has also admitted similar measures.

129.    Similar measures to those intended were granted by MM. Judgment of the 1ª Corporate Court of Rio de Janeiro in the judicial recovery of GRUPO CONSTELLATION 16 , a leading company in performance in pre-salt operations, for oil and gas exploration in Brazil. In the course of their judicial recovery, granted in 12.7.2019, the Recuperandas began to face cash flow problems, for external reasons, and needed to add the judicial recovery plan.

130.    In order to ensure the liquidity of its operation and the maintenance of cash during the renegotiation of the judicial recovery plan, the recoveries formulated, in 06.04.2021, a request for urgent protection **to (i)** grant the deadline for the submission of an additive, **with the suspension of the enforceability of the obligations laid down in the PRJ in force until the additive is approved and approved**; and **(ii)** the extension of the judicial supervision period of the judicial recovery process for a further 12 (twelve) months, which **was granted** by MM. Recuperational Judgement 17, in a decision maintained by E. 16ª Civil Chamber of the E. Court of Justice of Rio de Janeiro:

---

[16] TJRJ, nº 0288463-96.2018.8.19.0001, 1ª Paulo Business Court. Decision: 7.4.2021.

[17] "FLS. 124169/124185: Considering the reasons set out by the recoveries, reasons which do not give further clarification, I grant them a deadline for the submission of an additive to the **plan, determining, at the outset, the suspension of the enforceability of the principal and ancillary obligations of the plan** , all of which shall be considered unenforceable until **a new additive is submitted**, **approved and** approved, including the ancillary obligation to maintain minimum liquidity, provided for in the plan and its annexes new restructuring instruments and in the agreements approved in these files, and also in the the extension of the period of supervision of this court in relation to the present judicial recovery for a further 12 (twelve) months from this date."

"(...) A decision that, accepting reasons related to the pandemic, **gave the request of the Recuperandas to suspend the obligations agreed in the PRJ Primitive until the new conclave approves, or not, an additive to be presented. Non-conformity on the part of creditors,** (...) 3. The Recovery Plan, especially in the face of extraordinary economic contexts, is legitimate to grant a deadline to creditors and recoveries for the preparation and presentation of a substitute plan, thanks to the principle of the preservation of the company and the inequities of a possible automatic application of Article 73, IV, of Law 11,101. **4. Protection of recovery from actions and executions that can be deferred as an instrument to support the new crisis of the company, preventing attacks capable of making the presentation of a new plan impossible.** Protection that, however, cannot be given for an indefinite period, or 'until a new additive is presented', submitting the creditors to the bookkeeper of the recoveries. 5. Term of protection set at 90 days of the acceptance of the presentation of a new plan, plus a further 60 for the manifestation of creditors in a new meeting." (TJ-RJ, 16ª Cv. AI No. 0032565- 80.2021.8.19.0000, Rel. Des. Eduardo Gusmao Alves de Brito Neto, J. 1.8.2022)

131.    Also noteworthy is the decision made by MM. Judgment of the 1ª Corporate Court of Rio de Janeiro in the court proceedings of the judicial recovery of J.J.M ARTINS ,giving provisions aimed at the preservation of the company, including determining the suspension of the enforceability of the obligations of the Concursal.18

132.    Similarly, in the judicial recovery of W ERNER , it was determined " *THE suspension of compliance with the judicial recovery plan for six (6) months, starting from March*" [19]. In the judicial recovery of GPC, in turn, it was determined the " *suspension of payment of all concursal credits for a period of 90* days " [20].

133.    **Considering (i)** the need for resettlement of certain clauses of theP LANO ; **(ii)** the presentation of the Economic-Financial Report Annex attesting to the economic and financial viability of the R ECUPERANDAS activities (doc. 3); **and (iii)** a

---

[18] TJRJ, nº 0053441-63.2015.8.19.0001, 1ª Paulo Business Court. Decision: 22.5.20.

[19] TJRJ, nº 0007270-46.2020.8.19.0042, 4ª Civil Court of Petropolis. Decision: 16.6.20.

[20] TJRJ, nº 0116330-24.2013.8.19.0001, 7ª Paulo Business Court. Decision: 6.4.20.

It is essential to preserve the activities of R ECUPERANDAS during the time necessary for negotiation, resettlement, approval and approval of the obligations provided for in A DITAMENTO (docs. 1 and 2), the granting of the urgency guardianship that is requested is a measure that is imposed in the present case.

134.    Failure to grant the measure will seriously compromise the continuity of R ECUPERANDAS activities, exposing them to executions and property constraints that make it impossible to maintain their operations and, consequently, endanger the fulfillment of the obligations provided for in A Ditamento, frustrating the objectives of the recovery process and LRE.

135.    Finally, it should be noted that several contracts signed with suppliers of products and services to G Rupo O I have express resolution clauses (*ipso facto* clauses), which provide for the termination of the disputes, in full law, in situations such as the present. From the presentation of This ADITAMENTO, there is a risk that essential suppliers of GRupo O I will act such clauses, which would affect the operation of GRupo O I before its creditors appreciate The A Ditamento.

136.    In this context, also as a way of preserving the useful result of the measure proposed here, it is necessary that the effectiveness of the aforementioned clauses be suspended, in view of the principle of the preservation of the company, as has been repeatedly granted by this Court of Justice of the State of Rio de Janeiro, under the understanding that such provisions are abusive and incompatible with such principle[21].

---

[21] such measures have been taken both in the 1ª judicial recovery of G Rupo O I , and in the injunction in this 2ª judicial recovery, when it was determined the suspension of the clauses of all contracts that provided for termination by the simple fact of the distribution of the judicial recovery. Check out, in this respect, what the e. 8ª Civil Chamber consigned when confirming the decision given in 1ª RJ: "INTERNAL AGGRAVATING IN INSTRUMENT AGGRAVATING. BUSINESS LAW, ADMINISTRATIVE LAW AND CIVIL PROCEDURE. JUDICIAL RECOVERY. IRRESIGNAÇÃO AGAINST DECISION REJECTING SUSPENSIVE EFFECT. **EFFECTIVENESS SOBRISATION**
**CONTRACTUAL TERMINATION** CLAUSE. **Weighting between the contractual rigor of negotiating ties between the parties and the social function of the activity developed by the aggravating factor that is the maintenance of the supply of products by the aggravating** factor **in order to avoid the risk of injury to the activities of the aggravated hair** . Knowledge AND DISTRIBUTION OF THE RESOURCE." (TJRJ, 8ª CC, AI n° 0038854-05.2016.8.19.0000, Des. Rapporteur Cézar Augusto Rodrigues Costa, J. 14.2.2017). Identical measures were filed in the judicial recovery of TheA MERICANAS (TJRJ, 4ª Vara

137.    Thus, theG Rupo O I, based on Article 300 of the CPC, trusts that you will grant the urgency protection required below, in *an unprecedented way*, *changes*part, in order to (i) suspend, for 180 days, the enforceability of the obligations laid down in the PRJ, with the subsequent prohibition of allegation of failure to comply with the PRJ and/or filing of bankruptcy or executions brought against theRupo O I in respect of claims or obligations subject to TheDUTAMENTO; (II) prohibit, for 180 days, any form of retention, custody, seizure, seizure, search and seizure and judicial and/or extrajudicial constriction on the assets of R ECUPERANDAS , arising from judicial and/or extrajudicial demands whose claims or obligations are subject to TheDITAMENTO; and (III) prevent the decree of default and/or advance expiration of any obligation based on the presentation of TheA DITAMENTO (*ipso facto* clauses).

138.    Finally, it should be clarified that the measures requested here would only involve the provisional suspension of the enforceability of P LANO's obligations, so that, in the remote event that the proposal for Adirective will not be adopted ( *quod* non !), the consequence will not be that foreseen in the §8th of article 56 of LRE, but the cessation of the overstocking of P LANO , which will remain in force.

## REQUESTS

139.    In all respects, theR ECUPERANDAS trust that you, after the approval of the urgency protection required in items 103 and 137 above, in character

---

Business, Case No. 0803087-20.2023.8.19.0001, Judge of Law Paulo Assed, delivered in 13.1.2023) and by several other Courts of Justice of the country (TJSP, 2ª Reserved Chamber of Business Law, AI No. 2017701-76.2019.8.26.0000, Rel. Des. Mauricio Pessoa, J. 10.6.2019; TJRS, 6ª CC, AI nº 70052212727, des Rel. Artur Arnildo Ludwig, J. 20.6.2013; and TJPR, 17ª CC, AI No. 1,292,381-0, des. Rel. Luis Sérgio Swiech, J.22.72015).

This is also the understanding of the doctrine, which recognizes **the nullity of clause *ipso facto***, because "*the objectives of insolvency law are to create conditions for the recovery of the company, when feasible, and to maximize the value of the assets __liquidated__ in the event of bankruptcy, to distribute it according to the legal hierarchy of*" priorities; in addition, the objectives of preserving the current value of the allocation of assets of the debtor company can be added, __in order to enable its recovery. Therefore, as authorized opinion of Deborah Kirschbaum, the decision granting the processing does not authorize the creditor to invoke the resolution clause expressed as insolvency__" (AYOUB, Luiz Roberto. CAVALLI, Cassio Machado. The jurisprudential construction of the judicial recovery of companies – 4. Ed., Rio de Janeiro: Forensics, 2020, griffou).

*Inaudita alters* part in the face of the imminent risk in which G Rupo O I is suffering aggressive constrictions in its assets, **(i)** will seek creditors, the i. Public Prosecutor and the i. Judicial Administrators to take notice of The DITAMENTO and the Economic-Financial Laudo (docs. 1, 2 and 3); **and (ii)** shall determine the dispatch of the notice referred to in Article 52, §1°, of the LRE, giving knowledge about the presentation of the A DITAMENTO and the Economic-Financial Report, urging creditors to present any objections.

140.    Finally, G Rupo O I requires all subpoenas and publications to be made, cumulatively and exclusively, on behalf of the lawyers signatories to this demonstration, under penalty of nullity (Article 272, §1, of the CPC).

In these terms
P. Acceptance.
Rio de Janeiro, July 1 , 2025.

| | | |
|---|---|---|
| Marcos Pitanga Ferreira OAB/RJ 144,825 | Thiago Peixoto Alves OAB/SP 301,491 | Paulo Padis OAB/RJ 139,860 |
| Luiz Carlos Malheiros France OAB/RJ 163,989 | John Felipe Martins de Almeida OAB/RJ 200,664 | Talitha Aguillar Leite OAB/SP 344,859 |
| John Felipe Lynch Meggiolaro OAB /RJ 216,273 | Helena Acker Caetano OAB/RJ 230,206 | Mariana Leoni Beserra OAB /SP 443,636 |
| Fernanda Anuda OAB/RJ 241,307 | Edson Bossonaro Junior OAB/RJ 264,022 | |
| Diana Lise Freitas OAB/RJ 256,584 | Luis Fellipe Freitas OAB/RJ 261,146 | |

| LIST OF DOCUMENTS | |
|---|---|
| **-** | Proxy and Corporate Acts |
| **Doc. 01** | Addendum to the Judicial Recovery Plan of O I , PTIF and Ic OOP |
| **Doc. 02** | Comparative *redline* between the approved P LANO of 19.4.2024 and the<br><br>ADDITION OF THE PLAN |
| **Doc. 03** | Financial and Economic Feasibility Report of ADITAMENTO AO<br><br>PLAN |
| **Doc. 04** | Technical Note of Prof. Paulo Penalva |
| **Doc. 05** | Financial Statement Reference Form<br><br>Consolidated G Rupo O I December 2024 |
| **Doc. 06** | Intermediate Financial Statements for the 1st quarter of 2025<br><br>From Oi Group |
| **Doc. 07** | Presentation of the Financial Statements of the 1st<br><br>Quarter of 2025 Oi Group |

**ADDITION TO THE CONSOLIDATED JUDICIAL RECOVERY PLAN**

OI S.A. – IN JUDICIAL RECOVERY

PORTUGAL TELECOM INTERNATIONAL FINANCE BV – IN JUDICIAL RECOVERY OI

BRASIL HOLDINGS COÖPERATIEF UA – IN JUDICIAL RECOVERY

july 1 , 2025

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

After the implementation of several restructuring measures provided for in the joint judicial recovery plan approved at the general meeting of creditors on April 19 , 2024 and approved by a decision issued on May 28 , 2024 by the 7ª Corporate Court of the Comarca of the Capital of the State of Rio from January ("Judgement of Judicial Recovery") ("Plan"), as detailed below, the New Management of Oi Group (as defined below) identified some economic-financial indicators that affect the fulfillment of the short-term obligations provided for in the Plan. In this context, given the need to restructure the payment conditions of certain creditors for the adequacy of cash generation and payment flow of Oi Group in the short term, the **companies OI S.A. – in judicial recovery** ("Oi" or "Company"), a publicly traded company, registered with CNPJ/MF under nº 76,535,764/0001-43, with headquarters and main establishment at Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **PORTUGAL TELECOM INTERNATIONAL**

**FINANCE B.V . – In judicial** recovery ("PTIF"), a private legal entity incorporated in accordance with the laws of the Netherlands, based in Amsterdam, Delflandllan 1 (Queens Tower), Office 806, 1062 EA, and principal establishment in this city of Rio de Janeiro; **and OI BRASIL Holdings COÖPERATIEF U.A. – in judicial recovery** ("Oi Coop"), a private legal entity incorporated in accordance with the laws of the Netherlands, based in Amsterdam, Delflandllan 1 (Queens Tower), Office 806, 1062 EA, and main establishment in this city of Rio de Janeiro (being Oi, PTIF and Oi Coop together hereinafter referred to as "Oi Group" or "Recuperandas"), present, in the records of the judicial recovery process No. 0090940-03.2023.8.19.0001 (migrated from case No. 0809863-36.2023.8.19.0001 – PJE) ("judicial recovery"), in progress before the court of judicial recovery, this addition to the Plan ("Amendment"), pursuant to Articles 45 and 48 of Law 11.101/2005 ("LRF"), as amended, for the following reasons.

1.    DEFINITIONS AND INTERPRETATION RULES

**1.1.    Definitions and Interpretation.** The terms and expressions used in this addition in capital letters shall have the meanings assigned to them in the Plan, except as expressly amended by this Amendment in accordance with **Annex 1.1**. The principles and rules of interpretation described in the Plan are hereby incorporated into and fully apply to this addendum. Any and all terms defined in this addendum shall be incorporated into the Plan.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD8-1070E87E2A76

**2. HISTORY OF RESTRUCTURING OF OI GROUP AND OBJECTIVES OF THIS ADDITION TO THE PLAN**

**2.1.    First judicial recovery.** Over the last decades, after the privatization of telecommunications services in Brazil in 1998, the loss of relevance of fixed telephony in the new context of the provision of services, associated with the scope and costs necessary to fulfill all concession obligations, they were decisive elements for the drastic reduction of the profitability of Oi Group operations.

In addition to the rapid change in the telecommunications sector, with the emergence of new technologies and the need to maintain the concession, a serious financial crisis and the precariousness of Brazilian tax indicators drastically increased Oi's debt, especially high due to the need for investments to anticipate the achievement of universalization goals imposed by ANATEL, as well as, at that time, to allow the acceleration of the operation of mobile services (in 2022 by Telemar and, in 2004, by Brasil Telecom, today Oi).

The level of indebtedness was significantly impacted by the high Brazilian inflation rates, in addition to the depreciation of the national currency against the US dollar . This time, different from what happened to its direct competitors, who financed themselves through their controllers abroad, with much lower interest and inflation, Oi was massively impacted on its capital structure.

To make matters worse, the acquisition of Brasil Telecom, made possible by amending the decree of the General Plan of Outorgas (Decree No. 6,654/2008) and approved with various constraints and obligations by ANATEL at the end of 2008 (Act No. 7,828/2008), it ended up revealing contingencies that generated large losses of cash and result for the operation and that generate, to this day, significant inefficiencies.

In view of the scenario of financial and market crisis, in June 2016, Oi filed a request for judicial recovery ("first judicial recovery"), so that the request for processing the judicial recovery was filed on June 29 , 2016 by the court of judicial recovery, recognizing the viability of the Company and, above all, the importance of its survival, not only for its creditors, but also for its thousands of employees and for Brazil.

The First Judicial Recovery Plan, added in 2020 ("Addition to the First Judicial Recovery Plan"), provided for several measures for the restructuring of its financial debt and for the implementation of its new strategic business plan, including: *(I)* increases of

capital*; (ii)* alienation of part of its *non-core*assets; *and (iii)* alienation of assets from its non-circulating asset.

Capital increases were made between July 2018 and January 2019. In view of the conversion of debt into capital, as well as the subscription and payment of new shares, the net liabilities of the Recuperandas were reduced by more than$ R 11,000,000,000.00 4,000,000,000.00 (eleven billion reais) and the total value of R$ (four billion reais) was invested in the Oi Group.

The sale of *non core* assets of Oi Group was also a mechanism used by Recuperandas to restructure their debt. Among the operations carried out, Oi Group made the sale of the shares held in PT Ventures SGPS , S.A., completed on January 24, 2020, and Cabo Verde Telecom S.A., completed on May 21, 2019, allowing a real operational transformation of Oi Group.

Despite all the measures implemented, Oi Group made the *sale (i)* of the optical fiber-based telecommunications network operation, in the form of UPI Infez ("UPI Infez"), in a transaction totaling$ R 12,923,338,290.68 (twelve billion, nine hundred and twenty-three million, three hundred thirty-eight thousand, two hundred and ninety reais and sixty-eight cents); *(ii)* the operation in telephony and data in the mobile communication market, in the form of the UPI mobile assets ("UPI mobile assets"), with an adjusted closing price of$ R 15,922,235,801.48 (fifteen billion, nine hundred and twenty- two million, two hundred and thirty-five thousand, eight hundred and one reais and forty-eight cents)*; (iii)* of the Torres units, in the form of the Upis Torres ("Upis Torres"), for the value of$ R 1,077,000,000 (one billion and seventy- seven million reais);
*(IV)* data center units, in the form of the UPI Data Center ("UPI Data Center"), by value
Of$R 325,000,000.00 (three hundred and twenty-five million reais); *(v)* of various properties; and
*(VI)* Lemvig RJ Telecommunications Infrastructure and Networks S.A., owner of part of Oi's reversible and non-reversible tower infrastructure, to NK 108 Empreendimentos e Participacoes S.A.

Oi Group's performance, throughout the first judicial recovery, was guided to ensure compliance with all its obligations, which was reflected in the payment of approximately$R 25 11.6 billion credits subject to that process, *being (i)* R$ billion by converting debt into capital (Oi shares)*; (ii)* $ R 4.6 2.4 billion in favor of the National Bank for Economic and Social Development – BNDES*; (iii)* R$425 billion to its partner suppliers*; (iv)* approximately R$ million for small creditors in

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

Mediation programs*; (V)* more than$ R 730 1.93 million to labor creditors*; (vi*) more than R$ 3.5 billion in favor of ANATEL, through conversion into income from judicial deposits; *and (vii*) R$ billion in interest to qualified *bondholders*.

**2.2.    Second judicial recovery.** Despite the efforts of Oi Group to implement its new strategic plan between 2019 and 2022, as provided for in the addendum to the Plan of First Judicial Recovery, external and unpredictable factors compromised its restructuring, leading to the need to seek judicial protection again. Although all the obligations provided for in the previous judicial recovery plan were fully met until its closure, the new crisis was triggered, in large part, by regulatory and competitive delays that postponed the completion of the sales of UPI Mobile Assets and UPI Infez, fundamental to make possible the addition to the Plan of the First Judicial Recovery.

Additionally, the Covid-19 pandemic and subsequent economic variations frustrated key premises of the addition to the Plan of the First Judicial Recovery, substantially raising the Company's financial costs. The increase in the dollar and the deterioration of macroeconomic indicators aggravated the disconnection between the capital structure of Oi Group and its new operational reality, requiring the maintenance of assets and costly contracts for periods higher than expected, consuming cash and compromising its sustainability.

The Group also faced more severe losses than projected in its fixed telephony client base, while remaining bound to contracts with extremely costly *take or pay* clauses, whose services no longer reflected its current demand, generating relevant economic imbalances. Added to this is the frustration of cash receipt expectations, as in the case of arbitration involving UPI mobile assets and Sky's withdrawal to acquire Oi's pay TV client base.

Moreover, the permanence in the concession regime, without the expected migration to the authorization model and without definition of compensation amounts due by ANATEL, resulted in the continuity of costly obligations associated with an obsolete, admittedly unsustainable service. Although the Company sought, with the support of its financial advisor, alternatives to restructure its debt and adapt to the new operational reality, negotiations with the main creditors were not successful, reinforcing the need for a new judicial recovery.

In view of all this context, on March 1 , 2023, Oi Group filed a new request for

Judicial recovery (" Second Judicial Recovery"), which resulted in the approval of the EM Plan
general meeting of creditors on april 19 , 2024.

Since the filing of the Second Judicial Recovery, Oi Group has made its best efforts to negotiate
with its main creditors and suppliers to maintain its regular activities. As it is widely known about
the recovery judgment and its creditors, Oi has adopted several measures to enable the
restructuring of certain debts of the Company and the support of its ongoing operations. Among
all the actions implemented by Oi Group, the following actions and transactions carried out so
far are highlighted:

(i) The disputes between Oi and ANATEL were submitted to the consensual settlement
procedure established by Normative Instruction No. 91, of December 22, 2022,
edited by the Court of Auditors of the Union (" TCU"), culminating in the suspension
of the arbitration before the ICC. consensual Solution Committee ("CSC") was
established , which discussed and enabled a proposal for a consensual solution, the
termination of fixed telephony concession contracts with transition to a fixed-line
Switched Telephone Service ("STFC") authorization with reduced scope and defined
term;

(ii) It concluded with ANATEL an agreement, pursuant to Laws 13,988/2020, No.
10.480/2002 and No. 10,522/2002, as amended by Law No. 14,112/2020, and
Portarias No. 249/2020 and No. 333/2020, to consider the credit held by the
Regulatory Agency in the context of the first judicial recovery. According to this
agreement, pursuant to the second resettlement instrument of the transaction,
ANATEL granted Oi a 55.37% discount (fifty-five comma thirty-seven percent) on the
total amount of its credit. The agreement was signed in September 2024, with the
payment initiated through the withdrawal of judicial deposits. The remaining balance
will be 114 (one hundred and fourteen) non-linear plots by 2034.

(iii) Concluded, with a group of international financial creditors representing the majority
of *(i)* holders of 10%/12% Senior PIK Toggle Notes maturing in 2025 issued by Oi,
on July 27, 2018, and guaranteed, jointly and severally, by Telemar and Oi Mobile,
both incorporated in Oi, in addition to Oi Coop and PTIF; *and (ii)* holders of claims
against Oi arising from agreements with *export* credit agencies ( *Export
Credit*Agencies ), a long-term financing, in the form "*debtor in possession*", subject to
*a Note Purchase Agreement*,

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1B70E87E2A76

With the guarantee formalized through fiduciary sale of shares owned by Oi in V.tal –
Rede Neutra de Telecommunications S.A. ("V.tal"), as disclosed to the market in
relevant fact of the same date ("Dip Emergencial Original"), which was subsequently
added to add a liquidity of USD 125,000,000.00 (one hundred twenty-five million) to
the Company, cost reduction, simplification and improvement of conditions, in
addition to meeting the short-term working capital needs of Oi Group and investment
to maintain its activities ("Updated Original Emergency Dip");

**(iv)**    On October 27, 2023, he concluded with V.tal the instrument of costly disposal of
scrap and other related documents, including collateral instruments ("  Scrap
Operation").

**(v)**    On February 28 , 2025, it concluded with V.tal and others the Investment and Other
Avenças Agreement, which aimed at the disposal and transfer of an isolated
productive unit (UPI), composed of 100% (one hundred percent) of the shares issued
by ClientCo Serviços de Rede Nordeste S.A. ("UPI ClientCo"), to whose share
capital the Company contributed certain assets, liabilities, rights and obligations of
the fiber optic operation, in accordance with the provisions of the Plan, with
counterparts totaling $ R 5,715,500,148.00 (five billion, seven hundred and fifteen
million, five hundred thousand thirteen hundred and forty-eight reais);

**(vi)**    On February 28, 2025, sold and transferred the Isolated Productive Unit (UPI),
composed of 100% (one hundred percent) of Oi Serviços de TV por Pagamento S.A.
("UPI TV por Pagamento") to Mileto Tecnologia S.A., for an amount of up to$ R
30,000,000.00 (thirty million reais); and

**(vii)**    Migrated from the concession regime to the authorization regime, with approval of
Anatel in November 2024, allowing Oi Group to stop providing the fixed telephone
service as a public service, and to act under private regime, as provided for in the
General Telecommunications Law (Law No. 9,472/1997), with the amendments
introduced by Law No. 13,879/2019. This transition enabled the Company to align its
obligations to the current market dynamics, maintaining the commitment to provide
mandatory voice service in areas without alternatives, until a maximum of December
31 , 2028, while dishonoring itself of typical concession charges, like the
maintenance of poles and orelles,  which were  already gone

economically unviable in the territorial extension hitherto required.

In addition to all the measures mentioned, the Approved Plan also provided *for (i)* the capital increase of the Company through the capitalization of certain credits; *and (ii*) the appointment of new members to the Company's Board of Directors to remain in their positions until the election of independent members after the completion of the capital increase.

Initially, on June 7, 2024, three new members were appointed to the Board of Directors. Subsequently, pursuant to clause 7.3.1 of the Plan, in meetings held on August 21, 2024 and November 24, 2024, the Board of Directors approved the capital increase of the Company by converting the assets held by certain international financial creditors, this resulted in the Company's exchange of control and the election of independent advisors (" CA") on December 11, 2024.

On December 12 , 2024,  the CA dismissed the former members of the Company's Statutory Board and elected new members (" Statutory Board " and, together with the CA, the "New Management").

From this, the members of the Statutory Board assumed their positions and immediately started the economic, financial and marketing analyzes of Oi Group. The objective of the Statutory Board is to prioritize Oi's continuity and growth through a strategic plan for current operations, allowing the maintenance of liquidity and cash flow in the short term.

After the dedication of the Statutory Board to understand the business as a whole and draw a strategic operational plan, the Company reduced its costs and expenses and optimized its cash generation, confirming its financial viability. However, despite the work carried out by Nova Management in the last six months and considering the restructuring measures taken so far, it was found that the Company needs additional months for the effective recomposition of cash and financial organization. In this sense, payments from certain creditors whose conditions depend on the availability of resources in the short term may jeopardize the financial sustainability of Oi Group.

Given this scenario, Oi Group presents this addition, which has as main objectives:
*(I)* change the payment terms of Labor creditors (Class I) and certain Quyrographer creditors (Class III), to ensure the adequacy of the creditors' payment flow in the short term and to allow the maintenance of the Company's working capital under New Management;

(*III*) to predict the reduction of Oi Group's liabilities and to increase the availability of immediate resources for the maintenance of its activities; *and (IV)* ensure a financial breath so that New Management can adapt the capital structure of Oi Group according to the financial reality of the Company after the implementation of several restructuring measures foreseen in the addition to the Plan First Recovery and the Plan currently in force.

**2.3.**    <u>**Current structure of Oi Group and its affiliates.**</u>  The new Oi that emerged from the corporate reorganization and sale of assets in the first judicial recovery and in the course of the Second Judicial Recovery is a company focused on providing fiber optic connectivity and digital services to residential, business and corporate users, focusing on the *client-centric* model. Structurally, the company is formed by Oi S.A., focused on B2C, PME; Oi Solutions, the connectivity arm and IT solutions for B2B; V.tal, in which Oi holds a relevant share; and by three companies, Oi Services, Serede and Tahto, which are wholly owned subsidiaries of Oi and represent important elements in the Oi Group transformation process.

All Recuperandas act in a coordinated and integrated manner under corporate, operational, financial, administrative and sole management control, exercised by the controlling company, Oi.

Regarding specifically to Recuperandas, Oi is registered with CVM - Securities and Exchange Commission, having its shares negotiated with B3 S.A. – Brazil, Bolsa, Counter" (<u>B3  OIBR3"</u>) <u>under codes OIBR4 and</u>. ADR's - " *American Depositary Receipts* " representing common and preferred shares of their issue are being traded on the counter market in the United States under trading codes "OIBZQ" and "OIBRQ" respectively.  The Company's share capital is sprayed.

After the regime migration before ANATEL, through the signing of the single term of authorization for the operation of telecommunications services in 2024, Oi became a company that provides telecommunications services in a private regime.

PTIF and OI COOP are wholly owned subsidiaries of the Oi parent company, registered in the Netherlands, having been used as investment vehicles of Oi Group. Such vehicles do not carry out operational activities, having acted only, before the first judicial recovery of Oi, as *its long way* to raise funds in the international market, funds that were poured into the financing of group activities in Brazil.

In addition to the single management and clearly integrated activities, Oi Group companies have a close economic relationship, in view of the existence of contracts, guarantees and obligations that bind companies to each other, making them financially dependent on each other.

**2.4.    Economic-Financial and Operational Feasibility of Oi Group.** The viability of this addition and of the measures provided for in it for the restructuring of certain claims subject to recovery is confirmed in detail by the Economic-Financial Report, pursuant to Article 53, II and III of the LRF, which is set out in **Annex 2.4** of the Plan.

**3.    RESTRUCTURING MEASURES**

**3.1.    Overview.** Oi Group proposes the adoption of the measures listed below as a way to overcome its current and momentary economic and financial crisis, which are detailed in the specific sections of the Plan, under the terms of the LRF and other applicable laws:

**3.1.1.    Restructuring of Concursal**Credits . Oi Group will carry out a restructuring and equalization of its liabilities relating to Concursal Credits and Extraconcursal Credits whose holders wish to be Acceding Extraconcursal Creditors, adapting them to their ability to pay, subject to change in time, in charges and in the form of payment, in the terms set out in **clause 4 and** following.

**3.1.1.1.**    The Recuperandas will use their best efforts to cancel the securities issued and currently existing, subject to the provisions of the laws applicable to each of the jurisdictions to which the Recuperandas are subject, and may take all appropriate and necessary measures in any and all applicable jurisdiction, including Brazil, Portugal, the United States of America and the United Kingdom, in order to comply with their laws and implement the measures provided for in the Plan, and may, in these cases, consult third parties, such as, for example, depositary institutions to ensure that the measures to be implemented comply with the laws of their respective**jurisdictions .**

**3.1.1.2.    Sub-rogation of Oi.** The payment of Class III Credits will be due and always carried out by Oi, in accordance with the terms and conditions described in this addendum, so that Concursal Creditors will become creditors of Oi and no longer of Recuperanda that is its respective original debtor. In the form of judicial approval of the Plan, Oi assumed and subresorted to all rights and

Obligations of the other Recuperandas that were the respective original debtor of the Concursal Credits, except for the *Intercompany Credits*, which remain with the original debtor. Any Credits held by Oi due to payments made under the Plan and this addendum that import or imported in the subrogation of the respective obligations to the other Recuperandas will be considered and treated as *Intercompany* Credits for the purposes of the Plan, including payment.

**3.1.2.** **Disposal and oneration of assets.** Oi Group*, (i)* at any time after the Plan Approval Date*, (I.1*) may dispose of or onerate the goods listed in **the Annex 5.1** *; (I.2*) may promote the disposal, assignment or encumbrance of the assets listed in **Annex 4.2.8.3** to the Plan; *(I.3 )* shall promote the disposal of the assets listed in **Annexes 5.2.1(iii) (a)** and **5.2.1 (iii) (b)** in accordance with **clause 4.2.8.6** *; (i.4)* may dispose of, assign or encumber the rights and/or receivables arising from the Arbitral Procedure No. 26470/PFF that it deals with the ICC, in accordance with the terms and conditions established for that purpose under the consensual solution procedure, whose self-composition term should be concluded in terms materially consistent with the conditions laid down in **Annex 3.2**; *(I.5*) should promote the sale of the Real Estate; *(I.6*) shall take the necessary measures to dispose or onerate the assets eventually received by Oi as part of the payment of the purchase price under the competitive procedure for the disposal of UPI ClientCo; *(I.7*) shall promote organized disposal processes for UPI ClientCo, pursuant to **clause 5.2 and following**; *and (I.8*) may promote any encumbrance of goods provided for in the Plan ; and

*(ii)* at any time after the implementation of the New Governance*, (II. 1)* may dispose or onerate any *other (II. 1.1)* assets that are part of its permanent (non-rolling) asset, including those listed in **Annexes 3.1.2** and **4.2.2.2.1 (f) (I);** *(II. 1.2*) assets that are part of its current assets, *and (II. 1.3)* rights arising from judicial or arbitral decisions carried out on trial or not in favor of the Recuperandas; *and (II. 2)* may promote organized processes of disposal for the UPI V.tal , under **the** terms of **the clause 5.2 and** following , observed, in any case, those alienations and onerations that are prerogatives conferred on Oi Group, as provided in items (I.1), (I.2),(I.4), (II.4), (II. 1) and (II.2) above.

