## Exhibit C

**V.tal Appeal**

## Exhibit C-1

**V.tal Appeal (Portuguese)**

# PINHEIRONETO
### A D V O G A D O S

**SÃO PAULO**
R. Hungria, 1.100
01455-906
São Paulo - SP
t. +55 (11) 3247 8400

**RIO DE JANEIRO**
R. Humaitá, 275
16º andar
22261-005
Rio de Janeiro - RJ
t. +55 (21) 2506 1600

**BRASÍLIA**
SAFS. Quadra 2 Bloco B
Ed. Via Office - 3º andar
70070-600
Brasília - DF
t. +55 (61) 3312 9400

**PALO ALTO**
228 Hamilton Avenue,
3rd floor
CA 94301 USA
t. +1 650 798 5068

**TÓQUIO**
1-6-2 Marunouchi,
Chiyoda-ku, 21st floor
100-0005
Tokyo - Japan
t. +81 (3) 3216 7191

Exmo. Sr. Desembargador Primeiro Vice-Presidente Do Tribunal De Justiça Do Estado Do Rio De Janeiro

**Processo de Origem nº 0090940-03.2023.8.19.0001**

**Distribuição por prevenção à Primeira Câmara de Direito Privado**

**V.TAL – REDE NEUTRA DE TELECOMUNICAÇÕES S.A.**, sociedade inscrita no CNPJ sob o nº 02.041.460/0001-93, com sede na Rua Casa do Ator, nº 919, Vila Olímpia, cidade de São Paulo, Estado de São Paulo, CEP 04546-003 ("V.tal" ou "Agravante"), por seus advogados (**docs. nºs 1 e 2**), vem respeitosa e tempestivamente, com fundamento nos artigos 1.015 e seguintes do Código de Processo Civil ("CPC"), interpor este

**AGRAVO DE INSTRUMENTO**

**com pedido de antecipação da tutela recursal**

contra a r. decisão de fls. 117.355/117.359 ("Decisão Agravada") (**doc. nº 3**), proferida nos autos da recuperação judicial[1] ("Recuperação Judicial") da **OI S.A.** e

---

[1] Proc. nº 0090940-03.2023.8.19.0001, em curso perante a 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro ("Juízo da Recuperação").

**P I N H E I R O N E T O**
A D V O G A D O S

**Outras** ("Agravadas" ou "Grupo Oi" ou "Recuperandas"), pelas seguintes razões de fato e de direito.

1.      **Tempestividade**. Em **7.8.2025**, a r. Decisão Agravada foi disponibilizada no Diário de Justiça Eletrônico, sendo publicada, portanto, em **8.8.2025**. Dessa forma, o prazo de 15 (quinze) dias úteis previsto no art. 1.003, §5º do CPC para a interposição deste recurso finda-se em **29.8.2025**, sendo manifestamente tempestivo o recurso apresentado nesta data (**26.8.2025**).

2.      **Prevenção.** A Primeira Câmara de Direito Privado deste E. Tribunal de Justiça do Estado do Rio de Janeiro ("TJRJ") à relatoria da eminente Desembargadora Mônica Maria Costa Di Piero está preventa para o julgamento deste recurso, a teor do artigo 930, parágrafo único, do CPC, na medida em que tem julgado os recursos provenientes da Recuperação Judicial[2].

3.      **Cabimento do Agravo**. Por se tratar de recurso interposto contra decisão proferida no âmbito de recuperação judicial, é inequívoco o cabimento deste agravo de instrumento, nos termos do art. 1.015, parágrafo único, do CPC, art. 189, §1º, II, da Lei n° 11.101/05 ("LRF") e Tema 1.022 do Superior Tribunal de Justiça ("STJ")[3].

4.      **Instrução do Recurso**. Em cumprimento ao artigo 1.017 do CPC, muito embora os autos do processo de que tirado este recurso sejam eletrônicos, o que dispensaria sua instrução, essas razões recursais estão acompanhadas de todas as cópias obrigatórias, inclusive procurações outorgadas às partes, decisões agravadas e comprovante de recolhimento de custas processuais (**doc. n° 4**). Caso este E. TJRJ repute necessária a apresentação de alguma peça adicional, a Agravante requer seja

---

[2]   Agravos de instrumento n°s   0069602-39.2024.8.19.0000;   0069530-52.2024.8.19.0000;   0069733-14.2024.8.19.0000; e 0072455-21.2024.8.19.0000.

[3] "É cabível agravo de instrumento contra todas as decisões interlocutórias proferidas nos processos de recuperação judicial e nos processos de falência, por força do art. 1.015, parágrafo único, CPC".





concedido prazo para que seja complementada a documentação, nos termos do artigo 1.017, § 3°, do CPC.

5.    **Declaração de Autenticidade**. Os advogados da Agravante, signatários deste recurso, nos termos do artigo 1.017, II, do CPC, declaram serem autênticas as cópias dos documentos que instruem o recurso.

6.    **Representação Processual**. Em atenção ao disposto no artigo 1.016, IV, do CPC, a Agravante informa os nomes e endereços dos patronos da Agravante, das Agravadas e do Administrador Judicial, como segue:

(i)    **Pela Agravante:** os advogados _Thiago Braga Junqueira_, inscrito na OAB/SP sob o nº 286.786, _João Guilherme Thiesi Da Silva_, inscrito na OAB/SP sob o n° 410.293, _Maria Fernanda Marchesan Del Grande_, inscrita na OAB/SP sob o n° 493.904 e _Sophia Weinschenker Bollmann_, inscrita na OAB/SP sob o nº 519.960, todos com endereço profissional da Rua Hungria, 1.100, Jardim Europa, São Paulo/SP (**doc. n° 2**); e

(ii)    **Pelas Agravadas:** os advogados _Marcos Pitanga Ferreira_, inscrito na OAB/RJ sob o nº 144.825, _Luiz Carlos Malheiros França_, inscrito na OAB/RJ sob o nº 163.989, _João Felipe Lynch Meggiolaro_, inscrito na OAB/RJ sob o nº 216.273, _Fernanda Anuda_, inscrita na OAB/RJ sob o nº 241.307, _Diana Lise Freitas_, inscrita na OAB/RJ sob o nº 256.584, _Thiago Peixoto Alves_, inscrito na OAB/RJ sob o nº 301.049, _João Felipe Martins de Almeida_, inscrito na OAB/RJ sob o nº 200.664, _Helena Acker Caetano_, inscrita na OAB/RJ sob o nº 230.206, _Edson Bossonaro Júnior_, inscrito na OAB/RJ sob o nº 264.022, e _Luís Fellipe Freitas_, inscrito na OAB/RJ sob o nº 261.146, todos integrantes do escritório Ferro, Castro Neves, Daltro e Gomide Advogados, com endereço profissional na Av. Rio Branco, nº 85, 13º, 15º, 17º e 18º andares, Centro, Rio de Janeiro/RJ, CEP 20040-004; bem como os advogados _Paulo Padis_, inscrito na OAB/RJ sob o nº 139.860-A, _Talitha Aguillar Leite_, inscrita na OAB/SP sob o nº 344.859, e _Mariana Leoni Beserra_, inscrita na OAB/SP sob o nº 443.636, estes últimos integrantes do escritório Padis Mattar Advogados,

## PINHEIRONETO
### ADVOGADOS

com endereço profissional na Av. Brigadeiro Faria Lima, nº 1.663, 12º andar, Jardim Paulistano, São Paulo/SP, CEP 01452-001. (**doc. n° 5 e 6**);

**(iii)** **Pelo Administrador Judicial:** _Wald Administração De Falências E Empresas Em Recuperação Judicial Ltda._, representada por Arnoldo Wald Filho, inscrito na OAB/RJ sob o n° 58.789, e Adriana Campos Conrado Zamponi, inscrita na OAB/RJ sob o n° 92.831, ambos com endereço profissional na Rua General Venâncio Flores, nº 305, 10º andar, Leblon, Rio de Janeiro; _K2 Consultoria Econômica_, representada por João Ricardo Uchoa Viana, com sede na Rua Primeiro de Março, nº 23, 14º andar, Centro, Rio de Janeiro; e _Preserva-Ação Administração Judicial_, representada por Bruno Rezende, inscrito na OAB/RJ sob o n° 124.405, com sede na Avenida Rio Branco, nº 116, 15º andar, Centro, Rio de Janeiro (**doc. n° 7**);

7.     **Das Intimações**. A Agravante requer que as intimações referentes a este recurso sejam realizadas exclusiva e conjuntamente em nome dos procuradores que subscrevem este agravo, sob pena de nulidade, nos termos do artigo 272, § 5°, do CPC.

Nestes termos,

P. Deferimento.

São Paulo, 26 de agosto de 2025.

**Thiago Braga Junqueira**
**OAB/SP nº 286.786**

**João Guilherme Thiesi da Silva**
**OAB/SP nº 410.293**

**Maria Fernanda M. Del Grande**
**OAB/SP n° 493.904**

**Sophia Weinschenker Bollmann**
**OAB/SP nº 519.960**

**PINHEIRONETO**
A D V O G A D O S

Página

**6**

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**ANEXO I**

**Lista de Documentos Obrigatórios e Facultativos**

| | |
|---|---|
| **Doc. nº 1** | Documentos Societários de V.tal |
| **Doc. nº 2** | Procuração de V.tal aos seus Advogados |
| **Doc. nº 3** | Decisão Agravada |
| **Doc. nº 4** | Guia e Comprovante de Recolhimento de Custas |
| **Doc. nº 5** | Documentos Societários do Grupo Oi |
| **Doc. nº 6** | Procurações do Grupo Oi aos seus Advogados |
| **Doc. nº 7** | Decisões de Nomeação do Administrador Judicial |
| **Doc. nº 8** | Pedido de Encerramento do *Chapter 15* |
| **Doc. nº 9** | Primeira Decisão |
| **Doc. nº 10** | Segunda Decisão |
| **Doc. nº 11** | Decisão de Efeito Suspensivo |
| **Doc. nº 12** | Parecer Professor Daniel Carnio Costa |
| **Doc. nº 13** | *Amicus Brief* |
| **Doc. nº 14** | Audiência *Chapter 15* – 18.8.2025 |
| **Doc. nº 15** | Audiência *Chapter 15* – 14.8.2025 |
| **Doc. nº 16** | Decisão Estabelecimento |
| **Doc. nº 17** | Decisão Jurisdição Brasileira |
| **Doc. nº 18** | Acordo Entre Credores |

**PINHEIRONETO**
A D V O G A D O S

**E. Tribunal de Justiça do Estado do Rio de Janeiro** ("TJRJ")

**Agravante:**          V.tal – Rede Neutra De Telecomunicações S.A. ("V.tal" ou "Agravante")

**Agravadas:**          Oi S.A. e Outros ("Agravadas" ou "Grupo Oi" ou "Recuperandas")

**Administrador Judicial:**    Wald Administração De Falências E Empresas Em Recuperação Judicial Ltda, K2 Consultoria Econômica e Preserva-Ação Administração Judicial  (todas em conjunto, "Administrador Judicial")

**RAZÕES DE AGRAVO DE INSTRUMENTO**

Egrégio Tribunal,

**I.       O RISCO DE CONVALIDAR A TUTELA DO DESCRÉDITO**

> *P: Você sabe — você não tem certeza de como, Sr. Padis, mas você reconhece, não é, que se a Oi reestruturar com sucesso o financiamento de devedores em posse neste Tribunal de Falências dos Estados Unidos, isso poderia afetar o mercado de financiamento DIP no Brasil, não é, senhor?*
> *R: Acho que o mercado terá que se adaptar.*

8.     O que se vê neste caso não é apenas uma infração à letra da lei, mas a reaparição de um traço antigo de nossa história: a crença de que a ordem jurídica é sempre maleável, sempre negociável, sempre sujeita a ser torcida em favor daquele que se considera mais forte. Desde os tempos coloniais, a lei foi tratada muitas vezes como um ornamento — algo que se exibe quando convém e se descarta quando atrapalha. Agora, esse velho expediente ganha corpo no ambiente concursal brasileiro, justamente no terreno em que a previsibilidade e a tutela do crédito deveriam ser mais sólidas.

9.     O Grupo Oi ensaia aqui a repetição desse padrão: beneficiou-se do regime

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

# PINHEIRONETO
### A D V O G A D O S

da recuperação judicial duas vezes, colheu seus frutos, e, antes mesmo de cumprir os compromissos assumidos, anuncia que irá à jurisdição estrangeira buscar uma nova proteção, à revelia das travas impostas pela lei brasileira. Não o faz às escondidas, mas com desfaçatez, quase como uma ostentação. Seus assessores dizem, em alto e bom som, que o sistema jurídico brasileiro "*terá que se adaptar*", numa confissão brutal de desprezo — não apenas pelos credores, mas pelo próprio Poder Judiciário.

10.      Admitir a possibilidade dessa manobra é abrir a porteira para que toda e qualquer empresa em reestruturação no Brasil veja, no estrangeiro, a oportunidade de romper todos os seus compromissos legitimamente assumidos com credores nacionais, sob supervisão do Poder Judiciário brasileiro. É dar um sinal inequívoco de que basta atravessar fronteiras para esvaziar garantias, frustrar pactos e reduzir a nada os acordos e convenções livremente celebrados. É a consagração de uma espécie de anistia ao devedor contumaz, travestida de estratégia internacional. É a antítese da recuperação judicial: em vez de restabelecer a confiança, instaura-se o descrédito.

11.      É essa lógica de indiferença, de dar de ombros às regras, que corrói silenciosamente a confiança no direito. E confiança, aqui, não é detalhe: é o cimento que sustenta todo o edifício concursal. Quando se rompe a fidúcia, quando se banaliza o pacto firmado entre devedor, credores e Estado, não há recuperação possível. O que sobra é o cinismo erigido em método, é a repetição de um velho vício — agora projetado sobre um sistema que não pode sobreviver sem integridade, pressuposto indispensável para que a cooperação ocorra.

12.      É por isso que a V.tal interpõe este recurso: não se trata apenas de corrigir uma decisão em um processo específico, mas de afirmar que o sistema concursal brasileiro não é  palco para estratégias açodadas e a lei de insolvência não existe como ornamento, retórica vazia, ou concessão graciosa a quem dela se serve. É lei fundada em política pública relevantíssima, compromisso institucional. Admitir a sobreposição de um processo estrangeiro de insolvência a uma recuperação judicial em curso seria renunciar à própria autoridade deste E. Tribunal e sinalizar ao

TJRJ 20250077735 78 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

mercado que o Brasil se converteu em terra de ninguém. Cabe a esta Corte, portanto, repor as coisas em seu devido lugar e restaurar a confiança que sustenta todo o sistema concursal brasileiro.

**II.        OBJETO DESTE AGRAVO – SUMÁRIO DAS RAZÕES DE REFORMA**

13.      **Decisão Agravada – Intenção de Ajuizamento de *Chapter 11* pela Oi**. Trata-se de agravo de instrumento interposto contra a r. decisão proferida pelo D. Juízo da 7ª Vara Empresarial do Foro da Comarca do Rio de Janeiro, Estado do Rio de Janeiro ("Juízo da Recuperação") que, dentre outros pontos, declarou que "*não irá (...) determinar a quem quer que seja que se abstenha de distribuir ação (procedimento judicial) perante qualquer jurisdição*" ("Decisão Agravada").

14.      A r. Decisão Agravada faz referência ao pedido de ajuizamento de um processo principal de reestruturação pretendido pela Oi, na forma do capítulo 11 do Código de Falências dos Estados Unidos ("*Chapter 11*"), a ser apresentado perante o Poder Judiciário americano, caso seja deferido o seu pedido de encerramento do *Chapter 15* das Agravadas[4] ("Pedido de Encerramento do *Chapter 15*" – **doc. nº 8**), em curso perante o Tribunal de Falências da Corte do Distrito Sul do Estado de Nova Iorque ("Juízo de Nova Iorque"). A pretensão declarada pelo Grupo Oi seria de que o *Chapter 11* tramitasse de forma concomitante ao processo de Recuperação Judicial atualmente em curso perante o Juízo da Recuperação.

15.      **Rejeição do Pedido de V.tal – Ilegalidades do *Chapter 11.*** A Decisão Agravada, assim, rejeitou implicitamente o pedido formulado pela V.tal para que o Juízo da Recuperação também apreciasse a legalidade em torno do pretenso *Chapter 11*, inclusive após oitiva dos i. Administradores Judiciais e representante do Ministério Público.[5] A r. Decisão Agravada, no entanto, merece ser reformada para

---

[4] O processo de *Chapter 15* das Devedoras, atualmente em trâmite perante o Juízo de Nova Iorque, visa ao reconhecimento desta Recuperação Judicial como o processo principal de reestruturação das Devedoras e à eficácia das disposições do plano de recuperação judicial das Agravadas, aprovado em 19.4.2024 ("Plano"), nos Estados Unidos da América. Tal processo é regido pelo Capítulo 15 do Código de Falências dos Estados Unidos e se trata de processo não principal de insolvência transnacional, conforme os princípios estabelecidos pela Lei Modelo da UNCITRAL para Insolvências Transnacionais.

[5] De fato, a V.tal requereu que: "*V.Exa. se digne determinar a intimação dos i. Administradores Judiciais e do representante do Ministério Público para que se manifestem sobre a possibilidade de ajuizamento do pedido de restruturação no judiciário norte-americano (Chapter 11) e suas consequências para este processo de*

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

que a jurisdição brasileira, após a oitiva dos i. Administradores Judiciais e do membro do Ministério Público, <u>reconheça e comunique</u> ao Juízo de Nova Iorque (167-P, LFR) que um eventual *Chapter 11* a ser ajuizado pelo Grupo Oi é <u>materialmente ilegal e incompatível com a Recuperação Judicial</u>, pois, resumidamente, verifica-se

- <u>Violação à Ordem Pública</u>: A LFR veda o ajuizamento de novo pedido de recuperação judicial no prazo de <u>5 (cinco) anos</u> contados da decisão de homologação do plano de recuperação judicial respectivo (artigo 48, II, LFR). Trata-se de norma de ordem pública, que reflete políticas eleitas pelo legislador nacional como parte da estrutura de incentivos econômicos que fundamenta a LFR. O Grupo Oi teve seu plano homologado há pouco mais de <u>15 (quinze) meses</u>. Admitir o ajuizamento do *Chapter 11* (procedimento análogo à recuperação judicial) é, portanto, violar norma fundamental da LFR e de ordem pública;

- <u>Impossibilidade do *Chapter 11* Reestruturar Créditos que **não** se sujeitam à Recuperação Judicial</u>: As regras de insolvência transnacional incluídas na LFR (artigos 167-A e seguintes) vedam (no contexto do Grupo Oi) o reconhecimento de um processo estrangeiro que venha a reestruturar créditos que <u>não</u> se sujeitam a uma recuperação judicial. É o que dispõem, em conjunto, os artigos 167-M, §3º, 167-S, I, e 167-B, III, todos da LFR. Dada a existência da Recuperação Judicial e o fato de que o *centro de interesses principais* do Grupo Oi é reconhecidamente (inclusive, por decisão transitada em julgado) no Rio de Janeiro, o *Chapter 11* não poderá ser reconhecido pela jurisdição brasileira dado que o objetivo declarado pelo Grupo Oi é justamente afetar créditos extraconcursais e burlar a vedação ao novo pedido de reestruturação em um período inferior a cinco anos;

- <u>Risco de Decisões Conflitantes</u>: A coexistência de dois processos de insolvência principal é medida inédita no Brasil. A Recuperação Judicial e um pretenso *Chapter 11* não tutelam só a reestruturação de determinados créditos, mas também direitos, deveres, limitações e prerrogativas de

---

*Recuperação Judicial, à luz da legislação brasileira e dos demais fatos e considerações trazidos no âmbito desta manifestação*". (fls. 116.966/116.978 da Recuperação Judicial – destaques originais)

TJRJ 20250077735378 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica



# P I N H E I R O N E T O
A D V O G A D O S

devedores e credores a eles submetidos. O risco de tais regras e consequentes decisões judiciais serem conflitantes entre si é certo, conforme inclusive já reconhecido pelo Juízo de Nova Iorque e pela Oi. Tal medida indesejada, que pode gerar prejuízos incontáveis para diversos stakeholders, deve ser coibida e afastada; e

- <u>Necessidade de Manutenção do *Chapter 15*</u>: O *Chapter 15* é e continua sendo necessário para fins de implementação da Recuperação Judicial. O processo e o plano de recuperação judicial ainda não foram implementados – pelo contrário; o Grupo Oi recentemente apresentou aditamento ao plano, no qual, dentre outros, pretende alienar seu principal ativo (a UPI V.tal) e afetar garantias concedidas a credores relevantes com conexões nos Estados Unidos. O cenário de incerteza é substancial e indiscutível. É provável que eventuais decisões a serem proferidas pelo Juízo da Recuperação deverão ser confirmadas no âmbito do *Chapter 15*, sob pena de esvaziamento da jurisdição do Juízo da Recuperação. O encerramento daquele procedimento auxiliar, portanto, é prematuro e inapropriado.

16.    Como se vê, a r. Decisão Agravada não apenas deixou de exercer o indispensável controle de legalidade sobre o pretendido *Chapter 11*, como abriu perigoso precedente de legitimação a um expediente flagrantemente ilegal, incompatível com a ordem pública brasileira e corrosivo da autoridade deste E. Tribunal. É nesse contexto que se impõe avançar, no próximo capítulo, para a reconstituição dos principais atos processuais relevantes, sem os quais não se compreende a extensão do litígio e os reais contornos da manobra tentada pela Oi, cujo ineditismo por si só já denuncia a sua impropriedade jurídica.

## III.    OBSERVAÇÕES INICIAIS NECESSÁRIAS

17.    **Atual Situação das Agravadas**. Há quase 10 (dez) anos ininterruptos, as Agravadas se valem de processos de reestruturação previstos na LFR para manter as suas atividades. Atualmente, na Recuperação Judicial de origem (a segunda requerida pelo Grupo Oi), tornou-se público o inadimplemento do plano de recuperação judicial proposto pelo Grupo Oi ("<u>Plano</u>"), conforme noticiado pelos I.

- 10 -

**PINHEIRONETO**
A D V O G A D O S

Administradores Judiciais[6] no Relatório Mensal de Atividades referente ao mês de junho de 2025.

18.   **Pedido de Aditamento ao Plano e Primeira Decisão**. Nesse cenário, em **1.7.2025**, as Agravadas apresentaram aditamento ao Plano no âmbito da Recuperação Judicial ("Aditamento ao Plano"), para deliberação pelos credores em assembleia geral de credores. Em **9.7.2025**, antes de decidir sobre o processamento do Aditamento ao Plano, o D. Juízo da Recuperação determinou "*a prévia manifestação - ainda que breve - do órgão do Ministério Público, da Administração Judicial conjunta e, também, do Observador Judicial, já nomeado, acerca do aditamento ao PRJ apresentado, e os documentos que o instruem*", além da intimação da ANATEL e do CADE ("Primeira Decisão" – **doc. nº 9**).

19.   **Pedido de Encerramento do *Chapter 15***. Em **7.7.2025**, as Agravadas informaram ao D. Juízo da Recuperação o Pedido de Encerramento do *Chapter 15*, com a intenção de ajuizamento de *Chapter 11*, que se justificaria por dois motivos: *(i)* a lei brasileira não lhes permite apresentar nova recuperação judicial até **28.5.2029**; e *(ii)* a intenção de novar os créditos que, por força do artigo 49, *caput* e §3º da LFR, não estão sujeitos à Recuperação Judicial.

