# EXHIBIT B

The Judiciary of the State of Rio de Janeiro

Electronic Judicial Proceeding (PJe)

30-Sep-2025

Number: 0960108-88.2025.8.19.0001

Class: PRECAUTIONARY MEASURE

Adjudicating body: 7th Business Court of the Judicial District of Rio de Janeiro

Last case assignment: 25-Sep-2025

Reference case: 0090940-03.2023.8.19.0001

Subjects: Composition with Creditors

Confidentiality level: 0 (Public)

In forma pauperis proceeding: NO

Request for preliminary injunction or early relief? YES

| Parties | Attorneys |
|---|---|
| OI S.A. – UNDER JUDICIAL REORGANIZATION (PETITIONER) | |
| | TALITHA AGUILLAR LEITE (ATTORNEY) PAULO CALIL FRANCO PADIS (ATTORNEY) |
| OI S.A. – UNDER JUDICIAL REORGANIZATION (RESPONDENT) | |
| **Exhibits** | |

| Id. | Date signed | Exhibit | Type |
|---|---|---|---|
| 230429628 | 30-Sep-2025 15:50 | Decision | Decision |

**The Judiciary of the State of Rio de Janeiro**

**Judicial District of Rio de Janeiro**

**7th Business Court of the Judicial District of Rio de Janeiro**

**Palácio da Justiça, Avenida Erasmo Braga 115, Centro, RIO DE JANEIRO - RJ - CEP:**

**<u>DECISION</u>**

Case No. 0960108-88.2025.8.19.0001

Class: PRECAUTIONARY MEASURE (12134)

PETITIONER: OI S.A. – UNDER JUDICIAL REORGANIZATION

RESPONDENT: OI S.A. – UNDER JUDICIAL REORGANIZATION

**Case No. 0960108-88.2025.8.19.0001**

DECISION

This is an incidental proceeding assigned in relation to the main proceeding for the judicial reorganization of the Oi Group (No. 0090940-03.2023.8.19.0001), filed by OI S.A. – IN JUDICIAL REORGANIZATION, PORTUGAL TELECOM INTERNATIONA FINANCE BV – IN JUDICIAL REORGANIZATION and OI BRASIL HOLDINGS COOPERATIEF UA – IN JUDICIAL REORGANIZATION, with a request for preliminary injunctive relief, for the adoption of measures "for the recovery of Oi: in accordance with the principle of preservation of the company," by ordering suspension of the enforceability of the Reorganization Debtors' post-petition obligations for an initial period of sixty days and, consequently, monetization of 6,000 metric tons of scrap underground copper cables owned by the company, already extracted and currently stored at V.Tal's distribution centers, through reimbursement to V.Tal for the extraction costs, in the amount of BRL7.60 per kilo, since the obligations provided for in the LTLA agreement will be suspended" (sic – page 20 of the complaint).

It provides a historical account of its financial crisis, marked by structural and technological transformations in the telecommunications sector, characterized by the obsolescence of services historically offered through costly contracts.

It says it has been taking measures to overcome the difficulties, citing examples such as the decommissioning of legacy systems (Oscar Project), technological modernization (Phoenix Project), optimization of costs for suppliers, cost resizing (New Age Project), monetization of non-strategic and loss-making assets, regularization and monetization of real estate, transaction with the Chief Public Attorney's Office for the National Treasury (PGFN), administrative efficiency, and governance.

It argues that it has been taking important steps toward effectively restoring the financial health of the Oi Group, including operating results that are trending toward reversal, approaching equilibrium, and signaling a return to profitability in regular operations, as pointed out by the Watchdog in the main case record. This would be a strategic transition from a group focused on mass retail and loss-making services to a leaner,

more technological organization oriented towards digital and corporate solutions. All in accordance with the provisions of article 47 of the Reorganization and Bankruptcy Act (LTF), which deals with the preservation of the company, its social function, and the maintenance of employment.

It adds that its bankruptcy would have serious repercussions for the telecommunications market and for public policy on digital inclusion in locations where there are no other providers.

All this to conclude with the need for "equalization of post-petition liabilities," especially for mediation procedures.

It clarifies that, despite the measures reported, there are significant post-petition liabilities, estimated at BRL1.5 billion, whose restructuring is limited by the instruments of the LRF, giving rise to the search for alternative solutions, among which was the filing for Chapter 11 in the United States of America.

