DAVIS POLK & WARDWELL LLP
Elliot Moskowitz
David Schiff
Joseph W. Brown
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to the Ad Hoc Group and Special Counsel to the Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Oi S.A., *et al.*,[1] | Case No. 23-10193 (LGB) |
| Debtors in Foreign Proceeding. | (Jointly Administered) |

**STATEMENT OF THE AD HOC GROUP OF SECURED NOTEHOLDERS AND**
**THE INDENTURE TRUSTEE REGARDING DEVELOPMENTS**
**IN THE BRAZILIAN RJ PROCEEDING**

The ad hoc group of secured noteholders[2] (the "**Ad Hoc Group**") and UMB Bank N.A. as trustee under the Notes (the "**Indenture Trustee**" and, together with the Ad Hoc Group, the "**Noteholder Parties**"), through their undersigned counsel, hereby submit this statement (this "**Statement**") apprising the Court of certain developments in Oi's Brazilian judicial reorganization (the "**Brazilian RJ Proceeding**") and the potential need for relief from this Court in the near future.

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

[2] The holders and/or their affiliated, managed, advised and/or sub-advised funds and accounts are beneficial owners of (a) the 10.000% / 13.500% PIK Toggle Senior Secured Notes due 2027 (the "**NPSD Notes**") and (b) the 8.50% PIK Subordinated Secured Notes due 2028 (the "**RUD Notes**" and, together with the NPSD Notes, the "**Notes**", and the holders thereof, the "**Noteholders**"), in each case issued by Oi S.A. ("**Oi**").

**STATEMENT**

1.      The Noteholder Parties submit this Statement to apprise the Court of certain developments in the Brazilian RJ Proceeding, as well as significant concerns that the rights of Oi's international financial creditors—the holders of its New York law-governed Notes—may be jeopardized.

2.      The Noteholder Parties are not seeking relief in the Chapter 15 Cases today through this Statement.  However, because developments in Brazil are moving quickly, the Noteholder Parties believe it is important to keep the Court updated so that the Court will have the necessary background for any relief the Noteholder Parties may need to seek in the near term, potentially on an urgent basis.  Although the Noteholder Parties hope that none of the circumstances outlined below come to pass, these matters directly implicate, among other things, the rights of holders of U.S. securities in Oi's restructuring under their New York law-governed debt and security agreements and Oi's judicial reorganization plan (the "**RJ Plan**"), each of which was authorized and granted effectiveness in the United States by prior order of this Court.  *Order (I) Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Granting Related Relief* entered on June 17, 2024 [ECF No. 42] (the "**FFE Order**") ¶ 3, 17.  As such, the matters discussed below go to the heart of the Chapter 15 Cases and are squarely within the purview of this Court.

3.      Oi is currently running a sale process for UPI V.tal, which is Oi's equity stake in V.tal.  This equity stake is the most significant portion of the collateral securing Oi's New York law-governed securities and is subject to specific rules and requirements under a New York law-governed Intercreditor Agreement.[3]  That Intercreditor Agreement governs both the authority of

---

[3] "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of August 8, 2024 (as supplemented, amended or modified from time to time), among the Company, GLAS Americas, LLC, as Intercreditor Agent and Collateral Agent (each as defined therein), and the grantors and other parties from time to time party thereto.

the collateral agent as well as the circumstances in which collateral can be disposed of and released

and the application of proceeds therefrom.  Accordingly, the Noteholder Parties expect that Oi's

efforts to effectuate any such collateral disposition will likely require adjudication in the United

States.

4.      The Noteholder Parties are concerned that the sale process underway in Brazil has

been designed to trample on their rights under the RJ Plan, the Intercreditor Agreement and this

Court's FFE Order, resulting in the potential loss of billions of dollars to the holders of the Notes,

which include not only the Ad Hoc Group, but all other holders as well.  To that end, the Indenture

Trustee has filed a motion (the "**RJ Court Motion**") in the 7th Business Court of the City and

State of Rio de Janeiro, Brazil (the "**RJ Court**") laying out these concerns in detail, an English-

language translation of which is attached as **Exhibit A**.  The Noteholder Parties have also sent a

letter to the Judicial Manager (as defined below), attached as **Exhibit B**, (the "**February 11**

**Letter**") raising similar concerns.[4]

5.      The Noteholder Parties believe it is important for the Court to be aware of these

documents, the serious concerns set forth therein, and the recent events described below.

### Certain Events Since September 2025

6.      On September 30, 2025, shortly before this Court issued the *Memorandum Opinion*

*Denying the Debtors' Motion to Terminate and Dismiss* [ECF No. 129], Judge Simone Gastesi

Chevrand, who oversees the Brazilian RJ Proceeding for the RJ Court, issued an order that, among

other things, removed Oi's entire board of directors and executive team.  In place of Oi's board

---

The Intercreditor Agreement similarly includes protections that are currently in effect to prevent a non-conforming
sale or release of the V.tal share collateral.

[4] Oi's responses to the RJ Court Motion and the February 11 Letter are attached hereto, respectively, as **Exhibit C**
and **Exhibit D**.  As the Court will see, Oi's responses are cursory and fail to meaningfully address the issues set forth
in detail in the RJ Court Motion and the February 11 Letter.

and executive governance, Judge Chevrand appointed, on a provisional basis, Dr. Bruno Rezende, an attorney based in Rio de Janeiro, as judicial manager (the "**Judicial Manager**"), with operating authority over Oi in both its business operations and in the Brazilian RJ Proceeding. The Judicial Manager is not himself a judge but rather was selected by the RJ Court to assume his role in this case. He is expected to be paid a portion of amounts distributed to creditors.[5]

7.       On November 10, 2025, Oi was ordered into a *falência* (liquidation) proceeding, but the order placing Oi in a *falência* was subsequently overturned on November 14, 2025 through an injunction granted on appeal.

8.       As a result of such events, as well as defaults that occurred earlier in 2025, the Notes have been subject to events of default and have accelerated and become due automatically in accordance with their terms since July 2025.

9.       At the time of the Judicial Manager's appointment, Oi was the subject of a court-ordered mediation process in Brazil that was still in its early stages. However, following the Judicial Manager's appointment, and the conversion to (and then back from) *falência*, no further developments have occurred in the mediation to the knowledge of the Noteholder Parties.

10.       Nevertheless, the Ad Hoc Group has sought to have discussions with the Judicial Manager and other stakeholders toward a consensual resolution in the Brazilian RJ Proceeding to address Oi's defaulted senior secured debt (much of which was extended as debtor-in-possession financing) and make certain currently encumbered collateral available for Oi's estate and other stakeholders. The Noteholder Parties continue to seek such engagement, but discussions have not produced meaningful traction with the Judicial Manager to date.

---

[5] Appeals (including from the Ad Hoc Group) are currently pending in Brazil with respect to both the Judicial Manager's compensation arrangement and the question of whether his appointment will be subject to creditor referendum.

11.     Instead, the Judicial Manager's principal act to date in respect of the Notes has been to launch a sale process for UPI V.tal—i.e., Oi's equity stake in V.tal—which is generally understood to be the most valuable collateral securing the Notes.  Bids in this process are due to be opened by the RJ Court on March 5, 2026.

12.     The Noteholder Parties are not aware of any other Brazilian judicial reorganization proceeding that has been recognized under chapter 15 in which the debtor was placed under the control of a judicial manager, particularly after a restructuring plan was approved and granted full force and effect by the chapter 15 court.  In this regard, any future request by Oi's foreign representative for assistance will be without precedent.[6]

### Concerns Around the UPI V.tal Sale Process

13.     To be sure, there is nothing per se problematic about an attempt by Oi to sell UPI V.tal.  The V.tal shares are pledged to secure the Notes pursuant to a bankruptcy-remote fiduciary assignment that was granted pursuant to the RJ Plan (and is enforceable under the terms of the FFE Order) for the benefit of the holders of the Notes and certain other secured creditors.  The RJ Plan specifically contemplates the sale of UPI V.tal for the purpose of repaying the Notes and other similarly secured debt (with Oi benefitting from any excess sale proceeds).

14.     However, as a key safeguard for the benefit of the Noteholders, the RJ Plan includes certain protections requiring the sale to be for cash at a minimum price (R$12,315,977,451.75[7] (the "**Minimum Price**")), unless the sale is expressly approved by requisite holders of the NPSD Notes.  RJ Plan Clause 5.2.2.2.4.  The RJ Plan also provides that

---

[6] To date, Oi has not made any filing to notice the substitution of the Judicial Manager as Oi's foreign representative, though by order of the RJ Court, he is the sole party entitled to exercise control over Oi.  The Noteholder Parties fully reserve their rights with respect to any such purported substitution.

[7] Increased from R$8,000,000,0000.00 in accordance with the terms of the RJ Plan.  The current Minimum Price of R$12,315,977,451.75 is equivalent to more than USD$2.6 billion.

the proceeds of any such sale must be applied in accordance with a strict waterfall set forth in the Intercreditor Agreement.

15.    In other words, the RJ Plan protects Noteholders by ensuring that their valuable V.tal share collateral cannot be sold below the Minimum Price or for non-cash currency absent explicit Noteholder consent, and the proceeds of such sale cannot be appropriated away from the strict repayment waterfall in the Intercreditor Agreement.  Any sale that does not comport with these requirements would violate the RJ Plan, the New York law-governed security documents for the Notes and this Court's FFE Order declaring that such instruments and obligations are "enforceable obligations of [Oi] that are not subject to any modification or override except in accordance with their express terms."  FFE Order ¶17.

16.    The *edital* for the UPI V.tal sale process (i.e., the notice inviting parties to bid) generally comports with these protections on its face, and indeed, requests cash bids for at least the Minimum Price.  Indeed, the Noteholders would support a sale for cash at the Minimum Price, with proceeds applied to repay secured debt as provided in the Intercreditor Agreement.

17.    However, as set forth in greater detail in the RJ Court Motion, the sale process for UPI V.tal is not being conducted in a manner aimed at maximizing value.  Among other things, this sale, which seeks multi-billion dollar bids for a highly complex financial asset, is apparently being conducted without an investment banker capable of marketing such an asset (at present, the Noteholder Parties are ***not aware of any investment banker*** that has been engaged or has undertaken outreach efforts with respect to the sale) and on a timeline that spans Brazilian Carnaval and only allows 17 business days between launch[8] and the March 5, 2026 deadline for bids to be opened in the RJ Court.

---

[8] The *edital* was published in the Brazilian Official Gazette on February 3, 2026.

18.     It is also not clear to the Noteholder Parties whether any third-party bidders have been qualified into the process or whether any meaningful information about the asset has actually been made available to such parties (though Oi avers that certain diligence information has been made available by V.tal, without providing any details).  Indeed, the only parties that are publicly known to have qualified into this process and become eligible to bid on the assets are certain entities of BTG Pactual, the Brazilian financial institution that controls V.tal.  Yesterday, counsel for the BTG parties filed a motion on the RJ Court's docket, a translation of which is attached hereto as **Exhibit E**, indicating that five of its affiliated entities—including BGC Fibra Participações S.A., which is itself a party to the Intercreditor Agreement and which has appeared extensively in these Chapter 15 Cases as one of the entities making up V.tal—had become qualified bidders.  It is not at all clear whether any non-BTG parties have or will bid on UPI V.tal, but the fact that V.tal's controlling shareholder is the only known interested bidder is, in and of itself, concerning, particularly given that the sale process has been presented as an open marketing process, without a pre-negotiated stalking horse.

19.     Put another way, the lack of known advisors and apparent marketing of this complex, highly valuable financial asset, lack of a robust diligence process and abridged timeline, along with the fact that the only announced bidders in this ostensibly open process are numerous affiliates of V.tal and its controlling shareholder, all suggest a deficient process that is a far cry from what would be expected for a 363 sale, for example.

20.     In the face of these process deficiencies, the minimum price, currency and application-of-proceeds protections for the Noteholders that are described herein—protections that exist under both the RJ Plan and the New York law-governed documents entered into pursuant to the FFE Order—are of paramount importance.

21.      Given the unfortunately low likelihood that such a conforming bid will be received and the fact that the Judicial Manager has launched the process without attempting to discuss with the Noteholders what terms they might be willing to grant consent to accept, the Noteholder Parties have an acute concern that, in spite of these protections, the Judicial Manager may be seeking to move forward with a low, non-conforming bid without obtaining sufficient consents.  As detailed in the RJ Court Motion submitted by the Indenture Trustee, certain of the Judicial Manager's dealings with the Noteholder Parties' representatives have reflected a lack of transparency and candor that is additionally troubling in this regard.  *See* RJ Court Motion ¶ 8–10, 63–65.

22.      As further detailed in the RJ Court Motion, the Noteholder Parties are concerned that, in conjunction with receiving such a non-conforming bid, the Judicial Manager or Oi itself may attempt to disenfranchise the Noteholders of their consent rights or seek a judicial determination in Brazil simply overruling a "no" vote.  The Noteholder Parties also have knowledge that under-seal litigation has been brought in Brazil against certain holders of the Notes and have concern that such litigation could ultimately be used as a pretext to seize or re-appropriate all or a portion of the sale proceeds or impair the consent rights of Noteholders in contravention of the payment priorities set forth in the Intercreditor Agreement (and therefore in contravention of the RJ Plan as it was granted enforcement by this Court).

23.      Any such actions would be unlawful and infringe on binding legal instruments under both Brazilian and U.S. law.  The Noteholder Parties hope that the Judicial Manager and other stakeholders in the Brazilian RJ Proceeding will not attempt such a brazen maneuver.  And, of course, the Noteholder Parties would expect to take all necessary steps in Brazil and the United States (including before this Court) to enforce their legal rights and prevent an illegal deprivation of the value that was granted pursuant to the RJ Plan and Court order.

