# EXHIBIT A

Judiciary of the State of Rio de Janeiro PJe - Electronic Judicial Proceedings

02/09/2026

## Number: **0960108-88.2025.8.19.0001**

Class: **PRELIMINARY INJUNCTION**

Judging entity: **7th Commercial Court of the Capital District**

Last case assignment: **09/25/2025**

Reference case: **0090940-03.2023.8.19.0001**

Subject Matter: **Bankruptcy Proceedings**

Level of secrecy: **0 (Public)**

Legal aid? **NO**

Petition for an interlocutory order or preliminary injunction? **YES**

| Parties | Attorneys |
|---|---|
| **OI S.A. - IN JUDICIAL REORGANIZATION (PETITIONER)** | |
| | **TALITHA AGUILLAR LEITE (ATTORNEY)** |
| | **PAULO CALIL FRANCO PADIS (ATTORNEY)** |
| | **JOAO FELIPE VIANNA MARTINS DE ALMEIDA (ATTORNEY)** |
| | **MARCOS PITANGA CAETE FERREIRA (ATTORNEY)** |
| | **MARIANA LEONI BESERRA (ATTORNEY)** |
| | **LUIZ CARLOS MALHEIROS FRANCA (ATTORNEY)** |
| | **PAMELA VICTORIA FERREIRA FARIA (ATTORNEY)** |
| | **RAPHAELA VIEIRA MARQUES STEHLING MARIONI (ATTORNEY)** |
| | **AUGUSTO SILVA NERI (ATTORNEY)** |
| | **GABRIELA APARECIDA NOGUEIRA PALMA (ATTORNEY)** |
| | **GIULIANO ARANHA FREITAS (ATTORNEY)** |
| | **LUIS FELLIPE FREITAS MATEUS EGITO PINTO (ATTORNEY)** |
| **OI S.A. - IN JUDICIAL REORGANIZATION (RESPONDENT)** | |
| | **GILBERTO SILVA DE PAULA (ATTORNEY)** |
| | **ANDREZA CHRISTIANI CUNHA (ATTORNEY)** |

| Other participants | |
|---|---|
| **MUNICIPALITY OF RIO DE JANEIRO (INTERESTED PARTY)** | |
| **SECRETARY OF STATE FOR FINANCE AND PLANNING (INTERESTED PARTY)** | |
| **NATIONAL SOCIAL SECURITY INSTITUTE (INTERESTED PARTY)** | |
| **MINISTRY OF FINANCE (INTERESTED PARTY)** | |
| **ATTORNEY GENERAL OF THE FEDERAL DISTRICT (INTERESTED PARTY)** | |
| **OFFICE OF THE PROSECUTOR GENERAL OF THE STATE OF RIO DE JANEIRO (LAW ENFORCEMENT AGENCY)** | |
| **OFFICE OF THE RIO DE JANEIRO STATE ATTORNEY GENERAL (INTERESTED PARTY)** | |
| **1ST PUBLIC PROSECUTOR'S OFFICE FOR BANKRUPTCY ESTATES IN THE CAPITAL (400058) (INTERESTED PARTY)** | |

| | | | | |
|---|---|---|---|---|
| **PRESERVATION OF COURT-ORDERED REORGANIZATION, EXPERT TESTIMONY AND LEGAL COUNSEL (JUDICIAL ADMINISTRATOR)** | | | | |
| | | **BRUNO GALVÃO SOUZA PINTO DE REZENDE (ATTORNEY)** | | |
| **TATIANA BINATO DE CASTRO - INDIVIDUAL LAW FIRM (JUDICIAL ADMINISTRATOR)** | | | | |
| | | **TATIANA LOUREIRO BINATO DE CASTRO MICCIONE (ATTORNEY)** | | |
| **WALD ADMINISTRACAO DE FALÊNCIA E EMPRESAS EM RECUPERAÇÃO JUDICIAL LTDA (JUDICIAL ADMINISTRATOR)** | | | | |
| | | **ADRIANA CAMPOS CONRADO ZAMPONI (ATTORNEY)** | | |
| **FEDERAL ATTORNEY GENERAL'S OFFICE (INTERESTED PARTY)** | | | | |
| **PINTO MACHADO ADVOGADOS ASSOCIADOS (EXPERT WITNESS)** | | | | |
| | | **ADRIANO PINTO MACHADO (ATTORNEY)** | | |
| **NATIONAL TELECOMMUNICATIONS AGENCY (INTERESTED PARTY)** | | | | |

| Documents | | | |
|---|---|---|---|
| **Id.** | **Date of Signature** | **Document** | **Type** |
| 230429628 | 09/30/2025 15:50 | Ruling | Ruling |

## Judiciary of the State of Rio de Janeiro

### Capital District

### 7th Commercial Court of the Capital District

Palácio da Justiça, Avenida Erasmo Braga 115, Centro, RIO DE JANEIRO - RJ - CEP:

## **RULING**

Case: 0960108-88.2025.8.19.0001

Class: PRELIMINARY INJUNCTION (12134)

PETITIONER: OI S.A. - IN JUDICIAL REORGANIZATION

RESPONDENT: OI S.A. - IN JUDICIAL REORGANIZATION

# Case No. 0960108-88.2025.8.19.0001

RULING

     This is a motion assigned to this court due to its dependency on the primary judicial reorganization case initiated by the Oi Group (No. 0090940-03.2023.8.19.0001), filed by OI S.A. - IN JUDICIAL REORGANIZATION, PORTUGAL TELECOM INTERNATIONA FINANCE BV - IN JUDICIAL REORGANIZATION and OI BRASIL HOLDINGS COOPERATIEF UA - IN JUDICIAL REORGANIZATION, with a request for injunctive relief, to adopt measures *"for the reorganization of Oi: in line with the principle of company preservation", by ordering the suspension of the enforceability of the non-bankruptcy obligations of the Company subject to Reorganization for an initial period of sixty days and, consequently, the monetization of 6 thousand tons of buried copper*



*cable waste that are its property, which have already been extracted and are currently stored at the V. Tal distribution centers, through reimbursement to the latter for extraction costs in the amount of R$7.60 per kilo, since the obligations provided for in the LTLA contract will be suspended"(sic* - page 20 of the initial petition)

The motion traces the history of the company's financial crisis, consisting of structural and technological changes in the telecommunications sector, market by the obsolescence of services historically offered under onerous contracts.

The motion states that the company has been taking measures to overcome the difficulties, such as decommissioning the legacy project (Oscar Project), technological modernization (Phoenix Project), optimization of costs with suppliers, resizing costs (New Age Project), monetization of non-strategic assets and those that result in deficits, regularization and monetization of real estate, transactions with the Attorney General's Office, administrative efficiency and governance.

It argues that the company has been taking significant steps towards an effective reorganization of the financial health of the Oi Group, including operating results with a reversal trend, approaching balance and signaling the resumption of profitability in regular operations, as pointed out by the Watchdog in the primary proceedings. And this would be a strategic transition from a group focused on mass retail and services operating at a deficit to a leaner, more technological organization oriented towards digital and corporate solutions. All in accordance with Article 47 of the LTF, which deals with the preservation of the company, its corporate functions and the maintenance of employment.

The company adds that its bankruptcy would have serious repercussions on the telecommunications market and the public policy of digital inclusion in places where no other providers are available.

The above is for the purpose of eliminating the need for "equalization of non-bankruptcy liabilities", especially with mediation procedures.



It clarifies that despite the measures reported above, significant extra-bankruptcy liabilities exist, estimated at R$1.5 billion, the restructuring of which is limited by the instruments of the LRF, resulting in the search for alternative solutions, including the filing of Chapter 11 in the United States of America.

At a special hearing convened by the Hon. Appellate Court Judge Mônica Maria Costa Di Piero, held on September 11, 2025, an agreement was reached with V. Tal to set up two mediations: the first aimed at resolving operational issues ("Cash Flow 1") and the second aimed at resolving issues related to cash illiquidity ("Cash Flow 2").

