# Davis Polk

David Schiff
+1 212 450 3182
david.schiff@davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
davispolk.com

March 10, 2026

**Via ECF Filing**

Hon. Lisa G. Beckerman
United States Bankruptcy Judge, Southern District of New York
One Bowling Green, Rm. 623
New York, NY 10004
beckerman.chambers@nysb.uscourts.gov

Re:   *In re Oi S.A., et al.*,[1] Case No. 23-10193 (LGB)

To the Honorable Lisa G. Beckerman, United States Bankruptcy Judge:

The Ad Hoc Group of Secured Noteholders of Oi S.A. – Em Recuperação Judicial ("Oi" or the "Company") is appreciative that the Court has scheduled a status conference to discuss ongoing developments in the judicial restructuring ("RJ") proceedings. Ahead of today's status conference and given Oi's *Statement of Chapter 15 Debtors and Foreign Representative Regarding March 10, 2026 Status Conference* [ECF No. 143] (the "Oi Statement"), we write to supplement the joint statement that the Ad Hoc Group and UMB Bank, N.A., as the indenture trustee for the Notes[2] (the "Indenture Trustee") filed with the Court on February 13 at ECF No. 133 (the "Noteholder Statement"),[3] in light of further developments.

---

[1] The debtors in the above-captioned cases (the "Chapter 15 Cases"), along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands) (collectively, the "Chapter 15 Debtors").

[2] "Notes" means (i) the 8.50% PIK Subordinated Secured Notes Units due 2028, consisting of (x) 8.50% PIK Subordinated Secured Series A Notes due 2028 and (y) 8.50% PIK Subordinated Secured Series B Notes due 2028 (the "RUD Notes"), in each case, issued by Oi, and (ii) the 10.000%/13.500% PIK Toggle Senior Secured Notes Due 2027 (the "NPSD Notes") issued by Oi. "Noteholders" means holders and beneficial owners of the Notes.

[3] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Noteholder Statement.

**Davis Polk**

As set forth in detail below, the Oi Statement has served to only heighten the Noteholders' concerns, not allay them. Indeed, what the Oi Statement leaves out is more significant than what it includes. The Oi Statement offers a bland description of an ordinary course sales process—yet neglects to tell the Court that *the only bidder is an insider*. The Oi Statement goes on about the integrity of the various "fiduciaries" who are managing the sale process—without saying anything about Mr. Bruno Rezende's own financial incentives in the outcome. The Oi Statement pays lip service to what it calls the "initial right" of the Noteholders to accept or reject proposals below the Minimum Price—without providing any assurance that such a consent right will be respected after the vote is taken. And perhaps most relevant to this Court, the Oi Statement takes the position that what is occurring in Brazil has little connection to this Court or to contractual rights under U.S. law—without reviewing all of the steps Oi and third parties would have to take in order to effectuate the sale under New York law documents that only exist as a result of prior relief Oi itself sought from this Court when it filed by the Chapter 15 cases, and that, by order of this Court, cannot be modified or overridden. Oi cannot lawfully consummate the sale transaction and allocate proceeds unless it complies fully with its New York law transaction documents and their embedded creditor protections, and Oi has not yet shown any indication that it intends to seek relief from this Court to excuse its compliance. The Ad Hoc Group believes that this Court should undertake a careful review of these facts and order Oi to provide the clarity and transparency that is required in Chapter 15 cases before this Court.

***The ongoing sale process***

As predicted in the Noteholder Statement, the sale process failed to generate third-party interest given, among other things, Oi's failure to engage an investment banker[4] to market the asset or, apparently, to establish a diligence dataroom to inform potential bidders. The only bid submitted was from BTG, V.tal's controlling shareholder, and that bid was for an amount below the threshold clearing price. Mr. Bruno Rezende's sale procedures did not

---

[4] The Oi Statement wrongly claims that no "potentially relevant document includes requirements" for, among other things, an investment banker or a marketing process of particular duration. To the contrary, under the Intercreditor Agreement, the process for disposing of assets following an acceleration of secured debt expressly requires both the involvement of both a financial advisor (from an approved list of known firms) and a process of at least 60 days. *See* Intercreditor Agreement § 5.04(b)(ii) ("With respect to any Distressed Disposal of Share Collateral . . . that Distressed Disposal shall be effected pursuant to a Competitive Sales Process."); *Id.* § 1.01 (*"Competitive Sales Process"* means "a competitive auction or other sales process conducted with the advice of a Pre-Approved Financial Adviser which shall consist of at least one round which shall conclude on the date falling no later than 60 calendar days from the date of the relevant Enforcement Instructions unless the Pre-Approved Financial Adviser recommends an extension to such process. In the event the relevant Share Collateral is not sold in such first round, the subsequent process shall be conducted as required by the relevant Instructing Group with the ongoing advice of the Pre-Approved Financial Adviser.") However, the more salient fact is that, given its deficiencies, this sale process cannot be viewed as a serious market test.

