**Hearing Date: April 15, 2026 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: April 10, 2026 at 4:00 p.m. (prevailing Eastern Time)**
**Reply Date: April 13, 2026 at 4:00 p.m. (prevailing Eastern Time)**

**DAVIS POLK & WARDWELL LLP**
Elliot Moskowitz
David Schiff
Marc J. Tobak
Joseph W. Brown
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Oi S.A., *et al.*,[1] | Case No. 23-10193 (LGB) |
| Debtors in Foreign Proceeding. | (Jointly Administered) |

**MOTION FOR AN ORDER TO (I) ENFORCE THIS COURT'S PRIOR
ORDER GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN
RJ PLAN IN THE UNITED STATES AND (II) GRANT RELATED RELIEF**

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ........................................................................................1

JURISDICTION AND VENUE .......................................................................................7

RELIEF REQUESTED.....................................................................................................8

BACKGROUND ...............................................................................................................9

        A.     Oi Garners Support for Its 2024 RJ Plan by Promising Creditors Essential
             Protections ...........................................................................................................9

             i.     NPSD and RUD Creditors Are Protected by Specific and Detailed
                    Consent and Process Rights.....................................................................10

             ii.    Oi Is Bound to the Intercreditor Agreement Which Appoints a U.S.
                    Entity as Collateral Agent and Establishes a Payment Waterfall.............12

        B.     Oi Takes Steps to Sell the V.tal Stake Without Complying with the
             Bargained-for Procedures Protected by the FFE Order ......................................14

        C.     V.tal and Oi Pursue Litigation Against Creditors in Brazil................................17

ARGUMENT ...................................................................................................................19

    I.    This Court Has Ample Authority to Enforce Its Prior Order .........................................19

    II.   This Court Should Prohibit Violations of the FFE Order Through "Override" of the
        Postpetition Transaction Documents to Force the Sale of the V.tal Stake ......................22

        A.     Sale of the V.tal Stake in Contravention of the Terms of the Indentures and
             Intercreditor Agreement Is a Prohibited Override of These Documents ...........23

         B.     Distributing Proceeds of the Sale of the V.tal Stake in Contravention of the
             Terms of the Indentures and Intercreditor Agreement Will Be a Prohibited
             Override of These Documents ........................................................................24

NOTICE...........................................................................................................................28

CONCLUSION................................................................................................................28

i

## TABLE OF AUTHORITIES

### CASE(S)

PAGE(S)

*In re Bowflex, Inc.*,
  674 B.R. 47 (Bankr. D.N.J. 2025) ................................................................................. 20

*In re China Fishery Grp. Ltd.*,
  2023 WL 2435701 (Bankr. S.D.N.Y. Mar. 8, 2023) .......................................................... 19

*In re Kalikow*,
  602 F.3d 82 (2d Cir. 2010) ............................................................................................ 28

*In Matter of Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016) ................................................................................. 19, 27-28

*In re Petrie Retail, Inc.*,
  304 F.3d 223 (2d Cir. 2002) ........................................................................................... 28

*In re Sanjel (USA) Inc.*,
  2016 WL 4427075 (Bankr. W.D. Tex. July 28, 2016) ...................................................... 20

*Shilltani v. United States*,
  384 U.S. 364 (1966) ...................................................................................................... 22

*In re Texaco Inc.*,
  182 B.R. 937 (Bankr. S.D.N.Y. 1995) .............................................................................. 28

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ...................................................................................................... 19

*Worms v. Rozhkov (In re Markus),*
  78 F.4th 554 (2d Cir. 2023) ............................................................................................ 22

### STATUTES & RULES

11 U.S.C. § 105(a) ................................................................................... 8, 9, 19, 20, 28

11 U.S.C. § 1145 ................................................................................................................ 20

11 U.S.C. § 1145(a) ............................................................................................................ 9

11 U.S.C. § 1504 ................................................................................................................ 8

11 U.S.C. § 1507(a) ............................................................................................................ 9

11 U.S.C. § 1515 ................................................................................................................ 8

11 U.S.C. § 1521(a)(7) ........................................................................................................ 20

11 U.S.C. §§ 1521(a) ..................................................................................................... 9, 20

11 U.S.C. §§ 1522(c) ....................................................................................................... 8, 20

11 U.S.C. §§ 1525(a) ........................................................................................................... 9

28 U.S.C. § 1334 ........................................................................................................................ 7

28 U.S.C. § 1410........................................................................................................................... 8

28 U.S.C. § 157............................................................................................................................. 7

28 U.S.C. § 157(b) ....................................................................................................................... 8

28 U.S.C. § 157(b)(2)(P)............................................................................................................. 8

The ad hoc group of secured noteholders[2] (the "**Ad Hoc Group**"), through its undersigned counsel, hereby submits this motion (this "**Motion**") seeking entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Order**"), that enforces the terms of this Court's FFE Order (as defined herein), which Oi is in the process of violating in Brazil.

In support of this Motion, the Ad Hoc Group relies upon the *Declaration of Guilherme Vaz Leal da Costa* (the "**Vaz Declaration**") filed contemporaneously herewith. In further support of the relief requested herein, the Ad Hoc Group respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      At the most recent status conference (the "**Status Conference**"),[3] the Ad Hoc Group alerted the Court that certain actions Oi had taken in the Brazilian judicial restructuring proceeding (the "**RJ Proceeding**") placed the rights of stakeholders in this chapter 15 proceeding at risk of attack. The Court made its expectations clear: "I would hope that . . . people follow the rules and what people have agreed to that has been approved by two courts."[4] In light of this clear guidance, Oi's Noteholders were hopeful that Oi would comply with the FFE Order[5] and its judicial reorganization plan (the "**RJ Plan**").

2.      But that optimism was short-lived. Following the Status Conference, Oi sought and obtained permission from a Brazilian court to sell Oi's equity stake in V.tal - Rede Neutra de

---

[2] The holders and/or their affiliated, managed, advised and/or sub-advised funds and accounts are beneficial owners of (a) the 10.000% / 13.500% PIK Toggle Senior Secured Notes due 2027 (the "**NPSD Notes**" and the indenture issuing the NPSD Notes, the "**NPSD Indenture**") and (b) the 8.50% PIK Subordinated Secured Notes due 2028 (the "**RUD Notes**" and, the indenture issuing the RUD Notes, the "**RUD Indenture**" and, the RUD Notes together with the NPSD Notes, the "**Notes**" and, the NPSD Indenture together with the RUD Indenture, each, an "Indenture," and together, the "**Indentures**"), and the holders thereof, the "**Noteholders**"), in each case issued by Oi S.A. ("**Oi**"). The NPSD Indenture is included as Exhibit 10 to the Vaz Declaration. Where identical provisions appear at the same place in each Indenture, such provisions will be cited to the "Indentures." UMB Bank N.A. is trustee (the "**Indenture Trustee**"), and GLAS Americas is collateral agent (the "**Collateral Agent**"), under the Indentures.
[3] The Ad Hoc Group also respectfully refers the Court to its March 10 letter [ECF No. 144] and February 14 statement [ECF No. 133] for additional background in support of the Motion.
[4] March 10, 2026 Hr'g Tr. at 33:4–6; *see id*. at 22:24–25, 23:17–19, 33:17–18, 42:12–15.
[5] *Order (I) Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Granting Related Relief* [ECF No. 42] (the "**FFE Order**").

Telecomunicações S.A. ("**V.tal,**" and such equity, the "**V.tal Stake**")—the most valuable component of the collateral granted to Oi's secured Noteholders—in open defiance of the FFE Order, the New York-law governed Postpetition Transaction Documents,[6] and the overwhelming rejection of the sale by those Noteholders, whose consent is contractually required. As detailed below, Oi's violations of the FFE Order are open, obvious and ongoing.

3.      The Ad Hoc Group is cognizant of the limits of this Court's jurisdiction in presiding over a chapter 15 case. It does not ask the Court to expand the scope of its authority or to interfere with the RJ Proceeding.[7] Instead, the Ad Hoc Group asks the Court to enforce and protect the terms of the FFE Order, which was entered by the Court in 2024 as a result of Oi and the Original Foreign Representative (as defined herein) voluntarily requesting—and this Court then granting— comity to enforce and implement its RJ Plan in the United States. These same principles of comity now warrant the Court's intervention.

4.      This Court is vested with clear authority to enforce its prior FFE Order. The rights and protections that Oi and its aligned parties are violating reside in the FFE Order. Oi is before this Court voluntarily and is unquestionably subject to the Court's jurisdiction. But so too are entities of Banco BTG Pactual S.A. ("**BTG**") and V.tal. Indeed, BTG is an active participant in these chapter 15 cases through its subsidiaries, BGC Fibra Participações S.A. ("**BGC**") and V.tal. These parties executed the Intercreditor Agreement[8]—thereby submitting to jurisdiction in the

---

[6] The term "Postpetition Transaction Documents" includes "any [] document or instrument contemplated by the Brazilian RJ Plan (including, without limitation, the New Priority Secured Notes and the Roll-Up Notes)," including the Intercreditor Agreement (as defined herein) and the Indentures. FFE Order ¶ J.

