**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
Benjamin I. Finestone
Mario O. Gazzola
Jeremy Baldoni
Julia T. Rodrigues
295 5th Avenue, 9th Floor
New York, NY 10016
benjaminfinestone@quinnemanuel.com
mariogazzola@quinnemanuel.com
jeremybaldoni@quinnemanuel.com
juliarodrigues@quinnemanuel.com
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

K. John Shaffer (*pro hac vice*)
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
johnshaffer@quinnemanuel.com
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Counsel for BGC Fibra Participações S.A. and V.tal – Rede Neutra de Telecomunicações S.A.*

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Oi S.A. *et al.*,<br><br>      Debtors in a Foreign Proceeding.[1] | Chapter 15<br><br>Jointly Administered<br><br>Case No. 23-10193 (JPM) |

**OBJECTION TO MOTION FOR AN ORDER TO (I) ENFORCE THIS COURT'S
PRIOR ORDER GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN RJ
PLAN IN THE UNITED STATES AND (II) GRANT RELATED RELIEF**

---

[1]    The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. (8447 – Netherlands), and Portugal Telecom International Finance B.V. (5023 – Netherlands) ("Oi Group" or "Oi").

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. FACTUAL BACKGROUND.....................................................................................6

    A.  The Ad Hoc Group's Pattern Of Misconduct In Brazil ...........................................6

        1.  The RJ Court Removes Oi's Management ....................................................6

        2.  The Ad Hoc Group's Abuse Of Controlling Power......................................6

        3.  Brazilian Courts Have Repeatedly Found Against The Ad Hoc
           Group .............................................................................................................7

    B.  The Brazilian Court's Thorough And Fully Informed Consideration Of
        The V.Tal Sale ........................................................................................................9

        1.  The Competitive Sale Process ......................................................................9

        2.  The Evidence The RJ Court Considered.....................................................11

        3.  The Creditor Deliberation And The Ad Hoc Group's Rejection...............13

    C.  The Intercreditor Agreement and the Indentures Do Not Say What The Ad
        Hoc Group Claims They Do ..................................................................................14

    D.  The Ad Hoc Group Rushed To This Court Without First Pursuing Its
        Available Appellate Remedies In Brazil...............................................................16

III. ARGUMENT .........................................................................................................17

    A.  This Court Should Decline To Overrule The RJ Court's Decision
        Approving The Sale Of Oi's V.Tal Stake.............................................................19

        1.  Under The Notions Of Comity Underlying Chapter 15, A Chapter
           15 Court Should Not Sit In Judgment Of An Order Issued In A
           Foreign Main Proceeding.............................................................................19

        2.  Chapter 15 Jurisprudence Does Not Permit This Court To Preside
           Over The Foreign Asset Sale ......................................................................22

        3.  The Ad Hoc Group's Proposed Order Seeks Improper Relief For
           Its Breach Of Contract Claims....................................................................23

    B.  The Approved Sale Complies With The FFE Order...............................................24

        1.  The FFE Order Does Not Restrict The RJ Court's Authority Over
           The RJ Proceeding ......................................................................................25

        2.  The Sale Satisfies The Terms Of The Intercreditor Agreement, The
           Indentures, and the RJ Plan.......................................................................27

            (a)  The Sale Is A "Permitted V.tal Sale"...........................................27

            (b)  The Sale Is Not A "Distressed Disposal" Under The
                 Intercreditor Agreement................................................................29

i

(c)     The Ad Hoc Group Fails To Substantiate Its Process
        Claims ........................................................................30

(d)     The Ad Hoc Group Was Allowed To Exercise Its Voting
        Rights ........................................................................31

(e)     The Bid Complies With The Distribution Waterfall......................32

C.      The Contract Assertions Brought By The Ad Hoc Group Are "subject to
        the exclusive jurisdiction of the Courts of the City of Rio de Janeiro" .................33

D.      This Court Lacks Personal Jurisdiction .................................................36

IV.     CONCLUSION...........................................................................37

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Cozumel Caribe, S.A. de C.V.*,
508 B.R. .............................................................................................................................20

*In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*,
670 B.R. 150 (Bankr. D. Del. 2025) .................................................................................24

*CT Inv. Mgmt. Co., LLC v. Carbonell*,
2012 WL 92359 (S.D.N.Y. Jan. 11, 2012) ......................................................................23

*In re First Cent. Fin. Corp.*,
377 F.3d 209 (2d Cir. 2004) .............................................................................................3

*In re Gee*,
53 B.R. 891 (Bankr. S.D.N.Y. 1985) ...............................................................................20

*Jota v. Texaco Inc.*,
157 F.3d 153 (2d Cir. 1998) ...............................................................................................1

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
412 F.3d 418 (2d Cir. 2005) .......................................................................................1, 20

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) .............................................................................................3

*In re Maxwell Commc'n Corp.*
*plc by Homan*, 93 F.3d 1036 (2d Cir. 1996) ..................................................................20

*In re Mod. Land (China) Co., Ltd.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022) .............................................................................23

*In re Nat'l Bank of Anguilla (Priv. Banking Tr.) Ltd.*,
580 B.R. 64 (Bankr. S.D.N.Y. 2018) ...............................................................................20

*In re Oi Brasil Holdings Cooperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017) .............................................................................19

*In re Oi S.A.*,
587 B.R. 253 (Bankr. S.D.N.Y. 2018) ...................................................................1, 20, 22

*In re Rede Energia S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014) ..........................................................................23, 31

*In re Reliable Drug Stores, Inc.*,
70 F.3d 948 (7th Cir. 1995) ...............................................................................................3

*In re Sanjel (USA) Inc.*,
  2016 WL 4427075 (Bankr. W.D. Tex. July 29, 2016) ...........................................................34

## **Statutes**

11 U.S.C. § 1501 ............................................................................................................1, 19

11 U.S.C. § 1506 .....................................................................................................................23

11 U.S.C. § 1509(b)(3) ...........................................................................................................23

11 U.S.C. § 1520(a)(2) ............................................................................................................22

11 U.S.C. § 1522(a) .................................................................................................................33

## **Other Authorities**

Fed.R. Bankr.P. 8007(a)(1) .......................................................................................................4

## I.    PRELIMINARY STATEMENT

The Motion—which seeks injunction of an RJ Court-approved sale transaction—is an extraordinary request that should be summarily denied.[2]  In sum, the Motion asks this Court to look far past the Statue of Liberty and "second guess the wisdom of the Brazilian court[] or overrule [its] decisions, which would be fundamentally inconsistent with comity." *In re Oi S.A.*, 587 B.R. 253, 273 (Bankr. S.D.N.Y. 2018); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,* 412 F.3d 418, 424 (2d Cir. 2005) ("Since the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions.") (cleaned up); *Jota v. Texaco Inc.*, 157 F.3d 153, 159-60 (2d Cir. 1998) ("Under the principles of comity, United States courts 'ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States.'") (citation omitted).  The RJ Court's decision is firmly grounded in Brazilian law, and there is no dispute that the decision approves a sale by a Brazilian company, of Brazilian assets, in Brazil, to a Brazilian buyer, under the Brazilian legal regime governing sales within a Brazilian restructuring proceeding.  The Motion's premise is simply impossible to square with the purpose and scope of Chapter 15 of the Bankruptcy Code.  *See* 11 U.S.C. § 1501.

Even assuming it were appropriate to ask this Court to second guess the RJ Court, there would still be no basis for the Ad Hoc Group's extraordinary request.  In approving the sale, the RJ Court carefully considered the views—in support and in opposition—of a long list of interested parties and issued a well-reasoned opinion.  ECF 164, Ex. 9 ("Sale Order").  The RJ Court:

---

[2]  ECF 162 and 163, Ad Hoc Group's Motion For An Order To (I) Enforce This Court's Prior Order Granting Full Force And Effect To The Brazilian RJ Plan In The United States And (II) Grant Related Relief, April 6, 2026 ("Motion" or "Mot.").

- *appreciated the gravity of the situation*, acknowledging that "[o]nce again, this Court is called upon to render a fundamental decision in the course of this proceeding, the largest judicial reorganization in the country, a decision that will entail highly significant consequences, to which this Court will remain attentive and vigilant.  Here, the Court will decide on the sale of perhaps the most valuable asset still held by the Oi Group, namely its equity interest in V.Tal, through Isolated Productive Unit V.Tal, aptly referred to as the 'crown jewel' by the Public Prosecutor's Office acting before this Court," *id.* at 192-193;

- *recognized that a sale was "imperative,"* noting that a sale was "provided for in the approved Judicial Reorganization Plan, to be carried out in 2026, and it was likewise determined by a decision of a higher court that established priority for the orderly sale of assets upon the resumption of the judicial reorganization," *id.* at 193;

- *gathered comfort from the thoroughness of the marketing process*, recognizing that "the sale was launched through a public notice with broad market awareness," "the market was widely informed of the sale and could participate in the bidding process," and "the asset was broadly offered to the market through a public competitive process," *id.* at 195;

- *perceived the "plain and simple reality,"* noting that "it is clear that an unavoidable reality exists: for the sale of Oi's interest in V.Tal, there is only one proposal submitted, namely the BTG PROPOSAL" and that "only one interested party came forward: the present bidder," *id.* at 195;

- *displayed objectivity and balance*, rejecting the Ad Hoc Group's value proposition, finding that it was stale, "established 2 years ago" based on "historical numerical metrics," but also passing on the "bidder's analysis … as inherently biased, as it seeks to support its own proposal," *id.* at 196; and,

- *ultimately recognized "the fairness and reasonableness of the price set forth in the BTG PROPOSAL,"* supported by "the only technical and impartial valuation available, submitted by the Judicial Management together with the debtor, conducted by a well-established firm, which concludes that the value of the BTG PROPOSAL is 'reasonable,'" *id.* at 196, 199.

