**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Oi S.A. *et al.*,<br><br>    Debtors in a Foreign Proceeding.[1] | Chapter 15<br><br>Jointly Administered<br><br>Case No. 23-10193 (JPM) |

**DECLARATION OF MARCELO LAMEGO CARPENTER IN SUPPORT OF BGC's**
**AND V.TAL'S OPPOSITION TO AD HOC GROUP'S APRIL 6, 2026 MOTION**

I, Marcelo Lamego Carpenter, a Brazilian citizen, admitted to practice law in Brazil and a member in good standing of the Brazilian Bar Association and partner of Bermudes Advogados, a law firm located in Rio de Janeiro, São Paulo, Brasília and Belo Horizonte, Brazil ("Bermudes"), hereby declare under penalty of perjury under the laws of the United States of America as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "Declaration"), except for those portions specified as being otherwise.

2.      I am making this Declaration in accordance with section 1746 of title 28 of the United States Code.

3.      Since 2023, I have represented V.tal – Rede Neutra de Telecomunicações S.A. and BGC Fibra Participações S.A. (together, "V.tal") in various matters relating to the

---

[1]      The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. (8447 – Netherlands), Portugal Telecom International Finance B.V. (5023 – Netherlands) ("Oi Group" or "Oi").

insolvency of the Oi Group, including the judicial reorganization proceedings (the "Oi Group's JR Proceedings") filed on March, 1st, 2023 and currently pending before the 7th Lower Commercial Court of the City of Rio de Janeiro, Brazil (the "RJ Court") pursuant to Federal Law 11,101 of February 9, 2005 (as amended from time to time, the "Brazilian Bankruptcy Law" or the "BBL") of the laws of the Federative Republic of Brazil ("Brazil"), and related ancillary proceedings.  I submit this declaration in support of BGC's and V.tal's opposition to Ad Hoc Group's April 6, 2026 Motion (the "V.tal's Opposition" and the "Motion", respectively), filed contemporaneously herewith.

### Background and Qualifications

4.      I am a partner of the Brazilian law firm Bermudes Advogados, which has offices in Rio de Janeiro, São Paulo, Brasilia and Belo Horizonte, Brazil.  I studied law at the State University of Rio de Janeiro.  I received my law degree in 1996 and was admitted to the Brazilian bar in 1996.

5.      I have 30 years of experience in restructuring and insolvency matters under Brazilian law and general commercial litigation.  I filed the first major application for reorganization under the 2005 Brazilian bankruptcy law (VARIG - VIAÇÃO AÉREA RIO-GRANDENSE).  I have participated two times as a speaker in the INSOL International[2] Conference, one held in San Francisco, CA, on March 22-24, 2015, and the other held in São Paulo, SP, in June 2026 (25th Annual International Insolvency Conference).

6.      I have been recognized as a leader in my practice area by the Chambers Global, Chambers Latin America, the Latin American Corporate Counsel Association, and Who's Who Legal.

---

[2]  International Association of Restructuring, Insolvency & Bankruptcy Professionals

7.    I have authored and co-authored several publications in the fields of restructuring, insolvency, and corporate law, including articles on judicial reorganization of foreign companies in Brazil (published in *Aspetos Polêmicos e Atuais da Lei de Recuperação de Empresas*, D'Placido, 2016), the intersections between corporate law and judicial reorganization (in *Direito Empresarial – Estudos Jurídicos em Homenagem à Maria Salgado*, Lumen Juris, 2019), and the challenges of cross-border reorganization under Chapter 15 (in *Recuperação Judicial – Análise Comparada Brasil–Estados Unidos*, Almedina, 2020). I also co-authored the Brazilian chapter of the *Global Guide: Measures adopted to support distressed businesses through the COVID-19 crisis*, organized by INSOL International and the World Bank Group, and published an article on arbitration and the universal jurisdiction of bankruptcy in *Arbitragem, Mediação, Falência e Recuperação – Resolução de Disputas na Empresa em Crise* (Thomson Reuters, 2022).

8.    I am an associate of the Turnaround Management Association – TMA Brasil, a member of the panel of arbitrators at the CBMA (Centro Brasileiro de Mediação e Arbitragem), and a member of both the International Insolvency Institute and INSOL International; I also serve on the Insolvency and Restructuring Committee of the Brazilian Bar Association – Rio de Janeiro.

