Alan J.  Lipkin

Erin E.  Valentine

Marcel Engholm

CHAFFETZ LINDSEY LLP

1700 Broadway

New York, New York 10019

Telephone: (212) 257-6960

Facsimile: (212) 257-6950

*Attorneys for Foreign Representative*
*and Chapter 15 Debtors*

Hearing Date: April 15, 2026

Time: 10:00 A.M.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 15** |
| **Oi S.A.** *et al.,* | **Case No.  23-10193 (LGB)** |
| **Debtors in Foreign Proceeding** | **Jointly Administered** |

**OBJECTION TO MOTION FOR AN ORDER TO ENFORCE THIS COURT'S PRIOR**
**FULL FORCE AND EFFECT ORDER AND RELATED RELIEF**

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................i

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACT BACKGROUND ........................................................................................ 4

    A.   The UPI V.tal Auction ............................................................................................... 4

    B.   The Brazil Sale Order ............................................................................................... 7

ARGUMENT ............................................................................................................................. 10

I.    AS A MATTER OF COMITY AND APPLICABLE LAW, THIS CHAPTER 15 COURT
SHOULD RESPECT AND NOT CIRCUMVENT DECISIONS OF THE RJ COURT ............. 10

    A.   The Auction Process Was Properly Conducted. ...................................................... 12

    B.   All The Ad Hoc Group's Current Objections Were Presented To And Rejected By The
    RJ Court. .................................................................................................................. 13

        i.   The Facts Justify Approval Of The UPI V.tal Sale To BTG ...................................... 14

        ii.   The Legal Bases for the Brazil Sale Order ................................................................ 16

II.    THIS CHAPTER 15 COURT LACKS JURISDICTION OVER THE UPI V.TAL SALE
BEING CONSUMMATED ENTIRELY IN BRAZIL UNDER BRAZILIAN LAW, AND ANY
ALLEGED ISSUES CONCERNING PAYMENT DISTRIBUTIONS ARE NOT YET RIPE .. 20

III.    THE UPI V.TAL SALE ORDERED BY THE RJ COURT IS NOT A "DISTRESSED
DISPOSAL" AND ANY SUCH ARGUMENT IS BARRED ..................................................... 23

CONCLUSION.......................................................................................................................... 26

1.      Oi S.A. ("**Oi**"), Oi Brasil Holdings Coöperatief U.A. ("**Coop**"), Portugal Telecom International Finance B.V. ("**PTIF**," and together with Oi and Coop, the "**Chapter 15 Debtors**"),[1] and the Chapter 15 Debtors' foreign representative, Fabio Wagner (the "**Foreign Representative**"), hereby submit this objection to the motion filed by the ad hoc group of secured noteholders (the "**Ad Hoc Group**") on April 6, 2026 [ECF 162-164] (the "**Motion**") for an order enforcing this Court's previous FFE Order[2] [ECF 42] and related relief.[3]

## PRELIMINARY STATEMENT

2.      The Court's role in these chapter 15 cases is, as a matter of comity, to assist and give effect to the Brazilian RJ Proceeding.  The FFE Order acknowledges the Court's role of lending *support* to the Brazilian RJ Proceeding as well as giving effect to the RJ Plan and the lawful steps necessary to fulfill the Plan's purpose.  The Court recently reaffirmed this position at the March 10, 2026, Status Conference, acknowledging that "[the Statute of Liberty is] about where my jurisdiction goes in Chapter 15," [ECF 161 at 30:10-11] whereas the UPI V.tal sale is a "sale process being conducted in Brazil, not before me."  *Id.* at 30:22-23.

3.      Notwithstanding the Court's limited chapter 15 role, the Ad Hoc Group seeks exceptional relief.  The Motion requests the Court to "prohibit" the Chapter 15 Debtors from carrying out the RJ Court's Sale Order, essentially asking this Court to serve as an appellate court to overturn and/or stay the RJ Court's Sale Order requiring the Chapter 15 Debtors and their Judicial Manager to consummate the UPI V.tal Sale.

---

[1] The debtors in the above-captioned cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A.  – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A.  – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V.  – Em Recuperação Judicial (5023 – Netherlands).

[2] Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Motion.

[3] GLAS Americas, LLC ("**GLAS**") inexcusably filed a statement (the "**GLAS Statement**") immediately before this Objection was due.  The Chapter 15 Debtors reserve all rights to respond to the GLAS Statement separately if required.

4.      Such request is improper as it seeks to create a conflict between the RJ Court and this Court. As detailed below, after reviewing multiple motions and other filings and hearing argument from the Indenture Trustee, UMB Bank N.A., the Ad Hoc Group and certain individual bondholders (collectively, the "**Noteholder Parties**"), concerning the legality of the sale and fully considering their objections, the RJ Court ordered the sale of the UPI V.tal to BTG. The Brazil Sale Order is mandatory – the Chapter 15 Debtors have no discretion to refuse or delay the sale and are legally required to consummate it.

5.      Notably, the Ad Hoc Group's arguments in this Motion mirror the sale objections that were already overruled by the RJ Court. Thus, the Noteholder Parties came to this Court seeking a second bite at the apple before appealing or seeking to stay the Brazil Sale Order.[4]

6.      If granted, the Motion would substantially impede the Brazilian RJ Proceeding, have this Court exceed its chapter 15 jurisdiction, and place the Chapter 15 Debtors in the impossible position of choosing between disobeying an Order of this Court or of the RJ Court. To disguise their improper request, the Ad Hoc Group incorrectly argues the UPI V.tal sale cannot be consummated without action in, and assistance from, the United States. But under the applicable documents the UPI V.tal sale would be effectuated entirely in Brazil (where Oi's UPI V.tal shares are held and registered). Further, the applicable Collateral Documents are governed entirely by Brazilian law and subject to the exclusive jurisdiction of courts in Rio de Janeiro, Brazil. For example, the Intercreditor Agreement expressly carves out actions concerning the Collateral Documents (including the UPI V.tal Lien Agreement) by providing such disputes "will be subject to the exclusive jurisdiction of the Courts of the City of Rio de Janeiro, State of Rio de Janeiro,

---

[4] On April 9, 2026, the Noteholder Parties belatedly filed a Motion for Clarification (*Embargos de Declaracao*) seeking clarification and reconsideration of the Brazil Sale Order in the RJ Court.

Brazil." ECF 150 at 66, § 11.08(b). Hence, contrary to the Ad Hoc Group's assertions, there is no nexus between the sale of UPI V.tal and the United States.

