**DAVIS POLK & WARDWELL LLP**
Elliot Moskowitz
David Schiff
Marc J. Tobak
Joseph W. Brown
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Oi S.A., *et al.*,[1] | Case No. 23-10193 (LGB) |
| Debtors in Foreign Proceeding. | (Jointly Administered) |

### AD HOC GROUP'S REPLY TO OBJECTIONS TO ITS MOTION FOR AN ORDER TO (I) ENFORCE THIS COURT'S PRIOR ORDER GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN RJ PLAN IN THE UNITED STATES AND (II) GRANT RELATED RELIEF

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ......................................................................................................1

REPLY .............................................................................................................................................4

I.    The FFE Order Has Been Violated and Will Be Further Violated by the Sale Closing....4

    A.    Oi has Created a Conflict between the Sale Order and FFE Order and Taken No Steps to Resolve That Conflict ............................................................4

    B.    Oi is Flagrantly Violating the FFE Order by Seeking to Close the Sale Without Creditor Consents That Are Clearly Required Under the Postpetition Transaction Documents ...................................................................5

        ii.    The BTG Bid Is Clearly Not a "Permitted V.tal Sale" Under the NPSD Indenture.................................................................................................6

    C.    Consummating the Sale Will Lead to Additional Post-Closing Violations of the FFE Order That the Court Can Prevent Now.................................................13

        i.    The BTG Bid Contemplates Further Violations of the Intercreditor Agreement After the Closing of the Sale .................................................13

II.    This Court has Jurisdiction and Authority, and is Ideally Positioned, to Prevent Violations of Its FFE Order....................................................................................................15

    A.    This Court has Jurisdiction and Authority to Enforce the FFE Order ................15

        i.    This Court has Personal Jurisdiction over Parties Required to Grant the Requested Relief.....................................................................................16

        ii.    This Dispute Over the FFE Order and Postpetition Transaction Documents Belongs in this Court, not in Brazil.......................................17

    B.    Comity Principles Do Not Counsel in Favor of Declining to Exercise Jurisdiction and Authority Here.........................................................................20

        iii.    Having Procured the FFE Order, Oi Cannot Argue that Comity Requires this Court to Disregard the FFE Order .....................................20

        iv.    This Court is the Right Court to Enforce Its Own Orders and Doing So Does Not Impinge on Foreign Court Jurisdiction ...................................23

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Collins v. Oilsands Quest Inc.*,
484 B.R. 593 (S.D.N.Y. 2012) ................................................................................ 23

*Hamilton v. Atlas Turner, Inc.*,
197 F.3d 58 (2d Cir. 1999) ..................................................................................... 16

*Law v. Siegel*,
571 U.S. 415 (2014) ............................................................................................... 19

*In re Petition of Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
275 B.R. 699 (S.D.N.Y. 2002) ............................................................................... 23

*Roberts v. Bennaceur*,
658 Fed. App'x 611 (2d Cir. 2016) ........................................................................ 16

*In re Treco*,
240 F.3d 148 (2d Cir. 2001) .................................................................................. 23

### STATUTES & RULES

11 U.S.C. § 105 ............................................................................................................ 19

11 U.S.C. § 105(a) ....................................................................................................... 19

11 U.S.C. § 1525 .......................................................................................................... 19

11 U.S.C. § 1525(a) ..................................................................................................... 19

### OTHER AUTHORITIES

4 Collier Bankr. Manual ¶ 1501.02 (2025) .................................................................20

iii

The ad hoc group of secured noteholders (the "**Ad Hoc Group**")[2], through its undersigned counsel, hereby submits this reply (this "**Reply**") to the *Objection to Motion for an Order to (I) Enforce this Court's Prior Order Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Grant Related Relief* [ECF No. 180] (the "**BTG Objection**") and the *Objection to Motion for an Order to Enforce this Court's Prior Full Force and Effect Order and Related Relief* [ECF No. 182] (the "**Oi Objection**" and, collectively with the BTG Objection, the "**Objections**") and in support of its *Motion for an Order to (I) Enforce this Court's Prior Order Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Grant Related Relief* [ECF No. 163] (the "**Motion to Enforce**").[3]

In support of this Reply, the Ad Hoc Group relies upon the *Supp. Decl. of Guilherme Vaz Leal da Costa* ("**Supp. Decl.**") filed contemporaneously herewith.  In further support of this Reply, the Ad Hoc Group respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      Oi and BGC and V.tal ("**BTG**" and, together with Oi, the "**Objectors**") do very little to dispute the Ad Hoc Group's central contention: they have violated this Court's FFE Order and the Postpetition Transaction Documents.  Instead, they argue that this Court should not do anything about it, either because the Brazil Sale Order was "well-reasoned," or because the Ad Hoc Group was provided with the right to be heard in Brazil, or out of some notion that comity requires this Court to allow its own order to be violated.  All of this is wrong and beside the point.[4]

---

[2] The Ad Hoc Group consists of 15 institutions holding, in aggregate, approximately 92% of the NPSD Notes outstanding.  The Named Defendants constitute three institutions, one of which is not a current member of the Ad Hoc Group or holder of the Notes.

[3] Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the Motion to Enforce.

[4] The Objectors also spill considerable ink arguing to this Court that the Ad Hoc Group engaged in "misconduct" in connection with shares of Oi certain of its members received as a result of the RJ Plan.  This Reply does not attempt to refute those allegations in detail because they are irrelevant to the issues at hand, but the Ad Hoc Group strenuously

If the Objectors have violated this Court's order, then, like any federal court, this Court is empowered with the tools to remedy that violation.  The Court may do so here in New York (with the Statue of Liberty in sight), because, by their own doing, Oi and all of the parties necessary to the dispute are plainly before the Court and subject to its jurisdiction.

2.      While the Objectors try to characterize the relief sought by the Ad Hoc Group as novel, it is Oi's conduct that is unprecedented.  This Court is faced with a circumstance that, to the Ad Hoc Group's knowledge, has never before occurred in a chapter 15 case—a debtor has asked for and obtained an order from a U.S. bankruptcy court, aiding its restructuring by implementing U.S. financial transactions and New York-law governed agreements, only to turn around and openly violate that order without returning to the bankruptcy court to seek relief.  None of the general "comity" cases cited by the Objectors come close to permitting such an affront to this Court's authority or guide the Court to ignore the violation.

