**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Oi S.A., *et al.*,[1] | Case No. 23-10193 (LGB) |
| Debtors in Foreign Proceeding. | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION**
**OF GUILHERME VAZ LEAL DA COSTA**
**IN SUPPORT OF MOTION OF THE AD HOC GROUP FOR**
**AN ORDER TO (I) ENFORCE THIS COURT'S PRIOR ORDER**
**GRANTING FULL FORCE AND EFFECT TO THE BRAZILIAN RJ**
**PLAN IN THE UNITED STATES AND (II) GRANT RELATED RELIEF**

I, Guilherme Vaz Leal da Costa, a Brazilian citizen, admitted to practice law in Brazil and a member in good standing of the Brazilian Bar Association and partner of Pinheiro Guimarães – Advogados, a law firm with offices in Rio de Janeiro and São Paulo, Brazil ("**Pinheiro Guimarães**"), hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this supplemental declaration (this "**Supplemental Declaration**"), except for those portions specified as being otherwise.

2. I am making this Supplemental Declaration in accordance with section 1746 of title 28 of the United States Code.

3. I have represented the ad hoc group of secured noteholders[2] (the "**Ad Hoc Group**") since July 2025 in various matters relating to the insolvency of Oi and its

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Oi S.A. – Em Recuperação Judicial (01-43 – Brazil), Oi Brasil Holdings Coöperatief U.A. – Em Recuperação Judicial (8447 – Netherlands), Portugal Telecom International Finance B.V. – Em Recuperação Judicial (5023 – Netherlands).

[2] The holders and/or their affiliated, managed, advised and/or sub-advised funds and accounts are beneficial owners of (a) the 10.000% / 13.500% PIK Toggle Senior Secured Notes due 2027 (the "**NPSD Notes**" and

affiliates, including the judicial reorganization proceedings (the "**RJ Proceeding**") filed on March 1, 2023 and currently pending before the 7th Lower Commercial Court of the City of Rio de Janeiro, Brazil (the "**RJ Court**") pursuant to Federal Law 11,101 of February 9, 2005 (as amended from time to time, the "**Brazilian Bankruptcy Law**") of the laws of the Federative Republic of Brazil ("**Brazil**"), and related ancillary proceedings. I submit this Supplemental Declaration to supplement the *Declaration of Guilherme Vaz Leal da Costa* [ECF No. 164] (the "**Vaz Declaration**")[3] and provide additional context and factual background in support of the Motion to Enforce and in support of the *Ad Hoc Group's Reply to Objections to its Motion for an Order to (I) Enforce this Court's Prior Order Granting Full Force and Effect to the Brazilian RJ Plan in the United States and (II) Grant Related Relief* (the "**Reply**") filed contemporaneously herewith.

<u>**THE NOTICE OF SALE (EDITAL) PROCESS**</u>

4.      With respect to the Notice of Sale (*Edital*) and the sale process of the UPI V.tal, I have reviewed the *Declaration of Marcelo Lamego Carpenter in Support of BGC and V.tal's Opposition to Ad Hoc Group's April 6, 2026 Motion* [ECF No. 181] (the "**Carpenter Declaration**") and noticed that some relevant events that preceded the issuance of the *Edital* have not been mentioned. Please see below the complete sequencing of events:

---

the indenture issuing the NPSD Notes, the "**NPSD Indenture**" and the holders of the NPSD Notes, the "**NPSD Noteholders**") and (b) the 8.50% PIK Subordinated Secured Notes due 2028 (the "**RUD Notes**" and, the indenture issuing the RUD Notes, the "**RUD Indenture**" and, the RUD Notes together with the NPSD Notes, the "**Notes**" and, the NPSD Indenture together with the RUD Indenture, each, an "Indenture," and together, the "**Indentures**"), and the holders thereof, the "**Noteholders**"), in each case issued by Oi S.A. ("**Oi**"). UMB Bank N.A. is trustee (the "**Indenture Trustee**"), and GLAS Americas is collateral agent (the "**Collateral Agent**"), under the Indentures.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Vaz Declaration. The Vaz Declaration also contains a summary of my background and qualifications.

(i)     On December 18, 2025, the Judicial Manager, Mr. Bruno Rezende, submitted the draft *Edital* to counsel for the Ad Hoc Group for review;

(ii)    On January 2, 2026, within the relevant deadline provided for response, counsel for the Ad Hoc Group responded by e-mail rejecting the draft and submitting a revised version.  Among other points, the rejection was based on the following grounds: (a) the draft *Edital* lacked the required annexes to the V.tal UPI Sale Notice (including the Confidentiality Agreement, Antitrust Protocol, and Share Purchase Agreement); (b) the draft *Edital* lacked a credit bid provision; (c) the draft *Edital* did not provide that acquisition proposals involving methods of payment other than cash paid upfront must be approved through a Deliberation of the Restructuring Option I Creditors, as required under Clause 5.2.2.2.5 of the RJ Plan; (d) the draft *Edital* did not contain the deadlines and conditions for due diligence, as required under Clause 5.2.3.4 of the RJ Plan; and (e) the draft *Edital* did not expressly provide that the draft *Edital* and any sale process for the V.tal shares must comply with the terms of the fiduciary assignment agreements (the "**Fiduciary Assignment Agreement**")[4] of the V.tal Stake and may not limit or modify any rights set forth therein, or any rights provided under the Intercreditor Agreement, the instruments relating to the Noteholders' Exit Financing or the RUD Notes, all of which must be preserved and protected throughout the competitive process and sale;

(iii)   On January 6, 2026, the Judicial Manager acknowledged receipt of the revised draft and forwarded the annexes forming part of the V.tal UPI Sale Notice.  This was not mentioned in the Carpenter Declaration;

(iv)    On January 21, 2026, the Ad Hoc Group submitted comments on the annexes, specifically the Share Purchase Agreement and the Confidentiality Agreement.  This event was not mentioned in the Carpenter Declaration;

(v)     On January 27, 2026, following discussions with the Judicial Manager, the Ad Hoc Group sent a new draft *Edital* via email, in an effort to resolve open points, while expressly preserving creditor protections, including the right to reject any proposal through a Deliberation of the Restructuring Option I Creditors.  None of this was discussed in the Carpenter Declaration;

(vi)    On January 28, 2026, the Judicial Manager submitted a motion alleging that the Ad Hoc Group's rejection was abusive and requesting publication of the *Edital* on a cash-only basis, which only partially incorporated the Ad Hoc Group's comments.[5]  This event was not discussed in the Carpenter Declaration.  In addition, I believe the allegations of abuse made by the Judicial Manager were part of an effort to create a record for purposes of later disenfranchising creditor votes in Brazil, and that these allegations

---

[4] The Fiduciary Assignment Agreement, as well as the two amendments thereto, are attached as Exhibits A–C of the Carpenter Declaration.

[5] A copy of the January 28 motion filed by the Judicial Manager is attached as **Exhibit 1** hereto.

3

were not made in good faith given the engagement between the Ad Hoc Group and the Judicial Manager that preceded;

(vii)   On January 28, 2026, a decision was rendered ordering publication of the *Edital* as submitted by Oi.[6]  This event is not discussed in the Carpenter Declaration; and

(viii)   On January 30, 2026, after the RJ Court had already ordered publication of the *Edital*, the Indenture Trustee submitted a motion (the "**January 30 Indenture Trustee Motion**") clarifying the facts and circumstances that led to publication of the *Edital* and responding to the Judicial Manager's inaccurate and harmful allegations of abuse.  In the January 30 Indenture Trustee Motion, the Indenture Trustee stated that lack of further opposition to the *Edital* was conditioned on, among other things, the fact that the *Edital* expressly provided that the creditor protections set forth in the RJ Plan would be observed, including the right to reject a proposal below the Minimum Price (items 2.2 and 4.1 of the *Edital*), and contained additional reservations of rights for the protection of the Noteholders.[7]   This filing was made only after Judicial Manager presented the *Edital* to the RJ Court and after such court issued a decision to publish the *Edital* presented by the Judicial Manager.

5.   It should be emphasized that the final version of the *Edital* (as published in the Official Gazette and as referenced in the January 30 Indenture Trustee Motion) expressly provides (i) for the creditors' right to reject proposals below the Minimum Price (items 2.2 and 4.1 of the *Edital*); (ii) that the sale procedure and the winning proposal must comply with the terms of the Intercreditor Agreement and the Indentures (item 9(ii) of the *Edital*);[8] and (iii) any bidder was required to accept and acknowledge that its proposal must

---

[6] A copy of the January 28 decision rendered by the RJ Court is attached as **Exhibit 2** hereto.

[7] A certified translation of the January 30 Indenture Trustee Motion is attached as **Exhibit 3** hereto: "Without prejudice to the foregoing, the Trustee seeks to clarify that its decision not to object to the new draft of the notice does not impair its right, or that of any of the Restructuring Option I Creditors, to make any future resolution regarding proposals involving alternative methods of payment, including by means of a credit bid, strictly in accordance with Clause 5.2.2.2.5 of the PRJ." January 30 Indenture Trustee Motion ¶ 30; *see also id*. at ¶ 46 ("In view of the above, the Trustee informs that it does not object to the draft V.tal UPI sale notice submitted by the Reorganizing Debtors on pages 127,820/127,828, it being understood that this Court must observe that the prerogative to deliberate on proposals that are not in cash; and/or not paid in full; and/or below the minimum price, *lies exclusively with the Restructuring Option I Creditors*, as expressly provided for in Clause 5.2.2.2.5, *subject only to the rights of the New Financing – Third Parties creditors*.") (emphasis added).

[8] A certified translation of the *Edital* is appended as **Exhibit 4** hereto: "[T]his Notice (including its exhibits), the Competitive Procedure, and the Winning Bid must observe and respect the rights of creditors set forth in

4

comply with the *Edital* and the RJ Plan (item 3.1.1 (v) of the *Edital*). Any agreement by or on behalf of noteholders to the terms of the *Edital* was premised on the inclusion and implementation of these terms. In my view, these provisions of the *Edital* have not been honored.

## THE MARCH 5, 2026 HEARING AND ACKNOWLEDGEMENT THAT THE BTG BID WAS BELOW THE MINIMUM PRICE

6.      The following excerpts from certified translations of the relevant proceedings confirm that the BTG Bid was uncontroversially acknowledged by all parties as a non-conforming bid because the offered price was below the Minimum Price:

(i)      the March 5, 2026 Hearing Minutes;[9]

(ii)     the March 25 Judicial Administrator Report;[10]

(iii)    the March 25 Watchdog Opinion;[11]

(iv)     the March 25 Oi Fairness Opinion Motion;[12]

(v)      the Motion to Invalidate[13];

(vi)     the March 30, 2026 Hearing Minutes;[14] and

---

the fiduciary assignment of V.Tal Shares instrument (as per Exhibit 4.2.2.2.1(F)(I), item I.A, subitem 1, of the Judicial Reorganization Plan), the intercreditor agreement, the new money financing documents, the roll-up debt instrument, and the respective related instruments[.]" *Edital*, item 9(ii).

[9] A certified translation of the March 5, 2026 Hearing Minutes is appended as **Exhibit 5** hereto: "Thereafter, the Joint Court-Appointed Trustee stated that: the proposal meets the objective requirements and, considering that it is below the minimum price set forth in the public notice, the procedure for consulting the creditors, as provided for in the public notice, will be followed."

[10] Vaz Decl., Ex. 4 at ¶¶ 1–2.

[11] "In accordance with the UPI - V.tal Sale Notice, a hearing was held for the opening, in the first round, of the sealed proposals submitted, on March 5, 2026, which this Watchdog attended through Mr. Adriano Pinto Machado, as recorded in the Minutes (Index. 132.181). According to the Hearing Minutes, there was only one (1) qualified bidder, namely, a conglomerate headed by "BTG Pactual", which submitted a proposal to acquire UPI - V.Tal, for a value lower than the minimum price stipulated in the Notice, which is why this Honorable Court has ordered the initiation of this confidential proceeding. And, given the need to comply with Section 5.2.2.2.4 of the Judicial Reorganization Plan, in order to submit the proposal to the Restructuring Option I Creditors, this Honorable Court SUSPENDED the hearing and rescheduled it for March 30, 2026." Vaz Decl., Ex. 5.

[12] Vaz Decl., Ex. 1 at ¶¶ 7–8.

[13] Vaz Decl., Ex. 6 at ¶¶ 25–26.

[14] A certified translation of the March 30, 2026 Hearing Minutes is attached as **Exhibit 6** hereto: "The Court defined the scope of the hearing as the resumption of the act for the sale of the V.Tal UPI, due to the

(vii)   the Brazil Sale Order.[15]

## THE RJ PLAN DOES NOT PERMIT REDUCTION OF THE MINIMUM PRICE

7.      The RJ Plan does not contemplate any mechanism for reducing the Minimum Price based on a new appraisal.  To the contrary, the RJ Plan expressly provides that the parties waived any right to seek a new appraisal and acknowledged the Minimum Price set forth therein (Clause 5.2.3.3) as the clearing price for any transaction.  Accordingly, if any party intends to amend the Minimum Price provision, the proper procedure must be followed, including proposing an amendment to the RJ Plan and complying with the applicable legal requirements, including obtaining the requisite creditor approval.

8.      In addition, the RJ Plan expressly provides that any rejection of a proposal below the Minimum Price by the Restructuring Option I Creditors through the applicable resolution process shall prevail, and that Oi has no veto right over such rejection.[16]

9.      Neither the post-petition transaction documents nor the RJ Plan require creditors rejecting a sale below the Minimum Price to submit an alternative bid or provide any justification for their rejection.  The vote itself is the mechanism afforded to creditors, under both the operative U.S. debt documents and the RJ Plan, to protect the value of their collateral against a below-threshold sale.

---

submission of a single bid (BTG Bid) at a price lower than the minimum price provided for in the judicial reorganization plan, followed by rejection by the Restructuring Option I Creditors.”

[15] “On March 5, 2026, a hearing commenced for the opening of envelopes containing proposals for the acquisition of the Isolated Productive Unit V.Tal (ID 132.181).  A single proposal was submitted on that occasion (“BTG PROPOSAL”), and, as it was lower than the price set forth in the public notice, the procedure corresponding to such situation provided in the public notice of sale was initiated, with successive filings from the persons listed in the respective minutes.” Vaz Decl., Ex. 9.

[16] Clause 5.2.2.2.4 (b) of the RJ Plan; *see also* Vaz Decl. ¶ 15(iii).

10.     Moreover, it is my understanding that the rejection of the BTG Bid was based not only on the offered price being below the Minimum Price, but also on additional grounds set forth in the BTG Bid Rejection Letter.[17]

11.     The BTG Bid is not the only option available to the relevant secured creditors to monetize the V.tal Stake.  The RJ Court has the ability to order another round of the sale process to be launched, and could adjust the procedures for that subsequent round to create a higher likelihood of competitive bidding, including by using a professional investment banker to market the asset, ensuring a complete dataroom is available to potential investors and providing more time for such investors to carry out due diligence.

12.     In addition, in the event the V.tal Stake is not sold through the sale process set forth in the RJ Plan, the relevant secured creditors could eventually foreclose on the fiduciary lien, providing another path for this asset to be disposed of and used to address secured claims.[18]  Oi's current sale process is not being conducted under the terms of the Fiduciary Assignment Agreement.

**ARTICLE 39, §6 DOES NOT APPLY TO THE DELIBERATION AT ISSUE**

13.     As I mentioned in the Vaz Declaration, Article 39, § 6 of the Brazilian Bankruptcy Law does not apply to the resolution related to the rejection of BTG's Proposal. *See* Vaz Decl. ¶ 39.  Article 39 applies to votes exercised in the context of a General Meeting of Creditors, the matters of which are defined by statute. Here, the dispute concerns a Deliberation by the Restructuring Option I Creditors over whether to accept or

---

[17] *See* Vaz Decl., Ex. 2.
[18] As discussed below, there is currently a stay of enforcement of *extraconcursal* claims ordered by the RJ Court.

reject a proposed asset sale contemplated by the RJ Plan, and the relevant rules governing that deliberation that took place in the RJ Proceeding are specifically set forth in the RJ Plan itself.

14.     Even if Article 39, §6 were deemed applicable, it is my understanding that this provision is aimed at extraordinary situations and, by its own terms, a vote may be declared null for abusiveness only when it is manifestly exercised to obtain an unlawful advantage for oneself or for another.[19]

15.     To the best of my knowledge, this statutory provision (Article 39, §6) was introduced as part of the 2020 legislative reform enacted by Law No. 14,112 and was intended to curb the overuse of vote nullification based on alleged abusive voting.[20]

16.     Further, to my understanding, "Statement No. 45 of the First Conference on Commercial Law" cited in paragraph 43 of the Carpenter Declaration is a secondary normative source published in 2012—i.e., prior to the enactment of Law No. 14,112 that introduced Article 39, §6 to the Brazilian Bankruptcy Law—and, therefore, even if considered today, it should be interpreted in light of the underlying statute was subsequently amended and narrowed.

---

[19] Article 39, §6 states the following: "The vote shall be exercised by the creditor in its own interest and in accordance with its judgment of convenience, and may be declared null on grounds of abuse only if it is manifestly exercised to obtain an unlawful advantage for itself or for a third party."

[20] "In addition to the cramdown mechanism provided for in Article 58, §§1 and 2 of the Brazilian Bankruptcy Law, another provision that allows the court to override the rejection of a judicial reorganization plan is the finding of abuse in the exercise of voting rights by a given creditor or group of creditors, pursuant to Article 39, §6, as introduced by Law No. 14,112/2020. Prior to the 2020 amendment, there was no equivalent statutory provision, although a line of legal scholarship supported the disregard of votes cast in abuse of rights, based on the general rules set forth in the Civil Code, particularly Article 187. Following the 2020 reform, however, this concept became expressly provided for in Law No. 11,101/05. Article 39, §6 of the Brazilian Bankruptcy Law clarifies that voting rights must be exercised according to the creditor's business judgment and in its own interest, and may subsequently be declared null on grounds of abuse only when manifestly exercised to obtain an unlawful advantage for oneself or for a third party." (CUNHA, Fernando Antonio Maia da; DIAS, Maria Rita Rebello Pinho. Comentários à lei de recuperação de empresas e falência. 2. ed. Avaré: Editora Contracorrente, 2025, pages 350/351)

## CERTAIN EVENTS RELATED TO THE ACCELERATION OF THE NOTES

17.     With respect to the events that triggered the acceleration of the Notes, it is my understanding that:

(i)     On July 3, 2025, certain of Oi subsidiary guarantors filed for Judicial Reorganization;[21]

(ii)    On September 30, 2025 Judge Simone Gastesi Chevrand anticipated the effects of a liquidation of Oi, imposed a stay on post-petition claims and appointed Mr. Bruno Rezende as Judicial Manager of Oi;[22]

(iii)   The Indenture Trustee issued notices of default under the Notes on November 13, 2025,[23] notifying holders of defaults that had previously arisen and automatic acceleration that had previously occurred under the Indentures.  This notice discussed, among other things, defaults arising from the: (i) filing for Judicial Reorganization by Oi guarantor subsidiaries in July 2025 and (ii) appointment of the Judicial Manager;

(iv)    In December 2025, Oi approached its creditors seeking to sell and release liens on certain real estate assets that it would have been authorized to sell and apply proceeds in a pre-acceleration context as an "Ordinary Course Collateral Disposition." At that point, creditors, together with GLAS and the Indenture Trustee, understood that Oi could not carry out an "Ordinary Course Collateral Disposition" under the Intercreditor Agreement.  As a result, at Oi's request, counsel to the Ad Hoc Group agreed to provide consents to the Collateral Agent to permit the sale of such assets, notwithstanding the acceleration of the Notes;[24]

(v)     The Noteholders also never acknowledged that the sale of the V.tal Stake would be an Ordinary Course Collateral Disposition pursuant to the RJ Plan. To the contrary, the Noteholders and their representatives (including the Indenture Trustee) have repeatedly insisted in proceedings in Brazil that any sale of the collateral must comply with the relevant Postpetition Transaction Documents, and I understand that the same has been done in the United States.

---

[21] *See* Vaz Decl. ¶ 24(i).

[22] For further detail, *see* Vaz Decl. ¶ 24(ii)–(iii).

[23] Copies of the default notices issued by the Indenture Trustee are attached as **Exhibit 7** and **Exhibit 8** hereto.

[24]  A copy of the email sent by counsel to the Ad Hoc Group to the Collateral Agent on December 23, 2025 is attached as **Exhibit 9** hereto.

18.     Under the Brazilian Bankruptcy Law, (i) only pre-petition claims are subject to judicial reorganization;[25]-[26] (ii) pursuant to its Article 6, the stay provided therein prevents the commencement or continuation of enforcement actions against the debtor with respect to pre-petition clams;[27] (iii) both the statute and prevailing case law set forth that post-petition claims and claims secured by fiduciary liens are neither subject to, nor affected by, judicial reorganization proceedings;[28]-[29] and (iv) there is no legal provision in the Brazilian Bankruptcy Law that impairs creditors' ability to accelerate their debt or otherwise exercise their contractual rights – whether pre-petition or *extraconcursal*.

19.     The decision of the RJ Court on September 30, 2025 restricted the ability of the relevant creditors to file collection proceedings and enforce their relevant *extraconcursal* obligations and collateral.[30]   It did not prohibit the acceleration of the relevant debts (and my understanding is that the Notes had already accelerated automatically by that time in any event).

20.     Notwithstanding the above, it is important to highlight that the acceleration of the Notes is governed by New York Law.

---

[25] Article 49. All claims existing as of the date of the filing are subject to judicial reorganization, even if not yet due.

[26] *See* Savi Decl. ¶¶ 22–23 [ECF No. 4].

[27] Article 6. The declaration of bankruptcy or the granting of the processing of a judicial reorganization results in: [...] II – the suspension of enforcement proceedings filed against the debtor, including those brought by the personal creditors of a jointly liable partner, relating to claims or obligations subject to judicial reorganization or bankruptcy; III – the prohibition of any form of retention, attachment, levy, sequestration, search and seizure, or judicial or extrajudicial lien or constraint over the debtor's assets, arising from judicial or extrajudicial proceedings whose claims or obligations are subject to judicial reorganization or bankruptcy.

[28] *See* Vaz Decl. ¶ 17, n. 28; *see also* Junqueira Decl. ¶ 28 *et seq*.

[29] Article 49, paragraph 3 of the Brazilian Bankruptcy Law: "§3. In the case of a creditor holding the position of a fiduciary owner of movable or immovable property, a lessor under a financial lease, an owner or promissory seller of real estate whose respective agreements contain irrevocability or irretractability clauses, including in real estate developments, or an owner under a sale with retention of title, such creditor's claim shall not be subject to the effects of the judicial reorganization, and the property rights over the asset and the contractual terms shall prevail, subject to the applicable law. However, during the stay period referred to in § 4 of Article 6 of this Law, the sale or removal from the debtor's establishment of capital assets essential to its business activity shall not be permitted."

[30] *See* Vaz Decl. ¶¶ 18, 24(ii).

21.     Finally, Article 47 of the Brazilian Bankruptcy Law provides for the principle of the "preservation of the company" and usually is used as a secondary argument for decisions favoring a debtor in a Brazilian insolvency proceeding.[31]  This principle does not, on its face, prevent the acceleration of a debt against a debtor.

### SEIZURE OF NOTES HELD BY AD HOC GROUP MEMBERS

22.     It is my understanding that the Notes held by the Named Defendants have been made subject to attachment orders (*arresto*) issued by three different courts in Brazil.

23.     **Labor Court Attachments**. Initially, Notes held by certain Noteholders were made subject to attachment by two labor courts in collective enforcement proceedings filed against Serede – Serviços de Rede S.A. ("**Serede**"), a subsidiary of Oi.  Those attachments were ordered in judicial proceedings through which Serede's labor creditors seek to pierce Serede's corporate veil to reach former shareholders of Oi directly.

24.     The defendants in this litigation have argued that those proceedings lack merit for the following reasons:

(i)     The relevant noteholders became shareholders of Oi solely pursuant to the RJ Plan, having received such shares as partial satisfaction of claims they held against the Company. Moreover, Article 50, Paragraph 3 of the Brazilian Bankruptcy Law expressly provides that shareholders who acquire their equity interest pursuant to a restructuring implemented under a judicial reorganization plan are not liable for the Company's pre-existing obligations;[32]

---

[31] Article 47. Judicial reorganization is intended to enable the overcoming of the debtor's economic and financial crisis, so as to allow for the preservation of the productive source, the employment of workers, and the interests of creditors, thereby promoting the preservation of the company, its social function, and the encouragement of economic activity.

[32] Article 50. Judicial reorganization may be effected through, among other means, subject to the legislation applicable to each case: § 3. There shall be no succession or liability for debts of any nature attributed to any third-party creditor, investor, or new administrator as a result, respectively, of the mere conversion of debt into equity, the contribution of new funds to the debtor, or the replacement of the debtor's management.

11

(ii)     The allegations of abusive exercise of control are unsubstantiated, as there is no evidence of any exercise of control. In fact, Oi's corporate records confirm that the Company had no controlling shareholder;

(iii)    The labor courts no longer have jurisdiction to adjudicate the veil-piercing claims against Serede, given Serede's bankruptcy liquidation (*falência*) was declared on March 13, 2026. Pursuant to Article 82 of the Brazilian Bankruptcy Law,[33] only the bankruptcy court may adjudicate such claims;

(iv)     The judgment converting Serede's judicial reorganization into bankruptcy liquidation (*falência*) expressly rejected the allegation that Oi and Serede formed an economic group, recognizing that Serede has its own assets, its own liabilities and financial and patrimonial autonomy from Oi;

(v)      Under Brazilian labor law, a shareholder is only subsidiarily liable for the company's labor obligations relating to the period during which such entity was a shareholder (Article 10-A of Decree-Law No. 5452).[34] However, to the best of my knowledge, the vast majority, if not all, of Serede's labor debt relates to a period during which those holders were not shareholders; and

(vi)     None of those decisions is final, and all are currently under review by the relevant court.

25.     **RJ Court Attachment**.   Additionally, the Notes were attached by a decision issued by the RJ Court itself at Oi's request.  *See* Vaz Decl. ¶ 24(vi)–(vii).  Oi has full discretion to have the case dismissed and the RJ Court Attachment lifted, with consent of the Named Defendants.

26.     In my view, in addition to the reasons stated in paragraph 26 of the Vaz Declaration, the RJ Court Attachment and the underlying lawsuit lack merit for the following reasons:

---

[33] Article 82. The personal liability of partners with limited liability, controlling shareholders, and managers of the bankrupt company, as provided for under the applicable laws, shall be determined by the bankruptcy court itself, regardless of whether the assets have been liquidated and irrespective of proof that such assets are insufficient to cover the liabilities, in accordance with the ordinary procedure set forth in the Code of Civil Procedure.

[34] Article 10-A. A withdrawing partner shall be subsidiarily liable for the company's labor obligations relating to the period during which such person was a partner, only in actions filed up to two years after the amendment to the articles of association has been registered, observing the following order of preference: I – the debtor company; II – the current partners; and III – the withdrawing Partners.

12

(i)     According to Oi's initial pleadings, the lawsuit was allegedly filed in compliance with an order issued by the reporting judge of the Appellate Court, Judge Monica Maria Costa di Piero.  In my view, that statement is incorrect, because the order merely directed an investigation with respect to a certain holder, not the filing of a lawsuit.  If that had in fact been the order's meaning, it would raise constitutional concerns, since a court cannot request a lawsuit to be filed against a party;[35] and

(ii)    On September 3, 2025, Oi's Foreign Representative sent a letter to V.tal expressly acknowledging that Oi's management acted autonomously and independently.[36]

27.     **Parties Affected**. Only the Notes held by entities of two members of the Ad Hoc Group have been subject to attachment, while the Ad Hoc Group comprises numerous other creditor institutions.

28.     Even if the votes of the affected members of the Ad Hoc Group were disregarded, the BTG Bid still would have been rejected by the remaining Restructuring Option I Creditors.  The aggregate votes of Restructuring Option 1 Creditors voting to accept the BTG Bid were less than 7% of the class.

## PROCEDURAL MEASURES IN BRAZIL

29.     The decision approving the BTG Bid was issued on April 1, 2026, and was published in the Official Gazette on April 9, 2026.  Under the Brazilian Code of Civil Procedure, publication of a decision in the Official Gazette triggers the commencement of the deadline for the parties to file any appeals.

30.     Additionally, under the Brazilian Code of Civil Procedure, a party may first file a motion for clarification before the same court that issued the decision in order to

---

[35] The Brazilian Federal Constitution establishes the principles of the "Inertia" and "Natural Judge", under which, respectively: (i) provides that a judge may not initiate proceedings on their own motion, but must await the parties' initiative (Article 2 of the Brazilian Code of Civil Procedure); and (ii) ensures that all individuals are adjudicated only by judges who are competent and previously established by law prior to the relevant facts, prohibiting the creation of ad hoc or exceptional courts (Article 5, XXXVII and LIII of the Federal Constitution of 1988).
[36] ECF No. 144-1 ¶ 10.

13

address omissions, contradictions, ambiguities, or material errors in the ruling. Following the court's decision on such motion, the party may then pursue the appropriate appeal before the Court of Appeals.

31. On April 9, 2026, the Indenture Trustee filed a motion for clarification, with a request for suspensive effect, against such decision, arguing that the decision contains multiple contradictions, omissions, and errors, including with respect to the approval of a sale below the Minimum Price notwithstanding the creditors' rejection, the reliance on a *post hoc* private valuation and the failure to address the Indenture Trustee's arguments that the BTG Bid does not comply with the RJ Plan and the relevant restructuring documents.

32. On April 12, 2026, Oi filed a motion in the RJ Court that, among other things, attacked the Motion to Enforce filed with the Court in the United States and opposed the Indenture Trustee's request for a stay, seeking to expedite the closing of the sale transaction.[37]

## CLOSING OF THE TRANSACTION

33. The closing of the UPI V.tal transaction is contingent upon execution of the final documents, including the relevant draft of the Share Purchase Agreement ("**SPA**"), and the fulfilment of the relevant conditions precedent established thereof. One of the conditions precedents to closing by both parties (Oi and BTG) is the inexistence of a decision that deems the transaction to be unlawful.

34. In addition, the draft SPA establishes, also as a condition precedent (to the purchaser), the inexistence of, among other things, a claim that may result in the invalidation of the transaction.

---

[37] A certified translation of the April 12 Oi Motion is appended as **Exhibit 10** hereto.

35.      In light of the foregoing, the mere pendency of the Motion to Enforce before this Chapter 15 Court, and/or any potential ruling by this Court preventing Oi from consummating the UPI V.Tal sale transaction with BTG, provides the parties with a basis not to proceed with the closing of the sale.

## ARTICLES 167-L, 167-M, 167-N, AND 167-S OF THE BRAZILIAN BANKRUPTCY LAW ARE INAPPLICABLE

36.      The provisions cited in Carpenter Declaration—Articles 167-L,[38] 167-M,[39] 167-N,[40] and 167-S,[41] of the Brazilian Bankruptcy Law—are inapposite to the matter presently before this Court. Each of these provisions governs circumstances in which a party seeks recognition of a foreign insolvency proceeding in Brazil.

37.      This case does not involve any such request. To the contrary, Oi filed the main proceeding in Brazil (Oi's RJ Proceeding) and an ancillary proceeding in the U.S. (the chapter 15 proceeding). To the best of my knowledge, there has been no request in Brazil for recognition or enforcement of a foreign – main or non-main– proceeding.

---

[38] This provision applies in the context of a request for recognition of a foreign insolvency proceeding in Brazil, allowing the court to grant interim relief before recognition is decided in order to protect the estate and ensure the effectiveness of the proceeding.

[39] This provision establishes the legal remedies of a Brazilian court decision recognizing a foreign main proceeding.

[40] This provision governs the relief that a Brazilian court may grant upon recognizing a foreign proceeding – whether main or non-main – authorizing the court, at the request of the foreign representative, to order measures necessary to protect the debtor's assets and serve the interests of creditors.

[41] This provision addresses situations in which a foreign proceeding and a Brazilian insolvency proceeding concerning the same debtor are pending simultaneously, and a request for recognition of the foreign proceeding is submitted to a Brazilian court.

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on this day of April 13, 2026 in Rio de Janeiro, State of Rio de Janeiro, Brazil.

_____

Guilherme Vaz Leal da Costa

**Schedule 1 – Exhibit Summary**

| Exhibit | Document |
|---|---|
| 1 | January 28 Judicial Manager Motion |
| 2 | January 28 RJ Court Decision |
| 3 | January 30 Indenture Trustee Motion |
| 4 | *Edital* |
| 5 | March 5, 2026 Hearing Minutes |
| 6 | March 30, 2026 Hearing Minutes |
| 7 | NPSD Indenture Default Notice |
| 8 | RUD Indenture Default Notice |
| 9 | December 23 Email to Collateral Agent |
| 10 | April 12 Oi Motion |

**Exhibit 1**

January 28 Judicial Manager Motion

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

---------------------------------------------------------------------------------

I, the undersigned Sworn Public Translator and Commercial Interpreter, recognized and respected throughout the Federative Republic of Brazil, duly appointed and authorized by the Board of Trade of the State of Rio de Janeiro (JUCERJA) and registered under No 281, DO HEREBY CERTIFY AND ATTEST that I received a document in the Portuguese language for translation into English, which I have lawfully executed in my official capacity, as follows:-----

---------------------------------------------------------------------------------

*(All pages with the stamp of the Court of Appeals of the State of Rio de Janeiro – Electronically Stamped – and numbered from 127808 to 127818)*

*(On the margin of the first page: TJRJ CAP EMP07 202600259033 28/01/26 12:58:26138559 PROGER-VIRTUAL)*

*(Letterhead of SALOMÃO ADVOGADOS, FERRO, CASTRO NEVES, DALTRO & GOMIDE ADVOGADOS and PRESERVA AÇÃO – ADMINISTRAÇÃO JUDICIAL)*

**TO THE HONORABLE JUDGE OF THE 7ᵀᴴ CORPORATE COURT OF THE DISTRICT OF THE CAPITAL OF THE STATE OF RIO DE JANEIRO**

Case No. 0090940-03.2023.8.19.0001

**OI S.A. – IN COURT-SUPERVISED REORGANIZATION** ("Oi"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – IN COURT-SUPERVISED REORGANIZATION** ("PTIF"), and **OI BRASIL HOLDINGS COÖPERATIEF U.A. – IN COURT-SUPERVISED REORGANIZATION** ("Oi Coop" and, collectively with Oi and PTIF, the "Oi Group" or the "Reorganizing

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

Debtors"), already duly identified in the records of the court-supervised reorganization proceedings referenced above, appear, through their undersigned counsel and court-appointed manager, to submit the following:

**NECESSARY APPROVAL OF THE NOTICE OF SALE FOR THE V.TAL UPI**

1. Over the past months, particularly through the actions of the Court-Appointed Manager, the Reorganizing Debtors have made all their effort to implement the measures set forth in the Court-Supervised Reorganization Plan (the "Plan"), especially the asset disposal, to generate cash and satisfy creditors, in compliance with the decision rendered by the Hon. Appellate Judge Mônica Maria Costa de Piero, on 14 November 2025, in the interlocutory appeals No. 0096877-26.2025.8.19.0000 and No. 0096871-19.2025.8.19.0000.

2. Among the measures set out in the Plan, pursuant to Clause 5.2.2.2 thereof, the Oi Group must carry out the judicial sale of the V.tal UPI, consisting of 100% (one hundred percent) of the shares issued by V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal"), held

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

by Oi and its subsidiaries. This constitutes one of the most significant measures for the restructuring of the Oi Group, as it involves the most valuable asset currently held by it.

3. In summary, the Plan establishes that the V.tal UPI shall be sold through a judicial sale process, under a sealed-bid procedure, for a minimum aggregate price of BRL 8,000,000,000.00 (eight billion Brazilian reais), **to be paid in a single lump sum, in cash and in local currency**.

4. Although Clause 5.2.2.2.3 of the Plan provides for the possibility of revising the minimum price to reflect any changes in the "V.tal Asset Pool" up to the date of publication of the notice, there is no provision authorizing the sale of the V.tal UPI in any manner other than that expressly approved by the general meeting of creditors, particularly with respect to the payment of the transaction price.

5. Furthermore, considering the relevance of the asset and the existence of a secured fiduciary sale over the shares issued by V.tal and held by the Oi Group, the Plan expressly sets forth the rules and conditions applicable to the competitive process, defining the

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

minimum requirements and conditions, as well as the procedure to be observed by the Reorganizing Debtors and to be reflected in the relevant notice of sale of the V.tal UPI.

6. In this context, pursuant to Clause 5.2.2.2.1(1) of the Plan, prior to its submission to the records of this court-supervised reorganization proceeding, the notice of sale of the V.tal UPI was supposed to be reviewed and approved by the Restructuring Option I Creditors(2), within fifteen (15) days as from the date of notification of the respective creditors.

7. Accordingly, in compliance with the rules set out in the Plan, on 18 December 2025, Oi notified the Restructuring Option I Creditors, sending them the draft notice of sale of the V.tal UPI for their review and approval and, subsequently, in good faith, all annexes thereto.

8. mNotwithstanding the fact that Oi complied with all rules and procedures set forth in the Plan for the preparation of the Notice, after the expiration of the period for review and approval, on 2 January 2026, the Restructuring Option I Creditors(3) informed the **rejection** of the draft Notice of the V.tal UPI (**doc.**

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

**1**), invoking as justification issues that exceed the scope of their rights and constitute a clear abuse, to the detriment of the court-supervised reorganization of the Oi Group and causing direct harm to the other creditors.

**CLEAR ABUSE BY THE RESTRUCTURING OPTION I CREDITORS**

9. According to the allegations raised by the Restructuring Option I Creditors, the draft V.tal UPI Notice failed to provide for: **(i)** the option to acquire the V.tal UPI through giving in payment (*dação em pagamento*) using claims held by the creditors in whose favor the secured fiduciary sale over the shares issued by V.tal was created — that is, the creditors themselves (the "V.tal Asset Pool"); **(ii)** that acquisition proposals involving payment terms other than in a single lump sum and/or in cash basis must be subject to approval by the Restructuring Option I Creditors' Resolution; **(iii)** deadlines and conditions for the conduct of prior audit within the competitive process; **(iv)** that the notice and any process for the sale of the V.tal shares must comply with the terms of the Secured Fiduciary Sale Agreement of the V.tal Shares and may not limit or modify any rights provided

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

for therein, or the rights set forth in the Intercreditor Agreement, in the instruments related to the New Financing Notes and the Roll-Up Notes; **(v)** that any adjustment to the equity interest held by Oi and its subsidiaries in V.tal, as a result of indemnification events agreed upon under the Investment Agreements entered into by Oi on 1 October 2021 and 28 February 2025, would be limited until the date of the sale of the V.tal UPI; **(vi)** that the Minimum Conditions for participation in the competitive process could be modified at any time by means of a Resolution of the Restructuring Option I Creditors, and that the Restructuring Option I Creditors themselves would be exempt from complying with such Minimum Conditions to participate in the competitive process, under the argument that they had already, in a generic and unsubstantiated manner, "met such conditions"; and **(vii)** that the ratification (*homologação*) of the winning bid by this Honorable Court could only take place *after* the full and effective payment of the purchase price.

10. However, although the Plan grants them certain supervisory rights, the "amendments" proposed by the

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

Restructuring Option I Creditors to the draft notice are not limited to pointing out specific adjustments or clarifications; rather, they constitute a clear attempt to reopen material terms of the sale of the V.tal UPI, which have already been expressly defined in the Plan and approved by the General Meeting of Creditors. Accordingly, such challenge exceeds the limits of the review prerogative set out in the Plan and amounts to a clear abuse of rights.

11. Specifically with regard to **item (i)**, the Plan expressly establishes that payment for the V.tal UPI must be made **in a single lump sum, in cash and in local currency**, not allowing — at least at an initial stage — the sale of the asset through other forms of consideration. It should also be pointed out that the Plan was approved with this wording by the Restructuring Option I Creditors themselves, with no reservations:

**5.2.2.2.3. Minimum Price of the V.tal UPI**. The aggregate minimum price for the sale of the V.tal UPI to be set forth in the V.tal UPI Notice shall be the amount to be paid in a single lump sum, in cash and in local currency, of BRL 8,000,000,000.00 (eight

billion Brazilian reais) to Oi (the "V.tal UPI Minimum Price"), provided that the V.tal UPI Minimum Price may be proportionally adjusted to reflect any changes in the V.tal Asset Pool up to the date of publication of the V.tal UPI Notice.

12. For this very reason, in the case of the ClientCo UPI, the Plan expressly provided for alternative forms of payment, a possibility that was deliberately **not** extended to the V.tal UPI and cannot now be invoked, in this moment, by the Restructuring Option I Creditors as a justification for rejecting the notice. See the provision relating to the ClientCo UPI:

(i) **Price and Form of Payment**: For purposes of the Second Round of the ClientCo UPI Sale, there shall be no minimum price for the sale of the ClientCo UPI (or of the ClientCo UPIs, as applicable), and proposals providing for any forms of payment, or a combination thereof, may be accepted, including: *(a)* payment in cash; *(b)* set-off, delivery, cancellation, remission, or any other similar mechanism for purposes of implementing the relevant transaction, of all or part of the Post-Petition Claims (including interest and inflation adjustment) held by New Financing Creditors

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

or Third-Party New Financing Creditors and/or their Affiliates, provided that *(b.1)* such claims arise from obligations undertaken by Oi and duly performed or completed by the relevant bidder; and *(b.2)* are recognized by the Reorganizing Debtors; and/or *(c)* giving in payment of Permitted ClientCo Assets, which must be free and clear of any Liens.

13. On this topic, it is also necessary to draw a distinction between rule and exception. The Plan allows that, *after* the opening of bids, should Oi receive any offer involving consideration other than payment in cash and nonetheless deem it convenient to accept such offer, this acceptance may only occur upon approval by the Restructuring Option I Creditors. This exceptional prerogative, however, neither authorizes – nor presupposes – that the competitive procedure for the V.tal UPI be previously structured or guided by such criterion. The rule, as expressly established in the Plan, is the sale upon **payment in a single lump sum, in cash and in local currency**.

14. In other words, if and only if the Reorganizing Debtors decide to accept any proposal involving a different form of consideration, such condition must

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

then be submitted to the respective approval of the Restructuring Option I Creditors, always subject to the right of the New Financing Third-Parties to receive full payment of their claims in cash. This is not, as these creditors attempt, a basis for subverting this exception, from the outset, for their own immediate and direct benefit.

15. Indeed, allowing alternative forms of payment, in contravention of the provisions of the Plan, would undermine the competitive process and the sought-after maximization of the sale value of the V.tal UPI.

16. This conduct is further aggravated by the evident **self-serving benefit sought**, insofar as the Restructuring Option I Creditors seek to use **their claims as a means of acquiring the V.tal UPI**, to the detriment of the liquidity indispensable to the Reorganizing Debtors and without any authorization under the Plan, thereby jeopardizing the payment of the other creditors, who depend on such proceeds for the amortization of their claims. In essence, what is being attempted is the oblique introduction of a disguised forfeiture clause (*pacto comissório*), effectively allowing for the appropriation of the

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

collateral granted to them without any payment.

17. It should be noted that the Restructuring Option I Creditors do not intend to open the competitive process, on an equal manner, to other forms of credit set-off. On the contrary: **they seek to restrict such "benefit," of using claims as payment, exclusively to themselves, in their capacity as holders of the secured fiduciary sale over the V.tal Asset Pool**.

18. What is therefore evident is a clear abuse of rights by the Restructuring Option I Creditors, who, disregarding Law No. 11,101/2005 (the "Brazilian Bankruptcy and Reorganization Law" or "LFR"), exceed the bounds of reasonableness by attempting to impose conditions different from those provided in the Plan and duly approved by the creditors — including by themselves, who approved the Plan with **no** reservation.

19. With respect to **item (ii)**, as already explained, the Plan grants the Reorganizing Debtors the discretion, should they identify an advantage in a proposal that does not involve payment in cash, to submit it to the consideration of the Restructuring Option I Creditors and the Third-Parties – New Financing. Because it is an exception, such

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

possibility shall not be provided for in the notice and does not follow the same mechanisms applicable to proposals that may be submitted below the minimum price.

20. What the Restructuring Option I Creditors seek is to improperly equate legally distinct situations, by attempting to include, within the same framework as the "Proposals Below the V.tal UPI Minimum Price" — which are subject to a specific procedure expressly set forth in the Plan — what they have termed an "Alternative Proposal," which in reality consists of the use of their own claims as payment for the V.tal UPI, through giving in payment. As demonstrated, such claim is manifestly inconsistent with the Plan, which prohibits this form of consideration and establishes, as a rule, payment in a single lump sum, in cash and in local currency.

21. It should also be emphasized that, should any proposal involving alternative consideration be submitted by the Restructuring Option I Creditors themselves, an evident **conflict of interest** would arise, insofar as such creditors would simultaneously act as bidders and as the decision-making body

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

responsible for approving the proposal, thereby compromising the impartiality of the procedure and the observance of the principles of equal treatment and objective good faith.

22. With respect to **item (iii)**, Oi has expressly established the timeframe and conditions applicable to the audit in the context of the sale of the V.tal UPI and has, in fact, submitted the Non-Disclosure Agreement, the Antitrust Protocol, and the Purchase Agreement for review by the Restructuring Option I Creditors, which will form part of the annexes to the notice. Mere disagreement with such criteria should not, in itself, prevent the publication of the notice.

23. In summary, the Restructuring Option I Creditors seek: (a) the extension of the audit period to sixty (60) days; and (b) the submission, by Oi, of a detailed list of the information and documents to be made available in the "Data Room."

24. However, Oi clarifies that it is not possible to agree to the extension of the audit period to sixty (60) days, as such extension would exceed the stay period applicable to post-petition obligations, in a context in which the Reorganizing Debtors are facing

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

an extremely sensitive financial situation and are not in a position to wait for such an extended timeframe. The proposed extension compromises the urgency required for the sale of the asset, reduces the value of the transaction, and proves detrimental to all parties involved, including the Restructuring Option I Creditors themselves.

25. It should also be pointed out that an asset significantly more complex from an audit standpoint, such as the ClientCo UPI, had its process conducted within thirty (30) days. It is further noteworthy that the Restructuring Option I Creditors themselves approved the ClientCo UPI notice without raising any objections regarding such timeframe, which demonstrates the disproportionality of the request now submitted. Moreover, such request reveals alignment with the particular interests of these creditors, who seek to extend the timeline of the competitive process in order to enable the use of their own claims to acquire the asset, to the detriment of the necessary expediency and the collective interests of the court-supervised reorganization.

26. Accordingly, Oi understands that thirty (30) days,

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

consistent with the precedents of its own court-supervised reorganization, are more than sufficient for the audit process, and are aligned with the urgency and speed required by the proceeding.

27. When it comes to the list of documents to be made available in the Data Room, Oi clarifies that a significant portion of such information is exclusively owned by V.tal, and therefore Oi does not have control over or direct access to such documents — a fact that is well known to the Restructuring Option I Creditors.

28. Nevertheless, Oi informs that, on this date, it has formally reiterated its request to V.tal for the provision of the relevant information and will use its best efforts to provide potential interested parties with the most complete set of documents possible, without, however, being able to guarantee the completeness of such materials. Indeed, the Oi Group has no interest whatsoever in withholding information. On the contrary, the Reorganizing Debtors seek to make available all information in their possession in order to increase both interest in — and the value of — the acquisition of the UPI.

29. With respect to **item (iv)**, it is evident that the

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

sale of the V.tal UPI does not have the effect of modifying the agreements validly entered into between the Reorganizing Debtors and their creditors — and there is no provision to that effect in the draft notice — which renders the requested reservation of rights unnecessary. Even so, in a collaborative spirit, **Oi informs that it has included the reservation in the exact terms requested by the Restructuring Option I Creditors**.

30. Regarding **item (v),** the Restructuring Option I Creditors removed from the notice an essential reservation included by the Reorganizing Debtors, to the effect that the equity interest held by Oi and its subsidiaries in V.tal — currently corresponding to 27.26% — may be subject to changes as a result of indemnification events expressly provided for in the Investment Agreements entered into by Oi on 1 October 2021 and 28 February 2025. In its place, they proposed language that improperly suggests that such rights, which are valid, effective, and fully enforceable, would cease to produce effects as a result of the judicial sale of the V.tal UPI, an interpretation that finds no contractual or legal support and contradicts

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

the Plan itself.

31. Any adjustment to or waiver of such rights depends exclusively on the statement of intent of V.tal, the proper party to the aforementioned Investment Agreements, and it is not for the Reorganizing Debtors to negotiate, condition, or waive such rights for the benefit of the Restructuring Option I Creditors. Should the winning bidder deem it appropriate to address such matters, it must do so directly with V.tal, at the appropriate time, and such circumstance cannot serve as a pretext to prevent the publication of the notice or delay the commencement of the competitive process.

32. The Restructuring Option I Creditors, while seeking to strictly preserve the rights they hold under guarantees and debt instruments, adopt a contradictory position by attempting to set aside or undermine duly constituted rights in favor of third parties, which are fully known and pre-existing. This reveals an asymmetrical and legally impermissible approach that cannot be accepted by the Reorganizing Debtors or endorsed within the scope of this court-supervised reorganization.

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

33. With respect to **item (vi)**, the Restructuring Option I Creditors clearly seek to exceed the review rights granted to them under the Plan, attempting to expand such rights to the point of conferring upon themselves absolute discretionary power over the competitive process, to the detriment of legal certainty and in blatant violation of the principles of equality, impersonality, protection of legitimate expectations, reasonableness, and proportionality.

34. This is because, as is fundamental in any competitive process for the sale of a UPI, the existence of objective Minimum Conditions for the qualification of interested parties constitutes an essential element of the process. Such requirements ensure predictability for creditors, guarantee equal conditions among potential participants, and, in particular, provide the Reorganizing Debtors with the necessary assurance that the procedure will not be tainted by opportunistic conduct or by parties lacking economic, financial, or legal capacity, which could compromise the very credibility of the process.

35. Notwithstanding such elementary assumptions, the Restructuring Option I Creditors have unilaterally

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

proposed that: (a) the Minimum Conditions for participation in the competitive process could be modified at any time, by means of their own simple resolution, even if in noncompliance with the notice and the Plan; and (b) the Restructuring Option I Creditors themselves would be exempt from complying with such Minimum Conditions, under the generic and unsubstantiated allegation that they had already qualified to participate in the bidding process.

36. Oi is not aware of any prior qualification process conducted by such creditors. Should they wish to participate in the competitive process, they must, like all other interested parties, submit the required documentation, fully adhere to the terms of the notice, and comply with all established Minimum Conditions, on an equal and impersonal basis. It is not legally admissible for them to use the right to review the notice as a mechanism to exempt themselves from the most fundamental rules governing the judicial sale of UPIs.

37. In the same context, with respect to **item (vii),** the Restructuring Option I Creditors sought to condition the ratification of the winning bid by this

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

Honorable Court upon the prior full payment of the purchase price, thereby again subverting the logic and established practice of the processes for judicial sale of UPIs.

38. It is undisputed that the ratification of the winning bid precedes the closing of the transaction and the consequent payment of the price, especially because the consummation of the transaction is subject to the fulfillment of several conditions precedent, including regulatory and contractual conditions. It is not feasible to require the purchaser to make payment before at least having legal certainty that its bid has been declared the winning proposal in the process, which is why it is striking that such an elementary and widely recognized point has been the subject of attempted modification by such creditors.

39. Finally, it should be noted that, in good faith, Oi submitted to the Restructuring Option I Creditors the base draft of the Purchase Agreement for the V.tal UPI, which will be attached to the notice, even though it had no obligation to do so under the Plan.

40. Nevertheless, consistent with the conduct described above, such creditors have also attempted,

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

in this document, to improperly expand their rights by introducing unacceptable provisions, such as the requirement of their approval for any amendment to the draft agreement — which is untenable, as the agreement must be freely negotiated between seller and purchaser, and the Restructuring Option I Creditors have no prerogative to intervene or participate in such negotiations.

41. Notwithstanding the foregoing, the Reorganizing Debtors have, in good faith, accepted almost all of the amendments requested by such creditors, rejecting only those that were manifestly abusive.

42. Therefore, as demonstrated throughout this submission, the draft notice for the sale of the V.tal UPI strictly complies with the terms of the Plan, as approved by the general meeting of creditors, and does not contain any innovation, suppression, or modification of the rules agreed upon.

43. The rejection presented by the Restructuring Option I Creditors is not based on any noncompliance with the Plan, but rather on an attempt to impose conditions that were not approved by the body of creditors, with a clear deviation of purpose, self-

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

interest, and to the detriment of the regular progress of the court-supervised reorganization.

44. The attempt to subordinate the competitive process to private interests, to the detriment of the liquidity required by the Reorganizing Debtors and the preservation of the company, constitutes an abusive exercise of rights (Article 187 of the Brazilian Civil Code) and a direct violation of Article 47 of the Brazilian Bankruptcy and Reorganization Law (the LRF), thereby placing at risk the effectiveness of the restructuring measures set out in the Plan.

45. In light of the foregoing, the intervention of this Honorable Court is imperative to ensure compliance with the Plan, to prevent abusive conduct by the Restructuring Option I Creditors, and to enable the immediate commencement of the competitive process for the sale of the V.tal UPI, an essential measure for the success of the court-supervised reorganization of the Oi Group.

**RELIEF SOUGHT**

46. In view of all the above, the Oi Group respectfully requests that this Honorable Court:

(a) order the publication of the attached notice for

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 7 Livro Digital 01/2026 Página 1-24

the V.tal UPI, with the consequent commencement of the competitive process for its sale, recognizing the abuse of rights committed by the Restructuring Option I Creditors, in conditioning their approval of the notice upon the inclusion of provisions allowing them, as holders of a secured fiduciary sale over the V.tal shares, to offer their own claims as consideration for the asset, in clear violation of the Plan, which requires payment in a single lump sum, in cash; and (b) accordingly schedule the V.tal UPI Bidding Hearing within thirty (30) days as from the date of publication of the notice, for the opening of sealed bids for the acquisition of the V.tal UPI.

47. Finally, the Debtors inform that they are attaching to this submission the final, clean version of the notice and all annexes thereto (**doc. 1**), as well as versions of such documents with tracked changes, reflecting the amendments made by the Oi Group to the versions previously commented on by the aforementioned creditors (**doc. 2**).

Respectfully submitted.

Rio de Janeiro, 28 January 2026.

Luis Felipe Salomão Filho - OAB/RJ 234,563

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

Rodrigo Mendonça Raposo - OAB/RJ 154,448

Marcela Melichar - OAB/RJ 189,833

Marcos Pitanga Ferreira - OAB/RJ 144,825

Thiago Peixoto Alves - OAB/RJ 155,282

Bruno Rezende (In his capacity as Court-Appointed

Manager of the Reorganizing Debtors) - OAB/RJ

124,405

Footnotes:

(1) "**5.2.2.2.1. <u>V.tal UPI Notice</u>**. The V.tal UPI Notice shall be cumulatively reviewed and approved by the Restructuring Option I Creditors (as per the Resolution of the Restructuring Option I Creditors)."

(2) "**<u>Restructuring Option I Creditors</u>**": shall mean the Unsecured Creditors who elect to be paid through Restructuring Option I as provided for in Clause 4.2.2."

(3) Creditors holding New Financing - Restructuring Option I Creditors are the Unsecured Creditors who have granted New Financing to Oi.

--------------------------------------------------------------------------------

THIS WAS THE FULL TEXT of said document, the true translation whereof I ATTEST.--------------------------------------------------------------------------------
WITNESS MY HAND AND SEAL, April 13, 2026. --------------------------------
------------------------------------------------------------



Documento assinado digitalmente
**DEBORAH SZCZERBACKI**
Data: 13/04/2026 12:02:37-0300
Verifique em https://validar.iti.gov.br

Tribunal de Justiça do Estado do Rio de Janeiro
Página
127808
Carimbado Eletronicamente

EXMA. SRA. JUÍZA DE DIREITO DA 7ª VARA EMPRESARIAL DA COMARCA DA CAPITAL DO ESTADO DO RIO DE JANEIRO

Processo nº 0090940-03.2023.8.19.0001

**OI S.A. – EM RECUPERAÇÃO JUDICIAL** ("Oi"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – EM RECUPERAÇÃO JUDICIAL** ("PTIF") e **OI BRASIL HOLDINGS COÖPERATIEF U.A. – EM RECUPERAÇÃO JUDICIAL** ("Oi Coop" e, em conjunto com Oi e PTIF, "Grupo Oi" ou "Recuperandas"), já qualificadas nos autos da recuperação judicial em epígrafe, vêm, por seus advogados e gestor judicial abaixo assinados, expor e requerer o seguinte:

**NECESSÁRIA APROVAÇÃO DO EDITAL PARA ALIENAÇÃO DA UPI V.TAL**

1.      Ao longo dos últimos meses, mormente pela atuação do i. Gestor Judicial, as Recuperandas têm envidado todos os seus esforços para a implementação das medidas prevista no Plano de Recuperação Judicial ("Plano"), em especial a alienação de ativos, para geração de caixa e pagamento dos credores, em atenção à r. decisão proferida pela i. Desembargadora Mônica Maria Costa de Piero, em 14.11.25, nos autos dos agravos de instrumento nºs 0096877-26.2025.8.19.0000 e 0096871-19.2025.8.19.0000.

2.      Dentre as medidas previstas no Plano, nos termos de sua Cláusula 5.2.2.2, o Grupo Oi deverá alienar judicialmente a UPI V.tal, constituída por 100% (cem por cento) das ações de emissão da V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal"), de titularidade da Oi e de suas subsidiárias. Trata-se de uma das medidas relevantíssimas para o soerguimento do Grupo Oi, por se tratar do ativo mais valioso atualmente por ele detido.

3.      Em síntese, o Plano estabelece que a UPI V.tal deverá ser alienada judicialmente, na modalidade de propostas fechadas, pelo preço mínimo agregado de

TJRJ CAP EMP07 202600259033 28/01/26 12:58:26138559 PROGER-VIRTUAL

1

R$ 8.000.000.000,00 (oito bilhões de reais), **a ser pago à vista, em dinheiro e moeda corrente nacional**.

4.        Embora a Cláusula 5.2.2.2.3 do Plano preveja a possibilidade de revisão do preço mínimo para refletir eventual alteração no "Acervo V.tal" até a data de publicação do edital, inexiste qualquer previsão que autorize a alienação da UPI V.tal de maneira diversa daquela expressamente aprovada pela assembleia geral de credores, especialmente em relação ao pagamento do preço do negócio.

5.        Ainda, considerando a relevância do ativo e a existência de alienação fiduciária sobre as ações de emissão da V.tal de titularidade do Grupo Oi, o Plano prevê expressamente as regras e condições aplicáveis ao processo competitivo, definindo os requisitos e condições mínimas, bem como o procedimento que deverá ser observado pelas Recuperandas e refletido no respectivo edital de alienação da UPI V.tal.

6.        Nesse contexto, nos termos da Cláusula 5.2.2.2.1[1] do Plano, antes da sua apresentação nos autos desta recuperação judicial, o edital de alienação da UPI V.tal deveria ser revisado e aprovado pelos Credores Opção de Reestruturação I[2], dentro do prazo de 15 (quinze) dias contados da data de notificação dos respectivos credores.

7.        Assim, em observância às regras estabelecidas no Plano, em 18.12.25, a Oi notificou os Credores Opção de Reestruturação I, encaminhando-lhes a minuta do edital da UPI V.tal para análise e aprovação e, mais tarde, de boa-fé, todos os anexos deste edital.

8.        Não obstante a Oi tenha seguido todas as regras e o procedimento previstos no Plano para a elaboração do Edital, após o fim do prazo para revisão e aprovação, em 2.1.26, os Credores Opção de Reestruturação I[3] informaram a **rejeição** da minuta do Edital da UPI V.tal (**doc. 1**), usando como justificativas pontos que extrapolam sua esfera de direitos e configuram verdadeiro abuso, em detrimento da recuperação judicial do Grupo Oi e prejuízo direto aos demais credores.

---

[1] "**5.2.2.2.1. Edital UPI V.tal**. O Edital UPI V.tal deverá ser revisado e aprovado, cumulativamente, pelos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I)."

[2] "**Credores Opção de Reestruturação I**": significa os Credores Quirografários que elegerem ser pagos por meio da Opção de Reestruturação I prevista na Cláusula 4.2.2."

[3] Credores titulares do Novo Financiamento – Credores Opção de Reestruturação I são aqueles Credores Quirografários que concederam Novo Financiamento à Oi.

2

 

## EVIDENTE ABUSO DOS CREDORES OPÇÃO DE REESTRUTURAÇÃO I

9.          Segundo os Credores Opção de Reestruturação I alegaram, a minuta do Edital UPI V.tal não teria previsto: **(i)** a opção de aquisição da UPI V.tal mediante <u>dação em pagamento de créditos de titularidade dos credores em favor dos quais foi constituída a garantia de alienação sobre as ações de emissão da V.tal – ou seja, eles mesmos</u> ("<u>Acervo V.tal</u>"); **(ii)** que propostas de aquisição por meio de pagamento que não seja à vista e/ou em dinheiro devam ser aprovadas pela Deliberação de Credores Opção de Reestruturação I; **(iii)** prazos e condições para a auditoria prévia no âmbito do processo competitivo; **(iv)** que o edital e qualquer processo para venda das ações da V.tal devem observar os termos do Instrumento de Alienação Fiduciária em Garantia das Ações da V.Tal e não podem limitar ou modificar quaisquer direitos nele previstos, nem tampouco os direitos previstos no Acordo entre Credores (*Intercreditor Agreement*), nos instrumentos relacionados às *Notes* Novo Financiamento e às *Notes* Roll-Up; **(v)** que o ajuste da participação da Oi e suas subsidiárias na V.tal, em razão de eventos de indenização pactuados no âmbito dos Acordos de Investimentos celebrados pela Oi em 1º de outubro de 2021 e 28 de fevereiro de 2025, estaria limitado até a data da alienação da UPI V.tal; **(vi)** que as Condições Mínimas para participação no processo competitivo poderiam ser alteradas a qualquer tempo, mediante Deliberação dos Credores Opção de Reestruturação I, e que os próprios Credores Opção de Reestruturação I estariam dispensados de cumprir tais Condições Mínimas para participação no processo competitivo, sob o argumento de que já teriam, de forma genérica e não comprovada, "alcançado essas condições"; e, ainda, **(vii)** que a homologação da proposta vencedora por esse MM. Juízo somente poderia ocorrer *após* o efetivo pagamento integral do preço de aquisição.

10.         Ocorre que, embora o Plano lhes assegure determinados direitos de supervisão, as "alterações" apresentadas pelos Credores Opção de Reestruturação I à minuta do edital não se limitam a apontar eventuais ajustes ou esclarecimentos pontuais, mas consubstanciam verdadeira tentativa de reabrir condições materiais da alienação da UPI V.tal, já expressamente definidas no Plano e aprovadas pela Assembleia Geral de Credores. Trata-se, portanto, de insurgência que extrapola os limites da prerrogativa de revisão prevista no Plano e passa a configurar verdadeiro abuso de direito.

11.         Especificamente quanto ao **item (i)**, o Plano é expresso ao estabelecer que o pagamento pela UPI V.tal deverá ocorrer **<u>à vista, em dinheiro, em moeda corrente</u>**



**nacional**, não admitindo — ao menos em um primeiro momento — a alienação do ativo mediante outras formas de contraprestação. Ressalte-se, ademais, que o Plano foi aprovado com essa redação pelos próprios Credores Opção de Reestruturação I, sem nenhuma ressalva:

> 5.2.2.2.3. **Preço Mínimo UPI V.tal**. O preço mínimo agregado para alienação da UPI V.tal a ser previsto no Edital UPI V.tal será o valor a ser pago à vista, em dinheiro, em moeda corrente nacional, de R$8.000.000.000,00 (oito bilhões de Reais) para a Oi ("Preço Mínimo UPI V.tal"), ressalvado que o Preço Mínimo UPI V.tal poderá ser proporcionalmente alterado para refletir eventual mudança no Acervo V.tal até a data de publicação do Edital UPI V.tal.

12.      Não por outra razão, no caso da UPI ClientCo, houve previsão expressa, no Plano, de formas alternativas de pagamento, faculdade que deliberadamente **não** foi estendida à UPI V.tal e não pode, agora, ser usada pelos Credores Opção de Reestruturação I como justificativa para rejeitar o edital. Veja-se a previsão sobre a UPI ClientCo:

> (i)    **Preço e Forma de Pagamento**: Para fins da Segunda Rodada de Alienação UPI ClientCo, não haverá preço mínimo para alienação da UPI ClientCo (ou das UPIs ClientCo, conforme aplicável), podendo ser aceitas propostas que prevejam quaisquer formas de pagamento ou uma combinação delas, incluindo (a) pagamento em dinheiro; (b) compensação, entrega, cancelamento, perdão ou qualquer outra medida semelhante para fins de implementação da respectiva transação, da integralidade ou parcela de Créditos Extraconcursais (incluindo juros e correção monetária) detidos por Credores do Novo Financiamento ou Terceiros Novo Financiamento e/ou suas Afiliadas, desde que (b.1) decorrentes de obrigações contratadas pela Oi e já devidamente prestadas ou finalizadas pelo respectivo proponente; e (b.2) reconhecidos pelas Recuperandas; e/ou (c) dação em pagamento de Ativos Permitidos ClientCo , os quais deverão estar livres e desembaraçados de qualquer Ônus.

13.      Sobre o tema, impõe-se, ainda, a necessária distinção entre regra e exceção. O Plano admite que, *após* a abertura das propostas, caso a Oi venha a receber oferta que envolva contrapartida diversa do pagamento em dinheiro e, ainda assim, entenda ser conveniente aceitá-la, tal aceitação somente poderá ocorrer mediante a aprovação dos Credores Opção de Reestruturação I. Essa faculdade excepcional, contudo, não autoriza — nem pressupõe — que o procedimento competitivo da UPI V.tal seja previamente estruturado ou balizado sob esse critério. A regra, expressamente estabelecida no Plano, é

4

 

a alienação mediante **pagamento à vista, em dinheiro, em moeda corrente nacional**.

14. Ou seja, se e somente se as Recuperandas decidirem aceitar eventual proposta que envolva outra forma de pagamento, é que tal condição deverá ser submetida à respectiva aprovação dos Credores Opção de Reestruturação I, sempre com a observância do direito dos Terceiros de Novo Financiamento ao recebimento de seus créditos com pagamento integral em dinheiro. E não, como pretendem estes credores, ser feita uma subversão dessa exceção, já na largada, em benefício imediato e direto deles.

15. Afinal, abrir a possibilidade de outras formas de pagamento, na contramão do quanto previsto no Plano, significa minar o processo competitivo e a tão almejada maximização dos valores de venda da UPI V.tal.

16. A conduta se agrava diante do evidente **benefício próprio almejado**, na medida em que os Credores Opção de Reestruturação I buscam utilizar **seus créditos como forma de aquisição da UPI V.tal**, em prejuízo da liquidez indispensável às Recuperandas e sem qualquer autorização do Plano, colocando em risco o pagamento dos demais credores, que dependem deste valor para amortização de seus créditos. Em essência, pretende-se introduzir, de forma oblíqua, verdadeiro pacto comissório disfarçado, levando, sem nada pagar, a garantia a eles outorgada.

17. Note-se que os Credores Opção de Reestruturação I não pretendem abrir o processo competitivo, de forma isonômica, a outras modalidades de compensação de crédito. Ao contrário: **buscam restringir tal "benefício", de utilização de créditos em pagamento, exclusivamente a si próprios, na qualidade de titulares da alienação fiduciária sobre o Acervo V.tal**.

18. O que se verifica, portanto, é um claro abuso de direito por parte dos Credores Opção de Reestruturação I, que, ignorando a Lei nº 11.101/2005 ("LFR"), extrapolam os limites do razoável, ao tentar impor condições distintas daquelas previstas no Plano e regularmente aprovadas pelos credores –– inclusive por eles mesmos, que aprovaram o Plano **sem** nenhuma ressalva.

19. No que se refere ao **item (ii)**, conforme já exposto, o Plano assegura às Recuperandas a faculdade de, caso identifiquem vantagem em proposta que não envolva pagamento em dinheiro, submetê-la à apreciação dos Credores Opção de Reestruturação I

5




e dos Terceiros – Novo Financiamento. Por ser exceção, essa hipótese não deverá ser prevista no edital e não segue os mesmos mecanismos de eventualmente recebidas em valores inferiores ao preço mínimo.

20.    O que os Credores Opção de Reestruturação I buscam é indevidamente equiparar situações juridicamente distintas, ao tentar incluir no mesmo regime das "Propostas Inferiores ao Preço Mínimo UPI V.tal" — submetidas a procedimento próprio e expressamente previsto no Plano — aquilo que denominaram de "Proposta Alternativa", a qual consiste, em realidade na utilização de seus próprios créditos como forma de pagamento pela UPI V.tal, mediante dação em pagamento. Como visto, tal pretensão é manifestamente incompatível com o Plano, que veda essa modalidade de contraprestação e exige, como regra, o pagamento à vista, em dinheiro, em moeda corrente nacional.

21.    Ressalte-se, também, que, caso eventual proposta com contrapartidas diversas seja apresentada pelos próprios Credores Opção de Reestruturação I, restaria caracterizado evidente **conflito de interesses**, na medida em que tais credores seriam, simultaneamente, proponentes da oferta e a instância deliberativa responsável por sua aprovação, o que compromete a imparcialidade do procedimento e a observância dos princípios da isonomia e da boa-fé objetiva.

22.    No que se refere ao **item (iii)**, a Oi estabeleceu de forma expressa o prazo e as condições aplicáveis à auditoria no contexto da alienação da UPI V.tal, tendo, inclusive, apresentado o Acordo de Confidencialidade, o Protocolo Antitruste e o Contrato de Compra e Venda para revisão dos Credores Opção de Reestruturação I, que integrarão os anexos do edital. A mera discordância desses critérios não deveria, por si só, barrar a publicação do edital.

23.    Em síntese, os Credores Opção de Reestruturação I pretendem: (a) a ampliação do prazo destinado à auditoria para 60 (sessenta) dias; e (b) a apresentação, pela Oi, de uma lista detalhada das informações e documentos que seriam disponibilizados na "Sala de Informação".

24.    Todavia, a Oi esclarece que não é possível anuir com a ampliação do prazo de auditoria para 60 (sessenta) dias, uma vez que tal extensão ultrapassaria o período de suspensão das obrigações extraconcursais, em um contexto no qual as Recuperandas atravessam situação financeira extremamente sensível e não dispõem de condições para

6




Tribunal de Justiça do Estado do Rio de Janeiro
Página
127814
Carimbado Eletronicamente

aguardar prazo tão dilatado. A postergação pretendida compromete a celeridade necessária à alienação do ativo, retira valor da operação e se mostra prejudicial a todos os envolvidos, inclusive aos próprios Credores Opção de Reestruturação I.

25.    Ressalte-se, ademais, que ativo significativamente mais complexo sob o ponto de vista de auditoria, como a UPI ClientCo, teve seu processo conduzido em 30 (trinta) dias. Destaca-se, ainda, que os próprios Credores Opção de Reestruturação I aprovaram o edital da UPI ClientCo sem apresentar qualquer ressalva quanto ao prazo, o que evidencia a desproporcionalidade da pretensão ora formulada. Tal pleito revela-se, ademais, alinhado a interesse particular desses credores, que buscam dilatar o cronograma do processo competitivo para viabilizar a utilização de seus próprios créditos na aquisição do ativo, em detrimento da celeridade necessária e do interesse coletivo da recuperação judicial.

26.    Assim, a Oi entende que 30 (trinta) dias, tal qual como os precedentes de sua própria recuperação judicial, são mais do que suficientes para a auditoria, estando em linha com a celeridade e urgência que o processo necessita.

27.    No que concerne à relação de documentos a serem disponibilizados na Sala de Informação, a Oi esclarece que parcela significativa dessas informações é de titularidade exclusiva da própria V.tal, razão pela qual não detém ingerência ou disponibilidade direta sobre tais documentos – fato este que é de amplo conhecimento dos Credores Opção de Reestruturação I.

28.    Ainda assim, a Oi informa que, nesta data, reiterou formalmente o pedido à V.tal para a disponibilização das informações pertinentes e envidará seus melhores esforços para fornecer aos potenciais interessados o conjunto mais completo possível de documentos, sem que, contudo, possa assumir garantia quanto à integralidade desse acervo. Afinal, para o Grupo Oi, não há qualquer interesse em esconder informações. Pelo contrário, as Recuperandas querem disponibilizar todas as informações que possuem, para aumentar o interesse – e valor – da aquisição da UPI.

29.    Já sobre o **item (iv)**, é evidente que a alienação da UPI V.tal não tem o condão de modificar os instrumentos validamente celebrados entre as Recuperandas e seus credores – e não há qualquer previsão nesse sentido na minuta do edital –, razão pela qual a pretendida reserva de direitos mostra-se desnecessária. Ainda assim, em espírito colaborativo, **a Oi informa que promoveu a inclusão da ressalva nos exatos termos**

7



**solicitados pelos Credores Opção de Reestruturação I.**

30.        Sobre o **item (v)**, os Credores Opção de Reestruturação I suprimiram do edital a ressalva indispensável incluída pelas Recuperandas no sentido de que a participação societária detida pela Oi e por suas subsidiárias na V.tal — atualmente correspondente a 27,26% — poderá sofrer alterações em decorrência de eventos de indenização expressamente previstos nos Acordos de Investimentos celebrados pela Oi em 1º.10.21 e 28.2.25. Em substituição, propuseram redação que, de forma indevida, sugere que tais direitos, válidos, eficazes e plenamente oponíveis, deixariam de produzir efeitos em razão da alienação judicial da UPI V.tal, interpretação que não encontra respaldo contratual ou legal e contraria o próprio Plano.

31.        Eventual ajuste ou renúncia a tais direitos depende única e exclusivamente da manifestação de vontade da V.tal, parte legítima dos referidos Acordos de Investimentos, não cabendo às Recuperandas negociá-los, condicioná-los ou suprimi-los em benefício dos Credores Opção de Reestruturação I. Caso o adquirente vencedor entenda oportuno discutir tais temas, deverá fazê-lo diretamente com a V.tal, em momento próprio, não podendo esta circunstância servir de pretexto para obstar a publicação do edital ou retardar o início do processo competitivo.

32.        Os Credores Opção de Reestruturação I, ao mesmo tempo em que buscam resguardar, de forma rigorosa, os direitos que detêm sobre garantias e instrumentos de dívida, adotam postura contraditória ao pretender afastar ou esvaziar direitos regularmente constituídos em favor de terceiros, plenamente conhecidos e anteriores, o que revela tratamento assimétrico e juridicamente inadmissível, que não pode ser acolhido pelas Recuperandas nem chancelado no âmbito desta recuperação judicial.

33.        No que se refere ao **item (vi)**, os Credores Opção de Reestruturação I visam extrapolar, de forma evidente, o direito de revisão que lhes foi conferido pelo Plano, pretendendo ampliá-lo a ponto de lhes atribuir verdadeiro poder discricionário absoluto sobre o procedimento competitivo, em detrimento da segurança jurídica e em flagrante violação aos princípios da isonomia, da impessoalidade, da proteção da confiança legítima, da razoabilidade e da proporcionalidade.

34.        Isso porque, como é basilar em qualquer processo competitivo de alienação de UPI, a existência de Condições Mínimas objetivas para qualificação dos interessados

8





Tribunal de Justiça do Estado do Rio de Janeiro
Página
127816
Carimbado Eletronicamente

constitui elemento essencial do certame. Tais requisitos asseguram previsibilidade aos credores, garantem igualdade de condições entre os potenciais participantes e conferem, em especial, às Recuperandas a necessária segurança de que o procedimento não será contaminado por atuações oportunistas ou desprovidas de capacidade econômica, financeira ou jurídica, o que poderia comprometer a própria credibilidade do processo.

35.        Não obstante tais premissas elementares, os Credores Opção de Reestruturação I propuseram, de forma unilateral, que: (a) as Condições Mínimas de participação no processo competitivo poderiam ser alteradas a qualquer tempo, mediante simples deliberação própria, ainda que em desconformidade com o edital e com o Plano; e (b) os próprios Credores Opção de Reestruturação I estariam dispensados de se submeter a tais Condições Mínimas, sob a alegação genérica e não comprovada de que já teriam se qualificado para participar do certame.

36.        A Oi não tem conhecimento de qualquer procedimento de qualificação previamente realizado por tais credores. Caso desejem participar do processo competitivo, deverão, assim como todos os demais interessados, apresentar a documentação exigida, aderir integralmente aos termos do edital e cumprir todas as Condições Mínimas estabelecidas, de forma isonômica e impessoal. Não é juridicamente admissível que se utilizem do direito de revisão do edital como mecanismo para se eximirem das regras mais basilares que regem a alienação judicial de UPIs.

37.        Ainda nesse contexto, no **item (vii)**, os Credores Opção de Reestruturação I pretenderam condicionar a homologação da proposta vencedora por este MM. Juízo ao prévio pagamento integral do preço de aquisição, subvertendo, aqui também, a lógica e a prática consolidada dos processos de venda judicial de UPIs.

38.        É incontroverso que a homologação da proposta vencedora antecede o fechamento da operação e o consequente pagamento do preço, especialmente porque a consumação do negócio está condicionada ao cumprimento de diversas condições precedentes, inclusive de natureza regulatória e contratual. Não há como exigir que o adquirente efetue o pagamento antes mesmo de ter a certeza jurídica de que sua proposta foi declarada vencedora do certame, razão pela qual causa estranheza que um ponto tão elementar e amplamente reconhecido tenha sido objeto de tentativa de modificação pelos referidos credores.

9




39.        Por fim, é necessário dizer que, de boa-fé, a Oi encaminhou aos Credores Opção de Reestruturação I a minuta-base do Contrato de Compra e Venda da UPI V.tal, que será anexada ao edital, ainda que não tivesse nenhuma obrigação pelo Plano.

40.        Entretanto, na linha do quanto narrado acima, tais credores, também nesse documento, tentam ampliar indevidamente seus direitos, mediante a inserção de previsões inaceitáveis, como a exigência de sua aprovação para qualquer alteração da minuta contratual — o que não se sustenta, uma vez que o contrato deverá ser livremente negociado entre vendedor e comprador, não detendo os Credores Opção de Reestruturação I qualquer prerrogativa para intervir ou participar dessas negociações.

41.        Apesar disso, as Recuperandas aceitaram de boa-fé quase a integralidade das alterações por eles solicitadas, suprimindo apenas aquilo que era manifestamente abusivo.

42.        Portanto, como demonstrado ao longo desta manifestação, a minuta do edital para alienação da UPI V.tal observa estritamente os termos do Plano, tal como aprovado pela assembleia geral de credores, não havendo qualquer inovação, supressão ou modificação das regras pactuadas.

43.        A rejeição apresentada pelos Credores Opção de Reestruturação I não se funda em descumprimento do Plano, mas em pretensão de impor condições não aprovadas pela coletividade de credores, com nítido desvio de finalidade, benefício próprio e em prejuízo ao regular andamento da recuperação judicial.

44.        A tentativa de subordinar o procedimento competitivo a interesses particulares, em detrimento da liquidez necessária às Recuperandas e da preservação da empresa, configura exercício abusivo de direito (art. 187 do Código Civil) e afronta direta ao artigo 47 da LRF, colocando em risco a efetividade das medidas de soerguimento previstas no Plano.

45.        Diante desse cenário, mostra-se imprescindível a intervenção deste MM. Juízo para assegurar o cumprimento do Plano, afastar condutas abusivas dos Credores Opção de Reestruturação I e viabilizar o imediato início do processo competitivo de alienação da UPI V.tal, medida essencial para o êxito da recuperação judicial do Grupo Oi.

 

## PEDIDO

46.         Diante do exposto, o Grupo Oi requer seja:

(a)         determinada a publicação do anexo edital da UPI V.tal, com o consequente início do processo competitivo para a sua alienação, reconhecendo-se o abuso de direito praticado pelos Credores Opção de Reestruturação I, ao condicionarem a aprovação do edital à inclusão de previsão que lhes permita, na qualidade de titulares de alienação fiduciária sobre as ações da V.tal, oferecer seus próprios créditos como forma de pagamento pelo ativo, em clara desconformidade com o Plano, que exige pagamento à vista, em dinheiro; e

(b)         designada, por conseguinte, a Audiência Propostas UPI V.tal para 30 (trinta) dias contados da data da publicação do edital, para abertura das propostas fechadas de aquisição da UPI V.tal.

47.         Por fim, as Recuperandas informam que estão acostando na presente manifestação a versão final, sem marcas, do edital e de todos os seus anexos (**doc. 1**), bem como as versões destes documentos com marcas de revisões, as quais representam as alterações feitas pelo Grupo Oi nas versões anteriormente comentadas pelos mencionados credores (**doc. 2**).

Nestes termos
P. deferimento.
Rio de Janeiro, 28 de janeiro de 2026.


Luis Felipe Salomão Filho
OAB/RJ 234.563

Marcos Pitanga Ferreira
OAB/RJ 144.825

Bruno Rezende
(Na qualidade de Gestor Judicial
das Recuperandas)
OAB/RJ 124.405

Rodrigo Mendonça Raposo
OAB/RJ 154.448

Thiago Peixoto Alves
OAB/RJ 155.282

Marcela Melichar
OAB/RJ 189.833



11

**Exhibit 2**

January 28 RJ Court Decision

2

State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

**Fls.**

**Case: 0090940-03.2023.8.19.0001**

# Electronic Process

Class/Subject: Judicial Reorganization - Creditors' Contest / Judicial Reorganization and Bankruptcy

Author: OI S.A.
Author: PORTUGAL TELECOM INTERNATIONATIONAL FINANCE B.V.
Author: OI BRASIL HOLDINGS COOPERATIEF U.A.
Judicial Administrator: WALD ADMINISTRAÇÃO DE FALÊNCIAS E EMPRESAS EM ADMINISTRAÇÃO JUDICIAL LTDA
Judicial Administrator: PRESERVE JUDICIAL ADMINISTRATION, EXPERTISE AND CONSULTANCY EMPRESARIAL LTDA
Interested party: BANCO BTG PACTUAL S A
Interested party: VITAL S/A
Interested party: LIGGA TELECOMUNICAÇÕES S.A

_____

On this date, I make the final records to the MM. Dr. Judge
Simone Gastesi Chevrand

On 28/01/2026

## Decision

Case No. 0090940-03.2023.8.19.0001 (DCP) ? ?
? ? ?

Since the decision of ID 126653, numerous petitions have been directed to this process, which I will now face.

I  -  QUALIFICATIONS/INDICATIONS  OF  ACCOUNTS  FOR DEPOSITS/OBJECTIONS/SIMILAR:

ORDER: They should be unraveled, like the others that are irregularly addressed to this process. They are: 126762, 127113, 127197, 127248, 127265, 127325, 127339, 127373, 127391, 127408, 127422, 127434, 127450, 127479, 127541, 127541).

110 SIMONEGASTESI



State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

II    - ID 126670: FENATTEL's petition:

ORDER: Nothing to provide, since measures related to the subsidiaries SEREDE and TAHTO must be pursued at their own headquarters. This process is already excessively voluminous and contains a huge number of issues, and the entry of people who do not participate directly in it, notably to postulate in favor of those who are not parties, only compromises its development to the detriment of the parties themselves.

III   - ID 126699: petition by TELOKEN ADVOGADOS:

ORDER: In addition to being very difficult to understand what is contained in the petition, I do not see legitimacy for the petitioner to express his opinion on proposals from the Judicial Administration. If he is a creditor of the debtor, duly qualified, he must apply at his own headquarters. Nothing to provide.

IV   - ID 126734: ENERGISA Petition:

ORDER: The Judicial Administration.

V    - ID 126740: petition of the FEDERAL UNION:

ORDER: Clarify the Union, pointing out the id of the reiterated manifestation.

VI   - ID 126742: petition by PADIS MATTAR ADVOGADOS:

ORDER: The manifested resignation is observed.

VII  - ID 126840: petition of the Judicial Administration requesting authorization for the sale of assets shared with MILETO, for the amount of R$1,000.00, in order to comply with the commitment inserted in clause 2.2.2 of the SPA.

ORDER: After the Public Prosecutor's Office was consulted, there was no express statement on the point. Furthermore, what is required by the AJ is in execution of acts consequent to the sale of pay TV to MILETO, a sale resulting from a court decision that ratified it. I therefore grant the defendant.

VIII - ID 127032: ENERGISA petition:

ORDER: The Judicial Administration.

IX   - ID 127035: BTG petition:

ORDER: the Judicial Administration and the Public Prosecutor's Office.



110 SIMONEGASTESI

State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

X   - ID 127076: petition of AMERICAN TOWER DO BRASIL: asks for the conclusion of a real estate purchase and sale deal:

ORDER: The Judicial Administration and the Public Prosecutor's Office.

XI  - ID 127171: petition of BRUNO GALVÃO SOUZA DE PINTO REZENDE, Judicial Administrator, requesting measures to exclude an appointment against him due to debts of the Oi Group:

ORDER: The documents supporting the petition show that notes were made against Mr. Bruno Rezende as a result of debts owed by the Oi Group.

It is completely improper to hold the Group's manager personally liable for the payment of debts of the debtors. Thus, I FULLY REJECT the defendant in the petition and determine the immediate cancellation of the protests made (listed in items "b", "c" and "d" of the petition), and a period of 24 hours is set for the desideratum, under penalty of a fine by this Court. It is worth the gift as a warrant.

XII  - ID 127205: petition of UMB Bank, N.A.: notice of interposition of interlocutory appeal against the chapter of the decision that approved the proposal for fees presented by the Judicial Administration, in order to carry out the exercise of a retraction judgment.

I analyze this petition simultaneously with the ministerial promotion of ID 127301 (Ids 127305, 127309, 127313, 127317, 127321), opinion of the PUBLIC PROSECUTOR's Office, since both turn against the topic of the previous decision in the point that approved the fee proposal presented by the Judicial Administrator and Manager:

ORDER:

The Public Prosecutor's Office alleges that it did not agree with the fee proposal presented by the AJ because it was silent about it in an opinion issued after the AJ's petition was added to the records, as it would not have been open to express its opinion on the matter. It says that the fixation should be "annulled" and another decision rendered, in attention to reasonableness and proportionality.

The aggravating factor, UMB, argues that the fees set by the AJ are excessive, much higher than those arbitrated in other judicial reorganizations/bankruptcies, such as Light, Samarco and Americanas, and that 5% on everything that will be paid to creditors would result in the incidence of 5% on R$10 billion (bankruptcy liabilities already novated) and on R$7 billion (non-bankruptcy liabilities). leading to a potential remuneration of R$850 million, to the detriment of the payment of the debtor's creditors.

Well.

As for the one deduced by the Public Prosecutor's Office, I have that once the body is given a view to manifest itself in the process, it is allowed to talk about everything contained since its last manifestation. Even more so when it comes to a process of such great proportions as the present. Therefore, in principle, his silence regarding a certain piece added in the interregnum leads to the conclusion that he has tacit consent to it.



State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

However, in view of the resignation presented in his last promotion, I receive it as a motion for clarification, in order to make unquestionable his ability to turn against the decision approving fees through appeal, if he chooses to do so.

I then analyze both documents together, in view of the return of the matter to this Court, in the light of the arguments now explained. In any case, I have to say that they do not shake the decision handed down.

I recall, at the outset, that the present judicial reorganization cannot be compared to the others pointed out by the aggravating factor. Not only because it is much larger than them - the largest in Latin America, nor because of its very high degree of complexity or any other differentiating factor. But by a peculiarity that affects the judicial administration here, which does not find any precedent.

It is well known that the legislator took care to establish parameters for setting the fees of the judicial administrator in judicial reorganizations and bankruptcies, being seconded by the CNJ, which issued administrative and guiding rules on the subject.

The legislator thus established for the two different hypotheses covered by Law 11,101/2005: in the context of judicial reorganization, fees of up to 5% of the amount due to creditors; in bankruptcy, fees of up to 5% of the value of the sale of the assets.

In common, it established as a basis for calculation two objective parameters (amount due to creditors or value of the sale of the bankrupt's assets), which are independent of any specific action taken by the appointed judicial administrator.

Hence the rule is guided by recommendations from the CNJ that take into account the extent of the work to be performed, expertise, etc.

And these are the rules applied daily by the courts with business competence throughout the country, when arbitrating the fees of judicial administrators.

In the present case, they were also involved, keeping their peculiarities, for which the aggravating factor does not seem to have been addressed.

This Court converted the judicial reorganization of the Oi Group into bankruptcy and appointed a judicial administrator to proceed: (i) the orderly liquidation of assets; (ii) the management of the heart of the company responsible for the execution of public contracts underlying public services essential to the nation (bankruptcy kept in activity for this purpose).

Interlocutory appeals were filed by creditors ITAÚ and UNIBANCO, and they were granted suspensive effect to return the process to the judicial reorganization regime, by 2 judicial administrators, and PRESERVA AÇÃO, in the person of Dr. Bruno Rezende, was also entrusted with the management of the company and, moreover, the liquidation of the company's remaining assets.

In the course of these same interlocutory appeals, the suspension of bankruptcy and non-bankruptcy obligations was also determined - for another 90 days, according to a recent decision and, also, a reformed decision of this court that had determined the call of creditors for the election of new directors (before the resumption of the execution of the judicial reorganization plan approved in 2024).

In other words, what we now have is that this specific judicial administrator, PRESERVES ACTION, simultaneously exercises the functions of (i) judicial administrator in resumed judicial



State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

reorganization; (ii) judicial administrator in liquidation of assets of the Oi group (activity equivalent to that of AJ in the bankruptcy regime); and (iii) company manager.

The legislator failed to foresee such a situation, which is concrete here. However, this does not remove the duty of resolving it from the court; And this is what has been done.

If the legislator established a percentage of up to 5% for a single activity (judicial administration of judicial reorganization or bankruptcy), there is nothing more reasonable and proportional than to adopt the maximum legal threshold in this situation in which the judicial administration accumulates both functions, in addition to a third one, which is that of manager of a huge company.

It should be noted that the accumulation of functions did not lead to the accumulation of remunerations, but to their unified fixation, dosed in consideration of the vast extension of the work attributed to the administrator (RJ and liquidation) and manager, which considers this Court to comply with the CNJ's guidance in this regard.

On the other hand, the calculation made by the aggravating factor is fanciful. He adopted as the basis for calculating this 5% the total of the estimated bankruptcy and extra-bankruptcy liabilities. Nothing more simple, perhaps reckless.

When approving the proposal presented by the AJ, it was established here that the percentage of 5% will be levied on what is actually paid to creditors.

Now, it is undisputed - as recognized by the 1st and 2nd instances - that the group does not have cash (according to reports from the judicial administration, the watchdog, numerous news of contractual breaches in the records) and that its remaining assets are, in almost its entirety, given as collateral for loans received from bondholders, as pointed out in the approved judicial reorganization plan.

Therefore, the receipt of fees by the judicial administrator and manager will not depend on those objective bases to which nothing has been contributed (extent of the debt of the debtors, assets of the debtors). On the contrary, his fees will depend exclusively on his performance as a manager who will undertake the best practices to raise amounts that, then, once destined to creditors, will form the basis for calculating his remuneration.

The solution, innovative, as is recurrently necessary to give course to the present process, meets the criteria of reasonableness and proportionality, encourages the manager to perform his functions with maximum excellence, because his own fees will depend exclusively on his performance, it is within the legal parameter (despite the law of provided remuneration for single performance, while here there are three accumulated functions,  let it be said again).

The situation, thus posed, shows both the reasonableness of the percentage and the adequacy of the calculation basis set, as well as invalidating the arguments of the aggravating factor, which are not true. Unfortunately, the reality of the records shows that there is no minimum probability of all debts being met, no matter how great the commitment of the judicial manager is.

For the foregoing, I fail to exercise a positive judgment of retraction (regarding the interlocutory appeal filed) and reject the Public Prosecutor's Office's request, received as a motion for clarification.

A copy of this is sent to the at. Reporting Judge, reporting that no positive judgment of retraction was exercised.



110 SIMONEGASTESI

State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

Finally, I reject the request - made by the Public Prosecutor's Office - to call an EGM for the election of the new management of the reorganization company, by the creditors, since, as already clarified above, this was previously determined by this Court but was rejected by the 2nd instance. Thus, this Court lacks competence to assess the claim.

XIII  - ID 127402: official letter of d. Judgment of the 1st Labor Court of Pato Branco:

ORDER: The Judicial Administration.

XIV  - ID 127419: Petition by AMERICAN TOWER: asks for clarification.

ORDER: answered, according to ID 127464.

XV   - 127466 ID: HYDAC TECHNOLOGY Petition:

ORDER: nothing to provide, given that publications in this process are made in a general way.

XVI  - ID 127474: petition by the DEBTOR requesting authorization for the sale of non-essential assets:

ORDER: The Judicial Administration, the Manager and the Public Prosecutor's Office. I hereby authorize the safeguarding of a pen drive with information brought to the Court Registry Office, to which the people whose subpoenas have been determined at this time will have access.

XVII - ID 127488: Petition by ENERGISA SERGIPE:

ORDER: Nothing to provide, for now. Certainly, the creditor has knowledge of his credit and also the ability to participate, or not, in the reverse auction that has been initiated.

Therefore, we await the conclusion of the procedure.

XVIII   - ID 127594: Petition of COMPANHIA DE ELETRICIDADE DO ESTADO DA BAHIA - NEOENERGIA CELPE and OTHERS - opposes motion for clarification in view of the decision that authorized the holding of a reverse auction:

ORDER: In addition to not even glimpsing legitimacy to the appellant, the fact is that there is no defect in the embargoed decision, but the purpose of inserting conditions of its own interest in the bidding process. Furthermore, as the appellant maintains, it consists of the faculty that assists him to participate, or not, in the auction.

I therefore cease to hear the motions.

XIX - ID 127603: Petition of UFV MG II EQUIPAMENTOS FOTOVOLTAICOS LTDA. and OTHERS: requests the suspension of the reverse auction procedure due to the alleged absence of a list of extra-bankruptcy credits recognized by the Oi Group:



110 SIMONEGASTESI

State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

ORDER: In addition to the difficult verification of the legitimacy of the petitioners - they do not even allege, much less prove to be creditors of the debtor, the fact is that participating in the reverse auction is a faculty attributed to creditors.

Nothing to provide, therefore.

Wait for the procedure to be completed.

XX   - ID 127768: Petition of NTT BRASIL COMÉRCIO E SERVIÇOS - requests acknowledgment from the Judicial Administration and declaration that any difference resulting from the auction does not result in waiver of credit:

ORDER: The interested party must express its interest directly to the judicial management and administration, and it is certain that it is allowed to participate, or not, in the reverse auction.

Nothing to provide, therefore.

Wait for the procedure to be completed.

XXI  - ID 127804: OI petition - requests issuance of certificate:

ORDER: Once the pertinent costs have been paid, a certificate is issued.

XXII - ID 127808: OI Petition - asks for approval of the public notice for the sale of UPI V.Tal:

ORDER: in the course of processing AI No. 0096877-26.2025.8.19.0000, the eminent
Des. The Reporting Judge attributed to the judicial management the orderly liquidation of the assets of the reorganization company, among which is the participation in V. Tal. (p. 580 ff. of AI).

In compliance with the superior decision, and in view of the short deadline set therein for the conclusion of similar procedures (in the same decision extended for another 90 days), I grant the request by the Debtor.

Publish the notice.

I designate a hearing for the opening of proposals for March 5, 2026, at 3:00 pm. Summons everyone.

XXIII    - ID 127960 - petition of AC ZANELLA CONSTRUTORA E INCORPORADORA - requests authorization for the sale of property with write-off of unavailability:

ORDER: The Reorganization Company, the Judicial Administration and the Public Prosecutor's Office.

Rio de Janeiro, 28/01/2026.

**Simone Gastesi Chevrand - Chief Judge**



110 SIMONEGASTESI

State of Rio de Janeiro Judiciary
Court of Justice
Capital District
Registry Office of the 7th Business Court
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185 e-mail:
cap07vemp@tjrj.jus.br

_____

Records received from MM. Dr. Judge

Simone Gastesi Chevrand

In _____/_____/_____

Authentication Code: **4FBQ. ARIH. Q7XC. PDD4**

This code can be checked at: www.tjrj.jus.br – Services – Document validation



110 SIMONEGASTESI



Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

Fls.

**Processo: 0090940-03.2023.8.19.0001**

# Processo Eletrônico

Classe/Assunto: Recuperação Judicial - Concurso de Credores / Recuperação Judicial e Falência

Autor: OI S.A.
Autor: PORTUGAL TELECOM INTERNATIONATIONAL FINANCE B.V.
Autor: OI BRASIL HOLDINGS COOPERATIEF U.A.
Administrador Judicial: WALD ADMINISTRAÇÃO DE FALÊNCIAS E EMPRESAS EM ADMINISTRAÇÃO JUDICIAL LTDA
Administrador Judicial: PRESERVAR ADMINISTRACAO JUDICIAL, PERICIA E CONSULTORIA EMPRESARIAL LTDA
Interessado: BANCO BTG PACTUAL S A
Interessado: VITAL S/A
Interessado: LIGGA TELECOMUNICAÇÕES S.A

---

Nesta data, faço os autos conclusos ao MM. Dr. Juiz
Simone Gastesi Chevrand

Em 28/01/2026

## Decisão

Processo nº 0090940-03.2023.8.19.0001 (DCP)
 ? ? ? ? ?

Desde a decisão de ID 126653, foram direcionadas a este processo inúmeras petições, as quais passo a enfrentar.

I - HABILITAÇÕES/ INDICAÇÕES DE CONTAS PARA DEPÓSITOS/ IMPUGNAÇÕES / ASSEMELHADOS:

DESPACHO: Desentranhem-se-as, a exemplo das demais que são irregularmente endereçadas a este processo. São elas: 126762, 127113, 127197, 127248, 127265, 127325, 127339, 127373, 127391, 127408, 127422, 127434, 127450, 127479, 127541, 127541).

II - ID 126670: petição de FENATTEL:

DESPACHO: Nada a prover, vez que providências relacionadas as subsidiárias SEREDE e TAHTO devem ser perseguidas em sede própria. Este processo já é excessivamente volumoso e encerra enormidade de questões, e o ingresso de pessoas que dele não participam diretamente, notadamente para postular em prol de quem não é parte, apenas

110                                               SIMONEGASTESI





Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail: cap07vemp@tjrj.jus.br

compromete seu desenvolvimento em prejuízo das partes em si.


III - ID 126699: petição de TELOKEN ADVOGADOS:

DESPACHO: Além de ser muito difícil compreender o contido na peça, não vislumbro legitimidade ao peticionante para manifestar-se sobre propostas da Administração judicial. Acaso seja credor da recuperanda, devidamente habilitado, deve postular em sede própria. Nada a prover.


IV - ID 126734: Petição de ENERGISA:

DESPACHO: A Administração Judicial.


V - ID 126740: petição da UNIÃO FEDERAL:

DESPACHO: Esclareça a União, apontando o id de manifestação reiterada.


VI - ID 126742: petição de PADIS MATTAR ADVOGADOS:

DESPACHO: Observe-se a renúncia manifestada.


VII - ID 126840: petição da Administração Judicial pedindo autorização para alienação de ativos compartilhados à MILETO, pelo valor de R$1.000,00, a fim de dar cumprimento ao compromisso inserto na cláusula 2.2.2 do SPA.

DESPACHO: Dada vista ao Ministério Público, não houve manifestação expressa acerca do ponto. Outrossim, o requerido pela AJ importa em execução de atos consequentes à venda da TV por assinatura à MILETO, venda esta decorrente de decisão judicial que a homologou. Defiro, pois, o requerido.


VIII - ID 127032: petição de ENERGISA:

DESPACHO: A Administração Judicial.


IX - ID 127035: petição de BTG:

DESPACHO: a Administração Judicial e ao Ministério Público.


X - ID 127076: petição de AMERICAN TOWER DO BRASIL: pede conclusão de negócio de compra e venda de imóveis:

DESPACHO: A Administração Judicial e ao Ministério Público.


XI - ID 127171: petição de BRUNO GALVÃO SOUZA DE PINTO REZENDE, Administrador Judicial, pedindo providências para exclusão de apontamento em seu desfavor em razão de débitos do Grupo Oi:

DESPACHO: Os documentos que instruem a petição demonstram que foram promovidos apontamentos em desfavor do sr. Bruno Rezende em decorrência de débitos do Grupo Oi.

110                                        SIMONEGASTESI



 

Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail: cap07vemp@tjrj.jus.br

É de todo indevido proceder à responsabilização pessoal do gestor do Grupo para pagamento de débitos das recuperandas. Assim, DEFIRO integralmente o requerido na petição e determino o imediato cancelamento dos protestos realizados (relacionados nos itens "b", "c" e "d" da petição), ficando fixado desde já prazo de 24 horas para o desiderato, sob pena de cominação de multa por este Juízo. Vale a presente como mandado.

XII - ID 127205: petição de UMB Bank, N.A.: noticia interposição de agravo de instrumento em face de capítulo de decisão que homologou proposta de honorários apresentada pela Administração Judicial, a fim de realização de exercício de juízo de retratação.

Analiso esta petição simultaneamente à promoção ministerial de ID 127301 (Ids 127305, 127309, 127313, 127317, 127321), parecer do MINISTÉRIO PÚBLICO, porquanto ambos se voltam contra o tópico de decisão anterior no ponto que homologou proposta de honorários apresentada pelo Administrador Judicial e Gestor:

DESPACHO:

O d. órgão do Ministério Público alega não ter concordado com proposta de honorários apresentada pelo AJ em razão de ter sobre ela silenciado em parecer emitido após juntada aos autos da petição do AJ, pois não lhe teria sido aberta vista para manifestar-se a respeito. Diz que a fixação deve ser "anulada" e outra decisão proferida, em atenção à razoabilidade e à proporcionalidade.

O agravante, UMB, defende que os honorários da AJ fixados são excessivos, muito superiores aos arbitrados em outras recuperações judiciais/falências, como da Light, Samarco e Americanas, e que 5% sobre tudo que vier a ser pago aos credores importaria na incidência de 5% sobre R$10 bilhões (passivo concursal já novado) e sobre R$7 bilhões (passivo extraconcursal inadimplido), levando a remuneração potencial de R$850 milhões, em prejuízo do pagamento dos credores da recuperanda.

Pois bem.

Quanto a deduzido pelo Ministério Público, tenho que uma vez dada vista ao órgão para manifestação no processo, a ele é facultado falar sobre todo o contido desde sua última manifestação. Ainda mais quando se trata de um processo de tão grandes proporções como o presente. Logo, em princípio, seu silêncio quanto a determinada peça juntada no interregno leva a concluir no sentido da sua anuência tácita a respeito.

Contudo, ante irresignação apresentada em sua última promoção, recebo-a como embargos de declaração, de modo a tornar inquestionável sua faculdade de voltar-se contra a decisão homologatória de honorários através de recurso, caso assim opte por fazer.

Analiso, então, ambas as peças conjuntamente, diante da devolução da questão a este Juízo, à luz dos argumentos agora expendidos. De toda sorte, tenho que eles não abalam a decisão proferida.

Relembro, de início, que a presente recuperação judicial não pode ser comparada às outras apontadas pelo agravante. Não só por ser muito maior do que elas - a maior da América Latina, nem por seu elevadíssimo grau de complexidade ou qualquer outro fator diferenciador. Mas por peculiaridade que aqui atinge a administração judicial a qual não encontra qualquer precedente.

Bem se sabe que o legislador cuidou de estabelecer parâmetros para fixação de honorários do administrador judicial em recuperações judiciais e falências, sendo secundado pelo CNJ que editou normas administrativas e orientadoras do assunto.

110                                         SIMONEGASTESI





Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail: cap07vemp@tjrj.jus.br

O legislador assim estabeleceu para as duas distintas hipóteses versadas na Lei 11.101/2005: em sede de recuperação judicial, honorários de até 5% sobre o valor devido aos credores; em sede de falência, honorários de até 5% sobre o valor da venda dos bens.

Em comum, fixou como base de cálculo dois parâmetros objetivos (valor devido aos credores ou valor da venda dos bens do falido), os quais independem de qualquer atuação específica adotada pelo administrador judicial nomeado.

Daí a norma ser orientada por recomendações do CNJ que tomam em conta extensão do labor a ser executado, expertise etc.

E são estas as regras aplicadas diariamente pelos juízos com competência empresarial de todo o país, por ocasião do arbitramento de honorários de administradores judiciais.

No presente processo, elas também o foram, guardadas suas peculiaridades,   para as quais parece não ter atentado o agravante.

Este Juízo convolou a recuperação judicial do Grupo Oi em falência e nomeou administrador judicial para proceder: (i) à liquidação ordenada de bens; (ii) à gestão do coração da empresa responsável pela execução de contratos públicos subjacentes a serviços públicos essenciais à nação (falido mantido em atividade para esse desiderato).

Interpostos agravos de instrumento pelos credores ITAÚ e UNIBANCO, a eles foi deferido efeito suspensivo para se retornar o processo ao regime da recuperação judicial, por 2 administradores judiciais, sendo que à PRESERVA AÇÃO, na pessoa do dr. Bruno Rezende, foi também incumbida a gestão da empresa e, mais, a liquidação dos ativos remanescentes da empresa.

No curso desses mesmos agravos de instrumento, foi também determinada suspensão das obrigações concursais e extraconcursais - por mais 90 dias, conforme recente decisão e, ainda, reformada decisão deste juízo que havia determinado a convocação de credores para eleição de novos diretores (ante restabelecimento da execução do plano de recuperação judicial homologado em 2024).

Ou seja, o que agora se tem é que esse administrador judicial específico, PRESERVA AÇÃO, exerce, simultaneamente, as funções de (i) administrador judicial em recuperação judicial retomada; (ii) administrador judicial em liquidação de ativos do grupo Oi (atividade equiparada a da AJ no regime da falência); e (iii) gestor da empresa.

Deixou o legislador de prever tal situação que, aqui, se verifica de concreto. Contudo, isto não afasta do juízo o dever de solucioná-la; e é isto que foi feito.

Se o legislador estabeleceu percentual de até 5% para uma única atividade (administração judicial de recuperação judicial ou de falência), nada mais razoável e proporcional que se adote o patamar máximo legal nesta situação em que a administração judicial acumula ambas as funções, além de uma terceira que é a de gestor de uma enorme empresa.

Veja-se que a acumulação de funções não levou à acumulação de remunerações, mas à sua fixação unificada, dosada em consideração à vasta extensão ao labor atribuído ao administrador (de RJ e de liquidação) e gestor, o que reputa este Juízo atender à orientação do CNJ a respeito.

Por outro lado, é fantasioso o cálculo elaborado pelo agravante. Ele adotou como base de cálculo desses 5% a totalidade dos estimados passivos concursal e extraconcursal. Nada mais singelo, quiçá temerário.

Ao homologar a proposta apresentada pelo AJ, aqui se fixou que o percentual de 5% incidirá sobre o que for efetivamente pago aos credores.

110                                                    SIMONEGASTESI



Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

Ora, é inconteste - porquanto reconhecido pelas 1ª e 2ª instâncias - que o grupo não possui caixa (conforme laudos da administração judicial, do watchdog, inúmeras notícias de descumprimentos contratuais nos autos) e que seu patrimônio remanescente encontra-se, em quase sua totalidade, dado em garantia de empréstimos recebidos de bondholders, conforme pontuado no plano de recuperação judicial homologado.

Em sendo assim, o recebimento de honorários pelo administrador judicial e gestor dependerá não daquelas bases objetivas para as quais nada contribuiu (extensão do débito das recuperandas, patrimônio das recuperandas). Ao contrário, seus honorários dependerão exclusivamente do seu desempenho como gestor que venha a empreender as melhores práticas para angariar valores que, então, uma vez destinados aos credores, formarão a base de cálculo de sua remuneração.

A solução, inovadora, como recorrentemente se faz necessário para dar curso ao presente processo, atende aos critérios de razoabilidade e proporcionalidade, estimula o gestor a realizar com máxima excelência suas funções, pois seus próprios honorários dependerão exclusivamente de sua atuação, está dentro do parâmetro legal (apesar da lei de previsto remuneração para atuação única, enquanto aqui se tem três funções acumuladas, diga-se novamente).

A situação, assim posta, evidencia tanto a razoabilidade do percentual e adequação da base de cálculo fixadas, como infirma os argumentos do agravante, que não são verídicos. Infelizmente, a realidade dos autos demonstra que não há mínima probabilidade de todos os débitos serem atendidos, por maior que seja o empenho do gestor judicial.

Pelo exposto, deixo de exercer juízo positivo de retratação (quanto ao agravo de instrumento interposto) e rejeito a peça do Ministério Público, recebida como embargos de declaração.

Encaminhe-se cópia da presente ao em. Desembargador Relator, noticiando que não foi exercido juízo positivo de retratação.

Por fim, indefiro requerimento - feito pelo MP - de convocação de AGE para eleição de nova gestão da recuperanda, pelos credores, porquanto, como já esclarecido acima, isto foi anteriormente determinado por este Juízo mas foi afastado pela e. 2ª instância. De modo que falece a este Juízo competência para apreciar o pleito.

    XIII - ID 127402: ofício do d. Juízo da 1ª Vara do Trabalho de Pato Branco:

DESPACHO: A Administração Judicial.

    XIV - ID 127419: Petição de AMERICAN TOWER: pede esclarecimentos.

DESPACHO: respondido, conforme ID 127464.

    XV - ID 127466: petição de HYDAC TECNOLOGIA:

DESPACHO: nada a prover, sendo certo que publicações neste processo são feitas de forma geral.

    XVI - ID 127474: petição da RECUPERANDA pedindo autorização para alienação de ativos não essenciais:

DESPACHO: A Administração Judicial, ao Gestor e ao Ministério Público. Desde já autorizo

110                                                            SIMONEGASTESI





Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

acautelamento de pen drive com informações trazido ao Cartório da Vara, ao qual terão acesso as pessoas cujas intimações se determinou neste momento.

XVII - ID 127488: Petição de ENERGISA SERGIPE:

DESPACHO: Nada a prover, por hora. Decerto possui o credor conhecimento de seu crédito e, ainda, faculdade de participar, ou não, do leilão reverso deflagrado.

Aguarde-se, pois, conclusão do procedimento.

XVIII - ID 127594: Petição de COMPANHIA DE ELETRICIDADE DO ESTADO DA BAHIA - NEOENERGIA CELPE e OUTRAS - opõe embargos de declaração diante da decisão que autorizou realização de leilão reverso:

DESPACHO: Além de sequer vislumbrar legitimidade ao embargante, fato é que não há qualquer vício na decisão embargada, senão o propósito de nela inserir condições de próprio interesse no certame. Ademais, como sustenta o embargante, consiste em faculdade que lhe assiste participar, ou não, do leilão.

Deixo, pois, de conhecer dos embargos.

XIX - ID 127603: Petição de UFV MG II EQUIPAMENTOS FOTOVOLTAICOS LTDA. e OUTROS: pede a suspensão do procedimento de leilão reverso por suposta ausência de relação de créditos extraconcursais reconhecidos pelo Grupo Oi:

DESPACHO: Para além da difícil constatação de legitimidade dos peticionantes - sequer alegam, nem muito menos comprovam serem credores da recuperanda, fato é que participar do leilão reverso é uma faculdade atribuída aos credores.

Nada a prover, portanto.

Aguarde-se a conclusão do procedimento.

XX - ID 127768: Petição de NTT BRASIL COMÉRCIO E SERVIÇOS - pede ciência a Administração Judicial e declaração de que eventual diferença decorrente do leilão não importa em renúncia ao crédito:

DESPACHO: Deve a interessada manifestar seu interesse diretamente a gestão e administração judicial, sendo certo que lhe é facultado participar, ou não, do leilão reverso.

Nada a prover, portanto.

Aguarde-se a conclusão do procedimento.

XXI - ID 127804: petição da OI - pede emissão de certidão:

DESPACHO: Recolhidas as custas pertinentes, expeça-se certidão.

XXII - ID 127808: Petição da OI - pede aprovação de edital para alienação da UPI V.Tal:

DESPACHO: no curso do processamento do AI nº 0096877-26.2025.8.19.0000, a eminente Des. Relatora atribuiu à gestão judicial a liquidação ordenada de ativos da recuperanda, dentre





Estado do Rio de Janeiro Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

os quais se insere a participação na V. Tal. (fls. 580 ss. do AI).

Em cumprimento à r. decisão superior, e atenta ao exíguo prazo na mesma fixada para conclusão de semelhantes procedimentos (na mesma decisão prorrogado por mais 90 dias), defiro o requerido pela Recuperanda.

Publique-se o edital.

Designo audiência para abertura de propostas para o dia 05 de março de 2026, as 15:00 horas. Intimem-se todos.


   XXIII - ID 127960 - petição de AC ZANELLA CONSTRUTORA E INCORPORADORA - pede autorização para alienação de imóvel com baixa de indisponibilidades:

DESPACHO: A Recuperanda, a Administração Judicial e ao Ministério Público.

Rio de Janeiro, 28/01/2026.


**Simone Gastesi Chevrand - Juiz Titular**

_____

Autos recebidos do MM. Dr. Juiz

Simone Gastesi Chevrand

Em ____/____/_____


Código de Autenticação: **4FBQ.ARIH.Q7XC.PDD4**
Este código pode ser verificado em: www.tjrj.jus.br – Serviços – Validação de documentos

SIMONEGASTESI



SIMONE GASTESI CHEVRAND:20762    Assinado em 28/01/2026 18:16:51
Local: TJ-RJ

**Exhibit 3**

January 30 Indenture Trustee Motion

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

-------------------------------------------------------------------------------

I, the undersigned Sworn Public Translator and Commercial Interpreter, recognized and respected throughout the Federative Republic of Brazil, duly appointed and authorized by the Board of Trade of the State of Rio de Janeiro (JUCERJA) and registered under No 281, DO HEREBY CERTIFY AND ATTEST that I received a document in the Portuguese language for translation into English, which I have lawfully executed in my official capacity, as follows:-----

-------------------------------------------------------------------------------

*(All pages with the stamp of the Court of Appeals of the State of Rio de Janeiro – Electronically Stamped – and numbered from 128471 to 128483)*

*(On the margin of the first page: TJRJ CAP EMP07 202600314606 30/01/26 17:42:42136248 PROGER-VIRTUAL)*

*(Letterhead of PINHEIRO GUIMARÃES – Av. Rio Branco 181, 27th floor – 20040-918 Rio de Janeiro, RJ – Phone: (21) 4501-5000 – Faz: (21) 4501-5025)*

**TO THE HONORABLE JUDGE OF THE 7TH CORPORATE COURT OF THE DISTRICT OF THE CAPITAL OF THE STATE OF RIO DE JANEIRO**

Court-Supervised Reorganization No. 0090940-03.2023.8.19.0001

**UMB BANK, N.A.,** in its capacity as trustee ("UMB"), already duly identified in the records of the Court-Supervised Reorganization of the Oi Group, in response to the submission filed on pages 127,808/127,818 by

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

the Reorganizing Debtors, through their Court-Appointed Manager, respectfully presents and requests as follows.

I. V.TAL UPI – KEY PROVISIONS OF THE REORGANIZATION PLAN

1. UMB acts as trustee (the "Trustee") of two issuances of Notes directly related to the implementation of the Court-Supervised Reorganization Plan approved by this Honorable Court on May 28, 2024 (the "PRJ" (*Plano de Recuperação Judicial*) – index 43038): (i) the Notes representing the so-called "New Financing – Restructuring Option I Creditors";(1) and (ii) the Notes embodying the so-called "Roll-Up Debt".(2)

2. Such instruments were subscribed by the "Restructuring Option I Creditors", defined in the PRJ as the financial creditors that injected new funds into the Oi Group, pursuant to Clause 4.2.2 of the PRJ.(3)

3. As consideration for the financing granted and the agreed restructuring, the PRJ provided for the granting of a package of guarantees in favor of certain creditors – including the Restructuring Option I Creditors –, as detailed in Annex 4.2.2.2.1(f)(I) (doc.

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

1) and formalized through the Security Documents listed in Annex 4.2.2.2.1(f)(II) (doc. 2).

4. Among the guarantees granted, particular relevance is given to the fiduciary assignment of 100% of the shares issued by V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal") held by Oi and Rio Alto Investimentos e Participações S.A. The relevant document was executed on July 27, 2024, subsequently amended, and remains in full force and effect (the "V.tal Shares Fiduciary Assignment Agreement" – doc. 3). The Annex to the V.tal Shares Fiduciary Assignment Agreement provides that the security is granted in favor of, among other obligations, the Notes issued under the New Financing – Restructuring Option I Creditors and the Roll-Up Debt, instruments under which UMB acts as trustee.(4)

5. Furthermore, the PRJ authorizes the sale of such assets – namely, the shares issued by V.tal – as an isolated productive unit (*unidade produtiva isolada*), pursuant to Clause 5.2.1(ii) of the PRJ. This is the so-called "V.tal UPI", conceived as one of the main asset monetization sources in the reorganization process.

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

6. In this context, the PRJ provides that, in the event of the sale of the V.tal UPI, the proceeds from such sale **shall be allocated, on a priority basis, to the payment of the debt embodied in the "New Financing"** (as defined in the PRJ, collectively, as the New Financing – Restructuring Option I Creditors and the New Financing – Third Parties), until full release thereof. Only after such release may any excess proceeds be used to pay other secured claims, subject to the order and conditions set forth in the PRJ, as set out in Clause 5.3.2(i):(5)

"5.3.2. Net Proceeds from the Sale of the V.tal UPI. Oi shall allocate the Net Proceeds from the Sale of the V.tal UPI in the following order:

(i) **an amount equivalent to 100% (one hundred percent) of the Net Proceeds from the Sale of the V.tal UPI shall be used to fully amortize the New Financing** and, if applicable, the Bridge Loan, on a *pro rata* basis;

(ii) **after full amortization of the New Financing** and, if applicable, the Bridge Loan, an amount equivalent to 100% (one hundred percent) of any remaining Net Proceeds from the Sale of the V.tal UPI shall be used to fully amortize the Unsecured ToP Debt 2024/2025

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

Reinstated – Option I, on a *pro rata* basis; [...]"
(emphasis added)

7. Naturally, the PRJ provides that the creditors that granted the New Financing – the Restructuring Option I Creditors — being priority creditors – must participate in the procedures required for the sale of the V.tal UPI, <u>including with respect to the drafting, review and approval of the relevant Notice</u>. As for the New Financing – Third Parties creditors, the PRJ affords them specific protection through a veto right over alternative proposals that do not ensure payment of their claims in cash.

8. Pursuant to Clause 5.2.2.2,(6) the sale of the V.tal UPI must strictly comply with the procedure set forth therein. More specifically, Clauses 5.2.2.2.1 and 5.2.2.2.1.1 are unequivocal in providing that:

"5.2.2.2.1. V.tal UPI Notice. <u>The V.tal UPI Notice shall be reviewed and approved, cumulatively, by the Restructuring Option I Creditors (as per the Restructuring Option I Creditors Resolution)</u>.

5.2.2.2.1.1. The review and approval of the V.tal UPI Notice by the Restructuring Option I Creditors shall be communicated to the Court-Appointed Administrator

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

within fifteen (15) days as from the date on which the relevant Creditors are notified of the V.tal UPI Notice. If the resolution by the Restructuring Option I Creditors is not communicated to the Court-Appointed Administrator within the prescribed period, the V.tal UPI Notice shall be automatically deemed rejected. The Court-Appointed Administrator shall communicate the result of the resolution to Oi within one (1) Business Day." (emphasis added)

9. Therefore, the fundamental key provision underlying the creation of the V.tal UPI was its linkage to the priority satisfaction of the New Financing, reflecting the economic rationale of the new money contributed by the New Financing Creditors and the centrality of such financing to the very feasibility of the plan and the restructuring of the Oi Group; no proceeds from the sale of the V.tal UPI may be allocated to any other creditor, potential creditor, or to the Debtors before being applied to the payment of the New Financing Claims.

II. V.TAL UPI SALE NOTICE

EVOLUTION OF THE NEGOTIATIONS

10. At the end of 2025 (December 10, 2025), counsel

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

to the Trustee, following further consultations with the majority of the Restructuring Option I Creditors, negotiated a structure for the sale of the V.tal UPI involving two alternatives: (i) payment for the asset in cash; or (ii) payment through a credit of the creditors secured by the shares issued by V.tal held by the Debtors (i.e., a credit bid allowing the Restructuring Option I Creditors and other secured creditors to acquire the asset by offsetting their claims, subject to certain terms and conditions).

11. On December 18, 2025, the Court-Appointed Manager submitted to counsel for the Trustee the first draft of the V.tal UPI Notice for review, making reference to Clauses 5.2.2.2.1 and 5.2.2.2.1.1 of the PRJ (doc. 4). Such Clauses expressly and unequivocally establish that the validity and effectiveness of the Notice are conditioned upon **the prior valid resolution and approval by such creditors**.

12. Notwithstanding the express provisions set forth in the clauses above, in the email sent, the Court-Appointed Manager adopted slightly softer language, stating that they were sending "*the V.tal UPI Notice*

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

*(...) for **acknowledgment and review** within fifteen (15) calendar days, as from the date hereof*" (as opposed to what is provided in the PRJ, which conditions the publication of the Notice upon **approval** by the creditors).

13. In the lawful and proper exercise of the prerogative granted under the plan to the Restructuring Option I Creditors – which constitutes a true procedural condition for the effectiveness of the Notice – they proceeded to review the draft submitted, rejected the publication of the Notice in the format originally proposed, and, on January 2, 2025, returned the draft to the Court-Appointed Manager with objective adjustments directly related to strict compliance with the PRJ. Among the comments made at the time, which led to the rejection of the draft, the following stand out: (i) the fact that the original draft prohibited payment for the V.tal UPI through giving in payment of claims (credit bid); and (ii) the fact that the creditors had not received the draft annexes, which were to be published together with the Notice and should therefore also have been **reviewed and approved** by them (doc. 5).

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

14. With respect to item (i) above, it is important to point out that Clause 5.2.2.2.5 of the PRJ, which governs the method of payment applicable to the sale of the V.tal UPI, **expressly and exclusively assigns to the Restructuring Option I Creditors the authority to approve, through a specific resolution, any method of payment other than payment in cash, subject to compliance with the other provisions set forth in the PRJ**:

"5.2.2.2.5. Method of Payment for the V.tal UPI. The V.tal UPI Notice shall provide that the purchase price for the V.tal UPI shall be paid in full, in cash, in local currency, **except if otherwise approved by the Restructuring Option I Creditors (as per a Restructuring Option I Creditors Resolution)**, in any case subject to the provisions of Clause 5.2.3.2, and provided that the Restructuring Option I Creditors may not, without the prior and express consent of the New Financing Third Parties, resolve to accept any proposals that do not result in the full cash repayment, in cash, of the total updated amount of the New Financing – Third Parties." (emphasis added)

15. The PRJ establishes, as a rule, that payment must

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

be made in cash, in full, and in an amount equal to or greater than the minimum price. However, it also provides, **as an exception**, that any proposal deviating from such rule – i.e., not in cash; and/or not paid in full; and/or below the minimum price – must necessarily be submitted to a Resolution of the Restructuring Option I Creditors.

16. In other words, payment for the V.tal UPI must be made in full, in cash, in local currency, **unless otherwise approved by the Restructuring Option I Creditors**, through a Restructuring Option I Creditors Resolution, and subject to the other safeguards set forth therein (including the consent of the New Financing Third Parties). **There is therefore no authority whatsoever granted to the Reorgnizing Debtors to approve or reject alternative methods of payment**. Such authority is an **exclusive** deliberative prerogative of the Restructuring Option I Creditors, strictly in accordance with the terms agreed upon in the plan and approved by this Honorable Court.

17. Thereafter, counsel to the Trustee, following further consultations with the majority of the Restructuring Option I Creditors, conducted transparent and

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

good-faith negotiations with the Court-Appointed Manager to align the conduct of the competitive procedure, always aiming at enabling the sale of the V.tal UPI in a prompt, efficient, and secure manner – and, most importantly, in compliance with the PRJ.

18. As a direct result of these negotiations, and in light of considerations raised by the Court-Appointed Manager through a telephone call, **on January 27, 2026**, the Trustee, after consulting the majority of the Restructuring Option I Creditors, chose to withdraw its comments regarding the admissibility of the credit bid, not objecting to the provision that, initially, the Notice would contemplate only the sale of the V.tal UPI through cash payment. Accordingly, shortly thereafter, they submitted to the Court-Appointed Manager a new consolidated version of the notice (doc. 6), **which expressly did not object to the sale of the V.tal UPI through bids paid in full and in cash, in strict compliance with the terms advocated by the Court-Appointed Manager**.

III. THE COURT-APPOINTED MANAGER'S CONCERNING OMISSION

19. To everyone's surprise, on January 28, 2026, on

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

the very day following the email mentioned in the preceding paragraph, the Court-Appointed Manager, acting on behalf of the Reorganizing Debtors, filed the petition on pages 127,808/127,818, completely disregarding the fact that, just one day earlier, the concept of publishing a Notice providing for the sale of the V.tal UPI exclusively for cash had been agreed upon.

20. Based on the omission of such a relevant fact, it was alleged that the Restructuring Option I Creditors were improperly obstructing the process for the sale of the V.tal UPI, on the grounds that they:

- Had altered essential terms of the Plan, including:

▪ the use of their own claims as a method of payment (giving in payment); and

▪ the requirement of prior approval for any payments not made in full;

- Were seeking their own benefit, to the detriment of the Reorganizing Debtors' liquidity and of the other creditors; and

- Were potentially subject to a conflict of interest, as they would simultaneously act as bidders and as evaluators of the proposals.

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

21. On that basis, it is argued that the alleged requirements imposed by the Restructuring Option I Creditors:

- Exceed the "right of review" provided for in the Plan;

- Represent an improper reopening of material terms already approved; and

- Constitute an abuse of rights (Article 187 of the Brazilian Civil Code), in violation of the principles of the Brazilian Bankruptcy and Reorganization Law (the LFR), particularly Article 47 (preservation of the company).

22. However, in proceedings of such magnitude and visibility as the present one, it is essential that any information submitted to the Court be strictly faithful to the actual facts.

23. Any inaccuracy in the information conveyed in these proceedings has the potential to reverberate beyond the case itself. Moreover, any incorrect information presented in this context undermines the very credibility of the delicate process of negotiating alternatives for the sale of Oi's assets, in compliance with the Court's decision.

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

24. Accordingly, it is immediately apparent that all accusations made against the Restructuring Option I Creditors are entirely unfounded, as the fundamental key provision underlying such allegations – the supposed refusal to accept the concept proposed by the Court-Appointed Manager for the Notice – **finds no support in the facts**, as demonstrated by the communication sent on January 27, 2026 (doc. 6).

IV. ABSENCE OF ABUSIVE CONDUCT BY THE RESTRUCTURING OPTION I CREDITORS:

LAWFUL EXERCISE OF RIGHTS.

25. Indeed, from the outset of the negotiations, the conduct of the Restructuring Option I Creditors, through the Trustee, has been guided by the maximization of the asset's value, the preservation of legal certainty in the process, and the pursuit of consensual solutions that would enable the prompt implementation of the PRJ, thereby avoiding further litigation involving one of the most sensitive and strategic assets in the reorganization.

26. What is at stake, therefore, is not unjustified resistance, but rather the responsible reaffirmation that the competitive procedure must fully comply with

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

the legal framework approved by the General Meeting of Creditors and ratified by this Honorable Court, without interpretative shortcuts, without the suppression of deliberative prerogatives, and without the construction of narratives unsupported by the facts, which undermine the credibility required in the conduct of the process for the sale of Oi's assets.

27. Also, the Restructuring Option I Creditors are the primary economic stakeholders in the sale of the V.tal UPI, insofar as the proceeds therefrom are primarily allocated to the repayment of the New Financing, prior to any other claims. Thus, there is no legal or economic rationale to suggest that such creditors would act to devalue the asset, frustrate the competitive procedure, or create unnecessary obstacles.

28. There is no abuse in the exercise of a right when it is carried out within the exact limits defined by the very instrument that grants it. The PRJ not only authorizes, but imposes the active participation of the Restructuring Option I Creditors in structuring the competitive procedure for the V.tal UPI, precisely because they are the holders of the New Financing Notes, a super-priority, post-petition claim, and the

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

primary economic beneficiaries of the proceeds arising from such sale. In this regard, it is important to emphasize that the PRJ requires the "approval" of the Notice, not mere consultation. It is no coincidence that Clause 5.2.2.2.1.1 of the PRJ establishes that, in the absence of a statement by the Restructuring Option I Creditors, the Notice shall be deemed "rejected." This is not incidental. It is an express right granted to such creditors, who are the primary recipients of the proceeds from the V.tal UPI; not to Oi, let alone to the Court-Appointed Manager.

29. In light of the foregoing, and consistent with the cooperative approach that has always guided their conduct, the Restructuring Option I Creditors, through the Trustee, reiterate their acknowledgment of and agreement with the text set forth in the draft V.tal UPI sale notice submitted by the Reorganizing Debtors on pages 127,820/127,828 – as had already been communicated to the Court-Appointed Manager on January 27.

V. A NECESSARY RESERVATION

PRESERVATION OF THE CREDIT BID

30. Without prejudice to the foregoing, the Trustee seeks to clarify that its decision not to object to

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

the new draft of the notice does not impair its right, or that of any of the Restructuring Option I Creditors, to make any future resolution regarding proposals involving alternative methods of payment, including by means of a credit bid, strictly in accordance with Clause 5.2.2.2.5 of the PRJ.

31. This reservation is particularly relevant in light of the attempt by the Reorganizing Debtors and the Court-Appointed Manager to portray the credit bid as a mechanism inherently detrimental to the court-supervised reorganization or to other creditors – a position that finds no lawful or economic basis.

32. As already demonstrated, the proceeds arising from the sale of the V.tal UPI have a clearly defined priority allocation under the PRJ, directed toward the repayment of the New Financing and of the other obligations secured by the V.tal Shares Fiduciary Assignment Agreement.

33. This provision reflects the economic rationale that enabled the very continuity of the Oi Group's operations, insofar as the Restructuring Option I Creditors contributed billions of reais in new financ-

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

ing, assuming significant risks and providing essential liquidity at a critical moment in the court-supervised reorganization. It is important to point out that such new resources enabled the Oi Group, throughout the court-supervised reorganization process, to satisfy various in-court and out-of-court obligations toward several of its creditors. The Restructuring Option I Creditors, by express provision of the plan approved at the General Meeting of Creditors and ratified by this Honorable Court, were granted a priority position both in the receipt of proceeds and in strategic decisions relating to the sale of the asset primarily intended to satisfy their claims.

34. Contrary to what is suggested by the Reorganizing Debtors, the prohibition of a credit bid is not only legally unfounded, but also logically inconsistent. If the proceeds from the sale of the V.tal UPI, when paid in cash, must necessarily be applied first to satisfy the claims of these same creditors, there is no rational basis to prevent them from using their own claims, which are super-priority, post-petition claims, as a means of payment to acquire the asset,

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

thereby reducing the Reorganizing Debtors' indebtedness and benefiting all creditors.

35. Moreover, depending on the value involved, a sale through a credit bid may be far more beneficial to the Reorganizing Debtors and to Oi's creditors than a cash sale.

36. Indeed, in a scenario where a credit bid is made using claims in an amount equal to or greater than the minimum price, there would be substantial (if not full) satisfaction of such claims; consequently, there would be a release (whether substantial or potentially full, depending on the case) of all other guarantees granted under the PRJ (such as those over real estate assets; Oi Soluções; and the receivables arising from the ANATEL arbitration). The release of such guarantees would benefit not only Oi, **but also labor and unsecured creditors**, who would gain access to a new source of unencumbered and freely available funds.

37. On the other hand, a cash sale below the minimum price would most likely not result in the satisfaction of the claims secured by the V.tal Asset Pool. The proceeds would be allocated to such creditors, who would remain with the security interests granted over

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

the remaining assets, which would still need to be sold to satisfy those same creditors. As is evident, such a scenario would be detrimental to Oi and to the other creditors.

38. Therefore, the narrative put forward in the Reorganizing Debtors' submission, suggesting that the use of a credit bid would prejudice other creditors or frustrate the purpose of the process, does not reflect what actually occurred, or withstands scrutiny in light of the facts evidenced.

39. By way of illustration, it should be noted that the minimum price for the sale of the V.tal UPI is approximately R$12.3 billion, whereas the obligations secured under the V.tal Shares Fiduciary Assignment Agreement amount to approximately R$13 billion (based on figures disclosed by the Reorganizing Debtors and subject to any adjustments).(7) Accordingly, it is evident that a credit bid at the minimum price would be significantly more advantageous to the reorganizing debtors than a cash sale at a lower amount insufficient to satisfy the secured priority obligations.

40. Furthermore, and in the interest of accuracy, the allegation that the Restructuring Option I Creditors

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

acted under a conflict of interest by suggesting the use of claims held by creditors secured under the V.tal Shares Fiduciary Assignment Agreement as a method of payment must be rejected. In reality, this constitutes a basic and fundamental mechanism, fully aligned with the economic and financial rationale of the transaction.

41. Indeed, the proceeds from the sale of the V.tal UPI are primarily allocated to the Restructuring Option I Creditors, who are granted the exclusive prerogative to select any cash proposal below the Minimum Price. Evidently, subject to the rights of the New Financing Third Parties Creditors, the same logic applies if the Restructuring Option I Creditors themselves elect to acquire the V.tal UPI through the use of their claims. Being the primary beneficiaries of the sale proceeds, it is natural that they may decide to satisfy their secured claims through the offsetting of such claims against the purchase price of the asset. There is therefore no material difference between the scenarios: in both cases, the decision lies with the beneficiaries of the transaction, with the only variation being the currency used for payment of the

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

V.tal UPI – and, consequently, for the satisfaction of the secured claims.

42. Finally, there is no logical basis for the Reorganizing Debtors' argument that a credit bid would harm Oi's "*liquidity*." The proceeds from the sale are primarily allocated to obligations secured by the V.tal Asset Pool. If such creditors agree to receive payment of their respective claims through the asset itself, there is no detriment to Oi or to third parties, since Oi would thereby extinguish the corresponding debt in an amount equal to the claims utilized, and such third parties would not be entitled to receive any portion of such proceeds in any event; accordingly, they should have no basis for objection.

43. In other words, whether payment is made in cash or through a credit bid, the proceeds from the sale of the V.tal UPI would never generate "liquidity" for Oi or for third parties; unless, of course, the purchase price were sufficient to satisfy all priority claims in the payment waterfall. In any event, it is clear that allowing credit bids as an alternative to cash offers is beneficial, as, depending on the cash bids submitted, it may prove far more advantageous to

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

Oi and to the other creditors.

VI. CONCLUSION AND REQUESTS

44. This submission demonstrates, therefore, that the Restructuring Option I Creditors are interested in complying with the Court of Appeals' determination that the Reorganizing Debtors' assets be sold, while maximizing the value of the V.tal Asset Pool. Undoubtedly, litigation and any potential devaluation of the asset do not benefit the Reorganizing Debtors, and severely harm the creditors.

45. The consensus with the Court-Appointed Manager regarding the notice, it bears repeating, **was reached on the eve of the filing of the petition on pages 127,808/127,818**, as is now evidenced and reaffirmed herein. It is therefore incumbent upon this Court and all interested parties to fully acknowledge the facts that occurred in the course of the negotiations in order to assess the conduct of the parties. In addition to disregarding express provisions of the PRJ, the petition on pages 127,808/127,818 reflects an improper and concerning mischaracterization of what was, once again, discussed and negotiated with the Court-Appointed Manager since the submission of the first

draft of the notice.

46. In view of the above, the Trustee informs that it does not object to the draft V.tal UPI sale notice submitted by the Reorganizing Debtors on pages 127,820/127,828, it being understood that this Court must observe that the prerogative to deliberate on proposals that are not in cash; and/or not paid in full; and/or below the minimum price, **lies exclusively with the Restructuring Option I Creditors**, as expressly provided for in Clause 5.2.2.2.5, **subject only to the rights of the New Financing – Third Parties creditors**.

47. Finally, the Trustee (i) reaffirms its commitment, and that of the Restructuring Option I Creditors, to cooperation and to maximizing the value of the Reorganizing Debtors' assets, which it expects to achieve through transparent and good-faith negotiations, without suppression of information or unfounded allegations of abuse, and disregarding the actual factual context by the Reorganizing Debtors; and (ii) remains available, including to participate in hearings with the interested parties, in the presence of this Court. Respectfully submitted,

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

Rio de Janeiro, January 30, 2026.

Gustavo Mota Guedes - OAB/RJ 95,346

Guilherme Vaz Leal da Costa - OAB/RJ 158,892

Frederico Mocarzel - OAB/RJ 186,497

Maria Cecília Mattos - OAB/RJ 217,785

Footnotes:

(1) "5.4.1. New Financing. Oi shall raise new funds in a total amount of up to USD 655,000,000.00 (six hundred and fifty-five million Dollars), and not less than USD 650,000,000.00 (six hundred and fifty million Dollars), or the equivalent in Reais, consisting of: (a) up to USD 505,000,000.00 (five hundred and five million Dollars), and not less than USD 500,000,000.00 (five hundred million Dollars), or the equivalent in Reais (the 'New Financing Amount – Restructuring Option I Creditors'), to be granted by the Restructuring Option I Creditors ("New Financing Creditors" and "New Financing – Restructuring Option I Creditors", respectively); and (b) USD 150,000,000.00 (one hundred and fifty million Dollars), or the equivalent in Reais ('New Financing Amount – Third Parties'), to be granted by any Person other than the Restructuring Option I Creditors ('New Financing Third Parties' and

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

'New Financing – Third Parties', with the New Financing – Third Parties and the New Financing – Restructuring Option I Creditors colectively defined as the 'New Financing')."

(2) "4.2.2.1. Roll-Up Debt. Oi shall issue debt in the total amount of R$6,750,000,000.00 (six billion, seven hundred and fifty million Reais) ('Total Roll-Up Debt Amount'), in two (2) tranches, the first tranche in the amount of R$4,500,000,000.00 ('Roll-Up Debt Tranche 1') and the second tranche in the amount of R$2,250,000,000.00 ('Roll-Up Debt Tranche 2'), for payment of part of the Restructuring Option I Claims, duly converted by the Conversion Exchange Rate, where applicable ('Roll-Up Debt'), in accordance with the terms and conditions set forth in the subclauses below and in the relevant Roll-Up Debt Documents."

(3) "4.2.2. Restructuring Option I. Unsecured Creditors who (i) hold exclusively Financial Claims; (ii) are compliant with the Non-Litigation, Release and Waiver Commitment provided in Clause 9.3; and (iii) agree to participate in the New Financing and timely submit to Oi the New Financing Adherence Agreements, pursuant to Clause 5.4.1.3, may, pursuant to Clause

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 4 Livro Digital 01/2026 Página 1-28

4.4, elect to receive payment of their relevant Class III Claims in accordance with the terms and conditions of this Clause 4.2.2 *et seq.* ('Restructuring Option I Claims' and 'Restructuring Option I Creditors', respectively)."

(4) "New Financing – Restructuring Option I Agreement: Indenture, entered into by Oi S.A., the guarantor subsidiaries, and **UMB Bank, N.A., as trustee, registrar, paying agent and transfer agent**, governing the 10,000% / 13,500% PIK Toggle Senior Secured Notes due 2027.

Date: July 2024.

Principal Amount: up to US$505,000,000.

Maturity: June 30, 2027.

Interest: 10,000% / 13,500% PIK Toggle.

Default Interest: 5.00%."

(5) "[...] 5.3.2. Net Proceeds from the Sale of the V.tal UPI. Oi shall allocate the Net Proceeds from the Sale of the V.tal UPI in the following order:

(i) an amount equivalent to 100% (one hundred percent) of the Net Proceeds from the Sale of the V.tal UPI shall be used to fully amortize the New Financing and, if applicable, the Bridge Loan, on a *pro rata* basis;

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

[...]"

(6) "**5.2.2.2. Sale of the V.tal UPI.** Subject to the provisions of **Clause 5.1 (*ii*.2),** the Competitive Procedure for the sale of the V.tal UPI may be carried out in accordance with **Clause 5.2.2.2 *et seq.*,** through a sealed-bid process, in accordance with the rules set forth in this Plan and in the relevant sale notice (the 'V.tal UPI Notice')."

(7) According to Oi's Financial Statements (doc. 7), (i) the outstanding balance of the New Financing – Restructuring Option I Creditors is approximately R$3.7 billion; (ii) the New Financing – Third Parties totals approximately R$710.3 million; and (iii) the Roll-Up Debt amounts to approximately R$7.9 billion. Taken together, these obligations already amount to approximately R$12.3 billion, without prejudice to other Secured Obligations still included in the payment waterfall, such as the Unsecured ToP Debt 2024/2025 Reinstated, with a nominal amount of R$571.6 million.

---------------------------------------------------------------------------------------

THIS WAS THE FULL TEXT of said document, the true translation whereof I ATTEST.----------------------------------------------------------------------------------
WITNESS MY HAND AND SEAL, April 03, 2026. ---------------------------------
------------------------------------------------------------------





# PINHEIRO GUIMARÃES

AV. RIO BRANCO 181, 27º ANDAR
20040-918  RIO DE JANEIRO, RJ

TEL.: (21) 4501-5000
FAX : (21) 4501-5025

Tribunal de Justiça do Estado do Rio de Janeiro
Página
**128471**
Carimbado Eletronicamente

EXMA. SRA. DRA. JUÍZA DE DIREITO DA 7ª VARA EMPRESARIAL DA COMARCA DA CAPITAL DO ESTADO DO RIO DE JANEIRO

Recuperação Judicial nº 0090940-03.2023.8.19.0001

UMB BANK, N.A., na qualidade de *trustee* ("UMB"), já qualificado nos autos da Recuperação Judicial do Grupo Oi, vem, em atenção à manifestação apresentada às fls. 127.808/127.818 pelas Recuperandas, por intermédio de seu Gestor Judicial, expor e requerer o que segue.

## I.   UPI V.TAL – PREMISSAS DO PLANO DE RECUPERAÇÃO

1.        O UMB é o *trustee* (o "Trustee") de duas emissões de *Notes* diretamente relacionadas à execução do Plano de Recuperação Judicial homologado por este MM. Juízo em 28 de maio de 2024 (o "PRJ" – index 43038): (i) as *Notes* representativas do chamado "Novo Financiamento – Credores Opção de Reestruturação I";[1] e (ii) as *Notes* que consubstanciam a denominada "Dívida Roll-Up".[2]

---

[1] "5.4.1. Novo Financiamento. A Oi contratará novos recursos no valor total de até USD 655.000.000,00 (seiscentos e cinquenta e cinco milhões de Dólares), não podendo ser inferior a USD 650.000.000,00 (seiscentos e cinquenta milhões de Dólares) ou o equivalente em Reais, sendo (a) até USD 505.000.000,00 (quinhentos e cinco milhões de Dólares), não podendo ser inferior a USD 500.000.000,00 (quinhentos milhões de Dólares) ou o equivalente em Reais ('Valor Novo Financiamento – Credores Opção de Reestruturação I') a ser concedido pelos Credores Opção de Reestruturação I ("Credores do Novo Financiamento" e "Novo Financiamento – Credores Opção de Reestruturação I", respectivamente); e (b) USD 150.000.000,00 (cento e cinquenta milhões de Dólares), ou o equivalente em Reais ('Valor Novo Financiamento – Terceiros') a ser concedido por qualquer Pessoa que não os Credores Opção de Reestruturação I ('Terceiros Novo Financiamento' e 'Novo Financiamento – Terceiros', sendo o Novo Financiamento – Terceiros e o Novo Financiamento – Credores Opção de Reestruturação I definidos, em conjunto, como o 'Novo Financiamento')."

[2] "4.2.2.1. Dívida Roll-Up. A Oi realizará a emissão de uma dívida no valor total de R$6.750.000.000,00 (seis bilhões, setecentos e cinquenta milhões de Reais) ('Valor Total Dívida Roll-Up'), em 2 (duas) tranches, sendo a primeira tranche no valor de R$4.500.000.000,00 (quatro bilhões e quinhentos milhões de Reais) ('Tranche 1 Dívida Roll-Up') e a segunda tranche no valor de R$2.250.000.000,00 (dois bilhões, duzentos e cinquenta milhões de Reais) ('Tranche 2 Dívida Roll- Up'), para pagamento de parte dos Créditos Opção de Reestruturação I, devidamente convertidos pela Taxa de Câmbio Conversão, quando aplicável ('Dívida Roll-Up'), de acordo com os termos e condições descritos nas subcláusulas abaixo e nos respectivos Instrumentos da Dívida Roll-Up."

TJRJ CAP EMP07 202600314606 30/01/26 17:42:42136248 PROGER-VIRTUAL

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128472
Carimbado Eletronicamente

2.          Tais instrumentos foram subscritos pelos "Credores Opção de Reestruturação I", assim definidos no PRJ como os credores financeiros que aportaram recursos novos ao Grupo Oi, nos termos da Cláusula 4.2.2 do PRJ.[3]

3.          Como contrapartida ao financiamento concedido e à reestruturação pactuada, o PRJ previu a outorga de um pacote de garantias em favor de determinados credores – entre eles, os Credores Opção de Reestruturação I –, detalhadamente descritas no Anexo 4.2.2.2.1(f)(I) (doc. 1) e formalizadas por meio dos Instrumentos de Garantia elencados no Anexo 4.2.2.2.1(f)(II) (doc. 2).

4.          Dentre as garantias outorgadas, tem especial relevância a alienação fiduciária de 100% das ações de emissão da V.tal – Rede Neutra de Telecomunicações S.A. ("V.tal") detidas pela Oi e pela Rio Alto Investimentos e Participações S.A. O respectivo instrumento foi celebrado em 27 de julho de 2024, posteriormente aditado, e encontra-se plenamente em vigor (o "Instrumento de AF Ações V.tal" – doc. 3). O Anexo do Instrumento de AF Ações V.Tal prevê que a garantia é outorgada em favor, dentre outras dívidas, das *Notes* do Novo Financiamento – Credores Opção de Reestruturação I e da Dívida Roll-Up, instrumentos nos quais a UMB figura como *trustee*.[4]

5.          Ademais, o PRJ autoriza a alienação desses bens – isto é, das ações de emissão da V.tal – na forma de uma unidade produtiva isolada, nos termos da Cláusula 5.2.1(ii) do PRJ. Trata-se da chamada "UPI V.tal", concebida como uma das principais fontes de monetização de ativos no processo de recuperação.

6.          Nesse contexto, o PRJ prevê que, em caso de alienação da UPI V.tal,

---

[3] "4.2.2. Opção de Reestruturação I. Os Credores Quirografários que (i) sejam titulares exclusivamente de Créditos Financeiros; (ii) estejam adimplentes com o Compromisso de Não Litigar, Quitação e Renúncia previsto na Cláusula 9.3; e (iii) concordarem em participar do Novo Financiamento e tempestivamente enviarem à Oi os Termos de Adesão Novo Financiamento, nos termos da Cláusula 5.4.1.3, poderão, nos termos na Cláusula 4.4, optar por receber o pagamento dos seus respectivos Créditos Classe III de acordo com os termos e condições desta Cláusula 4.2.2 e seguintes ('Créditos Opção de Reestruturação I' e 'Credores Opção de Reestruturação I', respectivamente)."

[4] "Novo Financiamento – Opção de Reestruturação I

Contrato: Indenture, celebrada entre Oi S.A., as subsidiárias garantidoras, e **UMB Bank, N.A., como fiduciário, agente de registro, agente de pagamento e agente de transferência**, que rege as Notas Senior Garantidas PIK Toggle de 10.000% / 13.500% com vencimento em 2027.

Data: julho de 2024.

Valor Nominal: até US$ 505,000,000.

Prazo: 30 de junho de 2027.

Juros: 10.000% / 13.500% PIK Toggle.

Juros de Mora: 5.00%."

o produto da venda **seja destinado, com prioridade, ao pagamento da dívida consubstanciada no "Novo Financiamento"** (definidos no PRJ, em conjunto, como o Novo Financiamento – Credores Opção de Reestruturação I e o Novo Financiamento – Terceiros), até a sua quitação integral. Somente após tal quitação é que eventual valor excedente poderia ser destinado ao pagamento de outros créditos garantidos, observada a ordem e as condições estabelecidas no PRJ, na forma da Cláusula 5.3.2(i):[5]

> "5.3.2. Receita Líquida da Venda da UPI V.tal. A Oi destinará a Receita Líquida da Venda da UPI V.tal na seguinte ordem:
>
> (i) **o montante equivalente a 100% (cem por cento) da Receita Líquida da Venda da UPI V.tal será usado para amortizar integralmente o Novo Financiamento** e, caso aplicável, o Empréstimo-Ponte, de forma *pro rata*;
>
> (ii) **após a amortização integral do Novo Financiamento** e, se realizado, do Empréstimo-Ponte, o montante equivalente a 100% (cem por cento) de eventual saldo da Receita Líquida da Venda da UPI V.tal será usado para amortizar integralmente a Dívida ToP sem Garantia 2024/2025 *Reinstated* – Opção I*, de forma *pro rata*; [...]" (g.n.)

7.        Naturalmente, o PRJ prevê que os credores que concederam o Novo Financiamento – Credores Opção de Reestruturação I – credores prioritários que são – devam participar dos procedimentos necessários à alienação da UPI V.tal, inclusive no que diz respeito à elaboração, revisão e aprovação do respectivo edital. Já aos credores do Novo Financiamento – Terceiros, o PRJ assegura proteção específica por meio de um direito de veto a propostas alternativas que não assegurem o pagamento de seus créditos em dinheiro.

8.        Nos termos da Cláusula 5.2.2.2,[6] a alienação da UPI V.tal deve observar rigorosamente o procedimento ali previsto. Mais especificamente, as

---

[5] "[...] 5.3.2. Receita Líquida da Venda da UPI V.tal. A Oi destinará a Receita Líquida da Venda da UPI V.tal na seguinte ordem:

(i) o montante equivalente a 100% (cem por cento) da Receita Líquida da Venda da UPI V.tal será usado para amortizar integralmente o Novo Financiamento e, caso aplicável, o Empréstimo-Ponte, de forma pro rata; [...]"

[6] "**5.2.2.2. Alienação da UPI V.tal**. Observados os termos da **Cláusula 5.1 (*ii*.2)**, o Procedimento Competitivo para a alienação da UPI V.tal poderá ser realizado nos termos da **Cláusula 5.2.2.2 e seguintes**, na modalidade de propostas fechadas, conforme as regras definidas neste Plano e no respectivo edital de alienação ('Edital UPI V.tal')."

3

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128474
Carimbado Eletronicamente

Cláusulas 5.2.2.2.1 e 5.2.2.2.1.1 são inequívocas ao dispor que:

> "5.2.2.2.1. Edital UPI V.tal. <u>O Edital UPI V.tal deverá ser revisado e aprovado, cumulativamente, pelos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I).</u>
>
> 5.2.2.2.1.1. A revisão e aprovação do Edital UPI V.tal pelos Credores Opção de Reestruturação I deverá ser comunicada à Administração Judicial em até 15 (quinze) dias contados da data em que os respectivos Credores forem notificados sobre o Edital UPI V.tal. Caso a deliberação pelos Credores Opção de Reestruturação I não seja comunicada à Administração Judicial no prazo previsto, <u>o Edital UPI V.tal será considerado automaticamente rejeitado</u>. A Administração Judicial deverá comunicar o resultado da deliberação à Oi em até 1 (um) Dia Útil." (g.n.)

9.      Portanto, a premissa fundamental que levou à constituição da UPI V.tal foi a sua vinculação à satisfação prioritária do Novo Financiamento, refletindo a lógica econômica do dinheiro novo aportado pelos Credores do Novo Financiamento e a centralidade desse financiamento para a própria viabilidade do plano e o soerguimento do Grupo Oi; nenhum recurso proveniente da alienação UPI V.tal pode ser destinado a qualquer outro credor, potencial credor, ou às Devedoras antes de serem aplicados para pagamento dos Créditos do Novo Financiamento.

## II.    EDITAL DE ALIENAÇÃO DA UPI V.TAL
<u>A EVOLUÇÃO DAS NEGOCIAÇÕES</u>

10.     Ao final do ano de 2025 (10 de dezembro de 2025), os assessores jurídicos do Trustee, após novas consultas com a maioria dos Credores Opção de Reestruturação I, negociaram uma estrutura de venda da UPI V.tal que envolveria duas alternativas: (i) pagamento pelo ativo em dinheiro, ou (ii) pagamento com crédito dos credores garantidos pelas ações de emissão da V.tal detidas pelas Devedoras (ou seja, um *credit bid* que permitiria que os Credores Opção de Reestruturação I e outros credores fiduciários adquirissem o ativo mediante o pagamento com seus créditos, sujeito a determinados termos e condições).

11.     Em 18 de dezembro de 2025, o Gestor Judicial encaminhou aos

4

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128475
Carimbado Eletronicamente

assessores jurídicos do Trustee a primeira minuta do edital da UPI V.tal, para análise, fazendo referência das Cláusulas 5.2.2.2.1 e 5.2.2.2.1.1 do PRJ (doc. 4). Tais Cláusulas estabelecem, de forma expressa e inequívoca, que a validade e a eficácia do edital estão condicionadas **à prévia deliberação válida e aprovação desses credores.**

12.        Em que pese a previsão expressa contida nos dispositivos acima elencados, no e-mail enviado, o Gestor Judicial adotou linguagem ligeiramente mais branda, dizendo que estaria encaminhando "*o Edital da UPI V.Tal (...) para **ciência e apreciação** no prazo de 15 (quinze) dias corridos, contados a partir da presente data*" (diferente do previsto no PRJ, que condiciona a publicação do Edital à **aprovação** pelos credores).

13.        No exercício legítimo e regular da prerrogativa atribuída pelo plano aos Credores Opção de Reestruturação I – que constitui verdadeira condição procedimental de eficácia do edital –, eles procederam à análise da minuta apresentada, rejeitaram a publicação do Edital no formato originalmente proposto, e devolveram, em 2 de janeiro de 2025, a minuta ao Gestor Judicial com ajustes objetivos e diretamente relacionados à fiel observância do PRJ. Dentre os comentários feitos na ocasião, e que importaram na rejeição da minuta, destacam-se: (i) o fato de que na minuta original havia a proibição de pagamento pela UPI V.tal mediante dação de créditos em pagamento (*credit bid*) e (ii) não ter sido recebido pelos credores a minuta dos anexos, que deveriam ser publicados juntamente com o Edital e que, portanto, também deveriam ser **analisados e aprovados** por eles (doc. 5).

14.        Sobre o ponto (i), acima, é importante  ressaltar que a Cláusula 5.2.2.2.5 do PRJ, que disciplina a forma de pagamento aplicável à alienação da UPI V.tal, **atribui de maneira expressa e exclusiva aos Credores Opção de Reestruturação I a competência para aprovar, mediante deliberação específica, eventual forma de pagamento diversa do pagamento em dinheiro, sujeito ao cumprimento das demais disposições previstas no PRJ**:

> "5.2.2.2.5. Forma de Pagamento UPI V.tal. O Edital UPI V.tal deverá prever que o valor de alienação da UPI V.tal deverá ser pago à vista, em dinheiro, em moeda corrente nacional, **exceto se aprovado de outra maneira pelos Credores Opção de Reestruturação I (conforme Deliberação de Credores Opção de Reestruturação I)**, em qualquer

5

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128476
Carimbado Eletronicamente

caso observado o disposto na Cláusula 5.2.3.2, e ressalvado que os Credores Opção de Reestruturação I não poderão, sem o prévio e expresso consentimento dos Terceiros Novo Financiamento, deliberar pela aceitação de quaisquer propostas que não resultem na quitação integral, em dinheiro, do montante total e atualizado do Novo Financiamento – Terceiros." (g.n.)

15.       O PRJ prevê, <u>como regra</u>, que o pagamento deve ser feito em dinheiro, à vista, e em valor igual ou superior ao preço mínimo. Contudo, prevê, **como exceção**, que qualquer proposta distinta – ou seja, que não seja em dinheiro; e/ou que não seja à vista; e/ou que seja inferior ao preço mínimo – deva ser necessariamente apreciada por Deliberação dos Credores Opção de Reestruturação I.

16.       Ou seja, o pagamento da UPI V.tal deverá ocorrer à vista, em dinheiro, em moeda corrente nacional, **<u>exceto se aprovado de outra maneira pelos Credores Opção de Reestruturação I</u>**, mediante Deliberação de Credores Opção de Reestruturação I, e observadas as demais salvaguardas ali previstas (inclusive o consentimento dos Terceiros Novo Financiamento). **<u>Não há, portanto, qualquer atribuição conferida às Recuperandas para autorizar ou não formas alternativas de pagamento</u>**. Trata-se de faculdade deliberativa **exclusiva** dos Credores Opção de Reestruturação I, nos exatos termos pactuados no plano e homologados por este MM. Juízo.

17.       A partir daí, os assessores jurídicos do Trustee, após novas consultas com a maioria dos Credores Opção de Reestruturação I, conduziram negociações transparentes e de boa-fé com o Gestor Judicial para alinhar a condução do procedimento competitivo, sempre com o objetivo de viabilizar a alienação da UPI V.tal de forma célere, eficiente e segura – e, mais importante, em respeito ao PRJ.

18.       Como resultado direto dessas negociações, em razão de ponderações feitas pelo Gestor Judicial por meio de contato telefônico, **em 27 de janeiro de 2026**, o Trustee, após consultar a maioria dos Credores Opção de Reestruturação I, optou por retirar seus comentários quanto à admissibilidade do *credit bid*, não se opondo à previsão de que, inicialmente, o Edital apenas previsse a venda da UPI V.tal mediante pagamento em dinheiro. Assim, logo na sequência, encaminharam ao Gestor Judicial nova versão consolidada do edital (doc. 6), **que**

6

128477
Tribunal de Justiça do Estado do Rio de Janeiro
Página
Carimbado Eletronicamente

**expressamente não se opôs à alienação da UPI V.tal mediante lances à vista e em dinheiro, nos exatos termos defendidos pelo Gestor Judicial**.

### III.    A PREOCUPANTE OMISSÃO DO GESTOR JUDICIAL

19.         Para surpresa de todos, em 28 de janeiro de 2026, logo no dia seguinte ao envio do e-mail mencionado no parágrafo anterior, o Gestor Judicial, representando as Recuperandas, apresentou a petição de fls. 127.808/127.818, ignorando completamente o fato de que foi acordado, um dia antes, o conceito de se publicar um Edital prevendo venda da UPI V.tal exclusivamente por dinheiro.

20.         A partir da omissão sobre  fato tão relevante, afirmou que os Credores Opção de Reestruturação I estariam obstruindo indevidamente o processo de venda da UPI V.tal, pois:

- Teriam alterado condições essenciais do Plano, incluindo:
  - uso de créditos próprios como forma de pagamento (dação em pagamento); e
  - exigência de aprovação prévia para pagamentos que não sejam à vista;
- Estariam buscando benefício próprio, em prejuízo da liquidez das Recuperandas e dos demais credores; e
- Estariam potencialmente em conflito de interesses, pois seriam simultaneamente proponentes e julgadores das propostas.

21.         Em razão disso, sustenta que as supostas exigências dos Credores Opção Reestruturação I:

- Extrapolariam o "direito de revisão" previsto no Plano;
- Representariam reabertura indevida de condições materiais já aprovadas; e
- Configurariam abuso de direito (art. 187 do CC), violando os princípios da LFR, especialmente o art. 47 (preservação da empresa).

22.         Ora, é certo que, em casos com tamanha magnitude e visibilidade como o presente, é necessário ser fiel à realidade dos fatos quando informações forem prestadas nos autos.

7

Tribunal de Justiça do Estado do Rio de Janeiro

Página

128478

Carimbado Eletronicamente

23. Qualquer imprecisão de informações veiculadas nestes autos tem o condão de reverberar para fora do processo. Mais ainda: informações incorretas apresentadas neste contexto colocam em dúvida a própria credibilidade do delicado processo de negociação de alternativas para a venda de bens da Oi, em cumprimento à decisão do Tribunal.

24. Assim, vê-se, de plano, que todas as acusações feitas aos Credores Opção de Reestruturação I, absolutamente, não se sustentam, pois a premissa fundamental para tais alegações – suposta recusa em se aceitar o conceito sugerido pelo Gestor Judicial ao Edital – **não tem respaldo nos fatos ocorridos**, e ora provados, por meio da comunicação feita em 27 de janeiro de 2026 (doc. 6).

IV. AUSÊNCIA DE CONDUTA ABUSIVA POR PARTE DOS CREDORES OPÇÃO DE REESTRUTURAÇÃO I:
EXERCÍCIO REGULAR DE DIREITOS.

25. Com efeito, desde o início das tratativas, a atuação dos Credores Opção de Reestruturação I, por intermédio do Trustee, foi orientada pela maximização do valor do ativo, pela preservação da segurança jurídica do processo e pela busca de soluções consensuais que permitissem a implementação célere do PRJ, evitando-se novos litígios em torno de um dos ativos mais sensíveis e estratégicos da recuperação.

26. O que se tem, portanto, não é resistência injustificada, mas a reafirmação responsável de que o procedimento competitivo deve observar, integralmente, o regime jurídico aprovado em Assembleia Geral de Credores e homologado por este MM. Juízo, sem atalhos interpretativos, sem supressão de competências deliberativas e sem a construção de narrativas que não encontram respaldo nos fatos e que fragilizam a necessária  credibilidade que se deve ter  na condução do processo de venda dos ativos da Oi.

27. Ademais, os Credores Opção de Reestruturação I são os principais interessados econômicos na alienação da UPI V.tal, na medida em que os recursos dela provenientes se destinam prioritariamente à quitação do Novo Financiamento, antes de qualquer outro crédito. Não há, portanto, qualquer racionalidade jurídica ou econômica em supor que esses credores atuariam para desvalorizar o ativo, frustrar o procedimento competitivo ou criar embaraços

8

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128479
Carimbado Eletronicamente

desnecessários.

28.        Não há abuso no exercício de um direito quando ele é praticado nos exatos limites definidos pelo próprio título que o institui. O PRJ não apenas autoriza, mas impõe a participação ativa dos Credores Opção de Reestruturação I na estruturação do procedimento competitivo da UPI V.tal, justamente porque são eles os titulares das *Notes* do Novo Financiamento, crédito extraconcursal e prioritário, e os principais destinatários econômicos dos recursos provenientes dessa alienação. Neste ponto, importante ressaltar que o PRJ prevê a necessidade de "aprovação" do Edital, não mera consulta. Não por outro motivo, que a Cláusula 5.2.2.2.1.1 do PRJ estabelece que, na ausência de manifestação dos Credores Opção de Reestruturação I, tem-se o Edital como "rejeitado". Isso não é ao acaso. Trata-se de direito expresso atribuído aos referidos credores que são os principais destinatários dos recursos provenientes da UPI V.tal; não à Oi e muito menos ao Gestor Judicial.

29.        Feitos esses esclarecimentos, e em linha com a postura colaborativa que sempre orientou sua atuação, os Credores Opção de Reestruturação I, por intermédio do Trustee, reiteram  sua ciência e concordância com o texto proposto na minuta do edital de alienação da UPI V.tal apresentada pelas Recuperandas às fls. 127.820/127.828 – conforme já havia sido informado ao Gestor Judicial no dia 27 de janeiro.

V.   NECESSÁRIA RESSALVA
PRESERVAÇÃO DO *CREDIT BID*

30.        Sem prejuízo do quanto exposto, o Trustee busca esclarecer que sua decisão de não se opor à nova minuta do edital não prejudica seu direito, ou de qualquer dos Credores Opção de Reestruturação I, de eventual deliberação futura acerca de propostas com forma alternativa de pagamento, inclusive mediante *credit bid*, nos estritos termos autorizados pelo PRJ, em sua Cláusula 5.2.2.2.5.

31.        Essa ressalva é particularmente relevante diante da tentativa das Recuperandas e do Gestor Judicial de tratar o *credit bid* como mecanismo intrinsecamente prejudicial à recuperação judicial ou aos demais credores – o  que não encontra respaldo jurídico ou econômico.

32.      Como já demonstrado, os recursos oriundos da alienação da UPI V.tal têm destinação prioritária claramente definida no PRJ, voltada à quitação do Novo Financiamento e das demais dívidas garantidas pelo Instrumento de AF Ações V.Tal.

33.      Essa previsão reflete a lógica econômica que viabilizou a própria continuidade das atividades do Grupo Oi, na medida em que os Credores Opção de Reestruturação I aportaram bilhões de reais em financiamento novo, assumindo riscos relevantes e conferindo liquidez essencial em momento crítico da recuperação judicial. É importante enfatizar que esses novos recursos permitiram ao Grupo Oi, ao longo do processo de recuperação judicial, cumprir diversas obrigações concursais e extraconcursais perante vários de seus credores. Aos Credores Opção de Reestruturação I, por regra expressa do plano aprovado em Assembleia Geral de Credores e homologado por este MM. Juízo, foi assegurada posição prioritária tanto no recebimento dos recursos quanto nas decisões estratégicas relacionadas à alienação do ativo destinado primordialmente à satisfação de seus créditos.

34.      Ao contrário do que sugerem as Recuperandas, a vedação ao *credit bid* revela-se não apenas juridicamente infundada, mas logicamente incoerente. Se o produto da alienação da UPI V.tal, quando pago em dinheiro, será obrigatoriamente canalizado, em primeiro lugar, para satisfazer os créditos desses mesmos credores, não há qualquer racionalidade em impedir que utilizem o próprio crédito, de natureza prioritária e extraconcursal, como meio de pagamento para aquisição do ativo, reduzindo o endividamento das Recuperandas e beneficiando a todos os credores.

35.      Ademais, veja-se que, a depender do valor, a venda por *credit bid* pode ser muito mais benéfica às Recuperandas e aos credores da Oi do que uma venda em dinheiro.

36.      Com efeito, em uma hipótese em que haja um *credit bid* com a utilização de créditos em montante igual ou superior ao preço mínimo, haverá substancial (quiçá integral) satisfação de seus créditos; consequentemente, haveria a liberação (substancial ou integral, a depender), de todas as demais garantias outorgadas nos termos do PRJ (como sobre os imóveis; a Oi Soluções; os recebíveis da arbitragem ANATEL). A liberação das garantias favoreceria não

10

apenas a Oi, **como também os credores trabalhistas e quirografários**, que teriam uma nova fonte de recursos livre e desembaraçada.

37.        Por outro lado, uma venda em dinheiro inferior ao preço mínimo muito provavelmente não resultaria na satisfação dos créditos garantidos pelo Acervo V.Tal. O produto seria destinado a tais credores, que permaneceriam com as garantias constituídas sobre os demais ativos, que ainda seriam vendidos para pagamento desses mesmos credores. Situação que, como se vê, prejudicaria a Oi e demais credores.

38.        Portanto, a narrativa construída na manifestação das Recuperandas, ao sugerir que a utilização do *credit bid* prejudicaria outros credores ou frustraria a finalidade do processo, não corresponde ao que ocorreu, ou não é merecedora de crédito em razão dos fatos comprovados.

39.        Apenas a título exemplificativo, verifica-se que o preço mínimo para alienação da UPI V.tal é de aproximadamente R$12,3 bilhões, enquanto as dívidas garantidas pelo Instrumento de AF Ações V.Tal alcançam aproximadamente R$13 bilhões (assumindo os números divulgados pelas Recuperandas e sujeitos a eventuais ajustes).[7] Assim, vê-se que um *credit bid* pelo preço mínimo seria muito mais vantajoso às recuperandas do que uma venda em dinheiro em montante inferior que não fosse suficiente a saldar as obrigações prioritárias garantidas.

40.        Adicionalmente, e a bem da verdade, cumpre afastar a alegação de que os Credores da Opção de Reestruturação I teriam atuado em conflito de interesses ao sugerirem a utilização dos créditos detidos pelas partes garantidas pelo Instrumento de AF Ações V.tal como forma de pagamento. Trata-se, na realidade, de previsão básica e elementar, plenamente alinhada à racionalidade econômica e financeira da operação.

41.        Com efeito, o produto da venda da UPI V.tal é destinado prioritariamente aos Credores da Opção de Reestruturação I, aos quais é conferida a prerrogativa exclusiva de escolher qualquer proposta em dinheiro que seja

---

[7] Conforme as Demonstrações Financeiras da Oi (doc. 7), (i) o saldo do Novo Financiamento – Credores Opção de Reestruturação I corresponde a cerca de R$ 3,7 bilhões; (ii) o Novo Financiamento – Terceiros totaliza aproximadamente R$ 710,3 milhões; e (iii) a Dívida Roll-Up alcança cerca de R$ 7,9 bilhões. Somadas, essas obrigações já perfazem aproximadamente R$ 12,3 bilhões, sem prejuízo de outras Obrigações Garantidas ainda inseridas no fluxo de pagamento, como as Dívidas ToP sem Garantia 2024/2025 Reinstated, cujo valor nominal era de R$ 571,6 milhões.

11

inferior ao Preço Mínimo. Evidentemente, respeitados os direitos do Credor Novo Financiamento Terceiros, a mesma lógica se aplica caso os próprios Credores da Opção de Reestruturação I optem por adquirir a UPI V.tal mediante a utilização de seus créditos. Sendo eles destinatários prioritários do produto da venda, é natural que possam decidir pela liquidação de seus créditos garantidos por meio da compensação entre tais créditos e o valor devido pela aquisição do ativo. Não há, portanto, qualquer diferença substancial entre os cenários: em ambos, a decisão cabe aos beneficiários da operação, variando apenas a moeda empregada para o pagamento da UPI V.tal — e, por consequência, para a satisfação dos créditos garantidos.

42.       Por fim, não há qualquer lógica no argumento das Recuperandas de que um *credit bid* prejudicaria a "*liquidez*" da Oi. Ora, o produto da venda é destinado prioritariamente às obrigações garantidas pelo Acervo V.Tal. Se tais credores aceitam receber o pagamento de seus respectivos créditos com o ativo, não há qualquer prejuízo à Oi ou a terceiros, já que aquela teria a quitação da dívida correspondente ao valor dos créditos utilizados e estes sequer teriam direito a receber qualquer centavo de tal venda; portanto, não deveriam se importar.

43.       Ou seja, fosse o pagamento feito por dinheiro ou crédito, o produto da alienação UPI V.tal jamais geraria "liquidez" à Oi ou a terceiros; a não ser, claro, que o preço oferecido fosse suficiente para pagar todos os créditos prioritários da cascata de pagamentos. Seja como for, é certo que a opção de ter-se o *credit bid* como alternativa a propostas em dinheiro é benéfica, pois, a depender dos lances oferecidos em dinheiro, pode ser muito mais vantajosa à Oi e aos demais credores.

## VI.   Conclusão e Pedidos

44.       Esta manifestação, portanto, demonstra que os Credores Opção de Reestruturação I têm interesse em cumprir a determinação do Tribunal de Justiça para que os ativos das Recuperandas sejam vendidos, maximizando o valor do Acervo V.tal. Sem dúvida, o litígio e eventual desvalorização do ativo não aproveita às Recuperandas, e prejudica severamente os credores.

45.       O consenso com o Gestor Judicial sobre o edital, repita-se, **foi atingido na véspera do protocolo da petição de fls. 127.808/127.818**, o que ora

12

se comprova e se ratifica, cabendo a este Juízo e demais interessados ter ciência de todos os fatos ocorridos no curso da negociação para avaliar as condutas das partes. Além de passar por cima de regras expressas do PRJ, a petição de fls. 127.808/127.818 reflete uma indevida e preocupante deturpação do que foi, repita-se, conversado e negociado com o Gestor Judicial desde o envio da primeira minuta do edital.

46.         Diante do exposto, o Trustee informa que não se opõe à minuta do edital de alienação da UPI V.tal apresentada pelas Recuperandas às fls. 127.820/127.828, sendo certo que deverá ser observado pelo Juízo que a prerrogativa de deliberar sobre propostas que não sejam em dinheiro; e/ou que não sejam à vista; e/ou inferiores ao preço mínimo, **cabe única e exclusivamente aos Credores Opção de Reestruturação I**, na forma expressamente prevista na Cláusula 5.2.2.2.5, **resguardados apenas os direitos dos credores do Novo Financiamento – Terceiros**.

47.         Por fim, o Trustee (i) reafirma seu compromisso, e dos Credores Opção de Reestruturação I, com a cooperação e a maximização dos ativos das Recuperandas, o que espera alcançar mediante negociações e tratativas transparentes e de boa fé, sem supressão de informações ou alegações de abuso infundadas e ignorando o real contexto fático por parte das Recuperandas, e (ii) permanece à disposição, inclusive, para participar de audiências com os interessados, com a presença do Juízo.

Termos em que,
E.D.

Rio de Janeiro, 30 de janeiro de 2026.

Gustavo Mota Guedes
OAB/RJ 95.346

Guilherme Vaz Leal da Costa
OAB/RJ 158.892

Frederico Mocarzel
OAB/RJ 186.497

Maria Cecília Mattos
OAB/RJ 217.785



13

**Exhibit 4**

*Edital*

Translation No. 070
Book No. 1
Page 827

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

*I, Patricia Stanzione Galizia, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that an electronic document was submitted to me, written in Portuguese, the translation of which is as follows:*

Case No.: 0090940-03.2023.8.19.0001

Ordinary Proceeding

Electronic Stamp of the Court of Appeals of the State of Rio de Janeiro – Page _

## CERTIFICATE OF PUBLICATION

I hereby certify that the notice below was sent to the Electronic Court Gazette of Rio de Janeiro in the course of business on January 28, 2026, and was published on February 2, 2026, on pages 31/34 of issue: Year 18 - No. 102 of the Electronic Court Gazette (DJE).

NOTICE OF SALE OF ISOLATED PRODUCTIVE UNIT BY MEANS OF SEALED BIDS

Notice of judicial sale of the Isolated Productive Unit(s) ("UPI(s)"), by means of a competitive procedure through the submission of sealed bids, with grounds on Article 142, item IV of Law No. 11.101/2005 ("Notice"), extracted from the case records of the case processed under No. 0090940-03.2023.8.19.0001 (migrated from case No. 0809863-36.2023.8.19.0001 – PJe) ("Judicial Reorganization Proceedings"), pending before this court ("Reorganization Court"), corresponding to the Judicial Reorganization Proceedings of the companies OI S.A. – Under Judicial Reorganization ("Oi"), PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – Under Judicial Reorganization ("PTIF"), and OI BRASIL HOLDINGS COÖPERATIEF U.A. – Under Judicial Reorganization ("Oi Coop"), hereinafter collectively referred to as the "Reorganization Companies" or "Oi Group", as set forth below:

THE HONORABLE JUDGE Simone Gastesi Chevrand, Judge of the 7th Business Court of the Judicial District of the Capital City of the State of Rio de Janeiro, HEREBY GIVES NOTICE to all those who may become aware of and be interested in this NOTICE that, as a result of the decision at pages 61.100/61.135, published in the DJE on May 29, 2024, which ratified the decision of the General Meeting of Creditors ("AGC"), concluded on April 19, 2024, which approved the Judicial Reorganization Plan of the Oi Group submitted to vote at said AGC ("Judicial Reorganization Plan"), entered of record together with its exhibits at pages 56.787/58.633 of the case records of the Judicial Reorganization, and of the decision at pages 127.999/128.005, which authorized the judicial sale that is the subject matter of this Notice, a judicial sale of the V.Tal UPI(s), as described below, shall be carried out by means of a competitive procedure among potential interested bidders, in the form of sealed bids, pursuant to Articles 60, 66, Paragraph 3, 141 and 142, item IV, all of Law No. 11.101/2005, without the acquirer succeeding to any obligations of any nature of the Reorganization Companies, including with respect to obligations of a fiscal, tax and non-tax, environmental, regulatory, administrative, civil, commercial, labor, consumer, criminal, anti-corruption, and social-security nature, pursuant to Articles 60, sole paragraph, 141, item II, and 142 of Law No. 11.101/2005 and Article 133, paragraph one, item II of Law No. 5.172/1966 ("Competitive Procedure"). Accordingly, this Notice serves to promote and establish the conditions for said Competitive Procedure, and all interested bidders are hereby informed that, after being duly qualified under the terms of this Notice, they may submit sealed bids for the acquisition of the V.Tal UPI. Terms used and not defined in this Notice shall have the meanings assigned to them in the Judicial Reorganization Plan. 1. Subject matter and Minimum Price. The subject matter of the Competitive Procedure is the sale of one hundred percent (100%) of the V.Tal Shares held by Oi S.A. – Under Judicial Reorganization and by its wholly owned subsidiary Rio Alto Investimentos e Participações S.A. ("Rio Alto"), as defined in item 1.1 below and described in Exhibit 5.2.1(ii) of the Judicial Reorganization Plan, subject to the change in the percentage of V.Tal Shares held by Oi and its subsidiaries since approval of the Judicial Reorganization Plan, pursuant to Clause 5.2.2.2.3 of the Judicial Reorganization Plan. All other assets, rights, obligations, and liabilities not comprising the V.Tal Assets shall not be part of the V.Tal UPI and shall not be part of the Competitive Procedure, remaining under the ownership and responsibility of the Oi

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38- RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Translation No. 070
Book No. 1
Page 828

## Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

Group. 1.1. The assets comprising the V.Tal UPI, as described in Exhibit 5.2.1(ii) of the Judicial Reorganization Plan, consist of all shares issued by V.Tal Rede Neutra de Telecomunicações S.A. ("V.Tal") held by Oi and its wholly-owned subsidiary, Rio Alto, which total ten billion, three hundred forty-nine million, two hundred eighty-nine thousand, seven hundred sixty-eight (10,349,289,768) common registered shares, without par value, representing, as of this date, twenty-seven point twenty-six percent (27.26%) of V.Tal's capital stock, and such percentage may change as a result of compensation events agreed under the investment agreements entered into by Oi on October 1, 2021 and February 28, 2025 ("V.Tal Shares"). 1.2. The V.Tal UPI shall be sold free and clear of any Liens, without the acquirer succeeding to in any debts, contingencies, and obligations of any nature of the Reorganization Companies, including with respect to obligations of a fiscal, tax, environmental, regulatory, administrative, civil, commercial, labor, consumer, criminal, anti-corruption, and social-security nature, pursuant to Articles 60, sole paragraph, 66, Paragraph 3, 141, item II, and 142 of Law No. 11.101/2005 and Article 133, paragraph one, item II, of Law No. 5.172/1966. 2. Minimum purchase price for the V.Tal UPI. Subject to the provisions of item 4.1 below, the minimum purchase price for the acquisition of all V.Tal Shares comprising the V.Tal UPI, to be considered by the Reorganization Court and to be paid in full, in cash, by any interested bidder that wins the Competitive Procedure, is twelve billion, three hundred fifteen million, nine hundred seventy-seven thousand, four hundred fifty-one *Reais* and seventy-five cents (R$12,315,977,451.75) (the "V.Tal UPI Minimum Purchase Price").

2.1. Payment shall be made exclusively in cash, in a lump sum, in an amount equal to or greater than that indicated above, and bids providing for deferred payment and the use of any type of claim, asset, set-off, or any other form of consideration other than Brazilian legal tender are prohibited. 2.2. If Oi receives only bids for the acquisition of the V.Tal UPI, in cash, in an amount lower than the V.Tal UPI Minimum Purchase Price, the V.Tal UPI Bid Hearing (as defined in item 4 below) shall be suspended, and the Judicial Administrator shall submit, within two (2) business days from the date of the V.Tal UPI Bid Hearing, all Bids below the V.Tal UPI Minimum Purchase Price for review and decision by the Creditors under Restructuring Option I, in accordance with the terms and deadlines set forth in Clause 5.2.2.2.4 of the Judicial Reorganization Plan, subject to the prior and express consent of the New Financing Third Parties, if the circumstance set forth in Clause 5.2.2.2.5 of the Judicial Reorganization Plan is verified. 2.3. Regardless of the amount offered by participants in the Competitive Procedure for the acquisition of the V.Tal UPI, as applicable, only bids providing for payment in cash, in a lump sum, and in Brazilian legal tender shall be considered valid and accepted. 3. Minimum requirements and V.Tal Minimum Purchase Price Conditions for participation in the Competitive Procedure. Duly organized entities that meet the Minimum Conditions and the V.Tal UPI Conditions, as provided in the Judicial Reorganization Plan and in this Notice, shall be admitted to participate in the Competitive Procedure for the sale of the V.Tal Isolated Productive Unit. 1. Minimum Conditions. Interested bidders wishing to participate in the Competitive Procedure for the sale of the V.Tal UPI shall submit a notice of interest within seven (7) business days from the publication of this Notice, by submitting a Qualification Notice to the Oi Group, to be sent by email to Bruno Rezende (brunorezende@psvar.com.br, Fabio Wagner (fabio.wagner@oi.net.br), and André Paradizi (andre.paradizi@oi.net.br), with a copy to the Judicial Administration (credoroi@wald.com.br) and to the Judicial Management (gestao.oi@psvar.com.br), and filed with the Reorganization Court within the same deadline established herein ("Qualification"). 3.1.1. The Qualification notice to be submitted by each interested bidder wishing to participate in the Competitive Procedure must, in addition to indicating the interest in participating in the Competitive Procedure, meet, at a minimum, the following conditions, under penalty of such interested bidder having its Qualification Notice disregarded: (i) submit certificates of existence and good standing, such as certificates and certificate of registration and tax status, duly issued by the authorities responsible for the registration of the interested bidder's organization; (ii) submit a copy of its articles of association or bylaws or any other organization document. If it is a joint-stock company, the interested bidder must submit a copy of the corporate books and records indicating the individuals or legal entities holding the shares, or, in the case of publicly-held companies, an updated shareholding position statement. If it is an investment fund, the interested bidder must submit a copy of the fund's bylaws and the bylaws or articles of

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38 - RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29.

Translation No. 070
Book No. 1
Page 829

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

association of the fund administrator; (iii) submit a bank reference letter from at least two (2) first-tier financial institutions attesting to the economic, financial, and patrimonial capacity of the interested bidder to participate in the Competitive Procedure; (iv) submit evidence that it has availability of funds or sufficient means to pay the proposed purchase price, by presenting an irrevocable letter of credit from a financial institution registered with the Central Bank of Brazil; (v) the interested bidder must expressly agree to and expressly adhere to the terms and conditions set forth in the Judicial Reorganization Plan of the Oi Group and in this Notice, without any reservations; and (vi) the interested bidder may carry out the qualification for participation in the Competitive Procedure in its own name or in the name of a bidder-controlled acquisition vehicle to be created in the future for such purpose. 3.2. Confidentiality Agreement and Antitrust Protocol – Within the same deadline set forth in item 3.1 above for Qualification and compliance with the minimum requirements – namely, seven (7) Business Days from the publication of this Notice in the Electronic Court Gazette of the State of Rio de Janeiro – the interested bidder must execute the Confidentiality Agreement and, if applicable, the Antitrust Protocol, which constitute, respectively, Exhibits I and II, integral parts of this Notice, which must be executed and sent by email to the recipients set forth in item 3.1 above, together with documents evidencing the signatory's powers of representation, along with a list containing no more than fifteen (15) names of its representatives, with their respective identification, who shall be granted access to the information and due diligence documents to be made available regarding the V.Tal UPI (as defined in item 3.3 below). 3.2.1. Any agreements already executed between the interested bidder and Oi that are materially in the form of Exhibits I and II and remain valid and effective may be submitted and accepted as valid, avoiding the need to submit new agreements. 3.2.2. The execution of the Confidentiality Agreement and, if applicable, the Antitrust Protocol (or the submission of materially similar agreements pursuant to item 3.2.1) shall grant duly qualified interested bidders in the acquisition of the V.Tal UPI unrestricted access to all due diligence documents and information to be made available regarding the V.Tal UPI in the Data Room (as defined in item 3.3 below). 3.2.3. Interested bidders that do not execute the Confidentiality Agreement and/or the Antitrust Protocol and/or do not submit such documents, together with documents evidencing powers of representation and/or the list of representatives, in the manner and within the deadline set forth in item 3.2 above shall not be qualified to conduct Due Diligence, and any bids submitted by such interested bidders shall not be considered for purposes of the Competitive Procedure for the sale of the V.Tal UPI. 3.2.4. If (i) the Confidentiality Agreement and/or the Antitrust Protocol have their terms amended (except for the cases set forth in item 3.2.1); and/or (ii) the submission of the Confidentiality Agreement and/or the Antitrust Protocol does not comply with the provisions of this Notice, the respective interested bidders shall not be qualified to conduct due diligence and shall not have access to the documents and information relating to the V.Tal UPI, and any bids submitted by such interested bidders shall not be considered for purposes of the Competitive Procedure for the V.Tal UPI. 3.3. Due diligence – Access to information. After the expiration of the deadline set forth in item 3.3.2 of this Notice, interested bidders in the acquisition of the V.Tal UPI that have complied with the Minimum Conditions and have submitted the executed Confidentiality Agreement and, if applicable, the Antitrust Protocol, pursuant to item 3.2 of this Notice, shall be granted access to the documents and information organized by the Oi Group regarding the V.Tal UPI and made available in the Data Room, for a period of thirty (30) days ("Due Diligence"). 3.3.1. The documents and information organized by the Oi Group shall be made available virtually on a digital platform to be informed in due course by the Oi Group ("Data Room"). 3.3.2. Verification of compliance of the Confidentiality Agreement and the Antitrust Protocol shall be carried out by the Oi Group within two (2) business days after their respective receipt. 3.3.3. Upon confirmation of compliance with the requirements set forth in items 3.1 and 3.2 above, the Oi Group shall return to the interested bidder one of the counterparts of the Confidentiality Agreement and, if applicable, the Antitrust Protocol, duly executed, together with instructions for access to the documents and information made available virtually. 3.3.4. If noncompliance with any of the requirements of the Confidentiality Agreement and/or the Antitrust Protocol is verified, both counterparts received and the documents attached thereto shall be returned, and the sender shall not have access to the documents and information made available by the Oi Group. 3.4. V.Tal UPI Conditions. The sealed bids for the acquisition of the V.Tal UPI to be submitted by interested bidders pursuant to item 3.4.1 below must comply, in addition to the Minimum Conditions set forth above in

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38 - RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP - Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Patricia Stanzione Galizia

Translation No. 070
Book No. 1
Page 830

Tradutora Juramentada * Certified Translator
JUCESP # 1944

this Notice, with the following requirements ("V.Tal UPI Conditions"): (i) the obligation to pay the purchase price in cash, in a lump sum, and in Brazilian legal tender; (ii) express adherence to the terms and conditions set forth in this Notice, as well as the irrevocable and irreversible commitment to negotiate and execute the V.Tal UPI Share Purchase Agreement attached as Exhibit III; (iii) express agreement with the format and procedure of the Competitive Procedure for the V.Tal UPI established in the Judicial Reorganization Plan and in this Notice; (iv) the effectiveness of the bid and the closing of the acquisition of the V.Tal UPI not being subject to any condition other than those provided in the Judicial Reorganization Plan, in this Notice, or to any term or condition not reasonably customary for transactions of a similar nature, excluding any requirement for additional due diligence; (v) a statement of acknowledgment by the bidder that the Reorganization Companies may, at any time until the V.Tal UPI Bid Hearing, require the submission of documentation evidencing its economic, financial and patrimonial capacity; and/or that it has the ability to obtain funds or sufficient means to pay the amount proposed for the acquisition of the V.Tal UPI, under penalty of the bid submitted by such interested bidder not being considered for purposes of the Competitive Procedure; (vi) the obligation of the bidder to expressly declare that it is bound by and required to comply with all terms, conditions and obligations set forth in the Judicial Reorganization Plan relating to the sale of the V.Tal UPI; and (vii) a statement of acknowledgment and agreement that Oi's equity interest in V.Tal may change until the closing date of the sale of the V.Tal UPI as a result of compensation events agreed under investment agreements entered into by Oi on October 1, 2021 and February 28, 2025. 3.4.1. For purposes of this Notice, "V.Tal UPI Share Purchase Agreement" means the Share Purchase Agreement to be entered into between the winner of the Competitive Procedure and Oi, pursuant to which one hundred percent (100%) of the V.Tal Shares shall be sold by Oi to such winner, free and clear of any liens. 3.5. Submission of sealed bids. Interested bidders that meet the requirements for participation in the Competitive Procedure for the V.Tal UPI, in accordance with the terms and conditions set forth in this Notice ("Qualified Bidders"), must submit their sealed bids for the acquisition of the V.Tal UPI during the V.Tal UPI Bid Hearing ("Deadline for Submission of Sealed Bids"), in compliance with the V.Tal UPI requirements described in item 3.4 above. 3.5.1. The sealed envelopes must be sealed and identified and must be delivered directly to the Reorganization Court during the V.Tal UPI Bid Hearing, which, together with the judicial administrator, shall be responsible for opening them and verifying that they meet the Minimum Conditions and the V.Tal UPI requirements. 3.6. V.Tal UPI Share Purchase Agreement. The envelope containing the sealed bid must include, as an inseparable attachment thereto, a marked copy of the V.Tal UPI Share Purchase Agreement, the base draft of which is available in the data room, evidencing the changes proposed by the Qualified Bidder. The willingness of the Qualified Bidder to accept the terms and conditions set forth in the base draft made available in the data room may also be a factor in the evaluation of the bids submitted, in the event of a tie. 3.6.1. Interested bidders may also, until the Deadline for Submission of Sealed Bids, contact Oi and/or its representatives in order to discuss and negotiate the V.Tal UPI Share Purchase Agreement and/or clarify doubts regarding such document or the Competitive Procedure, pursuant to Clause 5.2.3.4 of the Judicial Reorganization Plan. 4. Hearing for the opening of sealed bids. The sealed bids shall be opened at a hearing presided over by this Court, in the presence of the Public Prosecutor, the judicial administrator, the court-appointed manager, the Reorganization Companies and other interested parties, in the hearing room of this Court, located in room 706 of the Central Tower of the Courthouse of the Capital City, located at Av. Erasmo Braga, No. 115, Rio de Janeiro/RJ, at 03:00 PM on March 5, 2026 ("V.Tal UPI Bid Hearing"), and the Qualified Bidders are hereby notified of such hearing. 4.1. Bids below the Minimum Purchase Price. If, after the opening of bids pursuant to item 4 above, the purchase price for the V.Tal UPI set forth in the bid(s) is lower than the Minimum Purchase Price for the V.Tal UPI ("Bids below the Minimum Purchase Price for the V.Tal UPI"), the V.Tal UPI Bid Hearing shall be suspended, and the judicial administrator shall submit, within up to two (2) business days from the date of the V.Tal UPI Bid Hearing, such bids below the Minimum Purchase Price for the V.Tal UPI for review and decision by the Creditors under Restructuring Option I, in accordance with the terms and deadlines set forth in Clause 5.2.2.2.4 of the Judicial Reorganization Plan. 4.1.1.1. If the Creditors under Restructuring Option I accept one of the bids below the Minimum Purchase Price for the V.Tal UPI and communicate such decision to the judicial administrator within ten (10) calendar days from receipt of such bids, in accordance with the terms and conditions set forth

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38 - RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29.

Translation No. 070
Book No. 1
Page 831

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

in Clause 5.2.2.2.4 of the Judicial Reorganization Plan, such accepted bid shall be deemed the Winning Bid (as defined in item 5 below). 4.1.1.2. If the decision by the Creditors under Restructuring Option I (i) does not occur within ten (10) calendar days from receipt of the bids below the Minimum Purchase Price for the V.Tal UPI, or (ii) the result of such decision is not communicated to the judicial administrator within ten (10) calendar days from receipt of such bids, all such bids shall be automatically deemed rejected, as provided in Clause 5.2.2.2.4(b) of the Judicial Reorganization Plan. 4.1.1.3. The Judicial Administrator must communicate the result of the decisions to the Reorganization Court within up to two (2) business days after the expiration of the period set forth in items 4.1.1.1 and 4.1.1.2 above, and the V.Tal UPI Bid Hearing shall be resumed within up to five (5) days after the expiration of the period set forth in this item 4.1.1.2 ("Continued V.Tal UPI Bid Hearing"). 5. Winning Bid. The bidder offering the best bid for the V.Tal UPI, subject to the Minimum Purchase Price for the V.Tal UPI, or the bid below the Minimum Purchase Price for the V.Tal UPI approved by the Creditors under Restructuring Option I, as applicable, shall be deemed the winner. The Reorganization Court shall determine and declare, during the V.Tal UPI Bid Hearing or on the date of the continued V.Tal UPI Bid Hearing, as applicable, the bid selected and deemed the winning bid, which must necessarily comply with the requirements and conditions set forth in this Notice and in the Judicial Reorganization Plan ("Winning Bid"). 5.1. Court approval of the Winning Bid. The Reorganization Court shall declare the Winning Bid and issue the court approval order of the sale of the V.Tal UPI, for the benefit of the bidder submitting the Winning Bid, as applicable ("Court Approval Order"), at the V.Tal UPI Bid Hearing or on the date of the continued V.Tal UPI Bid Hearing, as applicable. The Court Approval Order shall contain an express statement that the V.Tal UPI shall be transferred free and clear of successor liability, reflecting the terms of item 7 below. 5.2. Return of documents. Except for the Winning Bid, which shall be filed in the records, the remaining bids and the documents attached thereto shall be returned to their respective holders or representatives after the conclusion of the V.Tal UPI Bid Hearing. 6. Payment of the purchase price and transfer of the V.Tal UPI. Payment of the purchase price for the V.Tal UPI by the respective acquirer must be made in cash, in a lump sum, in Brazilian legal tender, with available funds free and clear of any liens, on the closing date of the sale of the V.Tal UPI. 7. Free and clear of successor liability and liability for debts of the Reorganization Companies. The V.Tal UPI shall be sold free and clear of any liens, and the successful bidder shall not succeed to the debtor's obligations of any nature, including, without limitation, obligations of an environmental, regulatory, administrative, criminal, anti-corruption, tax, and labor nature, pursuant to Articles 60, sole paragraph, 141, item II, and 142 of Law No. 11.101/2005 and Article 133, paragraph one, item II, of Law No. 5.172/1966. 8. Certificate of sale. Upon court approval of the Winning Bid in the Competitive Procedure for the sale of the V.Tal UPI, and upon evidence of payment of the purchase price for the V.Tal UPI under the terms and conditions of the Winning Bid and the respective V.Tal UPI Share Purchase Agreement to be entered into by the respective parties, the certificate of sale shall be issued in favor of the respective winner of the Competitive Procedure for the sale of the V.Tal UPI, as applicable, and it shall constitute a valid instrument of title to evidence the judicial acquisition of the V.Tal UPI, with the V.Tal UPI and/or the respective acquirer being free and clear of successor liability with respect to any debts and/or obligations of the Reorganization Companies and/or any other companies of the Oi Group, pursuant to Articles 60, sole paragraph, 141, item II, and 142 of Law No. 11.101/2005 and Article 133, paragraph one, item II, of Law No. 5.172/1966, subject to the provisions of item 7 of this Notice. 9. General provisions. (i) Pursuant to Clause 5.2.3.6 of the Judicial Reorganization Plan, the Exhibits are integral and inseparable parts of this Notice; (ii) this Notice (including its exhibits), the Competitive Procedure, and the Winning Bid must observe and respect the rights of creditors set forth in the fiduciary assignment of V.Tal Shares instrument (as per Exhibit 4.2.2.2.1(F)(I), item I.A, subitem 1, of the Judicial Reorganization Plan), the intercreditor agreement, the new money financing documents, the roll-up debt instrument, and the respective related instruments; (iii) this Notice must be construed together with the terms and conditions of the Judicial Reorganization Plan. In the event of any conflict between the provisions of this Notice and those of the Judicial Reorganization Plan, the Judicial Reorganization Plan shall prevail; and (iv) by operation of this Notice and upon the closing of the sale of the V.Tal UPI, the Reorganization Court expressly authorizes the Oi Group, the bidder submitting the Winning Bid, and their respective agents or representatives to perform all acts and continue any operations necessary or useful for the

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38 - RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29.

Translation No. 070
Book No. 1
Page 832

# Patricia Stanzione Galizia

Tradutora Juramentada * Certified Translator
JUCESP # 1944

implementation of the judicial sale of the V.Tal UPI, as necessary, and this Notice shall serve as a judicial order and official communication enforceable against any third party, including governmental entities, agencies, or public offices, for purposes of effecting registrations, annotations, transfers, or any other measures necessary or useful for the closing of the judicial sale of the V.Tal UPI, in accordance with this Notice. 10. Waiver of publication of the exhibits to the Notice. Due to the high number of characters, publication of the Exhibits to this Notice is hereby waived, and such Exhibits shall be filed in the records of the judicial reorganization proceeding and made available on the websites www.recjud.com.br and www.recuperacaojudicialoi.com.br. And, so that it may come to the knowledge of interested parties, I caused this NOTICE to be issued, and it shall be published and posted in accordance with the law. Given and executed in this city of Rio de Janeiro, on January 28, 2026. I, Maria Lucília de Souza Gerk, Chief Clerk of the Judicial Office, enrollment No. 01/27058, caused it to be typed and sign it by order of THE HONORABLE JUDGE SIMONE GASTESI CHEVRAND.

Rio de Janeiro, February 2, 2026

Office of the 7th Business Court

*IN WITNESS WHEREOF I set my hand and seal to this translation.*

*São Paulo, April 13, 2026*

_____

Patricia Stanzione Galizia

Certified Translator

all/384476.doc

PATRICIA STANZIONE GALIZIA - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1944 - CPF 267.120.998-38 - RG 23.506.852-4
Rua Monte Alegre, 1419 - Apt. 62 - Perdizes - 05014-002 - São Paulo - SP- Brasil
Fone/WhatsApp: 55-11-9-9249-55593 - e-mail: patricia.galizia@gmail.com

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29.



# SIGNATURES

# MANIFEST



Validation code: YW8DY-K8VFW-VM34E-XNU29

Document signed with ICP Brazil digital certificates on Assinador ONR by the following signers:

Patricia Stanzione Galizia (CPF ***.120.998-**)

To verify signatures, access the  validation direct link for this document:

https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29

Or access the signed document search available at the link below and provide the validation code:

https://assinador.onr.org.br/validate

Document signed at Assinador ONR. To validate the document and its signatures, access https://assinador.onr.org.br/validate/YW8DY-K8VFW-VM34E-XNU29.

Página

128855

Processo: 0090940-03.2023.8.19.0001
Procedimento Ordinário

## CERTIDÃO DE PUBLICAÇÃO

Certifico e dou fé que o edital abaixo, foi remetido(a) para o Diário da Justiça Eletrônico do Rio de Janeiro no expediente do dia 28/01/2026 e foi publicado em 02/02/2026 na(s) folha(s) 31/34 da edição: Ano 18 - n° 102 do DJE.

EDITAL DE ALIENAÇÃO JUDICIAL DE UNIDADE PRODUTIVA ISOLADA POR MEIO DE PROPOSTAS FECHADAS

Edital de alienação judicial da(s) Unidade(s) Produtiva(s) Isolada(s) (¿UPI(s)¿), por meio de processo competitivo mediante a apresentação de propostas fechadas, com fundamento no inciso IV do artigo 142 da Lei n° 11.101/2005 (¿Edital¿), extraído dos autos do processo autuado sob o n° 0090940-03.2023.8.19.0001 (migrado do processo n° 0809863-36.2023.8.19.0001 ¿ Pje) (¿Processo de Recuperação Judicial¿), em trâmite perante esse Juízo (¿Juízo da Recuperação¿), correspondente à Ação de Recuperação Judicial das sociedades OI S.A. ¿ EM RECUPERAÇÃO JUDICIAL (¿Oi¿), PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. ¿ EM RECUPERAÇÃO JUDICIAL (¿PTIF¿) e OI BRASIL HOLDINGS COÖPERATIEF U.A. ¿ EM RECUPERAÇÃO JUDICIAL (¿Oi Coop¿), doravante coletivamente denominadas de ¿Recuperandas¿ ou ¿Grupo Oi¿, na forma abaixo:
A EXMA. SRA. DRA. Simone Gastesi Chevrand, Juíza de Direito da 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro, FAZ SABER a quem do presente EDITAL conhecimento tiver e interessar possa, que, em razão da decisão de fls. 61.100/61.135, publicada no DJe de 29 de maio de 2024, que homologou a decisão da Assembleia Geral de Credores (¿AGC¿), concluída em 19 de abril de 2024, a qual aprovou o Plano de Recuperação Judicial do Grupo Oi submetido à votação na referida AGC (¿Plano de Recuperação Judicial¿), juntado com os seus anexos às fls. 56.787/58.633 dos autos da Recuperação Judicial, e da decisão de fls. 127.999/128.005, que autorizou a alienação judicial objeto deste Edital, será realizada alienação judicial da(s) UPI(s) V.tal, abaixo descrita(s), por meio de processo competitivo entre os potenciais interessados, na modalidade de propostas fechadas, com amparo nos artigos 60, 66, §3º, 141 e 142, inciso IV, todos da Lei nº 11.101/2005, sem que o adquirente suceda às Recuperandas em quaisquer obrigações de quaisquer naturezas, inclusive em relação às obrigações de natureza fiscal, tributárias e não tributárias, ambiental, regulatória, administrativa, cível, comercial, trabalhista, consumerista, penal, anticorrupção, previdenciária, nos termos dos artigos 60, parágrafo único, 141, inciso II e 142 da Lei nº 11.101/2005 e do artigo 133, parágrafo primeiro, inciso II da Lei nº 5.172/1966 (¿Procedimento Competitivo¿). Desta forma, serve o presente Edital para promover e estabelecer as condições para o referido Procedimento Competitivo, ficando todos os interessados cientificados de que poderão, após devidamente qualificados nos termos deste Edital, apresentar propostas fechadas para aquisição da UPI V.tal. Os termos utilizados neste Edital e aqui não definidos terão a definição que lhes foi atribuída no Plano de Recuperação Judicial. 1. Objeto e Preço Mínimo. O objeto do Processo Competitivo é a alienação de 100% (cem por cento) das Ações V.tal detidas pela Oi S.A. ¿ Em Recuperação Judicial e pela sua

subsidiária integral Rio Alto Investimentos e Participações S.A. (¿Rio Alto¿), conforme definido no item 1.1 abaixo e descrito no Anexo 5.2.1(ii) do Plano de Recuperação Judicial, observada a alteração do percentual de Ações V.tal detidos pela Oi e suas subsidiárias desde a aprovação do Plano de Recuperação Judicial, nos termos da Cláusula 5.2.2.2.3 do Plano de Recuperação Judicial. Todos os demais ativos, direitos, obrigações e passivos que não componham o Acervo V.tal não integrarão a UPI V.tal e não farão parte do Processo Competitivo, continuando na propriedade e obrigação do Grupo Oi. 1.1.  Os ativos que compõem a UPI V.tal, conforme descrição contida noAnexo 5.2.1(ii) do Plano de Recuperação Judicial, são a totalidade das ações de emissão da V.tal Rede Neutra de Telecomunicações S.A. (¿V.Tal¿) de titularidade da Oi e de sua subsidiária integral, Rio Alto, as quais totalizam 10.349.289.768 (dez bilhões, trezentas e quarenta e nove milhões, duzentas e oitenta  e nove mil, setecentas e sessenta e oito) ações ordinárias, nominativas e sem valor nominal, representativas, nesta data, de 27,26% (vinte e sete virgula vinte e seis porcento) do capital social da V.tal, sendo que tal percentual poderá sofrer alterações em razão de eventos de indenização pactuados no âmbito dos Acordos de Investimentos celebrados pela Oi em 1º de outubro de 2021 e 28 de fevereiro de 2025 (¿Ações V.tal¿). 1.2.  A UPI V.tal será alienada livre e desembaraçada de qualquer Ônus, sem que o adquirente suceda às  Recuperandas  em quaisquer  dívidas, contingências e obrigações de quaisquer naturezas, inclusive em relação às obrigações de natureza fiscal, tributárias, ambiental, regulatória, administrativa, cível, comercial, trabalhista, consumerista, penal,  anticorrupção, previdenciária nos termos dos artigos 60, parágrafo único, 66, §3º, 141, inciso II e 142 da Lei nº 11.101/2005 e do artigo 133, parágrafo primeiro, inciso II da Lei nº 5.172/1966.  2.  Preço Mínimo UPI V.tal. Observado o disposto no item 4.1 abaixo, o preço mínimo para aquisição da totalidade das Ações V.tal, que compõe a UPI V.tal, a ser considerado pelo Juízo da Recuperação e pago por eventual interessado vencedor do Processo Competitivo à vista, em dinheiro, é de R$ 12.315.977.451,75 (doze bilhões, trezentos e quinze milhões, novecentos e setenta e sete mil, quatrocentos e cinquenta e um reais e setenta e cinco centavos) (¿Preço Mínimo UPI V.tal¿). 2.1.  O pagamento deverá ser realizado exclusivamente em dinheiro e à vista, em valor igual ou superior ao acima indicado, sendo vedadas propostas em pagamento diferido e a utilização de qualquer espécie de crédito, ativo, compensação ou outra forma de contrapartida que não seja moeda corrente nacional 2.2.  Na hipótese de a Oi receber apenas propostas para aquisição da UPI V.tal, em dinheiro, em  valor  inferior  ao  Preço  Mínimo  UPI  V.tal,  a  Audiência Propostas  UPI  V.tal  (conforme definida no item 4 abaixo) deverá ser suspensa e o Administrador Judicial deverá submeter, em 2  (dois)  Dias  Úteis  contados  da  data  da Audiência  Propostas  UPI  V.tal, todas as Propostas Inferiores  ao  Preço  Mínimo  UPI  V.tal  à análise  e  deliberação  dos  Credores  Opção  de Reestruturação I, nos termos e prazos previstos na Cláusula 5.2.2.2.4 do Plano de Recuperação Judicial, observada  a  necessidade do  prévio  e  expresso  consentimento  dos  Terceiros  Novo Financiamento, caso configurada a  hipótese  prevista  na  Cláusula  5.2.2.2.5  do  Plano  de Recuperação Judicial. 2.3. Independentemente do valor ofertado pelos participantes do Processo Competitivo para aquisição  da  UPI  V.tal,  conforme  aplicável,  somente  serão  consideradas  válidas  e aceitas propostas com ofertas de pagamento à vista, em dinheiro e em moeda corrente nacional. 3. Condições Mínimas e Condições UPI V.tal para participação no Processo Competitivo. Serão admitidos a participar do Procedimento Competitivo de alienação da UPI

Tribunal de Justiça do Estado do Rio de Janeiro

Página

**128857**

Carimbado Eletronicamente

V.tal as pessoas regularmente constituídas que atendam às Condições Mínimas e as Condições UPI V.tal, conforme o disposto no Plano de Recuperação Judicial e neste Edital. 1. Condições Mínimas. Os interessados em participar do Processo Competitivo de alienação da UPI V.tal deverão manifestar seu interesse no prazo de 7 (sete) Dias Úteis contados da publicação deste Edital, por meio de apresentação de notificação de qualificação ao Grupo Oi, a ser encaminhada por e-mail para Bruno Rezende (brunorezende@psvar.com.br), Fabio Wagner (fabio.wagner@oi.net.br) e André Paradizi (andre.paradizi@oi.net.br), com cópia para a Administração Judicial (credoroi@wald.com.br) e para a Gestão Judicial (gestao.oi@psvar.com.br) e protocolo perante o Juízo da Recuperação, no mesmo prazo aqui estabelecido (¿Qualificação¿). 3.1.1. A notificação de Qualificação a ser apresentada por cada interessado em participar do Processo Competitivo deverá, além de informar o interesse na participação no Processo Competitivo, reunir, no mínimo, as seguintes condições, sob pena do respectivo interessado ter sua notificação de Qualificação desconsiderada: (i) apresentar comprovantes de existência e regularidade, como certidões e comprovantes de inscrição e situação cadastral, devidamente emitidos pelos órgãos responsáveis pelo registro de constituição do interessado; (ii) apresentar cópia do respectivo contrato social ou estatuto social ou qualquer outro documento de constituição. Caso seja uma sociedade por ações, o interessado deverá apresentar cópia dos livros societários que indiquem as pessoas físicas ou jurídicas titulares das ações, ou, no caso de companhias abertas, o extrato de posição acionária atualizado. Caso seja um fundo de investimento, o interessado deverá apresentar cópia do regulamento do fundo e estatuto social ou contrato social do administrador do fundo; (iii) apresentar declaração de referência bancária de pelo menos 2 (duas) instituições financeiras de primeira linha atestando a capacidade econômica, financeira e patrimonial do interessado para participar do Processo Competitivo; (iv) apresentar prova de que tem disponibilidade de recursos ou meios suficientes para fazer frente ao pagamento do preço de aquisição proposto, mediante apresentação de carta de crédito irrevogável e irretratável de instituição financeira registrada no Banco Central do Brasil; (v) o interessado deverá, obrigatoriamente, concordar e aderir expressamente aos termos e condições previstos no Plano de Recuperação Judicial do Grupo Oi e neste Edital, sem quaisquer ressalvas; e. (vi) o interessado poderá realizar a habilitação para participação no Procedimento Competitivo em nome próprio ou em nome de veículo por ele controlado a ser futuramente criado para tal fim. 3.2. Acordo de Confidencialidade e Protocolo Antitruste ¿ No mesmo prazo estabelecido no item 3.1 acima para a Qualificação e atendimento às Condições Mínimas ¿ qual seja, 7 (sete) Dias Úteis contados da publicação deste Edital no Diário da Justiça Eletrônico do Estado do Rio de Janeiro ¿, o interessado deverá assinar o Acordo de Confidencialidade e, se aplicável, o Protocolo Antitruste, que constituem, respectivamente, os Anexos I e II, partes integrantes deste Edital, os quais deverão ser assinados e encaminhados por e-mail para os destinatários previstos no item 3.1 acima e acompanhados dos documentos que comprovem os poderes de representação do subscritor, juntamente com lista contendo no máximo 15 (quinze) nomes de seus representantes, com suas respectivas qualificações, aos quais será franqueado acesso às informações e documentos da Auditoria que serão disponibilizados a respeito da UPI V.tal (conforme definido no item 3.3 abaixo). 3.2.1. Eventuais acordos que já tenham sido assinados entre o interessado e a Oi e que sejam materialmente na forma dos Anexos I e II e

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128858
Carimbado Eletronicamente

permaneçam válidos e eficazes poderão ser apresentados e aceitos como válidos, evitando a necessidade de apresentação de novos acordos. 3.2.2. A assinatura do Acordo de Confidencialidade e, se aplicável, do Protocolo Antitruste (ou a apresentação dos acordos materialmente similares conforme item 3.2.1) conferirá aos interessados na aquisição da UPI V.tal devidamente qualificados, o acesso irrestrito a todos os documentos e informações da Auditoria que serão disponibilizados a respeito da UPI V.tal na Sala de Informação (conforme definido no item 3.3 abaixo). 3.2.3. Os interessados que não assinarem o Acordo de Confidencialidade e/ou o Protocolo Antitruste e/ou não encaminharem os referidos documentos, juntamente com os documentos que comprovem os poderes de representação e/ou a lista de representantes, na forma e no prazo previsto no item 3.2 acima não estarão habilitados para realizar a Auditoria e as propostas eventualmente enviadas por tais interessados não serão consideradas para fins do Procedimento Competitivo de alienação da UPI V.tal. 3.2.4. Caso (i) o Acordo de Confidencialidade e/ou o Protocolo Antitruste tenham seus termos alterados (exceto pelos casos dispostos no item 3.2.1); e/ou (ii) o envio do Acordo de Confidencialidade e/ou do Protocolo Antitruste não observe o quanto disposto no presente Edital, os respectivos interessados não estarão habilitados para realização da Auditoria e não terão acesso aos documentos e informações relativos à UPI V.tal, e as propostas eventualmente enviadas por tais interessados não serão consideradas para fins do Procedimento Competitivo de alienação da UPI V.tal. 3.3. Auditoria - Acesso às informações. Após encerramento do prazo previsto no item 3.3.2 deste Edital, será franqueado aos interessados na aquisição da UPI V.tal que tenham atendido às Condições Mínimas e que tenham enviado o Acordo de Confidencialidade e, se aplicável, o Protocolo Antitruste assinados, nos termos do item 3.2 deste Edital, acesso aos documentos e informações organizados pelo Grupo Oi a respeito da UPI V.tal e disponibilizados na Sala de Informação, pelo prazo de 30 (trinta) dias (¿Auditoria¿). 3.3.1. Os documentos e informações organizados pelo Grupo Oi serão disponibilizados de forma virtual em plataforma digital a ser informada oportunamente pelo Grupo Oi ("Sala de Informação"). 3.3.2. A verificação da regularidade do Acordo de Confidencialidade e do Protocolo Antitruste será feita pelo Grupo Oi em até 2 (dois) dias úteis após o seu respectivo recebimento. 3.3.3. Confirmado o atendimento aos requisitos indicados nos itens 3.1 e 3.2 acima, o Grupo Oi restituirá ao interessado uma das vias do Acordo de Confidencialidade e, se aplicável, do Protocolo Antitruste, devidamente assinadas, com as instruções para acesso aos documentos e informações disponibilizados virtualmente. 3.3.4. Verificado o desatendimento a qualquer dos requisitos do Acordo de Confidencialidade e/ou do Protocolo Antitruste, as duas vias recebidas e os documentos a elas anexados serão restituídos e o remetente não terá acesso aos documentos e informações disponibilizados pelo Grupo Oi. 3.4. Condições UPI V.tal. As propostas fechadas para a aquisição da UPI V.tal a serem apresentadas pelos interessados nos termos do item 3.4.1 abaixo deverão observar, além das Condições Mínimas previstas acima neste Edital, os seguintes requisitos (¿Condições UPI V.tal¿): (i) a obrigação de pagamento do preço de aquisição à vista, em dinheiro e em moeda corrente nacional; (ii) a expressa adesão aos termos e condições fixados neste Edital, bem como o compromisso irrevogável e irretratável de negociar e celebrar o Contrato de Compra e Venda UPI V.tal do Anexo III; (iii) a expressa concordância com o formato e procedimento do Procedimento Competitivo de alienação da UPI V.tal estabelecidos no Plano de Recuperação Judicial e neste Edital; (iv) a

Tribunal de Justiça do Estado do Rio de Janeiro
Página
128859
Carimbado Eletronicamente

não sujeição da efetividade da proposta e da consumação da aquisição da UPI V.tal a qualquer outra condição que não esteja prevista no Plano de Recuperação Judicial, neste Edital ou a termo ou condição não razoavelmente usuais para operação de natureza similar, excluindo qualquer exigência de realização de diligência adicional; (v) a declaração de ciência do proponente de que as Recuperandas poderão, a qualquer momento até a realização da Audiência Propostas UPI V.tal, exigir a apresentação de documentação que comprove sua capacidade econômica, financeira e patrimonial; e/ou que possui capacidade de obtenção de recursos ou meios suficientes para fazer frente ao pagamento do montante proposto para aquisição da UPI V.tal sob pena de a proposta enviada por tal interessado não ser considerada para fins do Procedimento Competitivo; (vi) a obrigação do proponente de se declarar expressamente vinculado e obrigado a observar todos os termos, condições e obrigações estabelecidos no Plano de Recuperação Judicial relativos à venda da UPI V.tal; e (vii) a declaração de ciência e concordância de que a participação societária da Oi na V.tal poderá sofrer alterações, até a data de fechamento da alienação da UPI V.tal, em razão de eventos de indenização pactuados no âmbito de Acordos de Investimentos celebrados pela Oi em 1º de outubro de 2021 e 28 de fevereiro de 2025. 3.4.1. Para fins deste Edital, ¿Contrato de Compra e Venda UPI V.tal¿ significa o contrato de compra e venda de ações a ser celebrado entre o vencedor do Procedimento Competitivo e a Oi, por meio do qual serão alienadas, pela Oi ao respectivo vencedor, 100% (cem por cento) das Ações V.tal, livres e desembaraçadas de quaisquer Ônus. 3.5. Apresentação de Propostas Fechadas. Os interessados que atendam aos requisitos para sua participação no Procedimento Competitivo de alienação da UPI V.tal, conforme os termos e condições previstos neste Edital (¿Interessados Qualificados¿), deverão apresentar suas propostas fechadas para aquisição da UPI V.tal durante a Audiência Propostas UPI V.tal (¿Data-Limite Apresentação Propostas Fechadas¿), observadas as Condições UPI V.tal descritas no item 3.4 acima. 3.5.1. Os envelopes fechados deverão estar lacrados e identificados e ser entregues diretamente ao Juízo da Recuperação durante a Audiência Propostas UPI V.tal, que será, juntamente com a Administração Judicial, responsável por abri-los e conferir que preenchem as Condições Mínimas e as Condições UPI V.tal. 3.6. Contrato de Compra e Venda UPI V.tal. O envelope contendo a proposta fechada deverá conter como anexo indissociável a ela uma cópia marcada do Contrato de Compra e Venda da UPI V.tal cuja minuta-base consta da Sala de Informação, evidenciando as alterações propostas pelo Interessado Qualificado. A disposição do Interessado Qualificado em aceitar os termos e condições constantes da minuta-base disponibilizada na Sala de Informação também poderá ser um fator na avaliação das Propostas apresentadas, em caso de empate. 3.6.1. Os Interessados também poderão, até a Data-Limite Apresentação Propostas Fechadas, contatar a Oi e/ou representantes com o intuito de discutir e debater o Contrato de Compra e Venda da UPI V.tal e/ou tirar dúvidas acerca de referido documento ou do Procedimento Competitivo, nos termos da Cláusula 5.2.3.4 do Plano de Recuperação Judicial. 4. Audiência de Abertura das Propostas Fechadas. As propostas fechadas serão abertas em audiência presidida por este MM. Juízo, na presença do sr. Promotor de Justiça, do Administrador Judicial, do Gestor Judicial, das Recuperandas e demais interessados, na sala de audiências deste Juízo, localizada na sala 706 da Lâmina Central do Fórum da Capital, situado na Av. Erasmo Braga, nº 115, Rio de Janeiro/RJ, às 15 horas do dia 05 de março de 2026 (¿Audiência Propostas UPI V.tal¿), de cuja realização os

Tribunal de Justiça do Estado do Rio de Janeiro

Página

128860

Carimbado Eletronicamente

Interessados Qualificados ficam desde já intimados. 4.1. Propostas Inferiores ao Preço Mínimo . Caso, após a abertura de propostas nos termos do item 4 acima, o preço de aquisição da UPI V.tal previsto na(s) proposta(s) seja(m) inferior(es) ao Preço Mínimo UPI V.tal (¿Propostas Inferiores ao Preço Mínimo UPI V.tal¿), a Audiência Propostas UPI V.tal será suspensa e o Administrador Judicial submeterá, em até 2 (dois) Dias Úteis contados da data da Audiência Propostas UPI V.tal, a(s) Proposta(s) Inferior(es) ao Preço Mínimo UPI V.tal, para análise e deliberação dos Credores Opção de Reestruturação I, nos termos e prazos previstos na Cláusula 5.2.2.2.4 do Plano de Recuperação Judicial. 4.1.1.1. Caso os Credores Opção de Reestruturação I aceitem uma das Propostas Inferiores ao Preço Mínimo UPI V.tal e comuniquem tal decisão ao Administrador Judicial em até 10 (dez) dias corridos do recebimento de tais propostas, observados os termos e condições previstos na Cláusula 5.2.2.2.4 do Plano de Recuperação Judicial, tal Proposta Inferior ao Preço Mínimo UPI V.tal aceita será considerada a Proposta Vencedora (conforme definido no item 5 abaixo). 4.1.1.2. Caso a deliberação pelos Credores Opção de Reestruturação I (i) não ocorra no prazo de 10 (dez) dias corridos contados do recebimento das Propostas Inferiores ao Preço Mínimo UPI V.tal, ou (ii) o resultado da deliberação pelos Credores Opção de Reestruturação I não seja comunicado ao Administrador Judicial no prazo de 10 (dez) dias corridos contados do recebimento das Propostas Inferiores ao Preço Mínimo UPI V.tal, todas as Propostas Inferiores ao Preço Mínimo UPI V.tal apresentadas pela Oi serão consideradas automaticamente rejeitadas, conforme previsto na Cláusula 5.2.2.2.4 (b) do Plano de Recuperação Judicial. 4.1.1.3. OAdministradorJudicial deverá comunicar o resultado das deliberações ao Juízo da Recuperação em até 2 (dois) Dias Úteis após o término do prazo previsto nos itens 4.1.1.1e 4.1.1.2 acima e a Audiência Propostas UPI V.tal será retomada no prazo de até 5 (cinco) dias após o término do prazo previsto neste item 4.1.1.2 (¿Continuação da Audiência Propostas UPI V.tal¿). 5. Proposta Vencedora. Será considerado vencedor o proponente que oferecer a melhor proposta pela UPI V.tal, observado o Preço Mínimo UPI V.tal, ou a Proposta Inferior ao Preço Mínimo UPI V.tal aprovada pelos Credores Opção de Reestruturação I, conforme o caso. O Juízo da Recuperação apurará e declarará durante a Audiência Propostas UPI V.tal ou na data da Continuação da Audiência Propostas UPI V.tal, conforme o caso, a proposta selecionada e considerada vencedora, que deverá necessariamente observar os requisitos e condições previstos neste Edital e no Plano de Recuperação Judicial (¿Proposta Vencedora¿). 5.1. Homologação da Proposta Vencedora. O Juízo da Recuperação declarará a Proposta Vencedora e proferirá decisão de homologação da alienação da UPI V.tal, em benefício do proponente da Proposta Vencedora, conforme o caso (¿Decisão Homologação¿) na Audiência Propostas UPI V.tal ou na data da Continuação da Audiência Propostas UPI V.tal, conforme o caso. A Decisão Homologação conterá declaração expressa no sentido de que a UPI V.tal será transferida livre de sucessão, refletindo os termos do item 7 abaixo. 5.2. Restituição de Documentos. Salvo a Proposta Vencedora, que será juntada aos autos, as demais propostas e os documentos a elas anexados serão restituídos aos seus respectivos titulares ou representantes após o encerramento da Audiência Propostas UPI V.tal. 6. Pagamento do Preço e Transferência da UPI V.tal. O pagamento do preço de aquisição da UPI V.tal pelo respectivo adquirente deverá ser integralmente realizado em dinheiro, à vista, em moeda corrente nacional, em recursos disponíveis, livres e desembaraçados de qualquer Ônus, na data de fechamento da alienação da UPI V.tal. 7.

Tribunal de Justiça do Estado do Rio de Janeiro

Página

**128861**

Carimbado Eletronicamente

Ausência de Sucessão e Responsabilidade por Dívidas das Recuperandas. A UPI V.tal será alienada livre de qualquer Ônus e não haverá sucessão do arrematante nas obrigações do devedor de qualquer natureza, incluídas, mas não exclusivamente, as de natureza ambiental, regulatória, administrativa, penal, anticorrupção, tributária e trabalhista, nos termos dos artigos 60, parágrafo único, 141, inciso II e 142 da Lei nº 11.101/2005 e do artigo 133, parágrafo primeiro, inciso II da Lei nº 5.172/1966. 8. Auto de Arrematação. Homologada a Proposta Vencedora do Procedimento Competitivo de alienação da UPI V.tal, e comprovado o pagamento do preço de aquisição UPI V.tal nos termos e condições da Proposta Vencedora e do respectivo Contrato de Compra e Venda UPI V.tal a ser celebrado entre as respectivas partes, será lavrado o auto de arrematação em favor do respectivo vencedor do Procedimento Competitivo de alienação da UPI V.tal, conforme o caso, que constituirá título hábil a comprovar a aquisição judicial da UPI V.tal, com a ausência de sucessão da UPI V.tal e/ou do respectivo adquirente em relação a quaisquer dívidas e/ou obrigações das Recuperandas e/ou de quaisquer outras empresas do Grupo Oi, na forma dos artigos 60, parágrafo único, 141, inciso II e 142 da Lei nº 11.101/2005 e do artigo 133, parágrafo primeiro, inciso II da Lei nº 5.172/1966, observado o disposto no item 7 deste Edital. 9. Disposições Gerais. (i) Conforme Cláusula 5.2.3.6 do Plano de Recuperação Judicial, os Anexos são parte integrante e indissociável deste Edital; (ii) este Edital (incluindo seus anexos), o Procedimento Competitivo, e a Proposta Vencedora deverão observar e respeitar os direitos dos credores previstos no instrumento de Alienação Fiduciária Ações V.Tal (conforme Anexo 4.2.2.2.1(F)(I), item I.A, subitem 1, do Plano de Recuperação Judicial), no Contrato entre Credores (Intercreditor Agreement), nos Instrumentos do Novo Financiamento, no Instrumento de Dívida Roll-Up e respectivos instrumentos relacionados; (iii) este Edital deverá ser interpretado em conjunto com os termos e condições do Plano de Recuperação Judicial. Em caso de qualquer divergência entre o disposto neste Edital e o previsto no Plano de Recuperação Judicial, o Plano de Recuperação Judicial prevalecerá; e (iv) pela operação do presente Edital e mediante a consumação da venda da UPI V.tal, o Juízo da Recuperação autoriza expressamente o Grupo Oi, o respectivo proponente da Proposta Vencedora e seus respectivos agentes ou representantes a praticar todos os atos e continuar quaisquer operações necessárias ou úteis para implementação da alienação judicial da UPI V.tal, conforme necessário, servindo este Edital como decisão judicial e ofício oponível a qualquer terceiro, inclusive entes governamentais, órgãos ou repartições públicas para fins de promoção de registros, averbações, transferências ou quaisquer outras medidas necessárias ou úteis para a consumação da alienação judicial da UPI V.tal, na forma deste Edital. 10. Dispensa de Publicação dos Anexos do Edital. Em razão do elevado número de caracteres, fica dispensada a publicação dos Anexos deste Edital, os quais serão juntados aos autos do processo de recuperação judicial e disponibilizados nos sites www.recjud.com.br e www.recuperacaojudicialoi.com.br. E, para que chegue ao conhecimento dos interessados, mandei expedir o presente EDITAL que será publicado e afixado na forma da Lei. Dado e passado nesta cidade do Rio de Janeiro,aos 28 de janeiro de 2026. Eu, Maria Lucília de Souza Gerk, Chefe de Serventia Judicial, matrícula 01/27058 mandei digitar e o subscrevo por ordem da EXMA. DRA. SIMONE GASTESI CHEVRAND.

Rio de Janeiro, 2 de fevereiro de 2026
Cartório da 7ª Vara Empresarial



13 ABR 2026 - V.**070**

**Exhibit 5**

March 5, 2026 Hearing Minutes

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

------------------------------------------------------------

I, the undersigned Sworn Public Translator and Commercial Interpreter, recognized and respected throughout the Federative Republic of Brazil, duly appointed and authorized by the Board of Trade of the State of Rio de Janeiro (JUCERJA) and registered under No 281, DO HEREBY CERTIFY AND ATTEST that I received a document in the Portuguese language for translation into English, which I have lawfully executed in my official capacity, as follows:-----

------------------------------------------------------------

*(All pages initialed and with the stamp of the Court of Appeals of the State of Rio de Janeiro – Electronically Stamped – and numbered from 132191 to 132197)*

**MINUTES OF THE HEARING FOR THE SALE OF THE ASSETS OF A BUSINESS COMPANY UNDER COURT-SUPERVISED REORGANIZATION BY ACTION**

**Case No.:** 0090940-03.2023.8.19.0001

**Action:** Court-Supervised Reorganization

**Debtors:** OI S.A.; PORTUGAL TELECOM INTERNATIONAL FINANCE B.V.; and OI BRASIL HOLDINGS COOPERATIEF U.A.A. (OI GROUP), represented by their counsel, Mr. Rodrigo Moraes Mendonça Raposo (OAB/SP No. 484,277)

**Court-Appointed Manager:** Mr. Bruno Rezende (OAB/RJ No. 12,405)

**Joint Court-Appointed Trustee:** Wald Administração de Falências e Empresas em Recuperação Judicial Ltda., represented by Ms. Adriana Conrado Zamponi (OAB/RJ No. 92,831)

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

**WatchDog:** Mr. Adriano Pinto Machado (OAB/RJ No. 78,188)

**Public Prosecution Service**: Mr. Pedro Rubim Borges Fortes

**Interested Parties:** BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA; BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP; BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTI-CIPAÇÕES MULTIESTRATÉGIA; STANS 13, S.A.; BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A. (represented by Mr. Marcelo Lamego Carpenter Ferreira (OAB/RJ No. 092,518) and UMB BANK, represented by Mr. Guilherme Vaz Leal da Costa (OAB/RJ No. 158,892), COMITÊ DE CREDORES TRABALHISTAS DA SEREDE (Mr. Robson Caetano da Silva – OAB No. 176,943).

On **the fifth (5th) day of March, two thousand and twenty-six (2026), at 3:00 p.m.,** a Hearing was convened and commenced for the opening, in the first round, of sealed bids for the sale of the asset consisting of Oi S.A.'s participation in V. Tal – within the scope of the Court-Supervised Reorganization of the OI GROUP, in accordance with Articles 60, 66, §3; 141 and 142, items IV and V, of Law No. 11,101/2011,

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

presided over by the Honorable Judge of the 7th Business Court of the Capital, Ms. SIMONE GASTESI CHEVRAND.

In the hearing room, the presence of the Debtors, the Joint Court-Appointed Trustee, the Court-Appointed Manager, the appointed Watchdog, and the representative of the Public Prosecution Service, as mentioned above, was confirmed. Also present were representatives of the bidders and of UMB BANK.

The customary call was made to announce the opening of the hearing, in accordance with the Public Notice, duly published in the Official Electronic Gazette (DJe), as per index 128,060.

The following proposal was submitted:

**By BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.**

**By order of the Court, THE ENVELOPE containing the submitted proposal WAS OPENED, and the terms of the proposal were made available for review by the Court-Appointed Trustee and all other attendees.**

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

**Thereafter, the Joint Court-Appointed Trustee stated that:** the proposal meets the objective requirements and, considering that it is below the minimum price set forth in the public notice, the procedure for consulting the creditors, as provided for in the public notice, will be followed.

**The court-appointed manager,** in turn, also agreed with the suspension of the hearing, as argued by the debtor.

**On behalf of OI,** it was stated that it advocates for compliance with the procedure set forth in the public notice, as presented by the Court-Appointed Trustee, with the hearing of the manager and the Court-Appointed Trustee.

**The Watchdog** then stated that: it agrees with the considerations of all those who preceded it, supporting the suspension of the hearing, as argued by the debtor.

**On behalf of UMB,** it was stated that the court-supervised reorganization plan must be followed in its strict terms, including clause 5.2.2.2.4, item "b", which provides that: "OI shall not have the right to veto the deliberation of the Restructuring Option I

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

Creditors, as set forth in this Clause, nor to impose upon the Restructuring Option I Creditors the acceptance of any Proposals Below the Minimum Price for UPI V. TAL."

**The Public Prosecution Service**, in turn, stated that: it does not oppose, at this time, the suspension of the hearing, as argued by the debtor, so that an opportunity may be given for any interested and involved parties to submit their positions, emphasizing that, in the view of the Public Prosecution Service, preclusion has not yet occurred with respect to certain sensitive aspects that were challenged and that may occasionally result in adjustments, should there be any concrete offer capable of resulting in a higher economic benefit than the amount proposed at this time, reserving the Public Prosecution Service the prerogative to express its position at a later stage, in accordance with the protocol adopted by this Honorable Court in its prudent consideration on this date.

**The proponents** clarified that, should there be any change to the rules of the public notice, including the admission of other proposals submitted outside the

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

deadline and conditions set forth therein, they reserve the right to amend or withdraw the proposal submitted.

**After hearing all parties, the Court ruled as follows:** Initially, in view of the need to adopt the deadline set forth in the public notice for cases involving submission of a proposal below the minimum price for UPI V. Tal, it is ordered that the proposal submitted shall remain under seal, with access restricted exclusively to the debtors, the Public Prosecution Service, the Court-Appointed Trustee, and the Court-Appointed Manager. **All those present who are aware of the minimum terms of the proposal are hereby ordered to maintain the confidentiality of the information obtained at this hearing, under penalty of civil and criminal liability.**

Furthermore, it is understood that compliance with the provisions set forth in items 2 *et seq.* of the published public notice is required, during which the Restructuring Option I Creditors shall have full opportunity to express their views, should they so wish. Only upon the lapse of the specified deadlines shall

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

the issues presented and any pending matters be decided simultaneously, also in accordance with the public notice.

Additionally, in light of the considerations presented by the parties and interested stakeholders present, especially the Public Prosecution Service, it is determined that, once the stages of submission of the proposal to the Restructuring Option I Creditors by the Court-Appointed Trustee have been completed, with communication to the Court within 2 days, all of the following parties shall be given the opportunity to submit their positions in the case records, and only thereafter shall the hearing be resumed.

Accordingly, subject to the deadlines of 02 business days for the Court-Appointed Trustee to notify the Restructuring Option I Creditors, ending on March 9; followed by the period for the Restructuring Option I Creditors, ending on March 19; and then a further period of 02 days for communication to the Court, ending on March 23, all parties (OI, proponents, Court-Appointed Trustee, Court-Appointed Management, and Watchdog) shall submit their positions within a common period of 02 days, between March 24 and 25;

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

thereafter, the Public Prosecution Service shall submit its position (on March 26 and 27), so that the hearing shall be resumed on March 30, 2026, at 3:00 p.m.

In view of the foregoing, **this hearing is hereby SUSPENDED. For compliance with the schedule described above, in accordance with the public notice, the hearing is hereby RESCHEDULED for March 30, 2026, at 3:00 p.m.,** for its continuation. All parties are deemed notified at this time.

Until the resumption of the hearing, the confidentiality of all submissions made shall be preserved (as specified above), which shall be ensured through the opening of a specific confidential incidental proceeding for this purpose. Upon the resumption of the hearing on the scheduled date, the confidential proceeding shall be attached to the case records and the confidentiality imposed thereon shall be lifted.

**Counsel for UMB** stated that it opposes the confidentiality with respect to the submissions to be filed, also because there may be creditors interested in challenging the terms of the proposal.

**Counsel for the PROPONENTS** stated that it understands

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

that the confidentiality of the proposal would be compromised if the confidentiality of the submissions were lifted.

**The DEBTOR** stated that it considers the maintenance of confidentiality appropriate, as determined by the Court.

**The COURT-APPOINTED TRUSTEE** stated that it agrees with the Court's decision, since the hearing has been suspended until a subsequent hearing.

**The PUBLIC PROSECUTION SERVICE** stated that, although it understands the argument that certain creditors may be interested in becoming aware of the value of the proposal, on the other hand it is necessary to preserve the procedure customarily adopted for hearings of this nature, in which confidentiality of the proposals must be maintained until the moment of a potential approval. For this reason, it agrees with the Court's decision regarding the maintenance of confidentiality, without prejudice to the possibility of deferred adversarial proceedings and subsequent challenges by creditors who may consider themselves dissatisfied.

**The COURT ruled as follows:** I do not identify any

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

prejudice in adopting the confidentiality previously determined. On the contrary, greater harm may result from the disclosure of the submissions, in violation of the provisions of the public notice. Indeed, it was established that the hearing at which the proposal will be decided would be deferred. It is also a fact that the proposal submitted contains elements to be assessed only by those who will have access to the confidential incidental proceeding to be instituted. Furthermore, any creditors not represented by the objecting party – who will effectively have access to the confidential proceeding – besides not being able to be represented by it, due to an evident lack of standing, could and should have qualified to participate in the bidding process, pursuant to the public notice. Therefore, the allegation of any need for such parties to have prior knowledge of the matters deliberated herein is not justified, at least at this stage.

As previously stated, once the hearing is resumed and a decision regarding the proposal is rendered, the confidentiality shall be lifted, as has already been adopted by this Court in numerous prior situations

## DEBORAH SZCZERBACKI
### Tradutor Público - Inglês
### Sworn Translator
### JUCERJA Matrícula nº 281

Nº 2 Livro Digital 01/2026 Página 1-13

and, as well-noted by the Public Prosecution Service, those who disagree with the decision may then submit their arguments and challenge the respective ruling. In the absence of reasonable grounds to alter this Court's conclusion, **I hereby maintain the determination to open a confidential incidental proceeding, to which all submissions by the aforementioned parties shall be directed and which shall thereafter be attached to the main case records.**

There being nothing further, I hereby close this hearing and, for full publicity, it was ordered that these Minutes be drawn up, made available for reading by the interested parties, and immediately attached to the Court-Supervised Reorganization case file, as well as posted on the websites www.recuperacaojudicial.oi.com.br and www.recjud.com.br.

There being nothing further, the hearing was closed at 4:53 p.m., and these minutes are signed by all those present. Published in the hearing and the parties present are deemed notified.

(Assinatura) **Simone Gastesi Chevrand**

**JUDGE OF LAW**

(Assinatura) **Pedro Rubim Borges Fortes**

DEBORAH SZCZERBACKI
Tradutor Público - Inglês Sworn Translator
JUCERJA Matrícula nº 281

**PUBLIC PROSECUTION SERVICE**

DEBTORS

*(Assinaturas)* JOINT COURT-APPOINTED TRUSTEE

(Ms. Adriana Conrado Zamponi)

*(Assinatura)* COURT-APPOINTED MANAGER

Mr. Bruno Rezende

*(Assinatura)* WATCHDOG

(Mr. Adriano Pinto Machado)

*(Assinatura)*

BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.

Mr. Marcelo Lamego Carpenter Ferreira OAB/RJ No. 092,518

*(Assinatura)* UMB BANK

(Mr. Guilherme Vaz Leal da Costa - OAB/RJ No. 158,892)

*(Assinatura)*

COMITÊ DE CREDORES TRABALHISTAS DA SEREDE

(Mr. Robson Caetano da Silva – OAB No. 176,943)

-------------------------------------------------------------------------------

**DEBORAH SZCZERBACKI**
**Tradutor Público - Inglês**
**Sworn Translator**
**JUCERJA Matrícula nº 281**

Nº 2 Livro Digital 01/2026 Página 1-13

THIS WAS THE FULL TEXT of said document, the true translation whereof I ATTEST.-------------------------------------------------------------------------------------
WITNESS MY HAND AND SEAL, March 31, 2026. ---------------------------------
--------------------------------------------------------------------



Página
132190

# ATA DE AUDIÊNCIA DE LEILÃO DE ATIVO DE SOCIEDADE EMPRESÁRIA EM RECUPERAÇÃO JUDICIAL

**Processo n°:** 0090940-03.2023.8.19.0001

**Ação:** Recuperação Judicial.

**Recuperandas:** OI S.A.; PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. E OI BRASIL HOLDINGS COOPERATIEF U.A.A. (GRUPO OI), representada por seus advogados, dr. Rodrigo Moraes Mendonça Raposo (OAB/SP n° 484.277)

**Gestor Judicial:** Dr. Bruno Rezende (OAB/RJ n°124.405)

**Administração Judicial Conjunta:** Wald Administração de Falências e Empresas em Recuperação Judicial Ltda, representada pela Dra. Adriana Conrado Zamponi (OAB/RJ n° 92.831)

**WatchDog:** Dr. Adriano Pinto Machado (OAB/RJ 77.188)

**Ministério Público:** Dr. Pedro Rubim Borges Fortes

**Interessado(s):** BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.(representada por Dr. Marcelo Lamego Carpenter Ferreira (OAB/RJ 092.518) e UMB BANK, representado por Dr. Guilherme Vaz Leal da Costa (OAB/RJ158.892), COMITÊ DE CREDORES TRABALHISTAS DA SEREDE (Dr. Robson Caetano da Silva - OAB 176943).



Aos **cinco (05) dias do mês de março de dois mil e vinte e seis, às 15:00 horas**, foi instaurada e iniciada a Audiência de abertura, em primeira rodada, das propostas fechadas para venda de ativo constituído pela participação da Oi S.A. na V. Tal - nos autos da Recuperação do GRUPO OI, na forma prevista nos arts. 60; 66, §3°; 141 e 142, incisos IV e V, da Lei 11.101/2011, presidida pela MM. Juíza de Direito titular da 7ª Vara Empresarial da Capital, Dra. SIMONE GASTESI CHEVRAND.





PRBF-

Tribunal de Justiça do Estado do Rio de Janeiro
Página
132191
Certificado Eletronicamente

Na sala de audiência, confirmadas as presenças das Recuperandas, da Administração Judicial Conjunta, do Gestor judicial, do WatchDog nomeado e do representante do Ministério Público, acima mencionados. Presentes, ainda, o representante das proponentes e da empresa UMB BANK.

Procedido ao pregão de estilo para anúncio da abertura da audiência, nos termos do Edital, devidamente publicado no DJe, nos termos de index 128.060.

Foi apresentada a seguinte proposta:

**Por BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.**

**Pelo Juízo FOI ABERTO O ENVELOPE referente à proposta oferecida, foi dada vista à Administração Judicial e aos demais presentes dos termos da proposta apresentada.**

**Em seguida, a Administração Judicial Conjunta disse que:** a proposta preenche os requisitos objetivos e, considerando que é abaixo do preço mínimo do edital, seguirá o procedimento de oitiva dos credores conforme o edital.

**O gestor judicial,** por sua vez, também anuiu com a suspensão da audiência, conforme sustentado pela recuperanda.

PRBF-

**Pela OI** foi dito que pugna pelo cumprimento do procedimento previsto no edital, conforme apresentado pela AJ, com oitiva do gestor e da AJ.

**O WatchDog,** então, disse que: concorda com a ponderação de todos os que o antecederam com a suspensão da audiência, conforme sustentado pela recuperanda.

**Pela UMB,** foi dito que o plano de recuperação judicial deverá ser seguido em seus estritos termos, inclusive a cláusula 5.2.2.2.4, item 'b', que diz que: "a OI não terá direito de veto sobre a deliberação dos Credores Opção de Reestruturação I, nos termos desta Cláusula, tampouco de impor aos Credores Opção de Reestruturação I a aceitação de quaisquer Propostas Inferiores ao Preço Mínimo UPI V.TAL.".

**O Ministério Público,** enfim, disse que: não se opõe, por ora, a suspensão da audiência, conforme sustentado pela recuperanda, de modo a que seja dada oportunidade para manifestação de eventuais interessados e envolvidos, ressaltando que, na visão do Ministério Público, ainda não ocorreu preclusão com relação a alguns aspectos sensíveis que foram impugnados e que eventualmente podem resultar em ajustes, caso haja oferta concreta que possa resultar em benefício econômico superior ao valor proposto nesta oportunidade, ressalvando o Ministério Público a prerrogativa de se manifestar a respeito posteriormente, conforme o protocolo adotado pela prudente consideração deste MM Juízo nesta data.

**Pelos proponentes** foi esclarecido que, caso haja alteração das regras do edital, inclusive para admissão de outras propostas apresentadas fora do prazo e condições previstos no edital, se reservam no direito de alterar ou retirar a proposta apresentada.

**O Juízo, após a oitiva de todos, decidiu que:** De início, tendo em vista a necessidade de adoção do prazo constante do edital para a hipótese de apresentação de proposta em valor inferior ao do preço mínimo UPI V.Tal, determino que a proposta apresentada fique em segredo de justiça com acesso exclusivo as recuperandas, Ministério Público, Administração Judicial, Gestão judicial. **Determino a todos os**





**presentes, com conhecimento dos termos mínimos da proposta, que tem obrigação de manterem sigilo das informações obtidas nesta audiência, pena de responsabilizações cíveis e criminais.**

No mais, entendo que impõe-se o cumprimento do disposto nos itens 2 e seguintes do edital publicado, durante o qual os Credores Opção Restruturação I terão oportunidade ampla de manifestação, caso assim o queiram. Apenas com o decurso dos prazos apontados serão decididas simultaneamente questões que se apresentem e eventualmente pendentes, também em conformidade com o edital.

Tenho por bem, ainda, diante das ponderações feitas pelas partes e interessados aqui presentes, especialmente o Ministério Público, que uma vez ultrapassadas as etapas de envio da proposta aos Credores Opção Restruturação I pela AJ, com a comunicação ao Juízo em 2 dias, deverão todos – os abaixo relacionados - ter oportunidade para se manifestarem nos autos para, somente então, retomar a audiência.

Nesse passo, observados os prazos de 02 dias úteis da AJ para comunicação aos Credores Opção Restruturação I, com término em 09 de março; iniciado o prazo dos Credores Opção Restruturação I, com término no dia 19.03; e então com prazo de 02 dias para comunicação ao Juízo, terminando em 23.03. Então, dirão todos (Oi, proponentes, Administração Judicial Gestão Judicial e Watchdog) no prazo comum de 02 dias, entre 24 e 25 de março de março; em seguida o Ministério Público se manifestará (dias 26 e 27 de março), de modo que a audiência será retomada em 30.03.2026, as 15:00 horas.

À vista do exposto, **SUSPENDO esta audiência. Para cumprimento do cronograma acima descrito, em obediência ao edital, REDESIGNO o dia 30.03.2026, as 15:00 horas,** para sua retomada. Saem todos intimados neste ato.

Até a retomada da audiência, será preservado sigilo de todas as manifestações apresentadas (conforme acima discriminado), o que se garante com abertura de incidente sigiloso próprio a esta finalidade. Com a retomada da audiência acima marcada, o procedimento sigiloso será juntado aos autos e levantado o sigilo a ele impresso.



PRBF



Tribunal de Justiça do Estado do Rio de Janeiro
Página
132194
Carimbado Eletronicamente

**Pelo patrono de UMB** foi dito que se opõe ao segredo justiça relativo às manifestações a serem apresentadas, inclusive porque pode haver credores interessados em questionarem e os termos da proposta.

**Pelo patrono dos PROPONENTES** foi dito que entende que o sigilo da proposta será comprometido caso haja a abertura do sigilo das manifestações.

**Pela RECUPERANDA** foi dito entende adequada a manutenção do sigilo na forma decidida pelo Juízo.

**Pela ADMINISTRAÇÃO JUDICIAL** foi dito que concorda com a decisão do Juízo, já que está sendo suspenso o ato até posterior audiência.

**Pelo MINISTÉRIO PÚBLICO** foi dito que, apesar de entender a ideia de que eventuais credores podem estar interessados em ter conhecimento do valor da proposta, por outro lado, torna-se necessário a preservação do procedimento adotado como praxe para audiências desse tipo, em que se deve preservar o sigilo com relação as propostas até o momento de eventual aprovação. Razão pela qual concorda com a decisão do Juízo com relação a manutenção do sigilo, ressalvada a possibilidade de contraditório diferido e de impugnação posterior pelos credores que eventualmente se considerem insatisfeitos.

**Pelo JUÍZO foi decidido**: não vislumbro qualquer prejuízo na adoção do sigilo antes pontuado. Ao revés, prejuízo maior pode ocorrer com a publicização das manifestações, em desrespeito ao previsto no edital. De fato, ficou previsto o diferimento da audiência na qual se decidirá acerca da proposta apresentada. E também é fato que a proposta apresentada guarda elementos a serem avaliados apenas por aqueles que terão acesso ao incidente sigiloso a ser instaurado. Ademais, eventuais credores que não são representados pelo impugnante – que efetivamente acessará o incidente sigiloso - além de não poderem ser por ele representados, ante natural falta de legitimidade, poderiam, e deveriam, ter se habilitado a participar do certame, nos termos do edital. Logo, alegação de necessidade de

PRBF.




conhecimento dos termos do que aqui se deliberou por tais pessoas não se justifica, ao menos antecipadamente.

Conforme dito antes, uma vez retomada a audiência, com deliberação acerca da proposta, o sigilo será levantado, como já foi adotado anteriormente por este Juízo em inúmeras situações prévias e, conforme bem levantado pelo Ministério Público, poderão aqueles que discordarem do decidido se manifestarem e impugnarem a decisão respectiva.

Inexistindo razões razoáveis para alterarem a conclusão deste Juízo, **mantenho a determinação de abertura de incidente sigiloso para o qual serão dirigidas todas as manifestações das partes antes elencadas e que, após, será juntado aos autos principais.**

Nada mais havendo, encerro a presente audiência e, para plena publicidade, foi determinada a Lavratura da presente Ata, que foi disponibilizada para leitura aos interessados, e deverá ser acostada imediatamente nos autos da Recuperação Judicial e inserida nos sites www.recuperacaojudicial.oi.com.br e www.recjud.com.br.

Nada mais havendo, foi encerrada a presente às 16:53 que, para constar, vai assinada por todos os presentes. Publicada em audiência e intimados os presentes.

**Simone Gastesi Chevrand**

**JUÍZA DE DIREITO**

**Pedro Rubim Borges Fortes**

**MINISTÉRIO PÚBLICO**

Página
132196

RECUPERANDAS

RODRIGO MORAG MENDONÇA RAPOJO
OAB/SP 484.277

ADMINISTRAÇÃO JUDICIAL CONJUNTA

(Dra. Adriana Conrado Zamponi)

GESTOR JUDICIAL

Dr. Bruno Rezende

WATCHDOG

(Dr. Adriano Pinto Machado)

BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.

Dr. Marcelo Lamego Carpenter Ferreira OAB/RJ 092.518

UMB BANK

(Dr. Guilherme Vaz Leal da Costa - OAB/RJ158.892)



COMITÊ DE CREDORES TRABALHISTAS DA SEREDE

(Dr. Robson Caetano da Silva -OAB 176943).





**Exhibit 6**

March 30, 2026 Hearing Minutes

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter

**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70

Translation: 28.927/26          Book: 151          Page:  1

I, the undersigned Sworn Public Translator and Commercial Interpreter, registered under no. 242 with the Board of Trade of the State of Rio de Janeiro (JUCERJA), Federative Republic of Brazil, and under taxpayer registration no. (CPF/MF) 098.714.677-70 with the Ministry of Finance, do hereby certify that an *original* document written in Portuguese has been submitted to me for translation into English, which I undertake in my official capacity, as follows: --------------------

State of Rio de Janeiro

Judiciary Branch

Court of Justice

Judicial District of Rio de Janeiro

Office of the 7th Business Court

**7th Business Court**

Av. Erasmo Braga, 115, Lna Central 706 - ZIP Code: 20020-903 - Centro - Rio de Janeiro – RJ - Phone: 3133 2185 - e-mail: cap07vemp@tjrj.jus.br

**Electronic Proceeding**

Case No.: **0090940-03.2023.8.19.0001**

Filed on: July 28, 2023

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  2

Class/Subject Matter: Judicial Reorganization - Composition with Creditors / Judicial Reorganization and Bankruptcy

Processing Error. Parameter: 64

**Hearing: Special**

**Hearing Date: March 30, 2026**

**WRITTEN RECORD**

MINUTES OF THE AUCTION HEARING OF ASSETS OF A BUSINESS COMPANY UNDER JUDICIAL REORGANIZATION

Case No.: 0090940-03.2023.8.19.0001

Action: Judicial Reorganization.

Debtors in Possession: OI S.A.; PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. and OI BRASIL HOLDINGS COOPERATIEF U.A.A. (OI GROUP), represented by their attorneys, Dr. Rodrigo Moraes Mendonça Raposo (São Paulo State Bar Association, No. 484.277)

Trustee: Dr. Bruno Rezende (Rio de Janeiro State Bar Association, No. 124.405)

Joint Bankruptcy Trustee: Wald Administração de Falências e Empresas em Recuperação Judicial Ltda., represented by Dr. Adriana Conrado Zamponi (Rio de Janeiro State Bar Association, No. 92.831)

WatchDog: Dr. Adriano Pinto Machado (Rio de Janeiro State Bar Association, No. 77.188)

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 – E-mail:
marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  3

Public Prosecutor's Office: Dr. Pedro Rubim Borges Fortes

Interested Party(ies): BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A. (represented by Dr. Marcelo Lamego Carpenter Ferreira (Rio de Janeiro State Bar Association, No. 092.518) and UMB BANK, represented by Dr. Guilherme Vaz Leal da Costa (Rio de Janeiro State Bar Association, No. 158.892) and Dr. Gustavo Mota Guedes (Rio de Janeiro State Bar Association, No. 95346), SEREDE EMPLOYEES' COMMITTEE OF CREDITORS (Dr. Robson Caetano da Silva - State Bar Association No. 176943); FUNDOS PIMCO (Dr. Alexandre Kingston, Rio de Janeiro State Bar Association, No. 103.458); Glas Americas LLC (Dr. Eduardo Guimarães Wanderley, Rio de Janeiro State Bar Association, No. 285.314).

On the Thirtieth (30th) Day of the Month of March, in the Year Two Thousand Twenty-Six, at 3:00 p.m.,

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26        Book: 151        Page:  4

the hearing for the opening of the sealed bids for the sale of the asset consisting of Oi S.A.'s interest in V.tal was resumed, in the Judicial Reorganization Proceedings of the OI GROUP, as provided for in Articles 60; 66, Section 3; 141 and 142, Items IV and V, of Law No. 11.101/2011, presided over by the Honorable Presiding Judge of the 7th Business Court of the Capital, Judge SIMONE GASTESI CHEVRAND.

In the Courtroom, the appearances of the Debtors in Possession, the Joint Bankruptcy Trustee, the Trustee, the appointed WatchDog, and the representative of the Public Prosecutor's Office, mentioned above, were confirmed. Also present were the representative of the bidders and of UMB BANK – Trustee.

The customary call of the case was made.

The Court defined the scope of the hearing as the resumption of the act for the sale of the V.tal UPI, due to the submission of a single bid (BTG BID) at a price lower than the minimum price provided for in the judicial reorganization plan, followed by rejection by the Restructuring Option I Creditors.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 – E-mail:
marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  5

Thereafter, in view of the suggestion made by UMB Trustee to convert the hearing into a conciliation session for the resumption of discussions, in order to resolve the outstanding points under dispute, the matter was submitted to the BIDDER.

The BIDDER stated its opposition to converting the hearing into a conciliation session, informing that there is no possibility of changing its bid. It also informed that there is no intention to carry out an IPO within the next 18 months. It further states herein that such declaration was made by the attorney-in-fact representing the BIDDERS.

UMB stated that it is open to negotiations, taking as a starting point the amount offered by the BIDDERS. It also stated that there is no interest in carrying out a credit bid, which rules out the allegation of conflict of interest raised by the Bidder. It emphasizes that this violates Article 50, Section 1, of Law No. 11.101/05, since it entails suppression of collateral.

The Court then stated that, in view of the Bidder's express disagreement with the possibility of revising its bid, there is no further basis to

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  6

defer the analysis of the BTG BID submitted, as already pointed out by the Honorable Public Prosecutor's Office in its opinion.

The Court further stated that, although all Parties have already expressed themselves in the case file, in compliance with the deadlines established in the Notice and in the calendar set at the initial hearing (held on March 5, 2026), it notes that only the Restructuring Option I Creditors (through their representative UMB), the Bidder, and the Public Prosecutor's Office have submitted conclusive statements.

Therefore, conclusive statements remain to be submitted by the following Parties: Debtor in Possession Oi, the Bankruptcy Trustee, the Trustee, and the Watchdog (in view of the impossibility of the settlement it had advocated).

I also deem it appropriate to hear important Interested Parties in the sale at issue herein, currently represented by the Employees' Committee of Creditors.

Accordingly, upon the floor being given to the DEBTOR IN POSSESSION and to the Trustee, through their counsel, it was stated that: considering (i) the Company's delicate financial situation, (ii)

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 – E-mail:
marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  7

that this is the only bid submitted, (iii) that the fairness opinion presented by G5 Partners concluded that the proposed amount is reasonable from a strictly financial standpoint, and (iv) that the proposed payment would be made in cash upfront, a structure consistent with the Notice, the Debtors in Possession and the Trustee are in favor of approval of the Bid.

Upon the floor being given to the BANKRUPTCY TRUSTEE, it was stated that: in view of the fact that the bid submitted by the BTG Group was the only bid submitted, the Bankruptcy Trustee does not object to the request of the Debtors in Possession and of the Trustee.

Upon the floor being given to the WATCHDOG, it inquired of UMB what amount it considered reasonable for conciliation and whether it had succeeded in obtaining other bids. Furthermore, it concurs with the Bankruptcy Trustee and with the Judicial Management.

UMB stated that discussions are ongoing and that it is open to rounds of conciliation; however, without a formal bid, it is not possible to state what amount it deems appropriate. It further

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26     Book: 151     Page:  8

asserts that the bid amount is inconsistent with the minimum price set forth in the plan and in the Notice, and that the will of the creditors shall be respected.

Upon the floor being given to the EMPLOYEES' COMMITTEE OF CREDITORS, it was stated that: it understands, based on the points presented by the Debtors in Possession, that since the Bid is in cash, at this time it adheres to the Bid.

Thereafter, upon the floor being given to the FUNDOS PIMCO, whose appearance is hereby allowed, it was stated that: they expect the Parties to make greater efforts to improve the Bid, in a manner consistent with the judicial reorganization plan.

By Glas Americas LLC (Collateral Agent), whose appearance was also allowed, it was stated that: reiterating what had been kept by the Trustee regarding the formal aspects of the plan, there is an order of the U.S. Court, by virtue of Chapter 15, which gave force and effect to the Debtor in Possession's reorganization plan in U.S. territory, as approved by the creditors and confirmed by this Honorable Court.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 – E-mail:
marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  9

The Bidder stated, in view of the matters raised by the creditors, that the bid submitted is fully consistent with the sale Notice and with the plan, especially with respect to the form of payment, through deposit of the purchase price into an escrow account, it being incumbent not upon the Bidder, but upon the Debtor in Possession, management, and the Bankruptcy Trustee, with authorization from the Court, to determine the manner in which the funds paid under the terms of the bid submitted are to be used.

The Honorable PUBLIC PROSECUTOR's Office was given the opportunity to state whether it had anything to add to the opinion already entered in the case file, and it stated that it refers to the opinion already entered.

After hearing all those present, the Court rendered the following ORDER: The trust receipt of the V.tal UPI involves numerous issues of great complexity, not only legal and economic, but also social. In view of all the arguments to be analyzed, let the case file be submitted for a prompt DECISION.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  10

There being nothing further, I close this hearing and, for full public notice, the drafting of these Minutes was ordered, which were made available for reading by the Interested Parties, and shall be immediately attached to the Judicial Reorganization case file and posted on the websites www.recuperacaojudicial.oi.com.br and www.recjud.com.br.

There being nothing further, this hearing was adjourned at 4:02 p.m., and, for the record, is signed by all those present. Published in open court, with those present deemed notified.

Simone Gastesi Chevrand

JUDGE OF LAW

Pedro Rubim Borges Fortes

PUBLIC PROSECUTOR'S OFFICE

DEBTORS IN POSSESSION

JOINT BANKRUPTCY TRUSTEE

(Dr. Adriana Conrado Zamponi)

TRUSTEE

Dr. Bruno Rezende

WATCHDOG

(Dr. Adriano Pinto Machado)

BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page:  11

INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.

Dr. Marcelo Lamego Carpenter Ferreira

Rio de Janeiro State Bar Association No. 092.518

UMB BANK

(Dr. Guilherme Vaz Leal da Costa - Rio de Janeiro State Bar Association No. 158.892)

SEREDE EMPLOYEES' COMMITTEE OF CREDITORS

(Dr. Robson Caetano da Silva - State Bar Association No. 176943).

FUNDOS PIMCO

(Dr. Alexandre Kingston, Rio de Janeiro State Bar Association, No. 103.458);

Glas Americas LLC

(Dr. Eduardo Guimarães Wanderley, Rio de Janeiro State Bar Association, No. 285.314).

**Simone Gastesi Chevrand**

**Presiding Judge**

**Plaintiff: OI S.A.**

**Plaintiff: PORTUGAL TELECOM INTERNATIONATIONAL FINANCE B.V.**

**Plaintiff: OI BRASIL HOLDINGS COOPERATIEF U.A.**

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.927/26          Book: 151          Page: 12

**Bankruptcy Trustee: WALD ADMINISTRAÇÃO DE FALÊNCIAS E EMPRESAS EM ADMINISTRAÇÃO JUDICIAL LTDA**

**Bankruptcy Trustee: PRESERVAR ADMINISTRACAO JUDICIAL, PERICIA E CONSULTORIA EMPRESARIAL LTDA**

**Interested Party: BANCO BTG PACTUAL S A**

**Interested Party: VITAL S/A**

**Interested Party: LIGGA TELECOMUNICAÇÕES S.A**

**Amicus Curiae: NATIONAL FEDERATION OF WORKERS IN TELECOMMUNICATIONS COMPANIES AND TELEPHONE SWITCHBOARD OPERATORS**

**Expert: PINTO MACHADO ADVOGADOS ASSOCIADOS**

Authentication Code: **4IA8.2CH7.GSZY.RCE4**

This code may be verified at: www.tjrj.jus.br – *Serviços* [Services] – *Validação de documentos* [Document Validation]

SIMONE GASTESI CHEVRAND:20762

Signed on March 30, 2026 at 6:07:45 p.m. Location: TJ-RJ [Court of Justice of the State of Rio de Janeiro]

[Stamp:]

Court of Justice of the State of Rio de Janeiro

Pages: from 133948 to 133953

Stamped electronically

[Seal:]

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 – E-mail:
marianarego@juramentada.com



# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter

**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70

Translation: 28.927/26          Book: 151          Page:  13

```
[Logo]

JUDICIARY BRANCH OF THE STATE OF RIO DE JANEIRO

DIGITALLY SIGNED

-------------------------------------------------

This translation does not pass a judgment on the

format, authenticity and/or content of the

translated document. There was nothing further on

the document to which I attest. Witness my hand

and seal. ----------------------------------------

         Rio de Janeiro, March 31, 2026.




             MARIANA SANTOS RÊGO
```

*Mariana Santos Rêgo*
Sworn Public Translator and
Commercial Interpreter
CPF 098.714.677-70

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373 –
E-mail: marianarego@juramentada.com

Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial   **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

# Processo Eletrônico

Processo : **0090940-03.2023.8.19.0001**        Distribuído em: 28/07/2023
Classe/Assunto: Recuperação Judicial - Concurso de Credores / Recuperação Judicial e Falência
Erro de Processamento. Parâmetro: 64

**Audiência : Especial**
**Data da Audiência : 30/03/2026**

## ASSENTADA

        ATA DE AUDIÊNCIA DE LEILÃO DE ATIVO DE SOCIEDADE EMPRESÁRIA EM
RECUPERAÇÃO JUDICIAL

Processo n°: 0090940-03.2023.8.19.0001

Ação: Recuperação Judicial.

Recuperandas: OI S.A.; PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. E OI BRASIL
HOLDINGS COOPERATIEF U.A.A. (GRUPO OI), representada por seus advogados, dr. Rodrigo Moraes
Mendonça Raposo (OAB/SP nº 484.277)

Gestor Judicial: Dr. Bruno Rezende (OAB/RJ n°124.405)

Administração Judicial Conjunta: Wald Administração de Falências e Empresas em Recuperação Judicial
Ltda, representada pela Dra. Adriana Conrado Zamponi (OAB/RJ n° 92.831)

WatchDog: Dr. Adriano Pinto Machado (OAB/RJ 77.188)

Ministério Público: Dr. Pedro Rubim Borges Fortes

Interessado(s): BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES
MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL
ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES   MULTIESTRATÉGIA,
STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.(representada por Dr. Marcelo
Lamego Carpenter Ferreira (OAB/RJ 092.518) e UMB BANK, representado por Dr. Guilherme Vaz Leal
da Costa (OAB/RJ158.892)e Dr. Gustavo Mota Guedes (OAB/RJ 95346), COMITÊ DE CREDORES
TRABALHISTAS DA SEREDE (Dr. Robson Caetano da Silva -OAB 176943); FUNDOS PIMCO (Dr.
Alexandre Kingston, OAB/RJ 103.458); Glas Americas LLC (Dr. Eduardo Guimarães Wanderley, OAB/RJ
285.314).

Aos trinta (30) dias do mês de março de dois mil e vinte e seis, às 15:00 horas, foi retomada a audiência
de abertura das propostas fechadas para venda de ativo constituído pela participação da Oi S.A. na V.
Tal - nos autos da Recuperação do GRUPO Oi, na forma prevista nos arts. 60; 66, §3°; 141 e 142,
incisos IV e V, da Lei 11.101/2011, presidida pela MM. Juíza de Direito titular da 7ª Vara Empresarial da



Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial      **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br
Capital, Dra. SIMONE GASTESI CHEVRAND.

Na sala de audiência, confirmadas as presenças das Recuperandas, da Administração Judicial Conjunta, do Gestor judicial, do WatchDog nomeado e do representante do Ministério Público, acima mencionados. Presentes, ainda, o representante das proponentes e da UMB BANK - Trustee.

Procedido ao pregão de estilo.

Pelo Juízo foi definido o escopo da audiência, de retomada do ato de venda da UPI V.Tal, em razão da apresentação de proposta única (PROPOSTA BTG) por preço inferior ao preço mínimo previsto no plano de recuperação judicial, seguido de recusa pelos credores Opção Reestruturação I.

Em continuidade, haja vista a sugestão da UMB ¿ Trustee ¿ no sentido de convolação da audiência em sessão de conciliação para retomada de tratativas, a fim de buscar compor arestas objeto de divergência, foi colocada a questão ao PROPONENTE.

O PROPONENTE manifestou-se contrariamente a conversão da audiência em sessão de conciliação, informando não haver possibilidade de alteração de sua proposta. Informou, também, que não há intenção de realizar IPO nos próximos 18 meses. Afirma, ainda, nesse ato, declaração neste sentido pelo advogado-procurador representante das PROPONENTES.

Pela UMB foi dito que está aberto a negociações, partindo-se do valor que foi oferecido pelas PROPONENTES. E não há interesse em realizar credit bid, o que afasta a alegação de conflito de interesses sustentado pelo proponente. Ressalta que viola o art. 50, §1º da Lei 11.101/05, pois importa em supressão de garantia.

Pelo Juízo então foi dito que, haja vista expressa discordância do proponente à possibilidade de rever sua proposta, não há mais que se falar em diferir a análise da PROPOSTA BTG apresentada, conforme já pontuado pelo d. órgão do Ministério Público em seu parecer.

Pelo Juízo foi dito, ainda, que a despeito de já terem todos se manifestado nos autos, em observância aos prazos estabelecidos no Edital e na forma calendarizada fixada na audiência inicial (de 05 de março de 2026), observo que apenas há manifestação conclusiva apresentada por Credores Opção Reestruturação I (através de seu representante UMB), do Proponente e do Ministério Público.



Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial    **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail:
cap07vemp@tjrj.jus.br

Portanto, resta manifestação conclusiva dos seguintes personagens: Recuperanda Oi, Administração Judicial, Gestor Judicial, Watchdog (diante da impossibilidade de composição pela qual opinou). Reputo adequado, ainda, ouvir importantes interessados na alienação que aqui se trata, hoje representada por Comitê de Credores Trabalhistas.

Sendo assim, dada a palavra a RECUPERANDA e ao Gestor Judicial, por seu advogado, foi dito que: considerando (i) a situação delicada financeira da companhia, (ii) que se trata de única proposta apresentada; (iii) que fairness opinion apresentado pela G5 Partners concluiu pela razoabilidade do valor proposto do ponto de vista estritamente financeiro; (iv) que o pagamento proposto se daria em dinheiro à vista, modelo este aderente ao edital, as Recuperandas e o Gestor Judicial opinam favoravelmente à homologação da proposta.

Dada a palavra a ADMINISTRAÇÃO JUDICIAL, foi dito que: tendo em vista que a proposta apresentada pelo Grupo BTG foi a única apresentada, a AJ não se opõe ao pedido das recuperandas e do Gestor Judicial.

Dada a palavra ao WATCHDOG, indagou à UMB qual valor entende razoável para conciliação e se logrou obter outras propostas. No mais, acompanha a AJ e a Gestão Judicial.

A UMB se manifestou no sentido de que há conversas em andamento e que está aberto a rodadas de conciliação, sem, contudo, ser possível informar, sem proposta formal, qual o valor que reputa adequado. Assevera, ainda, que o valor da proposta está em desacordo com o preço mínimo previsto no plano e no edital, devendo ser respeitada a vontade dos credores.

Dada a palavra ao COMITÊ DE CREDORES TRABALHISTAS, foi dito que: entende que, com base nos pontos apresentados pelas Recuperandas, que, tendo em vista a proposta é em dinheiro, neste momento, aderem à proposta.

Após, dada a palavra aos FUNDOS PIMCO, cuja habilitação ora se defere, foi dito que: espera que as partes envidem maiores esforços para melhora da proposta, de forma aderente ao plano de recuperação.

Pela Glas Americas LLC (Agente de Garantias), cuja habilitação também se deferiu, foi dito que: reiterando quanto sustentado pelo Trustee, a respeito dos aspectos formais do plano, existe uma ordem do Juízo americano, por força do Chapter 15, que deu ¿força e efeito¿ ao plano de recuperação da recuperanda em território americano, conforme aprovado pelos credores e homologado por este MM. Juízo.



111

Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial     **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185     e-mail: cap07vemp@tjrj.jus.br

Pela proponente foi dito, à vista do levantado pelos credores, que a proposta apresentada está integralmente aderente ao edital de venda e ao plano, especialmente no que se refere à forma de pagamento, mediante depósito do preço em conta escrow, cabendo não à proponente, mas à recuperanda, gestão e Administração Judicial determinar com autorização do Juízo, a forma de utilização dos recursos pagos nos termos da proposta apresentada.

Foi oportunizado ao d. órgão do MINISTÉRIO PÚBLICO a fim de dizer se tem algo a acrescentar ao seu parecer já lançado nos autos, tendo dito que se reporta ao parecer já lançado.

Após oitiva de todos, pelo Juízo foi proferido o seguinte DESPACHO: A alienação da UPI V.Tal envolve inúmeras questões de grande complexidade, não só jurídica e econômicas como também sociais. À vista de todos os argumentos a serem analisados, venham os autos conclusos para breve DECISÃO.

Nada mais havendo, encerro a presente audiência e, para plena publicidade, foi determinada a Lavratura da presente Ata, que foi disponibilizada para leitura aos interessados, e deverá ser acostada imediatamente nos autos da Recuperação Judicial e inserida nos sites www.recuperacaojudicial.oi.com.br e www.recjud.com.br.

Nada mais havendo, foi encerrada a presente às 16:02 que, para constar, vai assinada por todos os presentes. Publicada em audiência e intimados os presentes.

Simone Gastesi Chevrand

JUÍZA DE DIREITO

Pedro Rubim Borges Fortes

MINISTÉRIO PÚBLICO

RECUPERANDAS



111

Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial    **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail: cap07vemp@tjrj.jus.br

ADMINISTRAÇÃO JUDICIAL CONJUNTA

(Dra. Adriana Conrado Zamponi)

GESTOR JUDICIAL

Dr. Bruno Rezende

WATCHDOG

(Dr. Adriano Pinto Machado)

BTG PACTUAL INFRACO MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES MULTIESTRATÉGIA, BTG PACTUAL INFRACO CO-INVESTIDOR FUND LP, BTG PACTUAL ECONOMIA REAL MASTER FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES  MULTIESTRATÉGIA, STANS 13, S.A., BGC FIBRA PARTICIPAÇÕES S.A., BGC HOLDING S.A.

Dr. Marcelo Lamego Carpenter Ferreira OAB/RJ 092.518

UMB BANK

(Dr. Guilherme Vaz Leal da Costa - OAB/RJ158.892)

COMITÊ DE CREDORES TRABALHISTAS DA SEREDE

(Dr. Robson Caetano da Silva - OAB 176943).



111

Estado do Rio de Janeiro
Poder Judiciário
Tribunal de Justiça
Comarca da Capital
Cartório da 7ª Vara Empresarial      **7ª Vara Empresarial**
Av. Erasmo Braga, 115 Lna Central 706CEP: 20020-903 - Centro - Rio de Janeiro - RJ Tel.: 3133 2185    e-mail: cap07vemp@tjrj.jus.br

FUNDOS PIMCO

(Dr. Alexandre Kingston, OAB/RJ 103.458);

Glas Americas LLC

(Dr. Eduardo Guimarães Wanderley, OAB/RJ 285.314).

**Simone Gastesi Chevrand
Juiz Titular**

**Autor: OI S.A.**
**Autor: PORTUGAL TELECOM INTERNATIONATIONAL FINANCE B.V.**
**Autor: OI BRASIL HOLDINGS COOPERATIEF U.A.**
**Administrador Judicial: WALD ADMINISTRAÇÃO DE FALÊNCIAS E EMPRESAS EM ADMINISTRAÇÃO JUDICIAL LTDA**
**Administrador Judicial: PRESERVAR ADMINISTRACAO JUDICIAL, PERICIA E CONSULTORIA EMPRESARIAL LTDA**
**Interessado: BANCO BTG PACTUAL S A**
**Interessado: VITAL S/A**
**Interessado: LIGGA TELECOMUNICAÇÕES S.A**
**Amicus Curiae: FEDERAÇÃO NACIONAL DOS TRABALHADORES EM EMPRESAS DE TELECOMUNICAÇÕES E OPERADORES DE MESAS TELEFÔNICAS**
**Perito: PINTO MACHADO ADVOGADOS ASSOCIADOS**



Código de Autenticação: **4IA8.2CH7.GSZY.RCE4**
Código pode ser verificado em: www.tjrj.jus.br – Serviços – Validação de documentos

Este documento foi assinado digitalmente por Mariana Santos Rego.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código 87CE-4E19-68BC-4866.

This document has been digitally signed by Mariana Santos Rego. To verify the signature visit http://assinaturas.certisign.com.br and use the code 87CE-4E19-68BC-4866.

111

# PROTOCOLO DE ASSINATURA(S)

The above document has been submitted for digital signature on the platform Portal de Assinaturas Certisign. To verify the signature click on the link: http://assinaturas.certisign.com.br/Verificar/87CE-4E19-68BC-4866 or visit http://assinaturas.certisign.com.br and use the code below to check the validity of the document.

## Código para verificação: 87CE-4E19-68BC-4866



### Hash do Documento

9209CA39361A3BABA124F1AE025484181404B147687066FC13B05D7CBB89A774

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 31/03/2026 é(são) :

☑ MARIANA SANTOS REGO - 098.714.677-70  em 31/03/2026 20:25 UTC-03:00
**Tipo:** Certificado Digital

**Evidências**

**IP:** 177.19.43.164
**AC:** AC SAFEWEB RFB v5

**Exhibit 7**

NPSD Indenture Default Notice



November 13, 2025

**NOTICE OF EVENTS OF DEFAULT**

**TO HOLDERS OF THE**
**OI S.A. – IN JUDICIAL REORGANIZATION**
**10.000% / 13.500% PIK TOGGLE SENIOR SECURED NOTES DUE 2027**

**CUSIP & ISIN[1]**

| <u>144A</u> | <u>Reg. S</u> | <u>IAI</u> |
|---|---|---|
| 67117EAE8 | P7354FAD8 | 67117EAF5 |
| US67117EAE86 | USP7354FAD89 | US67117EAF51 |

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT MAY BE OF INTEREST TO THE REGISTERED AND BENEFICIAL HOLDERS OF THE ABOVE-REFERENCED NOTES. PLEASE EXPEDITE RE-TRANSMITTAL OF THIS NOTICE TO SUCH HOLDERS IMMEDIATELY. YOUR FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH THIS PARAGRAPH MAY IMPAIR THE OPPORTUNITY FOR THE REGISTERED AND BENEFICIAL HOLDERS ON WHOSE BEHALF YOU ACT TO TAKE ANY ACTION THEY DEEM APPROPRIATE CONCERNING THE MATTERS DESCRIBED IN THIS NOTICE.**

Reference is made to that certain Indenture, dated as of August 8, 2024 (as supplemented, amended or modified from time to time, the "*Indenture*"), by and between Oi S.A. - in judicial reorganization, a corporation (*sociedade anônima*) organized and existing under the laws of the Federative Republic of Brazil (the "*Company*"), each of the Subsidiary Guarantors from time to time party thereto, and UMB Bank, N.A., as trustee (in such capacity, the "*Trustee*"), registrar, paying agent, and transfer agent, governing the 10.000% / 13.500% PIK Toggle Senior Secured Notes due 2027. Capitalized terms used herein but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

**Events of Default & Acceleration**

Notice is hereby provided that Events of Default, as defined in the Indenture have occurred and are continuing.

Specifically, pursuant to Section 6.01(6) of the Indenture, an Event of Default occurs if the Company, any Subsidiary Guarantor or any Material Subsidiary commences a voluntary case or other proceeding seeking liquidation, judicial or extrajudicial reorganization or other relief with respect to itself or its Indebtedness under any bankruptcy, insolvency or other similar law, or seeks the appointment of a trustee, receiver, judicial administrator (*administrador judicial*), liquidator, custodian or other similar official of it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or makes a general assignment or conveyance for the benefit of creditors.

---

[1] CUSIPs and ISINs have been included solely for the convenience of Holders. The Trustee assumes no responsibility or liability for the selection or use of such numbers and makes no representation as to the correctness of the CUSIPs or ISINs provided above.

Additionally, pursuant to Section 6.01(7) of the Indenture, an Event of Default occurs if a court of competent jurisdiction enters an order or decree against the Company, any Subsidiary Guarantor or any Material Subsidiary for (a) liquidation, reorganization or other relief with respect to it or its Indebtedness under any bankruptcy, insolvency or other similar law or (b) the appointment of a trustee, receiver, judicial administrator (*administrador judicial*), liquidator, custodian or other similar official of it or any substantial part of its property such order or decree remains undismissed and unstayed for a period of thirty (30) calendar days.

Under Section 6.02 of the Indenture, if an Event of Default specified in Section 6.01(6), (7), or (8) occurs and is continuing, the principal amount, premium, if any, accrued and unpaid interest and Additional Amounts, if any, on all the Securities becomes immediately due and payable without notice or any other act on the part of the Trustee or any Holder.

The Trustee has become aware that (i) on July 3, 2025, a motion for judicial reorganization of Subsidiary Guarantors Serede - Serviços de Rede S.A. ("*Serede*") and Brasil Telecom Call Center S.A. ("*Tahto*") was submitted before the 7th Business Court of the Judicial District of the Capital of the State of Rio de Janeiro (the "*Competent Court*"), pursuant to articles 51 *et seq.* of Law 11.101/2005 and article 122, sole paragraph, of the Law 6,404/76 (the "*Request for Judicial Reorganization*"); (ii) on July 30, 2025, in the case files of the Request for Judicial Reorganization, the Competent Court issued a decision ordering, among other things, the suspension of (a) all lawsuits and enforcement proceedings against Serede and Tahto; and (b) any contractual provision that provides for early maturity of debts and/or contracts, or authorizes their termination, due to the state of financial crisis (the "*Relief Order*"); (iii) on September 30, 2025, the Competent Court entered an order appointing Dr. Bruno Rezende as an "intervenor" of the Company and appointing Dra. Tatiana Binato as "intervenor" of the Serede and Tahto and granting each of them management authority over the respective entities with rights equivalent to that of a judicial administrator in a *falência* proceeding (the "*Intervenor Appointment Order*"); and (iv) on October 30, 2025, the Competent Court extended the previously granted management authority in the Intervenor Appointment Order.

Additionally, on November 10, 2025 the Competent Court issued an order converting the Company's judicial reorganization into a liquidation proceeding (*falência*) under Brazil law (the "*Conversion Order*").

Notice is hereby given that:

(i)     The Request for Judicial Reorganization constituted an Event of Default under Section 6.01(6) of the Indenture that is continuing.

(ii)    As a result of the Event of Default caused by the Request for Judicial Reorganization, the obligations on all Securities became immediately due and payable in accordance with Section 6.02 of the Indenture as of no later than July 3, 2025.

(iii)   The entry of the Relief Order, the commencement of the judicial reorganization (*recuperação judicial*) of Serede and Tahto, and the appointment of a judicial administrator (*administrador judicial*) for Serede and Tahto constituted additional Events of Default under Section 6.01(7) of the Indenture as a result of such order and appointment having remained undismissed and unstayed for more than thirty (30) calendar days.

(iv)    As a result of the Intervenor Appointment Order having remained undismissed and unstayed on October 30, 2025 (30 calendar days after its entry), an additional Event of Default occurred pursuant to Section 6.01(7)(b) of the Indenture.

2

(v)      The entry of the Conversion Order will constitute an additional Event of Default under Section 6.01(7) of the Indenture on December 10, 2025 (30 calendar days after its entry) so long as the Conversion Order remains undismissed and unstayed as of that date.

## Additional Information

If you wish to obtain further information, please contact the Trustee at the following address:

UMB Bank, N.A.
120 Sixth Street South, Suite 1400
Minneapolis, Minnesota 55402
Attention: Jordana Renert
Email:  jordana.renert@umb.com

The Trustee may conclude that a specific response to specific inquiries from a particular Holder may not be appropriate either because, among other things, the disclosure in question may not be in the best interest of all Holders or may not be consistent with the equal and full dissemination of information to all Holders. Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the Trustee or its directors, officers, agents, attorneys, or employees. Each Holder receiving this Notice should seek any advice it may require of its own advisors in respect of the matters set forth herein.

Respectfully,
**UMB BANK, N.A.**, as Trustee

**Exhibit 8**

RUD Indenture Default Notice

8



November 13, 2025

**NOTICE OF EVENTS OF DEFAULT**

**TO HOLDERS OF THE**
**OI S.A. – IN JUDICIAL REORGANIZATION**
**8.50% PIK SUBORDINATED SECURED NOTES DUE 2028**
**consisting of**
**8.50% PIK SUBORDINATED SECURED SERIES A NOTES DUE 2028**
**8.50% PIK SUBORDINATED SECURED SERIES B NOTES DUE 2028**

**CUSIP & ISIN[1]**

| <u>144A</u> | <u>Reg. S</u> | <u>IAI</u> |
|---|---|---|
| 67117EAG3 | P7354FAG1 | 67117EAM0 |
| US67117EAG35 | USP7354FAG11 | US67117EAM03 |

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT MAY BE OF INTEREST TO THE REGISTERED AND BENEFICIAL HOLDERS OF THE ABOVE-REFERENCED NOTES. PLEASE EXPEDITE RE-TRANSMITTAL OF THIS NOTICE TO SUCH HOLDERS IMMEDIATELY. YOUR FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH THIS PARAGRAPH MAY IMPAIR THE OPPORTUNITY FOR THE REGISTERED AND BENEFICIAL HOLDERS ON WHOSE BEHALF YOU ACT TO TAKE ANY ACTION THEY DEEM APPROPRIATE CONCERNING THE MATTERS DESCRIBED IN THIS NOTICE.**

Reference is made to that certain Indenture, dated as of August 8, 2024 (as supplemented, amended or modified from time to time, the "*Indenture*"), by and between Oi S.A. - in judicial reorganization, a corporation (*sociedade anônima*) organized and existing under the laws of the Federative Republic of Brazil (the "*Company*"), each of the Subsidiary Guarantors from time to time party thereto, and UMB Bank, N.A., as trustee (in such capacity, the "*Trustee*"), registrar, paying agent, and transfer agent, governing the 8.50% PIK Subordinated Secured Notes Due 2028, consisting of 8.50% PIK Subordinated Secured Series A Notes Due 2028 and 8.50% PIK Subordinated Secured Series B Notes Due 2028 Units (the "*Notes Units*"). Capitalized terms used herein but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

**Events of Default & Acceleration**

Notice is hereby provided that Events of Default, as defined in the Indenture have occurred and are continuing.

Specifically, pursuant to Section 6.01(6) of the Indenture, an Event of Default occurs if the Company, any Subsidiary Guarantor or any Material Subsidiary commences a voluntary case or other proceeding seeking liquidation, judicial or extrajudicial reorganization or other relief with respect to itself or its Indebtedness under any bankruptcy, insolvency or other similar law, or seeks the appointment of a trustee, receiver,

---

[1] CUSIPs and ISINs have been included solely for the convenience of Holders. The Trustee assumes no responsibility or liability for the selection or use of such numbers and makes no representation as to the correctness of the CUSIPs or ISINs provided above.

1

judicial administrator (*administrador judicial*), liquidator, custodian or other similar official of it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or makes a general assignment or conveyance for the benefit of creditors.

Additionally, pursuant to Section 6.01(7) of the Indenture, an Event of Default occurs if a court of competent jurisdiction enters an order or decree against the Company, any Subsidiary Guarantor or any Material Subsidiary for (a) liquidation, reorganization or other relief with respect to it or its Indebtedness under any bankruptcy, insolvency or other similar law or (b) the appointment of a trustee, receiver, judicial administrator (*administrador judicial*), liquidator, custodian or other similar official of it or any substantial part of its property such order or decree remains undismissed and unstayed for a period of thirty (30) calendar days.

Under Section 6.02 of the Indenture, if an Event of Default specified in Section 6.01(6), (7), or (8) occurs and is continuing, the principal amount, premium, if any, accrued and unpaid interest and Additional Amounts, if any, on all the Securities becomes immediately due and payable without notice or any other act on the part of the Trustee or any Holder.

The Trustee has become aware that (i) on July 3, 2025, a motion for judicial reorganization of Subsidiary Guarantors Serede - Serviços de Rede S.A. ("*Serede*") and Brasil Telecom Call Center S.A. ("*Tahto*") was submitted before the 7th Business Court of the Judicial District of the Capital of the State of Rio de Janeiro (the "*Competent Court*"), pursuant to articles 51 *et seq.* of Law 11.101/2005 and article 122, sole paragraph, of the Law 6,404/76 (the "*Request for Judicial Reorganization*"); (ii) on July 30, 2025, in the case files of the Request for Judicial Reorganization, the Competent Court issued a decision ordering, among other things, the suspension of (a) all lawsuits and enforcement proceedings against Serede and Tahto; and (b) any contractual provision that provides for early maturity of debts and/or contracts, or authorizes their termination, due to the state of financial crisis (the "*Relief Order*"); (iii) on September 30, 2025, the Competent Court entered an order appointing Dr. Bruno Rezende as an "intervenor" of the Company and appointing Dra. Tatiana Binato as "intervenor" of the Serede and Tahto and granting each of them management authority over the respective entities with rights equivalent to that of a judicial administrator in a *falência* proceeding (the "*Intervenor Appointment Order*"); and (iv) on October 30, 2025, the Competent Court extended the previously granted management authority in the Intervenor Appointment Order.

Additionally, on November 10, 2025 the Competent Court issued an order converting the Company's judicial reorganization into a liquidation proceeding (*falência*) under Brazil law (the "*Conversion Order*").

Notice is hereby given that:

(i)     The Request for Judicial Reorganization constituted an Event of Default under Section 6.01(6) of the Indenture that is continuing.

(ii)    As a result of the Event of Default caused by the Request for Judicial Reorganization, the obligations on all Securities became immediately due and payable in accordance with Section 6.02 of the Indenture as of no later than July 3, 2025.

(iii)   The entry of the Relief Order, the commencement of the judicial reorganization (*recuperação judicial*) of Serede and Tahto, and the appointment of a judicial administrator (*administrador judicial*) for Serede and Tahto constituted additional Events of Default under Section 6.01(7) of the Indenture as a result of such order and appointment having remained undismissed and unstayed for more than thirty (30) calendar days.

2

(iv)    As a result of the Intervenor Appointment Order having remained undismissed and unstayed on October 30, 2025 (30 calendar days after its entry), an additional Event of Default occurred pursuant to Section 6.01(7)(b) of the Indenture.

(v)    The entry of the Conversion Order will constitute an additional Event of Default under Section 6.01(7) of the Indenture on December 10, 2025 (30 calendar days after its entry) so long as the Conversion Order remains undismissed and unstayed as of that date.

## Additional Information

If you wish to obtain further information, please contact the Trustee at the following address:

UMB Bank, N.A.
120 Sixth Street South, Suite 1400
Minneapolis, Minnesota 55402
Attention: Jordana Renert
Email:  jordana.renert@umb.com

The Trustee may conclude that a specific response to specific inquiries from a particular Holder may not be appropriate either because, among other things, the disclosure in question may not be in the best interest of all Holders or may not be consistent with the equal and full dissemination of information to all Holders. Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the Trustee or its directors, officers, agents, attorneys, or employees. Each Holder receiving this Notice should seek any advice it may require of its own advisors in respect of the matters set forth herein.

Respectfully,
**UMB BANK, N.A.**, as Trustee

3

**Exhibit 9**

December 23 Email to Collateral Agent

## Nirappel, James

| | |
|---|---|
| **From:** | Nirappel, James |
| **Sent:** | Tuesday, December 23, 2025 2:09 PM |
| **To:** | Appleby, Laura E.; Geoff King; Machado, Liv; Sanches, Aline |
| **Cc:** | oi.dpw; pg-projectbravo@pinheiroguimaraes.com.br |
| **Subject:** | Oi |

All—

Reference is made to that certain intercreditor agreement, dated as of August 8, 2024 (the "Intercreditor Agreement"), by and among, *inter alios*, Oi S.A. – In Judicial Reorganization, Rio Alto Investimentos e Participações, S.A., UMB Bank, N.A. and GLAS Trust Company LLC, as collateral agent and intercreditor agent. Capitalized terms used but not defined herein shall have the meanings set forth in the Intercreditor Agreement.

We confirm that requisite holders under each of the First Priority Indenture and Roll-Up Indenture consent to the release of Liens over the real estate properties located at (A) Rua Santo Antônio n. 687 (formerly n. 668), Bom Fim/Independência, Porto Alegre, RS, Brazil (with registration number 113,020 and 167,662 at Porto Alegre, RS, First Region Real Estate Registrar (*Cartório de Registro de Imóveis*)) and (B) Av. Maria Perpétua, n. 72, Ladeira, Juiz de Fora, MG, Brazil (with registration number 1,582 at Juiz de Fora, MG Real Estate Registrar (*Cartório de Registro de Imóveis*)), in each case in accordance with the provisions governing Ordinary Course Collateral Dispositions in Section 8.01 of the Intercreditor Agreement and provided that proceeds are treated in accordance with Section 12.01 of the Intercreditor Agreement, notwithstanding the fact that the obligations under each of the First Priority Indenture and Roll-Up Indenture have been accelerated.

Thanks
James

**James Nirappel**

+1 212 450 3585 office
+1 646 413 5642 mobile
james.nirappel@davispolk.com

---

**Davis Polk & Wardwell LLP**

Confidentiality Note: This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's privacy notice for important information on how we process personal data. Our website is at davispolk.com.

**Exhibit 10**

April 12 Oi Motion

10

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page: 1

I, the undersigned Sworn Public Translator and Commercial Interpreter, registered under no. 242 with the Board of Trade of the State of Rio de Janeiro (JUCERJA), Federative Republic of Brazil, and under taxpayer registration no. (CPF/MF) 098.714.677-70 with the Ministry of Finance, do hereby certify that an *original* document written in Portuguese has been submitted to me for translation into English, which I undertake in my official capacity, as follows: --------------------

**SALOMÃO ADVOGADOS**

**FCDG ADVOGADOS**

TO THE HONORABLE JUDGE OF THE 7TH BUSINESS COURT OF THE CAPITAL DISTRICT OF THE STATE OF RIO DE JANEIRO

Judicial Reorganization No. 0090940-03.2023.8.19.0001

Incident No. 3034029-12.2026.8.19.0001

**OI S.A. – UNDER JUDICIAL REORGANIZATION** ("OI"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – UNDER JUDICIAL REORGANIZATION** ("PTIF") **AND OI BRASIL HOLDINGS COÖPERATIEF U.A. – UNDER JUDICIAL REORGANIZATION** ("OI COOP" and, together with OI and PTIF, "OI GROUP" or "REORGANIZING PARTIES"),

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  2

already identified in the aforementioned judicial reorganization proceedings, hereby submit, through their attorneys, a response to the motion for clarification on pages 134364/134374, as follows:

DELAY STRATEGY AND DISREGARD FOR BRAZILIAN JURISDICTION

1. The real purpose of UMB in opposing its motions for clarification is to interrupt the deadline for filing an interlocutory appeal against the aforementioned decision, while simultaneously seeking, improperly and indirectly, to obtain the reversal of said decision before the North American jurisdiction – an inappropriate route of action – which has been used by the Ad Hoc creditors ("AHG creditors") to create obstacles to the sale of UPI V. Tal, to the detriment of the orderly liquidation of assets underway before this Honorable Court and the interests of the creditors.

2. UMB, in its capacity as trustee and representative of the AHG creditors, actually seeks, before the US jurisdiction, by means of an unwarranted request within the scope of Chapter 15 of Oi (case no. 23-10193), pending before the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  3

Bankruptcy and Judicial Reorganization Court of the Southern District of New York ("NEW YORK COURT"), that the consummation of the sale of UPI V. Tal be conditioned on a prior and non-existent authorization by the Honorable Court of New York (item 23, "(ii)", of Ev. 36, ANNEX 3 and pages 134382/134451)[1]. The strategy of the AHG creditors, represented by UMB, to "appeal" to the New York Court with the aim of "reforming" the aforementioned challenged decision, suspending the completion of the sale of UPI V. Tal, represents an unacceptable affront to the authority of the Brazilian Judiciary Branch.

3.This claim is inadmissible, even in light of the cooperative logic that should govern transnational insolvency through cooperation between competing jurisdictions.

4.Ultimately, what UMB (AHG creditors) intends is to use the foreign ancillary process as if it were a substitute for appeals and a reviewing instance of this Judicial Reorganization, in an inadmissible reversal between the main process and the non-main process, promoting conflict between jurisdictions, and not cooperation between them.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26        Book: 151        Page:  4

5.To reiterate: the Chapter 15 process of the OI Group is not a full restructuring process, as a Chapter 11 action would be, but an ancillary process, intended to obtain assistance measures in jurisdictional cooperation to ensure efficiency in the recovery process, as provided for in Article 167-Q, V, of the Brazilian Bankruptcy Law. By using it as a way to circumvent the decision of this Honorable Bankruptcy Court, the AHG creditors (represented by UMB) subvert this logic, transforming the non-principal foreign ancillary process into a platform to supervise, threaten and constrain the authority of this Honorable

Brazilian Court.

6.There is no way to condone the claim of the AHG creditors (represented in this lawsuit by UMB) to seek (i) the adoption of judicial measures within the scope of the non-main foreign Chapter 15 proceeding with the stated purpose of suspending the decisions rendered within the scope of the main insolvency proceeding, reversing the logic of articles 167-B, I, and 167-J of Law No. 11,101/2005 (Brazilian Bankruptcy Law, "LRE") and

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  5

challenging the authority of the Brazilian Judiciary Branch; and, at the same time, (ii) to file the motions for clarification now being answered through their trustee, in order to interrupt the running of the time limit for appeal and ensure that the NEW YORK COURT examines such controversy before the filing of any appeal in Brazil.

7.The NEW YORK COURT has already scheduled a hearing to address the request made by the AHG creditors for next Wednesday (April 15, 2026). Therefore, it is likely that the New York Court will review the request even before the deadline for filing an interlocutory appeal by UMB expires, so that this controversy will have been resolved under the US jurisdiction before the legal deadline for UMB to appeal the aforementioned decision expires.

8.It is evident that the opposition to the clarifications now being answered represents (i) the mere dissatisfaction of UMB (i.e., AHG creditors) against the result of the challenged decision, therefore, the defects raised in the aforementioned clarifications do not exist (as will be detailed below); and (ii) a procedural

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  6

strategy that sought to interrupt the deadline for filing an interlocutory appeal against the decision that approved the sale of UPI V. Tal, with the objective of ensuring a definition regarding this controversy under the NEW YORK COURT before the end of any appeal period in Brazil. This behavior proves the absence of a legitimate interest of UMB in opposing the motions for clarification.

9.It cannot be admitted that the opposition of declaratory appeals serves as a dilatory maneuver to favor the adoption of illegal measures, which, in itself, already imposes the non-recognition of the appeal, or, ultimately, its dismissal, for the reasons that will be detailed below.

**NON-EXISTENT OMISSIONS AND CONTRADICTIONS**

**UNWARRANTED DECLARATORY APPEALS - MERE MERIT DISSATISFACTION**

10.The declaratory appeals now answered attempt to re-discuss, through an inappropriate jurisdiction, the conclusions reached by the appealed decision, which approved the proposal for the acquisition of UPI V. Tal presented by the BTG CONSORTIUM ("PROPOSAL") through detailed, coherent and exhaustive reasoning.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  7

11.A brief reading of the declaratory appeals is enough to show that UMB only reiterates facts and arguments that have already been rejected by this Honorable Court,

thus seeking only to re-discuss the merits of the challenged decision, which is not permitted in the context of a motion for clarification.

12.As is known, motions for clarification are a resource with limited grounds, admissible only in the exhaustive hypotheses of article 1,022 of the Code of Civil Procedure, namely: (i) obscurity or contradiction; (ii) omission regarding a point or issue on which the judge should have ruled ex officio or at the request of a party; or (iii) material error. It is a resource aimed at perfecting the judicial decision, and not at reforming it.

13.None of these hypotheses are verified in the present case. The challenged decision addressed, in a reasoned and exhaustive manner, all the issues raised by the parties throughout the incident, having assessed: (i) the regularity of the competitive procedure; (ii) the preclusion of the right to challenge the notice; (iii) the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26      Book: 151      Page: 8

reasonableness of the offered price, based on the independent report from G5 PARTNERS; (iv) the arguments regarding the form of payment and guarantees; and (v) the conditions for approval of the proposal, including the reservation regarding the abstention from carrying out an Initial Public Offer (IPO).

14.What UMB calls "contradictions" and "omissions" is, in fact, mere disagreement with the outcome of the judicial decision, which does not authorize the filing of motions for clarification, insofar as motions for clarification are not intended for the re-discussion of the merits[2].

15.If that were the case, UMB should have filed the appropriate interlocutory appeal with the 1st Chamber of Private Law of the Court of Justice of the State of Rio de Janeiro, which has jurisdiction to hear appeals in this judicial reorganization case, but the appellant chose to use the declaratory motions as an improper substitute for an appeal. In this sense, since the motions for clarification were filed with the clear purpose of re-discussing the merits of the decision, they do not even deserve consideration

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70

Translation: 28.943/26          Book: 151          Page:  9

and should be rejected outright.

16.Even if that were not the case, there is no doubt that the omissions and obscurities pointed out do not exist, as will be demonstrated:

I. **NO CONTRADICTION REGARDING THE PREMISE OF MAXIMIZING VALUES:** in Chapter I of the motions, UMB alleges that the challenged decision would be contradictory in recognizing UPI V as the "most valuable asset" of the debtor and, at the same time, approving its sale for a value lower than the minimum stipulated in the Notice and rejected by the Creditors Opção de Reestruturação I. There is no contradiction between recognizing the strategic relevance of the asset and accepting its sale for the best price available on the current market. The aforementioned challenged decision did not ignore the importance of the asset; on the contrary, it was precisely because it recognized its centrality to the judicial reorganization that it deemed its sale essential at the value that the market revealed the asset is actually worth, refraining from adhering to absurd formalities that would frustrate the sale process of this highly relevant asset, ultimately compromising the very process of orderly asset

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  10

liquidation that is currently underway.

UMB also argues that the challenged decision is contradictory in "replacing" the economic deliberation attributed by the JRP to the Creditors Opção de Reestruturação I, while simultaneously acknowledging that the Court "does not possess market knowledge or expertise to perform valuation." (page 134059, highlighted). The Honorable Court did not conduct any independent economic valuation of the asset, relying instead on an independent technical report from G5 PARTNERS – the only impartial technical assessment presented in the case file – to determine the reasonableness of the price[3].

Furthermore, the alleged contradiction indicated by UMB, of having allowed the creditors to deliberate and then disregarding their result, is equally unfounded. The challenged decision respected the procedure foreseen in the Judicial Reorganization Plan (JRP) and the Notice of Negotiation, submitting the proposal to the deliberation of the Creditors Opção de Reestruturação I, in accordance with Clause 5.2.2.2.4 of the JRP and respecting the right to a fair hearing. The Creditors Opção de

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  11

Reestruturação I had the opportunity to produce the evidence they wished regarding the real value of the asset and to present concrete alternatives to the PROPOSAL – which, it should be reiterated, they did not do, limiting themselves to the abstract and formalistic defense of the minimum value of the notice of negotiation. Only after analyzing the outcome of this deliberation and in light of the set of circumstances of the specific case and evidentiary elements brought to the record – the G5 report, the behavior of the creditors, the market context, the absence of concrete alternatives, and favorable opinions from the Judicial Administration, the Watchdog, and the Labor Creditors Committee – did the Court exercise its prerogative of control and approve the proposal. Therefore, there is no contradiction, only UMB's dissatisfaction with the outcome of the decision.

**II. SOUNDNESS OF THE EVIDENTIARY BASIS – FAIRNESS OPINION OF G5:** UMB questions the adoption of the G5 PARTNERS report as the evidentiary basis of the appealed decision, arguing that it was a "study commissioned" by OI and prepared after the presentation of the PROPOSAL and the deliberation

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26        Book: 151        Page:  12

of the creditors. Again, there is no contradiction whatsoever: the report was commissioned by the Judicial Management of the OI GROUP and attached to the case file only to support the analyses and deliberations of this honorable court with impartial and objective technical information, as highlighted in the Valuation Memorandum (Ev. 23, OUT3).

As highlighted by the aforementioned appealed decision, G5 PARTNERS is the largest independent financial services company in Brazil, specializing in asset management and mergers and acquisitions advisory, with experience in issuing fairness opinions in company sale and merger processes. There is no reason to doubt the integrity and independence of its assessments.

UMB also argues that the fact that the report was the only study attached to the case file does not make it an "impartial element." The appellant confuses the absence of "independent investigations" by G5 regarding the financial information provided by the companies undergoing judicial reorganization with the alleged "lack of independence" of G5 PARTNERS. What the consulting firm stated in its disclaimers was that it did

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  13

not independently examine the accounting, financial, and prospective data provided to it by the companies undergoing reorganization as a basis for the valuation analyses, which is common in analyses of this type, which do not aim to audit the company – a process that would be much more complex and take months to complete. The absence of an independent audit of the data, in turn, does not compromise the independence of G5, which produced an unbiased and objective technical analysis in light of validated valuation methodologies, such as discounted cash flow, and not a study with "commissioned" results, as UMB suggests.

Furthermore, the challenged decision correctly stated that "no other technical element was brought to the proceedings other than the G5 report" (pages 134048/134064, highlighted). Indeed, throughout the entire incident, the appellant failed to present any alternative technical assessment to counter the results of G5 PARTNERS. It merely formulated generic and theoretical objections, devoid of evidentiary basis, as rightly recognized by this Honorable Court: "with all due respect to the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  14

representatives of the appellants, this Court cannot fail to recognize that they have not, in the very least, provided evidence to support their allegations." (page 134061, emphasis added). If the price was considered inadequate, it was up to them to produce their own technical assessment, which they failed to do.

Therefore, there are no contradictions in the appealed decision, and the appellant's criticisms regarding the merits do not hold up.

**III. IMPOSSIBILITY OF CREDIT BID AND LACK OF CONCRETE ALTERNATIVES:** UMB claims that the appealed decision was incomplete, contradictory, and obscure (sic.) by not addressing the supposed "existing alternatives" to the approval of the PROPOSAL - the Credit Bid and the possibility of conducting a new competitive round to maximize the value of the asset. Contrary to what was claimed, the appealed decision did, in fact, address these issues, in an express and reasoned manner.

Regarding the Credit Bid, it was noted that UMB "has no legitimacy whatsoever to now point to the existence of alleged restrictive conditions - not even specified ones - that would have limited

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  15

access to broad competition. Especially because, let it be said again, it insists on having no interest whatsoever in acquiring the asset through a credit bid." (page 134058, emphasis added). Regarding alternatives, it was noted that "all of UMB's claims would have greater credibility and reliability if they had presented concrete alternatives to the sale they are now challenging; if they had sought valuations of the alienated asset from recognized companies in the sector; if they had proven that they were looking for other parties interested in purchasing the asset. But they brought up absolutely none of that." (page 134058, emphasis added).

It should be recalled that the Credit Bid was prohibited by the Tender Notice, which stipulated that proposals for deferred payment and the use of any type of credit, asset, compensation or other form of consideration other than national currency are prohibited (pages 127819/127903). The JRP also stipulated that payment should be made "in cash, in national currency" (item 5.2.2.2.3), and UMB expressly stated its non-opposition to the draft of the tender notice containing these prohibitions. By not objecting

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  16

at the appropriate time, the right to challenge the provision of the Tender Notice regarding the prohibition of the Credit Bid was forfeited – temporally, logically and consumptively. Furthermore, UMB made it clear during the hearing that it had no interest whatsoever in making proposals in this regard, as recorded in the appealed decision: "It was quite clear that there is no intention on the part of the creditors Opção Reestruturação I to acquire UPI V.Tal through a credit bid - nor through other possible forms of purchase, even if not contemplated in the sale notice." (page 134057). Finally, it should be recalled that all the credits that were intended to be used as consideration were subject to seizure by this Honorable Court in the proceedings no. 3019135-31.2026.8.19.0001 and by the Labor Court, making the Credit Bid impossible, so that its use would subvert the payment order established in the Judicial Reorganization Plan (JRP).

Regarding the alleged need for a new competitive round, the challenged decision addressed the issue by stating that (i) the Fairness Opinion of G5 PARTNERS carried out an impartial assessment,

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  17

sound to the proof that the offered value reflects the market value of the asset, which makes it unlikely – virtually impossible – that holding a new round would result in maximizing the amount; and (ii) the asset was offered to the market through a public competitive process, to which only one candidate qualified. Asked in court by the Watchdog to clarify the search for other interested parties in acquiring the shares at the minimum price, or at least at a price similar to the PROPOSAL, the creditors limited themselves to a "clear evasion," as highlighted by this Honorable Court. As considered by the Watchdog and confirmed by the court, "it would be difficult to find another interested party in acquiring this shareholding" (page 134059, highlighted), since it is "a highly stressed asset, especially due to the notorious critical financial situation in which the debtor finds itself." (page 134059, emphasis added). Furthermore, it should be reiterated that UMB has not demonstrated the existence of other interested parties, nor has it undertaken any concrete efforts to identify them.

In this context, it is evident that there is no

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  18

omission whatsoever in the challenged decision and that, on the merits, seeking the determination of a new competitive round is equivalent to demanding that the Court order the repetition of a procedure doomed to failure, when all the elements of the case indicate that such a procedure would not only never result in the presentation of more advantageous proposals, but would also bring the concrete risk of withdrawal of the PROPOSAL and frustration of the entire competitive process for the sale of UPI V. Tal.

**IV. ABUSIVE REJECTION OF THE PROPOSAL:** UMB also alleges that the challenged decision is contradictory and incomplete in classifying the creditors' rejection as economically irrational, arguing that concrete economic, contractual and structural damages resulting from the approval of the PROPOSAL have been demonstrated. The aforementioned challenged decision analyzed each of the grounds invoked by the creditors and concluded, with due justification, that none of them justified the refusal. The price was considered fair based on the independent valuation by G5 PARTNERS.

Regarding the alleged losses, the minimum price

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  19

of R$ 12.3 billion is demonstrably outdated, as shown by the G5 Partners report and by the challenged decision itself. In this sense, if there is an alleged inability to pay the first layer of the waterfall, this stems from the outdated minimum price itself, and not from any defect in the PROPOSAL. The same applies to the alleged uncertainty regarding the net value resulting from the transaction, which is inherent in any sale and does not constitute any flaw in the offer made by the BTG CONSORTIUM. In this sense, mere disagreement with the valuation made by the challenged decision does not constitute an omission or contradiction that can be corrected via a motion for clarification.

**V. FIDUCIARY GUARANTEE AND FACTUAL PREMISES:** UMB still argues that the sale of UPI V. Tal did not occur under the terms foreseen in the JRP and that the Decision was silent regarding article 50, §1, of Law 11.101/2005.

This is, once again, an attempt to re-discuss the merits, and not to remedy any defect. The sale of UPI V. Tal was always foreseen in the JRP as a mechanism for monetizing the asset in favor of the creditors, including the Creditors Opção de

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  20

Reestruturação I, and it is certain that, by accepting this asset as collateral, these creditors assumed the risk of depreciation of the value of their fiduciary guarantee, which is inherent to variations in the market value of this category of assets. It is evident, in this context, that there is no foreclosure or suppression of the fiduciary guarantee, but rather a judicial sale regulated by the Plan and the Public Notice, and evaluated according to the specific market circumstances in which the sale took place.

**VI. COMPLIANCE WITH THE JUDICIAL REORGANIZATION PROGRAM AND DEBT INSTRUMENTS:** UMB also alleges that the appealed decision was remiss in stating that certain issues raised by the trustee could not be opposed to the BTG CONSORTIUM. The appealed decision addressed the issue exhaustively, only acknowledging, on this point, that the mechanisms for distributing the proceeds of the sale are matters to be resolved between the creditors, their guarantors, and the companies undergoing judicial reorganization, while the proponent is only required to comply with the requirements of the Notice and the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  21

Judicial Reorganization Plan regarding payment, which was done.

On the merits, the allegations in item 24 of the motion for clarification also fail. As demonstrated by the BTG CONSORTIUM in its statement of Ev. 24 of incident no. 3034029-12.2026.8.19.0001, such statements by UMB are incorrect: the clauses in question are applicable only to an event of execution of the Fiduciary Alienation of Shares V. Tal, and not to the hypothesis of alienation ordered now in progress via UPI. In this case, payment must be made directly to the creditors, in accordance with the Mandatory Redemption mechanism provided for in the Indentures, and not to the Guarantee Agent, as intended by UMB. Therefore, the PROPOSAL, by providing for payment into an escrow account, fulfills the requirements of JRP[4].

**VII. FUTURE TRANSACTIONS:** UMB also requests clarification regarding the determination to refrain from conducting an IPO for 24 months and regarding the 90% gross profit compensation mechanism in case of non-compliance, arguing that any compensation should be reverted in favor of secured creditors and that the compensation

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  22

should cover not only IPOs, but any future sale, even if carried out outside the stock exchange environment. These requests, however, do not constitute motions for clarification, but rather a true procedural innovation. The points raised do not refer to omission, contradiction or obscurity of the challenged decision, but to its claim for modification and supplementation, which would exceed the strict limits of motions for clarification. In any case, the challenged decision was clear and objective in extending the abstention period to 24 months – longer than the 18 months originally indicated by the proponents – and setting compensation at 90% of the gross profit obtained, less 10% as a pre-fixed commitment of the operation. The fact that UMB disagrees with the terms or intends to extend them does not constitute an omission, but a matter to be eventually returned to the Honorable Court of Justice of Rio de Janeiro in the form of an interlocutory appeal, if desired; the appellant chose not to do so.

17. For all these reasons, there is no doubt that there are no omissions, obscurities or contradictions to be remedied in the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**

Sworn Public Translator & Commercial Interpreter

**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70

Translation: 28.943/26          Book: 151          Page:  23

aforementioned challenged decision, and the motion for clarification should be rejected.

**IMPROPER REQUEST FOR SUSPENSIVE EFFECT:**

**VERY SERIOUS RISK OF LOSSES TO OI AND CREDITORS**

**-   DEFINITIVE   FRUSTRATION   OF   THE   ALIENATION PROCESS   –   CONCRETE   RISK   OF   WITHDRAWAL   AND FRUSTRATION OF THE SINGLE PROPOSAL**

18. Finally, it is imperative that the request for suspensive effect formulated by UMB be rejected. Although the request was formulated to plead for the suspension of the alienation process of UPI V. Tal only until a decision on the motions for clarification and any eventual appeal, the true purpose of UMB is to gain time to adopt the measures stated before a foreign jurisdiction to challenge, directly or indirectly, the very authority of this court's decision.

19. This circumstance is sufficient for the request to be denied: UMB is not using the appeal and the respective request for a stay of execution to legitimately discuss any defect in the challenged decision, but as an illegal artifice that is part of a deliberate strategy to defy Brazilian jurisdiction.

20. If this request is granted, it will cause very

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  24

serious and irreversible harm to OI and all its creditors.

21.**Firstly**, the suspension would indefinitely postpone the entry of resources essential to the orderly liquidation of assets and the payment of creditors that is underway under the Judicial Management of the OI GROUP.

22.The UPI V. Tal is the most valuable remaining asset of the debtor, as stated in the challenged decision itself. Its sale is fundamental to the success of the orderly liquidation of assets and payment of overdue creditors, which has been diligently conducted by the esteemed Judicial Administrator, as determined by this Honorable Bankruptcy Court and the 1st Chamber of Private Law, so that any delay in its completion compromises OI's ability to honor its commitments.

23.Furthermore, the sale of this asset would be fundamental to releasing several other guarantees of OI, which can be freely sold during the course of the judicial reorganization, with the proceeds going towards paying creditors. Such payments are also essential to ensure the successful outcome

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  25

of the attached liability action, since the credits of some of the AHG creditors are currently under attachment.

24.**Secondly**, and even more seriously, the indefinite suspension of the conclusion of the sale of UPI V. Tal could lead the BTG CONSORTIUM to withdraw its proposal. This possibility is real and has already been raised by the proponents in the hearings held by this Honorable Court to organize the sale of the asset, when they pointed out that any changes to the terms of the proposal would result in a loss of interest in the acquisition.

25.The withdrawal of the proposal, in turn, would cause irreparable harm to the companies undergoing judicial reorganization, jeopardizing the payment of all creditors. After all, given all the circumstances discussed above and the subject of the challenged decision, it is highly unlikely, if not virtually impossible, that a new proponent will present themselves to the competitive process in the future, which could result in the definitive frustration of the sale of UPI V. Tal.

26.As it turned out, the asset was brought to

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  26

market broadly and publicly through a notice of general knowledge, and no other interested party qualified or submitted a proposal. Moreover, the independent economic and financial analyses carried out by G5 PARTNERS demonstrated that UPI V. Tal proved to be significantly less valuable than anticipated, and it was proven that the minimum price originally set in the notice (R$ 12,315,977,451.75) is outdated and does not reflect the current market reality.

27. These facts, in themselves, already demonstrate the objective difficulty in finding buyers for the asset under the current conditions.

28. Should the BTG CONSORTIUM's proposal be withdrawn due to the legal uncertainty and instability generated by the appellant's conduct, however, these circumstances will be further aggravated, as the message conveyed to the market will be that submitting proposals lower than the outdated price foreseen in the Judicial Reorganization Plan (JRP), even if more consistent with the real market value of the asset, could result in legal action before a foreign jurisdiction, "blocking" the acquisition

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26 Book: 151 Page: 27

process for years on end, in a context of high litigation and legal uncertainty.

29. Given this scenario, it is unlikely – indeed, practically impossible – that, if the sale of UPI V. Tal is thwarted, a better proposal than the one currently under analysis will be submitted. Frustrating the ongoing sale process would mean condemning OI and its creditors to a scenario of uncertainty, in which there is no guarantee that a new interested party will emerge willing to submit an equivalent or higher offer.

30. At this point, it should be reiterated that the possibility of the BTG CONSORTIUM withdrawing its proposal is not mere conjecture – it is a concrete risk declared by the proponents themselves.

31. During the hearings held to discuss the sale of UPI V. Tal, the PROPONENTS stated that their proposal was final and not subject to adjustments of any kind, especially regarding the offered price. Moreover, the BTG Consortium declared that, if it were not possible to accept and approve the PROPOSAL, or if the possibility of submitting new proposals by third parties were reopened, contrary to the rules of the Tender

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page: 28

Notice, it reserved the right to withdraw the submitted proposal.

32.This fact unequivocally demonstrates that the BTG CONSORTIUM will not hesitate to withdraw the proposal if a scenario of great legal uncertainty and instability arises, such as that which would be generated by granting suspensive effect to these declaratory appeals and the consequent indefinite suspension of the homologation, especially if this is associated with the adoption of contentious measures before a foreign jurisdiction.

33.Nor should it be argued that the mere establishment of penalties for the withdrawal of the proposal would eliminate this risk.

34.Although the proposal presented by the BTG CONSORTIUM is binding under the terms of the Judicial Reorganization Plan and voluntary withdrawal may, in theory, lead to the application of the fine set by the court, Regarding the decision regarding the penalty of 50% of the proposal value (R$ 4.5 billion), it should be noted that (i) the appealed decision has not yet become final and (ii) the PROPOSER may still argue that any withdrawal of the

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  29

proposal due to the alteration of the bases and circumstances considered at the time of the proposal submission does not equate to a voluntary withdrawal, so that the factual premise for the application of the penalty would not be verified.

35. It is possible that, in the event of an indefinite postponement of the closing of the transaction, the BTG CONSORTIUM may seek to withdraw from the proposal and legally challenge the application of the penalty, alleging the occurrence of supervening events that would justify the withdrawal, such as changes in market conditions, alterations in the scenario considered, or the legal uncertainty arising from the impossibility of consummating the deal within a reasonable time.

36. Therefore, the abstract provision for a penalty in the event of voluntary withdrawal, in itself, does not guarantee the maintenance of the proposal, and its eventual collection would lead to a lengthy legal dispute, while the resources that OI would obtain from the sale would remain indefinitely unavailable, perhaps for many years.

37. In this scenario, OI and its creditors would

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  30

be in the worst possible situation: without the asset (whose sale process would already be thwarted), without the proceeds from the sale, and involved in a legal dispute for the collection of a fine with uncertain results, which would make the suspensive effect prejudicial and damaging to the entire process of recovery and orderly liquidation of assets.

38. For all these reasons, granting the suspensive effect requested by UMB is unthinkable, as it could cause irreversible damage to the OI GROUP, making its rejection mandatory.

39. In view of the above, the Debtors request:

i. the rejection of the request for suspensive effect;

ii. the dismissal of the motion for clarification, given its merely infringing purpose; or

iii. Ultimately, the complete rejection of the motions for clarification filed by UMB, on the merits, given the absence of omissions, obscurities, or material errors, with the consequent upholding, in all its terms, of the challenged decision that approved the PROPOSAL for the acquisition of UPI V. Tal.

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

## MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  31

In these terms,

I request approval.

Rio de Janeiro, April 12, 2026.

Luis Felipe Salomão Filho

OAB/RJ 234.563

Rodrigo Mendonça Raposo

OAB/RJ 154.448

Marcos Pitanga Ferreira

OAB/RJ 144.825

Thiago Peixoto Alves

OAB/RJ 155.282

NOTES:

1. 23. The Ad Hoc Group respectfully requests that the Proposed Order be issued, which establishes, among other things: (...) (ii) that the parties to the Extrajudicial Operation Documents (including Oi, BGC and V. Tal) may not, without authorization from this Court, under Chapter 15 of the Bankruptcy Code or applicable legislation, consummate any sale of the V. Tal Participation in violation of the terms of the FFE Order, the Extrajudicial Operation Documents and the JR Plan, including, without limitation to the generality of the above, the requirement that any sale of the Participation in V. Tal satisfies

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  32

the Minimum Price and constitutes a 'Permitted Sale of V. Tal' under the terms of the NPSD Deed, respecting the consent rights granted to creditors in accordance with its terms; and" (ANNEX 3, Event 36, and pages 134382/134451)

2. Declaratory appeals are only admissible to remedy obscurity, contradiction, omission, or material error, and are not intended for the re-examination of matters already decided. 2. The absence of prior consideration of the matter in the court of origin prevents its analysis by the Superior Court of Justice, even when dealing with a matter of public order. 3. The re-examination of the factual and evidentiary context is prohibited in special appeals, according to Precedent No. 7 of the Superior Court of Justice (STJ). (...)" (EDcl in AgRg in AREsp No. 2,788,454/SP, rapporteur Minister Messod Azulay Neto, Fifth Group, decided on Feb 3, 2026, DJEN of Feb 10, 2026.) .

3. "[The] assessment presented by the judicial management, in the report from G5 (the largest independent financial services company in Brazil in asset management, mergers and acquisitions advisory, and usually responsible for issuing

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

**MARIANA SANTOS RÊGO**

Sworn Public Translator & Commercial Interpreter

**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70

Translation: 28.943/26          Book: 151          Page:  33

"fairness opinions" in company selection processes), indicates that the proposed price is "fair" according to the underlying market; the proponent's assessment is that its proposal is high, superior to what the market practices, and fits within its exclusive purpose of ending the remaining effects of the debtor's situation on its business. (...) The performance of the judicial management, also on this point, is considered commendable by the Court, especially because, as previously defined, no other technical element was brought to the case file other than the G5 report." (page 135060, highlighted).

4. See V. Tal's explanation: "102. It turns out there is a premise error in AHG's statement, given that the sale of UPI V. Tal will not occur through the execution of the V. Tal Share AF, but rather through an ordered sale in the judicial reorganization process through an isolated productive unit. In this scenario, the Creditors' Agreement does not stipulate that payment should be made to the Guarantee Agent, but rather directly to the creditors, in accordance with the terms of the Indentures and other applicable debt

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

# MARIANA SANTOS RÊGO
Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page:  34

instruments. 103. This is because the Creditors' Agreement establishes two scenarios for the sale of V. Tal's shares held by Oi: (i) the first scenario, corresponding to a forced sale due to the execution of the V. Tal Share AF, verified after the occurrence of a default event on the applicable debts (Distressed Disposal); (ii) the second scenario, corresponding to an ordered sale in the course of Oi's business, including through an isolated productive unit in the within the scope of judicial reorganization, before the occurrence of a default event (Ordinary Course Collateral Disposition). 104. The sale of UPI V. Tal is a sale in the ordinary course of business and at the discretion of Oi, since (i) it was conducted in a public competitive process within the scope of this judicial reorganization, and (ii) independently of any enforcement procedure by the AF of V. Tal Shares." (Ev. 24, court case no. 3034029-12.2026.8.19.0001).

--------------------------------------------------

This translation does not pass a judgment on the format, authenticity and/or content of the translated document. There was nothing further on the document to which I attest. Witness my hand

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com



# MARIANA SANTOS RÊGO

Sworn Public Translator & Commercial Interpreter
**Portuguese/English -** JUCERJA No. 242 – CPF: 098.714.677-70
Translation: 28.943/26          Book: 151          Page: 35

```
and seal. ----------------------------------------
          Rio de Janeiro, April 13, 2026.



          MARIANA  SANTOS  RÊGO
```

*Mariana Santos Rêgo*
Sworn Public Translator and
Commercial Interpreter
CPF 098.714.677-70

Rua Pompeu Loureiro, 99 / 302 – Copacabana – RJ – CEP: 22061-000
Phone: + 55 21 2551-6653 / + 55 21 9897-3373
E-mail: marianarego@juramentada.com

 

EXMA. SRA. JUÍZA DE DIREITO DA 7ª VARA EMPRESARIAL DA COMARCA DA CAPITAL DO ESTADO DO RIO DE JANEIRO

Recuperação Judicial nº 0090940-03.2023.8.19.0001

Incidente nº 3034029-12.2026.8.19.0001

**OI S.A. – EM RECUPERAÇÃO JUDICIAL** ("Oɪ"), **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – EM RECUPERAÇÃO JUDICIAL** ("PTIF") e **OI BRASIL HOLDINGS COÖPERATIEF U.A. – EM RECUPERAÇÃO JUDICIAL** ("Oɪ Coop" e, em conjunto com Oɪ e PTIF, "Grupo Oɪ" ou "Recuperandas"), já qualificadas nos autos da recuperação judicial em epígrafe, vêm, por seus advogados, oferecer resposta aos embargos de declaração de fls. 134.364/134.374, nos seguintes termos:

## ESTRATÉGIA POSTERGATÓRIA E
## DESRESPEITO À JURISDIÇÃO BRASILEIRA

1.      O real propósito do UMB com a oposição dos seus embargos de declaração é interromper o prazo para a interposição de agravo de instrumento contra a r. decisão embargada, enquanto busca, em paralelo, obter, de maneira imprópria e transversa, a reforma do referido *decisum* perante a jurisdição norte-americana – via inadequada –, a qual vem sendo utilizada pelos credores *Ad Hoc* ("credores AHG") para criar obstáculos à alienação da UPI V.tal, em prejuízo ao processo de liquidação ordenado de ativos em curso perante esse MM. Juízo e os interesses dos credores.

2.      O UMB, na qualidade de *trustee* e representante dos credores AHG, quer, na verdade, perante a jurisdição norte-americana, mediante a apresentação de um descabido requerimento no âmbito do *Chapter 15* da Oi (autos nº 23-10193), em curso perante o Juízo da Vara de Falências e Recuperações Judiciais do Distrito Sul de Nova Iorque ("Juízo de Nova Iorque"), que a consumação da alienação da UPI V.tal seja condicionada a uma prévia e inexistente autorização pelo MM. Juízo de Nova Iorque

(item 23, "(ii)", do Ev. 36, ANEXO3 e das fls. 134.382/134.451)[1]. A estratégia dos credores AHG, representados pela UMB, de "recorrerem" ao Juízo de Nova Iorque com o objetivo de "reformar" a r. decisão embargada, suspendendo a consumação da alienação da UPI V.tal, representa uma afronta inadmissível à autoridade do Poder Judiciário brasileiro.

3.      Essa pretensão é inadmissível, inclusive, à luz da lógica cooperativa que deve presidir a insolvência transnacional mediante a cooperação entre jurisdições concorrentes.

4.      Em última instância, o que o UMB (credores AHG) pretende é utilizar o processo estrangeiro auxiliar como se fosse um sucedâneo recursal e uma instância revisora desta Recuperação Judicial, em inversão inadmissível entre o processo principal e o processo não principal, promovendo o conflito entre jurisdições, e não a cooperação entre elas.

5.      Repise-se: o processo de *Chapter 15* do Grupo OI não é um processo pleno de reestruturação, como seria uma ação de *Chapter 11*, mas um processo auxiliar, que se destina a obter medidas de assistência em cooperação jurisdicional para garantir eficiência ao processo de soerguimento, como previsto pelo art. 167-Q, V, da LRE. Ao utilizá-lo como forma de burlar a decisão desse MM. Juízo Recuperacional, os credores AHG (representados pelo UMB) subvertem essa lógica, transmudando o processo estrangeiro não principal auxiliar em uma plataforma para supervisionar, ameaçar e constranger a autoridade deste MM. Juízo brasileiro.

6.      Não há como se coonestar com a pretensão dos credores AHG (representados nessa demanda pelo UMB) de buscar **(i)** a adoção de medidas judiciais no âmbito do processo estrangeiro não principal do *Chapter 15* com a finalidade declarada de suspender as decisões proferidas no âmbito do processo concursal principal, invertendo

---

[1] " 23. O Grupo Ad Hoc requer, respeitosamente, seja proferida a Ordem Proposta, a qual estabeleça, entre outros: (...) (ii) que as partes dos Documentos da Operação Extraconcursais (incluindo a Oi, a BGC e a V.tal) não poderão, sem autorização desta Vara, nos termos do Capítulo 15 do Código de Falências ou da legislação aplicável, consumar qualquer operação de venda da Participação da V.tal em violação aos termos da Ordem FFE, dos Documentos da Operação Extraconcursais e do Plano de RJ, incluindo, sem que se limite a generalidade do acima exposto, a exigência de que qualquer venda da Participação na V.tal satisfaça o Preço Mínimo e constitua uma 'Venda Permitida da V.tal' nos termos da Escritura NPSD, respeitando os direitos de consentimento concedidos aos credores em conformidade com seus termos; e" (ANEXO3, Evento 36, e fls. 134.382/134.451)

a lógica dos arts. 167-B, I, e 167-J da Lei nº 11.101/2005 ("LRE") e desafiando a autoridade do Poder Judiciário brasileiro; e, ao mesmo tempo, **(ii)** opor os embargos de declaração ora respondidos por meio do seu *trustee*, a fim de interromper o decurso do prazo para agravo e assegurar que o JUÍZO DE NOVA IORQUE examine tal controvérsia antes da interposição de eventual recurso no Brasil.

7.     O JUÍZO DE NOVA IORQUE já designou uma audiência para tratar a respeito do requerimento formulado pelos credores AHG para o próximo dia 15.04.26, quarta-feira. Desse modo, é provável que o Juízo de Nova Iorque analise o requerimento antes mesmo do término do prazo de interposição de agravo de instrumento pelo UMB, de modo que essa controvérsia terá sido dirimida perante a jurisdição norte-americana antes do término do prazo legal para o UMB agravar do referido *decisum*.

8.     É evidente que a oposição dos aclaratórios ora respondidos representa **(i)** a mera irresignação do UMB (leia-se, credores AHG) contra o resultado da r. decisão embargada, inexistindo, portanto, os vícios suscitados nos referidos aclaratórios (conforme será detalhado abaixo); e **(ii)** uma estratégia processual que buscou interromper o prazo para interposição de agravo de instrumento contra a r. decisão que homologou a alienação da UPI V.tal, com o objetivo de assegurar uma definição a respeito dessa controvérsia perante o JUÍZO DE NOVA IORQUE antes do término de eventual prazo recursal no Brasil. Este comportamento comprova a ausência de interesse legítimo do UMB na oposição dos embargos de declaração.

9.     Não se pode admitir que a oposição de embargos de declaração sirva como instrumento de manobra dilatória para favorecer a adoção de medidas ilegais, o que, por si só, já impõe o não conhecimento do recurso, ou, no limite, o seu desprovimento, pelos motivos que serão detalhados abaixo.

## OMISSÕES E CONTRADIÇÕES INEXISTENTES
## EMBARGOS DE DECLARAÇÃO DESCABIDOS - MERA IRRESIGNAÇÃO DE MÉRITO

10.     Os embargos de declaração ora respondidos tentam rediscutir, por via inadequada, as conclusões alcançadas pela r. decisão embargada, que homologou a proposta para aquisição da UPI V.tal apresentada pelo CONSÓRCIO BTG ("PROPOSTA") através de fundamentação detalhada, coerente e exaustiva.

3

11.     Basta uma breve leitura dos embargos de declaração para constatar que o UMB se limita a reiterar fatos e argumentos que já foram rechaçados por esse MM. Juízo, buscando, na realidade, a rediscussão do mérito da decisão embargada, o que não se admite em sede de embargos de declaração.

12.     Como se sabe, os embargos de declaração constituem recurso de fundamentação vinculada, cabíveis apenas nas hipóteses taxativas do art. 1.022 do Código de Processo Civil, a saber: **(i)** obscuridade ou contradição; **(ii)** omissão quanto a ponto ou questão sobre a qual devia se pronunciar o juiz de ofício ou a requerimento; ou **(iii)** erro material. Trata-se de recurso vocacionado ao aperfeiçoamento da decisão judicial, e não à sua reforma.

13.     Nenhuma dessas hipóteses se verifica no caso concreto. A decisão embargada enfrentou, de forma fundamentada e exaustiva, todas as questões suscitadas pelas partes ao longo do incidente, tendo analisado: **(i)** a regularidade do procedimento competitivo; **(ii)** a preclusão do direito de impugnação ao edital; **(iii)** a razoabilidade do preço ofertado, com base no laudo independente da G5 PARTNERS; **(iv)** os argumentos relativos à forma de pagamento e às garantias; e **(v)** as condições para homologação da proposta, incluindo a ressalva relativa à abstenção de realização de IPO.

14.     O que o UMB denomina "contradições" e "omissões" constitui, na verdade, mero inconformismo com o resultado da decisão judicial, o que não autoriza a oposição de embargos de declaração, na medida em que os embargos de declaração não se prestam à rediscussão do mérito[2].

15.     Se quisesse, o UMB deveria ter interposto o competente agravo de instrumento à c. 1ª Câmara de Direito Privado do e. Tribunal de Justiça do Estado do Rio de Janeiro, preventa para apreciar recursos desta recuperação judicial, mas o embargante optou por

---

[2] "Os embargos de declaração são cabíveis apenas para sanar obscuridade, contradição, omissão ou erro material, não se prestando ao reexame da matéria já decidida. 2. A ausência de prequestionamento da matéria no Tribunal de origem impede sua análise pelo Superior Tribunal de Justiça, mesmo em se tratando de matéria de ordem pública. 3. O reexame do contexto fático-probatório é vedado em sede de recurso especial, conforme Súmula nº 7 do STJ. (...)" (EDcl no AgRg no AREsp n. 2.788.454/SP, relator Ministro Messod Azulay Neto, Quinta Turma, julgado em 3/2/2026, DJEN de 10/2/2026.)

se valer dos declaratórios como sucedâneo recursal impróprio. Nesse sentido, tendo os embargos de declaração sido opostos com o nítido propósito de rediscutir o mérito da decisão, eles sequer merecem conhecimento, devendo ser rejeitados de plano.

16.    Ainda que assim, não fosse, não há dúvidas de que inexistem as omissões e obscuridades apontadas, como será demonstrado:

I.    INEXISTÊNCIA DE CONTRADIÇÃO QUANTO À PREMISSA DA MAXIMIZAÇÃO DE VALORES: no Capítulo I dos embargos, o UMB alega que a r. decisão embargada seria contraditória ao reconhecer a UPI V.tal como o "*ativo mais precioso*" da Recuperanda e, ao mesmo tempo, homologar a sua alienação por valor inferior ao mínimo previsto no Edital e rejeitada pelos Credores Opção de Reestruturação I. Não há qualquer contradição entre reconhecer a relevância estratégica do ativo e aceitar a sua alienação pelo melhor preço disponível no mercado atual. A r. decisão embargada não ignorou a importância do ativo, pelo contrário: foi precisamente por reconhecer sua centralidade para a recuperação judicial que entendeu imprescindível a sua alienação pelo valor que o mercado revelou que o bem de fato vale, abstendo-se de se apegar a formalidades absurdas que frustrariam o processo de alienação desse ativo tão relevante, comprometendo, ao final, o próprio processo de liquidação ordenada de ativos que se encontra em curso.

O UMB também sustenta que a r. decisão embargada seria contraditória ao "*substituir*" a deliberação econômica atribuída pelo PRJ aos Credores Opção de Reestruturação I, reconhecendo, ao mesmo tempo, que o Juízo "***não é detentor de conhecimentos de mercado ou expertise para realização de valuation.***" (fl. 134059, grifou-se). O MM. Juízo não realizou nenhuma avaliação econômica autônoma do ativo, tendo se amparado em laudo técnico independente da G5 PARTNERS – a única avaliação técnica imparcial trazida aos autos – para aferir a razoabilidade do preço[3].

Ademais, a suposta contradição indicada pelo UMB, de ter permitido a deliberação dos credores para, depois, desconsiderar o seu resultado, é igualmente improcedente. A decisão embargada respeitou o procedimento previsto no PRJ e no Edital, submetendo a proposta à deliberação dos Credores Opção de Reestruturação I, nos termos da Cláusula 5.2.2.2.4 do PRJ e respeitando o contraditório. Os Credores Opção de Reestruturação I tiveram a oportunidade de produzirem as provas que quiseram a respeito do valor real do ativo e apresentarem alternativas concretas à PROPOSTA – o que, repita-se, eles

---

[3] "[A] avaliação apresentada pela gestão judicial, no laudo da G5 (maior empresa independente de serviços financeiros do Brasil na gestão de patrimônio, assessoria em fusões e aquisições, e habitualmente responsável pela emissão de "*fairness opinion*" em processos de seleção de empresas), indica ser o preço proposto "fair" - "justo", segundo mercado subjacente; a avaliação do proponente é a de que sua proposta é elevada, superior a que o mercado pratica e se insere no seu propósito - exclusivo - de encerrar reflexos remanescentes da situação da recuperanda em seu negócio. (...) A atuação da gestão judicial, também neste ponto, é considerada louvável pelo Juízo, especialmente porque, como antes definido, não se trouxe nenhum outro elemento técnico aos autos senão o laudo da G5." (fl. 135.060, grifou-se).

não fizeram, limitando-se à defesa abstrata e formalista do valor mínimo do edital. Somente após a análise do resultado dessa deliberação e à luz do conjunto das circunstâncias do caso concreto e elementos probatórios trazidos aos autos – *laudo da G5, comportamento dos credores, contexto do mercado, ausência de alternativas concretas, e manifestações favoráveis da Administração Judicial, do Watchdog e do Comitê de Credores Trabalhistas* –, é que o Juízo exerceu sua prerrogativa de controle e homologou a proposta. Inexiste, portanto, qualquer contradição, apenas insatisfação do UMB com o resultado da decisão.

II.  **HIGIDEZ DA BASE PROBATÓRIA – *FAIRNESS OPINION* DA G5:** o UMB questiona a adoção do laudo da G5 PARTNERS como base probatória da decisão embargada, sustentando que se trataria de "*estudo encomendado*" pela OI e elaborado após a apresentação da PROPOSTA e a deliberação dos credores. Novamente, não há contradição alguma: o laudo foi contratado pela Gestão Judicial do GRUPO OI e juntado aos autos apenas para subsidiar as análises e deliberações desse MM. Juízo com informações técnicas isentas e objetivas, conforme destacado no *Valuation Memorandum* (Ev. 23, OUT3).

Como bem destacado pela r. decisão embargada, a G5 PARTNERS é a maior empresa independente de serviços financeiros do Brasil na gestão de patrimônio e em assessoria em fusões e aquisições, com experiência na emissão de *fairness opinions* em processos de alienação e fusão de empresas, não havendo qualquer razão para se duvidar da idoneidade e independência de suas análises.

O UMB também alega que o fato de o laudo ter sido o único estudo juntado aos autos não o converteria em "*elemento imparcial*." O embargante confunde a ausência de "*investigações independentes*", pela G5, a respeito das **informações financeiras** fornecidas pelas Recuperandas com a alegada "*falta de independência*" da G5 PARTNERS. O que a consultoria registrou em seus *disclaimers* foi que não examinou, de maneira independente, os **dados** contábeis, financeiros e prospectivos que lhe foram fornecidos pelas Recuperandas como base para as análises de *Valuation*, o que é comum em análises desse tipo, que não têm a finalidade de auditar a companhia – processo que seria muito mais complexo e levaria meses para ser concluído. A ausência de auditoria independente dos dados, por sua vez, não compromete a **independência da G5**, que produziu uma análise técnica isenta e objetiva à luz de avalizadas metodologias de *Valuation*, como o fluxo de caixa descontado, e não um estudo com resultados "encomendados", como o UMB sugere.

Além disso, a r. decisão embargada bem consignou que "***não se trouxe nenhum outro elemento técnico aos autos senão o laudo da G5***" (fl. 134.048/134.064, grifou-se). Com efeito, o embargante, ao longo de todo o incidente, não apresentou qualquer avaliação técnica alternativa para contrapor os resultados da G5 PARTNERS. Limitou-se a formular objeções genéricas e teóricas, desprovidas de substrato probatório, como bem reconhecido por esse MM. Juízo: "***com todo respeito devido aos representantes dos impugnantes, não pode este Juízo deixar de reconhecer que não se desincumbiram, minimamente, de fazerem prova de suas alegações.***" (fl. 134061, grifou-se). Se considerava o preço inadequado, cabia-lhe produzir sua própria avaliação técnica, o que não fez.

6

Portanto, inexistem contradições na decisão embargada e as críticas do embargante, no mérito, não prosperam.

III.    **IMPOSSIBILIDADE *CREDIT BID* E INEXISTÊNCIA DE ALTERNATIVAS CONCRETAS:** o UMB alega que a decisão embargada teria sido omissa, contraditória e obscura (sic.) ao não enfrentar as supostas "alternativas existentes" à homologação da PROPOSTA - o *Credit Bid* e a possibilidade de realizar uma nova rodada competitiva para maximizar o valor do ativo. Ao contrário do alegado, a decisão embargada enfrentou, sim, essas questões, de forma <u>expressa</u> e <u>fundamentada</u>.

Quanto ao *Credit Bid*, consignou que a UMB "*não guarda mínima legitimidade agora apontar para a existência de supostas condições restritivas - tampouco discriminadas, que teriam limitado acesso a ampla concorrência. Inclusive porque, diga-se novamente, **insiste em não ter mínimo interesse em adquirir o ativo através de credit bid.**"* (fl. 134058, grifou-se). Quanto às alternativas, registrou-se que "***todas as alegações da UMB se revestiriam de maior credibilidade e confiabilidade caso tivesse, de concreto, apresentado alternativas à admissão da venda que agora impugnam; se houvessem buscado avaliações do bem alienado por empresas reconhecidas no segmento; se tivessem comprovado estar em busca de outros interessados na compra do ativo. Mas não trouxeram rigorosamente nada disso.***" (fl. 134058, grifou-se).

Recorde-se que o *Credit Bid* estava vedado pelo Edital, que previu que são vedadas propostas em pagamento diferido e a utilização de qualquer espécie de crédito, ativo, compensação ou outra forma de contrapartida que não seja moeda corrente nacional (fl. 127.819/127.903). O PRJ também determinava que o pagamento deveria ser realizado "*à vista, em dinheiro, em moeda corrente nacional*" (cl. 5.2.2.2.3), sendo que o UMB ***expressamente manifestou sua não oposição à minuta do edital que continha essas vedações.*** Ao não se insurgir no momento oportuno, operou-se preclusão – temporal, lógica e consumativa – do direito de impugnar a disposição do Edital quanto à vedação ao *Credit Bid*. Além disso, o UMB ***deixou claro durante a audiência que não tinha interesse algum em realizar propostas nesse sentido***, como registrado pela decisão agravada: "*Ficou bastante claro que não há, da parte dos credores Opção Reestruturação I, qualquer intenção de aquisição da UPI V.Tal através de credit bid - tampouco por outras possíveis formas de compra, ainda que não contempladas no edital de venda.*" (fl. 134.057). Por fim, recorde-se que a totalidade dos créditos que se pretendia utilizar como contrapartida foi objeto de arresto por esse MM. Juízo nos autos do processo nº 3019135-31.2026.8.19.0001 e pela Justiça do Trabalho, tornando o *Credit Bid* impossível, de modo que a sua utilização subverteria a ordem de pagamento estabelecida no PRJ.

Quanto à alegada necessidade de nova rodada competitiva, a r. decisão embargada abordou a questão ao consignar que **(i)** o *Fairness Opinion* da G5 PARTNERS realizou avaliação isenta, hígida à prova de que o valor ofertado reflete o valor de mercado do bem, o que torna improvável – virtualmente, impossível – que a realização de nova rodada resultasse em maximização de valor; e **(ii)** o ativo foi ofertado ao mercado, através de processo competitivo público, ao qual apenas um candidato se habilitou. Instados em audiência pelo *Watchdog* a esclarecer sobre a busca de outros interessados na aquisição pelo preço mínimo,

7

ou ao menos em preço assemelhado à PROPOSTA, os credores limitaram-se a uma "*clara evasiva*", conforme destacado por esse MM. Juízo. Como ponderado pelo Watchdog e confirmado pelo juízo, "*dificilmente se encontraria outro interessado na aquisição dessa participação acionária*" (fl. 134059, grifou-se), tratando-se de "*ativo deveras estressado, especialmente pela notória situação financeira crítica em que se encontra a recuperada.*" (fl. 134059, grifou-se). Não fosse suficiente, repise-se que o UMB não demonstrou existirem outros interessados, tampouco empreendeu esforços concretos para identificá-los.

Nesse contexto, é evidente que não há omissão alguma na r. decisão embargada e que, no mérito, pretender a determinação de uma nova rodada competitiva equivale a exigir que o Juízo ordene a repetição de um procedimento fadado ao fracasso, quando todos os elementos dos autos indicam que tal procedimento não apenas jamais resultaria na apresentação de propostas mais vantajosas, como traria o risco concreto de retirada da PROPOSTA e frustração de todo o processo competitivo para alienação da UPI V.tal.

IV.   **REJEIÇÃO ABUSIVA DA PROPOSTA**: o UMB também alega que a decisão embargada seria contraditória e omissa ao classificar a rejeição dos credores como economicamente irracional, sustentando que teriam sido demonstrados prejuízos econômicos, contratuais e estruturais concretos decorrentes da homologação da PROPOSTA. A r. decisão embargada analisou cada um dos fundamentos invocados pelos credores e concluiu, fundamentadamente, que nenhum deles justificava a recusa. O preço foi considerado justo (*Fair*) com base na avaliação independente da G5 PARTNERS.

Quanto aos alegados prejuízos, o preço mínimo de R$ 12,3 bilhões encontra-se comprovadamente defasado, conforme demonstrado pelo laudo da G5 Partners e pela própria r. decisão embargada. Nesse sentido, se há a alegada incapacidade de quitar a primeira camada da *waterfall*, isso decorre da defasagem do próprio preço mínimo, e não de qualquer defeito da PROPOSTA. O mesmo vale para a alegada incerteza quanto ao valor líquido resultante da operação, que é inerente a qualquer alienação e não constitui qualquer vício na oferta realizada pelo CONSÓRCIO BTG. Nesse sentido, a simples discordância com a valoração feita pela r. decisão embargada não configura omissão ou contradição passível de correção via embargos de declaração.

V.   **GARANTIA FIDUCIÁRIA E PREMISSAS FÁTICAS**: o UMB ainda sustenta que a alienação da UPI V.tal não teria ocorrido nos termos previstos no PRJ e que a Decisão teria sido omissa quanto ao art. 50, §1º, da Lei 11.101/2005.

Trata-se, uma vez mais, de tentativa de rediscussão do mérito, e não de sanar qualquer vício. A alienação da UPI V.tal sempre esteve prevista no PRJ como mecanismo de monetização do ativo em favor dos credores, inclusive dos Credores Opção de Reestruturação I, sendo certo que, ao admitirem esse ativo como garantia, tais credores assumiram o risco de depreciação do valor de sua garantia fiduciária, o que é inerente às variações no valor de mercado dessa categoria de ativos. É evidente, nesse contexto, que não há excussão ou supressão da garantia fiduciária, mas alienação judicial regulada pelo Plano e pelo Edital e avaliada segundo as circunstâncias concretas de mercado em que a alienação se deu.

8

**VI.** **CUMPRIMENTO DO PRJ E DOS INSTRUMENTOS DE DÍVIDA**: o UMB também alega que a r. decisão embargada teria sido omissa ao afirmar que determinadas questões suscitadas pelo *trustee* não seriam oponíveis ao CONSÓRCIO BTG. A decisão embargada enfrentou a questão de maneira exaustiva, tendo apenas reconhecendo, nesse ponto, que os mecanismos de distribuição do produto da venda constituem questões a serem resolvidas entre os credores, seus agentes de garantias e as Recuperandas, enquanto ao proponente compete tão somente cumprir com os requisitos do Edital e do PRJ quanto ao pagamento, o foi feito.

No mérito, tampouco prosperam as alegações do item 24 dos embargos de declaração. Como demonstrado pelo CONSÓRCIO BTG em sua manifestação de Ev. 24 do incidente nº 3034029-12.2026.8.19.0001, tais afirmações do UMB são equivocadas: as cláusulas em questão são aplicáveis apenas a um evento de excussão da Alienação Fiduciária de Ações V.tal, e não à hipótese de alienação ordenada ora em curso pela via de UPI. Nessa hipótese, o pagamento deve ser realizado diretamente para os credores, de acordo com o mecanismo de Resgate Obrigatório previsto nas Indentures, e não ao Agente de Garantias, como pretendido pela UMB. Portanto, a PROPOSTA, ao prever o pagamento em conta vinculada, cumpre os requisitos do PRJ[4].

**VII.** **TRANSAÇÕES FUTURAS**: o UMB também pede esclarecimentos sobre a determinação de abstenção de realização de IPO por 24 meses e sobre o mecanismo de indenização de 90% do lucro bruto em caso de descumprimento, defendendo que eventual indenização fosse revertida em favor dos credores garantidos e que a indenização deveria abranger não apenas IPO, mas qualquer alienação futura, ainda que realizada fora do ambiente da bolsa de valores. Esses pedidos, contudo, não configuram embargos de declaração, mas sim verdadeira inovação recursal. Os pontos suscitados não se referem a omissão, contradição ou obscuridade da r. decisão embargada, mas à sua pretensão de modificação e complementação, que extrapolaria os limites estritos dos embargos declaratórios. De todo modo, a Decisão Embargada foi clara e objetiva ao estender o prazo de abstenção para 24 meses – superior aos 18 meses originalmente indicados pelos proponentes – e fixar indenização de 90% do lucro bruto obtido, descontados 10% a título prefixado de compromissos da operação. O fato de a UMB discordar dos termos ou pretender a sua ampliação não configura omissão, mas matéria a ser eventualmente devolvida ao e. TJRJ em sede de agravo de instrumento, se quiser, o embargante optou por não fazer.

---

[4] Confira-se a explicação da V.tal: "102. Ocorre que há erro de premissa na afirmação do AHG, tendo em vista que a alienação da UPI V.tal não ocorrerá por meio da excussão da AF de Ações V.tal, mas sim por meio de uma alienação ordenada no processo de recuperação judicial por meio de unidade produtiva isolada. Neste cenário, o Acordo entre Credores não prevê que o pagamento deve ser realizado ao Agente de Garantias, mas sim diretamente aos credores, de acordo com os termos das Indentures e demais instrumentos de dívida aplicáveis. 103. Isso porque o Acordo entre Credores estabelece dois cenários de venda das ações de emissão da V.tal detidas pela Oi: (i) o primeiro cenário, correspondente a uma venda forçada em razão da excussão da AF de Ações V.tal, verificada após a ocorrência de um evento de inadimplemento das dívidas aplicáveis (Distressed Disposal); (ii) o segundo cenário, correspondente a uma venda ordenada no curso dos negócios da Oi, inclusive por meio de uma unidade produtiva isolada no âmbito da recuperação judicial, antes da ocorrência de um evento de inadimplemento (Ordinary Course Collateral Disposition). 104. A alienação da UPI V.tal é uma venda no curso ordinário e de livre iniciativa da Oi, eis que (i) conduzida em processo competitivo público no âmbito desta recuperação judicial, e (ii) independentemente de qualquer procedimento de excussão da AF de Ações V.tal." (Ev. 24, proc. nº 3034029-12.2026.8.19.0001).

17.     Por todas essas razões, não há dúvidas de que inexistem omissões, obscuridades ou contradições a serem sanadas r. decisão embargada, devendo ser rejeitados os embargos de declaração.

## INDEVIDO PEDIDO DE EFEITO SUSPENSIVO:
## RISCO GRAVÍSSIMO DE PREJUÍZOS À OI E AOS CREDORES
## - FRUSTRAÇÃO DEFINITIVA DO PROCESSO DE ALIENAÇÃO –
## RISCO CONCRETO DE RETIRADA E FRUSTRAÇÃO DE PROPOSTA ÚNICA

18.     Por fim, é imperioso que o pedido de efeito suspensivo formulado pelo UMB seja rejeitado. Embora o pedido tenha sido formulado para pleitear o sobrestamento do processo de alienação da UPI V.tal apenas até decisão sobre os embargos de declaração e eventual agravo de instrumento, a verdadeira finalidade do UMB é ganhar tempo para a adoção das medidas enunciadas perante jurisdição estrangeira para desafiar, direta ou indiretamente, a própria autoridade da decisão deste juízo.

19.     Essa circunstância é suficiente para que o pedido seja indeferido: o UMB não utiliza o recurso e respectivo pedido de efeito suspensivo para discutir, legitimamente, qualquer vício da decisão embargada, mas como artifício ilegal que é parte de uma estratégia deliberada para desafiar a jurisdição brasileira.

20.     Caso esse pedido seja acolhido, ele acarretará prejuízos gravíssimos e irreversíveis à OI e a todos os seus credores.

21.     Em **primeiro** lugar, a suspensão postergaria indefinidamente a entrada de recursos essenciais ao processo de liquidação ordenada de ativos e ao pagamento dos credores que está em curso sob a Gestão Judicial do GRUPO OI.

22.     A UPI V.tal é o ativo mais valioso remanescente da Recuperanda, como consignado na própria r. decisão embargada. A sua alienação é fundamental para o sucesso do processos de liquidação ordenada de ativos e pagamento de credores em atraso que vem sendo diligentemente conduzida pelo i. Gestor Judicial, conforme determinado por esse MM. Juízo Recuperacional e pela 1ª Câmara de Direito Privado,

10

de modo que qualquer atraso na sua consumação compromete a capacidade de a OI honrar seus compromissos.

23.     Além disso, a alienação desse ativo seria fundamental para a liberação de diversas outras garantias da OI, as quais poderão ser alienadas livremente no curso da recuperação judicial, com a destinação de tais recursos ao pagamento dos credores. Tais pagamentos também são essenciais para assegurar o resultado útil da ação de responsabilidade em apenso, já que os créditos de parte dos credores AHG encontram-se atualmente arrestados.

24.     Em **segundo** lugar, e *de forma ainda mais gravosa*, a suspensão indeterminada da conclusão da alienação da UPI V.tal **pode levar o CONSÓRCIO BTG a retirar a sua proposta**. Essa possibilidade é concreta e já foi inclusive aventada pelos proponentes nas audiências realizadas por esse MM. Juízo para organizar a alienação do ativo, quando pontuaram que eventuais modificações nas condições da proposta resultariam na perda de interesse na aquisição.

25.     A retirada da proposta, por sua vez, acarretaria prejuízos irremediáveis para as Recuperandas, colocando em risco o pagamento de todos os credores. Afinal, por todas as circunstâncias que já foram discutidas acima e objeto da r. decisão embargada, é altamente improvável, senão virtualmente impossível, que um novo proponente se apresente ao processo competitivo, no futuro, o que pode resultar na frustração definitiva da alienação da UPI V.tal.

26.     Como se viu, o ativo foi levado ao mercado de forma ampla e pública, por meio de edital de conhecimento geral, e nenhum outro interessado se habilitou ou apresentou proposta. Mais do que isso, as análises econômico-financeiras independentes realizadas pela G5 PARTNERS demonstraram que a UPI V.tal se mostrou significativamente menos valiosa do que estava previsto, tendo sido comprovado que o preço mínimo originalmente fixado no edital (R$ 12.315.977.451,75) encontra-se defasado e não reflete a realidade atual do mercado.

27.     Esses fatos, por si só, já demonstram a dificuldade objetiva de se encontrar compradores para o ativo nas condições atuais.

28.      Caso a proposta do Consórcio BTG venha a ser retirada em razão da insegurança jurídica e da instabilidade geradas pela conduta do embargante, contudo, essas circunstâncias serão ainda mais agravadas, na medida em que a mensagem que se passará ao mercado é de que a apresentação de propostas inferiores ao preço defasado previsto no PRJ, ainda que mais condizentes com o real valor de mercado do bem, poderá resultar na adoção de medidas judiciais perante jurisdição estrangeira, "travando" o processo de aquisição por anos a fio, em contexto de alta litigiosidade e insegurança jurídica.

29.      Diante desse cenário, é improvável – repita-se, praticamente impossível – que, se frustrada a alienação da UPI V.tal, venha a ser apresentada uma proposta melhor do que a atualmente em análise. Frustrar o processo de alienação em curso significaria condenar a Oi e seus credores a um cenário de incerteza, no qual não há qualquer garantia de que surgirá novo interessado disposto a apresentar oferta equivalente ou superior.

30.      Nesse ponto, reitere-se que a possibilidade de retirada da proposta pelo Consórcio BTG não é mera conjectura – trata-se de risco concreto e declarado pelos próprios proponentes.

31.      No curso das audiências realizadas para discussão sobre a alienação da UPI V.tal, os Proponentes afirmaram que sua proposta era final e não sujeita a ajustes de qualquer natureza, em especial no que se refere ao preço ofertado. Mais do que isso, o Consórcio BTG declarou que, caso não fosse possível a aceitação e homologação da Proposta, ou caso fosse reaberta a possibilidade de apresentação de novas propostas por terceiros, contrariando as regras do Edital, se reservava o direito de retirar a proposta apresentada.

32.      Esse fato demonstra, de forma inequívoca, que o Consórcio BTG não hesitará em retirar a proposta caso se configure um cenário de grande insegurança jurídica e instabilidade, como aquele que seria gerado pela concessão de efeito suspensivo aos presentes embargos de declaração e pela consequente suspensão indeterminada da homologação, sobretudo se isso for associado à adoção de medidas contenciosas perante jurisdição estrangeira.

33.     Nem se diga que o simples estabelecimento de penalidades para a retirada de proposta afastaria esse risco.

34.     Embora a proposta apresentada pelo CONSÓRCIO BTG seja vinculante nos termos do Plano de Recuperação Judicial e a desistência voluntária possa, em tese, acarretar a incidência da multa fixada pela r. decisão embargada em 50% do valor da proposta (R$ 4,5 bilhões), cumpre observar que **(i)** a decisão embargada ainda não transitou em julgado e **(ii)** o PROPONENTE ainda poderá alegar que eventual retirada da proposta em decorrência da alteração das bases e circunstâncias consideradas por ocasião do oferecimento da proposta não equivale a uma desistência voluntária, de modo que não estaria verificada a premissa fática para a incidência da penalidade.

35.     É possível que, diante de uma eventual postergação indefinida do fechamento da operação, o CONSÓRCIO BTG busque desistir da proposta e conteste judicialmente a aplicação da multa, alegando a ocorrência de fatos supervenientes que justificariam a retirada, como a mudança de condições de mercado, a alteração do cenário considerado ou a própria insegurança jurídica decorrente da impossibilidade de consumação do negócio em prazo razoável.

36.     Portanto, a previsão abstrata da multa para a hipótese de desistência voluntária, por si só, não garante a manutenção da proposta, e sua eventual cobrança ensejaria longa disputa judicial, ao passo que os recursos que a OI obteria com a alienação ficariam indefinidamente indisponíveis, talvez por anos a fio.

37.     Nesse cenário, a OI e seus credores ficariam na pior situação possível: sem o ativo (que já teria seu processo de alienação frustrado), sem os recursos provenientes da venda e envolvidos em disputa judicial para cobrança de multa de resultado incerto, o que tornaria o efeito suspensivo prejudicial e danoso a todo o processo de soerguimento e de liquidação ordenada de ativos.

38.     Por todas essas razões, é impensável a concessão do efeito suspensivo pleiteado pelo UMB, o que poderia causar prejuízos irreversíveis ao GRUPO OI, sendo de rigor o seu indeferimento.

\* \* \*

13

39.    Diante do exposto, as Recuperandas requerem:

**(i)**    o **indeferimento** do pedido de efeito suspensivo;

**(ii)**    o **não conhecimento** dos embargos de declaração, diante de sua finalidade meramente infringente; ou

**(iii)**    no limite, a **rejeição** integral dos embargos de declaração opostos pelo UMB, no mérito, diante da inexistência de omissões, obscuridades ou erros materiais, com a consequente manutenção, em todos os seus termos, da r. decisão embargada que homologou a PROPOSTA para aquisição da UPI V.tal.

Nestes termos
P. deferimento.
Rio de Janeiro, 12 de abril de 2026.

Luis Felipe Salomão Filho
OAB/RJ 234.563

Marcos Pitanga Ferreira
OAB/RJ 144.825

Rodrigo Mendonça Raposo
OAB/RJ 154.448

Thiago Peixoto Alves
OAB/RJ 155.282



Este documento foi assinado digitalmente por Mariana Santos Rego.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código 260B-81D7-8771-E9CE.

This document has been digitally signed by Mariana Santos Rego.
To verify the signature visit http://assinaturas.certisign.com.br and use the code 260B-81D7-8771-E9CE.

## PROTOCOLO DE ASSINATURA(S)

The above document has been submitted for digital signature on the platform Portal de Assinaturas Certisign. To verify the signature click on the link: http://assinaturas.certisign.com.br/Verificar/260B-81D7-8771-E9CE or visit http://assinaturas.certisign.com.br and use the code below to check the validity of the document.

## Código para verificação: 260B-81D7-8771-E9CE



**Hash do Documento**

F9F4FEC8E6F921772FA663B811BAE8BCE8E7402BDDE81368351EE4027588D3D6

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 13/04/2026 é(são) :

☑ MARIANA SANTOS REGO - 098.714.677-70  em 13/04/2026 14:55 UTC-03:00
**Tipo:** Certificado Digital

**Evidências**

**IP:** 177.19.43.164
**AC:** AC SAFEWEB RFB v5