**3.1.2.1.** In any of the cases provided for in items (i) to (ii) of **clause 3.1.2,** the disposal, assignment and/or enunciation may occur in the form of Art. 60, 60-A, 66, 140,
141 and 142 of LRF, in the way Oi Group understands more efficient, including extrajudicially and directly to any interested parties, regardless of new

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

Approval of the Concursal creditors or of the court of judicial recovery (except as
expressly provided otherwise in the Plan), or of obtaining a specific judicial permit for
formalization of the disposal, assignment and/or oneration in question with the
competent property records, provided that the terms and conditions of the Plan are
observed, the applicable law and any necessary and applicable contractual and/or
regulatory requirements, authorizations or limitations, notably with regard to ANATEL
and CADE, and those provided for in the Bylaws of Oi or the other Recuperandas,
observed, without prejudice to the provisions of **clause 4.2.8.6**, the maintenance of any
rights of V.tal derived from lending contracts on the Real Estate.

**3.1.2.2.**    The divestitures, as well as the approval of the Plan, subject to the judicial
approval of the Plan, shall be ratified by means of and by virtue of the approval of the
Plan, subject to the judicial approval of the Plan, transfers and/or Onerations *(i)* of
assets carried out in the normal course of the Company's business between the closure
of the first judicial recovery and the Date of the Order reported in the records of the
judicial recovery; *(II)* the rights and/or receivables arising from the Arbitral Procedure
No. 26470/PFF which he deals with the ICC, in compliance with the terms and
conditions established for that purpose under the consensual solution procedure, the
term of self-composition shall be concluded in terms materially consistent with the
conditions laid down in **Annex 3.2**; *(III )* Those authorized or determined by judicial or
arbitral decisions, carried on trial or not, or by law until the date of approval of the
addendum.

**3.1.2.3.**    In the disposal of UPI(s), the UPI(s) and the acquirer(s) shall not succeed in
the obligations of the Oi Group of any nature, pursuant to Article 60, sole paragraph
and Article 141, paragraph II of the LRF and Article 133, first paragraph, point II of Law
No 5,172/1966, including tax, tax and non-tax obligations, environmental, regulatory,
administrative, criminal, anti-corruption, civil, commercial, consumerist, labor and social
security.

**3.1.2.3.1.** The provisions of **clause 3.1.2.3** shall apply after judicial approval of the
Plan, regardless of the form that may be implemented for the disposal or assignment
of the UPI(s), applying, as the case may be, the provisions of article 60, sole
paragraph, 60-A, 142, 144 or 145 of the LRF.

**3.1.2.4.**    In the sale of the other Mobile Goods or Real Estate of Oi Group (including
any assets received by Oi due to payment for the sale of

Upis under the Plan, as applicable), that do not constitute or form Upis, whether such goods sold individually or in block, directly or indirectly, by means of their contribution in the capital of some Oi Group company and the sale of the shares or shares of their issue, the acquirer(s) shall not succeed in the obligations of the Oi Group of any kind, in accordance with the provisions of article 66,

§3º, 141, item II and article 142 of LRF, including obligations of an environmental, regulatory, administrative, anti-corruption or labor nature, except obligations related to the alienated good ( *propter*rem ), such as urban land and territorial tax ("IPTU") and condominium, in the case of disposal of the Real Estate, subject to the provisions of **clause 4.2.8.6**, the maintenance of possible rights of V.tal derived from lending contracts on the Real Estate.

**3.1.2.4.1.** In accordance with **clause 7.2**, the Recuperandas shall prepare and submit to creditors Restructuring Option I and to the creditors *Take or Pay* Without Guarantee – Option I, an annual sales plan for the sale of the Real Estate within thirty (30) business days of the Plan Approval Date (" Sales Plan"), which must necessarily provide for a minimum annual sales value of$R 100,000,000.00 (one hundred million reais) ("Annual Minimum Sales Value"). In the years following the approval of the Plan and until the full payment of the New Financing, the Top Debt without *Reinstated* Guarantee – Option I and the *Roll*-Up Debt , the Recuperandas must submit to creditors Restructuring Option I and to the creditors *Take or Pay* Without Guarantee – Option I the Sales Plan for those years until January 31 of each year, may be changed by Recuperandas to replace the properties to be sold in a given year and provided that the minimum annual value of sales is respected.

**3.1.2.4.1.1.**  Subject to the provisions of **clause 3.1.2.4.1.2** below and, in any case, until the full payment of the New Financing, the *Roll-Up* Debt and the Top Debt without *Reinstated* Guarantee – Option I, creditors Restructuring Option I and the *creditors Take or Pay* Without Guarantee – Option I will have the right to follow the sale of the Real Estate and the fulfillment of the Sales Plan and, for this purpose, they shall have the right to request and receive information regarding the process of disposal of the Real Estate and fulfillment of the Sales Plan.

**3.1.2.4.1.2.**  Until the implementation of the New Governance, it will be up to the Supervisor

Judicial (*Watchdog* ) monitor compliance with the Sales Plan, which, for this purpose, will have the attributions set out in **clause 7.2.5**.

3.1.3.    **New features.** Oi Group may prospect the new resources and adopt the measures provided for in **clause 5.5 and following**, without the need for new authorization from Concursal creditors or judicial recovery, by hiring new lines of credit, financing of any nature or other forms of capture, including in the capital market and offering guarantees, to be approved under the terms of Oi's Bylaws or the other Recuperandas, as applicable, and provided that the terms and conditions laid down in the Plan and in the LRF are observed, and observed and/or obtained any necessary contractual or regulatory requirements, authorizations or limitations, notably with regard to ANATEL and CADE, as applicable. Any new resources shall have an extra-concursal nature for the purposes of the provisions of the LRF, unless otherwise agreed between the parties. Any other prospecting operations for new resources not provided for in **Clause 5.5 and following** of the Plan may only occur after the implementation of the New Governance.

3.1.4.    **Corporate Reorganization.** Oi Group may carry out Corporate Reorganization Operations and adopt the measures provided for in **clause 6**, aiming at obtaining a more efficient and adequate structure for the implementation of the planned proposals of the Plan (including the constitution and disposal of UPIS), the continuity of its activities, the implementation of its strategic business plan, and provided that the terms and conditions set out in the Plan and LRF are observed and/or obtained any necessary contractual or regulatory requirements, authorizations or limitations, especially with regard to ANATEL and CADE, as applicable. Any other Corporate Reorganization Operations not provided for in **clause 6** in the Plan may only occur after the implementation of the New Governance.

3.1.5.    **Judicial deposits.** After the judicial approval of the Plan, Oi Group may immediately withdraw the full amount of judicial deposits that have not been used for payments, in the forms provided for in the Plan.

3.2.    **ANATEL AGREEMENT.** Oi Group concluded a self-composition term under the consensual solution procedure in terms materially consistent with the conditions set out in **Anexo3.1.6** of the Plan, in order to make it possible, in an amicable way, to close fixed telephone concession contracts for an authorization of the STFC.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

**3.3.    Addition to the Plan.** In addition to the means of recovery described above, as a more efficient solution for the readjustment of the capital structure of Oi Group and the maintenance of the Company's short-term financial health, the addendum provides, in short,: *(I)* the change of the conditions of payment of Credits held by Labor Creditors **( Clause 4.1** ), Provider Creditors Partners**( Clause 4.2.6** ), *Take or Pay Creditors with Warranty* **( Clause 4.2.8** ), *Take or Pay creditors* without Warranty – Option I**( Clause 4.2.8** ), *Take or* Pay *creditors* without Warranty – Option II**( Clause 4.2.9**) and Acceding Extraconcursal Creditors**( clause 4.10** )*; (ii)* the use of recursive deposits for the acquisition of immediate remedies and payment of creditors**( clauses 5.4** )*; (iii)* the exclusion of clause 4.2.7 of the Plan – Credits transacted from suppliers; *and (IV)* the possibility of setting up a vehicle for the contribution of the Real Estate **( clause 5.3.5** ).

**4.    RESTRUCTURING OF CREDITS**

**4.1.    Labor Credits – Class I.** Labor creditors may elect one of the following payment options:

**4.1.1.    Labor Credits – Option I.** Limited to the aggregate value of$ R 30,000,000.00 **4.1.1** (thirty million reais), Labor Credentials holders who agree to adhere to the payment option provided for in **this clause 4.1.3 , pursuant to clause** ("Labor Credits – Option I"), they will receive the amount of up to$ R 9,000.00 180 (nine thousand reais) in up to (one hundred and eighty) days counted from the judicial approval of the addendum, limited to the value of their respective Labor Credits.

**4.1.1.1.** Once the limit of the aggregate value of$ R 30,000,000.00 **4.1.1** (thirty million reais) provided for in **clause** has been reached, Labor Credits will be necessarily restructured under the terms of Labor Credits – Option II.

**4.1.1.2.** Labour creditors who adhere to the option provided for in **the clause 4.1.1** whose Labor Credits – Option I exceed the amount of$ R 9,000.00 (nine thousand reais) will grant Recuperandas full, irrevocable and unrestricted discharge in respect of the remaining balance of their respective credit.

**4.1.2.    Labor Credits – Option** II. Labor Credentials Holders of Labor Credits who agree to adhere to the payment option provided for in **this clause 4.1.2** ("Labor Credits – Option II"), pursuant to **clause 4.1.3**, will be

Paid in a single installment, limited to the amount equivalent to 150 (one hundred and fifty) minimum wages, within three (3) years from the date of approval of the addendum.

**4.1.2.1.**    To ensure payment within the time limit set out in **clause 4.1.2**, Work Credits – Option II will be guaranteed by the assets listed in **Annex 4.1.2.1** of this addendum.

**4.1.2.2.**    Labor creditors whose Labor Credits – Option II exceed the equivalent value of 150 (one hundred and fifty) minimum wages will be paid in the form of **clause 4.2.11** of the Plan (General Payment Modality).

**4.1.3.**    **Labour payment** option. Labour creditors must send to Recuperandas, within thirty (30) days counted from the judicial approval of this addendum and in the form of **clause 10.7**, the payment option form contained in **Annex 4.1.3** ("Labor Option Form").

**4.1.3.1.**    Work Creditors who no longer submit the Labor Option Form pursuant to **clause 4.1.3** will be automatically paid under **clause 4.1.2**.

**4.2.**    **Quirographer Credits – Class**III . With the exception of Class III Credits owned by Chiropractic creditors who, as expressly provided for in the Plan and pursuant to Article 45, §3 of LRF, will not be affected and restructured by this addendum (including those who, as the choice of payment made by the holder in the context of the first judicial recovery, they will be restructured and paid in accordance with **clause 4.3.7 and following** of the First Judicial Recovery Plan or **clause 4.3.6** of the First Judicial Recovery Plan), each Class III Credit Holder Quilographer may choose, at its sole discretion, to have all of their respective Class III Credits paid in the manner provided for in **this Section 4.2**, provided that the conditions and requirements applicable to each Quorographer Credor and their respective Class III Credits are met, No possibility of dividing the value of Class III credit between these options, except for the cases in which a certain portion of the Class III credit of the respective Chiropractor should be paid according to a specific payment option provided for in the Plan on the basis of its origin.

**4.2.1.**    **Linear Payment of Class**III **Credits**. Unless otherwise provided in the Plan:

(i)      **Holders of Class III Credits of $R 5,000.00 (five thousand reais**) **or less**. Holders of Class III Credits in the total amount of up to$R 5,000.00 **4.4** (five thousand reais) may choose, in accordance with **clause,** for the full receipt of the value of your Class III credit contained in the relationship of creditors of the Judicial *Administrator (a)* primarily by lifting the value of the Judicial Deposit in its respective proceedings against the Oi Group, within thirty (30) days counted from the Plan's Date of Approval; *or (b)* in a single installment, by means of a deposit to be made by the Recuperandas, in national currency, within thirty (30) days from the date of approval of the Plan, in a bank account to be indicated by the Chiropractor holder of Class III Credits when choosing the payment option; and

(ii)      **Holders of Class III Credits in value greater than$R 5,000.00 (five thousand reais**) . The Chiropractor holders of Class III Credits in value greater than$R 5,000.00 **4.4** (five thousand reais) may choose, under the terms providedfor in **clause** 5,000.00**,** to receive the total amount of R$ (five thousand reais), including, where applicable, any and all costs and procedural expenses incurred by the Chiropractor in question. By making the option provided for in **this clause 4.2.1(ii)**, the respective Class III Credit Holder Quorographer will automatically waive the right to receive payment of the value of your Class III Credit that exceeds$R 5,000.00 (five thousand reais) and grant to Recuperandas, at the same time of choosing the payment option, the widest, shallow, irrevocable and irreparable discharge of the amount exceeding$R 5,000.00 (five thousand reais).

**4.2.2.**    **Restructuring Option**I . *(I)* are exclusively holders of Financial Credits*; (ii)* are in compliance with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**; *and (iii)* agree to participate in the New Financing and promptly send Oi the New Financing Terms of Accession, pursuant to **clause 5.5.1.3**, they may, under **clause 4.4**, choose to receive payment of their respective Class III Credits in accordance with the terms and conditions of **this clause 4.2.2 and following** ("Restructuring Option Credits I" and "Restructuring Option Creditors I", respectively).

   **4.2.2.1.**      **_Debt Roll-_**Up . Oi will issue a debt in the total amount of

R 6,750,000,000.00 _2 (six billion, seven hundred and fifty million reais) (" _total value debt *Roll-Up*"), in 4,500,000,000.00 (two) tranches, the first tranche worth R$ _1_(four billion and five hundred million reais) ("Tranche 2,250,000,000.00 _debt *Roll*-Up_ ") and the second tranche worth R$ (two billion$, two hundred and fifty million reais) ("Tranche 2 *Debt Roll*-Up "), for payment of part of the Credits Restructuring Option I, duly converted by the exchange rate conversion, where applicable ("*Roll*-Up Debt "), in accordance with the terms and conditions described in the sub-clauses below and in the respective *Roll*-Up Debt Instruments.

**4.2.2.2.**       Oi may issue *(i) Roll*-Up *Debentures* for Class III Credits in reais, subject to the terms and conditions set out in **Annex 4.2.2.2.1 (a)**; and/*or (ii) Roll*-Up Notes for Class III Credits in dollar, which shall provide for equivalent terms and conditions (subject to only the necessary adjustments due to their applicable laws), subject to the terms and conditions set out in **Annex 4.2.2.2.1 (B)** . In any case, Tranche 1 *Debt Roll*-Up and Tranche 2 Debt *Roll-Up* will be part of a single *Roll-Up* debt instrument, either in reais or dollars.

**4.2.2.2.1. Tranche 1 Debt Roll**-Up . Tranche 1 *Roll*-Up *Debt* , in the total amount of$R 4,500,000,000.00 _1_ (four billion and five hundred million reais) ("Tranche Total Value *Roll*-Up _Debt_ "), will observe the following minimum terms and conditions:

(a)       Date of issue: Will be the date thus defined in the respective *Roll*-Up _debt instruments_, as applicable, which should occur until July 15, 2024, and may be extended in common agreement by Oi and the creditors Restructuring Option I (by Deliberation of Credentials Restructuring Option I). *Roll-Up* debt shall be issued in satisfactory form and content to creditors Restructuring Option I (by Deliberation of Restructuring Option I), acting in good faith, substantially in accordance with the terms and conditions set out in **Annex 4.2.2.2.1(a) and Annex 4.2.2.2.1(B)** on the same date as the New Financing and, in the case, the participatory debt and the *A&E reinstated* debt.

(b)       Allocation: Observing the total value of Class III Credits owned by the respective Credor Option Restructuring I constant in the relationship of creditors of the _Judicial Administrator_, each Credor Option Restructuring I will live up to a percentage

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

Of the value of Tranche 1 Debt *Roll-Up* proportional to the amount actually disbursed by such Credor Option Restructuring I in the context of the New Financing – Creditors Restructuring Option I and will receive an equivalent amount of debentures and/or Notes issued in Tranche 1 Debt *Roll*-Up .

(c)    <u>Principal Payment:</u> The value of Tranche 1 principal *Roll-Up* debt will be amortized in a single parcel ( bullet ), on the last business day of December 2028 ("Tranche Due Date 1 <u>*Roll*</u>-Up Debt ").

(d)    <u>Interest and Monetary Correction: On Class III Credits will cover remunerative interest from the Date of Approval until the date of effective payment, to be capitalized every six months to the value of the principal and paid, in cash, on the Expiration Date of Tranche 1 Debt</u> *Roll*-Up . For Class III Credits originally denominated *in (i)* dollars, an annual interest rate of 8.5% (eight comma five percent) will be applied; and*(ii* ) reais, the annual interest rate corresponding to that applicable to Class III Credits originally denominated in dollars, to be calculated on the basis of the market closing curves disclosed in the *Bloomberg* Information System, the business day immediately prior to the date of the General Meeting of Creditors deliberating on the approval of the Plan.

(e)    <u>Optional Redemption or Extraordinary Amortization: Oi may redeem or amortize,</u> at any time and at its sole discretion, under the terms to be provided for in the respective *Roll-Up* Debt Instruments and in the *Intercredtor* Agreement , including under **clause 5.3**, without the incidence of any penalty and by means of payment of the face value of the respective debt instrument and capitalized interest up to the date of exercise of the option, the whole or, in a *pro*rata manner, part of the debentures and notes issued under Tranche 1 Debt *Roll*-Up and in circulation, provided that the Bridge Loan (case realized), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option I have been previously and fully settled.

(f)    <u>Guarantees:</u> *Roll-Up* <u>debt</u> shall be guaranteed by the assets listed in **Annex 4.2.2.2.1 (f) (I)** *pro* rata according to the terms and conditions laid down in the *Roll-Up* Guarantee instruments listed in **Annex 4.2.2.2.1 (f)(ii)** , which are in negotiation and will be finalized in good faith between Oi and creditors option of

Restructuring I, Third Parties New Financing and Debt Credentials Top Without Guarantee *Reinstated* – Option I, and Approved by Deliberation of Creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of Top Debt Credentials Without *Guarantee Reinstated* – Option I, respectively, as well as the *waterfall* and other terms provided for in the Agreement between Creditors (*Intercreditor*Agreement ), substantially in the form of **Annex 4.2.2.2.1(f) (iii)** . The guarantees granted under **this clause 4.2.2.2.1(f)** are, as applicable, subject to regulatory authorizations on the Properties or third parties, necessary due to comodate contracts concluded on the Properties for the benefit of V.tal.

(g)      Release of Guarantees : In the event of disposal of the assets listed in **Annex 4.2.2.2.1 (f) (I)** , the Onerations provided for in **item (f)** above must be released on the closing date of the respective sale ("Closing Date"), so that the respective transactions can be carried out and completed, provided that *(i.a)* on the same Closing Date of Sale, the payment of the price of the respective asset is made entirely in a linked bank account*( escrow*account ) owned by Oi and that it will be fiducially disposed to the benefit of creditors Restructuring Option I, third parties New financing and creditors of the Top Debt without *Reinstated* Guarantee – Option I, *and (i.b)* the *escrow* account contract shall establish the obligation to perform the distribution of the *Cash Sweep* in accordance **with clause 5.3**, on the working day following the Closing Date the sale of the said asset; *or (ii)* if the payment of the purchase price of the asset in the context of the respective competitive procedure involves the payment of assets, such assets, unless otherwise approved by Deliberation of Creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee
– Option I, will be charged, by means of a guarantee constituted and perfected prior to the Closing Date of Sale, under suspensive condition, becoming effective concomitantly with the release of the guarantee, observed, in this case, the terms and conditions provided for in **item (f)** above.

(h)      Other contractual conditions: The other conditions applicable to debentures issued under the *Roll-Up* debt will be described in the *Roll-Up* Debentures Debentures Debentures Debentures Debentures Debentures, as noted in **Annex 4.2.2.1.1(a)** , and the other conditions applicable to notes issued under the *Roll-Up* debt will be described in

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

*Notes Roll*-Up scripture, observed **Annex 4.2.2.2.1 (B**) .

**4.2.2.2.2.  Tranche 2 Debt Roll-Up.** The Tranche 2 *Roll-Up Debt* will be issued only through the *Notes Roll*-Up , for both Class III Credits in dollar and Class III Credits in reais, duly converted by the conversion rate, in the total amount of$R 2,250,000,000.00 (two billion, two hundred and fifty million reais) ("Tranche Total Value 2 *Roll*-Up *Debt* "), subject to the following minimum terms and conditions:

(a)      Date of issue: Will be the date thus defined in the respective *Roll-Up* debt instruments, as applicable, which should occur until July 15, 2024, and may be extended in common agreement by Oi and the creditors Restructuring Option I (by Deliberation of Credentials Restructuring Option I). The *Roll-Up* debt shall be issued, in satisfactory form and content to creditors Restructuring Option I (by Deliberation of Restructuring Option I), acting in good faith, substantially in accordance with the terms and conditions set out in **Annex 4.2.2.2.1 (B)** on the same date as the New Financing, and, where applicable, of participatory debt and Dìvida *A&E reinstated* .

(b)      Allocation: Observed the total value of Class III Credits owned by the respective Credor Option Restructuring I constant in the relationship of creditors of the Judicial Administrator, each Credor Option Restructuring I will live up to a percentage of the total value of Tranche 2 Debt *Roll-Up* proportional to the amount actually disbursed by such Credor Option Restructuring I in the context of New Financing – Credentials Restructuring Option I and will receive an equivalent amount of Notes issued in Tranche 2 *Debt Roll-Up.*

(c)      Principal Payment: The value of Tranche 2 Debt *Roll-Up* principal will be amortized in a single parcel ( bullet ), on the last business day of December 2028, extendable until the last business day of December 2030, as provided for in the respective debt instruments (" Tranche Due Date 2 *Roll*-Up *Debt* ").

(d)      Interest and Monetary Correction: On Class III Credits will cover remunerative interest from the Date of Approval until the date of effective payment, to be capitalized every six months to the value of the principal and paid, in cash, on the Expiration Date of Tranche 2 Roll-Up Debt. For Class III Credits

Originally denominated in *(i)* dollars, an annual interest rate of 8.5% (eight comma five percent) will be applied; and *(ii )* reais, the annual interest rate corresponding to that applicable to Class III Credits originally denominated in dollars, to be calculated on the basis of the market closing curves disclosed in the *Bloomberg* Information System, the business day immediately prior to the date of the General Meeting of Creditors deliberating on the approval of the Plan.

(e)     <u>Mandatory Redemption or Extraordinary Amortization: Oi shall redeem or amortize, after December 31, 2028, under the terms to be provided in the</u> respective *Roll-Up* debt instrument, without the incidence of any penalty and through the payment of the principal amount, capitalized interest and any other charges incurred until the date of exercise of the option, all or, *pro* rata, of part of the Notes issued under Tranche 2 *Roll-Up* Debt and in circulation, provided that the Bridge Loan (if performed), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option I and Tranche 1 *Debt Roll-Up* have been previously and fully settled.

(f)     <u>Optional Redemption or Extraordinary Amortization: Oi may redeem or amortize,</u> at any time and at its sole discretion, under the terms to be provided in the respective *Roll-Up* debt instrument, without the incidence of any penalty and through the payment of the principal amount, capitalized interest and any other charges incurred until the date of exercise of the option, all or, *pro* rata, of part of the Notes issued under the *Roll*-Up Tranche 2 debt and in circulation, provided that the Bridge Loan (if performed), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option I and Tranche 1 *Debt Roll-Up* have been previously and fully settled.

(g)     <u>Guarantees:</u> *Roll-Up* debt shall be guaranteed by the assets listed in **Annex 4.2.2.2.1 (f) (I)** *pro* rata according to the terms and conditions laid down in the *Roll-Up* Guarantee instruments listed in **Annex 4.2.2.2.1 (f)(ii)** , which are in negotiation and will be finalized in good faith between Oi and creditors Restructuring Option I, Third Parties New Financing and Debt Creditors Top Without *Reinstated* Guarantee – Option I, and Approved by Deliberation of Creditors *Restructuring Option* I, new Financing and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee – Option I, respectively, as well

Such as the waterfall and other terms provided for in the Agreement between Creditors (*Intercreditor*Agreement ), substantially in the form of **Annex 4.2.2.2.1(f) (iii)** . The guarantees granted under **this clause 4.2.2.2.2(g** ) are, as applicable, subject to regulatory authorizations on the Real Estate and third parties, necessary due to real estate lending contracts.

(h)    Release of Guarantees: In the event of disposal of the assets listed in **Annex 4.2.2.2.1 (f) (I)** , the Onerations provided for in **item (g)** above must be released on the Closing Date of Sale, so that the respective transactions can be carried out and completed, provided that *(i.a)* on the same Closing Date of Sale, the payment of the price of the respective asset is made in full in a linked bank account (*escrow*account) owned by Oi and that will be fiducially disposed to the benefit of creditors Restructuring Option I, Third Parties New Financing and creditors of the Top Debt without *Guarantee Reinstated* – Option I, e *(i.b)* the *escrow* account contract shall establish an obligation to perform the distribution of the Cash Sweep in accordance with **clause 5.3** on the working day following the Closing Date of the sale of the said asset; *or (ii)* where the payment of the purchase price of the asset in the context of the respective competitive procedure involves the payment of assets, such assets, unless otherwise approved by Deliberation of creditors Restructuring Option I, new Financing and Deliberation of the creditors of the Top Debt Without *Guarantee Reinstated* – Option I, will be charged, through a guarantee constituted and perfected prior to the Closing Date of Sale, under suspensive condition, becoming effective concomitantly with the release of the guarantee, observed in this case, the terms and conditions set forth in **item (g)** above.

(i)    Other contractual conditions: The other conditions applicable to banknotes issued under Tranche 2 *Debt Roll-Up* will be described in the respective *Roll*-Up Debt Instrument , in satisfactory form and content to creditors Restructuring Option I (by Deliberation of Credentials Restructuring Option I), acting in good faith, substantially in accordance **with** the terms and conditions laid down **in Annex 4.2.2.1.1(B).** The *Roll-Up* Debt Instrument will contain the forecast that, on or from June 30, 2027, Oi may decide on the extension of Tranche's Due Date 2 *Debt Roll*-up until December 31, 2030, in the event that creditors option restructuring I will not be able to charge or demand

Oi Group's payment of the principal amount of Tranche 2 *Roll*-Up debt, capitalized interest and other charges and penalties, eventually incurred in the respective *Roll*-Up debt instrument, renouncing the right to seek the satisfaction of such values through the execution of any other good integral to the assets of the Recuperandas and/or request the bankruptcy of the Recuperandas, on the basis of the failure to implement the obligation to pay any remaining balance after the excution of the securities lodged on the assets referred to in **Annex 4.2.2.2.1 (f) (I**) .

**4.2.2.2.3.** The total amount of *Roll*-Up debt indicated in **clause 4.2.2.1** is the total amount to be made available by Oi to issue Tranche 1 Roll-Up debt and Tranche 2 *Roll*-Up debt. For each$R 1.00 1.00 (a Real) of *Roll*-Up Debentures issued under the terms and in the form of the Debentures *Roll*-Up Debentures Debentures will be paid R$ **4.2.2.2.2** (a Real) of the Credit Restructuring Option I of the respective Credor Restructuring Option I. Observed the provisions of Clause USD1.00 (**i**) for each (a dollar) from *Notes Roll*-Up issued under the terms and in the form of *Notes Roll*-Up will be paid$USD 1.00 (one dollar) of the Credit Restructuring Option I of the respective Credor Restructuring Option I.

**4.2.2.2.4.** **Rules of** Interpretation . In the event of a conflict of interpretation between the provisions of the Plan and the obligations provided for in the respective *Roll-Up* Debt Instrument after its conclusion, the said instrument shall prevail, being certain that the respective *Roll-Up* Debt Instrument shall reflect, at least, the terms and conditions provided for in **this clause 4.2.2.1.**

**4.2.2.2.5.** **Creditors Restructuring Option I Defaulters .** In the event that a certain creditor option restructuring I fails to comply, for any reason, with its obligation assumed in the context of the New Financing ("Credor option restructuring I default") and its commitment is not assumed by another creditor option restructuring I, the total amount debt *roll*-up , and consequently, the total value of Tranche 1 *Roll-Up* Debt and the total value of Tranche 2 *Roll*-Up Debt will be reduced in proportion to the share due and which was default by the respective Credor Restructuring Option I default in the context of the New Financing, and the entire Class III credit of such creditor Restructuring Option I default will be restructured in accordance with **clause 4.2.11.**

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

**4.2.2.3.    Capital Increase – Capitalization of** Credits . Oi will carry out a capital increase to be approved by Oi's Board of Directors, within the limit of the authorized capital provided for in Oi's Bylaws, with the consequent issuance by private subscription (i.e. without registration in CVM) of new common shares issued by Oi, in the form of Articles 170, §1st and 171, §2nd, of the Corporation Law and other applicable legal provisions, which enables the subscription and payment of new shares by *(a)* creditors Restructuring Option I, by capitalizing part of the remaining balance of credit Restructuring Option I after payment pursuant to **clause 4.2.2.1** in a *pro* rata manner to Class III Credits held by creditors Restructuring Option I, subject to the provisions of **clause 4.2.2.3.1** ("New Shares Capitalization of Credits"); *and (b)* shareholders holding regular shares issued by Oi in circulation on the occasion of the Capital Increase – Capitalization of Credits that exercise their respective right of preference through cash contribution ("Capital Increase – Capitalization of Credits").

**4.2.2.3.1.** The Capital Increase – Capitalization of Credits will be carried out in sufficient amount to *allow (i)* the capitalization of part of the remaining balance of the Credits Restructuring Option I, after the payment of part of the Credentials Restructuring Option I under **clause 4.2.2.1**; *and (ii)* the receipt by such creditors Restructuring Option I of New Shares Capitalization of Credits that together represent up to 80% (eighty percent) of Oi's total share capital, the right of preference of Oi shareholders on the occasion of the increase in Capital – Capitalization of Credits, pursuant to article 171 of the Brazilian Corporation Law.

**4.2.2.3.2.** The price of issuance of the new Shares Capitalization of Credits will be fixed in due time by the Board of Directors of Oi, observing the parameters, terms and conditions provided for in the Law of Companies by Shares, including the provisions of article 170 of the Law of Companies by Shares, a portion may be allocated to the capital reserve and the remainder to Oi's share capital.

**4.2.2.3.2.1.**  For purposes of capitalization of Class III Credits in Dollar in the context of Capital Increase – Capitalization of Credits, such credits will be converted to the national currency based on the conversion exchange rate.

**4.2.2.3.3.** The issuance of the new Shares Capitalization of Credits shall comply with the terms and conditions provided for in the Brazilian Corporation Law , including the right of preference provided for in article 171, *caput* and §2 of the Brazilian Corporation Law, as applicable, and the new Shares Capitalization of Credits will confer the same rights conferred by the other common shares issued by Oi in circulation.

**4.2.2.3.4.** In the event of the exercise of the right of preference by the shareholders of Oi on the occasion of the increase in Capital – Capitalization of Credits, the amounts must be paid by the respective shareholders in cash and will be delivered *pro*rata , creditors Restructuring Option I whose Restructuring Option Credits I will be capitalized, being certain that in this case, the percentage of Oi's total capital mentioned above to be held by such Quilographers after the completion of the Capital Increase – Credit Capitalization should be proportionally reduced.

**4.2.2.3.5.** The realization of the Capital Increase – Capitalization of Credits will be subject to the approval or prior analysis of ANATEL and CADE, as applicable, obliging Oi, by sending the information and documents applicable by the Quirograffarian creditors, to adopt all necessary measures with the said bodies to obtain such approval or prior analysis.

**4.2.2.3.6.** Each Credor Restructuring Option I may choose, at its discretion and until the approval of the Capital Increase – Capitalization of Credits by the Board of Directors, to *(i)* waive, in whole or in part, the *pro rata* portion of the new Shares Capitalization of Credits to which it would be entitled due to the subscription and payment of the Capital Increase – Capitalization of Credits under **clause 4.2.2.3**, pursuant to the Waiver Term for Receiving the New Shares Capitalization of Credits listed in **Annex 4.2.2.3.6**, in which case the amount of the subscription and payment of the Capital Increase – Capitalization of Credits must be reduced in proportion to the portion waived; *or (ii)* transfer to any person ("_New Shares Capitalization of Credits"), in_ whole or in part, your right to receive the said portion of the New Shares Capitalization of Credits to which you would be entitled due to the subscription and payment of the Capital Increase – Capitalization of Credits under **clause 4.2.2.3**, so that the transferee New Shares Capitalization of Credits will do justice to

Receipt of said portion of the new Shares Capitalization of Credits under the same terms applicable to the respective Credor Restructuring Option I Originating, becoming considered Credor Restructuring Option I in relation to the new Shares Capitalization of Credits.