20.   Na manifestação apresentada perante o Juízo de Nova Iorque para o encerramento do *Chapter 15*, os representantes do Grupo Oi apontaram, com base em declarações prestadas pelo Sr. Marcelo Milliet, atual CEO da Oi, que eventual ajuizamento de um processo de *Chapter 11* pela Oi contaria com o suporte do D. Juízo da Recuperação e do E. Tribunal de Justiça do Rio de Janeiro, muito embora não houvesse qualquer manifestação ou decisão nesse sentido.

21.   **Segunda Decisão – Ofício ao Juízo de Nova Iorque**. Em **18.7.2025**, o D. Juízo da Recuperação proferiu decisão, por meio da qual, *inter alia*, *(i)* suspendeu o pagamento de bonificações aos administradores das Agravadas, tendo em vista que, segundo entendimento externado na decisão, o recente aumento da remuneração

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

---

[6] Os I. Administradores Judiciais informaram que "as Recuperandas não comprovaram o cumprimento integral das obrigações previstas no Plano de Recuperação Judicial" (fls. 116.028 da Recuperação Judicial).

**PINHEIRO NETO**
A D V O G A D O S

da administração das Agravadas seria impróprio e inadequado; *(ii)* determinou que o *Watchdog* apresentasse relatório sobre as atividades recentes das Agravadas, inclusive eventual esvaziamento patrimonial; e (iii) ordenou a expedição de ofício para o Juízo de Nova Iorque, informando que "*se encontra em tramitação perante este Juízo da 7ª Vara Empresarial do Rio de Janeiro, RJ, processo de recuperação judicial do Grupo Oi, no qual a Recuperanda deixou de cumprir obrigações assumidas no mês de junho de 2025, sem justificativa para tanto, até o presente momento*" ("Segunda Decisão" – **doc. nº 10**).

22.    **Primeiro Agravo de Instrumento**. Em **23.7.2025**, a Agravante interpôs agravo de instrumento contra a r. Primeira Decisão e a r. Segunda Decisão, tendo em vista que tais decisões teriam deixado de (i) exercer controle de legalidade a respeito da propositura de eventual *Chapter 11* nos Estados Unidos da América; e (ii) determinar a intimação da Comissão de Valores Mobiliários ("CVM") e do Tribunal de Contas da União ("TCU") com quem a Oi celebrou acordo para migração de regime de prestação de serviços – de concessão em regime público para autorização em regime privado ("Primeiro Agravo de Instrumento").

23.    **Efeito Suspensivo**. Em **25.7.2025**, V. Exa. atribuiu efeito suspensivo ao Primeiro Agravo de Instrumento, determinando, dentre outros pontos, a complementação da comunicação ao Juízo de Nova Iorque, para "*que, antes de proferir qualquer decisão no processo relacionado ao Chapter 15 do Grupo Oi, aguarde a decisão do Juízo brasileiro tanto com relação à verificação e consequências do descumprimento do PRJ, já noticiado, quanto do pedido de Aditamento ao PRJ do processo principal em trâmite no Brasil*" ("Decisão de Efeito Suspensivo" – **doc. nº 11**).

24.    **Manifestação da Agravante**. Em **30.7.2025**, diante das alegações do Grupo Oi no âmbito do *Chapter 15* de que uma decisão do D. Juízo da Recuperação a respeito do Aditamento ao Plano seria eminente --- enquanto, na realidade, havia diversos prazos em curso para que terceiros se manifestassem sobre a questão ---, a Agravante apresentou manifestação na Recuperação Judicial, requerendo ao D. Juízo da Recuperação que esclarecesse os andamentos processuais da

*TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica*

**PINHEIRONETO**
A D V O G A D O S

Recuperação Judicial e complementasse tais informações ao D. Juízo de Nova
Iorque, a fim de demonstrar que uma decisão sobre o Aditamento ao Plano requeria
o cumprimento de etapas processuais que estavam em aberto.

25.    **A Decisão Agravada**. Em **4.8.2025**, o D. Juízo da Recuperação, proferiu a r.
Decisão Agravada, que, dentre outras determinações, declarou a impossibilidade de
proibir o Grupo Oi de ajuizar o *Chapter 11*. Ao assim decidir, *d.m.v,* o Juízo da
Recuperação rejeitou o pedido de V.tal para que fosse analisada a legalidade de
potencial ajuizamento de um *Chapter 11* pelo Grupo Oi e, consequentemente, deixou
de adotar as medidas necessárias à preservação, no Brasil, dos direitos e remédios
daqueles credores que a Oi pretende sujeitar ao procedimento estrangeiro, mas que,
por força das disposições da LFR, não poderiam ser afetados no Brasil. É contra
essa r. decisão que a V.tal ora se insurge.

**IV.    DAS RAZÕES PARA A REFORMA DA R. DECISÃO AGRAVADA**

   **(a) *Violação à Ordem Pública – Pedido de Chapter 11 que <u>NÃO</u> poderá Ser
   Reconhecido no Brasil***

26.    A LFR <u>não</u> foi concebida para ser um instrumento jurídico de reestruturação
eterna e continuada. Pelo contrário: a LFR prevê **(i)** prazo de até 2 (dois) anos para
a manutenção do devedor em recuperação judicial a partir da homologação do plano
de recuperação judicial (artigo 61 da LFR)[7] e **(ii)** quarentena de 5 (cinco) anos
contados da homologação do plano de recuperação judicial para requerer o
processamento de nova recuperação judicial (artigo 48, II, da LFR).[8] Permitir que o
Grupo Oi utilize o *Chapter 11* para contornar essa vedação seria, em termos simples
e diretos, legitimar a fraude à lei sob o disfarce de *internacionalização processual.*

---

[7] Art. 61, LFR: Proferida a decisão prevista no art. 58 desta Lei, o juiz poderá determinar a manutenção do devedor
em recuperação judicial até que sejam cumpridas todas as obrigações previstas no plano que vencerem até, no
máximo, 2 (dois) anos depois da concessão da recuperação judicial, independentemente do eventual período de
carência.

[8] Art. 48, LFR: Poderá requerer recuperação judicial o devedor que, no momento do pedido, exerça regularmente
suas atividades há mais de 2 (dois) anos e que atenda aos seguintes requisitos, cumulativamente: II - ão ter, há
menos de 5 (cinco) anos, obtido concessão de recuperação judicial.

TJRJ 20250007735578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica



**PINHEIRONETO**
A D V O G A D O S

27.    Como reconhecido na r. Decisão Agravada, não se disputa que empresas brasileiras possam, em determinadas circunstâncias, valer-se de mecanismos de reestruturação no exterior, incluindo o ajuizamento de um *Chapter 11*. É o caso específico das companhias aéreas brasileiras que se valeram de bem-sucedidas reestruturações por meio do ajuizamento de procedimentos de *Chapter 11*. Nesses casos, no entanto, <u>não</u> havia um processo de recuperação judicial principal concomitantemente em curso no Brasil – aqui, o que se pretende é inédito: a duplicidade de processos principais, nacional e estrangeiro, algo que não é admitido pelo ordenamento jurídico brasileiro.

28.    Nesse sentido, o Professor Daniel Carnio Costa, em parecer elaborado à luz dos elementos fáticos deste caso (**doc. nº 12**), concluiu que "*as circunstâncias do caso concreto indicam (...) que <u>uma decisão de concessão da recuperação judicial do Grupo Oi nos EUA não poderia ser reconhecida no Brasil, por representar manifesta violação à ordem pública nacional</u>, mesmo com utilização do mais rigoroso padrão de análise imposto para o sistema de insolvência transnacional*" (destaques acrescentados).   Ou seja, ainda que submetido ao mais rigoroso escrutínio técnico, o *Chapter 11* da Oi não passa pelo crivo da legalidade brasileira.

29.    A permissão para que o Grupo Oi ajuíze *Chapter 11* nos Estados Unidos da América consumaria verdadeira <u>inversão de incentivos previstos na LFR</u>, com o potencial de afetar toda a prática de insolvência no Brasil. Apesar de se tratar de fato incontroverso porque assumido publicamente tanto pelo CEO da Oi quanto por seus assessores jurídicos, a V.tal entende pertinente prestar alguns esclarecimentos que sustentam essa afirmação. Estaríamos diante de um precedente que, além de temerário, dinamitaria a lógica concursal brasileira ao premiar o devedor contumaz e punir os credores diligentes.

30.    Os investidores que financiam devedores em recuperação judicial no Brasil se baseiam nas disposições aplicáveis previstas na LFR para a avaliação de riscos e precificação dos financiamentos. Dentre essas disposições, estão **(i)** a impossibilidade de se reestruturar dívidas garantidas por alienação fiduciária em processos de recuperação judicial (artigo 49, § 3º, LFR); e **(ii)** a impossibilidade de o

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

devedor ajuizar uma futura recuperação judicial dentro do prazo mínimo de 5 (cinco) anos contados da r. decisão que conceder a sua recuperação judicial atual (artigo 48, II, LFR).

31.     A previsibilidade desses marcos legais não é detalhe técnico: é a âncora de todo o sistema de crédito. Romper com ela equivale a soltar o navio à deriva. Toda a lógica do financiamento empresarial no Brasil repousa sobre a certeza de que as garantias e vedações legais não serão flexibilizadas ao sabor da conveniência do devedor. E foi justamente essa confiança na tutela do direito de crédito que levou a V.tal (por meio de sua sociedade afiliada), a desembolsar o equivalente a **US$ 150 milhões** em Financiamento DIP para a Oi.

32.     Ao fazer o investimento, a V.tal tinha a legítima expectativa, fundada em declarações da própria Oi e em pronunciamentos do Poder Judiciário, de que a LFR seria a legislação a pautar, com exclusividade, o processo principal da Oi. Por isso, a V.tal acreditava que o D. Juízo da Recuperação Judicial seria o único competente para processar a reorganização do Grupo Oi e, portanto, que **(i)** as garantias fiduciárias atreladas ao Financiamento DIP (*e.g.*, as onerações sobre as ações de emissão da V.tal) poderiam ser excutidas em qualquer cenário, de acordo com a lei nacional de regência e o instrumento de garantias; e **(ii)** a Oi não poderia ajuizar uma nova recuperação judicial dentro do prazo de 5 (cinco) anos contados da homologação do Plano – de modo que o Grupo Oi deveria necessariamente adimplir integralmente o Financiamento DIP antes de tal prazo, na medida em que aquele vence em 2027, ou seja, dentro de tal quarentena

33.     Com o devido respeito, caso a Justiça brasileira autorize o Grupo Oi, depois de ter se beneficiado de investimentos e proteções viabilizados e conferidos a ele pela Recuperação Judicial, na forma da legislação nacional, conforme autorização dos credores brasileiros e do Poder Judiciário, a ajuizar um *Chapter 11* paralelamente à Recuperação Judicial no Brasil para reestruturar obrigações extraconcursais na jurisdição norte-americana, estaria alterando a lógica e os incentivos conferidos pelo ordenamento jurídico nacionais, de modo que os

TJRJ 20250077357826/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

# PINHEIRONETO
### A D V O G A D O S

investidores que financiam empresas em recuperação judicial passariam a incluir tais elementos em suas análises de risco.

34.    Isso significa que, muito provavelmente, as taxas de juros associadas a financiamentos em benefício de devedores em recuperação judicial seriam majoradas, o que tornaria o acesso ao crédito por sociedade em recuperação judicial ainda mais escasso e custoso.

35.    Os impactos negativos ao setor decorrentes desse precedente temerário, inclusive, foram endereçados pela Associação Brasileira de Special Situations e Litigation Finance em sua petição de *Amicus Brief* apresentada no âmbito do *Chapter 15* (**doc. nº 13**). Segundo a Associação:

> A intenção da Oi de reestruturar seus passivos perante este Tribunal, enquanto sua segunda recuperação judicial está pendente perante o judiciário brasileiro, **constitui uma tentativa de contornar a lei brasileira**, que a impede de tomar tais medidas naquela jurisdição. O plano de reorganização no caso em questão — a segunda recuperação judicial da Oi — foi confirmado em 28 de maio de 2024, o que significa que, de acordo com a legislação brasileira, a apresentação de outro pedido de recuperação judicial — o terceiro do tipo — só seria possível a partir de 28 de maio de 2029. **Permitir que a Oi apresente pedidos para reestruturar seus passivos extraconcursais em outra jurisdição dentro do período de proibição legal equivaleria, portanto, a uma violação da legislação brasileira**.
>
> **Se esse precedente for estabelecido, ele terá implicações sérias para o mercado de financiamento DIP brasileiro**, que ainda é novo e subdesenvolvido em comparação com o dos Estados Unidos, tendo em vista a recente mudança na legislação de insolvência brasileira que concede aos credores as garantias de que precisam para oferecer financiamento DIP. Se o plano da Oi for autorizado a seguir adiante, a certeza jurídica de que um empréstimo DIP não pode ser reestruturado dentro de cinco anos, conforme a legislação brasileira de insolvência, deixaria de existir. **Alguns credores podem sair completamente do mercado, enquanto outros podem oferecer crédito apenas a empresas insolventes em condições muito menos favoráveis. Embora tal incerteza sem dúvida afete o setor específico de financiamento DIP que a Associação representa, os impactos mais significativos seriam sentidos não apenas pelos credores, mas também pelos futuros devedores brasileiros**. A Lei nº 14.112/20 facilitou o mercado de financiamento DIP, gerando impactos positivos importantes para os devedores em todo o Brasil, e resolveu questões históricas que limitaram o acesso ao capital por décadas antes de sua aprovação. Antes dessa lei, o financiamento DIP raramente estava disponível para devedores brasileiros porque não havia mecanismo legal que garantisse que a dívida não poderia ser reestruturada, ou que oferecesse proteções adicionais a essa dívida. Se Oi for autorizada a vir aos Estados Unidos para fazer o

**P I N H E I R O N E T O**
A D V O G A D O S

que não poderia fazer no Brasil, isso corre o risco de retroceder ao regime anterior à Lei nº 14.112/20, quando os devedores sofriam com a incapacidade de garantir o financiamento necessário em condições aceitáveis.

Por essas razões, a Associação se manifesta neste processo para expressar sua preocupação com os efeitos que a concessão do pedido da Oi teria sobre a estrutura institucional do sistema de insolvência brasileiro e, consequentemente, sobre o ambiente de negócios do país (tradução livre; destaques acrescentados – **doc. nº 13**).

36.    Mas não só. Os efeitos deletérios dessa estratégia, para o mercado como um todo também foram reconhecidos pelos assessores do Grupo Oi na audiência no âmbito do *Chapter 15*, segundo os quais o mercado brasileiro *teria de se adaptar* a essa nova realidade:

P: Você sabe — você não tem certeza de como, Sr. Padis, mas você reconhece, não é, que se a Oi reestruturar com sucesso o financiamento de devedores em posse neste Tribunal de Falências dos Estados Unidos, isso poderia afetar o mercado de financiamento DIP no Brasil, não é, senhor? R: <u>Acho que o mercado terá que se adaptar</u>.

P: O mercado pode se adaptar, mas certamente pode ter um impacto, correto? R: É justo dizer isso.

P: E só para deixar claro, Sr. Padis, você não sabe nem uma vez que um Tribunal de Falências dos EUA reestruturou o financiamento do DIP brasileiro pelo menos dentro de cinco anos de um plano confirmado do RJ, correto? R: Eu não sei. Isso está correto. (tradução livre – **doc. nº 14**)[9]

37.    A declaração causa espanto. É a confissão de que pretendem submeter todo o sistema concursal brasileiro — cuidadosamente construído pelo legislador, pelos tribunais e pelos agentes econômicos — a um experimento jurídico de conveniência. É dizer, em alto e bom som, que o direito brasileiro pode ser atropelado e que os credores, investidores e trabalhadores terão de simplesmente se conformar com o caos.

38.    Sob o manto da reestruturação internacional, o que se esconde é uma mensagem cristalina: a Oi pretende reescrever as regras do jogo e, diante disso,

---

[9]  A Agravante esclarece que a tradução juramentada do documento será apresentada oportunamente.

## PINHEIRONETO
### A D V O G A D O S

todos os demais atores — inclusive este E. Tribunal — "*terão que se adaptar*". Uma chantagem institucional travestida de estratégia jurídica.

39.     O descaso da Oi, porém, não está limitado ao mercado de crédito e aos financiadores que, assumindo um risco controlado (pautado na análise da LFR) concederam DIP à Oi. Vai além e atinge todos os demais credores extraconcursais da Oi, cujos créditos se pretende reestruturar nos Estados Unidos.

40.     Tal como os financiadores do DIP, os vários credores que aprovaram o Plano e que mantêm relações comerciais com a Oi cujo fato gerador é posterior ao ajuizamento da Recuperação Judicial, tomaram essa medida de apoio ao Plano confiantes de que os seus créditos extraconcursais <u>não</u> seriam reestruturados por um processo judicial de reestruturação em, pelo menos, nos próximos 5 (cinco) anos contados da data em que o Plano foi homologado.

41.     Em outras palavras, ao tomar a decisão de aprovar o plano de recuperação judicial, os credores que mantêm relações comerciais de trato sucessivo com o devedor em recuperação judicial levam em consideração os termos de pagamentos de seu crédito concursal em conjunto com as expectativas de pagamento dos fornecimentos nos anos futuros, que serão viabilizados com a aprovação do plano e o soerguimento do devedor.

42.     Esse é o caso, por exemplo, de credores fornecedores parceiros do Grupo Oi, que aceitaram a reestruturação de seus créditos concursais nos termos previstos na cláusula 4.2.6 e seguintes do Plano, confiantes de que os fornecimentos contratados após o pedido da Recuperação Judicial não seriam impactados por um processo de reestruturação futuro – ou, ao menos, pelos próximos 5 (cinco) anos. Caso tais credores tivessem notícia de que os seus créditos extraconcursais seriam objeto de uma reestruturação num futuro *Chapter 11*, é razoável assumir que o seu voto de apoio ao Plano poderia ser diferente daquele computado em abril de 2024.

43.     A recuperação judicial é, antes de tudo, um pacto de confiança entre devedor, credores e o Poder Judiciário. Quando o devedor, depois de obter a homologação

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

de seu plano e colher os benefícios jurídicos e econômicos dele decorrentes, tenta subverter esse pacto com a propositura de um *Chapter 11*, o que se rompe não é apenas a expectativa dos credores, mas a própria credibilidade do processo concursal brasileiro. Sem fidúcia, não há negociação possível; sem previsibilidade, não há crédito; e sem crédito, não há reestruturação que se sustente.

44.      Nesse aspecto, destaca-se que, durante as audiências no âmbito do *Chapter 15*, tornou-se pública a intenção do Grupo Oi de reestruturar dívidas contratadas pela Oi junto a fornecedores parceiros, após o início da Recuperação Judicial. É o caso, por exemplo, das empresas titulares de torres de transmissão e satélites – que sustentam as obrigações da Oi no acordo celebrado com o TCU:

> P. Os credores "*high line*", esses também são credores de torres, correto?
>
> R. Correto.
>
> P. E sob a RJ, há 712 milhões de reais de créditos "*high line*" que não podem ser reestruturados pela RJ, certo?
>
> R. Certo.
>
> P. E a Oi acredita que esses créditos podem ser reestruturados por um processo de recuperação judicial na forma do *Chapter 11* na coluna dois, correto?
>
> R. Correto.
>
> P. Outra categoria de créditos que a Oi acredita que não podem ser reestruturados na RJ são os fornecedores pós-pedido de recuperação, correto?
>
> R. Correto.
>
> P. E a Oi acredita que pelo menos uma parte deles pode ser reestruturada pelo processo de recuperação judicial na forma do *Chapter 11* na segunda coluna, correto?
>
> R. Correto. (tradução livre – **doc. nº 15**)

45.      A medida pretendida pela Oi, conforme destaca o parecer preparado pelo Professor Daniel Carnio Costa, "*revela a inequívoca intenção do Grupo Oi de driblar limitação estruturante do sistema de insolvência brasileiro: o ajuizamento da terceira recuperação judicial sem que tenha decorrido o prazo de cinco anos da concessão*

TJRJ 20250077357826/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

*da segunda recuperação e sem que tenha havido o encerramento do caso,"* de modo que *"essa* <u>*pretensão da Oi não poderia ser reconhecida e aplicada pelo juízo brasileiro por configurar violação clara e manifesta à ordem pública brasileira,*</u> *já que, na prática, busca-se ajuizar um terceiro pedido de recuperação judicial antes do prazo legal de cinco anos, por meio de estratégia internacional que contorna norma procedimental essencial'* (**doc. nº 12** – destaques acrescentados).

### (b) Regras de Insolvência Transnacional que Proíbem a Reestruturação de Créditos não Afetados pela Recuperação Judicial no Brasil

46.    **Lei Modelo**. Desde 2021, o Brasil adota as regras inspiradas na Lei Modelo da UNCITRAL de Insolvência Transnacional no âmbito da LFR (artigos 167-A e seguintes). Nesse contexto, o legislador brasileiro optou por prever regras claras a respeito de processos de insolvência estrangeiros que venham a ser ajuizados por um devedor em recuperação judicial, como é o caso da Oi por meio do potencial ajuizamento do *Chapter 11* nos Estados Unidos da América.

47.    **Classificações Relevantes**. Para esse fim, a LFR estabelece as seguintes classificações relevantes para a análise deste caso: (i) <u>processo estrangeiro</u> [artigo. 167-B, inciso I] – qualquer processo judicial ou administrativo, de cunho coletivo, inclusive de natureza cautelar, aberto em outro país de acordo com disposições relativas à insolvência nele vigentes, em que os bens e as atividades de um devedor estejam sujeitos a uma autoridade estrangeira, para fins de reorganização ou liquidação; (ii) <u>processo estrangeiro principal</u> [artigo. 167-B, inciso II] – qualquer processo estrangeiro aberto no país em que o devedor tenha o centro de seus interesses principais; e (iii) <u>processo estrangeiro não principal</u> [artigo. 167-B, inciso III] – qualquer processo estrangeiro que não seja um processo estrangeiro principal, aberto em um país em que o devedor tenha estabelecimento ou bens.

48.    Em outras palavras, a Oi só poderá ter um processo estrangeiro principal reconhecido no Brasil caso o centro de principal interesse da Oi seja localizado em tal jurisdição estrangeira. A propósito do tema, a doutrina especializada estabelece critérios objetivos para definição do centro de principal interesse:

TJRJ 20250077357B 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

## PINHEIRONETO
### A D V O G A D O S

> "Principal é o processo estrangeiro que ocorre no centro de interesses principais do devedor, e que se **presume como o de sua sede administrativa ou domicílio do empresário individual por ocasião da realização do processo estrangeiro**, a menos que essa sede tenha sido transferida ou manipulada para alterar a competência. Nesse aspecto, **deverá ser verificado o país de administração dos interesses do devedor e que seria prontamente reconhecido pela coletividade de credores**, independentemente de sua sede estatutária, no momento do início do processo estrangeiro." (SACRAMONE, Marcelo Barbosa. Comentários à Lei de Recuperação de Empresas e Falência. 2. ed. São Paulo: Saraiva Educação, 2021. p. 640-641- grifos acrescentados)

49.      **Eventual *Chapter 11* – Processo Estrangeiro Não Principal**. Neste caso, uma vez que é claro que a Oi não tem seu centro de principal interesse nos Estados Unidos da América, notadamente porque optou por <u>duas vezes</u> ajuizar pedido de recuperação judicial no Brasil. Conforme expressamente reconhecido pela Oi no âmbito das petições de ajuizamento e de encerramento do *Chapter 15*[10], bem como nas audiências no âmbito do *Chapter 15* seu centro de principal interesse está no Brasil, eis que todas as suas operações e fonte de receitas se localizam no território brasileiro[11].