At a special hearing convened by Judge Mônica Maria Costa Di Piero on September 11, 2025, it was agreed with V.Tal to initiate two mediations: the first focused on addressing operational issues ("Box 1") and the second on addressing cash illiquidity ("Box 2).

Although optimistic about the settlement with important post-petition channels, it needs to address purely short-term operating expenses, which will only be achieved after addressing the so-called "Box 2."

This is because the Oi Group's projected cash flow for September 30, 2025, is approximately 21 million, and if the temporary suspension of the enforceability of the claims in question is not determined, it could reach a negative 178 million at the end of October 2025.

Therefore, it intends to reverse the negative projection from October to stabilize cash flow for a period of sixty days.

It points out that a similar measure was granted in the case of Grupo Light, a transcript of which is included in its complaint. And that it does not seek a broad interpretation of Article 20-B, paragraph 1 of the LRF, but rather to provide favorable conditions for negotiation.

It goes on to note that the existence of a public interest arising from the services provided allows for judicial intervention, with its general power of caution, to determine the suspension of the enforceability of post-petition claims, while seeking a settlement through mediation, as well as the sale of 6,000 tons of scrap underground copper cables, an operation that could generate approximately BRL100 million in cash.

Furthermore, there will be no loss to creditors, as the enforceability of their claims will be reinstated after the suspension period expires if no settlement is reached.

It indicates that V.Tal and its controller, Banco BTG Pactual S.A., have been taking actions that demonstrate a tendency not to negotiate ("Box 1") and also retained collected aerial copper cables in its possession (according to a police report), as well as declaring to the Superior Labor Court that it will not pay invoices related to services provided to it by Serede – including filing with the Labor Court an action for payment into court of BRL 56 million, instead of proceeding with the payment to workers. In turn, BTG retained BRL12 million related to the payment of an installment owed to the companies undergoing reorganization for the sale of receivables in December 2025, linked to the surplus of the Sistel Social Insurance Foundation ("SISTEL"). It then reported the assignment of the receivables to another member of the BTG Group, which assignment it did not communicate to the plaintiffs.

It also states that it has important strategic assets, such as a 27.26% stake in V.Tal, Oi's sponsorship of SISTEL, its link to Fundação Atlântico, which manages pension plans and has the capacity to fully settle debts scheduled for 2026 and 2027, claims held with various states, such as Santa Catarina (BRL308 million),

Pernambuco (BRL29 million), the Federal District (BRL 41 million), Rio de Janeiro (BRL 287 million), and Sergipe (BRL 17 million), in addition to discussions with ANATEL regarding amounts paid as inspection fees, totaling BRL 8.33 billion, with emphasis on the Telecommunications Inspection Fund, adjusted to BRL 17.2 billion. In addition to a receivables portfolio of approximately BRL13.2 billion, with an average recovery of BRL8 million per month over the last six months, strategic operating assets such as AIX de Participações Ltda. and Timor Telecom S.A.

Finally, it undertakes to use its cash exclusively to cover operating expenses, as well as for agreements with the National Telecommunications Agency (ANATEL) and the Brazilian General Accounting Office (TCU), refraining from making any bonus payments or extraordinary compensation to company officers.

It has attached exhibits.

**Having provided the necessary statement of facts, I now issue my DECISION as follows.**

There are a multitude of issues to be analyzed in light of the present incident now submitted to this Court and its content.

I will address them one by one.

## PROCEEDINGS UNDER SEAL

At first glance, I do not see any exceptional circumstances in this case, as set forth in the provisions of Article 189 of the Code of Civil Procedure, that would authorize limiting the rule of publicity of judicial proceedings provided for in the Brazilian Constitution. No reason has even been given that would lead to such an exception. Therefore, **I order the lifting of the confidentiality of the proceedings** so that their content may be made public.

## THE JURISDICTION OF THE 7TH BUSINESS COURT OF THE CAPITAL OF RIO DE JANEIRO

Still with regard to the preliminary allegations, the jurisdiction assigned to this Court for the processing of the case must be analyzed, in view of the original jurisdiction established in the course of the Oi Group's judicial reorganization process (No. 0090940¬03.2023.8.19.0001).

And, to this end, from the outset, there is an undeniable finding: the company undergoing reorganization claims to have post-petition debt estimated at BRL1.5 billion.