24.     Oi has responded to the RJ Court Motion in cursory fashion and generally refuted that it intends to do anything improper (though Oi has stopped short of affirmatively pledging to uphold and not seek to deprive creditor consent rights).  Notably, upon Mr. Rezende's counsel subsequently receiving the February 11 Letter, Oi gave only a short response, principally referring back to its filed response to the RJ Court Motion, but in doing so referred to the RJ Court as "the ***sole court with jurisdiction to decide any and all matters related to the case***," an additionally concerning statement to the extent it is intended to disregard or negate (a) the jurisdiction of this Court or the Chapter 15 Cases that Oi voluntarily commenced or (b) the force and protections of the FFE Order, which was entered at Oi's request and as a critical condition to consummation of the RJ Plan.

25.     Given (a) the highly unusual and unprecedented current circumstances of the Brazilian RJ Proceeding and the Chapter 15 Cases, (b) the importance of the V.tal share collateral to the Notes and to Oi's U.S. nexus in this process and (c) the fact that events may unfold quickly in Brazil, the Noteholder Parties seek to apprise this Court through this Statement that their rights may be under attack, and that as a result, the Noteholder Parties may be back before this Court soon to seek or oppose relief relevant to these matters.

26.     Finally, for the avoidance of doubt, the actions taken by the Indenture Trustee (both before the RJ Court and this Court) have been, and will continue to be, guided exclusively by the protection and preservation of the rights and interests of the entire body of Noteholders.

27.     The Noteholder Parties respectfully request that the Court consider this submission in anticipation of any such future requests for relief, and the Noteholder Parties further reserve all rights going forward to supplement this Statement and to make such additional requests.

28.     The Noteholder Parties will plan to keep the Court updated and are available at the

Court's convenience for a status conference should the Court wish to schedule one, either now or

after further reports.


Dated:    February 13, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By:     */s/ David Schiff*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Elliot Moskowitz
David Schiff
Joseph W. Brown

*Counsel to the Ad Hoc Group and Special*
*Counsel to the Indenture Trustee*

## **Exhibit A**

RJ Court Motion

Translation No. 039
Book No. 1
Page - 583 -

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

*I, Patricia Stanzione Galizia, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that an electronic document was submitted to me, written in Portuguese, the translation of which is as follows:*

Letterhead of Domingues, Cintra, Napoleão, Lins e Silva Advogados.

Stamp: "Rio de Janeiro State Court of Appeals – Page _ - Electronically stamped"

TJRJ CAP EMP07 202600424460 02/09/26 10:33:15 AM 137014 PROGER-VIRTUAL

HONORABLE JUDGE OF THE 7th BUSINESS COURT OF THE JUDICIAL DISTRICT OF THE CAPITAL CITY OF THE STATE OF RIO DE JANEIRO

Judicial Reorganization No. 0090940-03.2023.8.19.0001

**UMB BANK, N.A.,** in its capacity as trustee of the Notes described below ("Trustee"), already identified in the case records of the Judicial Reorganization requested by Oi S.A. et al ("Oi Group" or "Debtors"), hereby states and requests the following, in light of the recent events occurred in these proceedings, appeals, and incident motions:

## THE FUTURE OF OI's JUDICIAL REORGANIZATION

## CRITICAL MOMENT: THE INFLECTION POINT OF THE PROCEEDINGS

1.       This submission is made within the sensitive context of the Oi Group's Judicial Reorganization proceedings. More specifically, it expresses the legitimate concern of a significant portion of its creditors, which contributed a substantial amount of money to the attempt to revive the Group. The Trustee petitions, once again, to preserve the guarantees, priorities, and governance mechanisms related to the sale procedure of UPI V.tal[1]-[2] expressly set forth in the Oi Group's Judicial Reorganization Plan ("PRJ"), approved by the creditors at the General Creditors' Meeting and ratified by this Honorable Court.

## (a) Worrying Itinerary

2.       The Trustee has observed with great concern the occurrence of certain facts which, when analyzed together, generate well-founded suspicions that a plan to sell off the assets of the Oi Group is underway, which, if implemented, will result in the violation of fundamental, undisputed rights enshrined in the bankruptcy legislation, and, consequently, in billions in losses to all holders of the Notes in which the applicant appears as trustee (defined, under the terms of the Judicial Reorganization Plan, as the "Restructuring Option Creditors I").[3]

3.       The following is anticipated at this moment:

(i)       The execution of a sale process for UPI V.tal that will not be competitive, which would result in the submission of few, if not a single cash bid, at a price well below the Minimum Price stipulated in the PRJ (Section 5.2.2.2.3)[4] ("Minimal Bid");

(ii)       Called upon to express their opinion regarding the Minimal Bid, and possibly reject it, as permitted by Section 5.2.2.2.4 of the Judicial Reorganization Plan, it would possibly be argued that the creditors were acting "*in an abusive exercise of rights*" and in a "*conflict of interest*" situation, which arguments are ethereal and ambivalent, in order to force them, through a court order, to accept the Minimal Bid;

(iii)       In parallel, using the decision of the Honorable Judge Mônica Di Piero,[5] the Judicial Manager

---

[1] Whose bid notice on pages 127.819/127.900 was published on 02/03/2026 ("Bid Notice").

[2] UPI V.Tal is formed by the shares issued by V.Tal Rede Neutra de Telecomunicações S.A. ("V.Tal"), owned by Oi and Rio Alto.

[3] Holders of the credit notes relating to (i) New Creditor Financing Restructuring Option I; and (ii) the Roll-Up Debt, as per sections 5.4.1 and 4.2.2.1 of the PRJ (collectively, the "Notes").

[4] It should be clarified that the Minimum Price provided for in the PRJ was R$8 billion and, due to the increase in Oi's interest in V.Tal, it became R$12,315,977,451.75, according to the published Bid Notice.

[5] Rendered in the case records of Interlocutory Appeals No. 0096871-19.2025.8.19.0000 and 0096877-26.2025.8.19.0000,

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

would possibly file an action to allocate funds from this Minimal Bid to pay creditors other than those provided for in Section 5.3.2 of the Judicial Reorganization Plan and guaranteed by the Share AF Instrument (as defined below), as already announced by the Manager more than once in the case records (pages 127.808/127.818, 128.969/128.70 [sic], 129.705/129.714).In addition to benefiting other creditors (that is, those not included in Section 5.3.2), this illegal distribution of funds would potentially also benefit the Judicial Manager himself, who, in theory, according to the decision on pages […]. 126.653/126.655, stayed by the National Justice Council (CNJ) and challenged in Interlocutory Appeal No. 0001493-02.2026.8.19.0000, could result in the payment to said court assistant of fees corresponding to five percent (5%) of the amounts paid to creditors, if any, as explained in more detail in the paragraph below;[6]

(iv)    All the steps above would be implemented with undesirable speed and disregard for rights, with the opening of bids scheduled for March 5th of this year.

4.    What has been described in the paragraph above is not a pipe dream or a pointless fantasy. If only it were. As will be described below, there are events occurred in recent months that lead to this undesirable attempt at an event which, if it occurs, will violate the fundamental rights of the creditors of the New Financing Notes, which, relying on the Brazilian law and on the ratification of the Judicial Reorganization Plan by this Court, disbursed billions in DIP financing. Undoubtedly, this will create an extremely negative precedent and shake bankruptcy law, with unpredictable repercussions throughout the investor market that once invested, or would invest, funds in Brazil.

5.    It should be noted at this point that it is unknown whether the roadmap outlined above will actually materialize, or whether it will occur exactly as described, especially due to the judicial oversight that we hope this Honorable Court will exercise over the procedure, in order to uphold the credibility of the Judicial Branch.

## (b) Concrete Acts that Justify Suspicion

6.    First, there are several concrete elements that point to the fact that the sale process of UPI V.tal is being structured to be uncompetitive and potentially favor only one or a very few bidders. In this regard, it is noteworthy that the UPI V.tal asset is quite complex, and its purchase, through a process involving the purchase of equity interest, requires V.tal to provide information about the company and for potential interested parties to analyze this information in a regular due diligence process. Irrespective of that:

(i)    The sale process was launched in February, the month of Carnival, which, according to the schedule of the Rio de Janeiro Court of Appeals (TJRJ), only has 16 business days, so potential interested parties (not previously engaged) will certainly not have the time and human resources to carry out their studies; and

(ii)    the term for conducting due diligence stipulated in the Bid Notice, which, incidentally, was the subject of comments made by the Restructuring Option I Creditors, and which the Judicial Manager considered abusive, is only 30 days (of which only 17 are business days), and begins from the publication of the Bid Notice, when there was not even a data room set up. It is important to highlight that the availability of documents for due diligence purposes does not depend exclusively on Oi, or the Judicial Administrator, but rather on the prior organization and availability thereof by V.Tal; Therefore, it is uncertain when, or if, they will be made available.

7.    It is therefore suspected that this evident anti-competitive characteristic of the Bid Notice (disguised as respect for speed) is intentional in order to: (i) restrict the possibility of sale to one or a few bidders, which already have the necessary information and are already prepared to proceed with the purchase; and (ii), consequently, result in a very Minimal Bid, extremely below the Minimum Price stipulated in the Bid Notice, as the less competition there is, the more likely the bid will not be satisfactory.

---

ordering the initiation of a procedural incident to determine shareholder and management liability.
[6] As reported in the press on 01/15/2026, Justice Mauro Campbell stayed the decision that set the fees for the Judicial Administrator (exhibit 1).

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator

JUCESP # 1944

8.      Second, the Companies Under Reorganization (in a petition also signed by the Judicial Manager, pages 127.808/127.818) presented a version of the facts that is incompatible with the case records, disregarding objective events and express communications that occurred during the negotiations regarding the bid notice of UPI V.tal. This statement by the Companies Under Reorganization was filled with those typical arguments of convenience, to the effect that the Restructuring Option I Creditors were acting in "*abusive exercise of rights*" or in "*conflict of interests,*" which does not reflect reality.

9.      As demonstrated in the Trustee's statement on pages 128.471/128.483, at the end of the negotiations conducted transparently and continuously with the Judicial Manager, consensus was reached regarding the publication of a bid notice initially providing for the sale of UPI V.tal through payment in full and in cash, which consensus was formally notified on January 27, 2026 (page 128.747). Even so, the petition from the Companies Under Reorganization was filed the following day as if such consensus had not existed, attributing to the Restructuring Option I Creditors conduct that simply does not correspond to what actually occurred.

10.     Based on this artificial reconstruction of the sequence of events, the narrative of the Companies Under Reorganization begins to formulate serious accusations of abuse of rights, conflict of interest, and obstruction of the competitive procedure, without any correspondence to the acts actually performed by the Restructuring Option I Creditors. The intention was thus to support the existence of an alleged illegitimate "veto" or demands incompatible with the PRJ, when, in reality, the aforementioned creditors expressly stated their knowledge of an agreement with the draft bid notice, exactly as defended by the Judicial Manager himself.

11.     Indeed, by alleging that the Restructuring Option I Creditors are acting in an "abusive" manner in the assessment and review of the Bid Notice (**which they are entitled to pursuant to Section 5.2.2.2.1 of the PRJ,** the Judicial Manager plants the seed that he intends to reap when the same creditors reject a Minimal Bid (**they are entitled to pursuant to Section 5.2.2.2.4 of the PRJ**) to, using the argument already presented, allege that such rejection would be "abusive," which must be firmly rejected.

12.     Furthermore, it should be noted that the omission and inaccuracy of the information provided by the Companies Under Reorganization on pages 127.808/127.818 were acknowledged in their statement on pages 128.969/128.970, as they did not deny any of the facts narrated by the Trustee on pages 128.471/128.483.

13.     Third, there are also indications that the investigation ordered by Appellate Judge Mônica Maria Costa within the scope of Interlocutory Appeals No. 0096871-19.2025.8.19.0000 and 0096877-26.2025.8.19.0000 is being improperly used by the Judicial Management, in order to allow a future depletion of the proceeds from the sale of UPI V.tal, which should be entirely used for payment to creditors as provided for in Section 5.3.2 of the PRJ,[7] but never to creditors who are not entitled to such payment.

14.     This investigation was ordered due to the alleged obligation attributable to certain investment funds, which are only some of the various Restructuring Option I Creditors, arising from an alleged abuse of controlling power during the period in which they were shareholders of Oi, as a result of the conversion of part of their claims into shares, as provided for in the PRJ.

15.     Regarding these allegations, incident motion No. 0118557-64.2025.8.19.0001 was initiated, in which the manager of the funds provided information and requested that the Judicial Management, Judicial Administration, and Public Prosecutor's Office be notified of what was presented therein, which was ordered by this Honorable Court on 12/19/2025.

16.     After being summoned to respond, in two separate submissions the Judicial Management (signing on its own behalf in one, and jointly as Judicial Administrator in the other), requested dismissal of the proceedings *in limine*, arguing that: (i) only the Judicial Administrator would have standing to conduct the investigations, which should be conducted exclusively extrajudicially (i.e., without any supervision from

---

[7] These are: New Financing, Reinstated Unsecured ToP Debt 2024/2025 - Option I, and Roll-Up Debt.

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

# Patrícia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

this Honorable Court or control bodies, such as the Public Prosecutor's Office[8]; and (ii) the "incident motion" initiated would be an inappropriate procedure, implicitly stating that a separate action would be filed after the extrajudicial investigations, when the former shareholders would have the opportunity to express their views.

17.    Such peculiar conduct justifies the suspicion that there is an intention to use an order for "assessment, in separate case records, of shareholder and management liability" (terms used in the decision rendered by the TJRJ) as a basis for another measure that goes beyond the order of the TJRJ: an action for damages possibly seeking to block the funds from the sale of UPI V.tal and distribute them to other creditors.