Although it is optimistic that it will be able to make up relevant non-bankruptcy corridors, it needs to meet purely short-term operating expenses, which will only be achieved once the so-called "Cash Flow 2" has been resolved.

This is because the Oi Group's projected cash flow for September 30, 2025 is approximately 21 million and, if the temporary suspension of the enforceability of the credits to be recovered is not ordered, it could reach a negative 178 million by the end of October 2025.

It is therefore attempting to reverse the negative October projection in order to stabilize cash flow over the next sixty days.

The company points out that a similar measure was granted in the Light Group case, a transcript of which is included with its initial petition. It also states that it does not intend to propose an extensive interpretation of Article 20-B, §1 of the LRF, but rather to provide favorable conditions for negotiation.

It goes on to point out that the existence of public interest arising from the services it provides allows for judicial intervention, with its general power to issue injunctions



ordering the suspension of the enforceability of the non-bankruptcy claims, while their resolution is sought through mediation, as well as the sale of 6,000 tons of scrap buried copper cables, a transaction that could generate approximately 100 million reais in cash.

Furthermore, such an order would not be detrimental to the creditors, since the enforceability of their claims will be reestablished after the suspension period has elapsed, if no settlement is reached.

The company indicates that V. Tal and its controller, Banco BTG Pactual S.A., have been taking actions that show an inclination not to negotiate ("Cash Flow 1") and that aerial copper in its possession has also been seized (which is the subject of a police report), and that a statement has been made to the Superior Labor Court that it will refuse to pay invoices for services provided to it by Serede - including the filing of a consignment claim with the Labor Court for 56 million reais, instead of paying the workers. On the other hand, BTG withheld 12 million Reais related to the payment of the installment owed to the companies subject to reorganization for the sale of credits in December 2025, connected with the Sistel Social Security Foundation ("SISTEL") surplus. It later reported the assignment of the credit to another member of the BTG Group, of which the claimants were not informed.

It also states that it has significant strategic assets, such as its 27.26% stake in V. Tal, sponsorship of Oi in SISTEL, and its connection to Fundação Atlântico, which manages pension plans and has the capacity to fully pay debt installments scheduled for 2026 and 2027, credits held with various states, such as Santa Catarina (308 million reais), Pernambuco (29 million reais), the Federal District (41 million reais), Rio de Janeiro (287 million reais) and Sergipe (17 million reais), in addition to discussions with ANATEL regarding amounts paid as inspection fees, totaling 8.33 billion reais, highlighting the Telecommunications Inspection Fund, which has been adjusted to 17.2 billion reais. In addition to an accounts receivable portfolio of approximately 13.2 billion reais, with average recoveries of 8 million per month over the last six months, strategic operational assets such as AIX de Participações Ltda. and Timor Telecom S.A.



Finally, it undertakes to use its cash exclusively to cover operating expenses, as well as for agreements with the National Telecommunications Agency (ANATEL) and the Federal Audit Court (TCU), refraining from paying any bonuses or extraordinary remunerations to senior management.

Documents attached.

**The necessary Report has been prepared. The Court will now issue its RULING:**

There are a huge number of issues to be analyzed in view of the motion that has been submitted to this Court and its contents.

I will now address each of them in turn.

### - SEAL -

First, I note that no exceptional hypothesis exist in the sections of Article 189 of the CPC which would allow for the mitigation of the rule governing the public nature of judicial proceedings provided for in the Constitution of the Republic. No mention was made in the motion of any such exceptional circumstance. I therefore **order that seal attributed to the case** be **lifted** so that its contents may be made public.

## - THE JURISDICTION OF THE 7TH COMMERCIAL COURT OF THE CAPITAL OF RIO DE JANEIRO -


This document was generated by user 122.***.***-55 on 02/09/2026 15:29:10
Document number: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Electronically signed by: SIMONE GASTESI CHEVRAND – 09/30/2025 15:50:37

Also as a preliminary matter, the jurisdiction attributed to this Court to process the case must be analyzed, given the preventive measures established in the Oi Group's judicial reorganization proceedings (No. 0090940-03.2023.8.19.0001).

To that end, from the start, an inescapable fact exists: the Company subject to Reorganization claims that it has non-bankruptcy debts that it estimates at R$1.5 billion.

In other words, in addition to the discussion thus far in the primary judicial reorganization proceedings, which refer to the - probably substantial – breach of the obligations set forth in the approved JRP [Judicial Reorganization Plan], and which have been suspended by virtue of an interim relief measure granted by this Court (which was to remain in force until 08.31.2025 and was extended by the appellate court pending an analysis of the AMENDMENT TO THE JRP presented therein), the Petitioners affirm that they are also in breach of non-bankruptcy obligations.

Initially, it could be said that the bankruptcy court is not responsible to deal with non-bankruptcy debts. However, this court believes that it has absolute jurisdiction to deal with the matter put forth in the motion.

It is well known that the Oi Group once had vast assets. Today, however, it is extremely diminished and there are still doubts about its size.

The information provided by the Company subject to Reorganization over time, especially in the course of the second judicial reorganization, has proved to be inconsistent. For no other reason, in the records of the motion for the presentation of the Monthly Management Reports, the Judicial Administrator was ordered to promptly provide conclusions on compliance with the plan and the feasibility of maintaining this compliance. This began to be done by the Judicial Administrator in June 2025 and, in July, it began to receive information about the breaches (which were known to have begun in March 2025 for the most part, perhaps even earlier, when the 2nd Judicial Administrator was presented).



The inconsistency of information regarding assets is noted in a number of different ways. Regarding fixed assets, the Watchdog was told that there were 7,880 properties.

See page 119.272:

*"9. Therefore, based on the information initially provided, of the 7,880 (seven thousand, eight hundred eighty) properties, the real status of 7,500 (seven thousand five hundred) properties is unknown, since due diligence is still being undertaken to ascertain whether they are in the name of the Companies subject to Reorganization or any of their subsidiaries, or whether the properties are subject to any liens or encumbrances. (page 119.272, Judicial Observer's report)".*

However, 2,258 properties were reported soon afterwards:

*"In addition, this Judicial Observer introduces to the record the Updated Property List, from which it appears that, according to the most recent results of the due diligence process, the Oi Group owns 2,258 (two thousand, two hundred fifty-eight) properties that have not yet been sold, all legally registered in its name or that of its subsidiaries."* (page 121.109)

The cash balance reported to the Judicial Administrator and the Judicial Observer was R$915,331,014.00 (in July) which, at least in theory, would ensure that operating expenses would be covered for 8/9 months.

The Judicial Administrator agreed with those conclusions when it commented on the report (id. 120.406). And the Judicial Administrator pointed out that the amount alleged by the Watchdog (R$936,232,7914.71) would actually result in an available amount of just R$25,495,271.41 (in July 2025), since



This document was generated by user 122.***.***-55 on 02/09/2026 15:29:10
Document number: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Electronically signed by: SIMONE GASTESI CHEVRAND – 09/30/2025 15:50:37

No. 230429628 - Page 7

the remainder (R$915,331,014.00)          was blocked. Following is a quote from the statement of the Judicial Administrator:

> *"With regard to the cash balance, the Joint Judicial Administrator believes it is pertinent to add that, as presented in the 28th MAR [Monthly Activity Report] (pages 2967/2968 of the record in case 0132219-66.2023.8.19.000), the accounting balance reported by the Companies subject to Reorganization of R$ 936,232,791.71 as of July 2025 is not fully available for the payment of obligations, given the existence of blocked amounts of approximately R$ 915,331,014.00 (as of July), related to: (i) collateral with reciprocity of guarantee; (ii) amounts linked to ANATEL; and (iii) VTAL's restricted cash flow. Thus, the amount effectively available for use in operations in July 2025, is R$ 25,495,271.41, as reported by the Judicial Observer in his addendum."* (pages 120.410/120.411).