permit creditors to develop or submit credit bids for consideration, and Oi now seeks to move forward with consummating a sale to BTG notwithstanding these obvious shortcomings.

The specific price and other terms offered by BTG have not been officially announced.[5] Because the bid was for an amount below the minimum threshold, a process has now begun whereby secured noteholders (specifically the holders of the NPSD Notes) are entitled to receive the terms and a 10-day window (from yesterday) to vote on whether to move forward with the sale in spite of the below-minimum price or reject the transaction. The Ad Hoc Group will consider the proposal as information becomes available, and the members of the Ad Hoc Group will make voting decisions in due course.

If the holders of NPSD Notes reject this insider, below-minimum bid, it is clear under the governing, New York-law transaction documents (as well as under the RJ Plan) that Oi cannot proceed with such a sale.[6] Yet, Oi has, in Oi's Statement, attempted to qualify the NPSD holder's consent rights as "initial rights," suggesting that if creditors exercise their right to withhold consent to the BTG bid, Oi will nevertheless seek to have the will of the creditors and the plain language of the RJ Plan and New York law transaction documents overridden in order to proceed to the sale. Mr. Rezende and Oi's current representatives have certainly not committed to the contrary, and in recent litigation efforts (discussed below) these parties have actively sought to disenfranchise secured creditors.

### *Oi's secret lawsuit against certain Noteholders*

As the Noteholders expected, at least part of the *ex parte* communications with the Court relate to the suit that Oi initiated in the RJ Court, in secret, on an *ex parte* basis and on the eve of Brazil's Carnival holiday, against certain Noteholders, including current members

---

[5] Public reporting indicates a bid price of BRL4.5 billion, or approximately 36.5% of the threshold bid price. *See, e.g.*, Octus, Update 1: BTG Pactual-Led Consortium Bids BRL 4.5B for Oi SA's V.tal Stake, March 9, 2026, https://app.octus.com/v3#/items/intel/2452?item_id=370394.

[6] *See, e.g.*, Indenture § 1.01 ("Permitted V.Tal Sale" means an "Asset Sale of the Capital Stock of V.Tal in the form of a UPI Sale made pursuant to the terms of the Reorganization Plan that satisfies any of the following conditions: (1) both (i) the notice of sale with respect to such Asset Sale which is approved by Holders holding a majority of the aggregate outstanding of the Securities and (ii) the aggregate cash price for Asset Sales of Capital Stock of V.Tal is equal to at least BRL$8.0 billion (as increased or decreased based on an increase or decrease, respectively, of the value of such Capital Stock since the Reorganization Plan Confirmation); (2) together with all other Asset Sales of the Capital Stock of V.Tal, results in Net Cash Proceeds sufficient to, and which are applied to, repay, in full, the outstanding Securities; or (3) is consented to by Holders holding at least sixty percent (60%) of the aggregate outstanding principal amount of the Securities and, unless waived, any other creditor required to provide such consent under the Reorganization Plan."). Clause 5.2.2.24 of the RJ Plan (English translation): "[f]or clarification purposes, Oi will not have the right to veto the resolution of the Restructuring Option I Creditors, under the terms of this Clause, nor to impose on the Restructuring Option I Creditors, the acceptance of any Proposals Lower than the Minimum Price of UPI V.tal."

3

Davis Polk

of the Ad Hoc Group.[7] In lodging that suit, Oi also asked (again, in secret and on an *ex parte* basis) to seize all of the Notes and related collateral held by the defendant Noteholders and strip those Noteholders of all related "political rights" – i.e., voting and information rights such as the right to deny consent to a below-minimum-price sale of the V.tal shares. On February 19, before the defendants had an opportunity to respond, the RJ Court issued an initial decision granting (for Brazilian law purposes) the requested seizure but refusing, for now, to strip political rights. Oi is likely appealing (again, in secret) the decision with respect to political rights in order to have the defendant Noteholders disenfranchised, and we expect this appeal will be brought close to the deadline for Noteholders to vote on whether to proceed with the below-minimum sale transaction.