[7] Although the Ad Hoc Group has serious concerns about certain aspects of the RJ Proceeding, it also intends to continue to assert the rights of its members in that process.

[8] The "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of August 8, 2024 (as supplemented, amended or modified from time to time), among Oi, GLAS Americas, LLC, as Intercreditor Agent and Collateral Agent (each as defined therein) and the grantors and other parties from time to time party thereto. [ECF No. 150-1].

2

United States—and also litigated before this Court when they objected to Oi's chapter 15 termination motion.

5.    Oi's attempt to force a sale over creditor objections is the culmination of months of effort. First, Oi disregarded the terms of the RJ Plan and Postpetition Transaction Documents (and therefore, the express terms of the FFE Order) by running a deficient and rushed sale process for the V.tal Stake.

6.    Next, Oi sought to disenfranchise major creditors who would be likely to oppose its flawed process. In February, Oi filed, in secret, a lawsuit (the "**Oi Suit**") against three non-Brazilian former members of the Ad Hoc Group (the "**Named Defendants**"), alleging that those institutions, in their capacities as shareholders,[9] bear liability for Oi's distress and failure to repay claims under the RJ Plan. The lawsuit, which was brought before the 7th Lower Commercial Court of the City of Rio de Janeiro, Brazil (the "**RJ Court**"), sought to immediately deprive the Named Defendants of both their economic rights under the Notes and their "political rights," i.e., voting and consent rights they hold in connection with their Notes. Although the RJ Court allowed what is effectively a "prejudgment attachment" with respect to the Notes, it declined to grant the request to suspend the voting and consent rights associated with the Notes.

7.    This "sale process" yielded just one single bid—from V.tal's controlling shareholder, BTG (such bid, the "**BTG Bid**"). But the BTG Bid did not satisfy the essential and heavily bargained-for protection in Oi's RJ Plan—and incorporated into the FFE Order—that any sale of the V.tal Stake achieve a minimum sale price of R$12,315,977,451.75 (the "**Minimum Price**"). The BTG Bid is below the Minimum Price, so it is not a "Permitted V.tal Sale" (as defined

---

[9] As further described below, the Named Defendants along with other Noteholders received their equity in Oi as consideration for agreeing to restructure their prepetition claims through the RJ Plan.

herein) under the NPSD Indenture.  Therefore, Oi needed the consent of requisite creditors (holders of at least 60% of the NPSD Notes) to consummate the sale.[10]  Vaz Declaration ¶ 15(i).

8.      At first, Oi feigned compliance with this requirement by presenting the BTG Bid to the holders of the NPSD Notes.  But those creditors, including members of the Ad Hoc Group, rejected the BTG Bid in overwhelming numbers, with approximately 92.08% of the NPSD Notes voting to reject (the "**BTG Bid Rejection**").[11]  To be constructive, the Ad Hoc Group also sent a letter laying out the basis for its objection to the BTG Bid, beyond just the failure to reach the Minimum Price.  The letter identified other concerns too, including: (a) Oi's failure to disclose the net proceeds that would be available for distribution, (b) the lack of compliance with the payment allocation terms set forth in the RJ Plan and the Postpetition Transaction Documents and (c) the BTG Bid's payment mechanics, which would place Oi itself in charge of directing the sale proceeds to Noteholders, rather than the independent Collateral Agent and Indenture Trustee, as required by the Intercreditor Agreement, Indentures and RJ Plan.

9.      Ultimately, the proponents of the sale of the V.tal Stake—Oi, BTG, and, on information and belief, V.tal itself[12]—responded to the BTG Bid Rejection in *precisely* the manner the Ad Hoc Group predicted to this Court.  In a filing before the RJ Court, BTG sought to invalidate the votes of creditors, arguing that the creditors' determination is "abusive" and reflects a "conflict of interest."  That motion (the "**Motion to Invalidate**") asked the RJ Court to approve consummation of the BTG Bid, even though the proposed sale did not meet the Minimum Price and notwithstanding the express rejection by an overwhelming majority of creditors.

---

[10] The RUD Indenture contains parallel language requiring any sale that does not meet the Minimum Price to receive at least 60% noteholder consent.

[11] A certified translation of the Ad Hoc Group's rejection of the BTG Bid ("**BTG Bid Rejection Letter**") is included as Exhibit 2 to the Vaz Declaration.

[12] The Motion to Invalidate (as defined herein) was filed by BTG.  But it refers interchangeably to its proponent as "BTG" and "VTAL," calling into question the true separateness of bidder and target and suggesting that all of these parties may be working in concert to consummate the BTG Bid.

10.    On April 1, the RJ Court authorized the consummation of the sale under Brazilian law (the "**Brazil Sale Order**").[13]   The Brazil Sale Order purports to override creditors' rights because there are no higher bids and the RJ Court believes the sale to be the best outcome.  Notably, the Brazil Sale Order did not give credence to BTG's allegations about the conduct of the Noteholders or purported "conflicts of interest"—instead, the RJ Court concluded that Brazilian law allowed it to disregard the overwhelming rejection of creditors as "abusive" due to the lack of a more favorable alternative.  This finding is striking given the deficiencies in Oi's marketing process as well as Oi's and BTG's efforts throughout the process to prevent any discussion of a credit bid alternative.  Further, the Brazil Sale Order acknowledges the Noteholders' objections to the failure of the BTG Bid to comply with the payment processes required for proceeds of the Noteholders' collateral, describing this issue as "indeed relevant," but nevertheless approved the BTG Bid.  The Brazil Sale Order does not purport to override, and does not address, the violations the sale poses to the FFE Order or the Postpetition Transaction Documents.  But, if Oi and other parties attempt to carry out that order without obtaining relief from this Court, they will necessarily be committing such violations.

11.    Oi's disregard for the rights of the Noteholders will not end there.  Beyond consummation of a non-permitted sale, the Ad Hoc Group also fears (and its most dire predictions have, regrettably, all been realized to date) that Oi will attempt to misappropriate the proceeds from the sale, which are required under both the RJ Plan and U.S. law to be applied in accordance with the priorities set forth in the Intercreditor Agreement.  Specifically, relying on the prejudgment attachment it obtained in the Oi Suit, which purported to seize the Notes of the Named Defendants, Oi may seek to redistribute proceeds due to those parties.  This contravenes both the

---

[13] A certified translation of the Brazil Sale Order is included as Exhibit 9 to the Vaz Declaration.

RJ Plan and the Postpetition Transaction Documents, which require distributions to be made ratably through The Depository Trust Company ("**DTC**") (the clearing and payment system for virtually all capital markets debt in the United States).  The agreed-upon payment mechanics do not allow for amounts due to specific holders to be withheld or redistributed, and Oi has made no attempt to obtain (and could not obtain) a court order in the United States that would permit Oi to insert itself into the DTC payment system.  Indeed, Oi seems likely to bypass DTC and reallocate proceeds in Brazil in a manner that violates the Postpetition Transaction Documents.  This, too, risks harm to creditors—not just to the Named Defendants from whom Oi is attempting to deprive payment of contractually promised distributions, but to all holders of NPSD Notes.

12.    Oi is not only, *itself*, proceeding to consummate a transaction that will violate these instruments, but in doing so, it will inevitably seek to compel other parties (including administrative parties such as the Collateral Agent and Indenture Trustee) to similarly violate the FFE Order and the New York-law governed Postpetition Transaction Documents by releasing liens and/or distributing proceeds in a prohibited manner.

13.    The facts presented here are admittedly unusual—typically, when a chapter 15 court grants assistance to enforce a foreign restructuring plan, it is providing a grant of comity that need not be revisited because parties are working noncontroversially (and consensually) to implement the plan and carry out that relief.  In the vast majority of chapter 15 cases, no further action from the chapter 15 court is required to ensure that the relief it granted is carried out.  But this is an extraordinary case.  After obtaining this Court's assistance repeatedly in 2023 and 2024, Oi already pivoted once, when it asked this Court to terminate the chapter 15 proceedings in order to pursue a more fulsome restructuring in the United States.  Now, having been denied that relief and placed under the governance of a judicial manager, Dr. Bruno Rezende (the "**Judicial**

6

**Manager**"), Oi is trying a new strategy, in open disregard of its U.S. law obligations and the protections already granted by this Court.

14. Notably, Oi has made no effort to seek any relief from this Court. Of course, Oi knows that its actions are not likely to be endorsed by this Court, given they are not permitted under U.S. law either by contract or by the prior enforcement of the RJ Plan in the United States. And the Court expressed clear views at the Status Conference that Oi is simply disregarding.

15. Oi sought entry of the FFE Order in 2024 by voluntarily requesting assistance from this Court. It did so at least in part because it was important to creditors both in Brazil and the United States that (a) Oi's international financial creditors would have their debt obligations restructured in the form of enforceable U.S. securities, benefitting from contracts governed by U.S. law and enforceable in the United States, and (b) under the express terms of the FFE Order, creditors' rights under these instruments (including rights under New York law) could not simply be stricken by other goings on in Brazil, but instead, that these documents and instruments "are not subject to any modification or override except in accordance with their express terms." FFE Order ¶ 17. After promising creditors these protections in 2024—both in the RJ Plan itself and then in an order of this Court—Oi is now flouting them.