After providing due process to all parties, the RJ Court overruled the objections of the Ad Hoc Group and their representatives, finding that such parties were advancing "so-called 'pocket nullities,' consisting of purported defects that, in practice, seek to hinder the progress of the case by creating obstacles that are either nonexistent or irrelevant, as they produce no consequence other than delaying the proceeding." *Id.* at 195.  More specifically, the RJ Court determined:

2

- "Indeed, although UMB now challenges the competitive process initiated on the grounds that it contains 'restrictive conditions,' the fact is that it ***expressly agreed*** to such public notice.[]  Therefore, it has no standing to now allege the existence of purported restrictive conditions - not even specified - that would have limited access to broad competition, especially since, as reiterated, it maintains no interest in acquiring the asset through a credit proposal." *Id.* at 195 (emphasis added); *see also* ECF 164 ("Vaz Decl.") n.59 (conceding that the Ad Hoc Group approved of the bid notice and accompanying sale procedures);

- "… this Court deems it essential to note that all UMB's allegations would carry greater credibility and reliability had it concretely presented alternatives to the admission of the sale it now challenges; had it sought valuations of the asset by recognized firms in the field; or had it demonstrated efforts to identify other interested purchasers.  However, it has presented none of these.  Its allegations lack any evidentiary support and are therefore devoid of substance." *Id.* at 902;

- "With all due respect to the representatives of the objecting parties, this Court must acknowledge that they failed, even minimally, to substantiate their allegations." *Id.* at 904;

- "[T]he rejection expressed by the Creditors under Restructuring Option I and their representatives amounted to an exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith. *Id.* at 906.

At bottom, the RJ Court's Sale Order reads familiarly to many decisions approving sale transactions from the 90 Bankruptcy Courts that reside over asset sales in bankruptcy in this country. *Cf. In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983) ("To further the purposes of chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances.").  Frequently, creditors may be disappointed in the results of an auction process, but neither the RJ Court, nor this Court, nor the Bankruptcy Code, are able to guarantee an outcome that will appease all of its creditors. *Cf. In re First Cent. Fin. Corp.*, 377 F.3d 209, 217 (2d Cir. 2004) (noting that while creditors may "chafe at being required to accept less … the short — and conclusive — answer is that this is not injustice, it is bankruptcy"); *In re Reliable Drug Stores, Inc.*, 70 F.3d 948, 951 (7th Cir. 1995) ("bad breaks are common in bankruptcy").  The "plain and simple reality" acknowledged by the RJ Court overseeing the RJ Proceeding, that there was only one bid for the asset, does not give creditors the right to hold up

the process in a value-destructive manner—perhaps motivated by their own wrongdoing—hoping that somehow their obstructionist behavior will translate into more value.

Nothing in the Sale Order conflicts with this Court's FFE Order. First, nowhere does the Sale Order purport to modify, eviscerate, or override any party's contract rights. To the extent a breach has occurred (one has not, but assuming *arguendo*), the RJ Court did not purport to strip any party's right to enforce such contract rights in a court with jurisdiction. Indeed, the Ad Hoc Group concedes this fact, noting that the Sale Order "*does not purport to override*" any putative violations of the "Postpetition Transaction Documents." Mot. ¶ 10. Second, no breach of the indentures has occurred in any event. In a critical parenthetical that the Ad Hoc Group omits from its Motion without the use of ellipses, Mot. ¶ 32, the relevant indentures define the minimum price as: "at least BRL\$8.0 billion (*as increased or **decreased** based on an increase or **decrease**, respectively, of the value of such Capital Stock since the Reorganization Plan Confirmation*)." NPSD Indenture § 1.01 (emphasis added).[3] Thus, the minimum price floats with fair market value—and the Sale Order found that the marketing process was comprehensive and that the resulting sale price was "fair" and "reasonable." The minimum price was met.

Notwithstanding the RJ Court's careful and considered opinion, the Ad Hoc Group seeks this Court's intervention, not in aid of comity, but in an attempt to overrule it. In essence, the Ad Hoc Group's Motion seeks a stay pending appeal,[4] asking this Court to supplant the role of the Brazilian Appellate Court, and to invalidate the valid Sale Order under Brazilian law. Indeed, the Ad Hoc Group filed its Motion ***prior to even filing an appeal*** of the RJ Court's Order in Brazil,

---

[3]   ECF 164, Ex. 10 (The 10.000% / 13.500% PIK Toggle Senior Secured Notes due 2027 (the "NPSD Notes" and the indenture issuing the NPSD Notes, the "NPSD Indenture")).

[4]   By analogy, Fed.R. Bankr.P. 8007(a)(1) would direct the Ad Hoc Group to first seek a stay from the RJ Court.

where any challenge to the Sale Order is properly heard.[5] Nevertheless, in any such motion, a court would consider the harm threatened to other parties, including those not before the court, and to the public interest. Those factors would weigh heavily in favor of denying the Motion and not upsetting the RJ Proceeding.

Worse, the Ad Hoc Group's Motion presents an incomplete picture of the underlying proceedings. What it omits is as significant as what it includes: a sustained pattern of discredited conduct by the Ad Hoc Group in the Brazilian judicial reorganization proceedings, and multiple adverse rulings by Brazilian courts at every level of the judicial hierarchy.

The impetus for the Motion is not that the Ad Hoc Group believes the asset can be sold for more. Indeed, the Ad Hoc Group did not even engage a valuation expert to support its objections in Brazil, as the RJ Court recognized. Sale Order, at 197 (noting that the Ad Hoc Group's objections were "based solely on allegations lacking technical substantiation."). Rather, as the Ad Hoc Group's premature complaints about concerns with a potential payment process lay bare, the Ad Hoc Group is simply hoping to engineer a method of distributing proceeds that can evade the RJ Court's freezing orders against the Ad Hoc Group's controlling members.

Rather than only appeal to the Brazilian Appellate Court—which has the full context and background of the Ad Hoc Group's manipulation of Oi's RJ process—the Ad Hoc Group is hoping to have two bites at the apple and use this Court to potentially evade the consequences of its prior misconduct by seeking emergency relief before a Court that has not been confronted with the full background concerning the Ad Hoc Group's conduct.

The Motion should be denied.

---

[5] After the Motion was filed, the Ad Hoc Group filed a motion for reconsideration with the RJ Court.

## II.   FACTUAL BACKGROUND

### A.   <u>The Ad Hoc Group's Pattern Of Misconduct In Brazil</u>

#### 1.   <u>The RJ Court Removes Oi's Management</u>

As previously disclosed to this Court, ECF 130, following the hearing last summer on Oi's motion to terminate these Chapter 15 proceedings, the RJ Court removed Oi's entire board of directors and executive team, *id.* at 2, banned Oi from hiring or paying its financial advisors, *id.* at 3, and appointed a Judicial Administrator to assume control over the Company, *id.* at 2.  After the RJ Court appointed the Judicial Administrator, the Ad Hoc Group's direction of and involvement in Oi's former management's actions began to be unveiled.

#### 2.   <u>The Ad Hoc Group's Abuse Of Controlling Power</u>

Specifically, the Ad Hoc Group did not arrive at the current dispute as passive creditors asserting legitimate contractual rights.  They arrived as a group of former controlling shareholders who appointed a board, management and advisors later removed by Brazilian courts and who were held liable, by multiple courts, on a preliminary basis, for abusing their position of control over Oi in violation of the Brazilian Corporations Law.

Following Oi's second judicial reorganization, the Ad Hoc Group converted its debt to equity and engineered a governance structure that placed its own nominees on Oi's board of directors. Once installed, the Ad Hoc Group's nominees proceeded to appoint management and advisors—including the Ad Hoc Group's own former advisors and also an advisory firm named Íntegra Associados ("Íntegra"), owned by the same persons appointed by the Ad Hoc Group for the positions of CEO, CFO and one of the board members of Oi. RJ Court  According to this contract with Íntegra—which was never disclosed to the Brazilian Courts, the Judicial Administrator or the Watchdog, in breach of their legal obligations and fiduciary duties—the newly appointed managers would receive generous rewards if they were able to maximize the Ad

6

Hoc Group's own recoveries.  In particular, the undisclosed contract awarded to management (through their consultancy company) a large success bonus for repaying the Ad Hoc Group's debt, over the various layers of debt that was senior to theirs, at the expense of employees, suppliers, counterparties, and the Brazilian public.

Oi's newly appointed management, following the perverse incentives the Ad Hoc Group had enshrined, pursued the Ad Hoc Group's (sole) interests. Worse, it appears that rather than running and restructuring Oi's business in compliance with the RJ Plan, the newly appointed management was instructed to liquidate the Company's assets to repay the Ad Hoc Group's debt. A lawful liquidation of the Company's assets would require the Court to declare Oi Bankrupt, replace the Ad Hoc Group management for a Judicial Administrator and follow the creditor priority order.  While selectively defaulting on obligations to other creditors, breaching the RJ Plan and liquidating assets, the management appointed by the Ad Hoc Group also engineered a strategy to close Oi's Chapter 15 case in this Court so that Oi could file a Chapter 11 case that would allow it to restructure credits that could not be restructured under Brazilian law (and which were senior to the Ad Hoc Group's credits).