9.    I have concentrated my practice on restructuring and insolvency under Brazilian law, as well as on broader commercial litigation. At Bermudes Advogados, I have advised and represented, both in and out of court, a wide range of stakeholders—including debtors, creditors, special and ad hoc creditor committees, investors, and boards of directors—in matters involving the refinancing, restructuring, and turnaround of businesses and liabilities, as well as the divestment of distressed companies and assets. My experience encompasses proceedings such as judicial    reorganization    (*recuperação    judicial*),    out-of-court    restructuring    (*recuperação*

*extrajudicial*), and bankruptcy liquidation (*falência*), all in accordance with the Brazilian insolvency legal framework.

10.     To assist this Court's consideration of the Motion, I submit this declaration comprising matters that are statements of legal opinion and/or statements of fact.  Where the matters stated in this declaration are statements of legal opinion, such statements reflect Brazilian law based on my education and years of experience practicing Brazilian law in Brazil.  Where the matters stated in this declaration are statements of fact, they are either: (a) based on my personal knowledge, and are known to me to be true and accurate, or (b) if not within my personal knowledge, are derived from documents and/or information supplied to me by or on behalf of V.tal, and are true to the best of my knowledge, information and belief.

**I.      Overview and Background of The Sale Order**

11.     The Oi Judicial Reorganization Plan ("RJ Plan") provided for a competitive process for the sale of the Isolated Productive Unit V.tal ("UPI V.tal"), consisting of Oi's equity interest in V.tal, as a means to restructure Oi and repay its creditors.

12.     The structure of the competitive sale process for the UPI V.tal was set forth in detail in the RJ Plan, including: (i) the procedure for approval of the bidding rules; (ii) the form of payment (cash, upfront); (iii) the minimum price required for automatic approval of any bid; (iv) the procedure for approval of bids below the minimum price, subject to a vote by the Restructuring Option I Creditors (the class that includes the Ad Hoc Group); and (v) the allocation of proceeds from the sale.

13.     The RJ Court commenced and conducted the sale process for the UPI V.tal in accordance with the RJ Plan and pursuant to bidding procedures expressly approved by the creditors, including the Ad Hoc Group (the "Bidding Procedures" and "AHG").

14.     During the preliminary qualification phase, only the group of companies affiliated with BTG ("BTG") expressed interest and satisfied the eligibility requirements to participate in the competitive process.

15.     At the hearing held on March 5, 2026, BTG was the sole bidder and submitted an offer to acquire the UPI V.tal that complied with all requirements for submitting a bid set forth in the RJ Plan and the Bidding Procedures ("BTG Bid").

16.     On March 19, 2026, the Ad Hoc Group—whose claims had been subject to attachment not only by the RJ Court but also by two separate labor courts—submitted a notice to the Joint Judicial Administrators rejecting the BTG Bid, alleging that it contained "commercial, legal, and structural deficiencies."[3]

17.     The RJ Court, acting within its jurisdiction and following a thorough analysis that considered, among other factors: (i) the fairness of the price offered in the BTG Bid; (ii) the absence of any alternative bidders; (iii) the distressed condition of the asset; (iv) the support of the judicial administrator; (v) the support of the court-appointed watchdog; (vi) the generic nature of the Ad Hoc Group's objections; and (vii) the status of the Ad Hoc Group's claims, determined that the rejection of the bid constituted an abusive exercise of rights and, pursuant to Articles 39, §6, and 66 of Law No. 11,101/05, approved the BTG Bid.[4]

18.     The rights granted under the RJ Plan to the AHG were fully exercised.  The Restructuring Option I Creditors received and reviewed the Bidding Procedures (and expressly approved them), received and reviewed the BTG Bid, and ultimately rejected it.  However, as expressly permitted under Brazilian law, the RJ Court reviewed the legality of such exercise of rights, found it to be abusive, and approved the BTG Bid based on multiple grounds.

---

[3]   ECF 164, at 47-76.
[4]   ECF 164, at 183-201.

19.     For ease of reference, I set forth below a timeline of the relevant events:

**December 18, 2025** – Draft bidding procedures for UPI V.tal submitted to the Trustee.

**January 30, 2026** – Trustee files a motion informing it approves the draft bidding procedures.

**February 2, 2026** – Publication of the bidding notice (Edital) for the UPI V.tal sale process.

**February 11, 2026 –** Deadline for interest parties to register for participation in the competitive process.

**February 19, 2026** – RJ Court denies request to suspend AHG's voting rights.

**March 5, 2026** – Auction hearing held for UPI V.tal and BTG submits the **only binding bid** (R$ 4.5 billion).

**March 19, 2026** – Ad Hoc Group submits notice rejecting the BTG bid.

**March 23, 2026** – Judicial Administrator reports outcome of creditor vote (rejection driven by AHG block vote).

**March 25, 2026 –** Petition filed by Oi's judicial management attaching the G5 Partners report, indicating the reasonableness of BTG's proposal.