7. Consequently, the Court should ignore the Ad Hoc Group's attempt to muddy the issues by conflating the sale of UPI V.tal and the subsequent distribution of proceeds. It is correct that the Intercreditor Agreement and related indentures require the Collateral Agent[5] to distribute the sale proceeds consistent with a waterfall payment provision, unless modified by any court order. That waterfall, however, has no bearing on the UPI V.tal sale itself. Thus, as the RJ Court already determined, any distribution issues are not ripe for consideration.

8. Instead, once the sale is consummated, the UPI V.tal proceeds will be held in escrow pending resolution of any distribution issues in Brazil (or the U.S. if necessary). GLAS will be designated as Collateral Agent for the sale proceeds and a fiduciary lien will be granted over those proceeds in favor of the applicable creditors. Accordingly, the current sale closing process would not override the FFE Order, the Indentures, or the Intercreditor Agreement regarding distribution of proceeds.

9. In another meritless attempt to invalidate the UPI V.tal sale, the Ad Hoc Group argues the Notes were accelerated and, therefore, the UPI V.tal sale is a "Distressed Disposal." As such, they argue the Chapter 15 Debtors were obligated to follow a modified sale and distribution process. The Indenture Trustee, on behalf of the creditor group that includes the Ad Hoc Group, already raised similar arguments concerning the validity of the sale process before the RJ Court. *See* ECF 164 at 77-105.[6] The RJ Court explicitly overruled these arguments, finding the UPI V.tal auction was carried out consistent with the RJ Plan and the Court's directives. *Id.* at 193-99.

---

[5] Because GLAS Americas is based in the U.S., it has retained a Brazil-based company – TMF Brazil – to hold the shares.

[6] The Declaration of Guilherme Vaz Leal da Cosa ("**Vaz Decl**.") and documents exhibited thereto are at ECF 164. All page citations refer to the ECF page number in the Vaz Decl. rather than the page of each document or exhibit.

3

Unsatisfied with that ruling, the Ad Hoc Group improperly seeks to relitigate those arguments before this Court, hoping to override the Brazil Sale Order.

10. Even if an Acceleration Date had occurred, however, that alone would not signify the UPI V.tal sale is a "Distressed Disposal" under the Intercreditor Agreement and Indentures. Instead, multiple other preconditions also would need to have been satisfied by the Noteholder Parties and related entities before a Distressed Disposal could have been triggered. Yet none of those preconditions occurred. Rather, the Noteholder Parties actively participated in and until recently, consented to an ordinary course sale process. Hence, as the RJ Court found, through their conduct, the Noteholder Parties waived any Distressed Disposal argument and should be estopped from asserting it.

11. Consequently, the Motion should be denied.

## RELEVANT FACT BACKGROUND

12. On May 28, 2024, the RJ Court issued an order approving the RJ Plan (the "**Brazilian Confirmation Order**"). ECF 38-3. On June 17, 2024, this Court issued the FFE Order granting full force and effect to both the Brazilian Confirmation Order and the RJ Plan. ECF 42. The FFE Order held that these chapter 15 cases are to provide "cooperation under section 1525(a) of the Bankruptcy Code in implementing the Brazilian RJ Plan in the form of relief granted by this Order on the terms provided herein" [*Id.* at ¶ F] and "authorized [the parties], subject to the terms of the Brazilian RJ Plan, to take any and all lawful actions necessary to give effect to and implement the Brazilian RJ Plan and restructuring transactions approved by the Brazilian Confirmation Order, at the instruction of the applicable Chapter 15 Debtors[.]" *Id.* at ¶ 4.

### A. The UPI V.tal Auction

13. One such action has been the sale of UPI V.tal. Section 5.2.2.2 of the RJ Plan sets the "Bidding Procedure" for the "Sale of UPI V.tal" [ECF 38-1 at 48], requiring, among other

things, that UPI V.tal be sold for cash, in Brazilian currency, with a minimum price. *Id.* at 49, §

5.2.2.2.3.   Notably, the RJ Plan neither requires use of an investment banker, nor specifies a

particular sale timeline.

14.    On January 28, 2026, after notice, the RJ Court authorized the UPI V.tal sale

process and subsequently issued an *edital* (call for bids) giving public notice of the auction (in a

form agreed to by the Indenture Trustee) and setting forth the bid requirements.   The *edital*

followed the conditions for sale specified in the RJ Plan's Bidding Procedure.   No party objected

to the *edital's* terms at that time or argued the sale should not proceed in the ordinary course.

15.    On March 5, 2026, the public auction was held, and the sealed bids were opened in

the RJ Court.   Oi received no qualifying offers meeting all RJ Plan requirements and only one bid

from a qualified bidder, in a cash amount below the Minimum Price (the "**BTG Bid**").   On March

9, 2026, as directed by the RJ Plan, Oi's Judicial Administrator submitted the non-conforming bid

to Creditors of Restructuring Option I, a group of Oi creditors including the Ad Hoc Group (the

"**Option I Creditors**").

16.    On March 10, 2026, this Court held a Status Conference concerning recent

developments in the Brazilian RJ Proceeding.   ECF 161.   Regarding the UPI V.tal sale, the Court

correctly stated the sale process was entirely foreign to these chapter 15 cases:

> [This is] a sale process being conducted in Brazil, not before me.  And it doesn't
> involve U.S. assets.  This is a Brazilian company, shares located in Brazil and that
> are being sold by a Brazilian company under a Brazilian court proceeding.  [*Id.* at
> 30:22-31:2].

> [This] isn't a 363 sale.  It doesn't involve assets in the United States.  And the
> process that we have to go through here isn't necessarily what they do in Brazil . . .
> and my relief abilities are, as you understand, limited.  For sure if it involves assets
> in the United States, that's why we were discussing pre-judgement attachment of
> assets that are located in the United States.  That's a different story.  But that's not
> what we're talking about here.  [*Id.* at 31:24-32:14].

5

17.     Pursuant to the RJ Plan, Option I Creditors were given ten days to review the BTG Bid and submit comments to the Judicial Administrator. ECF 38-1 at 49, § 5.2.2.2.4(a). On March 19, 2026, a majority of creditors informed the Judicial Administrator they did not approve the BTG Bid. ECF 164 at 46-76. In its rejection letter, the Ad Hoc Group argued (among other things) that the Notes were accelerated in July 2025, and, therefore, reliance on Section 12.02 of the Intercreditor Agreement—which governs ordinary course dispositions—was improper so that disposition of UPI V.tal must be carried out as a Distressed Disposal and strictly comply with the post-acceleration payment waterfall set forth in Section 7.02 of the Intercreditor Agreement. ECF 164 at 74.