3.      The few substantive arguments offered by the Objectors—late in their respective briefs—that address the violations alleged by the Ad Hoc Group do not withstand even minimal scrutiny.  There is no serious question that the BTG Bid did not meet the Minimum Price requirement and was a "non-conforming" bid—this is conceded all over the record by Oi and is stated in the Brazil Sale Order itself.  There is likewise no question that the Brazil Sale Order purports to override the consent right exercised by the ~92% of Noteholders who voted to reject the BTG Bid—here again, the Brazil Sale Order itself says so.  The Intercreditor Agreement was violated in multiple ways, particularly in the failure to comply with the procedures for a Distressed Disposal, which the Objectors still claim they are permitted to ignore.  And there is no basis to

---

disputes the allegations.  These allegations are additionally misleading because the litigation in Brazil (which, again, the Ad Hoc Group submits is meritless) implicates only a subset of the Ad Hoc Group, not its entire membership.  Of the 15 institutions currently in the Ad Hoc Group, only two are among the Named Defendants.

2

argue that in ceasing opposition to publication of the *edital* (after its publication had already been ordered), the Indenture Trustee or the Ad Hoc Group somehow waived all of their rights—to the contrary, the *edital* expressly referenced the Minimum Price and the consent rights of the Noteholders were left intact.  All of these violations are not merely breaches of the Postpetition Transaction Documents but also of the FFE Order itself, which provides that such documents "are not subject to any modification or override" and enjoins all parties from "taking any action . . . that is in contravention or inconsistent with" the order.  FFE Order ¶ 7.  That is precisely what the Objectors have done.

4.      Finally, the Objectors complain that they are in an untenable position, required to close the sale by the RJ Court (Oi dramatically cites the potential for "criminal" liability) while potentially facing a competing order from this Court.  Well, that is a problem entirely of their own making when they decided to brazenly violate this Court's FFE Order, despite months of notice that these issues needed to be addressed.  It certainly does not justify the Objectors' continued course of action or the resulting harm to creditors who are relying on the protections they previously obtained in both the RJ Proceeding and in these chapter 15 cases.  Yet even now, these parties hold the keys to the solution.  The Judicial Manager could seek to extend his mandate beyond April 20—and, moments before the deadline for this filing, the Ad Hoc Group learned that the Judicial Manager's term has been extended for 60 days (which should allow Oi the ability to extend the sale timeline rather than rush to close before April 20, necessitating emergency activity for the parties and the Court).  The parties could also seek relief from the RJ Court, without relying on this Court to do that work for them in a court-to-court communication.  And the parties could agree to engage in dialogue with the Ad Hoc Group—either aided by a mediator or through counsel—to explore a resolution, as this Court wisely suggested.  If they are unwilling to take any

3

of these steps, then this Court should simply enforce its own FFE Order as the Ad Hoc Group has requested and Oi and the would-be asset purchasers can evaluate their next steps from there.

## REPLY

**I.    The FFE Order Has Been Violated and Will Be Further Violated by the Sale Closing**

**A.    Oi has Created a Conflict between the Sale Order and FFE Order and Taken No Steps to Resolve That Conflict**

5.    The Objectors argue that the Ad Hoc Group is attempting to "second-guess" the Brazilian Sale Order and that the Ad Hoc Group is seeking a "second bite at the apple." Oi Obj. ¶ 5; BTG Obj. p. 20. That is a gross mischaracterization of what has happened here. Oi procured the Brazilian Sale Order with full knowledge of the terms of the FFE Order. While the Ad Hoc Group objected to the Brazilian Sale Order and is continuing to appeal it, the Motion to Enforce is not an attempt to relitigate any of those issues here. That is why the lengthy discussion in BTG's brief regarding the supposed correctness of the Brazil Sale Order is irrelevant to the issues before this Court. *See* BTG Obj. pp. 9–13, 17–21. To be clear, the Ad Hoc Group is not asking this Court to opine on the Brazil Sale Order. Rather, the Ad Hoc Group is simply attempting to enforce this Court's order, which remains in full force and effect and is being violated.

6.    Oi argues that the relief sought by the Ad Hoc Group would create a conflict between this Court's orders and the Brazilian Sale Order. *See* Oi Obj. ¶ 4. But that ship has sailed—Oi *created* the conflict when it first obtained the FFE Order and then obtained the Brazil Sale Order without seeking any further relief from this Court. Under the circumstances, the Ad Hoc Group is entitled to seek enforcement of this Court's FFE Order and any conflict between the rulings of the two courts is entirely of Oi's own making.

7.    It is telling that neither Oi nor BTG asks this Court to determine that the Brazil Sale Order does not conflict with the FFE Order, or to modify the FFE Order to give effect to the Brazil

4

Sale Order. Instead, they ask that this Court simply disregard past, present, and future violations of the FFE Order that the Brazilian Sale Order will inevitably require. But they have cited no authority to support the contention that a final order of this Court may be ignored.

8. Far from constituting a "straitjacket" on the RJ Court as BTG argues (BTG Obj. p. 27) the FFE Order—which was obtained at Oi's own request— respects the RJ Court's authority over the sale process in Brazil, but provides that, as a matter of U.S. law, the Postpetition Transaction Documents are not "subject to any modification or override except in accordance with their express terms." FFE Order ¶ 17. This language was included in the FFE Order to provide creditors with assurance that neither Oi nor any other party would seek to deviate from the terms of the Postpetition Transaction Documents and, in particular, would not use further machinations outside the U.S. to undo the protections of those instruments that were entered into to implement the approved (and enforced) RJ Plan, without first obtaining requisite consents or obtaining relief from this Court. Just as Oi sought assistance from this Court to obtain the FFE Order in the first place, it could have returned to this Court to seek a modification of the FFE Order or requested other relief to permit the V.tal sale to take place (and the Ad Hoc Group would have its own day in court). Oi deliberately failed to take any of these steps—and it must now bear the consequences.