**4.2.2.3.6.1.** The Credor Restructuring Option I that transfers, in whole or in part, its right to receive its share of the new Shares Capitalization of Credits shall, until the date on which the Notice to Shareholders is published that disclose the beginning of the deadline for the exercise of Oi's shareholders' right of preference in relation to the Capital Increase – Capitalization of Credits, inform Oi about the transferee New Shares Capitalization of Credits, which shall provide the Company with the information necessary for applicable regulatory approvals.

**4.2.2.3.7.** Any CREATOR RESTRUCTURING OPTION I who, pursuant to **clause 4.2.2.3.6**, choose to waive, or transfer, in whole or in part, to a new CREDIT CAPITALIZATION CREDIT LICENSES transferee, your right to receive the *pro rata* portion of the new Shares Capitalization of Credits to which you will be entitled due to the subscription and payment of the Capital Increase - Capitalization of Credits under **clause 4.2.2.3**, acknowledges, by virtue of the approval of the Plan (and subject to judicial approval of the Plan), that *(i)* Your Credit Restructuring Option I corresponding to the new Shares Capitalization of Credits to which the respective Credor Restructuring Option I would do justice will be settled and such waiver or transfer of right will not prejudice the right of other creditors Restructuring Option I, nor shall it confer additional rights to the Credor Restructuring Option I that waives or transfers such rights, being certain that the respective waiver or transfer of *right (a)* will not affect the allocations of the total value of Tranche 1 *Roll*-Up *Debt* and the total value of Tranche 2 *Roll*-Up Debt , which shall be carried out as if such waiver or transfer of right has not been carried out; *e (b)* will not affect the amount of debentures issued under Tranche 1 Debt *Roll*-Up and notes issued under Tranche 1 *Debt Roll*-Up and Tranche 2 Debt *Roll*-Up that the Credor Restructuring Option I in question and that the other creditors Restructuring Option I do justice, whose calculations shall be carried out as if such waiver or transfer of right has not been carried out; *and (ii)* such waiver or transfer of right does not alter or modify the choice of payment option made under the Plan,

Nor does it limit, in any respect, the commitments made by the Restructuring Option I Credor under the Plan, the New Financing and the Restructuring Option I, including the commitment not to litigate, discharge and waiver provided for in **clause 9.3** of the Plan.

**4.2.2.3.8.** For clarification purposes, in any case (i) or (ii) of **clause 4.2.2.3.6** above, the rights of the Restructuring Option I Credor regarding *Roll-Up* Debt and New Financing will not be affected.

**4.2.3.** <u>**Restructuring Option**</u> II . Quirographer creditors may expressly choose, under the terms and conditions set out in **clause 4.4**, to receive payment of their respective Class III Credits in accordance with the terms and conditions of **this clause 4.2.3 and following** ("Restructuring Option II Credits" and "<u>Restructuring Option II creditors</u>", <u>respectively).</u>

**4.2.3.1.** ***A&E* Debt *Reinstated* .** Oi will restructure 8% (eight percent) of the Restructuring Option II Credits through **this clause 4.2.3.1** and **its sub-clauses** below, in accordance with the following terms and conditions ("<u>*A&E Reinstated*</u> Debt "):

(a)    <u>Date of issue: Will be the date thus defined in the respective *A&E reinstated debt* instruments</u> , as applicable, which should occur until July 15 , 2024, may be extended by common agreement between Oi and creditors Restructuring Option II. A&E debt should be issued on the same date as the New Financing, the *Roll-Up* debt and, where applicable, the Participatory Debt.

 <u>Principal Payment:</u> The principal amount will be amortized in a single *bullet* on the last business day of December 2044 ("<u>*A&E Reinstated* Debt </u>Due Date ").

(b)    <u>Interest and Monetary Correction: On Class III Credits will cover remunerative interest from the Date of Approval to the date of effective payment, to be capitalized to the value of the principal and paid, in cash, on the Due Date of the</u> *A&E Reinstated* <u>Debt </u> . For Class III Credits originally denominated in Reais, an annual interest rate of 50% (fifty percent) of the Interbank Deposit Certificate (CDI) will be applied. No interest will be charged for Class III Credits originally denominated in dollars.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

(c)    Other contractual conditions: The other conditions applicable to the *A&E reinstated* debt will be described in the instruments *Debt A&*E reinstated, substantially in the form of **Annex 4.2.3.1(d).**

**4.2.3.2.    Participatory Debt**. Oi will issue the participatory debt to the respective creditors Restructuring Option II in reais and in dollar, in accordance with the terms and conditions set out in **Annex 4.2.3.2**, for payment of 92% (ninety- two percent) of the Credits Restructuring Option II, according to the following terms and conditions:

(a)    Date of issue: Will be the date thus defined in the instrument of participatory debt, as applicable, which should occur until July 15, 2024, may be extended by common agreement between Oi and creditors Restructuring Option II. Participatory debt should be issued on the same date as the New Financing, the *Roll-Up* debt and, where applicable, the *A&E reinstated* debt.

(b)    Payment of Principal: The Participatory Debt will be amortized *(i)* in only one parcel ( bullet ), on the Due Date of Participatory Debt; *or (ii)* in advance, in part, by allocating 50% (fifty percent) of Oi's net profit *pro*rata , among the holders of the Participatory Debt, provided that the New Financing, the Top Debt Without Guarantee 2024/2025 *Reinstated* – Option I and the Top Debt with Guarantee 2024/January 2025 *Reinstated* , the *Roll-Up* Debt , the Bridge Loan, if applicable, have been fully discharged ("Date of Advance Amortization of Participatory Debt").

(c)    Due date: The participatory debt will expire on the last business day of the month

December 2050 (" Participatory Debt Due Date").

(d)    Interest and Monetary Correction: on Class III Credits, interest remuneration shall be paid from the Date of Approval until the date of effective payment, to be capitalized to the value of the principal and paid, in cash, on the Due Date of Participatory Debt or on the Advance Depreciation Date of Participatory Debt , as applicable. For Class III Credits originally denominated in Reais, an annual interest rate of 0.5% (zero comma five percent) will be applied. No interest will be charged for Class III Credits originally denominated in dollars.

(e)    **Prepayment Option :** Oi will have the option, at its sole discretion, at any time, to pay in advance, *pro*rata, the amounts due in the form of **this clause 4.2.3.2**, by means of payment of 10% (ten percent) from the principal value and capitalized interest until the date of exercise of the option, provided that the Bridge Loan (case realized), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option I and the Top Debt with Guarantee 2024/January 2025 *Reinstated ,* the *Roll-Up* debt has been previously and fully settled. If Oi exercises the pre-payment option provided for in this item, the amount equivalent to 90% (ninety percent) from the principal amount and capitalized interest until the exercise date of the option of pre-payment of Class III Credits restructured pursuant to **this clause 4.2.3.2** will be considered as a disgoodwill for the purposes of the Plan.

(f)    Other contractual conditions: The other conditions applicable to participatory debt are described in the instrument of **Annex 4.2.3.2** ("Participatory Debt Instrument").

(g)    Interpretation Rules: In the event that there is a conflict of interpretation between the provisions of the Plan and the obligations provided for in the respective instruments of participatory debt after its conclusion, this instrument will prevail, being certain that the instruments of participatory debt should reflect, at least, the terms and conditions provided for in **this clause 4.2.3.2**.

**4.2.3.3.**    The Chiropractor who wishes to receive payment of their respective Class III Credits in accordance with the terms and conditions of **this clause 4.2.3** shall assume and be in compliance with the commitment not to litigate, discharge and waiver of **clause 9.3** in relation to all of its Credits.

**4.2.4.    Credits Concursal Regulatory Agencies.** Observing the provisions of art. 45, §3º of LRF, Concursal Credits Regulatory Agencies will not be affected or restructured by the Plan or by this addendum.

**4.2.4.1.**    The provisions of **clause 4.2.4** shall not prejudice the prerogative of the parties to enter into a transaction involving the Concursal Credits Regulatory Agencies, including, but not limited to, the installments provided for in Law No 10,522 of June 19, 2002, the terms of which shall be concluded in terms materially consistent with the conditions laid down in A**NEXO 3.1.6.** In the event of overvenience of legal rule, agreement or administrative, judicial or arbitral decision that

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

Allow or determine alternative form for discharge or guarantee of Concursal Credits Regulatory Agencies, Recuperandas shall take all steps to adhere to such alternatives.

### 4.2.5.    **Credit from suppliers creditors.**

**4.2.5.1.    Supply credits – First judicial recovery.** Subject to the provisions of Article 45, §3 of LRF, the Supply Credits of the Supplier Creditors, including the Supplier Creditors Partners, which have been renewed under the First Judicial Recovery Plan will not be affected and will not be restructured under the Plan, it is certain that your payment terms will remain identical to those currently existing and applicable to such Supply Credits, as novated under the First Judicial Recovery Plan.

**4.2.5.2.    New Supply Credits.** Supplier creditors holding Supply Credits that have not been novated under the First Judicial Recovery Plan and who do not choose to receive payment of such Supply Credits in a different way, according to applicable payment options provided for in the Plan, they will receive payment of such Supply Credits under the terms and conditions set out below:

(a)    Grace period: Until the last working day of December 2045.

(b)    Installments: Depreciation of the principal in five (5) annual installments, equal and successive, winning the first on the first working day after the grace period referred to in item (a) above, and the others on the same day of subsequent years.

(c)    Interest and Monetary Correction: supply Credits (or any remaining balances) originally denominated in *(i)* reais shall be corrected annually by TR, from the Date of Approval or Recognition of the Plan in the jurisdiction of the Supplier Credor, as applicable, and paid in conjunction with the last installment referred to in item (b) above; *and (ii)* dollars or euros, will not be corrected and will not have the incidence of interest.

(d)    Pre-PaymentOption : Oi will have the option, at its sole discretion, at any time, to pay in advance the amounts due in the form of **this clause**

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

**4.2.5.2** , By means of payment of 15% (fifteen percent) of the principal amount and capitalized interest up to the date of exercise of the option, provided that the Bridge Loan (if realized), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option*I , top Debt* without *Reinstated* Guarantee - Option II, Top Debt with *Reinstated* Guarantee*, Roll-Up* Debt*, A&E Reinstated* Debt and, if carried out, the Bridge Loan have been previously and fully settled. If Oi exercises the pre-payment option provided for in this item, the amount equivalent to 85% (eighty-five percent) from the principal amount and capitalized interest until the exercise date of the pre-payment option of restructured Supply Credits under **this clause 4.2.5.2** will be considered as a disgoodwill for purposes in the Plan.

**4.2.5.2.1.**    For clarity, creditors holding Supply Credits who do not choose, pursuant to **clause 4.4**, to receive payment of such Supply Credits in the form of **clauses 4.2.6** to **4.2.8** (as applicable)**.** or fail to comply with the obligations and commitments assumed to receive your Credits in the forms set out in such clauses shall be paid in the form of **clause 4.2.5.2** above, and the general method of payment set out in **clause 4.2.11** shall not apply to them**.**

**4.2.6.**    **Creditors Credit Suppliers Partners.** Partner Suppliers Creditors who hold Supply Credits will be paid until December 31, 2038 with the amounts obtained by Recuperandas through *the (i)* Sale of Real Estate, subject to the terms of **clauses 5.3.4** and **5.3.4.1**, or by means of the modality provided for in **clause 5.3.5**.

**4.2.6.1.**    On January 1, 2039, the widest, full and shallow discharge by the Suppliers Partners creditors will be granted in irrevocable and irretrievable nature, regardless of any other formality.

**4.2.6.2.**    In the event that a particular Partner Supplier Provider Provider Provider Provider (i) fails to comply with the commitment not to litigate, discharge and waiver; or (ii) upon request by any of the Recuperandas, refuse to provide goods, content, rights and services under the terms and conditions (a) of the contracts concluded before the Date of the Order and practiced until the Date of the Order; or (b) as mutually agreed or practiced between the respective Partner Supplier Provider Provider Provider Provider Provider and Oi Group after the Order Date, at

Both cases of items (a) and (b) above, until the beginning of payment of their respective Supply Credits under **Clause 4.2.6** , as applicable, such Partner Vendor Provider shall have all of their respective Supply Credits paid in the form of **Clause 4.2.5.2**.

**4.2.6.3.** The Supply Credits of the Supplier Creditors Partners who have chosen the payment option provided for in **clause 4.2.6 and following** may be compensated with net and certain credits held by Oi against the respective Partner Supplier Provider Provider Provider, pursuant to **clause 10.13**, provided that such compensation is expressly canceled by the respective Partner Supplier Provider Provider Provider Provider.

**4.2.7.** *Take or Pay* **creditors credits with Warranty.** Remaining Credits arising from *take or pay* obligations held by *Take or* Pay creditors with Guarantee ("Top Debt with *Reinstated* Guarantee ") they will be restructured and paid until December 31, 2038 under the terms and conditions provided for in **clause 4.2.7.1** with the values obtained by the Recuperandas through the sale of Real Estate, in accordance with the terms of **clauses 5.3.4** and **5.3.4.1**, or by means of the modality provided for in **clause 5.3.5**.

**4.2.7.1.** The following discounts will be on Top Debt with Guarantee *Reinstated :*

(a) **Period from 2024 to January 2025**. Remaining Top Debt with *Reinstated* Guarantee Credits due between January 1, 2024 and February 15, 2025 will have a 60% (sixty percent) discount; and

(b) **Period from February 2025 to July 2027**. The remaining Top Debt with *Reinstated* Guarantee Credits due between February 16, 2025 and July 31, 2027 will have a 62% discount (sixty-two percent).

**4.2.7.2.** On January 1, 2039, the widest, full and shallow discharge of *Take or* Pay creditors with Guarantee will be granted in irrevocable and irreparable nature as to the possible remaining balance of their respective Credits, regardless of any other formality.

**4.2.7.3.** Take or Pay with Guarantee *creditors* elected this payment option within the time of choice of the payment option , automatically agreed *(a)* to

The termination of supply contracts to which they are parties, which occurred on February 28, 2025; *and (b)* with the submission of Credits of their ownership to the terms and conditions of this clause, even if not subject to this judicial recovery; *and (c)* be in compliance at any time with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**.

**4.2.7.4.**    The provisions of **clause 4.2.6.2** shall apply to *Take or* Pay with Guarantee creditors who fail to comply, at any time, with their commitment to not litigate, discharge and waiver.

**4.2.8.**    **Creditors Credit *Take or* Pay Without Guarantee – Option** I. *Take or* Pay Without Guarantee creditors who have already joined the Plan with all of their Credits held against the Recuperandas relating to the contracts listed in **Annex 4.2.9.5**, and agree to adhere to the payment option provided for in **this clause 4.2.8**, pursuant to **clause 4.4** ("*Take or Pay* creditors without Warranty - Option I"), shall be paid under the terms set out below:

**4.2.8.1.**    **Period to Order Date**. The Credits held by the *Take or* Pay creditors without Guarantee - Option I due by the Recuperandas until the Date of the Request, arising from the provision of services and/or rental of infrastructure, they will be paid until December 31, 2038 with the amounts obtained by Recuperandas through *the (i)* disposal of any Real Estate, subject to the terms of **clauses 5.3.4** and **5.3.4.1**; *and (ii)* disposal of any other assets provided for in **clause 5.3**, subject to the provisions of **clause 5.3.4**.

**4.2.8.2.**    **Period between the Order Date and December 31, 2023**. Credits held by *Take or Pay* creditors without Guarantee - Option I have been paid in full pursuant to clause 4.2.9.2 of the Plan.

**4.2.8.3.**    Credits held by *Take or Pay* creditors without Guarantee - Option I for periods *(a)* between January 1, 2024 and December 31, 2025 (" Top Debt without *Guarantee Reinstated* – Option I"); *and (b)* between january 1, 2026 and june 30 , 2027; they will be paid until December 31 , 2038 with the amounts obtained by Recuperandas *(i)* by means of the sale of Real Estate, in accordance with the terms of **clauses 5.3.4** and **5.3.4.1** , or by means of the modality provided for in **clause 5.3.5**; *e (II)* with respect to Top Debt without *Reinstated* Guarantee – Option I, through alienation

Of the assets provided for **in clause 5.3**, subject to the provisions of **clause 5.3.4**. These Credits will cover the following discounts:

(a)    **Period between 2024/2025**. The Top Debt Credits without *Reinstated* Guarantee – Option I will have a 20% discount (twenty percent) and keep the guarantees granted by the Recuperandas in the Plan, as provided for in **Annexes 4.2.2.2.1(f)(l), 4.2.2.2.1(f)(ii) and 4.2.2.2.1(f)(iii)** of the Plan. Take or Pay creditors without Warranty – Option I agree to add the respective Guarantee Instruments and the *Intercreditor*Agreement ( *Intercreditor*Agreement ) concluded with the Recuperandas and the applicable creditors in order to incorporate the necessary changes to the implementation of **clauses 5.3.4** and **5.3.4.1**; and

(b)    **Period between 2026/2027**. Credits for the period from January 1 , 2026 to June 30, 2027 will have a 35% discount (thirty-five percent).

**4.2.8.4.    Period starting July 1, 2027**. The infrastructure leasing contracts and the commercial exploitation rights assignment contracts listed in **Annex 4.2.8.1**, concluded between Oi and *Take or Pay* creditors without Warranty - Option I who choose to restructure all of their Credits under **this clause 4.2.8** will automatically terminate on July 1, 2027, without any penalty, indemnity or future financial obligations to the parties.

**4.2.8.5.**    On January 1, 2039, the widest, full and shallow discharge of *Take or Pay* creditors without Guarantee will be granted in irrevocable and irreparable nature – Option I as to the possible remaining balance of their respective Credits, regardless of any other formality.

**4.2.8.6.**    Unless otherwise agreed with the respective Credor *Take or* Pay without Warranty - Option I and observing the provisions of **clause 4.2.8.7**, Oi shall transfer to the respective Credor *Take or* Pay without Warranty - Option I, in the form provided for **in clause 5.2.4** of this addition or otherwise permitted in the form of Art. 60, 60- A, 66, 140, 141 and 142 of LRF *(i)* the ownership of the Towers owned by Oi in respect of which the respective Credor *Take or Pay* without Guarantee – Option I is the holder of the right to use, as indicated in **Annex 5.2.1 (III) (a)** (" Selected Torres Collection"); *and (ii)* the ownership/ownership of the Property, as listed in **Annex 5.2.1 (iii) (b)** , limited to the amount of$R 40,000,000.00 (forty million reais) per Credor *Take or* Pay without Guarantee – Option I ("Selected Property Collection").

Subject to the conditions agreed between each Credor *Take or Pay* without Warranty –
Option I, as applicable, and V.tal.

**4.2.8.6.1.** The selected Torres Collection and the selected Real Estate Collection
will be conferred on the capital of spes (one or more spes for each *Take or Pay*
Credor without Guarantee), through corporate or contractual operations, such spes
shall be disposed of to *Take or Pay* creditors without Warranty – Option I in the form
provided for in **Clause 5.2.4** of the Plan or otherwise permitted in the form of LRF
Art. 60, 60-A, 66, 140, 141 and 142, as long as agreed with *Take or Pay* creditors
without Warranty - Option I.

**4.2.8.6.2.** The disposal referred to in **this clause 4.2.8.6**, regardless of the form
chosen for its realization, shall be implemented without succession of the acquirer(s)
to the obligations of the Oi Group of any kind, pursuant to Art. 60, sole paragraph
and Art. 141, paragraph II of LRF and Art. 133, §1º, section II of Law No.
5,172/1966, including tax, tax and non-tax obligations, environmental, regulatory,
administrative, criminal, anti-corruption, civil, commercial, consumerist, labor and
social security.

**4.2.8.6.3.** Creditors will be responsible for paying all necessary expenses for the
formation and transfer of the UPIS in the form of **clause 4.2.8.6**, including, but not
limited to, taxes, emoluments, vacancy, demobilization and regularization of *sites*
subject to the Selected Torres Collection and the Selected Real Estate Collection. In
the event that Oi intends to occupy one or *more sites* object of the Selected Torres
Collection and Real Estate Collection selected after July 1 , 2027, the Parties shall
negotiate, in good faith, new contractual provisions to discipline the occupation and
use of *the sites* by Oi, including, but not limited to, the the amount of the respective
pecuniary compensation for the lease, deadlines, penalties and closing hypotheses,
observing the conditions agreed between each Credor *Take or* Pay without
Guarantee – Option I, as applicable, and V.tal. The respective Credor *Take or Pay*
without Warranty – Option I is not obliged to rent *any website* to Oi if the parties do
not reach a good term after trading in good faith.

**4.2.8.6.4.** After the disposal referred to in **this clause 4.2.8.6**, the respective creditors
*Take or* Pay without Warranty – Option I will be fully responsible for all

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87F2A76

Costs and expenses related to the selected Real Estate Collection, as new owners, being forbidden the collection of Oi of any remuneration, refunds or income arising from the use of the respective soil of the Selected Real Estate Collection, except any obligation whose generating fact is prior to the acquisition and transfer.

**4.2.8.7.**    Regarding the transfer of the selected Real Estate Collection:

**4.2.8.7.1.** Oi undertakes to celebrate promises of purchase and sale of the selected Properties contained in the Selected Properties Collection not transferred with the corresponding selected Real Estate and Towers, being certain that the credit arising from the celebration of these promises of purchase and sale should be capitalized or converted into capital of the corresponding selected Real Estate and Towers prior to its transfer to the creditors *Take or* Pay without Guarantee – Option I acquirers. Any costs of transfer of the selected Real Estate Assets Incident of the purchase and sale operation provided for in this clause, including but not limited to registration fees, fees, administrative costs, taxes or any expenses for the transfer of assets from the selected Real Estate will be borne by the respective creditors *Take or* Pay without Guarantee – Option I.

**4.2.8.7.1.1.** In the case of promises of purchase and sale of selected properties contained in the Selected Properties Collection concluded until the Date of approval of this addition, the respective Credor *Take or* Pay without Guarantee – Option I undertakes, within ten (10) working days counted from the judicial approval of this addendum, add such purchase and sale commitments to provide that all possible transfer costs of the selected Real Estate assets will be borne by the respective Credit *Take or* Pay without Guarantee – Option I, pursuant to **clause 4.2.8.7.1**.

**4.2.8.7.2.** In the event that it is not possible to transfer a certain selected Property to the respective SPE, the Credor *Take or* Pay without Warranty – Option I will have the right to request replacement by another Property owned by Oi, to be defined by common agreement between Oi and the Credor *Take or* Pay Without Guarantee – Option I, in a similar value to compose the selected Real Estate Collection and provided that

Already subject to a comodate contract or similar between Oi and the respective Credor *Take or* Pay without Guarantee – Option I.

**4.2.8.8.**    Regarding the selected Torres collection:

**4.2.8.8.1.** Within thirty (30) business days counted from the judicial approval of this addendum, Oi shall negotiate in good faith and conclude with each Credor *Take or Pay* without Guarantee - Option I onerous assignment contracts and/or lease contracts, as applicable, effective July 1, 2027, relating *(a* ) to the Properties, not members of the Selected Properties Collection; or *(b* ) to the Third Party Properties, provided that, in both cases, the respective Credor *Take or* Pay without Guarantee - Option I have installed towers that integrate the selected Torres Collection, so that the respective Credor *Take or* Pay without Guarantee - Option I can remain using the said Real Estate until (i) their respective disposal by Oi; or (ii) the final date of the respective original contract for the assignment of exploitation of use concluded with the Credor *Take or* Pay without Guarantee - Option I, whichever occurs first, subject to the exceptions agreed between the parties, subject to the conditions agreed between each Credor *Take or Pay* without Warranty – Option I, as applicable, and V.tal.

**4.2.8.8.2.** Subject to the conditions agreed between each Credor *Take or Pay* without Warranty – Option I, as applicable, the onerous assignment contract and/or the lease agreement to be concluded between Oi and a certain Credor *Take or* Pay without Guarantee Option I shall provide *that (i*) Oi may dispose of the Property(s) object(s) of the respective contract at any time; *(II)* In any event of divestiture, Credor *Take or* Pay Without Guarantee - Option I shall have the right of preference to acquire the Property(s) to be divested, including the procedure for exercising this right of preference; *and (iii)* as of July 1 , 2027, the Credor *Take or* Pay without Warranty - Option I will be responsible for all costs and expenses related to the Property(s) subject to the onerous assignment contract and/or the lease agreement, including any costs and expenses related to the lease, occupation (water, sewage, energy, cleaning, cleaning, etc. security, maintenance and, in the case of IPTU, the amount in the share in which such Credor *Take or* Pay without Guarantee – Option I use from the respective Property). The provisions of this clause shall not affect the lending contract concluded with V.tal.

**4.2.8.8.3.** Without prejudice to the provisions of **clause 4.2.8.8.2**, Oi will transfer, at the discretion of the respective Credor *Take or* Pay without Guarantee – Option I, to the corresponding SPE Properties and Selected Towers, the instruments concluded with the owner of the Properties in which Torres members of the Collection Torres Vedras Escoladas are installed, provided that (i) in the corresponding Property the only existing installation is a Tower member of the aforementioned Selected Torres Collection; and (ii) the transfer is not contrary to applicable laws. Oi will not bear any burden arising from the eventual non-acceptance by the respective owner of the aforementioned properties, where applicable, provided Oi has observed the applicable contractual procedures.

**4.2.8.8.4.** Without prejudice to the provisions of **clause 4.2.8.8.2**, in cases where it is not possible to assign pursuant to **clause 4.2.8.8.3 (i)** , Oi, upon request of Credor *Take or* Pay without Guarantee – Option I, will make better efforts to negotiate, in conjunction with the Credor *Take or* Pay without Guarantee – Option I and the respective owner of the Property the segregation of the respective contract in order to individualize the use of the space occupied by the Tower, observing the conditions agreed between each Credor *Take or Pay* without Guarantee – Option I, as applicable, and V.tal.

**4.2.8.9.** *Take or Pay* creditors without Warranty – Option I who wish to receive payment of their respective Credits under **this clause 4.2.8** shall
(I) agree to expressly adhere to the payment option provided for in **this clause 4.2.8** during the term of choice of payment option, under the terms set out in **clause 4.4**, when you automatically agree to the submission of Credits owned by you to the terms and conditions of this clause, even if not submitted to this judicial recovery; *and (ii)* be defaulted at any time with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**.

**4.2.8.10.** The provisions of **Clause 4.2.6.2** shall apply to *Take or Pay* creditors without Guarantee - Option I who fail to comply, at any time, with their commitment not to litigate, discharge and waiver.

**4.2.9.** ***Take or Pay* Credits without Warranty – Option** II. *Take or Pay* creditors without Warranty who have opted, in accordance with **Clause 4.4** , for the payment option provided

In **this clause 4.2.9** ("_ Take or Pay_ creditors without Warranty – Option II") will have all of their remaining Credits due in the periods *(a)* between February 1, 2024 and December 31 , 2025; and *(b)* from January 1 , 2026; paid until December 31 , 2038 with the amounts obtained by Recuperandas through the sale of Real Estate, in accordance with the terms of **clauses 5.3.4** and **5.3.4.1**, or through the modality provided for in **clause 5.3.5** ("Top Debt without _Reinstated_ Guarantee – Option II").

**4.2.9.1.**    The following discounts will cover the Top Debt without _Reinstated_ Guarantee – Option II:

(a)    **Period between 2024/2025**. The Remaining Credits of the Top Debt No Guarantee _Reinstated_ – Option II due between February 1, 2024 and December 31, 2025 will have a 60% (sixty percent) discount.

(b)    **Period from 2026**. The Recuperandas and the Take or Pay creditors without Guarantee – Option II will terminate, with effect from January 1, 2026, the supply contracts concluded between the parties, and it is certain that, in this case, a discount of 100% (one hundred percent) will be applied. on Your Credits due from January 1, 2026, without any compensation, penalty or cost incurred by Recuperandas or by Take or Pay creditors without Warranty – Option II.

**4.2.9.2.**    On January 1, 2039, the widest, full and shallow discharge by the creditors _Take or Pay_ without Guarantee - Option II as to the possible remaining balance of their respective Credits, regardless of any other formality, will be granted in irrevocable and irreparable nature.

**4.2.9.3.**    The provisions of **Clause 4.2.7.4** shall apply to _Take or Pay_ creditors without Guarantee - Option II who fail to comply, at any time, with their commitment not to litigate, discharge and waiver.

**4.2.10.    Unqualified ex-Bondholders credits.** Considering the nature and profile of the non-qualified former Bondholders, Oi will pay the former Non-Qualified Bondholders Credits as follows:

(i)    **Non-qualified ex-Bondholders credits until USD10,000.00.** Former non-qualified bondholders  holders holders of Ex-Bondholders Credits are not eligible.

Qualified in the amount of up to USD10,000.00 (ten thousand dollars) (inclusive), according to the relationship of creditors of the Judicial Administrator, may choose, in accordance with the terms and time limit provided for in **clause 4.4**, to receive full of their Unqualified Ex-Bondholders Credits, in a single installment, without discount, No interest or correction, until December 31, 2024, *provided that* such non-qualified former Bondholders *(a)* prove, at the time of choice of payment option, that they are holders of Unqualified Ex-Bondholders Credits of up to USD 10,000.00 (ten thousand dollars) (inclusive), according to the relationship of creditors of the Judicial Administrator; *and (b)* are in compliance with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**.

(ii)    **Non-qualified ex-Bondholders credits until USD20,000.00.** Former non-qualified bondholders who are holders of Unqualified ex-Bondholders Credits in an amount exceeding USD10,000.00 (ten thousand dollars) and up to USD20,000.00 (twenty thousand dollars) (inclusive), according to the relationship of creditors of the Judicial Administrator, may choose, in accordance with the terms and term provided for in **clause 4.4**, by the full receipt of your Unqualified Ex-Bondholders Credits, in a single installment, without discount, without interest incidence or correction, until December 31, 2026*, provided that* such unqualified former Bondholders *(a)* prove, at the time of choosing the payment option, who are holders of Non-Qualified Ex-Bondholders Credits of up to USD 20,000.00 (twenty thousand dollars) (inclusive) according to the relationship of creditors of the Judicial Administrator; *and (b)* are in compliance with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**.

(iii)    **Non-qualified ex-Bondholders credits above USD20,000.00**. Former non-qualified bondholders who hold former non-qualified bondholders Credits in excess of USD20,000.00 (twenty thousand dollars), according to the relationship of creditors of the Judicial Administrator, may choose, in accordance with the terms and time limit set out in **clause 4.4**, by receiving your Non-Qualified Ex-Bondholders Credits according to one of the other payment options provided for in the Plan, among those provided for in **clauses 4.2.1, 4.2.2 or 4.2.3**, observed, in any case, the requirements and conditions for choosing the respective options. For clarity, such non-qualified former Bondholders who are holders of Unqualified Ex-Bondholders Credits in amount greater than USD20,000.00 (twenty thousand dollars) will not be able to choose payment options

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87F2A76

Provided for in items "(i)" and "(ii)" above and waive the right to receive the share of their respective Non-Qualified Ex-Bondholders Credits exceeding the amount of USD20,000.00 (twenty thousand dollars).

**4.2.10.1.** If a non-qualified ex-Bondholder *(i)* does not express and timely express its option to receive payment of its respective non-qualified ex-Bondholders credit in accordance with the terms and conditions set out in **this clause 4.2.10 and following;** *or (ii)* fails to comply with the requirements set out in **this clause 4.2.10 and following** for receipt of payment of your respective non-qualified ex-Bondholders credit, such unqualified former Bondholder shall have the full of your unqualified ex-Bondholders credit allocated for payment in the form of **clause 4.2.11**.

**4.2.11.** **General Payment Modality.** Subject to the provisions of Article 45, §3º of the LRF, the New Qurographer Credits pursuant to **Clauses 4.3.6** of the First Judicial Recovery Plan will not be affected and will not be restructured under the terms of the Plan, it is certain that your payment terms will remain identical to those currently existing and applicable to such Quyrographer Credits, as novated under the First Judicial Recovery Plan. Without prejudice to the provisions of **this clause 4.2.11**, the Chiropractic Credits (or the respective and any remaining balances) indicated in **clause 4.2.11.1** shall be paid in the original currency as described below:

(a)    Grace period: Until the last working day of 2048.

(b)    Installments: Amortization of the principal in 5 (five) annual installments, equal and successive, the first on the last working day of the grace period referred to in item (a), and the others on the same day of the subsequent years.

(c)    Interest and Monetary Correction: class III Credits (or any remaining balances) originally denominated in *(i)* actual will be corrected annually by TR, from the Date of Approval or Recognition of the Plan in the jurisdiction of the Supplier Creator, as applicable, and paid in conjunction with the last installment referred to in item (b) above; *and (ii)* dollars or euros, will not be corrected and will not have the incidence of interest.