50.      **Centro de Principais Interesses no Brasil desde a Primeira RJ**. Além disso, no âmbito da Primeira RJ, o Grupo Oi também revelou que o seu centro de principal interesse estava no Brasil. Durante aquele processo, a Oi Coop e a PTIF tiveram seu processo de *suspension of payments* processado, enquanto a Primeira RJ estava em curso no Brasil. Em vista do paralelismo entre os processos holandeses e brasileiro, o D. Juízo da Recuperação declarou que havia "*necessidade da adoção de medidas efetivas por parte deste juízo recuperacional, com vista a proteger, a UNIVERSALIDADE DE CREDORES ENVOLVIDOS*" e "*que compete ao juízo da recuperação judicial decidir sobre todas as questões que envolvam os ativos*

TJRJ 20250077357B 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

---

[10] "Em 29 de março de 2023, o Tribunal realizou uma audiência para analisar a Petição Verificada e proferiu uma decisão que, entre outras coisas, concluiu que o centro de interesse principal de cada uma das Devedoras com base no Capítulo 15 está no Brasil e reconheceu o Processo de RJ brasileiro como um "processo principal estrangeiro" de cada uma das Devedoras com base no Capítulo 15". (**doc. nº 8**).

[11] "P. E quando a Oi entrou com seu segundo processo de RJ, a sede social da Oi era no Brasil, correto?
R. Correto.
P. E quando a Oi apresentou sua petição conforme o Capítulo 15 perante este Juízo, a sede social da Oi era no Brasil, correto?
R. Correto.
P. E sentado aqui hoje, Sr. Padis, você representa a Oi agora. A sede social da Oi, ela se mantém no Brasil, correto, senhor?
R. Esse é o meu entendimento." (**doc. nº 15**).

**PINHEIRONETO**
A D V O G A D O S

*das sociedades em Recuperação Judicial, ainda que não voltados para o pagamento dos credores"* (**doc. nº 16**).

51.    Diante disso, no momento em que a Coop e a PTIF tiveram sua falência decretada pelo Tribunal Recursal de Amsterdã, o D. Juízo da Recuperação declarou que "*a jurisdição brasileira e competência deste Juízo da recuperação judicial das empresas do Grupo OI permanecem, então, inabaladas,*" bem como determinou a prevalência da Primeira RJ sobre o procedimento de falência holandês, impondo multa aos administradores judiciais holandeses caso pratiquem medidas contra a determinação desse D. Juízo (**doc. nº 17**).

52.    Nesse sentido --- e similarmente ao quanto adotado na Primeira RJ ---, eventual *Chapter 11* ajuizado nos Estados Unidos da América seria classificado como processo estrangeiro não principal do Grupo Oi, nos termos da LFR (artigo 167-B, III da LFR), preservando-se o status da Recuperação Judicial como o processo principal de reestruturação do Grupo Oi.

53.    **Processos Concomitantes**. Nas hipóteses em que um devedor decida ajuizar um processo estrangeiro concomitantemente com um processo de recuperação judicial no Brasil, a LFR estabelece que o juiz deverá buscar a cooperação e a coordenação entre tais processos. Especificamente, a LFR estabelece que "se o processo no Brasil já estiver em curso quando o pedido de reconhecimento do processo estrangeiro tiver sido ajuizado, <u>qualquer medida de assistência determinada pelo juiz nos termos dos arts. 167-L[12] ou 167-N[13] da LFR</u>

---

[12] Art. 167-L. Após o ajuizamento do pedido de reconhecimento do processo estrangeiro, e antes de sua decisão, o juiz poderá conceder liminarmente as medidas de tutela provisória, fundadas em urgência ou evidência, necessárias para o cumprimento desta Lei, para a proteção da massa falida ou para a eficiência da administração.
§ 1º Salvo no caso do disposto no inciso IV do caput do art. 167-N desta Lei, as medidas de natureza provisória encerram-se com a decisão sobre o pedido de reconhecimento.
§ 2º O juiz poderá recusar-se a conceder as medidas de assistência provisória que possam interferir na administração do processo estrangeiro principal.
[13] Art. 167-N. Com a decisão de reconhecimento do processo estrangeiro, tanto principal como não principal, o juiz poderá determinar, a pedido do representante estrangeiro e desde que necessárias para a proteção dos bens do devedor e no interesse dos credores, entre outras, as seguintes medidas:
I - a ineficácia de transferência, de oneração ou de qualquer forma de disposição de bens do ativo não circulante do devedor realizadas sem prévia autorização judicial, caso não tenham decorrido automaticamente do reconhecimento previsto no art. 167-M desta Lei;
II - a oitiva de testemunhas, a colheita de provas ou o fornecimento de informações relativas a bens, a direitos, a obrigações, à responsabilidade e à atividade do devedor;
III - a autorização do representante estrangeiro ou de outra pessoa para administrar e/ou realizar o ativo do devedor, no todo ou em parte, localizado no Brasil;

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica



# PINHEIRONETO
### A D V O G A D O S

deve ser compatível com o processo brasileiro, <u>e o previsto no art. 167-M desta Lei não será aplicável se o processo estrangeiro for reconhecido como principal</u>" (artigo 167-S, I da LFR).

54.    Diante disso, caso o Grupo Oi eventualmente ajuíze um processo de *Chapter 11* nos Estados Unidos da América e busque o seu reconhecimento no Brasil, sabe-se que: (i) o *Chapter 11* não poderá ser reconhecido como processo estrangeiro principal, tendo em vista que a Oi ajuizou a Recuperação Judicial no Brasil e, portanto, assumiu que o seu centro de principal interesse do Grupo Oi não é nos Estados Unidos da América; e (ii) qualquer medida de cooperação a ser adotada pelo D. Juízo da Recuperação deve ser compatível com a Recuperação Judicial. Notadamente, tendo em vista que o *Chapter 11* não seria o processo estrangeiro principal do Grupo Oi, aplicar-se-á o previsto no artigo 167-M da LFR, diante do disposto no fim do artigo 167-S, I da LFR (copiado imediatamente acima).

55.    Por sua vez, o artigo 167, M, § 3º da LFR dispõe que "as medidas previstas neste artigo [(*i.e.,* suspensão de atos constritivos contra o devedor)] **não afetam os credores que não estejam sujeitos** aos processos de recuperação judicial (...)." Em outras palavras, na hipótese de o Grupo Oi ajuizar o *Chapter 11*, os efeitos decorrentes sobre créditos não sujeitos à recuperação judicial não poderão ser reconhecidos e aplicados pela jurisdição brasileira.

56.    Diante do acima --- e mediante um simples exercício interpretativo das disposições expressas contidas na LFR e do histórico desta Recuperação Judicial ---, chega-se às seguintes principais conclusões:

- Eventual pedido de *Chapter 11* pelo Grupo Oi nos Estados Unidos da América seria classificado no Brasil como um processo estrangeiro <u>não</u> principal

---

IV - a conversão, em definitiva, de qualquer medida de assistência provisória concedida anteriormente;
V - a concessão de qualquer outra medida que seja necessária.
§ 1º Com o reconhecimento do processo estrangeiro, tanto principal como não principal, o juiz poderá, a requerimento do representante estrangeiro, autorizá-lo, ou outra pessoa nomeada por aquele, a promover a destinação do ativo do devedor, no todo ou em parte, localizado no Brasil, desde que os interesses dos credores domiciliados ou estabelecidos no Brasil estejam adequadamente protegidos.
§ 2º Ao conceder medida de assistência prevista neste artigo requerida pelo representante estrangeiro de um processo estrangeiro não principal, o juiz deverá certificar-se de que as medidas para efetivá-la se referem a bens que, de acordo com o direito brasileiro, devam ser submetidos à disciplina aplicável ao processo estrangeiro não principal, ou certificar-se de que elas digam respeito a informações nele exigidas.

JUR_SP - 55617456v5 - 5769054.524399



**P I N H E I R O N E T O**
A D V O G A D O S

(artigo 167-B, II da LFR), tendo em vista que o centro de principal interesse do Grupo Oi não é nos Estados Unidos da América conforme já reconhecido no âmbito dos sucessivos pedidos de recuperação judicial do Grupo Oi no Brasil, nas petições apresentadas no *Chapter 15* e nas audiências no âmbito do *Chapter 15*;

- Tendo em vista que eventual *Chapter 11* do Grupo Oi seria um processo estrangeiro <u>não</u> principal, ao reconhecer as medidas adotadas no *Chapter 11* em território brasileiro, o D. Juízo da Recuperação deveria cooperar com o Juízo de Nova Iorque, desde que tal cooperação e assistência sejam compatíveis com o disposto na LFR, tendo em vista que o *Chapter 11* seria ajuizado com a Recuperação Judicial em curso (artigo 167-S, I da LFR); e

- Os efeitos de um *Chapter 11* sobre créditos não sujeitos à recuperação judicial no Brasil <u>não seriam passíveis de reconhecimento</u> e aplicação no Brasil (artigo 167-S, I, parte final e artigo 167-M, § 3º, LFR).

57.    **Preservação das Obrigações Extraconcursais da Agravante.** Conclui-se, portanto, que, caso a Oi venha a ajuizar o *Chapter 11* – o que se admite apenas para fins argumentativos –, a reestruturação das obrigações de natureza extraconcursal do Grupo Oi não seria passível de reconhecimento e aplicação de efeitos no Brasil.

58.    O que o Grupo Oi pretende por meio do *Chapter 11* é justamente reestruturar créditos que não se sujeitariam a uma recuperação judicial no Brasil. E tais créditos não podem ser reestruturados no Brasil *inter alia* porque a LFR consagra quarentena de 5 (cinco) anos para que um novo pedido de recuperação judicial seja ajuizado (artigo 48, II, LFR). Logo, a pretensa e presumida tentativa do Grupo Oi de buscar o reconhecimento dos efeitos de tal *Chapter 11* é, por definição, iniciativa natimorta.

59.    **Impacto sobre os Créditos Concursais.** Como se não bastasse a intenção manifestamente ilegal de reestruturar créditos que não se sujeitariam à Recuperação Judicial, as declarações prestadas pelo Sr. Marcelo Milliet na Audiência do *Chapter 15*, dão a entender que a estratégia do Grupo Oi não se restringe a tal objetivo. Questionado a respeito da extensão da reestruturação pretendida, o Sr. Marcelo

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

Milliet admitiu que o *Chapter 11* <u>teria impacto direto sobre créditos que já estão sendo</u> <u>reestruturados no Brasil</u> no âmbito da Recuperação Judicial.

60.    O Grupo Oi reconhece, portanto, que o *Chapter 11* pode <u>interferir também na</u> <u>esfera de créditos concursais</u> que estão sob a tutela do D. Juízo da Recuperação e desse E. Tribunal e que deveriam ser mantidos exclusivamente sujeitos à jurisdição brasileira.

> P. Sr. Milliet, você concorda que um pedido de recuperação judicial conforme o ajuizamento do *Chapter 11* teria um impacto direto nos créditos que estão sendo reestruturados no Brasil, correto?
>
> R. Créditos que não puderam ser reestruturados no Brasil.
>
> P. Também teria um impacto nos créditos que estão sendo reestruturados na RJ, correto?
>
> R. Por meio de negociações, sim. Okay. Mas nosso objetivo aqui é recuperar créditos que não podem ser recuperados no Brasil.
>
> P. Sr. Milliet, peço que o senhor vá para a página 44 da transcrição do seu depoimento, por favor.
>
> R. O primeiro volume?
>
> P. Sim. Me avise quando encontrar. Começando na Linha 19, perguntei: <u>ajuizamento</u> <u>do Capítulo 11 poderia ter um impacto direto nos créditos que estão sendo</u> <u>recuperados na JR?</u>
>
> R. <u>Eu concordei que isso tem um impacto.</u> Okay. Mas o impacto não é apenas negativo, é positivo também. Eu li isso corretamente?
>
> R. Sim. Sim. (tradução livre – **doc. nº 15**)

61.    **Novas Dívidas Prioritárias – Subordinação de Créditos Concursais.** O mesmo depoimento revela que o Grupo Oi busca obter um financiamento na modalidade *debtor-in-possession*, no âmbito do *Chapter 11*, que teria prioridade tanto sobre créditos extraconcursais detidos contra o Grupo Oi, quanto sobre os créditos concursais que já estão sendo reestruturados na Recuperação Judicial.

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

62.    O Grupo Oi admite, portanto, que pretende se utilizar de um processo estrangeiro para alterar a ordem de pagamentos e prioridade de distribuição de caixa estabelecida na Recuperação Judicial, no Plano já homologado pela jurisdição brasileira. Tal reconhecimento é particularmente grave, pois significa impor, por meio de um processo estrangeiro não principal, mais um prejuízo aos credores concursais da Recuperação Judicial, que talvez sequer tenham condições de ser ouvidos e se defender perante a justiça estadunidense.

> P. E com relação ao pedido de recuperação judicial conforme o ajuizamento do *Chapter 11*, você está buscando financiamento DIP conforme o *Chapter 11*, correto?
>
> R. Correto.
>
> P. E qualquer financiamento DIP conforme o ajuizamento do *Chapter 11* seria prioritário sobre os créditos que estão sendo reestruturados atualmente no Brasil, correto?
>
> R. Provavelmente, sim.
>
> P. E qualquer financiamento DIP conforme o ajuizamento do *Chapter 11* também seria prioritários sobre créditos que não podem ser reestruturados no Brasil, correto?
>
> R. Correto. (tradução livre – **doc. nº 15**)

63.    Em síntese, o que o Grupo Oi intenta por meio do *Chapter 11* é subverter, de fora para dentro, a ordem pública brasileira: reestruturar créditos que a lei nacional expressamente exclui da recuperação, criar novas dívidas prioritárias que atropelam credores concursais e reescrever a cascata de pagamentos já homologada pelo Judiciário brasileiro.

### (c) Risco de Decisões Conflitantes – Insegurança Jurídica Também Já Reconhecida pelo Juízo de Nova Iorque

64.    Caso o Grupo Oi viesse a ajuizar um *Chapter 11,* o D. Juízo da Recuperação e esse E. Tribunal enfrentariam situação inédita no regime de insolvência nacional, em que um mesmo devedor propõe uma Recuperação Judicial e um *Chapter 11* concomitantemente. Trata-se de um cenário não admitido pelo direito brasileiro e

TJRJ 20250007735678 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

que, se tolerado, abriria caminho para um grau inédito de desorganização institucional.

65.    Nesse sentido, no âmbito da Audiência do *Chapter 15* o Juízo de Nova Iorque já indicou, inclusive, que há uma série de dúvidas a respeito de como o processamento de um *Chapter 11* nos Estados Unidos da América poderia sequer ser efetivado no Brasil, tendo em vista os problemas de reconhecimento das decisões proferidas no *Chapter 11* em território brasileiro:

> O TRIBUNAL: Eles [a corte brasileira] estão cientes disso, mas eu não acho que você vai receber uma ordem dizendo: "Ok, divirta-se. Vá para Nova York e arquive o caso do Capítulo 11." Acho que você nunca vai receber um pedido como esse.
>
> TESTEMUNHA: Nós –
>
> O TRIBUNAL: **Eu ficaria chocado**. Quer dizer, estou esperando para ver o que os tribunais brasileiros dizem. Mas é mais uma preocupação com o que isso poderia ser. Mas acho que você nunca vai conseguir uma direção clara. **Eu ficaria chocado se o tribunal dissesse que isso funciona bem**. (...) E eu não posso — eu simplesmente — há muitos fatores a serem considerados, então é por isso que estou fazendo a pergunta. Porque, obviamente, acho que você não sabe mais do que eu sobre o que aconteceria.
>
> TESTEMUNHA: Isso é justo.
>
> O TRIBUNAL: (...) **mas vou dizer que acho que nenhum de nós sabe como isso terminaria nesse caminho. Eu não.** (...) (destaques acrescentados; **doc. nº 15**)

66.    Esse reconhecimento externo, portanto, não parte de uma desconfiança isolada: é a própria justiça americana quem admite que a tentativa da Oi seria um salto no escuro, um terreno movediço em que ninguém — nem mesmo o tribunal estrangeiro — sabe como pisar. Aliás, o Juízo de Nova Iorque inclusive reconheceu que a correlação entre um pretenso *Chapter 11* e a Recuperação Judicial seria uma verdadeira "terra de ninguém":

> O TRIBUNAL: Acho que você está realmente – A circunstância seria interessante, só digo isso, com certeza. **Porque todas as nossas diretrizes não seriam necessariamente aplicáveis e estaríamos quase voltando ao que tínhamos que fazer antes de tê-las.** É assim que eu vejo isso. Porque eu não vou ter --- você não vai ter as disposições da Lei Modelo que permitem a interface entre os dois tribunais,

**PINHEIRO NETO**
A D V O G A D O S

as diretrizes da JIN são realmente focadas principalmente em 15. Não tenho certeza
se elas não poderiam ser usadas para outra coisa, mas - e digo isso como
representante do JIN do nosso distrito. **Mas eu... Você sabe, você está em uma terra
de ninguém, acho que de certa forma.** (**doc. nº 14** – destaques acrescentados)

67.    É sintomático que o próprio juízo estrangeiro, que seria o foro da manobra, a
descreva como "terra de ninguém". Não há definição mais exata para o caos jurídico
que a Oi pretende instaurar. E, de fato, são diversos os pontos potencialmente
controvertidos que se verificarão na coexistência concomitante de dois processos
principais de reestruturação, inclusive a emissão de ordens pela jurisdição
estrangeira potencialmente conflitantes com as próprias decisões do D. Juízo da
Recuperação e desse E. Tribunal. Nesse sentido:

- Durante a Recuperação Judicial, o Grupo Oi não pode **alienar ou onerar
  bens do seu ativo fixo** exceto se autorizado pelo D. Juízo da Recuperação
  ou previsto no Plano (artigo 66, LFR).[14] Caso o *Chapter 11* envolva a
  alienação ou oneração de bens do ativo não circulante do Grupo Oi (seja na
  medida em que autorizado pelo Juízo estrangeiro, seja porque previsto no
  plano de recuperação respectivo), essa medida será potencialmente
  incompatível com a restrição existente sob a luz da LFR;

- Da mesma forma, um **financiamento pós-concursal** só se beneficia das
  proteções contidas na LFR e poderá contar com garantias reais ou fiduciárias
  se aprovadas pelo D. Juízo da Recuperação Judicial (ou caso previstas no
  Plano posteriormente homologado – artigo 69-A e seguintes, LFR). Caso o
  Grupo Oi busque a obtenção de um financiamento pós concursal com
  garantias no âmbito do *Chapter* e tal providência seja autorizada pela
  jurisdição estrangeira, a implementação de tal financiamento não seria
  conciliável com as regras da LFR, principalmente porque tal financiamento
  não poderia se sobrepor ao financiamento DIP já tomado de acordo com a
  previsão do PRJ e nem tampouco poderia se aproveitar de garantias que já

---

[14] Art. 66, LFR: Após a distribuição do pedido de recuperação judicial, o devedor não poderá alienar ou onerar bens
ou direitos de seu ativo não circulante, inclusive para os fins previstos no art. 67 desta Lei, salvo mediante
autorização do juiz, depois de ouvido o Comitê de Credores, se houver, com exceção daqueles previamente
autorizados no plano de recuperação judicial.

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

foram concedidas a outros credores no Brasil – como o Grupo Oi já anunciou
que pretende fazer; e

- A LFR estabelece que o D. Juízo da Recuperação Judicial deve, no curso da
  Recuperação Judicial, determinar o **afastamento da administração do
  Grupo Oi** caso verificadas determinadas hipóteses (artigo 64 e seguintes,
  LFR). A administração do Grupo Oi, naturalmente, será a mesma que proporá
  eventual *Chapter 11* e, consequentemente, será tutelada e supervisionada de
  acordo com as regras daquele procedimento, que adota o sistema do *Debtor
  in Possession* (ou seja, manutenção do devedor à frente dos negócios). Caso
  o D. Juízo da Recuperação determine o afastamento da administração do
  Grupo Oi, tal medida seria incompatível com o *Chapter 11* (ou até mesmo
  caso o Juízo estrangeiro determine a manutenção da administração na
  condução do Grupo Oi). Ou seja, tais determinações serão conflitantes e
  potencialmente inconciliáveis.

- Os planos de recuperação judicial do Grupo Oi, aprovados e homologados
  pelo D. Juízo da Recuperação, preveem e regulam diversos contratos
  celebrados no contexto das recuperações judiciais (*e.g.*, contratos de
  comodato, de utilização de infraestrutura de cobre, entre outros). Caso o
  Juízo estrangeiro, no âmbito de eventual *Chapter 11*, venha a autorizar a
  rejeição de tais contratos, a medida configuraria afronta direta às decisões
  judiciais brasileiras que (direta ou indiretamente) homologaram e atribuíram
  validade e eficácia a tais obrigações contratuais. Essa situação geraria, na
  prática, um efeito rescisório sobre contratos e obrigações já consolidados por
  decisões transitadas em julgado no Brasil, em clara violação à competência
  do D. Juízo da Recuperação e em total incompatibilidade com a LFR.

68.    De fato, é incerto como se conciliariam dois procedimentos principais de
reestruturação. A própria Oi em nenhum momento trouxe à Recuperação Judicial
qualquer esclarecimento a esse respeito, limitando-se a informar, de forma
superficial, que estaria avaliando a possibilidade de submeter um pedido de
instauração de *Chapter 11*. O silêncio eloquente da Oi é revelador: quem tem
estratégia legítima explica, quem trama manobra se esconde. No mesmo sentido, no

# PINHEIRO NETO
### A D V O G A D O S

âmbito da Audiência do *Chapter 15*, os próprios representantes do Grupo Oi e o Juízo de Nova Iorque deixaram claro que, no momento, a conciliação de ambos os processos se limita a exercícios de **futurologia**:

> O TRIBUNAL: (...) Tudo bem, então eu vou te fazer minha última pergunta aqui, (...) você prevê que a empresa possa precisar de alguma medida da justiça brasileira se fosse prosseguir e abrir um processo, exceto com respeito à emenda do plano?
> A razão pela qual estou fazendo essa pergunta é que você estava falando sobre um processo de venda. Isso não é apenas uma emenda ao plano. O plano prevê isso, eu entendo. Mas eu não tinha certeza se havia algo mais que você pudesse esperar, já que você esteve envolvido nas discussões sobre um processo do Capítulo 11 em que alguém precisaria voltar ao tribunal por alguns dos motivos pelos quais acabei de expressar algumas preocupações.
>
> TESTEMUNHA: Não relacionado à emenda do RJ, Excelência?
>
> O TRIBUNAL: Sim, não relacionado.
>
> TESTEMUNHA: Neste ponto, como você disse corretamente, Excelência, **é um pouco de futurologia. Eu não posso** –
>
> O TRIBUNAL: **Sim, tudo é futurologia. Eu concordo com isso. Essa é uma boa palavra para isso** (tradução livre; destaques acrescentados – **doc. nº 15**).