In other words, in addition to the discussion that has taken place so far in the main judicial reorganization proceedings, which refers to the non-fulfillment—probably substantial—of the obligations set forth in the approved Reorganization Plan, and which are suspended by virtue of a preliminary injunction issued by this Court (which would remain in effect until August 31, 2025 and was extended by the 2nd instance until the analysis of the ADDENDUM TO THE REORGANIZATION PLAN presented there), the Plaintiffs claim that they are also in default with regard to the fulfillment of post-petition obligations.

At first glance, one might say that it is not up to the reorganization court to deal with post-petition debt. However, this Court believes that it has jurisdiction, including universal jurisdiction, to deal with what will be decided here.

It is well known that the Oi Group once held vast assets. Today, however, these assets have been greatly reduced, and there are still well-founded doubts about their extent.

The information provided by the Reorganization Debtor over time, especially during the second judicial reorganization, proved to be inconsistent. For this reason, in the proceedings for the presentation of the Monthly Management Reports, the Bankruptcy Trustee was ordered to provide timely conclusions on

Docusign Envelope ID: 6D6BD74A-3330-4022-98F2-359CA9271F2C

23-10193-lgb    Doc 130-2    Filed 10/02/25    Entered 10/02/25 15:25:14    Exhibit B - Judge Simone September 30 Ruling (certified translation)    Pg 6 of 11

compliance with the plan and the feasibility of maintaining such compliance. This began to be carried out by the Bankruptcy Trustees in June 2025, and in July, information began to appear about defaults (which, as it later became known, had begun, for the most part, in approximately March 2025, perhaps even earlier, at the time of the presentation of the 2nd Judicial Reorganization).

The inconsistency of the information on assets can be seen in several ways. Regarding fixed assets, the Watchdog was told that there were 7,880 real properties.

On page 119,272, it states:

> "9. Therefore, according to the information initially provided, of the 7,880 (seven thousand, eight hundred and eighty) properties, the actual situation of 7,500 (seven thousand, five hundred) properties is unknown, as they are still undergoing due diligence to assess whether they are in the name of the Reorganization Trustees or any of their subsidiaries, or if they are subject to any constraints or encumbrances. (page 119,272, Watchdog report)."

Shortly thereafter, however, the existence of 2,258 properties was reported:

> "In addition, this Watchdog brings to the case record the Updated List of Properties, from which it can be inferred that, in line with the most recent results of the due diligence process, the Oi Group has 2,258 (two thousand, two hundred and fifty-eight) properties that have not yet been sold, all of which are duly registered in its name or in the name of its subsidiaries." (page 121,109)

The cash balance reported to the Bankruptcy Trustees and the Watchdog was BRL915,331,014.00 (in July), which, at least in theory, would ensure the maintenance of operating expenses for 8-9 months.

The Bankruptcy Trustees agreed with its conclusions when commenting on the report (id. 120.406). And it was the Bankruptcy Trustees that pointed out that the amount claimed by Watchdog (BRL936,232,7914.71) would actually result in BRL25,495,271.41 available (in July 2025). This is because the remaining amount (BRL915,331,014.00) was frozen. I transcribe an excerpt from the Bankruptcy Trustees's statement:

> "With regard to the cash balance, the Joint Bankruptcy Trustees consider it pertinent to add that, as presented in the 28th Monthly Activity Report (RMA) (pages 2967/2968, case 0132219-66.2023.8.19.000), the accounting balance reported by the Recoverable Companies of BRL 936,232,791.71 in July 2025 is not fully available for the payment of obligations, given the existence of frozen amounts of approximately BRL 915,331,014.00 (in July), related to: (i) collateral for reciprocal guarantees; (ii) amounts linked to ANATEL; and (iii) restricted cash from VTAL. Thus, the amount actually available for use in the transaction in July 2025 is BRL 25,495,271.41, as reported by the Watchdog in its addendum." (pages 120,410-120,411).

I highlight the extremely serious financial deficit situation of the group in reorganization, as assessed by both the Watchdog and the Bankruptcy Trustees, all of whom have the necessary technical expertise to do so.