18.    In other words, a deliberate and mistaken confusion between, on the one hand, the potential liability of a shareholder, and, on the other hand, the credit rights and guarantee rights related to the Notes, which would cause a serious violation of the rights of secured creditors who would, indirectly, have their guarantees rendered worthless. Indeed, such a measure would not only violate the PRJ (notably section 5.3.2 thereof), but also allocate funds to the Judicial Manager himself, should his fees, as determined by the decision on pages 126.653/126.655 (currently stayed by the National Council of Justice - CNJ), be maintained.

19.    In addition to exceeding the established "assessment" order, there would also be violations of corporate law, as the standing to bring the liability action provided for in article 246 of the Brazilian Corporation Law is vested exclusively in the shareholders of the company (in this case, Oi).

20.    Such non-compliance with the PRJ and legislation would, in fact, represent an act of violence against the collective of Restructuring Option I Creditors (i.e., the various holders of the Notes), as the shares issued by V.tal belonging to Oi are a shared guarantee to the community of such creditors, belonging to all.

21.    Fourth, because the representation of the Companies Under Reorganization has been conducted by the Judicial Management without observing the rights of the creditors, who are responsible for deciding on the choice of the manager pursuant to article 65 of Law 11.101/2005 ("LRF"). Indeed, the management can only be exercised by the Judicial Administration in an exceptional and temporary manner, until the creditors decide on the effective manager.[9]

22.    What we see, however, is yet another violation of the law, as the management continues to be exercised by the Judicial Administration based on a preliminary injunction issued by the TJRJ,[10] in summary proceedings and without the participation of the creditors.

23.    To illustrate the illegality, it can be seen that, under the procedures of the LRF, the plan and the obligations provided for therein should be complied with by the debtor itself, and supervised by the Judicial Administration. In the current format of these proceedings, however, the plan (and the sale of the most relevant asset) is being complied with by the very person who should be supervising it, creating an inherent conflict of interest.

24.    Fifth, besides creating an inherent anti-competitive characteristic, the speed with which the sale of such a complex asset is being carried out also generates a risk that the situation will not be reversible

---

[8] In this regard, when notified to comment on the incident motion spontaneously initiated by the creditor, the Judicial a Administration and Management stated that "*[t]he determination contained in the decisions rendered by the Honorable Appellate Judge Monica Di Piero is within the scope of the Judicial Management and Judicial Administration's role in providing clarifications and does not replace the assessment of liability that is being carried out - and is about to be concluded - to, soon, give rise to appropriate action.*" (pages 939/940 of those case records).

[9] Article 65. When the debtor is removed, in the cases provided for in article 64 of this Law, the judge shall call a general meeting of creditors to resolve on the name of the judicial manager who will assume the administration of the debtor's activities, applying to them, where applicable, all the rules on the duties, impediments, and compensation of the judicial administrator.

Paragraph 1 The judicial administrator shall perform the functions of manager until the general meeting resolves on the selection of the latter.

[10] Rendered in the case records of interlocutory appeal No. 0106636-14.2025.8.19.0000, filed by V.Tal.

PATRÍCIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

Translation No. 039
Book No. 1
Page - 587 -

**Patricia Stanzione Galizia**

Tradutora Juramentada * Certified Translator
JUCESP # 1944

after its completion. If the planned roadmap is implemented or even adapted to achieve the same result, there will be very few days for the Restructuring Option I Creditors to react to violations of their rights, creating a situation that is difficult to reverse, a reckless idea that a "fait accompli" has occurred.

25.    To avoid any doubt, the Trustee does not oppose the sale of UPI V.Tal, and the measures adopted by the Trustee were and will remain guided exclusively by the protection and preservation of the rights and interests of all Noteholders. This is not about preventing the sale, but rather about ensuring a transparent and competitive process, fully compliant with the PRJ, structured and conducted in a way that maximizes the value of UPI V.Tal.

26.    In view of the foregoing, it is clear that, far from being an exercise in futurology without any grounds *de facto* or *de jure*, the scenario described above is unfolding based on concrete actions that cause the justified and legitimate fear described herein.

27.    It will now be demonstrated how serious the scenario described above would be, and the reason why prior control of legality by this Honorable Court is necessary, preventing the worst from happening and making it clear to all interested parties that we are at a point of no return regarding the legality of the judicial reorganization process of the Oi Group.

## SACRED RIGHTS OF CREDITORS

28.    In light of the above, and the gravity of the unfolding scenario, it is now necessary to strictly observe the legal and economic framework of the PRJ, otherwise the internal coherence of the plan and the trust that underpinned the granting of essential financing for the continuity of the activities of the Companies Under Reorganization will be compromised.

29.    Thus, it is essential to recall the structural premises that guided the approval of the PRJ, especially those related to DIP financing, the guarantee package established in favor of creditors who contributed new funds, and the centrality of UPI V.tal as an asset primarily intended to satisfy these priority claims.

30.    It is from this framework, which will be detailed below, that one must understand both the rules applicable to the sale of UPI V.tal, and the insurmountable legal limits to any attempt to relativize the prerogatives guaranteed to the Restructuring Option I Creditors.

## A.    *DIP Financing*

31.    The Claimant acts as trustee for two issues of Notes directly related to performance of the PRJ: (i) the Notes representing the so-called "New Financing – Restructuring Option I Creditors";[11] and (ii) the Notes that representing the so-called "Roll-Up Debt".[12]

32.    These instruments were signed by the "Restructuring Option I Creditors," which are defined in the PRJ as the financial creditors who contributed new funds to the Oi Group, in accordance with Section 4.2.2 of the PRJ.[13]

---

[11] "5.4.1. New Financing. Oi will take out new funds in the total amount of up to six hundred and fifty-five million Dollars (USD655,000,000.00), which may not be less than six hundred and fifty million Dollars (USD650,000,000.00) or the equivalent in *Reais*, being (a) up to five hundred and five million Dollars (USD505,000,000.00), which may not be less than five hundred million Dollars (USD500,000,000.00) or the equivalent in *Reais* ('New Financing Amount - Restructuring Option I Creditors') to be granted by the Restructuring Option I Creditors ("New Financing Creditors" and "New Financing – Restructuring Option I Creditors", respectively); and (b) one hundred and fifty million Dollars (USD150,000,000.00), or the equivalent in Reais ('New Financing Amount - Third Parties'), to be granted by any Person other than the Restructuring Option I Creditors ('New Financing Third Parties' and 'New Financing – Third Parties', with New Financing – Third Parties and the New Financing - Restructuring Option I Creditors jointly defined as the 'New Financing').

[12] "4.2.2.1. Roll-Up Debt. Oi will issue debt totaling six billion, seven hundred and fifty million *Reais* (R$6,750,000,000.00) ('Roll-Up Debt Total Amount'), in two (2) tranches, the first tranche in the amount of four billion and five hundred million *Reais* (R$4,500,000,000.00) ('Roll-Up Debt Tranche 1') and the second tranche in the amount of two billion, two hundred and fifty million *Reais* (R$2,250,000,000.00) ('Roll-Up Debt Tranche 2'), for payment of part of the Restructuring Option Claims I, duly converted by the Conversion Exchange Rate, when applicable ('Roll-Up Debt'), in accordance with the terms and conditions described in the subsections below and in the respective Roll-Up Debt Instruments."

[13] "4.2.2. Restructuring Option I. Unsecured Creditors who (i) hold exclusively Financial Claims; (ii) are compliant with the

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

33.    The Restructuring Option I Creditors are at the center of this Judicial Reorganization not by chance, but because they were the economic agents that, assuming a high and substantial risk, enabled the continuity of the Oi Group's activities at its most critical moment, contributing billions of reais in new money, through DIP (debtor-in-possession) financing, in a scenario of severe liquidity restriction, deep financial deterioration, and absence of credit alternatives in the market.

34.    Precisely because of this extreme scenario, the contribution of new money was inextricably linked to the establishment of robust guarantees, the granting of absolute priority in receiving them, and, above all, strict adherence to the governance agreed upon in the PRJ – conditions without which the plan simply could not be sustained.

35.    In this sense, the decision to finance the Companies Under Reorganization was made based on the legitimate expectation that: (i) the PRJ would be fully and faithfully respected; and (ii) the rights, priorities, and protection mechanisms expressly granted to the Restructuring Option I Creditors would not be subsequently relativized or rendered worthless. This premise is the indispensable starting point for understanding the entire legal regime that follows.

## B.    _Legal Protection_

36.    The New Financing extended by the Restructuring Option I Creditors has a legal nature distinct from that of the general body of claims subject to Judicial Reorganization. It is a claim arising from financing extended during the course of the proceedings, which falls under the legal regime of DIP financing, endowed with first-priority status and priority of payment, in the exact terms of the LRF, especially after the amendments introduced by Law No. 14.112/2020.

37.    The reform of the LRF was unequivocal in stimulating and protecting the financing of companies under reorganization, based on the acknowledgment that without clear incentives, effective preservation of guarantees, and robust legal security, transactions of this nature simply do not become viable.[14]

38.    This understanding was reaffirmed by the Superior Court of Justice, which, when considering Special Appeal (REsp) No. 1.828.248/MT, established that the suppression of guarantees can only occur with the express consent of the holder creditor, precisely because the undue relaxation of these guarantees would be harmful to economic activity, generate profound legal uncertainty, and produce negative systemic effects on the credit market. Please see:

"_SPECIAL APPEAL. JUDICIAL REORGANIZATION. CORPORATE REORGANIZATION PLAN. SUPPRESSION OF SECURITY INTERESTS AND PERSONAL GUARANTEES. APPROVAL AT GENERAL MEETING. EXTENSION TO DISSENTING, SILENT, OR ABSENT CREDITORS. IMPOSSIBILITY. SPECIAL APPEAL DENIED. 1. The suppression of security interests and personal guarantees, provided for in a judicial reorganization plan approved in a general meeting of creditors, binds only those creditors who expressly consented to the measure, and therefore does not extend to credits dissenting from, silent, or absent from the resolution. 2. The Judicial Reorganization and Bankruptcy Law establishes that the novation established_

---

Non-Litigation, Release, and Waiver Commitment provided for in Section 9.3; and (iii) agree to participate in the New Financing and promptly send Oi the New Financing Adherence Instruments, pursuant to the provisions of Section 5.4.1.3, may, pursuant to Section 4.4, choose to receive payment of their respective Class III Claims in accordance with the terms and conditions of this Section 4.2.2 et seq. ('Restructuring Option I Claims' and 'Restructuring Option I Creditors', respectively."

[14] "Fifteen years after the enactment of the Bankruptcy and Reorganization Law (LRE), Law No. 14.112/2020 introduced significant improvements to the Brazilian insolvency regime. Section IV-A (articles 69-A to 69-F) and article 66-A were added, along with new wording for the sole paragraphs of articles 67 and 84, which now regulate the entire system of debtor financing during judicial reorganization. The new legal norm aimed to provide (i) economic incentives, by addressing matters involving first-priority claims and differentiated treatment; (ii) procedural incentives, by codifying the rules of competent jurisdiction for authorizing financing and maintaining effects in case of modification on appeal; and (iii) operational incentives, by stipulating the possibility of compulsory creation of subordinated guarantees. It is important to highlight that in the new wording of article 84 of the LRE, the amounts delivered by way of 'financing' have a better classification among first-priority claims in bankruptcy, ranking second in order of payment priority." (CAPARROZ FERRANTE, Fábio; OLIVEIRA, Marcus Vinicius Moura de. DIP financing: cenário atual e a importância da segurança jurídica para aperfeiçoamento do instituto. In: VASCONCELOS, Ronaldo et al. (org.). Reforma da Lei de Recuperação e Falência: estudos em homenagem aos Drs. Alexandre Alves Lazzarini e Cesar Ciampolini Neto. São Paulo: Thoth; IASP, 2025, chap. 28, p. 463).

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

*therein does not adversely affect to security interests and personal guarantees, because their suppression or substitution will only be admitted with the express approval of the creditor holding the respective guarantee. (Law 11.101/2005, Articles 50, sole paragraph, and 59), which is why the opinion of jurists and case law of this Court recognize the 'sui generis' character of the institution.* **3. The suppression of guarantees against the will of creditors, especially security interests and personal guarantees, would be detrimental to the economic activity in the country, bringing evident legal uncertainty and severely undermining the credit market, which would result in higher bank spreads and, consequently, higher interest rates, especially for those subject precisely to judicial reorganization regime. 4. Financing for a company under judicial reorganization is so vital to the success of strengthening productive activity that Law 14.112/2020, when amending Law 11.101/2005, established specific modalities of financing for companies under judicial reorganization, introducing into Brazilian law, the concepts of 'Debtor-in-Possession (DIP) Financing' and 'Partner Creditor'.** *5. Special Appeal denied."* [15] *- emphasis added*

39.     In this context, the legislator granted DIP lenders a set of specific protections, among which the following stand out:

(i)     pursuant to the provisions of article 69-B of the LRF,[16] the claim arising from DIP financing is classified as a first-priority claim, ensuring, moreover, that any reversal or annulment of the judicial decision authorizing the financing will not adversely affect bona fide financiers, fully preserving the amounts disbursed, the guarantees established, and the preference for payment; and

(ii)     pursuant to the provisions of article 84, I-B of the LRF,[17] in the event of conversion of judicial reorganization into bankruptcy, DIP financing enjoys absolute preference for payment over all other first-priority claims, with the exception only of expenses strictly essential to the administration of the bankruptcy estate and certain labor claims.