I would like to highlight the extremely serious financial deficit of the group subject to reorganization, as assessed by both the Watchdog and the Judicial Administrator, all of whom have the necessary technical expertise.

Following is a transcript of the conclusions of the Judicial Administrator, commenting on the Judicial Observer's report:

> *"VII. THE JOINT JUDICIAL ADMINISTRATOR'S CONCLUSION REGARDING THE JUDICIAL OBSERVER'S REPORT*
>
> *74. That said, the Joint Judicial Administrator believes that the report presented by the Judicial Observer accurately reflected the deficit accruing economic and financial situation of the Companies subject to Reorganization, in view of their financial statements, which provide evidence of the uncertain business continuity scenario already reported in the Monthly Activity Reports (MARs), since it was reported that the Companies subject to Reorganization do not generate sufficient cash flow to cover operating costs and expenses, a gross profit margin*



*as of December 2024 which is predominantly negative and EBIT which is dependent on extraordinary inflows (asset sales and intra-group transactions), without any structural reorganization having been observed, which is possibly due to the failure to materialize the assumptions set forth in the Judicial Reorganization Plan, in particular the lack of cash inflow from the sale of UPI Client Co, thereby jeopardizing the performance of bankruptcy and non-bankruptcy obligations, particularly those on the short and medium term.*

*75.    The Judicial Observer also pointed out that the total cash flow of the companies subject to reorganization (in the amount of R$936.2 million) would be able to last for a maximum of 9 months to cover the generation of negative cash flow if it were fully available, and that the amount actually available to the companies subject to reorganization is only approximately R$25 million, given the restrictions on the use of amounts with Anatel and other transactions, resulting in even more financial difficulties for the companies and corroborating the need to restore cash flow for operations.*

*76.    With regard to the cash flow projection contained in the Amendment to the JRP, the Joint Judicial Administrator corroborates the Judicial Observer's report that the new conditions set forth in the Amendment mitigate the financial situation of the Companies subject to Reorganization (compared to the current scenario), but do not substantially modify their cash flow for operations in the short term, since they necessarily depend on the sale of assets within the planned timetable and Capex discipline.*

*77.    In this context, the Joint Judicial Administrator, as complementary information, takes this opportunity to reiterate its report found on pages 116.055/116.058, in which it pointed to information regarding the feasibility report that provided guidance for the Amendment to the J.R.P. that lacks the solidity and consistency necessary to improve the ability of the affected creditors to make decisions, if the resolution in the A.G.C. is authorized.*

*78.    Pursuant to the prior request, the Judicial Administrator submits*


This document was generated by user 122.***.***-55 on 02/09/2026 15:29:10
Document number: 250930155037869000000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=250930155037869000000218767530
Electronically signed by: SIMONE GASTESI CHEVRAND – 09/30/2025 15:50:37

*this report for analysis by this Court, the Public Prosecutor's Office and all creditors/interested parties.*" (pages 120.425/120.426 of ID 120.406 of the primary files)

I am presenting all of the above information from the record of the primary case, public proceedings, to conclude that the information provided by the company subject to reorganization in this motion was already disclosed in the primary case. The difference is that it is now assumed that there is a billion-dollar non-bankruptcy debt that must be processed by this Court, given its maximum relevance to the course of the reorganization proceedings.

**I therefore declare that this court has jurisdiction to rule on the motion.**

**- ANTICIPATION OF THE EFFECTS OF THE INJUNCTION -**

That said, in this motion, the company is seeking a 60-day suspension of its non-bankruptcy obligations, in which it will attempt to make up the debts and sell scrap aerial copper, pointing out that its cash flow is currently R$21 million and this amount is insufficient to meet the obligations as of October 2025. This information on the reality of the company's cash flow is in line with the information provided by the Judicial Observer and the Judicial Administrator.

**Since this is the case, the suspension of non-bankruptcy obligations must be granted, but <u>not for the period or for the reasons given by the</u> <u>company subject to reorganization.</u>**

It is a fact that the Oi Group is responsible for providing innumerable essential services to the Brazilian population. Due to the company's history and its origins, it holds significant contracts through which it provides communications services in areas where no other telephone operator is available; it also provides stationary telephone services by maintaining payphones; it operates data centers that transmit signals to other operators; and it is also responsible for signals that serve 70% of CINDACTA.



Given the company's precarious financial situation, an order was issued to submit a transition plan for these services. However, the ruling of the Court was subject to an interlocutory appeal in which the ruling was upheld, but was deferred until the amendment to the JRP was analyzed. Which, as it turns out, is unlikely to occur.

Anatel was summoned and, in its statement, it clarified that the transition would not result in any major inconvenience to the national population. However, the same will probably not be true of the services covered by the CINDACTA operations.

Therefore, this Court believes **that it is imperative that a transition process be implemented for these services in order to ensure their continuity, out of respect for national public security**.

Thus, in view of the presumed impossibility of honoring the financial commitments of the Company subject to Reorganization, together with the need to ensure the continuity of the relevant public services it provides, **I rule that this motion will be used to implement the transition of the public services provided by the Oi Group.**

**In order to implement this transition, a number of steps will need to be taken, which I will now discuss.**

Previously, this Court had already pointed out the group's pre-bankruptcy situation, which was ratified by the Public Prosecutor's Office. Now it is clear that, when added to the need for the transitional phase described above, the partial anticipation of the effects of bankruptcy must be determined by this Court. This is necessary to ensure that the transition flows smoothly and carefully, as well as enabling the company to seek to negotiate with its creditors on reasonable terms in the interim.

It should be noted that it is not appropriate here to grant the bankruptcy decree requested by



numerous creditors in the primary case and in the motion filed for the purpose of opposing the amendment to the judicial reorganization plan that has been submitted.

Nor should the intended suspension of debts be granted in order to seek a settlement with creditors, which, as the company subject to reorganization has itself pointed out, would amount to a third judicial reorganization, which is forbidden by law under the existing circumstances.

The hypothesis is to partially anticipate the effects of the liquidation, with a view to the necessary transition of the provision of essential services for which the company subject to reorganization is responsible, while at the same time allowing it to negotiate with its creditors. Only after the expiration of the period, **which I now set at 30 (thirty) days**, will a decision be made regarding whether the company will be fully liquidated or whether the reorganization process will continue.

The anticipation of the effects of the liquidation is supported by the court's general power to order injunctive relief, in view of the situation provided for in Article 73, §1 of Law 11.101 of the LRF, the need to ensure the continuity of the public services it provides and the viability, even if minimal, of the company's continuity, even if in a significantly reduced capacity (which substantiate the *fumus* and *periculum*).

On the other hand, both the reports of the judicial observer and the most recent MARs presented by the Judicial Administrator converge in the sense that the assets of the company subject to reorganization have been drained, even more severely from December 2024 onwards.

In fact, the state of Rio de Janeiro has already taken a stance on the matter, when it filed a motion for clarification against the decisions that approved the sale of UPI ClientCo (fiber optics) and the television signal. Always strong on the argument regarding the draining of assets. It also insisted on the presentation of a real and updated list of the properties owned by the company subject to reorganization.



Although this court ordered the submission of a property list (which was said to be around 7,500), it denied the motions for clarification submitted by the State of Rio de Janeiro, based on the firm understanding that these sales were the result of the judicial reorganization plan that had been ratified and, therefore, would constitute mere compliance with that plan.

However, these rulings were made in light of the existing MARs, which did not yet show the extent to which the company subject to reorganization was financially compromised. It should be remembered that it was only in July 2025 that breach of obligations began to be reported (and, at that time, there was only talk of breach of bankruptcy obligations and a few non-bankruptcy obligations).

The fact is that there are very strong indications that the debtor's assets are being drained, implying its substantial liquidation, which appears to be subject to paragraph VI of Article 73 of the applicable Law. It should be noted that, although these significant conveyances were provided for in the JRP, they were decided without the involvement of the labor creditors, who would be affected by the draining of the assets, since the "amendment" presented sought to include them in the plan.