It is important to put the litigation in context. The gravamen of the complaint is that the defendants, in their capacity as shareholders of Oi (as a result of their having received equity through the RJ Plan due to the impairment of debt) abusively exercised control over Oi and did harm to the company and its creditors by installing a board and management that pursued deleterious legal strategies in Oi's restructuring. Featured prominently—perhaps most prominently—in the alleged misconduct is Oi's unsuccessful motion before this Court to terminate the Chapter 15 Cases and its effort to pursue a chapter 11 restructuring that never came to fruition.

The Ad Hoc Group believes these claims are both factually wrong and legally meritless. We are concerned that they have not been brought in good faith and are instead an attempt to obtain provisional attachment and disenfranchisement to circumvent the Noteholders' rights under the transaction documents at the very time Oi is seeking to sell the creditors' collateral.

Oi's appointment of Mr. Fábio Wagner as foreign representative (the "Foreign Representative") in these Chapter 15 Cases (ECF No. 140) is instructive, as Mr. Wagner is the individual who served as Oi's chief legal officer and was the executive charged with overseeing its purportedly abusive and harmful legal activities during the relevant period. If Oi truly believes that it suffered misconduct in its legal operations so severe as to warrant litigation and the attempted stripping of rights from creditors, it strains logic that Oi would, at the same time, entrust the person who directly oversaw the legal function with even greater responsibility and make him the Foreign Representative.

---

[7] To the extent the Court has concerns about the secrecy of the litigation, the complaint and the February 19 decision have both become public through press sources, and the Ad Hoc Group does not oppose the Court's public disclosure of these documents to the extent they have been provided on an *ex parte* basis. Indeed, the Ad Hoc Group is deeply concerned about any *ex parte* communications in these Chapter 15 Cases and supports transparent disclosure.

4

**Davis Polk**

Indeed, in 2025, Mr. Wagner emphatically denied the very same allegations that are the basis of Oi's lawsuit when they were made by V.tal and BTG as part of their own litigation campaign:

> "*Oi categorically rejects V.tal's narrative that the Company, its managers and advisors would be articulating plans aimed at harming creditors . . . [I]t is equally important to reaffirm that Oi's Executive Board and Board of Directors act with **total independence, free from external influences or undue pressure**. All decisions taken so far – and those that will guide the Company in the future – were adopted in the best interest of Oi, its creditors, employees, users and regulators, as well as in the protection of the public interest. This independence is not only a structural guarantee, but also a principle strictly observed in practice, ensuring that each measure is guided by the Company's transparency, legality and long-term sustainability.*"[8]

In other words, it is the stated position of the Foreign Representative that the allegations that underpin Oi's lawsuit in Brazil are baseless and wrong.

***Oi must respect its legal obligations in the United States and the authority of this Court***

The Ad Hoc Group believes that Oi's recent lawsuit and its efforts to have the Notes claims "seized" in Brazil are aimed not only to facilitate the sale of the V.tal shares over potential creditor objection, but also to withhold and reappropriate proceeds from that sale in a manner that is not permitted under the terms of the RJ Plan or Oi's U.S. law financing agreements. Because the February 19 decision provides for attachment of claims that consist of U.S. securities that the Ad Hoc Group understands are held in significant part in the United States, it seems necessary for Oi to obtain relief in the United States in order to actually give effect to the attachment. Indeed, both Oi's complaint and the February 19 decision in Brazil indicate that this Court should be notified. Oi has not taken any steps to obtain that relief—other than to communicate with this Court *ex parte.*

Further, if the requisite noteholders were to consent to a sale, the indenture, intercreditor agreement and other documents governing the Notes and the disposition of collateral require proceeds to be applied in accordance with a strict waterfall under U.S. law. Under the Intercreditor Agreement[9] to which Oi is a party, proceeds must be applied ratably, with

---

[8] September 3, 2025 letter from Mr. Fabio Wagner and Mr. Marcelo Milliet to V.tal, (the "September 3, 2025 Letter"), a translation of which is attached hereto as Exhibit 1 (emphasis added).

[9] "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of August 8, 2024 (as supplemented, amended or modified from time to time), among the Company, GLAS Americas, LLC, as Intercreditor Agent and Collateral Agent (each as defined therein) and the grantors and other parties from time to time party thereto.