16. The Ad Hoc Group therefore respectfully asks the Court to enter the Proposed Order to enforce the terms of its prior relief and prevent Oi (and anyone acting in concert with Oi) from taking actions that, if consummated, will cause grievous harm to United States creditors in violation of this Court's FFE Order, the terms of Oi's New York-law governed Postpetition Transaction Documents and the RJ Plan.

**JURISDICTION AND VENUE**

17. The Court has jurisdiction to consider this Motion pursuant to sections 157 and 1334 of title 28 of the United States Code, the Amended Standing Order of Reference from the

United States District Court for the Southern District of New York, dated as of January 31, 2012

and section 105(a) of the Bankruptcy Code.

18.    Antonio Reinaldo Rabelo Filho (the "**Original Foreign Representative**")

commenced these chapter 15 cases under sections 1504 and 1515 of the Bankruptcy Code.

19.    This is a core proceeding under section 157(b)(2) and (2)(P) of title 28 of the United

States Code.

20.    Venue is proper in this district pursuant to section 1410 of title 28 of the United

States Code.

21.    The statutory predicates for the relief requested herein are sections 105(a) and

1522(c) of the Bankruptcy Code.

22.    In its FFE Order, this Court retained exclusive jurisdiction "with respect to all

matters arising from or in relation to the implementation, effect, interpretation, enforcement,

amendment or modification of the Order and all matters arising in and under, and related to, these

chapter 15 cases, including any requests for additional relief or any adversary proceeding brought

in and through these chapter 15 cases."  FFE Order ¶ 21.

### RELIEF REQUESTED

23.    The Ad Hoc Group respectfully requests entry of the Proposed Order, which

provides, among other things:

(i)    the requirement that the terms of the Postpetition Transaction Documents are free from "any modification or override except in accordance with their express terms," is hereby enforced to the fullest extent permissible by law, and all parties (including Oi, BGC and V.tal) are required to abide by the FFE Order;

(ii)    the parties to the Postpetition Transaction Documents (including Oi, BGC and V.tal) shall not, without authorization of this Court under the provisions of chapter 15 of the Bankruptcy Code or applicable law, consummate any sale transaction of the V.tal Stake in violation of the terms of the FFE Order, Postpetition Transaction Documents and RJ Plan, including, without

8

limiting the generality of the foregoing, the requirement that any sale of the V.tal Stake satisfy the Minimum Price and constitute a "Permitted V.tal Sale" under the NPSD Indenture, respecting the consent rights afforded to creditors thereunder; and

(iii)    none of Oi, BGC, V.tal, the Collateral Agent or the Indenture Trustee shall, and Oi shall not take action to compel such parties to, without authorization of this Court under the provisions of chapter 15 of the Bankruptcy Code or applicable law, consummate any sale transaction or apply any proceeds thereof in a manner that violates the Postpetition Transaction Documents, the RJ Plan or the FFE Order, including, without limiting the generality of the foregoing, in a manner that does not fully comply with the waterfall set forth in section 7.02 of the Intercreditor Agreement and the provisions of the NPSD Indenture.

## BACKGROUND

A.    **Oi Garners Support for Its 2024 RJ Plan by Promising Creditors Essential Protections**

24.    To facilitate the RJ Proceeding, in 2023 and 2024, financial creditors of Oi (including members of the Ad Hoc Group) provided debtor-in-possession financing secured by the V.tal Stake.[14]

25.    Later in 2024, as part of the RJ Plan and following good faith negotiations with the former management team and advisors of Oi, Oi's DIP financing providers agreed to convert their existing DIP claims into the NPSD Notes that are still considered DIP financing and senior secured debt obligations subject to applicable protections in Brazil.    FFE Motion ¶ 35; Vaz Declaration ¶ 15.  Financial creditors also agreed to restructure their prepetition claims, receiving a combination of RUD Notes (also secured by the V.tal Stake) and new equity of Oi.  Vaz Declaration ¶ 11.

26.    The V.tal Stake is the most important and valuable piece of collateral that secures the Notes, as it provides the principal means of repayment for the NPSD Notes and RUD Notes.

---

[14] *See Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 1145(a), 1507(a), 1521(a), and 1525(a) (I) Enforcing the Brazilian RJ Plan in the United States and (II) Granting Related Relief* ("**FFE Motion**") ¶ 20 [ECF No. 37].

9

Vaz Declaration ¶ 12. Oi's ability to repay the Notes was always dependent on its ability to monetize the V.tal Stake for the benefit of its secured creditors. The collateral now has even greater importance given Oi's ongoing financial distress and apparent inability to repay these debt obligations from operating cash flows or other sources of financing. Vaz Declaration ¶ 24(ii).

27.     Creditors have continued to support Oi's liquidity over the past year, providing additional financial support by consenting to allow the interest on their Notes to be paid "in kind" rather than in cash. As a result of this forbearance, creditors have not, to date, received a single dollar of cash repayment on account of their NPSD Notes or RUD Notes. Vaz Declaration ¶ 26(ii).

28.     The Notes have been subject to certain events of default and have accelerated and become due automatically in accordance with their terms since July 2025 because of, among other things, the filing of motions for judicial reorganization of certain of Oi's Subsidiary Guarantors (as defined in the Indenture). Vaz Declaration ¶ 24(i).

      i.     *NPSD and RUD Creditors Are Protected by Specific and Detailed Consent and Process Rights*

29.     The holders of the Notes bargained for and obtained specific and detailed rights protecting their interests, all of which are governed under the terms of the Postpetition Transaction Documents and RJ Plan and are thus encompassed in this Court's FFE Order.

30.     Oi agreed that the NPSD Notes and RUD Notes would be governed by New York law and consented to the jurisdiction of courts in New York to resolve any disputes concerning those notes. *See* Indentures §§ 13.08, 13.14(1)–(2). The Intercreditor Agreement is also governed under New York law, and disputes arising out of it may be brought in New York. *See* Intercreditor Agreement § 11.08(a)–(c).

31.     More importantly, the Postpetition Transaction Documents included specific and heavily bargained-for requirements around any disposition of the V.tal Stake and any application

of proceeds therefrom.  The Indentures contain an asset sale covenant that prohibits any sale of the V.tal Stake other than one that qualifies as a "Permitted V.tal Sale."  *See* Indentures § 4.16(1)(ii).

32.      "**Permitted V.tal Sale**" means "Asset Sale of the Capital Stock of V.tal in the form of a UPI Sale made pursuant to the terms of the Reorganization Plan that satisfies any of the following conditions: (1) both (i) the notice of sale with respect to such Asset Sale is approved by Holders holding a majority of the aggregate outstanding of the Securities and (ii) the aggregate cash price for Asset Sales of Capital Stock of V.tal is equal to at least R$8.0 billion;[15] (2) together with all other Asset Sales of the Capital Stock of V.tal, results in Net Cash Proceeds sufficient to, and which are applied to, repay, in full, the outstanding Securities; or (3) is consented to by Holders holding at least sixty percent (60%) of the aggregate outstanding principal amount of the Securities and, unless waived, any other creditor required to provide such consent under the Reorganization Plan."  Indentures § 1.01.

33.      The Indentures also require that the proceeds of any sale of collateral be applied as required by the Intercreditor Agreement.  *See* Indentures § 4.16(2).  This is also applicable in the event that any proceeds are received by the Collateral Agent in connection with any foreclosure or enforcement action.  *See id.* § 12.01(3).

34.      As set forth above and below, Oi is openly and plainly violating the Indentures both by attempting to sell the V.tal Stake for less than the Minimum Price and by contemplating distribution of the proceeds of that sale in a manner that contravenes the Intercreditor Agreement.

---

[15] Following the sale of Oi's "ClientCo" business, the Minimum Price was increased from R$8,000,000,0000.00 in accordance with the terms of the RJ Plan.  The current Minimum Price of R$12,315,977,451.75 is equivalent to more than USD$2.6 billion.

     ii.    *Oi Is Bound to the Intercreditor Agreement Which Appoints a U.S. Entity as Collateral Agent and Establishes a Payment Waterfall*

35.    The NPSD Notes and RUD Notes are protected by a security arrangement that includes a master agreement—the Intercreditor Agreement—pursuant to which a United States entity (GLAS Americas, LLC) has been appointed to act as Collateral Agent and Intercreditor Agent for all secured creditors and to hold security—including the V.tal Stake—by a bankruptcy-remote fiduciary assignment in Brazil.  Vaz Declaration ¶¶ 14, 16; Intercreditor Agreement § 10.01(a)–(b).  The Intercreditor Agreement acts as the over-arching security agreement for the collateral that secures Oi's international financial debt and other post-RJ Plan secured obligations.  And, importantly, unlike some intercreditor agreements that bind only creditors, Oi itself is a party to this agreement.  BGC and V.tal are also parties to the Intercreditor Agreement.