### 3.    Brazilian Courts Have Repeatedly Found Against The Ad Hoc Group

The Ad Hoc Group's motion implies that the Brazilian judiciary has been indifferent to the rights of creditors.  The opposite is true.  The Brazilian courts, at multiple levels of jurisdiction, have repeatedly ruled against the Ad Hoc Group, specifically on the grounds of abuse of controlling power under Brazilian law.  The record of adverse decisions is extensive:

On **September 30, 2025**, in the decision reported to this Court in ECF 130, the Brazilian bankruptcy court issued a ruling in ancillary proceeding no. 3034029-12.2026.8.19.0001 that ordered removal of the management team installed by the Ad Hoc Group, citing misleading disclosures to the court and the engagement of professionals at grossly excessive fees in connection

7

with the scheme to file Chapter 11 in the United States.  The Ad Hoc Group sought to stay that decision.

On **October 1, 2025**, the Brazilian appellate court denied the Ad Hoc Group's stay request in interlocutory appeal no. 0083339-75.2025.8.19.0000, maintaining the removal of management and expressly finding that the representations made to the court by the management team had been inconsistent with the facts and documents as presented by court-appointed officers, and that management had moved in a direction entirely contrary to what had been committed to in the judicial reorganization plan.

On **November 7, 2025**, a Labor Court responsible for approximately eight thousand labor creditors administered by a Labor Creditors' Committee under case no. 0100210-65.2017.5.01.0081 found, at preliminary stage, that certain Ad Hoc Group members abused their position as controlling shareholders of Oi, resulting in an attachment order against their credit instruments.  The Ad Hoc Group's efforts to challenge this ruling through three different extraordinary writs were dismissed by Labor Appellate and Superior Courts.

On **November 14, 2025**, the bankruptcy appellate court ruled on further appeals to the September 30, 2025 decision on other grounds, but explicitly maintained the removal of the Ad Hoc Group's management team, attributing Oi's condition to management failures rather than inherent business unviability.

On **February 19, 2026**, in a liability action filed by Oi against the Ad Hoc Group (case no. 3019135-31.2026.8.19.0001), the RJ Court found a likelihood of success at the preliminary stage that the primary members of the Ad Hoc Group had committed abuse of controlling power.[6]  The RJ Court ordered attachment of the Ad Hoc Group's claims against Oi.  In issuing that preliminary

---

[6]  Carpenter Decl., Ex. A.

ruling, the RJ Court found strong evidentiary support for the conclusion that the Ad Hoc Group's members had acted with intentional and planned conduct to obtain undue advantage, to violate ethics and the law, to the detriment of the company, its shareholders, and its other creditors.[7]

On **February 27, 2026**, another Labor Court under case no. 0000285-14.2021.5.12.0061— similarly found, at a preliminary stage, that the Ad Hoc Group was liable for abusing its controlling power, resulting in an additional attachment order against its credit instruments.

Following the removal of its management team, the largest members of the Ad Hoc Group—apparently reading the direction of the proceedings—quickly sold down their equity positions in Oi between November 17 and November 25, 2025, reverting to the status of a mere creditor.

The Motion to this Court makes no mention of any of these facts.

B.     **The Brazilian Court's Thorough And Fully Informed Consideration Of The V.Tal Sale**

The Motion suggests that the RJ Court approved the bid in a rushed or procedurally deficient manner, without adequate consideration of the objections raised.  The record in those proceedings tells a very different story.  As reflected in the RJ Court's order approving the sale of UPI V.tal (the "Sale Order"), the RJ Court conducted a comprehensive, multi-week proceeding and held two separate evidentiary hearings in which every party with a stake in the outcome was heard, and in which the RJ Court carefully worked through the factual record and each of the objections that the Ad Hoc Group now seeks to relitigate (or litigate for the first time) before this Court.

1.     The Competitive Sale Process

---

[7]  Carpenter Decl., Ex. A.

The sale process was conducted pursuant to a public auction notice (*Edital*) published on February 2, 2026, pursuant to the RJ Plan as homologated by the Brazilian court.[8] The *Edital* established the terms of the competitive process, including objective qualification requirements and a cash-only payment requirement. **The *Edital* was reviewed and approved by the Creditors themselves—including the Ad Hoc Group through its trustee, UMB Bank N.A., which expressly stated that it did not oppose the terms of the *Edital*** and the cash-only payment requirement that it now challenges before this Court. *See also* Vaz Decl. n.59. Indeed, the RJ Court expressly chastised the Ad Hoc Group's belated attempt (via their Trustee) to challenge "the competitive process initiated on the grounds that it contains 'restrictive conditions,'" given that the Ad Hoc Group "***expressly agreed to such public notice***." Sale Order at 195 (emphasis added).

The Ad Hoc Group's complaints to this Court about the method of sale—including whether a financial advisor was required to be engaged (one was not)—should have been raised at the time of approving the *Edital,* to the appropriate court. The Ad Hoc Group now tries to litigate the method of sale before this Court, without having raised these concerns in the proper forum.[9] The reason is clear—in Brazilian filings and by approving the public bid notice (*Edital*), the Ad Hoc Group acknowledged that this was not at all a distressed disposition (i.e. collateral foreclosure) under Article 5 of the Intercreditor Agreement,[10] but rather an ordinary course disposition pursuant

---

[8] Carpenter Decl. ¶ 19.

[9] Indeed, the Ad Hoc Group did not challenge the absence of a financial advisor at the time it approved the *Edital*, did not raise the issue at the hearing before the RJ Court, and did not raise the issue in the appeal it subsequently filed challenging the Sale Order. The issue has now been waived.

[10] ECF No. 150-1, Intercreditor Agreement, dated August 8, 2024 ("Intercreditor Agreement").

to the RJ Plan. *See* ECF 164, Ex. 3 at 78-82 (acknowledging that the sale is a sale pursuant to the RJ Plan).

The RJ Court found that "the competitive model adopted for the sale is **the most transparent available**, as it directly offers the market, in a broad and public manner, the opportunity to compete freely." Sale Order at 195 (emphasis added). But despite the public auction process overseen by the RJ Court, only one bidder qualified and submitted a binding bid: BTG Pactual and its affiliated entities (the "Bid"), offering R$ 4.5 billion in cash, payable at closing in a single installment, with a contingent earn-out of R$ 500 million.

2.      The Evidence The RJ Court Considered

Before approving the Bid, the RJ Court considered an extensive evidentiary record. That record included:

**Valuation evidence.** G5 Partners Consultoria e Participações LTDA, described by the court as the largest independent financial services firm in Brazil for wealth management and M&A advice, and a firm regularly engaged to provide fairness opinions in competitive selection processes, submitted a fairness opinion concluding that the Bid price was "fair" from a strictly financial standpoint. G5 analyzed the V.tal stake using four distinct methodologies: discounted cash flow analysis (which yielded a range of approximately R$2.555 billion to R$3.356 billion), comparable public company multiples (R$1.42 billion to R$1.772 billion), precedent transaction multiples (R$1.61 billion to R$2.004 billion), and net asset value (approximately R$4.487 billion). Under each methodology, the Bid price of R$4.5 billion was at or above the indicated range. G5 expressly concluded that the minimum price established in the *Edital*—R$12.315 billion—was "outdated and no longer reflects current reality."[11] By contrast, the Ad Hoc Group submitted no

---

[11]   Sale Order, at 197.

11

competing technical valuation evidence. Its objections were characterized by the Brazilian court as unsubstantiated assertions unsupported by expert analysis.[12]

**Market comparables.** The RJ Court also considered evidence of the recent acquisition of Desktop S.A.[13]—a listed, financially healthy, and rapidly expanding fiber internet provider—by Claro NXT Comunicações, announced on March 22, 2026 (a week before the second evidentiary hearing before the RJ Court), at implied multiples of approximately 6x EBIDTA, compared to the 14x EBITDA embodied by the Bid. If anything, this comparable suggested that the Bid reflected or exceeded prevailing market pricing for comparable assets.

**The nature of the asset.** The RJ Court noted the specific circumstances of the sale: Oi's stake in V.tal is a minority position without control rights or meaningful governance protections, in a privately held company with limited liquidity, sold by an insolvent vendor that cannot offer the buyer indemnification protections available in ordinary course transactions. Each of these characteristics independently suppresses achievable market value relative to a theoretical enterprise value derived from historical projections.

**The attachment orders.** The RJ Court also noted that the claims of the Ad Hoc Group members—the very claims they sought to use as leverage over the payment mechanics and as the basis for a prospective credit bid—were subject to attachment orders issued both by the bankruptcy court itself and by the Labor Courts, on the grounds of abuse of controlling power. The RJ Court found it would be incoherent to treat the Ad Hoc Group's payment-structure objections as a basis for blocking a sale when those same claims were under attachment due to the Ad Hoc Group's own prior conduct.

---

[12]   *Id.*

[13]   Sale Order, at 190.

**The interests of all constituencies.** The RJ Court expressly considered the interests of Oi's labor creditors, who were not party to the RJ Plan but who stood to benefit from the monetization of the V.tal stake—and who, through their committee, voiced support for the Bid. The RJ Court weighed the dire financial condition of Oi, the absence of any viable alternative source of liquidity, the limited value of Oi's remaining assets, and the risk that if this bid were rejected, the next bid may not be as high in light of the freshly announced Desktop S.A. acquisition.

### 3. The Creditor Deliberation And The Ad Hoc Group's Rejection

Consistent with the procedures established in the *Edital* and the RJ Plan, the Bid—being below the minimum price established in the *Edital*—was submitted to the Restructuring Option I Creditors (the class that includes the Ad Hoc Group) for deliberation. The Ad Hoc Group, voting as a coordinated block, led the vote, and the rejection of the Bid.

The composition of that vote was significant. The overwhelming majority of the rejection vote was concentrated in the Ad Hoc Group itself. If the Ad Hoc Group's vote in block were to be disregarded, two thirds of the remaining votes would have approved the sale.