**March 25, 2026 –** Petition filed by the Watchdog with an analysis of BTG's proposal.

**March 25, 2026 –** Petition filed by UMB informing its rejection of the proposal and requesting negotiations regarding the BTG proposal.

**March 25, 2026** – Petition filed by BTG and co-proponents supporting approval of the proposal.

**March 30, 2026** – Hearing with participation of key stakeholders (including Labor Committee and Watchdog).

**April 1, 2026** – Order approving the BTG Bid.

## II.     The Order Approving the BTG Bid

20.     The order approving the BTG Bid (the "Sale Order")[5] is highly relevant to Oi's judicial reorganization; moreover, in my experience, it is neither unusual nor does it depart from established Brazilian law and practice in judicial reorganization, out-of-court restructuring, or bankruptcy proceedings.

---

[5]  ECF 164, at 183-201.

21.     The Brazilian Bankruptcy Law (the "BBL") expressly authorizes judicial intervention in creditor decisions where there is a finding of abusive exercise of rights, in furtherance of the general principles underlying the BBL, including maximization of asset value, creditor recovery, efficiency, and preservation of the business.

22.     Article 39, § 6 of the BBL provides that a creditor's vote may be declared null on the grounds of abuse only where it is manifestly exercised to obtain an unlawful advantage for itself or for others.  BBL further allows for the approval of a reorganization plan even in the absence of the statutory voting thresholds (the so-called "cramdown"), pursuant to Article 58, §1.

23.     In addition, Article 187 of the Brazilian Civil Code provides that a party commits an unlawful act when exercising a right in a manner that manifestly exceeds the limits imposed by its economic or social purpose, good faith, or accepted standards of conduct.

24.     Brazilian law thus prohibits the abusive exercise of rights, ensuring that contractual or statutory prerogatives are not invoked in a manner that contravenes their intended purpose or violates principles of good faith and fairness.  This principle is widely recognized in Brazilian legal doctrine: "*Thus, an individual abuses a right when they exercise it in an ostensibly regular manner but in contradiction to the values that the legal system intends to uphold through that right.  Under this perspective, the doctrine of abuse of rights serves the function of aligning private autonomy with the values that the legal system seeks to protect through the specific subjective legal situation in question.*"  (SCHREIBER, Anderson; TARTUCE, Flávio; SIMÃO, José Fernando; et al. Código Civil Comentado – Doutrina e Jurisprudência (p. 403). Editora Forense.)

25.     Under Brazilian law, any right—whether arising under a reorganization plan or otherwise, and whether tied to pre-petition or post-petition claims—is subject to judicial review for legality when exercised.

26.     The Sale Order did not find the Ad Hoc Group's rejection to be abusive merely because it opposed the BTG Bid, but rather that it was abusive due to multiple factual and legal circumstances surrounding the Oi proceedings that the decision analyzed.  Notably, while the RJ Court found the Ad Hoc Group's vote to be abusive under Brazilian law, the RJ Court expressly preserved the Ad Hoc Group's voting rights by denying Oi's request, in a separate liability action, to suspend such rights.

A.     **Fairness of the Price**

27.     The Sale Order found the price offered in the BTG Bid (R$4.5 billion) to be fair, notwithstanding that the RJ Plan had established a minimum price of approximately R$12.3 billion.

28.     The minimum price was set unilaterally by Oi in April 2024, without detailed disclosure of the methodology used, and no longer reflects current market conditions, particularly given changes in V.tal's business profile and increased exposure to retail market risks. Accordingly, it would not be appropriate to treat the minimum price as a fixed benchmark, as the realizable value of assets in a distressed sale is determined by actual market conditions rather than prior assumptions.  The value of V.tal was also materially affected by the instability of the Oi Group, including a significant impairment recognized in its financial statements.

29.     Based on a fairness opinion issued by G5 Partners, the RJ Court concluded that the BTG Bid represented a fair price under current market conditions:

> "On this point, the Court returns to the previously outlined situation: the valuation defended by the Creditors under Restructuring Option I is that set forth in the Judicial Reorganization Plan, established 2 years ago (and revised 1 year ago); the valuation

presented by the Judicial Management, in the GS report (the largest independent financial services firm in Brazil in asset management, M&A advisory, and regularly responsible for issuing 'fairness opinions' in company selection processes), indicates that the proposed price is 'fair' according to the underlying market; and the bidder's own valuation is that its proposal is high, above market practice, and aligned with its exclusive objective of eliminating residual impacts of the debtor's situation on its business.

[…]

In light of these results, it concluded that the initial valuation amount - twelve billion, three hundred million Reais (R$12,300,000,000.00) - is outdated and does not reflect the current reality.