18.     On March 23, 2026, UMB, as the Indenture Trustee, submitted a brief to the RJ Court supporting the BTG Bid Rejection Letter. ECF 164 at 77-105. In that brief, UMB argued (among other things) the BTG Bid violated the Intercreditor Agreement's proceeds-distribution mechanics by assigning Oi the role of directing payments to ultimate beneficiaries, rather than requiring that sale proceeds flow first to the Collateral Agent (GLAS) and then to the Indenture Trustee for distribution through the Depository Trust Company. ECF 164 at 90-91. UMB's arguments match the Ad Hoc Group's arguments in the Motion.

19.     On March 25, 2026, the Judicial Administrator, the Judicial Manager, and the independent watchdog appointed by a Brazilian Court (the "**Watchdog**") to supervise the UPI V.tal sale (among other things) each presented separate submissions to the RJ Court on the BTG Bid. The Judicial Manager, on behalf of Oi, did not then recommend that the RJ Court either accept or reject the bid. Rather, the Judicial Manager presented a "Fairness Opinion" prepared by

an independent financial expert, G5 Partners, containing an economic analysis and valuation of the BTG Bid. ECF 164 at 24-44.[7]

20.    On March 30, 2026, UMB made a second filing arguing G5 Partners' Fairness Opinion should be rejected. ECF 164 at 153.

21.    On March 30, 2026, the RJ Court held a hearing to consider the parties' submissions. At that hearing, the Judicial Administrator, Judicial Manager, and the Watchdog supported the BTG Bid. UMB and the Public Prosecutor's Office opposed it.

### B.    The Brazil Sale Order

22.    On April 1, 2026, having fully considered the filings and arguments presented at the March 30 hearing, the RJ Court issued a decision approving the BTG Bid and directing Oi to consummate the sale to BTG. ECF 164 at 182-200. The RJ Court found the auction process was properly conducted "in the most transparent [mode] available, as it directly offers the market, in a broad and public manner, the opportunity to compete freely." ECF 164 at 195. Further, the RJ Court determined "it is unlikely that another party would be found interested in acquiring [UPI V.tal] [as it] is a highly distressed asset" and its value "must be assessed in light of the volatile market that governs it." *Id.* at 194-96.

23.    The RJ Court also found the Option I Creditors did not have an "absolute right," under Brazilian Law, to approve or reject the sale. Instead, Brazilian Bankruptcy Law granted the RJ Court authority to "review [] the legitimacy of the vote" by creditors. *Id.* at 194. The RJ Court held that under the circumstances and based on the presentations to the RJ Court, "the rejection expressed by the Creditors under Restructuring Option I and their representatives amounted to an

---

[7] On March 25, 2026, BTG also filed a motion in support of its bid and in opposition to the Noteholder Parties' motion. ECF at 125.

exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith." *Id.*

at 199.

24.     The RJ Court's reasoning directly addresses the Motion's arguments.  Concerning

the contention a more restrictive sale process, consistent with a Distressed Disposal, was required,

the RJ Court stated:

> [T]he Court considers that the belated challenge to the public notice submitted by
> UMB in its latest filing does not succeed.  Indeed, although UMB now challenges
> the competitive process initiated on the grounds that it contains "restrictive
> conditions," the fact is that it expressly agreed to such public notice … Therefore,
> it has no standing to now allege the existence of purported restrictive conditions ….
>
> *             *             *
>
> In this Court's view, [UMB's] conduct closely resembles that of parties who allege
> procedural defects in themselves, without any actual impact or prejudice – the so-
> called "pocket nullities,"  consisting of purported defects that, in practice, seek to
> hinder the progress of the case by creating obstacles that are either nonexistent or
> irrelevant, as they produce no consequence other than delaying the proceeding.

ECF 164, at 195 (underlining emphasis added).

25.     Regarding the impact of the Option 1 Creditors' vote rejecting the BTG Bid and

the RJ Court's ability to oversee implementation of the RJ Plan and any related documents

governing the sale of UPI V.tal, the RJ Court stated:

> [T]his Court understands that creditors do not hold an absolute right to determine
> the conclusion of a transaction that is not exclusively theirs, but also encompasses
> the rights of the company under reorganization and thousands of other creditors
> whose positions are not reflected such as labor creditors ….
>
> *             *             *
>
> Amendments introduced into the Brazilian Bankruptcy Law make it clear that
> judicial review of the legitimacy of votes is not only possible but also necessary…
> In other words, if the Judiciary may analyze the legality and legitimacy of votes in
> the approval of a Judicial Reorganization Plan, it may – and must – exercise the
> same review over the actual implementation of the plan's provisions, here
> consisting of the execution of the sale of UPI V.tal and all that surrounds it.

\* \* \*

It is the legitimacy of the vote rejecting this sole proposal that must be assessed, since a discretionary right is not absolute and may be limited under the legal system, <u>especially when its exercise becomes abusive or contrary to the principles of good faith and social function</u>.

\* \* \*

It is in this context, combined with the fact that this Court recognizes the fairness and reasonableness of the price set forth in the BTG PROPOSAL, that this Court finds that the rejection expressed by the Creditors under Restructuring Option I and their representatives <u>amounted to an exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith</u>. With due respect to the legal opinion of the Public Prosecutor's Office, <u>approval of the BTG PROPOSAL is therefore imperative</u>.

ECF 164, at 192-99 (<u>underlining emphasis added</u>).

26.     As to any issues raised about the BTG Bid amount and terms, the RJ Court reasoned that:

The [UPI V.tal] asset in question . . . must be assessed in light of the <u>volatile market</u> that governs it. Indeed, the very acceptance of such collateral by the Creditors under Restructuring Option I inherently entails acceptance of the volatility of its value. As sophisticated investors, far from being vulnerable, they were fully aware that the collateral accepted in connection with the transaction would fluctuate in value according to normal market variations.

\* \* \*

With all due respect to the representatives of the objecting parties, this Court must acknowledge <u>that they failed, even minimally, to substantiate their allegations</u>. As previously stated, such objections would carry greater credibility if supported by technical evidence. However, they are based solely on allegations lacking technical substantiation, which, in this Court's view, renders them devoid of weight. In the context thus outlined, and in conclusion regarding the fairness of the price offered in the BTG PROPOSAL, <u>this Court finds that it should be accepted because it is "fair."</u>

ECF 164, at 196-97 (<u>underlining emphasis added</u>).

27.     Confirming that the issue of distribution of sale proceeds is separate from the sale and, therefore, premature to raise now, the RJ Court stated:

9

> [T]he issue of the allocation of the proceeds from the sale of Isolated Productive
> Unit V.Tal <u>cannot constitute</u> an obstacle to its [sale] consummation.