**B.** **Oi is Flagrantly Violating the FFE Order by Seeking to Close the Sale Without Creditor Consents That Are Clearly Required Under the Postpetition Transaction Documents**

> *i.* *The BTG Bid Lacks the Noteholder Consents Required Under the Postpetition Transaction Documents*

9. It is obvious that the Noteholders have not consented to the sale. Both the Postpetition Transaction Documents and the RJ Plan require express consents from holders of the NPSD Notes for the BTG Bid to be approved. It is uncontroverted that 92.08% of the NPSD Notes voted to reject the BTG Bid in the voting process taken in Brazil, while 6.22% of the NPSD Notes

5

voted to accept and 1.7% abstained from voting.[5]  Nor has Oi sought or obtained any consents or amendments under the Postpetition Transaction Documents themselves.  It is also beyond dispute that the majority of holders of the NPSD Notes are members of the Ad Hoc Group and have objected to the BTG Bid and filed the Motion to enforce their rights under New York law.

10.      The deprivation of voting rights is striking given the clarity of the RJ Plan:  "For clarification purposes, Oi will not have the right to veto the resolution of the Restructuring Option I Creditors, under the terms of this Clause, nor to impose on the Restructuring Option I Creditors, the acceptance of any Proposals Lower than the Minimum Price of UPI V.tal."  Clause 5.2.2.2.4 (b) of the RJ Plan.  But a non-consensual acceptance of a sale below the Minimum Price is precisely what is being imposed on creditors now.  The Ad Hoc Group obviously disagrees with the disenfranchisement that has occurred under Brazilian law and is continuing to assert its rights there in the appropriate forums.  But regardless, no action taken in Brazil permits the Objectors or any other party to override the US law rights that Oi willingly subjected itself to ***in these proceedings***.  When the Objectors argue that the Brazil Sale Order compels the Court to refrain from upholding the protections of the FFE Order and the Postpetition Transaction Documents, they are asking the Court to permit the very **override** that paragraph 17 of the FFE Order prohibits.

ii.      *The BTG Bid Is Clearly Not a "Permitted V.tal Sale" Under the NPSD Indenture*

11.      Because it falls woefully below the Minimum Price and lacks the support of 10% (let alone 60%) of the holders of the NPSD Noteholders, the BTG Bid cannot qualify as a "Permitted V.tal Sale. " Indentures § 1.01; *see also* Clause 5.2.2.2.4 of the RJ Plan.

---

[5] Relatedly, under the Indentures, certain sacred rights—including about the release of collateral—are subject to a 75% consent threshold, meaning if the law of the Indentures were followed, a 92% vote should certainly prevail. Indentures 9.02. BTG has also argued, without support, that, the remaining NPSD Noteholders (a small fraction of the overall class) would be found to have approved the BTG Bid by a two-thirds vote. This is yet another strained position the Objectors take in their attempt to justify the disenfranchisement of almost all holders of the NPSD Notes.

6

12.     Oi does not contest this point at all.  Instead, it relies exclusively on the Brazil Sale Order for its contention that the consent rights of the Noteholders were validly overridden.  Oi Obj. ¶ 37.  And the Brazil Sale Order itself states that the BTG Bid did not meet the threshold price requirements to avoid triggering a vote of the Noteholders.  Vaz Decl., Ex. 9 at p. 896 ("The price is below the minimum.").  While the Brazil Sale Order overrode those rights for other reasons, there can be no question whatsoever that absent such judicial relief, the sale could not proceed.  Indeed, that was the reason Oi solicited creditor votes in the first place, and was the reason it sought relief from the Brazil court once the voting results were tabulated.

13.     Notwithstanding this extensive record, BTG (but not Oi) argues that the BTG Bid qualifies as "Permitted V.tal Sale" even though it is woefully below the Minimum Price.[6] Completely ignoring the months of proceedings in Brazil wherein Oi took the position that the BTG Bid did not constitute a "Permitted V.tal Sale," BTG argues today that a different threshold valuation should apply for purposes of assessing compliance with the "Permitted V.tal Sale" requirement in the NPSD Indenture.  In contrast to the RJ Plan, which does not contain such language, BTG points to language in clause (1)(ii) of the NPSD Indenture, which provides that the "aggregate cash price" associated with a "Permitted V.tal Sale" is "equal to at least BRL\$8.0 billion (as increased or decreased based on an increase or decrease, respectively, of the value of such Capital Stock since the Reorganization Plan").  BTG Obj. p. 28.  BTG argues that the

---

[6] BTG also argues that the BTG Bid qualifies as a "Permitted V.tal Sale" under clause (1) because the notice of sale was "approved by Holders holding a majority of the aggregate outstanding of the Securities."  BTG Objection § III.B.2(a) ¶ 2 (page 27).  This is a distortion of the record.  The Noteholders raised numerous issues with the *edital*, and only after the RJ Court had already ordered its publication, the Indenture Trustee, as part of a response to allegations lodged in bad faith that creditors had engaged in "abusive" conduct, stated, with significant reservations of rights, that it would cease opposition to the notice that had already been ordered for publication.  *See* Supp. Dec. ¶ 4(viii).  And the bases on which the Indenture Trustee made this statement to accommodate the *edital* (including the Minimum Price, the voting rights of the NPSD Noteholders and compliance with the Postpetition Transaction Documents) have not been honored in the sale process.

parenthetical means the price can fluctuate and that it believes there is sufficient evidence in the record to support a downward adjustment. *Id.* p. 27-28.

14. As a threshold matter, no party to the proceedings in Brazil—not Oi, not BTG, not V.tal, not the Watchdog, and not even the Brazil court itself—adopted an interpretation of Minimum Price that meant it can fluctuate freely. The *edital* specified the BRL price set forth in the RJ Plan, and all of the parties proceeded under the assumption that the BTG Bid did not come close to meeting the Minimum Price.

15. Even if this interpretation were correct, BTG has done almost nothing to establish that the BTG Bid qualifies as a "Permitted V.tal Sale" using this much lower, fluctuating valuation metric. As its only support for this contention, BTG points to the amount reflected in the appraisal conducted by G5 Partners Consultoria e Participações LTDA (the "**G5 Appraisal**"), a financial analysis prepared *after* the BTG Bid was submitted and which was provided to the Brazil Court less than a week before the Brazil Sale Order was issued. Even Oi did not use the G5 Appraisal for these purposes (rather, it used the G5 Appraisal for the limited purpose of arguing to the Brazil court that the sale price was a reasonable one). There is simply no credible basis for this Court to assume that the Minimum Price in the Indentures has been changed or reduced, *by more than 60%*, and certainly the G5 Appraisal does not provide that support.