(d)    Pre-Payment Option: Oi will have the option, at its sole discretion, at any time, to pay in advance the amounts due in the form of this

**Clause 4.2.11**, by means of payment of 15% (fifteen percent) of the principal amount and capitalized interest until the date of exercise of the option, provided that the Bridge Loan (case realized), the New Financing, the Top Debt Without Guarantee *Reinstated* – Option*I* , top Debt without *Reinstated* Guarantee – Option II, Top Debt with *Reinstated* Guarantee*, Roll-Up* Debt and *A&E Reinstated* Debt have been previously and fully settled. If Oi exercises the pre-payment option provided for in this item, the amount equivalent to 85% (eighty-five percent) from the principal amount and capitalized interest until the exercise date of the option of pre-payment of the restructured Quirographer Credits under **this clause 4.2.11** will be considered as a disgoodwill for the purposes of the Plan.

**4.2.11.1.** Except as otherwise provided in this addendum, the General Payment Method provided for in **clause 4.2.11** shall apply to Chiropractic Credits *(a)* whose holder chooses such payment method, in accordance with **clause 4.4**; *(B)* whose holder, for any reason, until receipt of full payment of his/her respective Chiropractor credit restructured under the Plan, fails to comply with his/her commitment not to litigate, discharge and waiver provided for in **clause 9.3** , as applicable; *or (c)* that cannot be paid by any of the other modalities provided for in this addendum, notably in the case that *(i)* the Quilografary Credor does not indicate valid, correct and timely the option to pay its respective Quilografary Credit, in the form of **clause 4.4** *; (ii)* the Partner Supplier Credor, once requested by any of the Recuperandas, refuse to provide goods and/or services provided for in the contracts concluded before the Date of the Order under the same terms and conditions as applied until the Date of the Order by the respective Supplier Provider Provider Partner for the Recuperandas, as provided for in **clause 4.2.6.2**; *(III* ) Imliquid Credits have been materialized in accordance with **clause 4.5**; *(iv)* Late Credits have been enabled in accordance with **clause 4.7** *; (v)* Credits have been increased in accordance with **clause 4.8***; (*vi ) Reclassification of Credits **under Clause 4.9** ; or *( vii*) Framework in the concept of creditors Restructuring Option I Defaulters, pursuant to **Clause 4.2.2.2.4** ("Chiropractic Creditors – General Payment Modality").

**4.2.12.** **_Intercompany Credits ._**

**4.2.12.1.** **_Intercompany_ Credits in Reais ._** The Recuperandas may, within eighteen (18) months of the Approval Date and provided that the Nova is implemented

Governance, convening an alternative form of termination of Intercompany Credits in Reais under its terms and conditions applicable on the Order Date, including, but not limited to, payment settlement , corporate restructuring operations, capital increases and reductions and meeting of accounts in the form of the Law, as long as it does not involve cash disbursement or money by Recuperandas. The Recuperandas will pay the Intercompany Credits in Remaining Reais from 25 (twenty-five) years after the end of the payment of the Credits provided for in the form of **Clause 4.2.11 ,** as below:

(a)    Installments: Amortization of the principal in five (5) annual installments, equal and successive, the first being won on the last working day of the end of the period provided for in **clause 4.2.12.1**, and the others on the same day of the subsequent years.

(b)    Interest and Monetary Correction: Intercompany Credits in Reais will be corrected annually by TR from the Date of Approval, and paid together with the last installment referred to in item (a) above.

**4.2.12.2.  Intercompany credits in dollars or euros.** The Recuperandas may, within eighteen (18) months of the Homologation Date and provided that the New Governance is implemented, convince an alternative form of termination of *Intercompany* Credits in dollars or euros in its applicable terms and conditions on the Order Date, including, but not limited to, the settlement in payment, corporate restructuring operations, increases and reductions in capital and meeting of accounts in the form of the Law, provided that it does not involve disbursement of cash or money by Recuperandas. The Recuperandas will pay the Intercompany Credits denominated in dollars or in remaining euros, starting twenty-five (25) years after the end of the payment of the Credits provided for in the form of **Clause 4.2.11 ,** as follows:

(a)    Installments: Amortization of the principal in five (5) annual installments, equal and successive, the first being won on the last working day of the end of the period provided for in **clause 4.2.12.2**, and the others on the same day of the subsequent years.

(b)    Interest and Monetary Correction : No interest incidence or monetary correction.

**4.3.   Concursal Credits – ME/EPP.** Subject to the provisions of Article 45, §3º of LRF, the ME/EPP Credits, according to the values indicated in the relationship of creditors of the Judicial Administrator, will not be affected and will not be restructured under the terms of the Plan and the respective ones

Payment terms will remain identical to those currently existing, as the case may be, under *(i)* new terms under the First Judicial Recovery Plan; *or (ii)* originally negotiated and agreed with Oi Group.

**4.4.**    **Choice of** payment option . For the purposes of **clause 4.2**, creditors shall, within thirty (30) days of the date of approval of this amendment ("_Payment Option Choice_ Period") (except in the case of creditors who wish to opt for the payment option provided for in **clause 4.2.1**, whose applicable period will be twenty (20) calendar days from the date of approval), choose between the payment options of their respective Credits, as available in the Plan, through the electronic platforms https://credor.oi.com.br/ or https://deals.is.kroll/oi, as applicable to their Credits, informing, at the same time, the details of the bank account in which the payment should be made, if applicable, as well as presenting other necessary information ("Choice of payment option").

> **4.4.1.**    The Recuperandas are not responsible for any non-compliance with the choice and information provided by the Creditor under the Plan, for the intempative choice, or for any legal or regulatory impediment of the Creditor to receive the payment of his Credits under the terms of the chosen payment option, hypothesis in which they will be exempted from the obligation to make the respective payment, and the provisions of **clause 10.5.1**shall apply.

> **4.4.2.**    The deadline for choosing the payment option may be extended by Recuperandas, provided that they send notification to creditors within a maximum period of 3 (three) business days after the end of the term of choice of the payment option, as long as such an extension does not delay the implementing acts in accordance with the deadlines set out in the Plan, including the deadline for hiring the New Financing.

> **4.4.3.**    If a creditor gives a proxy to a representative of the Company prior to the date of the General Meeting of Creditors, with powers to vote on the Plan on its behalf and indicating the payment option provided for in the Plan and the bank account details at which the payment is to be made, such creditor shall be exempted from making the choice of payment of their respective Credits under **this clause 4.4**, and shall provide the information that may be necessary to obtain the applicable regulatory approvals.

> **4.4.4.**    Unless otherwise provided in the Plan, in particular the provisions of

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

**Clause 4.2** and in **clause 4.4.4.1**, considering the alternative nature of the payment options set out in **clause 4**, the choice of each creditor must necessarily be restricted to only one of those options, subject to the hypothesis in which a certain portion of the Class III Credit of the respective Quilografary Credor should be paid according to a specific payment option provided for in the Plan due to its origin.

> **4.4.4.1.** Agents (*trustee or* representatives of Credit Holders originating in *ECA Facility*Agreements ) representing more than one creditor will be able to choose different payment options applicable to their representatives, it is certain that each represented creditor will not be able to voluntarily receive payment of their respective Credits through more than one payment option, except as provided for in **clause 4.4.4** above.

**4.4.5.** The choice expressed by the respective Credor on the https://credor.oi.com.br/ electronic platform  will be irrevocable and irreparable, and may not later be changed for any reason, unless there is express agreement of the Recuperandas.

**4.4.6.** The creditor who is proven unable, for technical or operational reasons, to make the choice of the payment option of their respective credits through the platform provided by Oi at the e-mail address to be disclosed in due time by Recuperandas, may send the choice of payment option, within the same period provided for in **clause 4.4** and in accordance with **Annex 4.4.6,** by mail to Oi's mailbox No. 532, CEP 20,070-972, Rio de Janeiro-RJ, and must inform the bank account details in which the payment of your respective credit must be made.

**4.4.7.** The creditor who does not make the choice of the payment option of their respective credits within the period and forms set out in the Plan will receive his/her credit in the form provided for in **clause 4.2.11**.

**4.4.8.** The choices of the payment option by the Chirograffers holding Financial Credits in Foreign Currency and/or New and restructured Credit Holders pursuant to **clause 4.3.3.1** of the First Judicial Recovery Plan (" Foreign Financial Creditors") they will only be considered valid if the respective Chiropractor makes his choice of payment on a timely and individual basis through the https://deals.is.kroll/oi electronic platform or directly with Kroll Issuer Services Limited ("Specialized Agent") **.**

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

**4.4.9.**    The Specialized Agent will be responsible for consolidating the payment choices made individually by the Foreign Financial Creditors and sending Oi the list of all the choices between the applicable payment options provided for in **clause 4.2 and the following** made by such individual financial creditors.

**4.4.9.1.**    Oi will ask the *Facility Agreements* Agent*, the* Bonds 2025 *trustee* and the Specialized Agent to inform Foreign Financial Creditors of the individual payment option procedure applicable to such Foreign Financial Creditors.

**4.4.9.2.**    Holders of 2025 Bonds must make their choice of the payment option through *the (i)* Automatic Offer Program – ATOP System;
*(II)* Deposit or withdrawal at the Custodian – DVAC, in accordance with the regular procedures; *or (iii)* another applicable means. The choice of payment option by Bonds 2025 holders will be carried out in accordance with the Law applicable to Bonds 2025, and must occur simultaneously and until the time of choice of the payment option. As long as the payment option is in progress, Bonds 2025 holders may withdraw their choices and resubmit them as many times as they wish until the end date of the payment option choice deadline, or until the last possible date in accordance with the applicable law, what happens last. Oi may, but will not be obliged to, accept the withdrawal of payment choices after the end date of this period. Bond holders 2025 who choose to pay their Credits under Restructuring Option I or Restructuring Option II will receive their securities through *Depository Trust Company – DTC*, in accordance with regular procedures.

**4.5.**    **Principal Discount Order and Interest.** For all purposes, any discount or discount applied to Credits to be restructured under the terms in the Plan will be applied first to the interest that is due and to be paid and, only later, to the principal portion.

**4.6.**    **Illiquid credits.** Illiquid Credits are fully subject to the terms and conditions of the Plan and the effects of judicial recovery. Non-liquid Credits at the time of the Homologation Date that materialize and are recognized by a judicial or arbitral decision that makes them liquid, carried on trial, or by agreement between the parties, including

As a result of Mediation/Conciliation/Agreement, provided that on the basis of criteria established by the jurisprudence of the Superior Court of Justice or the Supreme Federal Court, they will be paid in the form provided for in **clause 4.2.11**, except where otherwise provided in the Plan.

**4.6.1.**    For the purposes of clarity, any Concursal creditors whose illiquid claims materialize and are recognized by a judicial or arbitral decision making them liquid, carried over to trial, or by agreement between the parties, before the Date of Approval, you must choose the payment option for your respective Concursal Credits under **clause 4.4 and** will be paid according to the form of the chosen payment option.

**4.7.    Delayed credits.** In the event of recognition of Credits by judicial or arbitral decision, carried out on trial, or agreement between the parties, after the Date of Approval, they will be considered as Late Credits and shall be paid according to the classification and criteria set forth in the Plan for the class in which the Delayed Credits in question must be enabled and included, and it is certain that, in the event that the Delayed Credits involve Class III Credits, their respective payments shall be made in the form provided for in **clause 4.2.11**.

**4.8.    Modification of the value of Credits.** In the event of a change in the value of any of the Credits already recognized and inserted in the relationship of creditors of the Judicial Administrator by judicial or arbitral decision, carried on trial, or, even if subject to the judicial decision, by agreement by the Recuperandas or agreement between the parties, the modified amount of the respective credit shall be paid under the terms set out in the Plan, and it is certain that, if a Class III credit has been increased, the increased portion of the Class III credit in question ("increased portion of Class III Credits") shall be paid under **clause 4.2.11**, unless the increase of Class III credit occurs until the end of the term of choice of the payment option provided for in **clause 4.4** of the Plan, hypothesis in which the increased portion of Class III Credits shall be paid according to the payment option chosen by the respective Quirographer Credor to receive the Class III Credit that is subject to increase.

**4.9.    Reclassification of Credits.** If, by judicial or arbitral decision, carried on trial, or agreement between the parties, the reclassification of any of the Class III Credits is determined, the reclassified credit shall be paid in accordance **with** the terms and conditions set out in **clause 4.2.11**.

**4.10.    Acceding Extraordinary Creditors.** The Extraconcursal creditors holding claims constituted after the Date of the Order and not paid by the Recuperandas until the end of the deadline for the choice of the payment option that wish to receive their Extraconcursal Credits in the form of one of the payment options provided for in the Plan, may do so, provided that they inform Recuperandas within thirty (30) days from the date of approval of this addendum and comply with all the requirements applicable to the respective chosen payment option.

**4.10.1.** The Extraconcursal creditors referred to in **clause 4.10** shall participate in the distribution of resources provided for in **clause 5.3.4** in a *pro*rata manner, limited to the value of their respective Credits.

**4.10.1.1.** On January 1, 2039, the widest, full and shallow discharge by the Acceding Extraordinary Creditors shall be granted in respect of any remaining balance of their respective Credits, regardless of any other formality.

**4.11.    Release of retained**value . From the judicial approval of the Plan, the Recuperandas shall, at their sole discretion, release of values that were retained as a result of the rules for the retention of portion of values contained in certain supply contracts concluded with certain Quirograffarian creditors, due to the risk assessment of possible future financial loss for Oi Group, it is certain that the release of the amounts retained to the respective Quirographer creditors will only be carried out if and when proven by the respective Quirographer Credor, in the strict terms of the supply contract, that the risk of financial loss for the Recuperandas that justified their retention no longer exists.

**5.    RESOURCES FOR PAYMENT OF CREDITORS**

**5.1.    Disposal and oneration of assets.** As a means of collecting resources necessary to fulfill the obligations of the Plan, Oi Group, *(i)* at any time after the Date of Approval, *(i.1*) may dispose or onerate the goods listed in **Annex 5.1**; *(I.2*) may promote the disposal, assignment or encumbrance of the assets listed in **Annex 4.2.8.3** to the Plan, pursuant to **clause 4.2.8.3** of the Plan*; (I.3 )* shall promote the disposal of the assets listed in **Annexes 5.2.1(iii)** and **5.2.1 (iii) (b)**, pursuant to clause 4.2.9.6 of the Plan; *(I.4*) shall promote the sale of the Real Estate*; (I.5*) shall promote organized processes of disposal to UPI ClientCo, pursuant to **clause 5.2 and following;** *(I.6*) shall take the measures

Necessary to dispose of or onerate the assets eventually received by Oi as part of the payment of the purchase price under the competitive disposal procedure of UPI ClientCo; *and (I.7)* may promote any oneration of goods provided for in the Plan; *and (ii)* at any time after the implementation of the New Governance*, (II. 1)* may dispose or onerate any *other (II. 1.1)* assets that are part of its permanent (non-rolling) asset*,* including those listed in **Annexes 3.1.2** and **4.2.2.2.1 (f) (I);** *(II. 1.2)* assets that are part of its current assets, *and (II.6 1.3)* rights arising from judicial or arbitral decisions carried on trial or not in favor of the Recuperandas; *and (II.6 2)* may promote organized processes of disposal to the UPI V.tal, pursuant to **clause 5.2 and following**. In any case, Oi may promote

(I) the disposal, assignment or encumbrance provided for in the Plan for other purposes, including the rights and/or receivables arising from the Arbitral Procedure No. 26470/PFF which it treats before the ICC, in accordance with the terms and conditions established for that purpose under the consensual settlement procedure, the term of self-composition shall be in terms materially consistent with the conditions laid down in **Annex 3.2**, and (ii) those divestitures and onerations which are prerogatives conferred on Oi Group, as provided in items (I.1), (I.2), (I.4), (II. 1) and (II. 2) above.

5.1.1.    The divestitures or Onerations provided for in **clause 5.1** may occur in the form of LRF Art. 60, 60-A, 66, 140, 141 and 142, regardless of the reapproval of Concursal creditors or the court of judicial recovery (except as expressly provided otherwise in the Plan), or obtaining a specific judicial permit to formalize the disposal, assignment or encumbrance in question with the competent property records, provided that the terms and conditions of the Plan are observed, the Law and, if applicable, any necessary and applicable contractual and/or regulatory requirements, authorizations or limitations, notably with regard to ANATEL and CADE, and those provided for in Oi's Bylaws or the other Recuperandas.

5.1.2.    The Recuperandas will make their best efforts with the aim of benefiting from opportunities for disposal of assets, including resulting from any changes in the regulatory model, always observing the provisions of **clause 5.1** and the interest of the Recuperandas themselves and creditors, obligations still pending compliance with creditors pursuant to the Plan.

5.1.3.    As provided for in **clause 5.1** above, the Recuperandas may, after the implementation of the New Governance, promote the sale or oneration of assets that are not listed in **Annexes 3.1.2  and 5.1**, *provided that (i)* possible are observed

Docusign Envelope ID: 6BB4A9EE-257F-4205-ACD9-1D70E87E2A76

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

Requirements or authorizations provided for in Oi's Bylaws or other Recuperandas*; (*ii) any necessary and applicable contractual and/or regulatory requirements*,* authorizations or limitations*; (iii)* the maintenance of any rights of third parties derived from lending contracts on the Real Estate; *and (IV)* until the judicial recovery is closed, *provided that* it is approved by the court of the judicial recovery, unless otherwise provided in **clause 3.1.2**.

**5.1.4.**    As set forth in **clause 3.1.2.4** , in the sale of Mobile Goods or Real Estate of Oi Group, which constitute or not Upis, including the sale of such Goods individually or in block, directly or indirectly, through the contribution of the same in the capital of some company and the disposal of the shares or shares of its issue, the acquirer(s) shall not succeed in the obligations of any nature of the Oi Group, pursuant to Art. 66, §3º, art. 141, item II, and art. 142 of LRF, including obligations of an environmental, regulatory, administrative, anti-corruption and labor nature, except for obligations relating to the alienated good (*propter*rem ), such as, in the case of real estate, IPTU and condominium.

**5.2.**    **Constitution and alienation of Upis .** In accordance with the terms provided for in **clause 5.1**, as a way of increasing the measures aimed at its economic and financial recovery and facilitating the process of alienation of assets, the Recuperandas must constitute and organize the Upis described in **clause 5.2.1** (together, the "Upis defined") to be disposed of, individually or in blocks, in whole or in part, unless expressly set forth otherwise in the Plan, without the UPI(s) and the acquirer(s) succeed the Recuperandas in any debts, contingencies and obligations of any nature, including in relation to tax, tax and non-tax obligations, environmental, regulatory, administrative, civil, consumer, commercial, labor, social security, criminal and anti-corruption, pursuant to Articles 60, sole paragraph, 141, section II and 142 of the LRF and article 133,
§1st, item II of Law No. 5,172/1966. After the implementation of the New Governance, the Recuperandas may constitute other UPIS than the defined Upis.

**5.2.1.**    **Constitution of the defined Upis.** The defined Upis described in items (i), (ii) and (III) below shall or may, as applicable, be constituted by carrying out and implementing corporate reorganization operations that Recuperandas deem most efficient and convenient, including, but not limited to, in the form of specific purpose companies, to whose capital the Recuperandas will transfer the goods and assets listed in the relevant Annexes (in each case, a "SPE").

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

(i)    **Composition of UPI ClientCo** . The Recuperandas may constitute one or more Upis ClientCo, and each UPI ClientCo will consist of 100% (one hundred percent) of the shares issued by an SPE (each , a "SPE ClientCo")_, _to whose share capital Recuperandas must contribute or transfer, through corporate or contractual transactions, all or a portion, as applicable, of the assets, liabilities, obligations and rights described in **Annex 5.2.1 (i)** as defined by the Recuperandas ("ClientCo Collection" and "ClientCo UPI", respectively). All other assets, liabilities, obligations and rights that are not transferred by Recuperandas to SPE ClientCo (or to SPEs ClientCo, as applicable) and which do not make up the ClientCo Collection will not be part of the ClientCo UPI(s) and will not be part of the judicial sale, continuing in the ownership and obligation of Recuperandas.

(a)    Oi shall (i) sign the instrument provided for in **Annex 5.2.1 (i) (b**) by which Oi will grant fiduciary divestiture over 100% (one hundred percent) of the shares issued by SPE ClientCo (or each SPE ClientCo, as applicable) to third parties New Financing, creditors of the New Financing, Bridge Loan creditors, if applicable, Top Debt creditors without *Reinstated* Guarantee – Option I and *Roll-Up* Debt Creditors, and (ii) register the instrument provided for in **Annex 5.2.1 (i) (b)** before all notary offices and books necessary for the improvement of such guarantee; in any case, in accordance with the order of priority provided for in **Annex 4.2.2.2.1(f)(I)** and the Contract between Creditors (*Intercreditor*Agreement ), which will remain effective and valid until the Closing Date of the Alienation of UPI ClientCo.

(ii)    **Composition of UPI V.**tal . If alienated, UPI V.tal will be composed of the assets, liabilities,obligations and rights described in **Annex 5.2.1 (II** ) ("V.tal Collection") and may be organized in the form of an SPE for whose share capital the Recuperandas must contribute or transfer, through corporate or contractual operations, the entire V.tal Collection ("SPE V.tal"). All other assets, liabilities, obligations and rights that are not described as V.tal Collection in **Annex 5.2.1 (II)** shall not be part of the UPI V.tal and shall not be part of the judicial alienation, continuing in the ownership and obligation of the Recuperandas, or of another SPE, if so established in the Plan.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

*(a)* Oi shall (i) sign an instrument by which it will grant fiduciary disposal over 100% (one hundred percent) of the shares issued by SPE V.tal to third parties New Financing, New Funding creditors, Bridge Loan creditors, if applicable, top Debt Creditors without *Reinstated* Guarantee – Option I and Debt Creditors *Roll-Up*, and (ii) register the instrument provided in item (i) above before all the registry offices and books necessary for the improvement of such guarantee; in any case, in accordance with the order of priority provided for in **Annex 4.2.2.2.1(f)(I**) and the Contract between Creditors (*Intercreditor*Agreement ), which will remain effective and valid until the Closing Date of the Alienation of the UPI V.tal.

(iii)     **Composition of Upis Real Estate and Selected Towers** . Each selected Real Estate and Towers will consist of 100% (one hundred percent) of the shares issued by a respective SPE ("SPES Real <u>Estate and Selected Towers")</u>, to whose share capital the Recuperandas must contribute or transfer, through corporate or contractual operations, their assets, liabilities, contracts, obligations and rights described in **Annex 5.2.1 (iii)(a)** ("<u>Selected Torres </u>Collection<u>") and</u> **Annex 5.2.1 (III) (b)** ("Selected Real Estate Collection" and "<u>Selected Towers"), as previously discussed and agreed with the respective acquirers of the Selected Real Estate and Towers. All other assets, liabilities, obligations and rights that are not transferred by the Recuperandas to the selected Real Estate and Torres Spes and that do not make up the Selected Real Estate Collection or the Selected Torres Collection will not integrate the selected Upis Real Estate and Torres and will not be part of the judicial alienation, continuing in the property and obligation of the Recuperandas.</u>

(a)     In the event of the impossibility of contribution of any of the selected Towers to the SPE Real Estate and Torres Selected, the Recuperandas and creditors should make their best efforts to, in good faith, negotiate the replacement of the respective tower with another that is available and able to be transferred to the SPE.

**5.2.1.1.**     **Transfer of the collections of the defined Upis and operation of the spes .** The Recuperandas shall contribute and transfer the collections of the Upis defined to the respective spes defined, in the form and until the date of conclusion of the respective purchase and sale contracts or another date later to be foreseen in the respective respective

Purchase and sale contracts, as applicable, so that the defined spes, when transferred to their respective acquirers, can operate the respective collections of the Upis defined independently and with the necessary authorizations.

**5.2.2.** **Sale of UPI ClientCo and UPI V.**tal . Without prejudice to other terms and conditions provided for in the respective Notice and in compliance with the provisions of the following clauses, as well as in Articles 60, 60-A, 66-A and 142 of the LRF, the ClientCo UPI(s) and V.tal UPI shall be legally disposed of, in whole or in part, together or separately, free and disembarked of any burden, by competitive process in the form of closed proposals, as authorized by Article 142, paragraph IV of the LRF, after the removal and signature of the respective self-surrender by the interested parties and by the transfer of the shares issued by each SPE UPI defined, as applicable, without the UPI(s) and the respective acquirer(s) succeed in the Recuperandas in any debts, contingencies and obligations of any nature, including in relation to obligations of a fiscal, tax and non-tax nature, environmental, regulatory, administrative, civil nature, commercial, consumerist, labor, criminal, anti-corruption and social security, pursuant to Art. 60, sole paragraph, 141, paragraph II and 142 of the LRF and article 133, §1st, section II of Law No. 5.172/1966 ("Competitive Procedure").

**5.2.2.1.** **Sale of UPI ClientCo .** The competitive procedure for the disposal of the IPU ClientCo (or the Upis ClientCo, as applicable) will be carried out in up to two rounds, in the form of closed proposals **,** according to the rules defined in **clause 5.2.2 and following**, and in the respective divestiture notice.

**5.2.2.1.1.** **Object of alienation .** The object of the sale will be 100% (one hundred percent) of the shares issued by SPE ClientCo (or the SPEs ClientCo, as applicable) held by Oi and its affiliates, which shall at all times correspond to 100% (one hundred percent) of the shares issued by SPE ClientCo (or all ClientCo spes, as applicable), free and free of any burden, in the form of Articles 60, sole paragraph, 141, section II and 142 of the LRF and Article 133, §1, paragraph II of Law no. 5,172/1996. Until the Closing Date of the Sale of UPI ClientCo (or UPIS ClientCo, as applicable), all shares issued by SPE ClientCo (or SPEs ClientCo, as applicable) shall remain onerated under the Plan and such security shall be released on the Closing Date of Sale of UPI ClientCo (or das

Upis ClientCo, as applicable), provided that in accordance with the terms set forth in the Plan.

**5.2.2.1.1.1.** In the event that multiple Upis ClientCo are formed, Upis ClientCo may be disposed of to different acquirers, provided that the following minimum conditions are met: *(I)* all acquirers must meet the Minimum Qualification Requirements, *(ii)* all Upis ClientCo shall be disposed of in the same competitive procedure; *(III)* In the first round of disposal UPI ClientCo, the aggregate value of disposal of all Upis ClientCo shall observe the UPI ClientCo Minimum Price; *e (IV)* the closing of all the disposal operations of all the Upis ClientCo shall occur simultaneously, on the same Closing Date of Sale; and the creditors option of restructuring I (according to Deliberation of Creditors Restructuring Option I) and Top Debt Creators Without *Reinstated* Guarantee – Option I (as Deliberation of Top Debt Credentials Without *Reinstated Guarantee* – Option I), may waive the requirements set out in items (ii), (III) and (IV) above.

**5.2.2.1.2.** <u>**First round.**</u> The call for sale of the first round ("Notice <u>UPI ClientCo – First Round") it shall be submitted to the court of </u>judicial recovery and published in the Electronic Justice Journal within thirty (30) calendar days counted from the Date of Approval and shall contain the following terms and conditions for the first round of the competitive procedure of disposal of UPI ClientCo ("First round of disposal UPI ClientCo"):

(i)    **UPI ClientCo Minimum Price and Payment Method** : For the purposes of the first round of disposal UPI ClientCo, only proposals with cash and national currency can be accepted. The minimum price for disposal of the IPU ClientCo (or, in the case of multiple UPIS ClientCo, the minimum price of all Upis ClientCo jointly considered) will be$R 7,300,000,000.00 (seven billion and three hundred million reais) for Oi ("IPU ClientCo Minimum Price").

(ii)    **Audience First round UPI ClientCo and winning proposal UPI ClientCo** : The closed proposals presented in the first round of

Disposal UPI ClientCo will be opened during a hearing to be designated within thirty (30) calendar days from the date of publication of the UPI ClientCo Notice – first round, on a date to be designated in the UPI ClientCo Notice – first round ("Audience UPI ClientCo"), under which the proposal that presents the highest purchase price for UPI ClientCo will be declared a winner, provided that it is necessarily equal to or greater than the UPI ClientCo Minimum Price ("UPI ClientCo Winning Proposal") for full cash payment. In the event of multiple Upis ClientCo being formed, the determination of the winning proposals UPI ClientCo will consider the added value of the best proposals for the disposal of all Upis ClientCo, in accordance with the terms of **clause 5.2.2.1.1.1**.

(iii)     **Deliberation on proposals below the UPI ClientCo Minimum Price** : If, in the first round of disposal UPI ClientCo, Oi receives *only (i)* proposals for acquisition of UPI ClientCo, in cash, in amounts below the UPI ClientCo Minimum Price; *or (ii)* proposals for acquisition of Upis ClientCo, in cash, the sum of the prices offered by tenderers does not reach the UPI ClientCo Minimum Price (in both cases, the "bids below the UPI ClientCo Minimum Price"), the First Round UPI ClientCo Hearing shall be suspended and the Judicial Administration shall submit, in two (2) business days counted from the Audience First Round UPI ClientCo, all proposals below the UPI ClientCo Minimum Price to analysis and deliberation*: (III. 1)* of creditors Restructuring Option I; *and (III. 2)* of the creditors of the Top Debt without *Guarantee Reinstated* – Option I.

(a)     Within ten (10) days counted from receipt of tenders below the UPI ClientCo Minimum Price, creditors Restructuring Option I (according to Deliberation of Credentials Restructuring Option I) and creditors of the Top Debt without *Reinstated* Guarantee – Option I (according to Deliberation of Top Debt Credentials without *Reinstated* Guarantee – Option I) shall decide whether any of the proposals below the UPI ClientCo Minimum Price are acceptable and communicate your decision to the Judicial Administration, subject to the provisions of **clause 5.2.3.2** ., hypothesis in which the proposal(s) below the minimum price UPI ClientCo accepted will be considered the winning proposal(s), except that the creditors option restructuring I and the creditors

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

Top Debt without *Reinstated* Guarantee – Option I may not, without the prior and express consent of the third party New Financing, decide on the acceptance of any proposals below the UPI ClientCo Minimum Price that do not result in the full discharge in cash of the total and updated amount of New Financing – Third Parties.

(b)    If the resolution by creditors Option of Restructuring IE by the creditors of the Top Debt without *Reinstated* Guarantee – Option I does not occur or the outcome of the deliberation is not communicated to the Judicial Administration within the period set forth above, all proposals below the UPI ClientCo Minimum Price will be automatically deemed rejected. The Judicial Administration shall communicate the outcome of the deliberation to the court of the judicial recovery within two (2) working days after the end of the period set out above. For clarification purposes, Oi will not have the right of veto on the resolution of creditors Restructuring Option I and creditors of the Top Debt without *Reinstated* Guarantee – Option I, under this clause, nor to impose on creditors a restructuring option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I the acceptance of any proposals below the UPI ClientCo Minimum Price.

5.2.2.1.3.    **Closing of the first round and beginning of the Second round of disposal UPI ClientCo.** A second round of the competitive disposal procedure of the UPI ClientCo ("Second round of UPI ClientCo sale") will be held <u>if one of the following is observed:</u>

(i)    At the First Round UPI ClientCo Audience, Oi does not receive any proposals;

(ii)    At the First Round UPI ClientCo Audience, Oi does not receive any cash tender that meets the minimum requirements necessary for the competitive process of disposal of UPI ClientCo;

(iii)    At the First Round UPI ClientCo Audience, Oi does not receive offers for all Upis ClientCo formed;

(iv)    At the First Round UPI ClientCo Audience, Oi receives only proposals lower than the UPI ClientCo Minimum Price and such lower bids

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

The ClientCo UPI Minimum Price are rejected by creditors Restructuring Option I and Top Debt *Reinstated* Debt creditors – Option I, pursuant to **clause 5.2.2.1.2 (III)**;

**5.2.2.1.3.1.** Within three (3) business days counted from the occurrence of any of the events described in **clause 5.2.2.1.3**, Oi will make available notice on the website https://www.recjud.com.br/, under the terms of the Notice UPI ClientCo – first round, communicating the closure of the first round of disposal of UPI ClientCo and, consequently, the beginning of the second round of disposal of UPI ClientCo.

**5.2.2.1.4.    Public Notice UPI ClientCo – Second Round.** The call for sale of the second round that ("Notice UPI ClientCo – Second Round") *(I)* Restructuring Option I and creditors of the Top Debt *Reinstated* – Option I within five (5) calendar days counted from the publication provided for in **clause 5.2.2.1.3.1** above shall be submitted by the Recuperandas for review and approval; *and (ii)* revised and deliberated, cumulatively, by *(a)* creditors Restructuring Option I (according to Deliberation of creditors Restructuring Option I); e *(b)* Top Debt Credentials Without *Reinstated* Guarantee – Option I (As Deliberation of Top Debt Credentials Without *Reinstated* Guarantee – Option I), observing the provisions of **Clause 5.2.3.2** .