69.    No entendimento da V.tal, aceitar que o andamento da Recuperação Judicial do Grupo Oi esteja sujeito a exercícios de **futurologia** em razão do ajuizamento do *Chapter 11* – como propõe o assessor jurídico do Grupo Oi – seria uma irresponsabilidade sem tamanho que pode comprometer os diversos *stakeholders* envolvidos, inclusive trabalhadores e parceiros comerciais com atividades de interesse público, como a V.tal. É transformar a reestruturação judicial, que deveria ser o *ápice da previsibilidade*, em um *cassino de resultados aleatórios*.

70.    Dentre os aspectos obscuros, é incerto **(i)** em que medida um *Chapter 11* potencialmente impactaria credores trabalhistas, tributários e aqueles devidos às autoridades regulatórias brasileiras; e **(ii)** como a Oi pretende dar efetividade no Brasil às decisões eventualmente proferidas pela justiça americana em vista da existência e continuidade da Recuperação Judicial, notadamente à luz dos artigos 167-A e seguintes da LFR.

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

71.    Ademais, no (indesejado) cenário em que a Recuperação Judicial seja convolada em falência diante dos descumprimentos do Plano e da deterioração da situação financeira do Grupo Oi, já noticiada pelos I. Administradores Judiciais e pelo Watchdog, caberia ao D. Juízo da Recuperação Judicial e a esse E. Tribunal dar eficácia às regras de arrecadação e alienação de ativos no cenário de liquidação das Agravadas. Simultaneamente, no entanto, o Juízo de Nova Iorque poderá também adotar medidas (potencialmente conflitantes) que impedirão a alienação de ativos do Grupo Oi, em prol do *Chapter 11*.

72.    A instauração do *Chapter 11*, portanto, causaria inevitável conflito de normas, incompatibilidade de procedimentos e substancial insegurança jurídica para a reestruturação do Grupo Oi e para todo o sistema de insolvência brasileiro. Tal medida, além de inconciliável com essa Recuperação Judicial e os possíveis desdobramentos dela decorrentes, não é no melhor interesse de qualquer parte envolvida na Recuperação Judicial. Não há vencedor nesse cenário: perde o credor, perde o investidor, perde o trabalhador, perde o Estado. Só o devedor ganha — e ganha porque trapaceou.

73.    De fato, um precedente como esse teria o potencial de abalar todo o sistema concursal brasileiro, esvaziando as proteções conferidas aos credores dispostos a ofertar financiamento e/ou serviços no curso de processos de recuperação judicial e reduzindo dramaticamente a disponibilidade de recursos para financiamento de empresas em crise no Brasil. Afinal, é incerto se qualquer financiador estaria disposto a realizar qualquer desembolso ao devedor em recuperação judicial no Brasil ciente de que as garantias e proteções conferidas pela LFR poderiam posteriormente vir a ser esvaziadas pela instauração de procedimento estrangeiro de reestruturação.

### (d) Necessária Manutenção do Chapter 15

74.    **Chapter 15**. Similarmente ao Capítulo VI-A da LFR, o *Chapter 15* é baseado na Lei Modelo da UNCITRAL sobre Insolvência Transnacional e visa a implementar reestruturações estrangeiras --- como a Recuperação Judicial --- no território dos Estados Unidos da América. No caso das Agravadas, a importância do *Chapter 15*

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

## PINHEIRO NETO
### A D V O G A D O S

decorre especialmente das emissões de dívida do Grupo Oi negociadas no mercado de capitais estadunidense (e regidas pelas leis do estado de Nova Iorque) e pelo número de credores estrangeiros com sede nos Estados Unidos da América.

75.    **Benefícios do *Chapter 15* para a Oi**. Não por outra razão, a Oi decidiu ingressar com o *Chapter 15* em suas duas recuperações judiciais, ao longo da última década. Mediante o reconhecimento da Recuperação Judicial como processo estrangeiro principal no âmbito do *Chapter 15*, as seguintes medidas são viabilizadas:

- Implementação da Recuperação Judicial: o *Chapter 15* serve como ferramenta processual para que a Oi (por meio de seu representante estrangeiro) implemente as medidas da Recuperação Judicial no território dos Estados Unidos da América, com o apoio do Tribunal de Nova Iorque. A esse respeito, por exemplo, o Plano estabelece a emissão de novas dívidas e contratos regidos pelas leis do estado de Nova Iorque, tais como o acordo entre credores ("Acordo entre Credores" – **doc. nº 18),** que estabelece os termos e condições do compartilhamento das garantias previstas no Plano entre os credores extraconcursais (financiadores do Financiamento DIP) e credores concursais (como os Credores da Dívida ToP sem Garantia Reinstated – Opção I e os titulares da Dívida Roll-Up).

- Proteção de ativos: o *Chapter 15* promove a suspensão de atos de execução e constrição do patrimônio da Oi nos Estados Unidos da América, refletindo os termos do artigo 6º da LFR naquela jurisdição. Tal medida é essencial para que os credores com acesso à justiça estadunidense sejam impedidos de executar o Grupo Oi nos Estados Unidos, promovendo igualdade de tratamento entre esses credores e os credores com acesso limitado à justiça brasileira.

- Execução e Novação do Crédito Concursal: o *Chapter 15* também serve como ferramenta para a implementação do Plano nos Estados

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

Unidos da América e os efeitos decorrentes de tal implementação, como a novação (*discharge*) dos créditos detidos pelos credores que não aprovaram o Plano. Essa medida previne que os credores que eventualmente não aprovaram o Plano expressamente conteste a reestruturação promovida pela Recuperação Judicial no futuro, o que traz estabilidade ao processo não apenas para a Oi, mas em benefício de todos os investidores e credores que acreditaram na novação do crédito da coletividade de credores promovida na Recuperação Judicial.

76.    **Importância do *Chapter 15* Reforçada com o Aditamento ao Plano**. A importância do *Chapter 15* não se encerra com a suposta "implementação substancial" do Plano, conforme alegado pelas Agravadas no Pedido de Encerramento do *Chapter 15* (**doc. nº 8**). A bem da verdade, o *Chapter 15* se mostra ainda especialmente relevante quando as Agravadas pretendem submeter o Aditamento ao Plano para a deliberação dos credores e, dessa forma, alterar substancialmente os termos de sua reestruturação.

77.    A esse respeito, o Aditamento ao Plano propõe que parte substancial das dívidas concursais das Agravadas sejam pagas até **31.12.2038**.[15] Dessa maneira, há um longo período de pagamento aos credores que pode demandar medidas de reestruturação cuja implementação pelo Tribunal de Nova Iorque seja necessária.

78.    Ademais, o Aditamento ao Plano prevê que grande parte da dívida concursal será paga por meio dos recursos obtidos com a venda de imóveis.[16] No entanto, as regras sobre destinação dos recursos obtidos com a venda de imóveis prevista no Aditamento ao Plano[17] são diferentes daquelas estabelecidas no Acordo entre Credores (regido pelas leis do estado de Nova Iorque):[18]

---

[15] Vide: 4.2.6, 4.2.7, 4.2.8 e 4.2.9.
[16] Vide: cláusulas 4.2.6, 4.2.7, 4.2.8 e 4.2.9.
[17] Vide cláusula 5.3.4 e 5.3.4.1 do Aditamento ao Plano.
[18] Vide cláusula 12.01 do Acordo entre Credores.

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

| *Aditamento ao Plano (cláusula 5.3.4)* | *Acordo entre Credores[19]* |
|---|---|
| "Como condição à destinação da Receita Líquida da Venda de Imóveis na ordem de pagamento abaixo, <u>a Companhia envidará esforços para alterar, conforme aplicável, as regras de pagamento (waterfall) e documentos correlatos junto aos credores detentores das garantias cujos objetos são os Imóveis ou recebíveis decorrentes da alienação dos Imóveis:</u> | "Com relação à soma dos Recursos Imobiliários em Curso Ordinário que excedam R$ 400.000.000,00 em qualquer momento: |
| (i)    Receita Líquida da Venda de Imóveis limitada a R$ 600.000.000,00. [...] será 100% (cem por cento) usada pela Oi para investimentos em suas próprias atividades ou de suas Afiliadas; | (A) primeiramente, de forma *pro rata* e *pari passu*, para o pagamento de todas as Obrigações ToP pendentes, até que todas as Obrigações ToP tenham sido integralmente pagas;<br>(B) em segundo lugar, de forma *pro rata* e *pari passu*, para o pagamento de todas as Obrigações de Liquidez Permitidas pendentes, até que todas as Obrigações de Liquidez Permitidas tenham sido integralmente pagas; |
| (ii)   Receita Líquida da Venda de Imóveis acima de R$ 600.000.000,00, limitada a R$ 1.600.000.000,00. [...] será utilizada para pagamento, de forma pro rata aos respectivos Créditos, aos seguintes Credores:<br>(1.1) Credores Fornecedores Parceiros;<br>(1.2) Dívida ToP com Garantia Reinstated;<br>(1.3) Dívida ToP sem Garantia Reinstated – Opção I;<br>(1.4) Dívida ToP sem Garantia Reinstated – Opção II;<br>(1.5) Credores Extraconcursais Aderentes. | (C) em terceiro lugar, de forma pro rata e pari passu, a cada Representante de Primeira Prioridade, para aplicação no pagamento de todas as Obrigações de Primeira Prioridade *[Novo Financiamento]* pendentes, até que todas as Obrigações de Primeira Prioridade tenham sido integralmente pagas;<br>(D) em quarto lugar, ao Fiduciário das Notas Roll-Up, para aplicação no pagamento de todas as Obrigações Roll-Up pendentes, até que todas as Obrigações Roll-Up tenham sido integralmente pagas; e<br>(E) em quinto lugar, à Companhia.<br>(tradução livre) |

79.    Dessa maneira, o Aditamento ao Plano pressupõe que o Acordo entre Credores seja <u>aditado</u> para que as suas regras se tornem compatíveis com aquelas previstas no Aditamento ao Plano, sob pena de violação do Acordo entre Credores e possível vencimento antecipado de dívidas.

---

[19] A Agravante informa que o documento ora apresentado corresponde ao Anexo 4.2.2.1.1(f)(iii) do Plano. A versão final do Acordo entre Credores foi celebrada privadamente entre as partes em 8.8.2024 (no contexto do desembolso do desembolso do Financiamento DIP) e reflete os termos do documento ora apresentado em todos os seus aspectos materiais.

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

66. Tendo em vista que o Acordo entre Credores é um <u>contrato pós-concursal</u> celebrado entre a Oi e credores concursais e extraconcursais --- inclusive (i) financiadores estrangeiros do Financiamento DIP, (ii) titulares da Dívida *Roll-Up* e (iii) Credores da Dívida ToP sem Garantia Reinstated – Opção I, com sede nos Estados Unidos da América ---, o Grupo Oi depende do consentimento de credores localizados nos Estados Unidos da América para a alteração de um contrato <u>não</u> sujeito à Recuperação Judicial, a fim de garantir a viabilidade de implementação do Aditamento ao Plano. Nesse sentido, o próprio Grupo Oi propõe linguagem no Aditamento ao Plano que os Credores da Dívida ToP sem Garantia Reinstated – Opção I deverão se comprometer a aditar o Acordo entre Credores.[20]

80.    Assim, a manutenção do *Chapter 15* para reconhecer a execução do Aditamento ao Plano no território dos Estados Unidos da América é essencial para (i) promover <u>estabilidade da reestruturação</u> das Devedoras pelos próximos anos --- cujos termos as Devedoras propuseram substancial alteração --- e (ii) assegurar a viabilidade de implementação do Aditamento ao Plano, tendo em vista que o Aditamento ao Plano depende da afetação de direitos de credores estrangeiros, com base em contrato pós-concursal regido pelas leis do estado de Nova Iorque.

81.    **Reconhecimento pelo Juízo de Nova Iorque**. Nesse sentido, o próprio Juízo de Nova Iorque reconheceu que, na atual conjuntura da Recuperação Judicial, é importante que a Oi permaneça com o *Chapter 15* aberto e ativo em Nova Iorque:

> O TRIBUNAL: (...) Você tem uma RJ andamento que permanecerá por mais alguns anos, independentemente se a companhia estivesse em dificuldade financeira, o processo ainda estaria em andamento. Você tem um aditamento pendente no Juízo brasileiro em relação a isso, então certamente não parece que os [motivos do *Chapter 15*] deixaram de existir.
>
> (...) O meu trabalho como Corte ancilar é estar lá para ajudar o processo principal. (...) você sabe, isso é o porquê de este ser o processo ancilar. (...) Eu nunca gostaria de não estar presente se o Juízo brasileiro sentisse que isso seria necessário. Isso é certo. E eu acho (...) que a nossa Corte tentaria evitar isso em qualquer estado, porque nós somos o processo ancilar aqui. E o motivo para isso é que o Representante

---

[20] "Os Credores Take or Pay sem Garantia – Opção I concordam, desde já, em aditar os respectivos Instrumentos de Garantia e o Contrato entre Credores (Intercreditor Agreement) celebrados com as Recuperandas e os Credores aplicáveis a fim de incorporar as alterações necessárias à implementação do disposto nas Cláusulas 5.3.4 e 5.3.4.1" (cláusula 4.2.8.3(a) do Aditamento ao Plano – fl. 113.342 da Recuperação Judicial). "

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

## PINHEIRONETO
### A D V O G A D O S

Estrangeiro achou que ajudaria vir para os Estados Unidos e obter cooperação, mas às vezes é também porque o Juízo principal acharia isso necessário de acordo com as circunstâncias.

(...) Então a pergunta é, você sabe, terá algo realmente pendente que o Juízo [brasileiro] falaria para nós que gostaríamos que nós estivéssemos lá? Nós não gostaríamos de não estar lá para eles.

(...) quando eu olho para cooperação, eu acho que nós já concordamos com isso. Mas isso significa que não existe a necessidade para mais cooperação? Eu acho que essa é a pergunta. E eu acho que a única pessoa que pode me responder isso de um jeito não enviesado é a provavelmente o Juízo no Brasil (destaques acrescentados; tradução livre – **doc. nº 14**).

82.    Assim, a Agravante sustenta, com o devido respeito, que a manutenção do *Chapter 15* perante o Juízo de Nova Iorque não é simples conveniência, mas verdadeira condição de possibilidade para que o D. Juízo da Recuperação exerça plenamente sua jurisdição. É medida de suma importância para implementar as providências de reestruturação necessárias, conferir estabilidade ao processo e assegurar a eficácia do Plano --- e do Aditamento ao Plano, caso venha a ser processado e aprovado.

### *(e) Estratégia Desastrada, Vazia e sem Sustentação*

83.    Até o momento o Grupo Oi não foi capaz de refutar as alegações de ilegalidade envolvendo a propositura de um *Chapter 11*. O Grupo Oi também não foi capaz de esclarecer as incertezas reiteradas pelo próprio Juízo de Nova Iorque acerca da impossibilidade de coexistência do *Chapter 11* e da Recuperação Judicial.

84.    Mais do que isso, o Grupo Oi não apresentou sequer um estudo ou análise sobre os possíveis resultados de um *Chapter 11*, a recuperabilidade dos créditos em um contexto como esse, os impactos sobre os credores ou as garantias a serem ofertadas. Na realidade, a apresentação de uma proposta de reestruturação aventureira desacompanhada de qualquer análise séria e crível acerca de sua viabilidade financeira parece ser a conduta recorrente dessa administração, a qual também foi identificada pelo Juízo da Recuperação ao analisar o laudo que acompanhou o Aditamento:

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

"Dos dados fornecidos pela empresa também se inferiu fragilidade quanto às avaliações de ativos que utiliza como base para estimar sua capacidade de honrar compromissos, inclusive os projetados no tempo. Além da utilização de garantias idênticas para assegurar obrigações múltiplas.

Não há, por exemplo, avaliação formal do ativo de enorme expressão que é a participação acionária da Recuperanda em 27,5% da VTal. Tampouco são seguras informações sobre depósitos judiciais a serem utilizados (não só quanto aos seus valores como a suas próprias existências), ou sobre créditos decorrentes de ações ou arbitragem, de extensões e soluções imprevisíveis.

Outrossim, **em razão de indícios no sentido da impropriedade de informações fornecidas pela Recuperanda, foi nomeado WatchDog para atuar no feito** (nos autos do incidente do RMA, cópia juntada a estes autos principais), por preclusa decisão. Com muito mais razão, agora, após vinda de laudos técnicos - ainda que breves - se faz imprescindível a ingerência desse Observador Judicial diretamente no seio da Recuperanda, a fim de aferir a veracidade dos dados por ela fornecidos relacionados aos números e operações praticados, assim como de eventual prática de abuso ou fraude."

"No que toca aos ativos, considerada a apontada fragilidade em diversas das avaliações adotadas, fica determinado que suas alienações e/ou onerações deverão ser previamente autorizadas pelo Juízo, o qual será comunicado a respeito pelo WatchDog. De modo que a partir da publicação da presente, será ineficaz toda e qualquer alienação ou oneração de ativo que não seja expressa e previamente deferida pelo Juízo." (fls. 116202/116209 da Recuperação Judicial).

85.    Também ficou demonstrado no âmbito do *Chapter 15* que (i) o Grupo Oi não possui a mínima indicação de que obterá um financiamento DIP no âmbito do *Chapter 11* (possivelmente devido às incertezas e ilegalidades que cercam a estratégia apresentada a potenciais financiadores); e (ii) o Grupo Oi estima que seriam despendidos mais de **US\$ 100 milhões** (*i.e.*, mais de meio bilhão de reais) em honorários de assessores para condução de um procedimento de *Chapter 11*:

P: Na verdade, a quantidade de honorários profissionais que a Oi estimou que incorrerá em um Capítulo 11 é mais de \$100 milhões a mais em taxas do que em um cenário do Capítulo 11, correto?

R: Correto (tradução livre – **doc. nº 15**).

\* \* \*

P. Ninguém concordou em fornecer financiamento DIP, correto?

R. Sim. Eles não eram contra, mas ainda não nos deram o "ok".

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

P. Atualmente não existem minutas de contratos de financiamento DIP sendo preparadas, correto?

R. Correto. Nós ainda não temos as condições comerciais.

[...]

P. Nenhuma dessas negociações para financiamento DIP avançou além de você fazer uma apresentação a um potencial investidor, correto?

R. Sim. Ainda não está concluído.

P. Nenhuma dessas discussões ou negociações "esquentou", certo?

R. Como mencionei ontem, não. Por "esquentar" quero dizer estar muito próximo de fechar um acordo. (tradução livre – **doc. nº 15**)

86. É sintomático: sem investidores dispostos a financiar, e com a previsão de que mais de meio bilhão de reais seriam sugados apenas em honorários, o *Chapter 11* não passa de um sorvedouro de recursos — um luxo que só interessa a quem fatura com a crise.

87. Em resumo, o anunciado pedido de *Chapter 11* é uma medida desastrada, sem fundamento e que coloca em risco toda a reestruturação do Grupo Oi, resultado de praticamente uma década de esforços dos credores e do Poder Judiciário Nacional.

73. E isso porque: **(i)** violaria princípios de ordem pública da lei Brasileira; **(ii)** criaria precedente temerário a todo o sistema de insolvência nacional e conflitos de jurisdição que tornaria seu processamento inviável do ponto de vista prático; **(iii)** é desprovido de qualquer análise crível sobre a sua viabilidade financeira; **(iv)** aumentaria (ainda mais) a litigiosidade envolvendo o Grupo Oi; **(v)** drenaria mais de meio bilhão de reais em honorários de advogados e assessores; **(vi)** prejudicaria o principal ativo do Grupo Oi, impactando a execução do próprio Plano; e **(vii)** reduziria o valor da garantia ofertada a diversos credores sob o Plano.

88. De fato, os administradores e assessores do Grupo Oi parecem ser os únicos a se beneficiar dessa estratégia aventureira e irresponsável em jurisdição



# PINHEIRO NETO
### A D V O G A D O S

estrangeira, que aparentemente serviria apenas para causar tumulto e confusão ao processo e drenar mais recursos da Oi sem qualquer eficiência.

89.    A esse respeito, destaca-se que eventual *Chapter 11* dependeria também da aprovação de um plano perante a justiça estrangeira – e é pouco crível que credores, mesmo após sucessivas ações de apoio, venham a consentir novamente com uma nova reestruturação marcada por ilegalidades e insegurança jurídica. A realidade é que o Grupo Oi já está incorrendo em custos relevantes sem apresentar qualquer plano minimamente embasado. Nesse sentido, no respeitoso entendimento de V.tal, a falta de preocupação com os custos incorridos é condenável diante do estado de crise em que a companhia se encontra.

## V.    NECESSÁRIA CONCESSÃO DE EFEITO SUSPENSIVO A ESTE RECURSO

90.    Até esta data, o mérito do Pedido de Encerramento do *Chapter 15* não foi apreciado pelo Juízo de Nova Iorque. Dessa maneira, a qualquer momento, o Juízo de Nova Iorque pode autorizar o encerramento do *Chapter 15* e a Oi poderá implementar as medidas pretendidas nos Estados Unidos da América, colocando em risco o direito da Agravante e da coletividade de credores, por meio de um potencial processo de *Chapter 11*.

91.    Nesse sentido, a Agravante respeitosamente entende ser fundamental a concessão de <u>tutela de urgência a este Agravo de Instrumento</u>, a fim de que:

**(i)**    caso o Primeiro Agravo de Instrumento tenha sua perda de objeto reconhecida, <u>os termos da r. Decisão de Efeito Suspensivo sejam convalidados e integralmente mantidos</u>, de forma que eventual decisão a respeito do Pedido de Encerramento do *Chapter 15* aguarde as decisões do Juízo da Recuperação a respeito dos já reconhecido descumprimento do Plano pelo Grupo Oi e do processamento do Aditamento ao Plano, exatamente nos termos da r. Decisão de Efeito Suspensivo; e

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

**(ii)** em linha com os deveres de cooperação e comunicação que norteiam as disposições de insolvência transnacional da LFR, <u>esse E. Tribunal expeça comunicação complementar ao Juízo de Nova Iorque</u>, informando que, *em juízo de cognição sumária*, (a) o ajuizamento do *Chapter 11* violaria a política pública brasileira; (b) os efeitos do *Chapter 11* sobre credores extraconcursais <u>não</u> poderiam ser reconhecidos no Brasil dada a existência da Recuperação Judicial; e (c) a manutenção do *Chapter 15* é necessária para dar efetividade às decisões a serem proferidas no âmbito e por força da Recuperação Judicial

### (a) Probabilidade do Direito

92. **Violação à Ordem Pública**. A LFR não oferece aos devedores um instrumento de reestruturação contínuo e ininterrupto. Pelo contrário, a LFR estabelece que o devedor apenas tem o direito de ajuizar um novo pedido de recuperação judicial desde que transcorridos, pelo menos, 5 (cinco) anos da data em que o seu plano de recuperação judicial foi homologado (artigo 47, II, LFR). Trata-se de regra basilar na LFR, parte da ordem pública da legislação brasileira (conforme reconhecido pelo Professor Daniel Carnio Costa – **doc. nº 12**), que dita os incentivos do processo de recuperação judicial, tendo em vista que confere aos credores a garantia de que os seus créditos pós-concursais (inclusive financiamentos DIP) devidos durante esses anos não poderão ser reestruturados até o fim de tal quarentena.

93. A tentativa da Oi em ajuizar o *Chapter 11* e, com isso, reestruturar créditos pós-concursais e extraconcursais nos Estados Unidos da América, transcorrido apenas pouco mais de 1 (um) ano da concessão da Recuperação Judicial, é medida que burla a LFR e viola a ordem pública, o que demanda a interferência do D. Juízo da Recuperação e desse E. Tribunal.