I transcribe the conclusions of the Bankruptcy Trustees, commenting on the Watchdog's report:

> "VII. CONCLUSION OF THE JOINT BANKRUPTCY TRUSTEES REGARDING THE WATCHDOG'S REPORT
>
> 74. That said, the Joint Bankruptcy Trustees believe that the report presented by the Watchdog accurately portrayed the deficit economic and financial situation of the companies undergoing reorganization, in light of their financial statements, highlighting the uncertainty surrounding the continuity of their businesses, already reported in the Monthly Activity Reports (RMAs), by reporting that the activities of the companies undergoing reorganization do not generate sufficient cash to cover operating costs and expenses, generating, as of December 2024, a predominantly negative EBITDA and EBIT margin dependent on extraordinary income (sale of assets and intragroup transactions), without any structural recovery, which may have resulted from the failure to improve the assumptions set forth in the Judicial Reorganization Plan, in particular the lack

Docusign Envelope ID: 6D6BD74A-3330-4022-98F2-359CA9271F2C

23-10193-lgb    Doc 130-2    Filed 10/02/25    Entered 10/02/25 15:25:14    Exhibit B - Judge Simone September 30 Ruling (certified translation)    Pg 7 of 11

of cash inflows from the sale of UPI Client.Co, which compromises fulfillment of bankruptcy and post-petition obligations, especially those in the short and medium term.

75. The Watchdog also noted that the total cash held by the companies undergoing reorganization (in the amount of BRL 936.2 million) would be sufficient to cover negative cash flow for a maximum of nine months if fully available, given that the amount actually available to the companies undergoing reorganization is around BRL 25 million. given the restriction on the use of funds with Anatel and other operations, which brings even more financial difficulties for the companies undergoing reorganization and corroborates the need to rebuild operating cash flow.

76. Regarding the Cash Flow projection contained in the Addendum to the Reorganization Plan, the Joint Bankruptcy Trustees corroborates the Watchdog's statement that the new conditions set forth in the Addendum mitigate the financial situation of the Companies Under Reorganization (when compared to the current scenario), but do not substantially change their operating cash flow in the short term, as they necessarily depend on the sale of assets within the planned schedule and Capex discipline.

77. In this context, the Joint Bankruptcy Trustees, on a complementary basis, take this opportunity to reiterate their report on pages 116.055-116.058, where they pointed out information regarding the feasibility report that instructed the Addendum to the Reorganization Plan that lacks the necessary soundness and consistency to improve the decision-making of the affected creditors, should the deliberation be authorized in the General Meeting of Creditors.

78. As appropriate, the Bankruptcy Trustees submits this present report for analysis by this Court, the Public Prosecutor's Office, and all creditors/interested parties." (pages 120.425-120.426 of ID 120.406 of the main case record)

I cite all this from the main case record, public proceedings, to conclude that what was narrated by the debtor in this incidental proceeding had already been revealed in the main case record. The difference is that now the existence of a billion-dollar post-petition debt is assumed, which must be processed by this Court, given its utmost relevance to the course of the reorganization proceedings.

**I therefore declare that this Court has jurisdiction to try the case.**

### THE ANTICIPATION OF THE EFFECTS OF THE PROTECTION

That said, in this incidental proceeding, the company under reorganization is seeking a 60-day suspension of post-petition obligations, during which it will seek to settle its debts and sell scrap copper, noting that its cash flow currently stands at BRL21 million, which is insufficient to meet its obligations as of October 2025. This information about the reality of its cash flow now brought forward converges with that of the Watchdog and the Bankruptcy Trustees.

**Very well. The suspension of post-petition obligations must be granted. However, <u>not for the period or for the reasons given by the company undergoing reorganization</u>.**

It is a fact that the Oi Group is responsible for providing numerous essential services to the Brazilian population. Given the company's history and origins, it holds important contracts through which it ensures communication in areas where no other telephone operator reaches; it also provides fixed telephone services, maintaining public payphones; it operates data centers that transmit signals to other operators; and it is also responsible for signals that serve 70% of CINDACTA.

Given the company's precarious financial situation, it was ordered to present a transition plan for these services. However, this court order was the subject of an interlocutory appeal, in which it was upheld but deferred until the amendment to the Reorganization Plan was reviewed. As can be seen, this is unlikely to happen.

Anatel was summoned and, in its statement, clarified that the transition will not cause major disruption to the Brazilian population. However, the same will probably not be true for the services that support CINDACTA's operation.

Therefore, this Court believes that **it is imperative to carry out a transition process for these services in order to ensure their continuity, in respect for national public security**.