40.     This legal protection was expressly incorporated into the PRJ itself, which, far from innovating or expanding the legal regime, merely implemented the safeguards already provided for by law, as can be seen in Section 5.4.1.1,[18] which recognizes the first-priority and super-priority nature of the so-called "New Financing," composed of the New Financing – Restructuring Option I Creditors and the New Financing – Third Parties.

41.     Therefore, any attempt to weaken this framework, especially after the approval of the PRJ, subverts the logic of the Bankruptcy Law, frustrates the legitimate trust of financiers, and compromises the credibility of the judicial reorganization system itself.

## C.    *The Guarantee Package*

42.     In exchange for the financing extended and the agreed reorganization, and in addition to the legal protections, the PRJ provided for the granting of a guarantee package in favor of certain creditors – including the Restructuring Option I Creditors – as detailed in Exhibit 4.2.2.2.1(f)(I) (pages 128.484/128.665) and formalized through the Guarantee Instruments listed in Exhibit 4.2.2.2.1(f)(II)

---

[15] Superior Court of Justice (STJ). Special Appeal (REsp) 1.828.248/MT, Justice Rapporteur Luis Felipe Salomão, Rapporteur for the appellate decision: Justice Raul Araújo, Fourth Panel, trial date 08/05/2021.

[16] Article 69-B. The modification, on appeal, of the decision authorizing the taking out of financing cannot alter its first-priority nature, as per article 84 of this Law, nor the guarantees granted by the debtor in favor of the bona fide financier, if the funds have already been disbursed.

[17] Article 84. Claims relating to the following shall be considered first-priority claims and shall be paid in precedence over those mentioned in article 83 of this Law, in the following order: [...] I.B - the amount effectively delivered to the debtor under judicial reorganization by the financier, in accordance with the provisions of Section IV-A of Chapter III of this Law;

[18] "5.4.1.1. Priority Nature. The New Financing shall be considered first-priority financing and shall enjoy absolute priority over all other payment obligations owed by the Companies Under Reorganization, subject to the provisions of articles 66, 67, 69 et seq., and 84 of the LRF. Upon Judicial Ratification of the Plan, the Companies Under Reorganization may take out the New Financing without the need for new authorization by the General Meeting of Creditors or by the Judicial Reorganization Court, including for the establishment of guarantees, and any modification on appeal of the Judicial Ratification of the Plan will not alter the first-priority and super-priority nature of the New Financing, as per articles 69-A and 69-B of the LRF."

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38-RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

# Patrícia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

(page 128.666), highlighting the following:

a.      Fiduciary sale of 100% of the shares of V.tal held by Oi and its affiliates;

b.      Fiduciary assignment of credit rights arising from Arbitration ICC No. 26470/PFF (and related accounts);

c.      Fiduciary sale of properties;

d.      Fiduciary assignment of receivables arising from the sale of these properties;

e.      Fiduciary assignment of 50% of receivables flows from corporate contracts (and related accounts) (B2B activity).

43.      Among these guarantees, the New Financing (including that extended by the Restructuring Option I Creditors, as well as the New Financing Third Parties) has the highest priority for receiving payment from the proceeds of the sale, pursuant to the provisions of Section 5.3.2 of the PRJ.

**D.      _UPI V.tal_**

44.      Among the guarantees granted, the fiduciary sale of 100% of the shares issued by V.tal held by Oi and Rio Alto Investimentos e Participações S.A. ("**Rio Alto**") organized in accordance with the "Agreement for the Fiduciary Assignment of Shares and Other Covenants under Condition Precedent", as amended, executed on July 27, 2024 (as amended, the "Share AF Instrument" pp. 129.131/129.208), is of particular relevance. This is the core guarantee of the New Financing structure.

45.      In line with this structure, the PRJ authorizes the sale of shares issued by V.tal given as collateral in the form of an isolated productive unit, pursuant to the provisions of Section 5.2.1(ii) of the PRJ. This is the so-called "UPI V.tal," conceived as one of the main, if not the main, sources of asset monetization in the reorganization proceedings.

46.      The PRJ is equally clear in establishing that, in the event of the sale of UPI V.tal, **the proceeds from the sale will be allocated, as a priority, to the payment of the debt represented by the New Financing, until full settlement thereof. Only after such settlement any excess amount could be used to pay for other secured claims, subject to the order and conditions established in the PRJ, as per Section 5.3.2(i).**[19]

47.      Therefore, the fundamental premise that led to the creation of UPI V.tal was its linkage to the priority satisfaction of the New Financing, reflecting the economic logic of the new money contributed by the New Financing Creditors and the centrality of this financing for the very feasibility of the plan and the reorganization of the Oi Group. No funds originating from the sale of UPI V.tal may be allocated to any other creditor, potential creditor, or to the debtors before being used to pay the New Financing claims, under penalty of clear non-compliance with the PRJ.

48.      In complete consistency with the centrality of the New Financing and the economic logic of the PRJ, it expressly stipulates that as priority creditors, creditors that granted the New Financing - Restructuring Option I Creditors must participate in the procedures for the sale of V.tal UPI, granting them specific, binding, and non-waivable decision-making prerogatives, among which the following stand out:

• Approval of the Bid Notice. Pursuant to the provisions of Sections 5.2.2.2.1 and 5.2.2.2.1.1 of the PRJ,[20]

---

[19] "[...] 5.3.2. Net Revenue from the Sale of UPI V.tal. Oi shall allocate the Net Revenue from the Sale of UPI V.tal in the following order:
(i) the amount equivalent to one hundred percent (100%) of the Net Revenue from the Sale of UPI V.tal shall be used to fully amortize the New Financing and, if applicable, the Bridge Loan, on a pro rata basis; (ii) after full amortization of the New Financing and, if made, the Bridge Loan, the amount equivalent to one hundred percent (100%) of any remaining balance of the Net Revenue from the Sale of UPI V.tal shall be used to fully amortize the Reinstated Unsecured ToP Debt 2024/2025 - Option I, on a pro rata basis; [...]"
[20] "5.2.2.2.1. UPI V.tal Bid Notice. The UPI V.tal Bid Notice shall be reviewed and approved, cumulatively, by the Restructuring Option I Creditors (as per the Resolution of Restructuring Option I Creditors).

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

the "UPI V.tal Bid Notice" is subject to prior review and approval through the so-called Resolution of Restructuring Option I Creditors[21] as a condition of validity for its publication, with the automatic rejection of the bid notice being expressly provided for in the event of lack of such approval, which highlights the mandatory and not merely advisory nature of this prerogative;

• Payment Method. In accordance with Section 5.2.2.2.5 of the PRJ,[22] it is exclusively incumbent upon the Restructuring Option I Creditors to resolve, through a specific decision, on the possible acceptance of a payment method other than cash payment, with the sole restriction being that they cannot approve bids that do not fully settle, in cash, the New Financing – Third Parties without the prior and express consent of these creditors. This is an express resolution power, which precludes any possibility of unilateral imposition by the Companies Under Reorganization or third parties; and

• Resolution on Prices and Bids. Pursuant to the provisions of Section 5.2.2.2.4,[23] the PRJ also grants the Resolution of Restructuring Option I Creditors the final say regarding the acceptance of bids that do not meet the specific parameters established in the PRJ. Thus, in the event that only bids below the Minimum Price are submitted, the resolution on a possible acceptance thereof rests exclusively with these creditors, under penalty of rejection of the bid, with no right of veto for the Companies Under Reorganization over such a decision;

• Release of guarantees: Pursuant to the provisions of Section 5.2.2.2.8,[24] the fiduciary guarantee encumbering V.Tal shares may only be released if the proceeds from the sale are deposited into a bank account subject to a **fiduciary** sale "*for the benefit of the Restructuring Option I Creditors, New Financing Third Parties, and Creditors of the Reinstated Unsecured ToP Debt – Option I*".

---

5.2.2.2.1.1. The review and approval of the UPI V.tal Bid Notice by the Restructuring Option I Creditors shall be informed to the Judicial Administration within fifteen (15) days from the date on which the respective Creditors are notified about the UPI V.tal Bid Notice. If the resolution by the Restructuring Option I Creditors is not informed to the Judicial Administration within the stipulated period, the UPI V.tal Bid Notice shall be considered automatically rejected. The Judicial Administration shall communicate the result of the resolution to Oi within one (1) Business Day."

[21] According to the PRJ, "'Resolution of Restructuring Option I Creditors' means any resolution between **New Financing Creditors - Restructuring Option I Creditors** provided for in this Plan (excluding that provided for in Section 7.1(iii)), which matter shall be deemed approved by holders of at least sixty percent (60%) of the total value of the Claims arising from the New Financing - Restructuring Option I Creditors existing at the time of the resolution."

[22] "5.2.2.2.5. UPI V.tal Payment Method. The UPI V.tal Bid Notice shall stipulate that the purchase price of UPI V.tal shall be paid in cash, in Brazilian currency, unless otherwise approved by the Restructuring Option I Creditors (**as per the Resolution of Restructuring Option I Creditors**), in any case subject to the provisions of Section 5.2.3.2, and provided that the Restructuring Option I Creditors may not, without the prior and express consent of the New Financing Third Parties, resolve to accept any bids that do not result in full settlement, in cash, of the total and adjusted amount of the New Financing – Third Parties."

[23] "5.2.2.2.4. Resolutions on Bids Lower than the UPI V.tal Minimum Price. If Oi receives only cash bids for the acquisition of UPI V.tal at values lower than the UPI V.tal Minimum Price ('Bids Lower than the UPI V.tal Minimum Price'), all Bids Lower than the UPI V.tal Minimum Price shall be submitted to the analysis and resolution of: Restructuring Option I Creditors.

[...] (b) If the resolution by the Restructuring Option I Creditors does not occur or the result of the resolution is not informed to the Judicial Administration within the period stipulated above, all Bids Lower than the UPI V.tal Minimum Price shall be considered automatically denied. The Judicial Administration shall inform the result of the resolution to the Bankruptcy Court within two (2) Business Days after the end of the period stipulated above. For clarification purposes, Oi shall not have the right to veto the resolution of the Restructuring Option I Creditors, under the terms of this Section, nor to impose on the Restructuring Option I Creditors the acceptance of any Bids Lower than the UPI V.tal Minimum Price."

[24] "5.2.2.2.8. Release of Guarantees. In the event of the sale of UPI V.tal, and provided that it is carried out strictly in accordance with the terms set forth in the Plan, the Encumbrances on the V.tal assets shall be released on the Closing Date of the Sale of UPI V.tal, so that the respective transactions may be carried out and completed, provided that (i.a) on the same Closing Date of the Sale, the payment of the price of the respective asset is made in full into an escrow account held by Oi and which shall be the subject of a fiduciary sale for the benefit of the Restructuring Option I Creditors, New Financing Third Parties, and Creditors of the Reinstated Unsecured ToP Debt - Option I, and (i.b) the escrow account agreement shall establish the obligation to distribute the Cash Sweep in accordance with the provisions of Section 5.3, on the Business Day following the Closing Date of the Sale of said asset; or (ii) if the payment of the purchase price of UPI V.tal in the context of the respective Competitive Procedure involves payment in kind with assets (...)"

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38-RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

49.    The structure outlined in the PRJ and the guarantee instruments leaves no room for doubt regarding the legal regime applicable to the fiduciary sale of V.tal shares. This is a full fiduciary guarantee, the validity of which is directly linked to the existence of the secured obligation, and its release is not permitted outside the cases expressly provided for by law and in the PRJ itself.

50.    In this sense, the fiduciary sale is only extinguished upon full satisfaction of the secured obligation, either through direct payment of the debt or through the sale of the asset itself given as collateral, provided that, in this case, the proceeds of the sale are entirely and primarily directed towards the settlement of the New Financing, in the exact terms and order stipulated in the PRJ. Outside of these scenarios, the guarantee must remain intact and fully effective, and its early, partial, or conditional release based on events unrelated to the logic of the PRJ is not permitted.

51.    Thus, the structure of the PRJ, the guarantees, and UPI V.tal reveals a cohesive system in which governance, payment priority, and the discipline of sake are not autonomous elements, but inseparable parts of the same legal-economic arrangement. Any attempt to treat the sale of UPI V.tal in isolation, dissociating it from the guarantees, the order of priorities, or the decision-making prerogatives of the Restructuring Option I Creditors, implies a rupture of the logic of the PRJ, which cannot be allowed.

## NECESSARY AND URGENT PRESERVATION OF RIGHTS

52.    It is precisely in light of this normative and economic arrangement that recent events within the scope of this judicial reorganization reveal a scenario of serious deterioration in the legal certainty that should guide the process, creating a well-founded fear that the rights of the Restructuring Option I Creditors may be deliberately violated by the Companies Under Reorganization, through the actions of the Judicial Manager, in manifest disregard of the law, the duly constituted guarantee instruments and, above all, the PRJ approved by the General Meeting of Creditors and ratified by this Court.

53.    This is a risk evidenced, as discussed in a previous chapter, by procedural acts already carried out and by a rhetorical escalation that consciously seeks to deplete expressly agreed-upon rights, replacing the rules of the PRJ with opportunistic construal lacking any basis in reality, incompatible with the binding nature of said instrument.

*(a)    Possible Rejection of Minimal Bids*
*No Abuse of Rights or Conflict of Interests*

54.    We reiterate that the rights of Restructuring Option I Creditors are not negotiable according to circumstances. These rights are guaranteed by Law No. 11.101/2005, especially under the DIP financing regime, by the contractual instruments duly executed and, above all, by the PRJ, which has binding force, having been ratified by a final and unappealable court order. The attempt to relativize these rights through unsubstantiated narratives contradicts the very authority of court orders.

55.    The fiduciary sale established in favor of the group of creditors, including the Restructuring Option I Creditors, especially the fiduciary sale of the shares of V.tal, constitutes a fiduciary ownership security interest, which is constitutionally protected, and which may only be released in the cases expressly provided for by law or in the PRJ. Other than in these cases, any attempt to remove the guarantee constitutes a true indirect expropriation without payment of compensation, which is prohibited by the legal system.