Next, I refer to the fact that UPI ClientCo did not bring monetized assets to the reorganization. In fact, according to the company subject to reorganization, the cash flow is now so compromised precisely for this reason, since it essentially involved the "offsetting" of credits.

Keeping this in mind, I believe that the provisions of §2 of Article 73 of the LRF should apply. Therefore, although the effectiveness of the act is maintained for the present, the shares of NIO (the company into which ClientCo - Oi Fibra - was transformed) will remain unavailable as surety.

There are also well-founded uncertainties about the transactions challenged by the Public Prosecutor's Office (id 120.227): the arbitration being processed by the International Chamber of Commerce and the arbitration involving ANATEL and TCU.



As far as the latter is concerned, it was already revealed in the primary case that it involved changing the public telephone service concession regime to "authorization". The first regime would end in December 2025, while the agreed change to the "authorization" regime would remain in effect until 2028.

Without going into the legality of the agreement reached by Oi, Anatel and V.Tal with the TCU, the fact is that the services addressed there - telephone services - will be the subject of a transition process in the motion that has been filed.

Therefore, the value of the aforementioned arbitration must also be taken into consideration in this case, both because of the application of the same legal provision invoked (Article 73, §2 of the LRF) as well as in order to maximize assets to ensure that the creditors are satisfied.

Furthermore, also due to the reported draining of assets, the provision of erroneous information, the hiring of professionals at extremely high costs (taking into account the hiring of attorneys to initiate Chapter 11 proceedings in the USA in the amount of US$100 million – which is completely incompatible with the reorganization situation), and the failure to present a transition plan, this Court is of the opinion that the effects of the preliminary injunction should extend to the removal of the Oi Group's administrators, its Executive Board and Board of Directors, as well as a prohibition on the hiring of INTEGRA, the company of the CEO (Mr. Marcelo Millet), whose "consulting services" have been repeatedly contracted in the business transactions that have been effectuated.

The transition process will be the responsibility of the Judicial Administrator, in the person of Dr. BRUNO REZENDE (PRESERVA), with the remaining judicial administrators carrying out their usual duties. The aforementioned judicial administrator will also act as the judicial manager of the company, responsible for its operations at this time and for bringing to the attention of this Court any and all transactions carried out by the company that involve the encumbrance or conveyance of its assets.

And with regard to the subsidiaries, the truth of the matter is that they are administered



by the same management team: The Executive Board and Board of Directors, who are also removed from the Board of Directors, are also prevented from hiring INTEGRA as a consultant.

As far as they are concerned, the subsidiaries should also be addressed here, since they filed for judicial reorganization, had their obligations suspended by extension of the suspension ordered in the primary case - the reorganization of the Oi Group, but are notoriously impacted by the financial insufficiency of their controller.

In order to implement the transition of the subsidiaries and their management, I have appointed Dr. TATIANA BINATO, who has well-known qualifications, since she carried out the "prior verification" in the respective case. She will have the same responsibilities as Dr. Bruno Rezende, as defined above. As soon as she is notified of this order, she must state whether she accepts the task, sign an agreement and estimate her fees. If her answer is affirmative, she will begin work immediately.

Both administrators will assist the remaining management of the companies which is not being removed under the terms of this order and they should make every effort to negotiate with their creditors during the suspension period, in this final opportunity to for reestablishment.

**In view of the above, I hereby issue the following RULING:**

1)  Proceed to lift the SEAL attributed to this motion;

2)  Designate this instrument as a "MOTION FOR THE TRANSITION OF ESSENTIAL PUBLIC SERVICES";

3) PARTIALLY ANTICIPATE the effects of the liquidation to:

   3.1) SUSPEND the due and past-due non-bankruptcy obligations for a period of 30 (thirty) days;


This document was generated by user 122.***.***-55 on 02/09/2026 15:29:10
Document number: 2509301550378690000021876753O
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Electronically signed by: SIMONE GASTESI CHEVRAND – 09/30/2025 15:50:37

3.2) REMOVE the Executive Board and Board of Directors from the management of the companies, Grupo Oi and subsidiaries Serede and Tahto;

3.3) ORDER that no business be conducted through the ÍNTEGRA company;

3.4) ORDER that the shares of NIO and the value of the arbitration that is the subject of the settlement between Oi, V.Tal and Anatel, before the TCU, are unavailable. An agreement in that regard is to be prepared and signed;

4) APPOINT Dr.  Bruno Rezende to implement the public services transition process and partially intervene in the Oi Group, as provided for above;

5) APPOINT Dr.  Tatiana Binato to implement the public services transition process underlying those provided by Oi through Serede and Tahto, and to partially intervene in the two subsidiaries, as provided for above;

6) ORDER that a copy of this document be attached to the judicial reorganization proceedings of the Oi Group and its subsidiaries Serede and Tahto;

7) Inform the Public Prosecutor's Office. All parties mentioned herein should be immediately notified. Anatel, CADE, TCU, Ministry of Aeronautics, Stock Exchange and CVM should be served with notice.

RIO DE JANEIRO, September 30, 2025.

SIMONE GASTESI CHEVRAND
Presiding Judge



THE STATE OF TEXAS          }
                           }
COUNTY OF FORT BEND   }

### AFFIDAVIT OF ACCURACY

BEFORE ME, the undersigned authority, on this day personally appeared Maria C. Sanchez, who, by oath and by presentation of identification, is personally known to me to be the person subscribing her name below and, after being by me duly sworn according to law, upon her oath deposes and says in due form of law that to the best of her knowledge, information and belief:

1.  "My name is Maria C. Sanchez, and I am over the age of twenty-one years and competent to make this affidavit."

2.  I speak, read, and write fluently in both the English and Spanish languages.

3.  I have been a professional legal translator since 1992 and graduated from the University of Salvador, Argentina with a degree in Legal and Technical Translations. For the past 22 years, I have worked as a chief editor and linguist for hundreds of documents in international arbitrations, litigation, and contracts and I am currently a Project Manager at TransLite Solutions, LLC.

4.  I hereby certify that the translator that performed the translation of the document in Portuguese into English, titled *"Tutela Cautelar Antecedente"*, is a professional legal translator, with over 15 years of experience in translations of English<>Portuguese and qualified to render an accurate translation.

**Translator: *Harriet Bosley***

MARIA CONCEPCION SANCHEZ

Sworn to before me this  03-02-26

Notary Public in and for the State of Texas
My commission expires:  09/12/2028

DANIEL LEGARIA-CAMPUZANO
NOTARY PUBLIC
STATE OF TEXAS
ID #135085663
EXPIRES 09/12/2028

Certified Translations

Poder Judiciário do Estado do Rio de Janeiro
PJe - Processo Judicial Eletrônico

09/02/2026

Número: **0960108-88.2025.8.19.0001**

Classe: **TUTELA CAUTELAR ANTECEDENTE**
Órgão julgador: **7ª Vara Empresarial da Comarca da Capital**
Última distribuição : **25/09/2025**
Processo referência: **0090940-03.2023.8.19.0001**
Assuntos: **Concurso de Credores**
Nível de Sigilo: **0 (Público)**
Justiça gratuita? **NÃO**
Pedido de liminar ou antecipação de tutela? **SIM**