5

# Davis Polk

payments running through the applicable trustees.[10] For the Notes, this means that payments would need to flow through the Indenture Trustee, which in turn would transfer payments for the holders to DTC, to run through the customary process for distribution to the accounts of beneficial owners in the manner that is customarily used for distributing payments in respect of market-traded notes. Again, in view of its recent litigation efforts, we anticipate that Oi may be attempting to circumvent or frustrate this process and instead may (i) actively seek judicial relief in Brazil purporting to excuse it from doing so, or (ii) simply not comply.

The contracts that Oi now seeks to disregard and maneuver around are not merely U.S. law obligations—they are also instruments that Oi voluntarily issued and entered into as a means of implementing its RJ Plan, and for which Oi (at the insistence of, and for the protection of, its creditors) actively sought this Court's approval and grant of comity when it voluntarily came to New York to commence the Chapter 15 proceedings in the first place.. Pursuant to the Court's 2024 plan enforcement order, Oi was able to issue and enter into the "Postpetition Transaction Documents" (including the U.S. law agreements and instruments that are now being violated or at risk of being violated), and as an additional protection for creditors, this Court ordered that those documents cannot be modified or overridden "except in accordance with their express terms." *Order (I) Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Granting Related Relief* entered on June 12, 2024 [ECF No. 42] (the "Plan Enforcement Order") at ¶ 17.

It is, therefore, telling that Oi mischaracterizes the Ad Hoc Group's position as an attempt to "usurp the RJ Court's authority." (Oi Statement ¶ 24.) It is Oi that appears to be setting the stage to disregard the authority of this Court. This Court, as Oi acknowledges, enjoined parties from impeding the terms of the Court's Plan Enforcement Order, (*Id*. at ¶ 19, quoting Plan Enforcement Order at ¶ 7) which specifically provided that the U.S. law transaction documents could not be "modified or overridden." At the very least, if Oi seeks to be excused from its obligations under the Postpetition Transaction Documents and the Plan Enforcement Order, Oi must seek this Court's approval of its noncompliance.

If Oi attempts to proceed with consummating sale transactions or allocating proceeds in a manner that does not comply with the financing documents, it will create conflicting mandates affecting not only the Noteholders that Oi has named in its lawsuit, but also numerous other Noteholders (including the other members of the Ad Hoc Group) and administrative parties such as the collateral agent and Indenture Trustee. These parties have enduring obligations and entitlements under the Postpetition Transaction Documents, on the one hand, and will now face a conflicting set of directions through the incompatible relief Oi has been pursuing and continues to pursue in Brazil, on the other.

---

[10] Intercreditor Agreement § 7.02.

6

**Davis Polk**

We respectfully submit that Oi and the Foreign Representative must lay out for the Court and creditors its intentions with respect to the sale process, including whether and to what extent Oi intends to comply with the RJ Plan and this Court's prior orders, and whether Oi intends to seek any relief before this Court.  Given what has already occurred, we believe the burden is on Oi and the Foreign Representative to provide this information.  Regardless, and as previewed in the Noteholder Statement, the Noteholders may need to come before the Court again on an expedited basis should Oi continue down its current path.

**Davis Polk**

We look forward to discussing these matters in detail at the conference before the Court.

Respectfully submitted,

*/s/ David Schiff*

David Schiff
Davis Polk & Wardwell LLP

**Exhibit 1**

English Translation of September 3, 2025 Letter



São Paulo, September 3, 2025.

To the

**V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal")**

Air conditioning: Rafael Pimenta, Thiago Gonzalez Queiroz, Manoela Arruda Moreira, Raphael Figueiredo, Jorge Luis da Costa Silva and Vitor Chen Hsia

Emails: rpimenta@galdino.com.br, tgonzalez@galdino.com.br, mmoreira@galdino.com.br, rfigueiredo@galdino.com.br and vchen@galdino.com.br

With copy to:

**Ad Hoc Creditors Group of Oi S.A. – Under Judicial Reorganization ("AHG")**

Attn: David Schiff and Guilherme Vaz Leal da Costa

Emails: david.schiff@davispolk.com and gvaz@pinheiroguimaraes.com.br

**Ref.: Response to the Counter-Notification of August 28, 2025, sent by V.tal.**

Dear Ladies and Gentlemen,

1.      We refer to the counter-notification of August 28, 2025, sent by V.tal in response to AHG's notification of August 24, 2025, suggesting a meeting between V.tal, AHG and Oi S.A. – In Judicial Reorganization ("Oi" and "Company") to address issues of common interest, notably Oi's liquidity crisis and the resolution of disputes between the parties in Brazil and the United States. The content of the response is surprising for the attempt to invert the reality of the facts and to disqualify, with unfounded allegations, the legitimate action of Oi and its representatives.