36.    Critically, the Intercreditor Agreement also provides specific requirements for any "Distressed Disposal"—i.e., an asset disposition following acceleration of debt, as is applicable now—such as the requirement that any such disposal "be effected pursuant to a Competitive Sales Process."[16] Intercreditor Agreement § 5.04(b)(ii).  As the Ad Hoc Group has noted to the Court, Oi violated the Intercreditor Agreement by failing to conduct a "Competitive Sales Process" in connection with the sale of the V.tal Stake.

37.    The Intercreditor Agreement sets forth, among other things, the limited terms on which the Collateral Agent may release collateral (both in the pre-acceleration, "ordinary course" and post-acceleration "Distressed Disposal" contexts) (*See* Intercreditor Agreement Articles VII, XII), as well as the way any proceeds from the disposition of collateral must be applied.  *See*

---

[16] Under the Intercreditor Agreement, "Competitive Sales Process" means a competitive auction or other sales process conducted with the advice of a Pre-Approved Financial Advisor—i.e., an investment banker. *See* Intercreditor Agreement § 1.01.

Intercreditor Agreement §§ 5.01, 8.01. Specifically, pursuant to Intercreditor Agreement section 5.03, all proceeds of Distressed Disposals must be paid or distributed to the Collateral Agent for application in accordance with Article VII of the Intercreditor Agreement, which requires that proceeds of any disposition of the V.tal Stake be applied subject to the following waterfall:

(i)     first, on a pro rata basis and ranking *pari passu* between them, to the Intercreditor Agent and the Collateral Agent;

(ii)    second, on a pro rata basis and ranking *pari passu* between them, to each First Priority Representative,[17] for application to the payment of all outstanding "First Priority Obligations"[18]—a group that includes claims on account of the NPSD Notes and the V.tal Debentures—until all First Priority Obligations have been paid;

(iii)   third, on a pro rata basis and ranking *pari passu* between them, to the payment of all outstanding ToP Obligations until all ToP Obligations have been paid;

(iv)    fourth, on a pro rata basis and ranking *pari passu* between them, to the payment of all outstanding Priority Liquidity Obligations until all Priority Liquidity Obligations have been paid;

(v)     fifth, to the Roll-Up Notes Units Trustee for application to the payment of all outstanding Roll-Up Obligations until all Roll-Up Obligations have been paid;

(vi)    sixth, on a pro rata basis and ranking *pari passu* between them, to the payment of all outstanding Permitted Liquidity Obligations until all Permitted Liquidity Obligations have been paid; and

(vii)   seventh, to Oi.

Intercreditor Agreement § 7.02.

---

[17] The "First Priority Representative" includes each of the Indenture Trustee and the representative under the V.tal debenture claims.

[18] The obligations of Oi corresponding to the NPSD Notes and V.tal debenture claims (the "First Priority Obligations") and to the RUD Notes (the "Roll-Up Obligations") are each explicitly defined to include all of principal, interest and other amounts, regardless of allowance or disallowance in the RJ Proceeding. *See* Intercreditor Agreement § 1.01.

38.     Pursuant to section 7.02's waterfall, proceeds must be applied ratably through the applicable "Representative." For the Notes, the applicable Representative is the Indenture Trustee. Accordingly, consistent with standard practice for North American capital markets transactions, Oi would remit sale proceeds to the Indenture Trustee, which would in turn distribute payments through DTC—the central clearinghouse—to the custodians holding interests in the Notes on behalf of their clients (including the members of the Ad Hoc Group), who are the ultimate beneficial owners. Custodians would then apply such proceeds for the benefit of the beneficial owners in accordance with the pro rata allocations.[19]

### B.      Oi Takes Steps to Sell the V.tal Stake Without Complying with the Bargained-for Procedures Protected by the FFE Order

39.     As explained above, the sale process did not comply with the Intercreditor Agreement's requirements for a Competitive Sales Process. As an example, the Ad Hoc Group is unaware of any investment banker or financial advisor that was hired to market the V.tal Stake or commence any marketing efforts.[20] *See* Intercreditor Agreement § 5.04(b)(ii). The only bidder was BTG, which already had information on V.tal through its majority ownership stake. The BTG Bid did not come close to meeting the Minimum Price.

40.     Under section 5.2.2.2.4 of the RJ Plan (as well as under the terms of the Indentures), creditors may reject a non-qualifying bid that will not deliver the required cash amounts. At the March 5, 2026 hearing in the RJ Court where the bids were unveiled, Wald Administração de Falências e Empresas Em Recuperação Judicial Ltda. (collectively, the "**Judicial Administrator**")

---

[19] These processes also parallel the terms of the RJ Plan, as enforced by this Court. Among other things, the RJ Plan requires that the lien securing the V.tal Stake may only be released if proceeds from any sale are deposited into an escrow account that is fiduciarily assigned in favor of the secured creditor. Vaz Declaration ¶¶ 16, 34; RJ Plan § 5.2.2.2.8.

[20] To the best of the Ad Hoc Group's knowledge, the only financial representative that has worked with Oi on the sale process is G5 Partners Consultoria e Participações LTDA, which conducted a fairness opinion that Oi filed with the RJ Court on March 25, 2026—i.e., *after* creditors had already delivered the BTG Bid Rejection. Vaz Declaration ¶ 29(v).

acknowledged that the BTG Bid did not meet the Minimum Price and recommended that next steps be governed pursuant to section 5.2.2.2.4 of the RJ Plan, which grants a period of 10 days for creditors to consider the BTG Bid.  Vaz Declaration ¶ 28.

41.     On March 9, 2026, BGC sent a letter to the Indenture Trustee and the Collateral Agent (the "**BTG Letter**") stating that the sale proceeds "shall be applied for the payment of the Secured Parties, as set forth in section 12.02 of the Intercreditor Agreement and in Clause 5.3.2 of the RJ Plan."  ECF No. 148, Ex. B ¶ 4.  However, given that the Notes have accelerated pursuant to their terms, any disposition would constitute a "Distressed Disposal" and the applicable section governing how proceeds should be applied would be section 7.02 (*not* 12.02) of the Intercreditor Agreement.  The BTG Letter also stated, incorrectly and in contravention of the Intercreditor Agreement that BTG signed, that Brazilian courts have exclusive jurisdiction over any disputes around the disposition of the V.tal Stake.  *See id.* ¶ 8.

42.     On March 19, 2026, the Ad Hoc Group submitted the BTG Bid Rejection.  On March 25, 2026, both the Judicial Administrator and the watchdog appointed by the RJ Court to supervise the process (Mr. Adriano Pinto Machado) filed motions acknowledging that approximately 92.08% of the NPSD Notes had voted to reject the BTG Bid.  Vaz Declaration ¶ 29(iii)–(iv).  The watchdog's motion reviewed the arguments raised by the Ad Hoc Group and concluded that such creditors duly exercised their rights to reject the BTG Bid.  Vaz Declaration ¶ 29(iv).  On March 27, 2026, the 1st Public Prosecutor's Office for Bankruptcy Matters of the Capital filed a statement in the RJ Proceeding concluding that the BTG Bid is insufficient given its failure to meet the Minimum Price, emphasizing the need for heightened caution given the importance of the V.tal Stake to Oi's portfolio of assets and upholding the

legitimacy of the BTG Bid Rejection by finding no evidence of abusive voting practices or conflicts of interest that BTG had alleged in its Motion to Invalidate.  Vaz Declaration ¶ 29(vii).

43.     On March 25, 2026, Oi (at the request of the Judicial Manager) filed a motion with a purported appraisal of the V.tal Stake to affirm the "fairness" of the BTG Bid.  Vaz Declaration ¶ 29(v).  A few hours later, BTG filed the Motion to Invalidate on the basis that the Ad Hoc Group voting as a block to reject the proposed sale constituted "conflicts of interest."  Vaz Declaration ¶ 29(vi).  The Motion to Invalidate incorrectly characterizes the BTG Bid Rejection as unlawful because it "was not related to the advantage of the [BTG Bid], but rather to the intention of presenting its own proposal untimely, using credits seized in any credit bid."  Vaz Declaration, Exhibit 6 at ¶ 84.  To the contrary, as explained in the BTG Bid Rejection, the Ad Hoc Group rejected the BTG Bid precisely because it was well below the Minimum Price and failed to provide assurance to *all* creditors that they would receive their ratable share.

44.     On March 30, 2026, the Indenture Trustee filed a motion in the RJ Court refuting the points made by BTG in its Motion to Invalidate.  Vaz Declaration, Exhibit ¶ 29(viii).  The Indenture Trustee's motion reiterates the exercise of the creditors' consent rights under the RJ Plan and reiterates the importance of adhering to the negotiated waterfall set forth in the Intercreditor Agreement.