In analyzing the vote, the RJ Court noted that "judicial review of creditor voting has evolved in the Brazilian legal system, moving beyond merely formal analysis to a more substantive one," with particular focus on "legality, legitimacy, and absence of abuse of rights, including consideration of the propriety of votes." Sale Order at 195. The RJ Court noted that amendments to the Brazilian Bankruptcy Law "make it clear that judicial review of the legitimacy of votes is not only possible **but also necessary**." *Id.* (emphasis added). The RJ Court found that "the legitimacy of the vote rejecting this sole proposal that must be assessed, since a discretionary right is not absolute and may be limited under the legal system, especially when its exercise becomes abusive or contrary to the principles of good faith and social function." *Id* at 195. The RJ Court also recognized that the Ad Hoc Group's block vote was cast against a backdrop of the pending

13

liability action in which those same creditors had already been found, at preliminary review, to have abused their political rights as shareholders for personal advantage. *Id.* at 198.

Critically, the Brazilian RJ Court also found that the Ad Hoc Group had expressly disclaimed any interest in submitting an alternative bid—whether by credit bid or otherwise. The Brazilian RJ Court heard argument on the Ad Hoc Group's stated intention to pursue a credit bid alternative, took testimony from Ad Hoc Group representatives at the March 30, 2026 hearing, and concluded that the Ad Hoc Group had failed to substantiate any credible alternative path to monetizing the V.tal stake at a higher value. The court-appointed Watchdog confirmed both the procedural regularity of the rejection and the practical reality that it was highly unlikely any other buyer capable of offering a higher price would emerge.

Accordingly, the RJ Court ruled that "the rejection expressed by the [Ad Hoc Group] and their representatives amounted to an exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith," *id.* at 199, requiring the RJ Court to disregard the vote under Brazilian Bankruptcy Law.

C.     **The Intercreditor Agreement and the Indentures Do Not Say What The Ad Hoc Group Claims They Do**

The Ad Hoc Group ignores or glosses over several provisions of the Intercreditor Agreement and the indenture that do not support its Motion. Most critically among them:

- The Ad Hoc Group relies on the "Distressed Disposal" provisions in the Intercreditor Agreement, but those are only applicable to dispositions (a) "being effected at the request or upon the instruction of the relevant Instructing Group in circumstances where the Collateral has become enforceable," (b) "being effected by enforcement of the Collateral, or (c) "being effected following the Acceleration date." ECF 150 at 17.

- The Ad Hoc Group asserts that the notes have automatically accelerated and become due because of the filing for judicial reorganization of certain Subsidiary Guarantors. Mot. ¶ 10. But in fact, the RJ Court stayed the effects of any acceleration on September 30, 2025, which has been extended through at least April 20, 2026. Declaration of Marcelo Lamego Carpenter in Support Of BGC and

14

V.Tal's Opposition To Ad Hoc Group's April 6, 2026 Motion ("Carpenter Decl.")
¶¶ 64-66. The Ad Hoc Group has never initiated or attempted to initiate a collateral
foreclosure under the Distressed Disposal provisions in the Intercreditor Agreement,
but rather explicitly consented to the public bid notice (*Edital*) that set the rules for
an ordinary course disposal under the RJ Plan.

- The Ad Hoc Group also asserts that BTG has consented to jurisdiction because
"Entities of BTG" are parties to the Intercreditor Agreement, but in fact entities
associated with BTG simply manage and administer investment funds which are
the holders of shares of V.tal's and BGC's capital stock.  The Ad Hoc Group cites
no law for the proposition that an investment fund administrator or investor, absent
veil piercing, can be bound by agreements of its subsidiaries, nor does the Ad Hoc
Group attempt to make out such a veil piercing claim at all.  Mot. ¶ 60.

- V.tal and BGC did not ever submit to the United States jurisdiction pursuant to the
Intercreditor Agreement. The Intercreditor Agreement makes it clear that *only*
"[t]he Company and each Grantor irrevocably consents and agrees . . . that any legal
action, suit or proceeding against it" may "be brought in the courts of the State of
New York or any United States federal court, sitting in the Borough of Manhattan,
in the City of New York, New York."  ECF 150 § 11.08(b).  V.tal and BGC are not
the Company or a Grantor under the Intercreditor Agreement, but mere creditors.

- V.tal and BGC do not represent all the bidders.  Only one of the six bidders is a
party to the Intercreditor Agreement (BGC).  V.tal is not a bidder at all, but rather
the object of the bid.

- The central argument of the Ad Hoc Group for challenging the sale of the V.tal
Stake is based on the fact that "[t]he V.tal Stake is the most important and valuable
piece of collateral that secures the Notes" (…) "[t]he collateral now has even greater
importance" (…) "[t]he Indentures also require that the proceeds of any sale of
collateral be applied as required by the Intercreditor Agreement" and "[t]he
Intercreditor Agreement acts as the over-arching security agreement for the
collateral that secures Oi's international financial debt and other post-RJ Plan
secured obligations," Mot. ¶26, 35, but glosses over the facts that (i) the Collateral
Documents (including the "V.Tal Fiduciary Lien Agreement,"—i.e., the agreement
which provides for liens on the V.tal's shares to secure the Notes) are governed by
Brazilian Law and subject to the jurisdiction of Brazilian Courts; and (ii) the
Intercreditor Agreement and the Indentures require that "any action that may be
brought in connection with the Collateral Documents will be subject to the
exclusive jurisdiction of the Courts of the City of Rio de Janeiro, State of Rio de
Janeiro, Brazil."  ECF 150 § 11.08(b); NPSD Indenture at 312, § 13.14(1) .

15

**D.**     **The Ad Hoc Group Rushed To This Court Without First Pursuing Its Available Appellate Remedies In Brazil**

Perhaps the most striking aspect of the Ad Hoc Group's Motion is what it chose to do—and not do—after the RJ Court issued its April 1, 2026 ruling approving the Bid. The Brazilian judicial system provided the Ad Hoc Group with well-established appellate procedures to challenge the court's decision. An interlocutory appeal (*agravo de instrumento*) could have been filed with the Rio de Janeiro appellate court on an expedited basis. *Embargos de declaração* could have been filed with the RJ Court (as they eventually were). The Ad Hoc Group could have moved to stay the sale. The Ad Hoc Group pursued none of this before filing the present motion.

Instead, within days of the April 1 ruling—and before filing any appeal in Brazil—the Ad Hoc Group filed the instant motion with this Court, seeking a U.S. injunction to block a transaction that the fully-informed RJ Court, presiding over one of the largest judicial reorganization in Brazilian history, had just approved after comprehensive proceedings. The Ad Hoc Group's decision to bypass the Brazilian Appellate Court and come directly to this Court first is a strategic choice that speaks for itself. The Brazilian courts—from the bankruptcy court and labor lower courts through multiple levels of appellate review—have extensively examined the Ad Hoc Group's conduct in Brazil throughout the Judicial Restructuring proceeding of Oi and have repeatedly ruled against it at every turn, in many cases finding that important wrongdoings were committed by the Ad Hoc Group under Brazilian law. The Ad Hoc Group has now found a different forum in which to try again, one that has not yet had the opportunity to consider the full record of the Ad Hoc Group's misconduct in Brazil and violations of Brazilian law.[14]

---

[14]    It seems to be the Ad Hoc Group *modus operandi* to attempt to circumvent Brazil's jurisdiction seeking an undue advantage at this Court, considering what was later uncovered about their role in the Chapter 11 strategy.

16

This Court should decline the Ad Hoc Group invitation. The RJ Court had full power and full information to decide whether to approve the sale of Oi's V.tal stake. It exercised that power after thorough proceedings in which the Ad Hoc Group was heard and responded to at length. The Ad Hoc Group's remedy, if it believes the RJ Court erred, lies in the Brazilian appellate system— not in an emergency application to this Court.

And the Ad Hoc Group knows this. Since filing the Motion, it has filed *embargos de declaração* challenging the Sale Order before the RJ Court. The pendency of this appeal is reason alone for this Court to reject the Motion and defer to the RJ Court, which should be afforded the opportunity to address any alleged deficiencies in its own order through the procedural mechanisms Brazilian law provides. To do otherwise would further risk directly conflicting decisions.

## III.    ARGUMENT

This Court should deny the Ad Hoc Group's Motion to overrule the Brazilian Sale Order for several reasons.[15]

***First***, while Chapter 15 courts are routinely asked to recognize (or not) decisions from foreign courts, principles of comity generally prohibit a Chapter 15 court from re-litigating or enjoining a decision made in a foreign main proceeding, and the Chapter 15 law specifically applicable to asset sales and the extraterritorial reach of Chapter 15 confirms that this Court should not re-litigate the asset sale proceeding in Brazil. As a consequence, the relief that the Ad Hoc

---

[15]   While the Ad Hoc Group presents its motion inconsistently, there can be no dispute that the crux of the Motion is to enjoin the sale that was approved in Brazil. *See* Mot. ¶ 2 ("Oi sought and obtained permission from a Brazilian court to sell Oi's equity stake in V.tal … the most valuable component of the collateral granted to Oi's secured Noteholders."); Mot. ¶ 10; Mot. ¶ 45 ("On April 1, 2026, the RJ Court entered the Brazil Sale Order, granting Oi's requested relief to approve the sale."); Proposed Order, ECF 163, at 136-37 (seeking to enjoin the sale).