[…]

Accordingly, the reasonableness of the proposed value must be recognized, including as noted by the Public Prosecutor's Office, which stated that the value of the asset must be based on concrete market valuation, not merely abstract considerations.

[…]

In the context thus outlined, and in conclusion regarding the fairness of the price offered in the BTG PROPOSAL, this Court finds that it should be accepted because it is 'fair.' It should be noted that, here, there is still a proposal at a price deemed 'fair.' If, however, the case were under the bankruptcy regime, the situation could require acceptance of an even lower price. Any creditor veto, in such context, would be deemed abusive, in light of the application of the 'best interest of the creditor theory.'"[6]

30.     The RJ Court further found that the AHG failed to provide any technical evidence supporting its objections to the valuation, rendering its challenge unsubstantiated:

"As to UMB's challenge to this report, which is essentially based on the argument that the report was engaged to 'assess whether the offered price is fair' ('without taking into account the competitive process,' etc.), it lacks plausibility.

[…]

With all due respect to the representatives of the objecting parties, this Court must acknowledge that they failed, even minimally, to substantiate their allegations. As previously stated, such objections would carry greater credibility if supported by technical evidence. However, they are based solely on allegations lacking technical substantiation, which, in this Court's view, renders them devoid of weight."[7]

---

[6] ECF 164, at 196-197.
[7] ECF 164, at 197.

31. In my experience, it is common in Brazilian distressed sales for assets to be sold below prior valuation benchmarks, particularly considering litigation risks and uncertainty inherent to such transactions.

**B. Failure to Challenge the Bidding Procedures**

32. Pursuant to Clause 5.2.2.2.1 of the RJ Plan, the bidding procedures for the sale of the UPI V.tal were required to be reviewed and approved by the Restructuring Option I Creditors within fifteen (15) days from the date of notice to such creditors.[8]

33. The draft bidding procedures prepared by Oi's judicial administrators were submitted to the Trustee on December 18, 2025.[9] The draft already included, among other provisions: (i) the minimum requirements for participation in the competitive process and the timeline for qualification, as well as the due diligence period; (ii) the requirement that bids be submitted exclusively in cash, payable upfront; (iii) the obligation to comply with the provisions of the RJ Plan, including Clause 5.3, which governs the cash sweep and the allocation of proceeds in accordance with the RJ Plan; and (iv) the possibility of receiving bids below the Minimum Price, the acceptance of which would be subject to a vote by the Restructuring Option I Creditors. The draft did not include any reference to hiring an investment bank, or any of the requirements in Section 5.04(b)(ii) that it be conducted pursuant to a "Competitive Sales Process."

34. The Trustee under the Notes expressly stated that it "*does not object to the draft bidding procedures for the sale of the UPI V.tal submitted by the Debtors*".[10] Accordingly, there was an affirmative act consenting to the commencement of the sale process under the exact terms set forth in the Bidding Procedures.

---

[8] ECF 36-1, at 87-88.
[9] ECF 164, at 25.
[10] ECF 164, at 131.

35.     Following publication of the Bidding Procedures approved by the Trustee —pursuant to a court order that was not appealed—the qualification period for participation in the competitive process commenced, requiring, among other things: (i) bank reference letters; (ii) evidence of financial capacity; and (iii) an express agreement to the terms of the RJ Plan and the Bidding Procedures.

36.     The Ad Hoc Group's assent to the bidding procedures was expressly recognized in the Sale Order in assessing the legality of the Ad Hoc Group's rejection of the proposal:

> "Indeed, although UMB now challenges the competitive process initiated on the grounds that it contains 'restrictive conditions,' the fact is that it expressly agreed to such public notice. See, in this regard, its filing in ID 128.471, at page 128.483, where it expressly states its lack of opposition to the draft public notice to be published."[11]

37.     Under Brazilian law, the failure to challenge a procedural act at the appropriate time results in waiver (preclusion) pursuant to Articles 223 and 507 of the Brazilian Code of Civil Procedure, thereby extinguishing the Ad Hoc Group's right to subsequently contest the terms of the Bidding Procedures.

### C.     Conduct of the Ad Hoc Group

38.     The conduct of the parties, as well as the substance of the arguments raised in an objection, are factors that, under Brazilian legal practice, are examined in determining whether there has been an abusive exercise of rights.  In particular, party conduct plays a central role in Brazilian law as a means of interpreting and assessing the parties' actions.

39.     At all stages of the competitive process, the AHG and its representatives (UMB) demonstrated resistance to the continuation of the sale process, including initially opposing the bidding procedures (even though they ultimately expressed full agreement with their terms).

---

[11]  ECF 164, at 195.