ECF 164, at 198 (<u>underlining emphasis added</u>).

28. Based on those and other findings, the RJ Court approved the BTG Bid and "award[ed] to the bidder [BTG] the asset subject to the sale of Isolated Productive Unit [UPI] V.tal." *Id.* at 199. Through such rulings, the Brazil Sale Order directed the Chapter 15 Debtors to consummate the sale of UPI V.tal to BTG. That process is now proceeding in the ordinary course. *See* Declaration of Thiago Peixoto dated April 11, 2026 ("**Peixoto Decl**.") at ¶¶ 10-14.

29. Instead of appealing the Brazil Sale Order or seeking injunctive remedies in Brazil, the Ad Hoc Group seeks relief from this Court, repeating the same arguments rejected by the RJ Court.[8] Such request effectively asks this Court to direct the Chapter 15 Debtors to violate the Brazil Sale Order.

**ARGUMENT**

**I.  AS A MATTER OF COMITY AND APPLICABLE LAW, THIS CHAPTER 15 COURT SHOULD RESPECT AND NOT CIRCUMVENT DECISIONS OF THE RJ COURT**

30. Contrary to the relief sought in the Motion, this Court's role in these chapter 15 cases is, as a matter of comity, to assist the Brazilian RJ Proceeding and the Brazilian Court in which the Brazilian RJ Proceeding is pending. Thus, this Court should <u>not</u> treat these cases as free-standing chapter 11 cases for the Chapter 15 Debtors or act as a Brazilian appellate court independently reviewing RJ Court rulings. Indeed, these cases' nature is well-documented through this Court's precedent and prior orders. For example, this Court's FFE Order, issued to bind the Chapter 15 Debtors' U.S. creditors to the Brazilian RJ Plan, expressly recognizes this Court's role

---

[8] On April 9, 2026, the Noteholder Parties belatedly filed a Motion for Clarification seeking reconsideration in the RJ Court.

as one of cooperation and assistance to the Brazilian RJ Proceeding.  Thus, the FFE Order found the Foreign Representative and Chapter 15 Debtors "are entitled to this Court's cooperation under section 1525(a) of the Bankruptcy Code in implementing the Brazilian RJ Plan" [ECF 42 at ¶ F] and that "[a]bsent the relief granted [by the Court], the Brazilian RJ Proceeding and the efforts of the Chapter 15 Debtors, their creditors, and other parties in interest to consummate the Brazilian RJ Plan could be impeded or harmed . . . ."  *Id.* at ¶ H.  Similarly, the FFE Order confirmed that recognition by this Court was "necessary and appropriate in the interests of international comity." *Id.* at ¶ T.  Notably, the Ad Hoc Group argues it "does not ask the Court to expand the scope of its authority or to interfere with the RJ Proceeding" [ECF 163 at ¶ 3], but that is the exact relief the Motion seeks to impose.  *See* ECF 163, Exh. A, ¶ 4 (directing the chapter 15 parties to take no action to "consummate any transaction or apply any proceeds thereof …..")

31.     Consistent with these findings, the FFE Order directs all parties to "take any and all lawful actions necessary to give effect to and implement the Brazilian RJ Plan and restructuring transactions approved by the Brazilian Confirmation Order."  ECF 42 at ¶ 4.  Further, the FFE Order permanently enjoins all entities from "commencing, continuing, or taking any action or asserting any claim that is in contravention or inconsistent with, or would interfere with, or impede the administration, implementation and/or consummation of the Brazilian RJ Plan, the Brazilian Confirmation Order, or the terms of this Order."  *Id.* at ¶ 7.[9]  In short, these chapter 15 cases' purpose is to support and give effect to the Brazilian RJ Proceeding — not to provide a parallel forum to relitigate matters properly decided by the RJ Court.

---

[9] Notably, the Motion attempts to turn this injunction on its head by suggesting that the FFE Order's injunction precludes the Judicial Manager and Oi from complying with the RJ Court's Brazil Sale Order that requires them to consummate the sale of UPI V.tal.  *See* ECF 163 at ¶ 59.

A.      **The Auction Process Was Properly Conducted.**

32.      The auction of UPI V.tal was noticed by the RJ Court through the *edital* (call for bids), a formal court announcement, and that *edital* adhered to the letter of the RJ Plan (and the notice was approved by the Noteholder Parties). While the Ad Hoc Group challenges aspects of the auction process, the auction was conducted consistent with the RJ Court's directed process and held in the RJ Court itself, with the Brazilian Judge presiding.

33.      As no conforming bid was received at the auction, on March 9, 2026, as directed by the RJ Plan, the Judicial Administrator sent the non-conforming bid to the Option I Creditors for review. The RJ Court set a conference date regarding the sale for March 30, 2026, after Option I Creditors had reviewed and either approved or rejected the bid. This process precisely followed the procedures in the RJ Plan and is how the Brazilian RJ Proceeding is designed to function—with the RJ Court supervising the process, the Judicial Manager conducting the sale in accordance with the RJ Plan, and applicable creditors exercising their bargained-for rights at the appropriate stage.[10]

34.      Further, all issues raised by the Ad Hoc Group are governed by the RJ Plan, which is precisely why the Noteholder Parties themselves filed a preemptive motion raising their concerns before the RJ Court and citing the RJ Plan almost exclusively. *See* ECF 133 at 12-25. Notably, despite having raised the Distressed Disposal argument in the BTG Bid Rejection Letter sent to the Judicial Administrator, the preemptive motion filed in the RJ Court failed to even mention the "Distressed Disposal" argument. ECF 164 at 78. Accordingly, contrary to the Ad Hoc Group's current position, UMB proceeded at every stage as though the UPI V.tal sale was an ordinary course disposition. UMB consented to the sale notice and the Noteholder Parties

---

[10] Significantly, the RJ Plan, including its provisions governing the sale of UPI V.tal, was negotiated by, among others, the Noteholder Parties.

participated in every stage of the ordinary course sale process. At no point did they treat the sale as a "Distressed Disposal," which requires numerous untaken preconditions to be satisfied by certain Noteholder and other Parties before different sale procedures could be necessary. As such, even if the Noteholder Parties had any basis for a "Distressed Disposal" argument, the RJ Court determined such an argument had been waived and, therefore, the Ad Hoc Group is now estopped from asserting it.[11]

35.     The Noteholder Parties have had ample notice of, and multiple opportunities to object to or otherwise participate in, each matter about which they now complain. The Noteholder Parties were present at the auction before the RJ Court and raised objections at that proceeding. On March 9, 2026, the non-conforming, but still highest, bid was provided to Option I Creditors for review—consistent with the RJ Plan—and again such creditors submitted objections. The Noteholder Parties' objections were placed on the record in and addressed by the RJ Court. Thus, the Ad Hoc Group's rights under the RJ Plan and the Intercreditor Agreement remain intact and continue to be respected.