16. Finally, BTG argues that the Ad Hoc Group could have put forth its own, competing appraisal if it disagreed with the appraisal of G5. But this entirely misunderstands the purpose of a Minimum Price and noteholder consent rights. Creditors' rights to grant or withhold consent is their means—under both the Postpetition Transaction Documents and the RJ Plan—to protect the value of their collateral from a below-threshold sale. Note that neither the Postpetition Transaction Documents nor the RJ Plan require creditors rejecting a sale below the Minimum Price to provide

an alternative or justification.   Supp. Decl. ¶ 7.  There is simply no requirement that the Ad Hoc Group offer their own valuation to justify their exercise of consent rights or the fact that it did not voluntarily provide a valuation somehow justifies reading the "Minimum Price" requirement to fluctuate as BTG now argues.

>                iii.    *The Sale Process Fails to Comply with the Intercreditor Agreement and the Objectors Are Not Excused from those Obligations*

17.    The BTG Bid and the sale process that led to it fail to comply with the asset disposition requirements under the Intercreditor Agreement and cannot be consummated in compliance with the Intercreditor Agreement unless requisite creditors amend or waive the relevant requirements.

18.    The Intercreditor Agreement expressly delineates between an asset disposition that occurs prior to an "Acceleration Date,"[7] which it describes as an "Ordinary Course Collateral Disposition," versus an asset disposition that occurs after an "Acceleration Date," which the agreement describes as a "Distressed Disposal."

19.    The Objectors characterize the proposed sale as an "Ordinary Course Collateral Disposition" under the Intercreditor Agreement.   They argue that no Acceleration Date has occurred because of a stay order entered in Brazil on September 30, 2025 and wrongly allege that creditors did not raise the fact of the acceleration until this year.

20.    They are wrong: it is objectively clear that an Acceleration Date has occurred. Numerous events have occurred that triggered *automatic* acceleration under the Indentures.  First and most significantly, on July 3, 2025, two of Oi's Subsidiary Guarantors (as defined in the

---

[7] "**Acceleration Date**" means, following (i) an Event of Default under any Debt Document . . . , the earlier of: (a) the date of occurrence of an Insolvency or Liquidation Proceeding in respect of any Grantor, and (b) the occurrence of an acceleration of Obligations under any Debt Document . . . whether automatically or by reason of a declaration or demand made, in accordance with the terms thereof.  Intercreditor Agreement § 1.01.  [ECF No. 150-1.]

9

Indentures) voluntarily commenced judicial reorganization proceedings, which constituted an Event of Default (as defined in the Indentures) under Section 6.01(6) of the Indentures and triggered an automatic acceleration of the Notes under Section 6.02 of the Indentures. The acceleration occurred automatically pursuant to the terms of the Indentures, meaning no notice was required to be given for the acceleration to take effect.[8]

21.    Oi had ample notice that the Notes had been accelerated prior to launching the sale process. In addition to its obvious awareness that its own Subsidiary Guarantors had filed judicial restructuring proceedings, on November 13, the Indenture Trustee issued acceleration notices to holders of the Notes. Supp. Decl., Exhibits 7–8.

22.    Contrary to Oi's arguments, there is no affirmative step that creditors must take or "preconditions" that must be met to trigger the Distressed Disposal obligations under the Intercreditor Agreement following the occurrence of the Acceleration Date. Oi Obj. ¶ 10. The "requirements" that Oi cites are not preconditions for "Distressed Disposal" sale requirements to be imposed, such that if creditors do not take these actions, Oi is free to conduct a sale without meeting any of these conditions—rather, they are actions that creditors would need to take if and when creditors sought to take enforcement steps to conduct a Distressed Disposal themselves. The fact that creditors have not yet taken enforcement steps in no way expands the rights of Oi or any other parties to sell or release liens on collateral under the Intercreditor Agreement. Rather, once the Acceleration Date has occurred, there is simply no authorized sale or release of liens under the Intercreditor Agreement except a Distressed Disposal. The Objectors do not contest that the process undertaken for this sale wholly fails to meet the requirements of an authorized Distressed

---

[8] The BTG Objection alleges that the Notes were not accelerated given the Notes were subject to successive stay orders issued within the context of Oi's RJ Proceedings. BTG Objection § III.B.2(b) ¶ 4 (page 30). However, these decisions did not suspend the effects of acceleration of the Notes; they merely stayed collection of debts. *See* Supplemental Vaz Decl. ¶¶ 18-21.

Disposal.  And the Noteholders at no point agreed that the sale of the V.tal Stake would not need to comply with the Distressed Disposal requirements or in any way waived their rights under the Intercreditor Agreement or the Indentures.

23.     Further, prior to the sale process, Oi had already engaged with its secured creditors with the knowledge that an Acceleration Date has occurred.  In late 2025, Oi sought to sell and release liens on certain real estate assets that it would have been authorized to sell as an "Ordinary Course Collateral Disposition."  Supp. Decl. ¶ 17(iv).  However, because of the acceleration, the Collateral Agent was initially unable to grant the requested lien release.  Because the Acceleration Date had occurred, the sale could not meet the Ordinary Course Collateral Disposition requirements, and the transaction required creditor consent.  Oi sought consent from creditors to facilitate the release, which Noteholders in the Ad Hoc Group provided to the Collateral Agent (in an act of support to Oi, and although the Noteholders themselves would see no proceeds from the sale) on December 23, 2025.  Supp. Decl. ¶ 17(iv).  Oi's attempt to argue now that an Acceleration Date has not occurred is directly contradicted by its own prior knowledge and behavior.[9]

24.     Further, the Postpetition Transaction Documents expressly state that a failure of the Indenture Trustee or the holders of the Notes to exercise remedies following acceleration does not waive any rights thereunder.  See Indentures § 6.03 ("A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default."); Intercreditor Agreement § 11.03(a) ("No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any

---

[9] For the same reason, the argument that the Ad Hoc Group was "l[ying] in wait" with respect to the occurrence of the acceleration (Oi Obj. ¶ 72) is simply not credible.

11

such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power").

25.     Oi has made no attempt to reconcile the inconsistencies between the sale process they have run and the express terms of the Intercreditor Agreement (which they have chosen to disregard). This is not to say that Oi could not have run a sale process different from the requirements outlined in the Intercreditor Agreement if it had come to the relevant creditor constituencies and sought the requisite consents; of course, it has not done so.