**5.2.2.1.4.1.**   The review and deliberation of the UPI ClientCo Notice – Second Round by the creditors Restructuring Option I and the creditors of the Top Debt Without *Guarantee Reinstated* – Option I shall be communicated to the Judicial Administration within five (5) days from the date on which the UPI ClientCo Notice – second round is submitted to the respective creditors. If the resolution by creditors Restructuring Option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I is not communicated to the Judicial Administration within the prescribed time limit, the UPI ClientCo – Second Round will be deemed automatically rejected. The Judicial Administration shall communicate the outcome of the deliberation to Oi within one (1) working day counted from the end of the deadline set above or the date on which it is notified on the deliberation of creditors Restructuring Option I and creditors of the Top Debt without *Guarantee Reinstated* – Option I, whichever comes first.

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

**5.2.2.1.5. Second round.** The UPI ClientCo Notice – Second Round will contain the following terms and conditions for the second round of the UPI ClientCo competitive sale procedure (" Second round of UPI ClientCo sale"):

(i) **Price and payment method** : For the purposes of the Second Round of Alienation UPI ClientCo, there will be no minimum price for disposal of UPI ClientCo (or Upis ClientCo, as applicable), and proposals that provide for any forms of payment or a combination thereof, *including (a)* cash payment; *(B)* compensation, delivery, cancellation, forgiveness or any other similar measure for the purpose of implementing the respective transaction, the whole or portion of Extraconcursal Credits (including interest and monetary correction) held by New Financing creditors or third parties New Financing and/or its affiliates, provided that *(B.1)* arising from obligations contracted by Oi and already duly provided or finalized by the respective tenderer; *and (B.2)* recognized by the Recuperandas; and/*or (c)* the payment of ClientCo permitted assets, which must be free and cleared of any burden.

(ii) **Audience Second Round UPI ClientCo:** the closed proposals presented in the Second Round of Alienation UPI ClientCo ("Proposals Second Round UPI ClientCo") will be opened during a hearing to be held within fifteen (15) calendar days counted from the date of publication of the UPI ClientCo Notice – Second Round ("Audience Second UPI ClientCo"). The Second Round UPI ClientCo Audience will be limited to the opening of the proposals Second Round UPI ClientCo, and there will be no statement or deliberation on the winning proposal UPI ClientCo during the Second Round UPI ClientCo Audience. The Second Round UPI ClientCo Hearing shall be suspended immediately after the opening of proposals Second Round UPI ClientCo, in order to enable the deliberation procedure provided for in **clause 5.2.2.1.5 (III** ) below.    -

(iii) **Deliberation on the winning proposal(s) UPI ClientCo**: The Judicial Administration shall submit, in two (2) working days counted from the Second round UPI ClientCo Audience, all proposals received in

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

Form of **clause 5.2.2.1.5 (i** ) and/or at the Second Round UPI ClientCo Hearing to the analysis and deliberation (*III. 1)* of creditors Restructuring Option I; *and (III. 2)* of the creditors of the Top Debt without *Guarantee Reinstated* – Option I, regardless of the values and conditions offered by the respective tenderers.

(a)    Within ten (10) days counted from receipt of the proposals Second Round UPI ClientCo, the creditors Restructuring Option I (according to Deliberation of Creditors Restructuring Option I) and the creditors of the Top Debt Without *Guarantee Reinstated* – Option I (according to Deliberation of Top Debt Creditors without *Reinstated* Guarantee – option I) shall decide whether any of the proposals Second Round UPI ClientCo are acceptable and communicate its decision to the Judicial Administration, subject to the provisions of **clause 5.2.3.2** ., in which case the second round UPI ClientCo accepted proposal(s) will be considered the winning proposal(s), except that the creditors Restructuring Option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I may not, without the prior express consent of the third parties New Financing, decide on the acceptance of any proposals Second Round UPI ClientCo that do not result in full discharge, in cash, of the total and updated amount of the New Financing – Third Parties.

(b)    If the resolution by the creditors Restructuring Option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I does not occur or the outcome of the deliberation is not communicated to the Judicial Administration within the time set forth above, all proposals Second Round UPI ClientCo will be deemed to be automatically rejected. The Judicial Administration shall communicate the outcome of the deliberation to the court of the judicial recovery within one (1) working day after the end of the period set out above. For clarification purposes, Oi will not have the right of veto on the resolution of creditors Restructuring Option I and creditors of the Top Debt without *Reinstated* Guarantee – Option I, under this clause.

(iv)    Oi **Linking** . By force and operation of the UPI ClientCo Plan and Notice – Second Round, Oi will be formally and irrevocably bound

The winning proposal, obliging itself to practice all necessary or useful acts for the implementation of the transaction provided for in the winning proposal, including the negotiation of good faith and conclusion of the purchase and sale contract and other accessory instruments, until the closing date of the sale UPI ClientCo, note that Recuperandas will not be required to bear unreasonable transaction implementation costs and/or outside market standards. For clarification purposes, Oi will not have the right to reject or veto the winning proposal, nor to impose on creditors restructuring option I and the creditors of the Top Debt without Reinstated Guarantee – Option I the acceptance of any proposals Second round UPI ClientCo, as well as other terms and conditions that are not expressly provided for in the Notice UPI ClientCo – Second Round.

(v)    Deadline : In the event that the winning proposal is declared in the second round of disposal UPI ClientCo, the Closing Date of the sale of UPI ClientCo shall occur until September 10, 2024 ("Closing Date Second Round UPI ClientCo alienation"), may such Deadline Closing Second Round UPI ClientCo Sale be extended by deliberation and approval of creditors Restructuring Option I (as Deliberation of creditors Restructuring Option I) and of the creditors of the Top Debt Without *Guarantee Reinstated* – Option I (according to Deliberation of Top Debt Creditors without *Reinstated* Guarantee – Option I).

**5.2.2.1.6.    Retained Value of Net Revenue of the Sale of UPI ClientCo.** Oi's Board of Directors may, within five (5) calendar days counted from the deliberation of the winning proposal(s) UPI ClientCo, decide on the need for retention by Oi of up to$R 1,500,000,000.00 (one billion and five hundred million reais) of the cash portion of UPI ClientCo's Net Sales Revenue relating to the disposal of ClientCo UPI(s) for investments in its own activities or its affiliates ("Withholding Value"). If, for any reason after the closure of the sale of ClientCo UPI(s), Oi cannot or is not authorized to retain the total amount of$ R 1,500,000,000.00 (one billion and five hundred million reais) of the Net Revenue of the sale of UPI ClientCo ("total amount of retention"), Oi's Board of Directors may decide and define the necessary amount that will need to be collected, which, in addition to the possible amount that has actually been able to retain from the Revenue

Net of the sale of UPI ClientCo, may not exceed the total amount of retention and inform, within five (5) days of such determination, the amount to be collected under **clause 5.5.3** to the creditors of the New Financing, third Parties New Financing and Debt Creditors Top Without *Reinstated* Guarantee – Option I. In this case, Oi may offer in guarantee to the Additional Indebtedness Allowed the assets listed in **Annex 5.4.3**, which will observe the order of priority ( waterfall ) also described **in Annex 5.4.3** and the rules laid down in the *Intercreditor*Agreement.

**5.2.2.1.6.1.** Oi shall, within five (5) working days from the date of the decision by its Board of Directors, request, based on, authorization (" request for retention"), cumulatively, of *the (i)* creditors Restructuring Option I (as Deliberation of creditors Restructuring Option I) *e (ii)* Top Debt Credentials Without *Reinstated* Guarantee – Option I (as Deliberation of Top Debt Credentials Without *Reinstated* Guarantee – Option I) , in compliance with **Clause 5.2.3.2** ), to hold the retention value indicated by the Board of Directors.

**5.2.2.1.6.1.1.** The resolution by creditors Restructuring Option I and the creditors of the Top Debt Without *Guarantee Reinstated* – Option I on the request for withholding should be communicated to the Judicial Administration within fifteen (15) business days from the date on which creditors option restructuring IE creditors of top Debt Without *Guarantee Reinstated* – Option I are notified of the request for withholding. In the event that the creditors' deliberation does not occur or the result of such deliberation is not communicated to the Judicial Administration within the time limit set out above, the request for retention shall be deemed automatically rejected. The Judicial Administration shall communicate the outcome of the deliberation by the creditors to Oi within one (1) business day after the expiry of the period provided above.

**5.2.2.1.6.2.** Creditors Restructuring Option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I may accept or reject, in whole or in part, the request for retention made by the Recuperandas, noting that, in the event of rejection, total or partial, or absence of communication to the Judicial Administration, the Recuperandas will be allowed to lift the

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

Additional Indebtedness Allowed, in the amount corresponding to the difference or totality of the amount of retention subject to the request for retention, as applicable, pursuant to **clause 5.5.3.**

**5.2.2.1.6.3.**   If a Credor Restructuring Option I, Third Parties New Financing or Debt Credor Top Without *Guarantee Reinstated* – Option I is the proponent of a closed proposal submitted, such tenderer shall be prevented from deliberating on a proposal(s) below the UPI ClientCo Minimum Price and the request for retention and, for this purpose, the respective Deliberation Quorum applicable to the group of such tenderer shall not take into account the amount of Credits owned by such tenderer.

**5.2.2.1.7.   <u>Other conditions UPI ClientCo .</u>** The closed proposals to be submitted by the interested parties shall comply, in addition to the minimum qualification requirements provided for in the Plan, with the following requirements, without prejudice to other conditions and requirements provided for in the UPI ClientCo Notice: *(I)* acquisition of all shares issued by SPE ClientCo or each SPE ClientCo, as applicable;
*(II)* express adherence to the terms and conditions set forth in the UPI ClientCo Notice *; (iii)* agreement with the format and procedure of the competitive procedure for disposal of UPI ClientCo established in the UPI ClientCo Plan and Notice; *and (IV)* the obligation of the interested party to declare himself expressly bound and obliged to observe all the terms, conditions and obligations set forth in the Plan in relation to the sale of UPI ClientCo, as well as other possible conditions that may be defined by the date of publication of the UPI ClientCo Notice.

**5.2.2.1.8.   <u>Release of guarantees.</u>** In the event of disposal of the UPI(s) ClientCo, and provided that it is strictly carried out under the terms provided in the Plan, the Onerations constituted in favor of the creditors of the New Financing, Third Parties New Financing, Bridge Loan creditors, Top Debt creditors without *Guarantee Reinstated* – Option I, *Roll-Up* Debt creditors, as applicable and, if applicable, creditors of the Additional Allowed Debt, and who fall on the ClientCo acquis or on the shares issued by SPE ClientCo shall be released on the Closing Date of UPI ClientCo, so that the respective operations can be carried out and completed, provided that *(i.a)* on the same Closing Date the sale of UPI ClientCo, the payment of the price of the respective asset is made entirely into account

Docusign Envelope ID: 6BB4A9EE-257F-4205-ACD9-1970E87E2A76

Linked bank (*escrow account*) owned by Oi and which will be fiducially disposed to the benefit of creditors Restructuring Option I, Third Parties New Financing and Top Debt creditors without *Reinstated* Guarantee – Option I,, *e (i.b)* the *escrow* account contract shall establish the obligation to perform the distribution of the Cash Sweep in accordance with **Clause 5.3**  on the working day following the UPI ClientCo Closing Date of that asset; *or (ii)* where payment of the purchase price of UPI ClientCo in the context of the respective competitive procedure involves payment of assets, such assets, unless otherwise approved by Deliberation of Creditors Restructuring Option I, new Financing and Deliberation of the creditors of the Top Debt Without *Guarantee Reinstated* – Option I, will be charged, through a guarantee constituted and perfected prior to the Closing Date Sale, in favor of the creditors New Financing, third parties New Financing, top Debt Credentials Without *Reinstated* Guarantee – Option I, *Roll-up* Debt Credentials and, if applicable, Allowed Additional Debt Credentials, and such guarantee is constituted and perfected before all notary and books required until the Closing Date of the UPI ClientCo, under suspensive condition, becoming effective concomitantly with the release of the guarantee, in this case, the terms and conditions provided for in the *Intercreditor*Agreement.

**5.2.2.2.**    **Sale of UPI V.**tal . In accordance with the terms of **clause 5.1 (**II .2) , the competitive procedure for the disposal of UPI V.tal may be carried out under **clause 5.2.2.2 and** following , in the form of closed proposals, according to the rules defined in the Plan and in the respective call for sale ("UPI V.tal").

    **5.2.2.2.1.**    **Public Notice UPI V.tal.** The UPI V.tal Notice should be revised and approved, cumulatively, by the creditors Restructuring Option I (according to Deliberation of Creditors Restructuring Option I).

        **5.2.2.2.1.1.**    The review and approval of the UPI V.tal Notice by the creditors Restructuring Option I shall be communicated to the Judicial Administration within fifteen (15) days from the date on which the respective creditors are notified of the UPI V.tal Notice. If the decision by creditors option

If Restructuring I is not communicated to the Judicial Administration within the prescribed period, the UPI V.tal Notice shall be deemed automatically rejected. The Judicial Administration shall communicate the outcome of the deliberation to Oi within one (1) business day.

**5.2.2.2.2.** **Object of alienation .** The object of the sale will be up to 100% (one hundred percent) of the shares issued by, as applicable, *(i)* V.tal owned by Oi and its subsidiaries at the time of completion of the said operation*; or*
*(II)* SPE V.tal; in both cases of items (i) and (ii), free and disembarked of any burden, in the form of articles 60, single paragraph, 141, item II and 142 of the LRF and article 133, §1, item II of Law no. 5,172/1996. Until the Closing Date the sale of the UPI V.tal (or the Upis V.tal, as applicable), all shares issued by V.tal or SPE V.tal, as applicable, shall remain under the terms of the Plan.

**5.2.2.2.3.** **Minimum price UPI V.tal.** The minimum aggregate price for disposal of UPI V.tal to be provided for in the UPI V.tal Notice shall be the amount to be paid in cash in national currency of$R 8,000,000,000.00 (eight billion reais) for Oi ("UPI V.tal Minimum Price"), except that the UPI V.tal Minimum Price may be changed proportionally to reflect any change in the V.tal Collection until the date of publication of the UPI V.tal Notice.

**5.2.2.2.4.** **Deliberation on proposals below the minimum UPI V.tal price** . If Oi receives only proposals for acquisition of UPI V.tal, in cash, in values below the UPI V.tal Minimum Price ("Proposals below the UPI V.tal Minimum Price"), all proposals below the UPI V.tal Minimum Price must be submitted to analysis and deliberation: Creditors Restructuring Option I.

(a)    Within ten (10) days counted from receipt of tenders lower than the minimum price UPI V.tal, creditors Restructuring Option I (according to Deliberation of Creditors Restructuring Option I) they shall decide whether any of the proposals below the UPI V.tal Minimum Price are acceptable and communicate their decision to the Judicial Administration, in accordance with the provisions of **clause 5.2.3.2** ., in which case the proposal below the UPI V.tal Minimum Price accepted will be considered the winning proposal. The resources

In cash calculated with the winning proposal will be distributed in accordance with **clause 5.3.2**. If the winning proposal includes any payment in goods or rights, such winning proposal shall ensure full payment in cash of the New Financing - Third Parties.

(b)        If the decision by creditors Restructuring Option I does not occur or the outcome of the decision is not communicated to the Judicial Administration within the period set out above, all proposals below the UPI V.tal Minimum Price will be automatically considered rejected. The Judicial Administration shall communicate the outcome of the deliberation to the court of the judicial recovery within two (2) working days after the end of the period set out above. For the purposes of clarification, Oi will not have the right of veto on the resolution of creditors Restructuring Option I, under this clause, nor to impose on creditors Restructuring Option I the acceptance of any proposals below the UPI V.tal Minimum Price.

**5.2.2.2.5.**    **Payment method UPI V.tal** . The UPI V.tal Notice shall provide that the amount of disposal of UPI V.tal shall be paid in cash in national currency, unless otherwise approved by creditors Restructuring Option I (as Deliberation of Credentials Restructuring Option I), in any case, subject to the provisions of **clause 5.2.3.2** , and except that creditors option restructuring I may not, without the prior express consent of the third party New Financing, decide on the acceptance of any proposals that do not result in full discharge, in cash, of the total and updated amount of the New Financing – Third Parties.

**5.2.2.2.6.**    The implementation of the competitive procedure for the disposal of UPI V.tal will be the discretion of Oi's administrative bodies and will not be mandatory.

**5.2.2.2.7.**    **Other conditions UPI V.tal**. The closed proposals to be submitted by the interested parties must comply, in addition to the minimum qualification requirements provided for in the Plan, the following requirements, without prejudice to other conditions and requirements provided for in the Notice UPI V.*tal (i)* the express adherence to the terms and conditions set out in the Notice UPI V.tal; *(II)* the agreement with the format and procedure of the competitive procedure for disposal of UPI V.tal

Established in the Plan; *and (iii)* the obligation of the interested party to declare himself expressly bound and obliged to observe all the terms, conditions and obligations set forth in the Plan in relation to the sale of UPI V.tal, as well as other possible conditions that may be defined by the date of publication of the UPI V.tal Notice.

**5.2.2.2.8.** <u>**Release of guarantees.**</u> In the event of disposal of UPI V.tal, and provided that it is strictly carried out under the terms provided in the Plan, the Onerations that fall on the V.tal Collection shall be released on the Closing Date of UPI V.tal, so that the respective operations can be carried out and completed, provided that *(i.a)* on the same Closing Date Sale, the payment of the price of the respective asset is fully made in a linked bank account (escrow account) owned by Oi and that it will be fiducially disposed to the benefit of creditors Restructuring Option I, third parties New financing and creditors of the Top Debt without *Reinstated* Guarantee – Option I,, *and (i.b)* the *escrow* account contract shall establish the obligation to carry out the distribution of the Cash Sweep in accordance **with clause 5.3**, on the working day following the Closing Date the sale of the said asset; *or (ii)* if the payment of the purchase price of UPI V.tal in the context of the respective competitive procedure involves the payment of assets, such assets, unless otherwise approved by Deliberation of Creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee – Option I, will be charged in favor of the creditors New Financing, Third Parties New Financing, top Debt Credentials Without *Reinstated* Guarantee – Option I, *Roll-up* Debt Credentials and, if applicable, Allowed Additional Debt Credentials, and such guarantee is constituted and perfected before all notary and books required until the Closing Date of the UPI ClientCo, under suspensive condition, becoming effective concomitantly with the release of the guarantee, in this case, the terms and conditions provided for in the *Intercreditor* Agreement.

**5.2.3.** <u>**General Rules of Competitive Procedures.**</u> The competitive procedure for disposal of each defined IPU shall comply with all the terms and conditions contained in the Plan, applicable legislation and regulations, including compliance and

Obtaining any necessary regulatory requirements, authorizations or limitations, especially with regard to ANATEL and CADE, and the respective notice, being the Recuperandas already authorized to request the court of judicial recovery that the filing, to be carried out after the conclusion of a certain competitive procedure, provide that its effectiveness is conditioned to the effective fulfillment of the previous conditions provided for in the purchase and sale contract applicable to the respective defined UPI. For the purposes of clarification, each competitive procedure must be done in the form of closed proposal, so that the respective binding proposals will remain confidential until the date and time designated for its disclosure under the terms of the respective Notice.

5.2.3.1.    **Competitive Procedure Notice.** The terms and conditions of the competitive procedure (as defined below) for the disposal of each of the defined UPIS will be provided in a notice to be presented in the files of the judicial recovery by the Recuperandas and timely published in the Electronic Justice Journal of the Court of Justice of the State of Rio de Janeiro and in a newspaper of great circulation, which will contemplate, among other rules*: (a)* deadline for qualification and for carrying out the respective competitive procedure*; (b)* Term and Conditions for Audit, if applicable; *(C)* the procedures to be adopted in each competitive procedure, including the order of submission and opening of binding proposals and the criteria for defining winning proposals, and in any case shall comply with the minimum rules laid down in the Plan.

5.2.3.2.    **Coordination of** creditors**' deliberations** . The Judicial Administrator shall be responsible for coordinating all the decisions of the creditors provided for in **clause 5.2.2**, which shall be responsible for the timely determination of the quorum for deliberation of the respective matters. Where applicable, for the purposes of calculating the creditors' shares Restructuring Option I, Third Parties New Financing and Top Debt Creditors Without *Guarantee Reinstated* – Option I who are holders of Credits in foreign currency in the respective creditors' deliberations, the value of such Credits shall be considered as converted into national currency based on the conversion exchange rate.

5.2.3.3.    **Judicial**Evaluation **Waiver**. The Recuperandas, acting with transparency and good faith, considering the peculiarities and unique characteristics of the assets that form the defined Upis and aiming at the speed of the necessary procedures

For the implementation of the disposal of defined PPIs and the reduction of costs in the procedure, without prejudice to the provisions of the Plan, do not require the realization of the judicial evaluation in the competitive procedures of disposal of defined PPIs, with which, already, the creditors agree upon approval of the Plan. Subject only and only to judicial approval of the Plan, the creditors and the Recuperandas hereby waive any rights, defenses or prerogatives exclusively with respect to the lack of judicial evaluation in the competitive procedures provided herein.

**5.2.3.4.    <u>Previous</u> Audit** . The Recuperandas shall, within the framework of each competitive procedure *(i)* make available to those interested in participating in the competitive procedure, by signing a confidentiality agreement and any other documents or carrying out measures aimed at preserving the interests of the Recuperandas and complying with the applicable legal rules, including those relating to competitive aspects, access to documents and information related to the respective defined IPU and the assets, obligations and rights that make up it for the performance of legal, financial and accounting audit, and independent evaluation of such documents and information by the interested parties ("Audit");

*(II)* provide responsible staff to answer interested parties' questions about the assets, obligations and rights that make up the respective defined UPI *; (iii)* grant interested parties reasonable access to assets and liabilities rendered, or to be rendered to each defined UPI; *and (IV)* take all other necessary and appropriate measures to regulate the performance of the competitive procedure. The deadlines and conditions for the Audit of each defined UPI shall be included in the respective Notice.

**5.2.3.5.    <u>Minimum Qualification</u>Requirements** . Those interested in participating in the competitive procedures must express their interest within seven (7) working days from the publication of the respective Notice ("Qualification"). Without prejudice to the financial criteria and other documents and conditions that may be required in each Notice under the Plan, each interested party to participate in any competitive procedure shall demonstrate through its Qualification Notification the fulfillment of the following minimum qualification requirements ("<u>Minimum Qualification Requirements"</u>), under penalty of disqualification by Oi, except that any interested parties who have submitted a binding proposal UPI ClientCo and/or binding proposal UPI V.tal that have been accepted by the Recuperandas and creditors in accordance with their respective deliberations will be exempted from demonstrating the fulfillment of the Minimum Qualification Requirements:

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87E2A76

(i)     The interested party should indicate the competitive procedure in which he wishes to participate, indicating also the UPI defined for whose acquisition he intends to submit a proposal;

(ii)     The interested party, by itself and/or its affiliates, must submit a proposal for the acquisition of the UPI defined as desired, observing the forms of payment allowed in each competitive procedure, as well as the deadlines and other conditions provided for in the draft of the respective purchase and sale contract, in the Plan and in the respective Notice;

(iii)     the interested party must present proof of existence and regularity, duly issued by the bodies responsible for the registration of the constitution of the interested party;

(iv)     in the case of a legal entity, the person concerned shall submit a copy of the respective constituent documents, as well as a corporate document proving the natural or legal persons holding the capital of the legal entity concerned;

(v)     The interested party must submit a bank reference statement of at least 2 (two) first-line financial institutions attesting their economic, financial and equity capacity to participate in the respective competitive procedure;

(vi)     The interested party must provide proof that he has the availability of sufficient resources or means to face the payment of the minimum price of the respective defined UPI, upon presentation of an irrevocable and irreparable letter of credit from a financial institution registered with the Central Bank of Brazil; and

(vii)     The interested party must expressly agree to the terms and conditions of the Plan and the respective Notice, without any caveats.

**5.2.3.6.**    <u>**Contract of Purchase and**</u> Sale . After determining the winning proposal, the tenderer of the winning proposal and/or its affiliates shall enter into a purchase and sale agreement with Oi for the acquisition of the defined UPI that he has acquired in the respective competitive procedure in terms usually adopted for such operations, within a maximum period of ninety (90) calendar days from the date of

The Lance of the Auto of Arrematation, may be extended by Oi, provided that approved by Deliberation of creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of the creditors of the Top Debt without *Guarantee Reinstated* – Option I. If Oi receives a binding proposal for a certain competitive procedure, the contract for the purchase and sale of the respective defined IPU shall be concluded substantially in the form of the draft attached to the respective notice.

**5.2.3.7.**    **Auto of Arrematation .** The Court of Appeal *(i)* will approve the winning proposal of each defined UPI; *and (ii)* will make the Self of Remediation in favor of the winner of the competitive procedure of each defined UPI and/or any Affiliate of such winner. The Auto de Arrematation shall constitute a document capable of proving the judicial acquisition of the respective defined UPI, with the absence of succession of the acquirer in any debts and/or obligations of the Recuperandas and/or any other companies of the Oi Group, in the form of Art. 60, sole paragraph, 60-A, 141, section II and 142 of LRF and art. 133, §1st, section II of Law No. 5,172/1966.

**5.2.3.7.1.**    As long as the divestitures of all defined Upis not completed, under penalty of non-compliance with the Plan, *(i)* the Defined Upis may not assume or subclaim any debt or obligation; *and (ii)* Oi Group may not dispose of, transfer, onerate or in any way dispose of the assets that make up the defined Upis, except as provided for in the Plan.

**5.2.3.7.2.**    The assets, assets and rights that will make up the Upis *(i)* are essential and are fully bound by the fulfillment of the Plan, for all purposes and effects of law, regardless of the transfer of such assets to the respective Upis defined, under the terms of the Plan; *and (ii)* may not be subject to pre-monitoring, attachment, arrest, arrest, kidnapping or any kind of restriction for the benefit or to ensure the right of any third party, whether or not holders of Credits of any nature against Oi Group.

**5.2.4.**    **Sale of Upis Real Estate and Selected Towers.** Subject to the provisions of the following clauses, as well as in Articles 60, 60-A, 66-A and 142 of LRF, the selected Upis Real Estate and Torres will be legally disposed of, in whole or in part, together or separate, free and cleared of any burden, by direct sale, by Oi, of 100% (one hundred percent) of the shares issued by each of the E Property Spes

Towers selected for the creditors *Take or* Pay without Guarantee – Option I, due to the particularity of the assets that make up each UPI Real Estate and Selected Towers. By mutual agreement between Oi and the respective Credor *Take or* Pay without Guarantee – Option I and subject to compliance with applicable regulatory conditions, the Selected Torres Collection will be transferred, in whole or in part, directly and without the need to contribute to the capital of SPE Properties and Selected Towers, prior to the Date-Limit Transfer Selected Properties and Towers.

**5.2.4.1.**    The purchase price of each SPE that integrates UPI Real Estate and Selected Towers will be paid by the respective *Take or* Pay Credit without Warranty – Option I (or any of its affiliates) subject to payment of part of Credor *Take or* Pay Credits without Guarantee – Option I in amount equivalent to the amount of the selected Torres Collection and the Selected Properties Collection.

**5.2.4.2.**    In the transfer of each selected Real Estate and Towers, pursuant to **clause 5.2.4**, the imposition of shares issued by SPE Real Estate and Torres or the selected Real Estate and Towers, in favor of the *creditors Take or* Pay Without Guarantee – Option I, as applicable, owned by Oi provided for in the Plan must be released on the Closing Date of Sale of the selected Upis Real Estate and Torres, so that the respective operation can be carried out and completed.

**5.2.4.3.**    As a result of the sale of the selected Real Estate and Torres Upis as described above, the selected Real Estate and Torres Spes will not be liable for any obligations of the Recuperandas, including those established in the Plan, such as the obligations of payment of Concursal Credits, and the *Take or Pay* creditors without Warranty – Option I acquirers of the shares issued by the selected Real Estate and Towers will not succeed the Recuperandas in any of their debts or obligations or any other companies of the Oi Group, in the form of Art. 60, sole paragraph, 60-A, 141, section II and 142 of LRF and art. 133, §1st, section II of Law No. 5,172/1966.

**5.2.4.4.**    The *creditors Take or* Pay Without Guarantee – Option I acquirers of the shares issued by the selected Real Estate and Towers shall conclude with Oi instrument for formalization of the acquisition of each UPI Real Estate and Towers selected in terms usually adopted for operations of this nature in up to 60 (sixty) days of the Date of Approval. In the event that the final transfer is not possible

From a certain Property selected to the respective SPE, the Credor *Take or* Pay Without *Guarantee* – Option I will have the right to request replacement by another Property owned by Oi, to be defined by common agreement between Oi and the respective Credor *Take or* Pay without Guarantee – Option I, in a similar value for it to compose the selected Real Estate Collection, being that, if it has not been carried out until December 31, 2025 and if there is no other property owned by Oi that has similar value and is transferable , Oi will compensate the Credor *Take or* Pay without Guarantee – Option I in the equivalent amount by reducing the future discounts foreseen in the Plan.

**5.2.4.5.    Right of** preference . The sale of Upis Real Estate and Selected Towers shall respect the right of preference and other rights granted to third parties and to the creditors *Take or* Pay – Option I on the assets belonging to the Selected Real Estate Collection and the Torres Collection selected under the applicable instruments, including *take or* pay contracts.

**5.2.4.6.**    The acquirers of the selected Upis Real Estate and Torres must observe the terms of any contracts for the assignment of the right of use to which are subject the selected Properties and Towers that compose the acquired UPI collection.

**5.2.4.7.    Preservation of the alienations of Upis.** Pursuant to articles 74 and 131 of LRF, the preservation, in any case, of any and all acts of alienation in relation to the disposal of the defined Upis is assured, provided that they are practiced in accordance with the provisions of the Plan.

**5.3.    *Cash Sweep*.** After the full payment of the original Emergency Dip updated and observed the provisions of **clause 5.3.6**, the Recuperandas shall allocate the *(i)* Net Revenue of the sale of UPI ClientCo*; (ii)* Net Revenue of the sale of UPI V.tal*; (iii)* Net Revenue of the Sale of Assets; *e (IV)* Net Revenue from Real Estate Sale, in accordance with the following terms and conditions:

**5.3.1.    Net Revenue from UPI ClientCo. Sale** Oi will allocate UPI ClientCo's Net Sales Revenue in the following order:

(i)    The amount corresponding to the withholding value, whose request for retention has been approved by the creditors Restructuring Option I and the creditors of the Top Debt without *Reinstated* Guarantee – Option I, in accordance with **clauses 5.2.2.1.6**

**And**following , will be intended for Oi to make investments in its own activities and/or its affiliates;

(ii)      The amount equivalent to 100% (one hundred percent) of the remaining balance of UPI ClientCo's Net Sales Revenue after the retention and destination provided for in **item (i)** above, as applicable, will be used to fully amortize the New Financing and, if applicable, the Bridge Loan, *pro rata*;

(iii)      After the full amortization of the New Financing and, if performed, the Bridge Loan, the amount equivalent to 100% (one hundred percent) of any balance of the Net Revenue of the Sale of UPI ClientCo will be used to fully amortize the Top Debt without *Reinstated Guarantee* – Option*I , pro rata*;

(iv)      After the full amortization of the Top Debt without *Reinstated* Guarantee – Option I, the amount equivalent *to (a)* 60% (sixty percent) of any balance of the Net Revenue of the Sale of UPI ClientCo will be used for redemption or amortization of all or part, *pro* rata , of the *Roll-Up* debt; *and (b)* 40% (forty percent) of any balance of the Net Revenue of the sale of UPI ClientCo may be used by Oi for investments in its own activities or its affiliates, provided that, until the full amortization of the *Roll-Up* debt, the resources arising from the sale of assets under the Plan that are effectively destined to Oi, including the retention value, should observe the total and aggregate limit of$ R 5,500,000,000.00 (five billion and five hundred million reais) ("Oi liquidity limit").