94. **Impossibilidade de Reestruturação de Créditos Extraconcursais**. Além disso, a LFR não permite que créditos pós e extraconcursais sejam reestruturados no âmbito de um eventual *Chapter 11* da Oi. Isso porque eventual *Chapter 11* não

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

seria classificado um processo estrangeiro principal de reestruturação da Oi, tendo em vista que o Grupo Oi ajuizou a Recuperação Judicial e, portanto, reconheceu que o seu centro de principal interesse não se encontra nos Estados Unidos da América (mas no Brasil).

79.      Diante disso, as medidas de implementação eventualmente alcançadas no *Chapter 11* poderiam ser reconhecidas D. Juízo da Recuperação, desde que tais medidas sejam compatíveis com o processo brasileiro (artigo 167-S, I da LFR). Além disso, eventual suspensão de direitos e atos constritivos obtida no âmbito do *Chapter 11* não poderia afetar credores extraconcursais (artigos 167-S, I, e 167-M, § 3º da LFR).

95.      **Necessária Manutenção do *Chapter 15***. Por fim, a atual conjuntura da Recuperação Judicial não admite que o Grupo Oi dispense a utilidade do processo de *Chapter 15*. Isso porque o Aditamento ao Plano prevê uma série de medidas de reestruturação que se estendem até, pelo menos, o fim do ano de 2038.

80.      Ademais, o Aditamento ao Plano é baseado na presunção de que credores estrangeiros --- concursais e extraconcursais --- consentirão com as principais regras de pagamento previstas no Aditamento ao Plano (*i.e.*, destinação dos recursos obtidos com a venda de imóveis), por meio de aditamento a um contrato pós-concursal regido pelas leis do estado de Nova Iorque.

81.      Dessa maneira, a manutenção do processo de *Chapter 15* é fundamental para que o Grupo Oi, o D. Juízo da Recuperação, esse E. Tribunal e a coletividade de credores tenham estabilidade e confiem na viabilidade do Aditamento ao Plano.

*(b) Existência de Perigo Efetivo de Dano e Risco ao Resultado Útil do Processo*

96.      **Risco Iminente**. Caso o Primeiro Agravo de Instrumento tenha sua perda de objeto reconhecida, a r. Decisão Liminar poderá deixar de produzir efeitos e, consequentemente, o Juízo de Nova Iorque poderá a qualquer momento proferir

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRO NETO**
A D V O G A D O S

decisão concedendo o Pedido de Encerramento do *Chapter 15* e, portanto, viabilizando o ajuizamento do *Chapter 11* pela Oi.

81.    Sabe-se que, com o ajuizamento do *Chapter 11*, há a suspensão automática de ações e execuções contra a Oi nos Estados Unidos da América (*automatic stay*), independentemente de qualquer decisão pelo Juízo de Nova Iorque. Além disso, o *Chapter 11* conferiria à Oi a prerrogativa de afetar contratos relacionados a créditos extraconcursais e (inclusive) concursais, que não poderiam ser afetados na Recuperação Judicial (*e.g.*, a possibilidade de rescindir contratos extraconcursais unilateralmente).

97.    Dessa maneira, a Agravante --- juntamente com todos os demais credores extraconcursais e concursais do Grupo Oi --- sofre perigo de dano com o ajuizamento iminente do *Chapter 11*, que poderá viabilizar medidas pela Oi que são contrárias à ordem pública e proibidas pela LFR, conforme exposto acima. Nesse cenário, o sucesso da Recuperação Judicial poderia ser comprometido, eis que direitos e interesses fundamentais do Grupo Oi e de seus credores e parceiros comerciais estariam sob a tutela de jurisdição estrangeira concomitante ao processo brasileiro.

98.    **Perigo de Conflito entre Jurisdições**. Além disso, há sério risco de as medidas de reestruturação viabilizadas pelo potencial *Chapter 11*, bem como as ordens a eventualmente serem proferidas pelo Juízo de Nova Iorque, serem conflitantes com as disposições da LFR e as determinações do D. Juízo da Recuperação e desse E. Tribunal, causando verdadeiro conflito de competência e instabilidade no processo. Tal conflito poderia comprometer a eficácia das medidas adotadas na Recuperação Judicial, que representa o processo principal de reestruturação do Grupo Oi, processado em seu centro de principal interesse.

### *(c) Reversibilidade da Medida*

99.    Conforme demonstrado neste Agravo de Instrumento, o potencial ajuizamento de *Chapter 11* pela Oi poderia afetar de maneira significativa os direitos e interesses de credores e parceiros comerciais relevantes do Grupo Oi. Dessa

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

## PINHEIRONETO
### A D V O G A D O S

maneira, a legalidade e a extensão dos efeitos de tal medida devem ser discutidas com cautela perante o D. Juízo da Recuperação e esse E. Tribunal.

100.    Nesse contexto, em **12.8.2025**, o D. Juízo da Recuperação determinou a suspensão de ações contra o patrimônio das Agravadas até 31.8.2025, que "poderá vir a ser dilatado, de acordo com o que venha a se apresentar no curso do processo" (fls. 118.173/118.176 da Recuperação Judicial). Criou-se, portanto, um ambiente de estabilidade momentânea para que a discussão sobre o Aditamento ao Plano seja debatida na Recuperação Judicial com a cautela que o assunto requer.

101.    No mesmo sentido, esse E. Tribunal agiu com cautela ao determinar a complementação do ofício ao Juízo de Nova Iorque, recomendando-se que este aguarde decisão a ser proferida sobre o Aditamento ao Plano, antes de decidir sobre o Pedido de Encerramento do *Chapter 15*, nos termos da r. Decisão Efeito Suspensivo.

102.    Todas essas medidas de cautela foram tomadas com base no fato de que a comunicação e a cooperação entre os Juízos da Recuperação e de Nova Iorque --- e o tempo que isso requer --- não causará qualquer dano irreversível ao Grupo Oi. Desse modo, quaisquer recomendações e comunicações a serem mantidas e enviadas por esse E. Tribunal ao Juízo de Nova Iorque não causará qualquer medida prejudicial de reversibilidade impossível para as Agravadas --- pelo contrário: apenas contribuirá com a segurança jurídica e estabilidade das medidas de reestruturação a serem perseguidas.

## VI.    CONCLUSÃO E PEDIDOS

103.    Por todo o exposto, a V.tal confia em que, nos termos do art. 1.019, I, do CPC, essa i. Relatoria concederá, *inaudita altera parte*, a antecipação dos efeitos da tutela recursal, determinando-se que:

   **(i)**    caso o Primeiro Agravo de Instrumento tenha sua perda de objeto reconhecida, os termos da r. Decisão de Efeito Suspensivo sejam

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

# PINHEIRONETO
### A D V O G A D O S

convalidados e integralmente mantidos, de forma que eventual decisão a respeito do Pedido de Encerramento do *Chapter 15* aguarde as decisões do Juízo da Recuperação a respeito dos já reconhecido descumprimento do Plano pelo Grupo Oi e do processamento do Aditamento ao Plano, exatamente nos termos da r. Decisão de Efeito Suspensivo; e

**(ii)** em linha com os deveres de cooperação e comunicação que norteiam as disposições de insolvência transnacional da LFR, esse E. Tribunal expeça comunicação complementar ao Juízo de Nova Iorque, informando que, *em juízo de cognição sumária*, (a) o ajuizamento do *Chapter 11* violaria a política pública brasileira; (b) os efeitos do *Chapter 11* sobre credores extraconcursais não poderiam ser reconhecidos no Brasil dada a existência da Recuperação Judicial; e (c) a manutenção do *Chapter 15* é necessária para dar efetividade às decisões a serem proferidas no âmbito e por força da Recuperação Judicial

104.　　Concedida a tutela de urgência recursal acima requerida, confia a Agravante que, ao final, será provido este recurso, ratificando-se os pedidos de antecipação dos efeitos da tutela recursal formulados acima e revertendo a r. Decisão Agravada, para todos os fins e efeitos de direito.

Nestes termos,

P. Deferimento.

São Paulo, 26 de agosto de 2025.

**Thiago Braga Junqueira**
**OAB/SP nº 286.786**

**João Guilherme Thiesi da Silva**
**OAB/SP nº 410.293**

**Maria Fernanda M. Del Grande**
**OAB/SP n° 493.904**

**Sophia Weinschenker Bollmann**
**OAB/SP nº 519.960**

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

## **Exhibit C-2**

**V.tal Appeal (English)**

# PINHEIRONETO
### ADVOGADOS

| SÃO PAULO | RIO DE JANEIRO | BRASÍLIA | PALO ALTO | TÓQUIO |
|---|---|---|---|---|
| R. Hungria, 1.100 | R. Humaitá, 275 | SAFS. Quadra 2 Bloco B | 228 Hamilton Avenue, | 1-6-2 Marunouchi, |
| 01455-906 | 16° andar | Ed. Via Office - 3° andar | 3rd floor | Chiyoda-ku, 21st floor |
| São Paulo - SP | 22261-005 | 70070-600 | CA 94301 USA | 100-0005 |
| t. +55 (11) 3247 8400 | Rio de Janeiro - RJ | Brasília - DF | t. +1 650 798 5068 | Tokyo - Japan |
| | t. +55 (21) 2506 1600 | t. +55 (61) 3312 9400 | | t. +81 (3) 3216 7191 |

Honourable Judge First Vice-President of the Court of Justice of
State of Rio de Janeiro

**Original Action No. 0090940-03.2023.8.19.0001**

**Distribution by prevention to the First Chamber of Private Law**

**V.TAL – NEUTRAL TELECOMMUNICATIONS NETWORK SA,** a company registered with the
CNPJ under number 02.041.460/0001-93, with headquarters at Rua Casa do Ator, number 919, Vila
Olímpia, city of São Paulo, State of São Paulo, CEP 04546-003 ("Your name" or
"Appellant"), through its lawyers **(docs. no. 1 and** 2), respectfully and timely, pursuant
to articles 1,015 et seq. of the Code of Civil Procedure ("CPC"), hereby file this

————

**INSTRUMENTAL APPEAL**

**with a request for advance relief from the appeal**

against the r. decision on fls. 117,355/117,359 ("Appealed Decision") **(doc. no.** 3),
issued in the judicial recovery proceedings1 ("Judicial Recovery") of **OI SA** and

---

1 Proc. No. 0090940-03.2023.8.19.0001, in progress before the 7th Business Court of the District of the Capital of the
State of Rio de Janeiro ("Recovery Court").



**PINHEIRO NETO**
A D V O G A D O S

**Others** ("Appellees" or "Oi Group" or "Recovering Parties"), for the following reasons:
fact and law.

1.    **Timeliness.** On August **7, 2025,** the Appealed Decision was made available on the
Electronic Official Gazette, being published, therefore, on **8.8.2025.** Thus,
the period of 15 (fifteen) business days provided for in art. 1,003, §5º of the CPC for the
The filing of this appeal ends on **8/29/2025,** and is clearly timely.
the appeal filed on this date **(26.8.2025).**

2.    **Prevention.** The First Chamber of Private Law of this E. Court of Justice of the
State of Rio de Janeiro ("TJRJ"), under the reporting of the eminent Justice Mônica Maria
Costa Di Piero, is prevented from judging this appeal, pursuant to article 930, sole
paragraph, of the CPC, to the extent that it has judged appeals arising from the Judicial
Recovery2 .

3.    **Admissibility of the Appeal.** Since this is an appeal filed against a decision
issued within the scope of judicial reorganization, the admissibility of this appeal is
unequivocal, pursuant to art. 1,015, sole paragraph, of the CPC, art. 189, §1º, II, of Law
No. 11,101/05 ("LRF") and Theme 1,022 of the Superior Court of Justice ("STJ")3 .

4.    **Appeal Instruction.** In compliance with Article 1,017 of the CPC, although the
case files from which this appeal is taken are electronic, which would dispense with its
instruction, these grounds for appeal are accompanied by all the
mandatory copies, including powers of attorney granted to the parties, appealed decisions
and proof of payment of legal costs **(doc. no.** 4). If this E. TJRJ deems it necessary to
present any additional document, the Appellant requests that it be

---

2    Instrumental appeals no. 0069602-39.2024.8.19.0000; 0069530-52.2024.8.19.0000; 0069733-
14.2024.8.19.0000; and 0072455-21.2024.8.19.0000. 3

"An appeal on the merits is admissible against all interlocutory decisions issued in judicial recovery and bankruptcy proceedings,
pursuant to art. 1,015, sole paragraph, CPC".

JUR_SP - 55617456v5 - 5769054.524399



## PINHEIRONETO
### A D V O G A D O S

a period of time is granted for the documentation to be completed, in accordance with the article 1,017, § 3, of the CPC.

5.      **Declaration of Authenticity.** The Appellant's lawyers, signatories of this appeal, under the terms of article 1,017, II, of the CPC, declare that the copies of the documents supporting the appeal.

6.      **Procedural Representation.** In accordance with the provisions of article 1,016, IV, of the CPC, the Appellant informs the names and addresses of the Appellant's lawyers, the Respondents and the Judicial Administrator, as follows:

(i)       **For the Appellant:** lawyers *Thiago Braga Junqueira,* registered with the OAB/SP under no. 286,786, *João Guilherme Thiesi Da Silva,* registered with the OAB/SP under no. 410,293, *Maria Fernanda Marchesan Del Grande,* registered at the OAB/SP under no. 493,904 and *Sophia Weinschenker Bollmann,* registered at the OAB/SP under no. 519,960, all with professional addresses at Rua Hungria, 1,100, Jardim Europa, São Paulo/SP **(doc. no. 2);** and

(ii)      **For the Appellees:** lawyers *Marcos Pitanga Ferreira,* registered with the OAB/RJ under number 144,825, *and Luiz Carlos Malheiros França,* registered with the OAB/RJ under no. 163,989, *João Felipe Lynch Meggiolaro,* registered with the OAB/RJ under no. 216,273, *Fernanda Anuda,* registered with the OAB/RJ under number 241,307, *Diana Lise Freitas,* registered with the OAB/RJ under no. 256,584, *Thiago Peixoto Alves,* registered with the OAB/RJ under no. 301,049, *João Felipe Martins de Almeida,* registered with the OAB/RJ under no. 200,664, *Helena Acker Caetano,* registered with the OAB/RJ under no. number 230.206, *Edson Bossonaro Junior,* written by OAB/RJ or number 264.022, and *Luís Fellipe Freitas,* registered with the OAB/RJ under number 261,146, all members of the law firm Ferro, Castro Neves, Daltro and Gomide Advogados, with address professional at Av. Rio Branco, No. 85, 13th, 15th, 17th and 18th floors, Centro, Rio de Janeiro/RJ, CEP 20040-004; as well as lawyers *Paulo Padis,* registered with the OAB/RJ under number 139,860-A, *Talitha Aguillar Leite,* registered with the OAB/SP under number 344,859, and *Mariana Leoni Beserra,* registered with the OAB/SP under No. 443,636, the latter members of the Padis Mattar Advogados office,

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

with professional address at Av. Brigadeiro Faria Lima, nº 1.663, 12th floor, Jardim Paulistano, São Paulo/SP, ZIP Code 01452-001. **(doc. no. 5 and** 6);

**(iii) By the Judicial Administrator:** *Wald Bankruptcy Administration and Companies Under Judicial Recovery Ltd.,* represented by Arnoldo Wald Son, registered with the OAB/RJ under number 58,789, and Adriana Campos Conrado Zamponi, registered with the OAB/RJ under number 92,831, both with address professional at Rua General Venâncio Flores, nº 305, 10th floor, Leblon, Rio of January; *K2 Economic Consulting,* represented by João Ricardo Uchoa Viana, headquartered at Rua Primeiro de Março, No. 23, 14th floor, Centro, Rio de January; and *Preserva-Ação Administração Judicial,* represented by Bruno Rezende, registered with the OAB/RJ under number 124,405, with headquarters at Avenida Rio Branco, No. 116, 15th floor, Centro, Rio de Janeiro **(doc. No.** 7);

7. **Of the Summonses.** The Appellant requests that the summonses relating to this appeal are carried out exclusively and jointly on behalf of the attorneys who subscribe to this appeal, under penalty of nullity, in accordance with article 272, § 5, of the CPC.

In these terms,

P. Grant.

Sao Paulo, August 26, 2025.

**Thiago Braga Junqueira**
**OAB/SP No. 286,786**

**João Guilherme Thiesi da Silva**
**OAB/SP No. 410,293**

**Maria Fernanda M. Del Grande**
**OAB/SP No. 493,904**

**Sophia Weinschenker Bollmann**
**OAB/SP No. 519,960**

**PINHEIRO NETO**

A D V O G A D O S

**ANNEX I**

**List of Mandatory and Optional Documents**

| | |
|---|---|
| **Doc. No. 1** | V.tal Corporate Documents |
| **Doc. No. 2** | Power of Attorney from you to your Lawyers |
| **Doc. No. 3** | Appealed Decision |
| **Doc. No. 4** | Guide and Proof of Payment of Costs |
| **Doc. No. 5** | Oi Group Corporate Documents |
| **Doc. No. 6** | Powers of Attorney from the Oi Group to its Lawyers |
| **Doc. No. 7** | Decisions on Appointment of the Judicial Administrator |
| **Doc. No. 8** | *Chapter 15* Filing Request |
| **Doc. No. 9** | First Decision |
| **Doc. No. 10** | Second Decision |
| **Doc. No. 11** | Suspensive Effect Decision |
| **Doc. No. 12** | Opinion of Professor Daniel Carnio Costa |
| **Doc. No. 13** | *Amicus Brief* |
| **Doc. No. 14** | *Chapter 15* Hearing – August 18, 2025 |
| **Doc. no. 15** | *Chapter 15* Hearing – August 14, 2025 |
| **Doc. no. 16** | Establishment Decision |
| **Doc. no. 17** | Brazilian Jurisdiction Decision |
| **Doc. no. 18** | Agreement Between Creditors |

**PINHEIRONETO**
A D V O G A D O S

**E. Court of Justice of the State of Rio de Janeiro** ("TJRJ")   _____

**Aggravating:**          V.tal – Neutral Telecommunications Network SA ("V.tal" or   _____
"<u>Aggravating</u>")

**Aggravated:**          Oi SA and Others ("Appellees<u>" or "Oi Grou</u>p" or   _____
"<u>Recovery</u>")   _____

**Judicial Administrator:** Wald Bankruptcy and Business Administration In

Judicial Recovery Ltda, K2 Economic Consulting and Preservation-Action

Judicial Administration (all together, "Judicial Admini<u>strator")</u>   _____

### REASONS FOR INSTRUMENTAL APPEAL

Distinguished Court,

## I. THE RISK OF VALIDATING THE PROTECTION OF DISCREDIT

> *Q: You know—you're not sure how, Mr. Padis, but you recognize, don't*
> *you, that if Oi successfully restructures its debtor-in-possession financing*
> *in this United States Bankruptcy Court, that could affect the DIP financing*
> *market in Brazil, don't you, sir?*
>
> *A: <u>I think the market will have to adapt.</u>   _____*

8. What we see in this case is not just a violation of the letter of the law, but

reappearance of an old trait of our history: the belief that the legal order is always malleable,

always negotiable, always subject to being twisted in favor of those who consider themselves

stronger. Since colonial times, the law has often been treated

like an ornament—something to be displayed when convenient and discarded when it is a

nuisance. Now, this old practice is gaining ground in the Brazilian bankruptcy environment,

precisely in the area where predictability and credit protection

should be more solid.

9. The Oi Group tries to repeat this pattern here: it benefited from the regime

TJRJ 202500773578 26/08/2025 21:36:27 EN@| Petição Inicial Eletrônica



**PINHEIRONETO**
A D V O G A D O S

of judicial recovery twice, reaped its fruits, and, even before complying

the commitments made, announces that it will go to the foreign jurisdiction to seek a

new protection, despite the restrictions imposed by Brazilian law. It does not do so at

hidden, but shamelessly, almost like an ostentation. His advisors

they say, loud and clear, that the Brazilian legal system *"will have to adapt"*,

in a brutal confession of contempt—not only for creditors, but for himself

Judiciary.


10.      Admitting the possibility of this maneuver is opening the floodgates for all and

any company undergoing restructuring in Brazil sees, abroad, the opportunity

to break all its legitimately undertaken commitments with domestic creditors, under the

supervision of the Brazilian Judiciary. This sends an unequivocal signal that crossing

borders is enough to void guarantees, frustrate pacts, and nullify freely entered into

agreements and conventions. It consecrates a kind of amnesty for the persistent debtor,

disguised as an international strategy. It is the antithesis of judicial recovery: instead of

restoring trust, it establishes

discredit.


11. It is this logic of indifference, of ignoring the rules, that silently erodes trust in the law.
And trust, here, is not a detail: it is the cement.

that supports the entire bankruptcy building. When the trust is broken, when it is

trivializes the pact signed between the debtor, creditors and the State, there is no recovery

possible. What remains is cynicism erected as a method, it is the repetition of an old vice

— now designed upon a system that cannot survive without integrity,

indispensable prerequisite for cooperation to occur.


12. That is why V.tal is filing this appeal: it is not just about correcting

a decision in a specific process, but to affirm that the competitive system

Brazilian society is not a stage for hasty strategies, and insolvency law does not exist as

an ornament, empty rhetoric, or a gracious concession to those who use it. It is law

based on highly relevant public policy and institutional commitment. Admit the

superimposition of a foreign insolvency proceeding on a judicial recovery

in progress would be to renounce the very authority of this E. Court and signal to the



**PINHEIRONETO**
A D V O G A D O S

market that Brazil has become a no man's land. It is therefore up to this Court to
restore things to their rightful place and restore the trust that underpins all
Brazilian competitive system.

## II. SUBJECT OF THIS APPEAL – SUMMARY OF THE REASONS FOR REFORM

13. **Appealed Decision – Intention to File *Chapter 11* by Oi.**
This is an appeal filed against the decision handed down by the judge.
Court of the 7th Business Court of the District of Rio de Janeiro, State of Rio
of January ("Recovery Court") which, among other points, declared that *"no
will (...) determine whoever it may be to refrain from filing an action (judicial procedure)
before any jurisdiction"* ("Aggravated Decision").

14. The Appealed Decision refers to Oi's request to file a main restructuring proceeding
under Chapter 11 of the United States Bankruptcy Code *("Chapter* 11"), to be filed with the
U.S. Judiciary if its petition to close *Chapter 15 of the Appel*lees4 is granted ("Filing for
Closure of *Chapter 15"* – **doc. no.** 8), currently pending before the Bankruptcy Court of the
Southern District of the State of New York ("New York Court"). Oi Group's stated intention
is for *Chapter 11* to proceed concurrently with the Reorganization proceeding.

Judicial proceedings currently underway before the Recovery Court.

15. **Rejection of V.tal's Request – Illegalities of *Chapter 11.*** The Appealed Decision,
therefore, implicitly rejected the request made by V.tal for the Reorganization Court to also
assess the legality surrounding the alleged
*Chapter 11,* including after hearing the Judicial Administrators and the representative of
the Public Prosecutor's Office.5 The Appealed Decision, however, deserves to be reformed to

---

4    The Debtors' *Chapter 15* proceeding , currently pending before the New York Court, seeks recognition of this Judicial
     Reorganization as the Debtors' main restructuring proceeding and the effectiveness of the provisions of the
     Appellees' judicial reorganization plan, approved on April 19, 2024 ("Plan"), in the United States of America. This
     proceeding is governed by Chapter 15 of the United States Bankruptcy Code and is a non-main cross-border
     insolvency proceeding, in accordance with the principles established by the Act.
     UNCITRAL Model for Cross-Border Insolvency.