Therefore, given the acknowledged impossibility of honoring financial commitments brought about by the Reorganization Debtor, coupled with the need to ensure the continuity of the important public service it provides, **I decide that this incidental proceeding will be used to process the transition of public services provided by the Oi Group.**

**To implement this transition, it is necessary to adopt several measures, which I will now address.**

Previously, this Court had already pointed out the group's pre-bankruptcy situation, which was endorsed by the Public Prosecutor's Office ( ). Now, as it appears, which, added to the need for the transitional phase described above, determines the partial anticipation of the effects of bankruptcy by this Court. This is so that the transition flows smoothly and rationally, and enables the company to seek to negotiate with its creditors on reasonable terms in the interim.

It should be noted that it is not appropriate here to grant the bankruptcy decree requested by numerous creditors in the main proceedings and in the incidental proceedings created for objections to the amendment to the judicial reorganization plan presented.

Nor is it appropriate to grant the requested suspension of debts in order to seek composition with creditors, which, as pointed out by the company undergoing reorganization itself, would result in a third judicial reorganization, which is prohibited by the governing law under the existing circumstances.

The hypothesis is, in fact, to anticipate, in part, the effects of liquidation, aiming at the necessary transition of the provision of essential services incumbent upon the company undergoing reorganization, while allowing it to negotiate with its creditors. Only after the expiration of the period, which I hereby set at thirty (30) days, will a decision be made regarding full liquidation or continuation of the reorganization process.

The anticipation of the effects of liquidation is supported by the court's general power of precaution, given the situation provided for in Article 73, paragraph 1 of Law 11,101 of the LRF, the need to ensure the continuity of the public service it provides and the viability, albeit minimal, of the company's continuity, even if in a greatly reduced form (which constitute a prima facie right and imminent irreparable harm).

On the other hand, both reports, from the watchdog and the most recent RMAs presented by the Bankruptcy Trustees, converge in the sense of the depletion of the assets of the company undergoing reorganization, which will be even more serious as of December 2024.

In fact, the State of Rio de Janeiro has already taken a position on this matter, filing motions for clarification in response to the decisions that approved the sale of UPI ClientCo (fiber optics) and television signals. It has always been strong in its argument of asset stripping. It also insisted on the presentation of a true and updated list of the properties of the company undergoing reorganization.

Although this Court ordered the submission of the list of properties (which was claimed to be around 7,500), it ultimately rejected the motion for clarification filed by the State of Rio de Janeiro, firmly believing that such sales were part of the approved judicial reorganization plan and, therefore, were merely in compliance with it.

Docusign Envelope ID: 6D6BD74A-3330-4022-98E2-359CA9271F2C

23-10193-lgb    Doc 130-2    Filed 10/02/25    Entered 10/02/25 15:25:14    Exhibit B - Judge Simone September 30 Ruling (certified translation)    Pg 9 of 11

However, these decisions were made in light of the existing RMAs, which did not yet show the serious financial situation of the company undergoing reorganization. It should be remembered that it was only in July 2025 that non-fulfillment of obligations began to be reported (and, at that time, there was only talk of non-fulfillment of bankruptcy obligations and a few post-petition obligations).

The fact is that there are very strong indications that the debtor's assets are being depleted, which implies its substantial liquidation, which appears to be dealt with by part VI of article 73 of the applicable law. It should be noted that although such important disposals were provided for in the Reorganization Plan, they were decided on without the presence of labor creditors, who would be affected by the depletion of assets, as the "addendum" presented sought to include them in the plan.

Furthermore, I would like to point out that UPI ClientCo did not bring monetized assets to the reorganization. In fact, according to the company undergoing reorganization, this is precisely why cash flow is so compromised today, since it essentially resulted in "compensation" of claims.

Based on this reasoning, I believe that the provisions of paragraph 2 of art. 73 of the LRF should apply to this case. Therefore, although the act remains effective at this time, the shares of NIO (the company into which ClientCo – Oi Fibra was transformed) will be frozen as a precautionary measure.

There are also well-founded doubts about transactions questioned by the Public Prosecutor's Office (id 120.227): the arbitration pending before the International Chamber of Commerce and the arbitration involving ANATEL and TCU.

As for the latter, it is already known in the main proceedings that it led to a change in the public telephone service concession regime to "authorization." The former would end in December 2025, while the agreed change to the "authorization" regime is expected to extend until 2028.

Without going into the regularity of the agreement entered into by Oi, Anatel, and V.Tal with the TCU, the fact is that the service addressed therein—telephone services—will be subject to transition in this incidental proceeding now underway.