56.    The release of a fiduciary sale is, by definition, an exceptional measure, and like any exception, it must be interpreted restrictively, not allowing for expansions, flexibilities, or hermeneutical shortcuts intended to serve the conveniences of the proceedings.

57.    Violation of this regime implies a direct affront not only to the national legal system, but also to foreign law. Indeed, on the one hand, the violation of creditors' rights would violate the PRJ, the guarantee instruments, the right to property (article 5, XXII of the Federal Constitution) and *res judicata* (article 5, XXXVI of the Federal Constitution), compromising the legal certainty required in the context of a judicial reorganization. On the other hand, it would also imply a violation of foreign instruments relating to the Notes and their guarantees and, moreover, would violate the decision rendered by the

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patrícia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

American courts that ratified the PRJ and the transaction documents.

58.    Thus, even if we were to disregard – for argumentation purposes only – the significant inconsistencies and omissions that mark the narrative constructed by the Companies Under Judicial Reorganization and the questionable conduct adopted by the Judicial Manager, as reported in a previous chapter, the accusations made in the statement on pages 128.808/128.818 would not be sustainable as a matter of law. First, the attempt to reclassify the regular exercise of prerogatives expressly provided for in the PRJ as an abuse of rights proves incompatible with the normative assumptions of judicial reorganization and with the legal framework applicable to DIP financing.

59.    Now, the PRJ, duly ratified by the courts, clearly and precisely outlines the mechanism for accepting bids in the context of the sale of UPI V.tal. There is a chapter in the PRJ dedicated exclusively to this:

(i)     If the bid is in cash and in full and meets the Minimum Price - which is currently R$12,315,977,451.75 –, acceptance is automatic (Sections 5.2.2.2.3 and 5.2.2.2.4 of the PRJ);

(ii)    If the bid is in cash and does not meet the Minimum Price, it must be analyzed through the Resolution of Restructuring Option I Creditors, who have the exclusive prerogative to accept or reject the bid; and

(iii)   If the bid involves payment in any form other than cash, the decision to accept or reject it will also rest with the Resolution of Restructuring Option I Creditors, without prejudice to the consent of the creditors of the New Financing - Third Parties.

60.    As it appears, the sales mechanism, negotiated exhaustively, is extensively detailed and does not allow for any flexible, creative interpretation, or even generic argument of abuse of rights. Abuse of rights is an exception, not a trump card, a generic and open clause to be used whenever the result of the restrictive application of the freely negotiated and, more seriously, judicially ratified rules is unsatisfactory.

"It is the Law itself that determines the meeting of creditors and their expression of will by majority vote. It is a presupposition of the Law that creditors will not vote based on a greater interest, but according to the maximization of their own individual utility as creditors. [...]"

In this sense, as there is no common or greater interest guiding the expressions of will of the creditors through voting, a vote can only be considered abusive if it is manifestly cast in bad faith, that is, to obtain an illicit advantage for oneself or for another. This is precisely the wording of article 39, paragraph 6, which requires that a vote can only be considered abusive when exercised to obtain an illicit advantage for oneself or for another.

The satisfaction of one's own claim, as deemed most convenient by the judicial reorganization or bankruptcy procedure, is not an illicit advantage, but the regular exercise of one's own right. An illicit advantage for oneself or another should be interpreted as obtaining benefits that exceed one's status as a creditor.[25]

----- / / -----

"Interlocutory appeal. Decision that recognized the abuse of the appellant's right to vote and ratified the judicial reorganization plan by 'cram down'. Reversal. Lack of evidence capable of demonstrating abuse of the right to vote. Need to demonstrate an attempt to obtain an illicit advantage or bad faith. Mere disagreement with the clauses does not imply abuse. [...] Impossibility of disregarding the appellant's vote. Appeal granted."

[Opinion]: "Indeed, the existence of abuse of voting rights deserves careful examination, especially in cases where the approval of the plan depends exclusively on the favorable vote of some creditor, precisely the situation in these case records. [...]

---

[25] SACRAMONE, Marcelo Barbosa. Comentários à lei de recuperação de empresa e falência. 6th ed. São Paulo, Saraiva Jur, 2025. E-book. p. 194.

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

Translation No. 039
Book No. 1
Page - 594 -

Patrícia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

In other words, a single dissenting vote by one creditor against the favorable votes of the others is not enough to constitute abuse; it is necessary to demonstrate an attempt to obtain an illicit advantage or bad faith, which was not evident in the case of these records, as the appellant's rejection of the plan stemmed from disagreement regarding the discount clauses, payment terms, and the absence of adjustment for inflation and late-payment interest."[26]

61.    Therefore, any argument that a refusal of a Minimal Bid would be abusive simply because it does not meet the specific interests of the Judicial Management or of a potential party interested in paying a low price for an asset (approximately 27.5% of V.Tal's capital stock) that was sold to Oi for a proportionally equivalent value of R$13.75 billion just over a year ago has no legal grounds.[27]

(b)    *Oi would have more beneficial alternatives than a Minimal Bid*

*No Conflict of Interests*

62.    The fundamental legal rights and protections described above cannot be violated in this case based on assumptions that Oi supposedly does not have a more beneficial alternative. There is no legal basis for the Judicial Manager or any other party to argue that such protections should be violated due to alleged "necessity." Furthermore, no such necessity exists, because Oi has the opportunity and the capacity to negotiate with its creditors and work towards a superior and consensually supported transaction.

63.    Certain creditors holding the New Financing Notes have been seeking for months to negotiate with the Judicial Manager an alternative transaction whereby UPI V.tal would be acquired in exchange for the transfer of their claims as payment (credit bid), with the necessary legal protections. This would result in the reduction of billions of reais in debt and the possibility that certain other assets currently held in trust would be released and made available for Oi to monetize for the benefit of the judicial reorganization.

64.    This transaction, whereby UPI V.Tal is acquired through a credit bid, would naturally involve the consent of the Restructuring Option I Creditors and f the New Financing – Third Parties, in accordance with the provisions of the PRJ and the applicable guarantee documents, and would also result in benefits to Oi and all its creditors, always subject to the terms and conditions of said documents.

65.    Unfortunately, instead of engaging in such negotiations in good faith, the Judicial Manager refused to do so, and, moreover, incorrectly labeled such a measure as illegal (which it clearly is not, since, as mentioned above, Section 5.2.2.2.5 of the PRJ expressly allows the acceptance of bids that are not in cash, provided that the applicable consents are obtained).

66.    In any case, and always observing the rights, procedures, and contractual rites of both the PRJ and the instruments of the Notes, the fact is that certain creditors of the New Financing Notes still intend to seek such an outcome and negotiate for that purpose, provided that such negotiations are conducted in good faith and with respect for the legal and contractual rights of the creditors.

67.    Furthermore, the prerogative granted to holders of the New Financing – Restructuring Option I Creditor to choose a bid that includes a credit bid is far from being a "conflict of interest"; it is a right expressly provided for in a plan thoroughly negotiated with parties and sophisticated advisors. As the opinion of jurists teaches, "complementary, non-exclusive interests are not conflicting interests. The existence of conflict assumes that one interest must be sacrificed for the other to prosper."[28]

---

[26] São Paulo State Court of Appeals (TJSP). Interlocutory Appeal (AI) 2079300-74.2023.8.26.0000, Appellate Judge Rapporteur Natan Zelinschi de Arruda, 2nd Reserved Chamber of Business Law, trial date 05/25/2023.

[27] As can be seen from the documents on pages 80.946/80.949, when acquiring the ClientCo UPI from Oi, V.Tal gave as payment, among other assets, approximately 10% of its issued shares, in an amount equivalent to R$4.99 billion (pages 83.976/84.002). Thus, assuming this valuation, the 27.5% stake currently held by Oi would be equivalent to at least approximately R$13.75 billion.

[28] LAMY FILHO, Alfredo; BULHÕES PEDREIRA, José Luiz. Direito das companhias. 2nd ed. Rio de Janeiro: Forense, 2017, p. 311.

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

Translation No. 039
Book No. 1
Page - 595 -

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

68.     As mentioned, unlike a conflict, there is actually an alignment of interests, insofar as the purchase of UPI V.tal through a credit bid is an alternative that would potentially be <u>more advantageous for Oi than a Minimal Bid</u>, as it would significantly reduce its debt and, at the same time, free up several guarantees to pay its other creditors.

69.     On the other hand, a sale through a Minimal Bid would be detrimental to all creditors (both secured and unsecured), as the price to be paid through the Minimal Bid would not be sufficient to settle the debts that have fiduciary guarantees and, consequently, there would be no unencumbered assets to be monetized in favor of the other creditors.

70.     In any case, even if the Judicial Managers maintains his refusal to negotiate such terms, the fact is that he cannot submit to this Court any claim to force the acceptance of a Minimal Bid that is inconsistent with any possible Resolution of the Restructuring Option I Creditors, much less if he does so under the argument that there is no other alternative. In fact, a Minimal Bid will not fully pay the secured claims and, therefore, will not benefit the judicial reorganization of Oi.

71.     Therefore, the narrative of any conflict of interest makes no sense. This narrative, used by the Judicial Manager on pages 128.808/128.818, appears to be an incomprehensible attempt to reject outright a potentially legitimate solution to the case, in favor of interests that are not very clear at this time, but which certainly do not align with the interests of the Oi Group and all its creditors.

*(c)     The Necessary Legality Review*

72.     The consolidation of a precedent that allows the conscious and deliberate violation of the approved PRJ, the established fiduciary guarantees, and the applicable law will produce extremely harmful systemic effects on the Brazilian credit and investment market.

73.     DIP financing, which is essential for the survival of companies in crisis, requires absolute confidence in the stability of the guarantees and strict compliance with the approved plans. The mere suggestion that such rights may be disregarded due to possible hidden interests or opportunistic narratives directly discourages investment, increases the cost of capital, and undermines the credibility of the Judicial Branch.

74.     It is precisely to avoid this scenario of insecurity and arbitrariness that the Trustee presents this statement, with the objective of safeguarding, affirming, and fully preserving all the rights and prerogatives of the Restructuring Option I Creditors, under the terms of the applicable law, the PRJ ratified by the court, and the contractual instruments executed in strict compliance with its performance.

75.     This statement does not seek to accuse anyone or create a fictional work. However, based on documented facts and events occurred in these proceedings, the Trustee anticipates and requests that the procedure for the sale of UPI V.tal and the law be duly observed during the term for submitting sealed bids for the acquisition of UPI V.tal, which demonstrates its interest and usefulness in the claim made herein, shedding light on the current state of the proceedings and their possible (perhaps probable) developments, for the benefit of all interested parties.

## CONCLUSION AND CLAIMS

76.     In light of all the above, the Trustee claims:

(i)     <u>a declaration</u> that the Oi Group's PRJ, as approved at the General Meeting of Creditors and judicially ratified, as well as the contractual instruments entered into in its performance, be fully and strictly observed, including with regard to governance, guarantees granted, order of priorities, and decision-making prerogatives attributed to Creditors in the context of the sale of UPI V.tal, recognizing that the exercise of these prerogatives is the legitimate expression of rights duly agreed upon and judicially ratified;

(ii)     <u>a declaration</u> that the PRJ, specifically Section 5.2.2.2.5, does not prohibit the price for the UPI V.tal from being paid through a credit bid, provided that, in such a case, the bid must be accepted by means of a Resolution of Restructuring Option I Creditors and the consent of the New Financing Third Parties, in strict compliance with the terms of the PRJ;

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

# Patricia Stanzione Galizia

Translation No. 039
Book No. 1
Page - 596 -

Tradutora Juramentada * Certified Translator
JUCESP # 1944

(iii)    in accordance with the decision of the CNJ – National Council of Justice), reported in the press on 01/15/2026,[29] as well as in light of the specific facts described above, <u>that an official letter be sent</u> providing information to the CNJ and the Disciplinary Board of the Court of Appeals of this State, including a copy of this statement, for their information regarding all proceedings; and

(iv)    <u>that the State Public Prosecutor's Office be notified</u> to comment on the facts reported above, so that it may exercise its supervisory function.

77.    Finally, it is claimed that all future resolutions regarding the sale of UPI V.tal be conducted in strict compliance with the aforementioned judicial declarations, preserving the consistency of the PRJ, legal certainty, and the trust that enabled the essential financing for the recovery of the Oi Group.

Terms in which,

granting is requested.

Rio de Janeiro, February 9, 2026.

(sgd)                                        (sgd)

Guilherme Domingues de Oliveira          Eduardo Gomes Matoso

Brazilian Bar Association, Rio de Janeiro Chapter    Brazilian Bar Association, Rio de Janeiro Chapter
OAB/RJ No. 102.99                        OAB/RJ No. 197.207

(sgd)

Simone de Lira Fernandes

Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ No. 262.431

*IN WITNESS WHEREOF I set my hand and seal to this translation.*

*São Paulo, February 12, 2026*

_____

Patricia Stanzione Galizia

Certified Translator

pgi/274771.doc

---

[29] https://oglobo.globo.com/blogs/lauro-jardim/post/2026/01/stj-suspende-remuneracao-de-administrador-judicial-da-oi-que-equivaleria-quase-a-uma-mega-da-virada.ghtml (exhibit 1)

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP - Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.



# SIGNATURES MANIFEST



## Validation code: EBGPJ-YYARN-GJP8W-PAUMV

Document signed with ICP Brazil digital certificates on Assinador ONR by the following signers:

Patricia Stanzione Galizia (CPF ***.120.998-**)

To verify signatures, access the  validation direct link for this document:

https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV

Or access the signed document search available at the link below and provide the validation code:

https://assinador.onr.org.br/validate

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/EBGPJ-YYARN-GJP8W-PAUMV.