| Partes | Advogados |
|---|---|
| **OI S.A. - EM RECUPERAÇÃO JUDICIAL (REQUERENTE)** | |
| | **TALITHA AGUILLAR LEITE (ADVOGADO)** **PAULO CALIL FRANCO PADIS (ADVOGADO)** **JOAO FELIPE VIANNA MARTINS DE ALMEIDA (ADVOGADO)** **MARCOS PITANGA CAETE FERREIRA (ADVOGADO)** **MARIANA LEONI BESERRA (ADVOGADO)** **LUIZ CARLOS MALHEIROS FRANCA (ADVOGADO)** **PAMELA VICTORIA FERREIRA FARIA (ADVOGADO)** **RAPHAELA VIEIRA MARQUES STEHLING MARIONI (ADVOGADO)** **AUGUSTO SILVA NERI (ADVOGADO)** **GABRIELA APARECIDA NOGUEIRA PALMA (ADVOGADO)** **GIULIANO ARANHA FREITAS (ADVOGADO)** **LUIS FELLIPE FREITAS MATEUS EGITO PINTO (ADVOGADO)** |
| **OI S.A. - EM RECUPERAÇÃO JUDICIAL (REQUERIDO)** | |
| | **GILBERTO SILVA DE PAULA (ADVOGADO)** **ANDREZA CHRISTIANI CUNHA (ADVOGADO)** |

| Outros participantes | |
|---|---|
| **MUNICIPIO DE RIO DE JANEIRO (INTERESSADO)** | |
| **SECRETARIA DE ESTADO DE FAZENDA E PLANEJAMENTO (INTERESSADO)** | |
| **INSTITUTO NACIONAL DO SEGURO SOCIAL (INTERESSADO)** | |
| **MINISTERIO DA FAZENDA (INTERESSADO)** | |
| **PROCURADORIA GERAL DO DISTRITO FEDERAL (INTERESSADO)** | |
| **MINISTERIO PUBLICO DO ESTADO DO RIO DE JANEIRO (FISCAL DA LEI)** | |
| **RIO DE JANEIRO PROCURADORIA GERAL DO ESTADO (INTERESSADO)** | |
| **1ª PROMOTORIA DE JUSTIÇA DE MASSAS FALIDAS DA CAPITAL ( 400058 ) (INTERESSADO)** | |

| PRESERVAR ADMINISTRACAO JUDICIAL PERICIA E CONSUL (ADMINISTRADOR JUDICIAL) | |
|---|---|
| | BRUNO GALVÃO SOUZA PINTO DE REZENDE (ADVOGADO) |
| TATIANA BINATO DE CASTRO - SOCIEDADE INDIVIDUAL DE ADVOCACIA (ADMINISTRADOR JUDICIAL) | |
| | TATIANA LOUREIRO BINATO DE CASTRO MICCIONE (ADVOGADO) |
| WALD ADMINISTRACAO DE FALENCIAS E EMPRESAS EM RECUPERACAO JUDICIAL LTDA (ADMINISTRADOR JUDICIAL) | |
| | ADRIANA CAMPOS CONRADO ZAMPONI (ADVOGADO) |
| ADVOCACIA GERAL DA UNIAO (INTERESSADO) | |
| PINTO MACHADO ADVOGADOS ASSOCIADOS (PERITO) | |
| | ADRIANO PINTO MACHADO (ADVOGADO) |
| AGENCIA NACIONAL DE TELECOMUNICACOES (INTERESSADO) | |

| Documentos | | | |
|---|---|---|---|
| Id. | Data da Assinatura | Documento | Tipo |
| 230429628 | 30/09/2025 15:50 | Decisão | Decisão |

**Poder Judiciário do Estado do Rio de Janeiro**

**Comarca da Capital**

**7ª Vara Empresarial da Comarca da Capital**

Palácio da Justiça, Avenida Erasmo Braga 115, Centro, RIO DE JANEIRO - RJ - CEP:

## <u>DECISÃO</u>

Processo: 0960108-88.2025.8.19.0001

Classe: TUTELA CAUTELAR ANTECEDENTE (12134)

REQUERENTE: OI S.A. - EM RECUPERACAO JUDICIAL

REQUERIDO: OI S.A. - EM RECUPERAÇÃO JUDICIAL

# Processo nº 0960108-88.2025.8.19.0001

## D E C I S Ã O

Trata-se de incidente distribuído por dependência ao processo principal de recuperação judicial do Grupo Oi (nº 0090940-03.2023.8.19.0001), movido por OI S.A. – EM RECUPERAÇÃO JUDICIAL, PORTUGAL TELECOM INTERNATIONA FINANCE BV – EM RECUERAÇÃO JUDICIAL e OI BRASIL HOLDINGS COOPERATIEF UA – EM RECUPERAÇÃO JUDICIAL, com pedido de concessão de tutela de urgência liminar, para adoção de medidas *"para o soerguimento da Oi: consonância com princípio da preservação da empresa"*, mediante a determinação da suspensão da exigibilidade de obrigações extraconcursais das Recuperandas, pelo prazo inicial de sessenta dias e, consequentemente, a monetização das 6 mil toneladas



*de sucata de cabos subterrâneos de cobre de sua propriedade, já extraídas e atualmente armazenadas nos centros de distribuição da V.Tal, mediante o reembolso a esta pelos custos de extração, no valor de R$7,60 por quilo, uma vez que as obrigações previstas no contrato LTLA estarão suspensas*" (*sic* – fl. 20 da petição inicial)

Traça histórico de sua crise financeira, gravada pelas transformações estruturais e tecnológicas no setor de telecomunicações, marcado pela obsolescência de serviços historicamente oferecidos por contratos onerosos.

Diz que vem empreendendo medidas para contornar as dificuldades, exemplificando-as com o descomissionamento do legado (Projeto Oscar), a modernização tecnológica (Projeto Fênix), a otimização de custos com fornecedores, o redimensionamento de custos (Projeto New Age), a monetização de ativos não estratégicos e deficitários, a regularização e monetização de imóveis, a transação junto à Procuradoria-Geral da Fazenda Nacional, a eficiência administrativa e governança.

Aduz que vem adotando passos importantes no caminho de uma recuperação efetiva da saúde financeira do Grupo Oi, inclusive com resultados operacionais com tendência de reversão, aproximando-se do equilíbrio e sinalizando a retomada da lucratividade nas operações regulares, como apontado pelo Watchdog nos autos principais. E isto seria uma transição estratégica de um grupo voltado ao varejo de massa e serviços deficitários para uma organização mais enxuta, tecnológica e orientada a soluções digitais e corporativas. Tudo em atenção ao previsto no art. 47 da LTF que trata da preservação da empresa, sua função social e a manutenção de empregos.

Acrescenta que sua falência teria graves repercussões para o mercado de telecomunicações e para a política pública de inclusão digital nas localidades em que não há outros provedores.

Tudo isto para arrematar com a necessidade de "equalização do passivo extraconcursal", especialmente com procedimentos de mediação.



Esclarece que a despeito das medidas relatadas, há passivo extraconcursal relevante, estimado em R$1,5 bilhão, cuja restruturação é limitada pelos instrumentos da LRF, ensejando busca de soluções alternativas, dentre as quais se inseriu a deflagração do Chapter 11 nos Estados Unidos da América.

Em sede de audiência especial convocada pela i. Desembargadora Mônica Maria Costa Di Piero, realizada em 11 de setembro de 2025, foi acordado com a V.Tal a instauração de duas mediações: a primeira voltada ao equacionamento de questões operacionais ("Caixa 1") e, a segunda, ao tratamento da iliquidez de caixa ("Caixa 2).

Muito embora esteja otimista quanto a composição com corredores extraconcursais relevantes, necessita fazer frente à despesas meramente operacionais de curto prazo, o que apenas será obtido após o equacionamento da denominada "Caixa 2".

Assim porque o fluxo de caixa do Grupo Oi projetado para 30.09.2025 é de aproximadamente 21 milhões e, caso não determinada a suspensão temporária da exigibilidade dos créditos a serem recompostos, poderá chegar a 178 milhões negativos no final de outubro de 2025.

Portanto, pretende reverter a projeção negativa de outubro para estabilizar o caixa pelo período de sessenta dias.

Destaca que providência assemelhada foi deferida no processo do Grupo Light, cuja transcrição faz constar de sua inicial. E que não pretende a interpretação extensiva do artigo 20-B, §1º da LRF, mas sim de propiciar condições favoráveis à negociação.