2.      First, it is frustrating to see, once again, V.tal's refusal to dialogue with Oi, precisely at a time of extreme financial and operational fragility of the Company. In scenarios like this, cooperation should be the minimum expected from a responsible counterparty, whose interdependence with Oi is undeniable. The dialogue between the parties could contribute to a more efficient restructuring, in line with the duty of good faith and cooperation typical of judicial reorganization proceedings.

3.      Secondly, it is regrettable that V.tal, instead of seeking joint solutions, persists in suffocating the Company through an escalation of judicial, extrajudicial and arbitration

measures. Such behavior compromises the preservation of value for creditors and employees, puts at risk the provision of essential services and, paradoxically, affects V.tal itself.

4. In addition, you. admit, again, that they are only willing to negotiate if Oi abdicates legally guaranteed rights, reinforcing the asymmetric and coercive nature of its stance.

5. <u>Thirdly</u>, V.tal's attempt to select isolated phrases from Oi's CEO to extract from them the narrative of an alleged "plan of attack" is perplexing. The Company faces challenges of a much higher magnitude, which are not limited to V.tal. Colloquial expressions expressed in moments of indignation cannot be distorted or transformed into "proof" of supposed business strategies.

6. It is no secret that V.tal has acted adversely to Oi for years, contributing decisively to the financial pressure on the Company. It is natural, therefore, that the administration registers consternation in the face of this reality and adopts **legitimate** and **lawful strategies** to protect itself from practices that constitute a true abuse of rights.

7. In addition, all of your conclusions about Oi's alleged intentions should be analyzed with caution, especially considering that there was no interest on the part of V.tal in receiving information about the Company's real financial condition, based only on data gathered in the *discovery* process in the United States, which evidently do not fully reflect Oi's situation.

8. Likewise, the testimonies provided in the Chapter 15 proceeding do not evidence any unlawful intent by Oi, but only the analysis of legal restructuring alternatives, in a scenario of urgency and extreme financial complexity.

9. Therefore, Oi categorically rejects V.tal's narrative that the Company, its managers and advisors would be articulating plans aimed at harming creditors. Such allegations were rejected by all the courts that analyzed them, without V.tal having presented any law, jurisprudence or technical opinion – other than those of its own lawyers – to support its narrative. All the measures discussed by Oi, both in Brazil and in other jurisdictions, are fully supported by specific legislation, recognized in business restructuring processes.

10. <u>Fourthly</u>, it is equally important to reaffirm that Oi's Executive Board and Board of Directors act with total independence, free from external influences or undue pressure. All decisions taken so far – and those that will guide the Company in the future – were adopted in the best interest of Oi, its creditors, employees, users and regulators, as well as in the protection of the public interest. This independence is not only a structural guarantee, but also a principle

strictly observed in practice, ensuring that each measure is guided by the Company's transparency, legality and long-term sustainability.

11.    <u>Fifthly</u>, Oi cannot fail to vehemently repudiate the very serious insinuation of V.tal that the Company, its managers and its advisors would be incurring in criminal offenses. This accusation is frivolous, unfounded and borders on defamation, exceeding the limits of a legitimate adversarial procedure. These frivolous accusations have already been answered to the "criminalist" lawyer hired by V.tal, with the purpose of intimidating Oi's administrators.

12.    <u>Finally</u>, it is regrettable that V.tal seeks to embarrass and intimidate professionals in the regular practice of law. Advocacy is an essential function of justice (article 133 of the Federal Constitution) and cannot be the object of retaliation.

13.    Oi reaffirms its willingness to participate in negotiations that take place in a transparent, constructive and good faith manner, trusting that V.tal will review its hostile stance and recognize that only responsible dialogue will allow it to reach a balanced and sustainable solution for all involved.

**OI S.A. – UNDER JUDICIAL REORGANIZATION**

*Assinado por:* Marcelo José Milliet
E200AA457EB741B...

*Assinado por:* Fábio Wagner
B88F01CB4F2244F...

**Marcelo José Milliet**         **Fábio Wagner**