45.     Nevertheless, on April 1, 2026, the RJ Court entered the Brazil Sale Order, granting Oi's requested relief to approve the sale.  As a result of all the foregoing, and as a direct result of Oi's open, obvious and ongoing disregard for the terms of the FFE Order and the Postpetition Transaction Documents, a sale of the V.tal Stake may occur in the near term.  Vaz Declaration ¶¶ 37–39.

C.    **V.tal and Oi Pursue Litigation Against Creditors in Brazil**

46.    Oi's recent efforts to override the rights of the Noteholders and force a below-market sale of V.tal to BTG over their objection have occurred against a backdrop of other actions taken to subvert those rights.

47.    Beginning in the fall of 2025, V.tal acted to advance what is in substance veil-piercing liability against certain investment funds that participated in the RJ Plan and, in accordance therewith, received part of their recovery in equity of Oi.  V.tal's actions included attending a meeting of Oi's unions and encouraging suit against these parties.[21]  V.tal also filed a "judicial protest" to this effect–effectively making public accusations against creditors without commencing an actual suit for damages.  Vaz Declaration ¶ 41.

48.    Creditors and Oi rejected these allegations and opposed them in responsive filings. The current foreign representative (Fabio Wagner)—who was then serving as Oi's chief legal officer—sent V.tal a letter stating that "Oi categorically rejects V.tal's narrative that Oi, its managers and advisors would be articulating plans aimed at harming creditors" and that "Oi's Executive Board and Board of Directors act with total independence, free from external influences or undue pressure [with] [a]ll decisions taken so far – and those that will guide the Company in the future – [] adopted in the best interest of Oi, its creditors, employees, users and regulators, as well as in the protection of the public interest."[22]

---

[21] FITRAELP Exec., *Em Defesa Dos Direitos e Empregos dos Trabalhadores* [In Defense of Workers' Rights and Jobs], FITRATELP (August 29, 2025, at 17:29 ET), https://www.fitratelp.org.br/noticias/em-defesa-dos-direitos-e-empregos-dos-trabalhadores-062f/(Braz.).

[22] *See* September 3, 2025 letter from Mr. Fabio Wagner and Mr. Marcelo Milliet to V.tal, a translation of which is attached as Exhibit 1 to the Ad Hoc Group's March 10 letter [ECF No. 144-1].

17

49.     Because V.tal's allegations were brought as a "judicial protest," the presiding court held that there were no grounds for further proceedings, and, by decision rendered on November 19, 2025, ordered that the case remain closed and archived, without any analysis of the merits.

50.     On February 12, 2026, Oi filed the Oi Suit against the Named Defendants under seal.  Vaz Declaration ¶ 24(vi).  Oi adopted a narrative similar to the "judicial protest," alleging "abuse of control" and other improper conduct under the Brazilian Civil Code and Brazilian Corporate Act.  *See Letter Re: Email Sent Chambers* [ECF No. 154].

51.     In its suit, Oi sought, in secret and on an *ex parte* basis, an order purporting to "seize" the claims and collateral of the Named Defendants—i.e., to confiscate the Notes, the principal consideration given in the RJ Plan, and to provide a mechanism to redirect to Oi proceeds from a sale of the V.tal Stake.  Vaz Declaration ¶ 24(vi).

52.     Oi also sought to strip noneconomic rights of the Named Defendants and protections—including the critical consent rights in the Indentures, the Intercreditor Agreement and the RJ Plan—that allow creditors to set a process around and consent to whether assets can properly be sold.  *Id*.  The relief Oi seeks is unprecedented in prior RJ proceedings.  Vaz Declaration ¶¶ 25–26, 34–35.

53.     Oi is using the Oi Suit to achieve the effect of a prejudgment attachment in the United States without any hearing on the merits.  As this Court recently stated, a prejudgment attachment is not "easy to get in the United States.  It's a rare remedy.  I got it once in a very unusual circumstance . . . .  And I certainly didn't do it without going to court on public notice."  March 10, 2026 Hr'g Tr. at 17:21–25.  This Court went on, explaining that the "standard is very high for [a prejudgment attachment].  And [] it is not something that we just automatically can

grant. . . . I'd still have to have a full hearing . . . . [I]t's not something that usually is done outside of the court system and without due process." *Id*. at 18:2–8.

54.     None of these procedures have been followed.  Oi has made no effort to effectuate an attachment in the United States, other than causing an email to be sent *ex parte* to the Court, even though the property it seeks to restrain consists of Notes held in the United States that are contractually entitled to payments through the U.S. financial system.[23]

## ARGUMENT

## I.     THIS COURT HAS AMPLE AUTHORITY TO ENFORCE ITS PRIOR ORDER

55.     In the FFE Order, this Court ordered that the contractual promises in the Indentures and Intercreditor Agreement "are not subject to any modification or override except in accordance with their express terms."  FFE Order ¶ 17.  This Court further enjoined all parties from "taking any action . . . that is in contravention or inconsistent with, or would interfere with . . . the terms of this Order[.]"  FFE Order ¶ 7.  Efforts to force a sale of the V.tal Stake in direct contravention of the contractual promises of the Indentures and Intercreditor Agreement are obvious attempts to modify or override those documents.  This Court has ample and uncontroverted authority to enforce its own prior order.

56.     The Supreme Court has held that this Court, like any federal court, possesses the inherent authority to issue orders that interpret and enforce its own prior orders.[24]  Congress also expressly provided for such authority in section 105(a) of the Bankruptcy Code, which empowers

---

[23] Given the need to shed light on the parties' intentions in structuring the auction and the apparent risk that the flawed auction process may have been designed as an end-run around creditor rights, the Ad Hoc Group may propound discovery in connection with this Motion.

[24] *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (A "[b]ankruptcy [c]ourt plainly ha[s] jurisdiction to interpret and enforce its own prior orders."); *see also In Matter of Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016) ("[T]he [Bankruptcy] Code charges the bankruptcy court with carrying out its orders . . . . Hence, a bankruptcy court 'plainly ha[s] jurisdiction to interpret and enforce its own prior orders.'" (citing *Travelers Indem. Co.*, 557 U.S. at 151)); *In re China Fishery Grp. Ltd.*, 2023 WL 2435701, at *2 n.8 (Bankr. S.D.N.Y. Mar. 8, 2023) (finding that the bankruptcy court retains jurisdiction to interpret and enforce its own orders) (citations omitted).

this Court to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules . . . ."  11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code has been invoked as the basis for bankruptcy court orders intended to interpret and enforce a prior order, such as an order confirming a chapter 11 plan or recognizing a foreign restructuring under chapter 15.[25]

57.    Moreover, even if the FFE Order had not itself provided for such authority, and even if the Court's inherent authority and section 105(a) all writs authority were not sufficient (which they are), section 1522(c) of the Bankruptcy Code independently authorizes the Court to "modify or terminate" any relief granted to a foreign representative pursuant to section 1521(a) of the Bankruptcy Code.  11 U.S.C. §§ 1521(a), 1522(c).  Because the FFE Order is relief that Oi's foreign representative sought and obtained under section 1521(a), FFE Order ¶ 12 (granting relief "[p]ursuant to sections 105(a), 1521(a)(7) and 1145" of the Bankruptcy Code), section 1522(c) is an independent source of authority to "modify" that relief by entering a further order interpreting and enforcing the FFE Order as the Ad Hoc Group now requests.[26]

58.    Both BTG and Oi have recently sought to distance the relief they are seeking in the RJ Court from the reach of this Court's jurisdiction.  *See* BTG Letter at p. 3 ("Moreover, because these matters are intimately intertwined in the Company's judicial reorganization proceedings, including the RJ Plan and the V.tal Collateral, any disputes that may arise concerning the foregoing will be subject to the exclusive jurisdiction of the Courts of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, including the 7th Business Court of the City of Rio de Janeiro"); *Statement of*

---

[25] *See, e.g.*, *In re Bowflex, Inc.*, 674 B.R. 47, 61 (Bankr. D.N.J. 2025) (upholding party's argument that "pursuant to Section 105(a) . . . the court is empowered to enforce its prior orders") (citations omitted).
[26] *See, e.g.*, *In re Sanjel (USA) Inc.*, 2016 WL 4427075 (Bankr. W.D. Tex. July 28, 2016) (holding two former employees were entitled to modification of prior court's recognition order under section 1522(c) to proceed with FLSA action against debtor's officers and directors).

*Chapter 15 Debtors and Foreign Representative Regarding March 10, 2026 Status Conference* [ECF No. 143] ¶ 24 ("[T]he RJ Court is the proper forum for resolving disputes arising under the RJ Plan . . . this Court's role should continue to be to support the Brazilian RJ Proceeding and assist the RJ Court.").

59.    But this Motion neither requests nor requires that this Court second-guess the RJ Court.  To the contrary, the Ad Hoc Group seeks this Court's assistance in enforcing *its own* prior order, with respect to documents that *this Court's order* shields from modification or override, and that must be carried out in the United States.  Indeed, the fact that (a) the FFE Order *itself* permanently enjoins actions that would interfere with its terms, FFE Order ¶ 7, and (b) the Court also expressly retained "exclusive jurisdiction with respect to all matters arising from or in relation to the implementation, effect, interpretation, enforcement, amendment, or modification of this Order," eliminates any doubt that the Court retained the authority to issue the very kind of relief sought here.  FFE Order ¶ 21.  These matters are intimately involved with the FFE Order and the Court has explicit jurisdiction over them.  No recognized principle of comity circumscribes this Court's jurisdiction to interpret its own order and its implementation in New York.