Group seeks—the general oversight by this Court of the sale process in Brazil and Brazilian proceeds from the sale process—is improper and contrary to the limited role that Chapter 15 courts play with respect to foreign main proceedings

*Second*, the FFE Order does not provide a basis to enjoin the RJ Court.  ECF 42 ("FFE Order").  Indeed, the FFE Order recognizes the RJ Plan, which the Sale Order was issued expressly in furtherance thereof; provides that the underlying contracts apply according to their own terms; and reaffirms that such contracts are not limited or modified by the FFE Order.  Nothing under the Sale Order modified or overrode the relevant contracts.  The Ad Hoc Group failed to establish otherwise (and even concedes as much).[16]  Beyond that, if the parties to those contracts believe they have been breached, they may assert whatever claims they have in the appropriate courts.  Regardless, the Ad Hoc Group's underlying breach of contract assertions fail on their merits.

*Third*, the substantive claims asserted by the Ad Hoc Group must be brought in Brazil because the contracts governing disposition of the relevant collateral, the V.tal shares, provide for exclusive jurisdiction in Brazil, and each contract the Ad Hoc Group asserts (the Intercreditor Agreement and two indentures) contains an applicable Brazilian exclusive jurisdiction clause.

*Fourth*, this Court lacks personal jurisdiction over relevant parties.  The Ad Hoc Group asserts no cognizable legal grounds at all for this Court to assert personal jurisdiction over the six bidders, and the mere participation by BGC (one out of six bidders) and V.tal, in earlier Chapter 15 termination proceedings, does not establish personal jurisdiction over them for all purposes (or over any of the other relevant stakeholders).

---

[16]   "***The Brazil Sale Order does not purport to override,*** *and does not address, the violations the sale poses to the FFE Order or the Postpetition Transaction Documents*."  Mot. ¶ 10 (emphasis added).

18

**A.**     <u>**This Court Should Decline To Overrule The RJ Court's Decision Approving The Sale Of Oi's V.Tal Stake**</u>

       1.     <u>Under The Notions Of Comity Underlying Chapter 15, A Chapter 15 Court Should Not Sit In Judgment Of An Order Issued In A Foreign Main Proceeding</u>

This Court should reject the Ad Hoc Group's effort to turn Chapter 15 on its head by using this Chapter 15 proceeding to ***overturn***, rather than ***respect***, a duly-issued order of the foreign main proceeding, in which the RJ Court exercised a fundamental bankruptcy power by approving an asset sale. The Ad Hoc Group offers zero authority for their extraordinary contention that this Court has the power to enjoin an asset sale that was duly approved in a foreign main proceeding, nor do they cite any instance where any United States court has taken any similar action. *See* Mot. ¶¶ 62-68. The Ad Hoc Group seeks to have this Court impermissibly assert authority over the RJ Court by overruling the Sale Order, as if United States courts were appellate courts with jurisdiction over foreign bankruptcy courts. They are not.

Were the present Motion to succeed, parties to the sale may be put in the untenable position of being ordered by the RJ Court (or the Brazilian appellate court) to consummate the sale, while simultaneously being ordered by this Court to not consummate that very same sale. Subjecting parties to a foreign main bankruptcy proceeding to inconsistent orders issued by a United States court would gravely subvert the notions of comity and the principles of Chapter 15 that underpin the United States's law governing cross-border insolvencies. *See In re Oi Brasil Holdings Cooperatief U.A.,* 578 B.R. 169, at 212 (Bankr. S.D.N.Y. 2017) ("American courts have long recognized the importance of comity particularly in the bankruptcy context because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding.") (cleaned up); 11 U.S.C. § 1501(a) (An objective of Chapter 15 is

to further "cooperation between … courts of the United States … and ... the courts and other competent authorities of foreign countries involved in cross-border insolvency cases.").

Chapter 15—and the principles of international comity that underlie it—exist precisely to avoid the mess that the Ad Hoc Group seeks to create.  The Second Circuit has "repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding. 'Since the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions."  *JP Morgan*, 412 F.3d, at 424 (cleaned up) (citation omitted). Chapter 15 caselaw is uniform: a Chapter 15 court is not to re-litigate issues decided by a foreign bankruptcy court.  *See In re Oi S.A.*, 587 B.R., at 273 ("It is simply not this Court's role to second guess the wisdom of the Brazilian courts or overrule their decisions, which would be fundamentally inconsistent with comity."); *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1053 (2d Cir. 1996) ("[C]omity argues decidedly against the risk of derailing … cooperation [of parallel bankruptcy proceedings] by the selfish application of our law to circumstances touching more directly upon the interests of another forum."); *In re Cozumel Caribe, S.A. de C.V.*, 508 B.R. 300, 337 (Bankr. S.D.N.Y. 2014) ("To inquire into a specific foreign proceeding … necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where the creditors are always provided the proverbial 'second bite at the apple.'") (citation omitted); *In re Gee*, 53 B.R. 891, 904 (Bankr. S.D.N.Y. 1985) (A United States bankruptcy court "should not sit as an appellate court over the foreign proceedings"); *In re Nat'l Bank of Anguilla (Priv. Banking Tr.) Ltd.*, 580 B.R. 64, 95 (Bankr. S.D.N.Y. 2018) ("The Second Circuit has 'recognized one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy

20

proceedings.' … A foreign nation's interest in the 'equitable and orderly distribution of a debtor's property' is an interest deserving of particular respect and deference, and accordingly, the Second Circuit has followed the general practice of United States courts and regularly defers to such actions.") (citation omitted)).

While the Ad Hoc Group at times seeks to frame its Motion as an effort to have this Court assert jurisdiction over Oi and the sale process that Oi is undertaking, rather than as an effort to attack the Brazilian RJ Order, the timing of and relief sought in the Ad Hoc Group's Motion belies that fiction. *See* Mot. ¶ 59 ("[T]his Motion neither requests nor requires that this Court second-guess the RJ Court."); Mot. ¶ 10 (asserting relevant violations would occur "if Oi and other parties attempt to carry out" the Brazilian RJ Order). Prior to the RJ Order, the Ad Hoc Group made no motion here to govern Oi's conduct with respect to the sales process, even though the Ad Hoc Group knew (and raised in Brazil) that the proposed sale could occur below the "minimum price" that they now assert. However, when the RJ Court ruled, the Ad Hoc Group quickly made the present Motion because it contends that the Brazilian order is at odds with this Court's FFE Order, and the Ad Hoc Group asks this court to overrule, in substance if not in form, the Brazilian RJ Order on that basis. *See* Mot. ¶ 10 ("The Brazil Sale Order purports to override creditors' rights . . ."); Mot. ¶ 23 (seeking to prohibit any "override"); *see also* ECF 165 at pg. 2 (asserting that "Oi obtained a Brazilian court order authorizing the sale of its most valuable asset … in direct contradiction of this Court's FFE Order and the New York-law governed Postpetition Transaction Documents."). The Ad Hoc Group's motion is a direct attack on the RJ Court's Order, and Chapter 15 prohibits such re-litigation of decisions made in a foreign main proceeding.

21

2.    <u>Chapter 15 Jurisprudence Does Not Permit This Court To Preside Over The Foreign Asset Sale</u>

Nothing in Chapter 15 itself, or in cases applying Chapter 15, authorizes this Court to second-guess the sale process approved by the RJ Court.  The Ad Hoc Group points to nothing to the contrary; instead, they merely argue that this Court has the power to resolve disputes involving three contracts under the FFE Order: the Intercreditor Agreement and two indentures.  Mot. ¶¶ 62-67.  But the FFE Order's statement that these contracts "shall be enforceable" (FFE Order ¶ 17) does **not** imply that this Court has the power, despite the recognized foreign main proceeding, to oversee the foreign sale of a foreign asset in that foreign proceeding.  Nor does it imply that this Court has the power to act as appellate court of review over the RJ Court, which has already adjudicated, in the Sale Order, the issues the Ad Hoc Group now complains of.  *See infra* Section III.B.2.

Chapter 15 jurisprudence—both the statute itself and an unbroken line of caselaw—establishes that a Chapter 15 court does not have the power that the Ad Hoc Group now asserts, to mandate that a foreign asset sale process in a foreign main proceeding proceed differently than it actually did, and to overturn an asset sale approval order from that foreign main proceeding.  *First,* while Chapter 15 provides for the sale of "property that is within the territorial jurisdiction of the United States," it does not provide that the Chapter 15 court will oversee the sale of foreign property, which is at issue here.  *See* 11 U.S.C. § 1520(a)(2).  *Second*, a Chapter 15 court generally does not have the power to mandate that the foreign debtor undertake specific action in the foreign bankruptcy proceeding, as the Ad Hoc Group seeks here.  *See In re Oi S.A.*, 587 B.R., at 271 ("[I]t would be starkly at odds with comity for this Court to insert itself into the Brazilian process in such an intrusive way by effectively requiring the Brazilian RJ Debtors to convene another meeting of creditors. . . . 'Chapter 15's directive that courts be guided by principles of comity was intended

22

to avoid such a result.'") (citation omitted); *In re Mod. Land (China) Co., Ltd.*, 641 B.R. 768, 777 (Bankr. S.D.N.Y. 2022) ("Chapter 15 limits a U.S. bankruptcy court's authority to enjoin conduct outside the territorial jurisdiction of the United States, but it does not make a discharge of New York law governed debt any less controlling."). *Third*, even if Oi's foreign representative had sought to have this Court grant full faith and credit to the Sale Order—and it has not—this Court's review would be limited to whether the order offends "the public policy of the United States" under 11 U.S.C. § 1506. *See CT Inv. Mgmt. Co., LLC v. Carbonell*, 2012 WL 92359, at *5 (S.D.N.Y. Jan. 11, 2012) (holding that, pursuant to 11 U.S.C. § 1509(b)(3), "[o]nce a foreign proceeding has been recognized by a U.S. bankruptcy court, it is mandatory that U.S. courts extend comity to a foreign representative's request for a grant of comity unless granting such request would contravene U.S. public policy…."); *In re Rede Energia S.A.*, 515 B.R. 69, 107 (Bankr. S.D.N.Y. 2014) (granting "full faith and credit" to a Brazilian reorganization plan and certain related relief under §§1507 and 1521, including regarding an asset sale, despite certain creditors' objections to the process in Brazil and holding: "[w]here … the proceedings in the foreign court progressed according to the course of a civilized jurisprudence and where the procedures followed in the foreign jurisdiction meet our fundamental standards of fairness, there is no violation of public policy."). However, the Ad Hoc Group has not, and cannot, show that the Brazilian RJ order offends such public policy; thus, the Ad Hoc Group has failed to satisfy even the more demanding standard of review that would apply were the Sale Order directly before this Court.