40.     The Sale Order analyzed the objections raised by the AHG and characterized them as "pocket nullities" (nulidades de algibeira), which, in Brazilian practice, refer to alleged defects that a party has long been aware of but only raises after an adverse decision, in an attempt to revive issues that should have been timely asserted.  As stated in the Sale Order:

> "In this Court's view, such conduct closely resembles that of parties who allege procedural defects in themselves, without any actual impact or prejudice - the so-called 'pocket nullities,' consisting of purported defects that, in practice, seek to hinder the progress of the case by creating obstacles that are either nonexistent or irrelevant, as they produce no consequence other than delaying the proceeding."[12]

41.     The Sale Order's assessment of the AHG's conduct is entirely consistent with the standard approach of Brazilian courts when evaluating creditor objections.

**D.      Abuse of Rights and Violation of Good Faith – Economically Irrational Conduct.**

42.     As previously described in this Declaration, findings of abusive exercise of rights—including in the context of judicial reorganization and bankruptcy proceedings—are common in Brazilian case law and are expressly provided for under the Brazilian Bankruptcy Law (Articles 39, §6, and 58, §1).

43.     This principle is also reflected in Statement No. 45 of the First Conference on Commercial Law, which provides that "[t]he magistrate may disregard the vote of creditors or the expression of will of the debtor, due to abuse of rights."[13]

44.     A mere rejection of a proposal is insufficient to characterize abuse; rather, a case-specific, contextual analysis is required.  One such circumstance—expressly recognized in the Sale Order—is economic irrationality:  "[a]mong the situations that may indicate that the vote

---

[12]   ECF 164, at 195.
[13]   Google Translate translation of original Portuguese, available at: https://www.cjf.jus.br/enunciados/enunciado/81.

exceeded the power conferred on the creditor and that will require more careful evaluation, the following can be pointed out: the unwaivability of negotiating payment terms and economic irrationality […] n. 24 SACRAMONE, Marcelo Barbosa. Comentários à lei de recuperação de empresa e falência. 6th ed. São Paulo: Saraiva Jur, 2025. Ebook. p. 195."[14]

45.     The Sale Order found that the AHG's exercise of its decision-making rights violated principles of economic rationality and good faith—which, under Brazilian law, govern all contractual relationships and procedural conduct:

> "It is in this context, combined with the fact that this Court recognizes the fairness and reasonableness of the price set forth in the BTG PROPOSAL, that this Court finds that the rejection expressed by the Creditors under Restructuring Option I and their representatives amounted to an exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith. With due respect to the legal opinion of the Public Prosecutor's Office, approval of the BTG PROPOSAL is therefore imperative."[15]

46.     As further recognized in the Sale Order, creditors' rights are not absolute and may be limited where exercised abusively or in violation of good faith principles: "It is the legitimacy of the vote rejecting this sole proposal that must be assessed, since a discretionary right is not absolute and may be limited under the legal system, especially when its exercise becomes abusive or contrary to the principles of good faith and social function."[16]

47.     The overall context considered by the Sale Order included: (i) the grounds asserted for rejection of the proposal; (ii) the fairness of the BTG Bid; (iii) the absence of any other qualified bidders or competing proposals; and (iv) the status of the AHG's claims, which were subject to attachment orders issued by more than one court in Brazil.

48.     The finding of abusive voting is inherently complex and requires a highly fact-specific and discretionary assessment by the competent court, which must weigh the

---

[14]   ECF 164, at 177.
[15]   ECF 164, at 199.
[16]   ECF 164, at 195.

competing interests at stake.  The substance of such a determination can only be assessed in light of the particular circumstances of the case.

49.     It is important to note that the AHG was able to fully exercise its voting rights with respect to the BTG Bid only because the RJ Court, on February 19, 2026, denied Oi's request—filed in a separate liability action—to suspend the AHG's rights in connection with its claims.  Ex. A, February 19, 2026 RJ Court Order, at pages 130,265-130,266.[17]  Had such request been granted, the AHG would have been prevented from exercising its voting rights:

> "The attachment of credits and the removal of guarantees offered to the defendants do not deprive them of the existence of the credit itself. As previously stated, it is indisputable; the defendants contributed significantly—through multi-billion dollar financial infusions—to the course of Oi's judicial reorganization proceedings.
>
> Such being the case, their inherent voting and veto rights cannot be curtailed.
>
> Indeed, consistent with the line of decisions adopted by this Court, to deprive the Judiciary of cognizance over matters one wishes to bring before it violates a constitutionally enshrined guarantee: the right of access to the Judiciary. And—it bears repeating—access to the Judiciary is a fundamental guarantee of a Democratic State governed by the Rule of Law.
>
> It cannot be anticipated that the defendants will engage in abuse, overreach, or manipulation of situations, nor that they will disrupt the course of the recovery proceedings during the accelerated phase in which they currently stand. Rather, it is good faith that must guide the conduct of all parties; indeed, it is good faith that must be presumed.
>
> In this vein, I deem that the rights to vote, to veto, to make representations, to issue opinions, and to object to conditions regarding the alienation or encumbrance of assets cannot, under any circumstances, be curtailed for the defendants. These rights must be safeguarded, while simultaneously urging the defendants to contribute in the manner best suited to the salutary continuation of these proceedings.
>
> […]
>
> For this reason, I deny the requested suspension of political and deliberative rights related to extra-insolvency debt instruments and linked to the defendants' credits arising from public tenders."

---

[17]   Google Translate translation of sections of the original Portuguese decision.  Original Portuguese decision is attached hereto as Ex. A.  A certified translation of the decision will be filed as soon as available.

50.     Based on my experience and understanding, both the Sale Order and the RJ Court acted appropriately and in accordance with applicable Brazilian law in relation to the AHG votes, preserving creditors' general voting rights while properly finding that the rejection of the proposal constituted an abusive exercise of rights in light of the specific factual and legal circumstances of the concrete case.

**E.     Supportive Positions of Key Stakeholders in the Judicial Reorganization**

51.     In approving the BTG Bid, the Sale Order took into account the favorable positions expressed by several key stakeholders in Oi's judicial reorganization proceedings.

52.     The Labor Creditors' Committee, which represents the interests of more than 8 thousand creditors, expressed its support for the BTG Bid during the hearing held on March 30, 2026.

53.     Oi's judicial administrators likewise voiced their support at the same hearing.

54.     The court-appointed Watchdog, after initially expressing some alignment with the AHG's objections, ultimately also supported approval of the BTG Bid.  This shift followed the hearing held on March 30, 2026, during which the Watchdog directly questioned the AHG's representative regarding the price it considered reasonable, the existence of any alternative interested parties, and the possibility of submitting a competing proposal. This exchange proved critical to the conclusions reached in the Sale Order, which identified the AHG's evasive conduct:

> "The precise intervention of the Watchdog at the hearing (continuation of the sale) corroborated this. When directly prompted to clarify whether they had sought other interested purchasers at the proposed minimum price, or at least at a price similar to the BTG PROPOSAL, the objecting parties clearly evaded the issue. In fact, their position aligned with their prior filings, which were likewise theoretical regarding a possible sale under more favorable conditions (to the Creditors under Restructuring Option I)."[18]

---

[18]   ECF 164, at 195.

**F.      Preservation of the Distribution of Sale Proceeds**

55.      In its objection to the BTG Bid, the AHG argued that the proposal violated the RJ Plan because it allegedly failed to comply with the mechanisms for distributing the proceeds from the sale of the UPI V.tal as set forth in the Indentures and the RJ Plan.

56.      However, the matter before the Court in the Sale Order concerned the approval of a proposal submitted by a third party to acquire an asset of Oi.  The payment mechanics included in the BTG Bid were compliant with all the requirements under the RJ Plan, in the sense that the purchase price will be deposited into an Oi's escrow account encumbered with a fiduciary lien to the benefit of the applicable creditors (including AHG), in compliance with the proceeds allocation provided under the RJ Plan. The mechanisms governing the calculation of net cash proceeds to be distributed by Oi (i.e. applicable deductions) are not matters to be addressed by the bidder, but rather are to be implemented by Oi upon receipt of the purchase consideration.  In submitting its proposal, BTG expressly agreed to the terms of the Bidding Procedures and the RJ Plan, both of which govern the allocation of the proceeds from the sale of the UPI V.tal.

57.      In addressing this specific argument raised by the AHG, the Sale Order expressly preserved the existing distribution mechanisms, thereby safeguarding all of the AHG's rights:

> "Following the challenge to the price lato sensu) comes the rejection of the proposed payment structure. And it is here that the greatest concern raised by the Creditors under Restructuring Option I lies, as they strongly advocate receiving payment through their collateral agents, into accounts designated by them, and by means of indirect distribution of the final proceeds to the actual beneficiaries.
> They point to transactions of the highest complexity, entered into under international jurisdiction, which could not be set aside by a Brazilian court.
> This consideration is indeed relevant, in this Court's view, but it does not appear capable of being asserted against the bidder. The arrangements underlying the distribution of value arising from enforcement of the collateral must be addressed not only among the

respective interested parties (beneficial owners and their collateral agents), but also between them and the debtor."[19]

58.    As far as I am aware, the Sale Order fully preserved the mechanisms for distribution of the proceeds from the sale of the UPI V.tal, as set forth in all applicable instruments. Therefore, nothing in the BTG Bid or in the Sale Order prevents AHG members (or any other creditors in the RJ Plan payment waterfall), to receive payment of their respective credits within one business day after closing of the sale.