### B.     All The Ad Hoc Group's Current Objections Were Presented To And Rejected By The RJ Court.

36.     In its filings and at the sale hearing in the RJ Court the Indenture Trustee argued, among other things:

- the BTG Bid should be rejected because it was "manifestly insufficient" as it is approximately 36% of the Minimum Price in the RJ Plan (*see* ECF 164, Ex. 3 at ¶¶ 17-19; Ex. 8 ¶ 5; *cf.* ECF 163 at ¶¶ 7, 32–34, 63–64);

---

[11] Certainly, this Court, as a Court of equity, should not entertain that argument. Regardless, as demonstrated below, the current sale of UPI V.tal is not a "Distressed Disposal."

- the BTG Bid violated the payment mechanics required by the Intercreditor Agreement, Indentures, and RJ Plan because it purportedly assigned to Oi the role of instructing the escrow account agent to make payments directly to ultimate beneficiaries, rather than directing proceeds through the Collateral Agent and then to the Indenture Trustee for distribution through DTC (*see* ECF 164, Ex. 3 at ¶¶ 23–32; *cf.* ECF 163 at ¶¶ 35–38, 69–74);

- the sale process was deficient and devoid of effective competition, having been conducted without a financial advisor, on a compressed timeline, and in a manner that yielded only a single bid from V.tal's controlling shareholder (*see* ECF 164, Ex. 8 at ¶¶ 82–86; *cf.* ECF 163 at ¶¶ 5, 36, 39); and

- the creditors' rejection of the BTG Bid was a legitimate and sovereign exercise of their consent rights under the RJ Plan, and not an "abusive" act (*see* ECF 164, Ex. 3 at ¶ 15; Ex. 8 at ¶¶ 7–9, 97–109, 125–126; *cf.* ECF 163 at ¶¶ 7–9, 63–64, 68).

37.    On April 1, 2026, the RJ Court issued its comprehensive Brazil Sale Order fully considering and overruling the Noteholder Parties' objections and approving and requiring Oi's sale of UPI V.tal to BTG:

> [C]ombined with the fact that the Court recognizes the fairness and reasonableness of the price set forth in the BTG PROPOSAL, this Court finds that the rejection expressed by the Creditors under Restructuring Option I and their representatives amounted to an exercise of economic irrationality, thereby tainting it with abusiveness and lack of good faith … [A]pproval of the BTG PROPOSAL is therefore imperative.

ECF 164 at 199. The Brazil Sale Order contains numerous reasons for the RJ Court's decision, including those summarized below.

    *i.    The Facts Justify Approval Of The UPI V.tal Sale To BTG*

14

38.    The Noteholder Parties challenged the fairness of the BTG purchase price and the method by which the BTG Bid prevailed.  The RJ Court found numerous factors warranting rejection of the Noteholder Parties' arguments.

39.    First, all evidence before the RJ Court demonstrated the fairness of BTG's purchase price. *See id.* at 197.  The principal valuation evidence submitted to the RJ Court was a written Fairness Opinion prepared by G5 Partners, Brazil's largest independent financial services firm and an expert in providing fairness opinions. *See id.* at 196.  Also, BTG submitted a market comparison highlighting a recent transaction at a lower price. *See id.* at 190.  In opposing the sale to BTG, the Noteholder Parties submitted no valuation evidence and merely referred to outdated valuations in the RJ Plan that the RJ Court found meaningless in the applicable, highly "volatile" market. *See id.* at 189, 196, 197.  Further, the RJ Court found UMB's "allegations lack any evidentiary support and are therefore devoid of substance" because UMB failed to: (a) present any alternatives to the challenged sale; (b) seek an expert appraisal of UPI V.tal; or (c) demonstrate UMB (or the Ad Hoc Group) was seeking alternative bidders. *Id.* at 195.

40.    Second, G5 Partners' Fairness Opinion was corroborated by the fact that BTG's Bid was the "one proposal submitted" notwithstanding the "broad market awareness" and there was no evidence suggesting another bid was likely. *Id.* at 193, 195.  Indeed, at the March 30 hearing, counsel for UMB conceded UMB was unaware of any other bid and confirmed there was no bondholder interest in submitting a credit or other bid. *See id.* at 194 (the Ad Hoc Group has "no intention of acquiring [UPI] V.tal through a credit proposal nor through other possible forms of acquisition ….").

41.    Third, acceptance of BTG's bid was recommended by multiple impartial parties, including: (a) Judicial Administrator Adriana Campos Conrado Zamponi; (b) Judicial Manager

15

Bruno Rezende; and (c) the judicially appointed independent Watchdog for the Oi RJ cases. The Oi Debtors' Labor Creditors' Committee also recommended approval of BTG's Bid. *Id.* at 192.

42.    Fourth, the RJ Court found the sale of UPI V.tal to be "imperative" as it is essential to fulfillment of the RJ Plan, survival of the Oi Debtors in their ongoing reorganization, and, therefore, critical to the Oi Debtors' continued ability to provide vital services to the public. *Id.* at 193. *See also* Peixoto Decl., Ex. D, November 14, 2025 of Appellate Court Judge Monica Maria Costa Di Piero (the "**November 14 Appellate Decision**") at 26 ("There is no doubt that, in this case, the orderly disposition of the assets, in the context of judicial reorganization, would have the power to ensure the subsistence of the business activity by the debtor, allowing the continuity of the provision of essential services, even if in a reduced way, and enabling the payment of extra-bankruptcy and bankruptcy credits").

43.    Fifth, the sale notice for UPI V.tal was not challenged by the Option I Creditors or any other party in interest and UMB "expressly agreed to such public notice." *See id.* at 193, 195. Further, the sale notice was widely publicized to the market through a "broad public procedure." ECF 164 at 195.

44.    Sixth, the RJ Court found it would be difficult to identify a purchaser of Oi's minority equity interest in V.tal other than its majority equity holder, particularly due to UPI V.tal's own financial distress and such minority interest's lack of control, governance rights, or meaningful liquidity. *See id.* at 195.

### ii.    *The Legal Bases for the Brazil Sale Order*

45.    Based on those facts and Brazilian Bankruptcy Law, the RJ Court held that "approval of the BTG PROPOSAL is imperative." ECF 164 at 199. The RJ Court's key legal considerations are summarized below.