> iv.     *The Sale Notice Did Not Waive Any Rights of the Noteholders Under the Postpetition Transaction Documents with Respect to the BTG Bid*

26.     The Objectors argue that the Indenture Trustee consented to the sale notice on behalf of the holders of the NPSD Notes, and in so doing, waived its objections to the attendant violations of the Postpetition Transaction Documents.  Oi Obj.  ¶ 70; BTG Obj.  27-30.

27.     First, the Objectors misdescribe and overstate this purported "consent."  Far from any waiver of all rights, the Objectors are referring to events surrounding a motion that the Indenture Trustee filed in Brazil two days after the RJ Court had already ordered publication of the *edital*.  Supp. Decl., Exhibit 3.  That motion refuted allegations made by the Judicial Manager that Noteholders were acting "abusively" by merely seeking to comment on the *edital* procedures. Supp. Decl. ¶ 4(viii).   In its motion—which, again, was filed after the *edital* had already been published—the Indenture Trustee ceased opposition to the form of the *edital* but expressly noted that the *edital* ultimately reflected all of the protections granted to them by the RJ Plan, including the ability to reject any bid that did not meet the Minimum Price and ongoing compliance with the Postpetition Transaction Documents.  Supp. Decl. ¶ 4(viii), n. 7, Ex. 3.  Moreover, even the originally published *edital* contained provisions requiring any sale to comply with the Postpetition

Transaction Documents.  Supp. Decl. ¶ 5.  Accordingly, the Noteholders' conduct with respect to the *edital* did not constitute a waiver of any rights—in fact, the opposite is true.

28.      Second, beyond the discussions around the *edital*, at no time did the Indenture Trustee or any other representative of the Noteholders agree that it was acceptable for the sale process for the V.tal Stake to proceed or be consummated without meeting the requirements under the Postpetition Transaction Documents, and the Objectors do not cite any such statements either. The Noteholders also never acknowledged that the sale of the V.tal Stake would be an Ordinary Course Collateral Disposition pursuant to the RJ Plan. Supp. Decl. ¶ 17(v).  To the contrary, the Noteholders and their representatives (including the Indenture Trustee) have repeatedly and consistently insisted that any sale of the collateral must comply with the relevant Postpetition Transaction Documents.  Supp. Decl. ¶ 17(v).

29.      Finally, the Objectors' basis for arguments about a purported waiver of rights under the Postpetition Transaction Documents based on the *edital* comes from the Brazil Sale Order itself.  Vaz Decl., Exhibit 9.  But this is simply another way in which the Objectors are trying to use the Brazil Sale Order to override the rights of the Noteholders under the Postpetition Transaction Documents, in direct contravention of the FFE Order.

**C.      Consummating the Sale Will Lead to Additional Post-Closing Violations of the FFE Order That the Court Can Prevent Now**

*i.      The BTG Bid Contemplates Further Violations of the Intercreditor Agreement After the Closing of the Sale*

30.      By its express terms, and based on facts that are known and acknowledged by the parties, the BTG Bid will cause further violations to the Postpetition Transaction Documents (and therefore to the FFE Order) if it is consummated.  The Objectors argue that the Motion is "prelitigating" these matters and that the Court should ignore these foreseeable harms.  But consistent with the Court's prior guidance, *see* March 10, 2025 Hr'g Tr. at 32:6-7 [ECF No. 161],

13

the Ad Hoc Group filed the Motion to Enforce directly after the issuance of the Brazil Sale Order, which—if carried out, as Oi says it will be prior to April 20—provides for Oi to violate this Court's FFE Order and the Postpetition Transaction Documents.    The Court can and should grant the requested relief in view of the violations that are already clear, and the ones that will inevitably follow if the BTG Bid is consummated.

31.    While certain violations of the Postpetition Transaction Documents will only take effect post-closing, they are evident now, based on the provisions of the BTG Bid itself.  Oi claims that the Collateral Agent will benefit from and control the escrow account or the lien on the proceeds.  Oi Decl. ¶¶ 66, 8.    This is simply incorrect pursuant to the plain language of the BTG Bid, which states that *Oi* will control the escrow account.  Vaz Decl. ¶ 40 n. 66.  The terms of the BTG Bid thus violate the terms of the Postpetition Transaction Documents by allowing for proceeds to be handled by parties other than the Collateral Agent and the applicable representatives for the debtholders (including the Indenture Trustee).

32.    Permitting the sale to be consummated under these terms would allow Oi—a party that has already shown its willingness to violate the FFE Order—to assume control over the distribution of sale proceeds and authority to direct the escrow agent (which, under the terms of the BTG Bid, is BTG Pactual itself), in direct contravention of the Intercreditor Agreement's requirement that proceeds flow through the Collateral Agent and be distributed in accordance with the contractual waterfall.  The Objectors' suggestion that these distribution concerns are not yet "ripe" because the sale has not closed ignores the obvious: once Oi takes control of the escrow and the sale is consummated, the harm to creditors will be irreversible.  This Court need not—and should not—wait for the violation to be fully consummated before acting.  Knowing that this is

precisely what the BTG Bid contemplates, it is not too early for this Court to require Oi to comply with the FFE Order and the Postpetition Transaction Documents.

33.    For its part, BTG is aware that funds may be misappropriated in contravention of the Postpetition Transaction Documents.  The BTG Objection acknowledges that proceeds remain subject to litigation in Brazil.  BTG Obj. pp. 27 & 32.  This is in conflict with its obligations under the Intercreditor Agreement, under which BGC and V.tal are parties and made the acknowledgment that proceeds must be distributed on a pro rata basis to all holders of the First Priority Obligations (as defined in the Intercreditor Agreement)—a group that includes claims on account of the NPSD Notes and the V.tal Debentures.  Intercreditor Agreement § 7.02 ("Unless and until the Termination Date has occurred with respect to all parties, following the Acceleration Date, each of the parties acknowledges and agrees that all proceeds derived from the Disposition, collection or recovery of V.Tal Collateral shall be applied [subject to the waterfall set forth in Section § 7.02].") (emphasis added).  BTG cannot look the other way and ask this Court to do the same, knowing that Oi intends to withhold funds from certain holders subject to the attachment order.