**5.3.2.**    **Net Revenue from the sale of UPI V.tal.** Oi will allocate the Net Revenue of the sale of UPI V.tal in the following order:

(i)      The amount equivalent to 100% (one hundred percent) of the Net Revenue of the Sale of UPI V.tal shall be used to fully amortize the New Financing and, if applicable, the Bridge Loan in a *pro*rata manner;

(ii)      After the full amortization of the New Financing and, if performed, the Bridge Loan, the amount equivalent to 100% (one hundred percent) of any balance of the Net Revenue of the Sale of UPI V.tal will be used to fully amortize the Top Debt without *Reinstated Guarantee* – Option*I , pro rata*;

(iii)    After the full amortization of the Top Debt without *Reinstated* Guarantee – Option*I ,* the amount equivalent to USD100,000,000.00 (one hundred million dollars) of any balance of the Net Revenue of the Sale of UPI V.tal will be used to amortize the Additional Allowed Debt, if applicable; and

(iv)    After the full amortization of the Top Debt without *Reinstated* Guarantee – Option I and, if applicable, of the Additional Allowed Debt, up to the limit of A USD100,000,000.00 (One hundred million dollars), the amount equivalent *to (a)* 60% (sixty percent) of any balance of the Net Revenue of the sale of UPI V.Tal shall be used for the redemption or amortization of all or part, in a *pro*rata manner, of the *Roll-Up* debt*; and (b)* 40% (forty percent) of any balance of the Net Revenue of the sale of UPI V.tal will be used by Oi for investments in its own activities or its affiliates, provided that always observed the Oi liquidity limit provided for in **clause 5.3.1 (iv)** .

5.3.3.    __Net Revenue from the Sale of__ Assets . Without prejudice to the provisions of **the clauses**
**5.3.1 and 5.3.2** above and **clause 5.3.4** below, Oi will allocate the amounts of the Net Revenue of the Sale of Assets as follows:

(i)    The amount equivalent to 100% (one hundred percent) of the Net Revenue of the Sale of Assets will be used to fully amortize the New Financing and, if applicable, the Bridge Loan in a *pro*rata manner;

(ii)    After the full amortization of the New Financing and, if performed, the Bridge Loan, the amount equivalent to 100% (one hundred percent) of any balance of the Net Revenue of the Sale of Assets will be used to fully amortize the Top Debt without *Reinstated* Guarantee – Option*I pro*rata; and

(iii)    After the full amortization of the Top Debt without *Reinstated* Guarantee – Option I, the amount equivalent *to (a)* 60% (sixty percent) of any balance of the Net Revenue of the Sale of Assets will be used for redemption or amortization of all or part, in a *pro* rata manner, of the *Roll-Up* debt; *and (b)* 40% (forty percent) of any balance of the Net Revenue of the Sale of Assets will be used by Oi for investments in its own activities or of its affiliates, provided that always observed of the Oi liquidity limit provided for in **clause 5.3.1 (iv) .**

5.3.4.    __Net Revenue from the Sale of Real__Estate . As a condition to the destination of the Revenue

In the order of payment below, the Company will endeavor to change, as applicable, the rules of payment ( waterfall ) and related documents with the creditors holding the guarantees whose objects are the Real Estate or receivables arising from the sale of the Real Estate:

(i)    **Net Revenue from the Sale of Real Estate Limited to$ R 600,000,000.00**. The Net Revenue of the Accumulated Real Estate Sale received by Oi since the approval of the Plan, limited to the aggregate amount of$ R 600,000,000.00 100 (six hundred million reais), will be% (one hundred percent) used by Oi for investments in its own activities or its affiliates;

(ii)    **Net Revenue from the Sale of Real Estate over$ R 600,000,000.00 1,600,000.00, limited to R$** . After the end of the period provided for in **clause 4.10**, the Net Revenue of the Accumulated Real Estate Sale received by Oi in the amount exceeding$ R 600,000,000.00 1,600,000,000.00 (six hundred million reais), limited to the aggregate amount of R$ (one billion and six hundred million reais), will be used for payment, in a *pro* rata manner to the respective Credits, to the following creditors:

*(1.1)* Supplier Creditors *Partners ; (1.2)*    Top

Debt with *Reinstated* Guarantee ;

*(1.3)* Top Debt without *Reinstated* Guarantee – Option I*;*

*(1.4)* Top Debt without *Reinstated* Guarantee – Option

II*; (1.5)* Acceding Extraconcursal Creditors.

(iii)    **Net Revenue from the Sale of Real Estate Accumulated above$ R 1,600,000,000.00**. The Net Revenue of the Accumulated Real Estate Sale received by Oi above$ R 1,600,000,000.00 100 (one billion and six hundred million reais) will be% (one hundred percent) distributed as follows:

(a)    The amount equivalent to 100% (one hundred percent) of the Net Revenue of the Sale of Real Estate will be used to fully amortize the Top Debt without *Reinstated* Guarantee – Option*I pro rata;*

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

(b)    After the full amortization of the Top Debt without *Reinstated* Guarantee –
Option I, the amount equivalent to 100% (one hundred percent) of any balance of
the Net Revenue of the Sale of Real Estate will be used to fully amortize the
Additional Allowed Debt, if applicable;

(c)    After the full amortization of the Top Debt without *Reinstated* Guarantee –
Option I and, if applicable, of the Allowed Additional Debt, the amount equivalent
to 100% (one hundred percent) of any balance of the Net Revenue of the Sale of
Real Estate will be used to fully amortize the New Financing and, if applicable,
the Bridge Loan, *pro*rata ; and

(d)    After the full amortization of the New Financing and, if applicable, the
Bridge Loan, the amount equivalent to 100% (one hundred percent) of any
balance of the Net Revenue of the Real Estate Sale will be used to fully amortize
the *Roll-Up* debt, *pro*rata .

**5.3.4.1.    <u>Account Escrow Real</u>** Estate . In the event of disposal of any Property prior
to the Closing Date of the sale of UPI ClientCo, Recuperandas shall deposit the
amounts related to the respective Net Revenue of the Sale of Real Estate in a linked
account owned by the recovered ones, to be constituted by them ("<u>Escrow Real Estate</u>
<u>Account"), which may only be distributed under</u> **clause 5.3.4** after the Closing Date of
the sale of UPI ClientCo, within the period established in the contract of the Escrow
Real Estate Account. If the Recuperandas dispose of Real Estate after the Closing
Date of the sale of UPI ClientCo, the amounts related to the respective Net Revenue of
the Sale of Real Estate due to the creditors will be distributed bimonthly by the
Recuperandas, subject to the provisions of **clause 5.3.4**.

**5.3.4.2.**    The Recuperandas must grant, on the date of creation of the Escrow Real
Estate account, guarantee on the Escrow Real Estate account to the Top Debt without
*Reinstated* Guarantee
– Option I, which will have priority over said guarantee, and the New Financing, subject
to the waterfall and other terms provided for in the Agreement between Creditors
(*Intercreditor*Agreement ).

**5.3.5.    <u>Real</u>**Estate **<u>Vehicle</u>**. As an alternative to the direct sale of the Real Estate,
Recuperandas may, at its sole discretion, constitute a vehicle for which the Real Estate
("Real Estate Vehicle") will be provided, and Recuperandas may, at their sole discretion,
choose to pay creditors, in accordance with Articles 356 to 359 of the Civil Code,
participation

Company of said Real Estate Vehicle, in proportion to their respective Credits.

**5.3.5.1.**   Through the implementation of the payment in accordance **with clause 5.3.5**, the applicable creditors will grant the Recuperandas, irrevocably and irretrievably, the widest, shallow and general discharge in respect of the Applicable Credits, having nothing else to complain about the said Credits.

**5.3.6.**   **Distribution of Cash Sweep resources**. The distribution of Cash Sweep values described in Clauses 5.3  will take place, in compliance with the rules and priorities described therein, with the consequent proportional reduction of the balance of the respective Credits and limited to the value of the respective Credits, as applicable. Any remaining balance of Credits after payment arising from Cash Sweep will be recalculated and adjusted in accordance with this Amendment and its payment will comply with the provisions, respectively, **in clauses 4.2.8 , 4.2.9 and 4.2.2**, as the case may be.

**5.4.**   **Recursal Deposits.** Through the judicial approval of this addition, the Recuperandas will be authorized to withdraw any and all recursive deposits that guarantee Concursal Credits arising from labor resources, in process before the Labor Court.

**5.4.1.1.**   As the recursive deposits of a labor nature are collected by the Recuperandas, the resources obtained will be used as follows:

(a)   50% (fifty percent) of the appeals raised by Recuperandas will be used for the payment of Labor creditors – Option I, being certain that once the limit of the aggregate value of$ R 30,000,000.00 **4.1.1** (thirty million reais) has been reached, pursuant to **clause** 50,% (fifty percent) of the resources obtained by the Recuperandas should be used for payment of Labor creditors – Option II; and

(b)   50% (fifty percent) of the funds raised by the Recuperandas will be used for the working capital of the Company.

**5.4.1.1.1.** If the net amount of the Labor Credit to be paid in accordance with **clauses 4.1.1 and 4.1.2**, at the time of withdrawal of the labor-related recursal deposit, is less than the amount corresponding to 50% (fifty percent) of the respective labor-related recursal deposit, the Recuperandas

They will pay the Labor Creditor the equivalent of his Labor Credit, being the difference used for the working capital of the Company.

**5.4.1.2.**    **Credit Rights Vehicle.** After the end of the period of three (3) years provided for in **clause 4.1.2** of this addendum, Recuperandas may, at their sole discretion, constitute a vehicle for which the credit rights on the recursive deposits of a labor nature ("Vehicle Creditorial Rights") will be granted, and may, even, give in payment to Labor Creditors – Option II, pursuant to Articles 356 to 359 of the Civil Code, corporate participation of said Vehicle Credit Rights, in proportion to their respective Labor Credits – Option II.

**5.4.1.2.1.**    Through the implementation of the payment in **clause 5.4.1.2**, Labor Creditors – Option II shall grant to Recuperandas, irrevocably and irretrievably, the widest, shallow and general discharge with respect to Labor Credit – Option II, having nothing else to complain about the said Credits.

**5.5.**    **Forms of financing.** As an essential factor for the maintenance of the appropriate working capital of Recuperandas and its affiliates and to enable the payment of Extraconcursal Credits, including the updated original Emergency Dip, as well as part of the Concursal Credit after the judicial approval of the Plan, Oi *(i)* will contract the New Financing provided for in **Clause 5.5.1** ; *(*ii ) will contract the Bridge Loan provided for in **Clause 5.5.2** ; *and (iii)* may contract the Additional Allowed Debt, subject to the terms and conditions set out in **Clause 5.5.3** .

**5.5.1.**    **New financing.** Oi will hire new resources in the total amount of up to USD 655,000,000.00 (six hundred fifty five million dollars), not less than USD 650,000,000.00 (six hundred and fifty million dollars) or the equivalent in reais, *being (a)* up to USD 505,000,000.00 (five hundred and five million dollars), may not be less than USD 500,000,000.00 (five hundred million) or the equivalent in reais ("Value New Financing – Credentials Restructuring Option I") to be granted by creditors Restructuring Option I ("New Financing Creditors" and "New Financing – Credentials Restructuring Option I", respectively); *and (b)* USD 150,000,000.00 (one hundred and fifty million dollars), or the equivalent in reais (" New Financing Value – Third Parties") to be granted by

Anyone other than creditors Restructuring Option I ("Third Parties New Financing" and "New Financing – Third Parties", with New Financing – Third Parties and New Financing – Creditors Restructuring Option I jointly defined as the "New Financing").

**5.5.1.1.    Priority nature.** The New Financing will be considered as priority extra-concursal financing and will have absolute priority over all other payment obligations due by the Recuperandas, in compliance with the provisions of LRF Art. 66, 67, 69 and seq. and 84. With the judicial approval of the Plan, the Recuperandas may contract the New Financing without the need for new authorization by the General Meeting of creditors or by the court of judicial recovery, including for the constitution of the guarantees, and any modification in the degree of appeal of judicial approval of the Plan will not alter the extra-concursal nature and super-priority of the New Financing, in the form of Articles 69-A and 69-B of the LRF.

**5.5.1.2.    Allocation of resources.** Oi will allocate 100% (one hundred percent) of the total amount of the New Financing as a priority to amortize or refinance the balance of the updated original Emergency DIP (including all its charges due up to the date of its payment), if any, including through the conversion provided for in **clause 5.4.1.3.1(i).** Oi will use any remaining balance after the amortization of the balance of the updated original Dip Emergency (including all its charges due up to the date of its payment) for the fulfillment of its obligations, in accordance with the terms of the Plan.

**5.5.1.3.    Accession to the New Financing.** Subject to the provisions of **clause 5.5**, each person wishing to participate in the New Financing must send to Oi, within thirty (30) days from the Date of Approval and in accordance with **clause 10.7**, the New Financing Agreement contained in **Annex 5.5.1.3**, duly completed and signed by the respective person or his representatives.

**5.5.1.4.    Commitment to Accession to New Financing – Credentials Restructuring Option**I . As a support for the judicial recovery and the rise of Oi Group, the creditors of the updated original Dip Emergency have signed with Oi a commitment to support the New Financing – creditors Restructuring Option I, through which they *may (i)* convert their Extraconcursal Credits arising from the updated original Emergency DIP or, if applicable, the Bridge Loan into

Share of the New Financing – Creditors Restructuring Option I, in the proportion of USD1.00/USD1.00 (or the equivalent in reais) of Extracursal Credits for each USD1.00/USD1.00 (or the equivalent in reais) of New Financing – Creditors Restructuring Option I; and/*or (ii)* to disburse the remaining amount, in cash, of the total of the New Financing – creditors Restructuring Option I, if the amount converted is not sufficient to reach the value New Financing – creditors Restructuring Option I (" <u>Difference New Financing – creditors Restructuring Option I"), provided that all applicable conditions provided for in the Plan and New Financing Instruments – Credentials Restructuring Option I</u>. In contrast, the creditors of the updated original Emergency Dip and the Bridge Loan, as applicable, shall be entitled to the receipt of *the Conversion Fee*, in accordance **with clause 5.5.1.4.4.**

> **5.5.1.4.1.1**. Creditors Restructuring Option I may, at its sole discretion, determine the allocation of the difference New Financing – Creditors Restructuring Option I among all or part of creditors Restructuring Option I, if applicable, provided that, and under any circumstances, the full value of the New Financing – creditors Restructuring Option I is effectively achieved.

**5.5.1.4.2.** <u>**Commitment to Accession to the New Financing – Third Parties.**</u> As a means of supporting the judicial recovery and the lifting of Oi Group, third, through the delivery to Oi of the Term of Accession to the New Funding – Third Parties, has committed to supporting the New Funding – Third Parties, through which it was forced to disburse the amount New Financing – Third Parties, by *(a)* conversion of its Extra-Concursal Credits arising from the Ponte-Loan, if applicable, in part of the New Financing – Third Parties, in the proportion of USD1.00/USD1.00 (or the equivalent in reais) of Extra-Concursal Credits for each USD1.00/USD1.00 (or the equivalent in reais) of New Financing – Third Parties; and/*or (b)* the disbursement, in cash, of the remaining amount of the Total New Financing – Third Parties, if the amount converted is not sufficient to reach the New Financing – Third Parties; in any case, provided that all applicable conditions provided for in the Plan and in the New Financing Instruments – Third Parties have been verified. On the other hand, the New Funding third parties will be entitled to the receipt of the support fee, in accordance with **clause 5.5.1.4.5**.

**5.5.1.4.3. <u>Mandatory conversion of Credits.</u>** Without prejudice to the provisions of **clause 5.5.1.4**, the instrument to be concluded by the Recuperandas for the contracting of the Bridge Loan under **clause 5.5.2** shall provide that each Bridge Loan Credor shall be obliged to convert the amount of the Bridge Loan granted to Oi into part of the New Financing, in the proportion of$R 1.00 USD1.00/1.00 of the amount of the Bridge Loan granted for each R$USD1.00/ of New Financing. In this case, each Bridge Loan Credor will be entitled to the receipt of *the Conversion Fee*, as provided for in **clause 5.5.1.4.4**.

**5.5.1.4.4. *<u>Conversion Fee</u>*.** Each creditor who converts his Extraconcursal Credits arising from the updated original Emergency Dip or the Bridge Loan in part of the New Financing – Restructuring Option Creditors I, pursuant to **clause 5.5.1.4**, shall be entitled to the receipt of a conversion fee, under the terms provided for in the New Financing instruments and in the amount proportional to the amount of your Extra Concursal Credits (" <u>*Conversion*</u>Fee ").

**5.5.1.4.5. <u>Support fee.</u>** Each New Third Party Financing that undertakes to support the New Financing – Third Parties, pursuant to **clause 5.5.1.4.2**, shall be entitled to the receipt of a support fee, as provided for in the New Financing instruments and in the amount proportional to the New Funding Value – third parties actually disbursed ("Support fee").

**5.5.1.5. <u>Hiring the New</u>**Financing . For the hiring of the New Funding, Oi will issue *(i)* Notes New Funding – creditors Restructuring Option I in Dollar or Debentures New Funding – creditors Restructuring Option I in Reais; *e (II)* Notes New Financing – Third Parties in Dollar or Debentures New Financing – Third Parties in Reais (**being items (i)** and **(ii)** , "New Financing Instruments"), which shall provide substantially equal terms and conditions (subject to only the necessary adjustments due to their applicable laws) and observe the following minimum terms and conditions:

(a)    <u>Date of issue</u>: Will be the date thus defined in the respective instruments of the New Financing, which should occur until July 15 , 2024, and may be extended in common agreement by Oi, the creditors of the Novo Financeira and the creditors

Third parties New financing. The New Financing should be issued on the same date as the *Roll-Up* Debt , the Participatory Debt and the *A&E Reinstated* Debt, in satisfactory form and content to the creditors *Restructuring* Option I (by Deliberation of Credentials Restructuring Option I) and to the third parties New Financing (by Deliberation of Third Parties New Financing), acting in good faith, substantially in the terms and conditions set out in **Annex 5.5.1** on the date defined in the respective New Financing Instrument.

(b)    Principal Payment: The principal amount will be amortized, in only one parcel ( bullet ), on June 30, 2027 ("New Financing Due Date").

(c)    Interest and Monetary Correction: In the event that the New Financing is granted in dollars, the Recuperandas may choose *between (a)* interest of 10.0% (ten percent) a year, to be paid quarterly starting on the last day of the third month after the Date of Issue foreseen in **item (a)** above, since the first and second interest payments will be capitalized to the principal amount and the other payments will be made in cash; *or (b)* interest of 13.5% (thirteen comma five percent) a year, of which 7.5% (seven comma five percent) will be paid quarterly, in cash, starting on the last day of the third month after the Issue Date foreseen in **item (a)** above and 6.0% (six percent) will be capitalized quarterly to the principal amount and paid on the New Financing Due Date. In the event that the New Financing is granted in Reais, Recuperandas may choose *between (a)* interest of 15.99% (fifteen comma ninety-nine percent) a year, to be paid quarterly starting on the last day of the third month after the date of issue foreseen in **item (a)** above, since the first and second interest payments will be capitalized to the principal value and the other payments will be made in cash; *or (b)* interest of 20.06% (twenty comma zero six percent) a year, of which 13.04% (thirteen comma zero four percent) will be paid quarterly, in cash, starting on the last day of the third month after the Issuing Date foreseen in **item (a)** above and 7.02% (seven comma zero two percent) will be capitalized quarterly to the value of the principal and paid on the Due Date New Financing.

(d)    Guarantees: The New Financing will be guaranteed by the assets listed in **Annex 4.2.2.2.1 (f)(I)** , *pro*rata , subject to the terms and conditions laid down

In the New Financing Guarantee Instruments listed in **Annex 4.2.2.2.1(f)(ii),** which are in negotiation and will be finalized in good faith between Oi and creditors Restructuring Option I, Third Parties New Financing and Debt creditors Top Without *Guarantee Reinstated* – Option I, and approved by Deliberation of Creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee – Option I, respectively, as well as the *waterfall* and other terms provided for in the Agreement between Creditors *( Intercreditor* Agreement *)*, substantially in the form of **Annex 4.2.2.2.1(f) (iii)**, observed in any case the impossibility of annulment or declaration of ineffectiveness of such guarantees in the form of Article 66 of the LRF.

(e)    Release of Guarantees : In the event of disposal of the assets listed in **Annex 4.2.2.2.1 (f) (I)** , the Onerations provided for in **item (d)** above must be released on the Sale Closing Date, so that the respective operations can be carried out and completed, provided that *(i.a)* on the same Closing Date Sale, the payment of the price of the respective asset is fully made in a linked bank account (escrow account) owned by Oi that must be fiducially disposed to the benefit of creditors Restructuring Option I, third parties New financing and creditors of the Top Debt without *Reinstated* Guarantee – Option I, *and (i.b)* the *escrow* account contract shall establish the obligation to perform the distribution of the Cash Sweep in accordance **with clause 5.3**, on the working day following the Closing Date the sale of the said asset; *or (ii)* if the payment of the purchase price of the asset in the context of the respective competitive procedure involves the payment of assets, such assets, unless otherwise approved by Deliberation of Creditors Restructuring Option I, Third Party Deliberation New Financing and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee – Option I, shall be encumbered, by means of a guarantee constituted and perfected prior to the Closing Date of Sale, under suspensive condition, becoming effective concomitantly with the release of the warranty, observed in this case the terms and conditions provided for in **item (d)** above.

(f)    Priority of the New Financing. The amounts disbursed under the New Financing – creditors Restructuring Option I are classified as Extraconcursal Credits, *pari passu with* the New Financing – Third Parties, and with  priority  over  the other Concursal and   Extraconcursal  Credits

Reuperandas, pursuant to Art. 67, 69, 69-A and following, and 84, I-B, from LRF, provided that the updated original Dip Emergency and the Bridge Loan have been previously and fully discharged.

(g)  <u>Interpretation Rules</u>: In the event that there is a conflict of interpretation between the provisions of the Plan and the obligations provided for in the respective instruments of the New Financing, the said instrument shall prevail, being certain that the instruments of the New Financing should reflect, at least, the terms and conditions provided for in **this clause 5.5.1** and **Annex 5.5.1**.

**5.5.1.5.1.** The New Financing – Creditors Restructuring Option I may be granted to Recuperandas by the creditors Restructuring Option I or *(i)* any funds or entities managed or managed by the said Credor Restructuring Option I or that is advised or managed by the same advisor or manager of the said Credor restructuring Option I; *or (ii)* any Affiliate of said Credor Restructuring Option I or the parties described in **item (i**) . The Credor Restructuring Option I shall be considered, for all purposes, as having validly elected and participated in the Restructuring Option I if any of the parties mentioned in **items (i) and (ii)** of **this clause 5.5.1.5.1** have in a timely manner submitted the commitment to join the New Financing – Credentials Restructuring Option I, pursuant to **clause 5.5.1.3** above.

**5.5.2.**    Bridge **loan** . The Recuperandas shall *collect (i)* after the Plan Approval Date; *or (ii)* if accepted by the Bridge Loan creditors, after the Plan's approval, provided that previously approved by the Court of Judicial Recovery, new remedies, in the total amount in reais equivalent to USD 135,796,059.00 (one hundred thirty-five million, seven hundred and ninety-six thousand and fifty-nine dollars) ("<u>Bridge Loan </u>Limit<u>")</u>, by means of a bridge loan to be hired in the form of the <u></u>instrument in **Annex 5.5.2 (i**) , secured in the form of the instruments listed in **Annex 5.5.2 (ii**) ("Bridge Loan"), the obligations assumed in the context of the updated original Emergency DIP.

**5.5.2.1.**    The Bridge Loan will preferably be granted by the creditors of the updated original DIP financing, who will be expected to confirm their financing commitment by April 19 , 2024. Case by April 19 , 2024, the creditors of the    updated  original DIP financing  do  not  confirm their  commitment to

financing or remain silent, the Recuperandas will be automatically authorized by the Concursal Creditors who are creditors of the updated original DIP financing to seek market financing alternatives to raise the amount equivalent to the Bridge Loan with anyone and will have *a* waiver of such creditors of the updated original DIP financing and the other creditors of the original DIP financing updated in the respective instruments for such contracting.

**5.5.3.    Additional Indebtedness** Allowed . If (i) the withholding value approved by the Restructuring Option I creditors, the Third Parties New Financing and the creditors of the Top Debt without *Reinstated* Guarantee – Option I, pursuant to **clause 5.2.2.1.6**, is less than$ R 1,500,000,000.00 (one billion and five hundred million reais), or (ii) no withholding value is approved, Oi will be authorized to raise financial resources with third parties in an amount corresponding to the difference between$ R 1,500,000,000.00 (one billion and five hundred million reais) and the actual retention value approved, if any ("Additional Indebtedness Allowed"). In this case, Oi may offer in guarantee of the Additional Indebtedness Allowed the assets listed in **Annex 5.5.3**, which will observe the order of priority ( waterfall ) also described in **Annex 5.5.3** and the rules established in the *Intercreditor* Agreement .

**5.6.    Additional Capital Increases .** Except as permitted under the Plan, the Company may perform, at any time after the implementation of the New Governance, without the need for prior authorization of the Concursal Creditors at the General Meeting of Creditors, and observed and/or obtained any necessary regulatory requirements, authorizations or limitations, notably with regard to ANATEL and CADE, new capital increases through public or private subscription, as well as authorized capital increases, it is true that the resources raised by the Recuperandas through these capital increases will not have an extra-concursal nature for the purposes of the provisions of the LRF, since they do not represent payment obligations.

**5.6.1.    Capital increases in Recuperandas .** After the implementation of the New Governance, Oi may also, if necessary and without the need for prior authorization of the Concursal Creditors at the General Meeting of Creditors, *(i)* approve, subscribe and integrate capital increases in other Recuperandas; and/*or (ii)* make a loan via *intercompany* for the transfer of resources to other Recuperandas.

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1970E87E2A76

**6.    CORPORATE REORGANIZATION**

**6.1.**   The Recuperandas may carry out *(a)* at any time, including before the implementation of the New Governance, the corporate reorganization operations described in **Annex 6.1 (a),** as well as operations foreseen in the Plan or that enable the implementation of the Plan; *and (b)* after the implementation of the New Governance, the corporate reorganization operations described in **Annex 6.1 (B)** and other corporate reorganization operations which may be appropriately defined by Recuperandas pursuant to Article 50 of LRF, such as division, merger, incorporation or incorporation of shares of one or more companies, processing, dissolution or liquidation between Recuperandas themselves and/or any of their affiliates, always with the aim of optimizing their operations and obtaining a more efficient structure, maintaining their activities, increasing their results and implementing their strategic plan, thus contributing to the fulfillment of the obligations contained in the Plan, in any case, provided that they are approved by the applicable corporate bodies of the respective Recuperandas, obtain the governmental authorizations, if applicable and necessary, and comply with the obligations of the Recuperandas assumed before Extraconcursal creditors.

**7.    CORPORATE GOVERNANCE**

**7.1.**   <u>**Regular**</u> Business <u>**Driving**</u>. From the approval of the Plan and until the implementation of the New Governance, the Recuperandas are obliged to conduct their operations and activities (and the operations and activities of their affiliates) with zeal and diligence, in compliance with the Law, note that Recuperandas do not commit or do any of the acts listed in **Annex 7.1** ("<u>Restricted Materials"),</u> except *if (i)* are expressly provided for in the Plan*; (ii)* are carried out to enable the implementation of the Plan or in accordance with the Plan; *or (iii)* otherwise have been previously authorized in writing by the Extraordinary Deliberation of Credentials Restructuring Option I.

**7.2.**   <u>**Judicial supervisor (*Watchdog*)**</u>. For the purpose of observing the activities of the Recuperandas and supervision of the sale of Real Estate, pursuant to **clause 7.2.5**, the appointment of one of the companies indicated by Quirograffian creditors listed in **Annex 7.2** as Judicial Supervisor *( Watchdog )* will be defined by Deliberation of Creditors Restructuring Option I and Deliberation of the creditors of the Top Debt without *Reinstated* Guarantee – Option I, within five (5) business days counted from the Plan's Homologation Date, which will remain in its position until the implementation of the New Governance; it is true that the failure of the Judicial Supervisor (*Watchdog* ) under the terms set forth herein and possible consequences of the

Lack of appointment will not be considered non-compliance by the Recuperandas of the Plan.

**7.2.1.**    The Judicial Supervisor (*Watchdog* )shall be independent, without any link of any nature, present or past, with the creditors of the New Financing or with the Recuperandas.

**7.2.2.**    The Recuperandas will allow the Judicial Supervisor (*Watchdog* ) *(i)* to have access to all documents and financial, economic and operational information of Oi and its affiliates, including balance sheets, revenues, cash flow, bank account statements, including information on the Real Estate (" Company Information"); *(II)* participate, without the right to vote or manifestation, as a mere listener, of any and all general meetings, board meetings or meetings of any statutory committees or not or directors of the Recuperandas; *and (iii)* have access to any and all documents and information relating to the implementation of the Plan, including access to all and each of the documents and meetings related to mergers and acquisitions and asset sales processes, including Real Estate Information.

**7.2.3.**    While appointed, it will also be up to the Judicial Supervisor*( Watchdog )*to monitor compliance with the Sales Plan under **clause 3.1.2.4.1 and sub-**clauses . In this sense, the Judicial Supervisor (*Watchdog* )shall have the following duties:*(*I ) update, monthly or whenever reasonably requested by the creditors Restructuring Option I and the creditors *Take or Pay* Without Guarantee – Option I on the process of disposal of the Real Estate; *(*II ) Follow the receipt of proposals and negotiations by Recuperandas and/or by the realtor eventually chosen to make the sale of the Real Estate; *(iii* ) track the transactions of the Escrow Real Estate account and monitor the funds deposited in the Escrow Real Estate account;*(iv* ) update, every six months or whenever reasonably requested by creditors Restructuring Option I and *Take or Pay* creditors without Warranty – Option I, the value of the Real Estate and provide written report to creditors Restructuring Option I and to *Take or Pay* creditors without Guarantee – Option I regarding the assessments; e*(*V ) submit reports quarterly or less regularly, if requested by creditors Restructuring Option I and the creditors *Take or* Pay in Guarantee – Option I in compliance with the provisions of the Plan, regarding the evaluation, process of disposal of the Real Estate and transactions of the Escrow Real Estate account; and*(vi* ) follow the Sales Plan.

**7.2.3.1.** The Recuperandas shall provide the Judicial Supervisor (*Watchdog* ) with access to all the information and documents deemed necessary by the respective Judicial Supervisor*( Watchdog* ) for the proper performance of their duties, provided that the confidentiality obligations assumed by the Judicial Supervisor*( Watchdog* ) are met. pursuant to **clause 7.2.4** below.

**7.2.4.** The Judicial Supervisor (*Watchdog* )shall enter into a confidentiality agreement with Recuperandas, substantially in accordance with **Annex 7.2.4,** for the purposes of accessing information of the Company and its affiliates that are confidential**.**

**7.2.4.1.** The Judicial Supervisor (*Watchdog* ) will not be able to pass on any information from the Company and its affiliates that is confidential without first performing proper treatment of the information received.

**7.2.4.1.1.** To give due treatment to the information, the Judicial Supervisor*( Watchdog* ) must aggregate, anonymise and/or modify the format of the information, as well as adopt any other measure that, in his/her opinion, is necessary to ensure the confidentiality of the Company's sensitive information, even with respect to the recipients themselves of the information provided. If it deems necessary, the Judicial Supervisor (*Watchdog* ) may also request that the shared information be restricted to the external advisors of the recipients, who must enter into a confidentiality agreement with the Recuperandas.

**7.2.4.1.2.** To the extent that the Company's information is not confidential, Novo Funding creditors may request direct access to it from the Judicial Supervisor*( Watchdog*). If any of the creditors of the Novo Financiamento wish to have access to Company information that is confidential, they shall request the Judicial Supervisor*( Watchdog* )*, who shall be responsible for giving due treatment to the information to be provided, pursuant to **clause 7.2.4.1.1.**

**7.2.5.** **Sale of Real**Estate . The Judicial Supervisor (*Watchdog* )shall have the following duties in relation to the disposal of the Real Estate:*(*I ) update the creditors Restructuring Option I and the *creditors Take or Pay* without Guarantee - Option I, monthly or whenever reasonably requested by the creditors Restructuring Option I and the creditors *Take or Pay* Without Guarantee - Option I, on the process of alienation of the Real Estate; *(*II ) Follow up on receipt of proposals and negotiations by the Recuperandas and/or by

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

Real estate broker eventually chosen to perform the sale of the Real Estate; *(iii* ) track the movements of the Escrow Real Estate account and monitor the resources deposited in the Escrow Real Estate account; *(iv* ) update, monthly or whenever reasonably requested by the creditors Restructuring Option I and the creditors *Take or Pay* Without Guarantee - Option I, the value of the Real Estate and provide written report to creditors Restructuring Option I and to *Take or Pay* creditors without Guarantee - Option I regarding the evaluations; e *(V* ) submit reports, if requested by the creditors Restructuring Option I and the creditors *Take or Pay* without Guarantee - Option I in compliance with the provisions of the Plan, regarding the evaluation, process of alienation of the Real Estate and transactions of the Escrow Real Estate account; and *(vi* ) follow the Sales Plan.

 **7.2.5.1.** The charge conferred on the Judicial Supervisor (*Watchdog* ) with respect to the Real Estate will end when the payment of the Top Debt without *Reinstated* Guarantee – Option I.