5    In fact, V.tal requested that: *"Your Excellency kindly order the summons of the Judicial Administrators and the
     representative of the Public Prosecutor's Office so that they can express their views on the possibility of filing a
     restructuring request in the North American judiciary (Chapter 11) and its consequences for this process."*

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

## PINHEIRONETO
### A D V O G A D O S

that the Brazilian jurisdiction, after hearing the Judicial Administrators and the member
of the Public Prosecutor's Office, recognize and report to the New York Court (167-P, LFR)
that any *Chapter 11* to be filed by the Oi Group is materially illegal and
incompatible with Judicial Recovery, since, in short, it is found

- Violation of Public Order: The LFR prohibits the filing of a new request for judicial
  recovery within 5 (five) years from the decision to approve the respective judicial
  recovery plan (article 48, II, LFR).
  This is a public policy rule, reflecting policies chosen by the national legislature as
  part of the economic incentive structure that underpins the LFR. The Oi Group's plan
  was approved just over 15 (fifteen) months ago. Allowing the filing of *Chapter 11* (a
  procedure analogous to judicial reorganization) is, therefore, a violation of a
  fundamental rule of the LFR and public policy;

- Impossibility of *Chapter 11* Restructuring Credits that are **not** subject to
  Judicial Recovery: The rules of transnational insolvency included in the
  LFR (articles 167-A and following) prohibit (in the context of the Oi Group) the
  recognition of foreign proceedings that restructure credits that are not subject to
  judicial recovery. This is what they provide,
  together, articles 167-M, §3, 167-S, I, and 167-B, III, all of the LFR. Given
  the existence of Judicial Recovery and the fact that the *center of interests*
  *main members* of the Oi Group are recognized (including, by final decision
  final and binding) in Rio de Janeiro, *Chapter 11* cannot be recognized by
  Brazilian jurisdiction given that the objective declared by the Oi Group is precisely
  affect extra-bankruptcy credits and circumvent the prohibition on new applications for
  restructuring in a period of less than five years;

- Risk of Conflicting Decisions: The coexistence of two decision-making processes
  primary insolvency is an unprecedented measure in Brazil. Judicial Recovery and a
  alleged *Chapter 11* does not only protect the restructuring of certain
  credits, but also rights, duties, limitations and prerogatives of

*Judicial Recovery, in light of Brazilian legislation and other facts and considerations brought up within the scope
of this statement."* (fls. 116,966/116,978 of the Judicial Recovery – original highlights)

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

debtors and creditors subject to them. The risk of such rules and

consequent judicial decisions being conflicting with each other is true, as

already recognized by the New York Court and by Oi. Such measure

unwanted, which can generate countless losses for various stakeholders,

must be prevented and removed; and

• Chapter 15 Maintenance Need : Chapter *15* is and continues

being necessary for the purposes of implementing the Judicial Recovery. The

the judicial recovery process and plan have not yet been implemented

– on the contrary; the Oi Group recently presented an addendum to the plan,

in which, among others, it intends to sell its main asset (UPI V.tal) and

affect guarantees granted to relevant creditors with connections in the United

States. The scenario of uncertainty is substantial and indisputable. It is

likely that any decisions to be made by the Court of

Recovery must be confirmed under *Chapter 15,* under penalty

of emptying the jurisdiction of the Recovery Court. The closure

of that auxiliary procedure, therefore, is premature and inappropriate.

16. As can be seen, the Appealed Decision not only failed to exercise the

indispensable control of legality over the intended *Chapter 11,* as opened

dangerous precedent of legitimizing a blatantly illegal expedient,

incompatible with Brazilian public order and corrosive to the authority of this E.

Court. It is in this context that it is necessary to move forward, in the next chapter, to the

reconstruction of the main relevant procedural acts, without which the extent of the

litigation and the real contours of the maneuver attempted by Oi cannot be understood,

whose originality alone reveals its legal impropriety.

## III. NECESSARY INITIAL OBSERVATIONS

17. **Current Situation of the Appellees.** For almost 10 (ten) uninterrupted years, the

Appellees have been using restructuring processes provided for in the LFR to maintain

their activities. Currently, in the original Judicial Reorganization (the second filed by the

Oi Group), the failure to comply with the judicial reorganization plan proposed by the Oi

Group ("Plan") has become public, as reported by the I.

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

Judicial Administrators6 in the Monthly Activity Report for the month of
June 2025.

18. **Request for Amendment to the Plan and First Decision.** In this scenario, in
**1.7.2025,** the Respondents submitted an addendum to the Plan within the scope of
Judicial Recovery ("Amendment to the Plan"), for deliberation by creditors in
general meeting of creditors. On **July 9, 2025,** before deciding on the processing
of the Amendment to the Plan, the Recovery Court determined *"the prior
manifestation - albeit brief - of the Public Ministry, the Administration
Joint Judiciary and also the Judicial Observer, already appointed, on the
amendment to the submitted PRJ, and the supporting documents",* in addition to the notification
from ANATEL and CADE ("First Decision" **– doc. no.** 9).

19. **Request for Closing of *Chapter 15.*** On **7.7.2025,** the Respondents informed the
Reorganization Court of the Request for Closing of *Chapter 15,* with the intention of filing
*Chapter 11,* which would be justified by two reasons: *(i)* Brazilian law does not allow them to file
a new judicial recovery until **28.5.2029;** and *(ii)* the intention to novate the credits that, by force
of article 49, *caput* and §3º of the LFR, are not subject to Judicial Recovery.

20. In the statement filed before the New York Court for the
closing of *Chapter 15,* representatives of the Oi Group pointed out, based on
in statements made by Mr. Marcelo Milliet, current CEO of Oi, that any eventual
filing a *Chapter 11* case by Oi would have the support of D.
Recovery Court and the E. Court of Justice of Rio de Janeiro, although
there was no manifestation or decision in that sense.

21. **Second Decision – Letter to the New York Court.** On **July 18, 2025,** D.
The Recovery Court issued a decision, by which, *inter alia, (i)* it suspended the
payment of bonuses to the administrators of the Respondents, considering that,
according to the understanding expressed in the decision, the recent increase in remuneration

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

---

⁶ The I. Judicial Administrators reported that "the Companies Under Reorganization did not prove full compliance with the
obligations provided for in the Judicial Recovery Plan" (fls. 116,028 of the Judicial Recovery).

**PINHEIRO NETO**
A D V O G A D O S

of the administration of the Respondents would be improper and inadequate; *(ii)* determined that the *Watchdog* to report on the recent activities of the Respondents,

including possible emptying of assets; and (iii) ordered the issuance of an official letter to the New York Court, informing that *"it is in progress before*

*this Court of the 7th Business Court of Rio de Janeiro, RJ, recovery process*
*Oi Group's legal proceedings, in which the Recovering Party failed to fulfill its obligations*
*assumed in June 2025, without justification for this, until now*
*moment"* ("Second Decision" – **doc. no.** 10).

22.       **First Instrument of Appeal.** On **July 23, 2025,** the Appellant filed an instrument of appeal against the First Decision and the Second Decision, alleging that such decisions failed to (i) exercise legality control over the filing of a potential *Chapter 11* in the United States of America; and (ii) order the summons of the Brazilian Securities and Exchange Commission ("CVM") and the Federal Court of Auditors ("TCU"), with whom Oi entered into an agreement for the migration of

service provision regime – from concession in the public regime to authorization in the private regime ("First Instrument Appeal").

23.       **Suspensive Effect.** On **July 25, 2025,** Your Excellency granted a suspensive effect to the First Instrument Appeal, determining, among other points, the completion of the communication to the New York Court, so that *"before*

*issue any decision in the proceedings related to Chapter 15 of the Oi Group,*
*await the decision of the Brazilian Court both regarding the verification and consequences*
*of non-compliance with the PRJ, already reported, and the request for*
*Amendment to the PRJ of the main case in progress in Brazil"* ("Effective Decision
Suspensive" – **doc. no.** 11).

24. **Statement by the Appellant.** On **July 30, 2025,** in view of the Group's allegations Hi, under *Chapter 15 ,* a decision by the D. Recovery Court

respect of the Amendment to the Plan would be eminent --- while, in reality, there was several deadlines in progress for third parties to comment on the matter ---,
The Appellant filed a statement in the Judicial Recovery, requesting D.
Recovery Court to clarify the procedural progress of the

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

Judicial Recovery and supplement such information to the D. Court of Nova York, in order to demonstrate that a decision on the Plan Addendum required the completion of procedural steps that were open.

25. **The Appealed Decision.** On **4.8.2025,** the Recovery Court issued the r. Appealed Decision, which, among other determinations, declared the impossibility of prohibit the Oi Group from filing *Chapter 11*. In so deciding, *dmv,* the Court of Recovery rejected V.tal's request for the legality of potential filing of a *Chapter 11* by the Oi Group and, consequently, left to adopt the necessary measures to preserve, in Brazil, the rights and remedies of those creditors that Oi intends to subject to foreign proceedings, but that, by virtue of the provisions of the LFR, could not be affected in Brazil. It is against this decision that you are now protesting against.

## IV. REASONS FOR REFORMING THE APPEALED DECISION

### (a) Violation of Public Policy – Chapter 11 Filing That CanNO<u>T Be</u> Recognized in Brazil

26. The LFR w<u>as n</u>ot designed to be a legal restructuring instrument eternal and continuous. On the contrary: the LFR provides for **(i)** a period of up to 2 (two) years for the maintenance of the debtor in judicial recovery from the approval of the judicial recovery plan (article 61 of the LFR)7 and **(ii)** quarantine of 5 (five) years counted from the approval of the judicial recovery plan to request the processing of a new judicial recovery (article 48, II, of the LFR).8 Allow the Oi Group using *Chapter 11* to circumvent this prohibition would, in simple terms, and direct, legitimize fraud against the law under the guise of *procedural internationalization.*

---

[7] Art. 61, LFR: Once the decision provided for in art. 58 of this Law has been issued, the judge may order the debtor to remain in judicial recovery until all obligations provided for in the plan that are due within a maximum of 2 (two) years after the granting of judicial recovery are fulfilled, regardless of any grace period.

[8] Art. 48, LFR: The debtor may request judicial recovery if, at the time of the request, he has been regularly carrying out his activities for more than 2 (two) years and meets the following requirements, cumulatively: II - he has not, less than 5 (five) years ago, obtained a judicial recovery grant.



**P I N H E I R O N E T O**
A D V O G A D O S

27. As recognized in the Appealed Decision, there is no dispute that companies
Brazilian companies may, under certain circumstances, avail themselves of restructuring
mechanisms abroad, including filing a *Chapter 11*. This is the case
specific to Brazilian airlines that have taken advantage of successful
restructuring through the filing of *Chapter 11* proceedings. In these
cases, however, there <u>was</u> no main judicial recovery process
concurrently underway in Brazil – here, what is intended is unprecedented: the
duplication of main processes, national and foreign, something that is not permitted
by the Brazilian legal system.

28. In this sense, Professor Daniel Carnio Costa, in an opinion prepared in light of the
factual elements of this case **(doc. no.** 12), concluded that *"the circumstances of the
specific case indicate (...) that a <u>decision to grant judicial recovery
of the Oi Group in the US could not be recognized in Brazil, as it represents a clear
violation of national public order, even using th</u>e most rigorous standard of analysis
imposed on the transnational insolvency system"* (emphasis added). In other words,
even when subjected to the most rigorous technical scrutiny, Oi's *Chapter 11* does not
pass the test of Brazilian legality.

29. Permission for the Oi Group to file *Chapter 11* in the United States of America
would constitute a true reversal of <u>the incentives provided for in the LFR, with th</u>e
potential to affect the entire insolvency practice in Brazil. Although this is in fact
uncontroversial because it was publicly assumed by both Oi's CEO and his
legal advisors, V.tal believes it is pertinent to provide some clarifications that support
this statement. We would be faced with a precedent that, in addition to
reckless, would dynamite the Brazilian bankruptcy logic by rewarding the persistent debtor and
punish diligent creditors.

30. Investors who finance debtors in judicial recovery in Brazil
are based on the applicable provisions set out in the LFR for risk assessment
and pricing of financing. Among these provisions are **(i)** the
impossibility of restructuring debts secured by fiduciary alienation in
judicial recovery proceedings (article 49, § 3, LFR); and **(ii)** the impossibility of the

- 14 -

**PINHEIRONETO**
A D V O G A D O S

debtor files a future judicial recovery within the minimum period of 5 (five)

years counted from the r. decision granting its current judicial recovery (article

48, II, LFR).

31. The predictability of these legal frameworks is not a technical detail: it is the anchor of

the entire credit system. Breaking with it is like setting the ship adrift. All

the logic of business financing in Brazil rests on the certainty that

legal guarantees and restrictions will not be relaxed at the convenience of the

debtor. And it was precisely this trust in the protection of the right to credit that led to

V.tal (through its affiliated company), to disburse the equivalent of **US$150 million** in DIP

Financing to Oi.

32. When making the investment, V.tal had a legitimate expectation, based on statements

from Oi itself and pronouncements from the Judiciary, that the LFR would be the legislation

that would exclusively guide Oi's main lawsuit. Therefore, V.tal believed that the Judicial

Reorganization Court would be the only one competent to process the reorganization of

the Oi Group and, therefore, that **(i)** the fiduciary guarantees linked to the DIP Financing

*(e.g.,* the encumbrances on the shares issued by V.tal) could be executed in any scenario,

in accordance with the governing national law and the guarantee instrument; and **(ii)** Oi

could not file a new judicial reorganization within 5 (five) years from the approval of the

Plan – so that the Oi Group would necessarily have to comply.

fully the DIP Financing before such term, to the extent that it matures in 2027, that is,

within such quarantine

33. With all due respect, if the Brazilian courts authorize the Oi Group, then

having benefited from investments and protections made possible and granted to him

by Judicial Recovery, in accordance with national legislation, as authorized

of Brazilian creditors and the Judiciary, to file a *Chapter 11*

parallel to the Judicial Recovery in Brazil to restructure obligations

extra-bankruptcy proceedings in the North American jurisdiction, would be changing the logic and

incentives granted by the national legal system, so that the

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

investors who finance companies in judicial recovery would now include such
elements in their risk analyses.

34.    This means that, most likely, the interest rates associated with
financing for the benefit of debtors in judicial recovery would be
increased, which would make access to credit for companies in judicial recovery
even more scarce and costly.

35. The negative impacts on the sector resulting from this reckless precedent,
were even addressed by the Brazilian Association of Special Situations and Litigation Finance in its *Amicus
Brief* petition filed under *Chapter 15* **(doc. no.** 13). According to the Association:

> Oi's intention to restructure its liabilities before this Court, while its second judicial reorganization is pending
> before the Brazilian judiciary, **constitutes an attempt to circumvent Brazilian law,** which prevents it from
> taking such measures in that jurisdiction. The reorganization plan in the case in question—Oi's second judicial
> reorganization—was confirmed on May 28, 2024, meaning that, under Brazilian law, the filing of another
> judicial reorganization petition—the third of its kind—would only be possible starting May 28, 2029. **Allowing
> Oi to file requests to restructure its extra-bankruptcy liabilities in another jurisdiction within the legal
> prohibition period would therefore amount to a violation of Brazilian law.**

> **If this precedent is set, it will have serious implications for the Brazilian DIP financing market,** which is
> still new and underdeveloped compared to the United States, given the recent change in Brazilian insolvency
> law that grants lenders the collateral they need to offer DIP financing. If Oi's plan is allowed to proceed, the
> legal certainty that a DIP loan cannot be restructured within five years, as per Brazilian insolvency law, would
> cease to exist. **Some lenders may exit the market entirely, while others may only offer credit to insolvent
> companies on much less favorable terms. Although such uncertainty will undoubtedly affect the sector,**

> **With the specific DIP financing model that the Association represents, the most significant impacts
> would be felt not only by creditors but also by future Brazilian debtors.** Law No. 14,112/20 facilitated the
> DIP financing market, generating significant positive impacts for debtors throughout Brazil, and resolved
> historical issues that limited access to capital for decades before its passage. Prior to this law, DIP financing
> was rarely available to Brazilian debtors because there was no legal mechanism guaranteeing that the debt
> could not be restructured or offering additional protections for that debt. If Oi is authorized to come to the
> United States to do so,

- 16 -

TJRJ 202500773578 26/08/2025 21:36:27 EN@| Petição Inicial Eletrônica



# PINHEIRO NETO
### A D V O G A D O S

which could not be done in Brazil, this runs the risk of returning to the regime prior to Law No.
14,112/20, when debtors suffered from the inability to secure the necessary financing under
acceptable conditions.

For these reasons, the Association is taking action in this proceeding to express its concern
about the effects that granting Oi's request would have on the institutional structure of the
Brazilian insolvency system and, consequently, on the country's business environment (free
translation; highlights added - **doc. no.** 13).

36. But not only that. The deleterious effects of this strategy, for the market as a whole
were also recognized by the Oi Group's advisors at the hearing in
scope of *Chapter 15,* according to which the Brazilian market *would have to adapt* to
this new reality:

Q: You know—you're not sure how, Mr. Padis, but you recognize, right, that if Oi successfully
restructures its debtor-in-possession financing in this U.S. Bankruptcy Court, that could affect
the DIP financing market in Brazil, right, sir? A: I think the market will have to adapt.

———

Q: The market can adapt, but it can certainly have an impact, right? A: That's fair to say.

Q: And just to be clear, Mr. Padis, you don't know for a single moment that a U.S. Bankruptcy
Court has restructured Brazilian DIP financing within at least five years of a confirmed RJ plan,
correct? A: I don't know. That's correct. (free translation – **doc. no.** 14)9

37. The statement is astonishing. It is the confession that they intend to subject all
the Brazilian competitive system — carefully constructed by the legislator, by the
courts and economic agents—to a legal experiment of convenience. It is to say, loud and clear, that Brazilian
law can be trampled and that creditors, investors, and workers will simply have to conform to the

chaos.

38. Under the cloak of international restructuring, what is hidden is a crystal clear message: Oi intends to
rewrite the rules of the game and, in light of this,

---

⁹  The Appellant clarifies that the sworn translation of the document will be presented in due course.

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica



# PINHEIRONETO
### ADVOGADOS

all other actors — including this E. Tribunal — *"will have to adapt."* A
institutional blackmail disguised as a legal strategy.

39. Oi's negligence, however, is not limited to the credit market and
financiers who, assuming a controlled risk (based on the LFR analysis)
granted DIP to Oi. It goes further and affects all other extra-bankruptcy creditors
from Oi, whose credits are intended to be restructured in the United States.

40.       Just like the DIP financiers, the various creditors who approved the Plan and who
maintain commercial relations with Oi whose triggering event is subsequent to the
filing of the Judicial Recovery, took this measure to support the Plan confident that their
extra-bankruptcy credits would not be restructured by a judicial restructuring process in at
least the next 5 (five) years from the date on which the Plan was approved.

41. In other words, when making the decision to approve the judicial recovery plan,
creditors who maintain successive business relationships with the debtor in judicial
recovery take into account the payment terms of their bankruptcy credit together with the
expectations of payment for supplies in future years, which will be made possible with the
approval of the plan and
the rise of the debtor.

42. This is the case, for example, of creditors who are suppliers and partners of the Group.
Hi, who accepted the restructuring of their bankruptcy credits under the terms provided
in clause 4.2.6 et seq. of the Plan, confident that the supplies
hired after the request for Judicial Recovery would not be impacted by a
future restructuring process – or at least for the next 5 (five) years.
If such creditors were informed that their extra-bankruptcy credits would be
subject to a future *Chapter 11 restructuring,* it is reasonable to assume that its
vote in support of the Plan could be different from that computed in April 2024.

43. Judicial recovery is, above all, a pact of trust between the debtor,
creditors and the Judiciary. When the debtor, after obtaining approval

JUR_SP - 55617456v5 - 5769054.524399



**PINHEIRO NETO**

A D V O G A D O S

of your plan and reap the legal and economic benefits arising from it, try

subvert this pact by proposing a *Chapter 11,* what is broken is not

only the expectations of creditors, but the credibility of the process itself

Brazilian bankruptcy. Without trust, there is no possible negotiation; without predictability,

there is no credit; and without credit, there is no sustainable restructuring.

44. In this regard, it is noteworthy that, during the hearings within the scope of *Chapter*
*On 15,* the Oi Group's intention to restructure debts contracted by Oi with partner

suppliers after the start of the Judicial Recovery became public. This is the case,

for example, from companies that own transmission towers and satellites – which support

Oi's obligations in the agreement signed with the TCU:

> Q. The *"high line"* creditors , these are also tower creditors, correct?
>
> A. Correct.
>
> Q. And under the RJ, there are 712 million reais of *"high line"* credits that cannot be restructured
> by the RJ, right?
>
> A. Of course.
>
> Q. And Oi believes that these credits can be restructured through a judicial recovery process in
> the form of *Chapter 11* in column two, correct?
>
> A. Correct.
>
> Q. Another category of credits that Oi believes cannot be restructured in RJ are post-recovery
> claims suppliers, correct?
>
> A. Correct.
>
> Q. And Oi believes that at least some of them can be restructured through the judicial recovery
> process in the form of *Chapter 11* in the second column, correct?
>
> A. Correct. (free translation – **doc. no. 15)**

45. The measure proposed by Oi, as highlighted in the opinion prepared by Professor

Daniel Carnio Costa, *"reveals the unequivocal intention of the Oi Group to circumvent*

*structural limitation of the Brazilian insolvency system: the filing of the third*

*judicial recovery without the five-year term of the concession having elapsed*

**PINHEIRONETO**

A D V O G A D O S

of the second recovery and without the case being closed," so

that *"this claim by Oi could not be recognized and applied by the court*

*Brazilian as it constitutes a clear and manifest violation of Brazilian public order, since,*

*in practice, the aim is to file a third request for judicial recovery before the*

*legal term of five years, through an international strategy that circumvents the norm*

*essential procedural"* **(doc. no. 12** – highlights added).

### (b) Cross-Border Insolvency Rules Prohibiting Corporate Restructuring Credits Not Affected by Judicial Recovery in Brazil

46.      **Model Law.** Since 2021, Brazil has adopted rules inspired by the Model Law.

of the UNCITRAL Cross-Border Insolvency Regulations under the LFR (Articles 167-A and

following). In this context, the Brazilian legislator chose to provide clear rules to

respect of foreign insolvency proceedings that may be filed by

a debtor in judicial recovery, as is the case of Oi through the potential

filing *Chapter 11* in the United States of America.

47. **Relevant Classifications.** To this end, the LFR establishes the following:

classifications relevant to the analysis of this case: (i) foreign process [article.

167-B, item I] – any judicial or administrative process, of a collective nature,

including of a precautionary nature, opened in another country in accordance with provisions

relating to insolvency in force therein, in which the assets and activities of a debtor

are subject to a foreign authority, for the purpose of reorganization or

liquidation; (ii) main foreign proceedings [article 167-B, item II] – any

foreign proceedings opened in the country where the debtor has the center of his or her business

main interests; and (iii) non-main foreign proceedings [article 167-B, paragraph

III] – any foreign proceeding other than a main foreign proceeding,

opened in a country where the debtor has an establishment or assets.