Therefore, the value of the aforementioned arbitration must also be brought into this case, both due to the application of the same legal provision invoked (Article 73, paragraph 2 of the LRF) and to maximize assets in order to ensure satisfaction of creditors.

Furthermore, due to the alleged asset stripping, the provision of misleading information, the hiring of extremely expensive professionals (given the hiring of lawyers to file for Chapter 11 in the US at a cost of USD100 million – completely incompatible with the reorganization situation), as well as the failure to present a transition plan, this Court considers that the anticipation of the effects of the injunction should extend to the removal of the administrators of the Oi Group, its Executive Committee and Board of Directors, as well as the prohibition of hiring the company of the CEO (Mr. Marcelo Millet), ÍNTEGRA, whose "consulting services" have been repeatedly engaged in the transactions carried out.

The transition process will be handled by the Bankruptcy Trustees, represented by Dr. BRUNO REZENDE (PRESERVA), with the other remaining bankruptcy trustees performing their usual duties. The aforementioned trustee will also be the company's manager at this time, responsible for its maintenance and for bringing to this Court any and all operations carried out by the company that involve the encumbrance or disposal of its assets.

As for the subsidiaries, it is certain that they are managed by the same administrative team: the Executive Committee and the Board of Directors, which are also removed from the Management, as well as preventing the hiring of INTEGRA advisory services.

With regard to the subsidiaries, they should also be addressed here, since they filed for judicial reorganization and had their obligations suspended by extension of the suspension determined in the main proceeding—the reorganization of the Oi Group—but are clearly affected by the financial insufficiency of their parent company.

To carry out the transition of the subsidiaries and their management, I appoint TATIANA BINATO, whose qualifications are well known, since she carried out the "preliminary assessment" in the respective proceedings. She will be responsible for the same duties assigned to Bruno Rezende, as determined above. She must, as soon as she is summoned, state whether she accepts the assignment, sign the agreement, and estimate her fees. If she accepts, she will begin her duties immediately.

Both administrators, in assisting the remaining management of the companies, which is not being removed here, must make every effort in negotiations with their creditors during the suspension period, in this final opportunity for recovery.

**In view of the foregoing, here is my DECISION:**

1) Proceed with the LIFTING OF THE SEAL of confidentiality on this case;

2) File it as an "INCIDENTAL PROCEEDING FOR THE TRANSITION OF ESSENTIAL PUBLIC SERVICES";

3) I ANTICIPATE, IN PART, the effects of the liquidation:

    3.1) To SUSPEND post-petition obligations, past due and falling due, for a period of 30 (thirty) days;

    3.2) To REMOVE from the management of the companies, Oi Group and subsidiaries Serede and Tahto, their Executive Committee and Board of Directors;

    3.3) To DETERMINE that no business be conducted through the company ÍNTEGRA;

    3.4) To DECREE the unavailability of NIO shares and the value of the arbitration subject to settlement between Oi, V.Tal, and Anatel, with the TCU.

    Draft an instrument to reflect this;

4) To APPOINT Bruno Rezende to carry out the transition process of public services and intervene, in part, in the Oi Group, as established above;

5) To APPOINT Tatiana Binato to carry out the transition process of the public services supporting those provided by Oi, through Serede and Tahto, and to intervene, in part, in the two subsidiaries, as established above;

6) To ORDER the attachment of a copy of this document to the judicial reorganization proceedings of the Oi Group and its subsidiaries Serede and Tahto;

7) To Notify the Public Prosecutor's Office. Summon all parties referred to herein, urgently. Issue summons to Anatel, CADE, TCU, Ministry of Aeronautics, Stock Exchange, and CVM.

RIO DE JANEIRO, September 30, 2025.

SIMONE GASTESI CHEVRAND

Presiding Judge

This document was generated by user 991.***.***-49 on 09/30/2025 at 3:51:42 p.m.

Document number: 25093015503786900000218767530

https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530

Digitally signed by: SIMONE GASTESI CHEVRAND - September 9, 2025, 3:50:37 p.m.

[All pages digitally stamped and numbered by the court.]

CERTIFICATION

This is to certify that the foregoing translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the original document entitled "2025.9.30 - Incidente Transação de Serviços Públicos Essenciais - Decisão - Antecipação Parcial dos Efeitos da Liquidação.pdf," which was written in Portuguese.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 1, 2025.

WILLIAM STEINMETZ

DocuSigned by: [signature]
044497E575D84B0...

Email: william.steinmetz@pm.me