## **Exhibit B**

Letter to Judicial Manager

**Davis Polk**

David Schiff
+1 212 450 3182
david.schiff@davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
davispolk.com

February 11, 2026

Oi S.A.
Rua Jangadeiro number 48, Ipanema, Rio de Janeiro,
CEP: 22420-010, Brazil
Attn: Bruno Rezende, c/o outside counsel

*Re*: Ad Hoc Group of Secured Noteholders of Oi S.A.

Dear Mr. Rezende:

We are writing to you on behalf of the Ad Hoc Group of Secured Noteholders of
Oi S.A. – Em Recuperação Judicial ("Oi" or the "Company") and UMB Bank, N.A., as the
indenture trustee of the Notes[1] (the "Indenture Trustee"), to raise serious concerns about
the ongoing RJ process and actions that we understand may be taken or attempted in the
RJ Case with respect to the Notes and the collateral securing the Notes, in an effort to
deprive the Noteholders of the value of their securities and liens in violation of the
Noteholders' legal and contractual rights. We write to convey these concerns and to notify
you that the Noteholders are prepared to fully enforce their rights by all available legal
means.

As context for these concerns, it is important to emphasize that the Noteholder group at
large consists of a broad and diverse range of investors. The interests at stake therefore
reflect a wide cross-section of the investment community, and actions affecting the Notes
or their collateral will directly impact a broad base of holders.

The Notes (including the NPSD Notes that constitute DIP financing) were issued pursuant
to the RJ Plan and were granted security in the form of fiduciary assignments. Importantly,
the Notes are U.S. securities, and they and certain of their accompanying security
instruments—including the Intercreditor Agreement[2] to which Oi is a party—are governed
by the laws of the State of New York. The Notes and their accompanying security interests

---

[1] "Notes" means (i) the 8.50% PIK Subordinated Secured Notes Units due 2028, consisting of (x) 8.50% PIK
Subordinated Secured Series A Notes due 2028 and (y) 8.50% PIK Subordinated Secured Series B Notes due
2028 (the "RUD Notes"), in each case, issued by Oi, and (ii) the 10.000%/13.500% PIK Toggle Senior
Secured Notes Due 2027 (the "NPSD Notes") issued by Oi. "Noteholders" means holders of the Notes.

[2] "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of August 8, 2024 (as
supplemented, amended or modified from time to time), among the Company, GLAS Americas, LLC, as
Intercreditor Agent and Collateral Agent (each as defined therein) and the grantors and other parties from
time to time party thereto.

**Davis Polk**

were also issued pursuant to express authorization of the court overseeing the chapter 15 bankruptcy case commenced by the Company captioned *In re Oi S.A. et al.*, (Case No. 23 10193 (LGB), pending in the United States Bankruptcy Court for the Southern District of New York pursuant to that certain *Order (I) Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Granting Related Relief* [Dkt. No. 42] (the "FFE Order"), which provides that such "instruments and obligations, once issued and in effect, shall be enforceable obligations of [Oi] that are not subject to any modification or override except in accordance with their express terms." FFE Order ¶17.

The Intercreditor Agreement and the fiduciary lien documents in respect of the Notes set forth strict requirements for the sale or disposition of collateral and the application of proceeds resulting from any such disposition. Among other things, the Noteholders benefit from the fundamental protection that V.tal shares cannot be sold unless: (a) the sale is for cash in an amount of not less than R$12,315,977,451.75, and any amount below that threshold must be approved by the holders of the NPSD Notes and (b) such cash proceeds must be paid to the Collateral Agent for distribution strictly in accordance with the priorities set forth in the Intercreditor Agreement. A deviation from these requirements is only permitted through valid consent of the requisite secured creditors; in other words, a non-conforming sale of the V.tal shares is invalid and illegal without the Noteholders' express consent.

On its face, the *edital* that you caused to be published for the potential sale of the V.tal shares purports to at least partially comply with these requirements, in that it requires that a bid for the shares must achieve a minimum price of R$12,315,977,451.75 (the "Minimum Price"), payable in cash, and acknowledges the right of holders of the NPSD Notes to reject a proposal that fails to meet these requirements.

We fully expect that, consistent with the Noteholders' legal and contractual rights, any bid that fails to meet these requirements will not be accepted without valid and express Noteholder consent, and proceeds will only be applied in accordance with the requirements of the Notes, the Intercreditor Agreement and the other security documents, unless the Noteholders agree otherwise.

However, as outlined in a motion recently filed by the Indenture Trustee (the "Motion," a copy of which is appended hereto as **Exhibit 1**), recent developments in the case and your conduct toward the Noteholders and their representatives suggest that you (and potentially others) may attempt to effectuate a sale and release of the fiduciary lien over the V.tal shares without satisfying the strictures of the security documents and the RJ Plan and without the creditor consent required for such a deviation.

**Davis Polk**

Any attempt to achieve such an outcome, whether by (i) declining to adhere to the clear requirements and procedures for disposition of the V.tal shares, (ii) disregarding the Noteholders' voting and consent rights or seeking to disenfranchise the Noteholders of those rights, (iii) diverting of all or any portion of sale proceeds for purposes other than payment in accordance with the strict priorities provided for under the Notes, the Intercreditor Agreement and other applicable interests or (iv) any other means, will constitute a violation of legal rights, subject to redress under U.S. law and in any other applicable jurisdiction.

The Ad Hoc Group has sought to engage with you constructively regarding potential avenues to facilitate a lawful disposition of the V.tal shares collateral in a manner that benefits the estates, and we remain interested in doing so. However, we are troubled that rather than engage constructively, you may instead be pursuing an unnecessarily aggressive and illegitimate path. If you proceed to ignore the aforementioned rights or otherwise deprive the Noteholders of their fundamental protections, Noteholders are prepared to take all steps to fully protect their rights.

We take note of Oi's responsive filing yesterday. We find that defense of the sale process to be unpersuasive in that it provides no explanation for why this deviation from ordinary practice is necessary or appropriate, nor why the measures proposed by the Noteholders cannot be implemented. Of greater concern, the response does not expressly refute the possibility of proceeding with a non-conforming sale of the V.tal shares to which Noteholders have not consented—we ask you to provide that assurance in response to this letter. The Noteholders, the Indenture Trustee and their respective representatives fully reserve all of their rights, including, without limitation, the right to further investigate and obtain discovery and testimony from you with respect to the matters discussed in this letter, and to seek and obtain compensation from any liable parties to the extent of any loss of the Noteholders' value.

Please be guided accordingly.

Sincerely,

David Schiff
Davis Polk & Wardwell LLP

**<u>Exhibit 1</u>**

[*omitted*]

## **Exhibit C**

Oi's Response to RJ Court Motion

Translation No. 040
Book No. 1
Page - 597 -

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

*I, Patricia Stanzione Galizia, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that an electronic document was submitted to me, written in Portuguese, the translation of which is as follows:*

Logo of Salomão Advogados

Logo of FCDG – FERRO, CASTRO NEVES, DALTRO & GOMIDE ADVOGADOS

Logo of Preserva Ação – ADMINISTRAÇÃO JUDICIAL – CERTIFICATION IM ISO 37301

HONORABLE JUDGE OF THE 7th BUSINESS COURT OF THE JUDICIAL DISTRICT OF THE CAPITAL CITY OF THE STATE OF RIO DE JANEIRO

Stamp: "Rio de Janeiro State Court of Appeals – Page _ - Electronically stamped"

Case No. 0090940-03.2023.8.19.0001

**OI S.A. – UNDER JUDICIAL REORGANIZATION** ("Oi"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – UNDER JUDICIAL REORGANIZATION** ("PTIF"), and **OI BRASIL HOLDINGS COÖPERATIEF U.A. – UNDER JUDICIAL REORGANIZATION** ("Oi Coop" and, collectively with Oi and PTIF, "Oi Group" or "Companies Under Reorganization"), already identified in the aforementioned <u>judicial reorganization</u> proceedings, hereby, through their undersigned counsel and judicial manager, state and request the following:

## UMB's EMPTY ALLEGATION:

## COMPETITIVE PROCESS IN ACCORDANCE WITH THE PLAN AND THE LAW

1.      The statement presented by UMB Bank N.A. ("UMB"), representing the Restructuring Option I Creditors, **is not supported by any concrete facts.** Despite the supposed seriousness of the conclusions it intends to draw, UMB failed to indicate, in an objective, specific, and detailed manner, **which acts actually carried out by the Companies Under reorganization or by the Judicial Management** would be capable of giving rise to a real risk of frustration of the creditors' rights relating to UPI V.tal and the guarantees on the shares of V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal"), owned by Oi and Rio Alto Participações S.A.

2.      What we note is UMB's attempt, once again, to construct a merely hypothetical scenario, based on conjectures, inferences, and subjective perceptions, dissociated from the procedural reality and the history of this judicial reorganization, which has always been guided by compliance with the judicial reorganization plan ("Plan") and the decisions rendered by this Honorable Court. In short, this is yet another belligerent attack by this group of creditors, just like the one already rejected in the decision ID 129768.

3.      <u>First</u>, the competitive procedure for the sale of UPI V.tal rigorously observes the procedure and timeframe ordinarily adopted in Brazil for transactions of this nature: publication of a bid notice, qualification of interested parties, a **thirty- (30)-day** audit, submission of bids, and declaration of the winning bidder. This is an identical model to that already used in this very judicial reorganization process, as in the case of UPI ClientCo, with satisfactory results **and without any challenge as to its regularity — including by UMB itself.**

4.      The truth is that the claim of potential lack of competitiveness does not stem from any structural flaw in the UPI V.tal sale procedure, but from the circumstance that **for internal reasons unrelated to the Companies Under Reorganization, the Restructuring Option I Creditors claim they are unable to structure a bid within the established term (if, at least once, they will have any interest in contributing anything to the Company).** Based on this specific limitation, an attempt is being made to construct a narrative of supposed protection of third-party interests which, in practice, reflects a concern focused on **self-interest.** This circumstance, however, does not authorize the relaxation of the rules of the bidding process, nor the differentiated treatment of one potential interested party to the detriment of others.

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/CZJAW-VBLZC-X9LYS-NZM2D.

Translation No. 040
Book No. 1
Page - 598 -

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

5.      Furthermore, we remind that the dynamics contemplated in the UPI V.tal bid notice and its publication have already been ratified in the decision on pages 127.999/128.005, and therefore, anyone who disagrees with it should file the appropriate legal appeal.

6.      Adherence to the principles of equality, parity among investors, and transparency is inherent in competitive procedures for the sale of UPIs, especially in a context of severe liquidity constraints, such as that faced by Oi. There are no legal grounds for adjusting the process schedule according to the **convenience** of a specific group of potential bidders – who, in their petitions that they **intend to offer their claims (and not cash) for UPI V.tal**, contrary to what is established by the Plan and the best interests of all other creditors (as, incidentally, is the practice of a specific group).

7.      As mentioned, it is interesting to note that the **Restructuring Option I Creditors themselves approved the bid notice for the sale of UPI ClientCo, which procedure was conducted within a period of thirty (30) days – identical to that now foreseen for UPI V Tal – without any claim at the time of insufficient time or harm to competitiveness.** Maintaining similar parameters in the present case reveals coherence and predictability in the conduct of the process, in addition to reflecting a practice that has already proven effective in several other sales made by the debtors during their two judicial reorganizations.

8.      Second, the claim that holding the competitive procedure for the sale of UPI V.tal in February, due to the Carnival period, would compromise or prevent the participation of interested parties is absurd.

9.      Competitive procedures involving highly complex and high-value assets are, by their very nature, conducted by professional investors accustomed to operating in multiple jurisdictions and dealing with rigid, pre-defined schedules. It is standard market practice that transactions of this magnitude are not subject to specific holidays, especially when accompanied by clear rules outlined in a judicial reorganization plan.

10.     It is unreasonable to assume that potential interested parties would refrain from evaluating or submitting bids in a transaction of this nature due to holidays, especially given the financial urgency of the Companies Under Judicial Reorganization, which demands the swift and responsible conduct of the bidding process. The lack of seriousness of an investor who cannot submit a bid due to local holidays is almost intuitive, even more so when advised by seasoned professionals accustomed to this type of work.

11.     Third, regarding information about UPI V.tal, the Companies Under Judicial Reorganization clarify that V.tal has already provided all the necessary documents for the conduction of a due diligence by any interested parties. Therefore, the generic allegations of insufficient information lack factual support and, in practice, only contribute to creating artificial obstacles to the regular progress of the judicial reorganization. Perhaps this is why UMB is so imprecise in its complaints.

12.     Fourth, as already demonstrated in detail in the petitions on pages 127.808/127.818 and 128.969/128.970, the Plan clearly and unequivocally establishes that the sale of UPI V.tal must occur through **payment in full, in cash, and in national currency.** Only if the Companies Under Reorganization receive bids that provide for considerations other than cash payment and, after discretionary analysis, consider such bids potentially advantageous, should these bids be submitted to the Restructuring Option I Creditors for approval or rejection, in the exact terms of Section 5.2.2.2 of the Plan.

13.     Any interpretation that deviates from these express rules would imply emptying the economic logic of the Plan and compromising the purpose of the competitive procedure, by allowing the substitution of cash payments with structures that, in addition to not ensuring immediate liquidity for the Companies Under Reorganization, tend to reduce the value effectively received in the bidding process, to the detriment of the interests of all creditors and the very feasibility of the judicial reorganization.