Prossegue lembrando que a existência de interesse público decorrente dos serviços prestados permite a intervenção judicial, com seu poder geral de cautela,


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37
Num. 230429628 - Pág. 3

para determinar a suspensão da exigibilidade dos créditos extraconcursais, enquanto se busca sua composição pela mediação, bem como a venda de 6 mil toneladas de sucata de cabos subterrâneos de cobre, operação esta que pode gerar aproximadamente 100 milhões de reais ao seu caixa.

Ainda, que inexistirá prejuízo aos credores, à medida que a exigibilidade de seus créditos será restabelecida após o decurso do prazo de suspensão, caso não alcançada composição.

Indica que a V.Tal e seu controlador, Banco BTG Pactual S.A., vem adotando ações que demonstram inclinação de não negociarem ("Caixa 1") e, também, reteve cobre aéreo arrecadado em sua posse (objeto de registro de ocorrência policial), bem como declarou ao Superior Tribunal do Trabalho que não pagará faturas relativas a serviços a ela pela Serede – inclusive ajuizando ação consignatória na Justiça Laboral, no valor de 56 milhões de reais, ao invés de proceder ao pagamento dos trabalhadores. Por sua vez, o BTG reteve 12 milhões do reais referente ao pagamento de parcela devida às recuperandas pela venda de crédito em dezembro de 2025, vinculada ao superávit da Fundação Sistel de Seguridade Social ("SISTEL"). Sendo que após informou a cessão do crédito a outro membro do Grupo BTG, cessão esta da qual não deu ciência as autoras.

Diz, mais, que possui importantes ativos estratégicos, como a participação societária de 27,26% na V.Tal, o patrocínio da Oi na SISTEL, vinculação à Fundação Atlântico, que gere planos previdenciários e tem capacidade de quitar integralmente e parcelas de dívidas previstas para 2026 e 2027, créditos detidos junto a diversos Estados, como Santa Catarina (308 milhões de reais), Pernambuco (29 milhões de reais), Distrito Federal (41 milhões de reais), Rio de Janeiro (287 milhões de reais) e Sergipe (17 milhões de reais, além de discussões com a ANATEL sobre valores pagos a título de taxa de fiscalização, totalizando 8,33 bilhões de reais, com destaque para o Fundo de Fiscalização de Telecomunicações, atualizado para 17,2 bilhões. Além de carteira de recebíveis, de aproximadamente 13,2 bilhões de reais, com média de recuperação de 8 milhões por mês nos últimos seis meses, ativos estratégicos operacionais, como AIX de Participações Ltda., e Timor Telecom S.A.


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

Por fim, compromete-se a utilizar seu caixa exclusivamente para o custeio de despesas operacionais, bem como para acordos com a Agência Nacional de Telecomunicações (ANATEL) e com o Tribunal de Contas da União (TCU), abstendo-se de realizar qualquer pagamento de bônus ou remuneração extraordinária a membros da administração estatutária.

Junta documentos.

**Feito necessário Relatório. Passo a DECIDIR:**

Há uma enormidade de questões a serem analisadas diante do presente incidente ora submetido a este Juízo e do conteúdo que ele encerra.

Passo ao enfrentamento gradual de todas elas.

## - O SEGREDO DE JUSTIÇA –

De início, não vislumbro, na espécie, qualquer hipótese excepcional, insculpida nos incisos do art. 189 do CPC, que autorize mitigar a regra da publicidade dos processos judiciais prevista na Constituição da República. Não foi sequer apontada qual razão levaria a tal excepcionalidade. Desta forma, **determino o levantamento do sigilo atribuído ao processo** para que seja publicizado seu conteúdo.

## - A COMPETÊNCIA DA 7ª VARA EMPRESARIAL DA CAPITAL DO RIO DE JANEIRO -



Ainda em sede preliminar, há de ser analisada a competência atribuída a este Juízo para o processamento do feito, diante da prevenção estabelecida pelo curso do processo de recuperação judicial do Grupo Oi (nº 0090940-03.2023.8.19.0001).

E, para tanto, já de início, traz-se constatação inafastável: a Recuperanda afirma possuir débito extraconcursal que estima em R$1,5 bilhão.

Ou seja, além da discussão até agora travada nos autos principais da recuperação judicial, que refere ao descumprimento – provavelmente substancial – das obrigações previstas no PRJ homologado, e que se encontram suspensas por força de decisão cautelar deste Juízo (a qual vigoraria até 31.08.2025 e foi prorrogada pela e. 2ª instância até momento da análise do ADITAMENTO AO PRJ lá apresentado), afirmam as Autoras que também estão inadimplentes para com o cumprimento de obrigações extraconcursais.

A princípio, poder-se-ia dizer que não cabe ao juízo recuperacional tratar de débito extraconcursal. Contudo, entende este Juízo ser sua a competência, inclusive absoluta, para tratar do que aqui se deliberará.

Bem se sabe que o Grupo Oi já possuiu vasto patrimônio. Hoje, porém, ele está reduzidíssimo e ainda há fundadas dúvidas sobre sua extensão.

As informações dadas pela Recuperanda ao longo do tempo, especialmente no curso da segunda recuperação judicial, se mostraram inconsistentes. Não por outro motivo, nos autos do incidente para apresentação dos Relatórios Mensais de Administração, foi determinada a AJ que passasse a indicar, pontualmente, conclusões sobre o cumprimento do plano e viabilidade de manutenção desse cumprimento. Isto passou a ser realizado pela Administração Judicial em junho de 2025 e, em julho, já teve início a vinda de informações sobre os descumprimentos (que após se soube terem iniciado, em grande parte, aproximadamente em março de 2025, quiçá ainda anteriormente, por ocasião da apresentação da 2ª RJ).



A inconsistência das informações sobre o patrimônio se verifica de diversas formas. Quanto aos ativos imobilizados, foi dito ao Watchdog serem de 7.880 imóveis.

Confira-se fl. 119.272:

*"9. Portanto, segundo as informações inicialmente prestadas, dos 7.880 (sete mil, oitocentos e oitenta) imóveis, não se sabe a real situação de 7.500 (sete mil e quinhentos) imóveis , que ainda se encontram em processo de due diligence para aferir se estão em nome das Recuperandas ou de alguma de suas subsidiárias, ou se sobre eles recai qualquer constrição ou gravame. (fl. 119.272, laudo do Observador Judicial)".*

Logo após, porém, foi informada existência de 2.258 imóveis:

*"Somado a isso, este Observador Judicial traz aos autos a Relação Atualizada dos Imóveis, dos quais se extrai que, de par com os resultados mais recentes do processo de due diligence, o Grupo Oi possui 2.258 (dois mil, duzentos e cinquenta e oito) imóveis ainda não vendidos, todos regularmente registrados em seu nome ou de suas subsidiárias."* (fl. 121.109)

O saldo de caixa informado a Administração Judicial e ao Observador Judicial era de R$915.331.014,00 (em julho) o que, ao menos em tese, asseguraria manutenção de despesas operacionais por 8/9 meses.

Com suas conclusões concordou a Administração Judicial, ao manifestar-se a respeito do laudo (id. 120.406). E foi a Administração Judicial quem apontou para o fato de que o valor acusado pelo Watchdog (R$936.232.7914,71), na realidade, resultaria em R$25.495.271,41 disponíveis (em julho de 2025). Pois o


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

restante (R$915.331.014,00) estava bloqueado. Transcrevo trecho do pronunciamento da Administração Judicial:

> *"Quanto ao saldo de caixa, a Administração Judicial Conjunta entende pertinente complementar que, conforme apresentado no 28º RMA (fls 2967/2968, processo 0132219-66.2023.8.19.000), o saldo contábil informado pelas Recuperandas de R$ 936.232.791,71 em julho de 2025 não está integralmente disponível para pagamento de obrigações, ante a existência de montantes bloqueados na ordem de aproximadamente R$ 915.331.014,00 (emjulho), relacionados a: (i) colaterais com reciprocidade de fiança; (ii) valores vinculados à ANATEL; e (iii) caixa restrito da VTAL. Assim, o valor efetivamente disponível para utilização na operação, em julho de 2025, é de R$ 25.495.271,41, como reportado pelo Observador Judicial em seu adendo."* (fls. 120.410/120.411).