60.    Finally, as discussed above, all parties that would be bound by the Proposed Order are *already subject* to this Court's jurisdiction.  Oi is before the Court as a chapter 15 debtor and is also a party to the Intercreditor Agreement and the Indentures, which are Postpetition Transaction Documents under the FFE Order.  The Judicial Manager has submitted himself to this Court on various occasions, most recently by participating in the Status Conference and, critically, is in control of Oi and conducted the "sale process" for the V.tal Stake.  Entities of BTG, including BGC and V.tal, are parties to the Intercreditor Agreement and have also voluntarily and extensively appeared and participated in these cases.  *See, e.g.*, *Notice of Appearance, and Request*

*for Service for Notices and Documents* [ECF No. 51]. Should any of these parties fail to comply with this Court's orders, the Court is vested with authority to compel enforcement, including through the issuance of sanctions.[27]

61.    The Ad Hoc Group is optimistic that parties already before this Court will not openly defy an enforcement order should the Court issue one. But if that should happen, the Court has various tools at its disposal.

## II.    THIS COURT SHOULD PROHIBIT VIOLATIONS OF THE FFE ORDER THROUGH "OVERRIDE" OF THE POSTPETITION TRANSACTION DOCUMENTS TO FORCE THE SALE OF THE V.TAL STAKE

62.    Oi's attempt to consummate a sale of the V.tal Stake in direct contravention of the terms of the Postpetition Transaction Documents is a violation of the FFE Order. Oi and BTG will presumably attempt to cast this as a matter of Brazilian law for the RJ Court. But no matter what the RJ Court may order, Oi and BTG (including V.tal) are independently bound under U.S. law by their respective obligations under the FFE Order and the New York-law governed Postpetition Transaction Documents that the FFE Order protects from override—all of which obligations Oi and the Original Foreign Representative voluntarily undertook and asked this Court to grant comity to facilitate as part of the implementation of its restructuring. Indeed, this Court has recognized that compliance with its prior order and New York law documents is integral to the functioning of the chapter 15 process and the credit markets more generally. *See* March 10, 2026 Hr'g Tr. at 23:23–25–24:1–2 ("[I]f people want to continue to access our markets here in the United States and they decide to have New York denominated documentation, [] people will expect that New York denominated documentation is going to be followed if the issue is dealt with in the

---

[27] *See, e.g.*, *Worms v. Rozhkov* (*In re Markus*), 78 F.4th 554, 564 (2d Cir. 2023) (quoting *Shilltani v. United States*, 384 U.S. 364, 370 (1966)) ("[B]ankruptcy courts, like Article III courts, possess inherent sanctioning powers" to enforce compliance with court orders).

documents."); *id.* at 24:12-18 (explaining that credit markets only work when documents, *i.e.*, plans or loan documents, are followed regardless of any restrictions in such documents).

**A.      Sale of the V.tal Stake in Contravention of the Terms of the Indentures and Intercreditor Agreement Is a Prohibited Override of These Documents**

63.      The contemplated sale of the V.tal Stake has already been pursued in contravention of the Intercreditor Agreement's requirements for Distressed Disposals, and cannot be completed without violating the NPSD Indenture's prohibition on Oi's sale of material assets (such as the V.tal Stake).  Under the NPSD Indenture, Oi may only sell the V.tal Stake through a "Permitted V.tal Sale."  Such a sale must either (i) be approved by a majority of Holders for a value of at least the Minimum Price, (ii) generate enough proceeds to fully repay all outstanding Securities (together with all other Asset Sales of the Capital Stock of V.tal), or (iii) be consented to by Holders of at least 60% of the outstanding principal amount of the Securities.  *See* NPSD Indenture §§ 1.01, 4.16(1)(ii).  None of these conditions are met here.

64.      The contemplated sale price is significantly less than the Minimum Price, meaning that the first condition cannot be met.  Under the second alternative, the sale would be permitted if it, and other sales, paid the outstanding Notes in full.  This is not the case, leaving the third condition as the only applicable alternative: "Is consented to by Holders holding at least sixty percent (60%) of the aggregate outstanding principal amount of the Securities and, unless waived, any other creditor required to provide such consent under the Reorganization Plan." *Id.*  This has not happened, as holders of more than 60% of the outstanding principal amount of the Securities have not voted affirmatively to accept the BTG Bid and so have *rejected* the sale.

65.      The contemplated sale also cannot be consummated without an impermissible override of the Intercreditor Agreement in violation of the FFE Order.

23

66.     The V.tal Stake is subject to liens in favor of the Collateral Agent. It cannot be sold to BTG free of those liens unless the Collateral Agent releases those liens. The Collateral Agent can, in turn, release those liens only if the sale of the V.tal Stake qualifies as a "Distressed Disposal" under the terms of the Intercreditor Agreement, subject to the Collateral Agent's right to seek direction from the Secured Parties (as defined in the Intercreditor Agreement). *See* Intercreditor Agreement § 5.01.

67.     As explained above, the defects in the sale process mean that the sale of the V.tal Stake already fails to qualify as a Distressed Disposal. Among other things, any Distressed Disposal must comply with specific requirements under the Intercreditor Agreement, including that any such disposal be effected pursuant to a Competitive Sales Process. *See* Intercreditor Agreement § 5.04(b)(ii).

68.     Efforts to consummate the V.tal sale in Brazil by overriding the rejecting vote of the Ad Hoc Group, and pursuant to a process that does not comply with the Intercreditor Agreement, are exactly what the FFE Order prohibits: unilaterally overriding the terms of the Indentures and Intercreditor Agreement without seeking modification under the terms of the Indentures themselves or obtaining relief from this Court's prior order.

**B.      Distributing Proceeds of the Sale of the V.tal Stake in Contravention of the Terms of the Indentures and Intercreditor Agreement Will Be a Prohibited Override of These Documents**

69.     If, as appears to be the case, Oi intends to withhold a portion of the sale price on account of the injunctive relief it has obtained in Brazil, the sale of the V.tal Stake will also require yet additional overrides of the Postpetition Transaction Documents in violation of the FFE Order.

70.     The Indentures require that the proceeds of any sale of collateral be applied as required by the Intercreditor Agreement, while the Intercreditor Agreement, in turn, sets forth a strict waterfall for sale proceeds of collateral, including the V.tal Stake. *See* Intercreditor

Agreement §§ 5.03, 7.02; Indentures § 4.16(2). Under the waterfall, proceeds must be distributed first to the Intercreditor Agent and Collateral Agent, then, second, to each First Priority Representative (including the Indenture Trustee), for application to the payment of all outstanding "First Priority Obligations"—a group that includes claims on account of the NPSD Notes and the V.tal Debentures—until all First Priority Obligations have been paid. Oi ranks seventh in the waterfall and may receive sale proceeds only if all six higher priority claimants have been paid in full. *See* Intercreditor Agreement §§ 5.03, 5.04(b)(ii); Indentures §§ 4.16(2) (requiring that proceeds of any sale of collateral be applied as required by the Intercreditor Agreement), 12.01(3) (requiring that proceeds received by the Collateral Agent in connection with any foreclosure or enforcement action be applied in accordance with the terms of the Intercreditor Agreement).

71.    If Oi instead withholds part of the sale proceeds and only pays the remainder to the Collateral Agent, the proceeds will have been improperly withheld and effectively distributed with the Collateral Agent to the "seventh" party in the waterfall ahead of the six higher-priority parties. Oi will thus be in violation of the Intercreditor Agreement, and if it acts to carry out payments in this manner, so too will BGC.

72.    In addition, if the Collateral Agent is compelled to release liens on the V.tal collateral under this circumstance, the Collateral Agent will similarly be put in a position to violate the Intercreditor Agreement. The Collateral Agent is only authorized to release liens in connection with a bona fide Distressed Disposal, which requires, among other things, that "[a]ll proceeds . . . be paid, or distributed, to the Collateral Agent for application in accordance with Article 7 of th[e] [Intercreditor] Agreement." Intercreditor Agreement § 5.03. Because Oi's withholding will have already made this condition impossible to meet, the Collateral Agent will be unable to release the liens in conformity with the Intercreditor Agreement. The sale, in turn, could not be consummated

25

unless the Collateral Agent were forced to release the liens in violation of the Intercreditor Agreement—an "override" that section 17 of the FFE Order expressly bars.

73.     That violation of the FFE Order will necessarily beget others, inviting complex and value-destroying litigation.  The Collateral Agent will have received insufficient proceeds from the sale of the V.tal Stake, and will, after deducting permissible fees and expenses, provide them to the next party in the waterfall, the "First Priority Representative," which is the Indenture Trustee under the NPSD Notes (UMB Bank N.A.).  The Indenture Trustee will then, in turn, be required to distribute proceeds to DTC.  DTC will distribute proceeds to the custodians holding the NPSD Notes for all beneficial owners, in accordance with the waterfall established by section 7.02 of the Intercreditor Agreement and section 4.16(2) of the Indentures.