3. <u>The Ad Hoc Group's Proposed Order Seeks Improper Relief For Its Breach Of Contract Claims</u>

The Ad Hoc Group's requests for relief, (Motion ¶ 23; Ex. A ¶¶ 2-5), extend far beyond the power of a Chapter 15 court and the scope of the Court's FFE Order that the Ad Hoc Group purportedly seeks to enforce. Specifically, in subparagraphs 23(ii)-(iii) of its Motion (*see* Proposed

Order ¶¶ 3-4), the Ad Hoc Group requests that this Court enjoin the parties to the Postpetition

Transaction Documents from "consummat[ing] any sale transaction of the V.tal stake," (Mot. ¶

23(ii)) or "tak[ing] *any* action to compel" parties to "consummate *any* sale transaction or apply

any proceeds thereof," "without authorization of this Court under the provisions of chapter 15 of

the Bankruptcy Code or applicable law" (Mot. ¶ 23(iii) (emphasis added)).  Not only would these

requests require affirmative approval from this Court for virtually any future "action," but they

would also effectively divest the RJ Court of its jurisdiction.  This absurd result runs counter to

the role of U.S. bankruptcy courts in Chapter 15 cases.  *See In re Credito Real, S.A.B. de C.V.,*

*SOFOM, E.N.R.*, 670 B.R. 150, 161 (Bankr. D. Del. 2025) ("[W]hen considering whether to

enforce an order entered in a foreign main proceeding, U.S. bankruptcy courts should aim to

maximize assistance to the foreign court conducting the foreign main proceeding.").  The Ad Hoc

Group has not justified such extraordinary requests for injunctive relief, opting instead to baldly

assert that the Court "has ample authority to enforce its prior order."  Mot. § I.

The Ad Hoc Group points to no case granting relief anything like what it seeks now, nor

could it: the Ad Hoc Group is proposing a massive expansion of the power of Chapter 15 courts

to police the day-to-day operations of foreign bankruptcy courts.  Its Motion should be denied.

## B.    **The Approved Sale Complies With The FFE Order**

As a threshold matter, the Sale Order does not conflict with the FFE Order because nothing

in the Sale Order modifies or overrides any term or provision in any contract.  Indeed, the Ad Hoc

Group effectively concedes as much, stating that "***[t]he Brazil Sale Order does not purport to***

***override,** and does not address, the violations the sale poses to the FFE Order or the Postpetition*

*Transaction Documents*."  Mot. ¶ 10 (emphasis added).

This concession should end the inquiry.  To the extent any member of the Ad Hoc Group

believes their contracts have been breached, they may pursue rights and remedies in the courts

with jurisdiction to consider such claims. It is true, of course, that for all the reasons set forth in the Sale Order, it is difficult to conceptualize what damages those claims might be premised on. But, in any event, the RJ Court nowhere purported to blunt, smother, or impair such putative claims or the contractual terms underlying them. For this reason, no violence has been done to this Court's FFE Order.

Venturing beyond the foregoing, the Sale Order does not breach the FFE Order because:

(1) the FFE Order's affirmation that the Indentures and Intercreditor Agreement are enforceable according to their terms does not prohibit the RJ Court from rendering binding decisions in the RJ Proceeding; and

(2) the sale satisfies the terms of the Intercreditor Agreement, the Indentures, and the RJ Plan that are asserted by the Ad Hoc Group.

1.    The FFE Order Does Not Restrict The RJ Court's Authority Over The RJ Proceeding

Contrary to the Ad Hoc Group's assertion, the FFE Order's affirmation that certain contracts are "enforceable" and "not subject to any modification or override" does not, according to the order's text or context, give this Court a veto over any action taken in the Brazilian RJ Proceeding that might affect the Postpetition Transaction Documents. Mot. ¶¶ 55-56; FFE Order ¶ 17. That reading of the FFE Order is textually wrong, and accepting it would turn Chapter 15 on its head. Paragraph 17 of the FFE Order provides:

> Nothing in this Order shall limit or impair the present or future rights of holders (or their agents) of debt or equity issued in accordance with the Brazilian RJ Plan or the Postpetition Transaction Documents, which instruments and obligations, once issued and in effect, shall be enforceable obligations of the Chapter 15 Debtors that are not subject to any modification or override except in accordance with their express terms.

FFE Order ¶ 17.

The opening clause, "[n]othing in this Order," makes clear that Paragraph 17 ensures that the FFE Order *itself* would not restrict the enforceability of the Postpetition Transaction Documents. The paragraph, under its plain terms, does not concern whether another court—let alone the foreign main proceeding—may adjudicate issues involving the Postpetition Transaction Documents.[17]

The surrounding provisions of the FFE Order confirm this reading. Paragraph 15 provides that "[n]othing in this Order shall limit, restrict, enjoin, enlarge, modify or otherwise impair (other than by making the terms of the Brazilian RJ Plan enforceable in the United States and for purposes of U.S. law) any rights or obligations under any of the Brazilian RJ Plan, Postpetition Transaction Documents, or any of the Exempt Securities or documents or instruments issued or entered into in connection therewith." FFE Order ¶ 15. Thus, Paragraph 17 did not "restrict" any rights under the RJ Plan; it merely affirmed that the referenced contracts are enforceable under their terms.

The Ad Hoc Group's interpretation—that Paragraph 17 gives this Court authority to strike down any action by the RJ Court that "overrides" the Postpetition Transaction Documents —would produce an absurd result. S*ee* Mot. ¶ 10 (asserting that "[t]he Brazil Sale Order purports to override creditors' rights"); *id.* ¶ 23 (seeking relief here from any "override"). If Paragraph 17 meant that the RJ Court could take no action in the RJ Proceeding that might affect any contractual right under the Postpetition Transaction Documents, then this Court would have effectively imposed a

---

[17]    As discussed below, the Ad Hoc Group's assertions under the relevant documents—the Intercreditor Agreement and the two indentures—should be brought in Brazil according to the terms of those documents. *See infra* Section III.C. That certain claims "may be brought" in New York does not change that result. *See* Intercreditor Agreement § 11.08(b) ("may be brought" in New York); *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 387 (2d Cir. 2007) (differentiating an exclusive jurisdiction clause in which claims "are to be brought" in a certain jurisdiction from a permissive jurisdiction clause that provides that claims "may" be brought in a jurisdiction.).

straitjacket on the very foreign proceeding it was asked to support via the Chapter 15 recognition proceedings.  Both the letter and the spirit of the FFE Order preclude that reading.

>    2.    The Sale Satisfies The Terms Of The Intercreditor Agreement, The Indentures, and the RJ Plan

Regardless, the Ad Hoc Group has failed to establish that this Court should "enforce" the FFE Order because the Ad Hoc Group's underlying breach of contract assertions fail on the merits. The sale qualifies as a "Permitted V.tal Sale" under the Indentures, and the Ad Hoc Group's contrary position depends on misquoting the contractual minimum price provision.  Next, the sale is not a "Distressed Disposal" under the Intercreditor Agreement—a point the Ad Hoc Group acknowledged in its Brazilian filings.  The Ad Hoc Group's process complaints are equally unavailing; it offers no evidence that anyone was willing to pay more, and the minimum price issue was fully litigated before the RJ Court.  Further, the Ad Hoc Group was not denied its voting rights; the RJ Court allowed it to vote and only afterward assessed the validity of that vote under Brazilian law.  Finally, the sale complies with the distribution waterfall, and the Brazilian RJ Court has yet to adjudicate the distribution of the sale proceeds (which has not yet taken place).

>    (a)    The Sale Is A "Permitted V.tal Sale"

The Ad Hoc Group incorrectly asserts that  the sale violates the Indentures because the Bid did not meet a contractual Minimum Price (Mot. ¶¶ 63-64); in fact, the sale satisfies that provision because the price reflects a "decrease . . . of the value of" the V.tal stock.  NPSD Indenture at 228.

Under the applicable provision, a sale qualifies as a "Permitted V.tal Sale" under clause (1), if two requirements are satisfied.  First, the clause requires that "the notice of sale with respect to such Asset Sale is approved by Holders holding a majority of the aggregate outstanding of the Securities. "  NPSD Indenture § 1.01.  The Ad Hoc Group concedes (and the Vaz Declaration attached to the Motion confirms) that UMB, acting on behalf of the Noteholders, expressly

27

approved the notice of sale (the *Edital*).  *See* Vaz Decl. ¶ 31 & n.59 (noting that although the Noteholders initially rejected the *Edital*, they subsequently "expressed their lack of opposition to it").  The first prong of clause (1) is therefore satisfied.