### III.    Attachment of the AHG's Claims by Multiple Courts in Brazil

59.    In the liability action No. 3019135.31.2026.8.19.0001, filed by Oi, serious arguments were presented suggesting that the largest members of the Ad Hoc Group ("AHG") may have exercised their governance rights as shareholders of the debtor in an abusive manner and for their own benefit, in violation of Brazilian Civil and Corporate Laws.

60.    Among the evidence considered are the following: (i) the use of shareholder control to appoint an unfit management, who would be rewarded to prioritize the repayment of their own pre-petition and post-petition claims, to the detriment of the company's social function, compliance with the RJ Plan, and the interests of other creditors; (ii) the violation of Company's compensation policies; (iii) the execution of contracts with a company owned by the CEO, CFO, and the Ad Hoc Group's board nominee appointed, without disclosing such conflicts to the Judicial Administrator, in violation of legal requirements and fiduciary duties; (iv) approval of measures designed to delay the payment of other creditors' claims, including through an attempted amendment to the RJ Plan, with the purpose of securing priority payment of claims held by the AHG; and (v) the adoption of strategies aimed to restructure liabilities in the United States that

---

[19]  ECF 164, at 198.

could not be restructured in Brazil (including under Chapter 11), with the purpose of eliminating debt senior to the AHG's debt.

61. In light of the seriousness of these indicia and the strong likelihood of the underlying allegations, the RJ Court ordered the attachment of all pre-petition and post-petition claims held by the defendants (PIMCO, Ashmore, and SC Lowy) against Oi, including any related guarantees. Ex. A, February 19, 2026 RJ Court Order, at page 130,265.

62. This attachment is not the only encumbrance affecting the AHG's claims. Such claims have also been subject to attachment orders issued by the Regional Labor Court of the 1st Region, likewise based on indicia of abuse of power.

63. The Sale Order expressly acknowledged that the AHG's claims were subject to attachment by both courts when analyzing the objections raised by the AHG:

> "Even if that were not the case, this Court cannot fail to consider that the claims now under discussion are, to a large extent (perhaps in their entirety), subject to attachment by its own decision, preliminarily issued in a liability action brought against those who now challenge the sale. It should be recalled that one of the grounds for issuance of that protective order was precisely the fact that the creditors are large international investors with likely no assets in the country available to satisfy any judgment that may be entered against them.
> Moreover, even if it is recognized that this Court's attachment order is not precluded, it is certain that those same claims were also subject to attachment by the Labor Court (EVENT 1, EXHIBIT 69 of case No. 0118557-64.2025.8.19.0001 - liability action brought against PIMCO et al)."[20]

64. In addition, the enforceability of the Notes—and, consequently, any automatic acceleration thereof arising from the bankruptcy filings of certain Oi subsidiaries—has been subject to successive stay orders issued within the context of the Oi judicial reorganization proceedings. These orders, taken together, establish a continuous judicially-imposed suspension of the exercise of rights associated with such notes.

---

[20] ECF 164, at 198.

65.     The RJ Court initially ordered, on September 30, 2025, a stay of enforceability of the notes for a period of thirty (30) days, which was subsequently extended by order dated October 30, 2025, for an additional ten (10) days.  ECF 130-2, Ex. B and C.[21] Thereafter, in the context of appeals filed by Itaú and Bradesco, further orders issued on November 14, 2025, granted injunctive relief against the liquidation adjudication order and confirmed that such stay would remain in effect.  Exs. D-G.  Most recently, by orders dated January 16, 2026, the RJ Court extended the stay for an additional ninety (90) days, effective as of January 20, 2026. Ex. H-I.

66.     These orders provide for the suspension of the enforceability of post-petition (extraconcursal) claims.  Under Brazilian law, such suspension necessarily encompasses the prohibition of measures aimed at enforcing such claims, including the declaration or implementation of acceleration, particularly where such acts would produce immediate enforcement effects against the debtor or its assets.

### IV.     **Possible Incompatibility Of The Motion With The Brazilian Bankruptcy Law**

67.     Granting the Motion filed by the Ad Hoc Group could create an inconsistency between the main judicial reorganization proceeding in Brazil and the ancillary proceeding (Chapter 15) currently pending before the court in New York.