16

46.     First, the RJ Court found the sale of UPI V.tal is provided for in the RJ Plan and mandated by the November 14 Appellate Decision.  *See* November 14 Appellate Decision at 26.  In effect, the RJ Court determined the sale of Oi's main asset, UPI V.tal, would help implement that Appellate Court Order and is "essential both to compliance with the [RJ Plan] and to the survival of the debtor."  *See* ECF 164 at 194.

47.     Second, the RJ Court found it has discretion concerning implementation of the RJ Plan and interpretation of related documents.  In effect, under Brazilian Bankruptcy Law, the Court is required to consider not only the strict legal terms of a plan or contract but also creditor input, the parties' good faith and reasonableness, and the purpose of the judicial reorganization process, i.e., the preservation of the debtor and its social function.  *See id.* at 193-94 (RJ Court finds "it is the duty of the Court to safeguard all the numerous interests involved in a judicial reorganization of this magnitude ….").  Consequently, the RJ Court has discretion over the "implementation of [the RJ] plan's provisions" regarding the UPI V.tal sale and, therefore, the power and obligation under the circumstances here to approve Oi's sale of UPI V.tal to BTG.  *See id.*

48.     Third, the RJ Court found that same discretion applies to evaluation of the creditors' vote in that context, particularly when there is "an impasse."  *Id.* at 194.  Accordingly, similar to designation of plan votes under the Bankruptcy Code, any creditor veto right is "not absolute."  *Id.*  Instead, such right is limited, especially when its exercise is found to be abusive or contrary to principles of "good faith" and the public interest.  *See id.* at 194-95.  Here, the RJ Court found the creditors' conduct and vote to be "an act of economic irrationality" and "lack[ing][] good faith."  *Id.* at 199.

49.     Fourth, the RJ Court found the BTG Bid to be fair and that its acceptance would promote creditor interests by maximizing asset value through an efficient and appropriate sale process. *See id.* at 197.

50.     Fifth, the RJ Court found that UMB had waived not only any right to challenge the notice of sale, but also the ability to challenge the bid process based on allegations regarding "restrictive conditions." *See id.* at 195.  The RJ Court based that waiver on UMB's express agreement to the belatedly challenged sale notice, which incorporated the bid process.  Regardless, the RJ Court found the bid process permitted broad competition and that UMB had "no standing" as it had "not even specified" any alleged "restrictive conditions." *Id.* at 195.

51.     Sixth, the RJ Court rejected the challenge to the BTG sale based on bondholder concerns about the distribution of sale proceeds. *See id.* at 198.  In distinguishing between the sale and the distribution of proceeds, the RJ Court found that most of the claims otherwise entitled to sale proceeds are subject to a preliminary injunction freezing any recoveries and that fact cannot preclude the sale itself.  Instead, there will be opportunity in the future to resolve the distribution issues.  Similarly, consideration of distribution issues now in connection with the sale would be premature. *See id. at.* 198.  Thus, any issue regarding treatment of UPI V.tal sale proceeds does not block approval and implementation of the sale: "The issue of the allocation of the proceeds from the sale of Isolated Productive Unit V.Tal cannot constitute an obstacle to its consummation." *Id.* at 198.

52.     While the RJ Court had no need to expressly address whether an amendment to the RJ Plan was necessary to approve and implement the sale of UPI V.tal to BTG because that issue does not appear to have been raised by the Noteholder Parties, the RJ Court implicitly found that no such amendment was necessary.  In effect, the RJ Court, whose Confirmation Order approved

18

the RJ Plan, and which court is best positioned to interpret that Order and plan, approved and required the sale to BTG without a plan amendment.

53.    Hence, the RJ Court correctly "approv[ed]" the sale to BTG "and award[ed] [UPI V.tal] to the bidder." *Id.* at 199. Thus, as UPI V.tal has already been awarded to BTG, only the closing of the sale is left to occur. Accordingly, Oi and the Judicial Manager must comply with that edict or face potential criminal penalty or contempt of Court. *See* Peixoto Decl. at ¶ 11 (*citing* Brazil Penal Code § 330).

54.    Consequently, the RJ Court is actively and competently managing the Oi Group's main insolvency proceedings in Brazil regarding the Chapter 15 Debtors' Brazilian assets and has fully considered and rejected all the Ad Hoc Group's arguments. Thus, there is no basis for the Ad Hoc Group's invitation for this Court to usurp the RJ Court's authority. Instead, the RJ Court has been and remains the proper forum for resolving disputes arising under the RJ Plan. Further, the Ad Hoc Group and its representatives, who have received all requisite notice and had multiple opportunities to be heard, have availed and continue to actively avail themselves of that forum, whose determinations should be binding. Hence, this Court's role in these chapter 15 cases should continue to be to support the Brazilian RJ Proceeding and assist the RJ Court.

55.    Moreover, the Ad Hoc Group's reliance on Bankruptcy Code sections 105(a) and 1522(c) is misplaced. While this Court has authority to interpret and enforce its prior orders, the relief sought here goes far beyond mere enforcement. Rather, the Ad Hoc Group asks this Court to enjoin compliance with a foreign court order, entered by the very court whose proceeding this Court recognized and agreed to assist. Granting such relief would not "enforce" the FFE Order; it would fundamentally undermine the comity principles upon which the FFE Order was premised. Similarly, section 1522(c) does not authorize this Court to effectively override the RJ Court's

19

directives, particularly when the FFE Order was designed to support, not supplant, the Brazilian RJ Proceeding.

56.     Also, as the Court well knows, section 105 may not be used in conflict with other express provisions of the Bankruptcy Code. *See Law v. Siegel*, 571 U.S. 415 (2014).  Thus, here section 105 may not be used to override chapter 15 comity principles as chapter 15, through section 1525(a), dictates that this "court shall cooperate to the maximum extent possible with a foreign court."   Otherwise, section 105 could be used to undermine this mandatory high standard of deference.

## II.   THIS CHAPTER 15 COURT LACKS JURISDICTION OVER THE UPI V.TAL SALE BEING CONSUMMATED ENTIRELY IN BRAZIL UNDER BRAZILIAN LAW, AND ANY ALLEGED ISSUES CONCERNING PAYMENT DISTRIBUTIONS ARE NOT YET RIPE

57.     The Ad Hoc Group asserts that due to potential sale proceeds distribution issues, implementing the Brazil Sale Order "without obtaining relief from this Court … will necessarily" violate the FFE Order or the Postpetition Transaction Documents.  ECF 163 ¶ 10.  Yet, the UPI V.tal sale is being consummated entirely in Brazil – pursuant to a Brazilian court order and under documents governed by Brazilian law that have exclusive Brazilian choice of jurisdiction clauses.  Thus, the Motion improperly conflates two distinct stages – (i) the UPI V.tal sale; and (ii) the distribution of proceeds – and incorrectly treats prospective distribution concerns as a basis for enjoining the sale itself.