## II.    THIS COURT HAS JURISDICTION AND AUTHORITY, AND IS IDEALLY POSITIONED, TO PREVENT VIOLATIONS OF ITS FFE ORDER

### A.    This Court has Jurisdiction and Authority to Enforce the FFE Order

34.    This Court is absolutely empowered to hear, rule on, and provide the requested relief in the Motion to Enforce.  This Court expressly retained exclusive jurisdiction to enforce its own FFE Order.  FFE Order ¶ 21.  That is all the Ad Hoc Group is asking—for all of Oi and BTG's efforts to confuse the matter, the Ad Hoc Group asks only that this Court exercise its jurisdiction to prevent a violation of its own order in the United States.

        *i.*    *This Court has Personal Jurisdiction over Parties Required to Grant the Requested Relief*

35.      BGC and V.tal argue that the Court lacks personal jurisdiction over them. This is both wrong and largely beside the point. The Court undisputedly has personal jurisdiction over Oi, which is the debtor in this Chapter 15 case. The personal jurisdiction inquiry could thus end here because enforcing the FFE Order with respect to Oi will be sufficient to prevent the imminent violation of the FFE Order with respect to the closing.

36.      But the Court also has personal jurisdiction over BGC and V.tal because they have forfeited any objection to personal jurisdiction by being consistently active litigants before this Court with respect to Oi's motion to dismiss the chapter 15 cases and terminate the recognition order. It is the law in the Second Circuit that forfeiture of a personal jurisdiction defense is weighed against "all of the relevant circumstances," and that significantly participating in litigation before the Court is a circumstance demonstrating forfeiture. *See, e.g., Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999).

37.      During the litigation on the motion to terminate, BTG extensively participated in litigation. They propounded discovery on Oi. They attended depositions. *See, e.g.*, August 11, 2025 Hr'g Tr. at 9:6–13 [ECF No. 97] (counsel to BTG discussing taking depositions of Oi's witnesses). Their counsel argued at length during hearings. (*see, e.g.*, August 18, 2025 Hr'g Tr. [ECF No. 104]) and examined witnesses at hearings (*see, e.g.*, August 14, 2025 Hr'g Tr. at 87:22 et seq. [ECF No. 103] (counsel to BTG examining Oi's witness)); and they filed pleadings (see, e.g., ECF No. 58)). Courts in the Second Circuit have found these very same actions sufficient to forfeit any personal jurisdiction defense. *See, e.g.*, *Hamilton*, 197 F.3d at 61 (defendant forfeited personal jurisdiction defense by participating in substantive proceedings and discovery); *Roberts v. Bennaceur*, 658 Fed. App'x 611 (2d Cir. 2016) (defendant forfeited personal jurisdiction defense

16

by issuing subpoenas and compelling depositions).[10]   Arguments to the contrary are also particularly weak coming from BTG, as their litigation before this Court in 2025 was all in an effort to keep the chapter 15 cases—and this forum—open in the interest of creditors.  *See BTG's Opposition to Motion to Terminate the Recognition Order and Dismiss the Chapter 15 Cases*, p. 5 [ECF No. 58].

> ii.   *This Dispute Over the FFE Order and Postpetition Transaction Documents Belongs in this Court, not in Brazil*

38.   This Court is the only appropriate forum to address violations of its own FFE Order, and to prospectively enforce the provisions of that order to avoid significant future litigation.  BTG urges this Court to decline to exercise its jurisdiction to enforce its own orders, arguing that the remedy for violation of the New York-law governed Postpetition Transaction Documents is for the Ad Hoc Group and other aggrieved creditors to sue in other courts.  BTG Obj. at ¶ 18.  That argument fails in several respects.

39.   *First*, there is no merit to the contention that the parties agreed that this dispute would be litigated in Brazil.  As explained in the Motion to Enforce, Oi consented to litigate disputes regarding the Intercreditor Agreement and Indenture in New York courts.  This point is undisputed.  However, the Objections argue that these disputes belong in Brazil because the forum-selection clauses provided that any action in connection with the "Collateral Documents" are subject to the exclusive jurisdiction of Brazilian courts.  *See* Oi Obj. ¶¶ 6, 60; BTG Obj. p. 34-35.  This is a gross and disingenuous misreading of the documents that overstates the extent to which the forum selection carveout for enforcement of Brazilian collateral documents, such as fiduciary lien agreements, applies to this dispute.  Oi Obj. ¶ 60.  Careful attention to the relevant language

---

[10] BTG argues that it entered "special appearances" that expressly did not waive an objection to personal jurisdiction. (BTG Obj. at 37 n.23).  Whatever force BTG's reservation of its objection to jurisdiction might have when made in July 2025, it plainly has no relevance after BTG subsequently participated in merits litigation before this Court.

17

shows that it does not apply. It governs only an "action" brought in connection with the collateral documents. This litigation is not an "action," which is commenced not by motion, but by a complaint. *E.g.*, Fed. R. Civ. P. 3 ("a civil action is commenced by filing a complaint"); Fed. R. Bank. P. 7003 (applying Fed. R. Civ. P. 3 in adversary proceedings). Moreover, this language cannot be read to pertain to any action under the Postpetition Transaction Documents, merely because it implicates collateral, as that would allow the "carve-out" reserving a Brazilian forum for the Collateral Documents to swallow the general clause providing for a New York forum—an absurd interpretation that would render the forum selection clause meaningless. New York law does not countenance such a result. *See, e.g.*, *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 404 ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."). Instead, the carve-out is limited to actions in connection with the Collateral Documents, themselves, as such instruments are governed by Brazilian law. The Motion to Enforce does not seek to enforce rights under the Collateral Documents and does not require any findings with respect to the Collateral Documents. Oi's sale process is taking place pursuant to the RJ Plan, not under the terms of the fiduciary lien agreements. Supp. Decl. ¶ 12. Rather the issues in the Postpetition Transaction Documents that are implicated by the Motion to Enforce—matters regarding Oi's violation of its New York law-governed obligations—fall squarely under the primary forum selection provisions, in favor of New York.

40.    *Second*, there is no meaningful conflict between this Court's exercise of its inherent and statutory powers to enforce its orders and section 1525 of the Bankruptcy Code. Oi argues that because section 1525 includes a general directive for chapter 15 courts to "cooperate" with foreign courts, this Court's jurisdiction is somehow limited and this Court is prevented from

granting relief. Oi Obj. ¶ 56. This is misguided. The duty to cooperate does not prevent this Court from exercising its 105(a) power to fashion a remedy, especially when denying relief would otherwise result in the violation of its own court order. Furthermore, this Court has "residual authority" to fashion a remedy under 105(a) so long as it does not transgress other provisions of the Bankruptcy Code. *United States v. Energy Res. Co.*, 495 U.S. 545, 549, (1990).