 **7.2.6.** In no event shall the Judicial Supervisor (*Watchdog* ) adopt measures that mean the exercise of control at Oi or its affiliates until the necessary regulatory approvals are obtained.

**7.3.** **Board of Directors.** Within ten (10) days of the Plan's Approval Date, Recuperandas shall take the necessary measures to ensure that the 3 (three) new members identified in **Annex 7.3** are appointed in place of three (3) members of Oi's current Board of Directors under the applicable Law, the effectiveness of the possession of such 3 (three) new members to the applicable regulatory approvals.

 **7.3.1.** The 3 (three) new members of the Board of Directors listed in **Annex 7.3** shall remain in their positions on the Board of Directors until the election of new members of the Board of Directors at Oi's extraordinary general meeting to be held after the completion of the Capital Increase – Capitalization of Credits (" New Governance"), except in the cases of resignation, overvenient impediment or vacancy provided for in Law.

 **7.3.2.** Oi will do its best to obtain the regulatory approvals necessary for the effective possession of the 3 (three) new members of the Board of Directors.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

8.    ADDITIONAL COMMITMENTS

8.1.    **Dividend** payments . The Recuperandas will be authorized, after full discharge of the obligations relating to the updated original Emergency Dip, the New Financing, the Bridge Loan, the Top Debt without *Reinstated* Guarantee – Option I, the Top Debt with Guarantee 2024/January 2025 *Reinstated* and the *Roll*-Up debt, to declare or make payment of any dividend, return of capital or make any other payment or distribution on (or related) shares of its emissions (including any payment in connection with any merger or consolidation involving the Recuperandas), provided that the obligations of the Recuperandas assumed before Extraconcursal creditors have been observed. Except for the restriction provided for in **this clause 8.1** the declaration or payment of *(a)* dividends, return of capital or make any other payment or distribution exclusively from one Recuperanda to another Recuperanda and, in this case, any restrictions may only be imposed after the Capital Increase – Capitalization of Credits; *or (b)* Payments by any Recuperanda to dissident shareholders in accordance with applicable law.

8.2.    **Obligations to do.** Through the Plan, Recuperandas undertake to, during the course of judicial recovery and until the full fulfillment of the obligations assumed in the Plan, *(a)* conduct business under **clause 7.1** *; (b)* observe all the terms, conditions and limitations set forth in the Plan; *and (c)* comply with all obligations assumed in the Plan.

9.    EFFECTS OF THE PLAN

9.1.    **Linking the Plan.** From the judicial approval of the Plan, the provisions of the Plan bind the Recuperandas, their shareholders and partners, the Concursal Creditors, the Acceding Extraconcursal Creditors and their assignees and successors, pursuant to Article 59 of the LRF.

9.1.1.    The approval of the Plan (subject to judicial approval of the Plan) constitutes authorization and binding consent of the Concursal Creditors so that the Recuperandas can, within the limits of the Law and the terms of the Plan and its Annexes, adopt any and all measures that are appropriate and necessary for the implementation of the measures provided for in the Plan and its Annexes, *including (i)* obtaining judicial, extrajudicial or administrative measures (whether in accordance with any insolvency law or in the framework of any proceeding of a principal or incidental nature)

Pending or to be initiated by the Recuperandas, any of the representatives of the Recuperandas or any representative of the judicial recovery in any jurisdiction other than Brazil for the purpose of conferring force, validity and effect on the judicial recovery, the Plan and its implementation; *and (ii)* the establishment of procedures for

*(A)* Concursal creditors not resident in Brazil express their choice as to the option to pay their respective Concursal Credits, without prejudice to the provisions of **clauses 4.4 , 4.4.3 and 4.4.8**; *(B)* Payment of Concursal Credits held by such Concursal Creditors not resident in Brazil in the applicable form, as provided for in the Plan; and *(c )* To ensure the equitable treatment of Concursal creditors, deduct from the amounts of Credits to be paid by Recuperandas, under the Plan, to Concursal creditors, resident or not in Brazil, indicated in the relationship of creditors of the Judicial Administrator, any and all amounts received by such creditors of the Recuperandas and/or arising from the eventual disposal, liquidation or excution of their assets in other jurisdictions, as applicable.

**9.2.    Novation.** With the judicial approval of the Plan, the Plan will involve the novation of Concursal Credits, as provided for in article 59 of the LRF, which will be paid under the Plan. By virtue of the novation arising from the judicial approval of the Plan, all terms, conditions, *covenants*, financial indices, assumptions of early maturity, restrictions, among others, and all obligations and guarantees of any nature relating to Concursal Credits contracted or provided by Recuperandas will be extinguished and will no longer apply to Recuperandas (and any co-obligation, guarantors, affiliates, successors, assigns, etc. administrators, ex-successor administrators or assignees), being replaced, in all its terms (except if and when otherwise provided in the Plan), by the Plan's predictions or its Annexes. The novation resulting from the judicial approval of the Plan will imply the termination and respective cancellation, release or termination, as the case may be, of any and all financial obligations and guarantees provided by Recuperandas, subject to judicial recovery, arising from securities and securities, financial contracts, as well as any other financial instrument paid under the Plan, and in the event that the Plan foresees the issuance of a new instrument of debt, the extinction and respective cancellation, release or termination will only occur after the issuance of said new instrument of debt.

9.2.1.    For the purposes of clarification, the new action referred to in the case of judicial approval of the Plan does not extend to bank guarantees and insurance guarantee or any other form of guarantee provided by third parties in favor of the Recuperandas to assure them

Judgments in the proceedings of lawsuits that have as object concursal credits, regardless of the novation or extinction of the obligations of these in favor of the Recuperandas.

**9.3.    Commitment not to litigate, discharge and** waiver . The non-disputing creditors, who approved the Plan without exception, are obliged, by operation and force of the Plan, individually and non-solidary, irrevocable and irretrievable, observing the exclusions of the commitment not to litigate, discharge and waiver, to *(i)* suspend or cause it to be suspended ( although the suspension causes extinction without judgment of merit) any and all ongoing demand against the Recuperandas, in Brazil or abroad (and any co-obligation, guarantors, affiliates, successors, assigns, etc. administrators, former administrators) from the judicial approval of the Plan and until the occurrence of each discharge event applicable to each Non-disputing Credor ("Period of Demands"); *and (ii)* refrain from taking any action to enforce or adjudicate any claim (including incidents to disregard legal personality) against Recuperandas, in Brazil or abroad (and any co-obligation, guarantor, affiliates, successors, assigns, administrators, ex- administrators); or *(iii)* grant discharge and waiver of claims as provided for in **clause 9.3.4**, directly, immediately and automatically, from the occurrence of each discharge event, *ipso*facto , without the need for any additional act ("Commitment not to litigate, discharge and waiver").

**9.3.1.**    The obligations provided for in **clause 9.3 and following** shall be deemed to be assumed, irrevocably and irretrievable, by non-litigant creditors and at the time of choice for any of the options referred to in **clause 4.2.2** (Restructuring Option I )**, clause 4.2.3**(Restructuring Option II)**, clause 4.2.6** (Credits from Partner Suppliers)**, clause 4.2.7** ( *Take or Pay* Credits with Warranty)**, clause**
**4.2.8** (*Take or Pay* Credits without Warranty – Option I) and **Clause 4.2.9** (*Take or Pay* Credits without Warranty – Option II).

**9.3.2.**    The Recuperandas and non-disputing creditors agree and establish, on the basis of the provisions of Article 6, I of the LRF, that during the period of suspension of the demands there will be the suspension of the prescribed period of the respective rights of the non-disputing creditors.

**9.3.3.    Exclusions from the commitment not to litigate, discharge and** waiver . The following are excluded and are not covered by the commitment not to litigate, discharge and renunciation ("Exclusions of the commitment not to litigate, discharge and renunciation"):*(A* ) demands

Promoted by non-litigant creditors against the Recuperandas in connection with acts, facts, relations and legal business that occurred or concluded after April 20, 2024, including, but not limited to, the New Financing and, if carried out, the Bridge Loan; *(*B) claims related to the inclusion of the respective Credits in the relationship of creditors or the amount of such Credits provided for in the relationship of creditors, provided that the creditors involved in such claims have expressly chosen one of the payment options provided for in the Plan or acceded to this Plan pursuant to **clause 4.10** to receive the full of their respective Credits held against the Recuperandas, regardless of any decision favorable to the respective creditors; *(*c) any demand promoted by any non-litigant creditor for the fulfillment of obligations under the Plan, its Annexes and other instruments related to the Plan, including, but not limited to, any agreements supporting the Plan, debt instruments and guarantees granted, observing the terms of the respective instruments*; (d)* demands promoted by creditors in relation to the updated Emergency Dip and its guarantees, in accordance with the respective instruments; e *(*e ) Demands in the exercise of the right of defense by any creditor against demands promoted by any Recuperanda, including but not limited to, any demands arising from agreements to support the Plan, instruments of debt and guarantee granted, subject to the terms of the respective instruments.

**9.3.4.** <u>**Quitations and Renunciations of Demands.**</u> Subject to the hypothesis of **clause 10.2** and in compliance with the exclusions of the commitment not to litigate, discharge and waiver, the occurrence of the discharge event(s) specified below shall directly, immediately and automatically, *ipso facto* without the need for any additional act, the waiver of the right to file new demands and the granting by all non-litigant creditors (on their own behalf and their affiliates, their successors, assigns, agents, preposits, consultants, advisors and representatives, in any way) involved in each discharge event, full , full, absolute discharge, unconditional, irrevocable and irretrievable, in favor of Recuperandas (and any co-obligation, guarantors, affiliates, successors, assigns, administrators, ex-administrators), exclusively with respect to the demands and their respective Concursal Credits or Acceding Extraconcursal Credits, as applicable, restructured through the Plan ("Withdrawals and Demands").

   (i)   <u>Discharge event I - Restructuring option I: Automatically after the cumulative verification</u> *(*i ) of the issuance of *Roll*-Up debts under **the clause**

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

**4.2.2.1**, as applicable; and (ii ) of the conclusion of the Capital Increase - Capitalization of Credits With the receipt of the new Shares Capitalization of Credits by the creditors Restructuring Option I, as applicable, the creditors Restructuring Option I will have to grant, voluntarily, the amounts and renunciations of demands provided for in **clause 9.3.4** (" Discharge Event I");

(ii)    Discharge event II - Restructuring option II: Automatically after the cumulative verification (i ) of the issuance of the *A&E* debt *reinstated* under **clause 4.2.3.1**; and (II ) of the issuance of Participatory Debt pursuant to **clause 4.2.3.2**, creditors option restructuring II shall voluntarily grant the amounts and renunciations of demands provided for in **clause 9.3.4** ("Discharge Event II");

(iii)    Discharge Event III – Vendor Creditors Partners: Automatically after receipt of payment of the amount equivalent to 10% (ten percent) of the amount of their respective Credits under **clause 4.2.6**, creditors who choose to have their respective Chiropractic Credits restructured under the terms of the option for Provider Creditors Partners shall voluntarily grant the amounts and renunciations of demands provided for in **clause 9.3.4** ("Discharge Event III");

(iv)    Discharge Event IV – *Take or* Pay Creditors with Guarantee: Automatically upon receipt of payment of the amount equivalent to 10% (ten percent) of the amount of their respective Credits under **Clause 4.2.7** , *take or* Pay with Guarantee Provider Creditors who choose to have their respective Credits restructured under **clause 4.2.7** shall voluntarily  the amounts and renunciations of demands provided for in **clause 9.3.4**  ("Discharge Event IV") ("Discharge Event IV"); and

(v)    Discharge Event V – *Take or Pay* creditors without Warranty – Option II: Automatically after receipt of payment of the amount equivalent to 10% (ten percent) of the amount of their respective Credits under **Clause 4.2.9.1** , creditors who choose to have their respective *Take or Pay* No Guarantee Credits restructured under **clause 4.2.9** shall voluntarily grant the amounts and waivers of demands provided for in **clause 9.3.4** above ("Discharge Event VI").

**9.3.5.** __Extinction of__ demands . Subject to the extent provided for **in clause 9.3.3**, creditors who choose to have their respective Class III Credits restructured in accordance with **clause 4.2.2** (Restructuring Option I), **clause 4.2.3** (Restructuring Option II)**, clause 4.2.6** (Credits from Partner Suppliers Creditors)**, clause 4.2.7** ( *take or Pay* Credits with Warranty)**, clause 4.2.8** ( *Take or Pay* Credits without Warranty – Option I) and **clause 4.2.9** (*Take or Pay* Credits without Warranty – Option II), as applicable, are irrevocably and irretrievable to request (or make it required), within five (5) days of the respective discharge event pursuant to **clause 9.3.4**, the termination, with resolution of the merits, of the existing claims against the Recuperandas (and any co-obligation, guarantors, affiliates, successors, assigns, administrators, former administrators), without charge to any party and with irrevocable waiver of the term of appeal, pursuant to article 487, III, "b" of the Brazilian Civil Procedure Code.

**9.3.6.** Except as otherwise provided in the respective transaction, each of the non-litigant creditors and the Recuperandas agree, establish and enforce, irrevocably and irretrievably , if applicable, *(I)* pay the respective pending judicial or administrative costs of payment arising out of or possibly necessary for the suspension or termination of claims pursuant to **this clause 9.3**, as applicable, including credit entitlements and claims, if determined by the competent court; *and (ii)* bear full and solely with the payment of contractual fees and/or sucumbency due or fixed in favor of its respective lawyer(s) constituted for the sponsorship of the demand, in cases of extinction of the demands, in any way, whether due to requests for suspension or requests for termination, including in relation to qualifications and credit challenges, each party must make the best efforts to obtain from its respective lawyers the waiver of the right to fees of sucumbency; in any case, it is mandatory to do the best to obtain from its respective lawyers the waiver of the right to sucumbency fees; to remain mutually unaffected and to reimburse the other Party, as applicable, for the amounts eventually collected and effectively disbursed by the respective Party in respect of the above "(i)" and "(ii)" items which were not their responsibility under this clause, within five (5) days of receipt of the notification forwarded to the respective party responsible for such amounts, informing about the collection and disbursement or on the date on which the collection becomes due, whichever occurs first, plus the legal charges. For clarity*, (a)* any court or administrative costs and expenses already incurred by either party shall be your responsibility and shall not be reimbursed by the other party, regardless of what

Determine the competent court; *and (b)* the values related to the expert fees shall always be the responsibility of the applicant for the expertise or the rateadas if it has been determined by the competent court or requested by both parties, pursuant to article 95 of the Brazilian Civil Procedure Code. This clause does not apply to the obligations of payment of costs and expenses incurred by the Recuperandas, in accordance with the instruments provided for in the Plan or in its Annexes.

**9.3.7.**    In accordance with the provisions of **clause 9.3.3** and with the exception of the hypothesis provided for in **clause 10.2**, with the judicial approval of the Plan, Concursal creditors, except Labor creditors, will no longer be able to *(I)* to judge or pursue any and all claims of any nature against the Recuperandas related to any Concursal Credit, except for the provisions of Article 6, §1, of LRF in respect of proceedings in which illiquid Credits are being discussed; *(II)* to enforce any award, court decision or arbitral award against the Recuperandas relating to any Concursal Credit;

*(III)* to penalize or encumber any assets of Recuperandas to satisfy their respective Concursal Credits*; (iv)* to create, improve, exploit or execute any real guarantee on the assets and rights of Recuperandas to ensure the payment of Concursal Credit; *(V)* claim any right of compensation of your respective Concursal Credit against any credit due to Recuperandas; *and (vi)* seek the satisfaction of your Concursal Credit by any means other than that provided for in the Plan, including by the settlement of bank bail letters, guarantee insurance or any other form of guarantee presented by Recuperandas.

**9.3.7.1.**    For the purposes of **clause 9.3.7**, item (vi) above and by virtue of the judicial approval of the Plan, Recuperandas may request the exemption and return to the issuing institutions of any guarantees, such as letters of bank bail and insurance guarantee, presented by Oi Group with the objective of ensuring the judgments in the proceedings of lawsuits that have as object concursal credits, observing the obligations assumed by the Recuperandas before the public authorities in the scope of agreements and transactions carried out in the form of the Law.

**9.4.**    __Cancellation of__protests . The judicial approval of the Plan will result in the cancellation of any and all protest with the notary offices of securities and documents that originate in Concursal Credit, as well as in the definitive deletion of the name of the Recuperandas in the records of any credit protection agencies when the referral originates from Concursal Credit.

**9.5.** **Formalization of documents and other arrangements.** Except with respect to Restructuring creditors I and third parties New Financing, Oi Group, the acquirers of any assets owned by any of the Recuperandas and the creditors and their representatives and lawyers shall perform all acts and enter into all contracts and other documents that, in form and substance, they are necessary or appropriate for the fulfillment and implementation of the provisions of the Plan and any agreements to support the Plan.

**9.6.** **Modification of the** Plan . Oi Group may submit additions, changes or modifications to the Plan at any time after the Plan Approval Date, provided that such additions, changes or modifications are accepted and approved by the Concursal Creditors, under the terms of LRF.

**9.6.1.** **Binding effect of** Plan **modifications**. Amendments, amendments or modifications to the Plan shall bind Oi Group, its Concursal Creditors and their respective assigns and successors, upon their approval by Concursal Creditors in the form of Art. 45, 45-A or 58, *caput* or §1st of LRF.

**9.7.** **Economic equivalence in the fulfillment of the** Plan . In the event that any of the operations and conditions provided for in this Plan, which does not involve cash payment to the Concursal creditors, it is not possible to be implemented by the Recuperandas, either by the course of the deadlines foreseen for the implementation of such operations, for regulatory reasons or for any other reason not attributable to Recuperandas, Recuperandas shall take the necessary measures to ensure an equivalent economic result for Concursal creditors or as agreed in the respective Purchase and Sale Agreements of Upis Torres and Selected Properties, observed, in any scenario, the hypotheses provided for in the Plan that require the approval of creditors Restructuring Option I (according to Deliberation of Creditors Restructuring Option I), of the third parties New Financing (according to Third Party Deliberation New Financing) and/or creditors of the Top Debt without *Reinstated Guarantee* – Option I (according to Deliberation of Top Debt Creditors without *Reinstated* Guarantee – Option I).

**9.8.** **Ratification of Acts.** The approval of the Plan (subject to judicial approval of the Plan) will imply the approval and ratification of all regular management acts practiced by the Recuperandas to implement its restructuring, in particular those adopted in the course of judicial recovery, including, but not limited to the acts necessary for restructuring in the form proposed in the Plan, to the celebration of the updated original Dip Emergency, as well as

Docusign Envelope ID: 6BB449FE-257F-4205-ACD9-1070E87E2A76

All other acts and actions necessary for the full implementation and consummation of the Plan and the Judicial Recovery, which are expressly authorized, validated and ratified for all purposes of law, including and especially articles 66, 74 and 131 of the LRF.

### 9.9. Disclaimer and Disclaimer.

#### 9.9.1. Exemption from Liability and Waiver of the Indemnified Parties. As a result of the judicial approval of the Plan, the creditors expressly release the Parties exempted from all liability for the regular acts of management practiced before or after the Date of the Request until the date of the Plan's approval, pursuant to **clause 7.1**, even with regard to the restructuring provided for in the Plan, granting the Free Parties ample, shallow, general, irrevocable and irretrievable discharge of all property, criminal and moral rights and claims arising from such acts in any way. Any irregular acts of management are not covered by this clause.

## 10. GENERAL PROVISIONS

### 10.1. Suspensive conditions. The effectiveness of the Plan is conditional on *the (i)* approval of the Plan; *and (ii)* judicial approval of the Plan.

### 10.2. Resolution condition . Without prejudice to the suspensive conditions set forth in **clause 10.1**, the Plan's resolution conditions are *(a)* the Company's failure to receive the full and full *amount (a.1)* of the New Financing until July 15, 2024, except where any extension is negotiated by common agreement between Oi and the creditors of the New Financing and the third parties New Financing, in the form of **clause 5.5.1.5 (a**); *and (a.2)* of the Bridge Loan, within eight (8) working days from the date of dispatch of *the request notice* provided for in the Bridge Loan Debt Instruments*; (b)* failure to verify the previous conditions of effectiveness, unless otherwise waived, under the consensual settlement procedure; *(C)* the resolution of the term of self-composition concluded under the consensual solution procedure*; (*d) the conclusion of a self-composition term in the framework of the consensual solution procedure in terms materially inconsistent with the main conditions set out in **Annex 3.2**; *and (e)* the failure to complete the UPI ClientCo competitive disposal procedure until the Closing Date Second Round UPI ClientCo sale (including if extended pursuant to **clause 5.2.2.1.5 (IV**) ) ("Resolving Conditions of the Plan"). Once any remedial condition of the Plan has been verified , the Plan and its stipulations will be automatically resolved, with the consequent maintenance and/or reconstitution of the rights and guarantees of creditors under the conditions originally

Contracted, as if the Plan had not been approved, except in the case of any fines or penalties provided for under the Plan for non-compliance with obligations assumed by creditors during the term of the Plan, which may be charged by Recuperandas under the terms provided for in the Plan.

**10.2.1.** In the event of the implementation of any of the resolution conditions, the Recuperandas administrations are already authorized, under the approval of the Plan, to take all necessary measures to convene a new General Meeting of creditors, in order to decide on the approval of an alternative judicial recovery plan or a modification to the Plan, in the best interest of the Recuperandas, pursuant to the provisions of article 35, I, "a", of the LRF.

**10.3.** **Obligations to do and not do.** Through the Plan, the Recuperandas undertake to, during the course of judicial recovery and until the full discharge of the obligations provided for in the Plan, *(a)* conduct the activities and operations of the Oi Group in accordance with the regular acts of management, subject to the restricted matters provided for in **Annex 7.1**; *(b)* comply with all the terms, conditions and limitations set forth in the Plan; *and (c)* comply with all obligations assumed in the Plan.

**10.3.1.** Without prejudice to the provisions of **clause 10.3** above, the Recuperandas undertake to take the measures that are within their reach and are necessary for this Plan to be recognized as effective, enforceable and binding in applicable foreign jurisdictions, to the extent that such recognition is necessary for the implementation of the measures provided for in the Plan in relation to the respective creditors.

**10.4.** **Credits in Foreign** Currency . For payment purposes, except for the express agreement of the creditor in favor of the conversion of his respective foreign currency credit to the national currency or as otherwise provided for in the Plan, credits originally registered in foreign currency will be kept in the respective original currency for all purposes of law and will be paid as provided in the Plan. The Quirograffarian Creditors with Credits registered in foreign currency may, at their sole discretion, choose to convert their credit to national currency, and for this purpose, expressly inform this option at the time and jointly to the sending of the respective term of accession indicating the option of payment, hypothesis in which the respective Class III credit will be converted by the conversion exchange rate.

**10.4.1.** Without prejudice to the provisions above and provided that it does not affect the rights of others

Concursal creditors, the Recuperandas may extend the deadlines provided for in the Plan that are applicable to the Quirograffarian creditors holders of Credits registered in foreign currency exclusively for compliance with rules or procedures provided for in foreign legislation, if necessary.

**10.5.    Means of payment.** Except as otherwise provided in the Plan, the amounts owed to creditors under the Plan will be paid by direct transfer of funds, by means of available electronic transfer (TED), or by Brazilian instant payment (PIX) or, in the case of creditors holding Class III Credits in dollar, upon remittance of amounts to the account of the respective foreign creditor, to be informed individually by the creditor when making the choice of payment in the form of **clause 4.4**. In the case of Financial Credits, payment will be made directly in the applicable systems of settlement and custody, before *the trustee or* the agents.

10.5.1.   The payments provided for in the Plan will be made only after the availability and sending by the Concursal Creditors of their updated registration data and bank account information on the electronic platform provided by Oi in the electronic address to be disclosed in due time by Recuperandas. If the Concursal Creditor does not make available and send the said information in a timely manner, or is prevented for legal or regulatory reasons, so that the Recuperandas can make the respective payment, on the dates and deadlines provided for in the Plan, it will not be considered non-compliance with the Plan. There will be no incidence of fines, monetary update or moral charges in relation to payments that have not been made on the dates and deadlines provided for in the Plan because the Concursal creditors have not made such information available and sent in due time.

10.5.2.   The documents of the effective transfer of resources will serve as proof of discharge of the respective amounts actually paid by the Recuperandas.

**10.6.    Payment dates.** In the event that any payment or obligation provided for in the Plan is expected to be made or satisfied on a day other than a working day, such payment or obligation may be made or satisfied, as the case may be, on the immediately following business day, without this characteristic of unpunctuality of the Recuperandas or implies the incidence of financial burdens. Likewise, in view of any payment obligations dependent on acts not yet performed, the Recuperandas will make every effort to make payments as soon as possible, according to the agreement

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

With the Plan Systematics.

**10.7.** **Communications.** All notifications, requests, requests and other communications to Oi Group, required or permitted by this Plan, to be effective, must be made in writing and will be considered made when sent by e-mail with proof of delivery, observing the following contact details:

> **Oi S.A. – In judicial recovery**
>
> E-mail: fabio.wagner@oi.net.br / daniella.ventura@oi.net.br / elen.souto@oi.net.br / luiz.rosa@oi.net.br
>
> A/C: Fabio Wagner / Daniella Geszikter Ventura / Elen Marques Souto La Croix / Luiz Henrique Soares Rosa

**10.8.** **Consent of** creditors . The Concursal Creditors are fully aware that the deadlines, terms and conditions of satisfaction of their Credits are amended by this Plan and that the clauses, terms and Conditions provided for in the Plan of First Judicial Recovery shall no longer apply to Recuperandas or Concursal Creditors and their respective Credits, unless expressly provided otherwise in the Plan. The Concursal creditors, in exercising their autonomy of the will, declare that they expressly agree with the said changes, in accordance with the terms provided for in the Plan.

**10.9.** **Divisibilty of the Plan's predictions.** In the event that any term or provision of the Plan is considered invalid, void or ineffective by the court of judicial recovery, the validity and effectiveness of the other provisions shall not be affected, and the Recuperandas shall propose new provisions to replace those declared invalid, null or ineffective, in order to maintain the purpose of the plan.

**10.10.** **Maximum** Payment . Concursal creditors will not receive from Oi Group, under any circumstances, any amounts that exceed the amount established in the Plan for Payment of their Concursal Credits, which must always observe the provisions of the Judicial Administrator's creditors relationship.

**10.11.** **Assignment of Credits.** Except as otherwise provided in the Plan or in the instruments issued in the form of the Plan, Concursal Creditors may assign their Concursal Credits or participation rights in such Concursal Credits to other Concursal creditors or to third parties, and such assignment shall only be considered effective and shall take effect provided that (*i* ) the assignment

Be notified to Oi Group and the Judicial Administration at least five (5) days of the payment dates; *(*ii) the notification is accompanied by proof that the assignees have irrevocably received and accepted the terms and conditions provided for in the Plan (including, but not limited to, the payment terms), and who are aware that the credit given is a Concursal Credit subject to the provisions of the Plan; *(*III ) The assignment or the promise of assignment shall be immediately communicated to the judgment of the recovery, in the form of Article 39 §7 of the LRF. The provisions of **items (i) to (iii**) above do not apply to the creditors of the New Financing and to the creditors Restructuring Option I, who may assign their Free Credits and regardless of prior notification and/or agreement of the Recuperandas.

**10.12.** **Sub-rogation .** For purposes of clarification, in the event that any party subclaims, in any way and at any time, in the rights of a particular Concursal Creditor on the respective Concursal Credits, such party shall be entitled to the payment of such Concursal Credits in the same terms as applicable to the respective Concursal Creditor.

**10.13.** **Credit Compensation** . After the implementation of the New Governance, the Recuperandas will have the option, but not the obligation, in their sole discretion, to pay all or part of the remaining balance of the Concursal Credits owned by their suppliers creditors and *Intercompany* creditors, through the use of any claims, advances, benefits, bonuses or equivalent, that Recuperandas hold against the respective Credor, for compensation of Concursal Credits, pursuant to article 368 and following of the Civil Code. In order to have no doubts, any remaining balance of the Concursal Credit of a particular creditor after the compensation provided for in this clause will receive the treatment provided for in the option of payment of his Concursal Credits, as chosen or applicable to the respective creditor, under the terms of the Plan.

**10.14.** **Changes prior to Plan approval.** The Recuperandas reserve the right, in the form of the Law, to amend this Plan until the date of approval of the Plan, including in order to supplement the protocol with additional documents and translations of related documents.

**10.15.** **Oi Group's powers to implement the Plan.**

 **10.15.1.** The approval of the Plan followed by the judicial approval of the Plan will empower Oi, through its legal representatives, to take all necessary measures for the implementation of the Plan.

 **10.15.2.** After the judicial approval of the Plan, Oi Group is already authorized to

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1B70E87E2A76

Take all necessary measures to (i) submit the Plan's approval to the ongoing insolvency proceedings before *Bankruptcy Court of the Southern District of New* York( *Chapter 15*) and the Supreme Court of Justice of England and *Wales ,* with the aim of giving effect to the Plan in US territory and in the United Kingdom, respectively, by binding creditors domiciled and established there, as well as (ii) initiating and/or proceeding to other judicial, extrajudicial or administrative proceedings, whether of insolvency or of another nature, in jurisdictions other than the Federative Republic of Brazil, including in the US and Dutch territory, as necessary, for the implementation of the Plan, including, but not limited to, insolvency proceedings or procedures necessary for the implementation of the Plan's provisions, notably under the applicable law of the United States of America and the Netherlands. Auxiliary processes abroad may not change the terms and conditions of the Plan.

**10.16. <u>Applicable law.</u>** Except as otherwise provided in the Plan or in debt instruments issued pursuant to **clauses 4.2.2.1, 4.2.3.1 , 5.5 and 5.5.1.4**, the rights, duties and obligations arising out of the Plan shall be governed, interpreted and executed in accordance with the laws in force in the Federative Republic of Brazil, observing the applicable laws for each of the Annexes.

**10.17. <u>Conflict resolution and election of Forum.</u>** All disputes or disputes arising out of or relating to this Plan, including claims by creditors regarding the value of their respective Concursal Credits may be subject to the Mediation Procedure in advance. in the form of the regulation of the Chamber of Mediation and Arbitration of the Getulio Vargas Foundation / RJ or alternatively the Permanent Center of consensual methods of dispute settlement of the Court of Justice of the State of Rio de Janeiro. If the disputes or disputes in question are not resolved in the Mediation, they will be *resolved (i*) by the court of the judicial recovery, until the end of the judicial recovery process with final decision of the approval decision; *and (ii*) for any business judgment of the Central Forum of the Comarca of Rio de Janeiro, after the closure of the judicial recovery process with final judgment of the approval decision. For clarity, this provision does not apply to instruments issued or concluded by Recuperandas, for implementation or in connection with this Plan, including, but not limited to, any agreements to support the Plan, debt and guarantee instruments granted under the Plan, for which the terms of the respective instruments will be observed.

The addition is signed by the duly constituted legal representatives of the Oi Group.

Rio de Janeiro, July 1 , 2025.