48. In other words, Oi may only have one main foreign lawsuit

recognized in Brazil if Oi's main center of interest is located in

such foreign jurisdiction. On this topic, specialized doctrine establishes objective criteria for

defining the center of main interest:

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica



Tribunal de Justiça do Estado do Rio de Janeiro
Página
22
Certificado Eletronicamente

"Principal proceedings are those conducted abroad that take place in the debtor's center of main interests and are **presumed to be the location of the debtor's administrative headquarters or domicile of the individual entrepreneur at the time of the commencement of the foreign proceedings,** unless such headquarters have been transferred or manipulated to alter jurisdiction. In this regard, **the country of administration of the debtor's interests must be verified and would be promptly recognized by the collective of creditors,** regardless of its registered office, at the time of the commencement of the foreign proceedings." (SACRAMONE, Marcelo Barbosa. Comments on the Business Recovery and Bankruptcy Law. 2nd ed. São Paulo: Saraiva Educação, 2021. p. 640-641 - emphasis added)

49. **Possible *Chapter 11* – Non-Main Foreign Proceeding.** In this case, since it is clear that Oi does not have its main center of interest in the United States States of America, notably because it chose to file a claim twice for judicial recovery in Brazil. As expressly recognized by Oi in the *Chapter* 1510 filing and closing petitions , as well as in *Chapter 15* hearings , your main focus is on Brazil, since all its operations and sources of revenue are located in the territory Brazilian11.

50. **Center of Main Interests in Brazil since the First RJ.** In addition Furthermore, within the scope of Primeira RJ, the Oi Group also revealed that its main focus was Brazil. During that process, Oi Coop and PTIF had their *payment suspension* process processed, while Primeira RJ RJ was underway in Brazil. In view of the parallelism between the Dutch and Brazilian processes, the Reorganization Court declared that there was *"a need for the adoption of effective measures by this reorganization court, with a view to protecting the UNIVERSALITY OF CREDITORS INVOLVED"* and *"that it is up to the judicial reorganization court to decide on all issues involving the assets*

---

[10] "On March 29, 2023, the Court held a hearing to consider the Verified Petition and issued a decision that, among other things, found that each of the Chapter 15 Debtors' main center of interest is in Brazil and recognized the Brazilian RJ Proceeding as a "foreign main proceeding" of each of the Chapter 15 Debtors." **(doc. no. 8)**.

[11] "Q. And when Oi filed its second RJ lawsuit, Oi's registered office was in Brazil, correct?
A. Correct.
Q. And when Oi filed its Chapter 15 petition before this Court, Oi's registered office was at Brazil, right?
A. Correct.
Q. And sitting here today, Mr. Padis, you represent Oi now. Oi's headquarters are in Brazil, correct? sir?
A. That is my understanding." **(doc. no.** 15).

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

*of companies in Judicial Recovery, even if not aimed at payment
of creditors"* **(doc. no.** 16).

51.      In view of this, at the time when Coop and PTIF went bankrupt
decreed by the Amsterdam Court of Appeal, the D. Recovery Court declared
that *"the Brazilian jurisdiction and competence of this Court of the judicial recovery of
OI Group companies remain, therefore, unshaken,"* as well as determined by
prevalence of the First RJ over the Dutch bankruptcy procedure, imposing
fine Dutch judicial administrators if they take measures against the
determination of this Court **(doc. no.** 17).

52. In this sense --- and similarly to what was adopted in the First RJ, any *Chapter*    ---,
*11* filed in the United States of America would be classified as a non-main foreign
process of the Oi Group, under the terms of the LFR (article 167-B, III of the LFR),
preserving the status of the Judicial Recovery as the main restructuring process of the
Oi Group.

53. **Concurrent Proceedings.** In cases where a debtor decides
filing a foreign lawsuit concurrently with a judicial recovery proceeding in Brazil, the LFR
establishes that the judge must seek cooperation and coordination between such
proceedings. Specifically, the LFR
establishes that "if the process in Brazil is already underway when the request for
recognition of the foreign proceedings has been filed, any assistance measure
determined by the judge under articles 167-L12 or 167-N13 of the LFR

---

[12] Art. 167-L. After filing the request for recognition of the foreign process, and before its decision, the judge may
provisionally grant the provisional protection measures, based on urgency or evidence, necessary for compliance
with this Law, for the protection of the bankrupt estate or for the efficiency of the administration.

§ 1 Except in the case provided for in item IV of the caput of art. 167-N of this Law, measures of a provisional nature
end with the decision on the application for recognition.
§ 2 The judge may refuse to grant provisional assistance measures that may interfere with the administration of the
main foreign proceedings.
[13] Art. 167-N. With the decision to recognize the foreign proceedings, both main and non-main, the judge may determine,
at the request of the foreign representative and provided they are necessary for the protection of the debtor's assets
and in the interest of the creditors, among others, the following measures:
I - the ineffectiveness of the transfer, encumbrance or any form of disposal of the debtor's non-current assets carried
out without prior judicial authorization, if they have not automatically resulted from the recognition provided for in art.
167-M of this Law;
II - the hearing of witnesses, the collection of evidence or the provision of information relating to assets, rights,
obligations, liability and activity of the debtor;
III - the authorization of the foreign representative or other person to manage and/or realize the debtor's assets,
in whole or in part, located in Brazil;

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

Machine Translated by Google

23-10193-lgb    Doc 117-3    Filed 09/02/25    Entered 09/02/25 12:17:13    Exhibit C -
V.tal Appeal    Pg 70 of 91

Tribunal de Justiça do Estado do Rio de Janeiro
Página
24
Certificado Eletronicamente

# PINHEIRO NETO
### A D V O G A D O S

must be compatible with the Brazilian process, and the provisions of art. 167-M of this Law shall not be applicable if the foreign proceeding is recognized as the main proceeding" (article 167-S, I from LFR).

54.       Therefore, if the Oi Group eventually files a *Chapter 1* lawsuit *11* in the United States of America and seek recognition in Brazil, you know-that: (i) *Chapter 11* cannot be recognized as a foreign proceeding main, considering that Oi filed for Judicial Recovery in Brazil and, therefore, it assumed that the main center of interest of the Oi Group is not in us United States of America; and (ii) any cooperative measure to be adopted by the D. Recovery Court must be compatible with Judicial Recovery. Notably, given that *Chapter 11* would not be the main foreign proceeding of the Oi Group, the provisions of article 167-M of the LFR will apply, in view of the provisions at the end of article 167-S, I of the LFR (copied immediately above).

55.       In turn, article 167, M, § 3 of the LFR provides that "the measures provided for in this article *[(i.e.,* suspension of restrictive acts against the debtor)] **do not affect** creditors **who are not subject** to judicial recovery proceedings (...)." In other words, if the Oi Group files *Chapter 11,* the resulting effects on credits not subject to judicial recovery cannot be recognized and applied by Brazilian jurisdiction.

56.       In view of the above --- and through a simple interpretative exercise of the express provisions contained in the LFR and the history of this Judicial Recovery ---, the following main conclusions are reached:

   • Possible *Chapter 11* filing by the Oi Group in the United States of America would be classified in Brazil as a non-main foreign proceeding        ____

---

IV - the conversion, definitively, of any provisional assistance measure previously granted;
V - the granting of any other measure that may be necessary.
§ 1º With the recognition of the foreign process, both main and non-main, the judge may, at the request of the foreign representative, authorize him, or another person appointed by him, to promote the destination of the debtor's assets, in whole or in part, located in Brazil, provided that the interests of creditors domiciled or established in Brazil are adequately protected.
§ 2º When granting the assistance measure provided for in this article requested by the foreign representative of a non-main foreign proceeding, the judge must ensure that the measures to implement it refer to assets that, according to Brazilian law, must be subject to the discipline applicable to the non-main foreign proceeding, or ensure that they relate to information required therein.

**PINHEIRONETO**
A D V O G A D O S

(article 167-B, II of the LFR), considering that the center of main interest
of the Oi Group is not in the United States of America as already recognized
within the scope of the successive requests for judicial recovery of the Oi Group in
Brazil, in the petitions filed in *Chapter 15* and in the hearings within the scope
do *Chapter 15;*

• Considering that a potential *Chapter 11* of the Oi Group would be a non-main foreign
proceeding, by recognizing the measures adopted in *Chapter 11*
in Brazilian territory, the D. Reorganization Court should cooperate with the New York
Court, provided that such cooperation and assistance are compatible with the
provisions of the LFR, given that *Chapter 11* would be
filed with the Judicial Recovery in progress (article 167-S, I of the LFR); and

• The effects of *Chapter 11* on credits not subject to recovery
judicial in Brazil would not be capable of recognition and application in the
Brazil (article 167-S, I, final part and article 167-M, § 3, LFR).

57. **Preservation of the Appellant's Extra-Bankruptcy Obligations.** It is therefore concluded
that, if Oi comes to judge *Chapter 11* – which is only admissible for
argumentative purposes –, the restructuring of obligations of an extra-bankruptcy nature
of the Oi Group would not be capable of recognition and application of effects in Brazil.

58. What the Oi Group intends to do through *Chapter 11* is precisely to restructure
credits that would not be subject to judicial recovery in Brazil. And such credits
cannot be restructured in Brazil *inter alia* because the LFR enshrines quarantine
5 (five) years for a new request for judicial recovery to be filed
(article 48, II, LFR). Therefore, the alleged and presumed attempt by the Oi Group to seek the
recognition of the effects of such *Chapter 11* is, by definition, a stillborn initiative.

59. **Impact on Bankruptcy Credits.** As if the intention were not enough
manifestly illegal to restructure credits that would not be subject to Recovery
Judicial, the statements made by Mr. Marcelo Milliet at the *Chapter* Hearing
*15,* imply that the Oi Group's strategy is not restricted to this objective.
When asked about the extent of the intended restructuring, Mr. Marcelo

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

Milliet admitted that *Chapter 11* would have a direct impact on credits that are already being restructured in Brazil within the scope of Judicial Recovery.

60. The Oi Group therefore recognizes that *Chapter 11* may also interfere with sphere of bankruptcy credits that are under the supervision of the D. Recovery Court and of that E. Court and which should be kept exclusively subject to the jurisdiction Brazilian.

> Q. Mr. Milliet, do you agree that a *Chapter 11* bankruptcy filing would have a direct impact on the loans being restructured in Brazil?

> A. Credits that could not be restructured in Brazil.

> Q. It would also have an impact on the loans that are being restructured in RJ, correct?

> A. Through negotiations, yes. Okay. But our goal here is to recover credits that cannot be recovered in Brazil.

> Q. Mr. Milliet, would you please turn to page 44 of the transcript of your testimony?

> A. The first volume?

> Q. Yes. Let me know when you find it. Starting at Line 19, I asked: Could filing Chapter 11 have a direct impact on the debts being recovered at JR?

> A. I agree that it has an impact. Okay. But the impact isn't just negative, it's positive too. Did I read that correctly?

> A. Yes. Yes. (free translation – **doc. no. 15**)

61. **New Priority Debts – Subordination of Bankruptcy Credits.** The The same statement reveals that the Oi Group is seeking to obtain financing in *debtor-in-possession* modality , within the scope of *Chapter 11,* which would have priority over both extra-bankruptcy credits held against the Oi Group, and over credits bankruptcy proceedings that are already being restructured in the Judicial Recovery.

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

62. The Oi Group therefore admits that it intends to use a process

foreigner to change the order of payments and priority of cash distribution

established in the Judicial Recovery, in the Plan already approved by the jurisdiction

Brazilian. Such recognition is particularly serious, as it means imposing, through

of a non-main foreign case, yet another loss to bankruptcy creditors

of Judicial Recovery, who may not even be able to be heard and

defend before the American justice system.

> Q. And regarding the Chapter 11 bankruptcy filing , you are seeking DIP financing under *Chapter 11*, correct?
>
> A. Correct.
>
> Q. And any DIP financing pursuant to the *Chapter 11* filing would take priority over the loans currently being restructured in Brazil, correct?
>
> A. Probably, yes.
>
> Q. And any DIP financing pursuant to the *Chapter 11* filing would also take priority over loans that cannot be restructured in Brazil, correct?
>
> A. Correct. (free translation – **doc. no. 15**)

63. In short, what the Oi Group intends through *Chapter 11* is to subvert, from the outside in, the Brazilian

public order: to restructure credits that national law

expressly excludes from recovery, creating new priority debts that overwhelm bankruptcy creditors and

rewriting the payment cascade already approved by

Brazilian judiciary.

### (c) Risk of Conflicting Decisions – Legal Insecurity Also Already Present
### Recognized by the New York Court

64. If the Oi Group were to file a *Chapter 11,* the D. Recovery Court and this E. Court would face an

unprecedented situation in the national insolvency regime, in which the same debtor proposes a Judicial

Recovery and a *Chapter 11.*

concomitantly. This is a scenario not permitted by Brazilian law and

- 26 -

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

which, if tolerated, would pave the way for an unprecedented degree of disorganization
institutional.

65. In this sense, within the scope of the *Chapter 15 Hearing* , the New York Court
has even indicated that there are a number of doubts regarding how the
processing a *Chapter 11* in the United States of America could even
be implemented in Brazil, given the problems of recognizing the
decisions handed down in *Chapter 11* in Brazilian territory:

> THE COURT: They [the Brazilian court] are aware of this, but I don't think you're going
> to get an order saying, "Okay, have fun. Go to New York and file Chapter 11." I don't
> think you'll ever get an order like that.
>
> WITNESS: We –
>
> THE COURT: **I would be shocked.** I mean, I'm waiting to see what the Brazilian courts
> say. But it's more of a concern about what this could be.
> But I don't think you're ever going to get a clear direction. **I would be shocked if the court said this works
> well. (...) And I can't— I just— there are too many factors to** consider, so that's why I'm asking the question.
> Because obviously, I don't think you know any more than I do about what would happen.
>
>
>
> WITNESS: That's fair.
>
> THE COURT: (...) **but I will say that I don't think any of us know how it would end
> up that way. I don't. (...)** (emphasis added; **doc. no. 15**)

66. This external recognition, therefore, does not arise from a distrust
isolated: it is the American justice system itself that admits that Oi's attempt would be a
leap in the dark, a shaky ground in which no one — not even the court
foreigner—knows how to tread. In fact, the New York Court even recognized that the
correlation between a supposed *Chapter 11* and Judicial Reorganization would be a
veritable "no man's land":

> THE COURT: I think you're really—the circumstance would be interesting, I'm just saying
> that, for sure. **Because all of our guidelines wouldn't necessarily apply, and we'd
> almost be back to what we had to do before we had them.** That's how I see it.
> Because I'm not going to have—you're not going to have the provisions of the Model Law
> that allow for the interface between the two courts,

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

## PINHEIRONETO
### A D V O G A D O S

> the JIN guidelines are really primarily focused on 15. I'm not sure they couldn't be used for
> something else, but—and I say this as our district's JIN representative. **But I... You know,**
> **you're in a no-man's land, I guess in a way. (doc. #14** – emphasis added)

67. It is symptomatic that the foreign court itself, which would be the forum for the maneuver,
describe as "no man's land." There is no more accurate definition for legal chaos
that Oi intends to establish. And, in fact, there are several potentially
controversial issues that will occur in the concomitant coexistence of two processes
restructuring principals, including the issuance of orders by the jurisdiction
foreign potentially conflicting with the decisions of the D. Court of
Recovery and this E. Court. In this sense:

• During the Judicial Recovery, the Oi Group cannot **sell or encumber**
**assets of its fixed assets** except if authorized by the Reorganization Court or
provided for in the Plan (article 66, LFR).14 If *Chapter 11* involves the disposal
or encumbrance of non-current assets of the Oi Group (whether to the extent
authorized by the foreign Court or because provided for in the respective
recovery plan), this measure will potentially
incompatible with the existing restriction under the LFR;

• Similarly, **post-bankruptcy financing** only benefits from
protections contained in the LFR and may rely on real or fiduciary guarantees
if approved by the D. Court of Judicial Recovery (or if provided for in the
Plan subsequently approved – article 69-A et seq., LFR). If the
Oi Group seeks to obtain post-bankruptcy financing with
guarantees under the *Chapter* and such action is authorized by
foreign jurisdiction, the implementation of such financing would not be
reconcilable with the LFR rules, mainly because such financing
could not overlap with the DIP financing already taken in accordance with the
forecast of the PRJ and could not take advantage of guarantees that already

---

[14] Art. 66, LFR: After the distribution of the request for judicial recovery, the debtor may not sell or encumber goods or
rights of its non-current assets, including for the purposes provided for in art. 67 of this Law, except with the
authorization of the judge, after hearing the Creditors' Committee, if any, with the exception of those previously
authorized in the judicial recovery plan.



**P I N H E I R O N E T O**
A D V O G A D O S

were granted to other creditors in Brazil – as the Oi Group has already announced
what you intend to do; and

- The LFR establishes that the Judicial Reorganization Court must, during the course
  of the Judicial Reorganization, order the **removal of the Oi Group's management**
  **if certain hypotheses are verified** (article 64 et seq., LFR). The Oi Group's
  management, naturally, will be the same that proposes a potential *Chapter 11*
  and, consequently, will be supervised and monitored in accordance with the rules
  of that procedure, which adopts the *Debtor in Possession* system (i.e., maintaining
  the debtor in charge of the business). If the Judicial Reorganization Court orders
  the removal of the Oi Group's management,
  Oi Group, such a measure would be incompatible with *Chapter 11* (or even if the
  foreign court orders the administration to remain in charge of the Oi Group). In
  other words, such determinations would be conflicting and potentially irreconcilable.

- The Oi Group's judicial recovery plans, approved and ratified
  by the Reorganization Court, provide for and regulate various contracts entered
  into in the context of judicial reorganizations *(e.g.,* loan-for-use agreements,
  copper infrastructure use agreements, among others). If the foreign court, within
  the scope of a potential *Chapter 11,* were to authorize the rejection of such
  contracts, the measure would constitute a direct affront to the Brazilian judicial
  decisions that (directly or indirectly) approved and attributed validity and
  effectiveness to such contractual obligations. This situation would, in practice,
  generate a rescissory effect on contracts and obligations already consolidated by
  final and binding decisions in Brazil, in clear violation of the jurisdiction of the
  Reorganization Court and in total incompatibility with the LFR.

68. In fact, it is uncertain how two main procedures would be reconciled
restructuring. Oi itself never filed for Judicial Recovery
any clarification in this regard, limiting itself to informing, in a manner
superficial, which would be evaluating the possibility of submitting an application for
*Chapter 11* filing. Oi's eloquent silence is revealing: who has
legitimate strategy explains, whoever plots a maneuver hides. In the same sense, in

**P I N H E I R O N E T O**
A D V O G A D O S

within the scope of the Chapter 15 Hearing , the representatives of the Oi Group themselves and the Court

from New York made it clear that, at the moment, the reconciliation of both

processes are limited to futurology exercises :

> THE COURT: (...) All right, so I'm going to ask you my last question here, (...) do you
> anticipate that the company might need any action from the Brazilian justice system if it
> were to go ahead and file a lawsuit, except with respect to the plan amendment?
> The reason I'm asking this is because you were talking about a sale process. This isn't
> just an amendment to the plan. The plan provides for that, I understand. But I wasn't
> sure if there was anything more you could expect, since you've been involved in
> discussions about a Chapter 11 process where someone would need to go back to court
> for some of the reasons I just expressed concerns about.
>
> WITNESS: Not related to the RJ amendment, Your Honor?
>
> THE COURT: Yes, unrelated.
>
> WITNESS: At this point, as you rightly said, Your Honor, **it's a bit of futurology. I can't**
>
> THE COURT: **Yes, it's all futurology. I agree with that. That's a good word for it**
> (free translation; emphasis added – **doc. no.** 15).

69. In V.tal's understanding, accepting that the progress of the Judicial Recovery

of the Oi Group is subject to **futurology** exercises due to the filing of the

*Chapter 11* – as proposed by the Oi Group's legal advisor – would be a

irresponsibility of such magnitude that it can compromise the various *stakeholders*

involved, including workers and business partners with activities of public interest, such

as V.tal. It is to transform the judicial restructuring, which should

be the *pinnacle of predictability,* in a *casino of random results.*

70.    Among the unclear aspects, it is uncertain **(i)** to what extent a *Chapter 11*

would potentially impact labor and tax creditors and those owed to Brazilian regulatory

authorities; and **(ii)** how Oi intends to give effect in Brazil to decisions eventually handed

down by the American courts in view of the existence and continuity of the Judicial

Recovery, notably in light of articles 167-A et seq. of the LFR.

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica



**PINHEIRONETO**
A D V O G A D O S

71. Furthermore, in the (undesirable) scenario in which the Judicial Recovery is
turned into bankruptcy due to non-compliance with the Plan and the deterioration of
financial situation of the Oi Group, already reported by the I. Judicial Administrators and by the
Watchdog, it would be up to the D. Judicial Recovery Court and this E. Court to give
effectiveness of the rules for collecting and disposing of assets in the liquidation scenario of
Appealed. Simultaneously, however, the New York Court may also
adopt (potentially conflicting) measures that will prevent the disposal of assets of the
Oi Group, in favor of *Chapter 11.*

72. The establishment of *Chapter 11,* therefore, would cause an inevitable conflict of rules,
incompatibility of procedures and substantial legal uncertainty for the restructuring of the Oi
Group and for the entire Brazilian insolvency system. Such a measure, in addition to being
irreconcilable with this Judicial Recovery and the possible
and the resulting consequences, is not in the best interests of any party involved in the Judicial
Reorganization. There is no winner in this scenario: the creditor loses, the investor loses, the
worker loses, the state loses. Only the debtor wins—and they win because they cheated.

73. Indeed, a precedent like this would have the potential to shake the entire system
Brazilian bankruptcy, undermining the protections afforded to creditors willing to
offer financing and/or services during judicial recovery processes and
dramatically reducing the availability of resources for financing
companies in crisis in Brazil. After all, it is uncertain whether any financier would be willing
to make any disbursement to the debtor in judicial recovery in Brazil aware
that the guarantees and protections conferred by the LFR could subsequently come to be
be emptied by the initiation of foreign restructuring proceedings.

### *(d) Chapter 15 Maintenance Required*

74. **Chapter 15.** Similar to Chapter VI-A of the LFR, *Chapter 15* is based
in the UNCITRAL Model Law on Cross-Border Insolvency and aims to implement
foreign restructurings --- such as Judicial Recovery --- in the territory of
United States of America. In the case of the Respondents, the importance of *Chapter 15*

- 31 -

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica



## PINHEIRONETO
### A D V O G A D O S

arises especially from the Oi Group's debt issues traded on the market

of US capital (and governed by the laws of the State of New York) and by the

number of foreign creditors based in the United States of America.

75.       *Chapter 15* **Benefits for Oi.** For no other reason, Oi decided

filing *Chapter 15* in its two judicial recoveries, over the last

decade. Through the recognition of Judicial Recovery as a process

principal foreign national under *Chapter 15,* the following measures are

made possible:

> • Implementation of Judicial Recovery: *Chapter 15* serves as
>
>     procedural tool for Oi (through its foreign representative) to implement the
>
>     Judicial Recovery measures in the United States of America, with the
>
>     support of the Court of
>
>     New York. In this regard, for example, the Plan establishes the
>
>     issuance of new debts and contracts governed by the laws of the state of
>
>     New York, such as the intercreditor agreement ("Intercreditor Agreement").
>
>     Creditors" – **doc. no. 18),** which establishes the terms and conditions of the
>
>     sharing of the guarantees provided for in the Plan among creditors
>
>     extra-bankruptcy (DIP Financing financiers) and creditors
>
>     bankruptcy proceedings (such as Creditors of Unsecured ToP Debt)
>
>     Reinstated – Option I and Roll-Up Debt Holders).