14.     It is worth reminding UMB, as already explained, of some other relevant sections of the Plan: (i) 5.2.2.2.3 and 5.2.2.2.5, which establish, as a rule, payment in cash, in national currency; (ii) 5.2.2.2.4, which only provides for the possibility of bondholders approving or rejecting cash bids below the minimum

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/CZJAW-VBLZC-X9LYS-NZM2D.

# Patrícia Stanzione Galizia

Tradutora Juramentada * Certified Translator

JUCESP # 1944

price – and not their power to approve, from the outset, the possibility of a credit bid.

15.      In short, Oi has the exclusive prerogative to stipulate the general rules of the bid notice, especially its schedule, with UMB only having the right to approve or reject it, when expressly provided for in the Plan, as well as the payment conditions and methods.

16.      Given this context, it is evident that the dissatisfaction expressed by UMB does not stem from any irregularity in the procedure, but from an attempt to postpone the progress of the bidding process, for the exclusive benefit of the Restructuring Option I Creditors, which is not in line with the principles governing judicial reorganization nor with the interest of the community.

17.      For this reason, Oi will not refute conjectures, assumptions, or imaginary scenarios constructed without support in concrete facts and presented with the clear purpose of disrupting the regular course of the proceedings.

18.      The process of sale of UPI V.tal has been conducted in strict compliance with the Plan, the decisions of this Honorable Court, and best market practices, with no grounds *de facto* or *de jure* to justify the claims made by UMB.

## INAPPLICABLE PROVISIONAL REMEDIES

19.      The allegation that the Judicial Management or the Companies Under Reorganization are engaged in any illicit conduct aimed at frustrating the creditors' rights over the funds from the sale of UPI V.tal lacks factual or legal support. It is an accusation made in the case records **without indicating a single concrete act that could lead to the alleged result.**

20.      All obligations and mechanisms provided for in the Plan for the sale of UPI V.tal. have been **observed** by Oi and the Judicial Management.

21.      The references made by UMB to an alleged underhanded plan to deplete guarantees or improperly redirect funds lack support. The generic mention of the possible filing of a "liability action" could never be sufficient to support this baseless allegation, as, if and when such a claim exists, this Honorable Court will decide what it deems appropriate and legal, in accordance with the orders already rendered by the Rio de Janeiro State Court of Appeals (TJRJ).

22.      We reiterate: the bid notice itself was structured in strict compliance with the Plan, preserving the rights and prerogatives of the Restructuring Option I Creditors.

23.      In this scenario, the petition submitted by UMB and the measures requested therein prove to be unnecessary and disproportionate, as they are based on premises that are not confirmed and risks that have not occurred. **In addition to being nonexistent in the Brazilian legal system, preventive** judicial action, **based on conjectures without evidence,** is not justified when there is no concrete or threatened violation of rights, under penalty of **transforming proceedings into a space for the discussion of merely conjectural hypotheses.**

24.      The Companies Under Reorganization and the Judicial Management state that the proceedings have been guided by strict adherence to the Plan, transparency in all actions taken, and the pursuit of solutions that serve the interests of all creditors, not just specific groups.

## CLAIM FOR AN OFFICIAL LETTER TO BE SENT TO THE NATIONAL COUNCIL OF JUSTICE - CNJ

25.      Finally, no less bizarre is the claim that an official letter be sent to the CNJ, with information on these proceedings, for a procedure that would investigate the adequacy of the judicial manager's remuneration.

26.      This Honorable Court ratified the fees proposed by the judicial manager in the decision ID 126653. Against this decision, UMB filed interlocutory appeal No. 0001493-02.2026.8.19.0000, which is pending trial. Therefore, the matter is under the jurisdiction of the Honorable Appellate Judge Rapporteur Mônica Maria Costa Di Piero, of the 1st Civil Chamber of this TJRJ, and therefore any and all discussions by UMB regarding compensation must be made in the higher courts.

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/CZJAW-VBLZC-X9LYS-NZM2D.

# Patricia Stanzione Galizia

Translation No. 040
Book No. 1
Page - 600 -

Tradutora Juramentada * Certified Translator
JUCESP # 1944

27.    Notwithstanding this, in parallel, this Honorable Court addressed, in the decision ID 127999, the arguments presented by UMB in its interlocutory appeal – when informed of its existence by the petition ID. 127105 –, and has **rejected** the allegations contained therein, as well as those that were the subject matter of the opinion of the Public Prosecutor's Office, ID 127301.

28.    Similarly, there is no logical sense in this Honorable Court sending an official letter to the CNJ stating that UMB is dissatisfied with the sale procedure of a UPI, based on hypothetical acts. That is not the venue of competent jurisdiction to resolve this matter. If UMB is dissatisfied, however absurd its accusations may be, it must respect the legal procedure for appeals, submitting the issues of this reorganization to this Court and to the appellate judge rapporteur, on appeal.

## **CLAIM**

29.    In light of all the above, we request that UMB's claims be denied in full.

Terms in which,

granting is requested.

Rio de Janeiro, February 10, 2026.

| | | |
|---|---|---|
| Luis Felipe Salomão Filho | Marcos Pitanga Ferreira | Bruno Rezende |
| Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ 234.563 | Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ 144.825 | (In the capacity as Judicial Manager of the COMPANIES UNDER REORGANIZATION) |
| | | Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ 124.405 |
| Rodrigo Mendonça Raposo | Thiago Peixoto Alves | |
| Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ 154.448 | Brazilian Bar Association, Rio de Janeiro Chapter OAB/RJ 155.282 | |

TJRJ CAP EMP07 202600463235 02/10/26 06:57:03 PM 138049 PROGER-VIRTUAL

*IN WITNESS WHEREOF I set my hand and seal to this translation.*

*São Paulo, February 12, 2026*

_____

Patricia Stanzione Galizia

Certified Translator

pgi/274772.doc

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matricula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com



# SIGNATURES MANIFEST



## Validation code: CZJAW-VBLZC-X9LYS-NZM2D

Document signed with ICP Brazil digital certificates on Assinador ONR by the following signers:

Patricia Stanzione Galizia (CPF ***.120.998-**)

To verify signatures, access the  validation direct link for this document:

https://assinador.onr.org.br/validate/CZJAW-VBLZC-X9LYS-NZM2D

Or access the signed document search available at the link below and provide the validation code:

https://assinador.onr.org.br/validate

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/CZJAW-VBLZC-X9LYS-NZM2D.

**<u>Exhibit D</u>**

Oi's Response to February 11 Letter

   

| | |
|---|---|
| Rio de Janeiro, 12 de fevereiro de 2026 | Rio de Janeiro, February 12, 2026 |
| Ao | To |
| **UMB Bank N.A. ("UMB")** | **UMB Bank N.A. ("UMB")** |
| <u>Via e-mail</u> | <u>By e-mail</u> |
| | |
| Prezados Senhores, | Dear Sirs, |
| | |
| A **Oi S.A. – Em Recuperação Judicial** ("Oi"), representada por seu gestor judicial e advogados externos, esclarece que as questões suscitadas por V.Sas. na notificação datada de ontem já foram judicializadas pelo UMB perante o Juízo da Recuperação Judicial da OI (processo n. 0090940-03.2023.8.19.0001), na forma da petição de 09.02.26, anexada na própria notificação, tendo a Recuperanda apresentado a sua resposta espontaneamente na petição datada de 10.02.26 (em anexo), estando, neste momento, aguardando decisão do único Juízo competente para dirimir todo e quaisquer assuntos relativo ao caso, nos estritos termos do Plano de Recuperação Judicial, da documentação vigente e das decisões anteriormente proferidas por aquele Juízo. | **Oi S.A. – Em Recuperação Judicial** ("Oi"), represented by its judicial administrator and external counsel, clarifies that the matters raised by you in the notice dated yesterday have already been brought by UMB before the Judicial Reorganization Court (case n. 0090940-03.2023.8.19.0001), as set forth in the motion dated February 9, 2026, attached to the notice itself. The Debtor in Reorganization voluntarily submitted its response in the motion dated February 10, 2026 (attached hereto) and is currently awaiting a decision from the sole court with jurisdiction to decide any and all matters related to the case, strictly in accordance with the Judicial Reorganization Plan, the applicable documentation, and the decisions previously rendered by that Court. |
| Atenciosamente, | Sincerely, |
| Bruno Rezende (Gestor Judicial) | Bruno Rezende (Judicial Administrator) |
| Luis Felipe Salomão Filho | Luis Felipe Salomão Filho |
| Rodrigo Mendonça Raposo | Rodrigo Mendonça Raposo |
| Raul Gonçalves Baptista | Raul Gonçalves Baptista |
| Marcos Pitanga Ferreira | Marcos Pitanga Ferreira |
| Thiago Peixoto Alves | Thiago Peixoto Alves |
| João Felipe Lynch Meggiolaro | João Felipe Lynch Meggiolaro |

 

Tribunal de Justiça do Estado do Rio de Janeiro
Página
**129860**
Certificado Eletronicamente

EXMA. SRA. JUÍZA DE DIREITO DA 7ª VARA EMPRESARIAL DA COMARCA DA CAPITAL DO ESTADO DO RIO DE JANEIRO

Processo nº 0090940-03.2023.8.19.0001

**OI S.A. – EM RECUPERAÇÃO JUDICIAL** ("Oi"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – EM RECUPERAÇÃO JUDICIAL** ("PTIF") e **OI BRASIL HOLDINGS COÖPERATIEF U.A. – EM RECUPERAÇÃO JUDICIAL** ("Oi Coop" e, em conjunto com Oi e PTIF, "Grupo Oi" ou "Recuperandas"), já qualificadas nos autos da recuperação judicial em epígrafe, vêm, por seus advogados e gestor judicial abaixo assinados, expor e requerer o seguinte:

## ALEGAÇÕES VAZIAS DO UMB:

## PROCESSO COMPETITIVO DE ACORDO COM O PLANO E A LEI

1.        A manifestação apresentada pelo UMB Bank N.A. ("UMB"), representante dos Credores Opção de Reestruturação I, **não se sustenta em nenhum fato concreto**. Apesar da suposta gravidade das conclusões que pretende extrair, o UMB deixou de indicar, de forma objetiva, específica e circunstanciada, **quais atos efetivamente praticados pelas Recuperandas ou pela Gestão Judicial** estariam aptos a ensejar o risco real de frustração dos direitos dos credores relativos à UPI V.tal e às garantias constituídas sobre as ações da V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal"), de titularidade da Oi e da Rio Alto Participações S.A.

2.        O que se observa é a tentativa do UMB, mais uma vez, de construir um cenário meramente hipotético, assentado em conjecturas, ilações e percepções subjetivas, dissociadas da realidade processual e do histórico dessa recuperação judicial, que sempre se pautou pela observância ao plano de recuperação judicial ("Plano") e às decisões proferidas por esse MM. Juízo. Essa é, em suma, mais uma investida belicosa desse grupo de credores, tal como a que já foi rechaçada na decisão de ID 129768.

3.        Em primeiro lugar, o procedimento competitivo para a alienação da UPI V.tal observa, de forma rigorosa, o rito e o prazo ordinariamente adotados no Brasil para operações dessa natureza: publicação de edital, habilitação dos interessados, auditoria de **30 (trinta) dias**, apresentação de propostas e declaração do vencedor. Trata-se de modelo

TJRJ CAP EMP07 202600463235 10/02/26 18:57:03138049 PROGER-VIRTUAL

 

Tribunal de Justiça do Estado do Rio de Janeiro
Página
129861
Certificado Eletronicamente

idêntico ao já utilizado neste próprio processo de recuperação judicial, como no caso da UPI ClientCo, com resultados satisfatórios **e sem qualquer questionamento quanto à sua regularidade — inclusive pelo próprio UMB**.

4.          A verdade é que a alegação de potencial ausência de competitividade não decorre de qualquer falha estrutural do procedimento de alienação da UPI V.tal, mas da circunstância de que **os Credores Opção de Reestruturação I, por razões internas e alheias às Recuperandas, alegam não conseguir estruturar uma proposta dentro do prazo estabelecido (se é que, ao menos uma vez, terão interesse em aportar algo na Companhia)**. A partir dessa limitação específica, procura-se construir uma narrativa de suposta tutela de interesses de terceiros que, na prática, reflete preocupação voltada a **interesses próprios**. Tal circunstância, contudo, não autoriza a flexibilização das regras do certame, nem o tratamento diferenciado de um potencial interessado em detrimento dos demais.

5.          Até porque, lembre-se, a dinâmica prevista no edital de venda da UPI V.tal e a sua publicação já foi homologada na decisão de fls. 127.999/128.005, cabendo a quem dela discordar, portanto, interpor o recurso legal cabível.

6.          A observância dos princípios da isonomia, da paridade entre investidores e da transparência é inerente a procedimentos competitivos de alienação de UPIs, sobretudo em contexto de severa restrição de liquidez, como o enfrentado pela Oi. Não há base jurídica para se ajustar o cronograma do processo em função da **conveniência** de um grupo específico de potenciais proponentes – que, reitere-se, afirmou em suas petições que **pretende oferecer seus créditos (e não dinheiro) pela UPI V.tal**, na contramão do quanto estabelecido pelo Plano e do melhor interesse de todos os demais credores (como, aliás, é a praxe de grupo específico).

7.          Como dito, curioso notar que **os próprios Credores da Opção de Reestruturação I aprovaram o edital da alienação da UPI ClientCo, cujo procedimento foi conduzido em prazo de 30 (trinta) dias – idêntico ao agora previsto para a UPI V Tal -, sem que à época se tenha alegado insuficiência temporal ou prejuízo à competitividade**. A manutenção de parâmetros semelhantes no presente caso revela coerência e previsibilidade na condução do processo, além de refletir prática que já se mostrou eficaz em diversas outras alienações feitas pelas devedoras durante suas duas recuperações judiciais.