Destaco a gravíssima situação de déficit financeiro do grupo em recuperação aferida tanto pelo Watchdog como pela Administração Judicial, todos dotados de expertise em questões técnicas necessárias para tanto.

Transcrevo as conclusões da Administração Judicial, ao comentar o laudo do Observador Judicial:

> *"VII. DA CONCLUSÃO DA ADMINISTRAÇÃO JUDICIAL CONJUNTA ACERCA DO LAUDO DO OBSERVADOR JUDICIAL*
>
> *74. Isso posto, a Administração Judicial Conjunta entende que o laudo apresentado pelo Observador Judicial bem retratou a situação econômico-financeira deficitária das Recuperandas, à luz das suas demonstrações financeiras, evidenciando o cenário de incertezas em relação à continuidade dos negócios, já noticiado nos Relatórios Mensais de Atividades (RMAs), ao reportar que as atividades das Recuperandas não geram caixa suficiente paracobrir os custos e despesas operacionais, gerando, a partir de dezembro de 2024, margem*


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

*bruta predominantemente negativa e o EBIT dependente de ingressos extraordinários (venda de ativos e operações intragrupo), sem que tenha sido observada uma recomposição estrutural, o que possivelmente decorreu do não aperfeiçoamento de premissas previstas no Plano de Recuperação Judicial, em especial o não ingresso de caixa em razão da venda da UPI Client.Co, o que compromete o cumprimento das obrigações concursais e extraconcursais, em especial as de curto e médio prazo.*

*75. O Observador Judicial bem atentou ainda que o total de caixa das recuperandas (no importe de R$ 936,2 milhões) teria condições de durar, no máximo, 09 meses para suprir a geração de caixa negativo acaso totalmente disponível, sendo que o valor efetivamente disponível às recuperandas cinge em torno de R$ 25 milhões, ante a restrição de uso dos valores junto à Anatel e outras operações, o que traz ainda mais dificuldades financeiras para as recuperandas e corrobora a necessidade de recomposição do caixa operacional.*

*76. Quanto à projeção do Fluxo de Caixa constante do Aditamento ao PRJ, a Administração Judicial Conjunta corrobora o registro do Observador Judicial no sentido de que as novas condições previstas no Aditamento atenuam a situação financeira das Recuperandas (se comparada com o cenário atual), mas não modificam substancialmente seu fluxo de caixa operacional no curto prazo, por dependerem obrigatoriamente da venda de ativos dentro do cronograma previsto e de disciplina de Capex.*

*77. Nesse contexto, a Administração Judicial Conjunta, a título complementar, aproveita o ensejo para reiterar seu relatório de fls. 116.055/116.058, onde apontou informações em relação ao laudo de viabilidade que instruiu o Aditamento ao P.R.J que carecem de solidez e consistências necessárias para melhor a tomada de decisão dos credores afetados, acaso seja autorizada a deliberação em A.G.C.*

*78. Sendo o que cabia, a Administração Judicial submete o*


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

*presente relatório à análise desse d. Juízo, do Ministério Público e de todos os credores/interessados.*" (fls. 120.425/120.426 do ID 120.406 dos autos principais)

Trago tudo isso que consta dos autos principais, processo público, para concluir que o narrado pela recuperanda, neste incidente, já havia sido revelado nos autos principais. A diferença é que agora é assumida existência de bilionário débito extraconcursal que há de ser processado por este Juízo, haja vista máxima relevância para o curso do processo recuperacional.

**Declaro, pois, a competência deste Juízo para o processamento do feito.**

### - A ANTECIPAÇÃO DOS EFEITOS DA TUTELA -

Dito isto, neste incidente, busca a recuperanda a suspensão das obrigações extraconcursais pelo prazo de 60 dias, no qual buscará compor os débitos e alienar sucata de cobre aéreo, destacando que seu caixa, no momento, é de R$21 milhões e este valor é insuficiente para fazer frente às obrigações já de outubro de 2025. Esta informação sobre a realidade do seu caixa ora trazida converge com as do Observador Judicial e da Administração Judicial.

**Pois bem. O deferimento da suspensão de obrigações extraconcursais se impõe. Contudo, <u>não pelo período nem pelos motivos trazidos pela recuperanda</u>.**

É fato que o Grupo Oi é responsável pela prestação de inúmeros serviços essenciais à população brasileira. Pelo histórico da empresa e de sua origem, detém relevantes contratos através dos quais assegura comunicação em áreas em que nenhuma outra operadora de telefonia chega; ainda presta serviços de telefonia fixa, com manutenção de orelhões; explora centrais de dados que propalam sinal a outras operadoras; e, também, responde por sinais que atendem a 70% do CINDACTA.


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

Num. 230429628 - Pág. 10

Já sendo vista a precária situação financeira da empresa, foi a ela determinada apresentação de plano de transição desses serviços. Contudo, esta determinação do Juízo foi objeto de agravo de instrumento no qual ela foi mantida, mas diferida até o momento de análise do aditamento ao PRJ. O que, como se vê, provavelmente não chegará a ocorrer.

Anatel foi intimada e, em sua manifestação, esclareceu que a transição não gerará maiores transtornos à população nacional. Provavelmente o mesmo não se dará em relação aos serviços que guarnecem operação do CINDACTA, contudo.

Logo, entende este Juízo **que é imperativa a realização de processo de transição desses serviços, de modo a assegurar suas continuidades, em respeito à segurança pública nacional**.

Deste modo, haja vista a assumida impossibilidade de honrar compromissos financeiros trazida pela Recuperanda, aliada à necessidade de assegurar a continuidade do relevante serviço público que ela presta, **resolvo que este incidente se destinará ao processamento da transição dos serviços públicos prestados pelo Grupo Oi.**

**Para implementar esta transição, necessária adoção de diversas providências, as quais passo a tratar.**

Anteriormente, este Juízo já havia pontuado a situação pré-falimentar do grupo, o que foi referendado pelo órgão do Ministério Público. Agora, ela sobressai, o que, somado à necessidade da fase transitória acima descrita, determina a antecipação parcial dos efeitos da falência por este Juízo. Isto para que a transição flua de forma serena e ponderada, assim como fique viabilizado à empresa buscar negociar com seus credores em termos razoáveis no interregno.

Veja-se que não cabe, aqui, conceder a decretação da falência requerida por


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

Num. 230429628 - Pág. 11

inúmeros credores no processo principal e no incidente criado para oposições ao aditamento ao plano de recuperação judicial apresentado.

Tampouco de deferir a pretendida suspensão dos débitos para busca de composição com credores o que, como salientado pela própria recuperanda, importaria em uma terceira recuperação judicial, vedada pela lei de regência nas circunstâncias existentes.

A hipótese é, sim, de antecipar, em parte, os efeitos da liquidação, visando a necessária transição da prestação dos serviços essenciais que incumbem à recuperanda, ao mesmo tempo em que se lhe permite negociar com seus credores. Para, somente após o decurso do prazo, **que ora fixo em 30 (trinta) dias**, se resolva acerca da liquidação integral, ou continuação do processo recuperacional.

A antecipação dos efeitos da liquidação tem respaldo no poder geral de cautela do juízo, diante da situação prevista no art. 73, §1º da Lei 11.101 da LRF, da necessidade de se assegurar a continuidade do serviço público que ela presta e da viabilidade, ainda que mínima, de continuidade da empresa, mesmo que de forma bastante reduzida (que consubstanciam o *fumus* e o *periculum*).