74.     But, because part of the sale proceeds will have been withheld at the Oi level of the waterfall, the preceding parties in this chain will be forced to decide whether to make payments pro rata—which will ensure that *every* beneficial owner is paid less than their contractual entitlements as a result of Oi's improper withholding—or to attempt some reconciliation to account for the fact that the amounts available for distribution have been reduced by Oi in an attempt to withhold proceeds specifically from the Named Defendants.  However, because the purported attachment of Notes has not been domesticated in the United States and has no legal effect here, there is no authority and no practical means by which the DTC payment system could withhold proceeds from the accounts of the Named Defendants, even if parties wanted to do so.  And the waterfall and turnover provisions of the Intercreditor Agreement require ratable distribution of proceeds.  In any event, the likely result for all holders of the NPSD Notes would be some combination of (a) receiving substantially less than they are contractually entitled and/or (b) becoming enmeshed in a lengthy and complex turnover litigation to address the deficiency of

26

proceeds.  At each step in this reticulated process, Oi's (and BTG's) disregard for and override of the Postpetition Transaction Documents will create greater and greater risk of a cascading set of additional impermissible overrides in violation of this Court's FFE Order.

75.     None of this is a direct or natural consequence of the litigation in Brazil against the Named Defendants.  To the contrary, it is the direct consequence of Oi's attempt to evade proper procedures in the United States by trying to "shortcut" to an attachment of sale proceeds to be distributed to the Named Defendants on account of their beneficial holdings.  What Oi could have done was commence an action in the United States against the Named Defendants to seek a prejudgment attachment against them here.  It has not, presumably because, as this Court made clear, Oi would need to satisfy a very high bar to obtain such relief that is typically not available in the United States under these circumstances.  *See supra* at ¶ 53.  Oi's attempt to circumvent legal procedures by seizing part of the proceeds at the outset improperly forces numerous other parties to bear the legal risks and uncertainty that Oi has created.

*     *     *

76.     The Ad Hoc Group, the Collateral Agent, the Indenture Trustee and other transaction parties should not be subjected to Oi's ongoing and contemplated violations of the FFE Order and Postpetition Transaction Documents.  The appropriate solution is to order Oi, and anyone acting in concert with it (including BTG), to cease its efforts to violate the FFE Order by interfering with, breaching, and overriding the terms of the Postpetition Transaction Documents.

77.     Because Oi has already acted in violation of the permanent injunction in this Court's FFE Order (FFE Order ¶ 7) and now seeks to proceed with a transaction that will cause it to violate—and may force others to violate—the permanent injunction of this Court, controlling Second Circuit authority empowers this Court to further enjoin actions that are inconsistent with the terms of its prior order.  In *In Matter of Motors Liquidation Co.*, for example, the Second

Circuit explained that, where a sale order "forever prohibited and enjoined" certain claims, a party's request for an order "to enforce and clarify" the prior order was not a request for a "new injunction . . . but, rather to enforce an injunction already in place."  829 F.3d at 153–54.  In such situations, bankruptcy courts have authority under section 105(a) to decide a "motion s[eeking] enforcement of a pre-existing injunction issued as part of the bankruptcy court's [prior] order."[28]

78.     Accordingly, the Ad Hoc Group respectfully seeks entry of the Proposed Order which enforces the terms of the Court's FFE Order.

### NOTICE

79.     Notice of this Motion has been provided to the parties listed in Exhibit B hereto.

### CONCLUSION

80.     For the reasons set forth above, the Ad Hoc Group respectfully requests that the Court enter the Proposed Order.[29]

81.     The Ad Hoc Group reserves all rights to supplement and/or amend this Motion. Nothing set forth in this Motion should be deemed a waiver of any objections or arguments that the Ad Hoc Group may have with respect to any motion filed by the Debtors, the foreign representative, or the Judicial Manager in these chapter 15 cases.

---

[28] *Id.  See also id.* at 154 (quoting *In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir. 2002)); *In re Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010) (holding the district court did not err in concluding that the Enforcement Motion did not seek a new injunction but, rather, "[sought] to enforce an injunction already in place [by the prior order]"); *In re Texaco Inc.*, 182 B.R. 937, 945 (Bankr. S.D.N.Y. 1995) (interpreting prior court order providing for injunction without engaging in new injunctive analysis).

[29] The Ad Hoc Group is willing to meet and confer about a schedule that accommodates the potential need to obtain discovery and the need for expedited relief.  The basis for expedition is further detailed in the Motion to Shorten Notice that the Ad Hoc Group is filing together with this Motion.

Dated:   April 6, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Elliot Moskowitz*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Elliot Moskowitz
David Schiff
Marc J. Tobak
Joseph W. Brown

*Counsel to the Ad Hoc Group*

29

Exhibit A

Proposed Order

Exhibit A-1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Oi S.A., *et al.*,[1] | Case No. 23-10193 (LGB) |
| Debtors in Foreign Proceeding. | (Jointly Administered) |

**ORDER (I) ENFORCING THIS COURT'S PRIOR**
**ORDER GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN**
**RJ PLAN IN THE UNITED STATES; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the Motion[2] of the ad hoc group of secured noteholders (the "**Ad Hoc Group**"), and the supporting documents thereto, for entry of an Order (this "**Order**") enforcing the terms of the FFE Order and granting related relief, all as more fully set forth in the Motion and the Vaz Declaration; and this Court having reviewed the Motion and the supporting documents thereto; and appropriate and timely notice of the filing of the Motion having been given; and no other or further notice being necessary or required; and any objections to the Motion having been resolved; and this Court having jurisdiction to consider this matter and enter this Order pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause to grant the relief ordered herein; and after due deliberation therefor;

---

[1]  The Debtors in these Chapter 15 Cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

**THIS COURT FINDS AND CONCLUDES THAT:**

A.      This Court retained exclusive jurisdiction "with respect to all matters arising from or in relation to the implementation, effect, interpretation, enforcement, amendment, or modification of th[e] [FFE] Order and all matters arising in and under, and related to, these Chapter 15 Cases, including any requests for additional relief or any adversary proceeding brought in and through these Chapter 15 Cases." FFE Order ¶ 10.

B.      Section 11.08(b) of the Intercreditor Agreement and section 13.14(1) of the NPSD Indenture each provide that "any . . . proceeding" relating to those documents may be brought in this Court, and that the parties thereto "irrevocably consent and submit to the non-exclusive jurisdiction" of this Court "*in personam*, generally and unconditionally" with respect to such proceedings. Intercreditor Agreement § 11.08(b); NPSD Indenture § 13.14(1).

C.      This is a core proceeding under section 157(b)(2) and (2)(P) of title 28 of the United States Code.

D.      Venue is proper in this district pursuant to section 1410 of title 28 of the United States Code.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is granted as provided herein.

2.      The requirement that the terms of the Postpetition Transaction Documents are free from "any modification or override except in accordance with their express terms" is hereby enforced to the fullest extent permissible by law, and all parties (including Oi, BGC and V.tal) are required to abide by the FFE Order.

3.      The parties to the Postpetition Transaction Documents (including Oi, BGC and V.tal) shall not, without authorization of this Court under the provisions of chapter 15 of the Bankruptcy Code or applicable law, consummate any sale transaction of the V.tal Stake in

2

violation of the terms of the FFE Order, Postpetition Transaction Documents and RJ Plan, including, without limiting the generality of the foregoing, the requirement that any sale of the V.tal Stake satisfy the Minimum Price and constitute a "Permitted V.tal Sale" under the NPSD Indenture, respecting the consent rights afforded to creditors thereunder.

4.      None of Oi, BGC, V.tal, the Collateral Agent or the Indenture Trustee shall, and Oi shall not take action to compel such parties to, without authorization of this Court under the provisions of chapter 15 of the Bankruptcy Code or applicable law, consummate any sale transaction or apply any proceeds thereof in a manner that violates the Postpetition Transaction Documents, the RJ Plan or the FFE Order, including, without limiting the generality of the foregoing, in a manner that does not fully comply with the waterfall set forth in section 7.02 of the Intercreditor Agreement and the provisions of the NPSD Indenture.

5.      Nothing in this Order shall limit, impair or affect the rights of the Ad Hoc Group or any other parties in interest.

6.      This Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of this Order, the FFE Order and any other request for additional relief in or related to the Chapter 15 Cases.

7.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

8.      A copy of this Order, confirmed to be true and correct, shall be served, within seven business days of entry thereof, by electronic mail or overnight express delivery, upon all Notice Parties listed in Exhibit B attached to the Motion.  Such service shall be good and sufficient service and adequate notice for all purposes.