Second, if the above requirement is satisfied, clause (1) deems a sale a "Permitted V.tal Sale" if the price equals "at least BRL\$8.0 billion (as increased or *decreased* based on an increase or *decrease*, respectively, of the value of such Capital Stock since the Reorganization Plan Confirmation)."  NPSD Indenture § 1.01 (emphasis added).  This provision is also satisfied by the sale.

The Ad Hoc Group purports to quote the relevant Indenture provision at paragraph 32 while improperly omitting (without even the use of ellipses despite continuing the quote before and after the eliminated language) the critical parenthetical, quoted above, providing for a potential price decrease.  Mot. ¶ 32.  The Motion presents the R\$8 billion figure as though it were a fixed, immovable floor.  It is not.  The RJ Court found, based on the only independent and impartial valuation in the record, that the bid price was reasonable in light of the current value of the asset.  That finding is consistent with the Indenture's own recognition that the benchmark price is subject to downward adjustment when the value of the underlying stock has decreased.  It is also consistent with recent market datapoints for similar sales.  *See above* at II.B.2.  The Ad Hoc Group has presented no evidence to support its alleged breach based on the sale price not achieving the requisite "value"; here, like in Brazil, it leaves its complaint about the asset's value entirely unsubstantiated.[18]  Thus, the Ad Hoc Group has established no breach.

---

[18]    Sale Order, at 197 ("With all due respect to the representatives of the objecting parties, this Court must acknowledge that they failed, even minimally, to substantiate their allegations. As previously stated, such objections would carry greater credibility if supported by technical evidence. However, they are based solely on allegations lacking technical substantiation, which, in this Court's view, renders them devoid of weight.").

       (b)      <u>The Sale Is Not A "Distressed Disposal" Under The Intercreditor
Agreement</u>

The Ad Hoc Group's motion relies extensively on the Intercreditor Agreement's provisions

governing "Distressed Disposals," including the requirements in Section 5.04(b)(ii) that any such

disposal be conducted pursuant to a "Competitive Sales Process" with the advice of a "Pre-

Approved Financial Advisor." *See* Mot. ¶ 36; Intercreditor Agreement §§ 1.01, 5.04(b)(ii). But

these provisions do not apply here because the sale at issue is not a Distressed Disposal, and

regardless, and the Ad Hoc Group waived this argument in the RJ Proceeding.

As discussed above, the Ad Hoc Group's present complaints about the method of sale

should have been raised at the time of approving the *Edital*, but they were not.[19] On the contrary,

in Brazilian filings, the Ad Hoc Group acknowledged that this was not a distressed disposition, but

an ordinary course disposition pursuant to the RJ Plan. *See* ECF 164, Ex. 3 at 78-82

(acknowledging that the sale is a sale pursuant to the RJ Plan). For this reason alone this Court

should not entertain these arguments.

But even if that were not so, the Ad Hoc Group's arguments fail on the merits. The

Intercreditor Agreement defines a "Distressed Disposal" as a disposition of an asset that is

"(a) being effected at the request or upon the instruction of the relevant Instructing Group in

circumstances where the Collateral has become enforceable; (b) being effected by enforcement of

the Collateral; or (c) being effected following the Acceleration Date." Intercreditor Agreement

§ 1.01. The sale of Oi's V.tal Stake satisfies none of these conditions. It is not being effected at

the request or instruction of any Instructing Group or by enforcement of the collateral. It is a court-

---

[19] The absence of a financial advisor was not challenged at the time the Ad Hoc Group approved the *Edital*, during the hearing before the RJ Court, or in the appeal the Ad Hoc Group subsequently filed challenging the Sale Order.

supervised judicial sale conducted under the RJ Plan.  The sale was initiated by the debtor's court-appointed judicial manager, conducted through a publicly noticed competitive process under the RJ Court's supervision, and approved by the RJ Court.  Thus, the applicable framework is instead the "Ordinary Course Collateral Disposition" provisions of Article 8 of the Intercreditor Agreement, which govern dispositions of collateral "permitted by the Debt Documents prior to the Acceleration Date."  Intercreditor Agreement § 1.01.

The Ad Hoc Group's contrary position depends on characterizing the Notes as having been accelerated, which would trigger the "Distressed Disposal" classification under clause (c) of the definition.  But the Brazilian courts have stayed the enforceability of the Notes through a series of orders entered under the auspices of the RJ Proceeding.  Carpenter Decl. ¶¶ 64-66.  The practical effect of these orders is that the Notes are not presently enforceable, and there is no live "acceleration" that would trigger the Distressed Disposal provisions.

Once again, the Ad Hoc Group's real complaint is with decisions made by the Brazilian courts in the RJ Proceeding—here, the stay orders.  Whether those orders were correctly decided is a question for the Brazilian Courts,[20] not for this Court sitting in a Chapter 15 proceeding.

(c)    The Ad Hoc Group Fails To Substantiate Its Process Claims

The Ad Hoc Group's complaints about the procedure for reaching the sale price also ring hollow.  The RJ Court found that the V.tal stake was offered to the market through a public, competitive process with broad market awareness, and even so, only one bid was submitted.  The Ad Hoc Group claims the price is below market, but it offers no evidence that any party was willing

---

[20]    And, as discussed below, "Distressed Disposals shall be conducted in accordance with . . . the relevant Collateral Document" (Intercreditor Agreement § 5.04(a)),  and "any action that may be brought in connection with the Collateral Documents will be subject to the exclusive jurisdiction" of certain courts in Brazil (*id.* § 11.08(b)).

to pay more.  As the RJ Court aptly noted, the objecting creditors' "allegations would carry greater credibility and reliability had [they] concretely presented alternatives," "sought valuations of the asset by recognized firms," or "demonstrated efforts to identify other interested purchasers."  Sale Order at 195.  They did none of these things.  *Cf. In re Rede Energia S.A.*, 515 B.R., at 99 (rejecting challenge to asset sale because it "was not manifestly contrary to U.S. public policy" and "[t]he Ad Hoc Group offers no evidence to substantiate its arguments . . . .").

In any event, the minimum price issue was raised, fully briefed, and adjudicated by the RJ Court—the court sitting in the debtor's COMI.  Sale Order, 183-200.  And the Ad Hoc Group's attempt to treat this Court as an appellate tribunal reviewing the RJ Court's application of Brazilian law to facts litigated before it is wholly inappropriate, as discussed above.

(d)    The Ad Hoc Group Was Allowed To Exercise Its Voting Rights

The Ad Hoc Group falsely asserts that the sale would be "overriding the rejecting vote of the Ad Hoc Group" (*see* Mot. ¶ 68); in fact, the RJ Court permitted the Ad Hoc Group to vote and, sitting in its jurisdiction as a bankruptcy court, it determined the validity of creditor votes under binding Brazilian law.  Even setting aside that the Ad Hoc Group has failed to establish that sale does not comply with the minimum price provision in the indenture, the Ad Hoc Group's vote and the RJ Court's assessment of the creditor vote constitute no contractual "override."

Oi asked the RJ Court to preemptively strip the Ad Hoc Group members of their "political rights"—i.e., their voting and consent rights under the Postpetition Transaction Documents and the RJ Plan—but the RJ Court declined to do so.  Mot. ¶ 6.  The RJ Court preserved those rights, allowed all creditors to vote, and only then—after the votes were cast—examined the circumstances in which they were exercised.   It was only after that process played out that the RJ Court concluded, on a case-specific basis, that the Ad Hoc Group's coordinated block rejection was an abusive exercise of rights under Brazilian law.  Understood in context, what the RJ Court

31

did was not to "override" the contractual framework; instead, it exercised a core function of a bankruptcy court: it oversaw a creditor vote, including determining the validity of certain votes under applicable law.

(e)    The Bid Complies With The Distribution Waterfall

This Court should not enjoin the sale, and it should decline to order any particular distribution of any eventual sale proceeds, because the sale complies with the distribution waterfall, and the proceeds distribution remains subject to litigation in Brazil.  The Ad Hoc Group does not allege any existing breach of the distribution waterfall requirements, nor does it allege any violation of the FFE Order based on such breach (Mot. ¶¶ 69-73); rather, it merely "fears" (Mot. ¶ 11) that such a breach may occur in certain future circumstances "[i]f Oi . . . withholds part of the sale proceeds."  Mot. ¶ 71.  The sale has not yet closed and thus no proceeds yet exist to distribute.  Despite the Ad Hoc Group's "fears," the facts require denial of its motion: (1) the Bid complies with the distribution waterfall, and as set forth in the Bid, the bidders will deposit the purchase consideration consistent with the RJ Plan and the relevant documents; (2) the distribution of the sale proceeds by Oi necessarily would only occur after the sale itself and thus presents a distinct question from whether the sale may close (the question before this Court); and (3) the RJ Court expressly indicated that it expects the question of sale proceeds distribution to be before it, but it has not yet decided that question.

The Sale Order acknowledged the creditors' concerns about the payment mechanics and distribution of proceeds but correctly recognized that the underlying arrangements governing Oi's distribution of value from the collateral "must be dealt with not only among the respective interested parties (the ultimate recipients and their collateral agents) but also between them and the debtor," and that such matters "cannot constitute an obstacle" to the completion of the sale. Sale Order at 198.  In other words, the RJ Court approved the sale while leaving the contractual

32

framework for distribution of proceeds intact—to be resolved among the parties and their agents, including through the mechanisms provided in the Postpetition Transaction Documents.

While the Ad Hoc Group seeks to *relitigate* the propriety of the sale process, it seeks to *prelitigate* the propriety of Oi's future distribution of the sale proceeds, which do not yet exist. This Court should entertain neither.  Specifically, the Ad Hoc Group's "fear" appears to be that the proceeds of the sale will be frozen pursuant to the multiple Brazilian judicial freezing orders, and what it now seeks (whether through forced mediation or an order of this Court) is a chance to devise a payment process that can evade the jurisdictional reach of those Brazilian court orders. This Court should not prospectively bind the hands of the Brazilian courts by now ordering a particular distribution of future proceeds.