68.     This is because such a ruling issued in the context of an ancillary proceeding would effectively override decisions in the main proceeding, in which a broad, public, and highly complex competitive process was subject to scrutiny by the Brazilian court, with the participation

---

[21]   Given the time constraints, computer-generated translations of Exs. B-I cited in this declaration were attached hereto.  Certified translations of the decisions will be filed as soon as available.

of the Public Prosecutor's Office, the Judicial Administrator, the Watchdog and other stakeholders who are not involved in the ancillary proceeding.

69.    The Sale Order concerns rights and obligations incurred and performed in Brazil, including obligations arising under the RJ Plan, the Bidding Procedures, and the asset itself being sold—namely, the shares of V.tal.

70.    The Brazilian Bankruptcy Law was recently amended to regulate cooperation between courts presiding over main and ancillary proceedings abroad.  Pursuant to Article 167-S, I, where a proceeding in Brazil is already pending at the time recognition of a foreign proceeding is sought, any relief granted under Articles 167-L or 167-N must be consistent with the Brazilian proceeding, and the provisions of Article 167-M shall not apply if the foreign proceeding is recognized as the main proceeding.

*[Remainder of page intentionally left blank; signature page follows]*

71. I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Dated: April 11th, 2026.

in Rio de Janeiro, Brazil.

**MARCELO LAMEGO CARPENTER**

Bermudes Advogados

Praça XV de Novembro, 20, Centro.

Rio de Janeiro, State of Rio de Janeiro, Brazil

20010-010

**Annex 1**

**Curriculum Vitae**

**Academic Background:**

– Law degree from the State University of Rio de Janeiro (UERJ), 1996

**Recognitions:**
**– Highly recommended in Bankruptcy/Restructuring and Dispute Resolution by leading legal rankings:** Chambers & Partners, The Legal 500, Leaders League, GRR 100 – Global Restructuring Review, Latin Lawyer 250, Análise Advocacia 500, among others

— Ranked in Análise Advocacia 2023 in Arbitration and Civil Law

— Recognized by Leaders League 2023 as a leader in arbitration

— Ranked by Leaders League 2023 and 2024 in the "Excellent" category in Bankruptcy Law

— Recognized in the Chambers Brazil Guide – Dispute Resolution: Litigation 2023 and 2024

— Ranked in the Chambers Brazil Guide – Restructuring 2023 and 2024

— Recognized in Chambers Global – Dispute Resolution: Litigation 2023 and 2024

— Listed in Chambers Rio de Janeiro – Dispute Resolution 2023 and 2024

— LACCA Approved Thought Leader in Litigation 2023 and 2024

— Best Lawyers 2023 in Arbitration and Mediation and Litigation

— Best Lawyers 2024 in Alternative Dispute Resolution

— WWL – National Leader – 2023

— The Legal 500 2024 and 2023 – Leading Individual in Restructuring and Insolvency

— Recognized in Latin Lawyer 250 2023 in Litigation

**Other Activities:**

– Member of the Turnaround Management Association – TMA Brasil

– Member of the panel of arbitrators at CBMA

– Member of the International Insolvency Institute

– Member of INSOL – International Association of Restructuring, Insolvency and Bankruptcy Professionals

– Member of the Insolvency and Restructuring Committee of the Rio de Janeiro Bar Association

Publications:
– *General Introduction to the Restructuring and Insolvency Legal Framework in Brazil* – The Restructuring Review, Editor Christopher Mallon, Law Business Research Ltd., 2008

– *Judicial reorganization in Brazil of foreign companies*, article published in the book *Aspetos Polêmicos e Atuais da Lei de Recuperação de Empresas*, D'Placido Editora, Belo Horizonte, 2016

– *Corporate law and judicial reorganization – Intersections and Limits*, article published in the book *Direito Empresarial – Estudos Jurídicos em Homenagem à Maria Salgado*, Lumen Juris, Rio de Janeiro, 2019

– *Chapter 15 and the challenges of cross-border reorganization*, article published in the book *Recuperação Judicial – Análise Comparada Brasil – Estados Unidos*, coordinated by André Chateaubriand Martins and Márcia Yagui, Almedina, 2020

– Co-author of the Brazilian chapter of the *Global Guide: Measures adopted to support distressed businesses through the COVID-19 crisis*, organized by INSOL International and the World Bank Group

– *Arbitration and the Universal Jurisdiction of Bankruptcy Courts*, article published in the book *Arbitragem, Mediação, Falência e Recuperação – Resolução de Disputas na Empresa em Crise*, coordinated by André Luis Monteiro, Fabiane Verçosa and Geraldo Fonseca, 1st ed., São Paulo, Thomson Reuters, 2022

**Languages:**
Portuguese and English.