58.     **Stage 1 of the sale process** concerns the transfer of Oi's UPI V.tal shares in exchange for the purchase price, as ordered by the Brazil Sale Order.  This occurs entirely in Brazil pursuant to that order and the Collateral Documents, which are all governed by Brazilian law.

59.     Specifically, the UPI V.tal shares are held in Brazil, and the shares are registered in the Registry of Securities and Documents (RTD) in Brazil.  Pursuant to the terms of the V.tal

23-10193-lgb    Doc 182    Filed 04/11/26    Entered 04/11/26 15:54:06    Main Document
Pg 23 of 31

Fiduciary Lien Agreement among Oi, GLAS as Collateral Agent, and V.tal, GLAS holds a security interest in the UPI V.tal shares (through its Brazilian agent, TMF). Peixoto Decl., Exh. A ("**V.tal Fiduciary Lien Agreement**" at § 2.1).

60. The Motion misleadingly cites to only part of the Intercreditor Agreement's section 11.08, which is a non-exclusive consent to jurisdiction in New York for disputes arising out of the agreement itself. ECF 163 at ¶ 30. However, the Ad Hoc Group conveniently leaves out a critical part of section 11.08(b), which carves out any action brought in connection with the Collateral Documents, including the V.tal Fiduciary Lien documents, and makes them subject to the exclusive jurisdiction of the courts of Rio de Janeiro, Brazil:

> Subject to the terms of the Collateral Documents, any action that may be brought in connection with the Collateral Documents will be subject to the **exclusive jurisdiction** of the Courts of the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

ECF 150 at 66, § 11.08(b) (Emphasis added).

61. Indeed, the agreements relevant to the sale and release of sale collateral contain exclusive choice of jurisdiction clauses designating the courts of Rio de Janeiro, Brazil as the exclusive forum for any dispute arising thereunder. *See* V.tal Fiduciary Lien Agreement at § 14 (including "express waiver" of any jurisdiction other than the courts of Rio de Janeiro); Peixoto Decl., Exh. C ("**Second Amendment to V.tal Fiduciary Lien Agreement**") at § 4.4 (same)).

62. Likewise, these agreements are governed by Brazilian law. V.tal Fiduciary Lien Agreement at § 15.2; Second Amendment to V.tal Fiduciary Lien Agreement, § 4.3.

63. Accordingly, any dispute concerning consummation of the UPI V.tal sale pursuant to the Brazil Sale Order, including any dispute regarding the transfer of UPI V.tal shares, must be resolved in Brazil. Correspondingly, this Court lacks jurisdiction over any such dispute, whether arising from the UPI V.tal sale or the Collateral Documents.

21

64.     The Ad Hoc Group also contends that BTG, BGC, and V.tal are subject to this Court's jurisdiction based on their execution of the Intercreditor Agreement and appearances in these cases. *See* ECF 163 at ¶¶ 58-60.  But the question here is not whether these parties have had contact with this Court; it is whether this Court should exercise jurisdiction to enjoin a sale that is being consummated entirely in Brazil, under Brazilian law, pursuant to a Brazilian court order, and under agreements in which the parties agreed to the exclusive jurisdiction of Brazilian courts. The principles of comity incorporated into chapter 15, including in section 1525(a), preclude such an exercise of jurisdiction, particularly where the RJ Court already fully adjudicated the issues the Ad Hoc Group now raises.

65.     **Stage 2 of the sale process** concerns distribution of proceeds from the UPI V.tal sale.  As a threshold protection for noteholders, the Collateral Agent is obligated to comply with the waterfall provisions in the Intercreditor Agreement, unless otherwise ordered by a court with appropriate jurisdiction.

66.     Further, contrary to the Ad Hoc Group's assertion [ECF 163 at ¶ 11] (which apparently let to the just filed Statement by GLAS) Oi will not control the escrow account or be able to direct funds for its own benefit.  Instead, pursuant to the Intercreditor Agreement and the RJ Plan, at the direction of TMF (on behalf of GLAS), the UPI V.tal sale proceeds shall be distributed in the following order of priority: (a) first, to the First Priority Debt (including New Money and V.tal Debentures); (b) second, to the ToP Obligations, until such obligations are paid in full; (c) third, to the Roll-Up Debt; and (d) fourth, to the Company.  *See* Peixoto Decl. at ¶ 14. Hence, the Ad Hoc Group's contention that Oi is attempting to "misappropriate the proceeds from the sale" is meritless.

67.     Separately, the Ad Hoc Group raises concerns about the Oi Suit and related prejudgment attachment obtained in Brazil against certain present and former members of the Ad Hoc Group (the "**Named Defendants**").  ECF 163 at ¶¶ 46-54.  That attachment was issued by a Brazilian court in connection with claims arising under Brazilian law.  To the extent the Ad Hoc Group contends the attachment improperly affects distributions to U.S. noteholders, those concerns relate to the distribution of proceeds (Stage 2) not to the sale itself, and are not ripe for adjudication.  Meanwhile, to the extent that prejudgment attachment applies, assets earmarked for the Named Defendants would be held in escrow subject to a fiduciary lien and under the Collateral Agent's direction.  *See* Peixoto Decl. at ¶ 14.

## III.     THE UPI V.TAL SALE ORDERED BY THE RJ COURT IS NOT A "DISTRESSED DISPOSAL" AND ANY SUCH ARGUMENT IS BARRED

68.     The Ad Hoc Group asserts a July 2025 Oi Debtor subsidiary bankruptcy filing automatically accelerated the Notes and, therefore, the UPI V.tal sale became a Distressed Disposal, not a sale to be implemented in the ordinary course.  ECF 163 at ¶ 28.  Yet the Ad Hoc Group provides no basis for its threshold assertion.  It does not attach a bankruptcy filing, identify a triggered Indenture provision, or explain the alleged acceleration.  The allegation's sole support is the Vaz Declaration ¶ 24(i), which in turn relies on the alleged assertion by unnamed "U.S. counsel" that "these events constituted events of defaults under the terms of the Indentures, causing the Notes to have accelerated and become due automatically in accordance with the terms."  ECF 164 at 11.  Notably, the Vaz Declaration does not assert a Distressed Disposal is required based on such acceleration alone.