41. Oi then attempts to invoke *Law v. Siegel*, 571 U.S. 415 (2014) for the proposition that section 105 of the Bankruptcy Code may not be used to override chapter 15 comity principles. Oi Obj. ¶ 56. This too is wrong.

42. What *Law* stands for is the basic—and here, irrelevant—proposition that "a bankruptcy court's § 105(a) and inherent powers may not be exercised in contravention of the Code." 571 U.S. at 423. In that case, the bankruptcy court ordered that amounts protected by a homestead exception in section 522 of the Code could nonetheless be used to pay administrative expenses in express contravention of the Code. *Id. Law* has no application here, where this Court's exercise of its inherent and section 105(a) power would not contravene anything in section 1525(a), which simply states that the court "shall cooperate to the maximum extent possible" with a foreign court or foreign representative. Oi has not shown that granting the relief the Ad Hoc Group seeks is in some way a lack of "cooperation", and to the extent the Court's ability to cooperate with the RJ Court is somehow limited by the present circumstances, this is a result of Oi's disregard for the FFE Order. To the contrary, this argument highlights the irony in the Objectors' behavior. They want all the benefits of chapter 15 when it aids them but seek to avoid bearing any of the burdens, which include complying with court orders that Oi, itself, procured, or seeking relief from this Court to reconcile conflicts between the two jurisdictions.

43.     *Third,* while multiple courts may be suitable for addressing breaches of the Postpetition Transaction Documents, that does not diminish this Court's authority to address such violations. Oi placed these issues squarely in front of the Court when it sought the FFE Order, and this Court is uniquely positioned (and has exclusive jurisdiction) to preserve and uphold that order. Indeed, action by this Court is needed to protect the integrity of the chapter 15 process.[11]

44.     Even a successful damages suit would leave Noteholders far worse off and facing unnecessary prejudice that this Court can avoid now, simply by enforcing its prior order and requiring Oi and its buyers to comply with them, without in any way expanding the scope of the Court's jurisdiction.

**B.     Comity Principles Do Not Counsel in Favor of Declining to Exercise Jurisdiction and Authority Here**

*iii.    Having Procured the FFE Order, Oi Cannot Argue that Comity Requires this Court to Disregard the FFE Order*

45.     This Court granted comity to the RJ Court when it entered the FFE Order and facilitated entry into the Postpetition Transaction Documents in order to provide critical financing to Oi to achieve its restructuring. *See* FFE Order ¶¶ 1, T, 3. That relief required Oi to comply with the promises it made under New York law and gave this Court clear authority and exclusive jurisdiction to enforce such relief. *See* FFE Order ¶¶ 17, 21. The Objectors now argue that, pursuant to their self-serving interpretation of principles of comity, this Court is required to turn a blind eye to violations of New York-law governed Postpetition Transaction Documents in favor of the Brazil Sale Order.

---

[11] *See* 4 Collier Bankruptcy Manual ¶ 1501.02 (2025) (describing the objectives of chapter 15, including "(i) to encourage cooperation between courts of the United States . . . and foreign courts in cross-border insolvency cases, (ii) to provide greater legal certainty for trade and investment, [and] (iii) to promote the fair and efficient administration of cross-border insolvencies that protect the interests of all creditors, the debtor and other interested entities . . . .").

46.     However, comity does not sanction Oi or BTG to violate this Court's FFE Order.   This is a case of parties (including Oi and BTG) trying to renege on obligations they undertook as part of this Court's exercise of comity that Oi itself sought.   Oi came to this Court requesting the jurisdiction of this Court to aid the RJ Proceeding and committed to certain obligations as a condition of that process.

47.     Oi does not cite a single case in which a federal bankruptcy court declined to enforce its own order based on principles of comity.  To the contrary, this case is a far cry from the cases cited in the BTG Objection (the Oi Objection did not cite any caselaw on the issue) because this Court has already entered a final chapter 15 order granting comity to an already approved plan and endorsing specific transactions in the United States to implement that plan.  Not one of the cited cases involves using a foreign court order to justify violations of a U.S. court order (let alone a U.S. court order that the chapter 15 debtor itself sought).  The reason the Objectors can cite no cases to support their position is because this situation is unprecedented—the Ad Hoc Group is unaware of any prior example where a chapter 15 debtor obtained an order in the U.S. and then sought to openly violate that order, whether based on a foreign court order or otherwise.

48.     Oi cries crocodile tears over the prospect that parties may potentially be subject to conflicting court orders (or even "criminal" penalties) if this Court exercises its jurisdiction over this dispute.  Oi Obj. ¶ 6. Oi is no position to raise such concerns, as it is Oi that has violated the FFE Order by obtaining the Brazil Sale Order and attempting to sell the V.tal Stake without complying with the conditions of the FFE Order, and without seeking any relief to reconcile the differences between the FFE Order and its current actions.  If Oi believes that compliance with the FFE Order is unnecessary because this Court should defer to the RJ Court, it is Oi's responsibility to return to this Court and make that argument.  However, Oi clearly has no intention of doing so.

Instead, it seeks to bypass this Court's FFE Order and push forward at the expense of creditors. As of the time of its filing on Saturday, Oi apparently had not even taken the basic step of asking courts in Brazil for the Judicial Manager's term to be extended and for process to be afforded more time, leaving it for this Court to make the request in a court-to-court communication. Moments before this filing was due, the Ad Hoc Group learned that the Judicial Manager's term has been extended for 60 days, which would appear to remove entirely the need for the closing to occur before April 20 and would allow for a more orderly process to occur if Oi agrees not to close the transaction for even a short period of time (a concession it was unwilling to make last week, necessitating significant burden to the parties, the Court and the Court's staff).

49.     The consequences are far-reaching. Oi's conduct has also created conflicts for other parties. The Collateral Agent and Indenture Trustee are now in the precarious position of facing conflicting mandates through the consummation of the BTG Bid, on the one hand, and the terms of the Postpetition Transaction Documents, on the other hand. Those parties have made filings with this Court explaining the predicament Oi has created. *See* ECF Nos. 179, 184. And efforts to reconcile the Brazil Sale Order and the Postpetition Transaction Documents may lead to considerable uncertainty and litigation for a broad group of Noteholders—including Noteholders that are not subject to any litigation or purported asset freezes in Brazil.