*(Remaining of the page intentionally left blank.*

*Signature sheet on the following page.)*

*( Subscription page of the addition to Oi S.A. Consolidated Judicial Recovery Plan – In Judicial Recovery, Portugal Telecom International Finance BV – In Judicial Recovery and Oi Brasil Holdings Coöperatief UA – in Judicial Recovery signed on July 1, 2025)*



## I S.A. – in judicial recovery



## P ORTUGAL T ELECOM I NTERNATIONAL F INANCE B.V. – IN JUDICIAL RECOVERY



## THE I B RASIL H OLDINGS C OÖPERATIEF U.A. – IN JUDICIAL RECOVERY

## LIST OF ATTACHMENTS

Appendix 1.1 – Definitions

Annex 2.4 – Economic and Financial Report

Annex 3.1.2 – Assets for sale and/or oneration Post-implementation of the New Governance

Annex 3.2 – Self-Composition Term

Annex 4.1.2.1 – Guarantee – Labor Creditors Annex

4.1.3 – Labor Option Form

Annex 4.2.2.2.1 (a) – Terms and Conditions Debentures *Roll-Up*

Appendix 4.2.2.2.1 (B) – *Notes Roll-Up* Terms and Conditions

Annex 4.2.2.2.1 (f) (I) – Goods and Assets under Guarantee and Priority Orders

(Waterfall) Annex 4.2.2.2.1 (f) (ii) – List of Warranty Instruments

Annex 4.2.2.1.1 (f) (iii) – Agreement between creditors (*Intercreditor* Agreement )

Annex 4.2.2.3.6  – Waiver Term on the receipt of the new Shares Capitalization of Credits

Annex 4.2.3.1(d) – *A&E* debt instruments *reinstated*

Annex 4.2.3.2 – Instrument of participatory debt in reais and dollars

**Error Attachment! Reference source not found.** – Assets for transfer to *creditors T ake or Pay/SES*

Annex 4.2.9.5.1 – *Take or Pay* Contracts without Warranty that will be terminated

Annex 4.4.6 – Payment Option Notification

Annex 5.1 – Assets for sale and/or oneration Annex

5.2.1 (i) – ClientCo Collection

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1970E87E2A76

Annex 5.2.1(i)(b) – Fiduciary divestiture of the shares of SPE

ClientCo Annex 5.2.1 (II) – V.tal acquis

Annex 5.2.1 (III) (a) – Selected Torres Collection

Annex 5.2.1 (III) (b) – Selected Real Estate Collection

Annex 5.3.3 – Net Revenue from the Sale of Assets

Annex 5.3.4 – Net Revenue from the Sale of Real

Estate

Annex 5.5.1.3 – Term of Accession New Financing Annex

5.4.1 – New Financing Terms and Conditions Annex 5.5.2 (i)

– Bridge Loan Debt Instrument

Annex 5.5.2 (II) – Bridge Loan Guarantee Instruments

Annex 5.4.3 – Goods and Assets in Guarantee and Priority Orders ( Waterfall ) with Additional
Indebtedness Allowed

Annex 6.1 (A) – Corporate Reorganizations at any time Annex 6.1 (B)

– Post-New Corporate Reorganizations Annex 7.1 – Regular Acts of

Management

Annex 7.2 – *Watchdog*

Annex 7.2.4 – *Watchdog* Confidentiality Agreement

Annex 7.3 – Composition of the Board of Directors

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1B70E87E2A76

## ANNEX 1.1

### SETTINGS

"**Judicial Administrator**" means Wald Bankruptcy Administration and Judicial Reorganization Companies Ltda., headquartered at Rua General Venancio Flores, nº 305, 10th floor, Leblon, Rio de Janeiro – RJ, CEP 22441-090; K2 Economic Consulting, based at Rua Primeiro de Março, nº 23, 14th floor, Centro, Rio de Janeiro – RJ, CEP 20010-000; and Preserve Judicial Administration Expertise and Business Consulting Ltda. (Preserves-Action Judicial Administration), with headquarters at Avenida Rio Branco, nº 116, 15th floor, Centro, Rio de Janeiro – RJ, as appointed by the court of judicial recovery, in accordance with the judgments given, respectively, on February 2, 2023, ratified on March 16, 2023, and on june 25, 2023.

"**Affiliates**" means, with respect to any person, any person directly or indirectly Controlling, controlled or under common control of that person.

"**Alienation of assets**" means the disposal of assets under **clause 5.1**.

"**ANATEL or Regulatory Agency**" means the National Telecommunications Agency, created by Law No. 9,472 of July 16, 1997.

"**Approval of the Plan**" means the approval of the Plan by the Concursal Creditors at the General Meeting of Creditors, in the form of article 45, 56-A or 58, *caput* and §1st of the LRF , or through terms of adhesion in the form of article 45-A of the LRF. For the purposes of the Plan, it is considered that the approval of the Plan will take place on the date of the General Meeting of the Creditors approving the Plan. In the event of approval pursuant to article 45-A and article 58, *caput* and §1 of the LRF, the approval of the Plan on the date of the decision granting the judicial recovery is considered.

"**General Meeting of Creditors**" means any general meeting of creditors held pursuant to Chapter II, Section IV of the LRF.

"**ClientCo Allowed Assets** " means (a) V.tal Issuance shares; and/or (b) shares of companies listed in B3 that make up the Bovespa Index, with *market* cap exceeding$ R 7,300,000,000.00 (seven billion and three hundred million reais), it is certain that the value allocated to the respective shares may be determined on the basis of the weighted average price per volume of the shares issued by the respective asset in the 90 (ninety) days preceding the date of the

Competitive procedure; and/or (c) shares of companies listed on foreign stock exchanges that compose the S&P500 or FTSE100 index.

" **Regular Management Act** " means the act practiced in good faith by administrator or advisor of the Recuperandas, with diligence and loyalty, in compliance with the fiduciary duties in relation to the Recuperandas and creditors, within their attributions and powers, without violation of the Law, the Bylaws and the Plan, based on the applicable technique, by disinterested, informed and reflected negotiating decision.

"**Public Proposals UPI ClientCo** " means the hearing for opening the proposals formulated for the acquisition of UPI ClientCo with date and time set in the respective Notice the UPI ClientCo, in the presence of the Judicial Administrator, Recuperandas and other proponents.

" **Audience Proposals UPI V.tal**" means the hearing for opening the proposals formulated for the acquisition of UPI V.tal with date and time set in the respective Call for Sale of UPI V.tal, in the presence of the Judicial Administrator, Recuperandas and other proponents.

" **Authorized Capital Increases** " means one or more capital increases of Oi upon deliberation of the Board of Directors, through public or private issuance of ordinary or preferred shares, if applicable, until the value of its share capital reaches the limit provided for in Oi's Bylaws at the time of the respective capital increase, and may, within the said limit, decide on the issue of subscription bonuses and convertible debentures in shares; or *(II* ) To grant the option to purchase shares to administrators, employees of the Company or company under its control and/or to natural persons who provide services to them, in accordance with the Plan approved by the General Meeting of Creditors without the shareholders having the right of preference to subscribe to such shares

"**Bonds 2025** " means the 10%/12% Senior PIK Toggle Notes due in 2025 issued by Oi, on July 27, 2018, and guaranteed, jointly and severally, by Oi Mobile S.A. (incorporated by the Company in February 2022), Telemar Norte Leste S.A. (incorporated by the Company in May 2021), Oi Coop and PTIF.

" **CADE** " means the Administrative Council for Economic Defense.

" **Civil Code**" means Law No. 10,406, of January 10 , 2002.

"**Agreement between creditors** " means the contract concluded between them
Third parties New financing, the creditors of the New Financing, the creditors of the Top Debt

No *Reinstated Guarantee* – Option I and Roll-Up debt creditors, in compliance with the terms and conditions set out in **Annex 4.2.2.2.2 (g) (iii**), which provides for the rules of excution, waterfall payment and sharing of the guarantees granted under the Plan.

**"Control"** means, pursuant to article 116 of the Brazilian Corporation Law, *(i)* the ownership of the rights of partners that permanently assure the holder of the majority of the votes in the social deliberations and the power to elect the majority of the directors of the company; *and (ii)* the effective use of such power to direct social activities and guide the functioning of the organs of society. The expressions and terms "Controller", "Controlled by", "Under Common Control" and "Controlled" have the meanings logically resulting from this definition of "Control".

"**Updated Original Dip Emergency Creditors** " means Extraconcursal Creators holding Extraconcursal Credits held against Oi arising from participation in the updated original Dip Emergency.

"**Updated Original Dip Emergency Credit** " means Extra Concursal Credits
Held against Oi arising from participation in the updated original Dip Emergency.

"**Atlantic Foundation Labor Credit"** means the Labor Credit owned by the Atlantic Foundation of Social Security, a private pension entity linked to the Oi Group.

"**Credits"** means Concursal Credits and Extraconcursal Credits held against Recuperandas.

"**Class III Credits"** means the Concursal Credits provided for in Articles 41, section III, and 83, section VI, of the LRF Against the Recuperandas, held by Persons other than those of the Recuperandas themselves.

"**Concursal Credits"** means the claims and obligations to make subject to the effects of the Judicial Recovery and the Plan, due or incensed, whose respective contracts, obligations and/or operative events occurred before the Date of the Request, regardless of whether or not they are related in the relationship of creditors of the Judicial Administrator. Concursal Credits are all Credits referred to in the Plan, regardless of their nature, except for Extraconcursal Credits.

"**Concursal Credits Regulatory Agencies"** means Non-tax Liquid Concursal Credits owned by regulatory agencies or arising from obligations imposed on

Reason for deliberation of regulatory agencies, including ANATEL. Regulatory agencies are not included in the Concursal Credits any administrative fines already considered invalidated by a decision issued in the Superior Court of Justice.

" **Supply** Credits " means Class III Credits arising from the provision of goods, content, rights and or non-financial services to Oi Group and other than Financial Credits.

" **Unqualified Ex-Bondholders** Credits " means Class III Credits that are new and restructured under **Clause 4.3.3.1** of the First Judicial Recovery Plan of Ownership of Unqualified Former Bondholders.

" **Extraconcursal Credits"** means claims held against Recuperandas that are not subject to the effects of the Plan because *(i)* their operative event is later than the Order Date, including, but not limited to, the updated original Emergency DIP and part of the *Take or Pay* Credits without Warranty; *or (ii)* to fall under Article 49, §3º and §4º of the LRF, or any other legal/judicial norm that excludes them from the effects of the Plan.

" **Acceding Extraconcursal** Credits " means the Extraconcursal Credits of the creditors Adherent extra-concursal.

" **Financial** Credits " means Class *III* Credits *(i)* arising from transactions contracted and carried out by Recuperandas under the National Financial System with financial institutions, under any modality, as well as other financial credits; *and (ii)* concerning *facility agreements*, debentures or *bonds* negotiated or issued abroad and regulated by foreign laws issued by the Recuperandas.

" **Illiquid Credits"** means the Concursal *Credits (i)* the subject of legal action or arbitration, whether initiated or not, derived from any existing legal relations and contracts prior to the Date of the Order*; (ii)* in relation to whose value is pending resolution of dispute or dispute; *or (iii)* those who, even if they do not fit in *items (i*) and *(ii)* above, for any reason do not appear in the relationship of creditors of the Judicial Administrator.

" **Intercompany Credits"** means the claims of Recuperandas arising from mutual transactions between themselves or with their affiliates as a form of cash management and transfer of resources between the different companies that make up the Oi Group, including with resources arising from operations carried out in the international market.

" **ME/EPP Credits"** means Concursal Credits held by microenterprises or small companies, defined in accordance with Complementary Law No. 123/2006, pursuant to Art. 41, paragraph IV of LRF.

" **Credits Restructuring Option**I ": means Class III Credits other than Supply Credits, Transactions Credits, *Take or Pay* Credits with Warranty or *Take or Pay* Credits without Warranty, held by Chiropractic creditors who elect to be paid through the Restructuring Option I provided for in Clause **4.2.2.**

" **Credits Restructuring Option**II ": means Class III Credits other than Supply Credits, Transactions Credits, *Take or Pay* Credits with Warranty or *Take or Pay* Credits without Warranty, held by Chiropractic creditors who elect to be paid through the Restructuring Option II provided for in **Clause 4.2.3.**

"**Chiropractic** Credits " means Class III Credits and Concursal Agencies Credits
Regulators.

" **Retardant Credits"** means Concursal Credits that are included in the list of creditors after the publication of the Judicial Administrator's creditors' relationship in the official press in the form of Article 7, §2 of LRF, except those Concursal Credits that have been the subject of transaction between the Recuperandas and the respective Credor until the Plan Approval Date.

" ***Take or* Pay Credits with** Guarantee " means Class III Credits indicated as "TOP Contracts" in the Concursal Creditors list provided for in art. 51, section III of the LRF and/or recognized in the opinion of the Judicial Administrator as original credits of *take or pay* obligations and arising from payment obligations guaranteed by guarantee, guarantee or guarantee assumed by the Recuperandas for services to be provided by creditors suppliers in the *take or pay* modality.

" ***Take or Pay* Credits without Warranty**" means Class III Credits indicated as "TOP Contracts" in the Concursal Creditors list provided for in art. 51, section III of LRF and/or recognized in the opinion of the Judicial Administrator as original credits of take or pay obligations and arising from payment obligations assumed by Recuperandas for services provided and to be provided and/or rental of infrastructure by supplier creditors in take or pay mode, but not originally guaranteed by guarantee, guarantee or guarantee.

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1070E87E2A76

"**Labor Credits**" means Concursal Credits derived from labor legislation or resulting from work accidents, pursuant to Art. 41, Section I of LRF.

"**Credits transacted**" means Class III Credits derived from agreements concluded between supplier creditors, which do not have any kind of ongoing demand against any of the Recuperandas before the Date of the Order, judicially approved, to establish specific forms of payments of their respective Class III Credits.

"**Creditors**" means all creditors referred to in this addendum.

"**Concursal Creditors**" means Concursal Credit Holders.

"**Extraordinary Creditors**" means holders of Extraconcursal Credits.

"**Acceding Extraordinary Creditors**" means Extraordinary Creditors who wish to receive their Extra-Concursal Credits in the form of the Plan, applicable to Chiropractic creditors, supplier creditors, supplier creditors or transacted supplier creditors.

"**Financial Creditors**" means the Chirograffarian creditors holding Financial Credits.

"**Supplier creditors**" means the Chirograffarian creditors holding Supply Credits.

"**Provider Creditors**" means the supplier creditors who *(a)* are in compliance with the commitment not to litigate, discharge and waiver provided for in **clause 9.3**, except in the event of a credit verification incident related to the judicial recovery process or in the cases provided for in **clause 9.3.3**; *(B)* have voted in favor of the adoption of this Plan, except in the event of an impediment of voting rights under Article 43 of the LRF or any other legal impediment; *and (C.1)* Maintain the supply to Recuperandas of goods, content, rights or services, as applicable, without unjustified alteration of the terms and conditions practiced until the Date of the Request in relation to Recuperandas ( no undue consideration shall be given to changes arising from negotiations between the creditors and the Recuperandas, even after the date of the request); *or (C.2)* have maintained, throughout the duration of their respective supply contracts concluded before the Date of the Order, the commitment to provide Recuperandas with goods, content, rights or services, as applicable, without unjustified alteration of the terms and conditions practiced until the end of the respective supply contracts.

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1D70E87E2A76

"**Non-disputing creditors**" means any creditor (including its respective affiliates) who chooses to receive payment of their respective restructured Quilographer credit pursuant to **clause 4.2.2** (Restructuring Option I), **clause 4.2.3** (Restructuring Option II) and **clause 4.2.6** (Credits from Partner Suppliers)**, clause 4.2.7** (*take or Pay* Credits with Warranty)**, Clause 4.2.7 9** (*Take or Pay* Credits without Warranty – Option I) and **Clause 4.2.7** (*Take or Pay* Credits without Warranty – Option II).

"**Credentials Restructuring Option**I ": Means the Chirograffarian creditors who elect to be Paid by means of the restructuring option I provided for in **clause 4.2.2.**

"**Credentials Restructuring Option**II ": Means the Chirograffarian creditors who elect to be Paid by means of the restructuring option II provided for in **clause 4.2.3.**

"**Participating Creditors New Funding**" means People Participating in the New Financing.

"**Chiropractic Creditors**" means creditors holding Class III Credits.

"**ME/EPP Concursal Creditors**" means ME/EPP Credit Holders.

"**Delayed Creditors**" means the holders of Delayed Credits.

"**Take or Pay Creditors with** Warranty " means the Supplier Creditors Partners holding *Take or Pay* Credits with Warranty.

"**Take or Pay creditors without Warranty**" means the creditors Suppliers Partners holding *Take or Pay* Credits without Warranty.

"**Labor Credentials**" means Labor Credit Holders.

"**Labor Creditors Judicial Deposits**" means Labor Creditors who are parties to judicial proceedings involving the Recuperandas, in whose records have been made judicial deposits.

"**Date of approval of the addendum** " means the day of publication of the first decision The degree to which this addition is approved.

"**Request Date**" means the date of filing the request for judicial recovery, which is, March 1, 2023.

" **Plan Approval Date** " means the day of publication of the first degree decision which Approved the Plan and granted the judicial recovery, which is, May 29 , 2024.

"**Debentures New Financing – Creditors Restructuring Option**I " means debentures to be issued in favor of creditors Restructuring Option I due to the New Financing, subject to the terms and conditions set out in **Annex 5.5.1**.

"**Debentures New Funding – Third**Parties " means debentures to be issued to third parties due to the New Funding, subject to the terms and conditions set out in **Annex 5.5.1.**

" **_Roll-_**Up **_Debentures_** " means debentures to be issued in favor of creditors Restructuring Option I, subject to the terms and conditions set out in **Annex 4.2.2.1 (a).**

"**Deliberation of creditors Restructuring Option**I " means any deliberation between creditors of the New Financing – creditors Restructuring Option I provided for in the Plan (excluding that provided for in **Clause 7.1 (III**) ), whose matter will be considered approved by holders of at least 60% (sixty percent) of the total amount of Credits derived from the New Financing – creditors Restructuring Option I existing at the time of deliberation.

" **Extraordinary Deliberation of Creditors Restructuring Option**I " means any deliberation between creditors of the New Financing – creditors Restructuring Option I provided for in **clause 7.1 (III**) of the Plan, whose matter will be deemed approved by vote of holders of more than 50% (fifty percent) of the total amount of Credits derived from the total value of Novo Financeira – creditors Restructuring Option I existing at the time of deliberation. Any New Funding Credor – Creators Restructuring Option I (together with its affiliates and related parties) that holds more than 30% (thirty percent) of voting power (or its votes, as applicable), will have its vote limited to 30% (thirty percent) and, consequently, the denominator used for the calculation of voting power will be reduced by the percentage of Credits derived from the New Financing – creditors Restructuring Option I that is discounted for voting purposes.

"**Deliberation of creditors of the Top Debt without _Reinstated Guarantee_ – Option**I " means any deliberation between creditors of the Top Debt without _Reinstated_ Guarantee – Option I provided for in the Plan, whose matter will be considered approved by holders of more than 75% (seventy-five percent) of the total amount of Credits arising from the Top Debt without _Reinstated_ Guarantee – Option I existing at the time of deliberation.

" **Third Party Deliberation New**Financing " means any deliberation between third parties New Financing provided for in the Plan, whose matter will be considered approved by holders of more than 60% (sixty percent) of the total amount New Third Party Financing existing at the time of deliberation.

" **Third Party Deliberation New Financing**" means any deliberation between third parties New Financing provided for in the Plan, whose matter will be considered approved by holders of more than 50% (fifty percent) of the total amount of Credits arising from the New Financing – third parties existing at the time of deliberation.

" Demand " means, in any degree of jurisdiction or instance, any dispute, action, claim, proceeding, complaint, incident of disregard of legal personality, arbitral proceedings, execution, judicial protest, decision, supervision, request for information (including for the initiation of a supervisory procedure), collection, notification (judicial or extrajudicial), infringement, subpoena, procedure, inquiry, judicial, arbitral or administrative demand, or any other type of investigation, action or proceeding, whether judicial, arbitral, administrative or criminal.

" **Judicial Deposit"** means the judicial deposits made by Oi Group in the context of lawsuits of any nature, which will be used in the payment of certain credits, as set out in the Plan, as well as deposits made as a result of decisions made in the first judicial recovery and in this judicial recovery in connection with the disposal of assets.

" **Business Day"** means any day other than a Saturday, Sunday or holiday in the city of Rio de Janeiro, State of Rio de Janeiro, except as otherwise provided in the Plan.

" **Updated original Dip Emergency** " means the long-term financing granted to the Company in the "*debtor-in-*possession " modality, amounting to up to USD400,000,000.00 (four hundred million dollars), with a relevant group of financial creditors representing the majority of *(i)* holders of 10%/12% Senior PIK Toggle Notes maturing in 2025 issued by Oi on July 27 , 2018, and guaranteed, jointly and severally, by Telemar and Oi Mobile, both incorporated in Oi, in addition to Oi Coop and PTIF; *and (ii)* holders of claims against Oi arising from agreements with *export* credit agencies ( *Export Credit*Agencies ), with the guarantee formalized through fiduciary alienation of shares owned by Oi at V.tal and whose main conditions are described in **clause 2.2**of the Plan.

"**Participatory Debt**" means, together, the debts to be issued or contracted by Oi for payment of ninety-two percent (92%) of creditors Restructuring Option II for Class III Credits in Real and in Dollars, in accordance with the terms and conditions set out in **Annex 4.2.3.2**.

"**Roll-**Up **Debt**" means, together, the *Roll*-Up Debentures and the *Roll*-Up Notes.

"**Dollar**" or **"USD"** means the currency in the United States of America.

"**ECA Facility Agreements**" means the loan contracts originally signed between Oi S.A. or its subsidiary Telemar Norte Leste and certain *export* credit agencies (*Export Credit*Agencies) and that, pursuant to clause 13.8 of the First Judicial Recovery Plan could be assigned to other creditors or to third parties provided certain conditions are met.

"**Financial charges**" means any monetary correction, interest, fine, penalties, indemnity, inflation, losses and damages, interest rates and/or other charges of a similar nature.

"**Statutes**" means the social statutes or similar constitutive document of Oi, PTIF and Oi Coop and its affiliates.

"**Euro**" means the currency in the European Union.

"**Unqualified Ex-Bondholders**" means individuals, retail investors, non-professional or qualified, who, in the context of the first judicial recovery, held Class III Credits represented by securities issued abroad and regulated by foreign laws, and whose Class III Credits were renewed and restructured under the clause
4.3.3.1 of the Plan of First Judicial Recovery.

"**Oi Group**" means Oi, Oi Coop and PTIF.

"**Judicial approval of the addendum to the Plan**" means the judicial decision issued by the court of the judicial recovery that approves this addition, pursuant to article 58, *caput or* §1st of LRF.

"**Judicial approval of the** *Plan*" means the judicial decision given by the court of judicial recovery that approves the Plan and grants the judicial recovery to Oi Group,

Docusign Envelope ID: 6BB4A9FF-257F-4205-ACD9-1070E87E2A76

Pursuant to art. 58, *caput* or §1st of LRF.

"**Real**Estate " means all properties owned by Oi and/or its affiliates and/or whose property is pending regularization on behalf of Oi or its affiliates.

" **Third Party Properties** " means all properties owned by third parties where Oi and/or its affiliates have the right to use, possession and/or exploitation.

" **Debt Instruments** " means Roll-Up Debt Instruments, Participatory Debt Instrument, *Reinstated A&E* Debt Instruments and New Financing Instruments.

" **Roll-Up *Debt Instruments*** " means, together, the Scripture Debentures *Roll*-Up , the *Notes Roll*-Up Scriptures.

" **New Financing Guarantee Instruments** " means the instruments to be concluded by Oi, containing the terms and conditions for the supply of the goods and assets listed in **Annex 5.5.1.5(d)(i**), under guarantee in the context of the New Financing.

" **Roll-*Up* *Guarantee Instruments*** " means the instruments to be concluded by Oi, containing the terms and conditions for the supply of the goods and assets listed in **Annex 4.2.2.1 (f) (I)** , under guarantee in the context of the *Roll*-Up Debt .

"**Judgement of judicial recovery"** means the judgment of the 7ª Corporate Court of the Capital/RJ.

" **Reports"** means the economic and financial reports and the evaluation of the assets and assets of the Oi Group, elaborated pursuant to article 53, paragraphs II and III of the LRF.

" **Economic-Financial**Report " means the report that attested and confirmed, pursuant to article 53, II and III of LRF, the feasibility of the Plan and the measures provided for in it for the recovery of Oi Group, which is contained in **Annex 2.4** of the Plan.

"**Law"** means any law, regulation, order, sentence or decree issued by any Government Authority.

" **Corporate Law"** means Law No. 6,404, of December 15, 1976, as amended.

"**LRF"** means Law No. 11,101 of February 9 , 2005, as amended.

"**Oi's net profit**" means Oi's financial result in a given fiscal year, after compensation of accumulated losses and the provision for the payment of income tax, of the social contribution on profit and any other tribute or contribution that will be created and due by Oi, as well as the adjustments of article 202 of the Brazilian Corporate Law , without prejudice to the provisions of §4 and §5 of the said article.

"**Mediation/Conciliation/Agreement**" means any procedure to be instituted pursuant to Law No. 13,140 of June 26, 2015, and Articles 20-A and following of LRF, or any transaction carried out to resolve claims verification incidents, or to render net illiquid credits.

"*Notes Roll-Up* " means, where jointly referred to, Tranche 1 *Notes Roll-Up* and Tranche 2 Notes Roll-Up, to be issued substantially in the form of **Annex 4.2.2.2.1 (B**) .

"**Oneration**" means any and all charges or charges of any kind, including any promise of sale, option of purchase or sale, bond, charges, deposit, restriction, right of preference or first offer, right of guarantee, guarantee, pledge, pledge, mortgage, fiduciary alienation, fiduciary assignment, domain reservation, claim, servitude, enjoyment or any other real right of enjoyment, guarantee or other guarantee, as well as any other claims that have substantially the same effects as the aforementioned institutes. The expressions and terms "onerar", "onus and "oneration" have the meanings logically derived from this definition of "oneration".

"**Indemnified Parties**" means Recuperandas, their affiliates, subsidiaries, affiliates, affiliates, affiliates, affiliates, and other third **parties**. associated entities, and other companies belonging to the same group, and their respective shareholders, directors, directors, officers and former directors, employees, lawyers, advisors, agents, representatives and representatives, including their predecessors and successors.

"**Person**" means any individual, firm, company, association without legal personality, partnership, trust or other legal or administrative decision entity that is not subject to questioning in the Judiciary.

"**Plan**" means the joint judicial recovery plan approved at the General Meeting of Creditors held on April 18 and 19 , 2024, according to the LFR, and approved by the Court of Judicial Recovery on May 28 , 2024, including all additions, modifications, amendments and additions, as well as all attachments and documents mentioned in

Plan Clauses.

" **Plan of First Judicial**Recovery " means the Plan of First Judicial Recovery approved by the creditors at the General Meeting of Creditors held on December 19 and 20, 2017, according to the LRF, and approved by the Judgement of the Judicial Recovery on January 8, 2018, and later added by adding to the First Judicial Recovery Plan approved at the general meeting of creditors held on September 8, 2020 and approved by the court of the judicial recovery on October 5, 2020.

" **Sales Plan"** means the sales plan to effect the sale of the Real Estate that should be prepared by the Recuperandas and submitted to creditors Restructuring Option I and to the *creditors Take or* Pay Without Guarantee – Option I, in the form of **clause 7.2.5.**

"**First judicial**recovery " means the process of judicial recovery of the Company and its wholly, direct and indirect subsidiaries, Oi Mobile S.A. (incorporated by the Company in February 2022), Telemar Norte Leste S.A. (incorporated by the Company in May 2021), Copart 4 Participacoes S.A. (incorporated by Telemar in January 2019), Copart 5 Participacoes S.A. (incorporated by the Company in March 2019), PTIF and Oi Coop, whose processing was granted, on June 29, 2016, by the court of judicial recovery, in the records of judicial recovery process No. 0203711-65.2016.8.19.0001.

" **Consensus Solution Procedure"** means the procedure for consensual resolution of controversy and conflict prevention in Case TC 020,662-2023-8 that deals with the Secretariat for External Control of Consensus Solution and Conflict Prevention (SecexConsensus) of the Court of Auditors of the Union.

"**Proceedings"** means any and all litigation, in judicial, administrative or arbitral spheres (at any stage, including enforcement/enforcement of judgment) ongoing on the Date of the Request involving discussion related to any of the Concursal Credits before the Judiciary or Arbitral Tribunal, as the case may be, including labor claims.

" **Real"** means the currency in the Federative Republic of Brazil.

" **Net Sales Revenue** " means the total amount of the cash counterpart or otherwise attributed, as the case may be, to the asset divested after the Plan Approval Date, including shares issued by a defined SPE owned by Recuperandas or its affiliates, and that they are effectively alienated to third parties by Recuperandas, being

Docusign Envelope ID: 6BB4A9FE-257F-4205-ACD9-1D70E87E2A76

Certain that the said value will be (a) net (x) of the Price Adjustment values; (y) of the applicable cost values; and (z) as applicable in the case of the disposal of real estate, of the values related to the costs of demobilization / decommissioning of such buildings; and (b) **adding** (x) the value of any debts or obligations of the Recuperandas directly or indirectly assumed by the acquirer, except for liabilities that comprise the UPI V. tal and UPI ClientCo, as the case may be, and (y) any additional amounts, being certain that in any case, the corresponding amounts will be computed as Net Sales Revenue only if and according to their actual disbursement to Recuperandas. For the purposes of this definition**, (a) "Additional Values"** means the amounts relating to any amounts to be due or released to Recuperandas after the closing of the sale of, as appropriate, a certain asset or UPI defined depending on future events, including forward price, contingent price (earn-outs), release of securities deposited in warranty (escrow) and similar events**; (b) "Price Adjustment Values"** means the amounts of adjustments to the purchase price of sale of, as the case may be, a certain asset or defined UPI agreed between the Recuperandas and the respective acquirer in the purchase and sale contract, it is certain that any retention or deposit into a guarantee deposit account (escrow) of the price adjustment will not exceed 15% (fifteen percent) of the respective purchase price, except if price adjustment in higher percentage is approved by Deliberation of creditors Restructuring Option I and Deliberation of creditors Top Debt without *Reinstated* Guarantee – Option I; E

**(C) "Cost Values"** means (i) the amounts of costs and expenses demonstrably incurred and necessary for the respective operation (such as costs and expenses with legal, accounting and financial advice and sales commission) jointly limited to the total amounts equivalent to 3.5% (three comma five percent) the purchase price for each operation; and

(II) the amounts of taxes incurred and paid, including income tax calculated in the transaction (or which will be disbursed in the same fiscal year as the closing of the transaction or the receipt of the corresponding amount by the Recuperandas) having as a generating fact the sale of the asset or the respective UPI defined, including any corporate reorganizations necessary to do so, being certain that the Recuperandas will be the only responsible for the collection of such taxes.

" **Net Revenue from the sale of UPI V.tal** " means the Net Revenue of Sale arising from Sale of UPI V.tal.

" **Net Revenue from the sale of UPI ClientCo** " means the Net Revenue of Sale arising from the sale of UPI ClientCo.

" **Net Revenue from the Sale of** Assets " means the Net Revenue from **Sale** arising from the sale of the assets listed in **Annex 5.3.3,** except the shares issued by SPE V.tal and SPE ClientCo.

" **Net Revenue from Real Estate Sale** " means Net Revenue from Sale arising from the sale of the properties listed in **Annex 5.3.4.**

" **Recognition of the Plan in the Jurisdiction of the Creditor"** means any and all decisions or court order necessary for this Plan to produce its regular effects in the jurisdiction applicable to the Creditor in question.

**"  Judicial recovery"** means this process of judicial recovery, filed under No. 0090940-03.2023.8.19.0001 (migrated from Case No. 0809863-36.2023.8.19.0001 – PJE), EM
Course before the court of judicial recovery.

"**Recuperandas** " means Oi, Oi Coop and PTIF.

**"Relationship of creditors of the Judicial Administrator"** means the list of creditors drawn up by the Judicial Administrator in the form of article 7, §2º of the LRF.

**"  Corporate Reorganizations"** means the corporate reorganization to be carried out under **clause 6.1** of the Plan.

**"**Sky " means Sky Broadband Services Ltda. (CNPJ No. 00,497,373/0001-10).

" **Conversion exchange** rate " means the average closing rate of dollar/real sale of thirty (30) days prior to the approval of the Plan, disclosed by the Central Bank of Brazil, corresponding to 5.0567.

" Towers " means the entire structural assembly capable of supporting the installation of antennas for transmission and radio frequency safely and within the allowable limits of angular deformation - bending plus torsion, including the tower structure, the foundation of the tower structure, the tower lighting (including light barrier, photocell and wiring controls, cables), tower work platform, all antenna supports and tower equipment, tower resting platforms, from stairs to tower (including safety cable, fall arrest, body guard, staios, vertical and horizontal stretches, the general tower grounding system (including lightning rods, wires and ground connections to the tower and ground ground grid of the ground), ground system for the site (including the global grounding system for the

location in relation to fences, walls, doors, containers, gates and energy entrances), power entry frame where meters, concrete foundations and/or metal shelters are located for energy entry, energy infrastructure from the distribution network of the concessionaire, the standard of energy input, including ducts, poles and power and fiber optic pipes, passing boxes and materials related to the site perimeter (such as walls, fences, gates, etc.), metal skid for Radio Base Station, concrete base for Radio Base Station, "eco box" (structure in metal profiles and checkered plate floor and variable dimensions) metallic for Radio Base Station, site lighting system, industrial outlet for generator (steck), excluding any operator equipment that is installed or attached to the Tower.

"**TR**" means the reference rate established by Law No. 8,177/91, as determined and disclosed by the Central Bank of Brazil, whose product will be added to the balance of the nominal value of the credit for the purposes of calculating the pecuniary value of the obligations provided for in the Plan, and that will be due on the payment dates set here. In the case of temporary unavailability of the TR, the last index number released will be used, *calculated pro rata temporis* for working days, however, no financial compensation will be made when the index number is disclosed. In the absence of verification and/or disclosure of the index number for a period exceeding five (5) working days after the expected date for its disclosure, or, in the event of its extinction or by legal imposition or judicial determination, the TR shall be replaced by the substitute legally determined for this purpose.

"**TRE** " means Regional Electoral Court.

"**TSE** " means Superior Electoral Court.

"**UPI**" means the isolated productive units that will be disposed of under Article 60 of LRF.