> • Asset protection: *Chapter 15* promotes the suspension of acts of
>
>     execution and seizure of Oi's assets in the United States of
>
>     America, reflecting the terms of Article 6 of the LFR in that jurisdiction.
>
>     This measure is essential to prevent creditors with access to US justice
>
>     from executing the Oi Group in the United States.
>
>     States, promoting equal treatment between these creditors and
>
>     creditors with limited access to Brazilian justice.

> • Execution and Novation of Bankruptcy Credit: *Chapter 15* also
>
>     serves as a tool for implementing the Plan in the States

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

States of America and the effects arising from such implementation,
such as the novation *(discharge)* of credits held by creditors who
did not approve the Plan. This measure prevents creditors who
eventually did not approve the Plan expressly contest the
restructuring promoted by the Judicial Recovery in the future, which
brings stability to the process not only for Oi, but for the benefit
of all investors and creditors who believed in the novation of
credit of the collective of creditors promoted in the Recovery
Judicial.

76. **Importance of *Chapter 15* Reinforced by the Plan Amendment.** The importance of
*Chapter 15* does not end with the alleged "substantial implementation" of the Plan, as alleged
by the Respondents in the *Chapter 15* Closure Motion **(doc. no.** 8). In fact, *Chapter 15* is
even more relevant when the Respondents intend to submit the Plan Amendment to the
creditors for deliberation and, thus, change

substantially the terms of its restructuring.

77. In this regard, the Amendment to the Plan proposes that a substantial part of the
Respondents' bankruptcy debts be paid by **12/31/2038.15** Thus, there is
a long period of payment to creditors that may require measures of
restructuring whose implementation by the New York Court is necessary.

78. Furthermore, the Amendment to the Plan provides that a large part of the bankruptcy debt
will be paid through funds obtained from the sale of real estate.16 However, the
rules on the allocation of resources obtained from the sale of real estate provided for in
Amendment to the Plan17 are different from those established in the Agreement between
Creditors (governed by New York State laws):                    18

---

15 Videos: 4.2.6, 4.2.7, 4.2.8 and 4.2.9.
16 See: clauses 4.2.6, 4.2.7, 4.2.8 and 4.2.9.
17 See clauses 5.3.4 and 5.3.4.1 of the Plan Amendment. 18
   See clause 12.01 of the Intercreditor Agreement.

TJRJ 20250077357826/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

| Amendment to the Plan (clause 5.3.4) | Agreement between Creditors19 |
|---|---|
| "As a condition for the allocation of Net Revenue of the Sale of Real Estate in the payment order below, the <u>Company will endeavor to change, as applicable, the rules of payment (waterfall) and related documents with the creditors holding the guarantees whose objects are Real Estate or receivables arising from the sale of the Properties:</u> | "Regarding the sum of Real Estate Resources in Ordinary Course that exceed R$ 400,000,000.00 at any time: |
| (i) Net Revenue from the Sale of Real Estate limited to R$600,000,000.00. [...] will be 100% (one hundred percent) used by Oi to investments in their own activities or its Affiliates; | (A) firstly, on a *pro rata* and *pari* basis *passu,* for the payment of all Outstanding ToP obligations, until all ToP obligations have been fully met paid; |
| (ii) Net Revenue from the Sale of Real Estate above R$ 600,000,000.00, limited to R$ 1,600,000.00. [...] will be used for payment, pro rata to the respective Credits, to the following Creditors: (1.1) Creditors Suppliers Partners; (1.2) Reinstated Secured ToP Debt; (1.3) Unsecured ToP Debt Reinstated – Option I; (1.4) Unsecured ToP Debt Reinstated – Option II; (1.5) Adhering Extra-Bankruptcy Creditors. | (B) secondly, on a *pro rata* and *pari* basis *passu,* for the payment of all Outstanding Permitted Liquidity Obligations, until all Liquidity Obligations Allowed have been paid in full; (C) thirdly, on a pro rata and pari basis passu, to each First Representative Priority, for application in the payment of all First Priority Obligations *[New Financing]* pending, until all the First Priority Obligations have been paid in full; (D) fourthly, to the Trustee of the Roll-Up Notes Up, for application in the payment of all Outstanding Roll-Up Obligations, until all outstanding Roll-Up Obligations have been fully paid; and (E) fifthly, to the Company. (free translation) |

TJRJ J20250077357826/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

79. Thus, the Amendment to the Plan presupposes that the Agreement between Creditors be a<u>mended</u> so that its rules become compatible with those provided for in the Amendment to the Plan, under penalty of violation of the Agreement between Creditors and possible early maturity of debts.

---

[19]  The Appellant informs that the document now submitted corresponds to Annex 4.2.2.1.1(f)(iii) of the Plan. The final version of the Intercreditor Agreement was privately executed between the parties on 8.8.2024 (in the context of the disbursement of the DIP Financing) and reflects the terms of the document now submitted in all its material respects.

**PINHEIRONETO**
A D V O G A D O S

66. Considering that the Intercreditor Agreement is a post-bankruptcy contract entered into between Oi and bankruptcy and extra-bankruptcy creditors --- including (i) foreign lenders of DIP Financing, (ii) holders of *Roll-Up* Debt and
(iii) Creditors of the Reinstated Unsecured ToP Debt – Option I, headquartered in United States of America ---, the Oi Group depends on the consent of creditors located in the United States of America for the modification of a contract not subject to Judicial Recovery, in order to guarantee the viability of implementing the Amendment to the Plan. In this sense, the Oi Group itself proposes language in the Amendment to the Plan that Creditors of Unsecured ToP Debt Reinstated – Option I must commit to amending the Intercreditor Agreement.20

80. Thus, maintaining *Chapter 15* to recognize the execution of the Plan Amendment in the United States of America is essential to (i) promote stability in the restructuring of the Debtors for the coming years --- whose terms the Debtors proposed substantial change --- and (ii) ensure the feasibility of implementing the Plan Amendment, given that the Plan Amendment depends on the allocation of rights of foreign creditors, based on a post-bankruptcy agreement governed by the laws of the state of New York.

81. **Recognition by the New York Court.** In this sense, the
The New York Court recognized that, in the current context of the Judicial Recovery, it is important for Oi to remain with *Chapter 15* open and active in New York:

> THE COURT: (...) You have an ongoing RJ that will continue for several more years, regardless of whether the company was in financial difficulty, the process would still be ongoing. You have an amendment pending in the Brazilian court regarding this, so it certainly doesn't appear that the [ Chapter *15 grounds]* have ceased to exist.

> (...) My job as an ancillary Court is to be there to help the main case. (...) you know, that's why this is the ancillary case. (...) I would never want to not be present if the Brazilian Court felt that it was necessary. That's for sure. And I think (...) our Court would try to avoid that in any state, because we are the ancillary case here. And the reason for that is that the Representative

---

20 "The Unsecured Take or Pay Creditors – Option I agree, from now on, to amend their respective Security Instruments and the Intercreditor Agreement entered into with the Debtors and the applicable Creditors in order to incorporate the changes necessary to implement the provisions of Clauses 5.3.4 and 5.3.4.1" (clause 4.2.8.3(a) of the Plan Amendment – fl. 113,342 of the Judicial Reorganization).

**PINHEIRO NETO**

A D V O G A D O S

Foreigner thought it would help to come to the United States and get cooperation, but sometimes it is also
because the main Court would find it necessary according to the circumstances.

(...) So the question is, you know, is there something really pending that the [Brazilian] Court would say to us
that we would like us to be there? We wouldn't want to not be there for them.

(...) when I look at cooperation, I think we already agree on that. But does that mean there's no need for more
cooperation? I think that's the question. And I think the only person who can answer that for me in an unbiased
way is probably the Judiciary in Brazil (emphasis added; free translation - **doc. no.** 14).

82. Thus, the Appellant maintains, with all due respect, that the maintenance of the
*Chapter 15* before the New York Court is not a simple convenience, but
true condition of possibility for the Recovery Court to fully exercise its jurisdiction. It is a
measure of utmost importance to implement the
necessary restructuring measures, provide stability to the process and
ensure the effectiveness of the Plan --- and the Amendment to the Plan, if it becomes
processed and approved.

### (e) A clumsy, empty and unsustainable strategy

83. To date, the Oi Group has not been able to refute the allegations of illegality involving
the filing of a *Chapter 11*. The Oi Group has also not been able to clarify the uncertainties
reiterated by the New York Court itself regarding the impossibility of *Chapter 11* and
Judicial Reorganization coexisting.

84. Furthermore, the Oi Group did not present even a study or analysis on the possible
outcomes of a *Chapter 11,* the recoverability of debts in such a context, the impacts on
creditors, or the guarantees to be offered. In fact, the presentation of a restructuring
proposal
adventurer unaccompanied by any serious and credible analysis of her
financial viability seems to be the recurring conduct of this administration, which
was also identified by the Recovery Court when analyzing the report that
accompanied the Addendum:

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica

## PINHEIRO NETO
### A D V O G A D O S

"The data provided by the company also revealed weaknesses in the asset valuations it uses as a basis for estimating its ability to honor commitments, including those projected over time. In addition, it also identified the use of identical collateral to secure multiple obligations.

For example, there is no formal assessment of the enormous asset that is the Company Under Reorganization's 27.5% equity stake in VTal. Nor is there reliable information regarding judicial deposits to be used (not only regarding their amounts but also their very existence), or about credits arising from lawsuits or arbitration, or from extensions and unpredictable solutions.

Furthermore, **due to evidence of inappropriate information provided by the Debtor, a WatchDog was appointed to act in the matter** (in the RMA incident records, a copy of which is attached to these main records), by a precluded decision. Even more so, now, after the technical reports—albeit brief—are available, it is essential for this Judicial Observer to intervene directly within the Debtor to assess the veracity of the data provided by it regarding the numbers and transactions carried out, as well as any possible abuse or fraud.

"Regarding the assets, considering the weaknesses identified in several of the assessments adopted, it is hereby determined that their disposals and/or encumbrances must be previously authorized by the Court, which will be notified accordingly by WatchDog. Therefore, from the publication of this document, any and all disposals or encumbrances of assets that are not expressly and previously approved by the Court will be ineffective." (fls. 116202/116209 of the Judicial Reorganization).

85. It was also demonstrated under *Chapter 15* that (i) the Oi Group did not has the slightest indication that it will obtain DIP financing under the *Chapter 11* (possibly due to the uncertainties and illegalities surrounding the strategy presented to potential financiers); and (ii) the Oi Group estimates that more than **US$100 million** *(i.e.,* more than half a billion reais) would be spent in advisory fees for conducting a *Chapter 11 proceeding:*

Q: In fact, the amount of professional fees that Oi has estimated it will incur in a Chapter 11 is over $100 million more in fees than in a Chapter 11 scenario, correct?

A: Correct (free translation – **doc. no.** 15).

…

Q. No one agreed to provide DIP financing, correct?

A. Yes. They weren't against it, but they haven't given us the "ok" yet.

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica



**PINHEIRO NETO**
A D V O G A D O S

TJRJ 202500773578 26/08/2025 21:36:27 EN@J Petição Inicial Eletrônica

Q. There are currently no draft DIP financing agreements being
prepared, correct?

A. Correct. We don't have the commercial conditions yet.

[...]

Q. None of these DIP financing negotiations have progressed beyond you making a presentation to a potential
investor, correct?

A. Yes. It is not finished yet.

Q. None of these discussions or negotiations got "heated," right?

A. As I mentioned yesterday, no. By "heating up," I mean being very close to closing a deal. (free translation –
**doc. no. 15**)

86. It is symptomatic: without investors willing to finance, and with the forecast of
that more than half a billion reais would be sucked up just in fees, *Chapter
11* is nothing more than a drain on resources — a luxury that only interests those who
invoice with the crisis.

87. In short, the announced *Chapter 11* filing is a disastrous move,
unfounded and which puts the entire restructuring of the Oi Group at risk, as a result
of practically a decade of efforts by creditors and the Judiciary
National.

73. And this is because: **(i)** it would violate public order principles of Brazilian law; **(ii)**
would create a reckless precedent for the entire national insolvency system and
jurisdictional conflicts that would make its processing unfeasible from a practical point
of view; **(iii)** is devoid of any credible analysis of its financial viability; **(iv)**
would (further) increase litigation involving the Oi Group; **(v)** would drain more than
half a billion reais in attorney and advisor fees; **(vi)** would harm the Oi Group's main
asset, impacting the execution of the Plan itself; and **(vii)** would reduce the value of
the guarantee offered to various creditors under the Plan.

88. In fact, the administrators and advisors of the Oi Group appear to be the only ones
to benefit from this adventurous and irresponsible strategy in jurisdiction

JUR_SP - 55617456v5 - 5769054.524399

**PINHEIRONETO**
A D V O G A D O S

Tribunal de Justiça do Estado do Rio de Janeiro
Página
**40**
Certificado Eletronicamente

foreign, which apparently would only serve to cause turmoil and confusion to the

process and drain more resources from Oi without any efficiency.

89. In this regard, it is worth noting that a possible *Chapter 11* would also depend on the

approval of a plan before a foreign court – and it is hardly credible that creditors,

even after successive support actions, they come to consent again to a

new restructuring marked by illegalities and legal uncertainty. The reality is

that the Oi Group is already incurring relevant costs without presenting any

minimally grounded plan. In this sense, in the respectful understanding of V.tal,

the lack of concern for the costs incurred is reprehensible given the state of

crisis in which the company finds itself.

## V. NECESSARY GRANTING OF SUSPENSIVE EFFECT TO THIS
### APPEAL

90. To date, the merits of the *Chapter 15* Filing Petition have not been considered by the

New York Court. Therefore, at any time, the New York Court may authorize the *Chapter

15* filing and Oi may

implement the intended measures in the United States of America, putting into effect

risk the rights of the Appellant and the collective of creditors, through a potential *Chapter

11 process.*

91. In this sense, the Appellant respectfully understands that it is essential to grant urgent

relief to this Instrument of Appeal, so that:

> (i)     if the First Instrument Appeal loses its purpose
>
>         recognized, the terms of the r. Decision of Suspensive Effect are
>
>         validated and fully maintained, so that any decision to
>
>         regarding the *Chapter 15* Closure Request, await the decisions
>
>         of the Recovery Court regarding the already recognized non-compliance
>
>         of the Plan by the Oi Group and the processing of the Amendment to the Plan,
>
>         exactly in accordance with the terms of the r. Decision of Suspensive Effect; and

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica



**PINHEIRONETO**
A D V O G A D O S

(ii) in line with the duties of cooperation and communication that guide the
cross-border insolvency provisions of the LFR, this E. Court issues
supplementary communication to the New York Court, informing that,
*in summary judgment,* (a) filing *Chapter 11* would violate the
Brazilian public policy; (b) the effects of *Chapter 11* on creditors
extra-bankruptcy agreements could not be recognized in Brazil given the
existence of the Judicial Recovery; and (c) the maintenance of *Chapter 15* is
necessary to give effect to the decisions to be made within the scope
and by virtue of the Judicial Recovery

### (a) Probability of Law

92. **Violation of Public Order.** The LFR does not offer debtors a
continuous and uninterrupted restructuring instrument. On the contrary, the LFR
establishes that the debtor only has the right to file a new request for judicial reorganization if at
least 5 (five) years have passed since the date on which its judicial reorganization plan was
approved (article 47, II, LFR). This is a fundamental rule in the LFR, part of the public order of
Brazilian legislation (as recognized by Professor Daniel Carnio Costa - **doc. no.** 12), which
dictates the incentives of the judicial reorganization process, given that it gives creditors the
guarantee that their post-bankruptcy credits (including DIP financing) due during those years
cannot be restructured until the end of such period.

Quarantine.

93. Oi's attempt to file *Chapter 11* and, with that, restructure credits
post-bankruptcy and extra-bankruptcy proceedings in the United States of America, elapsed
just over 1 (one) year after the granting of Judicial Recovery, it is a measure
that circumvents the LFR and violates public order, which requires the intervention of the Court
of Recovery and of this E. Court.

94. **Impossibility of Restructuring Extra-Bankruptcy Credits.** In addition
Furthermore, the LFR does not allow post-bankruptcy and extra-bankruptcy credits to be restructured
within the scope of a possible *Chapter 11* of Oi. This is because a possible *Chapter 11* would not



PINHEIRONETO
A D V O G A D O S

would be classified as a main foreign restructuring process for Oi, having

given that the Oi Group filed for Judicial Recovery and, therefore, recognized that

its main center of interest is not in the United States of America

(but in Brazil).

79.      In view of this, the implementation measures eventually achieved in the

*Chapter 11* could be recognized D. Recovery Court, as long as such

measures are compatible with the Brazilian process (article 167-S, I of the LFR). In addition

addition, any suspension of rights and restrictive acts obtained within the scope of *Chapter

11* could not affect extra-bankruptcy creditors (articles 167-S, I, and 167-M, § 3 of the

LFR).

95. **Necessary Maintenance of *Chapter 15.*** Finally, the current situation of the Judicial

Recovery does not allow the Oi Group to dispense with the usefulness of the *Chapter 15*

process . This is because the Amendment to the Plan provides for a series of restructuring

measures that extend until at least the end of 2038.

80. Furthermore, the Plan Amendment is based on the presumption that creditors

foreigners --- both bankrupt and extra-bankruptcy --- will consent to the main payment rules

provided for in the Amendment to the Plan *(i.e.,* allocation of resources obtained from the

sale of real estate), through an amendment to a post-bankruptcy contract.

contest governed by the laws of the state of New York.

81. Therefore, maintaining the *Chapter 15* process is essential.

so that the Oi Group, the D. Recovery Court, this E. Court and the community

of creditors have stability and trust in the viability of the Amendment to the Plan.

### (b) *Existence of Effective Danger of Damage and Risk to the Useful Result of the Process*

96. **Imminent Risk.** If the First Instrument Appeal has its loss of

recognized object, the r. Preliminary Decision may cease to produce effects and,

consequently, the New York Court may at any time issue

JUR_SP - 55617456v5 - 5769054.524399



**PINHEIRONETO**

A D V O G A D O S

decision granting the *Chapter 15* Closure Petition and, therefore,

enabling Oi to file *Chapter 11* .

81. It is known that, with the filing of *Chapter 11,* there is an automatic suspension

of actions and executions against Oi in the United States of America *(automatic stay),*

regardless of any decision by the New York Court. Furthermore, the

*Chapter 11* would give Oi the prerogative to affect contracts related to credits

extra-bankruptcy and (including) bankruptcies, which could not be affected in the

Judicial Recovery *(e.g.,* the possibility of terminating out-of-bankruptcy contracts)

unilaterally).

97. Therefore, the Appellant, along with all other non-bankruptcy and bankruptcy

creditors of the Oi Group, faces the risk of harm from the imminent filing of *Chapter 11,*

which could enable Oi to take measures that are contrary to public policy and prohibited

by the LFR, as explained above. In this scenario, the success of the Judicial

Reorganization could be compromised, since the fundamental rights and interests of

the Oi Group and its creditors and business partners would be subject to foreign

jurisdiction concurrent with the Brazilian proceedings.

98. **Danger of Conflict Between Jurisdictions.** Furthermore, there is a serious risk

that the restructuring measures made possible by the potential *Chapter 11,* as well as the

orders to be eventually issued by the New York Court, to be

conflicting with the provisions of the LFR and the determinations of the D. Court of

Recovery and this E. Court, causing a real conflict of jurisdiction and

instability in the process. Such conflict could compromise the effectiveness of the measures

adopted in the Judicial Recovery, which represents the main process of

restructuring of the Oi Group, processed in its main center of interest.

*(c) Reversibility of the Measure*

99. As demonstrated in this Instrument of Appeal, the potential

filing of *Chapter 11* by Oi could significantly affect the rights

and interests of creditors and relevant business partners of the Oi Group. This

TJRJ 202500773578 26/08/2025 21:36:27 EN@l Petição Inicial Eletrônica

**PINHEIRONETO**
A D V O G A D O S

Tribunal de Justiça do Estado do Rio de Janeiro
Página
**44**
Certificado Eletronicamente

way, the legality and extent of the effects of such a measure must be discussed
with caution before the D. Recovery Court and this E. Court.

100. In this context, on **8/12/2025,** the Recovery Court determined the
suspension of actions against the assets of the Respondents until 8/31/2025, which "may
may be extended, depending on what may arise during the course of the process"
(fls. 118,173/118,176 of the Judicial Recovery). Therefore, an environment of
momentary stability so that the discussion on the Amendment to the Plan can be
discussed in the Judicial Recovery with the caution that the matter requires.

101. In the same sense, this E. Court acted with caution in ordering the completion of the
letter to the New York Court, recommending that it await a decision to be issued on the
Amendment to the Plan, before deciding on the Request for Closure of *Chapter 15,* under
the terms of the r. Decision Suspensive Effect.

102. All these precautionary measures were taken on the basis that communication and
cooperation between the Reorganization and New York Courts ---
and the time this requires --- will not cause any irreversible damage to the Oi Group.
Thus, any recommendations and communications to be maintained and
sent by this E. Court to the New York Court will not cause any measure
harmful of impossible reversibility for the Respondents --- on the contrary: only
will contribute to the legal certainty and stability of the restructuring measures to be pursued.

## VI. CONCLUSION AND REQUESTS

103. In view of all the above, you trust that, in accordance with art. 1,019, I, of the CPC,
this i. Report will grant, *inaudita altera parte,* the anticipation of the effects of the protection
appeal, determining that:

(i)     if the First Instrument Appeal loses its purpose
        recognized, the terms of the r. Decision of Suspensive Effect are

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@I Petição Inicial Eletrônica



# P I N H E I R O N E T O
### A D V O G A D O S

validated and fully maintained, so that any decision to
regarding the *Chapter 15* Closure Request, await the decisions
of the Recovery Court regarding the already recognized non-compliance
of the Plan by the Oi Group and the processing of the Amendment to the Plan,
exactly in accordance with the terms of the r. Decision of Suspensive Effect; and

**(ii)** in line with the duties of cooperation and communication that guide the
cross-border insolvency provisions of the LFR, this E. Court issues
supplementary communication to the New York Court, informing that,
*in summary judgment,* (a) filing *Chapter 11* would violate Brazilian public policy; (b) the
effects of *Chapter 11* on creditors
extra-bankruptcy proceedings could not be recognized in Brazil given the existence of
Judicial Recovery; and (c) the maintenance of *Chapter 15* is necessary to give effect
to the decisions to be rendered within the scope and by virtue of the Judicial Recovery

104.         Having granted the above-requested urgent relief, the Appellant trusts that, in the
end, this appeal will be granted, ratifying the requests for advance effects of the relief formulated
above and reversing the r.
Appealed Decision, for all legal purposes and effects.

In these terms,

P. Grant.

Sao Paulo, August 26, 2025.

**Thiago Braga Junqueira**          **João Guilherme Thiesi da Silva**

**OAB/SP No. 286,786**               **OAB/SP No. 410,293**


**Maria Fernanda M. Del Grande**     **Sophia Weinschenker Bollmann**

**OAB/SP No. 493,904**               **OAB/SP No. 519,960**

JUR_SP - 55617456v5 - 5769054.524399

TJRJ 202500773578 26/08/2025 21:36:27 EN@! Petição Inicial Eletrônica