8.          Em segundo lugar, é absurda a alegação de que a realização do procedimento

2




Tribunal de Justiça do Estado do Rio de Janeiro
Página
**129862**
Certificado Eletronicamente

competitivo para alienação da UPI V.tal no mês de fevereiro, em razão do período de Carnaval, comprometeria ou inviabilizaria a participação de interessados.

9.        Procedimentos competitivos envolvendo ativos de elevada complexidade e elevado valor econômico são, por sua própria natureza, conduzidos por investidores profissionais, acostumados a operar em múltiplas jurisdições e a lidar com cronogramas rígidos e previamente definidos. É prática de mercado que operações dessa relevância não se subordinem a feriados pontuais, especialmente quando acompanhadas de regras claras previstas em plano de recuperação judicial.

10.       Não é razoável presumir que potenciais interessados deixariam de avaliar ou de apresentar propostas em operação dessa natureza em razão de feriados, sobretudo diante da urgência financeira das Recuperandas, que impõe a condução célere e responsável do certame. Chega a ser intuitiva a falta de seriedade de um investidor que não pode apresentar uma proposta por conta de feriados locais, ainda mais quando assessorados por profissionais sazonados, acostumados ao trabalho dessa espécie.

11.       Em terceiro lugar, no que se refere às informações sobre a UPI V.tal, as Recuperandas esclarecem que a V.tal já disponibilizou todos os documentos necessários para a realização da auditoria (*due diligence*) por parte de eventuais interessados. Assim, as alegações genéricas de insuficiência informacional não encontram respaldo fático e que, na prática, apenas contribuem para a criação de entraves artificiais ao regular andamento da recuperação judicial. Talvez por isso o UMB seja pouquíssimo preciso em suas reclamações.

12.       Em quarto lugar, conforme já demonstrado de forma detalhada na petição de fls. 127.808/127.818 e 128.969/128.970, o Plano estabelece, de maneira clara e inequívoca, que a alienação da UPI V.tal deve ocorrer **por pagamento à vista, em dinheiro e em moeda corrente nacional**. Apenas na hipótese de as Recuperandas receberem propostas que prevejam contrapartidas diversas do pagamento em dinheiro e, após análise discricionária, entenderem tais propostas potencialmente vantajosas, é que essas ofertas deverão ser submetidas à deliberação dos Credores Opção de Reestruturação I, para fins de aprovação ou rejeição, nos exatos termos da Cláusula 5.2.2.2 do Plano.

13.       Qualquer interpretação que se afaste desse regramento expresso implicaria esvaziar a lógica econômica do Plano e comprometer a finalidade do procedimento

  

competitivo, ao permitir a substituição do pagamento em dinheiro por estruturas que, além de não assegurarem liquidez imediata às Recuperandas, tendem a reduzir o valor efetivamente percebido no certame, em prejuízo do interesse do conjunto dos credores e da própria viabilidade da recuperação judicial.

14.     Não custa lembrar ao UMB, como já exposto, algumas outras cláusulas relevantes do Plano: (i) 5.2.2.2.3 e 5.2.2.2.5, as quais fixam, como regra, pagamento à vista, em dinheiro e moeda nacional; (ii) 5.2.2.2.4, que apenas prevê a possibilidade dos *bondholders* aprovarem ou rejeitarem propostas em dinheiro inferiores ao preço mínimo – e não a faculdade deles aprovarem, na largada, a possibilidade de um *credit bid*.

15.     Em suma, é da Oi a prerrogativa exclusiva de estipular regras gerais do edital, mormente seu cronograma, sendo direito do UMB apenas aprovar ou rejeitar, quando expressamente previsto no Plano, condições e formas de pagamento.

16.     Diante desse contexto, evidencia-se que a irresignação manifestada pelo UMB não decorre de qualquer irregularidade do procedimento, mas de uma tentativa de postergar o andamento do certame, em benefício exclusivo dos Credores Opção de Reestruturação I, o que não se coaduna com os princípios que regem a recuperação judicial nem com o interesse da coletividade.

17.     A Oi, por essa razão, não rebaterá conjecturas, suposições ou cenários imaginários, construídos sem apoio em fatos concretos e apresentados com o nítido propósito de tumultuar o regular andamento dos autos.

18.     O processo de alienação da UPI V.tal vem sendo conduzido em estrita conformidade com o Plano, com as decisões desse MM. Juízo e com as melhores práticas de mercado, inexistindo qualquer fundamento jurídico ou fático que justifique as pretensões formuladas pelo UMB.

## MEDIDAS PREVENTIVAS DESCABIDAS

19.     Não encontra respaldo fático ou jurídico a alegação de que a Gestão Judicial ou as Recuperandas estejam engajadas em qualquer conduta ilícita destinada a frustrar os direitos dos credores sobre os recursos provenientes da alienação da UPI V.tal. É uma acusação lançada nos autos **sem a indicação de um único ato concreto que pudesse conduzir ao resultado alegado**.

 

Página
**129864**

20.        Todas as obrigações e mecanismos, previstos no Plano, para a venda da UPI V.tal. vêm sendo **observados** pela Oi e pela Gestão Judicial.

21.        As referências feitas pelo UMB a um suposto plano escuso de esvaziamento de garantias ou de redirecionamento indevido de recursos carecem de suporte. A menção genérica à eventual propositura de uma "ação de responsabilidade" jamais poderia ser suficiente para amparar essa alegação vazia, vez que, se e quando existente tal demanda, lá será deliberado por esse MM. Juízo o que entender como adequado e legal, de acordo com as ordens já exaradas pelo TJRJ.

22.        Repita-se: o próprio edital do procedimento competitivo foi estruturado em estrita conformidade com o Plano, preservando os direitos e as prerrogativas dos Credores Opção de Reestruturação I.

23.        Nesse cenário, a petição apresentada pelo UMB e as providências nela requeridas revelam-se desnecessárias e desproporcionais, pois se baseiam em premissas que não se confirmam e em riscos que não se materializaram. A atuação judicial **preventiva, com base em conjecturas sem provas, além de inexistente no regulamento legal brasileiro,** não se justifica quando inexiste violação concreta ou iminente a direitos, sob pena de se **transformar o processo em espaço para o debate de hipóteses meramente conjecturais**.

24.        As Recuperandas e a Gestão Judicial registram que a condução do processo tem sido pautada pela observância estrita do Plano, pela transparência dos atos praticados e pela busca de soluções que atendam ao interesse do conjunto dos credores, e não de grupos específicos.

## PEDIDO DE OFÍCIO AO CNJ

25.        Por fim, não menos esdrúxulo é o pedido de expedição de ofício ao CNJ, com informações do presente processo, para procedimento que apuraria a adequação da remuneração do gestor judicial.

26.        Esse MM. Juízo homologou os honorários propostos pelo gestor judicial na decisão de ID 126653. Contra esse *decisum*, o UMB interpôs o agravo de instrumento nº 0001493-02.2026.8.19.0000, o qual está pendente de julgamento. Logo, a matéria está sob a jurisdição da Exma. Sra. Desembargadora Relatora Mônica Maria Costa Di Piero, da 1ª Câmara Cível desse e. TJRJ, pelo que toda e qualquer discussão do UMB relativa à




Tribunal de Justiça do Estado do Rio de Janeiro
Página
**129865**
Certificado Eletronicamente

remuneração deverá ser feita em 2ª instância.

27.　　　Não obstante a isso, em paralelo, esse MM. Juízo enfrentou, na decisão de ID 127999, os argumentos expostos pelo UMB em seu agravo – quando cientificado da sua existência pela petição de ID. 127105 – tendo **rejeitado** as alegações nele veiculadas, bem como as que foram objeto do parecer do Ministério Público de ID 127301.

28.　　　Da mesma forma, não há o mínimo sentido lógico que esse MM. Juízo remeta um ofício ao CNJ para mencionar que o UMB está irresignado com procedimento de venda de uma UPI, com base em atos hipotéticos. Lá não é o foro competente para se dirimir isso. Se o UMB está irresignado, por mais absurdas que sejam as suas acusações, deve respeitar o rito legal dos recursos, submetendo as questões dessa recuperação a V.Exa. e a i. relatora preventa, em grau recursal.

## PEDIDO

29.　　　Diante de todo o exposto, requer-se sejam integralmente rejeitados os pedidos do UMB.

Nestes termos
P. deferimento.
Rio de Janeiro, 10 de fevereiro de 2026.


Luis Felipe Salomão Filho
OAB/RJ 234.563

Marcos Pitanga Ferreira
OAB/RJ 144.825

Bruno Rezende
(Na qualidade de Gestor Judicial
das Recuperandas)
OAB/RJ 124.405

Rodrigo Mendonça Raposo
OAB/RJ 154.448

Thiago Peixoto Alves
OAB/RJ 155.282

## **Exhibit E**

BTG Motion

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

---

*I, Patricia Stanzione Galizia, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that an electronic document was submitted to me, written in Portuguese, the translation of which is as follows:*

---

Letterhead of Bermudes Advogados

Stamp: "Rio de Janeiro State Court of Appeals – Page _ - Electronically stamped"

HONORABLE JUDGE OF THE 7th BUSINESS COURT OF THE JUDICIAL DISTRICT OF THE CAPITAL CITY OF THE STATE OF RIO DE JANEIRO

Case No. 0090940-03.2023.8.19.0001

(I) BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA RESPONSABILIDADE LIMITADA, registered with the National Corporate Taxpayers' Register of the Ministry of Finance (CNPJ/MF) under No. 35.640.787/0001-30, represented by its manager, BTG Pactual Gestora de Recursos Ltda., with its principal place of business in the City of São Paulo, State of São Paulo, at Avenida Brigadeiro Faria Lima, No. 3477, 14th floor, Itaim Bibi, Postal Code (CEP) 04538-133, registered with the National Corporate Taxpayers' Register of the Ministry of Economy (CNPJ/ME) under No. 09.631.542/0001-37; (II) BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA RESPONSABILIDADE LIMITADA, registered with the CNPJ/MF under No. 41.063.274/0001-07, represented by its manager, BTG Pactual Gestora de Recursos Ltda., with its principal place of business in the City of São Paulo, State of São Paulo, at Avenida Brigadeiro Faria Lima, No. 3477, 14th floor, Itaim Bibi, Postal Code (CEP) 04538-133, registered with the CNPJ/ME under No. 09.631.542/0001-37; (III) BTG PACTUAL INFRACO CO-INVESTORS FUND L.P., a company with its principal place of business in the city of Ontario, Canada, at Bay St. Commerce Court West, Suite 530, Postal Code M5L LB9; (IV) STANS 13, S.A., a joint-stock company with its principal place of business in the City of São Paulo, State of São Paulo, at Avenida Brigadeiro Faria Lima, No. 3477, 14th floor, Itaim Bibi, Postal Code (CEP) 04538-133, registered with the Commercial Registry of the State of São Paulo (JUCESP) under State Registration Number (NIRE) 35300676327 and registered with CNPJ/MF under No. 62.947.289/0001-08; and (V) BGC FIBRA PARTICIPAÇÕES S.A., a joint-stock company registered with the CNPJ/MF under No. 54.173.980/0001-53, with its principal place of business in the city of São Paulo, State of São Paulo, at Avenida Presidente Juscelino Kubitschek, No. 1.830, 1st floor, Tower 3, Vila Nova Conceição, Postal Code (CEP) 04543-90, in the case records of the judicial reorganization of OI S.A. – Under Judicial Reorganization et al., in progress in this Honorable Court, hereby informs, through its undersigned counsel (exhibit 1), pursuant to item 3 of the Bid Notice for the Sale of UPI V.tal (pages 128.988/128.995), that, on this date, it sent to the Oi Group, with a copy to the Judicial Administration and to the Judicial Manager, a Qualification Notice, accompanied by the documents required by item 3.1.1 of the Bid Notice for the Sale of UPI V.tal (exhibit 2).

Terms in which,

Granting is requested.

Rio de Janeiro, February 11, 2026.

<table>
<tr><td>(sgd)</td><td>(sgd)</td></tr>
<tr><td>Marcelo Lamego Carpenter</td><td>Ricardo Loretti</td></tr>
<tr><td>Brazilian Bar Association, Rio de Janeiro Chapter<br>OAB/RJ 92.518</td><td>Brazilian Bar Association, Rio de Janeiro Chapter<br>OAB/RJ 130.613</td></tr>
<tr><td>(sgd)</td><td>(sgd)</td></tr>
</table>

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português – Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/C5BM3-AH2YM-AUP5X-PHB3M.

Translation No. 041
Book No. 1
Page - 602 -

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

Eduarda Simonis

Brazilian Bar Association, Rio de Janeiro Chapter
OAB/RJ 200.986

Mathias Felipe Mattoso Badofszky

Brazilian Bar Association, Rio de Janeiro Chapter
OAB/RJ 235.056

TJRJ CAP EMP07 202600485622 02/11/26 11:55:04 PM 137019 PROGER-VIRTUAL

*IN WITNESS WHEREOF I set my hand and seal to this translation.*

*São Paulo, February 12, 2026*

_____

Patricia Stanzione Galizia
Certified Translator

pgi/274773.doc

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38-RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/C5BM3-AH2YM-AUP5X-PHB3M.



# SIGNATURES
# MANIFEST



## Validation code: C5BM3-AH2YM-AUP5X-PHB3M

Document signed with ICP Brazil digital certificates on Assinador ONR by the following signers:

Patricia Stanzione Galizia (CPF ***.120.998-**)

To verify signatures, access the  validation direct link for this document:

https://assinador.onr.org.br/validate/C5BM3-AH2YM-AUP5X-PHB3M

Or access the signed document search available at the link below and provide the validation code:

https://assinador.onr.org.br/validate

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/C5BM3-AH2YM-AUP5X-PHB3M.