De outro lado, ambos os laudos, do observador judicial, como os mais recentes RMAs apresentados pela Administração Judicial, convergem no sentido do esvaziamento do patrimônio da recuperanda, de forma ainda mais grave a partir de dezembro de 2024.

Aliás, o Estado do Rio de Janeiro já veio se posicionando a respeito, ao opor embargos de declaração em face das decisões que homologaram a venda da UPI ClientCo (fibra ótica) e de sinal de televisão. Sempre forte no argumento do esvaziamento patrimonial. Também insistiu na apresentação de relação real e atualizada dos imóveis da recuperanda.


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

Num. 230429628 - Pág. 12

Muito embora este Juízo tenha determinado a vinda da relação de imóveis (que se afirmava ser de cerca de 7.500), acabou por rejeitar os embargos de declaração do Estado do RJ, firme no entendimento de que tais alienações decorreram do plano de recuperação judicial homologado e, portanto, seriam mero cumprimento do mesmo.

Porém, estas decisões se deram à luz dos RMAs existentes que ainda não mostravam o grave comprometimento financeiro da recuperanda. Relembre-se que apenas em julho de 2025 passou a ser informado descumprimento de obrigações (e, naquela época, somente se falava em descumprimento de obrigações concursais e poucas extraconcursais).

Fato é que há fortíssimos indícios de que venha ocorrendo esvaziamento patrimonial da devedora que implica em sua substancial liquidação, o que aparenta ser tratado pelo inciso VI do art. 73 da Lei de regência. Veja-se que muito embora previstas tais importantes alienações no PRJ, elas foram deliberadas sem a presença dos credores trabalhistas, os quais seriam atingidos pelo esvaziamento patrimonial, à medida que o "aditamento" apresentado quis incluí-los no plano.

Em continuação, trago o fato de a UPI ClientCo não ter trazido ativos monetizados à recuperação. Aliás, segundo a recuperanda, é justamente por este motivo que hoje o caixa está tão comprometido, já que importou, essencialmente, em "compensação" de créditos.

Neste raciocínio, reputo que deve incidir à hipótese o que dispõe o §2º do art. 73 da LRF. De modo que, embora mantida, neste momento, a eficácia do ato, as ações da NIO (empresa em que se transformou a ClientCo – Oi Fibra), ficarão indisponibilizadas, em caráter assecuratório.

Igualmente pairam dúvidas fundadas sobre operações questionadas pelo órgão do Ministério Público (id 120.227): a arbitragem em trâmite perante a Câmara de Comércio Internacional e a arbitragem que envolve ANATEL e TCU.



Quanto a esta última, já se sabe, no processo principal, que ela importou na alteração do regime de concessão de serviço público de telefonia para "autorização". Sendo que o primeiro findaria em dezembro de 2025, enquanto a acordada mudança para regime de "autorização" deverá se estender até 2028.

Sem aqui adentrar na regularidade da composição entabulada pela Oi, Anatel e V.Tal, junto ao TCU, fato é que o serviço ali abordado – de serviços de telefonia, será objeto de transição neste incidente ora deflagrado.

Portanto, também o valor da aludida arbitragem há de ser trazido para este feito, tanto pela incidência do mesmo dispositivo legal invocado (art. 73, §2º da LRF) como para maximizar ativos de modo a assegurar satisfação de credores.

Outrossim, também pelo laudado esvaziamento patrimonial, pelo fornecimento de informações equivocadas, pela contratação de profissionais com custos elevadíssimos (haja vista contratação de advogados para promoverem o Chapter 11 nos EUA na ordem de US$100 milhões – de todo incompatível com a situação recuperacional), bem como pela ausência de apresentação de plano de transição, reputa este Juízo que a antecipação dos efeitos da tutela deve se estender ao afastamento dos administradores do Grupo Oi, sua Diretoria e Conselho Administrativo, assim como impedimento de contratação da empresa do CEO (sr. Marcelo Millet), ÍNTEGRA, cuja "assessoria" vem sendo reiteradamente contratada nos negócios realizados.

O processo de transição ficará a cargo da Administração Judicial, na pessoa do dr. BRUNO REZENDE (PRESERVA), incumbindo aos demais Administradores judiciais remanescentes funções habituais. O aludido administrador também será, neste momento, gestor da empresa, responsável pela sua manutenção neste momento e por trazer a este Juízo toda e qualquer operação realizada pela empresa que importe em oneração ou alienação de seu patrimônio.

E, quanto ao ponto das subsidiárias, é certo que as elas são administradas



pela mesma equipe administrativa: Diretoria e Conselho Administrativo, que ficam igualmente afastados da Administração, como também impedida contratação da INTEGRA assessoria.

No que concerne a elas, as subsidiárias, também devem ser aqui tratadas, eis que pediram a recuperação judicial, tiveram obrigações suspensas por extensão à suspensão determinada no processo principal – de recuperação do Grupo Oi, mas estão notoriamente atingidas pela insuficiência financeira de seu controlador.

Para realização da transição das subsidiárias e sua gestão, nomeio a dra. TATIANA BINATO, qualificação conhecida, eis que realizou a "constatação prévia" no processo respectivo. A ela incumbirá os mesmos ônus atribuídos dr. Bruno Rezende, acima definidos. Deverá, tão logo intimada, dizer se aceita o encargo, firmar termo e estimar honorários. Em caso positivo, iniciará, de imediato, suas funções.

Ambos os gestores, em auxílio à administração remanescente das empresas, que não está sendo aqui afastada, deverão envidar máximos esforços em tratativas com seus credores durante o período de suspensão, nesta derradeira oportunidade de restabelecimento.

**À vista de todo o exposto, DECIDO:**

1) Proceda-se ao LEVANTAMENTO DO SEGREDO DE JUSTIÇA etiquetado e este incidente;

2) Autue-se como "INCIDENTE DE TRANSIÇÃO DE SERVIÇOS PÚBLICOS ESSENCIAIS";

3) ANTECIPO, EM PARTE, os efeitos da liquidação para:

3.1) SUSPENDER as obrigações extraconcursais, vencidas e vincendas, pelo prazo de 30 (trinta) dias;


Este documento foi gerado pelo usuário 122.***.***-55 em 09/02/2026 15:29:10
Número do documento: 25093015503786900000218767530
https://tjrj.pje.jus.br:443/1g/Processo/ConsultaDocumento/listView.seam?x=25093015503786900000218767530
Assinado eletronicamente por: SIMONE GASTESI CHEVRAND - 30/09/2025 15:50:37

Num. 230429628 - Pág. 15

3.2) AFASTAR da gestão das empresas, Grupo Oi e subsidiárias Serede e Tahto, sua Diretoria e Conselho Administrativo;

3.3) DETERMINAR que não sejam realizados negócios através da empresa ÍNTEGRA;

3.4) DECRETAR a indisponibilidade das ações da NIO e do valor da arbitragem objeto de transação entre Oi, V.Tal e Anatel, junto ao TCU. Lavre-se Termo;

4) NOMEAR o dr. Bruno Rezende para realizar o processo de transição dos serviços públicos e intervir, em parte, no Grupo Oi, conforme estabelecido acima;

5) NOMEAR a dra. Tatiana Binato para realizar o processo de transição dos serviços públicos subjacentes aos prestados pela Oi, através da Serede e Tahto, e intervir, em parte, nas duas subsidiárias, conforme estabelecido acima;

6) DETERMINAR a juntada de cópia da presente aos autos da recuperação judicial do Grupo Oi e das subsidiárias Serede e Tahto;

7) Ciência ao Ministério Público. Intimem-se todos os aqui referidos, com urgência. Intime-se Anatel, CADE, TCU, Ministério da Aeronáutica, Bolsa de Valores e CVM.

RIO DE JANEIRO, 30 de setembro de 2025.

SIMONE GASTESI CHEVRAND
Juiz Titular