3

**IT IS SO ORDERED**.

Dated: New York, New York
_____, 2026

 

 

THE HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE

Exhibit B

Notice Parties

Exhibit B-1

**Notice Parties**

**Via Electronic Service**

beckerman.chambers@nysb.uscourts.gov
richard.morrissey@usdoj.gov
ustp.region02@usdoj.gov
fabio.wagner@oi.net.br
rodrigo.aguiar@oi.net.br
daniella.ventura@oi.net.br
ppadis@padismattar.com.br
tleite@padismattar.com.br
Vincent.vroom@loyensloeff.com
josemiguel.vilela@vtal.com
ld-juridico@vtal.com
juridico.societario@vtal.com
benjaminfinestone@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
mariogazzola@quinnemanuel.com
jeremybaldoni@quinnemanuel.com
lindsayweber@quinnemanuel.com
maggieoleary@quinnemanuel.com
johnshaffer@quinnemanuel.com
juliarodrigues@quinnemauel.com
tjunqueira@pn.com.br
abernini@pn.com.br
Joseph.Costantino@bnymellon.com
shazia.flores@umb.com
Legal.Notices@lawdeb.com
George.akerman@lawdeb.com
lily.frost@lawdeb.com
Charles.Farnsworth@bakermckenzie.com
ppapayments@citi.com
agency.trust@citi.com
transactorhubtampa@citi.com
francisco.vazquez@nortonrosefulbright.com
marian.baldwin@nortonrosefulbright.com
steve.lyons@sclowy.com
stan.genchev@sclowy.com
arjun.malhotra@sclowy.com
legal@sclowy.com
Marco.Tramontano@ashmoregroup.com
Robin.Forrest@ashmoregroup.com
Jacob.Steinfeld@ashmoregroup.com
operations@melqart.com
wouter.vanoverfelt@vontobel.com
corporateactions@bluebay.com

Exhibit B-2

derek.reisinger@brcap.com
Joshua.kogan@brcap.com
Oliver.Slyfield@kroll.com
ClientServices.Americas@glas.agency
tmgus@glas.agency
CTS.Brazil@tmf-group.com
diogo.malheiros@tmf-group.com
carla.ribeiro@tmf-group.com
leone.azevedo@tmf-group.com
adriana@wald.com.br
brunorezende@psvar.com.br
joao.ricardo@k2consultoria.com
brunatarabossi@pintomachado.adv.br
gabriela@mbscanlon.com
nbaker@stblaw.com
wrussell@stblaw.com
moshe.fink@stblaw.com
sean.lee@stblaw.com
weber@chipmanbrown.com
philip.abelson@whitecase.com
rkebrdle@whitecase.com
aparracriste@whitecase.com
ricardo.pasianotto@whitecase.com
jzakia@whitecase.com
claire.campbell@whitecase.com
peter.strom@whitecase.com
a.lipkin@chaffetzlindsey.com
kyle.kistinger@faegredrinker.com
laura.appleby@faegredrinker.com
james.millar@faegredrinker.com

Exhibit B-3

**Via First Class Mail**

| | |
|---|---|
| United States Bankruptcy Court for the Southern District of New York<br><br>Attn: Honorable Lisa G. Beckerman<br><br>One Bowling Green, Courtroom 623<br><br>New York, NY 10004-1408 | The Office of the United States Trustee for the Southern District of New York<br><br>Attn: Richard C. Morrissey<br><br>One Bowling Green, Suite 534<br><br>New York, NY 10004-1408 |
| Pinheiro Neto Advogados<br><br>Attn: Thiago Junqueira<br><br>Rua Hungria, 1100<br><br>São Paulo, SP, 01455-906, Brasil | Deutsche Bank AG<br><br>London Branch<br><br>Winchester House<br><br>1 Great Winchester Street<br><br>EC2N 2DB London, United Kingdom |
| Banco Citibank S.A.<br><br>Attn: Equipe Agency & Trust<br><br>Av. Paulista, 1111 –5th floor<br><br>Bela Vista, São Paulo, SP 01311-920, Brazil | The Law Debenture Trust Corporation p.l.c.<br><br>Attn: Trust Management (Ref: 204244)<br><br>8th Floor, 100 Bishopsgate<br><br>London EC2N 4AG<br><br>United Kingdom |
| Wilmington Trust (London) Limited<br><br>Attn: Marcy Massaki; Keith Reader<br><br>Third Floor, 1 King's Arms Yard<br><br>London EC2R 7AF | Citibank, N.A., London Branch<br><br>Attn: Agency & Trust<br><br>Citigroup Centre<br><br>Canada Square, Canary Wharf<br><br>London E14 5LB, United Kingdom |

Exhibit B-4

| | |
|---|---|
| Banco BTG Pactual S.A.<br><br>Attn: Renato Mazzola<br><br>Avenida Brigadeiro Faria Lima, nº 3.477<br><br>14º andar, Itaim Bibi,<br><br>São Paulo, SP, Brasil, CEP 04538-133 | Paul Hastings LLP<br><br>Attn: Geoffrey M. King, Louise K. Simpson<br><br>71 S. Wacker Drive, Forty-Fifth Floor<br><br>Chicago, Illinois 60606 |
| Preserva-Ação Administração Judicial<br><br>Attn: Bruno Rezende<br><br>Avenida Rio Branco, 116, 15º andar<br><br>CEP 20040-001, Rio de Janeiro/RJ | Wald Administração de Falências E Empresas Em<br><br>Recuperação Judicial Ltda.<br><br>Attn: Adriana Campos Conrado Zampon<br><br>Rua Ataulfo de Paiva, 1165, 3º andar<br><br>CEP 22240-034, Rio de Janeiro/RJ |
| American Tower do Brasil - Cessão de Infraestruturas Ltda.<br><br>Rua Olimpíadas, 205 – 8º andar<br><br>Vila Olímpia – São Paulo - SP<br><br>CEP 04551-000 – Brasil | CR2 Cessão De Infraestruturas S.A.<br><br>Rua Rio Branco 70, Sala 47<br><br>4º Andar Centro, Americana<br><br>São Paulo, CEP 13465-030, Brazil |
| SBA Torres Brasil Ltda.<br><br>Avenida das Nações Unidas, 12 399<br><br>Condomínio Florida Penthouses – Edifício<br><br>Landmark Nações Unidas, Torre C, 5º andar<br><br>Conj. 51-A<br><br>Bairro Brooklin Paulista – São Paulo-SP<br><br>CEP 04578-000 – Brasil | IHS Brasil - Cessão de Infraestruturas S.A.<br><br>Avenida Dr. Chucri Zaidan, 296, 22º andar<br><br>(Condomínio Torre Z)<br><br>Bairro Vila Cordeiro<br><br>São Paulo - SP, CEP 04583-110, Brazil |

Exhibit B-5

| | |
|---|---|
| New Skies Satellites Ltda.<br><br>Avenida das Nações Unidas, 12 551 – 18º andar<br><br>Sala 1804 (Parte II)<br><br>Bairro Brooklin Paulista<br><br>São Paulo – SP, CEP 04578-903, Brazil | Hispamar Satelite S.A.<br><br>Praia do Flamengo, 200 – 17º andar<br><br>Flamengo – Rio de Janeiro-RJ<br><br>CEP 22210-901 – Brasil |
| Telefonica Brasil S.A.<br><br>Avenida Engenheiro Luís Carlos Berrini<br><br>1376 – Cidade Monções<br><br>São Paulo – SP, CEP 04571-936, Brazil | Brazil Tower Cessão De Infraestruturas S.A.<br><br>Alameda Oscar Niemeyer, 222 – 6º andar<br><br>Bairro Vale do Sereno<br><br>Nova Lima – MG, CEP 34006-049, Brazil |
| Claro S.A.<br><br>Rua Henri Dunant, 780 – Torres A e B<br><br>Bairro Santo Amaro<br><br>São Paulo – SP, CEP 04709-110, Brazil | Torres do Brasil S.A.<br><br>Avenida Alfredo Egidio de Souza Aranha<br><br>100 – Bloco C, 3º andar<br><br>Bairro Vila Cruzeiro<br><br>São Paulo – SP, CEP 04726-908, Brazil<br>(CNPJ 38.350.109/0001-21) |
| K2 Consultoria Econômica<br><br>Attn: João Ricardo Uchoa Viana<br><br>Rua Primeiro de Março, 23, 14º andar,<br><br>CEP 20010-000, Rio de Janeiro/RJ | BGC FIBRA PARTICIPAÇÕES S.A.<br><br>Avenida Presidente Juscelino Kubitschek, nº 1.830,<br><br>1º andar, Torre 3<br><br>Vila Nova Conceição 04543-900 |

Exhibit B-6

| Wald Administração De Falências E Empresas | Wald Administração De Falências E Empresas |
|---|---|
| Em Recuperação Judicial Ltda | Em Recuperação Judicial Ltda |
| Attn: Adriana Campos Conrado Zamponi | Attn: Arnoldo Wald Filho |
| Rua General Venâncio Flores, no. 305, 10th floor | Rua General Venâncio Flores, no. 305, 10th floor |
| Leblon, Rio de Janeiro | Leblon, Rio de Janeiro |

Exhibit B-7