If and when Oi receives funds to distribute and Oi makes a distribution, if Oi's distribution violates the waterfall, the RJ Court did not eliminate any of the Ad Hoc Group's remedies, to the extent any exist—including potentially under the contractual provisions they invoke here.  The RJ Court did not enjoin anyone from pursuing claims under the Postpetition Transaction Documents.

C.      **The Contract Assertions Brought By The Ad Hoc Group Are "subject to the exclusive jurisdiction of the Courts of the City of Rio de Janeiro"**

All of the substantive breaches that the Ad Hoc Group seeks to vindicate here are subject to applicable exclusive jurisdiction clauses in favor of Brazil; thus, its claims are properly heard in Brazil.  The substantive basis that the Ad Hoc Group asserts to bring its motion before this Court is that the FFE Order states that certain documents "shall be enforceable obligations of the Chapter 15 Debtors that are not subject to any modification or override except in accordance with their express terms."  FFE Order ¶ 17; *see* Mot. ¶¶ 55, 59.[21]  The Ad Hoc Group argues that this

---

[21]   While the Ad Hoc Group argues that "section 1522(c) is an independent source of authority" for the Court to grant relief (Mot. ¶ 57), it fails to establish (or even seek to establish) that the requirements for such relief have been satisfied, including that "the interests of the

provision allows this Court to adjudicate assertions that these documents have been breached.  The

Ad Hoc Group points to three particular documents that it seeks to enforce under the FFE Order:

the Intercreditor Agreement, the NPSD Indenture, and the RUD Indenture.  Mot. ¶ 60.  All three

documents have essentially identical jurisdiction clauses; all such clauses establish that courts in

Brazil have exclusive jurisdiction over the claims the Ad Hoc Group now asserts (*i.e.*, concerning

the V.tal share collateral).  ECF 150 § 11.08; NPSD Indenture  at 218; RUD Indenture § 13.14.

Under the Intercreditor Agreement, the NPSD Indenture, and the RUD Indenture, the Ad

Hoc Group should litigate in Brazil, because all three contain jurisdictional clauses that state: "any

action that may be brought *in connection with the Collateral Documents* will be subject to the

exclusive jurisdiction of the Courts of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil."

*Id.* (emphasis added).  For example, the Ad Hoc Group expressly asserts a breach under Section

5.04 of the Intercreditor Agreement because "the Intercreditor Agreement …  provides specific

requirements for any 'Distressed Disposal.'"  Mot. ¶ 36.  According to that very section of the

Intercreditor Agreement, such "Distressed Disposals shall be conducted in accordance with this

Agreement and the relevant *Collateral Document*."   Intercreditor Agreement § 5.04 (emphasis

---

creditors and other interested entities, including the debtor, are sufficiently protected," and thus Section 1522(c) does not apply.  *See* 11 U.S.C. § 1522(a).  Indeed, the case cited by the Ad Hoc Group (Mot. ¶ 57 n.26) shows why Section 1522(c) cannot apply here: in that case, in determining whether such interests were "sufficiently protected," the court held that it would be "unreasonable and exceedingly burdensome to require" the party seeking relief to seek it in the foreign venue, but here, the Ad Hoc Group already has, and is continuing to, seek relief in Brazil, including by participating in the sale process and appealing the Sale Order.  *See In re Sanjel (USA) Inc.*,  2016 WL 4427075, at *6 (Bankr. W.D. Tex. July 29, 2016).  The RJ Court has already weighed whether the interests of creditors and the debtors are sufficiently protected by the sale order and has decided that they are; the Ad Hoc Group has not even attempted to provide grounds for this Court to second-guess that determination.  Similarly, the Ad Hoc Group asserts that Section 105 may provide this Court authority to grant relief (Mot. ¶ 56), but it cites no authority that Section 105 supersedes the more specific relevant provisions of Chapter 15 here (including Section 1522), nor does it cite any Chapter 15 caselaw at all in which Section 105 was used to modify a Chapter 15 order.

added).    Because the Ad Hoc Group's claim requires compliance with the relevant Collateral Document, and actions brought "in connection with the Collateral Documents" must be brought in Brazil, the Ad Hoc Group's claim under the Intercreditor Agreement is subject to exclusive jurisdiction in Brazil.

The rest of the Ad Hoc Group's breach assertions, which are all under the Indentures and the Intercreditor Agreement, are also subject to exclusive jurisdiction in Brazil, because they all relate to the permitted sale of the V.tal stake, the associated release of the lien, and the distribution of the resulting sale proceeds.    As the Ad Hoc Group states, the V.tal stake acts as "security" in connection with the NPSD and RUD indentures, and    "[t]he Intercreditor Agreement acts as the over-arching security agreement for the collateral."    Mot. ¶ 35.    The Ad Hoc Group's witness asserts: "The RJ Plan also expressly provides that the existing fiduciary lien on the V.tal Stake shall only be released in the event the sale of the UPI V.tal occurs pursuant to the exact terms of the RJ Plan."    *See* Vaz Decl. ¶ 16.    Finally, "[t]he Indentures … require that the proceeds of any sale of collateral be applied as required by the Intercreditor Agreement."    Mot. ¶ 33.    Because, under the exclusive jurisdiction clauses, all of the Ad Hoc Group's breach assertions are "in connection with the Collateral Documents" related to the V.tal stake security and sale, all such claims must be brought exclusively in Brazil.[22]

---

[22]    Specifically, "Collateral Documents," includes "the V.Tal Fiduciary Lien Agreement," (ECF 150 at pg. 14; NPSD Indenture at pg. 218; RUD Indenture at 11); and the "V.Tal Fiduciary Lien Agreement," in turn, means the "Fiduciary Transfer of Shares Agreement … relating to the V.Tal Fiduciary Lien" (ECF 150 at 34; NPSD Indenture at 236; RUD Indenture at 30).    The V.Tal Fiduciary Lien is "the security interest, in the form of a fiduciary lien of shares under the laws of Brazil … over 100% of the Capital Stock of V.Tal."    *Id.*    Because, as the Ad Hoc Group and its witness assert, the sale of the V.tal stake is in connection with V.Tal Fiduciary Lien, the Ad Hoc Group's present motion about the potential release of the fiduciary lien and the underlying sale of the V.tal stake is subject to exclusive jurisdiction in Brazil.    *See, e.g.*, Vaz Decl. ¶ 16; Mot. ¶¶ 33, 35, 38, 66.

35

The FFE Order provides that "[n]othing in this Order shall limit, restrict, enjoin, enlarge, modify or otherwise impair (other than by making the terms of the Brazilian RJ Plan enforceable in the United States and for purposes of U.S. law) any rights or obligations under any of the Brazilian RJ Plan, Postpetition Transaction Documents, or any of the Exempt Securities or documents or instruments issued or entered into in connection therewith." FFE Order ¶ 15. The instant Motion therefore seeks to improperly read the FFE Order as divesting the Brazilian court of its "exclusive jurisdiction" under the Postpetition Transaction Documents (which include the NPSD and RUD Indentures) when the FFE Order expressly disclaims modification of those same documents.

### D.      This Court Lacks Personal Jurisdiction

This Court lacks personal jurisdiction over V.tal, BGC, or the other bidder entities (which the Ad Hoc Group imprecisely refers to as BTG). The Ad Hoc Group has asserted no coherent basis for this Court's assertion of personal jurisdiction over any of the bidder entities in the sale at issue. See Mot. ¶ 60. Despite the Ad Hoc Group's baseless characterization of those bidder entities as "BTG," and characterization of "BTG" as "an active participant in these Chapter 15 cases through its subsidiaries," (Mot. ¶¶ 4, 60), those entities have never entered an appearance in these Chapter 15 cases. Nor are those bidder entities parties to the Intercreditor Agreement or the NPSD Indenture that are the subject of the Motion. Further, the Ad Hoc Group has set forth no legal grounds for asserting jurisdiction over BTG based on BGC's or V.tal's earlier participation in these Chapter 15 proceedings, *id.*, and no such grounds exist. Further, neither V.tal nor BGC has consented to jurisdiction in New York with regard to the asset sale in Brazil, either under the

36

Intercreditor Agreement or otherwise, and their limited participation in the earlier Chapter 15 termination proceedings does not establish otherwise.[23]  *See* ECF 150 § 11.08(b).

## IV.    CONCLUSION

For the foregoing reasons, the Ad Hoc Group's motion should be denied in its entirety.

---

[23]   While BGC and V.tal have appeared in these cases, these special appearances expressly stated that such appearances shall not "constitute a waiver of … any objection to the jurisdiction of this Bankruptcy Court for any purpose other than with respect to this Notice." ECF 51 at 3.

Dated: April 11, 2026                               **Quinn Emanuel Urquhart &**
New York, New York                               **Sullivan, LLP**

*/s/ Benjamin I. Finestone*
Benjamin I. Finestone
Mario O. Gazzola
Jeremy Baldoni
Julia T. Rodrigues
295 5th Avenue, 9th Floor
New York, NY 10016
benjaminfinestone@quinnemanuel.com
mariogazzola@quinnemanuel.com
jeremybaldoni@quinnemanuel.com
juliarodrigues@quinnemanuel.com
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

K. John Shaffer (*pro hac vice*)
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
johnshaffer@quinnemanuel.com
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Counsel to BGC Fibra Participações S.A. and
V.tal – Rede Neutra de Telecomunicações S.A.*

38