69.     Even assuming an automatic acceleration occurred, the Motion's enormous leap from an acceleration to the requirement for a Distressed Disposal having been triggered is likewise unsupported.  Yet that support is critical as not every asset sale following an acceleration is a

Distressed Disposal.  Instead, the Intercreditor Agreement and Collateral Documents prescribe a multi-step notice and enforcement process that must be completed before any post-acceleration asset disposition can qualify as a Distressed Disposal.  *See, e.g*., ECF 150, § 3.01.  The contractual framework requires, at a minimum, the following sequential steps to trigger a Distressed Disposal.  First, following an Acceleration Date, the Representative (here, UMB) was required to provide "prompt" notice to the Intercreditor Agent (GLAS), who was then required to "promptly … notify the other Representatives." *Id.* at 38-39, § 3.01(a), (j).  Second, the applicable Instructing Group (the NPSD Noteholders) was required to deliver an "Enforcement Request Notice" to GLAS, as Intercreditor Agent, specifying the event giving rise to the Acceleration Date, together with "Enforcement Instructions" detailing the specific enforcement actions GLAS should take.  *Id.* at 37, § 3.01(a).  Third, upon receipt of the Enforcement Request Notice, GLAS was required to "promptly deliver a copy to … each Representative," [*Id.*, § 3.01(b)] and to "exercise and enforce any such Enforcement Action solely in accordance with such Enforcement Instructions."  *Id.* at 38, § 3.01(g). Fourth, respecting the UPI V.tal sale specifically, the V.tal Fiduciary Lien Agreement requires that GLAS (as Collateral Agent) shall, "as instructed by the Secured Parties, execute, sell, assign, transfer, or otherwise dispose" of UPI V.tal shares.  Peixoto Decl., Exh. A, §§ 2.1, 6.1.

70.     Each of these steps is a contractual prerequisite to a Distressed Disposal and not merely a formality.  Nonetheless, the Ad Hoc Group has not identified when, how, or whether the Noteholders, UMB, or GLAS took any of the steps contractually required to convert an Acceleration Date into a Distressed Disposal of UPI V.tal.  The reason for that glaring omission is self-evident: none of those steps occurred.  To the contrary, even if the alleged acceleration occurred, none of the NPSD Noteholders, UMB, or GLAS raised the purported acceleration or

took any action to initiate enforcement at any point. In fact, the Noteholder Parties participated in and complied with the ordinary course by reviewing and approving the *edital*, submitting to the competitive bidding procedure, and casting votes on the BTG Bid, all without once invoking the Distressed Disposal framework. *See* ECF 164 at 195. On information and belief, the Ad Hoc Group only first raised the purported acceleration in February 2026 – seven months after the alleged triggering event – and then only as a post hoc justification for rejecting the ongoing auction.

71.     Accordingly, the UPI V.tal auction was properly conducted as an ordinary course sale.

72.     Moreover, even if the Ad Hoc Group demonstrated an acceleration occurred, the Group cannot lie in wait for nearly a year, acquiescing or participating in every step of an ordinary-course sale process, and then invoke acceleration at the eleventh hour when the sale outcome does not suit the Ad Hoc Group. Having elected to participate in the ordinary-course process without reservation, the Ad Hoc Group has (and all Noteholder Parties have) waived any argument the sale should have proceeded as a Distressed Disposal.

73.     Indeed, the Ad Hoc Group's belated Distressed Disposal argument is precisely the type of "pocket nullit[y]" criticized by the RJ Court when finding in the Brazil Sale Order that the Noteholder Parties' actions precluded their assertion of deficiencies in the sale process. ECF 164 at 195. Such misconduct is a "purported defect[] that, in practice, seek[s] to hinder the progress of the case by creating obstacles that are either nonexistent or irrelevant, as they produce no consequence other than delaying the proceeding." *Id.* at 195. As the RJ Court correctly found, the Noteholder Parties' failure to timely object to the sale mechanics constituted a waiver of such arguments. *See id.* Significantly, whether the sale procedures derive from instruments governed by U.S. or Brazilian law, and regardless of which forum has jurisdiction over related disputes, the

RJ Court had jurisdiction to determine that objections to the sale mechanics were waived because the objectors failed to timely raise those objections and actively participated in the sale process without objection.  The Ad Hoc Group cannot revive in these chapter 15 cases the objections the Group was found to have waived in the forum where the sale was conducted.  Consequently, the Motion's Distressed Disposal argument is meritless.

## CONCLUSION

74.    For the reasons set forth above, the Chapter 15 Debtors and the Foreign Representative respectfully request that the Court deny the Motion and enter the proposed order attached hereto as Exhibit A.

Dated: April 11, 2026
New York, New York

Respectfully submitted,

*/s/ Alan J. Lipkin__ _____*
**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor
New York, NY 10019
Alan J.  Lipkin
Erin E.  Valentine
Marcel Engholm
a.lipkin@chaffetzlindsey.com
e.valentine@chaffetzlindsey.com
m.engholm@chaffetzlindsey.com

*Counsel for the Foreign Representative
and Chapter 15 Debtors*

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 15** |
| **Oi S.A.** *et al.,* | **Case No. 23-10193 (LGB)** |
| **Debtors in Foreign Proceeding.**[12] | **Jointly Administered** |

**[DRAFT] ORDER DENYING MOTION FOR AN ORDER TO (I) ENFORCE THIS COURT'S PRIOR ORDER GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN RJ PLAN IN THE UNITED STATES AND (II) GRANT RELATED RELIEF REQUESTED**

**WHEREAS**, on April 6, 2026, the Ad Hoc Group[13] filed the Motion to Enforce this Court's Prior Order Granting Full Force and Effect to the Brazilian RJ Plan in the United States [ECF 163] (the "**Motion**");[14]

**WHEREAS**, on April 7, 2026, the Court entered an Order scheduling a hearing (the "**Hearing**") to consider the relief requested in the Motion to be held on April 15, 2026 at 10:00 A.M. (EST) [ECF 166];

**WHEREAS**, on April 11, 2026, the Chapter 15 Debtors and their Foreign Representative and BTG filed Objections to the Motion [ECF ___ and ____];

**WHEREAS**, on April 13, 2026, the Ad Hoc Group filed a Reply to the Chapter 15 Debtors' Objection [ECF ___];

---

[12] The debtors in the above-captioned cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

[13] As defined therein.

[14] Each capitalized term in this Order not otherwise defined shall have the meaning ascribed to it in ECF 163.

**WHEREAS**, on April 15, 2026, the Court has fully considered the Motion, Objections, Reply and all other filings in this Court respecting the Motion and all arguments at the Hearing on whether the Motion should be granted.

NOW, THEREFORE, IT IS HEREBY

**ORDERED**, that the Motion is denied.

Dated: New York, New York
April ___, 2026

_____
HONORABLE LISA G.  BECKERMAN
UNITED STATES BANKRUPTCY JUDGE