50.     It is telling that the proposed order that Oi requests this Court enter in lieu of the relief sought by the Ad Hoc Group does not ask this Court to bless the sale transaction or find that the FFE Order is not breached. Oi is deliberately avoiding seeking a ruling from this Court on the issue, consistently asserting that this Court does not need to do so. Oi is worried about what this Court will conclude if contronted with that question.

51.     To make matters worse, the Objectors have all stonewalled the Ad Hoc Group when it comes to discovery.  Upon filing the Motion to Enforce, the Ad Hoc Group served these parties with basic document requests.  BTG (at the deadline) and Oi (after the deadline) both served objections and responses declining to produce any documents.  While the violations of the FFE Order are clear on their face, the Ad Hoc Group believes it would be helpful for the Court to understand whether the sale process was the product of collusion rather than the arms'-length process trumpeted by Oi, and whether the assertions Oi is making to this Court about V.tal's value are supportable.  The parties' complete refusal to produce any discovery on these topics speaks for itself and is yet another example of Oi's attempt to deprive the Ad Hoc Group of fundamental rights.  Oi's refusal to agree to hold off on closing for even a short period of time (a refusal that appears now to be entirely pretextual since the Judicial Manager's term has been extended, as noted above) appears to be motivated in part to short-circuit this process and deprive the Ad Hoc Group of even minimal discovery that would normally occur in a contested hearing of this nature.

> ### iv.     *This Court is the Right Court to Enforce Its Own Orders and Doing So Does Not Impinge on Foreign Court Jurisdiction*

52.     The Objectors cite general principles of "comity" to argue that a ruling on the Motion to Enforce would impinge on the RJ Court's jurisdiction.  But nothing about "comity" deprives this Court of the ability to rule on its own order and explain what its own order requires.  Indeed, comity has never been used to divest a court from the basic and unremarkable principle of the authority to interpret (and enforce) its own prior order.  In fact, courts have repeatedly held that comity should not be mistaken for blind and categorical deference to a foreign court's proceedings or orders.  *See, e.g.*, *In re Petition of Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 275 B.R. 699, 708 n. 4 (S.D.N.Y. 2002) (quoting *In re Treco*, 240 F.3d 148, 157 (2d Cir. 2001)); *see also Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 596–97 (S.D.N.Y. 2012).  It is implicit in the

concept that deference must be withheld where appropriate to, for example, avoid violation of a court's prior order.

53.     The Ad Hoc Group has rights in Brazil under Brazilian law and separate rights in the United States under the FFE Order and the Postpetition Transaction Documents.  Given that these rights are independent, there is no merit to the contention that this Court's ruling on the Motion to Enforce and the relief sought thereby would deprive the RJ Court of its jurisdiction.  In fact, these rights are independent of each other *because* Oi has already been in the chapter 15 court to request it to grant recognition of the RJ proceedings and obtain entry of the FFE Order.

54.     Despite what the Objectors say, the Motion to Enforce is not a "second bite at the apple" with respect to the Brazil Sale Order, as all parties should have been well aware that Noteholders would pursue precisely this path.  The Ad Hoc Group telegraphed that it would be seeking relief as needed in multiple court filings[12] and at the Status Conference held on March 10.

55.     Oi argues that because the Ad Hoc Group pursued its available remedies in Brazil, this Court should abstain from hearing its arguments.  As explained, principles of comity do not call for abstention when doing so would be inappropriate.  Abstention would be entirely inappropriate here; as this Court recently suggested, it "could certainly tell someone they are in violation of [her] order" if there is a violation, and to come back to the chapter 15 court after "something [occurs] that actually violates those documents[.]"  Mar. 10, 2026 Hr'g Tr. at 31:6–8, 32:7 [ECF No. 161].  This is exactly what the Ad Hoc Group has done.  The trigger to come in front of this court is the violation of the Postpetition Transaction Documents—not whatever rights the Ad Hoc Group retains in Brazil, which of course, it will continue to pursue.  *See* Supp.

---

[12] *See Statement of the Ad Hoc Group of Secured Noteholders and the Indenture Trustee Regarding Developments in the Brazilian RJ Proceeding* [ECF No. 133]; *see also Letter of the Ad Hoc Group of Secured Noteholders to the Hon. Lisa G. Beckerman* [ECF No. 144].

Decl. ¶ 29–31.  Simply put, the state of litigation and Ad Hoc Group's appellate rights in Brazil are not relevant to the question of ripeness here, which is dictated by the moment in time the FFE Order and Postpetition Transaction Documents were violated.

56.     Given there is material risk to those independent rights and economic harm to Noteholders (including the Ad Hoc Group), this *is* the appropriate court to address violations of New York-law governed documents and the FFE Order.  The sale cannot be consummated without violating an existing U.S. court order and New York-governed obligations.  And if Oi wants to be permitted to do that it should be coming to this Court and asking for relief.

57.     The Objectors have already told the Court what they plan to do if the Motion to Enforce is denied:  They will proceed with the closing and, according to the Oi Objection, apply proceeds in a manner prejudicial to certain creditors and, in any case, not in accordance with the Postpetition Transaction Documents.   Indeed, the Objectors provide no comfort that the Intercreditor Agreement's waterfall will be adhered to and that proceeds will be distributed accordingly.  Rather, BTG merely notes that the "contractual framework for distribution . . . [will] be resolved among the parties and their agents" at a future point in time and that "the Brazilian RJ Court has yet to adjudicate the distribution of the sale proceeds," while Oi similarly argues that "any issue regarding treatment of UPI V.tal sale proceeds [will] not block approval and implementation of the sale[.]"  *See* BTG Objection at ¶ 2; Oi Objection at  ¶ 51.  It is only because there has been and will be a violation of this Court's order that the Ad Hoc Group comes before this Court to seek its relief.

## CONCLUSION

58.     Based on the foregoing, the Ad Hoc Group respectfully requests that the Court overrule the Objections and enter the Proposed Order attached as Exhibit A to the Motion to Enforce.

Dated:    April 13, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ Elliot Moskowitz*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Elliot Moskowitz
David Schiff
Marc J. Tobak
Joseph W. Brown

*Counsel to the Ad Hoc Group*

26